John J. Nelson (SBN 317598)
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC**
401 W. Broadway, Suite 1760
San Diego, CA 92101
Telephone: (858) 209-6941
Fax: (865) 522-0049
Email: jnelson@milberg.com

Gary. M. Klinger*
Glen L. Abramson*
Alexandra M. Honeycutt*
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC**
227 W. Monroe Street, Suite 2100
Chicago, Illinois 60606
Telephone: 866.252.0878
Email: gklinger@milberg.com
          gabramson@milberg.com
          ahoneycutt@milberg.com

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NORTHERN CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| C.M., on behalf of herself and all others similarly situated, | Case No. _____ |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | JURY TRIAL DEMANDED |
| BETTERHELP, INC., | |
| Defendant. | |

Plaintiff C.M.[1] bring this class action complaint on behalf of herself and all others similarly situated (the "Class Members") against BetterHelp, Inc. ("BetterHelp" or "Defendant"). The allegations contained in this class action complaint are based on Plaintiff's personal knowledge of facts pertaining to herself and upon information and belief, including further investigation conducted by Plaintiff's counsel.

## NATURE OF THE ACTION

1.      This is a class action lawsuit brought on behalf of a nationwide class to address Defendant's improper, unauthorized, and illegal disclosure of their personally identifiable information ("PII") and/or protected health information ("PHI") (collectively referred to as "Private Information") to third-party advertising platforms such as Facebook, Snapchat, and others.

2.      Information about a person's mental health is among the most confidential and sensitive information in our society, and the mishandling of medical information can have serious consequences, including discrimination in the workplace or denial of insurance coverage. If people do not trust that their medical information will be kept private, they may be less likely to seek medical treatment, which can lead to more serious health problems down the road. In addition, protecting medical information and making sure it is kept confidential and not disclosed to anyone other than the person's medical provider is necessary to maintain public trust in the healthcare system as a whole.

3.      Recognizing these facts, and in order to implement requirements of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), the United States Department of Health and Human Services ("HHS") has established "Standards for Privacy of Individually Identifiable Health Information" (also known as the "Privacy Rule") governing how health care providers must safeguard and protect Private Information. Under the HIPAA Privacy Rule, **no** health care provider can disclose a person's personally identifiable protected health information to a third party without express written authorization.

---

[1] Plaintiff brings this action anonymously to protect her confidential personal health information, which is protected under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA").

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

4.      Defendant has developed, advertised, and offered for sale an online mental health counseling service that matches users with Defendant's therapists and then facilitates counseling via Defendant's websites, including www.betterhelp.com, and apps. In addition to general mental health counseling services, Defendant offers specialized counseling services for specific demographics, including but not limited to teens (via www.teencounseling.com), people of Christian faith (via www.faithfulcounseling.com), and members of the LGBTQ community (via www.pridecounseling.com). Defendants' separate websites and apps are collectively referred to herein as "Defendants' Website" or the "Website."

5.      Millions of consumers have signed up for Defendant's counseling services. In doing so, those customers entrusted Defendant with their Private Information, including their health status and histories, mental health condition, and symptoms and treatment sought, as well as identifying information such as names, email addresses, and IP addresses.

6.      Recognizing the sensitivity of this Private Information, Defendant repeatedly promised to keep it private and use it only for non-advertising purposes such as to facilitate consumers' mental health therapy.

7.      Rather than protecting Plaintiff's and Class Members' confidential and sensitive Private Information, however, Defendant installed web beacons and cookies on its Website to track users and collect data and information about them that it could later monetize.

8.      According to a complaint filed by the Federal Trade Commission ("FTC"), from 2013 to December 2020, Defendant continually broke its promises to protect consumers' Private Information, instead using it to target existing and new customers with advertising for its services. Defendant also handed over Plaintiff's and Class Members' Private Information to some of the largest online advertising companies in the world, such as Facebook, Pinterest, Criteo, and Snapchat, often permitting these companies to use the sensitive Private Information for their own research, product development, and advertising purposes.

9.      The FTC also alleged that Defendant: (i) failed to employ reasonable measures to safeguard Private Information it collected from customers; (ii) failed to properly train its employees to protect Private Information when using it for advertising; (iii) failed to properly supervise staff

in the use of Private Information; (iv) failed to provide customers with proper notice as to the collection, use, and disclosure of their Private Information; and (v) failed to limit how third parties could use customers' Private Information.

10.     The FTC's Director of its Bureau of Consumer Protection, Samuel Levine, recently stated, "Digital health companies and mobile apps should not cash in on consumers' extremely sensitive and personally identifiable health information," noting that the sale of this information constituted blatant "misuse and illegal exploitation."

11.     In response to the use of tracking and data collection technologies by companies offering health care services, the Office for Civil Rights at the U.S. Department of Health and Human Services ("HHS") recently published a bulletin concerning the Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates (the "Bulletin").[2] The Bulletin warns that:

> An impermissible disclosure of an individual's PHI not only violates the Privacy Rule but also may result in a wide range of additional harms to the individual or others. For example, an impermissible disclosure of PHI may result in identity theft, financial loss, discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others identified in the individual's PHI. Such disclosures can reveal incredibly sensitive information about an individual, including diagnoses, frequency of visits to a therapist or other health care professionals, and where an individual seeks medical treatment. While it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors, because of the proliferation of tracking technologies collecting sensitive information, now more than ever, it is critical for regulated entities to ensure that they disclose PHI **only** as expressly permitted or required by the HIPAA Privacy Rule.

12.     And as recently noted by the Hon. William J. Orrick in a decision concerning the use of the data tracking technologies by healthcare organizations, "[o]ur nation recognizes the importance of privacy in general and health information in particular: the safekeeping of this sensitive information is enshrined under state and federal law."[3]

13.     Consequently, Plaintiff brings this action for legal and equitable remedies to address and rectify the illegal conduct and actions described herein.

---

[2] https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html

[3] *In re Meta Pixel Healthcare Litig.*, No. 22-CV-03580-WHO, 2022 WL 17869218, at *1 (N.D. Cal. Dec. 22, 2022)

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of the class is a citizen of a state different from Defendant.

15.     This Court has personal jurisdiction over Defendant because its principal place of business is in this District and many of the acts and omissions giving rise to Plaintiff's claims occurred in and emanated from this District.

16.     Venue is proper under 18 U.S.C § 1391(b)(1) because Defendant's principal place of business is in this District.

## DIVISIONAL ASSIGNMENT

17.     Pursuant to Civil Local Rule 3-2(c), a substantial part of the events giving rise to the claims brought in this Complaint occurred in Santa Clara County, California. Consequently, assignment of this action to the San Jose Division is appropriate.

## THE PARTIES

18.     Plaintiff C.M. is an adult citizen of the State of Texas. She brings this action anonymously to protect her confidential personal health information, which is protected under HIPAA.

19.     Defendant BetterHelp, Inc. is a Delaware corporation with a principal place of business located at 990 Villa Street, Mountain View, CA  94041.

20.     Defendant does business under various other names in addition to BetterHelp, including Compile, Inc., Mytherapist, Teen Counseling, Faithful Counseling, Pride Counseling, Icounseling, Regain, and Terappeuta.

## FACTUAL ALLEGATIONS

**Background**

21.     Defendant BetterHelp has been in operation since 2013, offering online mental health counseling services via various websites and apps.

22.     Defendant's primary website, www.betterhelp.com, offers general counseling services and has been in operation since 2013. In addition, Defendant has numerous other websites and apps that are targeted to more specific demographics. In 2016, Defendant began offering marriage and relationship counseling and services via www.regain.us. In 2017, Defendant began offering specialized counseling to teenagers via www.teencounseling.com, to people of Christian faith via www.faithfulcounsling.com, to the LGBTQ community via www.pridecounseling.com.

23.     Since its inception, Defendant has signed up over 2 million users and as of 2022 had more than 374,000 active users in the United States. Defendant earned more than $345 million in revenue in 2020 and more than $720 million in revenue in 2021.

**Defendant's Deceptive and Unfair Marketing Practices**

24.     Defendant has spent significant efforts since inception advertising and marketing its services through various digital and traditional media platforms, including television and radio as well as podcasts, search engine ads, and through third parties such as Facebook, Snapchat, Pinterest, and Criteo.

25.     Defendant has spent tens of millions of dollars annually to market its counseling services. In 2020, Defendant spent between $10-20 million on Facebook advertising alone. This advertising was extremely successful; by 2021, Defendant's advertising through Facebook was generating approximately 90,000 – 120,000 new customers per year.

26.     Defendant markets all of its services by offering online communications with licensed therapists telling "who you can trust." BetterHelp also claims that customers using its therapists will "get the same professionalism and quality you would expect from an in-office therapist, but with the ability to communicate when and how you want."[4]

---

[4] betterhelp.com (last visited March 6, 2023)

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED



**Professional, licensed, and vetted therapists who you can trust**

Tap into the world's largest network of licensed, accredited, and experienced therapists who can help you with a range of issues including depression, anxiety, relationships, trauma, grief, and more. With our therapists, you get the same professionalism and quality you would expect from an in-office therapist, but with the ability to communicate when and how you want.

**Get Matched to a Therapist**

27.     Customers signing up for Defendant's counseling services pay between $60 and $90 per week. To sign up for counseling services, a customer must fill out an online intake questionnaire and answer a detailed series of questions about the customer's personal life and mental health, including age, gender, marital/relationship status, whether the customer has ever been in therapy before. The online questionnaire also asks questions about the customer's subjective rating of their physical health, eating habits, financial status, and sleep habits, and the customer's employment status.

28.      The questionnaire also asks a series of questions about symptoms or reasons why the customer is seeking therapy (e.g., feelings of depression, anxiety, grief, etc.), including asking if the customer is "experiencing overwhelming sadness, grief, or depression" or has been having thoughts that the customer "would be better off dead or hurting yourself in some way."

29.     The questionnaire also asks if the customer identities as religious or as a member of the LGBTQ community, directing them to Faithful Counseling or Pride Counseling, respectively. In addition, teenagers are directed to Teen Counseling.

30.     According to the FTC, in 2017, Defendant delegated most decision-making authority over its use of Facebook's advertising services to a junior marketing analyst who was a recent college graduate, had never worked in marketing, and had no experience and little training in

safeguarding consumers' Private Information when using that information for advertising. In 2017 Defendant gave the analyst unilateral authority to decide what Private Information to upload to Facebook and how to use that information. Defendant provided this marketing analyst with little training on how to protect customers' Private Information in connection with advertising until 2021.

31.     Until November 2021, Defendant's Website included privacy assurances throughout the pages of the questionnaire. For example, at the top of each question, Defendant stated that it was asking for "general and *anonymous*" background information (emphasis added). In reality, the information collected was not anonymous.

32.     In addition, from at least August 2017 to December 2020, Website visitors taking the questionnaire who reached the question about whether they were taking any medication were shown the statement: "Rest assured – any information provided in this questionnaire will stay private between you and your counselor." In December 2020, this statement was changed to read: "Rest assured – this information will stay private between you and your counselor." In January 2021, the statement was changed again, reading: "Rest assured – your health information will stay private between you and your counselor." In October 2021, Defendant removed this representation altogether.

33.     Defendant also made false promises about its use of customers' email addresses, telling visitors to the Faithful Counseling, Pride Counseling, and Teen Counseling websites during the sign-up process that their email addresses would not be shared. From at least August 2017 to December 2020, Defendant assured such Website visitors that "Your email address is kept *strictly private*. It is never shared sold or disclosed to anyone. Even your counselor won't know your real email address." (emphasis added)

34.     Millions of Website visitors, including those like Plaintiff and Class Members who ultimately signed up for Defendant's counseling services, were presented with these repeated promises about the confidentiality of the Private Information they shared with Defendant. Despite these promises, however, Defendant used Private Information extensively for Defendant's own profit, including by sharing and disclosing Private Information and selling email addresses.

35.    The FTC's complaint against Defendant sets forth in great detail the extent to which Defendant brazenly violated Plaintiff's and Class Members' privacy and other rights by disclosing Private Information to third parties like Facebook, Snapchat, and others. A copy of the FTC's complaint is attached hereto as Exhibit "A."  A few highlights are worth noting here:

- The intake questionnaire's privacy assurances were "displayed in large, high-contrast, unavoidable text," while Defendant's privacy policies were linked in "small, low-contrast writing that is barely visible at the bottom of the page." When Defendant added a banner at the bottom of each page in September 2020 disclosing its use of cookies, it still falsely stated: "We never sell or rent any information you share with us." Exh. A at 7-9. This was false.

- Defendant's privacy policies went through numerous iterations that each contained deceptive and misleading statements about Defendant's use and disclosure of Private Information. While Defendant disclosed it would use web beacons (including pixels) and cookies for certain limited purposes, it never disclosed that it would use or disclose Private Information for advertising purposes or to sell to third parties for their own purposes. *Id.* at 9-10

- Defendant disclosed millions of Class Members' Private Information to advertisers including Facebook. Over 7 million email addresses were uploaded to Facebook, which "matched over 4 million of these Visitors and Users with their Facebook user IDs, linking their use of the Service for mental health treatment with their Facebook accounts." Defendant also allowed Facebook to "automatically track certain actions" of Website users known as "Events." Defendant "recorded and automatically disclosed these Events to Facebook through web beacons [Defendant] had placed on each of the [Websites]." Defendant and Facebook used this data to target advertising to millions of Class Members. *Id.* at 10-12.

36.    On March 2, 2023, the FTC announced that it had finalized a Consent Order with Defendant addressing Defendant's deceptive and misleading business practices in using sensitive

personally identifiable information and personal health information and disclosing it to third parties. *See* Exhibit B.

37.    As part of the Consent Order, Defendant has agreed to pay $7.8 million to the FTC and to be subject to various auditing and compliance monitoring procedures in connection with its privacy policies and handling of customer data and information. *Id.*

38.    In addition, Defendant is required under the Consent Order to provide its customers with a Notice advising customers about the FTC action and telling customers that (i) it will tell the advertising companies that received customers' information to delete it; (ii) it is no longer sharing customers' health information with other companies for advertising and it is no longer sharing customers' personal information for advertising without the customers' permission; and (iii) it will enhance its privacy program to better protect customers' personal health information, including participating in an independent audit program every two years for the next 20 years. *Id.* at 22-23.

**Defendant Was Enriched and Benefitted from the Use and Disclosure of Plaintiff's and Class Members' Private Information, Which Had Financial Value**

39.    In exchange for disclosing the Private Information of its patients, Defendant was able to obtain tens or hundreds of thousands of new customers, each of whom paid between $60 and $90 per week for Defendant's counseling services.

40.    Defendant's disclosure of Private Information also hurt Plaintiff and the Class. Conservative estimates suggest that in 2018, Internet companies earned $202 per American user from mining and selling data. That figure is only due to keep increasing; estimates for 2022 are as high as $434 per user, for a total of more than $200 billion industry wide.

41.    The value of health data in particular is well-known and has been reported on extensively in the media. For example, Time Magazine published an article in 2017 titled "How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry" in which it described the

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

extensive market for health data and observed that the market for information was both lucrative and a significant risk to privacy.[5]

42.     Similarly, CNBC published an article in 2019 in which it observed that "[d]e-identified patient data has become its own small economy: There's a whole market of brokers who compile the data from providers and other health-care organizations and sell it to buyers."[6]

**IP Addresses Are Personally Identifiable Information**

43.     On information and belief, Defendant also disclosed and sold Plaintiff's and Class Members' Computer IP addresses.

44.     An IP address is a number that identifies the address of a device connected to the Internet.

45.     IP addresses are used to identify and route communications on the Internet.

46.     IP addresses of individual Internet users are used by Internet service providers, websites, and third-party tracking companies to facilitate and track Internet communications.

47.     Under HIPAA, an IP address is considered personally identifiable information:

- HIPAA defines personally identifiable information to include "any unique identifying number, characteristic or code" and specifically lists the example of IP addresses.  See 45 C.F.R. § 164.514 (2).

- HIPAA further declares information as personally identifiable where the covered entity has "actual knowledge that the information to identify an individual who is a subject of the information." 45 C.F.R. § 164.514(2)(ii); See also, 45 C.F.R. § 164.514(b)(2)(i)(O).

---

[5] *See* https://time.com/4588104/medical-data-industry/ (last visited February 16, 2023).

[6] *See* https://www.cnbc.com/2019/12/18/hospital-execs-say-theyre-flooded-with-requests-for-your-health-data.html (last visited February 16, 2023).

48.      Consequently, by disclosing IP addresses, Defendant's business practices violated

HIPAA and industry privacy standards.

**Defendant Violated Industry Standards**

49.      A medical provider's duty of confidentiality is a cardinal rule and is embedded in

the physician-patient and hospital-patient relationship.

50.      The American Medical Association's ("AMA") Code of Medical Ethics contains

numerous rules protecting the privacy of patient data and communications.

51.      AMA Code of Ethics Opinion 3.1.1 provides:

Protecting information gathered in association with the care of the patient is a core value in
health care… Patient privacy encompasses a number of aspects, including, … personal data
(informational privacy)

52.      AMA Code of Medical Ethics Opinion 3.2.4 provides:

Information gathered and recorded in association with the care of the patient is confidential.
Patients are entitled to expect that the sensitive personal information they divulge will be
used solely to enable their physician to most effectively provide needed services. Disclosing
information for commercial purposes without consent undermines trust, violates principles
of informed consent and confidentiality, and may harm the integrity of the patient-physician
relationship. Physicians who propose to permit third-party access to specific patient
information for commercial purposes should: (A) Only provide data that has been de-
identified. [and] (b) Fully inform each patient whose record would be involved (or the
patient's authorized surrogate when the individual lacks decision-making capacity about the
purposes for which access would be granted.

53.      AMA Code of Medical Ethics Opinion 3.3.2 provides:

Information gathered and recorded in association with the care of a patient is confidential,
regardless of the form in which it is collected or stored. Physicians who collect or store
patient information electronically…must…:(c ) release patient information only in keeping
ethics guidelines for confidentiality.

## PLAINTIFF'S EXPERIENCE WITH DEFENDANT'S WEBSITE

54.      Beginning in January 2020, Plaintiff C.M. sought counseling services from

Defendant to deal with stress and anxiety she was experiencing as the result of serving as a caregiver

for her husband, who was critically ill at the time.

55.     Plaintiff filled out the intake questionnaire and ultimately decided to sign up for Defendant's services, paying $130/month for a monthly subscription for psychotherapy and mental health counseling.

56.     Prior to deciding to transact with Defendant, Plaintiff viewed and relied upon Defendant's representations concerning its commitment to maintaining the confidentiality of Private Information communicated by consumers via Defendant's web platforms. Had Plaintiff known that Defendant would not maintain her information as private and confidential, Plaintiff would not have purchased Defendant's services or would have paid less for them.

57.     Over the next two months, Plaintiff spoke with two BetterHelp therapists to discuss her mental health issues. Plaintiff's therapy sessions occurred approximately once per week via the BetterHelp app on her smartphone.

58.     In December 2021, Plaintiff again sought psychotherapy and mental health counseling services from Defendant. From December 2021 through March 2022, Plaintiff paid $1,005 for numerous live video and telephone therapy sessions with two separate BetterHelp therapists.

59.     Beginning in October 2022, Plaintiff again sought psychotherapy and mental health counseling services from Defendant, paying an additional $965 for monthly subscriptions and add-on live therapy sessions.

60.     Plaintiff reasonably expected that her communications with Defendant via the Website and app were confidential, solely between herself and Defendant and her therapists, and that such communications would not be disclosed to a third party.

61.     Plaintiff has an active Facebook account that she accesses on her computer and smartphone. She also has an active Pinterest account.

62.     On information and belief and based on Defendant's standard practices as described herein and in the FTC complaint, Defendant disclosed Plaintiff's Private Information and communications to third parties, including when she completed her intake questionnaire on Defendant's Website.

63.     On information and belief, information disclosed by Defendant to Facebook included Plaintiff's Facebook ID and allowed Facebook to link her Private Information to her Facebook account, allowing Facebook to target ads to Plaintiff.

64.     Through the process detailed in this Complaint, Defendant disclosed Plaintiff's communications and Private Information, including those that contained personally identifiable information, protected health information, and related confidential information, to third parties. Defendant never disclosed to Plaintiff that it would disclose, sell, or otherwise share her Private Information with third parties. Instead, Defendant disclosed Plaintiff's Private Information without Plaintiff's knowledge, consent, or express written authorization.

65.     Thus, Defendant misrepresented the manner in which it handled Plaintiff's Private Information and unlawfully disclosed Plaintiff's Private Information.

## CLASS ACTION ALLEGATIONS

66.     Plaintiff brings this action on behalf of herself and on behalf of all other persons similarly situated ("the Class") pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

67.     The Nationwide Class that Plaintiff seeks to represent is defined as follows:

**All individuals residing in the United States whose Private Information was disclosed to a third party without authorization or consent through a BetterHelp Website or App (including betterhelp.com, teencounseling.com, faithfulcounseling.com, pridecounseling.com, and regain.us).**

68.     Excluded from the Class are Defendant, its agents, affiliates, parents, subsidiaries, any entity in which Defendant has a controlling interest, any Defendant officer or director, any

successor or assign, and any Judge who adjudicates this case, including their staff and immediate family.

69.     Plaintiff reserves the right to modify or amend the definition of the proposed classes before the Court determines whether certification is appropriate.

70.     <u>Numerosity</u>, Fed R. Civ. P. 23(a)(1). The Class Members for each proposed Class are so numerous that joinder of all members is impracticable. Upon information and belief, there are millions of individuals whose Private Information may have been improperly disclosed to third parties, and the Class is identifiable within Defendant's records.

71.     <u>Commonality</u>, Fed. R. Civ. P. 23(a)(2) and (b)(3). Questions of law and fact common to each Class exist and predominate over any questions affecting only individual Class Members. These include:

   a.   Whether and to what extent Defendant had a duty to protect the PII and PHI of Plaintiff and Class Members;

   b.   Whether Defendant had duties not to disclose the PII and PHI of Plaintiff and Class Members to unauthorized third parties;

   c.   Whether Defendant violated its Privacy Policies by disclosing the PII and PHI of Plaintiff and Class Members to Facebook, Snapchat, Pinterest, Criteo, and/or additional third parties;

   d.   Whether Defendant adequately, promptly, and accurately informed Plaintiff and Class Members that their PII and PHI would be disclosed to third parties;

   e.   Whether Defendant violated the law by failing to promptly notify Plaintiff and Class Members that their PII and PHI had been compromised;

   f.   Whether Defendant adequately addressed and fixed the practices which permitted the disclosure of patient PHI and PII;

g.   Whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to safeguard the PII and PHI of Plaintiff and Class Members;

h.   Whether Defendant violated the consumer protection statutes invoked herein;

i.   Whether Plaintiff and Class Members are entitled to actual, consequential, and/or nominal damages as a result of Defendant's wrongful conduct;

j.   Whether Defendant knowingly made false representations as to its data security and/or Privacy Policies practices;

k.   Whether Defendant knowingly omitted material representations with respect to its data security and/or Privacy Policies practices; and

72.   <u>Typicality</u>, Fed. R. Civ. P. 23(a)(3). Plaintiff's claims are typical of those of other Class Members because each had their Private Information misused and disclosed as a result of Defendant's conduct.

73.   <u>Adequacy</u>, Fed. R. Civ. P. 23(a)(4). Plaintiff will fairly and adequately represent and protect the interests of the Class Members in that Plaintiff has no disabling conflicts of interest that would be antagonistic to those of the other Members of the Class. Plaintiff seeks no relief that is antagonistic or adverse to the Members of the Class and the infringement of the rights and the damages Plaintiff has suffered are typical of other Class Members. Plaintiff has also retained counsel experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously.

74.   <u>Superiority and Manageability</u>, Fed. R. Civ. P. 23(b)(3). Class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence,

effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Defendant. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

75.    Policies Generally Applicable to the Class. This class action is also appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's policies challenged herein apply to and affect Class Members uniformly and Plaintiff's challenge of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

76.    The nature of this action and the nature of laws available to Plaintiff and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and Class Members for the wrongs alleged because Defendant would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiff was exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

77.    The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class

Members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

78.     Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

79.     Unless a Class-wide injunction is issued, Defendant may continue in its failure to properly secure the Private Information of Class Members, Defendant may continue to refuse to provide proper notification to Class Members regarding the practices complained of herein, and Defendant may continue to act unlawfully as set forth in this Complaint.

80.     Further, Defendant has acted or refused to act on grounds generally applicable to each Class and, accordingly, final injunctive or corresponding declaratory relief with regard to the Class Members as a whole is appropriate under Rule 23(b)(2) of the Federal Rules of Civil Procedure.

81.     Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

    a.   Whether Defendant owed a legal duty to not disclose Plaintiff's and Class Members' Private Information;

    b.   Whether Defendant owed a legal duty to not disclose Plaintiff's and Class Members' Private Information with respect to Defendant's Privacy Policies;

    c.   Whether Defendant breached a legal duty to Plaintiff and Class Members to exercise due care in collecting, storing, using, and safeguarding their Private Information;

    d.   Whether Defendant failed to comply with its own policies and applicable laws, regulations, and industry standards relating to data security;

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

e. Whether Defendant adequately and accurately informed Plaintiff and Class Members that their Private Information would be disclosed to third parties;

f. Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information disclosed to third parties; and

g. Whether Class Members are entitled to actual, consequential, and/or nominal damages, and/or injunctive relief as a result of Defendant's wrongful conduct.

82. Plaintiff reserves the right to amend or modify the Class definition as this case progresses.

<u>**COUNT I**</u>
**BREACH OF IMPLIED CONTRACT**
**(On behalf of Plaintiff and the Nationwide Class)**

83. Plaintiff repeats and re-alleges each and every allegation contained in the Complaint as if fully set forth herein.

84. When Plaintiff and Class Members provided their Private Information to Defendant in exchange for services, they entered into an implied contract pursuant to which Defendant agreed to safeguard and not disclose their Private Information without consent.

85. Plaintiff and Class Members accepted Defendant's offers and provided their Private Information to Defendant.

86. Plaintiff and Class Members would not have entrusted Defendant with their Private Information in the absence of an implied contract between them and Defendant obligating Defendant to not disclose Private Information without consent.

87. Defendant breached these implied contracts by disclosing Plaintiff's and Class Members' Private Information to third parties, including Facebook, Snapchat, Pinterest, and Criteo.

88. As a direct and proximate result of Defendant's breaches of these implied contracts, Plaintiff and Class Members sustained damages as alleged herein. Plaintiff and Class Members

would not have used Defendant's services, or would have paid substantially for these services, had they known their Private Information would be disclosed.

89.     Plaintiff and Class Members are entitled to compensatory and consequential damages as a result of Defendant's breach of implied contract.

**COUNT II**
**VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW**
**Cal. Bus. & Prof. Code § 17200**

90.     Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein and brings this claim individually and on behalf of the proposed Class.

91.     This Count is pleaded in the alternative to the breach of contract count above.

92.     California's Unfair Competition Law ("UCL") prohibits any "unlawful, unfair, or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200.

93.     Defendant engaged in unlawful business practices in connection with its disclosure of Plaintiff's and Class Members' Private Information to unrelated third parties, including Facebook, Snapchat, Pinterest, and Criteo, in violation of the UCL.

94.     The acts, omissions, and conduct of Defendant were controlled, directed, and emanated from its California headquarters.

95.     The acts, omissions, and conduct of Defendant as alleged herein constitute "business practices" within the meaning of the UCL.

96.     Defendant violated the "unlawful" prong of the UCL by violating, inter alia, Plaintiff's and Class Member's constitutional rights to privacy, state and federal privacy statutes, and state consumer protection statutes, such as HIPAA and the California Confidentiality of Information Act ("CMIA"). Defendant also violated the unlawful prong of the UCL by

disseminating false and misleading statements regarding its privacy practices in violation of California's False Advertising Laws.

97.   Defendant's acts, omissions, and conduct also violate the unfair prong of the UCL because those acts, omissions, and conduct, as alleged herein, offended public policy (including the aforementioned federal and state privacy statutes and state consumer protection statutes, such as HIPAA and CMIA and constitute immoral, unethical, oppressive, and unscrupulous activities that caused substantial injury, including to Plaintiff and Class Members.

98.   Defendant's acts, omissions, and conduct also violate the fraudulent prong of the UCL because Defendant made material misrepresentations and omissions of fact to induce Plaintiff and Class Members to purchase Defendant's services without disclosing that Defendant shared, used, and sold Plaintiff's and Class Members Private Information and without obtaining consent. Defendant's acts, omissions, nondisclosures, and misleading statements as alleged herein were and are false, misleading, and/or likely to deceive the consuming public.

99.   Plaintiff viewed and relied upon Defendant's representations concerning the confidentiality of information provided by Plaintiff and Class Members to Defendant. Had Defendant disclosed that it shared Private Information with third parties, Plaintiff would not have purchased Defendant's services or would have paid considerably less for those services.

100.   The harm caused by the Defendant's conduct outweighs any potential benefits attributable to such conduct and there were reasonably available alternatives to further Defendant's legitimate business interests other than Defendant's conduct described herein.

101.   As result of Defendant's violations of the UCL, Plaintiff and Class Members have suffered injury in fact and lost money or property, including but not limited to payments to Defendant and/or other valuable consideration, *e.g.*, access to their private and personal data. The

unauthorized access to Plaintiff's and Class Members' private and personal data also has diminished the value of that information.

### COUNT III
**VIOLATION OF CALIFORNIA FALSE ADVERTISING LAW**
**Cal. Bus. & Prof. Code § 17500**

102.    Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein and brings this claim individually and on behalf of the proposed Class.

103.    This Count is pleaded in the alternative to the breach of contract count above.

104.    The acts, omissions, and conduct of Defendant were controlled, directed, and emanated from its California headquarters.

105.    California's False Advertising Law, Cal. Bus. & Prof. Code § 17500, et seq., makes it "unlawful for any person to make or disseminate or cause to be made or disseminated before the public in this state, … in any advertising device … or in any other manner or means whatever, including over the Internet, any statement, concerning … personal property or services, professional or otherwise, or performance or disposition thereof, which is untrue or misleading and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading.

106.    Defendant committed acts of false advertising, as defined by § 17500, by intentionally making and disseminating statements to consumers in California and the general public concerning Defendant's products and services, as well as circumstances and facts connected to such products and services, which are untrue and misleading on their face and by omission, and which are known (or which by the exercise of reasonable care should be known) by Defendant to be untrue or misleading. Defendant has also intentionally made or disseminated such untrue or misleading statements and material omissions to consumers in California and to the public as part of a plan or scheme with intent not to sell those services as advertised.

107.   Defendant's statements include but are not limited to representations and omissions made to consumers in the intake questionnaire and privacy policy regarding Defendant's commitment to maintain the privacy of Private Information and not to disclose Private Information to third parties. Such representations and omissions constitute false and deceptive advertisements.

108.   Plaintiff viewed and relied upon Defendant's representations concerning the confidentiality of information provided by Plaintiff and Class Members to Defendant. Had Defendant disclosed that it shared Private Information with third parties, Plaintiff would not have purchased Defendant's services or would have paid considerably less for those services.

109.   Defendant's actions in violation of § 17500, as described herein, were false and misleading such that the general public is and was likely to be deceived. Plaintiff and the members of the Class were deceived by Defendant's statements and omissions made online when they signed up and started paying for BetterHelp services, and there is a strong probability that consumers and members of the public were also or are likely to be deceived as well. Any reasonable consumer would be misled by Defendant's false and misleading statements and material omissions. Plaintiff and other members of the Class did not learn of Defendant's disclosure of their Private Information until after they had already signed up and paid for Defendant's services and the FTC settlement was announced. They relied on Defendant's statements and omissions to their detriment.

110.   Plaintiff and the Class lost money or property as a result of Defendant's FAL violations because they would not have purchased BetterHelp services on the same terms if the true facts were known about the product and the BetterHelp services do not have the characteristics as promised by Defendant. Plaintiff, individually and on behalf of all similarly situated consumers, seeks individual, representative, and public injunctive relief and any other necessary orders or judgments that will prevent Defendant from continuing with its false and deceptive advertisements

and omissions; restitution that will restore the full amount of their money or property; disgorgement of Defendant's relevant profits and proceeds; and an award of costs and reasonable attorneys' fees.

## COUNT IV - VIOLATION OF THE CALIFORNIA
## CONFIDENTIALITY OF MEDICAL INFORMATION ACT
### Cal. Civ. Code § 56, *et seq*

111.    Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein and brings this claim individually and on behalf of the proposed Class.

112.    The California Confidentiality of Medical Information Act, Cal. Civ. Code § 56, *et seq* ("CMIA") prohibits health care providers from disclosing medical information relating to their patients without a patient's authorization. "Medical information" refers to "any individually identifiable information, in electronic or physical form, in possession of or derived from a provider of health care… regarding a patient's medical history, mental or physical condition, or treatment. 'Individually Identifiable' means that the medical information includes or contains any element of personal identifying information sufficient to allow identification of the individual..." Cal. Civ. Code § 56.05.

113.    Defendant is a healthcare provider as defined by Cal. Civ. Code § 56.06.

114.    Plaintiff and Class Members are patients, and, as a health care provider, Defendant has an ongoing obligation to comply with the CMIA's requirements.

115.    As set forth above, names, addresses, telephone numbers, email addresses, device identifiers, web URLs, Internet Protocol (IP) addresses, and other characteristics that can uniquely identify Plaintiff and Class members are transmitted to in combination with patient mental health concerns, treatment(s) sought, medications, and whether the patient is suffering from anxiety, depression, or a number of other mental health symptoms. This protected health information and personally identifiable information constitutes confidential information under the CMIA. This information is collected, recorded, and stored by Defendant and intentionally disclosed to third parties without Plaintiff's and Class Members' knowledge or consent.

116.    Facebook ID is also an identifier sufficient to allow identification of an individual. Along with patients' confidential Private Information, Defendant discloses to Facebook the patient's FID.

117.    Pursuant to the CMIA, the information communicated to Defendant and disclosed to third parties constitutes medical information because it is patient information derived from a health care provider regarding patients' medical treatment and physical and mental condition and is in combination with individually identifying information. Cal. Civ. Code § 56.05(i).

118.    As set forth above, Facebook and other third parties view, process, and analyze the confidential medical information it receives from Defendant and uses that Private Information for advertising and marketing purposes.

119.    As demonstrated hereinabove, Defendant fails to obtain its patients' authorization for the disclosure of medical information and fails to disclose in its Website Privacy Policy that it shares protected health information with third parties for their marketing purposes.

120.    Pursuant to CMIA Section 56.11, a valid authorization for disclosure of medical information must be: (1) "Clearly separate from any other language present on the same page and is executed by a signature which serves no other purpose than to execute the authorization;" (2) signed and dated by the patient or her representative; (3) state the name and function of the third party that receives the information; (4) state a specific date after which the authorization expires. Accordingly, the information set forth in Defendant's Website Privacy Policy and any Terms and Conditions do not qualify as a valid authorization.

121.    Based on the above, Defendant is violating the CMIA by disclosing its patients' medical information to third parties along with the patients' individually identifying information. Accordingly, Plaintiff and Class Members seek all relief available for Defendant's CMIA violations.

122.     Plaintiff and members of the Class seek nominal damages, compensatory damages, punitive damages, attorneys' fees and costs of litigation for Defendant's violation of the CMIA.

**COUNT IV**
**UNJUST ENRICHMENT**
**(On behalf of Plaintiff and the Nationwide Class)**

123.     Plaintiff repeats and re-alleges each and every allegation contained in the Complaint as if fully set forth herein.

124.     This Count is pleaded in the alternative to the breach of contract count above.

125.     Defendant benefits from the use of Plaintiff's and Class Members' Private Information and unjustly retained those benefits at their expense.

126.     Plaintiff and Class Members conferred a benefit upon Defendant in the form of Private Information that Defendant collected from Plaintiff and Class Members, without authorization and proper compensation. Defendant consciously collected and used this information for its own gain, providing Defendant with economic, intangible, and other benefits, including substantial monetary compensation.

127.     Defendant unjustly retained those benefits at the expense of Plaintiff and Class Members because Defendant's conduct damaged Plaintiff and Class Members, all without providing any commensurate compensation to Plaintiff and Class Members.

128.     The benefits that Defendant derived from Plaintiff and Class Members was not offered by Plaintiff and Class Members gratuitously and rightly belongs to Plaintiff and Class Members. It would be inequitable under unjust enrichment principles in Missouri and every other state for Defendant to be permitted to retain any of the profit or other benefits wrongly derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

129.    Defendant should be compelled to disgorge into a common fund for the benefit of Plaintiff and Class Members all unlawful or inequitable proceeds that Defendant received, and such other relief as the Court may deem just and proper.

## RELIEF REQUESTED

130.    Plaintiff, on behalf of herself and the proposed Class, respectfully requests that the Court grant the following relief:

(a)    Certification of this action as a class action pursuant to Federal Rule of Civil Procedure 23 and appointment of Plaintiff and Plaintiff's counsel to represent the Class;

(b)    An order enjoining Defendant from engaging in the unlawful practices and illegal acts described herein;

(c)    An order awarding Plaintiff and the Class: (1) actual or statutory damages; (2) punitive damages—as warranted—in an amount to be determined at trial; (3) prejudgment interest on all amounts awarded; (4) injunctive relief as the Court may deem proper;  (5) reasonable attorneys' fees and expenses and costs of suit pursuant to applicable law; and (6) such other and further relief as the Court may deem appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff, on behalf of herself and the proposed Class, demand a trial by jury for all of the claims asserted in this Complaint so triable.

Dated: March 7, 2023                    Respectfully submitted,

By: _____
John J. Nelson (SBN 317598)
**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN, PLLC**
401 W. Broadway,. Suite 1760
San Diego, CA 92101
Telephone: (858) 209-6941
Fax: (865) 522-0049
Email: jnelson@milberg.com

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

Gary M. Klinger*
Glen L. Abramson*
Alexandra M. Honeycutt*
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC**
227 W. Monroe Street, Suite 2100
Chicago, Illinois 60606
Telephone: 866.252.0878
gklinger@milberg.com
gabramson@milberg.com
ahoneycutt@milberg.com

*Pro Hac Vice Application Forthcoming*

*Attorneys for Plaintiff and the Putative Class*

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED