Gary. M. Klinger (pro hac vice)
MILBERG COLEMAN BRYSON PHILLIPS
GROSSMAN, PLLC
227 W. Monroe Street, Suite 2100
Chicago, Illinois 60606
Telephone: 866.252.0878
Email: gklinger@milberg.com
gabramson@milberg.com
ahoneycutt@milberg.com
jnelson@milberg.com

*Plaintiffs' Co-Lead Interim Class Counsel*

Maureen M. Brady (pro hac vice)
MCSHANE AND BRADY LLC
1656 Washington
Suite 140
Kansas City, MO 64108
816-888-8010
Email: mbrady@mcshanebradylaw.com

*Plaintiffs' Co-Lead Interim Class Counsel*

Julian Hammond (SBN 268849)
jhammond@hammondlawpc.com
Christina Tusan (SBN 192203)
ctusan@hammondlawpc.com
Polina Brandler (SBN 269086)
pbrandler@hammondlawpc.com
Adrian Barnes (SBN 253131)
abarnes@hammondlawpc.com
Ari Cherniak (SBN 290071)
acherniak@hammondlawpc.com
HAMMONDLAW, P.C.
1201 Pacific Ave, Suite 600
Tacoma, WA 98402
[Tel:] (310) 601-6766
[Fax] (310) 295-2385

*Plaintiffs' Co-Lead Interim Class Counsel*

Alan M. Mansfield (SBN: 125998)
amansfield@whatleykallas.com
WHATLEY KALLAS LLP
1 Sansome Street, 35th Floor
PMB #131
San Francisco, CA 94104 /
16870 West Bernardo Drive, Ste 400, San
Diego, CA 92127
Phone: (619) 308-5034
Fax: (888) 341-5048

*Plaintiffs' Liaison Counsel*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| **IN RE BETTERHELP, INC. DATA DISCLOSURE CASES**<br><br>This Document Relates To:<br><br>All Cases/ | **Master File No. 3:23-cv-01033-RS**<br><br>**CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED ON ALL CAUSES OF ACTION SO TRIABLE** |

Plaintiffs C.M., Jane Doe I , L.M., Jane Doe II , Jane Doe III , R.S., S.C., and T.R. (collectively "Plaintiffs") on behalf of themselves and all others similarly situated, assert the following against Defendants BetterHelp, Inc. ("BetterHelp" or "Defendant") and DOES 1-10 inclusive, based upon personal knowledge where so identified and otherwise on information and belief and the investigation of counsel, which included consultation with experts in the field of data privacy and review of publicly available reports, as to all other matters , which allegations are likely to have evidentiary support after reasonable opportunity for further investigation and discovery.

## SUMMARY OF ALLEGATIONS

1.      This is a class action lawsuit brought on behalf of a nationwide class to address Defendant's improper, unauthorized, and illegal disclosure of their personally identifiable information ("PII") and/or protected health information ("PHI") (collectively referred to as "Private Information") to third-party advertising platforms including, but not limited to, Facebook, Snapchat, Pinterest, Criteo, and others. The Private Information disclosed included, but was not limited to, Plaintiffs' and Class Members' names, email addresses, IP Addresses, the fact that Plaintiffs and Class Members enrolled in Defendant's services, as well as certain intake responses related to their respective mental health and other medical conditions.

2.      Information about a person's mental health is among the most confidential and sensitive information in our society, and the mishandling of such information, and medical information generally, can have serious consequences, including harassment, discrimination in the workplace, and social stigmatization. If people do not trust that their medical information will be kept private, they may be less likely to seek medical treatment or to disclose sensitive information, which can lead to more health problems down the road. In addition, protecting medical information and making sure it is kept confidential is necessary to maintain public trust in the healthcare system as a whole.

3.      BetterHelp is an online "market leading direct-to-consumer ("D2C") mental health platform"[1] and offers online counseling and therapy services (the "Service") via its network of over 30,000 licensed clinicians who use BetterHelp's platform for web, mobile app, phone, and text-

---

[1] Teladoc Health, Inc., <u>Fiscal 2022 Annual Report</u>, Form 10-K, p. 4 (2022).

CONSOLIDATED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

1   based interactions.[2] In the most recent reported year, fiscal 2022 (the 52 weeks ending Dec. 31,

2   2022), BetterHelp had revenues of over $1 billion.[3] As of December 31, 2022, Defendant had

3   420,000 paying users.[4]

4          4.      Defendant offers and has offered its Service under several differed names, each of

5   which had its own website and app (collectively "Sites").   These Sites were designed to

6   accommodate different demographics of people who are seeking mental health and counseling

7   services.   Defendant's   primary   website   and   app,   named   "BetterHelp,"   (found   at

8   www.betterhelp.com) serves general audiences and has been in operation since about 2013. Faithful

9   Counseling, in operation since about July 2017, is aimed at members of the Christian Faith. Pride

10  Counseling, in operation since about August 2017, caters to the LGBTQ community. Teen

11  Counseling, in operation since about January 2017, offers counseling to 13- to 18-year-olds with

12  parental consent. ReGain, in operation since about May 2016, offers couples counseling. Defendant

13  also offered the Service through the iCounseling website and app from about February 2017 to

14  November 2020, the Terrapeuta website and app from about March 2017 to March 2019, and the

15  MyTherapist website and app from about June 2017 to March 2019. Each of these Sites operates, or

16  has operated, similarly and each one facilitates counseling and/or therapy via the Service.

17         5.      When Plaintiffs and Class Members used one of Defendant's Sites in order to sign

18  up for the Service and become a paying user, they were required to fill out a questionnaire (the

19  "Intake Questionnaire"), answering detailed questions regarding themselves, their health status and

20  histories—including their mental health issues, whether they are in therapy for mental health issues

21  and whether they are seeking therapy from Better Help. Upon completing the Intake Questionnaire,

22  Plaintiffs and Class Members were required to create a paid account for the Service by entering their

23  name, email address, phone number, emergency contact information, and payment details.

24         6.      Since the time of BetterHelp's inception, millions of consumers, including Plaintiffs

25  and Class Members, have signed up for Defendant's counseling services and completed the required

26  online intake questionnaire on one of BetterHelp's websites. In doing so, they entrusted Defendant

27  _____

[2] *Id.* at p. 4.

28  [3] *Id.* at p. F-41.

[4] *Id.* at p. 60.

with their Private Information, including their health status and histories, mental health condition, their symptoms, the fact that they are seeking therapy to assist with their then-current mental health issues, whether they previously were in therapy, as well as identifying information such as names dates of birth, physical addresses, email addresses, and IP addresses. In providing such information to BetterHelp these consumers expected and understood that BetterHelp would keep that information confidential.

7. Recognizing the sensitivity of this Private Information, as well as consumer concerns about privacy—particularly as it relates to their mental health issues and related medical conditions—Defendant repeatedly promised to keep it private and use it only for non-advertising purposes, i.e., to facilitate consumers' mental health therapy.

8. Rather than protecting Class Members' confidential and sensitive Private Information, however, Defendant installed web beacons and cookies on its latform that enabled third party marketing companies like Facebook (or "Meta"), Snapchat, Criteo, and Pinterest to intercept its user's Private Information and to track users as well as to collect information that could be used to build individual consumer profiles. BetterHelp and these third-party marketing companies have benefited from the ability to analyze a user's experience and activity on the Sites to assess the website's functionality and traffic. These third-party websites also gain information about specific individuals that can be used to target/retarget them with advertisements and to measure the results of their advertisement efforts.

9. And by associating a website visitor's browser fingerprint, IP address, name, email address, telephone number, or other unique identifier, with their use of another website, advertisers can build a profile reflecting an individual's interests, concerns, or habits in intimate detail.

10. Unbeknownst to Plaintiffs and Class Members, the answers they gave to the questions on the Intake Questionnaire, along with the personal information and personal identifiers they provided as they used the Service, were secretly intercepted by and/or disclosed to at least Facebook, Snapchat, Criteo, and Pinterest, none of which were authorized by Plaintiffs or Class Members to receive their Private Information.

11. BetterHelp's goal in sharing its users' Private Information and communications with

CONSOLIDATED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

these companies was not to provide any benefit to the users of its Service but instead was intended to: (1) increase its market share through the identification of new potential patients and the recapture/retention of prior patients, and (2) to cultivate and maintain relationships with various social media sites.

12.    According to the United States Federal Trade Commission, ("FTC") from 2013 to December 2020, Defendant continually broke its promises to protect consumers' Private Information, instead using it to target existing and new customers with advertising for its services. Defendant also handed over Plaintiffs' and Class Members' Private Information to some of the largest online advertising companies in the world, such as Facebook, Pinterest, Criteo, and Snapchat, often permitting these companies to use the sensitive Private Information for their own research, product development, and advertising purposes.

13.    On March 2, 2023, the FTC announced that it had finalized a Consent Order with Defendant addressing Defendant's deceptive and misleading business practices in using sensitive personally identifiable information and personal health information and disclosing it to third parties.[56]

14.    The importance of keeping consumers' health information confidential also has been addressed by United States Department of Health and Human Services ("HHS").  The HHS, in order to implement the requirements of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), established "Standards for Privacy of Individually Identifiable Health Information" (also known as the "Privacy Rule") governing how health care providers must safeguard and protect Private Information. Under the HIPAA Privacy Rule, **no** health care provider can disclose a person's personally identifiable protected health information to a third party without express written authorization.

15.    In response to the use of tracking and data collection technologies by online companies offering health care services, like BetterHelp, the Office for Civil Rights at the U.S.

---

[5] Attached hereto as Exhibit A is a true and correct copy of the FTC's complaint against BetterHelp.

[6] Attached hereto as Exhibit B is a true and correct copy of the FTC's Consent Order with BetterHelp.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Department of Health and Human Services ("HHS") recently published a bulletin concerning the Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates.[7] The bulletin warns that:

> An impermissible disclosure of an individual's PHI not only violates the Privacy Rule but also may result in a wide range of additional harms to the individual or others. For example, an impermissible disclosure of PHI may result in identity theft, financial loss, discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others identified in the individual's PHI. Such disclosures can reveal incredibly sensitive information about an individual, including diagnoses, frequency of visits to a therapist or other health care professionals, and where an individual seeks medical treatment. While it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors, because of the proliferation of tracking technologies collecting sensitive information, now more than ever, it is critical for regulated entities to ensure that they disclose PHI **only** as expressly permitted or required by the HIPAA Privacy Rule.

16.     The guidance states that covered entities, such as BetterHelp, "**are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules.** For example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures."[8]

17.     Similarly, under California law, medical information is considered to be among the most sensitive private personal information available. "Medical Information" is defined by California's Confidential Medical Information Act, Cal. Civ. Code sections 56, *et seq*. ("CMIA") as:

> any individually identifiable information,[9] in electronic or physical form, in

---

[7] https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html

[8] U.S. Department of Health and Human Services, Office of Civil Rights, Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates (content last reviewed Dec. 1, 2022) (emphasis in the original), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html#ftnref9 (last visited, Mar. 23, 2023).

[9] "Individually identifiable" means that the Medical Information includes or contains any element of personal identifying information sufficient to allow identification of the individual, such as the patient's name, address, electronic mail address, telephone number, or Social Security Number, or other information that, alone or in combination with other publicly available information, reveals the identity of the individual.

CONSOLIDATED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

possession of or derived from a provider of health care, health care service plan, pharmaceutical company, or contractor regarding a patient's medical history, mental or physical condition, or treatment.[10]

18.     The California Constitution also recognizes the right of individuals to privacy in their affairs generally: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possession, and protecting property, and pursuing and obtaining safety, happiness, and privacy." Cal. Const., Art. I., § 1. And to protect those rights in an increasingly technological world, the California Invasion of Privacy Act ("CIPA") was enacted in 1967 to address "the development of new devices and techniques for the purpose of eavesdropping upon private communications and the invasion of privacy resulting from the continual and increasing use of such devices and techniques." Cal. Pen. Code § 630.

19.     Privacy polls and studies show that almost all Americans consider one of the most important privacy rights to be the need for an individual's affirmative consent before a company collects and shares its customers' data, and thus the expectation that companies such as BetterHelp will protect the confidentiality of Private Information is both reasonable and material to consumers. For example, a recent study by Consumer Reports shows that 92% of Americans believe that internet companies and websites should be required to obtain consent before selling or sharing consumers' data, and the same percentage believe internet companies and websites should be required to provide consumers with a complete list of the data that has been collected about them.[11] Moreover, according to a study by Pew Research Center, approximately 79% of Americans are concerned about how data is collected about them by companies.[12]

20.     The concern about sharing medical information is compounded by the reality that

---

[10] "Private Information", for purposes of this Complaint, refers to the above definition and encompasses both Personal Health Information ("PHI"), and Personally Identifiable Information ("PII"), including information associated with individual's health maintained within BetterHelp's computer systems.

[11] *Consumers Less Confident About Healthcare, Data Privacy, and Car Safety, New Survey Finds*, CONSUMER REPORTS (May 11, 2017), https://www.consumerreports.org/consumer-reports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety/.

[12] *Americans and Privacy: Concerned, Confused, and Feeling Lack of Control Over Their Personal Information*, PEW RESEARCH CENTER, (Nov. 15, 2019), https://www.pewresearch.org/internet/2019/11/15/americans-and-privacy-concerned-confused-and-feeling-lack-of-control-over-their-personal-information/.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

advertisers view this type of information as being of particularly high value. Indeed, having access to the data women share with their healthcare providers allows advertisers to obtain data on children before they are even born. As one article put it: "the datafication of family life can begin from the moment in which a parent thinks about having a baby."[13] The article continues "Children today are the very first generation of citizens to be datafied from before birth, and we cannot foresee — as yet — the social and political consequences of this historical transformation. What is particularly worrying about this process of datafication of children is that companies like . . . Facebook . . . are harnessing and collecting multiple typologies of children's data and have the potential to store a plurality of data traces under unique ID profiles."[14]

21.     And privacy law experts have expressed concerns about the disclosure to third parties of a user's sensitive medical information in particular. For example, Dena Mendelsohn–the former Senior Policy Counsel at Consumer Reports and current Director of Health Policy and Data Governance at Elektra Labs–explained that having one's personal health information disseminated in ways one is unaware of could have serious repercussions, including affecting one's ability to obtain life insurance and how much one pay for that coverage, increasing the rate one is charged on loans, and leaving one vulnerable to workplace discrimination.[15]

22.     Defendant's actions constitute an extreme invasion of Plaintiffs' and Class Members' right to privacy and violate several statutory and common law doctrines, including the California Invasion of Privacy Act ("CIPA"), Cal. Penal Code § 631, *et seq*.; the California Constitution Article I, Section I; California's Confidentiality of Medical Information Act, Cal. Civ. Code § 56, *et seq*.; California's Consumers Legal Remedies Act, Cal. Civ. Code § 1750, *et seq*. California's Unfair Competition Law, Bus. & Prof. Code § 17200, *et seq*.; California's False Advertising Law, Bus. & Prof. Code § 17500, *et seq*. California's Online Privacy Protection Act, California Business and Professions Code §§ 22575-22579 ("CalOPPA")"); the California Consumer Privacy Act, Cal. Civ.

---

[13] Veronica Barassi, *Tech Companies Are Profiling Us From Before Birth*, THE MIT PRESS READER, https://thereader.mitpress.mit.edu/tech-companies-are-profiling-us-from-before-birth/.

[14] *Id.*

[15] Donna Rosato, *What Your Period Tracker App Knows About You*, CONSUMER REPORTS (Jan. 28, 2020), https://www.consumerreports.org/health-privacy/what-your-period-tracker-app-knows-about-you/.

CONSOLIDATED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Code § 1798.100, *et seq* (CCPA); the California Computer Data Access and Fraud Act, Cal. Penal Code § 502 ("CDAFA"); the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510 *et seq*.; the Federal Trade Commission Act, 15 U.S.C. § 45 *et seq*. ("FTC Act"), the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Parts 160 and 164; 42 C.F.R. §2 a federal statute which addresses the privacy of mental health information. and common law doctrines such as breach of contract, breach of implied contract, negligence and negligence per se, and breach of confidence.

23.     As a result of Defendant's reckless and wanton acts and omissions detailed herein, Plaintiffs and Class Members seek remedies on their own behalf and on behalf of all those similarly situated for violations of the aforementioned statutes and common law doctrines.

## PARTIES

**A.     Plaintiffs**

*Plaintiff C.M.*

*24.*     Plaintiff C.M. is a resident of the State of Texas. Plaintiff C.M. created her BetterHelp account in approximately 2017-2018 for help dealing with caregiver stress and fatigue after her husband grew ill. Before creating her account, Better Help required Plaintiff C.M. to fill out the BetterHelp questionnaire in effect at that time and to provide her Private Information to BetterHelp in order to access its services. In the course of filling out her questionnaire, Plaintiff C.M. read and relied on BetterHelp's representations concerning its commitment to keep the information she provided confidential. Ultimately, Plaintiff C.M. signed up for BetterHelp's services for which she paid approximately $60-$90 monthly. Had Plaintiff C.M. known that Defendant would not keep her Private Information confidential, she would not have completed the questionnaire and would not have paid for the Service—or would have paid significantly less for that Service. Plaintiff C.M. had a Facebook and Instagram account during the relevant time period. After creating her BetterHelp account, Plaintiff C.M. received targeted ads for mental health services and online therapists that she believes directly resulted from her use of the platform. Plaintiff C.M. reasonably expected that her communications with BetterHelp were solely between herself and BetterHelp and that any information that she provided to BetterHelp would be maintained as confidential. Plaintiff C.M. first learned that BetterHelp had shared her Private Information without her consent or knowledge after

she read a news article in or about March of 2023. Since learning of BetterHelp's disclosure of her Private Information to unauthorized parties, Plaintiff C.M. has suffered, anxiety, annoyance, irritation, and embarrassment.

**Plaintiff S.C.**

25.     Plaintiff S.C. is a resident of the State of Wisconsin. Plaintiff S.C. created her BetterHelp account in approximately 2019 for help dealing with depression. Before creating her account, Plaintiff S.C. was required to fill out the BetterHelp Intake Questionnaire in effect at that time and she provided her Private Information as requested by BetterHelp. In the course of filling out her questionnaire, Plaintiff S.C. read and relied on BetterHelp's representations concerning its commitment to keep the information she provided confidential. Ultimately, Plaintiff S.C. signed up for BetterHelp's services for which she paid approximately $65 weekly. Had Plaintiff S.C. known that Defendant would not keep her information confidential she would not have completed the questionnaire and would not have paid for the Service or would have paid significantly less. Plaintiff S.C. had a Facebook and Instagram account during the relevant time period. Almost immediately after creating her BetterHelp account, Plaintiff S.C. received targeted ads for alternative mental health services providers and mood supplements on Facebook and Instagram that she believes resulted from her use of the Platform. Plaintiff S.C. reasonably expected that her communications with BetterHelp were solely between herself and BetterHelp and that any information that she provided to BetterHelp would be maintained as confidential. Plaintiff S.C. first learned that BetterHelp had shared her Private Information without her consent or knowledge after she read an online post in or about March of 2023.

**Plaintiff Jane Doe I**

26.     Plaintiff Jane Doe I is a resident of the State of Michigan. Plaintiff Jane Doe I created her BetterHelp account in approximately October of 2021 for help with dialectical behavior therapy and cognitive behavior therapy. Before creating her account, Plaintiff Jane Doe I was required to fill out the BetterHelp Intake Questionnaire in effect at that time and she provided her Private Information as requested by BetterHelp. In the course of filling out her questionnaire, Plaintiff Jane Doe I read and relied on BetterHelp's representations concerning its commitment to keep the

information she provided confidential. Ultimately, Plaintiff Jane Doe I signed up for BetterHelp's services for which she paid approximately $240 for a month. Plaintiff Jane Doe I had a Facebook and Instagram account during the relevant time period.  Had Plaintiff Jane Doe I known that Defendant would not keep her information confidential she would not have completed the questionnaire and would not have paid for the Service or would have paid significantly less. After stopping use of the Service, Plaintiff Jane Doe I began to receive advertisements from BetterHelp encouraging her to renew her use of the Service multiple times a day that she believes resulted from her stopping use of the Service. Plaintiff Jane Doe I reasonably expected that her communications with BetterHelp were solely between herself and BetterHelp and that any information that she provided to BetterHelp would be maintained as confidential. Plaintiff Jane Doe I first learned that BetterHelp had shared her Private Information without her consent or knowledge after she read a CNN article in or about March of 2023. As a result of learning of the disclosure of her Private Information, Plaintiff Jane Doe I feels psychological turmoil and distrust due to the misuse of her Private Information.

### Plaintiff L.M.

27.    Plaintiff L.M. is a resident of the State of South Carolina. Plaintiff L.M. created her BetterHelp account in approximately October of 2021 for help coping with feelings of stress and to learn coping mechanisms. Before creating her account, Plaintiff L.M. was required to fill out the BetterHelp Intake Questionnaire in effect at that time and she provided her Private Information as requested by BetterHelp. In the course of filling out her questionnaire, Plaintiff L.M. read and relied on BetterHelp's representations concerning its commitment to keep the information she provided confidential. Ultimately, Plaintiff L.M. signed up for BetterHelp's services for which she paid a month's subscription through a promotional coupon. Had Plaintiff L.M. known that Defendant would not keep her information confidential she would not have completed the questionnaire and would not have paid for the Service or would have paid significantly less. Plaintiff L.M. had a Facebook and Instagram account during the relevant time period. After creating her account with BetterHelp, Plaintiff L.M. began to receive an increase in the number of targeted advertisements she received that she believes resulted from her use of the Service. Plaintiff L.M. reasonably expected

that her communications with BetterHelp were solely between herself and BetterHelp and that any information that she provided to BetterHelp would be maintained as confidential. Plaintiff L.M. first learned that BetterHelp had shared her Private Information without her consent or knowledge after she received an email from BetterHelp disclosing that her Private Information was shared. As a result of learning of the disclosure of her Private Information, Plaintiff L.M. feels stress and anxiety and feels that she has lost trust in healthcare entities.

**Plaintiff R.S.**

28.   Plaintiff R.S. is a resident of the State of California. Plaintiff R.S. created his BetterHelp account in approximately April of 2021 for mental health counseling. Before creating his account, Plaintiff R.S. was required to fill out the BetterHelp questionnaire in effect at that time and provided his Private Information as requested by BetterHelp. In the course of filling out his questionnaire Plaintiff R.S. read and relied on BetterHelp's representations concerning its commitment to keep the information he provided confidential. Ultimately, Plaintiff R.S. signed up for BetterHelp's services for which he paid approximately $150 monthly. Had Plaintiff R.S. known that Defendant would not keep his information confidential he would not have completed the questionnaire and would not have paid for the Service or would have paid significantly less. Plaintiff R.S. had a Facebook and Instagram account during the relevant time period. Immediately after creating his BetterHelp account, Plaintiff R.S. received targeted ads for mental health services, treatment options, and mental health facilities that he believes resulted from his use of the Platform. Plaintiff R.S. reasonably expected that his communications with BetterHelp were solely between himself and BetterHelp and that any information that he provided to BetterHelp would be maintained as confidential. Plaintiff R.S. first learned that BetterHelp had shared his Private Information without his consent or knowledge after he read a Facebook post in or about March of 2023. Since learning of BetterHelp's disclosure of his Private Information to unauthorized parties, Plaintiff R.S. has suffered, anger, anxiety, embarrassment, and shame.

**Plaintiff Jane Doe II**

29.   Plaintiff Jane Doe II is a resident of the State of California. Plaintiff Jane Doe II created her BetterHelp account in approximately June of 2020 for help with bi-polar disorder. Before

creating her account, Plaintiff Jane Doe II was required to fill out the BetterHelp Intake Questionnaire in effect at that time and she provided her Private Information as requested by BetterHelp. In the course of filling out her questionnaire, Plaintiff Jane Doe II read and relied on BetterHelp's representations concerning its commitment to keep the information she provided confidential. Ultimately, Plaintiff Jane Doe II signed up for BetterHelp's services for which she paid approximately $300 for a month. Plaintiff Jane Doe II used the Platform to search for information regarding bi-polar disorder and to text chat with her therapist. Had Plaintiff Jane Doe II known that Defendant would not keep her information confidential she would not have completed the questionnaire and would not have paid for the Service, or would have paid significantly less. Plaintiff Jane Doe II had an Instagram account during the relevant time period. Shortly after beginning use of the Service, Plaintiff Jane Doe II began to receive advertisements from BetterHelp and advertisements for bi-polar medication that she believes resulted from her stopping use of the Service. Plaintiff Jane Doe II reasonably expected that her communications with BetterHelp were solely between herself and BetterHelp and that any information that she provided to BetterHelp would be maintained as confidential. Plaintiff Jane Doe II first learned that BetterHelp had shared her Private Information without her consent or knowledge after she read a Facebook post in or about March of 2023. As a result of learning of the disclosure of her Private Information, Plaintiff Jane Doe II feels stress and anxiety at the misuse of her Private Information.

### Plaintiff Jane Doe III

30.     Plaintiff Jane Doe III is a resident of the State of California. Plaintiff Jane Doe III created her BetterHelp account in approximately October of 2018 for mental health counseling. Before creating her account, Plaintiff Jane Doe III was required to fill out the BetterHelp Intake Questionnaire in effect at that time and she provided her Private Information as requested by BetterHelp. In the course of filling out her questionnaire, Plaintiff Jane Doe III read and relied on BetterHelp's representations concerning its commitment to keep the information she provided confidential. Ultimately, Plaintiff Jane Doe II signed up for BetterHelp's services and paid for approximately 18 months of Defendant's Service. Plaintiff Jane Doe III used the platform to review billing information and to communicate with her therapist. Had Plaintiff Jane Doe III known that

Defendant would not keep her information confidential she would not have completed the questionnaire and would not have paid for the Service or would have paid significantly less. Plaintiff Jane Doe III had a Facebook, Instagram, and Twitter account during the relevant time period. Shortly after beginning use of the Service, Plaintiff Jane Doe III began to receive advertisements for BetterHelp products and services that she believes resulted from her use of the Service. Plaintiff Jane Doe III reasonably expected that her communications with BetterHelp were solely between herself and BetterHelp and that any information that she provided to BetterHelp would be maintained as confidential. Plaintiff Jane Doe III first learned that BetterHelp had shared her Private Information without her consent or knowledge after she read a Facebook post in or about March of 2023. As a result of learning of the disclosure of her Private Information, Plaintiff Jane Doe III feels stress and anxiety and feels violated at the misuse of her Private Information.

### *Plaintiff T.R.*

31.     Plaintiff T.R. is a resident of the State of California. Plaintiff T.R. created his BetterHelp account in approximately 2019 or 2020 for mental health counseling. Before creating his account, Plaintiff T.R. was required to fill-out the BetterHelp questionnaire in effect at that time and provided his Private Information as requested by BetterHelp. In the course of filling out his questionnaire Plaintiff T.R. read and relied on BetterHelp's representations concerning its commitment to keep the information he provided confidential. Ultimately, Plaintiff T.R. signed up for BetterHelp's services a paid for four months of the Service. Had Plaintiff T.R. known that Defendant would not keep his information confidential he would not have completed the questionnaire and would not have paid for the Service, or would have paid significantly less. Shortly after creating his BetterHelp account, Plaintiff T.R. received targeted ads for BetterHelp multiple times a day that he believes resulted from his use of the platform. Plaintiff T.R. reasonably expected that his communications with BetterHelp were solely between himself and BetterHelp and that any information that he provided to BetterHelp would be maintained as confidential. Plaintiff T.R. first learned that BetterHelp had shared his Private Information without his consent or knowledge after he read a Facebook post in or about March of 2023.

**B.     Defendants**

32.     Defendant BetterHelp, Inc., also doing business as Compile, Inc.; MyTherapist; Teen Counseling; Faithful Counseling; Pride Counseling; iCounseling; ReGain; and Terappeuta, is a Delaware corporation with its principal office or place of business located at 990 Villa St., Mountain View, CA 94041. BetterHelp operates in and from California through through various websites, including, https://www.BetterHelp.com, https://www.regain.us, and https://www.teencounseling.com. The company provides its Service to millions of patients nationwide..

33.     The true names, roles, and capacities in terms of their involvement in the wrongdoing at issue, whether individual, corporate, associate, or otherwise, of Defendants named as Does 1 through 10, inclusive, are currently unknown to Plaintiffs and, therefore, these entities and/or individuals are named as Defendants under fictitious names. Plaintiffs will identify these Defendants' true identities and their involvement in the wrongdoing at issue if and when they become known.

## JURISDICTION AND VENUE

34.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C § 1332(d), because the amount in controversy for the Class exceeds $5,000,000 exclusive of interest and costs, there are more than 100 putative Class Members defined below, and minimal diversity exists because a significant portion of putative Class Members, including several of the named Plaintiffs, are citizens of a state different from the citizenship of Defendant.

35.     This Court has general personal jurisdiction over BetterHelp because it maintains its principal place of business in California. Additionally, BetterHelp is subject to specific personal jurisdiction in this State because a substantial part of the events and conduct giving rise to Plaintiffs' and others' claims occurred in or arose out of actions taken this State.

36.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), (c), and (d) because BetterHelp is based in this District, transacts business in this District and a substantial portion of the events giving rise to the claims occurred in this District.

## FACTUAL ALLEGATIONS

**A.     THE BETTERHELP PLATFORM**

37.     Defendant BetterHelp has been in operation since 2013, offering online mental health counseling services via various websites and apps. BetterHelp has spent significant effort and capital since inception by advertising and marketing its services through various digital and traditional media platforms, including television and radio as well as podcasts, search engine ads, and through third parties such as Facebook, Snapchat, Pinterest, and Criteo.

38.     Defendant has spent tens of millions of dollars annually to market its counseling services. In 2020, Defendant spent between $10-20 million on Facebook advertising alone. This advertising was extremely successful; by 2021, Defendant's advertising through Facebook was generating approximately 90,000 – 120,000 new customers per year.

39.     Defendant markets its services by offering consumers online communications with licensed therapists "who you can trust." BetterHelp also claims that customers using its therapists will "get the same professionalism and quality you would expect from an in-office therapist, but with the ability to communicate when and how you want."[16]

40.     To begin the process of signing up for the Service or using the platform, when a Class Member visited one of Defendant's Sites, she would be asked if she was looking for "Individual," "Couples," or "Teen" therapy. Having made her selection, she would then be asked a series of questions regarding her mental health, including "Have you been in therapy before", "Rate your physical health", and "Are you experiencing depression."

41.     Defendant's mandatory Intake Questionnaire also asks a series of sensitive questions about mental health symptoms and the reasons why the individual is seeking therapy (e.g., feelings of depression, anxiety, grief, etc.), including if the customer is "experiencing overwhelming sadness, grief, or depression" or has been having thoughts that the customer "would be better off dead or hurting yourself in some way."

42.     Depending upon the answers to some of the questions in Defendant's Intake Questionnaire, the Class Member might be invited to move to another of Defendant's Sites. If, for example, the Class Member was on the platform and indicated that she was seeking couples counseling she might be re-directed to Defendant's ReGain website; if she indicated that she was a

---

[16] betterhelp.com (last visited March 6, 2023)

CONSOLIDATED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

1  member of the LGBTQ community she might be re-directed to Defendant's Pride Counseling

2  website. All Class Members, regardless of the type of service they selected, were required to

3  complete the Intake Questionnaire in order to sign up for the Service. On information and belief, the

4  Intake Questionnaire on each Site was identical or substantially similar in all material respects.

5  43.    Upon completing the Intake Questionnaire, Plaintiffs and Class Members would be

6  prompted to create a paid account for the Service by entering her personal information, including

7  her name, email address, phone number, emergency contact information, and payment details.

8  44.    On information and belief, throughout the Class Period, the process of signing-up for

9  the Service on each of Defendant's Sites has been substantially the same.

10  45.    Thus, as a condition of using the Service, Plaintiffs and other Class Members were

11  required by Defendant to enter confidential, private, and sensitive personal and health information

12  into the respective website or app.

13  **B.    BETTERHELP PROMISED TO MAINTAIN CONFIDENTIALITY**

14  46.    Throughout the operation of its Service, BetterHelp made repeated representations to

15  its users, and to those who fill out its mandatory Intake Questionnaire, regarding its commitment to

16  maintaining the Private Information of Plaintiffs and Class Members as confidential. Plaintiffs relied

17  on these representations when deciding to provide their Private Information to BetterHelp and when

18  deciding whether to pay for BetterHelp's Service or access its platform.

19  47.    Unfortunately for Plaintiffs and Class Members, these representations were false,

20  misleading, and deceptive as BetterHelp completely disregarded its commitment to confidentiality

21  and instead allowed third parties to monitor Plaintiffs and Class Members in real time as they filled

22  out the questionnaire or used the platform.

23  48.    For example, from September 2013 to December 2020, Defendant displayed HIPAA

24  seals on its platform which reasonable consumers, including Plaintiffs and Class Members,

25  understood to signal Defendant's purported compliance with HIPAA regulations.

26  49.    By displaying HIPAA seals on most pages of Defendant's platform, BetterHelp

27  signaled and suggested to Plaintiffs and Class Members that a government agency or other third

28  party had reviewed Defendant's privacy and information security practices and determined that they

met HIPAA's requirements.

50.     Defendant also represented to consumers that it was in fact "HIPAA certified," with its customer service representatives informing consumers that Defendant was HIPAA Certified.

51.     No government agency or other third party reviewed Defendant's information practices for compliance with HIPAA, let alone determined that the practices met the requirements of HIPAA and BetterHelp qualified for no such certification.

52.     BetterHelp also made repeated and unambiguous privacy assurances to Plaintiffs and Class Members throughout its Intake Questionnaire. For example, at least until November 2021, each of Defendant's platforms displayed a banner at the top of each question in the questionnaire, explaining that BetterHelp was merely asking for "some general and *anonymous* background information about you and the issues you'd like to deal with in online therapy" (emphasis added) so that the individual completing the questionnaire could be matched "with the most suitable therapist for you."

53.     As Plaintiffs and other Class Members proceeded through the Intake Questionnaire, Defendant made additional privacy assurances, which it periodically modified. From at least August 2017 to December 2020, when a Plaintiff or other Class Member reached the question as to whether they had taken medication, they were shown the statement: "Rest assured – any information provided in this questionnaire will stay private between you and your counselor." In December 2020, Defendant changed the statement to read: "Rest assured – *this information* will stay private between you and your counselor." (emphasis on alteration added). And in January 2021, Defendant changed it again to state: "Rest assured – *your health information* will stay private between you and your counselor. (emphasis on alteration added). This latter version of the representation remained in use until September 2021, when it was removed altogether.

54.     Defendant also made false promises about its use of customers' email addresses, telling visitors to the Faithful Counseling, Pride Counseling, and Teen Counseling websites during the sign-up process that their email addresses would not be shared. From at least August 2017 to December 2020, Defendant assured such Website visitors that "Your email address is kept *strictly private*. It is never shared sold or disclosed to anyone. Even your counselor won't know your real

CONSOLIDATED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

email address." (emphasis added).

55.     Millions of users, including Plaintiffs and Class Members, who ultimately signed up for BetterHelp's counseling services were presented with these repeated promises and relied on these promises when deciding to pay for Defendant's services and whether to provide their Private Information to Defendant. Despite these promises, and contrary to Plaintiffs' and Class Members' expectations, Defendant shared the Private Information for its own benefit, including by sharing it, allowing for its interception by third parties, and disclosing it in return for valuable marketing and analytical data.

56.     In addition to the unambiguous and unavoidable representations that BetterHelp presented to Plaintiffs and Class Members about how it would keep their information confidential throughout out the mandatory intake questionnaire, BetterHelp also maintained a Privacy Policy that could only be accessed by scrolling to the bottom of the webpage and clicking on a hyperlink in shaded and fine print font. Users were never affirmatively required to read or assent to the Privacy Policy before completing BetterHelp's Intake Questionnaire or using the platform.[17] Moreover, prominently displayed on the BetterHelp landing page was a representation that "[a]ll counselors are licensed, accredited professionals. BetterHelp allows you to connect with them in a safe and private online environment. Anything you share is confidential."[18]

57.     From August 2013 to November 2018, Defendant's Privacy Policy represented that BetterHelp would only use and disclose users' email addresses, IP addresses, enrollment in the Service, and intake questionnaire responses for certain purposes, including to connect them with therapists and operate the Service.[19] Notably, the Privacy Policy made no mention of using or disclosing this information for advertising purposes, and it said nothing about permitting third parties to use this information for their own purposes.

58.     In November 2018, Defendant updated the Privacy Policy to state affirmatively that

---

[17] Defendant's Landing Page as of June 3, 2017 with the Privacy Policy hyperlink located at the bottom of the page can be found at
https://web.archive.org/web/20170603005910/https://www.betterhelp.com/
[18] Id.
[19] Defendant's Privacy Policy as of February 28, 2017 can be found at
https://web.archive.org/web/20170228111124/https://www.betterhelp.com/privacy/

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

it would use and disclose this information only for limited purposes, such as to operate and improve the Service. These limited purposes did not include using or disclosing the information for advertising or disclosing the information to third parties for their own purposes.[20]

59.     Defendant revised its Privacy Policy again in September 2019, stating that it might *use* this medical information for advertising. But the policy continued to say that defendant would only *disclose this medical information to third parties* for certain stated limited purposes, which did not include advertising or the third parties' own purposes.[21]

60.     In September 2020, Defendant revised the Privacy Policy yet again to state that it might both use and disclose users' information for advertising. However, the Privacy Policy continued to claim that Defendant would disclose this information to third parties for only the stated limited purposes, which did not include third parties' own purposes.[22]

61.     From August 2013 to June 2021, Defendant's privacy policies stated that it would use web beacons (including pixels) and cookies for limited purposes. These limited purposes did not include the use or disclosure of users' medical information for advertising purposes, or the disclosure of this information for third parties' own purposes. In fact, the Privacy Policy expressly represented that "[w]e use cookies and web beacons to enable the technical operation of the platform, to administer your log-in to your account and to collect the Log Data." Accordingly, the Privacy Policy represented that the use of such tools was limited to the platform's functionality. However, as discussed below, these tools permitted Defendant and third parties, including Meta, to collect Plaintiffs' and Class Members' Private Information, including what pages they visited and what information they communicated over the platform."

**C.     BETTERHELP DISCLOSED THE PRIVATE INFORMATION OF PLAINTIFFS AND CLASS MEMBERS TO UNAUTHORIZED PARTIES**

62.     Despite Defendant's consistent and unambiguous messaging regarding its

---

[20] Defendant's Privacy Policy as of December 5, 2018 can be found at https://web.archive.org/web/20181205150455/https://www.betterhelp.com/privacy/
[21] Defendant's Privacy Policy as of January 9, 2020 can be found at https://web.archive.org/web/20200109021030/https://www.betterhelp.com/privacy/
[22] Defendant's Privacy Policy as of November 27, 2020 can be found at https://web.archive.org/web/20201127181507/https://www.betterhelp.com/privacy/

commitment to the confidentiality of information communicated on its platform, Defendant disregarded its promises and the rights and expectations of Plaintiffs and Class Members by sharing their Private Information with third party marketing companies in exchange for valuable analytics and marketing insights.

63.     Completely unbeknownst to Plaintiffs and Class Members the Private Information that they communicated to Defendant through Defendant's platform and while signing up for the Service, including the fact that they were seeking mental health treatment, was intercepted by and/or disclosed to unauthorized third parties including Facebook, Pinterest, Criteo, and Snapchat.

64.     Contrary to the understanding and expectations of Plaintiffs and Class Members, BetterHelp used a wide variety of tactics to share the Private Information of over 7 million consumers who filled out Defendant's Intake Questionnaire or who provided Private Information during their use of the Service.

65.     On several occasions during the Class Period, Defendant uploaded Plaintiffs' and Class Members' email addresses to Meta. For example: between January 2017 and October 2018, Defendant uploaded 170,000 visitors' and users' email addresses to Facebook, re-targeting these individuals and targeting potential new users with advertisements for the Service; between January 2018 and October 2018, Defendant uploaded 15,000 users' email addresses to Facebook to find and target new potential users with advertisements for the Service; and, in October 2017 Defendant uploaded the email addresses of all of their current and former users – nearly 2 million in total – to Meta, targeting them all with advertisements to refer their Facebook friends to the Service.

66.     Defendant also used Private Information obtained from Class Members who signed up for the Service through Pride Counseling in order to optimize Defendant's future advertisements for the Service. From November 2017 to October 2020, Defendant gathered information concerning Class Members' mental health statuses and their connection with Class Members' LGBTQ identities. Defendant gathered this information through the Intake Questionnaire whenever a Pride Counseling user revealed that the User's "LGBTQ identity is contributing to your mental health concerns." Defendant used Facebook to identify characteristics and interests common among these users and then to target future advertisements for the Service on Facebook to individuals with similar

characteristics and interests.

67.     As another example, in January 2019, Defendant disclosed the IP addresses and email addresses of approximately 5.6 million visitors to its platform (including Class Members) to Snapchat in order to re-target them with advertisements for the Service.

68.     Similarly, from July 2018 to January 2019, Defendant disclosed the email addresses of over 70,000 visitors (including Class Members) to Criteo in order to re-target them with advertisements.

69.     And, from August 2019 to September 2020, Defendant disclosed the email addresses of visitors (including Class Members) to Pinterest for advertising purposes.

70.     As evidenced by Defendant's repeated and willful disclosure of Private Information, Defendant failed to implement reasonable and adequate data security policies and procedures and failed to employ, train, and oversee its marketing personal and to ensure that their practices complied with BetterHelp's representations and applicable laws.

71.     For example, according to the FTC, in 2017 Defendant delegated most decision-making authority over its use of Facebook's advertising services to a junior marketing analyst who was a recent college graduate, had never worked in marketing, and had no experience and little training in safeguarding consumers' Private Information or ensuring that only appropriate information was used for advertising. In 2017 Defendant gave the analyst unilateral authority to decide what Private Information to upload to Facebook and how to use that information. Defendant provided this marketing analyst with little training on how to protect customers' Private Information in connection with advertising until 2021.

72.     As a result of Defendant's failure to perform due diligence in hiring and training its employees, Defendant's marketing team not only disclosed the Private Information of Plaintiffs and Class Members as described above, but also made the decision to employ tracking software that allowed companies like Facebook to intercept the communications of Plaintiffs and Class Members with BetterHelp in real time, including the Private Information transmitted through the Intake Questionnaire.

**D.     BETTERHELP'S TRACKING PIXELS TRANSMITTED CONFIDENTIAL INFORMATION TO FACEBOOK IN REAL TIME**

73.     Facebook and other online platforms derive revenue almost exclusively from selling targeted advertising to both the users of its own platform, Facebook, and to internet users generally by integrating web beacons and cookies onto websites like BetterHelp's. Facebook generated $117 billion in revenue in 2021, roughly 97% of which was derived from selling advertising space.[23] Facebook can generate such revenue through its ability to precisely target individual consumers. One way it is able to do this is through the use of web beacons or "pixels."

74.     A pixel is a piece of code that "tracks the people and [the] type of actions they take"[24] as they interact with a website, including how long a person spends on a particular web page, which buttons the person clicks, which pages they view, and the text or phrases they type into various portions of the website (such as a general search bar, chat feature, or text box), among other things.

75.     Social media platforms like Facebook use the pixel and similar tracking software to build profiles on web users that include real names, locations, email addresses, telephone numbers, interests, purchasing habits, and communications that the companies associate with unique personal identifiers like IP addresses, browser fingerprints, device IDs and cookie identifiers.

76.     By associating or assigning these identifiers to a particular individual these companies can track a user's behavior across websites in order to build a more detailed consumer profile. Facebook for example assigns what it calls a Facebook user ID ("FID") to each individual user of its platform. A user's FID is associated with their Facebook profile, which typically includes diverse demographic and personal information such as user's location, photos, interests, employment history, relationship status, and other details. Since the Facebook ID serves as a unique identifier for an individual's Facebook account, Facebook or any regular person can effortlessly utilize the Facebook ID to locate, access, and view the user's corresponding Facebook profile without difficulty. In the case of Facebook, the pixel forces the website user to share the user's FID with each communication via a "cookie" that Facebook stores in their browser. And for both Facebook account-holders and users who do not have a Facebook account, these identifiers also

---

[23] FACEBOOK, META REPORTS FOURTH QUARTER AND FULL YEAR 2021 RESULTS, https://investor.fb.com/investor-news/press-release-details/2022/Meta-Reports-Fourth-Quarter-and-Full-Year-2021-Results/default.aspx

[24] See *Retargeting*, Facebook,  https://www.facebook.com/business/goals/retargeting.

1   include cookies that Facebook ties to their browser, such as "datr" and "fr" cookies.[25]

2       77.    The pixel functions by being embedded in a user's web browser after they request to

3   visit a website. Web browsers are software applications that allow consumers to navigate the web

4   and view and exchange electronic information and communications over the internet.  Each "client

5   device" (such as computer, tablet, or smart phone) accesses web content through a web browser

6   (e.g., Google's Chrome browser, Mozilla's Firefox browser, Apple's Safari browser, or Microsoft's

7   Edge browser).

8       78.    Every website, including the BetterHelp Sites, is hosted by a computer "server" that

9   holds the website's contents and through which the entity in charge of the website exchanges

10  communications with Internet users' client devices via their web browsers.

11      79.    Web communications consist of HTTP or HTTPS Requests and HTTP or HTTPS

12  Responses, and any given browsing session may consist of thousands of individual HTTP Requests

13  and HTTP Responses, along with corresponding cookies:

14  **HTTP Request**: an electronic communication sent from the client device's browser to the
15  website's server. GET Requests are one of the most common types of HTTP Requests. In
    addition to specifying a particular URL (i.e., web address), GET Requests can also send
16  data to the host server embedded inside the URL, and can include cookies. POST Requests
    can send a large amount of data outside of the URL. (For instance, uploading a PDF for
17  filing a motion to a court)

18  **Cookies**: a small text file that can be used to store information on the client device which
19  can later be communicated to a server or servers. Cookies are sent with HTTP Requests
    from client devices to the host server. Some cookies are "third-party cookies," which
20  means they can store and communicate data when visiting one website to an entirely
    different website.
21

22  **HTTP Response**: an electronic communication that is sent as a reply to the client device's
    web browser from the host server in response to an HTTP Request. HTTP Responses may
23  consist of a web page, another kind of file, text information, or error codes, among other
    data.[26]
24      80.    A website visitor's HTTP Request essentially asks BetterHelp's platform to retrieve

25  certain information (such as the Intake Questionnaire page). The HTTP Response sends the

26

27  ───────────────
    [25] Meta, *Cookies Policy* (Oct. 5, 2022), https://www.facebook.com/policy/cookies.
28  [26] One browsing session may consist of hundreds or thousands of individual HTTP Requests and
    HTTP Responses.

CONSOLIDATED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

1  requested information in the form of "Markup." This is the foundation for the pages, images, words,

2  buttons, and other features that appear on Plaintiffs' and Class Members' screens as they navigate

3  Defendant's Website.

4          81.    Every website is comprised of Markup and "Source Code." Source Code is simply a

5  set of instructions that commands the website visitor's browser to take certain actions when the web

6  page first loads or when a specified event triggers the code.

7          82.    Source code may also command a web browser to send data transmissions to third

8  parties in the form of HTTP Requests quietly executed in the background without notifying the web

9  browser's user. The pixel software is source code that does just that. The pixel acts much like a

10 traditional wiretap. When a user visits the BetterHelp platform via an HTTP Request to BetterHelp's

11 server, the server sends an HTTP Response including the Markup that displays the webpage visible

12 to the user and the invisible Source Code, in this case the pixel. Once the webpage is loaded into the

13 patient's browser, the pixel software waits for the user to communicate information via a GET

14 Request, which duplicates that GET Request on dispatch and directs it to a third-party server, in this

15 case, Facebook's server.

16         83.    This second transmission, completely invisible and unknown to the user, contains the

17 content of the original request sent to the host website ("GET request"), along with the data that the

18 pixel was configured to collect ("POST request"). GET and POST requests are communications that

19 contain contents from both the user and from servers associated with the website they are visiting.

20 These second and unintended transmissions are initiated by pixel code and concurrent with the

21 communications to and from the host website.

22         84.    In addition to the communication itself, the pixel software that Defendant

23 intentionally embeds on its Sites will also capture personal identifiers like the FID, browser

24 fingerprints, device IDs, and IP addresses. IP addresses are used to identify and route

25 communications on the Internet. IP addresses of individual Internet users are used by websites and

26 tracking companies to facilitate and track Internet communications. Individual homes and their

27 occupants can be, and are, tracked and targeted with advertising using IP addresses. Thus, IP

28 addresses are personally identifiable, particularly in combination with other information disclosed

through the pixel software.

85.     Completely unbeknownst to Plaintiffs and other Class Members, and continuing to the present, Private Information that they communicated to Defendant through Defendant's Sites and while signing up for the Service, including the fact that they signed up for the Service, was intercepted by and/or disclosed to unauthorized third parties including at least Meta, Pinterest, Criteo, and Snapchat.

86.     Facebook warns developers and those who incorporate the Facebook pixel into their website that the pixel is a personal identifier because it "relies on Facebook cookies, which enable us to match your website visitors to their respective Facebook user accounts."[27]

87.     Nevertheless, on date unknown and continuing to the present, Defendant embedded pixel software and other tracking tools throughout its platform, including the Intake Questionnaire, and allowed third parties to intercept the confidential communications of Plaintiffs and Class Members without their consent or knowledge.

88.     When a Plaintiff or another Class Member visited Defendant's platform and completed the steps necessary to obtain Defendant's Service, the pixel or other tracking tool automatically caused the Plaintiff's or Class Member's personal identifiers, including email addresses, IP addresses and the c_user, _fr, _datr, and _fbp cookies, to be transmitted to Meta, attached to the fact that the Plaintiff or Class Member had visited the Sites, the titles of the pages the Plaintiff or Class Member visited, and the text they inputted into form fields, like those on the Intake Questionnaire.

89.     Because Defendant only collected email addresses from individuals seeking mental health therapy via the Service, disclosure of Plaintiffs' or a Class Member's email address implicitly identified Plaintiffs or the respective Class Member as one seeking and/or receiving mental health treatment via the Service. Thus, each such disclosure constituted a disclosure of Private Information, including PHI.

90.     Because Defendant disclosed Plaintiffs' and Class Members' email addresses,

---

[27] Facebook, Get Started, https://developers.facebook.com/docs/meta-pixel/get-started (last visited Jan. 18, 2023).

names, IP addresses and other personal identifiers, including their Facebook user IDs, in conjunction with other data about their enrollment in the Service and/or their Intake Questionnaire responses, each such disclosure constituted a disclosure of Private Information, including PHI.

91.     In addition to the "automatic events" that the pixel automatically collects and transmits from a website without the website owner or developer being required to add any additional code, Defendant intentionally configured the pixel on its website to track, collect, and disclose "custom events" such as a user's response to certain questions in the Intake Questionnaire such as: "Have you been in counseling or therapy before?" or questions regarding their faith, their sexuality, and even their financial condition.

92.     Defendant disclosed to Facebook the details of over 1.5 million visitors' and users' previous therapy – gathered through their affirmative responses to the Intake Questionnaire question: "Have you been in counseling or therapy before?"

93.     And between October 2018 and November 2020, Defendant disclosed to Facebook the financial status of over 3.5 million visitors and users who answered that they had "good" or "fair" financial status on the Intake Questionnaire.

94.     In addition, between January and December 2020, Defendant shared with Facebook the fact that over 180,000 identifiable visitors had become paying users. This information was disclosed through an event notifying Facebook that the users had entered credit card information after completing the Intake Questionnaire.

95.     Put simply, when Plaintiffs or other Class Members used Defendant's platform to obtain the Service from Defendant, their Private Information, including their identities, unique identifiers, and protected health information was disclosed to Facebook.

96.     Defendant disclosed Plaintiffs' and Class Members' Private Information to Facebook in order to allow BetterHelp to improve its marketing and advertising and to increase Defendant's subscribers, revenues, and profits. Thus, Defendant embedded the pixel on its platform solely for its own benefit and used Plaintiffs' and Class Members' Private Information for its own marketing and advertising purposes and to increase its revenues and profits.

97.     Moreover, and as evidenced by Plaintiffs' receipt of targeted ads from BetterHelp or

related to mental health services, Facebook analyzes, categorizes, and uses the Private Information disclosed to them by BetterHelp for their own purposes, including building consumer profiles and directing advertisements at Plaintiffs and Class Members. Defendant did not contractually limit how Facebook and other third parties could use and disclose the Private Information they received from Defendant about Plaintiffs and Class Members other than merely agreeing to those third parties' general terms of service, which either placed no restrictions on the third parties' use and disclosure of the information or specifically permitted the third parties to use the information for their own purposes.

## E. DEFENDANT HAD A DUTY TO PROTECT THE PRIVATE INFORMATION OF PLAINTIFFS AND CLASS MEMBERS FROM DISCLOSURE

98.    Defendant is required by the laws identified herein, and various other laws and regulations designed to protect Plaintiffs' and Class Members' Private Information and to handle notification of any breach in accordance with applicable breach notification statutes. These duties are established in numerous California statutes, including Cal. Civ. Code §§ 56.10(a), 56.101, 1798.21, 1798.29, Cal. Bus. and Prof. Code §§ 17200 et seq., Cal. Bus. and Prof. Code §§ 22575-2257, Cal. Penal Code § 630-632 et seq., as well as Article I, § 1 of the California Constitution. Failure to do so results in acts of negligence *per se* by Defendant.

99.    Defendant is a covered entity pursuant to the Health Insurance Portability and Accountability Act ("HIPAA"). *See* 45 C.F.R. § 160.102. Defendant must therefore comply with the HIPAA Privacy Rule and Security Rule. *See* 45 C.F.R. Part 160 and Part 164, Subparts A through E.

100.    Defendant is a covered entities pursuant to the Health Information Technology Act ("HITECH")[28]. *See* 42 U.S.C. §17921, 45 C.F.R. § 160.103.

101.    HIPAA's Privacy Rule, otherwise known as "Standards for Privacy of Individually Identifiable Health Information," establishes national standards for the protection of health information.

102.    HIPAA's Security Rule, otherwise known as "Security Standards for the Protection

---

[28] HIPAA and HITECH work in tandem to provide guidelines and rules for maintaining protected health information.  HITECH references and incorporates HIPAA.

27

of Electronic Protected Health Information," establishes national security standards for the protection of health information that is held or transferred in electronic form. See 42 C.F.R. §§ 164.302-164.318.

103.   Defendant is a covered entity pursuant to the Health Insurance Portability and Accountability Act ("HIPAA"). *See* 45 C.F.R. § 160.102. Defendant must therefore comply with the HIPAA Privacy Rule and Security Rule. *See* 45 C.F.R. Part 160 and Part 164, Subparts A through E.

104.   Defendant is a covered entities pursuant to the Health Information Technology Act ("HITECH")[29].  *See* 42 U.S.C. §17921, 45 C.F.R. § 160.103.

105.   HIPAA's Privacy Rule, otherwise known as "Standards for Privacy of Individually Identifiable Health Information," establishes national standards for the protection of health information.

106.   HIPAA's Security Rule, otherwise known as "Security Standards for the Protection of Electronic Protected Health Information," establishes national security standards for the protection of health information that is held or transferred in electronic form. See 42 C.F.R. §§ 164.302-164.318.

107.   HIPAA limits the permissible uses of "protected health information" and prohibits the unauthorized disclosure of "protected health information." 45 C.F.R. § 164.502. HIPAA requires that covered entities implement appropriate administrative, technical, and physical safeguards for this information and requires that covered entities reasonably safeguard protected health information from any intentional or unintentional use or disclosure that is in violation of the standards, implementation specifications or other requirements of this subpart. *See* 45 C.F.R. § 164.530(c).

108.   HIPAA requires a covered entity to have and apply appropriate sanctions against members of its workforce who fail to comply with the privacy policies and procedures of the covered entity or the requirements of 45 C.F.R. Part 164, Subparts D or E. *See* 45 C.F.R. § 164.530(e).

109.   HIPAA requires a covered entity to mitigate, to the extent practicable, any harmful

---

[29] HIPAA and HITECH work in tandem to provide guidelines and rules for maintaining protected health information.  HITECH references and incorporates HIPAA.

effect that is known to the covered entity of a use or disclosure of protected health information in violation of its policies and procedures or the requirements of 45 C.F.R. Part 164, Subpart E by the covered entity or its business associate. *See* 45 C.F.R. § 164.530(f).

110.    Under HIPAA PHI means individually identifiable health information:

(1) Except as provided in paragraph (2) of this definition, that is:

(i) Transmitted by electronic media;

(ii) Maintained in electronic media; or

(iii) Transmitted or maintained in any other form or medium.[30]

111.    HIPAA and HITECH obligated Defendant to implement technical policies and procedures for electronic information systems that maintain electronic protected health information so that such systems were accessible only to those persons or software programs that had been granted access rights and who have a working need to access and view the information. *See* 45 C.F.R. § 164.312(a)(1); *see also* 42 U.S.C. §17902.

112.    HIPAA and HITECH also obligated Defendant to implement policies and procedures to prevent, detect, contain, and correct security violations, and to protect against uses or disclosures of electronic protected health information that are reasonably anticipated but not permitted by the privacy rules. *See* 45 C.F.R. § 164.306(a)(1) and § 164.306(a)(3); *see also* 42 U.S.C. §17902.

113.    HIPAA further obligated Defendant to ensure that its workforce complied with HIPAA security standard rules (*see* 45 C.F.R. § 164.306(a)(4)) to effectively train its workforces on the policies and procedures with respect to protected health information, as necessary and appropriate for those individuals to carry out their functions and maintain the security of protected health information. *See* 45 C.F.R. § 164.530(b)(1).

114.    HIPAA also requires the Office of Civil Rights ("OCR"), within the Department of Health and Human Services ("HHS"), to issue annual guidance documents on the provisions in the HIPAA Security Rule. *See* 45 C.F.R. §§ 164.302-164.318. For example, "HHS has developed guidance and tools to assist HIPAA covered entities in identifying and implementing the most cost

---

[30] 45 C.F.R. § 160.103

effective and appropriate administrative, physical, and technical safeguards to protect the confidentiality, integrity, and availability of e-PHI and comply with the risk analysis requirements of the Security Rule." *See* US Department of Health & Human Services, Security Rule Guidance Material.[31] The list of resources includes a link to guidelines set by the National Institute of Standards and Technology (NIST), which OCR says "represents the industry standard for good business practices with respect to standards for securing e-PHI." *See* US Department of Health & Human Services, Guidance on Risk Analysis.[32]

115.    Should a health care provider experience an unauthorized disclosure, it is required to conduct a Four Factor Risk Assessment (HIPAA Omnibus Rule). This standard requires, "A covered entity or business associate must now undertake a four-factor risk assessment to determine whether or not PHI has been compromised and overcome the presumption that the breach must be reported. The four-factor risk assessment focuses on:

(1) the nature and extent of the PHI involved in the incident (e.g., whether the incident involved sensitive information like social security numbers or infectious disease test results);

(2) the recipient of the PHI;

(3) whether the PHI was actually acquired or viewed; and

(4) the extent to which the risk that the PHI was compromised has been mitigated following unauthorized disclosure (e.g., whether it was immediately sequestered and destroyed).[33]

116.    The HIPAA Breach Notification Rule, 45 CFR §§ 164.400-414, requires HIPAA covered entities and their business associates to provide notification following a breach of unsecured protected health information.

---

[31] http://www.hhs.gov/hipaa/for-professionals/security/guidance/index.html
[32] https://www.hhs.gov/hipaa/for-professionals/security/guidance/guidance-risk-analysis/index.html
[33] 78 Fed. Reg. 5641-46, *See also*, 45 C.F.R. §164.304

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

117.    The HIPAA Contingency Operations Rule, 45 C.F.R. §164.301(a), requires a healthcare provider to have security measures in place and train its employees and staff so that all its staff and employees know their rolls in facility security.

118.    Defendant failed to provide proper notice to Plaintiff of the disclosure.

119.    Defendant failed to conduct or improperly conducted the four-factor risk assessment following the unauthorized disclosure.

120.    As Defendant is an entity covered by HIPAA and is required to comply with the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C, which establish national security standards and duties for Defendant's protection of PHI maintained by them in electronic form. HIPAA limits the permissible uses of health information and prohibits the disclosure of this information without explicit authorization. *See* 45 C.F.R. § 164.502. HIPAA also requires that covered entities implement appropriate safeguards to protect this information. See 45 C.F.R. § 164.530(c)(1).

121.    HIPAA requires Defendant to "comply with the applicable standards, implementation specifications, and requirements" of HIPAA "with respect to electronic protected health information." 45 C.F.R. § 164.302.

122.    "Electronic protected health information" is defined as "individually identifiable health information ... that is (i) transmitted by electronic media; maintained in electronic media." 45 C.F.R. § 160.103.

123.    HIPAA's Security Rule requires Defendant to: (a) ensure the confidentiality, integrity, and availability of all electronic protected health information the covered entity or business associate creates, receives, maintains, or transmits; (b) protect against any reasonably anticipated threats or hazards to the security or integrity of such information; (c) protect against any reasonably anticipated uses or disclosures of such information that are not permitted; and (d) ensure compliance by its workforce.

124.    HIPAA also requires Defendant to "review and modify the security measures

CONSOLIDATED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

implemented . . . as needed to continue provision of reasonable and appropriate protection of electronic protected health information." 45 C.F.R. § 164.306(c), and also to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. § 164.312(a)(1).

125.    Defendant failed to comply with safeguards mandated by HIPAA regulations by, *inter alia*, doing the following:

(a)    Failing to ensure the confidentiality and integrity of electronic PHI that Defendant creates, receives, maintains, and transmits, in violation of 45 C.F.R. section 164.306(a)(1);

(b)    Failing to implement technical policies and procedures for electronic information systems that maintain electronic PHI to allow access only to those persons or software programs that have been granted access rights such as by the use of multi factor authentication, in violation of 45 C.F.R. section 164.312(a)(1);

(c)    Failing to implement policies and procedures to prevent, detect, contain, and correct security violations, in violation of 45 C.F.R. section 164.308(a)(1);

(d)    Failing to identify and respond to suspected or known security incidents and mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity, in violation of 45 C.F.R. section 164.308(a)(6)(ii);

(e)    Failing to protect against any reasonably-anticipated threats or hazards to the security or integrity of electronic PHI, in violation of 45 C.F.R. section 164.306(a)(2);

(f)    Failing to protect against any reasonably anticipated uses or disclosures of electronic PHI that are not permitted under the privacy rules regarding individually identifiable health information, in violation of 45 C.F.R. section 164.306(a)(3);

(g)    Failing to ensure compliance with HIPAA security standard rules by its workforce by providing for adequate comprehensive training rather than simply using training software to test staff by imitating phishing emails, in violation of 45 C.F.R. section 164.306(a)(4);

(h)     Impermissibly and improperly using and disclosing PHI that is and remains accessible to unauthorized persons, in violation of 45 C.F.R. section 164.502, et seq.;

(i)     Failing to effectively train all members of its workforce (including independent contractors) on the policies and procedures with respect to PHI as necessary and appropriate for the members of its workforce to carry out their functions and to maintain security of PHI, in violation of 45 C.F.R. sections 164.530(b) and 164.308(a)(5); and

(j)     Failing to design, implement, and enforce policies and procedures establishing physical and administrative safeguards to reasonably safeguard PHI in compliance with violation of 45 C.F.R. section 164.530(c).

126.    Defendant also violated the duties applicable to it under the Federal Trade Commission Act, 15 U.S.C. § 45 *et seq.* ("FTC Act"), from engaging in "unfair or deceptive acts or practices in or affecting commerce." The FTC pursuant to that Act has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act and a per se violation of the UCL.

127.    As established by these laws, Defendant owed a duty to Plaintiffs and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Private Information in its possession from being misused by unauthorized persons such as the companies identified herein.

128.    By taking affirmative acts inconsistent with these obligations, Defendant disclosed and permitted the disclosure of Private Information to unauthorized third parties. Through such actions or inactions, BetterHelp failed to preserve the confidentiality of Private Information it was duty-bound to protect.

**F.     PRIVATE INFORMATION IS A VALUABLE PROPERTY RIGHT**

129.    As evidenced by the value that BetterHelp and its advertising partners derived from the Private Information of Plaintiffs and Class Members, Private Information is a valuable commodity. Unsurprisingly, Facebook and others does not offer the pixel to companies like

BetterHelp solely for Defendant's benefit. "Data is the new oil of the digital economy,"[34] and Facebook has built its more-than $300 billion market capitalization on mining and using that 'digital' oil. Thus, the large volumes of personal and sensitive health-related data Defendant provides to Facebook are actively viewed, examined, analyzed, curated, and used by the company. Facebook acquires the raw data in order to transform it into a monetizable commodity, just as an oil company acquires crude oil to transform it into gasoline. Indeed, Facebook offers the pixel free of charge[35] and the price that Defendant pays for the pixel is the data that it allows Facebook to collect.

130.    Conservative estimates suggest that in 2018, Internet companies earned $202 per American user from mining and selling data. That figure is expected to keep increasing; estimates for 2022 are as high as $434 per user, for a total of more than $200 billion industry wide.

131.    An active and robust legitimate marketplace for Private Information taken from Plaintiffs and Class Members exists. In 2021, the data brokering industry was worth roughly $200 billion.[36] In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[37,38] Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50.00 a year.[39] Users of the personal data collection app Streamlytics can earn up to $200 a month by selling their personal information to marketing companies who use it to build consumer demographics profiles.[40]

132.    Moreover, health information has value to consumers. According to the annual Financial Trust Index Survey, conducted by the University of Chicago's Booth School of Business and Northwestern University's Kellogg School of Management, which interviewed more than 1,000

[34]  https://www.wired.com/insights/2014/07/data-new-oil-digital-economy/ (last visited April 25, 2023).

[35] https://seodigitalgroup.com/facebook-pixel/ (last visited April 25, 2023).

[36] https://www.latimes.com/business/story/2019-11-05/column-data-brokers

[37] https://datacoup.com/

[38] https://digi.me/what-is-digime/

[39] Nielsen Computer & Mobile Panel, *Frequently Asked Questions, available at* https://computermobilepanel.nielsen.com/ui/US/en/faqen.html

[40] How To Sell Your Own Data And Why You May Want to, available at https://www.mic.com/impact/selling-personal-data-streamlytics (last accessed August 7, 2023)

Americans, 93 percent would not share their health data with a digital platform for free. Half of the survey respondents would only share their data for $100,000 or more, and 22 percent would only share their data if they received between $1,000 and $100,000.[41]

133.    In 2015, *TechCrunch* reported that "to obtain a list containing the names of individuals suffering from a particular disease," a market participant would have to spend about "$0.30 per name."[42] That same report noted that "Data has become a strategic asset that allows companies to acquire or maintain a competitive edge" and that the value of a single user's data (within the corporate acquisition context) can vary from $15 to more than $40 per user.[43]

134.    Similarly, CNBC published an article in 2019 in which it observed that "[d]e-identified patient data has become its own small economy: There's a whole market of brokers who compile the data from providers and other health-care organizations and sell it to buyers."[44]

135.    Given the existence of a market for the Private Information, in which Plaintiffs and Class Members have a privacy and property interest, disclosed by Defendant, Defendant has deprived Plaintiffs and Class Members of the economic value of their Medical Information by disclosing such data without authorization and without providing proper consideration for Plaintiffs' and other Class Members' property.

## TOLLING, CONCEALMENT, AND ESTOPPEL

136.    The applicable statutes of limitation have been tolled as a result of Defendant's knowing and active concealment and denial of the facts alleged herein.

137.    Defendant had exclusive knowledge of these material facts yet failed to disclose to Plaintiffs and Class Members that by interacting with the BetterHelp Sites their sensitive Private Information, including medical information, would be intercepted, collected, used, and stored by

---

[41] Andrea Park, *How much should health data cost? $100K or more, according to patients*, Becker's Hosp. Rev. (Feb. 12, 2020), https://www.beckershospitalreview.com/healthcare-information-technology/how-much-should-health-data-cost-100k-or-more-according-to-patients.html.

[42] Pauline Glickman and Nicholas Glady, *What's the Value of Your Data?*, TECHCRUNCH (Oct. 13, 2015), https://techcrunch.com/2015/10/13/whats-the-value-of-your-data/.

[43] *Id.*

[44] *See* https://www.cnbc.com/2019/12/18/hospital-execs-say-theyre-flooded-with-requests-for-your-health-data.html (last visited August 16, 2023).

CONSOLIDATED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

unauthorized third parties.

138.     Plaintiffs and Class Members could not with due diligence have discovered the full scope of Defendant's conduct, including because there were no disclosures or other indication that BetterHelp was sharing such data and, in fact, BetterHelp kept them from discovering this information by falsely claiming that their information would be kept confidential.

139.     The earliest that Plaintiffs and Class Members, acting with due diligence, could have reasonably discovered this conduct would have been on March 2, 2023, when the FTC announced its settlement with BetterHelp and the news was widely reported in the media.

140.     All applicable statutes of limitation also have been tolled by operation of the discovery rule. Under the circumstances, Defendant was under a duty to disclose the nature and significance of their data collection practices but did not do so. Defendant is therefore estopped from relying on any potentially applicable statute of limitations.

## CLASS ACTION ALLEGATIONS

141.     Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23 individually and on behalf of the following Class:

> All natural persons residing in the United States who used one of Defendant's websites or apps to sign up for or use Defendant's Service and whose Private Information was disclosed to or intercepted by any unauthorized third party.

142.     Plaintiffs T.R., Jane Doe II, Jane Doe III, and R.S. (California Plaintiffs) bring this action pursuant to Federal Rule of Civil Procedure 23 individually and on behalf of the following California Subclass:

> All natural persons residing in California who used one of Defendant's websites or apps to sign up for or use Defendant's Service and whose Private Information was disclosed to or intercepted by any unauthorized third party.

143.     Excluded from the Class and Subclass are: (1) any Judge or Magistrate presiding over this action and any members of their immediate families; (2) the Defendant, Defendant's subsidiaries, affiliates, parents, successors, predecessors, and any entity in which the Defendant or its parents have a controlling interest and its current or former employees, officers, and directors; and (3) Plaintiffs' counsel and Defendant's counsel.

144.    Numerosity: The exact number of members of the Class and Subclasses are unknown and unavailable to Plaintiffs at this time but is estimated to number in the millions and individual joinder in this case is impracticable. The members of the Class and Subclasses can be identified through BetterHelp's records.

145.    Predominant Common Questions: The Class's and Subclass's' claims present common questions of law and fact, and those questions predominate over any questions that may affect individual Class Members. Common questions for the Class and Subclass include, but are not limited to, the following:

- Whether Defendant implemented and maintained reasonable security practices and procedures appropriate to protect Plaintiffs' and Class Members' Private Information from unauthorized access, or disclosure;

- Whether Defendant and its employees, agents, officers, or directors negligently or unlawfully disclosed or permitted the unauthorized disclosure of Plaintiffs' and Class Members' Private Information to unauthorized persons;

- Whether Defendant negligently created, maintained, preserved, stored, abandoned, or disposed of Plaintiffs' and Class Members' Private Information, and failed to protect and preserve the integrity of the Private Information found on BetterHelp's systems;

- Whether Defendant's actions or inactions were a proximate result of the negligent or reckless release of confidential information or records concerning Plaintiffs and the Class;

- Whether Defendant adequately, promptly, timely, and accurately informed Plaintiffs and the Class Members that their Private Information had been compromised and whether Defendant violated the law by failing to promptly and fully notify Plaintiffs and the Class Members of this material fact;

- Whether Defendant engaged in "unfair" business practices by failing to safeguard the Private Information of Plaintiffs and Class Members;

- Whether Defendant violated the state and federal laws cited herein; and

- Whether Plaintiffs and the Class are entitled to damages, equitable and injunctive relief to redress the imminent and currently ongoing harm faced as a result of the unauthorized disclosure and Defendant's failure to provide full and adequate notice thereof, and the scope of such relief.

146. **Typicality:** Plaintiffs' claims are typical of the claims of the other members of the Class and the Subclass, respectively. The claims of Plaintiffs and the members of the Class and Subclass arise from the same conduct by Defendant and are based on the same legal theories.

147. **Adequate Representation:** Plaintiffs have, and will continue to, fairly and adequately represent and protect the interests of the Class and Subclass. Plaintiffs have retained counsel competent and experienced in complex litigation and class actions, including litigations to remedy privacy violations. Plaintiffs have no interest that is materially antagonistic to the interests of the Class, and Defendant has no defenses unique to any Plaintiffs. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the members of the Class and Subclass, and they have the resources to do so. Neither Plaintiffs nor their counsel have any interest materially adverse to the interests of the other members of the Class and Subclass.

148. **Substantial Benefits:** This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Class and Subclass is impracticable. This proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Class treatment will create economies of time, effort, and expense and promote uniform decision-making.

149. Plaintiffs reserve the right to revise the class allegations and definitions based on facts learned and legal developments following additional investigation, discovery, or otherwise.

## CALIFORNIA LAW APPLIES TO THE ENTIRE CLASS

150. California substantive laws apply to every member of the Class. California's substantive laws may be constitutionally applied to the claims of Plaintiffs and the Classes under the Due Process Clause, 14th Amend. § 1, and the Full Faith and Credit Clause, Art. IV. § 1 of the U.S.

Constitution. California has significant contact, or significant aggregation of contacts, to the claims asserted by Plaintiffs and Class Members, thereby creating state interests to ensure that the choice of California state law is not arbitrary or unfair.

151.     BetterHelp's principal place of business is located in and it conducts substantial business in California such that California has an interest in regulating BetterHelp's conduct under its laws. BetterHelp's decision to reside in California and avail itself of California's laws, renders the application of California law to the claims herein constitutionally permissible. The conduct at issue also originated in and emanated from California as that is where the decisions to include the tracking processes and the representations at issue were made and likely effectuated, and where the illegal data transfers took place. BetterHelp aided and allowed third parties such as Facebook and the other third parties identified herein to receive and intercept this data while it was in transit or was being sent from or received within California through servers maintained by either BetterHelp or third parties such as Facebook and the other third parties identified herein in this State.

152.     The application of California laws to the Class is also appropriate under California's choice of law rules because California has significant contacts to the claims of Plaintiffs and the proposed Class, and California has a greater interest in applying its laws here than any other interested state.

### COUNT I
### Negligence and Negligence *per se*
**(On Behalf of Plaintiffs and the Nationwide Class)**

153.     Plaintiffs incorporate the foregoing allegations by reference as if fully set forth herein to the extent relevant to this Count and the relief available thereunder.

154.     Defendant knowingly collected, came into possession of, and maintained Plaintiffs' and Class Members' Private Information, and had a duty to exercise reasonable care in safeguarding, securing, and protecting such information from being compromised, misused, and disclosed to unauthorized parties.

155.     As a provider of health care and mental health services, Defendant had a special relationship with Plaintiffs and Class Members who entrusted Defendant with adequately protecting their Private Information.

156.    Defendant knew that the Private Information was private and confidential and should be protected as private and confidential, and thus, Defendant owed a duty of care not to subject Plaintiffs' and Class Members' Private Information to an unreasonable risk of unauthorized disclosure.

157.    Defendant knew, or should have known, of the risks inherent in collecting and storing Private Information, and the importance of not permitting unauthorized access to such sensitive information.

158.    Defendant's failure to take proper measures to protect Plaintiffs' and Class Members' Private Information and failure to adequately train and oversee its employees caused the unauthorized disclosure of Plaintiffs' and Class Members 'Private Information to unauthorized third parties. As described above, Plaintiffs and Class Members are part of a foreseeable, discernable group that was at high risk if their Private Information were compromised or otherwise wrongly disclosed if not adequately protected by Defendant.

159.    Defendant had a duty under common law to have procedures in place to detect and prevent the unauthorized dissemination of Plaintiffs' and Class Members' Private Information.

160.    Defendant had a duty to employ reasonable security measures, systems, processes, and otherwise protect the Private Information of Plaintiffs and Class Members pursuant to the state and federal laws set forth above, resulting in Defendant's liability under principles of negligence and negligence per se.

161.    Defendant owed a duty to timely and adequately inform Plaintiffs and Class Members that their Private Information had been improperly disclosed to unauthorized third parties.

162.    Defendant systematically failed to provide adequate security for data in its possession or over which it had exclusive supervision and control.

163.    Defendant, through its actions and omissions, unlawfully breached its duties to Plaintiffs and Class Members by failing to exercise reasonable care in protecting and safeguarding Plaintiffs' and Class Members' Private Information within Defendant's possession, supervision, and control.

164.    Defendant, through its actions and omissions, unlawfully breached duties owed to

Plaintiffs and Class Members by failing to have appropriate procedures in place to prevent dissemination of Plaintiffs' and Class Members' Private Information.

165.     Defendant, through its actions and omissions, unlawfully breached duties to timely and fully disclose to Plaintiffs and Class Members that the Private Information within Defendant's possession, supervision, and control was compromised, the nature of the compromise, and precisely the type of information compromised by being accessed by unauthorized third parties.

166.     Defendant's breach of duties owed to Plaintiffs and Class Members proximately caused Plaintiffs' and Class Members' Private Information to be compromised and the harm complained of herein.

167.     Pursuant to the laws set forth herein, including Cal. Civ. Code s§ 56.10(a), 56.101, 1798.21, 1798.29 and Article I, § 1 of the California Constitution, the FTC Act, HIPAA, the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C and the other sections identified above, Defendant was required by law to maintain adequate and reasonable data and cybersecurity measures to maintain the security and privacy of Plaintiffs' and Class Members' Private Information.

168.     Plaintiffs and Class Members are within the class of persons that these statutes and rules were designed to protect.

169.     It was reasonably foreseeable to Defendant (and it was actually intended by Defendant) that the failure to reasonably protect and secure Plaintiffs' and Class Members' Private Information in compliance with applicable laws would result in unauthorized third-parties gaining access to Plaintiffs' and Class Members' Private Information resulting in Defendant's liability under principles of negligence per se.

170.     Plaintiffs' and Class Members' Private Information constitutes personal property that was taken and misused as a proximate result of Defendant's negligence, resulting in harm, injury and damages to Plaintiffs and Class Members. As a proximate result of Defendant's negligence and breach of duties as set forth above, Defendant's breaches of duty caused Plaintiffs and Class

Members to suffer by: a) receiving unwanted advertisements that reveal they sought or are seeking treatment for specific medical conditions; b) experiencing feelings of fear, anxiety and worry about the status of their Private Information; and c) the diminution in the value of their personal data for which there is a tangible value and loss of control over their Private Information, all of which can constitute actionable actual damages.

171.    In failing to secure Plaintiffs' and Class Members' Private Information, Defendant is guilty of oppression, fraud, or malice. Defendant's action, or failure to act, constituted a reckless, willful, or conscious disregard of Plaintiffs' and Class Members' rights. Plaintiffs, in addition to seeking actual damages, also seeks punitive damages on behalf of themselves and the Class.

172.    Defendants' conduct in violation of applicable laws directly and proximately caused the unauthorized access to and disclosure of Plaintiffs' and Class Members' Private Information and Plaintiffs and Class Members have suffered and will continue to suffer damages as a result of Defendant's conduct. Plaintiffs and Class Members seek actual, compensatory, and punitive damages, and all other relief they may be entitled to as a proximate result of Defendant's negligence and negligence per se.

173.    Plaintiffs, on behalf of themselves and the Class, seek relief as further described below.

**COUNT II**
**Invasion of Privacy**
**(On Behalf of Plaintiffs and the Nationwide Class)**

174.    Plaintiffs incorporate the foregoing allegations by reference as if fully set forth herein to the extent relevant to this Count and the relief available thereunder.

175.    Defendant's secret disclosure of Plaintiffs' and other Class Members' Private Information, including each Class Member's email address, IP address, Facebook User ID, and other individually identifying information, and information about their medical history, mental and physical condition, and treatment (including that they were seeking or receiving mental health treatment), constitutes an intentional intrusion upon Plaintiffs' and Class Members' private matters that were intended to stay private from third parties.

176.    Plaintiffs and Class Members had a reasonable expectation of privacy in their Private

1  Information. Plaintiffs and Class Members did not consent to, authorize, or have any reason to know

2  about Defendant's intrusion into their privacy at the time it occurred.

3       177.    Defendant's intrusion into Plaintiffs' and Class Members' private affairs, seclusion,

4  and solitude, would be highly offensive to a reasonable person.

5       178.    Plaintiffs and Class Members expected that the Private Information, including PHI,

6  they shared with a provider of mental healthcare (particularly one who promised that it would keep

7  this information confidential and indicated it was HIPAA compliant on its website) would not be

8  disclosed to an unauthorized third party. Social norms and industry standards inform the

9  understanding that Private Information, including PHI, is highly protected and that disclosure of that

10  information to third parties requires consent and authorization. The secret disclosure of Private

11  Information would be highly offensive to a reasonable person and was highly offensive to Plaintiffs.

12       179.    Plaintiffs and Class Members have been harmed as a result of Defendant's actions,

13  including by, but not limited to, an invasion of their privacy rights.

14       180.    Plaintiffs and Class Members seek appropriate relief for their injuries, including, but

15  not limited to, monetary damages to compensate for the harm to their privacy interests and

16  disgorgement of profits made by Defendant as a result of its intrusions into Plaintiffs' and Class

17  Members' private matters.

18       181.    Plaintiffs and Class Members are also entitled to punitive damages resulting from the

19  malicious, willful, and intentional nature of Defendant's actions which were directed at invading

20  Plaintiffs' and Class Members' privacy rights in conscious disregard of those rights. Such damages

21  are necessary to deter Defendant from engaging in such conduct in the future.

22       182.    This action, if successful, will enforce an important right affecting the public interest

23  and would confer a significant benefit on a large class of persons and/or the general public. Private

24  enforcement is necessary and places a disproportionate financial burden on Plaintiffs in relation to

25  Plaintiffs' stake in the matter. Because this case is brought for the purposes of enforcing important

26  rights affecting the public interest, Plaintiffs also seek the recovery of attorneys' fees and costs in

27  prosecuting this action against Defendant under Code of Civil Procedure § 1021.5 and other

28  applicable law.

183.     Plaintiffs, on behalf of themselves and the Class, request relief as further described below.

**COUNT III**
**Breach of Contract**
**(On Behalf of Plaintiffs and the Nationwide Class)**

184.     Plaintiffs incorporate the foregoing allegations by reference as if fully set forth herein to the extent relevant to this Count and the relief available thereunder.

185.     In its Privacy Policy, as described above, Defendant set out specific limited purposes for which it would use or disclose Plaintiffs' and Class Members' Private Information.

186.     As discussed in this Complaint, Defendants made specific representations that it would, in fact, keep Plaintiffs' and Class Members' Private Information Confidential and comply with HIPAA. Plaintiffs and Class Members read, understood, and relied on these promises when deciding whether to communicate their Private Information to, or transact with, Defendant. These representations and promises formed the basis of Plaintiffs' and Class Members' contracts with Defendant.

187.     At least prior to September 2020, Defendant's disclosure of Plaintiffs' and Class Members' Private Information to Meta and/or other unauthorized third parties for Defendant's advertising purposes did not fall within any required or permissible uses or disclosures that Defendant set out in its Privacy Policy.

188.     Moreover, at no time has Defendant's disclosure of Plaintiffs' and Class Members' Private Information to Meta and/or other unauthorized third parties, under which Meta and/or other unauthorized third parties were able to use that Private Information for their own purposes, fallen within any required or permissible uses or disclosures that Defendant set out in its Privacy Policy.

189.     Plaintiffs and other Class Members did not provide any written authorization or express consent for Defendant to disclose their Private Information to Meta or other third parties, to use their Private Information for Defendant's own marketing purposes, or to permit third parties to use Plaintiffs' and Class Members' Private Information for those third parties' own purposes.

190.     At least prior to June 2021, Defendant's use of web beacons (including pixels) and cookies to disclose or permit the interception of Private Information by third parties, including Meta,

44
CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

for advertising purposes or for the third parties' own purposes, did not fall within the limited purposes of web beacons and cookies set out in Defendant's privacy policies.

191.   Plaintiffs and other Class Members accepted Defendant's promises to protect their Private Information in accordance with Defendant's Privacy Policy, and not to disclose their Private Information to third parties without authorization, when they used Defendant's Sites to sign up for the Service.

192.   Plaintiffs and Class Members fully performed their obligations under their contracts with Defendant, including entering their Private Information into Defendant's website and using Defendant's Sites to sign up for the Service.

193.   Defendant did not perform consistent with its obligations under the contract. Defendant secretly disclosed Plaintiffs' and Class Members' Private Information to Meta and other third parties in violation of Defendant's agreement with Plaintiffs and Class Members.

194.   As a direct and proximate result of Defendant's breaches of its contracts, Plaintiffs and Class Members sustained damages as alleged herein. Plaintiffs and Class Members would not have used Defendant's Sites to sign up for the Service or would not have entered their Private Information into Defendant's Sites had they known their Private Information would be disclosed.

195.   Plaintiffs and Class Members are entitled to compensatory and consequential damages as a result of Defendant's breach of contract.

196.   Plaintiffs, on behalf of themselves and the Class, seek relief as further described below.

## COUNT IV
### Breach of Implied Contract
### (On Behalf of Plaintiffs and the Nationwide Class)

197.   Plaintiffs incorporate the foregoing allegations by reference as if fully set forth herein to the extent relevant to this Count and the relief available thereunder.

198.   This Count is brought in the alternative to the breach of contract Count above.

199.   When Plaintiffs and Class Members used Defendant's Sites to sign up for Defendant's Service and entered their Private Information in order to obtain the Service, they entered implied contracts pursuant to which Defendant agreed to safeguard and not disclose their Private

Information without authorization or consent.

200.    Plaintiffs and Class Members accepted Defendant's offers and provided their Private Information to Defendant.

201.    Plaintiffs and Class Members would not have entrusted Defendant with their Private Information in the absence of an implied contract between them and Defendant obligating Defendant not to disclose this information without consent.

202.    Defendant breached these implied contracts by disclosing Plaintiffs' and Class Members' Private Information to Meta and other unauthorized third parties.

203.    As a direct and proximate result of Defendant's breaches of these implied contracts, Plaintiffs and Class Members sustained damages as alleged herein. Plaintiffs and Class Members would not have used Defendant's Sites to obtain the Service or would not have entered their Private Information into Defendant's Sites had they known their Private Information would be disclosed.

204.    Plaintiffs and Class Members are entitled to compensatory and consequential damages as a result of Defendant's breach of implied contract.

205.    Plaintiffs, on behalf of themselves and the Class, seek relief as further described below.

**COUNT V**
**Breach of Confidence**
**(On Behalf of Plaintiffs and the Nationwide Class)**

206.    Plaintiffs incorporate the foregoing allegations by reference as if fully set forth herein to the extent relevant to this Count and the relief available thereunder.

207.    At all times during Plaintiffs' and Class Members' interactions with Defendant, Defendant was required to be aware of the confidential and sensitive nature of Plaintiffs' and the Class Members' Private Information that Plaintiffs and Class Members provided to Defendant.

208.    As alleged herein, Defendant's relationship with Plaintiffs and Class Members was governed by the reasonable expectations that Plaintiffs' and the Class Members' Private Information would be collected, stored, and protected in confidence, and would not be disclosed to unauthorized third parties.

209.    Plaintiffs and Class Members provided their Private Information with the explicit and

implicit understandings that it would be protected and that such Private Information would not be disseminated to any unauthorized third parties, and that the persons who had access to such data would take precautions to protect that Private Information from unauthorized disclosure. These explicit or implicit understandings and relationships are evidenced by the numerous representations set forth above that imposed on Defendant a contractional obligation to ensure such Private Information was protected from unauthorized access.

210.    Defendant voluntarily received in confidence Plaintiffs' and Class Members' Private Information with the understanding that such information would not be disclosed or disseminated to the public or any unauthorized third parties.

211.    As a proximate result of Defendant's failure to prevent and protect this unauthorized disclosure, Plaintiffs' and Class Members' Private Information was disclosed and misappropriated to unauthorized third parties beyond Plaintiffs' and the Class Members' confidence, and without their express permission.

212.    As a direct and proximate result of Defendant's breaches of its duties, Plaintiffs and Class Members have suffered and will suffer injury, including, but not limited to: following: (i) suffering the loss of the benefit of their bargain; (ii) the loss of the opportunity how their Private Information is used; (iii) the compromise, publication, and theft of their Private Information; and (iv) time and expenses associated with the prevention, detection, and recovery to redress the and unauthorized use of their Private Information.

213.    But for Defendant's disclosure of Plaintiffs' and the Class Members' Private Information in violation of the parties' understanding and reasonable expectation of confidence, their Private Information would not have been compromised, stolen, viewed, accessed, and used by unauthorized third parties. Such actions and inactions were the direct, proximate, and legal cause of the exfiltration of Plaintiffs' and Class Members' Private Information as well as the resulting damages.

214.    The injury and harm Plaintiffs and Class Members suffered was the reasonably foreseeable result of Defendant's conduct, which permitted the unauthorized disclosure of Plaintiffs' and Class Members' Private Information. Defendant either knew, or should have known, that its

methods of accepting and sharing Plaintiffs' and the Class Members' Private Information was inadequate as it relates to the responsibility of BetterHelp to safeguard Plaintiffs' and the Class Members' Private Information.

215.    In failing to secure Plaintiffs' and Class Members' Private Information and promptly and fully notifying them of the facts surrounding this data breach and its failure to have in place systems that would protect such data from being compromised, Defendant is guilty of oppression, fraud, and malice. Defendant acted or failed to act with a reckless, willful, or conscious disregard of Plaintiffs' and Class Members' rights. Plaintiffs, in addition to seeking actual damages, also seek punitive damages on behalf of themselves and the Class.

216.    Plaintiffs, on behalf of themselves and the Class, seek relief as further described below.

### COUNT VI
### Unjust Enrichment
### (On Behalf of Plaintiffs and the Nationwide Class)

217.    Plaintiffs incorporate the foregoing allegations by reference as if fully set forth herein to the extent relevant to this Count and the relief available thereunder.

218.    This Count is pleaded in the alternative to all other Counts herein.

219.    Defendant benefited from receiving Plaintiffs' and Class Members' Private Information by its ability to retain and use that information for its own benefit. Defendant understood the receipt of such monetary benefits including by being able to improve its customer retention rates, analyze its marketing efforts and target new subscribers and ultimately increase its revenue.

220.    Defendant should not be allowed to retain such benefits and excess profits because Defendant obtained money or property as a result of the use and installation of this surreptitious tracking code from third parties and through other disclosures of Private Information.

221.    Defendant also understood and appreciated that Plaintiffs' and Class Members' Private Information was private and confidential, and its value depended upon Defendant maintaining the privacy and confidentiality of that information.

222.    Defendant failed to expend the resources necessary to provide reasonable security, safeguards, and protections to the Private Information of Plaintiffs and Class Members.

223.    Under the principles of equity and good conscience, Defendant should not be permitted to retain money that has been unjustly obtained and retained as a result of the use of this surreptitious tracking tools incorporated on its Sties.

224.    Defendant wrongfully accepted and retained these benefits to the detriment of Plaintiffs and Class Members.

225.    Defendant's enrichment at the expense of Plaintiffs and Class Members is and was unjust.

226.    Plaintiffs and Class Members have no adequate remedy at law.

227.    As a result of Defendant's wrongful conduct, as alleged above, Plaintiffs and Class Members are entitled to restitution and disgorgement of all profits, benefits, and other compensation obtained or retained by Defendant, plus interest thereon at the legal rate.

228.    Plaintiffs, on behalf of themselves and the Class, seek relief as further described below.

## COUNT VII
**Violation of the Electronic Communications Privacy Act (ECPA)**
**(On Behalf of Plaintiffs and the Nationwide Class)**

229.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein to the extent relevant to this Count and the relief available thereunder.

230.    The ECPA, 18 U.S.C. §§ 2510 *et seq*., makes it unlawful for a "person" to "intentionally intercept[], endeavor[] to intercept, or procure[] any other person to intercept or endeavor to intercept, any wire, oral, or electronic communications." 18 U.S.C. § 2511(1).

231.    "Intercept" is defined as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

232.    "Contents" is defined as "includ[ing] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8).

233.    "Person" is defined as "any employee, or agent of the United States or any State or political subdivision thereof, and any individual, partnership, association, joint stock company, trust, or corporation." 18 U.S.C. § 2510(6).

234.     "Electronic communication" is defined as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce . . . ." 18 U.S.C. § 2510(12).

235.     Plaintiffs' and Class Members' communications with BetterHelp through its Sites during which Plaintiffs and Class Members communicated Private Information with BetterHelp were electronic communications within the meaning of the ECPA.

236.     BetterHelp, Meta, Criteo, Pinterest, and Snapchat are persons within the meaning of the ECPA as they are corporations.

237.     The Meta Pixel and other web beacons and tracking tools used by the other unauthorized third parties identified herein, are each a "device or apparatus" that is "used to intercept a wire, oral, or electronic communication." 18 U.S.C. 2510(4).

238.     By incorporating the Meta Pixel and other tracking tools into its Sites and permitting them to intercept Plaintiffs' and Class Members' Private Information, Defendant intercepted or endeavored to intercept Plaintiffs' and Class Members' electronic communications and/or procured Meta and the other unauthorized third parties identified herein to intercept or endeavor to intercept Plaintiffs' and Class Members' electronic communications, in violation of the ECPA.

239.     18 U.S.C. § 2511(2)(d) provides a "party exception" to 18 U.S.C. § 2511(1) that does not apply in this case. Section 2511(1) provides: "It shall not be unlawful under this chapter [18 USCS §§ 2510 et seq.] for a person not acting under color of law to intercept a wire, oral, or electronic communication where such person is a party to the communication or where one of the parties to the communication has given prior consent to such interception *unless such communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State*." (emphasis added).

240.     Neither Plaintiffs nor the Class Members consented to Defendant's interception of, or to Defendant's procuring Meta and the other unauthorized third parties identified herein to intercept, their electronic communications with Defendant through Defendant's Sites.

241.    Defendant does not meet the requirements of the "party exception" to the ECPA because the electronic communications intercepted by Defendant, or which Defendant procured Meta and the other unauthorized third parties identified herein to intercept, were intercepted as part of Defendant's practice of divulging Private Information, including medical information, to an unauthorized third party in violation of numerous federal and state laws.

242.    As detailed in this Complaint, Defendant violated the CMIA and the California Constitution, and committed a tortious invasion of privacy, when it disclosed Plaintiffs' and Class Members' Private Information to Meta and the other unauthorized third parties identified herein through the Meta Pixel and other tracking tools. As detailed below, by those same acts, Defendant violated the California UCL.

243.    Also as detailed herein, Defendant violated the federal HIPAA Privacy Rule which regulates the use and disclosure of "protected health information" by "covered entities."

244.    Defendant is a "covered entity" within the meaning of 45 C.F.R. § 160.103.

245.    "Disclosure" within the meaning of the HIPAA Privacy Rule is defined as "the release, transfer, provision of access to, or divulging in any manner of information outside the entity holding the information." 45 C.F.R. § 160.103.

246.    The medical information provided by Plaintiffs and Class Members to BetterHelp when they signed up for and/or used Defendant's Service, as described above, is protected health information within the meaning of the HIPAA Privacy Rule. 45 C.F.R. § 160.103.

247.    As described above, Defendant disclosed Plaintiffs' and Class Members' protected health information to Meta and the other unauthorized third parties identified herein through the Meta Pixel and other tracking tools incorporated into Defendant's Sites. This disclosure was neither permitted nor required within the meaning of 45 C.F.R. § 164.502(a).

248.    Thus, Defendant committed a tortious act in violation of the federal HIPAA Privacy Rule when it disclosed Plaintiffs' and Class Members' private health information to Meta and the other unauthorized third parties identified herein.

249.    Moreover, pursuant to 42 U.S.C. § 1320d-6, it is a crime for a "person," such as Defendant, to knowingly disclose "individually identifiable health information" to a third party for

"commercial reasons. Thus, Defendant committed criminal acts when it knowingly disclosed Plaintiffs' and Class Members' private health information to Meta and the other unauthorized third parties identified herein.

250. Moreover, as detailed below, Defendant has repeatedly violated the Comprehensive Computer Data Access and Fraud Act, Penal Code § 502. Defendant's violations of this Act constitute crimes punishable by fines and/or imprisonment. Cal. Penal Code § 502(d)(3), (4).

251. Accordingly, Defendant violated the ECPA each time the Meta Pixel and other tracking tools on Defendant's Sites intercepted Plaintiffs' and Class Members' electronic communications through those Sites.

252. Pursuant to 18 U.S.C. § 2520, Plaintiffs and Class Members have been damaged by the interception and disclosure of their electronic communications in violation of the ECPA and are entitled to: (1) appropriate equitable or declaratory relief; (2) damages, in an amount to be determined at trial, assessed as the greater of (a) the sum of the actual damages suffered by Plaintiffs and the Class and any profits made by Defendant as a result of its violations, or (b) statutory damages of whichever is the greater of $100 per day per violation or $10,000; and (3) reasonable attorneys' fees and other litigation costs reasonably incurred.

253. Plaintiffs, on behalf of themselves and the Class, seek relief as further described below.

**COUNT VIII**
**Violation of the California Invasion of Privacy Act**
**(On Behalf of Plaintiffs and the Nationwide Class)**

254. Plaintiffs incorporate the foregoing allegations as if fully set forth herein to the extent relevant to this Count and the relief available thereunder.

255. The California Invasion of Privacy Act begins with its statement of purpose:

> The legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society. The Legislature by this chapter intends to protect the right of privacy of the people of this state.

Cal. Penal Code § 630.

256.     California Penal Code 631(a) provides a remedy against, inter alia: Any person who … intentionally taps, or makes any unauthorized connection, whether physically, electrically, …, or otherwise, with any telegraph or telephone wire, line, cable, or instrument … or who willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate  in any way, any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

257.     Defendant is a "person" within the meaning of Cal. Penal Code § 631.

258.     Plaintiffs' and Class Members' communications of Private Information with Defendant on and through Defendant's platform were intended to be confined to the parties. Plaintiffs and Class Members were using what they understood to be Defendant's secure platform and no indication was given that their Private Information would be shared with or viewed by any unauthorized third party. The circumstances reasonably indicate that Plaintiffs and Class Members desired their communications with Defendant to be confined to the parties thereto.

259.     Despite not having any authorization from Plaintiffs or Class Members, Defendant aided, agreed with, or conspired with Facebook and other third parties, to permit those third parties to intercept these communications and to learn the content of those communications while in transit or in the process of being sent or received.

260.      Defendant allowed Facebook and other to "intentionally tap … or make [an] unauthorized connection" with respect to Class Members' communications by placing third party tracking code on its website, without "the consent of all parties" including Plaintiffs and Class Members, and thereby violated CIPA.

261.     Defendant "aid[ed], agree[d] with, employ[d], or conspire[d] with" various third parties including providing marketing services by allowing such entities to "tap" communications on its website without "the consent of all parties" including Plaintiffs, and thereby violated CIPA.

262.    By allowing third parties to duplicate and divert its user's GET Requests to Facebook's and other's servers, Defendant facilitated the interception and simultaneous transmission to Facebook and other third party advertisers of Plaintiffs 'and other Class Members' Private Information while the information was "in transit" without their informed authorization or consent

263.    The information communicated between users and BetterHelp was transmitted to or from the State of California. The information was wiretapped "while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state."

264.    BetterHelp enabled non-parties to the communications to "read" the communications for the purposes of the statute. For example, Facebook and other third parties could see the information that Plaintiffs and Class Members communicated to BetterHelp via the Intake Questionnaire and elsewhere on the platform and subsequently used that information to build consumer profiles and target individuals, including Plaintiffs and Class Members, with advertisements tailored to mental health care or treatment.

265.    BetterHelp facilitated this communication "without authorization" of Class Members because it did not give Class Members any hint that the transmission was happening.

266.    Class Members did not request that Defendant and third parties target them with advertising that might be related to their health conditions and reasonably expected that their communications with BetterHelp were solely between themselves and BetterHelp and would remain confidential.

267.    Plaintiffs and Class Members have also suffered irreparable injury from these unauthorized acts of disclosure. Their personal, private, and sensitive Medical Information has been collected, viewed, accessed, stored, and used by Meta and other third parties, and has not been destroyed. Due to the continuing threat of such injury, Plaintiffs and Class Members have no adequate remedy at law and are entitled to injunctive relief. Plaintiffs and Class Members seek a permanent injunction under Penal Code § 637.2 enjoining Defendant from engaging in further conduct in violation of Cal. Penal Code § 630, et seq.

268.    Cal. Penal Code § 637.2(a) provides that any person who has been injured by a

violation of this chapter [including Penal Code §§ 630 and 631] may bring an action against the person who committed the violation for the greater of five thousand dollars ($5,000) per violation or three times the amount of actual damages, if any, sustained by the plaintiff.

269.    Cal. Penal Code § 637.2(b) provides that "[a]ny person may . . . bring an action to enjoin and restrain any violation of this chapter, and may in the same action seek damages as provided by subdivision (a)." Cal. Penal Code § 637.2(c) further provides, "It is not a necessary prerequisite to an action pursuant to this section that the plaintiff has suffered, or be threatened with, actual damages."

270.    Defendant is therefore liable to Plaintiffs and the Class for, at a minimum, statutory damages of $5,000 per violation and Plaintiffs and Class Members are also entitled to injunctive relief.

271.    Plaintiffs, on behalf of themselves and the Class, seek relief as further described below.

## COUNT IX
### Violation of the False Advertising Law
### (On Behalf of Plaintiffs and the Nationwide Class)

272.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein to the extent relevant to this Count and the relief available thereunder.

273.    The conduct described herein took place within the state of California and constitutes deceptive or false advertising in violation of Business and Professions Code, section 17500, et seq.

274.    Business and Professions Code, section 17500, et seq. prohibits deceptive or misleading practices in connection with advertising or representations made for the purpose of inducing, or which are likely to induce, consumers to purchase products or services.

275.    It is also unlawful under the FAL to disseminate statements concerning property or services that are "untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." Id.

276.    Defendant violated the FAL when it marketed, advertised, and promoted the privacy and integrity of its platform and induced Plaintiffs and Class Members to rely on those representations to their detriment. Defendant's promise to maintain the confidentiality of Plaintiffs'

and Class Members' Private Information was material in their decision to purchase Defendant's Service and in deciding how much to pay for it.

277.    At the time of their misrepresentations and omissions, Defendant was either aware that it disclosed Private Information contrary to its representations and that the confidentiality of Private Information was not being maintained or it was aware that it lacked the information and knowledge required to truthfully make this representation.

278.    Plaintiffs and Class Members reasonably reviewed and relied on Defendant's statements throughout the Intake Questionnaire and elsewhere concerning Defendant's promises to keep their information private and those statements were material to their decision to pay for Defendant's Service.

279.    As a direct and proximate result of Defendant's actions, as set forth herein, Defendant has received ill-gotten gains and profits.

280.    As a result, Plaintiffs and Class Members and the general public are entitled to injunctive and equitable relief, restitution, and an order for the disgorgement of the funds by which Defendant was unjustly enriched.

281.    Pursuant to Business & Professions Code, section 17535, Plaintiffs, on behalf of themselves and the Class, seek an order enjoining Defendants from continuing to engage in deceptive business practices, false advertising, and any other act prohibited by law, including those set forth in this Complaint.

282.    Plaintiffs, on behalf of themselves and the Class, seek relief as further described below.

## COUNT X
### Violation of the Consumers Legal Remedies Act
### (On Behalf of Plaintiffs and the Nationwide Class)

283.    Plaintiffs incorporate the foregoing allegations by reference as if fully set forth herein to the extent relevant to this Count and the relief available thereunder.

284.    The conduct described herein took place in the state of California and constitutes unfair methods of competition or deceptive acts or practices in violation of the Consumers Legal Remedies Act ("CLRA"), Civil Code, section 1750, et seq.

285.     The CLRA applies to all claims of Plaintiffs and all members of the Nationwide Class because the conduct which constitutes violations of the CLRA by Defendant occurred within and emanated from the state of California.

286.     Plaintiffs and Class Members are "consumers" as defined by Civil Code, section 1761(d) because they purchased Defendant's Service, and did so for personal, family, or household purposes.

287.     Defendants is a "person" as defined by Civil Code, section 1761(c).

288.     Plaintiffs' and Class Members' purchases of the BetterHelp service are "transactions" as defined by Civil Code, section 1761(e).

289.     The CLRA prohibits deceptive practices in connection with the conduct of a business that provides goods, property, or services primarily for personal, family, or household purposes.

290.     Defendant's false and misleading policies, acts, and practices were designed to, and did, induce Plaintiffs and Class Members to purchase BetterHelp's services and were designed to, and did, induce Plaintiffs and Class Members to purchase BetterHelp's services, and violated the following sections of the CLRA:

291.     Section 1770(a)(5): representing that goods, property, and services have sponsorship, approval, characteristics, uses, or benefits which they do not have;

292.     Section 1770(a)(7): representing that goods, property, and services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;

293.     Section 1770(a)(9): advertising goods, property, and services with intent not to sell them as advertised; and

294.     Section 1770(a)(16): representing the subject of a transaction has been supplied in accordance with a previous representation when it has not.

295.     Defendant engaged in unfair competition or unfair or deceptive acts or practices in violation of Civil Code, sections 1770(a)(5)-(16) by representing that it was HIPAA certified and that it would not disclose or use the Private Information in a manner inconsistent with its privacy guarantees and omitting that it shared Private Information with third parties.

296.     Defendant knew, or should have known, that its representations and advertisements

about the nature of its privacy practices were false or misleading and were likely to deceive a reasonable consumer. No reasonable consumer would engage Defendant's Service if they knew that Defendant would disclose their Private Information to third parties.

297.   In reliance on Defendant's misrepresentations about its products and services, Plaintiffs and the Class provided their Private Information and agreed to pay for Defendant's Service. Plaintiffs and Class Members would not have used Defendant's Service or would have paid less for it, but for Defendant's misrepresentations.

298.   As a direct and proximate consequence of the actions as identified above, Plaintiffs and Class Members suffered injury in fact, harms, and losses including but not limited to economic loss, lost time, anxiety, panic, and physical and mental distress.

299.   Defendant's wrongful business practices constituted, and constitute, a continuing course of conduct in violation of the CLRA.

300.   Defendant's conduct described herein was malicious, fraudulent, and wanton in that Defendant intentionally and knowingly provided misleading information to Plaintiffs and the Class.

301.   Pursuant to Civil Code, section 1780, Plaintiffs and the Class seek damages and reasonable attorney fees and costs, and any other relief that the Court deems proper.

302.   Pursuant to the provisions of Civil Code, section 1782(a), on or about March 21, 2023, Plaintiff Jane Doe I provided a letter to Defendant with notice of its alleged violations of the CLRA, demanding that Defendant correct such violations, and providing it with the opportunity to correct its business practices. As Defendant made no response within thirty days of its receipt of that notice, Plaintiffs seek monetary relief, including restitution and actual damages under the Consumers Legal Remedies Act.

303.   Pursuant to California Civil Code section 1780(d), attached hereto as Exhibit C is a declaration on behalf of Plaintiff Jane Doe I showing that this action has been commenced in the proper forum.

304.   Plaintiffs, on behalf of themselves and the Class, seek relief as further described below.

### COUNT XI
### Violation of California Constitution, Article I, Section 1

**(On Behalf of California Plaintiffs and the California Subclass)**

305.    California Plaintiffs R.S, Jane Doe II, Jane Doe III, and T.R ("Plaintiffs" for the purposes of this Count) incorporate the foregoing allegations by reference as if fully set forth herein to the extent relevant to this Count and the relief available thereunder.

306.    The California Constitution provides: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possession, and protecting property, and pursuing and obtaining safety, happiness, and privacy." Cal. Const., Art. I., § 1.

307.    Plaintiffs and California Class Members ("Class Members for the purposes of this Count) had a legitimate expectation of privacy in their Private Information and were entitled to the protection of this information against disclosure to unauthorized third parties.

308.    Defendant owed a duty to Plaintiffs and Class Members to keep their Private Information confidential.

309.    Defendant failed to protect and released to unauthorized third parties the Private Information of Plaintiffs and Class Members.

310.    Defendant allowed unauthorized third parties such as Meta, Snapchat, Criteo, Pinterest and others access to and examination of the Private Information of Plaintiffs and Class Members by way of Defendant's affirmative actions and negligent failures to protect this information.

311.    The unauthorized release to, custody of, and examination by unauthorized third parties of the Private Information of Plaintiffs and Class Members is highly offensive to a reasonable person.

312.    The intrusion at issue was into a place or thing, which was private and is entitled to be private. Plaintiffs and Class Members disclosed their Private Information to Defendant as part of Plaintiffs and Class Members' treatment relationships with Defendant, but privately and with the intention that the Private Information would be kept confidential and would be protected from unauthorized disclosure. Plaintiffs and Class Members were reasonable in their belief that such information would be kept private and would not be disclosed without their authorization or

affirmative consent.

313.    The sharing of data that resulted from the actions and inactions of Defendant constitutes an intentional interference with Plaintiffs' and Class Members' interest in solitude or seclusion, either as to their persons or as to their private affairs or concerns and those of their families, of a kind that would be highly offensive to a reasonable person.

314.    Defendant either knew or reasonably should have known that its inadequate and insufficient information security practices would cause injury and harm to Plaintiffs and Class Members.

315.    As a proximate result of the above acts and omissions of Defendant, the Private Information of Plaintiffs and Class Members was disclosed to third parties without authorization, causing Plaintiffs and Class Members to suffer injuries and damages.

316.    Unless and until enjoined and restrained by order of this Court, Defendant's wrongful conduct will continue to cause irreparable injury to Plaintiffs and the Class, entitling them to seek injunctive relief. Plaintiffs also seek damages to the fullest extent permitted by law.

317.    This action, if successful, will enforce an important right affecting the public interest and would confer a significant benefit, whether pecuniary or non-pecuniary, for a large class of persons and the general public. Private enforcement is necessary and places a disproportionate financial burden on Plaintiffs in relation to Plaintiffs' stake in the matter. Because this case is brought for the purposes of enforcing important rights affecting the public interest, Plaintiffs also seek the recovery of attorneys' fees and costs in prosecuting this action against Defendant under Cal. Code Civ. Proc. § 1021.5 and other applicable law.

318.    Plaintiffs, on behalf of themselves and the Class, seek relief as further described below.

### COUNT XII
**Violation of the Confidentiality of Medical Information Act**
**(On Behalf of California Plaintiffs and the California Subclass)**

319.    California Plaintiffs R.S, Jane Doe II, Jane Doe III, and T.R ("Plaintiffs" for the purposes of this Count) incorporate the foregoing allegations by reference as if fully set forth herein to the extent relevant to this Count and the relief available thereunder.

320.     California Civil Code § 56.06(d) specifically provides that (d) "[a]ny business that offers a mental health digital service to a consumer for the purpose of allowing the individual to manage the individual's information, or for the diagnosis, treatment, or management of a medical condition of the individual, shall be deemed to be a provider of health care subject to the requirements of this part." Thus, Defendant is, by statutory definition under the CMIA a "provider of health care" subject to the Act.

321.     Additionally, Defendant is a "provider of health care" and/or a "recipient" of medical information as defined by Cal. Civ. Code § 56.05(d) and (m), § 56.06(a) (b) and (d) and/or Section 56.13 and is therefore subject to the requirements of the CMIA.

322.     Defendant must not disclose or permit the disclosure of medical information regarding a patient of the provider of health care under 56.06(a) (b) & (d) without first obtaining authorization, subject to certain exceptions found in Cal. Civ. Code §§ 56.10(b) & (c) that do not apply here. Cal. Civ. Code § 56.10(a). By its affirmative acts and inactions set forth above, Defendant disclosed or permitted the disclosure of Private Information to unauthorized third parties, in violation of this Section.

323.     Defendant is required under the CMIA to ensure that it maintains, preserves, and stores medical information in a manner that preserves the confidentiality of the information contained therein. Cal. Civ. Code §§ 56.101(a) & 56.36(b).

324.     Defendant is required to create, maintain, preserve, store, abandon, destroy, or dispose of medical information in a non-negligent manner. Cal. Civ. Code § 56.101(a).

325.     Defendant's electronic health record systems or electronic medical record systems are required to protect and preserve the integrity of electronic medical information. Cal. Civ. Code § 56.101(b)(1)(A). The term "electronic health record" or "electronic medical record" means an electronic record of health-related information on an individual that is created, gathered, managed, and consulted by authorized health care clinicians and staff. Cal. Civ. Code § 56.101(c) as defined by 42 U.S.C. § 17921(5).

326.     Plaintiffs and California Subclass Members ("Class Members for the purposes of this Count are "Patients" as defined by Cal. Civ. Code section 56.05(l).

327.    A significant portion of the information at issue in this action is "medical information" and mental health application information as those terms are defined by § 56.05(i) and (j) of the CMIA.

328.    The CMIA also provides that "[n]o provider of health care, health care service plan, or contractor may require a patient, as a condition of receiving health care services, to sign an authorization, release, consent, or waiver that would permit the disclosure of medical information that otherwise may not be disclosed under Section 56.10 or any other provision of law. Cal. Civ. Code § 56.37(a). Accordingly, Plaintiffs and Class Members did not consent to Defendant's disclosure of their medical information.

329.    As described above, the actions or inactions of Defendants failed to preserve the confidentiality of Private Information, including but not limited to Plaintiffs' and Class Members' full names, dates of birth, email addresses, IP addresses, medical information and participant information that, either alone or in combination with other publicly available information, reveals their identities and that they are seeking treatment.

330.    As a proximate result of the wrongful conduct detailed herein, Defendant has released, disclosed, and/or negligently allowed third parties that are known to Defendants, including Facebook and other third parties as identified herein to access and view Plaintiffs' and Class Members' medical information without first obtaining their written authorization as required by the provisions of Civil Code § 56, et seq.

331.    As a further result of the Defendant's actions, the confidential nature of the Plaintiffs' and Class Members' medical information was breached due to Defendant's negligence or affirmative decisions.

332.    The Private Information was accessed, removed, and viewed by unauthorized third parties including Facebook, Snapchat, Criteo, Pinterest and other unauthorized parties.

333.    In violation of the CMIA, Defendant disclosed or permitted the disclosure of Private Information regarding Plaintiffs and Class Members without authorization to a third party. This disclosure did not qualify for any of the exemptions set forth in Cal. Civ. Code §§ 56.10(b) or (c), which provide limited bases for allowing unauthorized disclosures. This disclosure of medical

1  information to unauthorized individuals resulted from the affirmative actions and inactions of

2  Defendant and its employees.

3  334.  In violation of the CMIA, Defendant created, maintained, preserved, stored,

4  abandoned, or disposed of medical information of Plaintiffs and Class Members in a manner that

5  did not preserve the confidentiality of the information contained therein.

6  335.  In violation of the CMIA, Defendant negligently created, maintained, preserved,

7  stored, abandoned, or disposed of medical information of Plaintiffs and Class Members.

8  336.  In violation of the CMIA, Defendant's electronic health record systems or electronic

9  medical record systems did not protect and preserve the integrity of Plaintiffs' and Class Members'

10  Private Information.

11  337.  In violation of the CMIA, Defendant negligently released confidential or medical

12  information or records concerning Plaintiffs and Class Members. Defendant also violated §

13  56.101(a) of the CMIA, which prohibits the negligent sharing and release of Plaintiffs' and Class

14  Members' Private Information.

15  338.  In violation of the CMIA, as a recipient of medical information pursuant to an

16  authorization it disclosed and/or permitted the disclosure of that medical information without

17  obtaining a new authorization that meets the requirements of Section 56.11, or as specifically

18  required or permitted by law.

19  339.  Defendant failed to maintain, preserve, and store Plaintiffs' and Class Members'

20  medical information in a manner that preserves the confidentiality of the information contained

21  therein because Defendant disclosed to Meta and other third parties Plaintiffs' and Class Members'

22  Medical Information, as defined and described in this Complaint, including their email addresses

23  and IP addresses, and information about their medical histories, physical conditions, mental

24  conditions, and treatments.

25  340.  Defendant's failure to maintain, preserve, and store medical information in a manner

26  that preserves the confidentiality of the information was, at a minimum, negligent, and violates Civil

27  Code § 56.101(a).

28  341.  Accordingly, pursuant to Cal. Civil Code § 56.35 and 56.36, Plaintiffs and Class

Members are entitled to: (1) nominal damages of one thousand dollars ($1,000); (2) actual damages, in an amount to be determined at trial; (3) statutory damages pursuant to Civil Code § 56.36(c); (4) punitive damages of three thousand dollars ($3,000) pursuant to § 56.35; and (5) reasonable attorneys' fees and the costs of litigation.

342.    Plaintiffs, on behalf of themselves and the Class, seek relief as further described below.

### COUNT XIII
**Violation of the California Consumer Privacy Act**
**(On Behalf of California Plaintiffs and the California Subclass)**

343.    California Plaintiffs R.S, Jane Doe II, Jane Doe III, and T.R ("Plaintiffs" for the purposes of this Count) incorporate the foregoing allegations by reference as if fully set forth herein to the extent relevant to this Count and the relief available thereunder.

344.    The California Consumer Privacy Act ("CCPA") was enacted to protect consumers' sensitive information from collection and use by businesses without appropriate notice and consent.

345.    Through the above-detailed conduct, Defendant violated CCPA by subjecting the nonencrypted and nonredacted personal information of Plaintiffs and Class members to unauthorized access or disclosure as a result of Defendant's violation of its duty to implement and maintain reasonable security procedures and practices appropriate to the nature and protection of that information. Cal. Civ. Code § 1798.150(a).

346.    Under the Section 1798.150(a)(1) of the CCPA, as defined by California Civil Code Section 1798.81.5(d)(1)(A) "personal information" means an individual's first name or first initial and the individual's last name in combination with any one or more of the following data elements, when either the name or the data elements are not encrypted or redacted: (i) Social security number, (ii) Driver's license number, California identification card number, tax identification number, passport number, military identification number, or other unique identification number issued on a government document commonly used to verify the identity of a specific individual, (iii) Account number or credit or debit card number, in combination with any required security code, access code, or password that would permit access to an individual's financial account, (iv) Medical information,

(v) Health insurance information, (vi) Unique biometric data generated from measurements or technical analysis of human body characteristics, such as a fingerprint, retina, or iris image, used to authenticate a specific individual. Unique biometric data does not include a physical or digital photograph, unless used or stored for facial recognition purposes, (vii) Genetic data. Additionally, as set forth in Civil Code Section 1798.150(a)(1), the phrase "personal information" may also mean an email address in combination with a password or security question and answer that would permit access to an account.

347.    The personal information at issue in this action falls within the types of information actionable under Civil Code Section 1798.150(a)(1), since, as described above, Defendant by its actions and inactions, has caused the access and disclosure of the personal information as described herein, where either the name or the data elements were not encrypted nor redacted.

348.    Defendant maintained the personal information identified above in a different manner than any Plaintiff or Class Member's medical history, mental or physical condition, or treatment.

349.    In accordance with Cal. Civ. Code § 1798.150(b), on or about March 21, 2023 Plaintiffs' counsel sent a Notice of Violation to Defendant on behalf of Plaintiff Jane Doe I and all other similarly situated California residents identifying the specific provisions of this title the Plaintiff alleged have been or are being violated.

350.    As Defendant failed to cure the noticed violations and failed to provide Plaintiff Jane Doe I with an express written statement within 30 days of Plaintiff's Notice of Violation that the violations have been cured and that no further violations shall occur, Plaintiff Jane Doe I now seeks actual and punitive damages, statutory damages of between $100 and $750 per Class Member, attorneys' fees and costs, and any other relief the Court deems proper as a result of Defendant's CCPA violations.

## COUNT XIV
### Violation of the Comprehensive Computer Data Access and Fraud Act ("CDAFA")
### (On Behalf of California Plaintiffs and the California Subclass)

351.    California Plaintiffs, R.S, Jane Doe II, Jane Doe III, and T.R, ("Plaintiffs" for the purposes of this Count) incorporate the foregoing allegations by reference as if fully set forth herein to the extent relevant to this Count and the relief available thereunder.

352.    The California Legislature enacted the Comprehensive Computer Data Access and Fraud Act, California Penal Code § 502 ("CDAFA") to "expand the degree of protection afforded to individuals . . . from tampering, interference, damage, and unauthorized access to . . . computer data and computer systems." The Legislature found and declared "that the proliferation of computer technology has resulted in a concomitant proliferation of computer crime and other forms of unauthorized access to computers, computer systems, and computer data," further finding and declaring that "protection of the integrity of all types and forms of lawfully created computers, computer systems, and computer data is vital to the protection of the privacy of individuals." Cal. Penal Code § 502(a).

353.    Penal Code § 502(c)(6) makes it an offense when a person: "Knowingly and without permission provides or assists in providing a means of accessing a computer, computer system, or computer network in violation of this section." Defendant violated § 502(c)(6) when it: (i) assisted Meta and other third parties in accessing, without permission, Plaintiffs' and other California Subclass Members' ("Class Members" for the purposes of this Count) computers, mobile phones, tablets, or other devices in order to wrongfully obtain and use their personal data, including their Private Information, in violation of Plaintiffs' and other Class Members' reasonable expectations of privacy in their devices and data, in violation of § 502(c)(1)(B); and, (ii) assisted Meta and other third parties in accessing, taking, copying, and using Plaintiffs' and other Class Members' Private Information, in violation of  § 502(c)(2).

354.    Penal Code § 502(c)(7) makes it an offense when a person: "Knowingly and without permission accesses or causes to be accessed any computer, computer system, or computer network." Defendant violated this section when it incorporated the Meta Pixel and other web beacons and tracking devices into its Sites and when it configured the Meta Pixel and other third-party trackers to disclose Plaintiffs' and other Class Members' Private Information to Meta and other third parties, as described above, thereby causing Meta and other third parties to access Plaintiffs' and other Class Members' computers and other devices without permission.

355.    Penal Code § 502(c)(13) makes it an offense when a person: "Knowingly and without permission provides or assists in providing a means of accessing a computer, computer system, or

public safety infrastructure computer system computer, computer system, or computer network in violation of this section." Defendant violated this section when it incorporated the Meta Pixel and other web beacons and tracking devices into its Sites and when it configured the Meta Pixel and other web beacons and tracking devices to disclose Plaintiffs and other Class Members' Private Information to Meta and other third parties, as described above, thereby providing or assisting in providing a means for Meta and other third parties to access Plaintiffs' and other Class Members' computers and other devices without permission.

356.     Under § 502(b)(12) of the CDAFA a "Computer contaminant" is defined as "any set of computer instructions that are designed to . . . record, or transmit information within a computer, computer system, or computer network without the intent or permission of the owner of the information." Section 502(c)(8) makes it an offense when a person: "Knowingly introduces any computer contaminant into any computer, computer system, or computer network." Defendant violated § 502(c)(8) by knowingly introducing a computer contaminant into Plaintiffs' and other Class Members' devices when it incorporated the Meta Pixel and other web beacons and tracking devices into its Sites, which intercepted, transmitted, and disclosed Plaintiffs' and other Class Members' Private Information without permission.

357.     Plaintiffs and other Class Members suffered damage and loss as a result of Defendant's conduct. Defendant's practices have deprived Plaintiffs and other Class Members of control over their valuable property (namely, their Private Information), the ability to receive compensation for that data, and the ability to withhold their data for sale.

358.     Plaintiffs and other Class Members seek compensatory damages in accordance with California Penal Code § 502(e)(1), in an amount to be proven at trial, and injunctive or other equitable relief.

359.     Plaintiffs and other Class Members have also suffered irreparable and incalculable harm and injuries from Defendant's violations.  The harm will continue unless Defendant is enjoined from further violations of this section.  Plaintiffs and other Class Members have no adequate remedy at law.

360.     Plaintiffs and other Class Members are entitled to punitive or exemplary damages

pursuant to Penal Code § 502(e)(4) because Defendant's violations were willful and, upon information and belief, Defendant is guilty of oppression, fraud, or malice as defined in Civil Code § 3294. Plaintiffs and other Class Members are also entitled to recover their reasonable attorneys' fees under § 502(e)(2).

361.    Plaintiffs, on behalf of themselves and the Class, seek relief as further described below.

**COUNT XV**
**Violation of the Unfair Competition Law**
**(On Behalf of Plaintiffs and the Nationwide Class)**

362.    Plaintiffs incorporate the foregoing allegations by reference as if fully set forth herein to the extent relevant to this Count and the relief available thereunder, except as to entitlement to and claims for damages, which are not sought in this Count.

363.    The acts, misrepresentations, omissions, practices, and non-disclosures of Defendant as alleged herein constitute fraudulent, unlawful, and unfair business acts and practices within the meaning of Cal. Bus. & Prof. Code §§ 17200, et seq.

364.    As detailed herein, Defendant engaged in "fraudulent" business acts and practices by misrepresenting that it would not disclose the Private Information of Plaintiffs and Class Members to unauthorized Parties, by falsely representing its purported HIPAA certifications, and by deceiving Plaintiffs and Class Members into paying for its services and providing Private Information to it under circumstances materially different from those that Defendant knew to be true. Plaintiffs and Class Members relied on Defendant to keep their information private and would not have provided it had they known that Defendant would use it for advertising purposes and provide it to third parties.

365.    Defendant's above-described nondisclosures and misleading statements were false, misleading, and likely to deceive the consuming public in violation of the UCL.

366.    Defendant engaged in "unlawful" business acts and practices in violation of the statutes set forth herein, including Cal. Civ. Code §§ 56.10(a), 56.101, 1798.21, 1798.29 and Article I, § 1 of the California Constitution, the Online Privacy Protection Act, California Business and Professions Code §§ 22575-22579 ("CalOPPA"); California Consumers Legal Remedies Act Cal. Civ. Code § 1750 et seq. (CLRA); California Business and Professions Code section 17500 (FAL);

68

the California Invasion of Privacy Act, Cal. Penal Code § 630 et seq. ("CIPA"); the California Consumer Privacy Act, Cal. Civ. Code § 1798.100, *et seq* (CCPA); and California Computer Data Access and Fraud Act, Cal. Penal Code § 502 ("CDAFA"). Defendant also violated federal statutes and regulations, including the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510 *et seq.*, the FTC Act, HIPAA, the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C and the other sections identified above. Plaintiffs reserve the right to allege other violations of law committed by Defendant that constitutes unlawful business acts or practices within the meaning of Cal. Bus. & Prof. Code §§ 17200, et seq. The allegations of facts set forth in detail above specifically describe and demonstrate how Defendant's actions and inactions violated these laws.

367.    Defendant has also engaged in "unfair" business acts or practices. There are several tests that determine whether a practice that impacts consumers as compared to competitors is "unfair," examining the practice's impact on the public balanced against the reasons, justifications and motives of Defendant. Defendant's conduct would qualify as "unfair" under any of these standards:

(a)    whether the practice offends an established public policy, which here is whether the practices at issue offend the policies of protecting consumers' Private Information by engaging in illegal practices, as reflected in California law and policy set forth above;

(b)    balancing the utility of Defendant's conduct against the gravity of the harm created by that conduct, including whether Defendant's practices caused substantial injury to consumers with little to no countervailing legitimate benefit that could not reasonably have been avoided by the consumers themselves, and causes substantial injury to them; or

(c)    whether the practice is immoral, unethical, oppressive, unscrupulous, unconscionable or substantially injurious to consumers.

368.    The unfair business practices and harm caused by Defendant's failure to maintain

CONSOLIDATED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

adequate information security procedures and practices, including, but not limited to, failing to take adequate and reasonable measures to ensure its data systems were protected against unauthorized disclosures, failing to properly and adequately educate and train employees, failing to put into place reasonable or adequately protected computer systems and security practices to safeguard Plaintiffs' and Class Members' Private Information, improperly installing code, web beacons, and tracking tools that would permit access by unauthorized persons and thus failing to have adequate privacy policies and procedures in place that did not preserve the confidentiality of the Private Information of Plaintiffs and Class Members in its possession, and failing to protect and preserve the confidentiality of the Private Information of Plaintiffs and Class Members against disclosure and release, outweighs the utility of such conduct and such conduct offends public policy, is immoral, unscrupulous, unethical, and offensive, and caused substantial injury to Plaintiffs and Class Members. The allegations of facts set forth in detail above specifically describe and demonstrate how Defendant's actions and inactions constitute unfair business practices.

369. Defendant either knew or should have known that BetterHelp's policies, procedures and data security and protection practices were inadequate to safeguard the Private Information of Plaintiffs and Class Members. The business acts and practices by Defendant which caused Defendant to fail to keep confidential medical, demographic, or personal data protected, did not meet all applicable standards of care and vigilance.

370. Plaintiffs and Class Members suffered injury in fact and lost money or property as a result of Defendant's acts and practices in that a portion of any money Plaintiffs and Class Members paid for Defendant's Service went to fulfill Defendant's obligations with respect to the confidentiality and security of Plaintiffs' and Class Members' Private Information, and Defendant failed to fulfill those obligations.

371. Plaintiffs and Class Members also suffered injury in fact as a result of Defendant's acts and practices because they paid more for Defendant's services than they otherwise would have had they known Defendant was disclosing their Private Information to unauthorized third parties in violation of its legal obligations, social norms, and reasonable consumer expectations.

372. Plaintiffs and Class Members also suffered injury in fact as a result of Defendant's

acts and practices because their valuable personal information, which has a definitive value as described above in this Complaint, was shared with third parties without their consent and without compensating them for the use of that information.

373.    Plaintiffs and Class Members have also suffered (and will continue to suffer) economic damages and other injury and actual harm in the form of, inter alia: (i) invasion of privacy; (ii) breach of the confidentiality of their Private Information; and/or (iii) deprivation of the value of their Private Information, including medical information for which there is a well-established national and international market.

374.    Plaintiffs seek a declaration from the Court that Defendant's conduct alleged herein constitutes a violation of Bus. & Prof. Code § 17200 et seq. under the unlawful, unfair, and fraudulent prongs of the UCL.

375.    Plaintiffs and Class Members have no other adequate remedy of law in that, absent injunctive relief from the Court, Defendant is likely to not fully redress the issues raised by its illegal and unfair business practices. Plaintiffs also seek injunctive relief, for themselves, Class Members, and for the benefit of the public, in the form of an order of this Court requiring Defendant to correct its illegal conduct, to refrain from repeating the illegal and wrongful practices alleged above, and to protect and preserve the confidentiality of Private Information in Defendant's possession that has been accessed, downloaded, exfiltrated, and viewed by an unauthorized third party as a result of Defendant's illegal and wrongful practices set forth above.

376.    Pursuant to Cal. Bus. & Prof. Code § 17203, Plaintiffs seek an order of this Court for themselves, Class Members, and for the benefit of the public granting injunctive relief in the form of requiring Defendant to correct its illegal conduct, to prevent Defendant from repeating the illegal and wrongful practices as alleged above and protect and preserve the confidentiality of Private Information in Defendant's possession that has been accessed, downloaded, exfiltrated, and viewed by at least one unauthorized third party (i.e., Facebook, Snapchat, Pinterest, etc.) because of Defendant's illegal and wrongful practices set forth above.

377.    This action, if successful, will enforce an important right affecting the public interest and would confer a significant benefit, whether pecuniary or non-pecuniary, for a large class of

persons and the general public. Private enforcement is necessary and places a disproportionate financial burden on Plaintiffs in relation to Plaintiff's' respective stake in the matter. Because this case is brought for the purposes of enforcing important rights affecting the public interest, Plaintiffs also seek the recovery of attorneys' fees and costs in prosecuting this action against Defendant under Cal. Code Civ. Proc. § 1021.5 and other applicable law.

378.    Plaintiffs, on behalf of themselves and the Class, seek relief as further described below.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of the Class and for the benefit of the public, pray for orders and judgment in favor of Plaintiffs and against Defendant as follows, as may be applicable to the causes of action set forth above:

- Finding that this action satisfies the prerequisites for maintenance as a class action and certifying the Class and Subclass defined herein;

- Designating Plaintiffs as representatives of the Class, the California Plaintiffs as representatives of the California Subclass, and Plaintiffs' counsel as Class counsel;

- Awarding Plaintiffs and Class Members actual, compensatory, and punitive damages, for Defendant's negligence and negligence *per se*;

- Awarding Plaintiffs and Class Members compensatory damages, disgorgement of profits, and punitive damages for Defendant's invasion of privacy;

- Awarding compensatory and consequential damages for Defendant's breach of contract or, in the alternative, Defendant's breach of implied contract;

- Awarding compensatory and punitive damages for Defendant's breach of confidence;

- Awarding Plaintiffs and Class Members appropriate equitable or declaratory relief, the greater of the sum of the actual damages suffered and any profits made by BetterHelp as a result of its violations, or statutory damages of whichever is the greater of $100 per day per violation or $10,000, and reasonable attorneys' fees and

1    other litigation costs reasonably incurred, for Defendant's violations of the ECPA,

2    18 U.S.C. §§ 2510 *et seq.*;

3    • Awarding Plaintiffs and Class Members statutory damages of $5,000 per violation,

4    or three times the amount of actual damages, and injunctive relief for Defendant's

5    violations of California's Invasion of Privacy Act, Penal Code §§ 630 *et seq.*;

6    • Awarding Plaintiffs and Class Members restitution, disgorgement of profits, and

7    injunctive relief for Defendant's violations of the False Advertising Law;

8    • Awarding Plaintiffs and Class Members restitution and/or actual damages for

9    Defendant's violations of the Consumers Legal Remedies Act;

10   • Awarding California Plaintiffs and California Subclass Members injunctive relief,

11   compensatory damages, disgorgement of profits, and punitive damages for

12   Defendant's violation of Article 1, Section 1 of the California Constitution;

13   • Awarding California Plaintiffs and California Subclass Members nominal damages

14   of $1,000 per violation, or actual damages, and reasonable attorneys' fees and the

15   costs of litigation, for Defendant's violations of California's Confidentiality of

16   Medical Information Act, Cal. Civil Code § 56.101;

17   • Awarding California Plaintiffs and California Subclass Members nominal damages

18   of $1,000 per violation, or actual damages, punitive damages of $3,000 per violation,

19   and reasonable attorneys' fees and the costs of litigation, for Defendant's violations

20   of California's Confidentiality of Medical Information Act, Cal. Civil Code § 56.10;

21   • Awarding California Plaintiffs and California Subclass Members statutory damages

22   of $750 per class member, per violation for Defendant's violation of the California

23   Consumer Privacy Act (CCPA), Cal. Civ. Code § 1798.100.

24   • Awarding California Plaintiffs and California Subclass Members punitive or

25   exemplary damages, compensatory damages, injunctive relief, and reasonable

26   attorneys' fees and other litigation costs reasonably incurred, for Defendant's

27   violations of the Comprehensive Computer Data Access and Fraud Act (CDAFA),

28   Penal Code § 502;

- Declaring that Defendant's conduct alleged herein constitutes a violation of Bus. & Prof. Code §§ 17200 *et seq*. under the unlawful, unfair, and fraudulent prongs of the UCL;

- Awarding Plaintiffs and Class Members restitution and injunctive relief for Defendant's violations of the UCL, Cal. Bus. & Prof. Code §§ 17200 *et seq*.;

- Awarding pre- and post-judgment interest at the maximum rate permitted by applicable law;

- Awarding attorneys' fees and costs as authorized by statute and governing law, including Code of Civil Procedure § 1021.5; and

- Awarding such other and further relief, at law and in equity, as the nature of this case may require or as this Court deems just and proper.

### JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury on all issues so triable.

Dated: September 6, 2023

By: */s/ Gary M. Klinger*

Gary M. Klinger (pro hac vice)
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**
227 W. Monroe Street, Suite 2100
Chicago, Illinois 60606
Telephone: 866.252.0878
gklinger@milberg.com

John J. Nelson (SBN 317598)
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**
402 W. Broadway, Suite 1760
San Diego, CA 92101
Telephone: (858) 209-6941
Email: jnelson@milberg.com

Maureen M. Brady (pro hac vice)
**MCSHANE AND BRADY LLC**
1656 Washington
Suite 140
Kansas City, MO 64108
816-888-8010
Email: mbrady@mcshanebradylaw.com

Julian Hammond (SBN 268849)
jhammond@hammondlawpc.com
Christina Tusan (SBN 192203)
ctusan@hammondlawpc.com
Polina Brandler (SBN 269086)
pbrandler@hammondlawpc.com
Adrian Barnes (SBN 253131)
abarnes@hammondlawpc.com
Ari Cherniak (SBN 290071)
acherniak@hammondlawpc.com
**HAMMONDLAW, P.C.**
1201 Pacific Ave, Suite 600
Tacoma, WA 98402
[Tel:] (310) 601-6766
[Fax] (310) 295-2385

*Plaintiffs' Co-Lead Interim Class Counsel*

Alan M. Mansfield (SBN 125998)
**WHATLEY KALLAS LLP**
1 Sansome Street, 35th Floor, PMB #131
San Francisco, CA 94104 /
16870 West Bernardo Dr., Ste. 400
San Diego, CA, 92127
Phone: (619) 308-5034
Fax: (888) 341-5048
amansfield@whatleykallas.com

*Plaintiffs' Liaison Counsel*

April M. Strauss (SBN 163327)
**APRIL M. STRAUSS, A PC**
2500 Hospital Drive, Bldg 3
Mountain View, CA 94040
Phone: (650) 281-7081
Email: astrauss@sfaclp.com

William J. Doyle (SBN 188069)
Chris W. Cantrell (SBN 209874)
**DOYLE APC**
550 West B St, 4th Floor
San Diego, CA 92101
Phone: (800) 736-9085
(619) 736-0000
Email: bill@doyleapc.com
        chris@doyleapc.com

STEPHEN R. BASSER
SAMUEL M. WARD

**BARRACK, RODOS & BACINE**
600 West Broadway, Suite 900
San Diego, CA 92101
sbasser@barrack.com
sward@barrack.com
Telephone: (619) 230-0800
Facsimile: (619) 230-1874

Andrew J. Heo*
**BARRACK, RODOS & BACINE**
2001 Market Street, Ste. 3300
Philadelphia, PA 19103
Telephone.: (215) 963-0600
Facsimile: (215) 963-0838
aheo@barrack.com

John G. Emerson*
**EMERSON FIRM, PLLC**
2500 Wilcrest, Suite 300
Houston, TX 77042
Telephone: (800) 551-8649
Facsimile: (501) 286-4659

Daniel O. Herrera (pro hac vice anticipated)
**CAFFERTY CLOBES
MERIWETHER & SPRENGEL LLP**
135 S. LaSalle St., Suite 3210
Chicago, Illinois 60603
Telephone: (312) 782-4880
Facsimile: (312) 782-4485
Email: DHerrera@caffertyclobes.com


*Attorneys for Plaintiffs*

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL