Gary. M. Klinger (pro hac vice)
MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC
227 W. Monroe Street, Suite 2100
Chicago, Illinois 60606
Telephone: 866-252-0878
Email: gklinger@milberg.com
gabramson@milberg.com
ahoneycutt@milberg.com
jnelson@milberg.com

*Plaintiffs' Co-Lead Interim Class Counsel*

Maureen M. Brady (pro hac vice)
MCSHANE AND BRADY LLC
4006 Central Street
Kansas City, MO 64111
Telephone: 816-888-8010
Email: mbrady@mcshanebradylaw.com

*Plaintiffs' Co-Lead Interim Class Counsel*

Christina Tusan (SBN 192203)
HAMMONDLAW, P.C.
1201 Pacific Ave, Suite 600
Tacoma, WA 98402
Telephone: 310-601-6766
Fax: 310-295-2385
Email: ctusan@hammondlawpc.com
jhammond@hammondlawpc.com

*Plaintiffs' Co-Lead Interim Class Counsel*

Alan M. Mansfield (SBN: 125998)
WHATLEY KALLAS LLP
1 Sansome Street, 35th Floor
PMB #131
San Francisco, CA 94104 /
16870 West Bernardo Drive, Ste 400, San Diego, CA 92127
Telephone: 619- 308-5034
Fax: 888-341-5048
Email: amansfield@whatleykallas.com

*Plaintiffs' Liaison Counsel*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **IN RE BETTERHELP, INC. DATA DISCLOSURE CASES**<br><br>This Document Relates To:<br><br>All Cases. | **Master File No. 3:23-cv-01033-RS**<br><br>**FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED ON ALL CAUSES OF ACTION SO TRIABLE** |

Plaintiffs C.M., Jane Doe I, L.M., Jane Doe III, R.S., S.C., and T.R. (collectively "Plaintiffs") on behalf of themselves and all others similarly situated and for the benefit of the general public as applicable, assert the following against Defendants BetterHelp, Inc. ("BetterHelp" or "Defendant") and DOES 1-10 inclusive, based upon personal knowledge where so identified and otherwise on information and belief formed after an inquiry reasonable under the circumstances and the investigation of counsel, which included consultation with experts in the field of data privacy and review of publicly available reports, as to all other matters, which allegations will likely have evidentiary support after a reasonable opportunity for further investigation and discovery.

## SUMMARY OF ALLEGATIONS

1. This is a class action lawsuit brought on behalf of a nationwide class to seek redress for Defendant's improper, unauthorized, and illegal disclosure of millions of individuals' personally identifiable information ("PII") and/or Protected Health Information ("PHI") (collectively referred to as "Private Information") to third-party advertising platforms including, but not limited to, Facebook, Snapchat, Pinterest, Criteo, and others. The Private Information disclosed by BetterHelp includes, but is not limited to, Plaintiffs' and Class Members' names, email addresses, IP addresses, the fact that Plaintiffs and Class Members enrolled in Defendant's services, certain intake responses to a questionnaire required by BetterHelp to be completed prior to a referral that requested sensitive information related to their mental health and other medical conditions, and additional highly sensitive personal medical and mental health information.

2. Information about a person's mental health is among the most confidential and sensitive information in our society. The mishandling and unauthorized sharing of such information, and medical information generally, can have serious consequences, including harassment, discrimination in the workplace, and social stigmatization. If people do not trust that their medical information will be kept private, they may be less likely to seek medical treatment or to disclose sensitive information, which can lead to more health problems down the road. In addition, protecting medical information and making sure it is kept confidential is an obligation imposed by federal and state law on companies such as Defendant, and is necessary to maintain public trust in the healthcare system as a whole.

3. Defendant BetterHelp is an online "market leading direct-to-consumer ("D2C") mental health platform"[1] and offers online counseling and therapy services (the "Service") to consumers through its network of over 30,000 licensed clinicians who use BetterHelp's platform for web, mobile app, phone, and text-based interactions.[2] In fiscal year 2022 (the 52 weeks ending on Dec. 31, 2022), BetterHelp had revenues of over $1 billion.[3] As of December 31, 2022, Defendant had 420,000 paying users.[4] According to the Form 10-K of BetterHelp's parent company for fiscal year ended December 31, 2023, BetterHelp users purchase virtual therapy services for an access fee, generally on a monthly basis, and BetterHelp "primarily generate[s] revenue from paying users who pay a fee, most commonly monthly, to access our network of therapists and psychiatrists." According to this Form 10-K: "BetterHelp's total revenues increased by $114.0 million, or 11%, to $1,133.6 million [$1.14 Billion] for the year ended December 31, 2023, driven by a 9% increase in average monthly paying users. BetterHelp's Adjusted EBITDA increased by $22.1 million, or 19%, to $136.2 million for the year ended December 31, 2023, primarily reflecting higher gross profit, offset by higher operating expenses, most significantly higher advertising and marketing expenses." The importance of such marketing efforts, including the efforts described herein, is key to BetterHelp's success, as according to this Form 10-K: "Our ability to reach new potential paying users through various advertising channels helped us to increase BetterHelp paying users by 9% to 0.46 million [460,000] as of December 31, 2023, compared to 0.42 million [420,000] as of December 31, 2022."[5]

4. Defendant offers and has offered its Service under several different names, each of which had its own website and app (collectively the "Sites"). These Sites were designed to accommodate different demographics of people who are seeking mental health and counseling

---

[1] Teladoc Health, Inc., Fiscal 2022 Annual Report, Form 10-K, p. 4 (2022).
[2] *Id.* at p. 4.
[3] *Id.* at p. F-41.
[4] *Id.* at p. 60.
[5] *See* Teledoc Health, Inc. Form 10-K for year ended December 31, 2023 ,with references in this Complaint located at pp. 14-15, 32, 40-41, 55, 57, 66 (available at https://www.sec.gov/ix?doc=/Archives/edgar/data/1477449/000147744924000023/tdoc-20231231.htm (last accessed July 31, 2024).

services. Defendant's primary website and app, named "BetterHelp" (found at www.betterhelp.com) serves general audiences and has been in operation since about 2013. Faithful Counseling, in operation since about July 2017, is aimed at members of the Christian faith. Pride Counseling, in operation since about August 2017, caters to the LGBTQ community. Teen Counseling, in operation since about January 2017, offers counseling to 13- to 18-year-olds with parental consent. ReGain, in operation since about May 2016, offers couples counseling. Defendant also offered the Service through the iCounseling website and app from about February 2017 to November 2020, the Terrapeuta website and app from about March 2017 to March 2019, and the MyTherapist website and app from about June 2017 to March 2019. Each of these Sites operates, or has operated, through BetterHelp's servers located primarily in California, and each of these Sites facilitates counseling and/or therapy via the Service.

5. As noted above, BetterHelp collects and receives revenues from consumers, generally on a monthly basis, in exchange for providing access to its network of therapists and psychiatrists. In fact, BetterHelp's website has stated that, "The cost of counseling through BetterHelp ranges from $40 to $70 per week (billed monthly) and includes unlimited access to your counselor."[6] BetterHelp has also negotiated arrangements with various third-party organizations to provide access to their mental health therapist network for employees, paid for by such organizations. BetterHelp's parent company's Form 10-K explains that, "As it relates to the BetterHelp segment, users can purchase virtual therapy services for an access fee, generally on a monthly basis. . . . BetterHelp also provides virtual therapy services to employers as part of employee assistance programs, with revenues recorded based on completion of visit." BetterHelp is thereby responsible for furnishing and/or billing for such mental health therapy services to patients and/or is paid by patients and third-party organizations for providing mental health care access in the normal course of its business.

6. When Plaintiffs and Class Members used one of Defendant's Sites in order to sign

---

[6] See, e.g., https://web.archive.org/web/20200321045022/https://www.betterhelp.com/ (website version from 3/21/2020)(last visited August 2, 2024); and https://web.archive.org/web/20190426114300/https://www.betterhelp.com/faq/ (website version from 4/26/2019) (last visited August 2, 2024).

up for the Service and become a paying user, they were required to fill out a questionnaire (the "Intake Questionnaire"), answering detailed questions regarding themselves, their health status and histories—including their mental health issues, whether they are in therapy for mental health issues and whether they are seeking therapy from BetterHelp. Upon completing the Intake Questionnaire, Plaintiffs and Class Members were required to create a paid account for the Service by entering their name, email address, phone number, emergency contact information, and payment details.

7. Since the time of BetterHelp's inception, millions of consumers and patients, including Plaintiffs and Class Members, have signed up for Defendant's counseling services and completed the required Intake Questionnaire on one of the Sites. In doing so, they entrusted Defendant with their Private Information, including their health status and histories, mental health condition, their symptoms, the fact that they are seeking therapy to assist with their then-current mental health issues, whether they previously were in therapy, as well as identifying information such as names dates of birth, physical addresses, email addresses, and IP addresses. In providing such information to BetterHelp these consumers reasonably expected and understood that BetterHelp would keep that information confidential. BetterHelp and its parent company also recognizes this expectation and the obligations imposed upon BetterHelp in its most recent Form 10-K: "**Our use and disclosure of personally identifiable information, including health information, and other personal data is subject to federal, state, and foreign privacy and security regulations, and our failure to comply with those regulations or to adequately secure the information we hold could result in significant liability or reputational harm and, in turn, a material adverse effect on our Client base, membership base, and revenue**." (emphasis in original).

8. Recognizing the sensitivity of this Private Information, as well as patient and consumer concerns about privacy—particularly as it relates to their mental health issues and related medical conditions—Defendant repeatedly promised to keep such Private Information private and use it only for non-advertising purposes, *i.e.*, to facilitate consumers' mental health therapy.

9. Rather than protecting Class Members' confidential and sensitive Private

Information, however, Defendant installed web beacons and cookies on its platform for the Sites that enabled third party marketing companies like Facebook (also now known as "Meta" and jointly referred to herein as "Facebook/Meta" in this Complaint), Snapchat, Criteo, and Pinterest to intercept users' Private Information, gathered both in the information sign up process and thereafter, and to track users as well as to collect information that could be used to build individual consumer profiles and ultimately, market to them. As stated in BetterHelp parent company's 2023 Form 10-K: "In addition, we rely on relationships for our BetterHelp business with a wide variety of third parties, including internet search providers such as Google, social networking platforms such as Facebook, internet advertising networks, co-registration partners, retailers, distributors, television advertising agencies, and direct marketers, *to source new members and to promote or distribute our services and products*." (emphasis added).

10. Advertisers also use the information provided to them through third parties such as Defendant to build and expand upon profiles reflecting an individual's interests, concerns, or habits in intimate detail. This can be done by associating a website visitor's browser fingerprint, IP address, name, email address, telephone number, or other unique identifier with their use of a particular website, such as the Sites. BetterHelp's practices allowed these third-party websites to gain information about specific individuals that was thereafter used to target/retarget them with advertisements and to measure the results of their advertisement efforts – which as noted above is a key element of BetterHelp's business model.

11. Unbeknownst to Plaintiffs and Class Members, the answers they gave to the questions on the Intake Questionnaire, along with the Private Information and personal identifiers they provided as they subsequently used the Service, were secretly intercepted by and/or disclosed to at least Facebook/Meta, Snapchat, Criteo, and Pinterest. None of these third parties were authorized by Plaintiffs or Class Members to receive their Private Information from and through BetterHelp.

12. BetterHelp's goal in sharing its users' Private Information and communications with these companies was not to provide any medical or other benefit to the users of its Service but instead was intended to, *inter alia*: (1) increase its market share through the identification of new potential patients and the recapture/retention of prior patients, and (2) to cultivate and maintain relationships

with various social media sites.

13. According to the United States Federal Trade Commission ("FTC"), from 2013 to at least December 2020, Defendant continually broke its promises to protect consumers' Private Information, instead using it to intentionally target existing and new customers with advertising for its and others' goods and services. Defendant also handed over Plaintiffs' and Class Members' Private Information to some of the largest online advertising companies in the world, such as Facebook/Meta, Pinterest, Criteo, and Snapchat, often permitting these companies to use the sensitive Private Information for their own research, product development, and advertising purposes.

14. On March 2, 2023, the FTC announced that it had finalized a Consent Order with Defendant addressing Defendant's deceptive and misleading business practices in using sensitive Private Information and disclosing it to third parties.[7][8]

15. The importance of keeping consumers' health information confidential also has been addressed by the United States Department of Health and Human Services ("HHS"). The HHS, in order to implement the requirements of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), established "Standards for Privacy of Individually Identifiable Health Information" (also known as the "Privacy Rule") governing how companies, such as BetterHelp, must safeguard and protect Private Information. Under the HIPAA Privacy Rule, **no** covered entity or business associate can disclose a person's personally identifiable or protected health information to a third party without express written authorization. In addition, as BetterHelp's parent company recognized in its most recent Form 10-K: "HIPAA further requires that patients be notified of any unauthorized acquisition, access, use or disclosure of their unsecured PHI that has more than a low probability of compromising the privacy or security of such information, with certain exceptions related to unintentional or inadvertent use or disclosure by employees or authorized individuals. HIPAA specifies that such notifications must be made without unreasonable delay and in no case later than 60 calendar days after discovery of the breach. If a breach affects 500 patients or more, it

---

[7] Attached hereto as Exhibit A is a true and correct copy of the FTC's Complaint against BetterHelp.
[8] Attached hereto as Exhibit B is a true and correct copy of the FTC's Consent Order with BetterHelp.

must be reported to HHS without unreasonable delay, and HHS will post the name of the breaching entity on its public website. Breaches affecting 500 patients or more in the same state or jurisdiction must also be reported to the local media. If a breach involves fewer than 500 people, the covered entity must record it in a log and notify HHS at least annually." Yet, as set forth below, BetterHelp has failed and still refuses to comply with these obligations, despite the significant civil and criminal penalties associated with not doing so—as well as the harm to the public caused by its failure to comply with these laws.

16. In response to the use of tracking and data collection technologies by online companies offering health care services like BetterHelp, the Office for Civil Rights ("OCR") at HHS recently published a bulletin concerning the Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates.[9] The bulletin warns that:

> An impermissible disclosure of an individual's PHI not only violates the Privacy Rule but also may result in a wide range of additional harms to the individual or others. For example, an impermissible disclosure of PHI may result in identity theft, financial loss, discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others identified in the individual's PHI. Such disclosures can reveal incredibly sensitive information about an individual, including diagnoses, frequency of visits to a therapist or other health care professionals, and where an individual seeks medical treatment.
>
> While it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors, because of the proliferation of tracking technologies collecting sensitive information, OCR is providing this reminder that it is critical for regulated entities to ensure that they disclose PHI **only** as expressly permitted or required by the HIPAA Privacy Rule.[10]

17. The bulletin further states that covered or regulated entities, such as BetterHelp, "**are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules.** For example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures."[11]

---

[9] https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (last visited August 2, 2024).

[10] *Id.* (internal citations omitted).

[11] U.S. Department of Health and Human Services, Office of Civil Rights, Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates (content last reviewed Aug. 2,

BetterHelp's own parent company recognizes the application of HIPAA to entities such as BetterHelp, stating in its most recent Form 10-K: "HIPAA requires healthcare providers **like us** to develop and maintain policies and procedures with respect to PHI that is used or disclosed, including the adoption of administrative, physical, and technical safeguards to protect such information." (emphasis added).

18. Similarly, under California law, medical information is considered to be among the most sensitive private personal information available. "Medical Information" is defined by California's Confidential Medical Information Act, Cal. Civ. Code sections 56, *et seq*. ("CMIA") as:

> any individually identifiable information,[12] in electronic or physical form, in possession of or derived from a provider of health care, health care service plan, pharmaceutical company, or contractor regarding a patient's medical history, mental or physical condition, or treatment.

19. The California Constitution also recognizes the right of individuals to privacy in their affairs generally: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy." Cal. Const., Art. I., § 1. In addition, in order to protect those rights in an increasingly technological world, the California Invasion of Privacy Act ("CIPA") was enacted in 1967 to address "the development of new devices and techniques for the purpose of eavesdropping upon private communications and the invasion of privacy resulting from the continual and increasing use of such devices and techniques." Cal. Pen. Code § 630.

20. Privacy polls and studies show that almost all Americans consider one of the most important privacy rights to be the need to obtain an individual's affirmative consent before a company collects and shares its customers' data with third parties. Thus, the expectation that

---

2024) (emphasis in the original), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/ hipaa-online-tracking/index.html#ftnref9.

[12] "Individually identifiable" means that the Medical Information includes or contains any element of personal identifying information sufficient to allow identification of the individual, such as the patient's name, address, electronic mail address, telephone number, or Social Security Number, or other information that, alone or in combination with other publicly available information, reveals the identity of the individual.

companies such as BetterHelp will protect the confidentiality of Private Information and not share such data without their authorization and consent is both reasonable and material to consumers. For example, a recent study by Consumer Reports shows that 92% of Americans believe that internet companies and websites should be required to obtain consent before selling or sharing consumers' data, and the same percentage believe internet companies and websites should be required to provide consumers with a complete list of the data that has been collected about them.[13] Moreover, according to a study by Pew Research Center, approximately 79% of Americans are concerned about how data is collected about them by companies.[14]

21. The concern about sharing medical information is compounded by the reality that advertisers view this type of information as being of particularly high value. Indeed, having access to the data women share with their healthcare providers allows advertisers to obtain data on children before they are even born. As one article put it: "the datafication of family life can begin from the moment in which a parent thinks about having a baby."[15] The article continues "Children today are the very first generation of citizens to be datafied from before birth, and we cannot foresee—as yet—the social and political consequences of this historical transformation. What is particularly worrying about this process of datafication of children is that companies like . . . Facebook . . . are harnessing and collecting multiple typologies of children's data and have the potential to store a plurality of data traces under unique ID profiles."[16]

22. Privacy law experts have expressed concerns about the disclosure to third parties of a user's sensitive medical information in particular. For example, Dena Mendelsohn—the former Senior Policy Counsel at *Consumer Reports* and current Director of Health Policy and Data

---

[13] *Consumers Less Confident About Healthcare, Data Privacy, and Car Safety, New Survey Finds*, CONSUMER REPORTS (May 11, 2017), https://www.consumerreports.org/consumer-reports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety/.

[14] *Americans and Privacy: Concerned, Confused, and Feeling Lack of Control Over Their Personal Information*, PEW RESEARCH CENTER, (Nov. 15, 2019), https://www.pewresearch.org/internet/2019/11/15/americans-and-privacy-concerned-confused-and-feeling-lack-of-control-over-their-personal-information/.

[15] Veronica Barassi, *Tech Companies Are Profiling Us From Before Birth*, THE MIT PRESS READER, https://thereader.mitpress.mit.edu/tech-companies-are-profiling-us-from-before-birth/.

[16] *Id.*

Governance at Elektra Labs—explained that having one's personal health information disseminated in ways one is unaware of could have serious repercussions, including affecting one's ability to obtain life insurance and how much one pay for that coverage, increasing the rate one is charged on loans, and leaving one vulnerable to workplace discrimination.[17]

23. Defendant's actions constitute an extreme invasion of Plaintiffs' and Class Members' right to privacy and violate several statutory and common law doctrines, including CIPA, Cal. Penal Code § 631, *et seq*.; the California Constitution, Article I, Section I; the CMIA; California's Consumers Legal Remedies Act, Cal. Civ. Code § 1750, *et seq*. ("CLRA"); California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq*. ("UCL"); the California Consumer Privacy Act, Cal. Civ. Code § 1798.100, *et seq*. ("CCPA"); the Electronic Communications Privacy Act, 18 U.S.C. § 2510 *et seq*. and 18 U.S.C. § 2702, et seq. ("ECPA"); the Federal Trade Commission Act, 15 U.S.C. § 45 *et seq*. ("FTC Act"); the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Parts 160 and 164; 42 C.F.R. §2; and common law doctrines such as breach of privacy, implied contract, and unjust enrichment.

24. As a result of Defendant's acts and omissions detailed herein, Plaintiffs and Class Members seek remedies on their own behalf and on behalf of all those similarly situated for violations of the aforementioned statutes and common law doctrines.

## PARTIES

### A. Plaintiffs

***Plaintiff C.M.***

*25.* Plaintiff C.M. is a resident of the State of Texas. Plaintiff C.M. created her BetterHelp account in approximately 2017-2018 for help dealing with caregiver stress and fatigue after her husband grew ill. Before creating her account, BetterHelp required Plaintiff C.M. to fill out the Intake Questionnaire in effect at that time and to provide her Private Information to BetterHelp in order to access its services. In the course of filling out her questionnaire, Plaintiff C.M. read and

[17] Donna Rosato, *What Your Period Tracker App Knows About You*, CONSUMER REPORTS (Jan. 28, 2020), https://www.consumerreports.org/health-privacy/what-your-period-tracker-app-knows-about-you/.

relied on BetterHelp's representations concerning its commitment to keep the information she provided confidential. Ultimately, Plaintiff C.M. signed up for BetterHelp's services for which she paid BetterHelp approximately $60-$90 monthly. Had Plaintiff C.M. known that Defendant would not keep her Private Information confidential, she would not have completed the questionnaire and would not have paid for the Service or would have paid significantly less for that Service and thus lost money or property as a result of BetterHelp's unlawful conduct. Plaintiff C.M. had a Facebook and Instagram account during the relevant time period. After creating her BetterHelp account, Plaintiff C.M. received targeted ads for mental health services and online therapists that she believes directly resulted from her use of the BetterHelp platform. Plaintiff C.M. reasonably expected that her communications with BetterHelp were solely between herself and BetterHelp and that any information that she provided to BetterHelp would be maintained as confidential. Plaintiff C.M. first learned that BetterHelp had shared her Private Information without her consent or knowledge after she read a news article in or about March of 2023.

***Plaintiff S.C.***

26. Plaintiff S.C. is a resident of the State of Wisconsin. Plaintiff S.C. created her BetterHelp account in approximately 2019 for help dealing with depression. Before creating her account, Plaintiff S.C. was required to fill out the Intake Questionnaire in effect at that time and she provided her Private Information as requested by BetterHelp. In the course of filling out her questionnaire, Plaintiff S.C. read and relied on BetterHelp's representations concerning its commitment to keep the information she provided confidential. Ultimately, Plaintiff S.C. signed up for BetterHelp's services for which she paid approximately $65 weekly. Had Plaintiff S.C. known that Defendant would not keep her information confidential she would not have completed the questionnaire and would not have paid BetterHelp for the Service or would have paid significantly less and thus lost money or property as a result of BetterHelp's unlawful conduct. Plaintiff S.C. had a Facebook and Instagram account during the relevant time period. Almost immediately after creating her BetterHelp account, Plaintiff S.C. received targeted ads for alternative mental health services providers and mood supplements on Facebook and Instagram that she believes resulted from her use of the Sites. Plaintiff S.C. reasonably expected that her communications with

BetterHelp were solely between herself and BetterHelp and that any information that she provided to BetterHelp would be maintained as confidential. Plaintiff S.C. first learned that BetterHelp had shared her Private Information without her consent or knowledge after she read an online post in or about March of 2023.

***Plaintiff Jane Doe I***

27. Plaintiff Jane Doe I is a resident of the State of Michigan. Plaintiff Jane Doe I created her BetterHelp account in approximately October of 2021 for help with dialectical behavior therapy and cognitive behavior therapy. Before creating her account, Plaintiff Jane Doe I was required to fill out the Intake Questionnaire in effect at that time and she provided her Private Information as requested by BetterHelp. In the course of filling out her questionnaire, Plaintiff Jane Doe I read and relied on BetterHelp's representations concerning its commitment to keep the information she provided confidential. Ultimately, Plaintiff Jane Doe I signed up for BetterHelp's services for which she paid BetterHelp approximately $240 for a month. Plaintiff Jane Doe I had a Facebook and Instagram account during the relevant time period. Had Plaintiff Jane Doe I known that Defendant would not keep her information confidential, she would not have completed the questionnaire and would not have paid for the Service or would have paid significantly less and thus lost money or property as a result of BetterHelp's unlawful conduct. Both during and after stopping use of the Service, Plaintiff Jane Doe I began to receive advertisements from BetterHelp encouraging her to renew her use of the Service multiple times a day. She believes she started to see an increase in BetterHelp advertisements after she stopped using the Service. Plaintiff Jane Doe I reasonably expected that her communications with BetterHelp were solely between herself and BetterHelp and that any information that she provided to BetterHelp would be maintained as confidential. Plaintiff Jane Doe I first learned that BetterHelp had shared her Private Information without her consent or knowledge after she read a CNN article in or about March of 2023. In addition, as set forth herein, on or about March 21, 2023, Plaintiff Jane Doe I's counsel served the required CLRA and CCPA demand letter on BetterHelp by certified mail, return receipt requested, seeking relief on behalf of herself and all Class members. BetterHelp failed to respond to that letter in the 30-day period as

required by law.

***Plaintiff L.M.***

28. Plaintiff L.M. is a resident of the State of South Carolina. Plaintiff L.M. created her BetterHelp account in approximately October of 2021 for help coping with feelings of stress and to learn coping mechanisms. Before creating her account, Plaintiff L.M. was required to fill out the Intake Questionnaire in effect at that time and she provided her Private Information as requested by BetterHelp. In the course of filling out her questionnaire, Plaintiff L.M. read and relied on BetterHelp's representations concerning its commitment to keep the information she provided confidential. Ultimately, Plaintiff L.M. signed up for BetterHelp's services. She purchased a month's subscription through a promotional coupon. Had Plaintiff L.M. known that Defendant would not keep her information confidential she would not have completed the questionnaire and would not have paid for the Service or would have paid significantly less and thus lost money or property as a result of BetterHelp's unlawful conduct. Plaintiff L.M. had a Facebook and Instagram account during the relevant time period. After creating her account with BetterHelp, Plaintiff L.M. began to receive an increase in the number of targeted advertisements she received that she believes resulted from her use of the Service. Plaintiff L.M. reasonably expected that her communications with BetterHelp were solely between herself and BetterHelp and that any information that she provided to BetterHelp would be maintained as confidential. Plaintiff L.M. first learned that BetterHelp had shared her Private Information without her consent or knowledge after she received an email from BetterHelp disclosing that her Private Information was shared.

***Plaintiff R.S.***

29. Plaintiff R.S. is a resident of the State of California. Plaintiff R.S. created his BetterHelp account in approximately April of 2021 for mental health counseling. Before creating his account, Plaintiff R.S. was required to fill out the Intake Questionnaire in effect at that time and provided his Private Information as requested by BetterHelp. In the course of filling out his questionnaire, Plaintiff R.S. read and relied on BetterHelp's representations concerning its commitment to keep the information he provided confidential. Ultimately, Plaintiff R.S. signed up for BetterHelp's services for which he paid BetterHelp approximately $150 monthly. Had Plaintiff

R.S. known that Defendant would not keep his information confidential he would not have completed the questionnaire and would not have paid for the Service or would have paid significantly less and thus lost money or property as a result of BetterHelp's unlawful conduct. Plaintiff R.S. had a Facebook and Instagram account during the relevant time period. Immediately after creating his BetterHelp account, Plaintiff R.S. received targeted ads for mental health services, treatment options, and mental health facilities that he believes resulted from his use of the Service. Plaintiff R.S. reasonably expected that his communications with BetterHelp were solely between himself and BetterHelp and that any information that he provided to BetterHelp would be maintained as confidential. Plaintiff R.S. first learned that BetterHelp had shared his Private Information without his consent or knowledge after he read a Facebook post in or about March of 2023.

***Plaintiff Jane Doe III***

30. Plaintiff Jane Doe III is a resident of the State of California. Plaintiff Jane Doe III created her BetterHelp account in approximately October of 2018 for mental health counseling. Before creating her account, Plaintiff Jane Doe III was required to fill out the Intake Questionnaire in effect at that time and she provided her Private Information as requested by BetterHelp. In the course of filling out her questionnaire, Plaintiff Jane Doe III read and relied on BetterHelp's representations concerning its commitment to keep the information she provided confidential. Plaintiff Jane Doe III used the platform to review billing information and to communicate with her therapist. Plaintiff Jane Doe III paid approximately $954 to BetterHelp for mental health services. Had Plaintiff Jane Doe III known that Defendant would not keep her information confidential she would not have completed the questionnaire and would not have paid for the Service or would have paid significantly less and thus lost money or property as a result of BetterHelp's unlawful conduct. Plaintiff Jane Doe III had a Facebook, Instagram, and Twitter account during the relevant time period. Shortly after beginning use of the Service, Plaintiff Jane Doe III began to receive advertisements for BetterHelp products and services that she believes resulted from her use of the Service. Plaintiff Jane Doe III reasonably expected that her communications with BetterHelp were solely between herself and BetterHelp and that any information that she provided to BetterHelp

would be maintained as confidential. Plaintiff Jane Doe III first learned that BetterHelp had shared her Private Information without her consent or knowledge after she read a Facebook post in or about March of 2023.

***Plaintiff T.R.***

31. Plaintiff T.R. is a resident of the State of California. Plaintiff T.R. created his BetterHelp account in approximately 2019 or 2020 for mental health counseling. Before creating his account, Plaintiff T.R. was required to fill out the Intake Questionnaire in effect at that time and provided his Private Information as requested by BetterHelp. In the course of filling out his questionnaire Plaintiff T.R. read and relied on BetterHelp's representations concerning its commitment to keep the information he provided confidential. Ultimately, Plaintiff T.R. signed up for BetterHelp's services and paid $80 a month for four months of the Service. Had Plaintiff T.R. known that Defendant would not keep his information confidential, he would not have completed the questionnaire and would not have paid for the Service, or would have paid significantly less and thus lost money or property as a result of BetterHelp's unlawful conduct. Shortly after creating his BetterHelp account, Plaintiff T.R. received targeted ads for BetterHelp multiple times a day that he believes resulted from his use of the Service. Plaintiff T.R. reasonably expected that his communications with BetterHelp were solely between himself and BetterHelp and that any information that he provided to BetterHelp would be maintained as confidential. Plaintiff T.R. first learned that BetterHelp had shared his Private Information without his consent or knowledge after he read a Facebook post in or about March of 2023.

32. Based on the above allegations, each of the Plaintiffs suffered economic injury not only in terms of the taking and unauthorized dissemination of their Private Information in which they have a vested interest but also as a result of being required to pay money to BetterHelp for subscription services that were not consistent with the benefit of their bargain and their reasonable belief that BetterHelp would keep such information private and confidential. As alleged above, they either would have paid less or not subscribed to such Service at all had the true facts about BetterHelp's information gathering and sharing practices been timely and fully disclosed to them, and thus each lost money or property as a result of BetterHelp's unlawful conduct.

33. Each of these Plaintiffs also reasonably believes they are subject to the continued risk of ongoing or future harm from BetterHelp's as well as third parties' continued retention and use of their Private Information, based in part on the advertisements from BetterHelp many continue to receive despite no longer using the Service, as well as BetterHelp's right or duty established by its own promises to protect such data and not to share it with third parties, federal and state law, and the FTC Order requiring it demand such data be deleted (discussed *infra)*, and thus to control the conduct of such third parties. Several of these third parties still retain such Private Information, directly derived from Plaintiffs' and Class Members' use of BetterHelp Sites. It was BetterHelp's programming of the Sites that permitted the sharing of such data with such third parties. While the FTC Order compels BetterHelp to request such information be deleted, Facebook/Meta, Snapchat, Pinterest and Criteo have each advised Plaintiffs that they received no such request from BetterHelp. In addition, Plaintiffs have obtained discovery showing third parties continue to possess information improperly disclosed by BetterHelp, including certain Plaintiffs' Private Information obtained through BetterHelp. In addition to the other relief set forth below, BetterHelp can and should be compelled by this Court to do.

34. In addition, as detailed below, BetterHelp has its own direct duties and obligations to Plaintiffs and Class Members to redress the ongoing or future harm that exists as a result of its failure to comply with numerous rules and regulations applicable to it under various state and federal laws, including the disclosure requirements set forth by HHS as well as requirements under HIPAA and the CMIA regarding the sharing, deletion and notification to affected persons whose Private Information was shared without their authorization or consent, including taking all efforts necessary to ensure the deletion of such Private Information in the hands of third parties and all notifications as required by law.

35. In addition, while Plaintiffs and Class Members may wish to continue to use the benefits BetterHelp offers through its Service, they are unable to rely on Defendant's representations about the protection of such highly sensitive data in deciding whether or not to sign up again for such services in the future, and therefore, find themselves unable to use such services absent

appropriate injunctive relief requiring that BetterHelp comply with the applicable requirements of state and federal law, and the requirement to only make truthful representations about the protection of such Private Information upon which they could reasonably rely.

**B. Defendants**

36. Defendant BetterHelp, Inc., also doing business as Compile, Inc.; MyTherapist; Teen Counseling; Faithful Counseling; Pride Counseling; iCounseling; ReGain; and Terappeuta, is a Delaware corporation with its principal office or place of business located at 990 Villa St., Mountain View, CA 94041.

37. BetterHelp operates in and from California through various Sites, including, https://www.BetterHelp.com, https://www.regain.us, and https://www.teencounseling.com. The company provides its Service to millions of consumers nationwide, with its operations emanating out of its corporate offices in California.

38. The true names, roles, and capacities in terms of their involvement in the wrongdoing at issue, whether individual, corporate, associate, or otherwise, of Defendants named as Does 1 through 10, inclusive, are currently unknown to Plaintiffs and, therefore, these entities and/or individuals are named as Defendants under fictitious names. Plaintiffs will identify these Defendants' true identities and their involvement in the wrongdoing at issue if and when they become known.

**JURISDICTION AND VENUE**

39. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C § 1331 as this matter asserts a Cause of Action over which there is federal jurisdiction, and § 1332(d), because the amount in controversy for the Class exceeds $5,000,000 exclusive of interest and costs, there are more than 100 putative Class Members defined below, and minimal diversity exists because a significant portion of putative Class Members, including several of the named Plaintiffs, are citizens of a state different from the citizenship of Defendant.

40. This Court has general personal jurisdiction over BetterHelp because it maintains its principal place of business in California. Additionally, BetterHelp is subject to specific personal jurisdiction in this State because a substantial part of the events and conduct giving rise to Plaintiffs'

and others' claims occurred in, emanated from or arose out of actions taken within this State.

41. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), (c), and (d) because BetterHelp is based in this District, transacts business in this District and a substantial portion of the events giving rise to the claims occurred in this District.

## FACTUAL ALLEGATIONS

### A. THE BETTERHELP PLATFORM

42. Defendant BetterHelp has been in operation since 2013, offering paid subscription online mental health counseling services via various websites and apps, including the Sites. BetterHelp has spent significant effort and capital since inception by advertising and marketing its services through various digital and traditional media platforms, including television and radio as well as podcasts, search engine ads, and through third parties such as Facebook/Meta, Snapchat, Pinterest, and Criteo.

43. Defendant has spent tens if not hundreds of millions of dollars annually to market its counseling services. In 2020, Defendant spent between $10 million and $20 million on Facebook advertising alone. This advertising was extremely successful; by 2021, Defendant's advertising through Facebook was generating approximately 90,000 – 120,000 new customers per year.

44. Defendant markets its services by offering consumers online communications with licensed therapists "who you can trust." BetterHelp also claims that customers using its therapists will "get the same professionalism and quality you would expect from an in-office therapist, but with the ability to communicate when and how you want."[18]

45. To begin the process of signing up for the Service or using the platform, when a Class Member visited one of Defendant's Sites, she would be asked if she was looking for "Individual," "Couples," or "Teen" therapy. Having made her selection, she would then be asked a series of questions in the Intake Questionnaire regarding her mental health, including "Have you been in therapy before", "Rate your physical health", and "Are you experiencing depression."

46. Defendant's mandatory Intake Questionnaire also asks a series of sensitive questions

[18] betterhelp.com (last visited Aug. 2, 2024).

about mental health symptoms and the reasons why the individual is seeking therapy (e.g., feelings of depression, anxiety, grief, etc.), including if the customer is "experiencing overwhelming sadness, grief, or depression" or has been having thoughts that the customer "would be better off dead or hurting yourself in some way."

47. Depending upon the answers to some of the questions in Defendant's Intake Questionnaire, the Class Member might be invited to move to another of Defendant's Sites or respond to another Questionnaire asking even more intimate questions. If, for example, the Class Member was on one of the Sites and indicated that she was seeking couples counseling she might be re-directed to Defendant's ReGain website; if she indicated that she was a member of the LGBTQ community she might be re-directed to Defendant's Pride Counseling website. All Class Members, regardless of the type of service they selected, were required to complete the Intake Questionnaire in order to sign up for the Service. The Intake Questionnaire on each Site was identical or substantially similar in all material respects.

48. Upon completing the Intake Questionnaire, Plaintiffs and Class Members would be prompted to create a paid account for the Service by entering personal information, including name, email address, phone number, emergency contact information, and payment details.

49. Throughout the Class Period, the process of signing up for the Service on each of Defendant's Sites has been substantially the same.

50. Thus, as a condition of using the Service, Plaintiffs and other Class Members were required by Defendant to enter confidential, private, and sensitive personal and health information into the respective Sites they accessed.

## B. BETTERHELP PROMISED TO MAINTAIN CONFIDENTIALITY

51. Throughout the operation of its Service, BetterHelp made repeated representations to its users, and to those who fill out its mandatory Intake Questionnaire, regarding its commitment to maintaining the Private Information of Plaintiffs and Class Members as confidential. Plaintiffs relied on these representations when deciding to provide their Private Information to BetterHelp and when deciding whether to pay for BetterHelp's Service or access its platform.

52. Unfortunately for Plaintiffs and Class Members, BetterHelp's representations that it

would keep the Private Information of Plaintiffs and Class Members confidential were false, misleading, and deceptive as BetterHelp completely disregarded its commitment to confidentiality and instead allowed third parties to monitor Plaintiffs and Class Members in real time as they filled out the Intake Questionnaire or used the Sites.

53. For example, from September 2013 to December 2020, Defendant displayed HIPAA seals on its platform, which reasonable patients and consumers, including Plaintiffs and Class Members, understood to signal Defendant's purported compliance with HIPAA regulations.

54. By displaying HIPAA seals on many pages of Defendant's Sites, BetterHelp signaled and suggested to Plaintiffs and Class Members that a government agency or other third party had reviewed Defendant's privacy and information security practices and determined that they met HIPAA's requirements.

55. Defendant also represented to patients and consumers that it was in fact "HIPAA certified," with its customer service representatives informing consumers that Defendant was HIPAA Certified.

56. By displaying HIPAA seals and informing patients and customers that BetterHelp was HIPAA certified it reasonably enticed patients and customers, including Plaintiffs and the Class Members, to believe that any information collected from them would be kept private in compliance with industry standards for protecting such information. As such, Plaintiffs and the Class Members provided their Private Information to BetterHelp.

57. No government agency or other third party reviewed Defendant's information practices for compliance with HIPAA, let alone determined that its practices met the requirements of HIPAA and that BetterHelp did qualify for such certification.

58. BetterHelp also made repeated and unambiguous privacy assurances to Plaintiffs and Class Members throughout its Intake Questionnaire. For example, at least until November 2021, each of Defendant's platforms displayed a banner at the top of each question in the questionnaire, explaining that BetterHelp was merely asking for "some general and *anonymous* background information about you and the issues you'd like to deal with in online therapy" (emphasis added) so

that the individual completing the questionnaire could be matched "with the most suitable therapist for you."

59. As Plaintiffs and other Class Members proceeded through the Intake Questionnaire, Defendant made additional privacy assurances, which it periodically modified. From at least August 2017 to December 2020, when a Plaintiff or other Class Member reached the question as to whether they had taken medication, they were shown the statement: "Rest assured – any information provided in this questionnaire will stay private between you and your counselor." In December 2020, Defendant changed the statement to read: "Rest assured – *this information* will stay private between you and your counselor." (emphasis on alteration added). And in January 2021, Defendant changed it again to state: "Rest assured – *your health information* will stay private between you and your counselor. (emphasis on alteration added). This latter version of the representation remained in use until September 2021, when it was removed altogether, but could still be reasonably presumed.

60. Defendant also made false promises about its use of customers' email addresses, telling visitors to the Faithful Counseling, Pride Counseling, and Teen Counseling websites during the sign-up process that their email addresses would not be shared. From at least August 2017 to December 2020, Defendant assured such Website visitors that "Your email address is kept *strictly private*. It is never shared sold or disclosed to anyone. Even your counselor won't know your real email address." (emphasis added).

61. Millions of users, including Plaintiffs and Class Members, who ultimately signed up for BetterHelp's counseling services were presented with these repeated promises and relied on these promises when deciding to pay for Defendant's Service and whether to provide their Private Information to Defendant. Despite these promises, and contrary to Plaintiffs' and Class Members' reasonable expectations, Defendant shared the Private Information with unauthorized third parties for its own benefit, including by sharing it, allowing for its interception by third parties, and disclosing it in return for valuable marketing and analytical data.

62. In addition to the unambiguous representations that BetterHelp presented to Plaintiffs and Class Members about how it would keep their information confidential throughout out the mandatory Intake Questionnaire process, BetterHelp also maintained a Privacy Policy that could

only be accessed by scrolling to the bottom of the webpage and clicking on a hyperlink in shaded and fine print font. Users were never affirmatively required to read or assent to the Privacy Policy before completing BetterHelp's Intake Questionnaire or using the Sites.[19] Moreover, prominently displayed on the BetterHelp landing page was a representation that "[a]ll counselors are licensed, accredited professionals. BetterHelp allows you to connect with them in a safe and private online environment. Anything you share is confidential."[20]

63. From August 2013 to November 2018, Defendant's Privacy Policy represented that BetterHelp would only use and disclose users' email addresses, IP addresses, enrollment in the Service, and intake questionnaire responses for certain purposes, including to connect them with therapists and operate the Service.[21] Notably, the Privacy Policy made no mention of using or disclosing this information for advertising purposes, and it said nothing about permitting third parties to actually acquire, intercept, view, collect and use this information for their own purposes.

64. In November 2018, Defendant updated the Privacy Policy to state affirmatively that it would use and disclose this information only for limited purposes, such as to operate and improve the Service. These limited purposes did not include using or disclosing the information for advertising or disclosing the information to third parties to actually acquire, view, collect and use for their own purposes.[22]

65. Defendant revised its Privacy Policy again in September 2019, stating that it might *use* this medical information for advertising. But the policy continued to say that defendant would only *disclose this medical information to third parties* for certain stated limited purposes, which did not include advertising or allowing the third parties to actually acquire, intercept, view, collect and

---

[19] Defendant's Landing Page as of June 3, 2017 with the Privacy Policy hyperlink located at the bottom of the page can be found at https://web.archive.org/web/20170603005910/https://www.betterhelp.com/

[20] *Id.*

[21] Defendant's Privacy Policy as of February 28, 2017 can be found at https://web.archive.org/web/20170228111124/https://www.betterhelp.com/privacy/

[22] Defendant's Privacy Policy as of December 5, 2018 can be found at https://web.archive.org/web/20181205150455/https://www.betterhelp.com/privacy/

use for their own purposes.[23]

66. In September 2020, Defendant revised the Privacy Policy yet again to state that it might both use and disclose users' information for advertising. However, the Privacy Policy continued to claim that Defendant would disclose this information to third parties for only the stated limited purposes, which did not include third parties' to actually acquire, intercept, view, collect and use for their own purposes.[24]

67. From August 2013 to June 2021, Defendant's privacy policies stated that it would use web beacons (including pixels) and cookies for limited purposes. These limited purposes did not include the use or disclosure of users' Private Information for advertising purposes, or the disclosure of this information for third parties to actually intercept, acquire, view, collect and use for their own purposes. In fact, the Privacy Policy expressly represented that "[w]e use cookies and web beacons to enable the technical operation of the platform, to administer your log-in to your account and to collect the Log Data." Accordingly, the Privacy Policy represented that the use of such tools was limited to the platform's functionality. However, as discussed below, these tools permitted Defendant and third parties, including Facebook/Meta, to collect Plaintiffs' and Class Members' Private Information, including what pages they visited and what information they communicated through the Sites.

## C. BETTERHELP DISCLOSED THE PRIVATE INFORMATION OF PLAINTIFFS AND CLASS MEMBERS TO UNAUTHORIZED PARTIES

68. Despite Defendant's consistent and unambiguous messaging regarding its commitment to the confidentiality of information communicated through the use of its Sites, Defendant disregarded its promises and the rights and expectations of Plaintiffs and Class Members by sharing their Private Information with third party marketing companies in exchange for valuable analytics and marketing insights.

69. Completely unbeknownst to Plaintiffs and Class Members, the Private Information that they communicated to Defendant through the use of Defendant's Sites, both while signing up

---

[23] Defendant's Privacy Policy as of January 9, 2020 can be found at https://web.archive.org/web/20200109021030/https://www.betterhelp.com/privacy/

[24] Defendant's Privacy Policy as of November 27, 2020 can be found at https://web.archive.org/web/20201127181507/https://www.betterhelp.com/privacy/

for the Service and thereafter, including the fact that they were seeking mental health treatment, was intercepted by and/or disclosed to unauthorized third parties including Facebook/Meta, Pinterest, Criteo, and Snapchat.

70. Contrary to the understanding and expectations of Plaintiffs and Class Members, BetterHelp used a wide variety of tactics to share the Private Information of over 7 million consumers who filled out Defendant's Intake Questionnaire or who provided Private Information during their use of the Service.

71. On several occasions during the Class Period, Defendant uploaded Plaintiffs' and Class Members' email addresses to Meta. For example: (a) between January 2017 and October 2018, Defendant uploaded 170,000 visitors' and users' email addresses to Facebook, re-targeting these individuals and targeting potential new users with advertisements for the Service; (b) between January 2018 and October 2018, Defendant uploaded 15,000 users' email addresses to Facebook to find and target new potential users with advertisements for the Service; and, (c) in October 2017 Defendant uploaded the email addresses of all of their current and former users – nearly 2 million in total – to Meta, targeting them all with advertisements to refer their Facebook friends to the Service.

72. Defendant also used Private Information obtained from Class Members who signed up for the Service through Pride Counseling in order to optimize Defendant's future advertisements for the Service. From November 2017 to October 2020, Defendant gathered information concerning Class Members' mental health statuses and their connection with Class Members' LGBTQ identities when they visited its Site. For example, Defendant gathered this information through the Intake Questionnaire whenever a Pride Counseling user revealed that the User's "LGBTQ identity is contributing to your mental health concerns." Defendant used Facebook to identify characteristics and interests common among these users and then to target future advertisements for the Service on Facebook to individuals with similar characteristics and interests.

73. As another example, in January 2019, Defendant disclosed the IP addresses and email addresses of approximately 5.6 million visitors to its Sites (including Class Members) to Snapchat in order to re-target them with advertisements for the Service.

74. Similarly, from July 2018 to January 2019, Defendant disclosed the email addresses of over 70,000 visitors to its Sites (including Class Members) to Criteo in order to re-target them with advertisements.

75. And, from August 2019 to September 2020, Defendant disclosed the email addresses of thousands of visitors to its Sites (including Class Members) to Pinterest for advertising purposes.

76. As evidenced by Defendant's repeated and willful disclosure of Private Information, Defendant failed to implement reasonable and adequate data security policies and procedures and failed to employ, train, and oversee its marketing personnel to ensure that their practices complied with BetterHelp's representations and applicable laws.

77. For example, according to the FTC, in 2017 Defendant delegated most decision-making authority over its use of Facebook/Meta's advertising services to a junior marketing analyst who was a recent college graduate, had never worked in marketing, and had no experience and little training in safeguarding consumers' Private Information or ensuring that only appropriate information was used for advertising. In 2017, Defendant gave the analyst unilateral authority to decide what Private Information to upload to Facebook and how to use that information. Defendant provided this marketing analyst with little training on how to protect customers' Private Information in connection with advertising until 2021.

78. As a result of Defendant's failure to perform due diligence in hiring and training its employees, Defendant's marketing team not only disclosed the Private Information of Plaintiffs and Class Members as described above, but also made the decision to employ tracking software that allowed companies like Facebook/Meta to intercept the communications of Plaintiffs and Class Members with BetterHelp in real time, including the Private Information transmitted through the Intake Questionnaire and thereafter when using the Sites.

## D. BETTERHELP'S TRACKING PIXELS TRANSMITTED CONFIDENTIAL INFORMATION TO FACEBOOK IN REAL TIME

79. Facebook/Meta and other online platforms derive revenue almost exclusively from selling targeted advertising to both the users of its own platform, Facebook, and to internet users generally by integrating web beacons and cookies onto websites like BetterHelp's Sites. Facebook/Meta generated $117 billion in revenue in 2021, roughly 97% of which was derived from

selling advertising space.[25] Facebook/Meta can generate such revenue through its ability to precisely target individual consumers. One way it is able to do this is through the use of web beacons or "pixels."

80. A pixel is a piece of code that "tracks the people and [the] type of actions they take"[26] as they interact with a website, including, inter alia, how long a person spends on a particular web page, which buttons the person clicks, which pages they view, and the text or phrases they type into various portions of the website (such as a general search bar, chat feature, or text box), among other things.

81. Social media platforms like Facebook/Meta use the pixel and similar tracking software to build profiles on web users that include real names, locations, email addresses, telephone numbers, interests, purchasing habits, and communications that the companies associate with unique personal identifiers like IP addresses, browser fingerprints, device IDs and cookie identifiers.

82. By associating or assigning these identifiers to a particular individual these companies can track a user's behavior across websites in order to build a more detailed consumer profile. Facebook/Meta for example assigns what it calls a Facebook user ID ("FID") to each individual user of its platform. A user's FID is associated with their Facebook profile, which typically includes diverse demographic and personal information such as user's location, photos, interests, employment history, relationship status, and other details. Since the FID serves as a unique identifier for an individual's Facebook account, Facebook or any regular person can effortlessly utilize the FID to locate, access, and view the user's corresponding Facebook profile without difficulty. In the case of Facebook/Meta, the pixel forces the website user to share the user's FID with each communication via a "cookie" that Facebook/Meta stores in users browsers. And for both Facebook account-holders and users who do not have a Facebook account, these identifiers also include cookies that Facebook/Meta ties to users' browsers, such as "datr" and "fr" cookies.[27]

---

[25] FACEBOOK, META REPORTS FOURTH QUARTER AND FULL YEAR 2021 RESULTS, https://investor.fb.com/investor-news/press-release-details/2022/Meta-Reports-Fourth-Quarter-and-Full-Year-2021-Results/default.aspx

[26] See *Retargeting*, Facebook, https://www.facebook.com/business/goals/retargeting.

[27] Facebook/Meta, *Cookies Policy* (Oct. 5, 2022), https://www.facebook.com/policy/cookies.

83. The pixel functions by being embedded in a user's browser after they request to visit a website, such as the Sites. Web browsers are software applications that allow consumers to navigate the Internet and view and exchange electronic information and communications over the Internet. Each "client device" (such as computer, tablet, or smart phone) accesses web content through a browser (*e.g.*, Google's Chrome browser, Mozilla's Firefox browser, Apple's Safari browser, or Microsoft's Edge browser).

84. Every website, including the BetterHelp Sites, is hosted by a computer "server" that holds the website's contents and through which the entity in charge of the website exchanges communications with Internet users' client devices via the users' browsers.

85. Web communications consist of "HTTP" or HTTPS Requests and HTTP or HTTPS Responses, and any given browsing session may consist of thousands of individual HTTP Requests and HTTP Responses, along with corresponding cookies:

> **HTTP Request**: an electronic communication sent from the client device's browser to the website's server. GET Requests are one of the most common types of HTTP Requests. In addition to specifying a particular URL (i.e., web address), GET Requests can also send data to the host server embedded inside the URL, and can include cookies. POST Requests can send a large amount of data outside of the URL. (For instance, uploading a PDF for filing a motion to a court).
>
> **Cookies**: a small text file that can be used to store information on the client device which can later be communicated to a server or servers. Cookies are sent with HTTP Requests from client devices to the host server. Some cookies are "third-party cookies," which means they can store and communicate data when visiting one website to an entirely different website.
>
> **HTTP Response**: an electronic communication that is sent as a reply to the client device's web browser from the host server in response to an HTTP Request. HTTP Responses may consist of a web page, another kind of file, text information, or error codes, among other data.[28]

86. A website visitor's HTTP Request essentially asks BetterHelp's servers to retrieve certain information (such as the Intake Questionnaire page and any submitted responses). The HTTP Response sends the requested information in the form of a "Markup." This is the foundation for the pages, images, words, buttons, and other features that appear on Plaintiffs' and Class Members'

[28] One browsing session may consist of hundreds or thousands of individual HTTP Requests and HTTP Responses.

screens as they navigate Defendant's Sites.

87. Every website is comprised of Markup and "Source Code." Source Code is simply a set of instructions that commands the website visitor's browser to take certain actions when the web page first loads or when a specified event triggers the source code.

88. Source code may also command a web browser to send data transmissions to third parties in the form of HTTP Requests quietly executed in the background without notifying the browser's user. The pixel software is source code that does just that. The pixel acts much like a traditional wiretap. When a user visits a BetterHelp Site and accesses its servers via an HTTP Request to BetterHelp's server, the server sends an HTTP Response including the Markup that displays the webpage visible to the user and the invisible Source Code, in this case, the pixel. Once the webpage is loaded into the users' browser, the pixel software waits for the user to communicate information via a GET Request, which duplicates that GET Request in dispatch and directs it to a third-party server, in this case for example, Facebook/Meta's server.

89. This second transmission, completely invisible and unknown to the user, contains the content of the original request sent to the host website ("GET request"), along with the data that the pixel was configured to collect ("POST request"). GET and POST requests are communications that contain contents from both the user and from servers associated with the website they are visiting, including the Sites. These second transmissions are initiated by pixel code and concurrent with the communications to and from the host websites, including the Sites.

90. In addition to the communication itself, the pixel software that Defendant intentionally embeds on its Sites will also capture personal identifiers like the FID, browser fingerprints, device IDs, and IP addresses. IP addresses are used to identify and route communications on the Internet. IP addresses of individual Internet users are used by websites and tracking companies to facilitate and track Internet communications. Individual homes and their occupants can be, and are, tracked and targeted with advertising using IP addresses. Thus, IP addresses are personally identifiable, particularly in combination with other information disclosed through the pixel software.

91. Completely unbeknownst to Plaintiffs and other Class Members, and continuing to the present, Private Information that they communicated to Defendant through Defendant's Sites and while signing up for the Service and thereafter, including the fact that they signed up for the Service, was intercepted by and/or disclosed to unauthorized third parties including at least Facebook/Meta, Pinterest, Criteo, and Snapchat.

92. Facebook/Meta warns developers and those who incorporate the Facebook pixel into their website that the pixel is a personal identifier because it "relies on Facebook cookies, which enable us to match your website visitors to their respective Facebook user accounts."[29]

93. Nevertheless, on date unknown and continuing to the present, Defendant embedded pixel software and other tracking tools throughout its Sites, including the Intake Questionnaire, and allowed third parties to intercept the confidential communications and Private Information of Plaintiffs and Class Members without their authorization, consent or knowledge.

94. When a Plaintiff or Class Member visited one or more of Defendant's Sites and completed the steps necessary to obtain Defendant's Service, the pixel or other tracking tool automatically caused the users' personal identifiers, including email addresses, IP addresses and the c_user, _fr, _datr, and _fbp cookies, to be transmitted to Facebook/Meta, attached to the fact that the particular user had visited the Sites, the titles of the pages the user visited, and the text they inputted into form fields, like those on the Intake Questionnaire, as well as additional sensitive information.

95. Because Defendant only collected email addresses from individuals seeking mental health therapy via the Service, disclosure of simply a Plaintiffs' or a Class Member's email address implicitly identified Plaintiffs or the respective Class Member as one seeking and/or receiving mental health treatment via the Service. Thus, each such disclosure constituted a disclosure of Private Information.

96. Because Defendant disclosed Plaintiffs' and Class Members' email addresses, names, IP addresses and other personal identifiers, including their FIDs, in conjunction with other data about their enrollment in the Service and/or their Intake Questionnaire responses and other

[29] Facebook, Get Started, https://developers.facebook.com/docs/meta-pixel/get-started (last visited Jan. 18, 2023).

sensitive information, each such disclosure constituted a disclosure of Private Information of Plaintiffs and Class Members.

97. In addition to the "automatic events" that the pixel automatically collects and transmits from a website without the website owner or developer being required to add any additional code, Defendant intentionally configured the pixel on its Sites to track, collect, and disclose "custom events" such as a user's response to certain questions in the Intake Questionnaire such as: "Have you been in counseling or therapy before?" or questions regarding their faith, their sexuality, and even their financial condition.

98. Defendant disclosed to Facebook/Meta the details of over 1.5 million visitors' and users' previous therapy – gathered through their affirmative responses to the Intake Questionnaire question: "Have you been in counseling or therapy before?"

99. Between October 2018 and November 2020, Defendant disclosed to Facebook/Meta the financial status of over 3.5 million visitors and users who answered that they had "good" or "fair" financial status on the Intake Questionnaire.

100. In addition, between January and December 2020, Defendant shared with Facebook the fact that over 180,000 identifiable visitors had become paying users. This information was disclosed through an event notifying Facebook that the users had entered credit card information after completing the Intake Questionnaire.

101. Put simply, when Plaintiffs or other Class Members used Defendant's Sites to obtain the Service from Defendant, their Private Information, including their identities, unique identifiers, and protected health information was disclosed to Facebook/Meta and other third parties.

102. Defendant disclosed Plaintiffs' and Class Members' Private Information to Facebook/Meta and other third parties in order to allow BetterHelp to improve its marketing and advertising and to increase Defendant's subscribers, revenues, and profits. Thus, Defendant embedded the pixel on its Sites solely for its own benefit and used Plaintiffs' and Class Members' Private Information for its own marketing and advertising purposes and to increase its revenues and profits rather than to provide medical services to such individuals.

103. Moreover, and as evidenced by Plaintiffs' receipt of targeted ads from BetterHelp or related to mental health products and services, Facebook/Meta analyzes, categorizes, and uses the Private Information disclosed to them by BetterHelp through the Sites for their own purposes, including building consumer profiles and directing advertisements at Plaintiffs and Class Members. Defendant did not contractually limit how Facebook/Meta and other third parties could use and disclose the Private Information they received from Defendant about Plaintiffs and Class Members other than merely agreeing to those third parties' general terms of service, which either placed no restrictions on the third parties' use and disclosure of the information or specifically permitted the third parties to use the information for their own purposes, contrary to BetterHelp's representations and obligations under federal and state law, as discussed *infra*.

104. Facebook/Meta viewed and continues to have in its possession information that BetterHelp provided access to regarding several of the Plaintiffs' interactions with BetterHelp, including their Private Information. Facebook/Meta has viewed the information unlawfully shared with it by BetterHelp, associated it with individual Plaintiffs, and continues to possess information that verifies the fact, *inter alia*, that they were seeking mental health therapy from BetterHelp. Facebook/Meta also received from BetterHelp and retained and viewed information about the specific date and time when people log in to the BetterHelp website and, in some cases, highly private and Private Information they have not shared with others – and certainly did not authorize to be shared with companies such as Facebook/Meta. This is evidenced by the fact that Plaintiffs continue to receive advertisements from BetterHelp on Facebook/Meta despite no longer using the Service.

## E. DEFENDANT HAD A DUTY TO PROTECT THE PRIVATE INFORMATION OF PLAINTIFFS AND CLASS MEMBERS FROM DISCLOSURE

105. Defendant is required by the laws identified herein and various other laws and regulations designed to protect Plaintiffs' and Class Members' Private Information and to handle notification of any unauthorized use of such Private Information in accordance with applicable statutes, including breach notification statutes. These duties are established in numerous California statutes, including Cal. Civ. Code §§ 56.10(d), 1798.21, 1798.29, Cal. Bus. and Prof. Code §§ 17200 *et seq.*, the Online Privacy Protection Act, California Business and Professions Code §§ 22575-

22579 ("CalOPPA"); Cal. Penal Code § 630-632 *et seq*., as well as Article I, § 1 of the California Constitution.

106. Based on the Service it provides consumers and its business model and practices as set forth above, Defendant is a "covered entity" as a "health care provider" pursuant to HIPAA. *See* 45 C.F.R. § 160.102. Defendant must, therefore, comply with the HIPAA Privacy Rule and Security Rule. *See* 45 C.F.R. Part 160 and Part 164, Subparts A through E.

107. Defendant is also a "covered entity" pursuant to the Health Information Technology Act ("HITECH")[30]. *See* 42 U.S.C. §17921, 45 C.F.R. § 160.103.

108. HIPAA's Privacy Rule, otherwise known as "Standards for Privacy of Individually Identifiable Health Information," establishes national security standards and duties for Defendant's protection of Private Information maintained by it.

109. HIPAA's Security Rule, otherwise known as "Security Standards for the Protection of Electronic Protected Health Information," establishes national security standards for the protection of health information that is held or transferred. See 42 C.F.R. §§ 164.302-164.318.

110. HIPAA limits the permissible uses and disclosure of "protected health information" by companies such as BetterHelp and prohibits the unauthorized disclosure of "protected health information." 45 C.F.R. § 164.502. HIPAA requires that covered entities implement appropriate administrative, technical, and physical safeguards for this information and requires that covered entities reasonably safeguard protected health information from any intentional or unintentional use or disclosure that is in violation of the standards, implementation specifications or other requirements of this subpart. *See* 45 C.F.R. § 164.530(c).

111. HIPAA requires a covered entity to have and apply appropriate sanctions against members of its workforce who fail to comply with the privacy policies and procedures of the covered entity or the requirements of 45 C.F.R. Part 164, Subparts D or E. *See* 45 C.F.R. § 164.530(e).

112. HIPAA requires a covered entity to mitigate, to the extent practicable, any harmful effect that is known to the covered entity of a use or disclosure of protected health information in

[30] HIPAA and HITECH work in tandem to provide guidelines and rules for maintaining protected health information. HITECH references and incorporates HIPAA.

violation of its policies and procedures or the requirements of 45 C.F.R. Part 164, Subpart E by the covered entity or its business associate. *See* 45 C.F.R. § 164.530(f).

113. Under HIPAA, PHI means individually identifiable health information:

> (1) Except as provided in paragraph (2) of this definition, that is:
>
> (i) Transmitted by electronic media;
>
> (ii) Maintained in electronic media; or
>
> (iii) Transmitted or maintained in any other form or medium.[31]

114. HIPAA and HITECH obligated Defendant to implement technical policies and procedures for electronic information systems that maintain electronic protected health information so that such systems were accessible only to those persons or software programs that had been granted access rights and who have a working need to access and view the information. *See* 45 C.F.R. § 164.312(a)(1); *see also* 42 U.S.C. §17902.

115. HIPAA and HITECH also obligated Defendant to implement policies and procedures to prevent, detect, contain, and correct security violations, and to protect against uses or disclosures of electronic protected health information that are reasonably anticipated but not permitted by the Privacy Rule and the Security Rule. *See* 45 C.F.R. § 164.306(a)(1) and § 164.306(a)(3); *see also* 42 U.S.C. §17902.

116. HIPAA further obligated Defendant to ensure that its workforce complied with HIPAA security standard rules (*see* 45 C.F.R. § 164.306(a)(4)) to effectively train its workforces on the policies and procedures with respect to protected health information, as necessary and appropriate for those individuals to carry out their functions and maintain the security of protected health information. *See* 45 C.F.R. § 164.530(b)(1).

117. HIPAA also requires the Office of Civil Rights ("OCR"), within the "HHS", to issue annual guidance documents on the provisions in the HIPAA Security Rule. *See* 45 C.F.R. §§ 164.302-164.318. For example, "HHS has developed guidance and tools to assist HIPAA covered entities in identifying and implementing the most cost effective and appropriate administrative,

[31] 45 C.F.R. § 160.103

physical, and technical safeguards to protect the confidentiality, integrity, and availability of e-PHI and comply with the risk analysis requirements of the Security Rule." *See* U.S. Department of Health & Human Services, Security Rule Guidance Material.[32] The list of resources includes a link to guidelines set by the National Institute of Standards and Technology ("NIST"), which OCR says "represents the industry standard for good business practices with respect to standards for securing e-PHI." *See* US Department of Health & Human Services, Guidance on Risk Analysis.[33]

118. Should a health care provider experience an unauthorized disclosure, it is required to conduct a Four Factor Risk Assessment under the "HIPAA Omnibus Rule." This standard requires, "A covered entity or business associate must now undertake a four-factor risk assessment to determine whether or not PHI has been compromised and overcome the presumption that the breach must be reported. The four-factor risk assessment focuses on:

> (1) the nature and extent of the PHI involved in the incident (e.g., whether the incident involved sensitive information like social security numbers or infectious disease test results);
>
> (2) the recipient of the PHI;
>
> (3) whether the PHI was actually acquired or viewed; and
>
> (4) the extent to which the risk that the PHI was compromised has been mitigated following unauthorized disclosure (e.g., whether it was immediately sequestered and destroyed).[34]

119. The HIPAA Breach Notification Rule, 45 C.F.R. §§ 164.400-414, requires HIPAA covered entities and their business associates to provide notification following a breach or unauthorized access of unsecured protected health information.

120. The HIPAA Contingency Operations Rule, 45 C.F.R. §164.301(a), requires a

[32] http://www.hhs.gov/hipaa/for-professionals/security/guidance/index.html
[33] https://www.hhs.gov/hipaa/for-professionals/security/guidance/guidance-risk-analysis/index.html
[34] 78 Fed. Reg. 5641-46, *See also*, 45 C.F.R. §164.304

healthcare provider to have security measures in place and train its employees and staff so that all its staff and employees know their roles in facility security.

121. Defendant has failed to provide proper notice to Plaintiffs and Class Members of the unauthorized disclosures set forth above, as required by the laws and regulations set forth above and herein.

122. Defendant failed to conduct or improperly conducted the four-factor risk assessment following the unauthorized disclosures set forth above.

123. As Defendant is an entity covered by HIPAA it is required to comply with the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E and Security Rule 45 C.F.R. Part 160 and Part 164, Subparts A and C, which establish national security standards and duties for Defendant's protection of Private Information maintained by them in electronic form. HIPAA limits the permissible uses of health information and prohibits the disclosure of this information without explicit authorization. *See* 45 C.F.R. § 164.502. HIPAA also requires that covered entities implement appropriate safeguards to protect this information. See 45 C.F.R. § 164.530(c)(1).

124. HIPAA requires Defendant to "comply with the applicable standards, implementation specifications, and requirements" of HIPAA "with respect to electronic protected health information [defined above]" 45 C.F.R. § 164.302.

125. HIPAA's Security Rule requires Defendant to: (a) ensure the confidentiality, integrity, and availability of all electronic protected health information the covered entity or business associate creates, receives, maintains, or transmits; (b) protect against any reasonably anticipated threats or hazards to the security or integrity of such information; (c) protect against any reasonably anticipated uses or disclosures of such information that are not permitted; and (d) ensure compliance by its workforce.

126. HIPAA also requires Defendant to "review and modify the security measures implemented . . . as needed to continue provision of reasonable and appropriate protection of electronic protected health information" (45 C.F.R. § 164.306(c)), and also to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic

protected health information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. § 164.312(a)(1).

127. Defendant failed to comply with safeguards mandated by the above HIPAA regulations by, *inter alia*, doing the following:

(a) Failing to ensure the confidentiality and integrity of electronic PHI that Defendant creates, receives, maintains, and transmits, in violation of 45 C.F.R. § 164.306(a)(1);

(b) Failing to implement technical policies and procedures for electronic information systems that maintain electronic PHI to allow access only to those persons or software programs that have been granted access rights such as by the use of multi-factor authentication, in violation of 45 C.F.R. § 164.312(a)(1);

(c) Failing to implement policies and procedures to prevent, detect, contain, and correct security violations, in violation of 45 C.F.R. § 164.308(a)(1);

(d) Failing to identify and respond to suspected or known security incidents and mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity, in violation of 45 C.F.R. § 164.308(a)(6)(ii);

(e) Failing to protect against any reasonably-anticipated threats or hazards to the security or integrity of electronic PHI, in violation of 45 C.F.R. § 164.306(a)(2);

(f) Failing to protect against any reasonably anticipated uses or disclosures of electronic PHI that are not permitted under the Privacy Rules regarding individually identifiable health information, in violation of 45 C.F.R. § 164.306(a)(3);

(g) Failing to ensure compliance with HIPAA Security Rules by its workforce by providing for adequate comprehensive training rather than simply using training software to test staff by imitating phishing emails, in violation of 45 C.F.R. § 164.306(a)(4);

(h) Impermissibly and improperly using and disclosing PHI that is and remains accessible to unauthorized persons, in violation of 45 C.F.R. § 164.502, et seq.;

(i) Failing to effectively train all members of its workforce (including independent

contractors) on the policies and procedures with respect to PHI as necessary and appropriate for the members of its workforce to carry out their functions and to maintain security of PHI, in violation of 45 C.F.R. sections 164.530(b) and 164.308(a)(5); and

(j) Failing to design, implement, and enforce policies and procedures establishing physical and administrative safeguards to reasonably safeguard PHI, in violation of 45 C.F.R. § 164.530(c).

128. BetterHelp, by now claiming that HIPAA does not apply to it despite the laws governing its conduct and the representations it has publicly made, has not acted in accordance with these requirements, and still is not doing so. It has failed and refused to provide notice to either the OCR or the State Attorneys General of the unauthorized disclosure of such information. It has failed to disclose to each affected individual the nature of the Private Information disclosed and to whom it was disclosed as required by 45 C.F.R. § 164.404 *et seq*. It has failed to notify the Secretary of the HHS about the information that was disclosed to unauthorized third parties without Plaintiffs' and Class Members' authorization, as required by 45 C.F.R. § 16.408. It has failed to notify the media of the disclosure of Plaintiffs' and Class Members' information, as required by 45 C.F.R. § 164.406. And it has failed to comply with its legal obligations to prove that all disclosures were made as required to meet its burden to do so, as set forth in 45 C.F.R. § 164.402. BetterHelp also has failed to comply with its legal obligation to notify consumers and the California Attorney General of the unlawful disclosure of Plaintiffs' and Class Members' Private Information as required by, *inter alia*, the CMIA and sections California Civ. Code § 1798.82(a) and California Civ. Code § 1798.82(f). These violations have not been addressed by prior orders or directives from any Court or regulatory authority, and are the appropriate subject of injunctive relief to enjoin BetterHelp from failing and refusing to do so.

129. Defendant also violated the duties applicable to it under the Federal Trade Commission Act, 15 U.S.C. § 45 *et seq*. ("FTC Act"), from engaging in "unfair or deceptive acts or practices in or affecting commerce." The FTC, pursuant to that Act, has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive information,

such as the Private Information at issue herein, is an "unfair practice" in violation of the FTC Act and thus also constitutes a *per se* violation of the UCL.

130. As established by these laws, Defendant owed a duty to Plaintiffs and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Private Information in its possession from being provided to, intercepted by, and/or misused by unauthorized persons such as the companies identified herein.

131. By taking affirmative acts inconsistent with these obligations, Defendant disclosed and permitted the disclosure of Private Information to unauthorized third parties. Through such actions or inactions, BetterHelp failed to preserve the confidentiality of Plaintiff and Class Members' Private Information that it was duty-bound to protect.

## F. PRIVATE INFORMATION IS A VALUABLE PROPERTY RIGHT

132. As evidenced by the value that BetterHelp and its advertising partners derived from the Private Information of Plaintiffs and Class Members, Private Information is a valuable commodity. Unsurprisingly, Facebook/Meta and others do not offer the pixel to companies like BetterHelp solely for Defendant's benefit. "Data is the new oil of the digital economy,"[35] and Facebook has built its more-than $300 billion market capitalization on mining and using that "digital" oil. Thus, the large volumes of personal and sensitive health-related data Defendant provides to Facebook/Meta are actively viewed, examined, analyzed, curated, and used by the company. Facebook/Meta acquires the raw data in order to transform it into a monetizable commodity, just as an oil company acquires crude oil to transform it into gasoline. Indeed, Facebook/Meta offers the pixel free of charge[36] and the "price" that Defendant pays for the pixel is the data from Plaintiffs and Class Members that it allows Facebook/Meta to collect.

133. Conservative estimates suggest that in 2018, Internet companies earned $202 per American user from mining and selling data. That figure is expected to keep increasing; estimates for 2022 are as high as $434 per user, for a total of more than $200 billion industry-wide.

---

[35] https://www.wired.com/insights/2014/07/data-new-oil-digital-economy/ (last visited April 25, 2023).

[36] https://seodigitalgroup.com/facebook-pixel/ (last visited April 25, 2023).

134. An active and robust legitimate marketplace for Private Information taken from Plaintiffs and Class Members exists. In 2021, the data brokering industry was worth roughly $200 billion.[37] In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who, in turn, aggregates the information and provides it to marketers or app developers.[38,39] Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50.00 a year.[40] Users of the personal data collection app Streamlytics can earn up to $200 a month by selling their personal information to marketing companies who use it to build consumer demographics profiles.[41]

135. Moreover, health information has value to consumers. According to the annual Financial Trust Index Survey, conducted by the University of Chicago's Booth School of Business and Northwestern University's Kellogg School of Management, which interviewed more than 1,000 Americans, 93 percent would not share their health data with a digital platform for free. Half of the survey respondents would only share their data for $100,000 or more, and 22 percent would only share their data if they received between $1,000 and $100,000.[42]

136. In 2015, *TechCrunch* reported that "to obtain a list containing the names of individuals suffering from a particular disease," a market participant would have to spend about "$0.30 per name."[43] That same report noted that "Data has become a strategic asset that allows companies to acquire or maintain a competitive edge" and that the value of a single user's data (within the corporate acquisition context) can vary from $15 to more than $40 per user.[44]

137. Similarly, CNBC published an article in 2019 in which it observed that "[d]e-

---

[37] https://www.latimes.com/business/story/2019-11-05/column-data-brokers

[38] https://datacoup.com/

[39] https://digi.me/what-is-digime/

[40] Nielsen Computer & Mobile Panel, *Frequently Asked Questions, available at* https://computermobilepanel.nielsen.com/ui/US/en/faqen.html

[41] How To Sell Your Own Data And Why You May Want to, available at https://www.mic.com/impact/selling-personal-data-streamlytics (last accessed August 7, 2023)

[42] Andrea Park, *How much should health data cost? $100K or more, according to patients*, Becker's Hosp. Rev. (Feb. 12, 2020), https://www.beckershospitalreview.com/healthcare-information-technology/how-much-should-health-data-cost-100k-or-more-according-to-patients.html.

[43] Pauline Glickman and Nicholas Glady, *What's the Value of Your Data?*, TECHCRUNCH (Oct. 13, 2015), https://techcrunch.com/2015/10/13/whats-the-value-of-your-data/.

[44] *Id.*

identified patient data has become its own small economy: There's a whole market of brokers who compile the data from providers and other health-care organizations and sell it to buyers."[45]

138. Given the existence of a market for the Private Information disclosed by Defendant, in which Plaintiffs and Class Members have a privacy and property interest, Defendant has deprived Plaintiffs and Class Members of the economic value of their Private Information by disclosing such Private Information to unauthorized third parties such as Facebook/Meta without authorization and to do so and without providing proper consideration for Plaintiffs' and other Class Members' property.

**TOLLING, CONCEALMENT, AND ESTOPPEL**

139. The applicable statutes of limitation have been tolled as a result of Defendant's knowing and active concealment and denial of the facts alleged herein.

140. Defendant had exclusive knowledge of the material facts set forth above yet failed to disclose to Plaintiffs and Class Members that by interacting with the Sites their sensitive Private Information, including medical information, would be disclosed by Defendant and actually viewed, intercepted, collected, used, and stored by unauthorized third parties.

141. Plaintiffs and Class Members could not with due diligence have discovered the full scope of Defendant's conduct prior to March 2, 2023 because there were no disclosures or other indication that BetterHelp was sharing such Private Information and, in fact, BetterHelp kept them from discovering this information by falsely claiming that their information would be kept confidential.

142. The earliest that Plaintiffs and Class Members, acting with due diligence, could have reasonably discovered this conduct would have been on March 2, 2023, when the FTC announced its settlement with BetterHelp, and the news of that settlement was widely reported in the media.

143. All applicable statutes of limitation also have been tolled by operation of the discovery rule. Under the circumstances, Defendant was under a duty to disclose the nature and significance of their data collection practices but did not do so. Defendant is therefore estopped from

[45] *See* https://www.cnbc.com/2019/12/18/hospital-execs-say-theyre-flooded-with-requests-for-your-health-data.html (last visited August 16, 2023).

relying on any potentially applicable statutes of limitation.

## CLASS ACTION ALLEGATIONS

144. Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23 individually and on behalf of the following Class:

> All natural persons residing in the United States who accessed or used one of Defendant's Sites to sign up for or use Defendant's Service and whose Private Information was disclosed to any unauthorized third party.

145. Plaintiffs T.R., Jane Doe I, Jane Doe III, and R.S. (California Plaintiffs) bring this action pursuant to Federal Rule of Civil Procedure 23 individually and on behalf of the following California Subclass:

> All natural persons residing in California who accessed or used one of Defendant's Sites to sign up for or use Defendant's Service and whose Private Information was disclosed to any unauthorized third party.

146. Excluded from the Class and Subclass are: (1) any Judge or Magistrate presiding over this action and any members of their immediate families; (2) the Defendant, Defendant's subsidiaries, affiliates, parents, successors, predecessors, and any entity in which the Defendant or its parents have a controlling interest and its current or former employees, officers, and directors; and (3) Plaintiffs' counsel and Defendant's counsel.

147. **Numerosity:** The exact number of members of the Class and Subclass are unknown and unavailable to Plaintiffs at this time but is estimated to number in the millions and individual joinder in this case is impracticable. The members of the Class and Subclass can be identified through BetterHelp's records.

148. **Predominant Common Questions:** The Class's and Subclass's claims present common questions of law and fact, and those questions predominate over any questions that may affect individual Class Members. Common questions for the Class and Subclass include, but are not limited to, the following:

- Whether Defendant implemented and maintained reasonable security practices and procedures appropriate to protect Plaintiffs' and Class Members' Private Information from unauthorized access, or disclosure;

- Whether Defendant and its employees, agents, officers, or directors negligently or unlawfully disclosed or permitted the unauthorized disclosure of Plaintiffs' and Class Members' Private Information to unauthorized persons;
- Whether Defendant negligently created, maintained, preserved, stored, abandoned, or disposed of Plaintiffs' and Class Members' Private Information, and failed to protect and preserve the integrity of the Private Information provided by Plaintiffs and Class Members to BetterHelp and/or through the Sites;
- Whether Defendant adequately, promptly, timely, and accurately informed Plaintiffs and the Class Members that their Private Information had been compromised and whether Defendant violated the law by failing to promptly and fully notify Plaintiffs and the Class Members of this material fact;
- Whether Defendant engaged in acts of unfair competition or "unfair", "unlawful" or "fraudulent" business practices by failing to safeguard the Private Information of Plaintiffs and Class Members;
- Whether Defendant violated the state and federal laws cited herein; and
- Whether Plaintiffs and the Class are entitled to damages, equitable and/or injunctive relief to redress the imminent and currently ongoing harm faced as a result of the unauthorized disclosures described herein and Defendant's failure to provide full and adequate notice thereof, and the scope of such relief.

149. **Typicality:** Plaintiffs' claims are typical of the claims of the other members of the Class and the Subclass, respectively. The claims of Plaintiffs and the members of the Class and Subclass arise from the same conduct by Defendant and are based on the same legal theories.

150. **Adequate Representation:** Plaintiffs have, and will continue to, fairly and adequately represent and protect the interests of the Class and Subclass. Plaintiffs have retained counsel competent and experienced in complex litigation and class actions, including litigations to remedy privacy violations. Defendant has no defenses unique to any Plaintiffs. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the members of the Class

and Subclass, and they have the resources to do so. Neither Plaintiffs nor their counsel have any interest materially antagonistic or adverse to the interests of the other members of the Class and Subclass.

151. **Substantial Benefits:** This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy considering (a) the Class Members' interests in individually controlling the prosecution or defense of separate actions; (b) the extent and nature of any litigation concerning the controversy already begun by Class Members; (c) the desirability or undesirability of concentrating the litigation of the claims in this particular forum; and (d) the potential difficulties in managing a class action. This proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Class treatment will create economies of time, effort, and expense and promote uniform decision-making.

152. In addition, prosecuting separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members that would establish incompatible standards of conduct for Defendant, or adjudications with respect to individual Class Members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests. BetterHelp has acted or refused to act on grounds that apply generally to the Class, such that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole.

153. Plaintiffs reserve the right to revise the class allegations and definitions based on facts learned and legal developments following additional investigation, discovery, or otherwise.

## CALIFORNIA LAW APPLIES TO THE ENTIRE CLASS

154. California substantive laws apply to every member of the Class. California's substantive laws may be constitutionally applied to the claims of Plaintiffs and the Class Members under the Due Process Clause, 14th Amend. § 1, and the Full Faith and Credit Clause, Art. IV. § 1 of the U.S. Constitution. California has significant contact, or significant aggregation of contacts, to

the claims asserted by Plaintiffs and Class Members, thereby creating state interests to ensure that the choice of California state law is not arbitrary or unfair.

155. BetterHelp's principal place of business is located in, and it conducts substantial business in, California such that California has an interest in regulating BetterHelp's conduct under its laws. BetterHelp's decision to reside in California and avail itself of California's laws renders the application of California law to the claims herein constitutionally permissible. The conduct at issue also originated in and emanated from California as that is where the decisions to include the tracking processes and the representations at issue were made and likely effectuated, and where the illegal data transfers took place based on, *inter alia*, the location of BetterHelp's servers. BetterHelp aided and allowed third parties such as Facebook/Meta, Pinterest, Snap and Criteo and the other third parties identified herein to receive and intercept this data while it was in transit or was being sent from or received within California through servers maintained by either BetterHelp or third parties such as Facebook/Meta and the other third parties identified herein in this State.

156. The application of California law to the Class Members is also appropriate under California's choice of law rules because California has significant contacts to the claims of Plaintiffs and the Class Members, and California has a greater interest in applying its laws here than any other interested State.

## COUNT I
## Invasion of Privacy
## (On Behalf of Plaintiffs and the Nationwide Class)

157. Plaintiffs incorporate the foregoing allegations by reference as if fully set forth herein to the extent relevant to this Count and the relief available thereunder.

158. Defendant's secret disclosure of Plaintiffs' and other Class Members' Private Information, including each Class Member's email address, IP address, FID, and other individually identifying information, and information about their medical history, mental and physical condition, and treatment (including that they were seeking or receiving mental health treatment), constitutes an intentional intrusion upon Plaintiffs' and Class Members' private matters that were intended to stay private from third parties.

159. Plaintiffs and Class Members had a reasonable expectation of privacy in their Private

Information. Plaintiffs and Class Members did not consent to, authorize, or have any reason to know about Defendant's intrusion into their privacy at the time it occurred.

160. Defendant's intrusion into Plaintiffs' and Class Members' private affairs, seclusion, and solitude, would be highly offensive to a reasonable person.

161. Plaintiffs and Class Members expected that the Private Information, including PHI, they shared with a provider of mental healthcare (particularly one who promised that it would keep this information confidential and indicated it was HIPAA compliant on its website) would not be disclosed to an unauthorized third party. Social norms and industry standards inform the understanding that Private Information, including PHI, is highly protected and that disclosure of that information to third parties requires consent and authorization. The secret disclosure of Private Information would be highly offensive to a reasonable person and was highly offensive to Plaintiffs.

162. Plaintiffs and Class Members have been harmed as a result of Defendant's actions, including, but not limited to, an invasion of their privacy rights.

163. Plaintiffs and Class Members seek appropriate relief for their injuries, including, but not limited to, monetary damages to compensate for the harm to their privacy interests and disgorgement of profits made by Defendant as a result of its intrusions into Plaintiffs' and Class Members' private matters.

164. Plaintiffs and Class Members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Defendant's actions, which were directed at invading Plaintiffs' and Class Members' privacy rights in conscious disregard of those rights. Such damages are necessary to deter Defendant from engaging in such conduct in the future.

165. This action, if successful, will enforce an important right affecting the public interest and would confer a significant benefit on a large class of persons and/or the general public. Private enforcement is necessary and places a disproportionate financial burden on Plaintiffs in relation to Plaintiffs' stake in the matter. Because this case is brought for the purposes of enforcing important rights affecting the public interest, Plaintiffs also seek the recovery of attorneys' fees and costs in prosecuting this action against Defendant under Code of Civil Procedure § 1021.5 and other applicable law.

166. Plaintiffs, on behalf of themselves and the Class, request relief as further described below.

**COUNT II**
**Breach of Implied Contract**
**(On Behalf of Plaintiffs and the Nationwide Class)**

167. Plaintiffs incorporate the foregoing allegations by reference as if fully set forth herein to the extent relevant to this Count and the relief available thereunder.

168. Based on a consideration of the conduct and relationship of the parties as set forth above, an implied contract was created by the conduct of the parties. The conduct of both parties, which included BetterHelp offering health care services through the Sites and Plaintiffs and Class Members by reviewing, accessing and taking actions on the Sites, was intentional and each knew, or had reason to know, that the other party would interpret such conduct as an agreement to enter into a contract. Such an implied contract is manifested in the parties' conduct rather than expressed in words in the light of both the subject matter of the and the surrounding circumstances of these transactions.

169. Defendant solicited, offered, and invited Plaintiffs and Class Members to provide their Private Information while visiting the Sites, during the intake process and when Plaintiffs and Class Members were presented with the Intake Questionnaire.

170. When Plaintiffs and Class Members used Defendant's Sites to sign up for Defendant's Service and entered their Private Information as a condition of obtaining access to the Service, they entered into implied contracts pursuant to which Defendant, thought its statements regarding HIPAA compliance and promises of confidentiality, agreed to safeguard and not disclose their Private Information to others without first obtaining their authorization or consent to do so.

171. Throughout the Intake Questionnaire and as described above, Defendant made representations, including but not limited to those set forth in paragraphs 51-67, that a reasonable person would interpret to mean that Defendant would keep Plaintiffs' and Class Members' Private Information confidential and disclose it only to third parties in order to facilitate Plaintiffs' and Class Members' mental health treatment and not for advertising or other purposes.

172. Moreover, reasonable individuals understand that health care providers, and

specifically mental health care service providers, will maintain as confidential both the identities of patients and the details of their health concerns, symptoms, and treatment.

173. Defendant similarly understood that it was expected to maintain as confidential the identities of individuals seeking treatment and their reasons for doing so as evidenced by specific representations made to Plaintiffs and Class Members that it would, in fact, keep Plaintiffs' and Class Members' Private Information confidential. Moreover, by falsely representing that it was HIPAA certified, Defendant intended to convey to Plaintiffs and Class Members that it would comply with HIPAA's confidentiality requirements. Reasonable individuals understand that HIPAA is intended to preserve the confidentiality of Plaintiffs' and Class Members' Private Information and the fact that they are seeking treatment. These representations and promises formed the basis of Plaintiffs' and Class Members' implied contracts with Defendant.

174. Based on Defendant's representations and its conduct as alleged in detail above, Plaintiffs and Class Members understood that:

a. information provided to BetterHelp, including information provided during the course of filling out the Intake Questionnaire, would be maintained as confidential, and would only be disclosed to their treating therapist and not to unauthorized third parties;

b. email addresses communicated during the course of visiting, accessing or using the Sites would be kept strictly confidential and not shared or disclosed to anyone, even one's treating therapist;

c. Defendant was certified as compliant with HIPAA practices and thus would maintain Private Information, including PHI, and that they were seeking help for mental health issues, as confidential;

175. Plaintiffs and Class Members would not have entrusted Defendant with their Private Information in the absence of an implied contract between them and Defendant obligating Defendant not to disclose this information without consent.

176. Plaintiffs and Class Members fully performed their obligations under their implied contracts with Defendant, including by paying for Defendant's services, entering their Private

Information into Defendant's Intake Questionnaire or other subsequent questionnaires and/or spending time using Defendant's Sites to sign up for the Service or fill out the Intake Questionnaire.

177. Defendant did not perform actions consistent with its obligations under the parties' implied contract. Defendant secretly disclosed Plaintiffs' and Class Members' Private Information to Facebook/Meta and other third parties in violation of Defendant's implied agreement with Plaintiffs and Class Members.

178. As a direct and proximate result of Defendant's breaches of its implied agreements, Plaintiffs and Class Members sustained damages as alleged herein. Plaintiffs and Class Members would not have spent time signing up for the Service, would not have entered their Private Information into Defendant's Sites, and/or would not have paid for the Service at all or would have paid significantly less therefor had they known their Private Information would be disclosed to third parties including Facebook/Meta and others without their authorization or consent.

179. Plaintiffs and Class Members are entitled to compensatory and consequential damages as a result of Defendant's breach of implied contract.

180. Plaintiffs, on behalf of themselves and the Class Members, seek relief as further described below.

**COUNT III**
**Unjust Enrichment**
**(On Behalf of Plaintiffs and the Nationwide Class)**

181. Plaintiffs incorporate the foregoing allegations by reference as if fully set forth herein to the extent relevant to this Count and the relief available thereunder.

182. This Count is pleaded in the alternative to all other Counts herein.

183. Defendant benefited from receiving Plaintiffs' and Class Members' Private Information and compensation from Plaintiffs and Class Members for the Service, including by its ability to retain and use that information for its own benefit. Defendant understood the receipt of such monetary benefits including by being able to improve its customer retention rates, analyze its marketing efforts and target new subscribers and ultimately increase its revenue.

184. Defendant should not be allowed to retain such benefits and excess profits because Defendant obtained money or property as a result of the use and installation of this surreptitious

tracking code from third parties and through other disclosures of Private Information.

185. Defendant also understood and appreciated that Plaintiffs' and Class Members' Private Information was private and confidential, and its value depended upon Defendant maintaining the privacy and confidentiality of that information.

186. Defendant failed to expend the resources necessary to provide reasonable security, safeguards, and protections to the Private Information of Plaintiffs and Class Members.

187. Under the principles of equity and good conscience, Defendant should not be permitted to retain money that has been unjustly obtained and retained as a result of the use of this surreptitious tracking tools incorporated on its Sites.

188. Defendant wrongfully accepted and retained these benefits to the detriment of Plaintiffs and Class Members.

189. Defendant's enrichment at the expense of Plaintiffs and Class Members is and was unjust.

190. Plaintiffs and Class Members have no adequate remedy at law.

191. As a result of Defendant's wrongful conduct, as alleged above, Plaintiffs and Class Members are entitled to restitution and disgorgement of all profits, benefits, and other compensation obtained or retained by Defendant, plus interest thereon at the legal rate.

192. Plaintiffs, on behalf of themselves and the Class, seek relief as further described below.

**COUNT IV**
**Violation of the Electronic Communications Privacy Act (ECPA)**
**Wiretapping**
**18 U.S.C. § 2510 *et seq.***
**(On Behalf of Plaintiffs and the Nationwide Class)**

193. Plaintiffs incorporate the foregoing allegations as if fully set forth herein to the extent relevant to this Count and the relief available thereunder.

194. The ECPA, 18 U.S.C. § 2510 *et seq.*, makes it unlawful for a "person" to "intentionally intercept[], endeavor[] to intercept, or procure[] any other person to intercept or endeavor to intercept, any wire, oral, or electronic communications." 18 U.S.C. § 2511(1).

195. "Intercept" is defined as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

196. "Contents" is defined as "includ[ing] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8).

197. "Person" is defined as "any employee, or agent of the United States or any State or political subdivision thereof, and any individual, partnership, association, joint stock company, trust, or corporation." 18 U.S.C. § 2510(6).

198. "Electronic communication" is defined as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce . . . ." 18 U.S.C. § 2510(12).

199. Plaintiffs' and Class Members' communications with BetterHelp through its Sites during which Plaintiffs and Class Members communicated Private Information with BetterHelp were electronic communications within the meaning of the ECPA.

200. BetterHelp, Facebook/Meta, Criteo, Pinterest, and Snapchat are persons within the meaning of the ECPA as they are corporations.

201. Pixels and other web beacons and tracking tools used by the other unauthorized third parties as identified herein are each a "device or apparatus" that is "used to intercept a wire, oral, or electronic communication." 18 U.S.C. 2510(4).

202. By incorporating the pixels and other web beacons and tracking tools into its Sites and permitting them to intercept Plaintiffs' and Class Members' Private Information, Defendant intercepted or endeavored to intercept Plaintiffs' and Class Members' electronic communications and/or enabled and procured Facebook/Meta and the other unauthorized third parties identified herein to intercept or endeavor to intercept Plaintiffs' and Class Members' electronic communications, in violation of the ECPA.

203. 18 U.S.C. § 2511(2)(d) provides a "party exception" to 18 U.S.C. § 2511(1) that does not apply in this case. Section 2511(1) provides: "It shall not be unlawful under this chapter [18 U.S.C. §§ 2510 *et seq*.] for a person not acting under color of law to intercept a wire, oral, or electronic communication where such person is a party to the communication or where one of the parties to the communication has given prior consent to such interception *unless such communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State*." (emphasis added).

204. Neither Plaintiffs nor the Class Members consented to Defendant's interception of, or to Defendant's procuring Facebook/Meta and the other unauthorized third parties identified herein to intercept, their electronic communications with Defendant through Defendant's Sites.

205. Defendant does not meet the requirements of the "party exception" to the ECPA because the electronic communications intercepted by Defendant, or which Defendant procured Meta and the other unauthorized third parties identified herein to intercept, were intercepted as part of Defendant's practice of divulging Private Information, including medical information, to an unauthorized third party in violation of numerous federal and state laws identified herein, including HIPAA, which provides for significant criminal penalties.

206. As detailed in this Complaint, Defendant violated the CMIA and the California Constitution, and committed a tortious invasion of privacy, when it disclosed Plaintiffs' and Class Members' Private Information to Meta and the other unauthorized third parties identified herein through the Meta Pixel and other tracking tools. As detailed below, by those same acts, Defendant violated the California UCL.

207. Also as detailed herein, Defendant violated the federal HIPAA Privacy Rule which regulates the use and disclosure of "protected health information" by "covered entities."

208. Defendant is a "covered entity" within the meaning of 45 C.F.R. § 160.103.

209. "Disclosure" within the meaning of the HIPAA Privacy Rule is defined as "the release, transfer, provision of access to, or divulging in any manner of information outside the entity holding the information." 45 C.F.R. § 160.103.

210. The medical information provided by Plaintiffs and Class Members to BetterHelp when they signed up for and/or used Defendant's Service, as described above, is protected health information within the meaning of the HIPAA Privacy Rule. 45 C.F.R. § 160.103.

211. As described above, Defendant disclosed Plaintiffs' and Class Members' protected health information to Facebook/Meta and the other unauthorized third parties identified herein through the Meta Pixel and other tracking tools incorporated into Defendant's Sites. This disclosure was neither permitted nor required within the meaning of 45 C.F.R. § 164.502(a).

212. Thus, Defendant committed a tortious act in violation of the federal HIPAA Privacy Rule when it disclosed Plaintiffs' and Class Members' private health information to Facebook/Meta and the other unauthorized third parties identified herein.

213. Moreover, pursuant to 42 U.S.C. § 1320d-6, it is a crime for a "person," such as Defendant, to knowingly disclose "individually identifiable health information" to a third party for "commercial reasons". Thus, Defendant committed criminal acts when it knowingly disclosed Plaintiffs' and Class Members' private health information to Facebook/Meta and the other unauthorized third parties identified herein.

214. Accordingly, Defendant violated the ECPA each time the Meta Pixel and other tracking tools on Defendant's Sites intercepted Plaintiffs' and Class Members' electronic communications through those Sites.

215. Pursuant to 18 U.S.C. § 2520, Plaintiffs and Class Members have been damaged by the interception and disclosure of their electronic communications in violation of the ECPA and are entitled to: (1) appropriate equitable or declaratory relief; (2) damages, in an amount to be determined at trial, assessed as the greater of (a) the sum of the actual damages suffered by Plaintiffs and the Class and any profits made by Defendant as a result of its violations, or (b) statutory damages of whichever is the greater of $100 per day per violation or $10,000 per Class Member; and (3) reasonable attorneys' fees and other litigation costs reasonably incurred.

216. Plaintiffs, on behalf of themselves and the Class, seek relief as further described below.

**<u>COUNT V</u>**
**<u>Violation of the Electronic Communications Privacy Act (ECPA)</u>**
**Stored Communications Act**
**18 U.S.C. § 2702, *et seq*.**
(On Behalf of Plaintiffs and the Nationwide Class)

217. Plaintiffs incorporate the foregoing allegations as if fully set forth herein to the extent relevant to this Count and the relief available thereunder.

218. The ECPA provides that "a person or entity providing an electronic communication service to the public shall not knowingly divulge to any person or entity the contents of a communication while in electronic storage by that service." 18 U.S.C. § 2702(a)(1).

219. **Electronic Communication Service.** ECPA defines "electronic communications service" as "any service which provides to users thereof the ability to send or receive wire or electronic communications." 18 U.S.C. § 2510(15). Defendant's Sites qualify as an Electronic Communication Service because it allows its users to communicate with their therapist through the Sites to coordinate mental health services and treatment.

220. Defendant solicited Plaintiffs and Class Members to communicate their email addresses and other Private Information during the course of filling out the Intake Questionnaire or signing up for the service and then stored and thereafter disclosed those email addresses to Facebook, Snapchat, Criteo, Pinterest, and others beginning in January 2017 and continuing to September of 2021.

221. **Electronic Storage.** ECPA defines "electronic storage" as "any temporary, intermediate storage of a wire or electronic communication incidental to the electronic transmission thereof" and "any storage of such communication by an electronic communication service for purposes of backup protection of such communication." 18 U.S.C. § 2510(17).

222. Defendant stores the content of Plaintiffs' and Class Members' communications made during the Intake Questionnaire on its internal storage network and retrieved those communications from storage to disclose them to Facebook/Meta, Pinterest, Criteo, Snapchat, and others after they were made and received by Defendant.

223. Defendant knowingly divulged the contents of Plaintiffs' and Class Members' communications, including their email addresses from its electronic storage network.

224. **Exceptions Do Not Apply.** Section 2702(b) of the Stored Communication Act provides that an electronic communication service provider "may divulge the contents of a communication—"

a. "to an addressee or intended recipient of such communication or an agent of such addressee or intended recipient."

b. "as otherwise authorized in Section 2517, 2511(2)(a), or 2703 of this title;"

c. "with the lawful consent of the originator or an addressee or intended recipient of such communication, or the subscriber in the case of remote computing service;"

d. "to a person employed or authorized or whose facilities are used to forward such communication to its destination;"

e. "as may be necessarily incident to the rendition of the service or to the protection of the rights or property of the provider of that service;"

f. "to the National Center for Missing and Exploited Children, in connection with a reported submission thereto under section 2258A."

g. "to law enforcement agency, if the contents (i) were inadvertently obtained by the service provider; and (ii) appear to pertain to the commission of a crime;"

h. "to a governmental entity, if the provider, in good faith, believes that an emergency involving danger of death or serious physical injury to any person requires disclosure without delay of communications relating to the emergency"; or

i. "to a foreign government pursuant to an order from a foreign government that is subject to an executive agreement that the Attorney General has determined and certified to Congress satisfies Section 2523."

225. Defendant did not divulge the contents of Plaintiffs' and Class Members' communications to "addressees," "intended recipients," or "agents" of any such addressees or intended recipients of Plaintiffs and Class Members.

226. Sections 2517 and 2703 of the ECPA relate to investigations by government officials

and have no relevance here.

227. Section 2511(2)(a)(i) provides:

> It shall not be unlawful under this chapter for an operator of a switchboard, or an officer, employee, or agent of a provider of wire or electronic communication service, whose facilities are used in the transmission of a wire or electronic communication, to intercept, disclose, or use that communication in the normal course of his employment while engaged in any activity which is a necessary incident to the rendition of his service or to the protection of the rights or property of the provider of that service, except that a provider of wire communication service to the public shall not utilize service observing or random monitoring except for mechanical or service quality control checks.

228. Defendant's divulgence of the contents of Plaintiffs' and Class Members' communications on Defendant's website to Facebook/Meta, Snapchat, Pinterest, Criteo and others was not authorized by 18 U.S.C. § 2511(2)(a)(i) in that it was neither: (1) a necessary incident to the rendition of the Defendant's services; nor (2) necessary to the protection of the rights or property of Defendant.

229. Section 2517 of the ECPA relates to investigations by government officials and has no relevance here.

230. Defendant's divulgence of the contents of user communications obtained by accessing and using the Sites to Facebook/Meta, Snapchat, Pinterest, Criteo and others was not done "with the lawful consent of the originator or any addresses or intended recipient of such communication[s]." As alleged above: (a) Plaintiffs and Class Members did not authorize Defendant to divulge the contents of their communications; and (b) Defendant did not procure the "lawful consent" through the use of the Sites with which Plaintiffs and Class Members were communicating information.

231. Moreover, Defendant divulged the contents of Plaintiffs' and Class Members' communications through pixels and other beacons and tracking tools to individuals who are not "person[s] employed or whose facilities are used to forward such communication to its destination."

232. The contents of Plaintiffs' and Class Members' communications did not pertain to the commission of a crime and Defendant did not divulge the contents of their communications to a law enforcement agency.

233. As a result of the above actions and pursuant to 18 U.S.C. § 2707, the Court may award the sum of the actual damages suffered and any profits made by BetterHelp as a result of the violation, but in no case shall a person entitled to recover receive less than the sum of $1,000 per Class Member. Because the violation was willful and intentional, Plaintiffs are also entitled to punitive damages.

234. Plaintiffs and Class Members are additionally entitled to the costs of the action together with reasonable attorney fees as determined by the Court.

235. Plaintiffs, on behalf of themselves and the Class, seek relief as further described below.

**COUNT VI**
**Violation of the California Invasion of Privacy Act**
**(On Behalf of Plaintiffs and the Nationwide Class)**

236. Plaintiffs incorporate the foregoing allegations as if fully set forth herein to the extent relevant to this Count and the relief available thereunder.

237. The California Invasion of Privacy Act begins with its statement of purpose:

> The legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society. The Legislature by this chapter intends to protect the right of privacy of the people of this state.

Cal. Penal Code § 630.

238. California Penal Code 631(a) provides a remedy against, *inter alia*: "Any person who … intentionally taps, or makes any unauthorized connection, whether physically, electrically, …, or otherwise, with any telegraph or telephone wire, line, cable, or instrument … or who willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or who aids, agrees with, employs, or

conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section."

239. Defendant is a "person" within the meaning of Cal. Penal Code § 631.

240. Plaintiffs' and Class Members' communications of Private Information with Defendant on and through Defendant's Sites and servers were intended to be confined to the parties. Plaintiffs and Class Members were using what they understood to be Defendant's secure Sites and servers and no indication was given that their Private Information would be shared with or viewed by any unauthorized third party. The circumstances reasonably indicate that Plaintiffs and Class Members desired their communications with Defendant to be confined to the parties thereto.

241. Despite not having any authorization from Plaintiffs or Class Members, Defendant aided, agreed with, or conspired with Facebook/Meta, and other third parties to permit those third parties to intercept these communications and to learn the content of those communications while in transit or in the process of being sent or received.

242. Defendant allowed Facebook/Meta and other third parties to "intentionally tap . . . or make [an] unauthorized connection" with respect to Class Members' communications by placing and using pixels, website beacons and other third party tracking codes on its Sites without "the consent of all parties", including Plaintiffs and Class Members, and thereby violated CIPA.

243. Defendant "aid[ed], agree[d] with, employ[d], or conspire[d] with" various third parties including Facebook/Meta and others providing marketing services to BetterHelp by allowing such entities to "tap" communications on its Sites without "the consent of all parties", including Plaintiffs and Class Members, and thereby violated CIPA.

244. By allowing these third parties to duplicate and divert its users' GET Requests to Facebook/Meta's and others' servers, Defendant facilitated the interception and simultaneous transmission to Facebook and other third-party advertisers of Plaintiffs 'and other Class Members' Private Information while the information was "in transit" without their informed authorization or consent.

245. The information communicated between Plaintiffs and Class Members and BetterHelp was transmitted to or from the State of California. The information was wiretapped

"while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state."

246. BetterHelp enabled non-parties to the communications to "read" the communications for the purposes of the statute. For example, Facebook/Meta and other third parties could see the information that Plaintiffs and Class Members communicated to BetterHelp via the Intake Questionnaire and throughout the Sites and then used that information to build consumer profiles and target individuals, including Plaintiffs and Class Members, with advertisements tailored to mental health care or treatment.

247. BetterHelp facilitated these communications with third parties "without authorization" of Plaintiffs and Class Members because it did not give Plaintiffs and Class Members any hint that the transmission was happening.

248. Plaintiffs and Class Members did not request that Defendant and third parties target them with advertising that might be related to their health conditions and reasonably expected that their communications with BetterHelp were solely between themselves and BetterHelp and would remain confidential.

249. Plaintiffs and Class Members have also suffered irreparable injury from these unauthorized acts of disclosure. Their personal, private, and sensitive Private Information has been collected, viewed, accessed, stored, and used by Facebook/Meta and other third parties, has not been destroyed, and has not been reported in compliance with Defendant's obligation to do so pursuant to 45 C.F.R. § 164.402 *et seq.* and their obligations under state law to report such incidents as discussed herein. Due to the continuing threat of such injury, Plaintiffs and Class Members have no adequate remedy at law and are entitled to injunctive relief. Plaintiffs and Class Members thus seek an injunction under Penal Code § 637.2 enjoining Defendant from engaging in further conduct in violation of Cal. Penal Code § 630, *et seq.*, and enjoining Defendant from failing to meet its obligation to comply with 45 C.F.R. § 164.402 *et seq.* including its obligation to do the following: a) disclose to each affected individual the nature of the Private Information disclosed and to whom it was disclosed as required by 45 C.F.R. § 164.404 *et seq.*, b) notify the Secretary of the HHS about

the information that was disclosed as required by 45 C.F.R. § 164.408, (c) notify the media of the disclosure of Plaintiff and Class Members' Private Information as required by 45 C.F.R. § 164.406 (which required that such a disclosure should have occurred within 60 days of discovery); and (d) complying with its legal obligation to prove that all disclosures were made as required to meet its burden to do so as set forth in 45 C.F.R. § 164.402.

250. Cal. Penal Code § 637.2(a) provides that any person who has been injured by a violation of this chapter (including Penal Code §§ 630 and 631) may bring an action against the person who committed the violation for the greater of five thousand dollars ($5,000) per violation or three times the amount of actual damages, if any, sustained by Plaintiffs and Class Members.

251. Cal. Penal Code § 637.2(b) provides that "[a]ny person may . . . bring an action to enjoin and restrain any violation of this chapter, and may in the same action seek damages as provided by subdivision (a)." Cal. Penal Code § 637.2(c) further provides, "It is not a necessary prerequisite to an action pursuant to this section that the plaintiff has suffered, or be threatened with, actual damages."

252. Defendant is therefore liable to Plaintiffs and the Class for, at a minimum, statutory damages of $5,000 per Plaintiff and Class Member per violation and Plaintiffs and Class Members are also entitled to injunctive relief.

253. Plaintiffs, on behalf of themselves and the Class, seek relief as further described below.

**COUNT VII**
**Violation of the Consumers Legal Remedies Act**
**(On Behalf of Plaintiffs and the Nationwide Class)**

254. Plaintiffs incorporate the foregoing allegations by reference as if fully set forth herein to the extent relevant to this Count and the relief available thereunder.

255. The conduct described herein took place in and emanated from the State of California and constitutes unfair methods of competition or deceptive acts or practices in violation of the CLRA.

256. The CLRA applies to all claims of Plaintiffs and all members of the Class because the conduct that constitutes violations of the CLRA by Defendant occurred within and emanated

from the State of California.

257. Plaintiffs and Class Members are "consumers" as defined by Cal. Civil Code, section 1761(d) because they are individuals who sought or acquired by purchase Defendant's Service for personal, family, or household purposes.

258. Defendant is a "person" as defined by Cal. Civil Code, section 1761(c).

259. Plaintiffs' and Class Members' interactions and purchases of the BetterHelp Service are "transactions" as defined by Cal. Civil Code, section 1761(e), as they are part of an agreement between a consumer and another person, whether or not the agreement is a contract enforceable by action, and also includes the making of, and the performance pursuant to, that agreement.

260. The CLRA prohibits Defendant from engaging in deceptive practices undertaken by any person in a transaction that is either intended to result or that results in the sale of services to any consumer.

261. Defendant's false and misleading policies, acts, and practices were intended by BetterHelp to result in the sale of its services to Plaintiffs and Class Members. In doing so, BetterHelp violated the following sections of the CLRA:

262. Section 1770(a)(5): representing that services have sponsorship, approval, characteristics, uses, or benefits which they do not have;

263. Section 1770(a)(7): representing that services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;

264. Section 1770(a)(9): advertising services with intent not to sell them as advertised;

265. Section 1770(a)(14): Representing that a transaction confers or involves rights, remedies, or obligations that it does not have or involve, or that are prohibited by law; and

266. Section 1770(a)(16): representing the subject of a transaction has been supplied in accordance with a previous representation when it has not.

267. Defendant also engaged in unfair or deceptive acts or practices in violation of the above Civil Code sections by representing that it was HIPAA certified and that it would not disclose or use the Private Information of Plaintiffs and Class Members in a manner inconsistent with its

privacy guarantees and omitting from such persons the material fact that it shared Private Information of Plaintiffs and Class Members with unauthorized third parties.

268. These facts were material in that a reasonable consumer would not engage or interact with Defendant's Service or pay the prices they did if they knew that Defendant would disclose their Private Information to third parties without their full authorization or consent.

269. Plaintiffs and the Class Members provided their Private Information to Defendant and/or paid for Defendant's Service in connection with the transactions described above.

270. Plaintiffs and Class Members suffered damage, injury in fact, harms and/or losses, including but not limited to economic loss in the form of monthly subscription payments, as a result of the use or employment by BetterHelp of a method, act, or practice declared to be unlawful by Civil Code Section 1770 as set forth above.

271. Plaintiffs and Class Members also suffered damage as they paid for Defendant's services and/or provided their Private Information to Defendant, and they would not have paid for those Service, would have paid less for that Service and/or would not have provided such Private Information to BetterHelp had they known that Defendant would fail to keep their Private Information confidential.

272. Defendant's wrongful business practices constituted, and constitute, a continuing course of conduct in violation of the CLRA.

273. Pursuant to Cal. Civil Code, section 1780, Plaintiffs and the Class Members seek restitution, injunctive relief, reasonable attorneys' fees and costs, and any other relief that the Court deems proper as described herein.

274. Pursuant to the provisions of Cal. Civil Code, section 1782(a), on or about March 21, 2023, Plaintiff Jane Doe I through counsel sent a letter to Defendant with notice of the alleged violations of the CLRA, demanding that Defendant correct such violations on behalf of herself and all similarly affected persons, and providing it with the opportunity to correct its business practices. That letter was sent to BetterHelp via certified mail, return receipt requested, and was received by BetterHelp on or about March 27, 2024. As Defendant made no response within thirty days of its receipt of that notice, Plaintiffs and Class Members are also entitled to actual damages under the

CLRA.

275. Defendant's conduct described herein was malicious, fraudulent, and wanton in that Defendant intentionally and knowingly provided misleading information to Plaintiffs and the Class and omitted material facts from them, entitling Plaintiffs and the Class to exemplary damages.

276. Pursuant to California Civil Code section 1780(d), attached hereto as Exhibit C is a declaration showing that this action has been commenced in the proper forum.

**COUNT VII**
**Violation of California Constitution, Article I, Section 1**
**(On Behalf of California Plaintiffs and the California Subclass)**

277. California Plaintiffs R.S., Jane Doe III, and T.R. ("Plaintiffs" for the purposes of this Count) incorporate the foregoing allegations by reference as if fully set forth herein to the extent relevant to this Count and the relief available thereunder.

278. The California Constitution provides: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy." Cal. Const., Art. I., § 1.

279. Plaintiffs and Members of the California Subclass ("Class Members" for the purposes of this Count) had a legitimate expectation of privacy in their Private Information and were entitled to the protection of this information against disclosure to unauthorized third parties.

280. Defendant owed a duty to Plaintiffs and Class Members to keep their Private Information confidential.

281. Defendant failed to protect and released to unauthorized third parties the Private Information of Plaintiffs and Class Members.

282. Defendant allowed unauthorized third parties such as Facebook/Meta, Snapchat, Criteo, Pinterest and others access to and examination of the Private Information of Plaintiffs and Class Members by way of Defendant's affirmative actions and negligent failures to protect this information.

283. The unauthorized release to, custody of, and examination by unauthorized third parties of the Private Information of Plaintiffs and Class Members is highly offensive to a reasonable

person.

284. The intrusion at issue was into a place or thing, which was private and is entitled to be private. Plaintiffs and Class Members disclosed their Private Information to Defendant as part of Plaintiffs and Class Members' treatment relationships with Defendant, but privately and with the intention that the Private Information would be kept confidential and would be protected from unauthorized disclosure. Plaintiffs and Class Members were reasonable in their belief that such information would be kept private and would not be disclosed without their authorization or affirmative consent.

285. The sharing of data that resulted from the actions and inactions of Defendant constitutes an intentional interference with Plaintiffs' and Class Members' interest in solitude or seclusion, either as to their persons or as to their private affairs or concerns and those of their families, of a kind that would be highly offensive to a reasonable person.

286. Defendant either knew or reasonably should have known that its inadequate and insufficient information security practices would cause injury and harm to Plaintiffs and Class Members.

287. As a proximate result of the above acts and omissions of Defendant, the Private Information of Plaintiffs and Class Members was disclosed to third parties without authorization, causing Plaintiffs and Class Members to suffer injuries and damages.

288. Unless and until enjoined and restrained by order of this Court, Defendant's wrongful conduct will continue to cause irreparable injury to Plaintiffs and the Class Members, entitling them to seek injunctive relief in the form of requiring Defendant, inter alia, to disclose to each affected individual nature of the Private Information disclosed and to whom it was disclosed; to comply with all federal and state law requirements regarding disclosures to HHS, State Attorneys General, individuals, and the media as discussed more fully in paragraph 128 above; to delete all Private Information remaining in Defendant's possession; and to require Defendant to make reasonable efforts to ensure that all entities to whom this Private Information was disclosed delete such information. Plaintiffs also seek damages to the fullest extent permitted by law.

289. This action, if successful, will enforce an important right affecting the public interest

and would confer a significant benefit, whether pecuniary or non-pecuniary, for a large class of persons and the general public. Private enforcement is necessary and places a disproportionate financial burden on Plaintiffs in relation to Plaintiffs' stake in the matter. Because this case is brought for the purposes of enforcing important rights affecting the public interest, Plaintiffs also seek the recovery of attorneys' fees and costs in prosecuting this action against Defendant under Cal. Code Civ. Proc. § 1021.5 and other applicable law.

290. Plaintiffs, on behalf of themselves and the Class, seek relief as further described below.

**COUNT IX**
**Violation of the Confidentiality of Medical Information Act**
**(On Behalf of California Plaintiffs and the California Subclass)**

291. California Plaintiffs R.S., Jane Doe III, and T.R. ("Plaintiffs" for the purposes of this Count) incorporate the foregoing allegations by reference as if fully set forth herein to the extent relevant to this Count and the relief available thereunder.

292. Plaintiffs and California Subclass Members ("Class Members" for the purposes of this Count) are "Patients" as defined by Cal. Civ. Code section 56.05(m).

293. As described above, Defendant impermissibly shared Class Members' Private Information, including but not limited to their health status and histories, mental health condition, their symptoms, their therapists, the fact that they were seeking therapy to assist with their then-current mental health issues, whether they previously were or currently are in therapy, as well as Class Members' full names, dates of birth, email addresses, and IP addresses, that, either alone or in combination with other publicly available information, revealed their identities and that were are seeking treatment. A significant portion of their shared Private Information thus constitutes "medical information" as defined by § 56.05(j) of the CMIA.

294. BetterHelp and its affiliated companies are corporations.

295. Section 56.10(d) provides that "[e]xcept to the extent expressly authorized by a patient, enrollee, or subscriber, or as provided by subdivisions (b) and (c), a provider of health care, health care service plan, contractor, *or corporation and its subsidiaries and affiliates* shall not

intentionally share, sell, use for marketing, or otherwise use medical information for a purpose not necessary to provide health care services to the patient."

296. Pursuant to § 56.05(i), "'[m]arketing' means to make a communication about a product or service that encourages recipients of the communication to purchase or use the product or service."

297. As detailed herein, Defendant intentionally shared Class Members' medical information with third parties including, at least, Facebook/Meta, Snapchat, Criteo, and Pinterest, none of whom were authorized by Plaintiffs or Class Members to receive their medical information. Defendant did so, in part, by intentionally placing tracking tools on its Sites that automatically shared medical information such as Class Members' respective personal identifiers, including email addresses, IP addresses and the c_user, _fr, _datr, and _fbp cookies, attached to the fact that the Plaintiff or Class Member had visited the Sites, the titles of the pages Plaintiffs or Class Members visited, and the text they input into form fields, such as those on the Intake Questionnaire. Defendant also intentionally configured tracking tools on its Sites to track, collect, and share additional medical information such as a user's response to certain questions in the Intake Questionnaire such as: "Have you been in counseling or therapy before?", as well as individual therapist information, dates of therapy sessions, and highly personal responses to additional questionnaires. Such information was thereafter intentionally shared, sold, used for marketing, or otherwise provided by Defendant to third parties such as Facebook/Meta for purposes not necessary to providing health care services to Plaintiffs and Class Members.

298. As detailed herein, Defendant also intentionally used Class Members' medical information for marketing purposes and for purposes not necessary to provide health care services to Class Members, but rather for the purpose of increasing its market share through the identification of new potential patients and the recapture/retention of prior patients, to permit third parties to gain information about specific individuals that could be used to target/retarget them with advertisements for Defendant and its services and to measure the results of those marketing efforts, to cultivate and maintain relationships with various third parties (including social media sites), and to enhance Defendant's ability to analyze a user's experience and activity on the Sites.

299. Defendant's unauthorized sharing and usage of medical information did not qualify for any of the exemptions set forth in Cal. Civ. Code §§ 56.10(b) or (c), which provide limited bases for allowing unauthorized disclosures and/or uses by providers of health care, health care service plans, and contractors, but not by corporations such as Defendant.

300. Defendant repeatedly violated § 56.10(d) of the CMIA with respect to its sharing and usage of Plaintiffs' and other Class Members' medical information.

301. As detailed herein, Plaintiffs and other Class Members sustained economic losses from Defendant's intentional sharing of their medical information with unauthorized third parties and Defendant's intentional use of their respective medical information for marketing and for purposes not necessary to provide health care services to each Class Member.

302. Moreover, as alleged herein, the medical information that Defendant impermissibly shared with third parties was viewed or otherwise accessed by those third parties with whom it was shared, including Facebook/Meta, who used that information to revise and augment their user profiles for Plaintiffs and Class Members and to target Plaintiffs and Class Members with advertisements for mental health services, treatment options, medications and/or mental health facilities.

303. Pursuant to Cal. Civil Code §§ 56.35 and 56.36, Plaintiffs and Class Members are entitled to: (1) nominal damages of one thousand dollars ($1,000) per individual; (2) compensatory damages, in an amount to be determined at trial; (3) statutory damages pursuant to Civil Code § 56.36(c); (4) punitive damages of three thousand dollars ($3,000) pursuant to Civil Code § 56.35; (5) injunctive relief; (6) reasonable attorneys' fees and the costs of litigation, and such other and further relief as described below as the Court determines to be appropriate for this Cause of Action.

## COUNT X

### Violation of the California Consumer Privacy Act
### (On Behalf of California Plaintiffs and the California Subclass)

304. California Plaintiffs R.S., Jane Doe III, and T.R. ("Plaintiffs" for the purposes of this Count) incorporate the foregoing allegations by reference as if fully set forth herein to the extent relevant to this Count and the relief available thereunder.

305. The CCPA was enacted to protect consumers' sensitive information from collection and use by businesses without appropriate notice and consent. The CCPA protects the personal information of California consumers regardless of the location of the business holding the information.

306. Through the above-detailed conduct, Defendant violated CCPA by subjecting the nonencrypted and nonredacted Private Information of Plaintiffs and Class Members that it maintained to unauthorized access or disclosure as a result of Defendant's violation of its duty to implement and maintain reasonable security procedures and practices appropriate to the nature and protection of that information. Cal. Civ. Code § 1798.150(a).

307. Under Section 1798.150(a)(1) of the CCPA, as defined by California Civil Code Section 1798.81.5(d)(1)(A) "personal information" means an individual's first name or first initial and the individual's last name in combination with any one or more of the following data elements, when either the name or the data elements are not encrypted or redacted: (i) Social security number, (ii) Driver's license number, California identification card number, tax identification number, passport number, military identification number, or other unique identification number issued on a government document commonly used to verify the identity of a specific individual, (iii) Account number or credit or debit card number, in combination with any required security code, access code, or password that would permit access to an individual's financial account, (iv) Medical information, (v) Health insurance information, (vi) Unique biometric data generated from measurements or technical analysis of human body characteristics, such as a fingerprint, retina, or iris image, used to authenticate a specific individual. Unique biometric data does not include a physical or digital photograph, unless used or stored for facial recognition purposes, and (vii) Genetic data. Additionally, as set forth in Civil Code Section 1798.150(a)(1), the phrase "personal information" may also mean an email address in combination with a password or security question and answer that would permit access to an account.

308. The Private Information at issue in this action falls within the types of information actionable under Civil Code Section 1798.150(a)(1), since, as described above, Defendant, by its actions and inactions, has caused the access and disclosure of Private Information as described

herein, where either the name or the data elements were not encrypted nor redacted.

309. Defendant maintained the personal information identified above in a different manner than any Plaintiff or Class Member's medical history, mental or physical condition, or treatment.

310. In accordance with Cal. Civ. Code § 1798.150(b), on or about March 21, 2023, Plaintiffs' counsel sent a Notice of Violation to Defendant identifying the specific provisions of this title that Plaintiffs alleged have been or are being violated.

311. As Defendant failed to cure the noticed violations within 30 days of Plaintiffs' Notice of Violation or represent that the violations have been cured and that no further violations shall occur, Plaintiffs seek actual and punitive damages, statutory damages of between $100 and $750 per Class Member, attorneys' fees and costs, and any other relief the Court deems proper as a result of Defendant's CCPA violations.

**COUNT XI**
**Violation of the Unfair Competition Law**
**(On Behalf of Plaintiffs and the Nationwide Class)**

312. Plaintiffs incorporate the foregoing allegations by reference as if fully set forth herein to the extent relevant to this Count and the relief available thereunder, except as to entitlement to and claims for damages, which are not sought in this Count.

313. The acts, misrepresentations, omissions, practices, and non-disclosures of Defendant as alleged herein constitute fraudulent, unlawful, and unfair business acts and practices within the meaning of Cal. Bus. & Prof. Code §§ 17200, *et seq*.

314. As detailed herein, Defendant engaged in "fraudulent" business acts and practices by misrepresenting that it would not disclose the Private Information of Plaintiffs and Class Members to unauthorized Parties, by falsely representing its purported HIPAA certifications, and by deceiving Plaintiffs and Class Members into paying for its Service and providing Private Information to it under circumstances materially different from those that Defendant knew to be true. Plaintiffs and Class Members relied on Defendant to keep their Private Information private and would not have provided it had they known that Defendant would use it for advertising purposes and provide it to third parties. Defendant's nondisclosures and misleading statements were false, misleading, or likely to deceive the consuming public targeted by such conduct, in violation of the UCL.

315. Defendant engaged in "unlawful" business acts and practices in violation of the statutes set forth herein, including Cal. Civ. Code §§ 56.10(d), 1798.21, 1798.29 and Article I, § 1 of the California Constitution, the Online Privacy Protection Act, California Business and Professions Code §§ 22575-22579; California Consumers Legal Remedies Act Cal. Civ. Code § 1750 et seq.; California Business and Professions Code section 17500 (FAL); the California Invasion of Privacy Act, Cal. Penal Code § 630 et seq.; and the California Consumer Privacy Act, Cal. Civ. Code § 1798.100, *et seq* . Defendant also violated federal statutes and regulations, including the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510 *et seq*., the FTC Act, HIPAA, and the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C and the other sections identified above. Plaintiffs reserve the right to allege other violations of law committed by Defendant that constitute unlawful business acts or practices within the meaning of Cal. Bus. & Prof. Code §§ 17200, et seq. The allegations of facts set forth in detail above specifically describe and demonstrate how Defendant's actions and inactions violated these laws.

316. Defendant has also engaged in "unfair" business acts or practices. There are several tests that determine whether a practice that impacts consumers as compared to competitors is "unfair," examining the practice's impact on the public balanced against the reasons, justifications and motives of Defendant. Defendant's conduct would qualify as "unfair" under any of these standards:

(a) whether the practice offends an established public policy, which here is whether the practices at issue offend the policies of protecting consumers' Private Information by engaging in illegal practices, as reflected in California and federal law and policy set forth above;

(b) balancing the utility of Defendant's conduct against the gravity of the harm created by that conduct, including whether Defendant's practices caused substantial injury to consumers with little to no countervailing legitimate benefit that could not reasonably

have been avoided by the consumers themselves, and causes substantial injury to them; or

(c) whether the practice is immoral, unethical, oppressive, unscrupulous, unconscionable or substantially injurious to consumers.

317. The unfair business practices and harm caused by Defendant's conduct, including, but not limited to, failing to take adequate and reasonable measures to ensure its data systems would not permit unauthorized disclosures, failing to maintain adequate information security practices, failing to properly and adequately educate and train employees, failing to put into place reasonable or adequately protected computer systems and security practices to safeguard Plaintiffs' and Class Members' Private Information, improperly installing pixel code, web beacons, and tracking tools that would permit access to Private Information by unauthorized persons and thus failing to have adequate privacy policies and procedures in place that did not preserve the confidentiality of the Private Information of Plaintiffs and Class Members in its possession, and failing to protect and preserve the confidentiality of the Private Information of Plaintiffs and Class Members against disclosure and release, outweighs the utility of such conduct and such conduct offends public policy, is immoral, unscrupulous, unethical, and offensive, and caused substantial injury to Plaintiffs and Class Members. The allegations of facts set forth in detail above specifically describe and demonstrate how Defendant's actions and inactions constitute unfair business practices.

318. The business acts and practices by Defendant that caused Defendant to fail to keep the Private Information protected from unauthorized disclosure did not meet all applicable standards of care and vigilance.

319. Plaintiffs and/or Class Members (as is determined to be appropriate to assert such claims pursuant to Cal. Bus. & Prof. Code Section 17203) suffered injury in fact and lost money or property as a result of Defendant's acts and practices because they paid more for Defendant's services than they otherwise would have had they known Defendant was disclosing their Private Information to unauthorized third parties in violation of its legal obligations, social norms, and reasonable consumer expectations; because in general they paid for Defendant's Service and/or

provided their Private Information to Defendant and would not have paid for that Service, would have paid less and/or would not have provided their Private Information at all had they known that Defendant would fail to keep their Private Information confidential. A portion of any money Plaintiffs and Class Members paid for Defendant's Service went to fulfill Defendant's obligations with respect to protecting the confidentiality and security of Plaintiffs' and Class Members' Private Information, and Defendant failed to fulfill those obligations. Plaintiffs thus seek restitution and/or restitutionary disgorgement of such amounts, as permitted under the UCL.

320. Plaintiffs and/or Class Members have also suffered (and will continue to suffer) economic loss and other injury and actual harm in the form of, *inter alia*: (i) invasion of privacy; (ii) breach of the confidentiality of their Private Information; and/or (iii) deprivation of the value of their Private Information, including medical information for which there is a well-established national and international market.

321. Plaintiffs also seek a declaration from the Court that Defendant's conduct alleged herein constitutes a violation of Bus. & Prof. Code § 17200 *et seq*. under the unlawful, unfair, and fraudulent prongs of the UCL.

322. Absent injunctive relief from the Court, Defendant is likely to not fully redress the issues raised by its illegal business practices. Plaintiffs thus also seek injunctive relief, for themselves, Class Members, and for the benefit of the public, in the form of an order requiring Defendant to disclose to each affected individual the nature of the Private Information disclosed and to whom it was disclosed as required by the laws set forth above, to delete all Private Information remaining in Defendant's possession, and to require Defendant to take all efforts necessary to ensure that all entities to whom the Private Information of Plaintiffs and Class Members was disclosed without Plaintiffs' and Class Members' authorization or consent delete such information.

323. Pursuant to Cal. Bus. & Prof. Code § 17203, Plaintiffs also seek an order of this Court for themselves, Class Members, and for the benefit of the public granting injunctive relief in the form of prohibiting Defendant from refusing to do the following: a) disclose to each affected individual the nature of the Private Information disclosed and to whom it was disclosed as required by 45 C.F.R. § 164.404 *et seq*.; b) notify the Secretary of the HHS about the information that was

disclosed as required by 45 C.F.R. § 164.408; (c) notify the media of the disclosure of Plaintiffs' and Class Members' information as required by 45 C.F.R. § 164.406; and (d) comply with its legal obligation to prove that all disclosures were made as required to meet its burden to do so as set forth in 45 C.F.R. § 164.402.

324. This action, if successful, will enforce an important right affecting the public interest and would confer a significant benefit, whether pecuniary or non-pecuniary, for a large class of persons and/or the general public. Private enforcement is necessary and places a disproportionate financial burden on Plaintiffs in relation to Plaintiff's' respective stake in the matter. Because this case is brought for the purposes of enforcing important rights affecting the public interest, Plaintiffs also seek the recovery of attorneys' fees and costs in prosecuting this action against Defendant under Cal. Code Civ. Proc. § 1021.5 and other applicable law.

325. Plaintiffs, on behalf of themselves and the Class, seek relief as further described below.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of the Class Members and for the benefit of the public, pray for orders and judgment in favor of Plaintiffs and against Defendant as follows, as may be applicable to the causes of action set forth above:

- Finding that this action satisfies the prerequisites for maintenance as a class action and certifying the Class and Subclass defined herein;
- Designating Plaintiffs as representatives of the Class, the California Plaintiffs as representatives of the California Subclass, and Plaintiffs' counsel as Class Counsel;
- Awarding Plaintiffs and Class Members compensatory damages, disgorgement of profits, and punitive damages for Defendant's invasion of privacy;
- Awarding compensatory and consequential damages for Defendant's breach of implied contract;
- Awarding Plaintiffs and Class Members appropriate equitable or declaratory relief, the greater of the sum of the actual damages suffered and any profits made by

BetterHelp as a result of its violations, or statutory damages of whichever is the greater of $100 per day per violation or $10,000, and reasonable attorneys' fees and other litigation costs reasonably incurred, for each of Defendant's violations of the ECPA, 18 U.S.C. §§ 2510 *et seq*.;

- Awarding Plaintiffs and Class Members pursuant to 18 U.S.C. § 2707, the actual damages suffered and any profits made by BetterHelp as a result of the violation, but in no case shall a person entitled to recover receive less than the sum of $1,000 per Class Member. Plaintiffs and Class Members are also entitled to punitive damages;
- Awarding Plaintiffs and Class Members statutory damages of $5,000 per violation, or three times the amount of actual damages, and injunctive relief for Defendant's violations of California's Invasion of Privacy Act, Penal Code §§ 630 *et seq*.;
- Awarding Plaintiffs and Class Members restitution, injunctive relief and/or actual and punitive damages for Defendant's violations of the Consumers Legal Remedies Act;
- Awarding California Plaintiffs and California Subclass Members injunctive relief, compensatory damages, disgorgement of profits, and punitive damages for Defendant's violation of Article 1, Section 1 of the California Constitution;
- Awarding California Plaintiffs and California Subclass Members nominal damages of one thousand dollars ($1,000); (2) compensatory damages, in an amount to be determined at trial; (3) statutory damages pursuant to Cal. Civil Code § 56.36(c); (4) punitive damages of three thousand dollars ($3,000) pursuant to Cal. Civil Code § 56.35; and (5) reasonable attorneys' fees and the costs of litigation for its violations of California's Confidentiality of Medical Information Act, Cal. Civil Code § 56.10(d);
- Awarding California Plaintiffs and California Subclass Members statutory damages of between $100 to $750 per Class Member per violation for Defendant's violation of the California Consumer Privacy Act, Cal. Civ. Code § 1798.100;

- Declaring that Defendant's conduct alleged herein constitutes a violation of Bus. & Prof. Code §§ 17200 *et seq*. under the unlawful, unfair, and fraudulent prongs of the UCL;
- Awarding Plaintiffs and Class Members restitution, restitutionary disgorgement and injunctive relief for Defendant's violations of the UCL, Cal. Bus. & Prof. Code §§ 17200 *et seq*.;
- Awarding pre-judgment and post-judgment interest at the maximum rate permitted by applicable law;
- Awarding attorneys' fees and costs as authorized by statute and governing law, including but not limited to Cal. Code of Civil Procedure § 1021.5; and
- Awarding such other and further relief, at law and in equity, as the nature of this case may require or as this Court deems just and proper.

**JURY TRIAL DEMANDED**

Plaintiffs demand a trial by jury on all issues so triable.

Dated: August 5, 2024

By: _/s/ Gary M. Klinger_
Gary M. Klinger (pro hac vice)
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**
227 W. Monroe Street, Suite 2100
Chicago, Illinois 60606
Telephone: 866.252.0878
gklinger@milberg.com

John J. Nelson (SBN 317598)
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**
402 W. Broadway, Suite 1760
San Diego, CA 92101
Telephone: (858) 209-6941
Email: jnelson@milberg.com

Maureen M. Brady (pro hac vice)
**MCSHANE AND BRADY LLC**
4006 Central Street
Kansas City, MO 64111
816-888-8010

Email: mbrady@mcshanebradylaw.com

Christina Tusan (SBN 192203)
ctusan@hammondlawpc.com
Julian Hammond (SBN 268484)
jhammond@hammondlawpc.com
**HAMMONDLAW, P.C.**
1201 Pacific Ave, Suite 600
Tacoma, WA 98402
[Tel:] (310) 601-6766
[Fax] (310) 295-2385

*Plaintiffs' Co-Lead Interim Class Counsel*

Alan M. Mansfield (SBN 125998)
**WHATLEY KALLAS LLP**
1 Sansome Street, 35th Floor, PMB #131
San Francisco, CA 94104 /
16870 West Bernardo Dr., Ste. 400
San Diego, CA, 92127
Phone: (619) 308-5034
Fax: (888) 341-5048
amansfield@whatleykallas.com

*Plaintiffs' Liaison Counsel*

April M. Strauss (SBN 163327)
**APRIL M. STRAUSS, A PC**
2500 Hospital Drive, Bldg 3
Mountain View, CA 94040
Phone: (650) 281-7081
Email: astrauss@sfaclp.com

Sharon J. Zinns
CA Bar No. 241476
**ZINNS LAW, LLC**
4243 Dunwoody Club Dr.
Suite 104
Atlanta, GA 30350
Ph: (404) 882-9002
Email: sharon@zinnslaw.com

William J. Doyle (SBN 188069)
Chris W. Cantrell (SBN 209874)
**DOYLE APC**
550 West B St, 4th Floor
San Diego, CA 92101

Phone: (800) 736-9085
(619) 736-0000
Email: bill@doyleapc.com
chris@doyleapc.com

STEPHEN R. BASSER
SAMUEL M. WARD
**BARRACK, RODOS & BACINE**
600 West Broadway, Suite 900
San Diego, CA 92101
sbasser@barrack.com
sward@barrack.com
Telephone: (619) 230-0800
Facsimile: (619) 230-1874

Andrew J. Heo*
**BARRACK, RODOS & BACINE**
2001 Market Street, Ste. 3300
Philadelphia, PA 19103
Telephone.: (215) 963-0600
Facsimile: (215) 963-0838
aheo@barrack.com

John G. Emerson*
**EMERSON FIRM, PLLC**
2500 Wilcrest, Suite 300
Houston, TX 77042
Telephone: (800) 551-8649
Facsimile: (501) 286-4659

Daniel O. Herrera (pro hac vice anticipated)
**CAFFERTY CLOBES**
**MERIWETHER & SPRENGEL LLP**
135 S. LaSalle St., Suite 3210
Chicago, Illinois 60603
Telephone: (312) 782-4880
Facsimile: (312) 782-4485
Email: DHerrera@caffertyclobes.com

*Attorneys for Plaintiffs*

# EXHIBIT A

**2023169**

**UNITED STATES OF AMERICA**
**BEFORE THE FEDERAL TRADE COMMISSION**

| | |
|---|---|
| **COMMISSIONERS**: | **Lina M. Khan, Chair**<br>**Rebecca Kelly Slaughter**<br>**Christine S. Wilson**<br>**Alvaro M. Bedoya** |

| | |
|---|---|
| **In the Matter of**<br><br>**BETTERHELP, INC., a corporation,**<br>**also d/b/a**<br>**COMPILE, INC.,**<br>**also d/b/a MYTHERAPIST,**<br>**also d/b/a TEEN COUNSELING,**<br>**also d/b/a FAITHFUL COUNSELING,**<br>**also d/b/a PRIDE COUNSELING,**<br>**also d/b/a ICOUNSELING,**<br>**also d/b/a REGAIN,**<br>**also d/b/a TERAPPEUTA.** | **DOCKET NO.** |

## COMPLAINT

The Federal Trade Commission ("FTC" or "Commission"), having reason to believe that BetterHelp, Inc., a corporation, has violated the provisions of the Federal Trade Commission Act, and it appearing to the Commission that this proceeding is in the public interest, alleges:

1. Respondent BetterHelp, Inc. ("BetterHelp" or "Respondent"), also doing business as Compile, Inc.; MyTherapist; Teen Counseling; Faithful Counseling; Pride Counseling; iCounseling; ReGain; and Terappeuta, is a Delaware corporation with its principal office or place of business at 990 Villa Street, Mountain View, CA 94041.

2. Respondent has developed, advertised, and offered for sale an online counseling service (the "Service")—including specialized versions of the Service for people of the Christian faith, members of the LGBTQ community, and teenagers—which matches users with Respondent's therapists and then facilitates counseling via Respondent's websites and apps.

3. Millions of consumers have signed up for the Service, entrusting Respondent with their email addresses, IP addresses, and certain information about their health status and histories—such as the fact that they are seeking or are in therapy, and whether they have previously been in therapy. Because Respondent collects certain types of personal information from consumers when they take affirmative steps to sign up for the Service, Respondent's disclosure of that information to a third party would implicitly disclose the consumer's interest in or use of the

Service and therefore constitute a disclosure of the consumer's health information. For example, because Respondent obtained a consumer's email address only when the consumer took affirmative steps to utilize the Service, Respondent's disclosure of this information would identify the consumer as associated with seeking and/or receiving mental health treatment. Similarly, Respondent's disclosure that a consumer took affirmative steps to sign up for the Service (such as by filling out Respondent's intake questionnaire for the Service or becoming a paying user), along with an identifier (for example, an IP address), would disclose the consumer's seeking of mental health treatment via the Service.

4. Recognizing the sensitivity of this health information, Respondent has repeatedly promised to keep it private and use it only for non-advertising purposes such as to facilitate consumers' therapy.

5. From 2013 to December 2020, however, Respondent continually broke these privacy promises, monetizing consumers' health information to target them and others with advertisements for the Service. For example, from 2018 to 2020, Respondent used these consumers' email addresses and the fact that they had previously been in therapy to instruct Facebook to identify similar consumers and target them with advertisements for the Service, bringing in tens of thousands of new paying users, and millions of dollars in revenue, as a result.

6. To capitalize on these consumers' health information, Respondent handed it over to numerous third-party advertising platforms, including Facebook, Pinterest, Snapchat, and Criteo, often permitting these companies to use the information for their own research and product development as well.

7. In addition, Respondent failed to employ reasonable measures to safeguard the health information it collected from consumers. In particular, Respondent did not properly train its employees on how to protect the information when using it for advertising, and Respondent did not properly supervise its staff in the use of the information. Respondent also failed to provide consumers with proper notice as to the collection, use, and disclosure of their health information. And Respondent failed to limit contractually how third parties could use consumers' health information, instead merely agreeing to their stock contracts and terms.

8. It was only in December 2020, well after reporters brought these practices to light and the FTC began investigating the practices, that Respondent curtailed its unauthorized use and disclosure of consumers' health information.

9. The acts and practices of Respondent alleged in this complaint have been in or affecting commerce, as "commerce" is defined in Section 4 of the Federal Trade Commission Act.

## I. Background

### A. The Service

10. Respondent offers the Service under several names, each of which has its own website and app (collectively, the "Multi-Sites"). Its primary website and app, which is named "BetterHelp," serves general audiences and has been in operation since 2013. Faithful Counseling, in operation since July 2017, is aimed at consumers of the Christian faith. Pride

Counseling, in operation since August 2017, caters to the LGBTQ community. Teen Counseling, in operation since January 2017, offers counseling to 13- to 18-year-olds with parental consent. And ReGain, in operation since May 2016, offers couples counseling.[1] The Multi-Sites all function similarly and facilitate therapy via the Service, and they are all subject to Respondent's policies, practices, and procedures.

11. Users pay $60 to $90 per week for counseling through the Service. To sign up for the Service and become a paying user (a "User"), an individual visiting one of the Multi-Sites (a "Visitor") must fill out a questionnaire (the "Intake Questionnaire"), answering detailed questions about the Visitor's mental health.

12. Upon completing the Intake Questionnaire, a Visitor is prompted to create an account for the Service by entering the Visitor's name or nickname, email address, phone number, and emergency contact information. The Visitor is then asked to enter credit card information to become a paying User.

13. Respondent then utilizes the User's responses to the Intake Questionnaire to match the User with one of Respondent's more than 25,000 licensed therapists. Respondent's therapists provide Users with mental health therapy via video conferencing, text messaging, live chat, and audio calls.

14. Respondent's primary website and app, "BetterHelp," has seen explosive growth over the last few years, adding over 118,000 U.S. Users in 2018, over 158,000 U.S. Users in 2019, and over 641,000 U.S. Users in 2020. Since its inception, BetterHelp has signed up over 2 million Users, and, today, it has over 374,000 active Users in the United States. As a result, Respondent earned over $345 million in revenue in 2020, and over $720 million in revenue in 2021.

**B. Respondent's Marketing History**

15. Since its inception, Respondent has utilized numerous third parties to market the Service, including, at various times, Facebook, Snapchat, Pinterest, and Criteo. In addition, Respondent has advertised the Service on search engines, television, podcasts, and radio.

16. In 2017, Respondent delegated most decision-making authority over its use of Facebook's advertising services to a Junior Marketing Analyst who was a recent college graduate, had never worked in marketing, and had no experience and little training in safeguarding consumers' health information when using that information for advertising. In doing so, Respondent gave the Junior Marketing Analyst carte blanche to decide which Visitors' and Users' health information to upload to Facebook and how to use that information. This same individual, who now holds the title "Senior Marketing Analyst," continues to oversee Respondent's use of Facebook's advertising tools.

17. Respondent provided this marketing analyst with little training on how to protect Visitors' and Users' health information in connection with advertising until 2021. In fact, while

[1] Respondent also offered the Service through the iCounseling website and app from February 2017-November 2020, the Terappeuta website and app from March 2017-March 2019, and the MyTherapist website and app from June 2017-March 2019.

Respondent has purported to provide privacy training to its employees since 2015, it was not until 2021 that Respondent gave them any training specific to its business or advertising.

18. Respondent has spent tens of millions of dollars annually to market the Service. In 2020, for example, it spent $10-$20 million on Facebook advertising, and by 2021 Respondent's advertising on Facebook was bringing in approximately 30,000 to 40,000 new Users per quarter.

## II. <u>Respondent's Deceptive Business Practices</u>

19. In connection with the advertisement and sale of the Service, Respondent has disseminated, or caused to be disseminated, false and deceptive statements about its use and disclosure of consumers' health information. Respondent also disseminated, or caused to be disseminated, misleading and deceptive representations regarding its compliance with federal health privacy laws. Visitors and Users relied on these representations and were misled as a result.

### A. Deceptive Statements About Privacy on Respondent's Websites and Apps

<u>Respondent's deceptive statements concerning Intake Questionnaire responses</u>

20. Upon arriving at any of the Multi-Sites, a Visitor is immediately prompted to begin the Intake Questionnaire. For example, on the BetterHelp website, a Visitor begins the Intake Questionnaire by selecting whether he or she is looking for "Individual," "Couples," or "Teen" therapy, as shown below:




21. After making a selection, the Visitor is ushered through the Intake Questionnaire, which asks an array of questions. For many Visitors, these questions include whether the Visitor is "experiencing overwhelming sadness, grief, or depression"; whether the Visitor has been having thoughts that the Visitor "would be better off dead or hurting yourself in some way"; whether the Visitor is "currently taking any medication"; whether the Visitor has "problems or worries about intimacy"; and whether the Visitor has previously been in therapy.

22. The Intake Questionnaire also asks whether the Visitor identifies as a member of the Christian faith, shuttling such individuals to Faithful Counseling. Similarly, the Intake Questionnaire takes those who identify as members of the LGBTQ community to Pride

Counseling. And Respondent ushers teenagers to Teen Counseling, where the teenage Visitors provide their responses to the Intake Questionnaire before Respondent obtains parental consent.

23. Respondent has included privacy assurances throughout the Intake Questionnaire. Until November 2021, each Multi-Site displayed a banner at the top of each question, explaining that Respondent is merely asking for "some general and *anonymous* background information about you and the issues you'd like to deal with in online therapy" (emphasis added) so that the Visitor can be matched "with the most suitable therapist for you."

24. As Visitors proceed through the Intake Questionnaire, Respondent includes additional periodic privacy assurances. From at least August 2017 to December 2020, when a Visitor reached the question as to whether the Visitor was taking medication, the Visitor was shown the statement: "Rest assured—any information provided in this questionnaire will stay private between you and your counselor."

25. In December 2020, Respondent changed the statement to read: "Rest assured—*this information* will stay private between you and your counselor" (emphasis on alteration added). And in January 2021, Respondent changed it again to state: "Rest assured—*your health information* will stay private between you and your counselor" (emphasis on alteration added). This version, which was in use until September 2021, is circled in red below:




In October 2021, Respondent removed this representation altogether.

26. After being presented with these repeated promises of privacy, millions of Visitors, including those that became Users, filled out the Intake Questionnaire and shared their health information with Respondent.

27. Despite the aforementioned assurances of privacy, Respondent disclosed Visitors' and Users' Intake Questionnaire responses, as well as their email addresses and IP addresses, to Facebook for advertising purposes, as well as for Facebook's own purposes, as discussed in Paragraphs 51-54 and 57 below.

Respondent falsely promised to keep Christian, LGBTQ, and teenage consumers' email addresses "strictly private"

28. From at least August 2017 to as recently as December 2020, Respondent gave additional privacy assurances to Faithful Counseling, Pride Counseling, and Teen Counseling Visitors to induce them to sign up for the Service, stating that their email addresses would be "kept strictly private" and "never shared, sold or disclosed to anyone." This representation, which Respondent displayed prominently and unavoidably during the sign-up process, is circled in red below:




29. Tens of thousands of Visitors provided Respondent with their email addresses and signed up for Faithful Counseling, Pride Counseling, and Teen Counseling after viewing this privacy assurance.

30. Respondent understood that its disclosure of Visitors' email addresses in association with BetterHelp would reveal that the Visitors were seeking mental health treatment through the Service. And Respondent understood that consumers would want to keep this information private. In fact, a senior BetterHelp employee acknowledged at an investigational hearing conducted by FTC staff that individuals "want to keep . . . the fact that they're in therapy private" and at times even "keep their identities . . . secret from their therapist[s]."

31. Nevertheless, Respondent disclosed the email addresses of thousands of these Visitors to various third parties for advertising purposes and the third parties' own purposes, as discussed in further detail in Paragraphs 47-55 and 57, thereby revealing to the third parties that these Visitors were seeking and/or receiving mental health treatment via the Service.

Respondent pushed Visitors and Users into disclosing their health information

32. In addition to making false representations, Respondent has pushed Visitors and Users into handing over their health information before they have ever had a chance to read any privacy disclosures.

33. Upon visiting any of the Multi-Sites, Visitors are urged to begin the Intake Questionnaire and hand over their health information. At the same time, Visitors are repeatedly presented with the aforementioned privacy assurances discussed in Paragraphs 23-25 and 28—displayed in large, high-contrast, unavoidable text.

34. By contrast, Respondent linked to the privacy policy in small, low-contrast writing that is barely visible at the bottom of the page.

35. The image below depicts the BetterHelp homepage (www.betterhelp.com), with the prompts to enter the Intake Questionnaire magnified at the top and the link to the privacy policy magnified at the bottom and circled in red:




36. In September 2020, Respondent added the below banner to the bottom of every page of its Multi-Sites (until a Visitor closed it), which stated: "We use cookies to help the site function properly, analyze usage, and measure the effectiveness of our ads. We never sell or rent any information you share with us. Read our Privacy Policy [(linked)] to learn more."



37. Despite including a link to the privacy policy, the banner effectively dissuaded Visitors from reading the privacy policy by stating, until October 2020, that Respondent would "never sell or rent any information you share with us."

38. In May 2021, Respondent revised the banner and added the following underlined language: "We use BetterHelp and third-party cookies and web beacons to help the site function properly, analyze usage, <u>target</u> and measure the effectiveness of our ads. Read our Privacy Policy [(linked)] to learn more <u>and go to Cookie Preferences to manage your settings</u>" (emphasis added). But this banner still did not inform Visitors that Respondent would use and disclose their health information for advertising or that third parties would be able to use Visitors' information for their own purposes.

39. It was not until October 2021 that Respondent revised the banner to state that it discloses Visitors' IP addresses and other personal identifiers for advertising and offered Visitors an opportunity to opt out of the disclosures via the banner.

<u>Respondent's privacy policies claimed limited use and disclosure of consumers' information</u>

40. Those Visitors and Users that persevered and read Respondent's privacy policy were presented with additional deceptive statements about Respondent's use and disclosure of health information.

41. From August 2013 to November 2018, Respondent's privacy policies represented that it would use and disclose Visitors' and Users' email addresses, IP addresses, enrollment in the Service, and Intake Questionnaire responses for certain purposes, including to connect them with therapists and operate the Service. Notably, these privacy policies made no mention of using or disclosing this information for advertising purposes, and they said nothing about permitting third parties to use this information for their own purposes.

42. In November 2018, Respondent updated the privacy policy to state affirmatively that it would use and disclose this information only for limited purposes, such as to operate and improve the Service. These limited purposes did not include using or disclosing the information for advertising or disclosing the information to third parties for their own purposes.

43. Respondent revised its privacy policy again in September 2019, stating that it might *use* this health information for advertising. But the policy continued to say that Respondent would only *disclose* this information to third parties for certain stated limited purposes, which did not include advertising or the third parties' own purposes. In September 2020, Respondent revised the privacy policy yet again, finally stating that it may *both use and disclose* Visitors' and Users' information for advertising. But, even then, the privacy policy continued to claim that Respondent would disclose this information to third parties for only the stated limited purposes, which did not include third parties' own purposes.

44. From August 2013 to June 2021, Respondent's privacy policies stated that it would use web beacons (including pixels) and cookies for limited purposes. These limited purposes did not include the use or disclosure of Visitors' or Users' health information for advertising purposes, or the disclosure of this information for third parties' own purposes. These tools allow

Respondent and third parties to collect Visitors' and Users' information when they use one of the Multi-Sites, including what pages a Visitor or User visits and what information a Visitor or User inputs into the website (which would include the Visitor's or User's email address, IP address, and certain Intake Questionnaire responses).

45. But, as discussed in Paragraphs 46-57 below, these privacy policy representations misled Visitors and Users. In fact, Respondent used and disclosed Visitors' and Users' health information for advertising purposes, and Respondent disclosed this information to third parties for their own purposes, from 2013 to December 2020. Respondent used and disclosed this information for advertising purposes through various means, including by uploading consumers' email addresses to third-party advertising platforms and through web beacons (specifically pixels) Respondent had placed on various pages of the Multi-Sites.

**B. Respondent Used and Disclosed Millions of Consumers' Health Information for Advertising**

46. Since 2013, Respondent has repeatedly broken each of its aforementioned privacy promises, using Visitors' and Users' email addresses, IP addresses, enrollment in the Service, and certain Intake Questionnaire responses for various advertising purposes, including (1) re-targeting Visitors with advertisements for the Service; (2) using Users' health information to find and target potential new Users with advertisements—on the basis that these potential new Users were likely to sign up for the Service because they shared traits with current Users; and (3) optimizing Respondent's advertisements, which involved targeting advertisements at individuals with attributes similar to those that had previously responded to Respondent's ads, such as new Users. Using this health information for advertising, Respondent has brought in hundreds of thousands of new Users, resulting in millions of dollars in additional revenue.

47. Respondent utilized a number of third-party advertising platforms, including Facebook, Snapchat, Criteo, and Pinterest, to carry out this advertising. To do so, Respondent disclosed Visitors' and Users' email addresses, IP addresses, enrollment in the Service, and certain Intake Questionnaire responses to these third parties, as detailed below.

48. As noted above, each such disclosure of even a Visitor's or User's email address constituted a disclosure of the Visitor's or User's health information. Specifically, because Respondent collected email addresses only from Visitors and Users seeking mental health therapy via the Service (by filling out the Intake Questionnaire, signing up for the Service, and/or becoming a User), disclosure of a Visitor's or User's email address implicitly identified the Visitor or User as one seeking and/or receiving mental health treatment via the Service.

49. Although Respondent "hashed" Visitors' and Users' email addresses (i.e., converted the email addresses into a sequence of letters and numbers through a cryptographic tool) before disclosing them to third parties, the hashing was not meant to conceal the Visitors' and Users' identities from Facebook or the other recipient third parties. Rather, the hashing was done merely to hide the email addresses from a bad actor in the event of a security breach. In fact, Respondent knew that third parties such as Facebook were able to, and in fact would, effectively undo the hashing and reveal the email addresses of those Visitors and Users with accounts on the respective third parties' platforms, which is how Facebook matched these email addresses with

Facebook user IDs. Indeed, Facebook's standard terms of service, to which Respondent agreed, explained that Facebook would use hashed email addresses it received from Respondent to match Visitors and Users with their Facebook user IDs for advertising purposes, among other things. Thus, Respondent knew that by sending these lists of Visitors' and Users' email addresses to third parties, it was telling these third parties which of their users were seeking or in therapy through the Service.

50. In addition, Respondent disclosed the Visitor's or User's IP address in conjunction with other data about their enrollment in the Service and/or their Intake Questionnaire responses to third parties. Each such disclosure similarly constituted a disclosure of the Visitor's or User's health information because it both identified the individual (via the IP address) and conveyed to the recipient third party that the Visitor or User was seeking and/or receiving mental health treatment via the Service (via his or her enrollment in the Service or answering the Intake Questionnaire).

51. **Health information shared with Facebook:** Respondent disclosed Visitors' and Users' health information to Facebook in two ways.

52. First, Respondent compiled lists of Visitors' and Users' email addresses, which it then uploaded to Facebook to match these individuals to their Facebook user accounts in order to target them and others like them with advertisements. Between 2017 and 2018, Respondent uploaded lists of over 7 million Visitors' and Users' email addresses to Facebook. Facebook matched over 4 million of these Visitors and Users with their Facebook user IDs, linking their use of the Service for mental health treatment with their Facebook accounts. Several examples are listed below:

a. <u>January 2017 – October 2018</u>: Respondent uploaded over 170,000 Visitors' and Users' email addresses to Facebook, re-targeting these individuals and targeting potential new Users with advertisements for the Service.

b. <u>January 2018 – October 2018</u>: Respondent uploaded over 15,000 Users' email addresses to Facebook to find and target new potential Users with advertisements for the Service.

c. <u>October 2017</u>: Respondent uploaded the email addresses of all their current and former Users—nearly 2 million in total—to Facebook, targeting them all with advertisements to refer their Facebook friends to the Service.

53. Second, from 2013 to December 2020, Respondent shared Visitors' and Users' email addresses, IP addresses, and records known as "Events" with Facebook. These Events automatically tracked certain actions of each Visitor and User on the Multi-Sites, such as when they answered certain questions on the Intake Questionnaire in a certain way or when a Visitor enrolled in the Service to become a User. Respondent recorded and automatically disclosed these Events to Facebook through web beacons Respondent had placed on each of the Multi-Sites. Respondent disclosed Visitors' and Users' IP addresses, email addresses, and/or other persistent identifiers to Facebook alongside the Events so that Facebook could match the Events

information with the Visitors' and Users' Facebook accounts for advertising. Several examples are listed below:

a. January 2018: Respondent disclosed to Facebook that over 70,000 Visitors had signed up for accounts (but had not become paying Users)—through an Event denoting as much—in order to re-target them with advertisements for the Service.

b. November 2018 – March 2020: Respondent disclosed to Facebook over 1.5 million Visitors' and Users' previous therapy—gathered through their affirmative responses to the Intake Questionnaire question "Have you been in counseling or therapy before?"—to re-target the Visitors with advertisements and optimize Respondent's advertisements.

c. October 2018 – November 2020: Respondent used and shared over 3.5 million Visitors' and Users' "good" or "fair" financial status—gathered through the Intake Questionnaire—with Facebook to optimize Respondent's advertisements and to find potential new Users and target them with advertisements.

d. January – December 2020: Respondent shared with Facebook the fact that over 180,000 Visitors had become paying Users—through an Event denoting they had entered credit card information after completing the Intake Questionnaire—to optimize Respondent's advertisements and to find potential new Users and target them with advertisements.

54. Respondent labeled the Intake Questionnaire responses concerning prior therapy and financial status with anonymous Event titles before giving them to Facebook; however, in July 2018, the previously mentioned inexperienced and insufficiently trained Junior Marketing Analyst whom Respondent had put in charge of Facebook advertising revealed certain Events' true meaning to Facebook via the Facebook employee that serviced Respondent's advertising account. For example, though an affirmative response to the question "Have you been in counseling or therapy before?" was coded as "AddToWishlist," the analyst revealed to Facebook that this event meant that the "user completes questionnaire marking they have been in therapy before," thereby disclosing millions of Visitors' and Users' prior therapy to Facebook.

55. **Health information shared with other third parties:** In January 2019, Respondent disclosed to Snapchat the IP addresses and email addresses of approximately 5.6 million Visitors to re-target them with advertisements for the Service. From July 2018 to January 2019, Respondent disclosed the email addresses of over 70,000 Visitors—including Pride Counseling and Faithful Counseling Visitors—to Criteo in order to re-target them with advertisements. And, from August 2019 to September 2020, Respondent disclosed Visitors' email addresses to Pinterest for advertising.

56. **Additional use of health information for advertising:** From November 2017 to October 2020, Respondent used information concerning approximately 600,000 Pride Counseling Visitors' or Users' mental health statuses and their connection with the Visitors' and Users' LGBTQ identities to optimize future advertisements for the Service on Facebook. Respondent gathered this information through the Intake Questionnaire whenever a Pride

Counseling Visitor or User revealed that the Visitor's or User's "LGBTQ identity is contributing to your mental health concerns." Respondent used Facebook to identify characteristics and interests common among these Visitors and Users and then to target future advertisements for the Service on Facebook to individuals with similar characteristics and interests.

57. **Failure to limit third parties' use of health information:** In disclosing Visitors' and Users' health information to Facebook and other third parties, Respondent did not contractually limit how the third parties could use and disclose the data other than merely agreeing to these third parties' general terms of service, which either placed no restrictions on the third parties' use and disclosure of the information or specifically permitted the third parties to use the information for their own purposes. For example, Facebook's Business Tools Terms, to which Respondent agreed, stated that it "may also use Event Data . . . for research and development purposes, and to . . . improve the Facebook Company Products." Similarly, Pinterest's Ad Data Terms provided: "We use Ad Data you give us for measuring ad effectiveness, ad delivery and reporting, improving safety and security on Pinterest, research and product development, and for other uses that you give us permission for." And Facebook has in fact used the Visitor and User information it received from Respondent for its own purposes, including improving its advertising products, tracking suspicious activity on its platforms, and research and development.

58. Further, though Respondent has deleted some of the Visitor and User information it disclosed to third parties from those third parties' advertising platforms, this deletion did not remove the information from those third parties' underlying databases.

### C. Respondent's Deceptive Statements Were Material to Consumers

59. Respondent's deceptive privacy assurances were material to consumers.

60. Visitors and Users want to keep their health information private. Indeed, a senior BetterHelp employee acknowledged at an investigational hearing conducted by FTC staff that consumers want "privacy in the context of therapy."

61. And Respondent acknowledges that this information is sensitive. In fact, Respondent's customer service representatives tell consumers that their "name, age, address, *email*, *medical history*, conversations between you and your counselor" are "PHI" or "Protected Health Information"[2] (emphasis added).

62. Following the February 2020 publication of news reports that Respondent was sharing consumers' health information with third parties, including Facebook, numerous Users contacted Respondent and voiced their anger about the disclosures. For example, one individual noted: "I learned that you sell yet more private information to Facebook. This is disgusting. This information makes clients easily identifiable and your platform takes 100% control of its dissemination. I have no ability to decide where that information is sent. Only you do." Another stated: "I have not given ANY consent to share my information with ANYONE. ESPECIALLY ads targeting my mental health 'weakness.'" And another called Respondent an "untrustworthy

[2] Protected Health Information is information that is considered sensitive and is protected by federal health privacy laws in certain contexts, including the Health Insurance Portability and Accountability Act of 1996 ("HIPAA").

company." Other Users demanded the truth as to Respondent's data-sharing practices, asking for assurances as to the privacy of their health information.

63. Respondent scripted the following false responses, which customer service representatives provided to Respondent's customers: (1) "At BetterHelp, we are fully committed to protecting data and will not pass any P[ersonally] I[dentifiable] I[nformation] and/or P[rotected] H[ealth] I[nformation] to external entities including our third party partners;" and (2) "your P[rotected] H[ealth] I[nformation] and P[ersonally] I[dentifiable] I[nformation] is protected and not exposed" to Facebook.

64. Similarly, several health insurance and patient-advocacy companies representing tens of thousands of Users contacted Respondent, looking for assurance that Users' health information had not been shared with any third parties. Senior BetterHelp employees answered each such inquiry with a variation on the same falsehood, claiming again and again that Respondent did not share any health information with any third parties.

### D. Respondent's Deceptive HIPAA Seal

65. From September 2013 to December 2020, Respondent displayed seals—in proximity to seals provided by third parties to Respondent—implying Respondent's purported compliance with HIPAA. These seals are circled in red below:

September 2013 – December 2015:




January 2016 – December 2020:




66. By displaying the HIPAA seals on every page of the Multi-Sites, Respondent signaled to consumers that a government agency or other third party had reviewed Respondent's privacy and information security practices and determined that they met HIPAA's requirements. In addition, Respondent represented to consumers that it was in fact "HIPAA certified," with its customer service representatives informing consumers that "[y]ou will also be able to see our HIPAA certification at the bottom of" our webpages.

67. However, no government agency or other third party reviewed Respondent's information practices for compliance with HIPAA, let alone determined that the practices met the requirements of HIPAA.

68. In addition, hundreds of Respondent's therapists are not subject to HIPAA and the identifiable health information of Users who engage with those therapists is therefore not protected by HIPAA. Further, Respondent does not even know which of its therapists are, or are not, subject to HIPAA, and it does not know which data are, or are not, protected by that law.

69. In December 2020, after receiving a Civil Investigative Demand from the Commission, Respondent removed the "HIPAA" seals from the Multi-Sites.

## III. <u>Respondent's Unfair Business Practices</u>

### A. Respondent's Unreasonable Privacy Practices

70. From at least 2017 to at least 2021, Respondent has engaged in a number of practices that, individually or taken together, failed to safeguard Visitors' and Users' health information with respect to the collection, use, and disclosure of that information. Among other things, Respondent:

a. failed to develop, implement, or maintain written organizational standards, policies, procedures, or practices with respect to the collection, use, and disclosure of consumers' health information, including ensuring that Respondent's practices complied with its privacy representations to consumers;

b. failed to provide adequate guidance or training for employees or third-party contractors concerning properly safeguarding the privacy of consumers' health information in connection with the collection, use, and disclosure of that information;

c. failed to properly supervise employees with respect to their collection, use, and disclosure of consumers' health information;

d. failed to obtain Visitors' and Users' affirmative express consent to collect, use, and disclose their health information for Respondent's advertising, as well as for third parties' own purposes, such as research and improvement of their own products; and

e. failed to contractually limit third parties from using Visitors' and Users' health information for their own purposes, including but not limited to research and improvement of their own products, when Respondent did not provide Visitors and Users notice or obtain their consent for such uses.

71. As a result, Respondent repeatedly misrepresented its practices with respect to the collection, use, and disclosure of Visitors' and Users' health information (*see* Paragraphs 19-57, 62-64), and Respondent failed to provide consumers with sufficient notice or obtain their consent

as to these practices. Respondent disclosed these Visitors' and Users' health information to numerous third parties without authorization.

72. These misrepresentations went on for years because, until no earlier than January 2021, Respondent did nothing to ensure that its collection, use, and disclosure practices complied with their privacy promises to Visitors and Users. Indeed, neither the head of Respondent's marketing team, nor the analyst whom Respondent put in charge of advertising on Facebook reviewed the privacy policy on a regular basis, and there was no company requirement that anyone on the marketing team review the policy until no earlier than January 2021.

**B. Injury to Consumers**

73. Respondent's collection, use, and disclosure of millions of Visitors' and Users' health information without reasonable privacy practices or safeguards has caused or is likely to cause them substantial injury. This health information—including whether Visitors and Users have previously been in therapy, the fact that they are seeking therapy or in therapy via the Service, and whether their LGBTQ status is affecting their mental health, together with identifying information such as their email addresses and IP addresses—is highly sensitive. Disclosure of this information without these Visitors' and Users' authorization is likely to cause them stigma, embarrassment, and/or emotional distress. Exposure of this information may also affect these Visitors' and Users' ability to obtain and/or retain employment, housing, health insurance, or disability insurance.

74. In addition, Users pay $60 to $90 per week for the Service, which provides mental health therapy and counseling and includes privacy as an integral component—a price that includes a "price premium" based on Respondent's deceptive privacy assurances. Had Respondent not made these deceptive claims, consumers would not have been willing to purchase a subscription at the prevailing price because of consumers' privacy concerns. Thus, Respondent's deceptive privacy claims enabled it to inflate the price it charged to consumers, whose actual willingness to pay would have been lower had they known about the true privacy issues concerning Respondent's services. Consumers have therefore been injured by having to pay this price premium.

75. These harms were not reasonably avoidable by consumers. It was effectively impossible for Visitors and Users to know that Respondent was using and disclosing their health information for advertising purposes because Respondent actively concealed the practices through repeated misrepresentations and a lack of notice. Indeed, as described in Paragraph 62, numerous Users expressed outrage about the disclosures upon learning of them.

76. These harms were not outweighed by countervailing benefits to consumers or competition. Indeed, Respondent compromised consumers' health information for Respondent's own financial benefit through the growth of its user base, which only compounded these injuries by subjecting more Visitors and Users to Respondent's deceptive and unfair practices.

**Count I**
**Unfairness – Unfair Privacy Practices**

77. As described in Paragraphs 16-17 and 70-72, Respondent failed to employ reasonable measures to protect consumers' health information in connection with the collection, use, and disclosure of that information, resulting in the improper and unauthorized disclosure of that information to numerous third parties for advertising and other purposes.

78. Respondent's acts or practices as set forth in Paragraph 77 caused or are likely to cause substantial injury to consumers that is not outweighed by countervailing benefits to consumers or competition and is not reasonably avoidable by consumers themselves, as described in Paragraphs 73-76.

79. Therefore, Respondent's acts or practices as set forth in Paragraphs 77-78 constitute unfair acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. § 45(a), (n).

**Count II**
**Unfairness – Failure to Obtain Affirmative Express Consent Before Collecting, Using, and Disclosing Consumers' Health Information**

80. As described in Paragraphs 19-58, Respondent failed to obtain consumers' affirmative express consent before collecting, using, and disclosing to third parties those consumers' health information.

81. Respondent's acts or practices as set forth in Paragraph 80 caused or are likely to cause substantial injury to consumers that is not outweighed by countervailing benefits to consumers or competition and is not reasonably avoidable by consumers themselves, as described in Paragraphs 73-76.

82. Therefore, Respondent's acts or practices as set forth in Paragraphs 80-81 constitute unfair acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. § 45(a), (n).

**Count III**
**Failure to Disclose – Disclosure of Health Information for Advertising and Third Parties' Own Uses**

83. As described in Paragraphs 41 and 44, Respondent represented, directly or indirectly, expressly or by implication, that it would disclose consumers' health information to third parties for limited purposes, and the listed purposes did not include advertising or third parties' own uses.

84. In making the representations described in Paragraph 83, Respondent failed to disclose, or failed to disclose adequately to consumers, that it disclosed consumers' health information to third parties, including Facebook, Pinterest, Snapchat, and Criteo, for advertising as well as third parties' own uses, as alleged in Paragraphs 47-57. This additional information would have been material to consumers in their decisions to use Respondent's services.

85. Therefore, Respondent's acts or practices as set forth in Paragraphs 83-84 constitute deceptive acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. § 45(a).

**Count IV**
**Failure to Disclose – Use of Health Information for Advertising**

86. As described in Paragraphs 41 and 44, Respondent represented, directly or indirectly, expressly or by implication, that it would use consumers' health information for limited purposes, and the listed purposes did not include advertising or advertising-related purposes.

87. In making the representations described in Paragraph 86, Respondent failed to disclose, or failed to disclose adequately to consumers, that it used consumers' health information for advertising and advertising-related purposes, as alleged in Paragraphs 46, 53, and 56. This additional information would have been material to consumers in their decisions to use Respondent's services.

88. Therefore, Respondent's acts or practices as set forth in Paragraphs 86-87 constitute deceptive acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. § 45(a).

**Count V**
**Privacy Misrepresentation – Disclosure of Health Information for Advertising and Third Parties' Own Uses**

89. As described in Paragraphs 28-31, 42-43, and 63-64, Respondent represented, directly or indirectly, expressly or by implication, that it would not disclose consumers' health information to any third party for advertising or that third party's own uses.

90. In fact, as set forth in Paragraphs 46-55 and 57, Respondent disclosed consumers' health information to third parties, including Facebook, Pinterest, Snapchat, and Criteo, for advertising and those third parties' own uses. Therefore, the representations set forth in Paragraph 89 are false or misleading.

91. Therefore, Respondent's acts or practices as set forth in Paragraphs 89-90 constitute deceptive acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. § 45(a).

**Count VI**
**Privacy Misrepresentation – Use of Health Information for Advertising**

92. As described in Paragraph 42, Respondent represented, directly or indirectly, expressly or by implication, that it would not use consumers' health information for advertising or advertising-related purposes.

93. In fact, as set forth in Paragraphs 46, 53, and 56, Respondent did use consumers' health information for advertising and advertising-related purposes. Therefore, the representations set forth in Paragraph 92 are false or misleading.

94. Therefore, Respondent's acts or practices as set forth in Paragraphs 92-93 constitute deceptive acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. § 45(a).

**Count VII**
**Privacy Misrepresentation – Disclosure of Health Information**

95. As described in Paragraphs 23-26, Respondent represented, directly or indirectly, expressly or by implication, that it would not disclose consumers' health information to anyone except each consumer's licensed therapist.

96. In fact, as set forth in Paragraph 46-54, Respondent disclosed consumers' health information to at least one entity other than each consumer's licensed therapist—Facebook. Therefore, the representations set forth in Paragraph 95 are false or misleading.

97. Therefore, Respondent's acts or practices as set forth in Paragraphs 95-96 constitute deceptive acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. § 45(a).

**Count VIII**
**Privacy Misrepresentation – HIPAA Certification**

98. As described in Paragraphs 65-66, Respondent represented, expressly or by implication, directly or indirectly, that a government agency or other third party had reviewed Respondent's privacy and information practices and determined that they met HIPAA's requirements.

99. In fact, as set forth in Paragraphs 67-68, no government agency or other third party had ever reviewed Respondent's privacy or information security practices and determined that they met HIPAA's requirements.

100. Therefore, Respondent's acts or practices as set forth in Paragraphs 98-99 constitute deceptive acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. § 45(a).

THEREFORE, the Federal Trade Commission this ___ day of _______ 2022, has issued this complaint against Respondent.

By the Commission.

April J. Tabor
Secretary

SEAL:

# EXHIBIT B

**UNITED STATES OF AMERICA**
**BEFORE THE FEDERAL TRADE COMMISSION**

| | |
|---|---|
| **In the Matter of**<br><br>**BETTERHELP, INC., a corporation,**<br>**also d/b/a COMPILE, INC.,**<br>**also d/b/a MYTHERAPIST,**<br>**also d/b/a TEEN COUNSELING,**<br>**also d/b/a FAITHFUL COUNSELING,**<br>**also d/b/a PRIDE COUNSELING,**<br>**also d/b/a ICOUNSELING,**<br>**also d/b/a REGAIN,**<br>**also d/b/a TERAPPEUTA.** | **FILE NO. 2023169**<br><br>**AGREEMENT CONTAINING CONSENT ORDER** |

The Federal Trade Commission (the "FTC" or "Commission") has conducted an investigation of certain acts and practices of BetterHelp, Inc. ("Proposed Respondent"). The Commission's Bureau of Consumer Protection ("BCP") has prepared a draft administrative Complaint ("Draft Complaint"). BCP and Proposed Respondent, individually or through its duly authorized officers, enter into this Agreement Containing Consent Order ("Consent Agreement") to resolve the allegations in the attached Draft Complaint through a proposed Decision and Order to present to the Commission, which is also attached and made a part of this Consent Agreement.

**IT IS HEREBY AGREED** by and between Proposed Respondent and BCP, that:

1. The Proposed Respondent is BetterHelp, Inc. ("BetterHelp"), also doing business as Compile, Inc.; MyTherapist; Teen Counseling; Faithful Counseling; Pride Counseling; iCounseling; ReGain; and Terappeuta, a Delaware corporation with its principal office or place of business at 990 Villa St., Mountain View, CA 94041.

2. Proposed Respondent neither admits nor denies any of the allegations in the Draft Complaint, except as specifically stated in the Decision and Order. Only for purposes of this action, Proposed Respondent admits the facts necessary to establish jurisdiction.

3. Proposed Respondent waives:

   a. Any further procedural steps;

   b. The requirement that the Commission's Decision contain a statement of findings of fact and conclusions of law; and

   c. All rights to seek judicial review or otherwise to challenge or contest the validity of the Decision and Order issued pursuant to this Consent Agreement.

4. This Consent Agreement will not become part of the public record of the proceeding unless and until it is accepted by the Commission. If the Commission accepts this Consent Agreement, it, together with the Draft Complaint, will be placed on the public record for 30 days and information about them publicly released. Acceptance does not constitute final approval, but it serves as the basis for further actions leading to final disposition of the matter. Thereafter, the Commission may either withdraw its acceptance of this Consent Agreement and so notify Proposed Respondent, in which event the Commission will take such action as it may consider appropriate, or issue and serve its Complaint (in such form as the circumstances may require) and decision in disposition of the proceeding, which may include an Order. *See* Section 2.34 of the Commission's Rules, 16 C.F.R. § 2.34 ("Rule 2.34").

5. If this agreement is accepted by the Commission, and if such acceptance is not subsequently withdrawn by the Commission pursuant to Rule 2.34, the Commission may, without further notice to Proposed Respondent: (1) issue its Complaint corresponding in form and substance with the attached Draft Complaint and its Decision and Order; and (2) make information about them public. Proposed Respondent agrees that service of the Order may be effected by its publication on the Commission's website (ftc.gov), at which time the Order will become final. *See* Rule 2.32(d). Proposed Respondent waives any rights it may have to any other manner of service. *See* Rule 4.4.

6. When final, the Decision and Order will have the same force and effect and may be altered, modified, or set aside in the same manner and within the same time provided by statute for other Commission orders.

7. The Complaint may be used in construing the terms of the Decision and Order. No agreement, understanding, representation, or interpretation not contained in the Decision and Order or in this Consent Agreement may be used to vary or contradict the terms of the Decision and Order.

8. Proposed Respondent agrees to comply with the terms of the proposed Decision and Order from the date that Proposed Respondent signs this Consent Agreement. Proposed Respondent understands that it may be liable for civil penalties and other relief for each violation of the Decision and Order after it becomes final.

**BETTERHELP, INC.**

By:____________________
Kathryn Berry
General Counsel and Vice President

Date: 11 / 21 / 2022

____________________
Phyllis Sumner
King & Spalding
Attorney for Proposed Respondent

Date: 11 / 21 / 2022

____________________
Marisa Maleck
King & Spalding
Attorney for Proposed Respondent

Date: 11 / 21 / 2022

**FEDERAL TRADE COMMISSION**

By:____________________
Miles Plant
Attorney, Bureau of Consumer Protection

By:____________________
Manmeet Dhindsa
Attorney, Bureau of Consumer Protection

By:____________________
Ryan Mehm
Attorney, Bureau of Consumer Protection

**APPROVED:**

____________________
Benjamin Wiseman
Acting Associate Director
Division of Privacy and Identity Protection

____________________
Samuel Levine
Director
Bureau of Consumer Protection

2023169

**UNITED STATES OF AMERICA**
**BEFORE THE FEDERAL TRADE COMMISSION**

**COMMISSIONERS:** **Lina M. Khan, Chair**
**Rebecca Kelly Slaughter**
**Christine S. Wilson**
**Alvaro M. Bedoya**

| | |
|---|---|
| **In the Matter of**<br><br>**BETTERHELP, INC., a corporation,**<br>**also d/b/a COMPILE, INC.,**<br>**also d/b/a MYTHERAPIST,**<br>**also d/b/a TEEN COUNSELING,**<br>**also d/b/a FAITHFUL COUNSELING,**<br>**also d/b/a PRIDE COUNSELING,**<br>**also d/b/a ICOUNSELING,**<br>**also d/b/a REGAIN,**<br>**also d/b/a TERAPPEUTA.** | **DECISION AND ORDER**<br><br>**DOCKET NO. C-** |

**DECISION**

The Federal Trade Commission (the "FTC" or "Commission") initiated an investigation of certain acts and practices of the Respondent named in the caption. The Commission's Bureau of Consumer Protection ("BCP") prepared and furnished to Respondent a draft Complaint. BCP proposed to present the draft Complaint to the Commission for its consideration. If issued by the Commission, the draft Complaint would charge the Respondent with violations of the Federal Trade Commission Act.

Respondent and BCP thereafter executed an Agreement Containing Consent Order ("Consent Agreement"). The Consent Agreement includes: 1) statements by Respondent that it neither admits nor denies any of the allegations in the Complaint, except as specifically stated in this Decision and Order, and that only for purposes of this action, it admits the facts necessary to establish jurisdiction; and 2) waivers and other provisions as required by the Commission's Rules.

The Commission considered the matter and determined that it had reason to believe that Respondent has violated the Federal Trade Commission Act, and that a Complaint should issue stating its charges in that respect. The Commission accepted the executed Consent Agreement and placed it on the public record for a period of 30 days for the receipt and consideration of public comments. The Commission duly considered any comments received from interested persons pursuant to Section 2.34 of its Rules, 16 C.F.R. § 2.34. Now, in further conformity with

the procedure prescribed in Rule 2.34, the Commission issues its Complaint, makes the following Findings, and issues the following Order:

**Findings**

1. The Respondent is BetterHelp, Inc. ("BetterHelp"), also doing business as Compile, Inc.; MyTherapist; Teen Counseling; Faithful Counseling; Pride Counseling; iCounseling; ReGain; and Terappeuta, a Delaware corporation with its principal office or place of business at 990 Villa St., Mountain View, CA 94041.

2. The Commission has jurisdiction over the subject matter of this proceeding and over the Respondent, and the proceeding is in the public interest.

**ORDER**

**Definitions**

For purposes of this Order, the following definitions apply:

A. "Affirmative Express Consent" means any freely given, specific, informed, and unambiguous indication of an individual consumer's wishes demonstrating agreement by the individual, such as by a clear affirmative action, following a Clear and Conspicuous disclosure to the individual of:

   1. the categories of information that will be collected;

   2. the specific purpose(s) for which the information is being collected, used, or disclosed;

   3. the names or categories of Third Parties (e.g., "analytics partners" or "advertising partners") collecting the information, or to whom the information is disclosed, provided that if Respondent discloses the categories of Third Parties, the disclosure shall include a hyperlink to a separate page listing the names of the Third Parties;

   4. a simple, easily located means by which the consumer can withdraw consent; and

   5. any limitations on the consumer's ability to withdraw consent.

   The Clear and Conspicuous disclosure must be separate from any "privacy policy," "terms of service," "terms of use," or other similar document.

   The following do not constitute Affirmative Express Consent:

   1. Inferring consent from the hovering over, muting, pausing, or closing of a given piece of content by the consumer; or

2. Obtaining consent through a user interface that has the effect of subverting or impairing user autonomy, decision-making, or choice.

B. "Clear and Conspicuous" or "Clearly and Conspicuously" means that a required disclosure is difficult to miss (*i.e.*, easily noticeable) and easily understandable by ordinary consumers, including in all of the following ways:

1. In any communication that is solely visual or solely audible, the disclosure must be made through the same means through which the communication is presented. In any communication made through both visual and audible means, such as a television advertisement, the disclosure must be presented simultaneously in both the visual and audible portions of the communication even if the representation requiring the disclosure ("triggering representation") is made through only one means.

2. A visual disclosure, by its size, contrast, location, the length of time it appears, and other characteristics, must stand out from any accompanying text or other visual elements so that it is easily noticed, read, and understood.

3. An audible disclosure, including by telephone or streaming video, must be delivered in a volume, speed, and cadence sufficient for ordinary consumers to easily hear and understand it.

4. In any communication using an interactive electronic medium, such as the Internet or software, the disclosure must be unavoidable.

5. The disclosure must use diction and syntax understandable to ordinary consumers and must appear in each language in which the triggering representation appears.

6. The disclosure must comply with these requirements in each medium through which it is received, including all electronic devices and face-to-face communications.

7. The disclosure must not be contradicted or mitigated by, or inconsistent with, anything else in the communication.

8. When the representation or sales practice targets a specific audience, such as children, the elderly, or the terminally ill, "ordinary consumers" includes reasonable members of that group.

C. "Covered Business" means Respondent and any business that Respondent controls, directly or indirectly.

D. "Covered Incident" means any instance of a violation of Provision I, II, or III of this Order.

E. "Covered Information" means information from or about an individual consumer, including:

1. a first and last name;
2. a physical address, including street name and name of city or town;
3. geolocation information sufficient to identify street name and name of a city or town;
4. an email address or other online contact information, such as a user identifier or a screen name;
5. a telephone number;
6. a government-issued identification number, such as a driver's license, military identification, passport, Social Security number, or other personal identification number;
7. financial institution account number;
8. credit or debit card information;
9. data that depicts or describes the physical or biological traits of an identified or identifiable person, including depictions, descriptions, recordings, or copies of an individual's facial or other physical features, finger or handprints, voice, genetics, or characteristic movements or gestures;
10. a persistent identifier, such as a customer number held in a "cookie," a static Internet Protocol ("IP") address, a mobile device ID, processor serial number, or any other persistent identifier that can be used to recognize a user over time and/or across difference devices, websites, or online services;
11. Treatment Information; or
12. any individually identifiable information combined with any of (1) through (11) above.

F. "Covered User" means any individual consumer who created an account for the online properties, services, or mobile applications associated with BetterHelp before January 1, 2021, including those properties and mobile applications associated with BetterHelp; MyTherapist; Teen Counseling; Faithful Counseling; Pride Counseling; iCounseling; Regain; and Terappeuta.

G. "Customer" means any individual consumer who, between August 1, 2017, and December 31, 2020, signed up for and paid for the use of any online property, service, or

mobile application associated with BetterHelp, including those properties, services, and mobile applications associated with BetterHelp; MyTherapist; Teen Counseling; Faithful Counseling; Pride Counseling; iCounseling; Regain; and Terappeuta.

H. "Delete," "Deleted," or "Deletion," means to remove Covered Information such that it is not maintained in retrievable form and cannot be retrieved through physical or technical means.

I. "Respondent" means BetterHelp, also doing business as Compile, Inc.; MyTherapist; Teen Counseling; Faithful Counseling; Pride Counseling; iCounseling; ReGain; and Terappeuta, and its successors and assigns.

J. "Third Party" means any individual or entity other than:

1. Respondent;

2. a service provider of Respondent that:

   a. processes, uses, or receives Covered Information collected by or on behalf of Respondent for and at the direction of the Respondent and no other individual or entity,

   b. does not disclose Covered Information, or any individually identifiable information derived from such Covered Information, to any individual or entity other than Respondent or a subcontractor to such service provider bound to data processing terms no less restrictive than terms to which the service provider is bound, and

   c. does not use Covered Information for any purpose other than performing the services specified in the service provider's contract with Respondent;

3. a therapist or counselor employed by or contracted with Respondent;

4. an employee benefit program that contracts with Respondent for therapy services on behalf of the employee benefit program's members, employees, and/or clients, provided that before Respondent may disclose any information about any of those members, employees, and/or clients to the employee benefit program, Respondent must require the employee benefit plan to obtain the authorization of the members, employees, and/or clients for such disclosure; or

5. any entity (including a service provider) that uses Covered Information only as reasonably necessary to:

   a. comply with applicable law, regulation, or legal process;

   b. detect, prevent, or mitigate fraud or security vulnerabilities;

c. debug to identify and repair errors that impair existing intended functionality provided that any such use is reasonably necessary and proportionate to achieve the purpose for which the Covered Information was collected or processed; or

d. undertake internal research for the technological development and demonstration of Respondent's products or services provided that any such use is reasonably necessary and proportionate to achieve the purpose for which the Covered Information was collected or processed.

K. "Treatment Information" means individually identifiable information relating to the past, present, or future physical or mental health or condition(s) of a consumer, including:

1. drug, prescription, and pharmacy information;

2. information concerning the consumer's diagnosis;

3. information concerning the consumer's use of, creation of an account associated with, or response to a question or questionnaire related to, a service or product offered by Respondent or through one of any of Respondent's online properties, services, or mobile applications;

4. information concerning medical- or health-related purchases;

5. information concerning the past, present, or future payment for the provision of health care to the consumer; or

6. information derived or extrapolated from any of (1)-(5) above (e.g., proxy, derivative, inferred, emergent, or algorithmic data).

## Provisions

## I. Prohibition Against the Disclosure of Treatment Information and Covered Information for Certain Advertising Purposes

**IT IS ORDERED** that Respondent and Respondent's officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, are prohibited from disclosing to a Third Party for the purposes of advertising, marketing, promoting, offering, offering for sale, or selling any product or service: (1) Treatment Information; and (2) Covered Information for the purpose of targeting the consumer to which the disclosed information pertains.

## II. Affirmative Express Consent

**IT IS FURTHER ORDERED** that, within 30 days of the effective date of this Order, Respondent and Respondent's officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, in connection with any product or service, prior to disclosing any consumer's Covered Information to any Third Party, must obtain the relevant consumer's Affirmative Express Consent.

## III. Prohibition Against Misrepresentations about Privacy of Covered Information

**IT IS FURTHER ORDERED** that Respondent and Respondent's officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with promoting or offering for sale any product or service must not misrepresent (or assist another in misrepresenting) in any manner, expressly or by implication:

A. the extent to which Respondent collects, maintains, uses, discloses, Deletes, or permits or denies access to any Covered Information, or the extent to which Respondent protects the privacy, security, availability, confidentiality, or integrity of any Covered Information;

B. the purpose(s) for which Respondent, or any entity to whom Respondent discloses or permits access to Covered Information, collects, maintains, uses, discloses, or permits access to any Covered Information;

C. the extent to which a consumer can maintain privacy and anonymity when visiting or using any online properties, services, or mobile applications associated with Respondent;

D. the extent to which consumers may exercise control over Respondent's collection of, maintenance of, use of, Deletion of, disclosure of, or permission of access to, Covered Information, and the steps a consumer must take to implement such controls; and

E. the extent to which Respondent is a member of, adheres to, complies with, is certified by, is endorsed by, or otherwise participates in any privacy, security or any other compliance program sponsored by a government or any self-regulatory or standard-setting organization, including the Digital Advertising Alliance, the Digital Advertising Accountability Program, or any entity that certifies compliance with HIPAA; and

F. the extent to which Respondent is a HIPAA-covered entity, and the extent that Respondent's privacy and information practices are in compliance with HIPAA requirements.

## IV. Data Deletion

**IT IS FURTHER ORDERED** that Respondent and Respondent's officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, must:

A. within 60 days after the effective date of this Order:

1. identify all Third Parties that accessed, received, or acquired Covered Information from Respondent in any form, including hashed or encrypted Covered Information, without a consumer's Affirmative Express Consent;

2. identify what Covered Information was disclosed to each Third Party identified in sub-Provision IV.A.1; and

3. submit a list of the information identified in sub-Provisions IV.A.1-2 and the methodologies used to identify the information in sub-Provisions IV.A.1-2 to: DEbrief@ftc.gov or sent by overnight courier (not the U.S. Postal Service) to: Associate Director for Enforcement, Bureau of Consumer Protection, Federal Trade Commission, 600 Pennsylvania Avenue NW, Washington, DC 20580. The subject line must begin: "In re BetterHelp, Inc., [X-number]."

B. within 90 days after the effective date of this Order, provide a copy of the Complaint and Order to all Third Parties identified in sub-Provision IV.A.1, notify all such Third Parties in writing that the Federal Trade Commission alleges that Respondent disclosed Covered Information of consumers to them in a manner that was unfair or deceptive and in violation of the FTC Act, and instruct those Third Parties to Delete all Covered Information accessed, received, or acquired from Respondent without a consumer's Affirmative Express Consent. Respondent's instruction to each such Third Party shall include a list of the Covered Information identified in sub-Provision IV.A.2 and shall demand written confirmation from each such Third Party that it has Deleted such Covered Information. Respondent must provide all instructions sent to the Third Parties to: DEbrief@ftc.gov or sent by overnight courier (not the U.S. Postal Service) to: Associate Director for Enforcement, Bureau of Consumer Protection, Federal Trade Commission, 600 Pennsylvania Avenue NW, Washington, DC 20580. The subject line must begin: "In re BetterHelp, Inc., [X-number]"

C. as of the issuance of this Order:

1. Respondent shall not disclose any Covered Information in any form, including hashed or encrypted Covered Information, to any Third Party identified in sub-Provision IV.A.1 until Respondent confirms each Third Party's receipt of the instructions required by sub-Provision IV.B. This sub-Provision is subject to the prohibitions set forth in Provision I. Respondent must provide all receipts of confirmation and any responses from Third Parties within five (5) days of receipt to: DEbrief@ftc.gov or sent by overnight courier (not the U.S. Postal Service) to: Associate Director for Enforcement, Bureau of Consumer Protection, Federal Trade Commission, 600 Pennsylvania Avenue NW, Washington, DC 20580. The subject line must begin: "In re BetterHelp, Inc., [X-number]."

2. Respondent shall not use any Third Party identified in sub-Provision IV.A.1 to advertise, market, promote, offer, offer for sale, or sell any product or service until Respondent confirms each Third Party's receipt of the instructions required by sub-Provision IV.B.

## V. Notice to Users

**IT IS FURTHER ORDERED** that, on or before 14 days after the effective date of this Order, Respondent must email all Covered Users, using the last known verified email address in Respondent's possession, custody, or control, an exact copy of the notice attached hereto as Exhibit A ("Notice"), *provided however*, that if Respondent does not have email information for any Covered User, Respondent must send the Notice to that Covered User through Respondent's primary means of communicating with that user. Respondent shall not include with the Notice any other information, documents, or attachments.

## VI. Mandated Privacy Program

**IT IS FURTHER ORDERED** that any Covered Business, in connection with the collection, maintenance, use, or disclosure of, or provision of access to, Covered Information, must, within 60 days of the effective date of this Order, establish and implement, and thereafter maintain, a comprehensive privacy program ("Privacy Program") that protects the privacy, security, availability, confidentiality, and integrity of such Covered Information. To satisfy this requirement, Respondent must, for each Covered Business, at a minimum:

A. document in writing the content, implementation, and maintenance of the Privacy Program;

B. provide the written program and any evaluations thereof or updates thereto to the Covered Business's board of directors or governing body or, if no such board or equivalent governing body exists, to a senior officer of the Covered Business responsible for the Covered Business's Privacy Program at least once every 12 months and promptly (not to exceed 30 days) after a Covered Incident;

C. designate a qualified employee or employees, who report(s) directly to an executive, such as the Chief Executive Officer, Chief Compliance Officer, or Chief Legal Officer, to coordinate and be responsible for the Privacy Program; and keep the executive and the Board of Directors informed of the Privacy Program, including all actions and procedures implemented to comply with the requirements of this Order, and any actions and procedures to be implemented to ensure continued compliance with this Order;

D. assess and document, at least once every 12 months and promptly (not to exceed 30 days) following a Covered Incident, internal and external risks in each area of the Covered Business's operations to the privacy, security, availability, confidentiality, and integrity of Covered Information that could result in the unauthorized access, collection, use, destruction, or disclosure of, or provision of access to, Covered Information;

E. design, implement, maintain, and document safeguards that control for the internal and external risks to the privacy, security, availability, confidentiality, and integrity of Covered Information identified by the Covered Business in response to sub-Provision VI.D. Each safeguard must be based on the volume and sensitivity of the Covered Information that is at risk, and the likelihood that the risk could be realized and result in the unauthorized access, collection, use, Deletion, disclosure of, or provision of access to, the Covered Information. Such safeguards must also include:

1. policies, procedures, and technical measures to systematically inventory Covered Information in the Covered Business's control and Delete Covered Information that is no longer reasonably necessary and in accordance with applicable retention laws and regulations;

2. policies, procedures, and technical measures to prevent the collection, maintenance, use, or disclosure of, or provision of access to, Covered Information inconsistent with the Covered Business's representations to consumers;

3. audits, assessments, and reviews of the contracts, privacy policies, and terms of service associated with any Third Party to which the Covered Business discloses, or provides access to, Covered Information;

4. policies and technical measures that limit employee and contractor access to Covered Information to only those employees and contractors with a legitimate business need to access such Covered Information;

5. mandatory privacy training programs for all employees on at least an annual basis, updated to address the collection, use, and disclosure of Covered Information for advertising purposes; any internal or external risks identified by Respondent in sub-Provision VI.D; and safeguards implemented pursuant to sub-Provision VI.E, that include training on the requirements of this Order;

6. a data retention policy that, at a minimum, includes:

    a. a retention schedule that limits the retention of Covered Information for only as long as is necessary to fulfill the purpose for which the Covered Information was collected; provided, however, that such Covered Information need not be Deleted, and may be disclosed, to the extent requested by a government agency or required by law, regulation, or court order; and

    b. a requirement that Respondent documents, adheres to, and makes publicly available on its terms of service/use a retention schedule for Covered Information, setting forth: (1) the purposes for which the Covered Information is collected; (2) the specific business need for retaining each type of Covered Information; and (3) a set timeframe in accordance with applicable laws and regulations for Deletion of each type of Covered Information (absent any intervening Deletion requests from consumers) that precludes indefinite retention of any Covered Information;

7. for each product or service, policies and procedures to document internally the decision to collect, use, Delete, disclose, or provide access to, each type of Covered Information. Such documentation should include: (a) the name(s) of the person(s) who made the decision; (b) for what purpose the type of Covered Information is being collected; (c) the data segmentation controls in place to ensure that the Covered Information collected is only used and/or disclosed for the particular purpose(s) for which it was collected; (d) the data retention limit set and the technical means for achieving Deletion; (e) the safeguards in place to prevent unauthorized disclosure of each type of Covered Information; and (f) the access controls in place to ensure only authorized employees with a need-to-know have access to the Covered Information;

8. audits, assessments, reviews, or testing of each mechanism by which the Covered Business discloses Covered Information to a Third Party or provides a Third Party with access to Covered Information (including but not limited to web beacons, pixels, and Software Development Kits); and

9. for each product or service offered by any Covered Business, Clearly and Conspicuously disclose the categories of Covered Information collected from consumers, the purposes for the collection of each category of Covered Information, and any transfer of Covered Information to a Third Party. For each such transfer of Covered Information, the disclosure must, at a minimum, include: (a) the specific categories of Covered Information transferred; (b) the identity of each Third Party receiving the transfer; (c) the purposes for which the Covered Business transferred the Covered Information; (d) the purposes for which each Third Party receiving the Covered Information may use the Covered Information, including but not limited to the purposes for the Third Party reserves the right to use such Covered Information; and (e) whether each Third Party receiving the transfer of Covered Information reserves the right to transfer the Covered Information to other entities or individuals.

F. assess, at least once every 12 months, and promptly (not to exceed 30 days) following a Covered Incident, the sufficiency of any safeguards in place to address the internal and external risks to the privacy, security, availability, confidentiality, and integrity of Covered Information, and modify the Privacy Program based on the results;

G. test and monitor the effectiveness of the safeguards at least once every 12 months, and promptly (not to exceed 30 days) following a Covered Incident, and modify the Privacy Policy based on the results;

H. select and retain service providers capable of safeguarding Covered Information they receive from the Covered Business, and contractually require service providers to implement and maintain safeguards for Covered Information; and

I. evaluate and adjust the Privacy Program in light of any material changes to the Covered Business's operations or business arrangements, the results of the testing and monitoring required by sub-Provision VI.G, a Covered Incident, and any other circumstances that the

Covered Business knows or has reason to believe may have a material impact on the effectiveness of the Privacy Program or any of its individual safeguards (including but not limited to new or more efficient technological or operational methods to control for the risks identified in sub-Provision VI.D). The Covered Business may make this evaluation and adjustment to the Privacy Program at any time, but must, at a minimum, evaluate the Privacy Program at least once every 12 months and modify the Privacy Program as necessary based on the results.

## VII. Privacy Assessments by a Third-Party Assessor

**IT IS FURTHER ORDERED** that, in connection with its compliance with Provision VI, for any Covered Business that collects, maintains, uses, discloses, or provides access to Covered Information, Respondent must obtain initial and biennial assessments ("Assessments"):

A. The Assessments must be obtained from a qualified, objective, independent third-party professional ("Assessor"), who: (1) uses procedures and standards generally accepted in the profession; (2) conducts an independent review of the Privacy Program; (3) retains all documents relevant to each Assessment for 5 years after completion of such Assessment; and (4) will provide such documents to the Commission within 10 days of receipt of a written request from a representative of the Commission. No documents may be withheld on the basis of a claim of confidentiality, proprietary or trade secrets, work product protection, attorney-client privilege, statutory exemption, or any similar claim. The Assessor must have a minimum of 3 years of experience in the field of privacy and data protection.

B. For each Assessment, Respondent must provide the Associate Director for Enforcement for the Bureau of Consumer Protection at the Federal Trade Commission with the name, affiliation, and qualifications of the proposed Assessor, whom the Associate Director shall have the authority to approve in his or her sole discretion.

C. The reporting period for the Assessments must cover: (1) the first 240 days after the issuance date of the Order for the initial Assessment; and (2) each 2-year period thereafter for 20 years after the issuance date of the Order for the biennial Assessments.

D. Each Assessment must, for the entire assessment period:

   1. determine whether Respondent has implemented and maintained the Privacy Program required by Provision VI;

   2. assess the effectiveness of Respondent's implementation and maintenance of sub-Provisions VI.A-I;

   3. identify any gaps or weaknesses in the Privacy Program, or instances of material noncompliance with, sub-Provisions VI.A-I;

4. address the status of gaps or weaknesses in the Privacy Program, as well as any instances of material non-compliance with sub-Provisions VI.A-I, that were identified in any prior Assessment required by this Order; and

5. identify specific evidence (including, but not limited to, documents reviewed, sampling and testing performed, and interviews conducted) examined to make such determinations, assessments, and identifications, and explain why the evidence that the Assessor examined is (a) appropriate for assessing an enterprise of Respondent's size, complexity, and risk profile; and (b) sufficient to justify the Assessor's findings. No finding of any Assessment shall rely solely on assertions or attestations by Respondent, Respondent's management, or a Covered Business's management. The Assessment must be signed by the Assessor, state that the Assessor conducted an independent review of the Privacy Program and did not rely solely on assertions or attestations by Respondent, Respondent's management, or a Covered Business's management, and state the number of hours that each member of the Assessor's assessment team worked on the Assessment. To the extent a Covered Business revises, updates, or adds one or more safeguards required under sub-Provision VI.E in the middle of an Assessment period, the Assessment must assess the effectiveness of the revised, updated, or added safeguard(s) for the time period in which it was in effect, and provide a separate statement detailing the basis for each revised, updated, or additional safeguard.

E. Each Assessment must be completed within 60 days after the end of the reporting period to which the Assessment applies. Unless otherwise directed by a Commission representative in writing, Respondent must submit the initial Assessment to the Commission within 10 days after the Assessment has been completed via email to DEbrief@ftc.gov or by overnight courier (not the U.S. Postal Service) to: Associate Director for Enforcement, Bureau of Consumer Protection, Federal Trade Commission, 600 Pennsylvania Avenue NW, Washington, DC 20580. The subject line must begin, "In re BetterHelp, Inc., [X-number]." All subsequent biennial Assessments must be retained by Respondent until the Order is terminated and provided to the Associate Director for Enforcement within 10 days of request.

## VIII. Cooperation with Assessor

**IT IS FURTHER ORDERED** that Respondent, whether acting directly or indirectly, in connection with the Assessments required by Provision VII, must:

A. provide or otherwise make available to the Assessor all information and material in its possession, custody, or control that is relevant to the Assessment for which there is no reasonable claim of privilege;

B. provide or otherwise make available to the Assessor information about all Covered Information in Respondent's custody or control so that the Assessor can determine the scope of the Assessment; and

C. disclose all material facts to the Assessor, and not misrepresent in any manner, expressly or by implication, any fact material to the Assessor's: (1) determination of whether Respondent has implemented and maintained the Privacy Program required by Provision VI; (2) assessment of the effectiveness of the implementation and maintenance of sub-Provisions VI.A-I; or (3) identification of any gaps or weaknesses in, or instances of material noncompliance with, the Privacy Program required by Provision VI.

## IX. Annual Certification

**IT IS FURTHER ORDERED** that Respondent must:

A. one year after the issuance date of this Order, and each year thereafter for 10 years, provide the Commission with a certification from a senior corporate manager, or, if no such senior corporate manager exists, a senior officer of each Covered Business that: (1) the Covered Business has established, implemented, and maintained the requirements of this Order; (2) the Covered Business is not aware of any material noncompliance that has not been (a) corrected or (b) disclosed to the Commission; and (3) includes a brief description of any Covered Incident. The certification must be based on the personal knowledge of the senior corporate manager, senior officer, or subject matter experts upon whom the senior corporate manager or senior officer reasonably relies in making the certification.

B. unless otherwise directed by a Commission representative in writing, submit all annual certifications to the Commission pursuant to this Order via email to DEbrief@ftc.gov or by overnight courier (not the U.S. Postal Service) to: Associate Director for Enforcement, Bureau of Consumer Protection, Federal Trade Commission, 600 Pennsylvania Avenue NW, Washington, DC 20580. The subject line must begin, "In re BetterHelp, Inc., [X-number]."

## X. Covered Incident Reports

**IT IS FURTHER ORDERED** that Respondent, within 30 days after Respondent's discovery of a Covered Incident, must submit a report to the Commission. The report must include, to the extent possible:

A. the date, estimated date, or estimated date range when the Covered Incident occurred;

B. a description of the facts relating to the Covered Incident, including the causes and scope of the Covered Incident, if known;

C. the number of consumers whose information was affected;

D. the acts that Respondent has taken to date to remediate the Covered Incident; protect Covered Information from further disclosure, exposure, or access; and protect affected individuals from identity theft or other harm that may result from the Covered Incident; and

E. a representative copy of any materially different notice sent by Respondent to consumers or to any U.S. federal, state, or local government entity.

Unless otherwise directed by a Commission representative in writing, all Covered Incident reports to the Commission pursuant to this Order must be emailed to DEbrief@ftc.gov or sent by overnight courier (not the U.S. Postal Service) to: Associate Director for Enforcement, Bureau of Consumer Protection, Federal Trade Commission, 600 Pennsylvania Avenue NW, Washington, DC 20580. The subject line must begin: "In re BetterHelp, Inc., [X-number]."

## XI. Monetary Relief

**IT IS FURTHER ORDERED** that:

A. Respondent must pay to the Commission $7,800,000, which Respondent stipulates its undersigned counsel holds in escrow for no purpose other than payment to the Commission.

B. Such payment must be made within 8 days of the effective date of this Order by electronic fund transfer in accordance with instructions provided by a representative of the Commission.

## XII. Additional Monetary Provisions

**IT IS FURTHER ORDERED** that:

A. Respondent relinquishes dominion and all legal and equitable right, title, and interest in all assets transferred pursuant to this Order and may not seek the return of any assets.

B. The facts alleged in the Complaint will be taken as true, without further proof, in any subsequent civil litigation by or on behalf of the Commission to enforce its rights to any payment pursuant to this Order, such as a nondischargeability complaint in any bankruptcy case.

C. The facts alleged in the Complaint establish all elements necessary to sustain an action by or on behalf of the Commission pursuant to Section 523(a)(2)(A) of the Bankruptcy Code, 11 U.S.C. § 523(a)(2)(A), and this Order will have collateral estoppel effect for such purposes.

D. All money paid to the Commission pursuant to this Order may be deposited into a fund administered by the Commission or its designee to be used for relief, including consumer redress and any attendant expenses for the administration of any redress fund. If a representative of the Commission decides that direct redress to consumers is wholly or partially impracticable or money remains after redress is completed, the Commission may apply any remaining money for such other relief (including consumer information remedies) as it determines to be reasonably related to Respondent's practices alleged in

the Complaint. Any money not used is to be deposited to the U.S. Treasury. Respondent has no right to challenge any activities pursuant to this Provision.

E. All decisions regarding the administration and amount of redress provided shall be made by the Commission in its sole discretion; however, the names and identifying information of all consumers who receive redress shall be provided solely to the Redress Administrator pursuant to Provision XIII.

F. In the event of default on any obligation to make payment under this Order, interest, computed as if pursuant to 28 U.S.C. § 1961(a), shall accrue from the date of default to the date of payment. In the event such default continues for 10 days beyond the date that payment is due, the entire amount will immediately become due and payable.

G. Each day of nonpayment is a violation through continuing failure to obey or neglect to obey a final order of the Commission and thus will be deemed a separate offense and violation for which a civil penalty shall accrue.

H. Respondent acknowledges that its Taxpayer Identification Numbers (Social Security or Employer Identification Numbers), which Respondent has previously submitted to the Commission, may be used for collecting and reporting on any delinquent amount arising out of this Order, in accordance with 31 U.S.C. § 7701.

## XIII. Independent Redress Administrator

**IT IS FURTHER ORDERED** that an independent redress administrator ("Administrator") shall be appointed to assist with the efficient administration of consumer redress:

A. Commission staff, in their sole discretion, shall select the Administrator, who shall be an independent third party, not an employee of the Commission or Respondent.

B. Within 7 days of entry of this Order, Respondent must provide the Administrator with all information necessary to identify all Customers and all information necessary for the efficient administration of consumer redress to those Customers. Respondent stipulates it has provided such information to its undersigned counsel. If a representative of the Commission or the Administrator requests any additional information related to consumer redress, Respondent must provide it, in the form prescribed by the Commission or the Administrator, within 14 days of the request, provided that, any request for personally identifying Customer information shall be directed solely to the Administrator.

C. The Administrator shall be responsible for reviewing, assessing, and evaluating the Customer information for consumer redress, and for ensuring the efficient administration of consumer redress as follows:

1. The Administrator shall receive, review, and assess the Customer information provided by Respondent to ensure it is sufficient for the efficient administration of

consumer redress as determined by the Commission. If a representative of the Commission requests any additional information related to redress, the Administrator must provide it, in the form prescribed by the Commission, within 14 days, provided however, that the Administrator may not share personally identifying Customer information with the Commission.

2. Within 45 days of entry of this Order, the Administrator shall confirm in writing that it has a complete list of Customers, or that the Administrator does not and why not.

3. The Administrator is responsible for conducting supplemental address searches or other inquiries related to consumer redress if the Commission or the Administrator determines it necessary or advisable.

4. The Administrator is authorized to choose, engage, and employ service providers as the Administrator deems advisable or necessary in the performance of the Administrator's duties and responsibilities under the authority granted by this Order. The Administrator may only employ service providers capable of safeguarding Customer information they receive from the Administrator, and the Administrator must contractually require service providers to implement and maintain safeguards for such Customer information.

5. The Administrator shall administer consumer redress as specified by the Commission. The Administrator must follow all instructions dictated by the Commission for the efficient administration of consumer redress, including but not limited to instructions pertaining to consumer communications and redress process and distributions.

6. The Administrator must cooperate with the Commission to request the transfer of funds necessary for consumer redress distribution.

7. No later than three months after the date on which the Administrator is retained, and every three months thereafter until such time the Commission determines the administration of consumer redress has concluded, the Administrator shall submit a report to the Commission concerning the status of consumer redress and detailing the progress of the administration of consumer redress, including but not limited to the amounts of funds distributed for redress payment, the consumer participation rate, the length of time for consumers to receive redress payment, and any complaints received regarding consumer redress.

D. Respondent shall fully cooperate with and assist the Administrator. That cooperation and assistance shall include, but not be limited to, providing information to the Administrator as the Administrator deems necessary to be fully informed and discharge the responsibilities of the Administrator under this Order. For matters concerning this Order, the Administrator is authorized to communicate directly with Respondent.

E. Respondent is responsible for all costs and fees invoiced by the Administrator for its services, and the provision of consumer redress. The FTC is not responsible for any such costs or fees. None of the funds used to satisfy Provision XI of this Order shall be used to pay for the Administrator or any of its associated costs or fees.

## XIV. Acknowledgments of the Order

**IT IS FURTHER ORDERED** that Respondent obtain acknowledgments of receipt of this Order:

A. Respondent, within 10 days after the effective date of this Order, must submit to the Commission an acknowledgment of receipt of this Order sworn under penalty of perjury.

B. For 10 years after the issuance date of this Order, Respondent must deliver a copy of this Order to: (1) all principals, officers, directors, and LLC managers and members; (2) all employees having managerial responsibilities for conduct related to the subject matter of the Order and all agents and representatives who participate in conduct related to the subject matter of the Order; and (3) any business entity resulting from any change in structure as set forth in Provision XV. Delivery must occur within 10 days after the effective date of this Order for current personnel. For all others, delivery must occur before they assume their responsibilities.

C. From each individual or entity to which Respondent delivered a copy of this Order, that Respondent must obtain, within 30 days, a signed and dated acknowledgment of receipt of this Order.

## XV. Compliance Reports and Notices

**IT IS FURTHER ORDERED** that Respondent makes timely submissions to the Commission:

A. One hundred and eighty days after the effective date of this Order, and annually thereafter for five more years, Respondent must submit a compliance report, sworn under penalty of perjury, in which Respondent must: (a) identify the primary physical, postal, and email address and telephone number, as designated points of contact, which representatives of the Commission, may use to communicate with Respondent; (b) identify all of that Respondent's businesses by all of their names, telephone numbers, and physical, postal, email, and Internet addresses; (c) describe the activities of each business, including the services offered, the means of advertising and marketing, what Covered Information it collects, how Covered Information is used and disclosed to Third Parties; (d) describe in detail whether and how Respondent is in compliance with each Provision of this Order, including a discussion of all of the changes Respondent made to comply with the Order; and (e) provide a copy of each Acknowledgment of the Order obtained pursuant to this Order, unless previously submitted to the Commission.

B. Respondent must submit a compliance notice, sworn under penalty of perjury, within 14 days of any change in: (a) any designated point of contact; or (b) the structure of any Covered Business, including: creation, merger, sale, or dissolution of the entity or any subsidiary, parent, or affiliate that engages in any acts or practices subject to this Order.

C. Respondent must submit notice of the filing of any bankruptcy petition, insolvency proceeding, or similar proceeding by or against such Respondent within 14 days of its filing.

D. Any submission to the Commission required by this Order to be sworn under penalty of perjury must be true and accurate and comply with 28 U.S.C. § 1746, such as by concluding: "I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on: _____" and supplying the date, signatory's full name, title (if applicable), and signature.

E. Unless otherwise directed by a Commission representative in writing, all submissions to the Commission pursuant to this Order must be emailed to DEbrief@ftc.gov or sent by overnight courier (not the U.S. Postal Service) to: Associate Director for Enforcement, Bureau of Consumer Protection, Federal Trade Commission, 600 Pennsylvania Avenue NW, Washington, DC 20580. The subject line must begin: "In re BetterHelp, Inc., [X-number]."

## XVI. Recordkeeping

**IT IS FURTHER ORDERED** that Respondent must create certain records for 20 years after the issuance date of the Order, and retain each such record for 5 years, unless otherwise specified below. Specifically, Respondent for each Covered Business, must create and retain the following records:

A. accounting records showing the revenues from all products or services sold, the costs incurred in generating those revenues, and resulting net profit or loss;

B. personnel records showing, for each person providing services in relation to any aspect of the Order, whether as an employee or otherwise, that person's: name; addresses; telephone numbers; job title or position; dates of service; and (if applicable) the reason for termination;

C. copies or records of all consumer complaints and refund requests concerning the collection, use, maintenance, disclosure, deletion, or permission of access to Covered Information, whether received directly or indirectly, such as through a Third Party, and any response;

D. records of all disclosures of consumers' Covered Information to Third Parties showing, for each Third Party that received Covered Information, the name and address of the Third Party, the date(s) of such disclosures, the purpose(s) for which the Covered

Information was transferred, and how and when Respondent obtained consumers' Affirmative Express Consent for the disclosures in accordance with Provision II;

E. a copy of each unique advertisement or other marketing material making a representation subject to this Order;

F. a copy of each widely disseminated representation by Respondent that describes the extent to which Respondent maintains or protects the privacy, security, availability, confidentiality, or integrity of any Covered Information, including any representation concerning a change in any website or other service controlled by Respondent that relates to the privacy, security, availability, confidentiality, or integrity of Covered Information;

G. for 5 years after the date of preparation of each Assessment required by Provision VII, all materials relied upon to prepare the Assessment, whether prepared by or on behalf of Respondent, including all plans, reports, studies, reviews, audits, audit trails, policies, training materials, and assessments, and any other materials concerning Respondent's compliance with related Provisions of this Order, for the compliance period covered by such Assessment;

H. for 5 years from the date received, copies of all subpoenas and other communications with law enforcement, if such communication relate to Respondent's compliance with this Order;

I. for 5 years from the date created or received, all records, whether prepared by or on behalf of Respondent, that tend to show any lack of compliance by Respondent with this Order; and

J. all records necessary to demonstrate full compliance with each Provision of this Order, including all submissions to the Commission.

**XVII. Compliance Monitoring**

**IT IS FURTHER ORDERED** that, for the purpose of monitoring Respondent's compliance with this Order:

A. Within 10 days of receipt of a written request from a representative of the Commission, Respondent must: submit additional compliance reports or other requested information, which must be sworn under penalty of perjury, and produce records for inspection and copying.

B. For matters concerning this Order, representatives of the Commission are authorized to communicate directly with Respondent. Respondent must permit representatives of the Commission to interview anyone affiliated with Respondent who has agreed to such an interview. The interviewee may have counsel present.

C. The Commission may use all other lawful means, including posing through its representatives as consumers, suppliers, or other individuals or entities, to Respondent or any individual or entity affiliated with Respondent, without the necessity of identification or prior notice. Nothing in this Order limits the Commission's lawful use of compulsory process, pursuant to Sections 9 & 20 of the FTC Act, 15 U.S.C. §§ 49, 57b-1.

## XVIII. Order Effective Dates

**IT IS FURTHER ORDERED** that this Order is final and effective upon the date of its publication on the Commission's website (ftc.gov) as a final order. This Order will terminate 20 years from the date of its issuance (which date may be stated at the end of this Order, near the Commission's seal), or 20 years from the most recent date that the United States or the Commission files a complaint (with or without an accompanying settlement) in federal court alleging any violation of this Order, whichever comes later; *provided, however,* that the filing of such a complaint will not affect the duration of:

A. any Provision in this Order that terminates in less than 20 years;

B. this Order's application to Respondent that is not named as a defendant in such complaint; and

C. this Order if such complaint is filed after the Order has terminated pursuant to this Provision.

*Provided, further,* that if such complaint is dismissed or a federal court rules that Respondent did not violate any Provision of the Order, and the dismissal or ruling is either not appealed or upheld on appeal, then the Order will terminate according to this Provision as though the complaint had never been filed, except that the Order will not terminate between the date such complaint is filed and the later of the deadline for appealing such dismissal or ruling and the date such dismissal or ruling is upheld on appeal.

By the Commission.

April J. Tabor
Secretary

SEAL:
ISSUED:

**Exhibit A**

Notice to Covered Users

[Subject: The Federal Trade Commission Alleges That We Shared Information About You Without Your Permission]

[To appear with the BetterHelp logo]

Hello,

We are contacting you because you used BetterHelp's services (or its partner services Pride Counseling, Teen Counseling, Faithful Counseling, iCounseling, ReGain, or Terappeuta) or created an account for one of these services between January 2013 and December 2020. When you used our services, we promised to keep your personal health information private. The Federal Trade Commission ("FTC") alleges that we shared health information about you to other companies without your approval.

**What happened?**

The FTC alleges that we shared information about you, including information that could be used to identify you, with Facebook, Inc. (now "Meta"); Snapchat (Snap Inc.); Pinterest; and/or Criteo. The FTC alleges that this information may have included:

- Your hashed email address, which these companies used to identify you if you had an account with them
- The IP address that may identify your device when you access our service
- If you answered "yes" to the Intake Questionnaire question "Have you ever been in therapy before?"
- If you answered "good" or "fair" to the Intake Questionnaire question "How would you rate your current financial status?"

The FTC alleges that, in many cases, the companies we shared your information with linked it with your accounts on their platforms so we could show ads to you or people like you.

We didn't share your messages, transcripts of conversations, sessions data, journal entries, worksheets, or any other type of communications between you and your therapist with these companies.

**What are we doing in response?**

We have entered into an agreement with the FTC relating to the sharing of this information. To resolve the case:

- We'll tell the advertising companies that received your information to delete it.
- We aren't sharing your health information with other companies for advertising anymore. And we aren't sharing your personal information for advertising without your permission.
- We'll enhance our privacy program to better protect your personal health information. An independent third party will audit our program to make sure we're protecting your information. These audits will happen every two years for the next 20 years.

**Learn more**

If you have any questions, email us at [email address].

To learn more about the settlement, go to ftc.gov and search for "BetterHelp."

For advice on protecting your health privacy, read the FTC's Does your health app protect your sensitive info?

**2023169**

**UNITED STATES OF AMERICA**
**BEFORE THE FEDERAL TRADE COMMISSION**

**COMMISSIONERS**: **Lina M. Khan, Chair**
**Rebecca Kelly Slaughter**
**Christine S. Wilson**
**Alvaro M. Bedoya**

| | |
|---|---|
| **In the Matter of**<br><br>**BETTERHELP, INC., a corporation,**<br>**also d/b/a**<br>**COMPILE, INC.,**<br>**also d/b/a MYTHERAPIST,**<br>**also d/b/a TEEN COUNSELING,**<br>**also d/b/a FAITHFUL COUNSELING,**<br>**also d/b/a PRIDE COUNSELING,**<br>**also d/b/a ICOUNSELING,**<br>**also d/b/a REGAIN,**<br>**also d/b/a TERAPPEUTA.** | **DOCKET NO.** |

**COMPLAINT**

The Federal Trade Commission ("FTC" or "Commission"), having reason to believe that BetterHelp, Inc., a corporation, has violated the provisions of the Federal Trade Commission Act, and it appearing to the Commission that this proceeding is in the public interest, alleges:

1. Respondent BetterHelp, Inc. ("BetterHelp" or "Respondent"), also doing business as Compile, Inc.; MyTherapist; Teen Counseling; Faithful Counseling; Pride Counseling; iCounseling; ReGain; and Terappeuta, is a Delaware corporation with its principal office or place of business at 990 Villa Street, Mountain View, CA 94041.

2. Respondent has developed, advertised, and offered for sale an online counseling service (the "Service")—including specialized versions of the Service for people of the Christian faith, members of the LGBTQ community, and teenagers—which matches users with Respondent's therapists and then facilitates counseling via Respondent's websites and apps.

3. Millions of consumers have signed up for the Service, entrusting Respondent with their email addresses, IP addresses, and certain information about their health status and histories—such as the fact that they are seeking or are in therapy, and whether they have previously been in therapy. Because Respondent collects certain types of personal information from consumers when they take affirmative steps to sign up for the Service, Respondent's disclosure of that information to a third party would implicitly disclose the consumer's interest in or use of the

Service and therefore constitute a disclosure of the consumer's health information. For example, because Respondent obtained a consumer's email address only when the consumer took affirmative steps to utilize the Service, Respondent's disclosure of this information would identify the consumer as associated with seeking and/or receiving mental health treatment. Similarly, Respondent's disclosure that a consumer took affirmative steps to sign up for the Service (such as by filling out Respondent's intake questionnaire for the Service or becoming a paying user), along with an identifier (for example, an IP address), would disclose the consumer's seeking of mental health treatment via the Service.

4. Recognizing the sensitivity of this health information, Respondent has repeatedly promised to keep it private and use it only for non-advertising purposes such as to facilitate consumers' therapy.

5. From 2013 to December 2020, however, Respondent continually broke these privacy promises, monetizing consumers' health information to target them and others with advertisements for the Service. For example, from 2018 to 2020, Respondent used these consumers' email addresses and the fact that they had previously been in therapy to instruct Facebook to identify similar consumers and target them with advertisements for the Service, bringing in tens of thousands of new paying users, and millions of dollars in revenue, as a result.

6. To capitalize on these consumers' health information, Respondent handed it over to numerous third-party advertising platforms, including Facebook, Pinterest, Snapchat, and Criteo, often permitting these companies to use the information for their own research and product development as well.

7. In addition, Respondent failed to employ reasonable measures to safeguard the health information it collected from consumers. In particular, Respondent did not properly train its employees on how to protect the information when using it for advertising, and Respondent did not properly supervise its staff in the use of the information. Respondent also failed to provide consumers with proper notice as to the collection, use, and disclosure of their health information. And Respondent failed to limit contractually how third parties could use consumers' health information, instead merely agreeing to their stock contracts and terms.

8. It was only in December 2020, well after reporters brought these practices to light and the FTC began investigating the practices, that Respondent curtailed its unauthorized use and disclosure of consumers' health information.

9. The acts and practices of Respondent alleged in this complaint have been in or affecting commerce, as "commerce" is defined in Section 4 of the Federal Trade Commission Act.

## I. Background

### A. The Service

10. Respondent offers the Service under several names, each of which has its own website and app (collectively, the "Multi-Sites"). Its primary website and app, which is named "BetterHelp," serves general audiences and has been in operation since 2013. Faithful Counseling, in operation since July 2017, is aimed at consumers of the Christian faith. Pride

Counseling, in operation since August 2017, caters to the LGBTQ community. Teen Counseling, in operation since January 2017, offers counseling to 13- to 18-year-olds with parental consent. And ReGain, in operation since May 2016, offers couples counseling.[1] The Multi-Sites all function similarly and facilitate therapy via the Service, and they are all subject to Respondent's policies, practices, and procedures.

11. Users pay $60 to $90 per week for counseling through the Service. To sign up for the Service and become a paying user (a "User"), an individual visiting one of the Multi-Sites (a "Visitor") must fill out a questionnaire (the "Intake Questionnaire"), answering detailed questions about the Visitor's mental health.

12. Upon completing the Intake Questionnaire, a Visitor is prompted to create an account for the Service by entering the Visitor's name or nickname, email address, phone number, and emergency contact information. The Visitor is then asked to enter credit card information to become a paying User.

13. Respondent then utilizes the User's responses to the Intake Questionnaire to match the User with one of Respondent's more than 25,000 licensed therapists. Respondent's therapists provide Users with mental health therapy via video conferencing, text messaging, live chat, and audio calls.

14. Respondent's primary website and app, "BetterHelp," has seen explosive growth over the last few years, adding over 118,000 U.S. Users in 2018, over 158,000 U.S. Users in 2019, and over 641,000 U.S. Users in 2020. Since its inception, BetterHelp has signed up over 2 million Users, and, today, it has over 374,000 active Users in the United States. As a result, Respondent earned over $345 million in revenue in 2020, and over $720 million in revenue in 2021.

**B. Respondent's Marketing History**

15. Since its inception, Respondent has utilized numerous third parties to market the Service, including, at various times, Facebook, Snapchat, Pinterest, and Criteo. In addition, Respondent has advertised the Service on search engines, television, podcasts, and radio.

16. In 2017, Respondent delegated most decision-making authority over its use of Facebook's advertising services to a Junior Marketing Analyst who was a recent college graduate, had never worked in marketing, and had no experience and little training in safeguarding consumers' health information when using that information for advertising. In doing so, Respondent gave the Junior Marketing Analyst carte blanche to decide which Visitors' and Users' health information to upload to Facebook and how to use that information. This same individual, who now holds the title "Senior Marketing Analyst," continues to oversee Respondent's use of Facebook's advertising tools.

17. Respondent provided this marketing analyst with little training on how to protect Visitors' and Users' health information in connection with advertising until 2021. In fact, while

[1] Respondent also offered the Service through the iCounseling website and app from February 2017-November 2020, the Terappeuta website and app from March 2017-March 2019, and the MyTherapist website and app from June 2017-March 2019.

Respondent has purported to provide privacy training to its employees since 2015, it was not until 2021 that Respondent gave them any training specific to its business or advertising.

18. Respondent has spent tens of millions of dollars annually to market the Service. In 2020, for example, it spent $10-$20 million on Facebook advertising, and by 2021 Respondent's advertising on Facebook was bringing in approximately 30,000 to 40,000 new Users per quarter.

## II. <u>Respondent's Deceptive Business Practices</u>

19. In connection with the advertisement and sale of the Service, Respondent has disseminated, or caused to be disseminated, false and deceptive statements about its use and disclosure of consumers' health information. Respondent also disseminated, or caused to be disseminated, misleading and deceptive representations regarding its compliance with federal health privacy laws. Visitors and Users relied on these representations and were misled as a result.

### A. Deceptive Statements About Privacy on Respondent's Websites and Apps

<u>Respondent's deceptive statements concerning Intake Questionnaire responses</u>

20. Upon arriving at any of the Multi-Sites, a Visitor is immediately prompted to begin the Intake Questionnaire. For example, on the BetterHelp website, a Visitor begins the Intake Questionnaire by selecting whether he or she is looking for "Individual," "Couples," or "Teen" therapy, as shown below:




21. After making a selection, the Visitor is ushered through the Intake Questionnaire, which asks an array of questions. For many Visitors, these questions include whether the Visitor is "experiencing overwhelming sadness, grief, or depression"; whether the Visitor has been having thoughts that the Visitor "would be better off dead or hurting yourself in some way"; whether the Visitor is "currently taking any medication"; whether the Visitor has "problems or worries about intimacy"; and whether the Visitor has previously been in therapy.

22. The Intake Questionnaire also asks whether the Visitor identifies as a member of the Christian faith, shuttling such individuals to Faithful Counseling. Similarly, the Intake Questionnaire takes those who identify as members of the LGBTQ community to Pride

Counseling. And Respondent ushers teenagers to Teen Counseling, where the teenage Visitors provide their responses to the Intake Questionnaire before Respondent obtains parental consent.

23. Respondent has included privacy assurances throughout the Intake Questionnaire. Until November 2021, each Multi-Site displayed a banner at the top of each question, explaining that Respondent is merely asking for "some general and *anonymous* background information about you and the issues you'd like to deal with in online therapy" (emphasis added) so that the Visitor can be matched "with the most suitable therapist for you."

24. As Visitors proceed through the Intake Questionnaire, Respondent includes additional periodic privacy assurances. From at least August 2017 to December 2020, when a Visitor reached the question as to whether the Visitor was taking medication, the Visitor was shown the statement: "Rest assured—any information provided in this questionnaire will stay private between you and your counselor."

25. In December 2020, Respondent changed the statement to read: "Rest assured—*this information* will stay private between you and your counselor" (emphasis on alteration added). And in January 2021, Respondent changed it again to state: "Rest assured—*your health information* will stay private between you and your counselor" (emphasis on alteration added). This version, which was in use until September 2021, is circled in red below:




In October 2021, Respondent removed this representation altogether.

26. After being presented with these repeated promises of privacy, millions of Visitors, including those that became Users, filled out the Intake Questionnaire and shared their health information with Respondent.

27. Despite the aforementioned assurances of privacy, Respondent disclosed Visitors' and Users' Intake Questionnaire responses, as well as their email addresses and IP addresses, to Facebook for advertising purposes, as well as for Facebook's own purposes, as discussed in Paragraphs 51-54 and 57 below.

<u>Respondent falsely promised to keep Christian, LGBTQ, and teenage consumers' email addresses "strictly private"</u>

28. From at least August 2017 to as recently as December 2020, Respondent gave additional privacy assurances to Faithful Counseling, Pride Counseling, and Teen Counseling Visitors to induce them to sign up for the Service, stating that their email addresses would be "kept strictly private" and "never shared, sold or disclosed to anyone." This representation, which Respondent displayed prominently and unavoidably during the sign-up process, is circled in red below:




29. Tens of thousands of Visitors provided Respondent with their email addresses and signed up for Faithful Counseling, Pride Counseling, and Teen Counseling after viewing this privacy assurance.

30. Respondent understood that its disclosure of Visitors' email addresses in association with BetterHelp would reveal that the Visitors were seeking mental health treatment through the Service. And Respondent understood that consumers would want to keep this information private. In fact, a senior BetterHelp employee acknowledged at an investigational hearing conducted by FTC staff that individuals "want to keep . . . the fact that they're in therapy private" and at times even "keep their identities . . . secret from their therapist[s]."

31. Nevertheless, Respondent disclosed the email addresses of thousands of these Visitors to various third parties for advertising purposes and the third parties' own purposes, as discussed in further detail in Paragraphs 47-55 and 57, thereby revealing to the third parties that these Visitors were seeking and/or receiving mental health treatment via the Service.

Respondent pushed Visitors and Users into disclosing their health information

32. In addition to making false representations, Respondent has pushed Visitors and Users into handing over their health information before they have ever had a chance to read any privacy disclosures.

33. Upon visiting any of the Multi-Sites, Visitors are urged to begin the Intake Questionnaire and hand over their health information. At the same time, Visitors are repeatedly presented with the aforementioned privacy assurances discussed in Paragraphs 23-25 and 28—displayed in large, high-contrast, unavoidable text.

34. By contrast, Respondent linked to the privacy policy in small, low-contrast writing that is barely visible at the bottom of the page.

35. The image below depicts the BetterHelp homepage (www.betterhelp.com), with the prompts to enter the Intake Questionnaire magnified at the top and the link to the privacy policy magnified at the bottom and circled in red:




36. In September 2020, Respondent added the below banner to the bottom of every page of its Multi-Sites (until a Visitor closed it), which stated: “We use cookies to help the site function properly, analyze usage, and measure the effectiveness of our ads. We never sell or rent any information you share with us. Read our Privacy Policy [(linked)] to learn more.”



37. Despite including a link to the privacy policy, the banner effectively dissuaded Visitors from reading the privacy policy by stating, until October 2020, that Respondent would "never sell or rent any information you share with us."

38. In May 2021, Respondent revised the banner and added the following underlined language: "We use BetterHelp and third-party cookies and web beacons to help the site function properly, analyze usage, <u>target</u> and measure the effectiveness of our ads. Read our Privacy Policy [(linked)] to learn more <u>and go to Cookie Preferences to manage your settings</u>" (emphasis added). But this banner still did not inform Visitors that Respondent would use and disclose their health information for advertising or that third parties would be able to use Visitors' information for their own purposes.

39. It was not until October 2021 that Respondent revised the banner to state that it discloses Visitors' IP addresses and other personal identifiers for advertising and offered Visitors an opportunity to opt out of the disclosures via the banner.

<u>Respondent's privacy policies claimed limited use and disclosure of consumers' information</u>

40. Those Visitors and Users that persevered and read Respondent's privacy policy were presented with additional deceptive statements about Respondent's use and disclosure of health information.

41. From August 2013 to November 2018, Respondent's privacy policies represented that it would use and disclose Visitors' and Users' email addresses, IP addresses, enrollment in the Service, and Intake Questionnaire responses for certain purposes, including to connect them with therapists and operate the Service. Notably, these privacy policies made no mention of using or disclosing this information for advertising purposes, and they said nothing about permitting third parties to use this information for their own purposes.

42. In November 2018, Respondent updated the privacy policy to state affirmatively that it would use and disclose this information only for limited purposes, such as to operate and improve the Service. These limited purposes did not include using or disclosing the information for advertising or disclosing the information to third parties for their own purposes.

43. Respondent revised its privacy policy again in September 2019, stating that it might *use* this health information for advertising. But the policy continued to say that Respondent would only *disclose* this information to third parties for certain stated limited purposes, which did not include advertising or the third parties' own purposes. In September 2020, Respondent revised the privacy policy yet again, finally stating that it may *both use and disclose* Visitors' and Users' information for advertising. But, even then, the privacy policy continued to claim that Respondent would disclose this information to third parties for only the stated limited purposes, which did not include third parties' own purposes.

44. From August 2013 to June 2021, Respondent's privacy policies stated that it would use web beacons (including pixels) and cookies for limited purposes. These limited purposes did not include the use or disclosure of Visitors' or Users' health information for advertising purposes, or the disclosure of this information for third parties' own purposes. These tools allow

Respondent and third parties to collect Visitors' and Users' information when they use one of the Multi-Sites, including what pages a Visitor or User visits and what information a Visitor or User inputs into the website (which would include the Visitor's or User's email address, IP address, and certain Intake Questionnaire responses).

45. But, as discussed in Paragraphs 46-57 below, these privacy policy representations misled Visitors and Users. In fact, Respondent used and disclosed Visitors' and Users' health information for advertising purposes, and Respondent disclosed this information to third parties for their own purposes, from 2013 to December 2020. Respondent used and disclosed this information for advertising purposes through various means, including by uploading consumers' email addresses to third-party advertising platforms and through web beacons (specifically pixels) Respondent had placed on various pages of the Multi-Sites.

**B. Respondent Used and Disclosed Millions of Consumers' Health Information for Advertising**

46. Since 2013, Respondent has repeatedly broken each of its aforementioned privacy promises, using Visitors' and Users' email addresses, IP addresses, enrollment in the Service, and certain Intake Questionnaire responses for various advertising purposes, including (1) re-targeting Visitors with advertisements for the Service; (2) using Users' health information to find and target potential new Users with advertisements—on the basis that these potential new Users were likely to sign up for the Service because they shared traits with current Users; and (3) optimizing Respondent's advertisements, which involved targeting advertisements at individuals with attributes similar to those that had previously responded to Respondent's ads, such as new Users. Using this health information for advertising, Respondent has brought in hundreds of thousands of new Users, resulting in millions of dollars in additional revenue.

47. Respondent utilized a number of third-party advertising platforms, including Facebook, Snapchat, Criteo, and Pinterest, to carry out this advertising. To do so, Respondent disclosed Visitors' and Users' email addresses, IP addresses, enrollment in the Service, and certain Intake Questionnaire responses to these third parties, as detailed below.

48. As noted above, each such disclosure of even a Visitor's or User's email address constituted a disclosure of the Visitor's or User's health information. Specifically, because Respondent collected email addresses only from Visitors and Users seeking mental health therapy via the Service (by filling out the Intake Questionnaire, signing up for the Service, and/or becoming a User), disclosure of a Visitor's or User's email address implicitly identified the Visitor or User as one seeking and/or receiving mental health treatment via the Service.

49. Although Respondent "hashed" Visitors' and Users' email addresses (i.e., converted the email addresses into a sequence of letters and numbers through a cryptographic tool) before disclosing them to third parties, the hashing was not meant to conceal the Visitors' and Users' identities from Facebook or the other recipient third parties. Rather, the hashing was done merely to hide the email addresses from a bad actor in the event of a security breach. In fact, Respondent knew that third parties such as Facebook were able to, and in fact would, effectively undo the hashing and reveal the email addresses of those Visitors and Users with accounts on the respective third parties' platforms, which is how Facebook matched these email addresses with

Facebook user IDs. Indeed, Facebook's standard terms of service, to which Respondent agreed, explained that Facebook would use hashed email addresses it received from Respondent to match Visitors and Users with their Facebook user IDs for advertising purposes, among other things. Thus, Respondent knew that by sending these lists of Visitors' and Users' email addresses to third parties, it was telling these third parties which of their users were seeking or in therapy through the Service.

50. In addition, Respondent disclosed the Visitor's or User's IP address in conjunction with other data about their enrollment in the Service and/or their Intake Questionnaire responses to third parties. Each such disclosure similarly constituted a disclosure of the Visitor's or User's health information because it both identified the individual (via the IP address) and conveyed to the recipient third party that the Visitor or User was seeking and/or receiving mental health treatment via the Service (via his or her enrollment in the Service or answering the Intake Questionnaire).

51. **Health information shared with Facebook:** Respondent disclosed Visitors' and Users' health information to Facebook in two ways.

52. First, Respondent compiled lists of Visitors' and Users' email addresses, which it then uploaded to Facebook to match these individuals to their Facebook user accounts in order to target them and others like them with advertisements. Between 2017 and 2018, Respondent uploaded lists of over 7 million Visitors' and Users' email addresses to Facebook. Facebook matched over 4 million of these Visitors and Users with their Facebook user IDs, linking their use of the Service for mental health treatment with their Facebook accounts. Several examples are listed below:

a. January 2017 – October 2018: Respondent uploaded over 170,000 Visitors' and Users' email addresses to Facebook, re-targeting these individuals and targeting potential new Users with advertisements for the Service.

b. January 2018 – October 2018: Respondent uploaded over 15,000 Users' email addresses to Facebook to find and target new potential Users with advertisements for the Service.

c. October 2017: Respondent uploaded the email addresses of all their current and former Users—nearly 2 million in total—to Facebook, targeting them all with advertisements to refer their Facebook friends to the Service.

53. Second, from 2013 to December 2020, Respondent shared Visitors' and Users' email addresses, IP addresses, and records known as "Events" with Facebook. These Events automatically tracked certain actions of each Visitor and User on the Multi-Sites, such as when they answered certain questions on the Intake Questionnaire in a certain way or when a Visitor enrolled in the Service to become a User. Respondent recorded and automatically disclosed these Events to Facebook through web beacons Respondent had placed on each of the Multi-Sites. Respondent disclosed Visitors' and Users' IP addresses, email addresses, and/or other persistent identifiers to Facebook alongside the Events so that Facebook could match the Events

information with the Visitors' and Users' Facebook accounts for advertising. Several examples are listed below:

a. January 2018: Respondent disclosed to Facebook that over 70,000 Visitors had signed up for accounts (but had not become paying Users)—through an Event denoting as much—in order to re-target them with advertisements for the Service.

b. November 2018 – March 2020: Respondent disclosed to Facebook over 1.5 million Visitors' and Users' previous therapy—gathered through their affirmative responses to the Intake Questionnaire question "Have you been in counseling or therapy before?"—to re-target the Visitors with advertisements and optimize Respondent's advertisements.

c. October 2018 – November 2020: Respondent used and shared over 3.5 million Visitors' and Users' "good" or "fair" financial status—gathered through the Intake Questionnaire—with Facebook to optimize Respondent's advertisements and to find potential new Users and target them with advertisements.

d. January – December 2020: Respondent shared with Facebook the fact that over 180,000 Visitors had become paying Users—through an Event denoting they had entered credit card information after completing the Intake Questionnaire—to optimize Respondent's advertisements and to find potential new Users and target them with advertisements.

54. Respondent labeled the Intake Questionnaire responses concerning prior therapy and financial status with anonymous Event titles before giving them to Facebook; however, in July 2018, the previously mentioned inexperienced and insufficiently trained Junior Marketing Analyst whom Respondent had put in charge of Facebook advertising revealed certain Events' true meaning to Facebook via the Facebook employee that serviced Respondent's advertising account. For example, though an affirmative response to the question "Have you been in counseling or therapy before?" was coded as "AddToWishlist," the analyst revealed to Facebook that this event meant that the "user completes questionnaire marking they have been in therapy before," thereby disclosing millions of Visitors' and Users' prior therapy to Facebook.

55. **Health information shared with other third parties:** In January 2019, Respondent disclosed to Snapchat the IP addresses and email addresses of approximately 5.6 million Visitors to re-target them with advertisements for the Service. From July 2018 to January 2019, Respondent disclosed the email addresses of over 70,000 Visitors—including Pride Counseling and Faithful Counseling Visitors—to Criteo in order to re-target them with advertisements. And, from August 2019 to September 2020, Respondent disclosed Visitors' email addresses to Pinterest for advertising.

56. **Additional use of health information for advertising:** From November 2017 to October 2020, Respondent used information concerning approximately 600,000 Pride Counseling Visitors' or Users' mental health statuses and their connection with the Visitors' and Users' LGBTQ identities to optimize future advertisements for the Service on Facebook. Respondent gathered this information through the Intake Questionnaire whenever a Pride

Counseling Visitor or User revealed that the Visitor's or User's "LGBTQ identity is contributing to your mental health concerns." Respondent used Facebook to identify characteristics and interests common among these Visitors and Users and then to target future advertisements for the Service on Facebook to individuals with similar characteristics and interests.

57. **Failure to limit third parties' use of health information:** In disclosing Visitors' and Users' health information to Facebook and other third parties, Respondent did not contractually limit how the third parties could use and disclose the data other than merely agreeing to these third parties' general terms of service, which either placed no restrictions on the third parties' use and disclosure of the information or specifically permitted the third parties to use the information for their own purposes. For example, Facebook's Business Tools Terms, to which Respondent agreed, stated that it "may also use Event Data . . . for research and development purposes, and to . . . improve the Facebook Company Products." Similarly, Pinterest's Ad Data Terms provided: "We use Ad Data you give us for measuring ad effectiveness, ad delivery and reporting, improving safety and security on Pinterest, research and product development, and for other uses that you give us permission for." And Facebook has in fact used the Visitor and User information it received from Respondent for its own purposes, including improving its advertising products, tracking suspicious activity on its platforms, and research and development.

58. Further, though Respondent has deleted some of the Visitor and User information it disclosed to third parties from those third parties' advertising platforms, this deletion did not remove the information from those third parties' underlying databases.

### C. Respondent's Deceptive Statements Were Material to Consumers

59. Respondent's deceptive privacy assurances were material to consumers.

60. Visitors and Users want to keep their health information private. Indeed, a senior BetterHelp employee acknowledged at an investigational hearing conducted by FTC staff that consumers want "privacy in the context of therapy."

61. And Respondent acknowledges that this information is sensitive. In fact, Respondent's customer service representatives tell consumers that their "name, age, address, *email*, *medical history*, conversations between you and your counselor" are "PHI" or "Protected Health Information"[2] (emphasis added).

62. Following the February 2020 publication of news reports that Respondent was sharing consumers' health information with third parties, including Facebook, numerous Users contacted Respondent and voiced their anger about the disclosures. For example, one individual noted: "I learned that you sell yet more private information to Facebook. This is disgusting. This information makes clients easily identifiable and your platform takes 100% control of its dissemination. I have no ability to decide where that information is sent. Only you do." Another stated: "I have not given ANY consent to share my information with ANYONE. ESPECIALLY ads targeting my mental health 'weakness.'" And another called Respondent an "untrustworthy

[2] Protected Health Information is information that is considered sensitive and is protected by federal health privacy laws in certain contexts, including the Health Insurance Portability and Accountability Act of 1996 ("HIPAA").

company." Other Users demanded the truth as to Respondent's data-sharing practices, asking for assurances as to the privacy of their health information.

63. Respondent scripted the following false responses, which customer service representatives provided to Respondent's customers: (1) "At BetterHelp, we are fully committed to protecting data and will not pass any P[ersonally] I[dentifiable] I[nformation] and/or P[rotected] H[ealth] I[nformation] to external entities including our third party partners;" and (2) "your P[rotected] H[ealth] I[nformation] and P[ersonally] I[dentifiable] I[nformation] is protected and not exposed" to Facebook.

64. Similarly, several health insurance and patient-advocacy companies representing tens of thousands of Users contacted Respondent, looking for assurance that Users' health information had not been shared with any third parties. Senior BetterHelp employees answered each such inquiry with a variation on the same falsehood, claiming again and again that Respondent did not share any health information with any third parties.

**D. Respondent's Deceptive HIPAA Seal**

65. From September 2013 to December 2020, Respondent displayed seals—in proximity to seals provided by third parties to Respondent—implying Respondent's purported compliance with HIPAA. These seals are circled in red below:

September 2013 – December 2015:




January 2016 – December 2020:




66. By displaying the HIPAA seals on every page of the Multi-Sites, Respondent signaled to consumers that a government agency or other third party had reviewed Respondent's privacy and information security practices and determined that they met HIPAA's requirements. In addition, Respondent represented to consumers that it was in fact "HIPAA certified," with its customer service representatives informing consumers that "[y]ou will also be able to see our HIPAA certification at the bottom of" our webpages.

67. However, no government agency or other third party reviewed Respondent's information practices for compliance with HIPAA, let alone determined that the practices met the requirements of HIPAA.

68. In addition, hundreds of Respondent's therapists are not subject to HIPAA and the identifiable health information of Users who engage with those therapists is therefore not protected by HIPAA. Further, Respondent does not even know which of its therapists are, or are not, subject to HIPAA, and it does not know which data are, or are not, protected by that law.

69. In December 2020, after receiving a Civil Investigative Demand from the Commission, Respondent removed the "HIPAA" seals from the Multi-Sites.

## III. Respondent's Unfair Business Practices

### A. Respondent's Unreasonable Privacy Practices

70. From at least 2017 to at least 2021, Respondent has engaged in a number of practices that, individually or taken together, failed to safeguard Visitors' and Users' health information with respect to the collection, use, and disclosure of that information. Among other things, Respondent:

a. failed to develop, implement, or maintain written organizational standards, policies, procedures, or practices with respect to the collection, use, and disclosure of consumers' health information, including ensuring that Respondent's practices complied with its privacy representations to consumers;

b. failed to provide adequate guidance or training for employees or third-party contractors concerning properly safeguarding the privacy of consumers' health information in connection with the collection, use, and disclosure of that information;

c. failed to properly supervise employees with respect to their collection, use, and disclosure of consumers' health information;

d. failed to obtain Visitors' and Users' affirmative express consent to collect, use, and disclose their health information for Respondent's advertising, as well as for third parties' own purposes, such as research and improvement of their own products; and

e. failed to contractually limit third parties from using Visitors' and Users' health information for their own purposes, including but not limited to research and improvement of their own products, when Respondent did not provide Visitors and Users notice or obtain their consent for such uses.

71. As a result, Respondent repeatedly misrepresented its practices with respect to the collection, use, and disclosure of Visitors' and Users' health information (*see* Paragraphs 19-57, 62-64), and Respondent failed to provide consumers with sufficient notice or obtain their consent

as to these practices. Respondent disclosed these Visitors' and Users' health information to numerous third parties without authorization.

72. These misrepresentations went on for years because, until no earlier than January 2021, Respondent did nothing to ensure that its collection, use, and disclosure practices complied with their privacy promises to Visitors and Users. Indeed, neither the head of Respondent's marketing team, nor the analyst whom Respondent put in charge of advertising on Facebook reviewed the privacy policy on a regular basis, and there was no company requirement that anyone on the marketing team review the policy until no earlier than January 2021.

**B. Injury to Consumers**

73. Respondent's collection, use, and disclosure of millions of Visitors' and Users' health information without reasonable privacy practices or safeguards has caused or is likely to cause them substantial injury. This health information—including whether Visitors and Users have previously been in therapy, the fact that they are seeking therapy or in therapy via the Service, and whether their LGBTQ status is affecting their mental health, together with identifying information such as their email addresses and IP addresses—is highly sensitive. Disclosure of this information without these Visitors' and Users' authorization is likely to cause them stigma, embarrassment, and/or emotional distress. Exposure of this information may also affect these Visitors' and Users' ability to obtain and/or retain employment, housing, health insurance, or disability insurance.

74. In addition, Users pay $60 to $90 per week for the Service, which provides mental health therapy and counseling and includes privacy as an integral component—a price that includes a "price premium" based on Respondent's deceptive privacy assurances. Had Respondent not made these deceptive claims, consumers would not have been willing to purchase a subscription at the prevailing price because of consumers' privacy concerns. Thus, Respondent's deceptive privacy claims enabled it to inflate the price it charged to consumers, whose actual willingness to pay would have been lower had they known about the true privacy issues concerning Respondent's services. Consumers have therefore been injured by having to pay this price premium.

75. These harms were not reasonably avoidable by consumers. It was effectively impossible for Visitors and Users to know that Respondent was using and disclosing their health information for advertising purposes because Respondent actively concealed the practices through repeated misrepresentations and a lack of notice. Indeed, as described in Paragraph 62, numerous Users expressed outrage about the disclosures upon learning of them.

76. These harms were not outweighed by countervailing benefits to consumers or competition. Indeed, Respondent compromised consumers' health information for Respondent's own financial benefit through the growth of its user base, which only compounded these injuries by subjecting more Visitors and Users to Respondent's deceptive and unfair practices.

**Count I**
**Unfairness – Unfair Privacy Practices**

77. As described in Paragraphs 16-17 and 70-72, Respondent failed to employ reasonable measures to protect consumers' health information in connection with the collection, use, and disclosure of that information, resulting in the improper and unauthorized disclosure of that information to numerous third parties for advertising and other purposes.

78. Respondent's acts or practices as set forth in Paragraph 77 caused or are likely to cause substantial injury to consumers that is not outweighed by countervailing benefits to consumers or competition and is not reasonably avoidable by consumers themselves, as described in Paragraphs 73-76.

79. Therefore, Respondent's acts or practices as set forth in Paragraphs 77-78 constitute unfair acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. § 45(a), (n).

**Count II**
**Unfairness – Failure to Obtain Affirmative Express Consent Before Collecting, Using, and Disclosing Consumers' Health Information**

80. As described in Paragraphs 19-58, Respondent failed to obtain consumers' affirmative express consent before collecting, using, and disclosing to third parties those consumers' health information.

81. Respondent's acts or practices as set forth in Paragraph 80 caused or are likely to cause substantial injury to consumers that is not outweighed by countervailing benefits to consumers or competition and is not reasonably avoidable by consumers themselves, as described in Paragraphs 73-76.

82. Therefore, Respondent's acts or practices as set forth in Paragraphs 80-81 constitute unfair acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. § 45(a), (n).

**Count III**
**Failure to Disclose – Disclosure of Health Information for Advertising and Third Parties' Own Uses**

83. As described in Paragraphs 41 and 44, Respondent represented, directly or indirectly, expressly or by implication, that it would disclose consumers' health information to third parties for limited purposes, and the listed purposes did not include advertising or third parties' own uses.

84. In making the representations described in Paragraph 83, Respondent failed to disclose, or failed to disclose adequately to consumers, that it disclosed consumers' health information to third parties, including Facebook, Pinterest, Snapchat, and Criteo, for advertising as well as third parties' own uses, as alleged in Paragraphs 47-57. This additional information would have been material to consumers in their decisions to use Respondent's services.

85. Therefore, Respondent's acts or practices as set forth in Paragraphs 83-84 constitute deceptive acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. § 45(a).

**Count IV**
**Failure to Disclose – Use of Health Information for Advertising**

86. As described in Paragraphs 41 and 44, Respondent represented, directly or indirectly, expressly or by implication, that it would use consumers' health information for limited purposes, and the listed purposes did not include advertising or advertising-related purposes.

87. In making the representations described in Paragraph 86, Respondent failed to disclose, or failed to disclose adequately to consumers, that it used consumers' health information for advertising and advertising-related purposes, as alleged in Paragraphs 46, 53, and 56. This additional information would have been material to consumers in their decisions to use Respondent's services.

88. Therefore, Respondent's acts or practices as set forth in Paragraphs 86-87 constitute deceptive acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. § 45(a).

**Count V**
**Privacy Misrepresentation – Disclosure of Health Information for Advertising and Third Parties' Own Uses**

89. As described in Paragraphs 28-31, 42-43, and 63-64, Respondent represented, directly or indirectly, expressly or by implication, that it would not disclose consumers' health information to any third party for advertising or that third party's own uses.

90. In fact, as set forth in Paragraphs 46-55 and 57, Respondent disclosed consumers' health information to third parties, including Facebook, Pinterest, Snapchat, and Criteo, for advertising and those third parties' own uses. Therefore, the representations set forth in Paragraph 89 are false or misleading.

91. Therefore, Respondent's acts or practices as set forth in Paragraphs 89-90 constitute deceptive acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. § 45(a).

**Count VI**
**Privacy Misrepresentation – Use of Health Information for Advertising**

92. As described in Paragraph 42, Respondent represented, directly or indirectly, expressly or by implication, that it would not use consumers' health information for advertising or advertising-related purposes.

93. In fact, as set forth in Paragraphs 46, 53, and 56, Respondent did use consumers' health information for advertising and advertising-related purposes. Therefore, the representations set forth in Paragraph 92 are false or misleading.

94. Therefore, Respondent's acts or practices as set forth in Paragraphs 92-93 constitute deceptive acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. § 45(a).

**Count VII**
**Privacy Misrepresentation – Disclosure of Health Information**

95. As described in Paragraphs 23-26, Respondent represented, directly or indirectly, expressly or by implication, that it would not disclose consumers' health information to anyone except each consumer's licensed therapist.

96. In fact, as set forth in Paragraph 46-54, Respondent disclosed consumers' health information to at least one entity other than each consumer's licensed therapist—Facebook. Therefore, the representations set forth in Paragraph 95 are false or misleading.

97. Therefore, Respondent's acts or practices as set forth in Paragraphs 95-96 constitute deceptive acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. § 45(a).

**Count VIII**
**Privacy Misrepresentation – HIPAA Certification**

98. As described in Paragraphs 65-66, Respondent represented, expressly or by implication, directly or indirectly, that a government agency or other third party had reviewed Respondent's privacy and information practices and determined that they met HIPAA's requirements.

99. In fact, as set forth in Paragraphs 67-68, no government agency or other third party had ever reviewed Respondent's privacy or information security practices and determined that they met HIPAA's requirements.

100. Therefore, Respondent's acts or practices as set forth in Paragraphs 98-99 constitute deceptive acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. § 45(a).

THEREFORE, the Federal Trade Commission this ___ day of _______ 2022, has issued this complaint against Respondent.

By the Commission.

April J. Tabor
Secretary

SEAL:

**Analysis of Proposed Consent Order to Aid Public Comment**
***In the Matter of* BetterHelp, Inc.**
**File No. 2023169**

The Federal Trade Commission (the "Commission") has accepted, subject to final approval, an agreement containing a consent order from BetterHelp, Inc. ("Respondent" or "BetterHelp").

The proposed consent order ("Proposed Order") has been placed on the public record for thirty (30) days for receipt of comments by interested persons. Comments received during this period will become part of the public record. After thirty (30) days, the Commission will again review the agreement, along with any comments received, and will decide whether it should withdraw from the agreement and take appropriate action or make final the Proposed Order.

BetterHelp is an online mental-health counseling service that matches consumers with one of BetterHelp's over 25,000 contracted licensed therapists. Through BetterHelp's websites and apps, consumers can communicate with therapists via video conferencing, text messaging, live chat, and audio calls. BetterHelp has offered this service under several names, including BetterHelp Counseling, Faithful Counseling, Pride Counseling, ReGain, Terappeuta, iCounseling, and MyTherapist.

To sign up for BetterHelp's counseling service, a consumer must complete an online intake questionnaire, answering detailed questions about the consumer's mental health status and history (the "Intake Questionnaire"). Following completion of the Intake Questionnaire, the consumer can create an account by providing the consumer's name or nickname, email address, phone number, and emergency contact information.

As consumers progressed through the Intake Questionnaire, BetterHelp represented that the consumers' information "will stay private between you and your counselor." Similarly, when a consumer completed the Intake Questionnaire and signed up for an account to use Faithful Counseling, Pride Counseling, or Teen Counseling, BetterHelp represented that the consumer's email address would be "kept strictly private" and "never shared, sold or disclosed to anyone." BetterHelp made additional privacy guarantees in its privacy policies—first implicitly and then explicitly—of limited use and limited disclosure of consumers' email addresses, IP addresses, and health information. Despite representing to consumers that BetterHelp would keep consumers' information private and only use their information for non-advertising purposes, BetterHelp used and disclosed information obtained from consumers through the Intake Questionnaire and sign-up process for advertising.

Additionally, BetterHelp prominently displayed a seal—in close proximity to several other seals provided by third parties—that attested to BetterHelp's purported compliance with the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), a statute that sets forth privacy and information security protections for health information. In addition, BetterHelp represented to consumers that it was in fact

"HIPAA certified," with its customer service representatives informing consumers that "[y]ou will also be able to see our HIPAA certification at the bottom of" our webpages. However, no government agency or other third party had reviewed BetterHelp's information practices for compliance with HIPAA, let alone determined that the practices met the requirements of HIPAA.

The Commission's proposed eight-count complaint alleges that BetterHelp violated Section 5(a) of the Federal Trade Commission Act by: (1) unfairly failing to employ reasonable measures to protect consumers' health information in connection with the collection, use, and disclosure of that information (Count I); (2) unfairly failing to obtain consumers' affirmative express consent prior to collecting, using, and disclosing consumers' health information (Count II); (3) failing to disclose that it shared consumers' health information with third parties for BetterHelp's advertising purposes and the recipient third parties' own business purposes, and failing to disclose that BetterHelp used consumers' health information to target the consumers and others with advertisements (Counts III and IV); (4) misrepresenting that it would not disclose consumers' health information to third parties for advertising and the recipient third parties' own business purposes, that it would not use such information for advertising or advertising-related purposes, and that it would not share such information with anyone except each consumer's licensed therapist (Counts V-VII); and (5) misrepresenting that a governmental agency or third party had reviewed BetterHelp's practices and determined that such practices met the requirements of HIPAA (Count VIII).

**Summary of Proposed Order with BetterHelp**

The Proposed Order contains provisions designed to prevent BetterHelp from engaging in the same or similar acts or practices in the future.

**Part I** of the Proposed Order prohibits BetterHelp from sharing individually identifiable information relating to the past, present, or future physical or mental health or condition(s) of a consumer with any Third Party (i.e., any party other than BetterHelp, its service providers, therapists or counselors employed by or contracted with BetterHelp, certain employee benefit programs, and entities using consumers' information for other very limited purposes) for advertising. Part I also prohibits BetterHelp from sharing consumers' personal information more generally with Third Parties for the purpose of re-targeting (i.e., sharing personal information of consumers who have previously engaged with BetterHelp, such as by visiting one of its websites or using one of its apps, to send advertisements to those consumers).

**Part II** of the Proposed Order requires that, before it can share a consumers' personal information with a Third Party for any purpose that is not prohibited under Part I, BetterHelp must obtain that consumer's affirmative express consent, which includes informing the consumer of the information to be disclosed, the third parties that will receive the information, and how the information will be used.

**Part III** of the Proposed Order prohibits BetterHelp from misrepresenting: (1) the extent to which it collects, maintains, uses, discloses, deletes, or permits or denies access

to any Covered Information, or the extent to which it protects the privacy, security, availability, confidentiality, or integrity of Covered Information; (2) the purposes for which BetterHelp or any entity to whom it discloses or permits access to Covered Information collects, maintains, uses, discloses, or permits access to such information; (3) the extent to which a consumer can maintain privacy and anonymity when visiting or using BetterHelp's online properties; (4) the extent to which consumers may exercise control over BetterHelp's collection of, maintenance of, use of, deletion of, disclosure of, or permission of access to Covered Information; (5) the extent to which BetterHelp is a member of, adheres to, complies with, is certified by, is endorsed by, or otherwise participates in any privacy, security or any other compliance program sponsored by a government or any self-regulatory or standard-setting organization; and (6) the extent to which BetterHelp is covered by HIPAA, and the extent that its privacy and information practices are in compliance with HIPAA requirements.

**Part IV** of the Proposed Order requires BetterHelp to identify to the Commission which Third Parties received consumers' personal information from BetterHelp without their consent and what personal information each such Third Party received. Part IV also requires that BetterHelp then ask those Third Parties to delete such personal information.

**Part V** of the Proposed Order requires that BetterHelp provide notice to consumers who created an account with BetterHelp prior to January 1, 2021, that BetterHelp may have used and disclosed their personal information for advertising.

**Part VI** of the Proposed Order requires BetterHelp to establish and implement, and thereafter maintain, a comprehensive privacy program that protects the privacy, security, availability, confidentiality, and integrity of consumers' Covered Information.

**Part VII** of the Proposed Order requires BetterHelp to obtain initial and biennial privacy assessments by an independent, third-party professional ("Assessor") for 20 years, and **Part VIII** requires BetterHelp to cooperate with the Assessor in connection with the assessments required by Part VII.

**Part IX** of the Proposed Order requires that a BetterHelp executive certify the company's compliance with the Proposed Order.

**Part X** of the Proposed Order requires BetterHelp to notify the Commission following the discovery of a violation of Parts I, II, or III of the Proposed Order.

**Part XI** of the Proposed Order requires BetterHelp to pay $7,800,000 in monetary relief for consumer redress, and **Part XII** describes the procedures and legal rights related to that payment.

**Part XIII** of the Proposed Order requires BetterHelp to provide information to, and pay for, an independent redress administrator ("Administrator") selected by the Commission, which will be responsible for administration of consumer redress.

**Parts XIV through XVII** of the Proposed Order are reporting and compliance

provisions, which include recordkeeping requirements and provisions requiring BetterHelp to provide information or documents necessary for the Commission to monitor compliance.

**Part XVIII** states that the Proposed Order will remain in effect for twenty (20) years, with certain exceptions.

The purpose of this analysis is to aid public comment on the Proposed Order. It is not intended to constitute an official interpretation of the complaint or Proposed Order, or to modify in any way the Proposed Order's terms.

# EXHIBIT C

**DECLARATION OF VENUE**

I, Alan Mansfield, declare as follows:

1. I am one of the counsel for Plaintiffs in this action and make this declaration to the best of my knowledge of the facts stated herein.

2. At all relevant times herein, Defendant was and is an entity that has its headquarters and principal place of business based in Mountain View, California, is registered to do business in the State of California, and is doing business in the State of California and also in this Judicial District.

3. Some of the transactions that form the basis of this action occurred, and at least a portion of Defendant's obligations or liabilities arose, in this District, as sales of the services at issue were made both in and from this District, through the Company's websites that are likely reviewed and/or maintained in this District.

4. The Complaint filed in this matter contains a cause of action for violation of Cal. Civ. Code §§ 1750, *et seq.*, as against Defendant.

5. Per the foregoing assertions, the CLRA cause of action in this Complaint has been properly commenced in the proper county and District for trial under the venue provisions of the CLRA.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. This declaration was signed this 6th day of September, 2023 at San Diego, California.

Alan Mansfield

Alan Mansfield