**Pages 1 - 47**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Richard Seeborg, Judge

C.M., et al.,<br>
Plaintiffs,<br>
vs.<br>
BETTERHELP, INC.,<br>
Defendant.

**NO. 3:23-CV-01033-RS**

San Francisco, California
Thursday, June 13, 2024

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiffs:

CHRISTINA VICTORIA TUSAN, ESQ.
1201 Pacific Avenue
Tacoma, WA 98402
**BY: CHRISTINA V. TUSAN**
**ATTORNEY AT LAW**

McSHANE & BRADY, LLC
4006 Central Street
Kansas City, MO 64111
**BY: MAUREEN M. BRADY**
**ATTORNEY AT LAW**

WHATLEY KALLAS, LLP
16870 West Bernardo Drive, Suite 400
San Diego, CA 92127
**BY: ALAN M. MANSFIELD**
**ATTORNEY AT LAW**

(Appearances continued on page 2.)

REPORTED REMOTELY BY: Stephen W. Franklin, RMR, CRR, CPE
Official United States Reporter

**APPEARANCES (CONT.'D):**

For the Defendant:

KING & SPALDING, LLP
50 California Street, Suite 3300
San Francisco, CA 94111

**BY: QUYEN LE TA**
**ATTORNEY AT LAW**

KING & SPALDING, LLP
633 West Fifth Street, Suite 1600
Los Angeles, CA 90071

**BY: JAMES A. UNGER**
**ATTORNEY AT LAW**

**Thursday, June 13, 2024** **1:37 p.m.**

**P R O C E E D I N G S**

---o0o---

**THE COURTROOM DEPUTY:** Calling case 23-CV-1033, CM versus BetterHelp. Counsel, please come forward and state your appearances.

**MS. TUSAN:** Good afternoon, Your Honor. Christina Tusan on behalf of plaintiffs.

**MS. BRADY:** Good afternoon, Your Honor. Maureen Brady on behalf of plaintiffs.

**MR. MANSFIELD:** And good afternoon, Your Honor. Alan Mansfield for plaintiff. Ms. Tusan will be conducting the argument.

**THE COURT:** Good afternoon.

**MS. TA:** Good afternoon, Your Honor. Quyen Ta and James Unger on behalf of BetterHelp.

**THE COURT:** Good afternoon.

Well, Ms. Ta, why don't I keep you up here, because you're the moving party in this motion to dismiss the consolidated complaint in the putative class action. So why don't I let you begin.

**MS. TA:** Sure.

Your Honor, there's a lot of causes of action, so if you have a preference, or ...

**THE COURT:** Well, I mean, I know there are various

issues that you brought up. Standing is the one that I want to focus most attention on. So why don't you address that for me.

**MS. TA:** Sure.

And, Your Honor, I just wanted to say that I'm covering the statutory claims, and Mr. Unger, if there are any questions, will be covering the common law claims.

So, Your Honor, why don't we, in terms of standing, can we start with extraterritoriality?

**THE COURT:** You can start wherever you want.

**MS. TA:** Okay. Look, Your Honor, I think the case here, the manner of this case is that it's about disclosure of information, and a lot of these other claims really are about wiretapping, other causes of action that we just don't think make sense.

I'll start with extraterritoriality. Here we have a number of non-California plaintiffs who we assert, and we think we're right, cannot bring claims under a number of claims because they're California claims. And so, you know, for the two California plaintiffs, that is TR and one of the Jane Does. There's numerous Jane Does, I think. So our view about it is that if plaintiffs were injured in their home stated, then -- and they're not California residents, why should they be able to bring causes of action under California law? It causes all sorts of issues.

**THE COURT:** This is a, in my recollection, a fairly

actively litigated question. Where have -- has the Ninth Circuit weighed in on this issue?

**MS. TA:** To my understanding, no. I mean, I think -- and I'll just be upfront about it. I mean, I think there is mixed case law, but the weight of authority is helpful to BetterHelp. There's two cases you should look at, and I think plaintiffs have cited them, the *Debono* case and the, I think it's *Effinger*. It's in plaintiffs' opposition 22 to 23. One of them I think is a Judge Koh case.

But our view is that the arguments that plaintiffs make, which is that the conduct emanated from California because that's where BetterHelp made its decisions regarding tracking tools, misrepresentations, et cetera, and I think that's fairly summarized of their allegation in paragraph 151. That's quite vague. Many of these plaintiffs are, you know, living elsewhere and they're not California residents. It's not good policy to come in and say you can live elsewhere, you're California residents elsewhere, and you can bring claims under California law just because you vaguely assert that there are tracking tools that you -- the conduct emanated from California. I think that's too vague.

And so the cases that we think are supportive of our position, *In Re: Yahoo Mail Litigation*, that's 308 F.3d 577; *Doe versus Kaiser Foundation Health Plan*, 2024 Westlaw 1589982. For the UCL, it's *Wilson versus Frito-Lay*; that's 961 F.Supp.2d

1134. For the FAL claim, that's *Debono v. Cerebral*; that's 2023 Westlaw 300141. And then the CLRA, that case, just for convenience, and I know that you have to write an order eventually, it's *McKennon v. Dollar Thrifty Auto Group*, 2013 Westlaw 791457.

**THE COURT:** Okay.

**MS. TA:** So, I mean, the weight of authority really I think is in our favor, because there aren't allegations that are strong enough to suggest that out-of-state plaintiffs should be able to bring claims under California law. And Your Honor, as you know and you probably have thought about, too, they have a nationwide class. It'll present lots of issues down the line.

**THE COURT:** Let me shift your attention for a moment to the injury in fact on the UCL and the FAL and the CLRA claims.

**MS. TA:** Sure.

**THE COURT:** Why isn't it enough that the -- you know, the plaintiffs say they paid for services on, they contend, the promise of confidentiality, and they claim that was breached. They paid money, as I understand it, although I know there is a coupon person, and let's put that aside.

**MS. TA:** Right.

**THE COURT:** But they paid money. So why isn't that an economic loss in the sense that they didn't get what they

bargained for?

**MS. TA:** So, I mean, I think Your Honor has raised some good points. I think the weight of the authority goes the other way. At this point, as you probably read from the complaint, you know, these issues have been fixed. The FTC -- there was an FTC consent order. So that's for injunctive, right? We don't think that there's anything to do in terms of injunctive relief, but in terms of statutory standing --

**THE COURT:** Right.

**MS. TA:** -- I think that, you know, we think the cases don't necessarily say that. And it's really hard to, I would say, come up with a value. What is that value? And I think it goes to the vagaries with regard to plaintiffs' complaint. What was shared? You know, all they say in there is there was a disclosure, and then -- but what was shared? Was it health information? What was it?

**THE COURT:** Does it -- does that really matter if you do look at it as whatever was shared, something was shared, and that was contrary to the bargained-for exchange that they entered into?

**MS. TA:** Well, I think plaintiffs, I don't think they allege they could have received comparable services at a lower price. How do you recognize the value for that?

**THE COURT:** Well, so that's -- your argument is that they've -- that's the premium argument, that they -- you know,

and they haven't really alleged that, you know, they paid a premium for this, and but for the sharing of the information they would have paid a lesser price. That's kind of what I hear you saying. And you're saying, well, they didn't allege that. They can't proceed on that basis. And that would be presumably a form of economic harm, because we have cases where there's a premium.

But what I'm asking you more is just the basic question. If you paid for a service, putting aside whether or not it's -- there's no -- it's not a premium aspect. It's -- and you can -- I'm not -- I'm asking the question. I'm not telling you I agree with this. But tell me why it's wrong that if you have expended money for a service, and then part of that contractual agreement is that the information will not be shared, the allegation is the information was shared, why haven't you, you know, gotten your -- not gotten your bargained-for exchange, therefore you've been damaged economically?

**MS. TA:** I hear what you're saying, Your Honor. I think, having litigated these cases, I go with the practical sort of approach. How do you value that? That's why I went to the economic. Have they alleged that -- and provided any allegations that they haven't gotten the benefit of their bargains and this is what that amount is? How do we even begin --

**THE COURT:** So even if theoretically you say, I

understand if somebody made that argument, but it's too amorphous to be a basis for a showing of injury in fact, economic injury?

**MS. TA:** I think that's right. I mean, there's other forms of relief, right? Injunctive. Well, that's not available here. And I'm not saying that none of the claims can go forward. I'm just saying for certain of the claims, when you have to allege economic harm and you haven't, then you need to go back to the drawing board and go allege that.

**THE COURT:** Okay.

**MS. TA:** Yeah. I mean, I'm happy to address other causes of action. I mean, I think the allegations, I can go back to the complaint, I think they were quite vague in terms of --

**THE COURT:** There are a lot of them --

**MS. TA:** Yes.

**THE COURT:** -- I grant you that.

**MS. TA:** Yes. I mean, I want to be respectful of the Court's time. I'm happy to go through each one, but I also don't want to rehash the -- you know, we have a little chart here with all of the various, you know, causes of action, or I'm happy to go through them, but I also want to address the ones that you think are also the most problematic or that you wanted to discuss.

**THE COURT:** Well, I understand that you have -- some

of your arguments as I read them are, to characterize it, this -- or the statutory violations, this statute doesn't fit this conduct. It just doesn't fit. And there are a bunch of those in here.

**MS. TA:** Correct.

**THE COURT:** I think you characterize them as wiretap, the wiretap statutes and all that.

**MS. TA:** Correct.

**THE COURT:** I understand the argument, so I don't think I need to hear much about that.

**MS. TA:** Correct.

**THE COURT:** And then I think you said your colleague wanted to talk about the common law claims.

**MS. TA:** That's right.

**THE COURT:** So to the extent that we want to have discussion about that.

So what have we left out? I'm looking at we've more or less talked about --

**MS. TA:** We talked about the --

**THE COURT:** -- the CLRA, UCL, FAL. Then we've got some of these quote-unquote -- I mean, it is a shorthand to say wiretap. I understand what you're saying. They're not really wiretap statutes, but I understand what you're talking about.

And then we have their constitutional claim. I'm not sure I quite understand that one, but ...

**MS. TA:** Yeah. No, I think you're right, Your Honor. The bucketing in terms of the statutory claims, we've talked about extraterritoriality, we've spoken about the standing issues. I think the sort of the ones that I categorize is more like wiretap or interception. That just doesn't fit the pleadings here. Right? I mean, they're saying there is some type of interception. So, for instance, the ECPA. They go into the crime-tort exception. I think that's farfetched. The allegations that plaintiffs have that, when you read it, it says the purpose, you know, was for BetterHelp to make money with marketing. There was no allegation there about crime. Right? So that's one example.

I think one that is worth us talking that isn't necessarily wiretap is the CMIA, which is the California Confidentiality of Medical Information Act.

**THE COURT:** Right.

**MS. TA:** I mean, it carries with it some statutory damages. We also don't think that cause of action applies. BetterHelp isn't a provider of healthcare. Right? Now, I do think that there was some mention that it is a mental health digital service, but that term was added or that definition was added in January 2023, after these alleged disclosures. So it doesn't fit what has happened here.

**THE COURT:** That'd be decided on a motion to dismiss. That sounds more like a summary judgment point to me.

**MS. TA:** Well, potentially. But if -- but I think the allegations, if you look at it, and think about the CMIA, they also have to allege that medical information was disbursed or disclosed, and I don't think that there are enough allegations here to say that medical information was disclosed. I looked pretty closely, and I think it's pages 11 and 12 of the plaintiffs' opposition, they say that it leads to a conclusion, page 24 -- I'm sorry, paragraphs 24 to 31 of the complaint, where information may have been released, and those are just too conclusory.

So, I mean, I think, you know, when you look at the allegations themselves, I don't think that it's necessarily just a summary judgment argument.

**THE COURT:** On a different note, you said, and maybe I didn't -- I misheard you. I thought you said, well, some of these claims may be able to go forward. Maybe you were just -- which ones are not in contention and that are going to move on to the next stage from your perspective?

**MS. TA:** Look, Your Honor, I mean, I think they -- I will say that you have some case law out there that I'm not going to dispute. That would be unwise. Right? You have a case called *Rodriguez* in one of the claims, and so, you know, CIPA, for instance, they may or may not have alleged. I mean, I think there's case law going the other way, but I want to be respectful.

**THE COURT:** Of my prior iterations?

**MS. TA:** Exactly. But listen, I think --

**THE COURT:** Actually, I appreciate that. That's very respectful of you. I sometimes will reassess.

**MS. TA:** Thank you.

**THE COURT:** So, you know, if I'm wrong, I want to know it.

**MS. TA:** I appreciate that.

No, I think --

**THE COURT:** Of course, I'm not acknowledging I'm wrong. I'll say somehow things have changed, and therefore I have a new view. But, no, tell me if there's something that you think is wrong.

**MS. TA:** Well, listen, on the CIPA claim, when I made that statement, it was with your case in mind. However, I do think that when I said, look, this is not about wiretapping, I think you if just be practical and think about the allegations that they've made, it's really the allegation is that there is disclosure of information without users' consent. Here, CIPA, there's no intentional wiretapping for Internet communications, right? So there is case law that says this applies to phones, not Internet. I think your case was, you know, talking about no barriers, or no code barriers, or whatever. We don't even have to get to that point. Right? But if you wanted to go there, I know that case exists. We read very closely. I still

think that we don't necessarily need to get to that level of detail to say that the CIPA claim has not been properly pleaded or there aren't facts sufficient to make that claim valid.

**THE COURT:** Okay. Do you want your colleague to talk about the common law claims, and then I'll hear from the plaintiffs?

**MS. TA:** Yes. And, of course, we'll reserve any opportunity to respond.

Mr. Unger.

**MR. UNGER:** Thank you.

Good afternoon, Your Honor.

**THE COURT:** Good afternoon.

**MR. UNGER:** The first claim I'd like to talk about is the breach of confidence claim. Breach of confidence is a cause of action that has evolved in California that many of the seminal cases contain a simple fact pattern, which is that a plaintiff discloses in confidence to a defendant some piece of information, some -- and all the cases are very clear, it has to be novel information, and then the defendant goes and takes that information and discloses it in a way that harms the economic value of that information. In many ways it sounds like a variation of a trade secret claim.

So in *Farris* I was, it's a TV program, in *Friedman* it's a TV network is the novel idea, and in *Berkla* it's proprietary software, and here there is no similar allegation. What we're

talking about is the disclosure of personal data, not a novel idea. And so this is another one of the claims that really is a poor fit, and that is what happens when you bring 15 claims to address that -- address a variety of issues, data breaches, hacking, in this case something that looks like a trade secret claim, to address something that is really about the disclosure of data.

And I would acknowledge *Google RTB* which is cited in their papers, which is the sort of one exception to that fact pattern. And in that case, Judge Gonzalez Rogers held that the specific allegation that the combination and totality of disclosed personal information was sufficient to survive a motion to dismiss. But there, plaintiffs very specifically pled that there was a novel personal profile that was disclosed as to the individuals at issue. And here the word "novel" doesn't appear in their complaint, nor does any real characterization of browsing data, e-mail addresses, is there any real factual allegations that would describe novel information and fit this claim.

The second issue I'd like to talk about is the invasion of privacy claim under the California Constitution. They allege a cause of action for damages, and there is no case that permits a cause of action for damages under the California constitution's broad prefatory language talking about a right to privacy, as well as a right to safety and property. That

does not create rights of action for damages, and --

**THE COURT:** This is their -- they've got claim 2 and then Claim 11. Which are you talking about? Are you talking about 2, or 11, or both?

**MR. UNGER:** I'm talking about the -- apologies, Your Honor. There are quite a few claims. I'm talking about the constitutional claim.

**THE COURT:** I think that's 11?

**MR. UNGER:** Eleven, correct.

**THE COURT:** Okay.

**MR. UNGER:** And I do want to talk about 2, as well.

**THE COURT:** Go ahead.

**MR. UNGER:** But here there is no private right of action for damages, so that shouldn't be in the case.

In terms of standing, which Your Honor asked about earlier, this is another cause of action where standing is an issue for two reasons. The allegations are inconsistent here with the possibility of future harm. There's no allegation that these individual class rep' -- potential class representatives continue to use the service. And again, there's the FTC agreement which provides for deletion of data, as well as for specific changes in policy. So any injunctive relief has already been addressed, and there's no standing to pursue that kind of a claim where there is no future harm.

Regarding the common law invasion of privacy claim, that

requires an intrusion into an area where there's a reasonable expectation of privacy and that that intrusion be highly offensive. Plaintiffs really are alleging disclosure here, not an intrusion. Plaintiffs went to the website per the allegations. No one -- leaving aside code-based barriers, no one put a piece of software on their computers that went beyond the platform at issue. This is really the browsing data that they, themselves, provided to BetterHelp and that they say BetterHelp disclosed to third parties beyond what they would have agreed to.

The first --

**THE COURT:** Isn't that even a more -- that -- whatever label you put on it, the fact that it was initially shared by the plaintiff with your clients, then from their perspective a betrayal of that and the private information gets disclosed, that seems pretty outrageous to me.

**MR. UNGER:** I understand Your Honor's point about that. I think that is the way the allegations, which are quite vague, read, is that there was some sort of disclosure. Just to be clear about what is not alleged here, this is about providing information to companies that provide common third-party tools on websites that track use --

**THE COURT:** And I understand, and I think most of it is anonymized and all of that, or it is anonymized.

**MR. UNGER:** Correct, Your Honor.

**THE COURT:** I understand that.

But, you know, we're at the pleading stage, and they are saying that their private information, which they understood was going to remain in that private realm, was let out in some fashion or another. And I understand you may have a lot of arguments why one shouldn't be offended by that, but in terms of just from a pleading perspective, they say they identify that as outrageous conduct, but I'm not sure as a matter of law one can say that can't be.

**MR. UNGER:** I understand, and I'm aware of Your Honor's past decisions about the difficulty of deciding outrageousness at the pleading stage. I'm really focusing more on whether there was an intrusion here at all.

**THE COURT:** So you're really honing in on you think the distinction, the importance that I ought to be looking at, is the fact that this is not sort of a hacking situation or something like that; this is a voluntary disclosure at the outset.

**MR. UNGER:** Yes, Your Honor. And I think in some ways it's akin to your recent decision in --

**THE COURT:** I've made too many decisions. Okay.

**MR. UNGER:** In the *Hatz Lakum* case. I'm not sure --

**THE COURT:** Yes. No, I know about that one.

**MS. TA:** In which you explain that browsing activity is open conduct on the web, where there's not a reasonable

expectation of privacy.

And the issue here is not necessarily that it has to be a hat for this particular claim, but it -- the issue is that there are many cases that say there's a reasonable expectation of privacy if, for example, you download a piece of software by using a platform, and then you go beyond that platform and it keeps following you. Then it's intruding into a private space. But when you're just using the platform you agreed to use, it's not an intrusion to collect data that you are providing. There may be other issues, and leaving aside the issue of outrageousness, with the disclosure, but the label does matter at the pleading stage, and if we go forward with 15 claims that are mislabeled, I think that does create issues for how the case will proceed.

Moving on to the claim for breach of contract. Your Honor mentioned earlier that a user might feel that a contract had been created between themselves and BetterHelp, and what's pled here is that the privacy policy created a contract. But it was also pled in paragraph 56 of the complaint that plaintiffs were never required to read or assent to the privacy policy, and there's no allegation that they read it or relied on it. And where assent is an actual element of the formation of a contract, it's not clear that plaintiffs assented to this privacy policy. In fact, I think the complaint is somewhat artfully pled to avoid stating that they saw the privacy policy

to avoid any issue of them being on notice that that data was used.

**THE COURT:** Isn't that too cute on your part? I mean, if you offer a service and you include the privacy policy, then somebody buys into the service, to say, well, the privacy policy, you don't -- we don't have a separate assent to the privacy policy, so therefore it's not really part of the contract, I don't know. That makes me a little uncomfortable.

**MR. UNGER:** I understand Your Honor's point, and I think it certainly is not, as far as I know, any intentional design of the way the system works. But I do think the intentional pleading that they never read this policy, didn't rely on it, makes it difficult to construe it as a contract where both sides agree.

**THE COURT:** The breach of contract, breach of implied contract we've kind of covered. Unjust enrichment, you don't have to talk to me about that. Those arguments, is it a standalone, is it not, all that I'm pretty familiar with. You've talked about invasion of privacy. I think the only one you haven't discussed yet is negligence, so --

**MR. UNGER:** Yes, Judge.

**THE COURT:** -- anything you want to say on that one?

**MR. UNGER:** I do.

Plaintiffs submitted a statement of recent decision that included the *RC versus Walgreens* case from Judge Bernal in the

Central District. And while we obviously disagree with some aspects of that decision, unsurprisingly, because they submitted it, I think Judge Bernal got it right in terms of negligence in a case that involved the alleged disclosure of what the plaintiffs in that case said was medical information regarding purchases from Walgreens.

There, Judge Bernal said there was no duty under California law between the users of the website and the website itself to safeguard data in terms of the way it's shared with third parties, because sharing with third parties happens all the time. It may be many things, but it doesn't give rise to a duty under negligence law. Judge Bernal examined the question of a special relationship, which is what plaintiffs plead here as a basis for duty, and he noted that parents and children, employers and employees, there are many recognized special relationships. Under California law there is no special relationship that applies here. And he also specifically rejected HIPAA as a basis for a duty here, the alleged violation of HIPAA.

The cases that plaintiff relies on are not general negligence case, just like in *RC versus Walgreens*, they're really data breach cases. And I think that's a different duty, and I think that those really aren't that applicable here.

The second issue with the negligence claim is the damage. Judge Bernal also explained that loss of data is not a

recognized injury. And he noted in that case that there's something that I think really applies here, which is that plaintiffs there said this is highly sensitive data, we're outraged by it being shared with third parties. But then their theory of damage, of economic damage under the negligence claim, was that they lost the value of that data, the economic value, as in they could have sold it. Well, they're pleading that they would never have shared it, and they're also pleading that they lost the value of having sold it.

And there's a lot of allegations here about the large data market, the value of this data, but there is no economic injury that is possible where a plaintiff says, I would never have sold this data in terms of through the potential sale of the data they lost, nor do they say the fact that BetterHelp sold this -- and by the way, that is not an allegation that BetterHelp sold it, but the fact that BetterHelp provided it through these tracking tools diminished the value of the data to them if they had wanted to sell personal data to some third party.

So I think in both of those ways the negligence claim is deficient.

**THE COURT:** Okay. Thank you.

Let me hear from the plaintiffs.

**MS. TUSAN:** Appreciate the opportunity to respond to some of the issues raised.

I think it's important to talk about how this case is really very unique factually when compared to some of the other cases that are out there in terms of the nature of information shared, the representations made by BetterHelp that they would not share that information, and the actual injury, because this is ultra highly sensitive information for the plaintiffs in this case, as we've alleged.

So as a first point, we've alleged clearly that mental health information is among some of the most sensitive information in paragraphs 2, 15 and 16. We've also talked about how HHS has specifically talked about a person's mental health information being quite confidential and resulting in potential very serious consequences, like harassment, discrimination. Stigma we also discussed.

**THE COURT:** Well, yes. Although as I understand it, even under your averments here, this is anonymized information that's being disclosed, isn't it?

**MS. TUSAN:** Absolutely not, no.

Our allegation is that it is going along with actual information. So it's going along to Facebook with, for example, the C user cookies and the Facebook ID. Which, we allege Facebook specifically indicates to people who use the -- who use its pixels allows them to specifically identify a person by name. So Facebook ID4 is Mark Zuckerberg. This information would go along, if it was Mark Zuckerberg, with a

number 4. So Meta is actually able to identify, and Google similarly we make similar allegations.

**THE COURT:** Okay. You know, candidly it -- I mean, I'm not the lawyer here, so I'm not, you know, suggesting legal advice. But having a consolidated class action complaint with 15 claims for relief is very hard to manage and does sometimes have the flavor of trying to smash claims to cover the terrain. I think it would be a more effective presentation, frankly, if it was scaled down to a smaller number of claims for relief that are more targeted. Because this has the -- you know, I'll candidly give you my view. It looks like the kitchen sink has been thrown at this. And that makes it hard to really compartmentalize it all, and I think it actually hurts you in a sense to have it as 15 claims for relief here. But, you know, you're the master of your complaint, so that's for you to decide. But I'm giving you my reaction to it as I've looked through it.

But what does overlap several of these claims is economic injury. You know, where is the economic injury? So why don't you focus on that for me.

**MS. TUSAN:** Absolutely, Your Honor.

And the economic injury goes hand in hand with the type of very significant information that was shared from plaintiffs. And so in paragraphs 24 through 31, where we talk specifically about what plaintiffs' understanding of what they may or may

not have done, counsel's indicating that, well, they couldn't find a cheaper product that didn't share this information, there's that kind of analysis. That's the wrong analysis, and our plaintiffs allege they may not have ever used this service. Right? In this case you not only have a privacy policy, but something you don't see in a lot of cases you is see active representations, false representations, that information will be kept confidential. That's made at the outset to induce someone to give very personal information.

**THE COURT:** But again, I don't quibble with that. You know, all of that I understand.

**MS. TUSAN:** Sure.

**THE COURT:** And I think it just as a matter of -- it's an obvious factor that health information, mental health information is particularly sensitive, important and private. We don't -- I don't question any of that.

**MS. TUSAN:** Sure.

**THE COURT:** But some of these statutes under which you brought your claims do suggest that you have to have an economic injury.

**MS. TUSAN:** Right.

**THE COURT:** And this doesn't diminish the significance to your clients of this information being disclosed, but for -- and you can tell me if I'm wrong. For some of these statutes it's not a question of the importance of

the information, it's a question of the economic value of the information. And that's where I don't see what your basis is for doing that, as outraged as your clients may be. And I don't question that, that their, you know, sensitive medical information has been shared contrary to the privacy policy that they understood was in place.

**MS. TUSAN:** Right. And the specific representation on the website that they would keep it private and were HIPAA compliant.

Yes, so on the income loss, here we believe the *Smallman* case is very instructive, and that case really talks about -- and it discusses other cases in this space -- how, you know, plaintiffs can establish the existence of a market for their personally identifiable information. They don't also have to establish an impairment. They don't have to say we're actually going to sell our personal health information, but there is a diminished value to their information.

But aside from that, this really is a purchase transactions. Right? Plaintiffs are induced to give their information over. The economic losses, now they have information out there. They would have either paid less if the company said the only way you can, you know -- in order to get this service you were to give us your information. Again, they're saying there's no competitor, but they might have gone somewhere else where they could have kept it private, or they

may have never gone forward with them, and the injury is now this information is out there. Whether they would have sold it or not, I think *Smallman* and *Quickset* really say it's the value. Right? I may have~-- the disclosure is now happening, and they've lost value of their information.

**THE COURT:** You have the obstacle of, as defendants alluded to, my decision in the *Hats Lakum* case, which was a UCL case but I think is, you know, applicable to FAL and CLRA, at least. And, you know, in that case I said, you know, the unauthorized dissemination of personal information isn't sufficient to show economic injury. How is your case -- I mean, you may disagree with me, and that's perfectly fair, but it is what it is.

**MS. TUSAN:** Sure.

**THE COURT:** But another argument you might make is why you're in a different situation than *Hats Lakum* was versus *Oracle*. So tell me why.

**MS. TUSAN:** Absolutely. Yes, we think that it is very different factually.

First of all, there wasn't money being paid to *Oracle* by the plaintiffs in that case. *Oracle* is really the third party. Here it's a direct relationship between the patients and BetterHelp. The patience are paying for this service to BetterHelp. Very different than a third party who is, you know, just sort of getting a benefit because somebody's sharing

with them. And so we feel like it's a direct relationship there. We also feel like this is obviously very serious information. I know you understand that, but it is a different kind of status.

**THE COURT:** Your argument -- and I was asking the defense this, but I'm not sure you really averred this in your complaint, but is your argument that the economic loss is the fact that the information was -- that a service was purchased by your clients, and they didn't get what they bargained for in the sense that they bargained for confidentiality?

**MS. TUSAN:** Yes, Your Honor. That's one of our arguments, yes.

**THE COURT:** Okay. Where in the complaint is that sort of theory or concept averred?

**MS. TUSAN:** Sure. It's within the sections where we talked about the individual plaintiffs, certainly, and that's going to be starting at paragraph 24 with plaintiff CM. And it says she -- had plaintiff known defendant would not keep her information confidential, she would not have completed the questionnaire, would not have paid for service, or would have paid significantly less for the service, and those are consistent --

**THE COURT:** What paragraph is that?

**MS. TUSAN:** Paragraph 24, page 8. And that's consistent, those allegations are consistent across the

plaintiffs all the way through paragraph 31.

And I would also point the Court to *Selara Medical*, where they talk about plaintiff's loss of control of medical information, you know, is sufficient to show a loss of money. As well as *Capalla versus Walmart*, where they've alleged the breach of the privacy that they have standing under UCL. So I'd look at some of those cases. But, and, of course, the *Brown* case, where they lost money when Google took data and plaintiff received no money in return.

**THE COURT:** Let me shift your focus for a moment to the standing issue and your request for injunctive relief. You know, you, not surprisingly, point to the FTC's activities in this matter, but doesn't the FTC injunction kind of answer the injunctive relief?

**MS. TUSAN:** We don't believe that it does at this point. The FTC case involved straight false advertising allegations, right, under Section 5 of the FTC act. As you've mentioned, we have a number of other violations here we'd like to ensure they don't engage in, even if they were to, for example, take off their privacy representations but they still were engaging in illegal wiretapping or something else of that nature, there would still be violations or any of the other violations that we allege, CMIA for example.

And so the mention in that case is really sort of addressing the false statements. It, of course, does have

terms with respect to not sharing. But as we've alleged, our plaintiffs are continuing to receive targeted advertising, and so we continue to have a concern that there hasn't been potential compliance, and we'd like to be able to --

**THE COURT:** (Simultaneous crosstalk) -- the FTC's order?

**MS. TUSAN:** Depending on what was done and what was not done. Right? If, you know, the FTC required them to, for example, submit information, letters to third parties does not allow them to no longer use the information. But if BetterHelp, for example, is doing something different, using it in a different way, in some ways circumventing something that isn't included in the order, we feel that's important to cover. And we also feel like we should have a private enforcement mechanism for our plaintiffs. Right? The FTC is, you know, at least potentially looking to enforce it, but we've alleged other violations with respect to California-specific laws that weren't alleged there.

**THE COURT:** I mean, I hear your argument that your -- the coverage is broader that you seek or different than what the FTC has done, but if -- hypothetically, if it was simply the same injunctive relief that was sought here that's already been ordered by the FTC, there would be no point in another court just piling on another injunction if there's an injunction already in place that covers the conduct.

**MS. TUSAN:** I think we --

**THE COURT:** You can do an enforcement procedure of some kind, but you wouldn't have courts just add injunctions, would you?

**MS. TUSAN:** Well, I think the injunctions could be broader here, what we would be seeking a broader injunction that would cover more. I would also say it would also be enforceable by plaintiffs instead of just the FTC. So there could be additional things. We may find, for example, things in our case that are relevant in discovery. And not to go there yet, but we think we may find some things that suggest that there is a concern about that, and we want to be sure that we can enforce that in this case in front of this Court.

**THE COURT:** Okay. Any comments you want to make in response to the discussion of the common law counts? The, you know, breach of contract, invasion of privacy, negligence, anything you want to say on those?

**MS. TUSAN:** Sure. Yeah, I'd like to talk for a minute about the *Walgreens* case that we submitted. We do think that is a really important case. It's recent, and --

**THE COURT:** Judge Bernal's case?

**MS. TUSAN:** Yes. Correct, yes.

And they avoid the part of the decision on the negligence issue and said, well, they found no duty there. But the facts of this case on that issue are quite different. Right? In

that case it's people making purchases at Walgreens, an everyday customer who's making a purchase of a diabetic test kit was one of the examples. This is very different. This is a relationship where BetterHelp offers mental health therapy services connected for two licensed therapists. This is a very different case of duty versus an average customer who's going to make a purchase. And so we feel that there's a real distinction in terms of the relationship that's here.

And that's true with respect to them being a provider, as well. I don't know if you want me to address the issue under CMIA.

**THE COURT:** Well, your -- the duty concept, you're pointing me to why Judge Bernal's decision isn't a problem for you on the duty aspect, but what would you point to to say in an analogous situation, that a duty has been identified for purposes of a common law negligence claim?

**MS. TUSAN:** If I could just have a quick moment, Your Honor. I have too many notes.

I mean, I think we have discussed, really, the duty that attaches with respect to a -- an entity that is HIPAA-covered, and that relationship that you have as a HIPAA-covered entity.

**THE COURT:** Do you have -- are there cases that you could point me to, preferably Ninth Circuit cases, that would say that is in the -- the HIPAA aspect of this context creates a duty, you know, where otherwise you might not have a duty,

but because we've got HIPAA thrown into the equation, then you do have a relationship that rises to the level of a duty?

**MS. TUSAN:** I think that's --

If you want to jump in on that one?

Is it all right if Maureen jumps in?

**THE COURT:** Yes.

**MS. TUSAN:** Thanks.

**MS. BRADY:** May it please the Court, Your Honor.

With regards to a duty having -- under a common law claim, not only has the common law recognized a duty, but also defendants have also stated that they have a duty. Their policies and procedures say that they have a duty. They put on their website that they are HIPAA compliant. Is HIPAA creating a duty? It is not. HIPAA is a procedural statute only. That's all it does. It tells healthcare providers how and when information can be released.

**THE COURT:** Right. No, and I thought your argument was that the reason this transaction, as your colleague was saying, is something very different than purchasing something from Walgreens or whatever, is because there is this relationship between the provider and the -- and your client that -- and I thought that's where HIPAA came into it, that because of the nature of this relationship, the provider isn't -- has a duty that otherwise a, you know, a vendor wouldn't have.

And I was asking you if there is a case that says, yes, when you're talking about this kind of a HIPAA context, the provider has a duty that otherwise -- I mean, we have all these sorts of cases where, you know, a real estate agent and their client, there's no -- is there a duty there or not a duty there? A financial adviser and that sort of thing.

Are you saying that the HIPAA part of this is what elevates this into a duty relationship for negligence purposes?

**MS. BRADY:** No, Your Honor.

**THE COURT:** Okay.

**MS. BRADY:** No.

**THE COURT:** So what is the -- where is the duty? Why does this provider of service, the defendants, have a duty for negligence purposes to your client?

**MS. BRADY:** Because they stated they have a duty. They have stated on their website that we have a duty to maintain your privacy, so give I was your information.

**THE COURT:** Well, they may say they have a duty to maintain your privacy. They're not saying, for purposes of common law negligence we have a duty to you. They didn't say that in their website. So where is the case that says an analogous relationship is a duty relationship for common law negligence purposes?

**MS. BRADY:** I think she's got the case.

**THE COURT:** Okay.

**MS. TUSAN:** Yeah. I mean, I think we would point you to the *Tori versus Lifeline Screening* case. In that case, the Court really talked about that there was a, you know, plausible allegation about a reasonable expectation of privacy in medical information and found that there was an appropriate violation there. So we would just point you to that particular case. And that's a medical-related -- medical disclosure-type case similar to this one.

**THE COURT:** Okay. Any other issues you want to underline?

**MS. TUSAN:** I'd like to address the comment that, you know, that there's no common law violation because there's no intrusion alleged and it's not highly offensive.

Again, that's just not what our complaint alleges. What we're alleging is that there was a very clear intentional act by BetterHelp to install pixels on particular pages of the website. Those pixels gathered very, very sensitive information not only about the fact that people were getting treatment and care, but also about their serious conditions. And by gathering that and taking that information, what ended up happening was, you know, basically that is the highly offensive intrusion. They had a benefit that they were able to get from Meta, they gave the information to Meta with no limitations, and I would say that's another distinction between cases like *Kaiser*, where the Court said -- *Doe versus Kaiser*,

where the Court said, well, we were considering the fact that Kaiser was doing this more like a third-party vendor. Right? Or the cases where the Court said you're having a third party look at your website. It's a closed circuit, they're your vendor, they're giving you information about things that are happening on your website. Those cases are really different than this case. In that case, unlike *Kaiser*, we allege there was no limitation. BetterHelp gave this information to Meta to do what it chose with with absolutely no limitation. And so that's the kind of sharing and disclosure that is, of course, highly offensive. And again, the Court can decide at a later time, but there's clearly a reasonable expectation.

There isn't a question about what the intrusion was. The intrusion was persuading people to give you personal information that they had to give you in order to sign up for mental health services. Once you -- you if don't give the information, you can't sign up for mental health services. And in that way, under CMIA we argue they're a provider, because they take that information and then give it to their -- it's for the purpose of giving it to one of their 30,000 therapists who can give therapy. And so that is, in fact, the nature of it being very highly offensive is that they're collecting it, you have to give it in order to be able to get that assistance, and it's being shared with Meta without any restriction of any kind, and in the context of very different and deceptive

mainline misrepresentations, including that they wouldn't share your e-mail with anybody, when, in fact, they actually uploaded millions of consumers' actual e-mail addresses.

In addition to the C user cookie and Facebook I.D., they were uploading very specific information about these patients intentionally, to places like Snap, and Meta and Pintrist.

And so this face I feel like stands very uniquely, both in terms of the nature of what's shared, the amount of things that were shared, the number of entities in which it was shared with, and basically just a very significant amount of information, and that we allege plaintiffs found to be quite, quite significant and would not have shared or certainly would have paid less for if they did choose to share it if they had known.

I can talk about CMIA if you'd ...

**THE COURT:** Whatever you think I need to know.

**MS. TUSAN:** Sure, absolutely.

So with respect to the CMIA, we believe it's clear that BetterHelp is a provider under both Sections 56.06(a), 56.06(b), and those sections make it clear where it's an entity organized for the purpose of collecting or maintaining medical information in order to make it available. And we make it clear, and it's clear from BetterHelp's landing page, that what they're actually asking people to do is give us your information so that we can connect you with a therapist. So

this fits squarely within those sections. 56(a) is just generally a section about collecting information for the purpose of sharing, and 56.06(b) talks about doing it through a mobile application, which of course they also do in this case.

And here they're not complying with their requirement under 56101, that they do it in a manner that preserves the confidentiality of that information. And so in this particular case, we really do have a situation where, you know, where it fits within that.

Section 56.06(d), even though it came later and discusses sort of mental health, it doesn't in any way take away from the fact that a -- even if it weren't to be applied retroactively, we feel like (a) and (b) clearly cover it, because they talk about providers of healthcare. Which, mental health therapists certainly fall within that category. So with these facts, we think it's clear that CMIA, you know, definitely falls within that, and we make those allegations here at this point. And obviously for purposes of pleading, we feel that we've addressed that very clearly there.

Also, sorry, to go back to the negligence duty, I wanted to also mention *Selara* and (inaudible) cases to look at, as well. So I'm just putting that back on the radar.

With respect to CIPA, I think counsel's acknowledged that there's a wealth of Ninth Circuit decisions on this that really indicate that it applies in this particular manner, and would

again point to *Tori* and *Walgreens* as very recent cases that continue to find the application here. And so we feel like it's very clear that this type of disclosure is protected under CIPA, and that there really isn't any way in which this kind of conduct, where there was this intentional placement and there was this unlawful sharing, that it wouldn't be applicable. Pixels have been found to be the types of devices that fit within the categories that the courts are looking at, and so we feel like that's clear.

With respect to the -- well, I would ask the Court are there other things that you'd like me to focus on?

**THE COURT:** I think you've covered what I had questions about, so thank you.

**MS. TUSAN:** Okay.

**THE COURT:** You can have a short, a very short, the moving party having the burden, I'll give you a short opportunity to respond further.

**MS. TA:** We'll be very brief.

No threat of future injury. We looked at the complaint, paragraphs 89 to 97. Those are all about past conduct, Your Honor. And you're right. I mean, there is a -- this FTC consent order, and if plaintiffs are saying that there's broader conduct at issue, it hasn't been alleged, number one.

On the CMIA, I wanted --

**THE COURT:** Even if it's congruent with the FTC,

what's your answer to their point that, well, an injunction would provide an enforcement mechanism perhaps? Let's say the FTC decides for whatever reason they're not going to pursue a, what would be perceived as a violation of the consent order. I mean, we often have courts that are, more than one, issuing injunctions in particular circumstances. Why would it be wrong to do it here?

**MS. TA:** I wouldn't say it's wrong. It's just not a live issue, right, if it's already been addressed. I know they've alleged --

**THE COURT:** So if there's injunctive relief that's been ordered that covers the conduct anywhere, then you wouldn't issue another -- that moots the request? I guess that's what I'm asking, because I'm not -- and I understand that argument, although I also know many times courts will issue overlapping injunctions.

**MS. TA:** I understand. I think, Your Honor, I mean, I go back and look at the complaint. It's a motion to dismiss, and it's not clear from the complaint how these allegations here are somehow so much broader that that consent order doesn't cover.

**THE COURT:** Okay.

**MS. TA:** But I understand what you're saying.

**THE COURT:** Okay.

**MS. TA:** The second thing is the CMIA. There's a lot

of talk about the healthcare provider piece and also information. I do think it's important that some of the arguments that they've made relate to potentially the mental health digital service term. But again, that was added January 2023, after these events.

Similarly, you know, when plaintiffs' counsel is talking about mental health application information, again, that definition was added January 2023. If you go back and look at the California civil codes, 56.06, et cetera, that talks about organizations that are organized for purposes of maintaining medical information. Hospitals, et cetera. That's not what BetterHelp does.

So with that, Mr. --

**THE COURT:** Well, before you leave, I was talking with your counterpart about how this information is provided to Facebook and the other third parties, and I had been under the impression that when it got to the third parties, it was in an anonymized context, and they said, no, that's not true. Is it -- who's -- are they right about that?

**MS. TA:** To our understanding -- and, again, we've not really entered into, you know, full-blown discovery, but I think you're right, Your Honor, based on currently what we know. But, yes, it's anonymized. I mean, I don't think that, for instance, if you even go back and look at their --

**THE COURT:** So their averments that it's -- that

there's identifying information that is going to third parties, you know, they've averred that, and that brings up the question, I'm not sure just you saying that's not so would be a basis to deny the motion or grant the motion to dismiss. But I'm just, I'm wondering where this dispute is going ultimately, which is why I'm asking the question.

**MS. TA:** Right.

**THE COURT:** Is the -- do you know how, from your perspective how the information is being communicated to the third parties?

**MS. TA:** Well, one thing -- well, we're investigating, to be frank. But also keep in mind that with the FTC consent, the third parties had to destroy all that information. They're in the process of collecting it through subpoenas, which we're also analyzing. But it seems to be very limited, and we haven't received all of it.

**THE COURT:** Okay.

**MS. TA:** But I think you're right. At the place of the motion to dismiss at this procedural juncture, we have to look at what has been alleged. Right? And it hasn't been alleged that medical information has been sent on.

**THE COURT:** Okay. All right. So you're saying it's -- they haven't even -- they haven't claimed that it's anything but anonymized, or they haven't said how or what information. I understand.

**MS. TA:** Correct, correct. And Mr. Unger is going to talk about -- yes, and then we'll be done.

**THE COURT:** All right.

**MR. UNGER:** Yes, thank you, Your Honor.

I think it was stated that basically much of the case law should not apply. I don't think they put it that way, but that this case is extraordinarily unique because of the kind of information that was shared. And just going back to the allegations of the complaint, the primary tools that are discussed in the complaint are the Google tag manager and the Meta pixel. Your Honor's probably aware that those are ubiquitous tools that have resulted in litigation, a lot of litigation, in this district.

**THE COURT:** Uh-huh.

**MR. UNGER:** That's really not a unique fact pattern, nor is the association of that with things that are tangentially related to what could be described as medical care. The *RC versus Walgreens* case is very much -- the allegations are that, given what plaintiffs were browsing for, you could figure out specific medical conditions.

And I also think it's important to clarify the information that was allegedly shared. It's information that was provided during the sign-up process, but not information between a treating psychotherapist and the individuals: There's no allegation that any contents of any session like that was

disclosed.

And I think that in terms of the benefit of the bargain sort of damages that were discussed, those really sound like contract damages, which I think makes it even more important to align the fact that plaintiffs have not claimed to have relied on the privacy policy, with the idea that they made this bargain based on the privacy policy. There were some other statements on the website outside the privacy policy that were mentioned, but those are really highly generalized statements, and I don't think there is a clear -- it's clearly pled that they were actually even violated. They -- I mean, they basically say, rest assured your data will remain anonymous. Again, I think there's some dispute about what anonymous means.

But really what I heard on the other side was that somehow Facebook or Google has the ability to reconstruct and identify somebody to align with some piece of data they're provided, not that there's a person on the other side sitting there who can say, this is a person, they're in this stage of the sign-up process, this is a potential medical issue.

And again, I think if you look back at the complaint and most of the claims, they're really not talking about a loss of the benefit of the bargain for the services, that they paid money and they didn't get what they paid for because they thought they were confidential services. They're talking about the loss of the value of this data, and the case law really

focuses on that, as well.

The *Tori* case which they mentioned does not establish a duty and a special relationship in this situation. There's no mention of a special relationship. The word "duty" is not used in that case. They do discuss the sensitivity of private potential medical information and the importance of that and they do let a negligence claim go. But I don't think it stands for there's a general duty created in these situations. I think *RC versus Walgreens* gets it right there, that has never been established.

And they also mentioned a treater duty. Again, this is -- there's no allegation that information between a treating psychotherapist and any person was disclosed. This is about people using a website and information disclosed during the sign-up process.

And then finally on the intrusion point versus disclosure. I think paragraph 175 of the complaint really sums up sort of the attempt to turn disclosure, which is what is complained of, and I understand the Court takes it very seriously, but it is different than intrusion. It starts with that there was a secret disclosure of plaintiffs' private information, and then they say that constitutes an intrusion. There is a difference between disclosure and intrusion or between, you know, snooping and sharing. Right? There are -- these are publication and, you know, pilfering. I don't know. These are really two

different concepts.

**THE COURT:** Okay.

**MR. UNGER:** And so I think it's important, given that Your Honor acknowledged the sort of kitchen sink approach that's been employed here, to make sure that the allegations fit the claims that are pled so we can go forward.

**THE COURT:** Okay. I think I need to move on to the next -- all right. One point.

**MS. TUSAN:** No, I just wanted to point out that obviously at this stage discovery is ongoing, but our discovery is indicating that there is information that is directly shared with our plaintiff that they still have, that Meta still has information. So we would just ask the Court to, you know, allow us to continue discovery.

**THE COURT:** Well ...

**MS. TUSAN:** And paragraph 86 and 87 through 88 talk about how Facebook knows who the people are.

**THE COURT:** So that's an argument, you didn't really flesh it out in the brief, that sort of these unique cases where the defendants have all the information, and you should be able to do the discovery first, before the pleadings motions are decided? Is that what you're asking me?

**MS. TUSAN:** No. What I'm saying is that they were suggesting that you shouldn't essentially believe the allegation in the complaint that there isn't a connection, and

I'm saying we did both allege that there was a connection, and as we're starting discovery, we'll be able to see it.

**THE COURT:** Well, let me -- you had a basis for alleging --

**MS. TUSAN:** We absolutely did, and we're continuing to find additional evidence to support that was the point.

**THE COURT:** Okay. I got you.

**MS. TUSAN:** Thank you.

**THE COURT:** All right. Very good. Thank you. I will take the matter under submission and get you an order.

(Proceedings concluded at 2:40 p.m.)

**---o0o---**

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE: Thursday, September 12, 2024

______________________________

Stephen W. Franklin, RMR, CRR, CPE
Official Reporter, U.S. District Court