# Exhibit C

# Exhibit 1

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

IN RE BETTERHELP, INC., DATA )
) Case No. 3:23-cv-01033-RS
DISCLOSURE CASES. )
_________________________________)

VIDEO-RECORDED DEPOSITION OF

PERSON MOST KNOWLEDGEABLE NIKLAS VAUGHAN

50 CALIFORNIA STREET, SUITE 3300

SAN FRANCISCO, CALIFORNIA

FRIDAY, MARCH 21, 2025

9:11 A.M. PACIFIC STANDARD TIME

HIGHLY CONFIDENTIAL; SUBJECT TO PROTECTIVE ORDER

REPORTED BY: DAWN A. STARK
Certified Shorthand Reporter
License No. 7847

he'll answer.
THE WITNESS: Okay.
BY MR. ABRAMSON:
**Q. Can a visitor to BetterHelp's website provide BetterHelp with their email address without first filling out the Intake Questionnaire?**
MS. KISER: Objection to form. That is outside the scope.
If you know in your individual capacity, you can answer.
THE WITNESS: There's been multiple variations of the Intake Questionnaire over time, but I believe you do answer some questions before you get to the point where you fill out your email address.
BY MR. ABRAMSON:
**Q. Is there any functionality on the website that would allow a person to provide BetterHelp with their email address before having completed the Intake Questionnaire?**
MS. KISER: Objection to form. Not one of the topics.
If you know in your individual capacity, you can answer.
MR. ABRAMSON: It's related to the topic of the tracking tools, which he just discussed were on the Intake Questionnaire.



MS. KISER: No.
MR. ABRAMSON: Okay. We can talk about it after we take a break.
You can answer the question.
THE WITNESS: No, not that I'm aware of.
BY MR. ABRAMSON:
**Q. So everyone for whom BetterHelp has an email address filled out the Intake Questionnaire; correct?**
MS. KISER: Objection to form. Outside the scope.
If you know, you can answer.
THE WITNESS: Yes, I believe so.
BY MR. ABRAMSON:
**Q. After a person signs up for a BetterHelp account, they can schedule an appointment with a therapist; correct?**
MS. KISER: Objection to form. Outside the scope.
THE WITNESS: Yes, that's correct.
MR. ABRAMSON: Okay.
**Q. Can they also communicate with a therapist over text?**
MS. KISER: Objection to form. Outside the scope.
THE WITNESS: Yes, they can.
MR. ABRAMSON: Okay.
**Q. They can have live sessions with a therapist; correct?**
MS. KISER: Objection to form. Outside the scope.



THE WITNESS: Yes, they can.
MR. ABRAMSON: Okay.
**Q. Can they communicate over the phone through the platform with a therapist?**
MS. KISER: Objection to form. Outside the scope.
This is all individual testimony.
THE WITNESS: Yes, they can.
MR. ABRAMSON: It's not individual testimony just because you object that it's outside the scope.
MS. KISER: But, in fact, it is outside the scope.
MR. ABRAMSON: Okay. The Northern District has held that there's no such thing as "outside the scope" for purposes of a 30(b)(6) deposition.
MS. KISER: That is absolutely not true.
MR. ABRAMSON: We'll send you a case.
MS. KISER: I can send you cases, too.
MR. ABRAMSON: Okay. That sounds like a great exchange.
**Q. Can someone communicate with a therapist on the BetterHelp platform without logging in?**
MS. KISER: Objection to form. Vague. Outside the scope.
THE WITNESS: No, they cannot.
MR. ABRAMSON: Okay.
**Q. Were there tracking tools on the login page for the BetterHelp platform in 2017?**



MS. KISER: Objection to form.
THE WITNESS: I don't know the answer to that question; it's not something I've been prepared on.
MR. ABRAMSON: Okay.
**Q. Do you know whether there were tracking tools on the login page on the website at any time?**
MS. KISER: Objection to form. Outside the scope.
THE WITNESS: No, I'm -- I don't know.
MR. ABRAMSON: Okay.
**Q. Do you know whether there were tracking tools in the STK when a person logged into the app?**
MS. KISER: Objection to form. Outside the scope.
THE WITNESS: [redacted]
MR. ABRAMSON: Okay.
**Q.** [redacted]
MS. KISER: Objection to form.
THE WITNESS: [redacted]
MR. ABRAMSON: Okay.
**Q.** [redacted]

[redacted]
MS. KISER: Objection to form. Outside the scope.
THE WITNESS: [redacted]
MS. KISER: Objection to form. Outside the scope.
THE WITNESS: [redacted]
MS. KISER: Objection to form.
THE WITNESS: [redacted]
MS. KISER: Objection to form. Lack of foundation. Calls for speculation.
THE WITNESS: [redacted]



[redacted]
BY MR. ABRAMSON:
**Q. So is it fair to say that BetterHelp serves as a go-between for communications between therapists and patients?**
MS. KISER: Objection to form. Outside the scope.
If you -- also incomplete hypothetical.
If you know in your individual capacity, you can answer.
THE WITNESS: BetterHelp is a technology platform that connects clients to therapists and basically serves as the therapy office or therapy room, but virtually.
MS. KISER: When you come to a good stopping point, we'd like to take a short break.
MR. ABRAMSON: Okay. Why don't we do that now?
Let's go off the record.
THE VIDEOGRAPHER: Stand by, please.
Off the record at 10:14.
(Short recess taken.)
THE VIDEOGRAPHER: We're back on the record at 10:27.
BY MR. ABRAMSON:
**Q. Mr. Vaughan, between 2016 and 2021, when a person signed up for an account on BetterHelp, did they get to select their therapist?**



MS. KISER: Objection to form. Outside the scope.
If you know in your individual capacity, you can answer.
THE WITNESS: I believe the most common experience is we match you with a therapist based on your responses, but you always have the option to switch therapists.
BY MR. ABRAMSON:
**Q. So BetterHelp matches the patient with a therapist based on responses to the Intake Questionnaire.**
**Is that what you mean when you say "based on responses"?**
MS. KISER: Objection to form. Lack of foundation.
THE WITNESS: Based on the responses to the Intake Questionnaire, as well as what state they're in.
MR. ABRAMSON: Okay.
**Q. And so BetterHelp matches the person and suggests a therapist; correct?**
MS. KISER: Objection to form. Outside the scope. Lack of foundation.
THE WITNESS: Yes.
BY MR. ABRAMSON:
**Q. And does the customer then have the opportunity to learn information about that particular therapist?**
MS. KISER: Objection to form. Outside the scope. Lack of foundation. Calls for speculation.



THE WITNESS: Yes.
The client will see information about the therapist.
MR. ABRAMSON: Okay.
**Q.** [redacted]

MS. KISER: Objection to form. Lack of foundation. Outside the scope. Calls for speculation.

THE WITNESS: [redacted]

MR. ABRAMSON: Let me rephrase the question.

**Q.** [redacted]

MR. ABRAMSON: Okay.

**Q.** [redacted]

**Q. Okay. I believe you said that someone could review**



**information about BetterHelp-associated therapists on unauthenticated web pages; correct?**

MS. KISER: Objection to form. Misstates testimony. Outside the scope.

THE WITNESS: Yes.

Like I said, it's not part of the scope I've been prepared for.

I just know from personal experience that -- I don't know the timeframes, but I do know that we have had listings and reviews of -- and information about therapists that can be viewed by anyone.

You don't have to be authenticated to see those listings.

BY MR. ABRAMSON:

**Q.** [redacted]



[redacted]

BY MR. ABRAMSON:

**Q. Can patients and therapists communicate asynchronously through the BetterHelp platform?**

MS. KISER: Objection to form. Again, outside the scope.

If you know in your individual capacity, you can answer.

Also, vague as to time.

THE WITNESS: Yes.

From my knowledge, the options we provide are live video chat, live audio chat, live text chat or asynchronous messaging.

BY MR. ABRAMSON:

**Q.** [redacted]



[redacted]

[redacted]

MR. ABRAMSON: Okay.

Q. [redacted]

BY MR. ABRAMSON:

Q. [redacted]



[redacted]



[redacted]



[redacted]

Q. Did BetterHelp ever investigate whether cookie blockers would impact the functionality of trackers on the website?

BY MR. ABRAMSON:
**Q.** [redacted]
BY MR. ABRAMSON:
**Q. At any time that trackers were installed on the Intake Questionnaire, could a user who had disabled first-party cookies complete the questionnaire?**
MS. KISER: Objection to form. Outside the scope. Lack of foundation. Calls for speculation.
THE WITNESS: Yes.
In my personal capacity, I think that's -- would be a question for someone who's more technical than me, like an engineer, because I am not sure what specific impacts blocking cookies would have on the Intake Questionnaire specifically.
BY MR. ABRAMSON:
**Q. And that's for first-party cookies specifically; correct?**
MS. KISER: Objection to form.



THE WITNESS: Correct.
MR. ABRAMSON: Okay.
**Q. Could a user who had disabled first-party cookies complete the Account Creation Form?**
MS. KISER: Objection to form. Outside the scope. Lack of foundation. Calls for speculation. Vague as to time.
THE WITNESS: A similar -- same answer to before: It's a technical question that I'm not technical enough to be able to answer.
BY MR. ABRAMSON:
**Q. In preparing for your deposition today on behalf of BetterHelp, did you ask anyone with the technical expertise whether the website would function with first-party cookies disabled?**
MS. KISER: Objection to form. That was asked and answered; he said he didn't talk to anybody.
You may answer again.
THE WITNESS: No, I did not ask anyone that question.
MR. ABRAMSON: Okay.
**Q. Could a user who had disabled first-party cookies log into their account at any time between 2015 and 2021?**
MS. KISER: Objection to form. Compound. Vague as to time. Lack of foundation. Calls for speculation.



Outside the scope.
MR. ABRAMSON: It's vague as to time when I said between 2015 and 2021?
MS. KISER: Yeah, because it's hard for a person to answer for six or seven years in one answer. That is -- that is a difficult question to answer.
If you asked me, "What did you do for the last six years," it would be a very difficult question to answer.
MR. ABRAMSON: But it wouldn't be vague as to time.
MS. KISER: I think it's pretty vague.
Again, don't engage in colloquy with me.
I put my objections on the record and let the witness answer the question.
MR. ABRAMSON: I think you have been engaging in colloquy with me --
MS. KISER: Uh-uh.
MR. ABRAMSON: -- and turnabout is fair play.
MS. KISER: Just --
MR. ABRAMSON: The record --
(Remarks outside the record.)
MR. ABRAMSON: The record will reflect what the record reflects.
MS. KISER: Okay, Glen, calm down.
Go ahead.
MR. ABRAMSON: I'm perfectly calm.



MS. KISER: You don't seem calm.
MR. ABRAMSON: I think the video will reflect differently.
MS. KISER: Okay. Good.
THE WITNESS: In my personal capacity, that would be the same answer as the previous two questions: That's too technical for me to be able to answer.
BY MR. ABRAMSON:
**Q. Who at BetterHelp would have the technical expertise to answer that question?**
MS. KISER: Objection to form. Outside the scope.
If you know, you can answer.
THE WITNESS: I imagine someone -- an engineer on our -- a software engineer on our Engineering Team who has the historical context about how our site functioned throughout the times.
BY MR. ABRAMSON:
**Q. In 2020, did the website have a pop-up message that said, "You must have cookies enabled to use BetterHelp," that appeared if a person had disabled cookies?**
MS. KISER: Objection to form. Lack of foundation. Outside the scope.
If you know, you can answer.
THE WITNESS: I do not know the answer to that question.

**vendors."**

**Do you see that?**

MS. KISER: Objection to form. Lack of foundation.

MR. ABRAMSON: You're objecting to the form of "Do you see that"?

MS. KISER: I object to the fact that you're asking questions about this because you have no foundation.

It's not to him; there's no reason that he would know anything about this.

MR. ABRAMSON: Okay. You can answer.

THE WITNESS: (Reviewing screen.)

Yes, I see that.

BY MR. ABRAMSON:

**Q. You do see that?**

A. Yes.

**Q. Thank you.**

[redacted]



[redacted]

BY MR. ABRAMSON:

**Q.** [redacted]



BY MR. ABRAMSON:

**Q. And you said that was your understanding in your personal capacity; correct?**

A. Yes.

**Q. What is the basis for that understanding?**

MS. KISER: Objection to form.

THE WITNESS: The basis of that is when I first started at BetterHelp, we had recently -- fairly recently -- I can't say the exact date -- transitioned completely from Google Tag Manager to Zaraz, and that's the understanding I got during my training.

MR. ABRAMSON: Okay.

**Q. You mentioned a "pixel firing."**

**What does that refer to?**

MS. KISER: Objection to form. Vague.

THE WITNESS: A "pixel firing" means some kind of action is taken on the BetterHelp site, causing the pixel to transmit something to the vendor that the pixel is connected to.

MR. ABRAMSON: Okay.

**Q. And those vendors are third parties; correct?**

MS. KISER: Objection to form.

THE WITNESS: In the sense that they're other companies, yes; they're not BetterHelp, they're third-party company -- companies.



BY MR. ABRAMSON:

**Q. So when a pixel fires, it transmits information to a third party; correct?**

MS. KISER: Objection to form. Compound. Vague.

THE WITNESS: Yes.

When a pixel fires or get activated, it transmit -- transmits some kind of data to a third-party company.

BY MR. ABRAMSON:

**Q. So for example, when the Facebook pixel fires, it transmits data to Facebook; right?**

MS. KISER: Objection to form. Misstates testimony. Incomplete hypothetical. Calls for speculation. Outside the scope.

THE WITNESS: Yes.

When a Facebook pixel fires, it transmits some kind of data to our Facebook Ads account.

BY MR. ABRAMSON:

**Q. When the Facebook pixel fires, does it transmit the IP address to Facebook?**

MS. KISER: Objection to form. Outside the scope. Lack of foundation. Calls for speculation.

THE WITNESS: [redacted]

Page 114

MS. KISER: Objection to form. Outside the scope. Lack of foundation. Calls for speculation. Overbroad and vague.

THE WITNESS: By the "BetterHelp product," I mean the BetterHelp websites and apps.

MS. BRADY: Thank you; that's helpful, thank you very much.

**Q. Would you agree with me that BetterHelp is associated with thousands of mental-health counselors and healthcare providers nationwide?**

MS. KISER: Objection to form. Outside the scope. Lack of foundation. Vague.

THE WITNESS: Can you clarify "associated"?

MS. BRADY: I guess I was using the terms that you were using during the testimony.

**Q. Is there a -- does BetterHelp -- would you agree with me that BetterHelp has, within their 1099 association, a relationship with thousands of licensed counselors?**

MS. KISER: Objection to form. Compound. Vague. Calls for speculation. Lack of foundation. Outside the scope.

THE WITNESS: Yes.

So like I said, BetterHelp is the technological platform that connects customers coming to us, seeking mental-health therapy with licensed therapists that have

Page 115

signed on to BetterHelp and -- not as employees, but as contractors, and our technology facilitates those therapy relationships.

MS. BRADY: Thank you for that clarification.

**Q. Can we agree that Teladoc is a covered entity under the HIPAA statute?**

MS. KISER: Objection to form. Outside the scope. Calls for speculation. Lack of foundation. Irrelevant.

THE WITNESS: In my personal understanding, based on what Teladoc does, I do believe that Teladoc, in contrast to BetterHelp, is, in fact, a HIPAA-covered entity.

BY MS. BRADY:

**Q. Can we agree that the counselors that BetterHelp matches its customers with are also HIPAA-covered entities?**

**Is that --**

MS. KISER: Objection to form. Calls for a legal conclusion. Lack of foundation. Calls for speculation. Outside the topic.

THE WITNESS: I'm not familiar enough with HIPAA to speak on the -- what the requirements are for the individual therapists.

I'm just -- I'm familiar with BetterHelp and how our -- our platform works, and I know that our -- the BetterHelp platform is not subject to HIPAA.

MS. BRADY: Okay.

Page 116

**Q. And what is your understanding that your platform is not subject to HIPAA?**

**Where did you get that understanding?**

MS. KISER: Objection to form.

To the extent that you received understanding and legal advice from lawyers, do not share that, but to the extent that you can share facts, share facts.

THE WITNESS: Yes.

So there are -- you know, HIPAA is a federal law, and it lays out requirements and examples of who is covered by HIPAA and why.

And from my understanding, you know, we don't process HIPAA-covered transactions like billing through insurance, and therefore, we are not a HIPAA-covered entity.

MS. BRADY: Okay.

**Q. Do you know if BetterHelp is a business associate of Teladoc?**

MS. KISER: Objection to form. Outside the scope. Lack of foundation.

THE WITNESS: I do not know if -- I know we are -- BetterHelp is owned by Teladoc.

I do not know if BetterHelp is a BAA of -- if BetterHelp is a BAA of Teladoc, I don't know.

MS. BRADY: Okay.

**Q. Do you know if BetterHelp is a BAA of the counselors**

Page 117

**that it associates with?**

MS. KISER: Objection to form. Lack of foundation. Calls for speculation. Vague as to time.

THE WITNESS: No, I do not know.

MS. BRADY: Okay.

**Q. Well, can we agree that some of the information that the clients or prospective clients of BetterHelp that were provided -- that was -- let me strike that; let me back up a little bit.**

**You testified earlier that through the intake platform and through the various web pages, that customers and prospective customers fill out certain information that is collected by BetterHelp; correct?**

MS. KISER: Objection to form. Misstates testimony. Vague.

THE WITNESS: Prospective customers, they fill out an intake form, yes.

MS. BRADY: Okay.

**Q. And can we agree that the information that BetterHelp has requested from these prospective customers has sensitive aspects of it?**

MS. KISER: Objection to form. Lack of foundation. Calls for speculation. Vague as to time. Also, outside the scope.

If you know, you can answer in your individual

Page 114

MS. KISER: Objection to form. Outside the scope. Lack of foundation. Calls for speculation. Overbroad and vague.
THE WITNESS: By the "BetterHelp product," I mean the BetterHelp websites and apps.
MS. BRADY: Thank you; that's helpful, thank you very much.
**Q. Would you agree with me that BetterHelp is associated with thousands of mental-health counselors and healthcare providers nationwide?**
MS. KISER: Objection to form. Outside the scope. Lack of foundation. Vague.
THE WITNESS: Can you clarify "associated"?
MS. BRADY: I guess I was using the terms that you were using during the testimony.
**Q. Is there a -- does BetterHelp -- would you agree with me that BetterHelp has, within their 1099 association, a relationship with thousands of licensed counselors?**
MS. KISER: Objection to form. Compound. Vague. Calls for speculation. Lack of foundation. Outside the scope.
THE WITNESS: Yes.
So like I said, BetterHelp is the technological platform that connects customers coming to us, seeking mental-health therapy with licensed therapists that have

Page 115

signed on to BetterHelp and -- not as employees, but as contractors, and our technology facilitates those therapy relationships.
MS. BRADY: Thank you for that clarification.
**Q. Can we agree that Teladoc is a covered entity under the HIPAA statute?**
MS. KISER: Objection to form. Outside the scope. Calls for speculation. Lack of foundation. Irrelevant.
THE WITNESS: In my personal understanding, based on what Teladoc does, I do believe that Teladoc, in contrast to BetterHelp, is, in fact, a HIPAA-covered entity.
BY MS. BRADY:
**Q. Can we agree that the counselors that BetterHelp matches its customers with are also HIPAA-covered entities?**
**Is that --**
MS. KISER: Objection to form. Calls for a legal conclusion. Lack of foundation. Calls for speculation. Outside the topic.
THE WITNESS: I'm not familiar enough with HIPAA to speak on the -- what the requirements are for the individual therapists.
I'm just -- I'm familiar with BetterHelp and how our -- our platform works, and I know that our -- the BetterHelp platform is not subject to HIPAA.
MS. BRADY: Okay.

Page 116

**Q. And what is your understanding that your platform is not subject to HIPAA?**
**Where did you get that understanding?**
MS. KISER: Objection to form.
To the extent that you received understanding and legal advice from lawyers, do not share that, but to the extent that you can share facts, share facts.
THE WITNESS: Yes.
So there are -- you know, HIPAA is a federal law, and it lays out requirements and examples of who is covered by HIPAA and why.
And from my understanding, you know, we don't process HIPAA-covered transactions like billing through insurance, and therefore, we are not a HIPAA-covered entity.
MS. BRADY: Okay.
**Q. Do you know if BetterHelp is a business associate of Teladoc?**
MS. KISER: Objection to form. Outside the scope. Lack of foundation.
THE WITNESS: I do not know if -- I know we are -- BetterHelp is owned by Teladoc.
I do not know if BetterHelp is a BAA of -- if BetterHelp is a BAA of Teladoc, I don't know.
MS. BRADY: Okay.
**Q. Do you know if BetterHelp is a BAA of the counselors**

Page 117

**that it associates with?**
MS. KISER: Objection to form. Lack of foundation. Calls for speculation. Vague as to time.
THE WITNESS: No, I do not know.
MS. BRADY: Okay.
**Q. Well, can we agree that some of the information that the clients or prospective clients of BetterHelp that were provided -- that was -- let me strike that; let me back up a little bit.**
**You testified earlier that through the intake platform and through the various web pages, that customers and prospective customers fill out certain information that is collected by BetterHelp; correct?**
MS. KISER: Objection to form. Misstates testimony. Vague.
THE WITNESS: Prospective customers, they fill out an intake form, yes.
MS. BRADY: Okay.
**Q. And can we agree that the information that BetterHelp has requested from these prospective customers has sensitive aspects of it?**
MS. KISER: Objection to form. Lack of foundation. Calls for speculation. Vague as to time. Also, outside the scope.
If you know, you can answer in your individual

Page 118

capacity.

THE WITNESS: The BetterHelp intake form or questionnaire collects various questions of -- and answers from the person coming to us, seeking therapy, about themselves and the reason why they're seeking therapy, and we use that information to match the client with an appropriate licensed therapist.

MS. BRADY: Okay.

**Q. And some of that information is about their mental-health state.**

**Is that correct?**

MS. KISER: Objection to form. Outside the scope. Lack of foundation. Vague as to time. Calls for speculation.

THE WITNESS: In my personal experience of having gone through the intake form, I know that it asks optional questions about the reasons why you are seeking therapy.

MS. BRADY: Okay.

**Q. And we can agree that that is personal information, sensitive information; correct?**

MS. KISER: Objection to form. Lack of foundation. Outside the scope. Calls for speculation. Vague as to time.

THE WITNESS: Yes, of -- how do you define "sensitive"?

MS. BRADY: Sure.

Page 119

Information about how someone is feeling, those types of things; information if they're having suicidal ideation, depression; medical history, that kind of thing.

MS. KISER: Objection to form. Outside the scope. Compound. Vague.

THE WITNESS: We do ask questions about -- like I said, about some -- you know, we ask some demographic questions, and we ask some questions about the reasons you are seeking therapy, that's correct.

"Sensitive" is kind of a value judgment, so I would say it's up to, you know, each person to determine how sensitive that information is.

MS. BRADY: Okay.

THE WITNESS: That being said, BetterHelp takes -- or uses privacy -- the utmost care and respect and, you know, we protect that information and only use it for the -- for the purposes listed in the privacy policy, and mainly to make sure we match you with the most appropriate therapist so that you can get the best possible help.

MS. BRADY: Thank you for that.

**Q. And in that same regard, then can we agree that BetterHelp has certain obligations to keep information provided by the prospective customers and customers confidential?**

MS. KISER: Objection to form. Outside the scope.

Page 120

Vague as to time. Compound. Argumentative. Calls for a legal conclusion.

If you know in your individual capacity, you can respond.

THE WITNESS: Yes.

I know from my personal capacity that privacy is a high priority for us, information security is a high priority for us, and we handle any data or information we get with the highest care and the strongest security and privacy practices.

MS. BRADY: And I appreciate the answer, but my question is slightly different.

**Q. Would you agree with me, then, that BetterHelp has on obligation of privacy to its prospective customers that --**

MS. KISER: Objection -- I'm sorry, I thought you were done.

MS. BRADY: No.

I was going to -- I was, and then I was going to --

MS. KISER: That's okay.

You can start over --

MS. BRADY: -- who had provided information it.

MS. KISER: Yeah.

So probably we should -- do you want her to read the first part back and then you can talk on that part?

MS. BRADY: No.

Page 121

MS. KISER: I can -- did you understand the question, because I'm going to interpose some objections if you're going to answer it.

THE WITNESS: Could you repeat the question, please?

MS. BRADY: Sure, sure.

**Q. Would you agree with me that BetterHelp has obligations to its prospective customers to keep the information that those customers have provided to BetterHelp confidential?**

MS. KISER: Objection to form. Outside the scope. Asked and -- asked before. Vague as to time. Compound. Vague.

If you understand in your individual capacity, you can answer.

THE WITNESS: Yes.

In my individual capacity, we have an obligation to follow our privacy policy and other representations we make on the side, and handle that data in the way that we have laid out in our privacy policy.

MS. BRADY: Okay.

**Q. Does BetterHelp train its employees that it -- that each of the employees has an obligation to its prospective customers and customers to keep information provided to BetterHelp confidential?**

MS. KISER: Objection to form. Outside the scope.

THE WITNESS: To clarify: Are you talking about information provided in the Intake Questionnaire or --
MS. BRADY: Yes, sir.
THE WITNESS: Okay.
MS. KISER: Same objections.
Calls for speculation. Lack of foundation. Vague as to time.
THE WITNESS: Yes.
In our privacy policy, we do list out the types of data we collect and how we use it.
And yes, we have an obligation to follow those obligations we lay out in the privacy policy.
MS. BRADY: Okay.
**Q. And it's important to assure those customers and prospective customers that their information is going to be kept private; correct?**
MS. KISER: Objection to form. Lack of foundation. Asked and answered. Outside the scope. Vague as to time.
THE WITNESS: Yes.
We -- BetterHelp is in the business of making health -- mental healthcare more accessible and available, and definitely one of the core beliefs of our company is that privacy is of the utmost importance.
And we lay out our commitments in the privacy policy, and we follow those commitments.



BY MS. BRADY:
**Q. Why is privacy of the utmost importance to BetterHelp?**
MS. KISER: Objection to form. Asked and answered. Outside the scope. Vague as to time. Calls for speculation.
THE WITNESS: Privacy is important because we are in the business of providing the best mental healthcare and providing mental healthcare and making it available to as many people as possible.
And we explain that here's the data we collect, here's how we use it.
And we are not in the data business; that's not the focus of our company. We are in the business of providing and making mental healthcare as accessible and available as possible to as many people as possible.
BY MS. BRADY:
**Q. Can we agree, though, that, unfortunately, in today's world, mental healthcare still carries with it a stigma for people who utilize that service?**
MS. KISER: Objection to form.
That is far off the topics.
If you have a personal opinion you'd like to share, that's fine, but it calls for speculation and lack of foundation.
THE WITNESS: Yes.



It's hard to measure stigma.
From my -- my personal experience, I know that for some people, there's probably a stigma still around mental healthcare.
But the belief of BetterHelp and our mission is to work towards lessening that stigma, because mental healthcare is healthcare, and there should be nothing -- there's nothing shameful about seeking mental healthcare.
BY MS. BRADY:
**Q. And you testified that BetterHelp is High Trust certified; correct?**
MS. KISER: Objection. Form. Asked and answered multiple times now.
THE WITNESS: Yes, BetterHelp is High Trust certified.
BY MS. BRADY:
**Q. And in that certification and training of BetterHelp employees, does BetterHelp train its employees that there is a stigma associated with mental healthcare?**
MS. KISER: Objection to form. Lack of foundation. Calls for speculation. Vague as to time and far outside the scope of the topics.
If you have an opinion, you can answer.
THE WITNESS: In our privacy trainings, we do talk about safeguarding our customer's data and how important that



is.
The privacy training, to my memory, does not mention any kind of stigma, we just -- we have -- people trust us with their data, and we safeguard that -- safeguard that data and handle it with care.
MS. BRADY: And I know I asked this, but maybe I need to be more direct in my question.
**Q. Can we agree that customer and prospective customers can be harmed when their information is disclosed without permission?**
MS. KISER: Objection to form. Lack of foundation. Vague. Compound. Calls for speculation and a legal conclusion. Outside the scope of the topics.
THE WITNESS: Yeah.
That's a broad hypothetical example, so I would need more -- a more practical example of what that would mean.
MS. BRADY: Sure.
Maybe I'll give it to you this way, within the topics.
**Q. Does BetterHelp train its employees that its customers and prospective customers can be harmed if their information is disclosed without permission?**
MS. KISER: Objection to form. Lack of foundation. Incomplete hypothetical. Outside the scope. Vague as to time.

THE WITNESS: Like I said, we get trained on the fact that we need to secure and handle all types of data relating to our customers with care.

And there's listed-out ways that data can be used in our privacy policy, and we are not allowed and we do not use it in ways that are not in the privacy policy.

BY MS. BRADY:

**Q. Why is that?**

MS. KISER: Objection to form. Outside the scope. Calls for speculation.

THE WITNESS: We -- we use the data we collect to match our clients with therapists.

We use data to facilitate the therapy sessions, facilitate the virtual therapy room we provide, and our mission is to provide mental healthcare, make it more accessible, and like I said, we're not in the data business.

That's not what we -- that's not -- we're not a data company; we are a mental-health company, so we use the data in the way we need to in order to provide that service to our members.

MS. BRADY: Okay.

**Q. Does part of the High Trust certification instruct BetterHelp that customers and prospective customers can be harmed when information is wrongfully disclosed?**

MS. KISER: Objection to form. Outside the scope.



Calls for speculation. Incomplete hypothetical. Vague as to time.

THE WITNESS: I don't -- from my personal experience of taking our privacy trainings, it just highlights the importance that data can only be used in the ways that we have listed out in the privacy policy and using data outside of those purposes is not allowed.

It highlights the importance of that.

I don't believe it makes a valued judgment of the consequences of data being used with outside -- outside of those purposes.

MS. BRADY: Okay. Brian, can we show Exhibit 102, please?

THE VIDEOGRAPHER: (Indicating.)

(Vaughan Deposition Exhibit No. 102 was marked.)

BY MS. BRADY:

**Q. Sir, we are looking at what has been previously marked as Exhibit 102.**

**For the record, it's BetterHelp 1194 through 1197.**

**Have you ever seen this document before, sir?**

MS. KISER: Would you please let him read it --

MS. BRADY: Sure.

MS. KISER: -- before you ask him any questions?

And I'll note for the record this is a Teladoc document, not a BetterHelp document.



THE WITNESS: (Reviewing screen.)

The next page.

THE VIDEOGRAPHER: (Indicating.)

THE WITNESS: (Reviewing screen.)

The next page.

THE VIDEOGRAPHER: (Indicating.)

THE WITNESS: (Reviewing screen.)

The next page.

THE VIDEOGRAPHER: (Indicating.)

THE WITNESS: (Reviewing screen.)

All right.

BY MS. BRADY:

**Q. Sir, have you ever seen that document before today?**

MS. KISER: Objection to form. Outside the scope.

THE WITNESS: I have not seen this document in -- as part of my preparation for today.

MS. BRADY: Okay.

**Q. And for the record, it is a Teladoc Health Global Privacy and Security Training Policy.**

**Do you see where I'm reading that?**

A. Yes.

**Q. Okay. Thank you.**

**If you'll look at the purpose section of this document, it states that "The purpose of this policy is to establish Teladoc Health's responsibilities on behalf of the**



**Teladoc Health Group PA, its affiliates and subsidiaries."**

**Do you see where I'm reading that?**

A. (Witness reviewing screen.)

Yes.

**Q. Okay. Is BetterHelp an affiliate or subsidiary of Teladoc?**

MS. KISER: Objection to form. Calls for a legal conclusion. Asked and answered. Outside the scope.

THE WITNESS: Yes.

In my personal capacity, my understanding is BetterHelp is a subsidiary of Teladoc.

MS. BRADY: Thank you.

**Q. And as such, is BetterHelp required to abide by this policy and procedure?**

MS. KISER: Objection to form. This is outside the scope.

If you know in your individual capacity, you can answer.

Lack of foundation. Calls for speculation.

THE WITNESS: In my individual capacity, I do know that BetterHelp employees take privacy and security trainings both through BetterHelp-owned training portals, as well as Teladoc-owned training portals.

BY MS. BRADY:

**Q. And if we look down to the "Policy" section, it**

states that "Teladoc trains all Employees on its privacy and information security policies and procedures as necessary and appropriate for the Employee to carry out his or her specific job functions and as required by applicable law," and then it's got some qualifiers there.
Do you see where I'm reading that?
MS. KISER: Objection to form.
THE WITNESS: (Reviewing screen.)
Yes, I do.
BY MS. BRADY:
Q. Is BetterHelp or -- excuse me, I apologize.
Are BetterHelp employees trained on the Teladoc privacy and information security policies and procedures?
MS. KISER: Objection to form. Lack of foundation. Vague as to time and outside the scope.
THE WITNESS: In my experience, I have taken privacy and security training through a Teladoc portal.
MS. BRADY: Okay.
Q. Did it include the policy that we're looking at?
MS. KISER: Objection to form. Asked and answered. Lack of foundation.
THE WITNESS: (Reviewing screen.)
I cannot recall if the training I've taken in my personal capacity included this specific document.
MS. BRADY: Okay.



Q. Did your training in privacy include any references to Teladoc?
MS. KISER: Objection to form. Lack of foundation. Vague as to time. Overbroad.
THE WITNESS: The training I've taken since starting at BetterHelp -- which is, you know, after the time-period scope of this.
I have taken trainings both on our BetterHelp portal, specifically talking about BetterHelp.
I've also taken trainings on a Teladoc portal, which mentions Teladoc specifically.
MS. BRADY: Thank you.
Q. And the training that BetterHelp employees receive, does that include HIPAA-related training?
MS. KISER: Objection to form. Lack of foundation. Vague as to time. Compound. Incomplete hypothetical.
THE WITNESS: In my personal experience, the training on the Teladoc portal has mentions of HIPAA since Teladoc is a HIPAA-covered entity.
So yes, I've seen that, and that's opposed to the BetterHelp-specific training we also take, which does not talk about HIPPA.
MS. BRADY: Okay.
Q. So can we agree, then, that BetterHelp employees are trained in HIPPA compliance?



MS. KISER: Objection to form. Outside the scope. Lack of foundation. Vague. Compound. Calls for speculation. Incomplete hypothetical.
THE WITNESS: I am not familiar with the training procedures before I started at BetterHelp; it's not something I prepared for.
I can -- I can just speak from personal experience that since I've started at BetterHelp, I've taken some Teladoc trainings that do talk about HIPAA.
MS. BRADY: Okay.
Q. And the training that BetterHelp has for its employees, is that an annual training or is it more often or less often than that?
MS. KISER: Objection to form. Outside the scope.
THE WITNESS: In my experience, it's annual training, when you -- right when you first start and then annually after that.
MS. KISER: Maureen, when we come to a good breaking point, if we could just take a quick break.
MS. BRADY: Absolutely.
I think this is fine.
MS. KISER: This is a good point?
I appreciate it; I just need to run to the restroom.
MS. BRADY: No, you're fine.
THE VIDEOGRAPHER: Stand by, please.



Off the record at 1:55.
(Short recess taken.)
THE VIDEOGRAPHER: We're back on the record at 2:19.
MS. BRADY: Thank you for that short break, Mr. Vaughan.
I want to circle back a little bit and just clarify something because I may not have been super clear.
Q. Between 2015 and 2021, did BetterHelp train its employees on its privacy policy?
MS. KISER: Objection to form.
THE WITNESS: I do not know what the training looked like during that time period.
BY MS. BRADY:
Q. But you are here today to give testimony on behalf of BetterHelp with regard to that time period; correct?
MS. KISER: Yes, but not as to that topic.
MS. BRADY: Well, can you answer?
THE WITNESS: I am here to give testimony, yes, during that time and --
MS. BRADY: Okay.
THE WITNESS: -- on the broader topic.
MS. BRADY: And if we could look at the 30(b)(6) notice, which is 312.
Thank you.

THE VIDEOGRAPHER: (Indicating.)
MS. BRADY: You've already testified that you've reviewed this.
**Q. I'm going to direct to you page No. 10.**
**And this is all within Topic 6, which is the prior one, but subsection D requests that you give testimony regarding all training or education that BetterHelp provided to its employees on its policies, practices or procedures related to -- or relating to patient and customer privacy and data security.**
**Do you see where I'm reading this?**
A. (Witness reviewing screen.)
Yes.
**Q. Okay. Are you prepared to give testimony today about the training on the policies and procedures BetterHelp provided to its employees?**
MS. KISER: Objection. Form.
Subject to our objections, he is prepared to testify.
THE WITNESS: I am prepared to testify.
I have not been prepared on this particular subsection.
MS. BRADY: Okay. Thank you.
**Q. Do you have any -- no, that's fine.**
**Can we agree that at some point between 2013 and**



**2020, BetterHelp advertised that it was compliant with the privacy rules under HIPAA?**
MS. KISER: Objection to form. Misstates the record.
THE WITNESS: Can you specify how that was advertised or --
MS. BRADY: On its website.
MS. KISER: Objection to form. The website speaks for itself.
THE WITNESS: I know that we have displayed on our website that we are High Trust certified, yes.
MS. BRADY: I appreciate that.
**Q. But has BetterHelp ever displayed on its website that it was HIPAA compliant?**
MS. KISER: Objection to form. Misstates the record.
THE WITNESS: I know that BetterHelp, for some period of time, had a HIPAA logo or icon on its website, yes.
MS. BRADY: Okay.
**Q. And that is telling folks who visit the site that it abide by HIPAA.**
**Would you agree with that?**
MS. KISER: Objection to form. Lack of foundation. Calls for speculation.
THE WITNESS: The stance of BetterHelp is that



BetterHelp is not a HIPAA-covered entity under the law, but with its High Trust certification, which is the industry standard and the highest level of information security and privacy security, that those are comparable to the standards set out by HIPAA.
But it does not say that we're a HIPAA-covered entity because BetterHelp is not.
MS. BRADY: And I appreciate that, and maybe we're talking past each other, and I just want to be clear.
**Q. When I'm talking about HIPAA, I am talking about HIPAA as it applied not only to covered entities, but to business associates and any other affiliates that would fall within that framework.**
**Is that all right? We can have that understanding?**
MS. KISER: Objection to form. Vague.
THE WITNESS: Yes.
So from what I understand, you're talking about HIPAA representations as including both HIPAA-covered entities and HIPAA business associates.
MS. BRADY: Yes, sir, yes, sir, that's exactly what I'm talking about.
And I understand that BetterHelp's position is that it is not a covered entity; I've gotten that.
THE WITNESS: Yes.
//



BY MS. BRADY:
**Q. My questions previously were -- is -- excuse me, is BetterHelp a business associate of any covered entity, and my understanding is you did not know the answer to that question; correct?**
MS. KISER: Objection to form.
THE WITNESS: Correct.
MS. BRADY: Okay.
**Q. Has BetterHelp ever indicated that it was subject to the HIPAA rules and regulations?**
MS. KISER: Objection to form. Asked and answered. Vague as to time.
THE WITNESS: That I will refer to my previous answer about the HIPAA icon, which indicates the level of information security and privacy security that we apply to our platform and systems.
MS. BRADY: Brian, can we look at Exhibit 327?
THE VIDEOGRAPHER: (Indicating.)
(Vaughan Deposition Exhibit No. 327 was marked.)
MS. BRADY: Mr. Vaughan, I am showing you what has benchmarked as Exhibit 327, which for, the record is BetterHelp 8607 through 8657.
MS. KISER: Okay.
BY MS. BRADY:
**Q. Do you see that?**

Page 146

A. Yes.
MS. KISER: Yep.
You can let him read it.
MS. BRADY: Just a minute.
**Q. Have you ever seen this document before?**
MS. KISER: Objection to form.
THE WITNESS: (Reviewing screen.)
This document does look familiar, yes, but just by seeing one page, I'm -- I can't be completely sure.
MS. BRADY: Well, I want to direct you to just one portion of this document and ask if -- well, let me ask this.
**Q. You said that you've seen this document before.**
**Is this -- from your understanding, is this document responses given from BetterHelp to the FTC in regards to an investigation that was conducted by the FTC?**
MS. KISER: Objection to form.
You need to let him look at the document before you ask him any questions; he is entitled to read it.
THE WITNESS: Yes, I would need to read the entire document to get the full context of what this letter is.
MS. BRADY: Okay. Let's read it.
MS. KISER: Okay. Go ahead, Nik.
THE WITNESS: (Reviewing screen.)
Next question -- next page.
THE VIDEOGRAPHER: (Indicating.)

Page 147

THE WITNESS: (Reviewing screen.)
Next question -- next page.
THE VIDEOGRAPHER: (Indicating.)
THE WITNESS: (Reviewing screen.)
Next page.
THE VIDEOGRAPHER: (Indicating.)
THE WITNESS: (Reviewing screen.)
Next.
THE VIDEOGRAPHER: (Indicating.)
THE WITNESS: (Reviewing screen.)
Next.
THE VIDEOGRAPHER: (Indicating.)
THE WITNESS: (Reviewing document.)
Next.
THE VIDEOGRAPHER: (Indicating.)
THE WITNESS: (Reviewing screen.)
Next.
THE VIDEOGRAPHER: (Indicating.)
THE WITNESS: (Reviewing screen.)
Next.
THE VIDEOGRAPHER: (Indicating.)
THE WITNESS: (Reviewing screen.)
Next.
THE VIDEOGRAPHER: (Indicating.)
THE WITNESS: (Reviewing screen.)

Page 148

Next.
THE VIDEOGRAPHER: (Indicating.)
THE WITNESS: (Reviewing screen.)
Next.
THE VIDEOGRAPHER: (Indicating.)
THE WITNESS: (Reviewing screen.)
Next.
THE VIDEOGRAPHER: (Indicating.)
THE WITNESS: (Reviewing screen.)
Next.
THE VIDEOGRAPHER: (Indicating.)
THE WITNESS: (Reviewing screen.)
Next.
THE VIDEOGRAPHER: (Indicating.)
THE WITNESS: (Reviewing screen.)
Next.
THE VIDEOGRAPHER: (Indicating.)
THE WITNESS: (Reviewing screen.)
Next.
THE VIDEOGRAPHER: (Indicating.)
THE WITNESS: (Reviewing screen.)
Next.
THE VIDEOGRAPHER: (Indicating.)
THE WITNESS: (Reviewing screen.)
Next.

Page 149

THE VIDEOGRAPHER: (Indicating.)
THE WITNESS: (Reviewing screen.)
Next.
THE VIDEOGRAPHER: (Indicating.)
THE WITNESS: (Reviewing screen.)
Next.
THE VIDEOGRAPHER: (Indicating.)
THE WITNESS: (Reviewing screen.)
Next.
THE VIDEOGRAPHER: (Indicating.)
THE WITNESS: (Reviewing screen.)
Next.
THE VIDEOGRAPHER: (Indicating.)
THE WITNESS: (Reviewing screen.)
Next.
THE VIDEOGRAPHER: (Indicating.)
THE WITNESS: (Reviewing screen.)
Next.
THE VIDEOGRAPHER: (Indicating.)
THE WITNESS: (Reviewing screen.)
Next.
THE VIDEOGRAPHER: (Indicating.)
THE WITNESS: (Reviewing screen.)
Next.
THE VIDEOGRAPHER: (Indicating.)

THE WITNESS: (Reviewing screen.)
Next.
THE VIDEOGRAPHER: (Indicating.)
THE WITNESS: (Reviewing screen.)
Next.
THE VIDEOGRAPHER: (Indicating.)
THE WITNESS: (Reviewing screen.)
Next.
THE VIDEOGRAPHER: (Indicating.)
THE WITNESS: (Reviewing screen.)
Next.
THE VIDEOGRAPHER: (Indicating.)
THE WITNESS: (Reviewing screen.)
Next.
THE VIDEOGRAPHER: (Indicating.)
THE WITNESS: (Reviewing screen.)
Next.
THE VIDEOGRAPHER: (Indicating.)
THE WITNESS: (Reviewing screen.)
Next.
THE VIDEOGRAPHER: (Indicating.)
THE WITNESS: (Reviewing screen.)
Next.
THE VIDEOGRAPHER: (Indicating.)
THE WITNESS: (Reviewing screen.)



Next.
THE VIDEOGRAPHER: (Indicating.)
THE WITNESS: (Reviewing screen.)
Next.
THE VIDEOGRAPHER: (Indicating.)
THE WITNESS: (Reviewing screen.)
Next.
THE VIDEOGRAPHER: (Indicating.)
THE WITNESS: (Reviewing screen.)
Next.
THE VIDEOGRAPHER: (Indicating.)
THE WITNESS: (Reviewing screen.)
Next.
THE VIDEOGRAPHER: (Indicating.)
THE WITNESS: (Reviewing screen.)
Next.
THE VIDEOGRAPHER: (Indicating.)
THE WITNESS: (Reviewing screen.)
Next.
THE VIDEOGRAPHER: (Indicating.)
THE WITNESS: (Reviewing screen.)
Next.
THE VIDEOGRAPHER: (Indicating.)
THE WITNESS: (Reviewing screen.)
Next.



THE VIDEOGRAPHER: (Indicating.)
THE WITNESS: (Reviewing screen.)
Next.
THE VIDEOGRAPHER: (Indicating.)
THE WITNESS: (Reviewing screen.)
Next.
THE VIDEOGRAPHER: (Indicating.)
THE WITNESS: (Reviewing screen.)
Next.
THE VIDEOGRAPHER: (Indicating.)
THE WITNESS: (Reviewing screen.)
Next.
THE VIDEOGRAPHER: (Indicating.)
THE WITNESS: (Reviewing screen.)
Next.
THE VIDEOGRAPHER: (Indicating.)
THE WITNESS: (Reviewing screen.)
Next.
THE VIDEOGRAPHER: (Indicating.)
THE WITNESS: (Reviewing screen.)
Next.
THE VIDEOGRAPHER: (Indicating.)
THE WITNESS: (Reviewing screen.)
Next.
THE VIDEOGRAPHER: (Indicating.)



THE WITNESS: (Reviewing screen.)
Next -- that's the last one.
MS. BRADY: Very good.
THE WITNESS: I'm a pretty fast reader.
MS. BRADY: You are indeed.
**Q. All right. Would you agree with me that these are the responses that the BetterHelp gave to the FTC in response to an investigation that was -- that the FTC undertook?**
MS. KISER: Objection to form.
THE WITNESS: Yes, I agree.
MS. BRADY: Okay.
**Q. Did BetterHelp answer these questions truthfully?**
MS. KISER: Objection to form.
THE WITNESS: Yes.
BY MS. BRADY:
**Q. Did BetterHelp take these questions seriously?**
MS. KISER: Objection to form.
THE WITNESS: Yes.
BY MS. BRADY:
**Q. Did BetterHelp, once it received the list of questions from the FTC, undertake an investigation to answer these questions as truthfully and accurately as possible?**
MS. KISER: Objection to form. Argumentative. Compound. Asked and answered.
THE WITNESS: Yes, BetterHelp did.

MS. BRADY: Okay. I am going to turn to your -- or ask you to -- Brian, to turn to page 44.
THE VIDEOGRAPHER: (Indicating.)
MS. BRADY: All right.
**Q. And you read this section; correct?**
A. (Witness reviewing screen.)
Yes.
**Q. All right. And in this section, it's asking about a woman, Amber Lyda -- who is one of the therapists of BetterHelp; correct?**
MS. KISER: Objection to form.
THE WITNESS: (Reviewing screen.)
Yes.
MS. BRADY: All right.
**Q. And in it, it asks whether or not BetterHelp has entered into Business Associate Agreements with its counselors --**
MS. KISER: Objection to form. The --
BY MS. BRADY:
**Q. -- generally; correct?**
MS. KISER: Objection to form. The document speaks for itself.
THE WITNESS: Yes.
MS. BRADY: Okay.
**Q. I'd like to point to you the second sentence of the**



**first paragraph that begins, "While HIPAA regulations require covered entities to enter into written agreements with Business Associates, the existence of a BAA does not affect the status of the contracting entities for purposes of HIPAA."**
**Do you see where I'm reading that?**
A. (Witness reviewing screen.)
Yes, I do.
**Q. Can you tell me what BetterHelp meant by that answer?**
MS. KISER: Objection to form.
I would caution you, to the extent that you have any understanding that came from counsel, you may not disclose, but if have you a factual basis to explain that, you can.
THE WITNESS: (Reviewing screen.)
It's my understanding that it's BetterHelp's position that BetterHelp is not an entity covered by HIPAA, and the existence of any BAA does not change that fact.
MS. BRADY: Okay.
**Q. In a BAA, is a -- well, let me ask this, excuse me.**
**Does a business associate of BetterHelp -- or as a business associate, is BetterHelp required to comply with HIPAA regulations?**
MS. KISER: Objection to form. Misstates evidence and facts and records and also testimony. Outside the scope.



If you understand the question, you can answer.
Calls for a legal conclusion, as well.
THE WITNESS: Yes.
As I'm not a lawyer, I don't know the ins and outs of HIPAA regulation.
Again, BetterHelp maintains that we have never been a HIPAA-covered entity, and again, the existence of any BAAs does not affect that.
MS. BRADY: Okay. And I just want to be sure; let me just phrase it this way.
**Q. Does BetterHelp understand that a business associate to a covered entity would still be subject to the HIPAA rules and regulations?**
MS. KISER: Objection to form. Calls for a legal conclusion. Outside the scope of the topics.
And if you know in your individual capacity, you can answer.
THE WITNESS: I don't know.
MS. BRADY: Okay.
**Q. And you are answering on behalf of BetterHelp.**
**Is that correct?**
MS. KISER: Objection to form.
He is not answering on behalf of BetterHelp because we objected to this.
We can fight over whether we should have prepared a



witness to answer that question, but he is not answering on behalf of BetterHelp today, just to be clear.
MS. BRADY: Okay.
**Q. And if you'll look at this next paragraph that begins, "The Company began including BAAs along with the Terms and Conditions starting in June 2020, but the BAAs only apply to the extent the services that the Company provides to the counselors creates a business associate relationship under HIPAA."**
**Do you see where I'm reading that?**
A. (Witness reviewing screen.)
Yes.
**Q. Does BetterHelp have an understanding of what was meant by that answer?**
MS. KISER: Objection to form. Again, outside the scope of the preparation.
To the extent that your understanding would be as a result of conversations with counsel, we would maintain that it's privileged.
If you have an independent understanding, you may share.
But it calls for a legal conclusion. The document speaks for itself.
THE WITNESS: I can only read what I see in the document, but I can't make any legal conclusions of what is

meant by that sentence.
MS. BRADY: Okay. Let's look to the next page, please.
THE VIDEOGRAPHER: (Indicating.)
MS. BRADY: Oh, I'm sorry.
The next one -- 46, sorry.
THE VIDEOGRAPHER: (Indicating.)
MS. BRADY: All right.
**Q. And Mr. Vaughan, you mentioned that you have reviewed this; correct?**
A. Yes.
MS. KISER: Objection to form.
THE WITNESS: Yes.
MS. BRADY: Okay.
**Q. And I'll direct you to the -- well, the question is with regards to the HIPAA seal on the website.**
**Do you see where that is?**
MS. KISER: Objection to form.
THE WITNESS: (Reviewing screen.)
Yes, I see the HIPPA seal here on the page.
MS. BRADY: Okay.
**Q. Is that the HIPAA seal that you referenced earlier with regards to putting it on the BetterHelp web page?**
MS. KISER: Objection to form.
THE WITNESS: Yes, it was.



MS. BRADY: Okay.
**Q. And if you'll look at the answer BetterHelp gave, beginning with the second sentence in the first paragraph, "From the beginning of the Applicable Time Period until January 29, 2021, the Company included a hyperlink with the graphic (presented below) in the footer of a BetterHelp website."**
**Do you see where I'm reading that?**
MS. KISER: Objection to form.
THE WITNESS: (Reviewing screen.)
Yes, I see where that is.
BY MS. BRADY:
**Q. And that answer was truthful and accurate when given to a governmental entity; correct?**
MS. KISER: Objection to form.
THE WITNESS: (Reviewing screen.)
Yes.
MS. BRADY: Okay. Let's go to the next page.
THE VIDEOGRAPHER: (Indicating.)
MS. BRADY: Excuse me, I'm sorry; the next one, I apologize.
THE VIDEOGRAPHER: (Indicating.)
MS. BRADY: Sorry, give me a sec.
(Reviewing screen.)
I'll find it on a break; don't worry, we'll move on.



MS. KISER: Okay. Really? Okay.
MS. BRADY: Yeah, totally fine.
MS. KISER: Okay.
MS. BRADY: I can keep going.
MS. KISER: Okay.
MS. BRADY: All right. I just want to make sure that my understanding of your testimony is correct.
**Q. You mentioned that Teladoc provides policies and procedures and training on privacy to BetterHelp employees.**
**Is that correct?**
MS. KISER: Objection to form. Asked and answered.
THE WITNESS: Yes.
That's from my personal experience working at BetterHelp.
MS. BRADY: Okay.
**Q. Do you believe there's a good reason that Teladoc asked BetterHelp to undergo training on privacy policies that were drafted by Teladoc?**
MS. KISER: Objection to form. That's outside the scope. Lack of foundation. Calls for speculation.
THE WITNESS: Of -- from personal experience, I think information, security and privacy is important for any company, and any company I've ever worked for, you'd have to take mandated security and privacy trainings.
//



BY MS. BRADY:
**Q. Is that especially true when you're dealing with healthcare information?**
MS. KISER: Objection to form. Lack of foundation. Calls for speculation. Incomplete hypothetical. Outside the scope.
THE WITNESS: Speaking from personal experience, each privacy and security training is customized to the industry your company operates in.
So yes, a Teladoc training would likely look slightly different than a training from another company.
MS. BRADY: Okay.
**Q. But these policies, you would agree with me, are important because a company wouldn't just implement a policy for the purpose of doing paperwork; correct?**
MS. KISER: Objection to form. Outside the scope.
If you have an opinion in your personal capacity, you can answer.
But vague and incomplete hypothetical.
THE WITNESS: Any policy that a company has is important and has to be followed.
MS. BRADY: Okay.
**Q. And you would agree with me that policies and procedures are for the safety of the company's customers and prospective customers; correct?**

MS. KISER: Objection to form. Vague. Incomplete hypothetical. Outside the scope, as well.

MS. BRADY: And Liv, I really am not going to get crossways with you.

I just want to put on the record that Section 9 of the Rules of Professional Conduct in the Northern District of California requires, under Section H, a lawyer representing a Deponent or another party should limit objections to those that are well founded and necessary for the protection of his or her client's interests.

A lawyer should remember that most objections are preserved and need to be made only when form of the question is defective or privileged and information is sought.

MS. KISER: Well, thank you.

MS. BRADY: And you have been going on a little bit more than that, so I would ask that you keep to form and privilege.

MS. KISER: Thank you.

I --

MS. BRADY: Thank you.

MS. KISER: Let me respond by saying: I would ask you not to waste this witness's time by asking the same question over and over.

And I think it would behoove us all to stay focused on the topics that you noticed him for.



And let's just move on.

MS. BRADY: And I am.

MS. KISER: Okay. We can debate that, but let's not.

MS. BRADY: Do you need the question read back to you, sir?

MS. KISER: Yes, please.

MS. BRADY: Okay. Dawn, could you do that for me?

THE REPORTER: Yes.

(Record read.)

MS. KISER: Objection to form. Outside the scope. Calls for speculation. Incomplete hypothetical.

MS. BRADY: And again, you're going beyond form and privilege, Liv.

MS. KISER: We're not doing the colloquy.

THE WITNESS: Personal experience: Any company has very many different policies; they're all important.

Some of them are to protect customers.

Some of them are to protect employees.

Some of them are to protect the company.

So all -- all policies are important --

MS. BRADY: I appreciate that.

THE WITNESS: -- and need to be followed.

MS. BRADY: Oh, thank you.

**Q. Okay. So are privacy policies for the protection of**



**the customers' privacy?**

MS. KISER: Objection to form.

THE WITNESS: Yes.

My experience with privacy policies are that they are targeted and read and agreed to by customers using the product, and it talks about data and data collected and data used.

MS. BRADY: Okay.

**Q. And those policies are to protect the customer from a wrongful disclosure of their private information; correct?**

MS. KISER: Objection to form. Incomplete hypothetical. Calls for speculation.

THE WITNESS: The privacy policy lays out how -- what data is collected and how that data can be used, if you are referring to the public-facing privacy policy.

BY MS. BRADY:

**Q. Are there other privacy policies beside the public-facing privacy policy?**

A. I think the --

MS. KISER: Objection to form.

THE WITNESS: Sorry.

We also looked at an internal Teladoc privacy policy, and that's an internal document, so that's employee-facing versus customer-facing.

So I just wanted to -- you know, those are slightly



different types of documents.

MS. BRADY: Okay. Thank you for that; that's actually helpful.

**Q. So the internal privacy policy -- that is the Teladoc privacy policy -- does that have to be followed by the BetterHelp employees and organization?**

MS. KISER: Objection to form. Outside the scope. Calls for speculation.

THE WITNESS: From my understanding, BetterHelp employees, since we are owned by Teladoc, we have to follow and comply with certain, but not all, policies laid out by Teladoc.

MS. BRADY: Okay.

**Q. What policies does BetterHelp not have to comply with?**

MS. KISER: Objection to form. Outside the scope. Lack of foundation.

THE WITNESS: That I do not know.

I just know from personal experience that BetterHelp employees get trained on a subset of Teladoc's broader policies because not all of them apply to BetterHelp.

MS. BRADY: Okay.

**Q. Has BetterHelp ever heard of the Safe Harbor Provision?**

MS. KISER: Objection to form. Vague.

Page 174

(Reviewing screen.)
Next -- or previous.
THE VIDEOGRAPHER: (Indicating.)
THE WITNESS: Yeah.
(Reviewing screen.)
Can you go back to the next page, so I can finish that sentence?
THE VIDEOGRAPHER: (Indicating.)
THE WITNESS: (Reviewing screen.)
And we can go back again.
THE VIDEOGRAPHER: (Indicating.)
THE WITNESS: (Reviewing screen.)
And I am done.
MS. BRADY: Thank you.
(Remarks outside the record.)
MS. BRADY: So for ease of viewing --
THE WITNESS: Uh-huh.
MS. BRADY: -- I'm putting them side by side.
**Q. And this is an email chain, it looks like, from Amber Lyda, who is the woman we talked about previously; correct?**
MS. KISER: Objection to form.
THE WITNESS: (Reviewing screen.)
Yes, I see the email, yes.
MS. BRADY: Okay.

Page 175

**Q. And I'm going to direct you to about two-thirds of the way down on the second page, which is the first email sent, that starts, "As licensed therapists, we are required to provide a secure means to therapy, which does not allow Protected Health Information out in an identifiable way, but when I read the parts in the privacy policy and therapist agreement, it looks like there are exceptions made to that around marketing and third-party companies like" -- Facebook -- "FB."**
**Are you seeing where I'm reading that?**
MS. KISER: Objection to form.
You didn't read it correctly, but I think he can read it, so it doesn't matter.
THE WITNESS: (Reviewing screen.)
Yes, I can see where you're reading it.
MS. BRADY: Okay.
**Q. And she then asks, "Can you help me understand why, if any, identifiable information is being shared with entities that do not have a BAA with you?"**
MS. KISER: "What, if any," not "why."
MS. BRADY: Excuse me, thank you.
**Q. Do you see where I'm reading it?**
MS. KISER: Objection to form.
THE WITNESS: (Reviewing screen.)
Yes, I see the highlights.

Page 176

MS. BRADY: Okay. Great.
And let's zoom back out.
THE VIDEOGRAPHER: (Indicating.)
MS. BRADY: And it looks like there was a response from contact@betterhelp; that's on the bottom of the first page.
**Q. Does BetterHelp have any information as to who provided this response to Dr. Lightner -- or Lyda, excuse me?**
MS. KISER: Objection to form. Lack of foundation.
THE WITNESS: (Reviewing screen.)
No.
I can only see that this was from the BetterHelp Customer Support email, which is contact@betterhelp.com.
MS. BRADY: Thank you, that's helpful.
**Q. Okay. And then the answer that is given by the Customer Support states, "Thank you for your patience. We are HIPAA compliant."**
**Do you see where I'm reading that?**
A. (Witness reviewing screen.)
Yes.
**Q. Okay. So BetterHelp is stating that they are HIPAA compliant.**
**Is that correct?**
MS. KISER: Objection to form. The document speaks

Page 177

for itself.
THE WITNESS: This Customer Support rep says we are HIPAA compliant, yes.
MS. BRADY: Okay.
**Q. It states further that "Our Terms and Conditions do not include a Business Associate Agreement. BetterHelp presently does not have a Business Associate Agreement that we sign with counselors. However, BetterHelp does adhere to BAA standard with regards to data security and handling for PHI."**
**Do you see where I'm reading that?**
MS. KISER: Objection to form.
THE WITNESS: (Reviewing screen.)
Yes.
BY MS. BRADY:
**Q. Is that statement truthful and accurate?**
MS. KISER: Objection to form.
THE WITNESS: I do not know who wrote this email.
I can't speculate, you know, what was in their mind when they wrote this email; I can only see what's written.
BY MS. BRADY:
**Q. As it is applied to BetterHelp, is that statement truthful and accurate?**
MS. KISER: Objection to form. Asked and answered.
THE WITNESS: (Reviewing screen.)

I believe she's the manager of that team.
MS. BRADY: Okay.
**Q. Are Aaron and Farrah authorized to speak on behalf of BetterHelp --**
MS. KISER: Objection --
BY MS. BRADY:
**Q. -- when -- sorry -- when answering customer questions?**
MS. KISER: Objection to form. Calls for a legal conclusion.
THE WITNESS: Farrah and Aaron respond to inquiries from customers about various issues and try to resolve their issues, so they represent BetterHelp as Customer Support people.
MS. BRADY: All right.
**Q. And does BetterHelp train them on how to handle questions from customers?**
MS. KISER: Objection to form. Lack of foundation.
THE WITNESS: It's not in my scope of preparation to look at the training material for the Customer Success Team.
I do know from some personal experience that they have training covering a bunch of different scenarios.
MS. BRADY: All right. Let's look at page 3 and 4, sorry.
THE VIDEOGRAPHER: (Indicating.)



MS. BRADY: Okay.
**Q. And this is -- because it's an email chain, it goes backwards --**
A. Uh-huh.
**Q. -- and the customer's name and address look to be redacted; correct?**
MS. KISER: Objection to form.
THE WITNESS: (Reviewing screen.)
Yes.
MS. BRADY: Okay.
THE WITNESS: It seems like the customer email is redacted.
MS. BRADY: Okay.
**Q. So we've got -- if you'll follow along with me, on page 4, an inquiry from September 11th, 2020, from the client or the customer, and then just above that is Aaron's response to the customer's inquiry.**
**Are you following along with me?**
MS. KISER: She's getting it from that (indicating).
THE WITNESS: (Reviewing screen.)
Yes.
MS. BRADY: All right. Great.
**Q. And let's look at Aaron's response of September 15th, 2020, bottom --**
THE VIDEOGRAPHER: (Indicating.)



MS. BRADY: Yep.
**Q. "The Platform may also include the use of cookies and web beacons of services owned or provided by third parties that are not covered by our Privacy Policy and we do not have access or control over these cookies and web beacons.**
**"We may also use third-party cookies for the purposes of web analytics, attribution and error management.**
**"I'm afraid I have no way to speak to how 'easy' or 'difficult' it would be for these companies to piece together any information gathered by these beacons, but I can tell you that all the information you share with us is heavily encrypted and never sold or rented for any reason. It's 100 percent confidential and all communication is HIPAA compliant."**
**Do you see where I'm reading this?**
MS. KISER: Objection to form.
THE WITNESS: (Reviewing screen.)
Yes.
MS. BRADY: Okay.
**Q. Are those statements, made by Aaron at the BetterHelp team, truthful and accurate?**
MS. KISER: Objection to form.
THE WITNESS: The entire highlighted statement or are you referring to a specific part of it --



MS. BRADY: Well --
THE WITNESS: -- because it's a long paragraph?
MS. BRADY: I appreciate that.
In that paragraph if you want to parse it out as to what's accurate and what's not accurate, I'm happy to have you do that.
MS. KISER: Objection to form. Calls for a legal conclusion. Lack of foundation.
THE WITNESS: (Reviewing screen.)
I can't make a legal determination if this is an accurate representation.
I see there are parts of this that are coming from our, at the time, privacy policy that describes our use of cookies and web beacons, how we use third-party cookies for the purposes.
And as I mentioned during the previous topics, you know, the data we do share with third parties via cookies and web beacons, you know, are not -- we can't identify an individual human; it's all anonymous datapoints that we looked at and a third party looks at, at an aggregate level, to measure our -- the performance of the ads that we display on that third party.
BY MS. BRADY:
**Q. The statement is that the information is "heavily encrypted."**

**Q. Do you remember that?**
A. Yes.
**Q. Does the fact that tracking tools were present on the those web pages mean that the questions and answers to the questionnaire were shared with any third party?**
MR. ABRAMSON: Objection to form.
THE WITNESS: No, it does not.
BY MS. KISER:
If tracking tools were present on a log-in page, would that mean log-in information entered by users would be shared with any third party?
A. No.
**Q. Was any information between a patient and therapist ever shared with third parties?**
A. No.
**Q.** [redacted]



[redacted]
BY MS. KISER:
**Q.** [redacted]
BY MS. KISER:
**Q. Plaintiffs' counsel referred to "mental healthcare patients."**
**To your knowledge, is BetterHelp a healthcare provider?**
A. No, BetterHelp is not a healthcare provider.
BetterHelp is a platform -- a technology platform that provides a virtual room.
It provides the technology to connect the member or client with the therapist or counselor.
**Q. Thank you.**
MS. KISER: Nothing further.
MR. ABRAMSON: Just a few quick follow-up questions,



Mr. Vaughan.

FURTHER EXAMINATION

BY MR. ABRAMSON:
**Q. Your counsel went through a series of trackers and asked you if any personal information of a human being was ever sent to those entities; correct?**
A. Yes, that's correct.
**Q. Is an IP address personal information of a human?**
MS. KISER: Objection to form.
THE WITNESS: No.
It's BetterHelp's position that the data transmitted was anonymized and not intended to identify a specific human being and it wouldn't be possible to identify a specific human being, and the use for that transmission was also never to identify any individual human being.
It was to measure ad campaign on an aggregate level and not an individual or personal level.
MR. ABRAMSON: I understand that that's BetterHelp's position.
[redacted]



[redacted]
BY MR. ABRAMSON:
**Q. Are IP addresses considered personally identifiable information under HIPAA?**
MS. KISER: Objection to form. Calls for a legal conclusion.

THE WITNESS: I cannot -- I don't know how they're considered under HIPAA.
BY MR. ABRAMSON:
**Q. Are email addresses personal information of an individual?**
MS. KISER: Objection. Form.
THE WITNESS: I believe an email can, in certain cases, be considered personal information.
[redacted]
BY MR. ABRAMSON:
**Q. And that's your testimony, despite the document we looked at where Mr. Moore from Facebook said that Facebook could match hashed email addresses to account IDs that Facebook maintained?**
MS. KISER: Objection. Form. Argumentative.
THE WITNESS: Yes.
I stand by that hashed email addresses cannot be reversed, not by Facebook or by anyone else.
MR. ABRAMSON: Okay.
**Q. You testified in response to your counsel's questioning that the fact that Facebook could detect certain personal information did not mean that BetterHelp had sent that personal information to Facebook.**



**Is that right?**
A. Yes, that's correct.
**Q.** [redacted]
MS. KISER: Objection to form. Lack of foundation. Calls for speculation.
THE WITNESS: [redacted]
MR. ABRAMSON: Okay.
**Q.** [redacted]
//



BY MR. ABRAMSON:
**Q.** [redacted]
It's also available to anyone on the WayBack Machine.
MR. ABRAMSON: Thank you, Mr. Vaughan.
I don't have any further questions.
MS. KISER: Thank you.
We will read and sign.
THE VIDEOGRAPHER: Stand by, please.
Going off the record at 4:50 P.M.
This concludes the deposition.
(Remarks outside the record.)
MS. KISER: Same order as last time.
MR. HUDOCK: We would also like a rough.
(Proceedings adjourned at 4:50 P.M.)
--o0o--



DECLARATION UNDER PENALTY OF PERJURY

I, NIKLAS VAUGHAN, PERSON MOST KNOWLEDGEABLE, do hereby certify under penalty of perjury that I have read the foregoing transcript of my deposition taken on March 21, 2025; that I have made such corrections as appear noted on the Deposition Errata Page, attached hereto, signed by me; that my testimony as contained herein, as corrected, is true and correct.

Dated this ________ day of __________________, 20__, at ______________________________________________, California.

______________________________
PMK NIKLAS VAUGHAN

Exhibit 327

## Response to Follow-Up Questions

This serves as the Company's response to the follow-up questions from the Federal Trade Commission ("FTC") in response to the Company's previous responses to the Civil Investigative Demand ("CID") dated July 30, 2020. The Company objects to the Requests to the extent they are overly broad, unduly burdensome, seek information protected by the attorney-client privilege or other applicable privileges or protections, and/or seek information not currently known to the Company. The Company incorporates by reference its previous objections to certain definitions in the CID including of "Personal Information." The definition of "Personal Information" in the CID is vague and overbroad to the extent it includes any "information from or about an individual consumer," irrespective of whether that information is individually identifiable. The Company also objects to this definition to the extent it does not take into account whether such information is collected, used, stored, or disclosed in an anonymized, deidentified, aggregated, or encrypted form. As explained in our Cover Letter, production of these materials is not intended to waive any of the Company's rights or remedies, all of which are expressly reserved.

1. **Please describe all versions or paths of the entire intake questionnaire flow throughout the Applicable Time Period presented on any website or mobile application owned or operated by the Company, and explain how the questions presented to an individual aredetermined by the responses to prior questions.**

As we discussed on March 16, 2021, the Company has utilized numerous iterations of the intake questionnaire. The questions are not static, and the changes are not documented in the ordinary course of business. Nor can historic versions or iterations be reconstructed without significant burden. Without waiving that objection, the Company describes the paths as follows.

A tree representing iterations of the sequence in which questions may currently appear on BetterHelp's website, Regain's website, Pride Counseling's website, and Faithful Counseling's website is produced at BHDPIP00001149. As it demonstrates, the quiz path a user will travel depends on what website the user starts at, and whether, in some instances, the user is using a mobile device or desktop. It also demonstrates how answering certain questions can result in other questions being displayed or hidden. And it details what questions will redirect the flow of questions and what questions are there by default.

So, for example, if, on the BetterHelp website, a user were to identify as non-heterosexual, the user would then be shown a question (5) about whether they want to be "matched with a counselor who specializes in LGBT issues." If that user were to answer yes, the user would then be shown a question (6) about their preferred pronouns. That user would not be shown any questions (8–10, 29–33) about religion, but will be asked about their spirituality (11) as well as questions related to their identity (26–28).

**FOIA CONFIDENTIAL TREATMENT REQUESTED**

Some questions are asked on all websites. These include: "How old are you?"; "How would you rate your current financial status?"; and "Who referred you?" Users who fill out the intake questionnaire on a mobile device complete fewer questions than those who fill out the questionnaire on a desktop.

During the Applicable Time Period, multiple departments could be involved in changes to the questions, but the Product Department had the most involvement, including approving requests to change a question. Minor changes to the wording of questions occurred approximately every few weeks, and the entire list of questions was reviewed and evaluated approximately twice a year.

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

**2. The Company's response to Specification G.5 of the CID references a banner displayedwhile users are answering the intake questionnaire on the BetterHelp website. Please produce all iterations of the banner displayed during the Applicable Time Period and, foreach, state which websites and mobile applications the banner was displayed on and when it was in effect.**

The Company has continuously striven to enhance transparency and choice with respect to its cookie and web-beacon usage.

Consistent with these efforts, in September 2020, the Company launched a banner on the BetterHelp website and mobile app that popped up on every question in the intake questionnaire. The banner originally stated "We use cookies to help the site function properly, analyze usage, and measure the effectiveness of our ads. We never sell or rent any information you share with us. Read our Privacy Policy to learn more." The banner linked to the Privacy Policy.

One month later, the Company deleted the line about selling and renting information on the banner and added a disclosure, which also was included in the Privacy Policy, that the Company also used third-party web beacons. This banner originally appeared only on the BetterHelp website and app and stated: "We use BetterHelp and third-party cookies and web beacons to help the site function properly, analyze usage, and measure the effectiveness of our ads. Read our Privacy Policy to learn more."

In the next month, November 2020, BetterHelp rolled out this banner to all its active multi-sites and their applications. The content remained the same except the multi-site banner stated that the multi-site's (rather than BetterHelp's) cookies and web beacons were used (along with third-party cookies and web beacons). The colors of the banner differed by site. (Banners are not available for iCounseling, MyTherapist, and Terappueta, which reroute to BetterHelp.)

Current banners are produced at BHDPIP00001150–BHDPIP00001154 and a compilation of historical banners is produced at BHDPIP00001155.

[redacted]

---

1 [redacted]

**3. The Company's response to Specification G.5 of the CID states that, in December 2020,the representation "Rest assured – any information provided in this questionnaire will stay private between you and your counselor" was changed to "Rest assured – this information will stay private between you and your counselor." Please produce all iterations of the representation displayed during the Applicable Time Period and, for each, state which websites and mobile applications the representation was displayed on and when it was in effect. In addition, please Identify who decided to change the representation and explain why it was changed.**

The Company objects to this Request to the extent it calls for information protected by the attorney-client privilege or other applicable privileges or protections, and its response to this Request is not intended to, and does not, waive any applicable privilege or other legal basis under which information may be protected from disclosure.

The Company used three iterations of this statement, which appeared on the BetterHelp, Pride Counseling, and Faithful Counseling websites and apps. The statement appears on the pop-up box that contains the question, "Are you currently taking any medication?"

Since at least the beginning of the Applicable Time Period until December 2020, the pop-up box stated: "Rest assured – any information provided in this questionnaire will stay private between you and your counselor." The statements appeared in the pop-up box that contains the question, "Are you currently taking any medication?" on BetterHelp's, Pride Counseling's, and Faithful Counseling's websites and apps until December 2020.

In December 2020, the Company revised the statement to state: "Rest assured – this information will stay private between you and your counselor," which appeared on BetterHelp's, Pride Counseling's, and Faithful Counseling's websites and apps.

In January 2021, the Company further revised the statement to state: "Rest assured—your health information will stay private between you and your counselor." This statement still appears today on BetterHelp's, Pride Counseling's, and Faithful Counseling's website and apps.

A screenshot of the 2020 and 2021 statements is produced at BHDPIP00001156. These changes were implemented by the Product Team.

**4. Please produce all iterations of the BetterHelp FAQ and, for each, state when it was in effect.**

As we discussed on March 16, 2021, BetterHelp has utilized numerous iterations of the FAQ. All iterations of the BetterHelp FAQ are not stored in the ordinary course of business. Changes, if captured at all, may be stored in an internal database. That database, however, lacks the functionality to extract prior iterations of the BetterHelp FAQ.

As we discussed on March 16, in response to this Request, we are producing: (1) screen shots and descriptions of changes made on the Company's FAQs between March and April 30th; (2) an explanation of who had the ability to make changes to the FAQ; (3) an explanation of who had the authority to authorize changes to be made; and (4) previous iterations of the "can I stay anonymous" question that could be found after a reasonable search.

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

Screen shots of the changes made since the Company's last response to the FTC are produced at BHDPIP00001157–BHDPIP00001158. A current version of BetterHelp's FAQ is produced at BHDPIP00001428–BHDPIP00001435.

**5. The Company's current and prior privacy policies state: "You may decide which Information, if any, you would like to share with us, but some functions of the Platform may not be available to you without providing us the necessary Information. By deciding to provide the Information you agree to our methods of collections and use, as well to other terms and provisions of this Privacy Policy." Describe in detail all the ways in which an individual can opt out of sharing, or otherwise decide not to share, each type of the "Information" (as it is defined in those privacy policies) with the Company or a third party.**

The Company's recent Privacy Policy explains that the Company collects, uses, and stores the following types of data: "your personally identifiable information (such as, but not limited to, your name, phone number, email address, and address), billing and payment information, profile information, log data (information such as your computer, Internet Protocol address ("IP"), pages that you visit and the amount of time spent on those pages, actions you take and other statistics), information related to the Counselor Services or your need for Counselor Services, and any information which is exchanged between you and your Counselor."

The Company made updates to the Privacy Policy this month, setting forth the following categories of information: (1) visitor data; (2) onboarding data; (3) account registration data; (4) transaction data; (5) login data; (6) counseling session data; (7) customer data; (8) counselor data; and (9) communications data. The updated policy is produced at BHDPIP00001443–BHDPIP00001460.

(1) *Visitor Data* includes user visits to its websites and use of the Company's applications, which also includes the particular pages visited or viewed by the user, the amount of time the user spent on the website or application, website errors experienced by the user, visits to the Company's 'FAQ' page, and information about the browser or device used to access the website and application, such as the user's mobile device ID and IP address.

(2) *Onboarding Data* includes questionnaire responses provided by users in the process of initial registration, data regarding the pages viewed by the user, whether the user clicks the "Get started" link to begin completing the questionnaire, and whether the user responds to any of the questionnaire prompts.

(3) *Account Registration Data* includes data in connection with the account registration process, such as whether users registered using their Facebook or Google profiles, and whether a user verifies their reported email address or phone number. This data also includes the Company's identifier for account holders. (The Company assigns each user who creates a Company account an anonymized, sequentially generated client ID. Please see Response to Request 14 for more information.)

(4) *Transaction Data* includes information regarding payment for the Company's services by users and related transactions on its website, such as whether a user completed payment for the Company's services, signed up for the Company's

services using a trial offer, canceled or otherwise ended a trial, or completed a request to receive financial aid for the Company's services.

(5) *Login Data* includes data regarding logins to the Company's website and application by registered users (including Counselors) and activity conducted during that log in such as when a user logs in, the number of messages received or sent through the Company's website or app during that log in, and whether a user has been assigned, started, or completed a counseling goal. Login Data does not include the content of any messages sent or received by users or the content of any counseling goals.

(6) *Counseling Session Data* includes data regarding user counseling sessions such as whether a live session has been scheduled by the user, whether a Counselor or user joins a scheduled session, when a counseling session began and ended, and whether a counseling session was canceled or re-scheduled.

(7) *Customer Data* includes data from users that have signed up for the Company's services such as a user's self-reported name or nickname, age, e-mail address, phone number, and emergency contact information.

(8) *Counselor Data* includes but is not limited to information such as the Counselor's name, e-mail address, and phone number, address, NPI number (if applicable), CAQH number (if applicable) and education and job history.

(9) *Communications Data* includes communications between users and Counselors on the Platform, and communications between users and the Company's customer service team.

The Company's previous Privacy Policy explains that the Company may collect, use, and store this information for several different "business and marketing purposes" and describes the purposes and third parties involved. The updated Privacy Policy categorizes these purposes and third parties as follows:

(1) *Communication with the user*, which includes contacting the user with information, alerts, and suggestions that are related to the Platform; verifying the user's identity; completing an activity the user requests such as registering the user for the Platform or responding to a request for information; and reaching out to a user if the Company has a good reason to believe that the user or any other person may be in danger or may be either the cause or the victim of a criminal act.

(2) *Delivery of services to the user*, which includes creating the user's account and enabling the user to log on to the Platform; managing the user's account, providing the user with customer support, and ensuring the customer is receiving quality service; for billing and transaction processing purposes; to match users with Counselors and facilitate the Counselor Services; to supervise, administer, and monitor the platform; to measure and improve the quality, effectiveness and delivery of services.

(3) *Customization and marketing*, which includes advertising and marketing the Platform and Counselor Services to potential users and counselors; personalizing website experience and delivering content and product and service offerings relevant to individual interests, including targeted offers and ads through the Company's websites, third-party sites, and via email or text message.

(4) *Compliance with law*, which includes responding to law enforcement requests and as required by applicable law, court order, or governmental regulations; and complying with applicable state and federal laws, including, but not limited to laws related to protecting client and public health and safety.

(5) *Other uses with consent*, which includes any other purpose with the user's affirmative, specific consent.

<u>The updated Privacy Policy characterizes the information shared with third parties, along the following lines</u>:

(1) *For business purposes and advertising*, which includes facilitating Counselor Services; sharing information with vendors and service providers (including data hosting, data storage partners, analytics providers, advertising providers, and vendors providing technology services and support, payment processing and data security); and sharing information with professional advisers, such as auditors, law firms, and accounting firms.

(2) *With the user's direction or consent*, which includes sharing information with third parties if the user requests or directs the Company to do so.

(3) *With affiliates* within the Company's corporate group.

(4) *To comply with the law*, which includes sharing with a court, a regulatory entity, law enforcement personnel, or pursuant to a subpoena.

(5) *In the context of a transaction*, such as an asset sale, merger, bankruptcy, or other business transaction.

(6) *For other business reasons*, such as enforcing any applicable Term and Condition and/or Term of Use, and to ensure the safety and security of the Platform and the users of the Platform.

<u>The Privacy Policies and Opt-Out Pages inform visitors and users how they can opt out of sharing at least some of this data with either the Company and/or third parties</u>.

The previous and updated Privacy Policies explain that the Company uses cookies and web beacons; what those terms mean; and why the Company collects cookies and uses web beacons. Both specifically explain how to opt out.

**FOIA CONFIDENTIAL TREATMENT REQUESTED**

The Opt-Out page on the Company's websites further details opt-out options. Since 2018, the Company has published an "Opt-Out" page that explains how to opt out of tracking by the Company. The "opt out" page explains that a person "can clear anonymous tracking cookies from this site using your browser" and provides instructions for how to do so by linking to https://www.aboutcookies.org/how-to-delete-cookies/. At least throughout the Applicable Time Period, this option was available.[2]

The Company has since made it even easier to opt out of tracking.

[redacted] the Company began to roll out an automatic pop-up banner on the BetterHelp and multi-sites' landing pages that states: "[w]e use [Company] and third-party cookies and web beacons to help the site function properly, analyze usage, target and measure the effectiveness of our ads. Read our Privacy Policy to learn more and go to Cookie Preferences to manage your settings." This banner will be implemented for all sites by approximately June 2021.

As soon as a visitor clicks on the Cookie Preferences link, it will be given control over cookies and web beacons. The cookies/web beacons are defaulted "on" for everyone outside the European Union. However, this Cookie Preferences link offers the visitor several options to "opt out."

[redacted] The toggle tool has up to four tabs to click on, including tabs entitled (1) Your Privacy; (2) Strictly Necessary Cookies; (3) Performance Cookies; and (4) Targeting Cookies.[3]

At the tab "Your Privacy" the visitor is told that, because the Company "respect[s] [the visitor's] privacy, [the visitor] can choose not to allow some types of cookies," and directs the visitor to "learn more" by reviewing the Privacy Policy (which the tool links to).

In the other tabs, the visitor may be provided details around (1) three types of cookies—strictly necessary cookies (first-party cookies), performance cookies (third-party cookies), and targeting cookies (third-party cookies)—and (2) how to opt out.

The Company defines "strictly necessary cookies" as those "necessary for the website to function" and which "can't be switched off in [its] systems. They are usually only set in response to actions [the visitor] ha[s] taken which result in a request for services, such as setting [the visitor's] privacy preferences, logging in, or filling in forms." The visitor is not provided an option to opt out of these types of cookies as

---

[2] [redacted]

[3] The tabs that will appear will depend on the type of cookies on the site.

they are always active. However, the Company informs visitors that they can block these types of cookies by setting their "browser to block or alert [them] about these cookies" but warns that "some parts of the site may not work as a result."

In another tab, the Company defines "performance cookies" as cookies that "allow" the Company to "count visits and traffic sources so [it] can measure and improve the performance of [its] site. They help [the Company] to know which pages are the most and least popular and see how visitors move around the site. All information these cookies collect is usually aggregated and therefore anonymous. If [the visitor] do[es] not allow these cookies [the Company] will not know when [the visitor] ha[s] visited [the] site, and will not be able to monitor its performance." The visitor is provided an option via a toggle tool to opt out of sharing these cookies. If the visitor chooses not to share performance cookies, the web scripts for Mixpanel and Google Analytics will stop running. That means that Mixpanel and Google Analytics will not obtain any data for this visitor at that point moving forward.

The Company defines "targeting cookies" as those cookies that are "set through [its] site by [its] advertising partners and help [it] measure the effectiveness of [its] ads." The Company notes that these cookies "may also be used by those companies to build a profile of [the visitor's] interests and show [the visitor] relevant adverts on other sites." The Company further notes that these companies "do not store directly personal information but are based on uniquely identifying [the visitor's] browser and internet device." The Company explains that if the visitor doesn't "allow these cookies," the visitor "may experience less targeted advertising." The visitor is provided an option via a toggle tool to opt out of these cookies. If the visitor chooses to opt out of those cookies, the web scripts for ad partners will stop running. That means those ad partners will not obtain any data from the visitor at that point onward.

In short, to use the Services, a person can opt out of all cookies (except blocking strictly necessary cookies will mean some functionality will be lost). If the site visitor opts out of a specified category, resets the browser, or has a privacy plugin installed, web beacon script is blocked from running (and therefore tracking the visitor's actions).

<u>Historically, and now, there are other ways to opt out of providing at least some of the data described above.</u>

Those merely visiting the Company's platform do not need to share any of the information with the Company that they don't want to except the Visitor Data unless and until the visitor opts out of doing so. And a visitor doesn't share Visitor Data if they have a privacy plug in on their browser already or there is some other reason cookies are blocked.

To create an account, visitors must also provide some Onboarding Data and Account Registration Data. However, visitors choose their responses, such as whether to use a nickname. Visitors can just click whatever options they wish to answer the questions in order to create an account.

Visitors can also opt-out of sharing data regarding the pages viewed by opting out of performance and tracking cookies. They will soon be able to do so via the CookiePro cookie-settings tool; before CookiePro, they could have adjusted their browser setting or used a privacy plug in or otherwise blocked cookies.

Subscribers to the Company's Services must provide Login Data, Counseling Session Data, Customer Data, and Communications Data. This data is not shared with third-party advertising or analytics companies.

Subscribers can also opt-out of sharing information with their Counselors. They can use nicknames with their counselors (unless the Counselor's state guidelines dictate otherwise). They are also free to choose what they do and do not share with their Counselors.

[redacted]

Additionally, anyone has the option to stop using the Company's Services and to stop providing data at any time.

**FOIA CONFIDENTIAL TREATMENT REQUESTED**

6. **The Company's response to Specification G.1 of the CID states that the Company operates websites and mobile applications for MyTherapist, TeenCounseling, Faithfulcounseling, PrideCounseling, iCounseling, Regain, and Terappeuta. For each such website and mobile application, please state (1) how long it has been in operation;and (2) whether it was subject to the same privacy policies the Company provided in BHDPIP00000002, BHDPIP00000050, BHDPIP00000052, BHDPIP00000054, BHDPIP00000056, BHDPIP00000058, and BHDPIP00000060. If any such website or mobile application was subject to a different privacy policy at any time during its operation, please provide the applicable privacy policy and state when it was in effect.**

| Source | Length of Operation | Subject to Privacy Policies Provided? |
|---|---|---|
| Regain | May 2016-Present | Yes |
| TeenCounseling | January 2017-Present | Yes |
| iCounseling | February 2017-November 2020 (reroutes to BetterHelp) | Yes |
| Terappeuta* | March 2017-March 2019 (reroutes to BetterHelp) | Yes |
| MyTherapist | June 2017-March 2019 (reroutes to BetterHelp) | Yes |
| FaithfulCounseling | July 2017-Present | Yes |
| PrideCounseling | August 2017-Present | Yes |

*Changes to the Company's privacy policies were not always reflected on Terappeuta, which is a Spanish-language website. The last change made to its Privacy Policy occurred on September 18, 2018. This is produced at BHDPIP00001436–BHDPIP00001442.

7. **The Company's response to Specification P of the CID states:** [redacted] **With respectto this response:**

   a. **Explain the Company's understanding of the difference, if any, between pixels and web beacons, including whether the Company's reference to web beacons inthis response and elsewhere on its websites or mobile applications is meant to include the Facebook Pixel; and**

   b. **List each web beacon removed from the "BetterHelp platform":**

      i. **List each webpage it was removed from as well as how long it had been there.**

      ii. **Describe what Personal Information (including all identifiers such as name, phone number, address, geolocation, email address, device identifier, advertising identifier, IP address) and event data it was collecting and, for each such type of Personal Information or event data:**

      iii.

         1. **State the number of individuals for whom it was collected;**
         2. **Describe how the Company used it; and**
         3. **Identify each third party to which it was disclosed, and describe when and why it was disclosed to the third party;**

      iv. **Explain why the Company removed the web beacon.**

The Company objects to this Request to the extent it calls for information protected by the attorney-client privilege or other applicable privileges or protections, and its response to this Request is not intended to, and does not, waive any applicable privilege or other legal basis under which information may be protected from disclosure.

[redacted]

FOIA CONFIDENTIAL TREATMENT REQUESTED

[redacted]

[redacted]

[redacted]

[redacted]

| [redacted] | [redacted] |
|---|---|
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |

4 [redacted]

| | |
|---|---|
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |

[redacted]

**8. Specification K.2 asks for the number of users whose Personal Information was disclosed to third parties. The Company's response (through citation to its response to Specification G.8) lists the number of visitors, sign ups, and paid users for years 2017, 2018, and 2019. Please state which number—whether visitors, sign ups, or paid users—represents the number of individuals for which the Company sent Personal Information to third parties.**

The Company objects to the characterization of the information as "Personal Information" that the Company "sent . . . to third parties." [redacted]

[redacted]

[redacted]

| [redacted] | [redacted] | [redacted] | [redacted] |
|---|---|---|---|
| [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] |

[redacted]

9. **Please state the number of users of the Company's counseling services for each of the following of its clients:** [redacted]

[redacted]

[redacted]

**10. With respect to BHDPIP00000049, please define "Advertising Optimization","Advertising Attribution", and "Advertising to Users."**

"Advertising optimization" refers to the process of creating and refining ads that are relevant to users who see them and "[a]dvertising attribution" refers to the way of determining which types of marketing contributes to user behavior (known as conversions). There is overlap between the concepts because "advertising attribution" is a necessary part of "advertising optimization."

[redacted]

**11. With respect to BHDPIP00000049, please describe in detail what information was provided through "every page load," including what type of "browser information"Facebook, Pinterest, Reddit, and Twitter could access through those page loads.**

The Company objects to the characterization of BHDPIP00000049. Without waiving any objection, the Company respectfully refers the FTC to its Responses to Requests 7, 13, and 17, and its factual summary.

**12. With respect to BHDPIP00000049, please list which of the Company's websites or mobile applications shared each type of Personal Information listed in column B.**

The Company objects to the characterization of BHDPIP00000049. Without waiving any objection, the Company respectfully refers the FTC to its factual summary.

**FOIA CONFIDENTIAL TREATMENT REQUESTED**

**13. BHDPIP00000049 states that** [redacted]

The Company objects to this Request to the extent it calls for information protected by the attorney-client privilege or other applicable privileges or protections, and its response to this Request is not intended to, and does not, waive any applicable privilege or other legal basis under which information may be protected from disclosure.

[redacted]

[redacted]

**14. BHDPIP00000049 states that** [redacted]

The Company objects to the characterization of BHDPIP00000049. Without waiving any objection, the Company states that [redacted]

**15. Please state which identifiers (e.g., name, phone number, address, geolocation, email address, device identifier, advertising identifier, IP address) the Company disclosed to** [redacted]

The Company objects to the characterization of BHDPIP00000049. Without waiving the objection, the Company respectfully refers the FTC to its factual summary and Responses to Requests 7, 13–14, 16–17, and 23–24, which provide details about Facebook and Google Tag Manager.

**16. Please state the event names provided to Facebook for the following types of Personal Information listed in column B of BHDPIP00000049:**

a. [redacted]

[redacted]

[redacted]

The Company respectfully refers the FTC to its Responses to Request 7 and 17 for more context. The Company objects to the characterization of (a)–(c) as "Personal Information." [redacted]

Without waiving any objection, the Company states the event names for each event changed over the Applicable Time Period:

[redacted]

[redacted]

[redacted]

[redacted]

**17. Please provide the name and definition for each pixel and app event (both standard and custom events) the Company sent to** [redacted]

The Company objects to the characterization that it "sent" all of these events to Facebook. [redacted]

The Company also objects to this Request to the extent it calls for information protected by the attorney-client privilege or other applicable privileges or protections, and its response to this Request is not intended to, and does not, waive any applicable privilege or other legal basis under which information may be protected from disclosure.

[redacted]

[redacted]

[redacted]

- [redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

5 [redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

---

[redacted]

[redacted]

**18. Please describe in detail every advertising campaign the Company ran on Facebook during the Applicable Time period, including the targeting criteria (e.g., what events, Personal Information, and/or Custom Audiences the campaign utilized), advertisement imagery, dates of the campaign, click-through information, and conversion information.**

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

---

[redacted]

[redacted]

**19.** [redacted]

[redacted]

[redacted]

8 [redacted]

20. [redacted]

[redacted]

[redacted]

[redacted]

---

[redacted]

21. [redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

---

[redacted]

[redacted]

22. [redacted]

| [redacted] | [redacted] |
|---|---|
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |

| | |
|---|---|
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |

**FOIA CONFIDENTIAL TREATMENT REQUESTED**

| | |
|---|---|
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |

**FOIA CONFIDENTIAL TREATMENT REQUESTED**

[redacted]

[redacted]

[redacted]

[redacted]

23. [redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

**24.** [redacted]

[redacted]

[redacted]

[redacted]

**25. Please state how many therapists and counselors the Company contracted for each of theyears 2017, 2018, 2019, and 2020.**

[redacted]

[redacted]

| [redacted] | [redacted] |
|---|---|
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |

**26.** [redacted]

[redacted]

[redacted]

The Company objects to the remainder of this question as it seeks information protected by the attorney-client privilege.

27. **State how many of the Company's counselors and therapists submit claims to insurance, Medicare, or Medicaid, regardless of whether those claims stem from treatment providedthrough the Company.**

[redacted]

**28. With respect to the seal for "HIPAA" on the BetterHelp website, please identify:**

> **a. The organization that presented the Company with the seal;**
>
> **b. The date the seal was granted, and, if applicable, the date of any subsequentreview by the granting organization;**
>
> **c. The date on which the Company placed the seal on the www.betterhelp.comwebsite and its associated webpages; and**
>
> **d. The support or basis for the seal (e.g., any review process by, or application orcertification to, an organization issuing the seal).**

The Company objects to the characterization that it placed a HIPAA "seal" on its website. From the beginning of the Applicable Time Period until January 29, 2021, the Company included a hyperlink with the graphic (presented below) in the footer of the BetterHelp website.

By clicking this graphic, users were directed to the following url: https://www.hhs.gov/hipaa/index.html. That url, in turn, simply provides information about HIPAA.

No organization "granted" or "presented" this graphic to the Company nor does the Company ever represent that one did.

**29. Please state the time periods during which the advertisements in BHDPIP00000131-135and BHDPIP00000138-139 were run, as well as how many consumers these advertisements reached and how many became users of a website or mobile application owned or operated by the Company.**

The Company does not store or track the information responsive to this Request in the ordinary course. However, it can confirm that BHDPIP00000140 ran in July 2019.

**30. Please describe what, if any, efforts the Company has ever made to notify consumers of changes to its privacy policies, practices, or procedures, including who it notified and how it notified them. Please also describe any choice mechanisms the Company offered consumers with regard to changes to its privacy policies, practices, or procedures, including when and how these mechanisms were provided; this includes whether the Company obtained consumers' consent prior to using or disclosing information collectedunder a previous privacy policy for a purpose that was newly disclosed under a revised privacy policy.**

The Company objects to this Request to the extent it calls for information protected by the attorney-client privilege or other applicable privileges or protections, and its response to this Request is not intended to, and does not, waive any applicable privilege or other legal basis under which information may be protected from disclosure.

The Company has made continuous efforts to further enhance transparency and choice related to its privacy policies, practices, and procedures.

- Notice

Generally, the Company has notified subscribers of Privacy Policy changes by including a "tooltip" on its sessions webpage that says, "Terms of Service have been updated" with a link to the newest Privacy Policy.

During the last year, as part of an ongoing review of its privacy policies, practices, and procedures, including consulting with counsel, the Company updated this notice. In March 2020, the Company created a modal popup for when someone logs into their account. The title of the text on the modal is "Update to Terms & Conditions." The body of the text says "Our Terms of Use and Privacy Policy has been updated. A summary of some of the changes are highlighted below."

In March 2020, the Company used this modal, and highlighted two changes. The modal also linked to the Privacy Policy and Terms and Conditions, and informed clients that, "[b]y continuing to access or use the Platform," the client had "read and agreed to the full terms in the updated" policies. It looked like this (not true to size):



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY 

Modal text:

Title: Update to Terms & Conditions

Body: Our Terms of Use and Privacy Policy have been updated. A summary of some of the changes are highlighted below.

- Terms of Use – Notice to California Residents regarding counselor complaints
- Privacy Policy – How your information is used regarding complying with state and federal laws around public safety

By continuing to access or use the Platform, you agree that you have read and agree to the full terms in the updated Terms of Use and Privacy Policy. [Click here](link) to read the full Terms of Use. [Click here](link) to read the full Privacy Policy.

[Close]

In April 2021, the Company further updated its privacy policies and the following module provides notice of the changes (not true to size):

**Updates to Client Terms and Conditions and Privacy Policy**

Our Client Terms and Conditions and Privacy Policy have been updated.
The update to the Client Terms and Conditions includes the following change:

- Clarification on procedures when a client's Counselor is no longer on our Platform

The update to the Privacy Policy includes the following changes:

- Clarification on how and when the policy is applicable
- Additional detail about how we collect, use, and disclose information to further enhance transparency into our practices
- Updates to the sections pertaining to California and EU residents

Click here to read the full Client Terms and Conditions. Click here to read the full Privacy Policy. By continuing to access and use our websites and the Platform, you agree that you have read and agree to the full terms in the updated Client Terms and Conditions and Privacy Policy.

Close

- <u>Choice</u>

Generally, visitors cannot create an account without accepting the Terms and Conditions and Privacy Policy. However, throughout the Applicable Time Period, the Company has permitted visitors and users to opt out of anonymous tracking by third parties and the Company. More details on this subject are provided in Response to Request 5.

**31. Please produce documents sufficient to show all materially different representations the Company has made to consumers and/or publicly related to COVID-19, including any representations regarding how the Company's services may assist consumers with issues related to COVID-19.**

The Company objects to this Request on the grounds that (1) "representations" is vague; and (2) it is outside the scope of the CID. Without waiving its objections, the Company states as follows.

In February 2021, BetterHelp offered "Covid19 Support" in the form of a 50% discount for its Services. In doing so, it stated: "Licensed and vetted counselors are available to support you during these uncertain times." A copy of this statement is produced at BHDPIP00001307.

The Company also published articles referring to COVID-19 on the Regain and BetterHelp websites in August and December of 2020 and in February 2021. They are produced here BHDPIP00001308–BHDPIP00001421.

The Company also ran Google Ads that referenced "Covid" or "Covid-19." An export showing the text of these ads was previously produced at BHDPIP00000121. The ads include the following statements:

- Covid Mental Health Support
- Find a Therapist During Covid
- Get Therapy During Covid
- Get Help with Covid-19 Anxiety

Finally, the Company ran ads on social media platforms that referenced COVID-19, the pandemic, working from home, quarantine, and/or feature masks. Illustrative examples are produced at BHDPIP00001203; BHDPIP00001209; BHDPIP00001225; and BHDPIP00001421.

**32. Please state the number of consumers that have used the Company's services to address issues related to COVID-19, including the number of consumers that have utilized the Company's services following a diagnosis of COVID-19.**

The Company does not ask its users to provide this information nor does it track the number of users that have used the Company's services to address issues related to COVID-19 or following a diagnosis of COVID-19.

**From**: BetterHelp [contact@betterhelp.com]
**Sent**: 9/12/2020 12:35:53 PM
**To**: anj.ahearn@betterhelp.com
**Subject**: Fwd: Questions re HIPAA compliance

**Exhibit 114**

# Redacted fo r Privilege

How would you rate my reply?
Great Okay Not Good
On Mon, Mar 16, 2020 at 2:36 PM PDT, Amber Lyda <dr.amberlyda@gmail.com> wrote:
Thanks for getting back to me.

My understanding of HIPAA is that the only way you can be compliant is to provide a BAA or hold special status like being a "conduit" but I understand from your new Terms and Services that material from sessions is stored and can be viewed/read by BH staff. I have therapists ask me about this alot and I don't know how to respond...can you help?

Are ya'll moving to using a BAA?

I've also read the thing about FB having access to PHI (IP address for marketing purposes + the fact that they are a better help client = health information)...is that true? If not, can you help me understand so I can explain it to others who bring this info to me?

Thanks a bunch,
Amber

Be Well,
Amber

Amber Lyda, Psy.D.
Licensed Psychologist
https://www.dramberlyda.com/
561-508-8559

Due to the non-secure nature of e-mail, I cannot ensure the confidentiality of this communication. Please use discretion when sending information that is sensitive in nature. Also, please note that I do not maintain 24-hour access to e-mail accounts or voicemails. If you need immediate assistance, please go to your local emergency room or call 911. Other helpful resources may include:

1-800-273-8255 National Suicide Help Line
Crisis Text Line: Text START to 741-741

On Mon, Mar 9, 2020 at 12:12 PM PDT, BetterHelp <contact@betterhelp.com> wrote:
Hi Amber,

Thank you for your patience. We are HIPAA-compliant. More can be read about HIPAA here:
https://www.hhs.gov/hipaa/index.html

Our Terms and Conditions do not include a Business Associate Agreement. BetterHelp presently does not have a Business Associate Agreement that we sign with counselors. However, BetterHelp

does adhere to BAA standard with regards to data security and handling for PHI.

No identifiable information is ever shared.

Please let me know if you have any further questions.

Warm regards,
Christine
BetterHelp Team

*IMPORTANT: Please remember that online counseling is not appropriate for crisis situations. If you need immediate attention please call now 1-800-273-TALK (24 hours hotline). If you or anyone else might be in danger please call 911 or go to the nearest emergency room. Also, please note that this email was not written by a counselor and doesn't constitute as counseling.*

On Sat, Feb 29, 2020 at 11:21 AM PST, Amber Lyda <dr.amberlyda@gmail.com> wrote:
Hi there,
I'm reading through your privacy policy and have a few questions. I am a therapist trying to muddle through some recent rumors I've heard in my therapist-friend circles.

I'm not seeing anything in your privacy policy about being HIPAA compliant or offering a BAA. Are you and do you?

I've seen a recent article that brought up some questions for me about how FB may be accessing Protected Health Information and Individually Identifiable Data - can you clarify if that article was correct or if there is a misunderstanding? It's being passed around my therapy circles and I'd like to stop any misinformation from spreading if it's inaccurate. Here is the article: https://jezebel.com/the-spooky-loosely-regulated-world-of-online-therapy-1841791137?fbclid=IwAR23K2DZoJKNawrf0-uMDOrxLheEvt9NycGRxBo9I5Re_nPqUWDmWAlu24A

As licensed therapists we are required to provide a secure means to therapy, which does not allow Protected Health Information out in an identifiable way, but when I read the parts in the privacy policy and therapist agreement, it looks like there are exceptions made to that around marketing and third party companies like FB. Can you help me understand what, if any, identifiable information is being shared with entities that do not have a BAA with you?

Thanks so much,
Amber

Be Well,
Amber

Amber Lyda, Psy.D.
Licensed Psychologist
https://www.dramberlyda.com/
561-508-8559

Due to the non-secure nature of e-mail, I cannot ensure the confidentiality of this communication. Please use discretion when sending information that is sensitive in nature. Also, please note that I do not maintain 24-hour access to e-mail accounts or voicemails. If you need immediate assistance, please go to your local emergency room or call 911. Other helpful resources may include:

1-800-273-8255 National Suicide Help Line
Crisis Text Line: Text START to 741-741

**Exhibit 142**

# Redacted

How would you rate my reply?
Great Okay Not Good

On Fri, Oct 9, 2020 at 1:35 PM PDT, Redacted wrote:
Farrah,

Thank you for that straight, clear, and concise answer. I do very much appreciate finally receiving one.

However, because of the effort it required to get such an answer, I have chosen to move to change platforms for the time being.

This correspondence with BetterHelp began in late August and has moved into mid-October. All because I wanted clear answers about how private my information actually was after legitimate concerns arose. I would hope going forward that these inquiries are treated with more urgency and clarity.

It is my strongly held belief that sharing any cookies or information of any kind with any company that exists to monetize it's users should be stoppped immediately. This includes Pinterest and Snapchat, two companies I only learned BetterHelp partners with through this difficult process. Barring a cessation of such activity, BetterHelp's relationships with those companies should be more clearly and openly shared with users.

Thank you.

Redacted

On Fri, Oct 9, 2020 at 1:04 PM PDT, BetterHelp <contact@betterhelp.com> wrote:
Hello Redacted

I appreciate your continued patience -- we are taking this unique concern seriously and I wanted to ensure that I provided the correct information prior to response.

To confirm, Facebook is not given information about how often a user opens the app or how messages are sent. Neither is location data sent to Facebook. Facebook also does not track back to an individual user based on any of the Pixels that fire on the BetterHelp site. Your data is safeguarded using Data Loss Prevention (DLP) and other security measures acting similar to firewall rules so that your PHI and PII is protected and not exposed.

Warm regards,
Farrah
BetterHelp Team

*IMPORTANT: Please remember that online counseling is not appropriate for crisis situations. If you need immediate attention please call now 1-800-273-TALK (24 hours hotline). If you or anyone else might be in danger please call 911 or go to the nearest emergency room. Also, please note that this email was not written by a counselor and doesn't constitute as counseling.*
On Thu, Oct 1, 2020 at 1:33 PM PDT, Redacted wrote:

Farrah,

Is Facebook given information about how often I open the app and how often I send messages and my location? This is a very direct allegation made in the article and one that every single BetterHelp representative on this thread has avoided answering.

I struggle to comprehend why, if you all believe so strongly in privacy, that it has taken so long to get straight answers. I was suspicious of BetterHelp at the beginning of this ordeal and am now convinced this is an untrustworthy company. But, you now have very sensitive information of mine and I'd like to know what was shared with Facebook.

**Redacted**

On Thu, Sep 24, 2020 at 2:32 PM PDT, BetterHelp <contact@betterhelp.com> wrote:

Hello Redacted

Thank you for your patience as I reviewed your feedback and question further with our team. To confirm, BetterHelp does not share any PHI data with any third-party entities. The article inaccurately portrays data analytics tools as a major concern for privacy and attempts to raise baseless concerns. The reality is that most, if not all, businesses with an online presence use the same or similar analytics tools as a way to improve their user experiences. These types of analytics tools do not harvest any PHI as the article leads readers to believe.

At BetterHelp, our customers and their privacy are our primary concern. We have specifically developed our policies and processes for this very purpose, and in many instances have gone above and beyond regulatory requirements to protect our customers. BetterHelp fully stands behind our philosophy and reputation of protecting customer privacy and security.

Warm regards,
Farrah
BetterHelp Team

*IMPORTANT: Please remember that online counseling is not appropriate for crisis situations. If you need immediate attention please call now 1-800-273-TALK (24 hours hotline). If you or anyone else might be in danger please call 911 or go to the nearest emergency room. Also, please note that this email was not written by a counselor and doesn't constitute as counseling.*
On Thu, Sep 17, 2020 at 1:29 PM PDT, Redacted wrote:

It's important to note that Pinterest and Snapchat are both mentioned in the article, so thus far, it looks accurate on my end as I clearly saw that Snapchat and Pinterest were being sent information about my BetterHelp use.

On Thu, Sep 17, 2020 at 1:27 PM PDT, Redacted wrote:

Try again. I immediately got the pop up message: You Must Have Cookies Enabled to Use BetterHelp. I saw that cookies were sent to both Snapchat and Pinterest. Why would you send them information about my counseling? I seriously feel as if I am being misled at this point. But, rather than leave, I want to know what it going on since you now have very private information of mine.

I really do not understand what the trouble is in responding to the article. When you write "it sounds like you're referring to" it tells me you don't want to read and confront the details outlined. This is a privacy question that a client (me) has and your organization continues to tell me that privacy is priotized. Why is it so difficult to get a straight answer to this question? Again, I feel as though I am being intentionally misled. Why is it so hard for a clear, straight answer: the article is wrong OR the article is accurate? For the third time, here is the link: https://jezebel.com/the-spooky-loosely-regulated-world-of-online-therapy-1841791137 and here is a damning excerpt:

**"Facebook, for instance, is alerted every time a person opens the app, essentially signaling to the social media company how often we were going to a "session" and when we booked our appointments. (To confirm Facebook's retention of this information, we downloaded personal data from Facebook and identified the associated records from Better Help.) During a session with a therapist, we found that metadata from every message, though not its contents, was also sent to the social media company, meaning that Facebook knew what time of day we were going to therapy, our approximate location, and how long we were chatting on the app. When we asked about this directly, Better Help declined to elaborate on why a social media company needed to know quite so much about when and how we were asking for help- details that were connected to our Facebook profiles, and thus our identities, a process the social media company uses to sell targeted ads but which feels somewhat less nefarious when it's done to approximate shoe size rather than figure out how much distress a person is in."**

I am a client looking for privacy answers from a company that claims to take this seriously. Yet, weeks later, I am still unable to get a clear answer to a clear question. So how am to believe that this is all HIPAA compliant when you can't answer my questions?

Redacted

On Tue, Sep 15, 2020 at 4:05 PM PDT, BetterHelp <contact@betterhelp.com> wrote:

Hi Redacted

It sounds like you're referring to the use of *cookies and web beacons* that are collected by our site unless you **opt out of those being collected**, which you can easily do in your browser. As per our privacy policy, we use cookies and web beacons to **enable the technical operation of the Platform**, to administer your log-in to your account and to **collect the Log Data**. You can change your browser's settings so it will stop accepting cookies or to prompt you before accepting a cookie. *In some cases*, if you do not accept cookies you may not be able to use the Platform.

The Platform may also include the use of cookies and web beacons of services *owned or provided by third parties* that are not covered by our Privacy Policy and we do not have access or control over these cookies and web beacons. We may also use third party cookies for the purposes of web analytics, attribution and error management. I'm afraid I have no way to speak

to how "easy" or "difficult" it would be for these companies to piece together any information gathered by these beacons, but I can tell you that all the information you share with us is heavily encrypted and never sold or rented for any reason. It's 100% confidential and all communication is HIPAA-compliant.

Your nickname and year of birth cannot be changed on your end, but should be able to adjust this on mine. Our product team is working on an update that would allow users to change their username one time in the future, to make this easier. The reason it's not currently allowed is to prevent confusion on behalf of the counselors who work hard to monitor the progress of all their clients/members.

Let me know what you'd like me to change your name and birth year to and I'm happy to get that done.

If you're no longer interested in using our platform due to the nature of our privacy policy, I completely understand and can assist you with deactivating the account entirely.

Warm regards,
Aaron
BetterHelp Team

*IMPORTANT: Please remember that online counseling is not appropriate for crisis situations. If you need immediate attention please call now 1-800-273-TALK (24 hours hotline). If you or anyone else might be in danger please call 911 or go to the nearest emergency room. Also, please note that this email was not written by a counselor and doesn't constitute as counseling.*

On Fri, Sep 11, 2020 at 11:12 AM PDT, Redacted wrote:

> Also, I am unable to change my "nickname" on your platform. Same with my age. How many more emails will this take? I want to change this information immediately.
>
> On Fri, Sep 11, 2020 at 10:56 AM PDT, Redacted wrote:
>
> > Again, I'll provide you the link:
> >
> > https://jezebel.com/the-spooky-loosely-regulated-world-of-online-therapy-1841791137
> >
> > On Fri, Sep 11, 2020 at 10:53 AM PDT, Redacted wrote:
> >
> > > Finally, an attempt at a solution. I'll be editing that information and seeking outside confirmation that this was not somehow a HIPAA violation. Unreal that this took over two weeks.
> > >
> > > Now, about my data. You are attempting to portray BetterHelp as never selling my information but won't actually deny the details of the article. You only refer to "your information" or "information you shared" but the article clearly states what data you do share. It's the anonymized time and length and regularity and mode of my appointments. As the article states, it's not hard for these companies to piece together identities from this. Do you deny that Better Help sells this information to Facebook? I would like a clear answer before I proceed with BetterHelp. Especially after all of this irresponsibility.
> > >
> > > On Fri, Sep 11, 2020 at 9:53 AM PDT, BetterHelp <contact@betterhelp.com> wrote:
> > >
> > > > Hi Redacted

I'm sorry again for the long delay in response before, as this situation was only escalated to me yesterday. Our management team has reviewed this thread with Anthony (the previous representative you were working with) for quality assurance, as we can certainly understand your disappointment surrounding the poor quality of service you received.

**You can absolutely update this information** by simply scrolling all the way to the top of your message exchanges, and up to the top of your questionnaire responses (on a desktop). You'll find a green "**Update**" icon or hyperlink in the top-right corner you can click on to update any portion of the questionnaire you'd like. I've included a screenshot to show you what it should look like at the top of your questionnaire.

Yes, I can confirm that BetterHelp **will never sell or rent any information you shared on the platform** to third-parties.

Please let me know if you have any further questions.

Warm regards,
Aaron
BetterHelp Team

*IMPORTANT: Please remember that online counseling is not appropriate for crisis situations. If you need immediate attention please call now 1-800-273-TALK (24 hours hotline). If you or anyone else might be in danger please call 911 or go to the nearest emergency room. Also, please note that this email was not written by a counselor and doesn't constitute as counseling.*

On Thu, Sep 10, 2020 at 4:47 PM PDT, Redacted wrote:

> The last response took 8 days and this has been an ongoing problem for over two weeks. This should be considered an absolute failure on y'all's part.
>
> On Thu, Sep 10, 2020 at 4:38 PM PDT, Redacted wrote:
>
>> And how am I supposed to control this information now? I have no option to edit it. So if you are going to be so unapologetic about choosing who gets this information, I'd like to change it. How does any of this seem like the type of experience a person seeking counseling would appreciate? Seriously, answer that. How does Any of this seem helpful to people working up the courage to seek therapy?
>>
>> And if you don't sell info to Facebook, why is Jezebel reporting that you do? Can you clearly and without qualifiers deny that you sell the information that article says you? Or will you now try to make some petty distinction between "your information" and the details of my sessions the article outlines? Here's the link:
>>
>> https://jezebel.com/the-spooky-loosely-regulated-world-of-online-therapy-1841791137
>>
>> I seriously can't fathom how any of you find Any of this acceptable. What a headache.
>>
>> **Redacted**
>>
>> On Thu, Sep 10, 2020 at 4:27 PM PDT, BetterHelp <contact@betterhelp.com> wrote:

Hi **Redacted**

We sincerely appreciate your patience throughout this process, and I can certainly understand where you're coming from regarding your concerns about having your signup information shared with a professional counselor that you did not get to select directly. Before going on to address more of your *specific questions*, I'd like to share that our platform is 100% HIPAA-compliant, and any/all personal information that is shared with your counselor is **completely confidential between you and them**. Additionally, **we do not sell any of your information to Facebook** or other third parties.

On our landing page, you can scroll down a bit to learn the basics about the matching and communication processes. A little further down, there's a small FAQ section where you can get *even more details about this*. The "*Who will be helping me?*" section begins with "*After you sign up, we will match you to an available counselor who fits your objectives...*". If you click into "More frequently asked questions" you'll find many more. Two of those being "*How is my privacy protected?*" and "*Can I stay anonymous?*" which go into detail about how we **do not require you to use any personal information** (even your real name) when you create your account. **You can also select any day or year of birth you'd like**. This can help you ensure that *were you to be assigned a counselor you happened to know personally or have other concerns about your personal information being exposed to someone that you didn't trust*, it shouldn't be traceable back to you.

Furthermore, when you click "*Get Started*" to begin the intake questionnaire, at the top of the page it states "*Please fill out this short questionnaire to provide some general and anonymous background about you and the issues you'd like to deal with in online therapy. It would help us match you with the most suitable therapist for you. Your answers will also give this counselor a good starting point in getting to know you*." I can perhaps see why this may have still been confusing if you were still expecting to get to **choose your counselor** before the information is shared, so please know that we've discussed this internally and have provided feedback to our product team. They will consider updating the language to make this more clear.

Regarding matching you with a local counselors, this is based on state regulations put in place by each individual state licensing board. **Counselors are generally only able to work with a client that resides in their state(s) of licensure**. That said, many counselors are licensed in multiple states, so although any counselor you'd be paired with in our network **will be licensed in Texas**, they won't necessarily always **live in Texas**.

Please let me know if you have any further questions.

Warm regards,
Aaron
BetterHelp Team

*IMPORTANT: Please remember that online counseling is not appropriate for crisis situations. If you need immediate attention please call now 1-800-273-TALK (24 hours hotline). If you or anyone else might be in danger please call 911 or go to the nearest emergency room. Also, please note that this email was not written by a counselor and doesn't constitute as counseling.*

On Fri, Sep 4, 2020 at 11:59 AM PDT, Redacted wrote:

Hi support!

This is from the support page:
first-name : Redacted

last-name : Redacted

email : Redacted

message : My private information was shared with a counselor not of my choosing and without my permission. I demand to know why this is not covered by HIPAA. I have been seeking this answer for over a week and have received only poorly written and incompetent responses. This gross violation of privacy goes against any professional counseling ethics. Further, I learned that you sell yet more private information to Facebook. This is disgusting. This information makes clients easily identifiable and your platform takes 100% control of its dissemination. I have no ability to decide where that information is sent. Only you do. This seems like a violation of HIPAA and I demand to know what you plan to do about this.

support-type :

# Exhibit 2

# Transmittal Letter Withheld as Nonresponsive

# Transmittal Letter Withheld as Nonresponsive

**Response to Civil Investigative Demand Issued to BetterHelp, Inc.**

This serves as BetterHelp Inc.'s ("BetterHelp" or the "Company") response to the Civil Investigative Demand ("CID") issued to BetterHelp by the Federal Trade Commission ("FTC" or the "Commission") dated July 30, 2020, subject to the clarifications and limitations discussed during our meet and confer and memorialized in our letter to you dated August 28, 2020, in the letters from the Commission to BetterHelp dated September 2, 2020 and November 6, 2020. BetterHelp's investigation into this matter is ongoing, and, as agreed upon by BetterHelp and the Commission, BetterHelp is responding to the CID on a rolling basis and reserves the right to supplement these responses should it become aware of additional responsive documents or information.

BetterHelp objects to the requests in the CID to the extent they are overly broad, unduly burdensome, seek information protected by the attorney-client privilege or other applicable privileges or protections, and/or seek information not currently known to the Company. BetterHelp objects to the definition of "Health Information" in the CID as overbroad to the extent it includes categories of information such as "information collected in BetterHelp's intake questionnaire," or "information related to counseling," irrespective of whether that information is "individually identifiable." BetterHelp objects to the definition of "Personal Information" in the CID as vague and overbroad to the extent it includes any "information from or about an individual consumer," irrespective of whether that information is individually identifiable. BetterHelp objects to the definitions of Health Information and Personal Information to the extent they do not take into account whether such information is collected, used, stored, or disclosed in an anonymized, deidentified, aggregated, or encrypted form.

Production of these materials is not intended to waive any of BetterHelp's rights or remedies, all of which are expressly reserved. Production of these materials also is not intended to, and does not, waive any applicable privilege or other legal basis under which information may be protected from disclosure. If it were found that production of the enclosed materials constituted production of otherwise privileged matters, such disclosure would be inadvertent, and is not intended to, and does not, waive the attorney-client privilege or any other privileges or protections.

This production and the below responses contain confidential business information and competitively sensitive information of BetterHelp, including highly sensitive financial information, the disclosure of which would cause substantial competitive harm to BetterHelp. BetterHelp respectfully requests the information to be treated with the highest level of confidentiality available under all applicable statutes, rules, and regulations, including the Federal Trade Commission Act. This production and its exhibits also are exempt from disclosure under the Freedom of Information Act, 5 U.S.C. § 552, *et seq*. In addition, as these materials contain confidential information, they are further exempt from disclosure pursuant to the FTC Act, 15 U.S.C. §§ 46(f) and 57b-2, and all other applicable statutes, regulations, and operating procedures. We hereby request written notice of any request under the Freedom of Information Act or otherwise seeking access to this document, any information contained therein, or any documents produced in response to the CID, to enable us to substantiate the grounds for confidential treatment.

## I. Interrogatories

**A.** *State the Company's complete legal name, including all other names under which it does or has done business; principal place of business; corporate mailing address and telephone number; and date and state of incorporation.*

The Company's full legal name is Compile, Inc. doing business in California as BetterHelp, Inc. BetterHelp's principal address is 990 Villa St. Mountain View, CA 94041. BetterHelp's telephone number is (888) 688-9296. BetterHelp was incorporated on December 16, 2014 as a Delaware Corporation.

**B.** *Identify all current and former officers, directors, principals, and owners of the Company, specifying the period during which each person held each position; and all shareholders with 5 percent or more ownership of the Company, stating each shareholder's percentage of ownership.*

BetterHelp's officers and directors are Alon Matas (President), Adam Vandervoort (Treasurer), and Samantha Macina (Secretary). They have each held those positions since 2016. BetterHelp does not have a board of directors. BetterHelp is a wholly owned subsidiary of Teladoc Health, Inc. ("Teladoc"). As of August 17, 2020, the following shareholders owned five percent or more of Teladoc stock in the proportions identified below:

| Entity | Percent Owned |
|---|---|
| The Vanguard Group, Inc. | 8.09% |
| BlackRock Fund Advisors | 9.22% |
| JP Morgan Investment Management, Inc. | 6.07% |
| Baillie Gifford & Co. | 6.96% |

**C.** *Describe in detail the Company's corporate structure by identifying each parent, subsidiary, and affiliate of the Company (whether wholly or partially owned), and describe in detail the relationship between these entities, including a description of any agreement(s) between the Company and each entity (e.g., assignment of assets, service agreements, license agreements). In addition, state whether the Company has any current or former shareholders/owners, officers, directors, or principals in common with any of these entities.*

BetterHelp's parent company is Teladoc, a Delaware corporation. Teladoc's legal address is 2 Manhattanville Road, Suite 203, Purchase, NY 10577. BetterHelp is a wholly owned subsidiary of Teladoc. BetterHelp does not have any wholly owned or partially owned subsidiaries or



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY BH0008562

affiliates. Adam Vandervoort serves as Chief Legal Officer of Teladoc and Treasurer of BetterHelp.

**D.** *For each year, state the Company's number of employees by office, and describe, including through graphic representation (e.g., organizational charts), how authority and responsibility were distributed among employees within the Company. Your response should be sufficient to Identify all individuals who had the ability to control the Company's policies, practices, and procedures related to users' Personal Information.*

The below table shows the number of BetterHelp employees by year. All BetterHelp employees are based in the Company's principal office in Mountain View, CA.

| **Date** | **Employees** |
|---|---|
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |

A chart showing the organizational structure of BetterHelp as of August 1, 2020 is attached at BHDPIP00000006. A chart showing the organizational structure of BetterHelp as of August 1, 2019 is attached at BHDPIP00000005. A chart showing the organizational structure of BetterHelp as of August 1, 2018 is attached at BHDPIP00000004. A chart showing the organizational structure of BetterHelp as of August 1, 2017 is attached at BHDPIP00000003.

BetterHelp further refers the FTC to its response to Specification Q for a list of individuals with responsibility for BetterHelp's policies, practices, and procedures related to users' Personal Information.

**E.** *State, by year, the Company's annual gross and net revenues as well as its gross and net profits.*

| Year[1] | Gross Revenues | Net Revenues | Gross Profits | Net Profits |
|---|---|---|---|---|
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |

**F.** *Describe the Company's business model, as well as every product or service it furnishes to consumers.*

BetterHelp is an online counseling platform that offers access to licensed, trained, experienced, and accredited psychologists, marriage and family therapists, clinical social workers, and board licensed professional counselors. BetterHelp matches users with professional counseling, and facilitates counseling by direct messaging, live chat sessions, phone calls, and video conferences. The cost of counseling through BetterHelp ranges from $60 to $80 per week (billed monthly).

BetterHelp operates the following websites:

https://www.betterhelp.com/
https://www.mytherapist.com/
https://www.teencounseling.com/
https://www.faithfulcounseling.com/
https://www.pridecounseling.com/
https://www.icounseling.com/
https://www.regain.us/
https://www.terappeuta.com/

**G.** *For each product or service offered by the Company to consumers that involves the collection, use, storage, or disclosure of Personal Information:*

[1] BetterHelp reiterates its request for treatment of this non-public financial information with the highest level of confidentiality.



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY BH0008564

**1.** *Describe the functionality of the product or service;*

BetterHelp facilitates access to counseling services through an online platform. Users may access BetterHelp's service through BetterHelp's website and mobile applications, including the websites or mobile applications of BetterHelp's multi-sites (MyTherapist, TeenCounseling, Faithfulcounseling, PrideCounseling, iCounseling, Regain, and Terappeuta). In order to use BetterHelp's service, users create an account on the website or mobile application, and purchase a monthly subscription. After registering, users are matched with a counselor and may use the BetterHelp platform to communicate with the counselor through direct text messaging, live chat, phone calls, or video conference. Users also may use the platform to compose and share journal entries with their counselor, post questions for counselors to answer using the "Ask a Counselor" feature, or attend virtual "webinars.".

**2.** *State the time period(s) during which the product or service was or has been available;*

BetterHelp's online counseling platform has been available since 2013.

**3.** *State the cost of the product or service;*

The cost of counseling through BetterHelp ranges from $60 to $80 per week (billed monthly).

**4.** *State, by year, the total number of that product or service sold (i.e., the number of users) and the gross revenues attributable to the sale of that product or service (both in the U.S. and worldwide);*

| **Year**[2] | | **Paid Users (U.S.)** | | **Gross Revenues (U.S.)** |
|---|---|---|---|---|
| 2017 | **Redacted** | [redacted] | **Redacted** | [redacted] |
| 2018 | | [redacted] | | [redacted] |
| 2019 | | [redacted] | | [redacted] |

**5.** *Describe the account creation process, including any information that users are or have been solicited to supply, and any*

[2] BetterHelp reiterates its request for treatment of this non-public financial information with the highest level of confidentiality.

*representations users are or have been presented during that process;*

In order to create a BetterHelp account, users click the "Get started" link on the BetterHelp landing page. Users then complete a questionnaire, which includes approximately fifteen multiple choice questions regarding the user's background, counseling preferences, and financial status. Each question appears individually in a pop-up box after the user clicks a response to the prior question. The particular questions an individual user is asked depends on their responses and which multi-site they use to create an account. A complete list of questions that may appear in the questionnaire for each BetterHelp site is produced at BHDPIP00000094. Any individual user is only asked a subset of the questions that appear on that site.

While users are completing the questionnaire, a banner appears at the bottom of the screen that contains the following disclosure: "We use BetterHelp and third-party cookies and web beacons to help the site function properly, analyze usage, and measure the effectiveness of our ads. Read our Privacy Policy to learn more." The disclosure contains a hyperlink to BetterHelp's Privacy Policy. The banner appears on each page of the questionnaire until the user clicks the "OK" button or closes the banner. An image of this banner is shown below.[3]




Each question in the questionnaire appears in a pop-up box that contains the question, answer choices, and, for certain questions, additional statements related to the question as described further below:

- The pop-up box that contains the question, "How old are you?," also states: "Did you know? Almost a fifth of older adults in the United States have experienced depression. (Geriatric Mental Health Foundation, 2008)."
- The pop-up box that contains the question, "How would you rate your current physical health?," also states: "Studies

[3] Prior to October 2020, the banner stated: "We use cookies to help the site function properly, analyze usage, and measure the effectiveness of our ads. We never sell or rent any information you share with us. Read our Privacy Policy to learn more." BetterHelp is in the process of conforming the banner across all multi-sites.



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY BH0008566

show that exercise can help with depression as effectively as antidepressant medication. (*Psychosomatic Medicine*, 2007)."

- The pop-up box that contains the question, "Are you currently experiencing overwhelming sadness, grief, or depression?," also states: "Psychotherapy can serve as an effective treatment for clinical depression."

- The pop-box that contains the question, "Are you currently experiencing anxiety, panic attacks or have any phobias?," also states: "Some symptoms of panic attacks include a racing heart, dizziness, or chest pains."

- The pop-up box that contains the question, "Are you currently taking any medication?," also states: "Rest assured – this information will stay private between you and your counselor."[4]

- The pop-up box that contains the question, "How would you rate your current sleeping habits?," also states: "Many adults who have generalized anxiety disorder also suffer from sleep problems."

After completing the questionnaire, the user is then directed to a page where they may create a BetterHelp account. Users must create a BetterHelp account in order to be matched with a counselor and begin communicating with a counselor. In order to create an account, users provide a first name or nickname and email address, and create a password. Alternatively, users may create an account using their Facebook or Google log in credentials.

In order to create an account, users also must agree to the BetterHelp Terms and Conditions by checking a box next to the following statement: "I agree to the terms and conditions." This statement contains a hyperlink to the BetterHelp Terms and Conditions. By agreeing to the BetterHelp Terms and Conditions, users also agree to the BetterHelp Privacy Policy. As described further in response to Specification I, the BetterHelp Terms and Conditions and Privacy Policy contain disclosures regarding BetterHelp's policies and practices related to collection and disclosure of users' Personal Information.

---

[4] Prior to December 2020, the pop-up box stated: "Rest assured – any information provided in this questionnaire will stay private between you and your counselor."

After entering information to create an account and agreeing to the Terms and Conditions and Privacy Policy, users must then enter a 3-digit verification code that is automatically sent to the e-mail address they entered to create an account.

After verifying the email address, users are then asked two additional multiple choice questions regarding their counselor preferences, and one additional question ("What brings you here?") that users may answer in a free-form text box.

Users are then directed to a payment page where they can pay for their BetterHelp subscription by credit card, or using GooglePay or PayPal. The payment page also contains additional information regarding next steps in using the BetterHelp service, matching and communicating with a counselor, the cost of the service, and other differences between BetterHelp and traditional "in office" counseling.

After entering their payment information, users are asked to provide emergency contact information, including their full name, street address, and phone number. The page on which users enter emergency contact information also contains the following statement: "The emergency contact information is used to comply with counseling regulations and ethical code. It can be useful, for example, in case your counselor believes you are in immediate danger, so please enter it correctly. This information is stored safely and will be accessed only in case of emergencies. "

The foregoing description summarizes the account creation process on the BetterHelp website. The account creation process on BetterHelp's mobile application, and on the websites and mobile applications of BetterHelp's multi-sites is generally similar to the account creation process on BetterHelp's website. Differences with respect to information that users are solicited to supply, and representations presented to users during the account creation process on BetterHelp's multi-sites are described further below.

On the Faithful Counseling, iCounseling, Pride Counseling, and Teen Counseling multi-sites, the account creation page contains the below statement:




Users who create an account on the Regain multi-site, which facilitates individual as well as couples' counseling, may invite their partner to join the account. Users who select this option are requested to enter their partner's first name, email address, and a phone number, which is optional. If a user enters their partner's email address, their partner receives an automatic email containing an invitation to register on the Regain site. In order to register, the partner must click a link in the automatic email, which directs them to a page to enter their email address and password. Partners must also agree to the Terms and Conditions, and the Privacy Policy. After partners verify their email to complete the registration, a page with the following statement appears: "You are now part of a joint counseling page with [partner's name]. Please remember that all written communication is visible to you, your partner, and your counselor. If you'd like to speak privately with your counselor, you can book a live phone or video session ahead of time."

Users who register an account on the Teen Counseling site are requested to provide their parent's email address. Parents whose email address are provided receive an automatically generated email informing them of the account registration and providing a link to a page where they may sign a consent form and provide payment information. Before the email is sent, the user is shown the below preview of the email:



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY BH0008569


Email Preview

This is the email that will be sent to your parent. The link will take them to a page which explains the service, and lets them fill out a consent and payment form.

Any information about why you are seeking counseling will only be shared with your counselor.

**From:** Teencounseling.com
**Subject:** ~nik wants to talk to a licensed counselor

Dear ~nik,

~nik wants to talk to a licensed counselor on Teencounseling.com. The service is available only after a consultation and consent from a parent or legal guardian.

Please click here for more information.

Note: **Please do not share this link**, it is only meant to be used by one parent or guardian to log in.

If you have any questions or concerns, please let us know by replying to this email.

Thanks,
Teen Counseling Team

Close

The consent form is shown below:

1. I give permission for Teen Counseling to provide online counseling services to this minor.
2. I understand my consent covers online counseling services offered by licensed independent counselors who are contracted by Teen Counseling.
3. I understand that I can change my mind later on and decide I do not want this minor to get services through Teen Counseling. If I change my mind, I will follow the instructions on Teen Counseling to cancel these services. I understand that this consent form remains valid until I follow the procedures to cancel the services.
4. I understand that information shared by this minor is confidential with the following exceptions: imminent risk of harm to self or others, disclosure of abuse or neglect, or disclosure of another minor or elderly individual being abused or neglected.
5. I have the sole right to consent to mental health treatment for this minor. I am not legally mandated to confer with or get consent from any other legal guardian for mental health treatment for this minor.

Electronic Signature

Your name

Today's date

10/12/2020

Complete Consent Form

**6.** *List every website or mobile application through which the product or service is offered;*

**Websites:**

https://www.betterhelp.com/
https://www.mytherapist.com/
https://www.teencounseling.com/
https://www.faithfulcounseling.com/
https://www.pridecounseling.com/
https://www.icounseling.com/
https://www.regain.us/
https://www.terappeuta.com

**Mobile Applications:**

BetterHelp
MyTherapist
Teen Counseling
Faithfulcounseling
PrideCounseling
Regain
Terappeuta

**7.** *List each type of Personal Information that is collected, used, disclosed, or stored in connection with the product or service; and*

As a general matter, BetterHelp collects and stores all information that users provide to BetterHelp while using the platform, and data reflecting user and subscriber activity on the platform. [redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted] [redacted]

[redacted]

| | | | |
|---|---|---|---|
| [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] |

**H.** *For each type of Personal Information identified in response to Specification G.7:*

**1.** *Describe all methods and manners in which that type of Personal Information is collected, used, stored, and disclosed;*

[redacted]

[redacted]

[redacted]

[redacted]

**2.** *State the length of time that the Company retains such Personal Information; and*

[redacted]

**3.** *Describe each purpose for which that type of Personal Information is collected, used, stored, or disclosed.*

[redacted]

[redacted]



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY BH0008575

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

**I.** *Describe each representation the Company has made publicly and/or to individual consumers relating to the collection, use, disclosure, storage, or deletion of Personal Information, including the date(s) of the*

*representation, the source of the representation (e.g., the Company's website, email, privacy policy, terms of use, or other method), and whether the Company has modified or changed the representation during the applicable time period (including the reason for and date of any such change). The representations should include but are not limited to:*

**1.** *any standard notices or disclosures the Company provides to users at the time their Personal Information is collected;*

All users of BetterHelp's service must agree to BetterHelp's Terms and Conditions (BHDPIP00000001) and Privacy Policy (BHDPIP00000002), which contain detailed disclosures regarding BetterHelp's collection, use, disclosure, storage, and deletion of Personal Information.

The Terms and Conditions include disclosures regarding BetterHelp's security and privacy practices and incorporates the Privacy Policy. The Privacy Policy describes in further detail, among other things, BetterHelp's practices related to information collection, use, and disclosure; use of cookies and web beacons; and use of third party service providers. The Privacy Policy also contains disclosures related to the General Data Protection Regulation (GDPR) and the California Consumer Privacy Act (CCPA).

Since August 2017, BetterHelp has periodically updated the Terms and Conditions and Privacy Policy. Each version of the Terms and Conditions and Privacy Policy applicable during this period is produced at BHDPIP00000001 to BHDPIP00000002 and BHDPIP00000050 to BHDPIP00000061. The changes related to Personal Information are summarized below:

- On or around September 14, 2018, BetterHelp added a new section to the Privacy Policy, which included additional information related to users from the European Union consistent with the General Data Protection Regulation (GDPR). (BHDPIP00000052).

- On or around November 13, 2018, BetterHelp undertook a comprehensive review of the Terms and Conditions and Privacy Policy, including revising the sections in the Privacy Policy related to Information Collection and Use, Security, International Transfer, Compliance with Law Enforcement, and GDPR. (BHDPIP00000054; BHDPIP00000055).

- On or around September 17, 2019, BetterHelp updated the Privacy Policy, including revising the section on Information Collection, Use, and Disclosure, and adding a section related to opting out of marketing communications. (BHDPIP00000056).

- On or around December 31, 2019, BetterHelp updated the Privacy Policy, including revising the section on Information Collection, Use, and Disclosure, and adding a Privacy Notice for California Residents consistent with the California Consumer Privacy Act of 2018 (CCPA). (BHDPIP00000058).

- On or around February 27, 2020, BetterHelp updated the Privacy Policy, including revising the section on Information Collection, Use, and Disclosure. (BHDPIP00000060).

- On or around September 11, 2020, BetterHelp updated the Privacy Policy, including revising the section on Information Collection, Use, and Disclosure to conform similar language in the Privacy Notice for California residents, and revising the GDPR Notice. (BHDPIP00000002).

In addition to the Privacy Policy and Terms and Conditions, the BetterHelp Frequently Asked Questions page, available at https://www.betterhelp.com/faq/, includes the question, "How is my privacy protected?" and a response, copied below, which discusses protection of messages between users and counselors.



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY BH0008578

How is my privacy protected?

We are totally obsessed about securing your privacy and confidentiality. We have built a state-of-the-art technology, operation, and infrastructure with one thing in mind: protecting your privacy and safeguarding the information you provide. Our privacy and confidentiality standards are by far more advanced than what is required by law or regulations, so you can feel safe and comfortable.

- You don't need to identify yourself (see more about staying anonymous here).
- Everything you tell your counselor is protected by strict federal and state laws.
- We don't cooperate or work with any insurance companies or employers, so nothing needs to be shared, reported or filed with them.
- You can always click the "Shred" button next to each message that you've sent so it will no longer show in your account.
- All the messages between you and your counselor are secured and encrypted by banking-grade 256-bit encryption.
- Our servers are hosted in an "A Grade" facility, ensuring the best-in-class security and protection.
- Our browsing encryption system (SSL) follows modern best practices, providing world class online security and encryption.
- Our databases are encrypted and scrambled so they essentially become useless in the very unlikely event that they are being stolen or inappropriately used.

If you wish for any of your information or records to be released to a third party, please let your counselor know. Your counselor will send you an authorization form that you will need to fill and sign before your information can be released.

As described further in response to Specification G.5, certain pages visited by users during the account creation process contain statements regarding use of cookies and web beacons, and use of information regarding medication history, user email addresses, and emergency contact information.

The page containing the "Ask a Counselor" feature contains the following disclosure: "Note that this question will be public when answered. Avoid any personal details that can be used to identify you."

The page where users register for a Groupinar contains the disclosures shown below:

How do I join the Groupinar?

Choose the Groupinar you would like to attend and click on "register". You will be anonymously registered with the initials of the first and last letter of your BetterHelp nickname. The instructions on joining the Groupinar will be sent directly to your email. You can also download the ClickMeeting Webinar app to participate in the Groupinar on your mobile device.




**2.** *any standard notices or disclosures the Company provides to users prior to disclosing their Personal Information to a third party, including but not limited to the mechanism by which the Company discloses to users the type or Identity of each third party receiving the Personal Information;*

The BetterHelp Privacy Policy contains disclosures regarding the types of third parties that may receive Personal Information, including the following disclosures:

- "To let us operate the Platform effectively and to let you use the Platform, including the Counselor Services, we may have to collect your personally identifiable information (such as, but not limited to, your name, phone number, email address, and address), billing and payment information, profile information, log data (information such as your computer, Internet Protocol address ("IP"), pages that you visit and the amount of time spent on those pages, actions you take and other statistics), information related to the Counselor Services or your need for Counselor Services, and any information which is exchanged between you and your Counselor (collectively the "Information"). In some cases, some of the Information that you give to us is considered health related data.. . ." (BHDPIP00000002, at 1).

- User information "may be used or disclosed to third parties for one or more of the following business or marketing purposes: . . .

    - To match you with a Counselor.

    - To enable and facilitate the Counselor Services.

    - To supervise, administer and monitor the service.

- To measure and improve the quality, the effectiveness and the delivery of our services.
- Market the Platform and Counselor Services to you.

. . .

- To personalize your Website experience and to deliver content and product and service offerings relevant to your interests, including targeted offers and ads through our Websites, third-party sites, and via email or text message (with your consent, where required by law)."

(BHDPIP00000002, at 1–2).

- "Like many websites, we use 'cookies' and 'web beacons' to collect information. A "cookie" is a small data file that is transferred to your computer's hard disk for record-keeping purposes. A "web beacon" is a tiny image, placed on a Web page or email that can report your visit or use. We use cookies and web beacons to enable the technical operation of the Platform, to administer your log-in to your account and to collect the Log Data. You can change your browser's settings so it will stop accepting cookies or to prompt you before accepting a cookie. However, if you do not accept cookies you may not be able to use the Platform. The Platform may also include the use of cookies and web beacons of services owned or provided by third parties that are not covered by our Privacy Policy and we do not have access or control over these cookies and web beacons. We may also use third party cookies for the purposes of web analytics, attribution and error management." (BHDPIP00000002, at 2).
- "We cooperate with government and law enforcement officials to enforce and comply with the law. We may disclose information necessary or appropriate to protect the safety of the public or any person, to respond to claims and legal process (including but not limited to subpoenas), and to prevent or stop activity that may be illegal or dangerous. You should also be aware that Counselors may be obliged to disclose information to law enforcement or other authorities to conform to their professional and legal responsibilities. . . ." (BHDPIP00000002, at 4).

BetterHelp further refers the FTC to its response to Specification I.1.

**3.** *any representations to users stemming from Jezebel's February 19, 2020 publication of the article: "The Spooky, Loosely Regulated World of Online Therapy" by Molly Osberg and Dhruv Mehrotra, including press statements or responses provided to consumer inquiries;*

BetterHelp refers the FTC to the documents produced in response to Specification EE, which contain BetterHelp's responses to inquiries from users regarding the above-referenced article identified based on a search using the parameters set forth in the letter from the FTC to BetterHelp dated November 6, 2020.

**4.** *any Advertisement relating to the collection, use, disclosure, storage, or deletion of Personal Information, including Advertisements using the phrase "100% private"; and*

BetterHelp refers the FTC to the documents produced at BHDPIP00000121 to BHDPIP00000127, which contain tables showing the text of BetterHelp advertisements displayed on: [redacted]

[redacted]

[redacted]

5 [redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

BetterHelp further refers the FTC to the documents produced at BHDPIP00000130 to BHDPIP00000140, which include radio advertisements promoting BetterHelp. Certain of these advertisements used the following language or similar language: "Connect with your professional counselor in a safe and private online environment."

**5.** *any representation relating to the Health Insurance Portability Accountability Act, including all uses of the following graphic:*

A hyperlink with the above-referenced graphic is included in the footer of the BetterHelp site. By clicking this graphic, users are directed to the following url: https://www.hhs.gov/hipaa/index.html. In response to inquiries from users, BetterHelp customer service representatives have stated that the BetterHelp platform is HIPAA compliant, *see, e.g.*, BHDPIP00001090, and that HIPAA imposes medical records retention requirements, *see, e.g.*, BHDPIP00001112.[6]

**J.** *Describe the means by which the Company obtains consent from users relating to the collection, use, disclosure, or storage of Personal Information, including the means by which the Company enables users to opt into or out of the disclosure of their Personal Information to third parties.*

In order to sign up for BetterHelp's service, users must agree to BetterHelp's Terms and Conditions ("Terms and Conditions) and Privacy Policy ("Privacy Policy"). The Privacy Policy describes BetterHelp's policies and practices related to the collection, use, disclosure, and storage of Personal Information as defined in the CID, including the means by which users may choose or request not to disclose their Personal Information to third parties. A copy of the Terms and Conditions is attached as BHDPIP00000001. A copy of the Privacy Policy is attached at BHDPIP00000002.

---

[6] As previously discussed, BetterHelp has redacted personally identifiable information from communications with users before production, including communications obtained [redacted] In addition, in order to extract reviewable versions of responsive communications from [redacted] for production, each of these communications had to be forwarded from [redacted] to a BetterHelp email address, and produced from that email address. The email reflecting the forwarding of each communication for purposes of production also has been redacted.

**K.** *Identify each third party, excluding licensed therapists, to which the Company has disclosed any user's Personal Information, and, for each such third party:*

**1.** *Describe the specific products and services that third party provided to the Company, as well as how users' Personal Information related to each product or service (i.e., the purposes for the disclosures);*

BetterHelp refers the FTC to the table produced at BHDPIP00000049, which describes the purpose for which each third party service was used.

**2.** *List the specific types and amount (i.e., the number of users) of Personal Information disclosed to that third party for each of the third party's services or products;*

BetterHelp refers the FTC to the table produced at BHDPIP00000049, which lists the type of Personal Information disclosed to each third party. BetterHelp further refers the FTC to its response to Specification G.8, which provides the total number of visitors to BetterHelp's websites, users who signed up for BetterHelp's service, and users who paid for the service.

**3.** *State whether the disclosed Personal Information was de-identified, anonymized, pseduonymized or otherwise de-personalized, and, if so, how;*

BetterHelp refers the FTC to the table produced at BHDPIP00000049, which reflects that Personal Information disclosed to third parties generally is not disclosed in a form that is personally identifiable. [redacted]

**4.** *Describe the contractual arrangements relating to such disclosures, including who at the Company was responsible for entering into and overseeing those contractual arrangements, and any compensation You received for such disclosures (including free or discounted services); and*

BetterHelp refers the FTC to the agreements produced at BHDPIP00000008 to BHDPIP00000048, BHDPIP00000064 to BHDPIP00000084, and BHDPIP00001117 in response to Specification BB, and to BetterHelp's response to Specification O describing those agreements. BetterHelp employees responsible for entering into and overseeing the contractual arrangements reflected in these agreements include the individuals with responsibility for the function for which the third party product or service is used,

including Alain Adler (engineering), Danny Bragonier (marketing), Rushabh Gandhi (website applications), as well as counsel Anjali Ahearn.

**5.** *Describe the date, scope, and result of any request You made for the third party to delete the Personal Information it received from the Company.*

[redacted]

**L.** *Identify each third party from which a user can import data to the Company's products or services, or to which a user can export data from the Company's products or services, and describe the types of data that a user can import from or export to each such third party.*

When creating a BetterHelp account, users have the option of signing in to BetterHelp through their Facebook or Google account, which imports their name and email address from those accounts into their BetterHelp account. Users also have the option of paying for their BetterHelp subscription by importing their PayPal or Google Pay account information.

**M.** *Identify each third-party Software Development Kit and Application Program Interface integrated into or utilized by the Company's products or services, and describe the types of user data disclosed to a third party in connection with each such Software Development Kit or Application Program Interface.*

[redacted]

- [redacted]
- [redacted]
- [redacted]
- [redacted]
- [redacted]
- [redacted]
- [redacted]
- [redacted]
- [redacted]
- [redacted]
- [redacted]
- [redacted]
- [redacted]

[redacted] [redacted]

[redacted]

All Personal Information disclosed in connection with these services is identified in BHDPIP00000049.

**N.** *To the extent not otherwise stated in Your response to Specifications G, H, and K, describe* ***Your use of any Facebook products and services*** *(e.g., Analytics, Advertising, Log-in, Custom Audiences, Lookalike Audiences),* ***and identify what Personal Information and App Events*** *were disclosed to, or collected by, Facebook in connection with each product or service You used (including* ***the number of users for each type of Personal Information and App Event was shared****).*

[redacted]

[redacted]

[redacted]

| [redacted] | [redacted] | [redacted] | [redacted] |
|---|---|---|---|
| [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | |
| [redacted] | [redacted] | [redacted] | |
| [redacted] | [redacted] | [redacted] | |



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY 

| | | | |
|---|---|---|---|
| [redacted] | [redacted] | [redacted] | |
| [redacted] | [redacted] | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | | |
| [redacted] | | | |
| [redacted] | | | |
| [redacted] | | | |
| [redacted] | | | |
| [redacted] | | | |
| [redacted] | | | |
| [redacted] | | | |
| [redacted] | | | |
| [redacted] | | | |
| [redacted] | | | |
| [redacted] | | | |
| [redacted] | | | |

As reflected in BHDPIP00000049 and in BetterHelp's response to Specification H.3, BetterHelp uses Facebook products to market and advertise its services, optimize its advertising on Facebook's platform, including more effectively targeting BetterHelp's advertising to potential users and delivering content relevant to those users, and assess the effectiveness of its marketing and advertising. All Personal Information disclosed to Facebook in connection with these services is identified in BHDPIP00000049.

**O.** *Describe in detail the Company's* ***policies, practices, procedures, and relationships regarding the collection, use, storage, disclosure, and destruction of Personal Information****, including, but not limited to, those concerning de-identification, anonymization, pseudonymization, or other de-personalization, if any, prior to sharing with a third party. Explain the reason (including whether it was to comply with a law or regulation) for any changes to these policies, practices, procedures, and relationships during the applicable time period.*

As described further in BetterHelp's response to Specifications I.1 and I.2, BetterHelp's Terms and Conditions and Privacy Policy describe BetterHelp's policies and practices regarding the collection, use, storage,

disclosure, and destruction of Personal Information. The Privacy Policy describes in detail, among other things, BetterHelp's practices related to information collection, use, and disclosure; use of cookies and web beacons; and the various types of third parties that may receive Personal Information.

Additional policies and procedures related to BetterHelp's data privacy and security practices are produced at BHDPIP00000085 to BHDPIP00000093, including the following:

- Global Privacy and Security Incident Investigation Policy (BHDPIP00000087), which relates to investigating, responding to, and reporting privacy and security incidents.
- Global Privacy and Security Training Policy (BHDPIP00000088), which relates to training of employees on the privacy and security of PII and PHI.
- Requests to Amend PHI (BHDPIP00000092), which relates to responding to requests for an amendment or change to their PHI.
- Compliance Policy (BHDPIP00000085), which relates to security compliance reviews.
- Incident Notification Policy (BHDPIP00000089), which relates to notification of breaches of PHI.
- Mobile Device Policy (BHDPIP00000090), which relates to use of mobile devices.
- ePHI Controls Policy (BHDPIP00000086), which relates to practices for examining and monitoring of systems containing electronic personal PHI.
- Remote Access Policy (BHDPIP00000091), which relates to remote access to the Company's systems.
- Workstation Security Policy (BHDPIP00000093), which relates to use of desktop and laptop systems.

BetterHelp administers a training for all new employees and for all existing employees on an annual basis related to BetterHelp's privacy and security policies.

BetterHelp's disclosure of Personal Information to third parties, and third parties' use of that information is subject to the limitations set forth in the terms and conditions applicable to those products and services, which are

produced at BHDPIP00000008 to BHDPIP00000048, BHDPIP00000064 to BHDPIP00000084, and BHDPIP00001117.

[redacted]

[redacted]

[redacted]

[redacted]

**P.** *Describe any audits, assessments, or compliance reviews conducted by You or on Your behalf related to the policies, procedures, practices, or relationships described in Your response to Specification O.*

[redacted]

**Q.** *Identify all person(s) at the Company responsible for designing, implementing, enforcing, or maintaining the policies, procedures, practices, and relationships described in Your response to Specification O. For each such person, state his or her job title and responsibilities during the applicable period, as well as the dates they held those titles and responsibilities.*

The below table identifies individuals responsible for BetterHelp's policies, practices, procedures, and relationships regarding the collection, use, storage, disclosure, and destruction of Personal Information.

| Name | Title | Dates | Role |
|---|---|---|---|
| Alain Adler | Head of Engineering | July 2017–present | Responsible for managing engineering team |

| | | | |
|---|---|---|---|
| Anjali Ahearn | Vice President and Corporate Counsel | February 2019–present | In-house counsel to BetterHelp |
| Michael Aldridge | Director of Information Technology | February 2020–June 2020 | Responsible for managing information technology operations |
| Danny Bragonier | Co-Founder and Director of Sales Operations | January 2015–present | Responsible for managing marketing operations |
| Sharon Cohen | Head of Security | September 2019–present | Responsible for managing information security operations |
| Rushabh Gandhi | Director of Product | June 2018–present | Responsible for development and maintenance of websites and application |
| Alon Matas | President and Founder | January 2015-present | Responsible for company-wide policy |

**R.** *To the extent not otherwise stated in Your responses to these Specifications, describe any changes You have made to Your policies, procedures, or practices since Jezebel's February 19, 2020 publication of the article "The Spooky, Loosely Regulated World of Online Therapy" by Molly Osberg and Dhruv Mehrotra.*

[redacted]

[redacted]

**S.** *State whether the Company is subject to the Health Insurance Portability Accountability Act.*

BetterHelp is subject to the Health Insurance Portability Accountability Act ("HIPAA") in its capacity as a "business associate" to counselors at BetterHelp.

**T.** *Identify all person(s) at the Company who have participated in the preparation of responses to this CID.*

The following persons at the Company have participated in the preparation of responses to this CID:

Alain Adler
Anjali Ahearn
Danny Bragonier
Sam Broer
Rushabh Gandhi
Jessica Honbarger
James Imrie
Farrah Moore
Christopher Piwarski

## II. Document Requests

**U.** *Each different organization chart in effect during the applicable time period.*

Documents responsive to this request are produced at BHDPIP00000003 to BHDPIP00000006.

**V.** *A family tree of the Company and its parents, subsidiaries, and affiliates.*

A document responsive to this request is produced at BHDPIP00000007.

**W.** *An electronic copy of each materially different version of the App.*

An electronic copy of the BetterHelp mobile application and the mobile applications for each of the BetterHelp multi-sites is available at the links provided below. BetterHelp does not maintain historic copies of the BetterHelp mobile applications in the ordinary course of business.

BetterHelp

Android:
https://play.google.com/store/apps/details?id=com.betterhelp&hl=en_US&gl=US

iOS:
https://apps.apple.com/us/app/betterhelp-online-counseling/id995252384

MyTherapist

Android:
https://play.google.com/store/apps/details?id=com.mytherapist&hl=en_US&gl=US

iOS:
https://apps.apple.com/us/app/mytherapist-counseling/id1249032168

Teen Counseling

Android:
https://play.google.com/store/apps/details?id=com.teencounseling&hl=en_US&gl=US

iOS:
https://apps.apple.com/us/app/teen-counseling/id1206966896

Faithful Counseling

Android:
https://play.google.com/store/apps/details?id=com.faithfulcounseling&hl=en_US&gl=US

iOS:
https://apps.apple.com/us/app/faithful-counseling/id1290989821

Pride Counseling

Android:
https://play.google.com/store/apps/details?id=us.regain&hl=en_US&gl=US

iOS:
https://apps.apple.com/us/app/pride-counseling/id1295966295

Regain

Android:
https://play.google.com/store/apps/details?id=us.regain&hl=en_US&gl=US

iOS:
https://apps.apple.com/us/app/regain-couples-therapy/id1206964049

Terappeuta

Android:
https://play.google.com/store/apps/details?id=com.terappeuta&hl=en_US&gl=US

iOS:
https://apps.apple.com/us/app/terappeuta/id1220973919

**X.** *Documents sufficient to show each materially different representation made to consumers relating to the collection, use, storage, or disclosure of Personal Information, including Advertisements, and screenshots of the consent flows or permission screens, as described in Your response to Specification I.*

Documents responsive to this request are produced at BHDPIP00000001 to BHDPIP00000002, BHDPIP00000095 to BHDPIP00000140, BHDPIP00000142 to BHDPIP00000152, and BHDPIP00001090 to BHDPIP00001112.

**Y.** *Documents sufficient to show the details of any disclosures of Personal Information to third parties as well as any deletion requests described in Your response to Specification K.*

Documents responsive to this request are produced at BHDPIP00000049 and BHDPIP00000141.

**Z.** *All Documents concerning the disclosure of Personal Information or App Events to Facebook.*

Documents responsive to this request are produced at:

BHDPIP00000157, BHDPIP00000159 to BHDPIP00000179, BHDPIP00000191 to BHDPIP00000196, BHDPIP00000291 to BHDPIP00000319, BHDPIP00000365 to BHDPIP00000450, BHDPIP00000459, BHDPIP00000478 to BHDPIP00000528, BHDPIP00000542 to BHDPIP00000572, BHDPIP00000582 to BHDPIP00000611, BHDPIP00000613 to BHDPIP00000615, BHDPIP00000617, BHDPIP00000649 to BHDPIP00000671, BHDPIP00000675 to BHDPIP00000695, BHDPIP00000737 to

BHDPIP00000768, BHDPIP00000817 to BHDPIP00000828, BHDPIP00000831 to BHDPIP00000858, BHDPIP00000861 to BHDPIP00000862, BHDPIP00000865 to BHDPIP00000911, BHDPIP00000922 to BHDPIP00000926, BHDPIP00000934 to BHDPIP00000955, BHDPIP00000965 to BHDPIP00000969, BHDPIP00000981 to BHDPIP00000987, BHDPIP00000998, BHDPIP00001012 to BHDPIP00001029, BHDPIP00001031 to BHDPIP00001035, BHDPIP00001037 to BHDPIP00001039, BHDPIP00001077 to BHDPIP00001079, BHDPIP00001083, BHDPIP00001105, and BHDPIP00001115.

**AA.** *Each materially different Document constituting a policy or procedure identified pursuant to Specification O, including each different privacy policy, terms of service, and terms of use.*

Documents responsive to this request are produced at BHDPIP00000050 to BHDPIP00000061 and BHDPIP00000085 to BHDPIP00000093.

**BB.** *Each materially different Document constituting a contract entered into by the Company that relates to its disclosure of Personal Information.*

Documents responsive to this request are produced at BHDPIP00000008 to BHDPIP00000048, BHDPIP00000064 to BHDPIP00000084, and BHDPIP00001117.

**CC.** *Documents sufficient to show the assessments, audits, and compliance reviews described in Your response to Specification Q.*

Documents responsive to this request are produced at BHDPIP00000062, BHDPIP00000063, and BHDPIP00000085.

**DD.** *All Documents constituting or relating to complaints You received from users regarding Your disclosure of Personal Information to third parties and your responses to such complaints, including but not limited to internal communications concerning how to respond to such complaints.*

Documents responsive to this request are produced at:[7]

BHDPIP00000354 to BHDPIP00000434, BHDPIP00000498 to BHDPIP00000511, BHDPIP00000528, BHDPIP00000564 to BHDPIP00000572, BHDPIP00000585, BHDPIP00000603, BHDPIP00000652 to BHDPIP00000659, BHDPIP00000738, BHDPIP00000753, BHDPIP00000981, BHDPIP00000992, BHDPIP00001080 to BHDPIP00001083, BHDPIP00001092 to BHDPIP00001102, BHDPIP00001108, and BHDPIP00001115.

---

7 *See supra* note 6.



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY BH0008596

**EE.** *All Documents, including internal communications, concerning the article "The Spooky, Loosely Regulated World of Online Therapy" by Molly Osberg and Dhruv Mehrotra, published by Jezebel on February 19, 2020.*

Documents responsive to this request are produced at:

BHDPIP00000156, BHDPIP00000158, BHDPIP00000180 to BHDPIP00000188, BHDPIP00000199 to BHDPIP00000236, BHDPIP00000246 to BHDPIP00000286, BHDPIP00000325 to BHDPIP00000348, BHDPIP00000359, BHDPIP00000397 to BHDPIP00000434, BHDPIP00000450 to BHDPIP00000475, BHDPIP00000504 to BHDPIP00000541, BHDPIP00000564 to BHDPIP00000581, BHDPIP00000585 to BHDPIP00000593, BHDPIP00000612 to BHDPIP00000648, BHDPIP00000652 to BHDPIP00000659, BHDPIP00000674 to BHDPIP00000736, BHDPIP00000746 to BHDPIP00000787, BHDPIP00000789 to BHDPIP00000816, BHDPIP00000829 to BHDPIP00000830, BHDPIP00000917 to BHDPIP00000930, BHDPIP00000932 to BHDPIP00000933, BHDPIP00000935 to BHDPIP00000946, BHDPIP00000951 to BHDPIP00000955, BHDPIP00000965 to BHDPIP00000975, BHDPIP00000987 to BHDPIP00000991, BHDPIP00001005 to BHDPIP00001007, BHDPIP00001036, BHDPIP00001042 to BHDPIP00001076, BHDPIP00001083, BHDPIP00001100, and BHDPIP00001105.

**<u>Responses to Additional Request Dated September 11, 2020</u>**

**A.** *To BetterHelp's knowledge, how many of BetterHelp's therapists or counselors are subject to the Health Insurance Portability and Accountability Act ("HIPAA")?*

BetterHelp does not have independent knowledge of the number of counselors using the platform who are subject to HIPAA.

**B.** *Is BetterHelp a party to any HIPAA Business Associate agreements? If so, with whom?*

[redacted]

**C.** *Describe all policies, practices, and procedures BetterHelp has implemented to comply with HIPAA's Privacy Rule and Security Rule (45 CFR Part 160 and 45 CFR Part 160(A) and (C)).*

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

**D.** *Produce all communications with Facebook concerning the disclosure of Personal Information following Jezebel's February 19, 2020 publication of "The Spooky, Loosely Regulated World of Online Therapy" by Molly Osberg and Dhruv Mehrotra.*

BetterHelp has not identified any communications responsive to this request based on a search using the parameters set forth in the letter from the FTC to BetterHelp dated November 6, 2020. BetterHelp further refers the FTC to the documents produced in response to Specification EE.

**E.** *Produce representative examples of all HIPAA Business Associate agreements and contracts to which BetterHelp is a party.*

BetterHelp refers the FTC to the documents produced at BHDPIP00000154 and BHDPIP00000155.

**F.** *Produce documents sufficient to show all policies, practices, and procedures BetterHelp has implemented to comply with HIPPA's Privacy Rule and Security Rule (45 CFR Part 160 and 45 CFR Part 160(A) and (C)).*

BetterHelp refers the FTC to the documents produced at BHDPIP00000062, BHDPIP00000063, BHDPIP00000085 through BHDPIP00000093, and BHDPIP00000153.

**G.** *Produce all communications with BetterHelp's therapists or counselors concerning Jezebel's February 19, 2020 article entitled "The Spooky, Loosely Regulated World of Online Therapy" by Molly Osberg and Dhruv Mehrotra.*

BetterHelp refers the FTC to the documents produced in response to Specification EE, which contain communications with therapists or counselors concerning the above-referenced article identified based on a search using the parameters set forth in the letter from the FTC to BetterHelp dated November 6, 2020.

* * *



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY BH0008600

# Exhibit 3

# Transmittal Letter Withheld as Nonresponsive

# Transmittal Letter Withheld as Nonresponsive

**Response to Civil Investigative Demand Issued to BetterHelp, Inc.**

This serves as BetterHelp Inc.'s ("BetterHelp" or the "Company") response to the Civil Investigative Demand ("CID") issued to BetterHelp by the Federal Trade Commission ("FTC" or the "Commission") dated July 30, 2020, subject to the clarifications and limitations discussed during our meet and confer and memorialized in our letter to you dated August 28, 2020, in the letters from the Commission to BetterHelp dated September 2, 2020 and November 6, 2020. BetterHelp's investigation into this matter is ongoing, and, as agreed upon by BetterHelp and the Commission, BetterHelp is responding to the CID on a rolling basis and reserves the right to supplement these responses should it become aware of additional responsive documents or information.

BetterHelp objects to the requests in the CID to the extent they are overly broad, unduly burdensome, seek information protected by the attorney-client privilege or other applicable privileges or protections, and/or seek information not currently known to the Company. BetterHelp objects to the definition of "Health Information" in the CID as overbroad to the extent it includes categories of information such as "information collected in BetterHelp's intake questionnaire," or "information related to counseling," irrespective of whether that information is "individually identifiable." BetterHelp objects to the definition of "Personal Information" in the CID as vague and overbroad to the extent it includes any "information from or about an individual consumer," irrespective of whether that information is individually identifiable. BetterHelp objects to the definitions of Health Information and Personal Information to the extent they do not take into account whether such information is collected, used, stored, or disclosed in an anonymized, deidentified, aggregated, or encrypted form.

Production of these materials is not intended to waive any of BetterHelp's rights or remedies, all of which are expressly reserved. Production of these materials also is not intended to, and does not, waive any applicable privilege or other legal basis under which information may be protected from disclosure. If it were found that production of the enclosed materials constituted production of otherwise privileged matters, such disclosure would be inadvertent, and is not intended to, and does not, waive the attorney-client privilege or any other privileges or protections.

This production and the below responses contain confidential business information and competitively sensitive information of BetterHelp, including highly sensitive financial information, the disclosure of which would cause substantial competitive harm to BetterHelp. BetterHelp respectfully requests the information to be treated with the highest level of confidentiality available under all applicable statutes, rules, and regulations, including the Federal Trade Commission Act. This production and its exhibits also are exempt from disclosure under the Freedom of Information Act, 5 U.S.C. § 552, *et seq*. In addition, as these materials contain confidential information, they are further exempt from disclosure pursuant to the FTC Act, 15 U.S.C. §§ 46(f) and 57b-2, and all other applicable statutes, regulations, and operating procedures. We hereby request written notice of any request under the Freedom of Information Act or otherwise seeking access to this document, any information contained therein, or any documents produced in response to the CID, to enable us to substantiate the grounds for confidential treatment.

## I. Interrogatories

**A.** *State the Company's complete legal name, including all other names under which it does or has done business; principal place of business; corporate mailing address and telephone number; and date and state of incorporation.*

The Company's full legal name is Compile, Inc. doing business in California as BetterHelp, Inc. BetterHelp's principal address is 990 Villa St. Mountain View, CA 94041. BetterHelp's telephone number is (888) 688-9296. BetterHelp was incorporated on December 16, 2014 as a Delaware Corporation.

**B.** *Identify all current and former officers, directors, principals, and owners of the Company, specifying the period during which each person held each position; and all shareholders with 5 percent or more ownership of the Company, stating each shareholder's percentage of ownership.*

BetterHelp's officers and directors are Alon Matas (President), Adam Vandervoort (Treasurer), and Samantha Macina (Secretary). They have each held those positions since 2016. BetterHelp does not have a board of directors. BetterHelp is a wholly owned subsidiary of Teladoc Health, Inc. ("Teladoc"). As of August 17, 2020, the following shareholders owned five percent or more of Teladoc stock in the proportions identified below:

| Entity | Percent Owned |
|---|---|
| The Vanguard Group, Inc. | 8.09% |
| BlackRock Fund Advisors | 9.22% |
| JP Morgan Investment Management, Inc. | 6.07% |
| Baillie Gifford & Co. | 6.96% |

**C.** *Describe in detail the Company's corporate structure by identifying each parent, subsidiary, and affiliate of the Company (whether wholly or partially owned), and describe in detail the relationship between these entities, including a description of any agreement(s) between the Company and each entity (e.g., assignment of assets, service agreements, license agreements). In addition, state whether the Company has any current or former shareholders/owners, officers, directors, or principals in common with any of these entities.*

BetterHelp's parent company is Teladoc, a Delaware corporation. Teladoc's legal address is 2 Manhattanville Road, Suite 203, Purchase, NY 10577. BetterHelp is a wholly owned subsidiary of Teladoc. BetterHelp does not have any wholly owned or partially owned subsidiaries or



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY BH0008562

affiliates. Adam Vandervoort serves as Chief Legal Officer of Teladoc and Treasurer of BetterHelp.

**D.** *For each year, state the Company's number of employees by office, and describe, including through graphic representation (e.g., organizational charts), how authority and responsibility were distributed among employees within the Company. Your response should be sufficient to Identify all individuals who had the ability to control the Company's policies, practices, and procedures related to users' Personal Information.*

The below table shows the number of BetterHelp employees by year. All BetterHelp employees are based in the Company's principal office in Mountain View, CA.

| **Date** | **Employees** |
|---|---|
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |

A chart showing the organizational structure of BetterHelp as of August 1, 2020 is attached at BHDPIP00000006. A chart showing the organizational structure of BetterHelp as of August 1, 2019 is attached at BHDPIP00000005. A chart showing the organizational structure of BetterHelp as of August 1, 2018 is attached at BHDPIP00000004. A chart showing the organizational structure of BetterHelp as of August 1, 2017 is attached at BHDPIP00000003.

BetterHelp further refers the FTC to its response to Specification Q for a list of individuals with responsibility for BetterHelp's policies, practices, and procedures related to users' Personal Information.

**E.** *State, by year, the Company's annual gross and net revenues as well as its gross and net profits.*

| Year[1] | Gross Revenues | Net Revenues | Gross Profits | Net Profits |
|---|---|---|---|---|
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |

**F.** *Describe the Company's business model, as well as every product or service it furnishes to consumers.*

BetterHelp is an online counseling platform that offers access to licensed, trained, experienced, and accredited psychologists, marriage and family therapists, clinical social workers, and board licensed professional counselors. BetterHelp matches users with professional counseling, and facilitates counseling by direct messaging, live chat sessions, phone calls, and video conferences. The cost of counseling through BetterHelp ranges from $60 to $80 per week (billed monthly).

BetterHelp operates the following websites:

https://www.betterhelp.com/
https://www.mytherapist.com/
https://www.teencounseling.com/
https://www.faithfulcounseling.com/
https://www.pridecounseling.com/
https://www.icounseling.com/
https://www.regain.us/
https://www.terappeuta.com/

**G.** *For each product or service offered by the Company to consumers that involves the collection, use, storage, or disclosure of Personal Information:*

[1] BetterHelp reiterates its request for treatment of this non-public financial information with the highest level of confidentiality.

**1.** *Describe the functionality of the product or service;*

BetterHelp facilitates access to counseling services through an online platform. Users may access BetterHelp's service through BetterHelp's website and mobile applications, including the websites or mobile applications of BetterHelp's multi-sites (MyTherapist, TeenCounseling, Faithfulcounseling, PrideCounseling, iCounseling, Regain, and Terappeuta). In order to use BetterHelp's service, users create an account on the website or mobile application, and purchase a monthly subscription. After registering, users are matched with a counselor and may use the BetterHelp platform to communicate with the counselor through direct text messaging, live chat, phone calls, or video conference. Users also may use the platform to compose and share journal entries with their counselor, post questions for counselors to answer using the "Ask a Counselor" feature, or attend virtual "webinars.".

**2.** *State the time period(s) during which the product or service was or has been available;*

BetterHelp's online counseling platform has been available since 2013.

**3.** *State the cost of the product or service;*

The cost of counseling through BetterHelp ranges from $60 to $80 per week (billed monthly).

**4.** *State, by year, the total number of that product or service sold (i.e., the number of users) and the gross revenues attributable to the sale of that product or service (both in the U.S. and worldwide);*

| **Year**[2] | | **Paid Users (U.S.)** | | **Gross Revenues (U.S.)** |
|---|---|---|---|---|
| 2017 | **Redacted** | [redacted] | **Redacted** | [redacted] |
| 2018 | | [redacted] | | [redacted] |
| 2019 | | [redacted] | | [redacted] |

**5.** *Describe the account creation process, including any information that users are or have been solicited to supply, and any*

2 BetterHelp reiterates its request for treatment of this non-public financial information with the highest level of confidentiality.

*representations users are or have been presented during that process;*

In order to create a BetterHelp account, users click the "Get started" link on the BetterHelp landing page. Users then complete a questionnaire, which includes approximately fifteen multiple choice questions regarding the user's background, counseling preferences, and financial status. Each question appears individually in a pop-up box after the user clicks a response to the prior question. The particular questions an individual user is asked depends on their responses and which multi-site they use to create an account. A complete list of questions that may appear in the questionnaire for each BetterHelp site is produced at BHDPIP00000094. Any individual user is only asked a subset of the questions that appear on that site.

While users are completing the questionnaire, a banner appears at the bottom of the screen that contains the following disclosure: "We use BetterHelp and third-party cookies and web beacons to help the site function properly, analyze usage, and measure the effectiveness of our ads. Read our Privacy Policy to learn more." The disclosure contains a hyperlink to BetterHelp's Privacy Policy. The banner appears on each page of the questionnaire until the user clicks the "OK" button or closes the banner. An image of this banner is shown below.[3]




Each question in the questionnaire appears in a pop-up box that contains the question, answer choices, and, for certain questions, additional statements related to the question as described further below:

- The pop-up box that contains the question, "How old are you?," also states: "Did you know? Almost a fifth of older adults in the United States have experienced depression. (Geriatric Mental Health Foundation, 2008)."

- The pop-up box that contains the question, "How would you rate your current physical health?," also states: "Studies

[3] Prior to October 2020, the banner stated: "We use cookies to help the site function properly, analyze usage, and measure the effectiveness of our ads. We never sell or rent any information you share with us. Read our Privacy Policy to learn more." BetterHelp is in the process of conforming the banner across all multi-sites.

show that exercise can help with depression as effectively as antidepressant medication. (*Psychosomatic Medicine*, 2007)."

- The pop-up box that contains the question, "Are you currently experiencing overwhelming sadness, grief, or depression?," also states: "Psychotherapy can serve as an effective treatment for clinical depression."
- The pop-box that contains the question, "Are you currently experiencing anxiety, panic attacks or have any phobias?," also states: "Some symptoms of panic attacks include a racing heart, dizziness, or chest pains."
- The pop-up box that contains the question, "Are you currently taking any medication?," also states: "Rest assured – this information will stay private between you and your counselor."[4]
- The pop-up box that contains the question, "How would you rate your current sleeping habits?," also states: "Many adults who have generalized anxiety disorder also suffer from sleep problems."

After completing the questionnaire, the user is then directed to a page where they may create a BetterHelp account. Users must create a BetterHelp account in order to be matched with a counselor and begin communicating with a counselor. In order to create an account, users provide a first name or nickname and email address, and create a password. Alternatively, users may create an account using their Facebook or Google log in credentials.

In order to create an account, users also must agree to the BetterHelp Terms and Conditions by checking a box next to the following statement: "I agree to the terms and conditions." This statement contains a hyperlink to the BetterHelp Terms and Conditions. By agreeing to the BetterHelp Terms and Conditions, users also agree to the BetterHelp Privacy Policy. As described further in response to Specification I, the BetterHelp Terms and Conditions and Privacy Policy contain disclosures regarding BetterHelp's policies and practices related to collection and disclosure of users' Personal Information.

---

[4] Prior to December 2020, the pop-up box stated: "Rest assured – any information provided in this questionnaire will stay private between you and your counselor."

After entering information to create an account and agreeing to the Terms and Conditions and Privacy Policy, users must then enter a 3-digit verification code that is automatically sent to the e-mail address they entered to create an account.

After verifying the email address, users are then asked two additional multiple choice questions regarding their counselor preferences, and one additional question ("What brings you here?") that users may answer in a free-form text box.

Users are then directed to a payment page where they can pay for their BetterHelp subscription by credit card, or using GooglePay or PayPal. The payment page also contains additional information regarding next steps in using the BetterHelp service, matching and communicating with a counselor, the cost of the service, and other differences between BetterHelp and traditional "in office" counseling.

After entering their payment information, users are asked to provide emergency contact information, including their full name, street address, and phone number. The page on which users enter emergency contact information also contains the following statement: "The emergency contact information is used to comply with counseling regulations and ethical code. It can be useful, for example, in case your counselor believes you are in immediate danger, so please enter it correctly. This information is stored safely and will be accessed only in case of emergencies. "

The foregoing description summarizes the account creation process on the BetterHelp website. The account creation process on BetterHelp's mobile application, and on the websites and mobile applications of BetterHelp's multi-sites is generally similar to the account creation process on BetterHelp's website. Differences with respect to information that users are solicited to supply, and representations presented to users during the account creation process on BetterHelp's multi-sites are described further below.

On the Faithful Counseling, iCounseling, Pride Counseling, and Teen Counseling multi-sites, the account creation page contains the below statement:



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY BH0008568

**Notes about the privacy of your email**

- Your email address is kept strictly private. It is never shared, sold or disclosed to anyone. Even your counselor won't know your real email address.
- The content of all the messages between you and your counselor will appear only in our secure private system. We will only send you emails with alerts about new messages that are waiting for you.
- Your email address is used to log in to our private secure server. Make sure you type it correctly.

Users who create an account on the Regain multi-site, which facilitates individual as well as couples' counseling, may invite their partner to join the account. Users who select this option are requested to enter their partner's first name, email address, and a phone number, which is optional. If a user enters their partner's email address, their partner receives an automatic email containing an invitation to register on the Regain site. In order to register, the partner must click a link in the automatic email, which directs them to a page to enter their email address and password. Partners must also agree to the Terms and Conditions, and the Privacy Policy. After partners verify their email to complete the registration, a page with the following statement appears: "You are now part of a joint counseling page with [partner's name]. Please remember that all written communication is visible to you, your partner, and your counselor. If you'd like to speak privately with your counselor, you can book a live phone or video session ahead of time."

Users who register an account on the Teen Counseling site are requested to provide their parent's email address. Parents whose email address are provided receive an automatically generated email informing them of the account registration and providing a link to a page where they may sign a consent form and provide payment information. Before the email is sent, the user is shown the below preview of the email:



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY BH0008569



Email Preview

This is the email that will be sent to your parent. The link will take them to a page which explains the service, and lets them fill out a consent and payment form.

Any information about why you are seeking counseling will only be shared with your counselor.

**From:** Teencounseling.com
**Subject:** ~nik wants to talk to a licensed counselor

Dear ~nik,

~nik wants to talk to a licensed counselor on Teencounseling.com. The service is available only after a consultation and consent from a parent or legal guardian.

Please click here for more information.

Note: **Please do not share this link**, it is only meant to be used by one parent or guardian to log in.

If you have any questions or concerns, please let us know by replying to this email.

Thanks,
Teen Counseling Team

Close

The consent form is shown below:


1. I give permission for Teen Counseling to provide online counseling services to this minor.
2. I understand my consent covers online counseling services offered by licensed independent counselors who are contracted by Teen Counseling.
3. I understand that I can change my mind later on and decide I do not want this minor to get services through Teen Counseling. If I change my mind, I will follow the instructions on Teen Counseling to cancel these services. I understand that this consent form remains valid until I follow the procedures to cancel the services.
4. I understand that information shared by this minor is confidential with the following exceptions: Imminent risk of harm to self or others, disclosure of abuse or neglect, or disclosure of another minor or elderly individual being abused or neglected.
5. I have the sole right to consent to mental health treatment for this minor. I am not legally mandated to confer with or get consent from any other legal guardian for mental health treatment for this minor.

Electronic Signature

Your name

Today's date

10/12/2020

Complete Consent Form

6. *List every website or mobile application through which the product or service is offered;*

**Websites:**

https://www.betterhelp.com/
https://www.mytherapist.com/
https://www.teencounseling.com/
https://www.faithfulcounseling.com/
https://www.pridecounseling.com/
https://www.icounseling.com/
https://www.regain.us/
https://www.terappeuta.com

**Mobile Applications:**

BetterHelp
MyTherapist
Teen Counseling
Faithfulcounseling
PrideCounseling
Regain
Terappeuta

**7.** *List each type of Personal Information that is collected, used, disclosed, or stored in connection with the product or service; and*

As a general matter, BetterHelp collects and stores all information that users provide to BetterHelp while using the platform, and data reflecting user and subscriber activity on the platform. [redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY 

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted] [redacted]

[redacted]

| | | | |
|---|---|---|---|
| [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] |

**H.** *For each type of Personal Information identified in response to Specification G.7:*

**1.** *Describe all methods and manners in which that type of Personal Information is collected, used, stored, and disclosed;*

[redacted]

[redacted]

**2.** *State the length of time that the Company retains such Personal Information; and*

[redacted]

**3.** *Describe each purpose for which that type of Personal Information is collected, used, stored, or disclosed.*

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

**I.** *Describe each representation the Company has made publicly and/or to individual consumers relating to the collection, use, disclosure, storage, or deletion of Personal Information, including the date(s) of the*

*representation, the source of the representation (e.g., the Company's website, email, privacy policy, terms of use, or other method), and whether the Company has modified or changed the representation during the applicable time period (including the reason for and date of any such change). The representations should include but are not limited to:*

**1.** *any standard notices or disclosures the Company provides to users at the time their Personal Information is collected;*

All users of BetterHelp's service must agree to BetterHelp's Terms and Conditions (BHDPIP00000001) and Privacy Policy (BHDPIP00000002), which contain detailed disclosures regarding BetterHelp's collection, use, disclosure, storage, and deletion of Personal Information.

The Terms and Conditions include disclosures regarding BetterHelp's security and privacy practices and incorporates the Privacy Policy. The Privacy Policy describes in further detail, among other things, BetterHelp's practices related to information collection, use, and disclosure; use of cookies and web beacons; and use of third party service providers. The Privacy Policy also contains disclosures related to the General Data Protection Regulation (GDPR) and the California Consumer Privacy Act (CCPA).

Since August 2017, BetterHelp has periodically updated the Terms and Conditions and Privacy Policy. Each version of the Terms and Conditions and Privacy Policy applicable during this period is produced at BHDPIP00000001 to BHDPIP00000002 and BHDPIP00000050 to BHDPIP00000061. The changes related to Personal Information are summarized below:

- On or around September 14, 2018, BetterHelp added a new section to the Privacy Policy, which included additional information related to users from the European Union consistent with the General Data Protection Regulation (GDPR). (BHDPIP00000052).
- On or around November 13, 2018, BetterHelp undertook a comprehensive review of the Terms and Conditions and Privacy Policy, including revising the sections in the Privacy Policy related to Information Collection and Use, Security, International Transfer, Compliance with Law Enforcement, and GDPR. (BHDPIP00000054; BHDPIP00000055).

- On or around September 17, 2019, BetterHelp updated the Privacy Policy, including revising the section on Information Collection, Use, and Disclosure, and adding a section related to opting out of marketing communications. (BHDPIP00000056).

- On or around December 31, 2019, BetterHelp updated the Privacy Policy, including revising the section on Information Collection, Use, and Disclosure, and adding a Privacy Notice for California Residents consistent with the California Consumer Privacy Act of 2018 (CCPA). (BHDPIP00000058).

- On or around February 27, 2020, BetterHelp updated the Privacy Policy, including revising the section on Information Collection, Use, and Disclosure. (BHDPIP00000060).

- On or around September 11, 2020, BetterHelp updated the Privacy Policy, including revising the section on Information Collection, Use, and Disclosure to conform similar language in the Privacy Notice for California residents, and revising the GDPR Notice. (BHDPIP00000002).

In addition to the Privacy Policy and Terms and Conditions, the BetterHelp Frequently Asked Questions page, available at https://www.betterhelp.com/faq/, includes the question, "How is my privacy protected?" and a response, copied below, which discusses protection of messages between users and counselors.

How is my privacy protected?

We are totally obsessed about securing your privacy and confidentiality. We have built a state-of-the-art technology, operation, and infrastructure with one thing in mind: protecting your privacy and safeguarding the information you provide. Our privacy and confidentiality standards are by far more advanced than what is required by law or regulations, so you can feel safe and comfortable.

- You don't need to identify yourself (see more about staying anonymous here).
- Everything you tell your counselor is protected by strict federal and state laws.
- We don't cooperate or work with any insurance companies or employers, so nothing needs to be shared, reported or filed with them.
- You can always click the "Shred" button next to each message that you've sent so it will no longer show in your account.
- All the messages between you and your counselor are secured and encrypted by banking-grade 256-bit encryption.
- Our servers are hosted in an "A Grade" facility, ensuring the best-in-class security and protection.
- Our browsing encryption system (SSL) follows modern best practices, providing world class online security and encryption.
- Our databases are encrypted and scrambled so they essentially become useless in the very unlikely event that they are being stolen or inappropriately used.

If you wish for any of your information or records to be released to a third party, please let your counselor know. Your counselor will send you an authorization form that you will need to fill and sign before your information can be released.

As described further in response to Specification G.5, certain pages visited by users during the account creation process contain statements regarding use of cookies and web beacons, and use of information regarding medication history, user email addresses, and emergency contact information.

The page containing the "Ask a Counselor" feature contains the following disclosure: "Note that this question will be public when answered. Avoid any personal details that can be used to identify you."

The page where users register for a Groupinar contains the disclosures shown below:

How do I join the Groupinar?

Choose the Groupinar you would like to attend and click on "register". You will be anonymously registered with the initials of the first and last letter of your BetterHelp nickname. The instructions on joining the Groupinar will be sent directly to your email. You can also download the ClickMeeting Webinar app to participate in the Groupinar on your mobile device.




**2.** *any standard notices or disclosures the Company provides to users prior to disclosing their Personal Information to a third party, including but not limited to the mechanism by which the Company discloses to users the type or Identity of each third party receiving the Personal Information;*

The BetterHelp Privacy Policy contains disclosures regarding the types of third parties that may receive Personal Information, including the following disclosures:

- "To let us operate the Platform effectively and to let you use the Platform, including the Counselor Services, we may have to collect your personally identifiable information (such as, but not limited to, your name, phone number, email address, and address), billing and payment information, profile information, log data (information such as your computer, Internet Protocol address ("IP"), pages that you visit and the amount of time spent on those pages, actions you take and other statistics), information related to the Counselor Services or your need for Counselor Services, and any information which is exchanged between you and your Counselor (collectively the "Information"). In some cases, some of the Information that you give to us is considered health related data.. . ." (BHDPIP00000002, at 1).

- User information "may be used or disclosed to third parties for one or more of the following business or marketing purposes: . . .
    - To match you with a Counselor.
    - To enable and facilitate the Counselor Services.
    - To supervise, administer and monitor the service.

- To measure and improve the quality, the effectiveness and the delivery of our services.
- Market the Platform and Counselor Services to you.

. . .

- To personalize your Website experience and to deliver content and product and service offerings relevant to your interests, including targeted offers and ads through our Websites, third-party sites, and via email or text message (with your consent, where required by law)."

(BHDPIP00000002, at 1–2).

- "Like many websites, we use 'cookies' and 'web beacons' to collect information. A "cookie" is a small data file that is transferred to your computer's hard disk for record-keeping purposes. A "web beacon" is a tiny image, placed on a Web page or email that can report your visit or use. We use cookies and web beacons to enable the technical operation of the Platform, to administer your log-in to your account and to collect the Log Data. You can change your browser's settings so it will stop accepting cookies or to prompt you before accepting a cookie. However, if you do not accept cookies you may not be able to use the Platform. The Platform may also include the use of cookies and web beacons of services owned or provided by third parties that are not covered by our Privacy Policy and we do not have access or control over these cookies and web beacons. We may also use third party cookies for the purposes of web analytics, attribution and error management." (BHDPIP00000002, at 2).

- "We cooperate with government and law enforcement officials to enforce and comply with the law. We may disclose information necessary or appropriate to protect the safety of the public or any person, to respond to claims and legal process (including but not limited to subpoenas), and to prevent or stop activity that may be illegal or dangerous. You should also be aware that Counselors may be obliged to disclose information to law enforcement or other authorities to conform to their professional and legal responsibilities. . . ." (BHDPIP00000002, at 4).

BetterHelp further refers the FTC to its response to Specification I.1.

**3.** *any representations to users stemming from Jezebel's February 19, 2020 publication of the article: "The Spooky, Loosely Regulated World of Online Therapy" by Molly Osberg and Dhruv Mehrotra, including press statements or responses provided to consumer inquiries;*

BetterHelp refers the FTC to the documents produced in response to Specification EE, which contain BetterHelp's responses to inquiries from users regarding the above-referenced article identified based on a search using the parameters set forth in the letter from the FTC to BetterHelp dated November 6, 2020.

**4.** *any Advertisement relating to the collection, use, disclosure, storage, or deletion of Personal Information, including Advertisements using the phrase "100% private"; and*

BetterHelp refers the FTC to the documents produced at BHDPIP00000121 to BHDPIP00000127, which contain tables showing the text of BetterHelp advertisements displayed on: [redacted]

[redacted]

[redacted]

[5] [redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

BetterHelp further refers the FTC to the documents produced at BHDPIP00000130 to BHDPIP00000140, which include radio advertisements promoting BetterHelp. Certain of these advertisements used the following language or similar language: "Connect with your professional counselor in a safe and private online environment."

**5.** *any representation relating to the Health Insurance Portability Accountability Act, including all uses of the following graphic:*

A hyperlink with the above-referenced graphic is included in the footer of the BetterHelp site. By clicking this graphic, users are directed to the following url: https://www.hhs.gov/hipaa/index.html. In response to inquiries from users, BetterHelp customer service representatives have stated that the BetterHelp platform is HIPAA compliant, *see, e.g.*, BHDPIP00001090, and that HIPAA imposes medical records retention requirements, *see, e.g.*, BHDPIP00001112.[6]

**J.** *Describe the means by which the Company obtains consent from users relating to the collection, use, disclosure, or storage of Personal Information, including the means by which the Company enables users to opt into or out of the disclosure of their Personal Information to third parties.*

In order to sign up for BetterHelp's service, users must agree to BetterHelp's Terms and Conditions ("Terms and Conditions) and Privacy Policy ("Privacy Policy"). The Privacy Policy describes BetterHelp's policies and practices related to the collection, use, disclosure, and storage of Personal Information as defined in the CID, including the means by which users may choose or request not to disclose their Personal Information to third parties. A copy of the Terms and Conditions is attached as BHDPIP00000001. A copy of the Privacy Policy is attached at BHDPIP00000002.

---

6 As previously discussed, BetterHelp has redacted personally identifiable information from communications with users before production, including communications obtained [redacted] In addition, in order to extract reviewable versions of responsive communications from [redacted] for production, each of these communications had to be forwarded from [redacted] to a BetterHelp email address, and produced from that email address. The email reflecting the forwarding of each communication for purposes of production also has been redacted.



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY 

**K.** *Identify each third party, excluding licensed therapists, to which the Company has disclosed any user's Personal Information, and, for each such third party*:

**1.** *Describe the specific products and services that third party provided to the Company, as well as how users' Personal Information related to each product or service (i.e., the purposes for the disclosures);*

BetterHelp refers the FTC to the table produced at BHDPIP00000049, which describes the purpose for which each third party service was used.

**2.** *List the specific types and amount (i.e., the number of users) of Personal Information disclosed to that third party for each of the third party's services or products;*

BetterHelp refers the FTC to the table produced at BHDPIP00000049, which lists the type of Personal Information disclosed to each third party. BetterHelp further refers the FTC to its response to Specification G.8, which provides the total number of visitors to BetterHelp's websites, users who signed up for BetterHelp's service, and users who paid for the service.

**3.** *State whether the disclosed Personal Information was de-identified, anonymized, pseduonymized or otherwise de-personalized, and, if so, how;*

BetterHelp refers the FTC to the table produced at BHDPIP00000049, which reflects that Personal Information disclosed to third parties generally is not disclosed in a form that is personally identifiable. [redacted]

**4.** *Describe the contractual arrangements relating to such disclosures, including who at the Company was responsible for entering into and overseeing those contractual arrangements, and any compensation You received for such disclosures (including free or discounted services); and*

BetterHelp refers the FTC to the agreements produced at BHDPIP00000008 to BHDPIP00000048, BHDPIP00000064 to BHDPIP00000084, and BHDPIP00001117 in response to Specification BB, and to BetterHelp's response to Specification O describing those agreements. BetterHelp employees responsible for entering into and overseeing the contractual arrangements reflected in these agreements include the individuals with responsibility for the function for which the third party product or service is used,

including Alain Adler (engineering), Danny Bragonier (marketing), Rushabh Gandhi (website applications), as well as counsel Anjali Ahearn.

**5.** *Describe the date, scope, and result of any request You made for the third party to delete the Personal Information it received from the Company.*

[redacted]

**L.** *Identify each third party from which a user can import data to the Company's products or services, or to which a user can export data from the Company's products or services, and describe the types of data that a user can import from or export to each such third party.*

When creating a BetterHelp account, users have the option of signing in to BetterHelp through their Facebook or Google account, which imports their name and email address from those accounts into their BetterHelp account. Users also have the option of paying for their BetterHelp subscription by importing their PayPal or Google Pay account information.

**M.** *Identify each third-party Software Development Kit and Application Program Interface integrated into or utilized by the Company's products or services, and describe the types of user data disclosed to a third party in connection with each such Software Development Kit or Application Program Interface.*

[redacted]

[redacted]

[redacted]

All Personal Information disclosed in connection with these services is identified in BHDPIP00000049.

**N.** *To the extent not otherwise stated in Your response to Specifications G, H, and K, describe* ***Your use of any Facebook products and services*** *(e.g., Analytics, Advertising, Log-in, Custom Audiences, Lookalike Audiences),* ***and identify what Personal Information and App Events*** *were disclosed to, or collected by, Facebook in connection with each product or service You used (including* ***the number of users for each type of Personal Information and App Event was shared****).*

[redacted]

[redacted]

[redacted]

| [redacted] | [redacted] | [redacted] | [redacted] |
|---|---|---|---|
| [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | |
| [redacted] | [redacted] | [redacted] | |
| [redacted] | [redacted] | [redacted] | |

| | | | |
|---|---|---|---|
| [redacted] | [redacted] | [redacted] | |
| [redacted] | [redacted] | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | | |
| [redacted] | | | |
| [redacted] | | | |
| [redacted] | | | |
| [redacted] | | | |
| [redacted] | | | |
| [redacted] | | | |
| [redacted] | | | |
| [redacted] | | | |
| [redacted] | | | |
| [redacted] | | | |
| [redacted] | | | |
| [redacted] | | | |

As reflected in BHDPIP00000049 and in BetterHelp's response to Specification H.3, BetterHelp uses Facebook products to market and advertise its services, optimize its advertising on Facebook's platform, including more effectively targeting BetterHelp's advertising to potential users and delivering content relevant to those users, and assess the effectiveness of its marketing and advertising. All Personal Information disclosed to Facebook in connection with these services is identified in BHDPIP00000049.

**O.** *Describe in detail the Company's* ***policies, practices, procedures, and relationships regarding the collection, use, storage, disclosure, and destruction of Personal Information****, including, but not limited to, those concerning de-identification, anonymization, pseudonymization, or other de-personalization, if any, prior to sharing with a third party. Explain the reason (including whether it was to comply with a law or regulation) for any changes to these policies, practices, procedures, and relationships during the applicable time period.*

As described further in BetterHelp's response to Specifications I.1 and I.2, BetterHelp's Terms and Conditions and Privacy Policy describe BetterHelp's policies and practices regarding the collection, use, storage,

disclosure, and destruction of Personal Information. The Privacy Policy describes in detail, among other things, BetterHelp's practices related to information collection, use, and disclosure; use of cookies and web beacons; and the various types of third parties that may receive Personal Information.

Additional policies and procedures related to BetterHelp's data privacy and security practices are produced at BHDPIP00000085 to BHDPIP00000093, including the following:

- Global Privacy and Security Incident Investigation Policy (BHDPIP00000087), which relates to investigating, responding to, and reporting privacy and security incidents.

- Global Privacy and Security Training Policy (BHDPIP00000088), which relates to training of employees on the privacy and security of PII and PHI.

- Requests to Amend PHI (BHDPIP00000092), which relates to responding to requests for an amendment or change to their PHI.

- Compliance Policy (BHDPIP00000085), which relates to security compliance reviews.

- Incident Notification Policy (BHDPIP00000089), which relates to notification of breaches of PHI.

- Mobile Device Policy (BHDPIP00000090), which relates to use of mobile devices.

- ePHI Controls Policy (BHDPIP00000086), which relates to practices for examining and monitoring of systems containing electronic personal PHI.

- Remote Access Policy (BHDPIP00000091), which relates to remote access to the Company's systems.

- Workstation Security Policy (BHDPIP00000093), which relates to use of desktop and laptop systems.

BetterHelp administers a training for all new employees and for all existing employees on an annual basis related to BetterHelp's privacy and security policies.

BetterHelp's disclosure of Personal Information to third parties, and third parties' use of that information is subject to the limitations set forth in the terms and conditions applicable to those products and services, which are



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY BH0008589

produced at BHDPIP00000008 to BHDPIP00000048, BHDPIP00000064 to BHDPIP00000084, and BHDPIP00001117.

[redacted]

[redacted]

[redacted]

[redacted]

**P.** *Describe any audits, assessments, or compliance reviews conducted by You or on Your behalf related to the policies, procedures, practices, or relationships described in Your response to Specification O.*

[redacted]

[redacted]

[redacted]

**Q.** *Identify all person(s) at the Company responsible for designing, implementing, enforcing, or maintaining the policies, procedures, practices, and relationships described in Your response to Specification O. For each such person, state his or her job title and responsibilities during the applicable period, as well as the dates they held those titles and responsibilities.*

The below table identifies individuals responsible for BetterHelp's policies, practices, procedures, and relationships regarding the collection, use, storage, disclosure, and destruction of Personal Information.

| Name | Title | Dates | Role |
|---|---|---|---|
| Alain Adler | Head of Engineering | July 2017–present | Responsible for managing engineering team |

| | | | |
|---|---|---|---|
| Anjali Ahearn | Vice President and Corporate Counsel | February 2019–present | In-house counsel to BetterHelp |
| Michael Aldridge | Director of Information Technology | February 2020–June 2020 | Responsible for managing information technology operations |
| Danny Bragonier | Co-Founder and Director of Sales Operations | January 2015–present | Responsible for managing marketing operations |
| Sharon Cohen | Head of Security | September 2019–present | Responsible for managing information security operations |
| Rushabh Gandhi | Director of Product | June 2018–present | Responsible for development and maintenance of websites and application |
| Alon Matas | President and Founder | January 2015-present | Responsible for company-wide policy |

**R.** *To the extent not otherwise stated in Your responses to these Specifications, describe any changes You have made to Your policies, procedures, or practices since Jezebel's February 19, 2020 publication of the article "The Spooky, Loosely Regulated World of Online Therapy" by Molly Osberg and Dhruv Mehrotra.*

[redacted]

[redacted]

**S.** *State whether the Company is subject to the Health Insurance Portability Accountability Act.*

BetterHelp is subject to the Health Insurance Portability Accountability Act ("HIPAA") in its capacity as a "business associate" to counselors at BetterHelp.

**T.** *Identify all person(s) at the Company who have participated in the preparation of responses to this CID.*

The following persons at the Company have participated in the preparation of responses to this CID:

Alain Adler
Anjali Ahearn
Danny Bragonier
Sam Broer
Rushabh Gandhi
Jessica Honbarger
James Imrie
Farrah Moore
Christopher Piwarski

## II. Document Requests

**U.** *Each different organization chart in effect during the applicable time period.*

Documents responsive to this request are produced at BHDPIP00000003 to BHDPIP00000006.

**V.** *A family tree of the Company and its parents, subsidiaries, and affiliates.*

A document responsive to this request is produced at BHDPIP00000007.

**W.** *An electronic copy of each materially different version of the App.*

An electronic copy of the BetterHelp mobile application and the mobile applications for each of the BetterHelp multi-sites is available at the links provided below. BetterHelp does not maintain historic copies of the BetterHelp mobile applications in the ordinary course of business.



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY BH0008593

BetterHelp

Android:
https://play.google.com/store/apps/details?id=com.betterhelp&hl=en_US&gl=US

iOS:
https://apps.apple.com/us/app/betterhelp-online-counseling/id995252384

MyTherapist

Android:
https://play.google.com/store/apps/details?id=com.mytherapist&hl=en_US&gl=US

iOS:
https://apps.apple.com/us/app/mytherapist-counseling/id1249032168

Teen Counseling

Android:
https://play.google.com/store/apps/details?id=com.teencounseling&hl=en_US&gl=US

iOS:
https://apps.apple.com/us/app/teen-counseling/id1206966896

Faithful Counseling

Android:
https://play.google.com/store/apps/details?id=com.faithfulcounseling&hl=en_US&gl=US

iOS:
https://apps.apple.com/us/app/faithful-counseling/id1290989821

Pride Counseling

Android:
https://play.google.com/store/apps/details?id=us.regain&hl=en_US&gl=US

iOS:
https://apps.apple.com/us/app/pride-counseling/id1295966295

Regain



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY BH0008594

Android:
https://play.google.com/store/apps/details?id=us.regain&hl=en_US&gl=US

iOS:
https://apps.apple.com/us/app/regain-couples-therapy/id1206964049

Terappeuta

Android:
https://play.google.com/store/apps/details?id=com.terappeuta&hl=en_US&gl=US

iOS:
https://apps.apple.com/us/app/terappeuta/id1220973919

**X.** *Documents sufficient to show each materially different representation made to consumers relating to the collection, use, storage, or disclosure of Personal Information, including Advertisements, and screenshots of the consent flows or permission screens, as described in Your response to Specification I.*

Documents responsive to this request are produced at BHDPIP00000001 to BHDPIP00000002, BHDPIP00000095 to BHDPIP00000140, BHDPIP00000142 to BHDPIP00000152, and BHDPIP00001090 to BHDPIP00001112.

**Y.** *Documents sufficient to show the details of any disclosures of Personal Information to third parties as well as any deletion requests described in Your response to Specification K.*

Documents responsive to this request are produced at BHDPIP00000049 and BHDPIP00000141.

**Z.** *All Documents concerning the disclosure of Personal Information or App Events to Facebook.*

Documents responsive to this request are produced at:

BHDPIP00000157, BHDPIP00000159 to BHDPIP00000179, BHDPIP00000191 to BHDPIP00000196, BHDPIP00000291 to BHDPIP00000319, BHDPIP00000365 to BHDPIP00000450, BHDPIP00000459, BHDPIP00000478 to BHDPIP00000528, BHDPIP00000542 to BHDPIP00000572, BHDPIP00000582 to BHDPIP00000611, BHDPIP00000613 to BHDPIP00000615, BHDPIP00000617, BHDPIP00000649 to BHDPIP00000671, BHDPIP00000675 to BHDPIP00000695, BHDPIP00000737 to

BHDPIP00000768, BHDPIP00000817 to BHDPIP00000828, BHDPIP00000831 to BHDPIP00000858, BHDPIP00000861 to BHDPIP00000862, BHDPIP00000865 to BHDPIP00000911, BHDPIP00000922 to BHDPIP00000926, BHDPIP00000934 to BHDPIP00000955, BHDPIP00000965 to BHDPIP00000969, BHDPIP00000981 to BHDPIP00000987, BHDPIP00000998, BHDPIP00001012 to BHDPIP00001029, BHDPIP00001031 to BHDPIP00001035, BHDPIP00001037 to BHDPIP00001039, BHDPIP00001077 to BHDPIP00001079, BHDPIP00001083, BHDPIP00001105, and BHDPIP00001115.

**AA.** *Each materially different Document constituting a policy or procedure identified pursuant to Specification O, including each different privacy policy, terms of service, and terms of use.*

Documents responsive to this request are produced at BHDPIP00000050 to BHDPIP00000061 and BHDPIP00000085 to BHDPIP00000093.

**BB.** *Each materially different Document constituting a contract entered into by the Company that relates to its disclosure of Personal Information.*

Documents responsive to this request are produced at BHDPIP00000008 to BHDPIP00000048, BHDPIP00000064 to BHDPIP00000084, and BHDPIP00001117.

**CC.** *Documents sufficient to show the assessments, audits, and compliance reviews described in Your response to Specification Q.*

Documents responsive to this request are produced at BHDPIP00000062, BHDPIP00000063, and BHDPIP00000085.

**DD.** *All Documents constituting or relating to complaints You received from users regarding Your disclosure of Personal Information to third parties and your responses to such complaints, including but not limited to internal communications concerning how to respond to such complaints.*

Documents responsive to this request are produced at:[7]

BHDPIP00000354 to BHDPIP00000434, BHDPIP00000498 to BHDPIP00000511, BHDPIP00000528, BHDPIP00000564 to BHDPIP00000572, BHDPIP00000585, BHDPIP00000603, BHDPIP00000652 to BHDPIP00000659, BHDPIP00000738, BHDPIP00000753, BHDPIP00000981, BHDPIP00000992, BHDPIP00001080 to BHDPIP00001083, BHDPIP00001092 to BHDPIP00001102, BHDPIP00001108, and BHDPIP00001115.

---

[7] *See supra* note 6.

**EE.** *All Documents, including internal communications, concerning the article "The Spooky, Loosely Regulated World of Online Therapy" by Molly Osberg and Dhruv Mehrotra, published by Jezebel on February 19, 2020.*

Documents responsive to this request are produced at:

BHDPIP00000156, BHDPIP00000158, BHDPIP00000180 to BHDPIP00000188, BHDPIP00000199 to BHDPIP00000236, BHDPIP00000246 to BHDPIP00000286, BHDPIP00000325 to BHDPIP00000348, BHDPIP00000359, BHDPIP00000397 to BHDPIP00000434, BHDPIP00000450 to BHDPIP00000475, BHDPIP00000504 to BHDPIP00000541, BHDPIP00000564 to BHDPIP00000581, BHDPIP00000585 to BHDPIP00000593, BHDPIP00000612 to BHDPIP00000648, BHDPIP00000652 to BHDPIP00000659, BHDPIP00000674 to BHDPIP00000736, BHDPIP00000746 to BHDPIP00000787, BHDPIP00000789 to BHDPIP00000816, BHDPIP00000829 to BHDPIP00000830, BHDPIP00000917 to BHDPIP00000930, BHDPIP00000932 to BHDPIP00000933, BHDPIP00000935 to BHDPIP00000946, BHDPIP00000951 to BHDPIP00000955, BHDPIP00000965 to BHDPIP00000975, BHDPIP00000987 to BHDPIP00000991, BHDPIP00001005 to BHDPIP00001007, BHDPIP00001036, BHDPIP00001042 to BHDPIP00001076, BHDPIP00001083, BHDPIP00001100, and BHDPIP00001105.

**Responses to Additional Request Dated September 11, 2020**

**A.** *To BetterHelp's knowledge, how many of BetterHelp's therapists or counselors are subject to the Health Insurance Portability and Accountability Act ("HIPAA")?*

BetterHelp does not have independent knowledge of the number of counselors using the platform who are subject to HIPAA.

**B.** *Is BetterHelp a party to any HIPAA Business Associate agreements? If so, with whom?*

[redacted]

**C.** *Describe all policies, practices, and procedures BetterHelp has implemented to comply with HIPAA's Privacy Rule and Security Rule (45 CFR Part 160 and 45 CFR Part 160(A) and (C)).*

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

**D.** *Produce all communications with Facebook concerning the disclosure of Personal Information following Jezebel's February 19, 2020 publication of "The Spooky, Loosely Regulated World of Online Therapy" by Molly Osberg and Dhruv Mehrotra.*

BetterHelp has not identified any communications responsive to this request based on a search using the parameters set forth in the letter from the FTC to BetterHelp dated November 6, 2020. BetterHelp further refers the FTC to the documents produced in response to Specification EE.

**E.** *Produce representative examples of all HIPAA Business Associate agreements and contracts to which BetterHelp is a party.*

BetterHelp refers the FTC to the documents produced at BHDPIP00000154 and BHDPIP00000155.

**F.** *Produce documents sufficient to show all policies, practices, and procedures BetterHelp has implemented to comply with HIPPA's Privacy Rule and Security Rule (45 CFR Part 160 and 45 CFR Part 160(A) and (C)).*

BetterHelp refers the FTC to the documents produced at BHDPIP00000062, BHDPIP00000063, BHDPIP00000085 through BHDPIP00000093, and BHDPIP00000153.

**G.** *Produce all communications with BetterHelp's therapists or counselors concerning Jezebel's February 19, 2020 article entitled "The Spooky, Loosely Regulated World of Online Therapy" by Molly Osberg and Dhruv Mehrotra.*

BetterHelp refers the FTC to the documents produced in response to Specification EE, which contain communications with therapists or counselors concerning the above-referenced article identified based on a search using the parameters set forth in the letter from the FTC to BetterHelp dated November 6, 2020.

* * *

# Exhibit 5

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

Master File No. 3:23-cv-01033-RS

IN RE BETTERHELP, INC., DATA :
DISCLOSURE CASES :
:
This Document Relates to: All:
Actions :
- - - - - - - - - - - - - - -X

Video Deposition of JESSICA HONBARGER

(Taken by Plaintiffs)

Charlotte, North Carolina

April 16, 2025

Reported by: Andrea Nobrega
Court Reporter
Notary Public

you know, just kind of showing why someone might be interested.

**Q. And when you run the Facebook platform, how is that effected? Is that through a pixel or is that through just buying ad time? How does that work?**

MR. HAMMER: Objection, vague.

THE WITNESS: So it would depend. Can you rephrase the question?

BY MS. BRADY:

**Q. Sure. I'm just trying to figure out how the ads work with Facebook.**

**I mean, is it something where typically you write a copy and you would say, hey, put this out there, or is there something else that happens?**

A. Yeah, there is other things that we can input.

**Q. Okay. Walk me through that.**

A. Yeah. So we can specify, you know, which country we want to show the ad to.

So, in general, a lot of times we are showing it to people in the United States. That's where they are based are,



so it makes sense to match people in the United States.

You can say, you know, do I want people to click the ad? Do I want people to watch a video, that sort of stuff. Like what is my goal?

**Q. And is that affected through just giving Facebook an ad to run randomly or is it targeted?**

A. Sorry, I don't think I understand your question.

**Q. Sure. So I'm just going to tell you, I'm not an ad person, not a marketing person.**

A. Yeah.

**Q. So I just need to understand how marketing is done with Facebook.**

**Is it a pixel based marketing where you track and you want to pinpoint certain audiences, or is it more of a, you know, kind of of like a newspaper where you draft something and you put it in a newspaper and have them run it?**

MR. HAMMER: Objection, compound, vague.



THE WITNESS: I would say it could be both.

BY MS. BRADY:

**Q. How does BetterHelp do it?**

MR. HAMMER: Objection, vague as to time.

THE WITNESS: Yeah, do you mind specifying which time frame you are interested in?

BY MS. BRADY:

**Q. Yeah, let's go from 2017 to 2022.**

A. I would say we used both.

**Q. Okay.**

A. But I would maybe want to work on that language you used with the pixel. I feel like it didn't comply with my understanding of how we use the pixel.

**Q. Yes, great. So tell me how that worked.**

MR. HAMMER: Objection, vague.

THE WITNESS: Yeah, how what worked?

BY MS. BRADY:

**Q. How the pixel worked.**

A. Yes. So we have a pixel that --



actually I don't think we currently have a pixel. I need to check on that.

We basically are trying to measure events that happen on the website, and the pixel kind of does that.

It fires. It sends a signal when certain things happen, and we can tell Facebook we want to get these signals from ads.

**Q. Okay. I guess I'm a little -- I need some education on that.**

**So what is your understanding of what a pixel is?**

A. Yeah. So it's a pretty technical term. So I'm going to try to do my best to explain it, but it's basically a tracking technology for use for measurement that is kind of just like a binary, like, you know, this event happened and it's configured on a website somehow.

I'm not a developer by any means -- and yeah, it just passes that this event is happening.

**Q. So it passes events to BetterHelp**

**or to somebody else?**
A. It's passing a signal to a third -- I don't know, like, third party is a legal term. In this case they would be passing the signal to Facebook.
**Q. Okay. You mentioned that you don't think that there is a current pixel on the website, is that correct?**
A. It's just pixel is a specific term. I'm not sure if that -- like if there is a pixel.
**Q. Okay. Would there be some other type of tracking tool?**
A. Potentially.
**Q. Okay. What are some of the other types of tracking tools?**
A. There is something called like a conversion API.
**Q. Okay. Do you know if there is a conversion API on the website currently?**
A. I'm not sure.
**Q. Do you know who would know that?**
A. I think Nik Vaughn would probably be the best person to talk to about that.
**Q. Okay. Who is Nik Vaughn?**



A. I don't know his exact title, but I know he is kind of a specialist in privacy and how it interacts with the product.
**Q. Does he work for BetterHelp?**
A. Correct, BetterHelp.
**Q. Okay. Have you -- do you work with Mr. Vaughn?**
A. Yes.
**Q. How long have you worked with Mr. Vaughn?**
A. Since he started.
**Q. When did he start?**
A. I'm sorry, I can't remember when he started. It's been a couple years, though.
**Q. Okay.**
A. Yeah.
**Q. Has it been the entire time that you have been at BetterHelp?**
A. No.
**Q. Okay.**
A. He started after me.
**Q. Okay. Do you know if Mr. Vaughn started before 2022?**



A. I don't remember. I'm sorry.
**Q. That's alright. So form -- let's talk about this time frame for the time being, okay.**
[redacted]



[redacted]
BY MS. BRADY:
**Q. So you never worked with pixels, is that correct?**
MR. HAMMER: Objection, misstates testimony.
THE WITNESS: Yeah, I didn't work on implementing them -- slash -- you asked about like deciding what information was sent. I did not do that.
I worked with the pixel in my capacity of like running advertisements.
BY MS. BRADY:
**Q. So thank you for that because I want to clarify.**
A. Yeah.
**Q. I didn't ask about deciding which information, but dealing with that pixel and implementation and how information is passed back and forth.**
MR. HAMMER: Objection, compound. You are using a lot of really broad terms.

THE WITNESS: Yeah, dealing with -- can you break that down for me, please?

BY MS. BRADY:

**Q. Sure.**

A. Thank you.

**Q.** [redacted]



[redacted]



[redacted]



[redacted]

**Q. Sure. I'm trying to figure out -- and again, not a marketing person and I'm just trying to figure out what you remember, what you know and what you understand.**

[redacted]



[redacted]



[redacted]



BY MS. BRADY:

**Q. Who trained you at BetterHelp when you first started?**

A. So when I first started, there were kind of two main ways that I got trained.

I had to go through like a couple training modules provided by the company, and then -- that was kind of like bigger picture stuff.

And then for my specific role I was trained by Danny and an individual, John Pham.

**Q. Is Mr. Pham still with the company?**

A. He is not.

**Q. And what was Mr. Pham's role at BetterHelp while you were there?**

A. I don't recall his title, but I do recall that he managed Facebook at the time of my -- when I started.

**Q. Did you have any autonomy in deciding which channels to use and where to run ads from 2017 to 2022?**

MR. HAMMER: Objection, vague.

**that correct?**

MR. HAMMER: Objection, calls for speculation.

THE WITNESS: That's not necessarily true.

MS. BRADY: Okay.

THE WITNESS: Yeah, I would say anyone, even if they aren't having mental health issues, might seek therapy.

BY MS. BRADY:

**Q. Okay. If you are not having mental health issues, what is your understanding why folks would seek therapy?**

MR. HAMMER: Objection, calls for speculation.

THE WITNESS: Yeah, there is so many reasons. Like, honestly, therapy, again, this is -- I'm very passionate about this.

Like even if you are doing well, like therapy -- like it's important to, you know, like talk to someone and talk about like your day-to-day feelings.

You might not be going through



something in specific.

BY MS. BRADY:

**Q. Okay. So in that regard, dealing with folks who are seeking therapy, mental health therapy, whether they are having mental health issues or not, is it your understanding that privacy of that treatment or seeking that treatment is important?**

MR. HAMMER: Objection, calls for speculation.

THE WITNESS: Privacy is a very broad term. Like -- like, I'm sorry, I'm still having a hard time understanding what you are asking in specific.

BY MS. BRADY:

**Q. Sure.**

A. I don't mean to be difficult.

**Q. That's alright, but you have said that privacy is very important to BetterHelp?**

A. Yes.

**Q. Privacy and security is very important, right?**

A. Yes.



**Q. Okay. I'm asking if -- what is your understanding as to why privacy and security is so important for people seeking help through your platform?**

A. I just feel like I would have to speculate on that.

**Q. So you don't have an understanding, is that correct?**

A. I mean, sorry, this is just a complicated question.

**Q. Sure.**

A. I'm trying to think of what my understanding would be for -- I would say, in general, I personally can't take a stance. Like that is a policy.

**Q. So you don't have any -- you personally do not have an understanding as to why privacy and security is important, is that correct?**

A. I'm just -- I'm sorry, I don't know how to answer that question.

**Q. Okay. We have had a bunch of different depositions in this case already, so I understand that there is a database that houses customer information.**



**Is that your understanding as well?**

A. Yes.

**Q. Okay. And it's a single database that holds all of the customer information that BetterHelp collects, is that right?**

A. I don't know if it's a single database. I'm sorry, that's very technical.

**Q. Sure.**

A. But your first explanation was what I understand.

**Q. Okay, great, great. What I am interested in is how the marketing team might utilize that customer information to determine what kind of ad campaigns to run. And we can cut it down from '17 to '22.**

MR. HAMMER: Objection, vague.

THE WITNESS: Sure. Yeah, there is a lot of layers to that, but I can give an example.

BY MS. BRADY:

**Q. Yes, that would be lovely.**

A. [redacted]

[redacted]



[redacted]

**Q. Okay. How did BetterHelp utilize pixels on its websites from 2017 to 2022?**

MR. HAMMER: Objection, vague, over-broad.

THE WITNESS: Yeah, that's a bit of a big question. Do you mind breaking it down?

BY MS. BRADY:

**Q. Well, let's talk the 20,000 foot view.**

A. Uh-huh.

**Q. How did you utilize pixels in your work at BetterHelp?**



MR. HAMMER: Objection, vague and over-broad.

THE WITNESS: [redacted]

BY MS. BRADY:

**Q. Okay.** [redacted]

**Q. Okay. Is that something -- is the pixel something that originates from BetterHelp or is that something that originates from Facebook?**

MR. HAMMER: Objection, calls for speculation.



THE WITNESS: Originates from, I'm not really sure what that means exactly. Yeah, I'm not really sure what that means, sorry.

BY MS. BRADY:

**Q. Okay. Did BetterHelp engineer the pixel, do you know?**

MR. HAMMER: Objection, vague.

THE WITNESS: Engineer the pixel? Like we didn't create the Facebook pixel. We engineered a pixel for BetterHelp.

BY MS. BRADY:

**Q. What is the BetterHelp pixel that you engineered?**

MR. HAMMER: Objection, misstates testimony, vague and over-broad, calls for speculation.

THE WITNESS: Can you repeat the question?

BY MS. BRADY:

**Q. Sure. What's the BetterHelp pixel that BetterHelp engineered?**

MR. HAMMER: Same objections.

THE WITNESS: So we developed a version of the pixel that when you are

A. Uh-huh.

[redacted]



A. [redacted]



[redacted]

BY MS. BRADY:

**Q. Okay. Let's talk about that for a little bit. What information would people who subscribed to the service would Facebook be given to create a lookalike audience?**

MR. HAMMER: Objection, vague. I think there are some grammar issues in that question.



BY MS. BRADY:

**Q. I'm sure there is. Do you understand what I'm trying to get to?**

A. No.

**Q. So you said that it's all the people who subscribed to BetterHelp, correct --**

MR. HAMMER: Objection --

MS. BRADY: -- to create a custom audience?

MR. HAMMER: -- misstates testimony.

THE WITNESS: Not all of the people.

BY MS. BRADY:

**Q.** [redacted]

[redacted]



[redacted]

MR. HAMMER: Objection, misstates testimony, misstates what was just described.

THE WITNESS: [redacted]

BY MS. BRADY:

**Q. Okay. But how does that help BetterHelp?**

MR. HAMMER: Objection, vague.

THE WITNESS: How does what help BetterHelp?

BY MS. BRADY:

**Q.** [redacted]

MR. HAMMER: Objection, vague, misstates testimony.

THE WITNESS: [redacted]



BY MS. BRADY:

[redacted]

MR. HAMMER: Maureen, you just went over all this.

MS. BRADY: I know and she is giving me three different answers.

MR. HAMMER: No. She keeps saying the same thing.

MS. BRADY: She doesn't.

MR HAMMER: I don't think you are



understanding the terms.

BY MS. BRADY:

**Q.** [redacted]

[redacted]

**Q. Background?**

MR. HAMMER: Objection, vague.

THE WITNESS: I'm not sure what you mean by that.

BY MS. BRADY:

**Q.** [redacted]

MR. HAMMER: Objection, misstates testimony.

[redacted]



[redacted]



[redacted]

**Q. What is your understanding of a hashed email?**

A. Yeah, so my understanding is that hashing is a sort of cryptology term that encodes it in a way that it's not readable any longer, and it's like it cannot be reversed.

It is just kind of to us would look like mumbled garbage.

**Q. Do you have any understanding as to how Facebook would utilize hashed emails?**

A. No.

**Q. Okay. Do you have any understanding as to whether or not Facebook could also hash the email information of their users to match up the hashed emails from BetterHelp?**

A. I'm not sure how they did that.

**Q. What is your understanding of the**



**service that BetterHelp provides to the public?**

A. BetterHelp provides a way for people to connect with therapy, and it provides a platform for that like connection.

**Q. Does BetterHelp -- are you familiar with the term PHI?**

A. I have heard it.

**Q. What is your understanding of PHI?**

A. This is I know a legal term, so I might not be a hundred percent correct, but I believe it's personal health information.

**Q. Does BetterHelp store and maintain any personal health information for its customers or patients?**

MR. HAMMER: Objection, calls for legal conclusion, calls for speculation.

BY MS. BRADY:

**Q. To your knowledge?**

A. I'm not sure.

**Q. We have been talking mostly about the social media channels that BetterHelp advertises on, correct?**

A. Yes.
**Q. And you mentioned that you primarily handle the Facebook channel, is that correct?**
A. Yes.
**Q. And is that true today?**
A. Yes.
**Q. Does -- how does -- currently, how does BetterHelp advertise with Facebook?**
MR. HAMMER: Objection, vague.
THE WITNESS: Can you be a little more specific?
BY MS. BRADY:
**Q. Sure.** [redacted]



[redacted]
**Q. Other than Facebook, and I know you mentioned a few of them, from 2017 to 2022, what other social media channels were you particularly in charge of for Betterhelp advertising?**
A. I probably won't be able to do a comprehensive list, but I will list the ones I can remember, Snap Chat, Pinterest, Reddit, I want to say Tik Tok.
It might have gone outside of that window, but I know it was somewhere around there.
There might be more, but those are the ones I can remember right now.
**Q. Anything on YouTube?**
A. I didn't manage that.
**Q. Did someone else on your team manage YouTube?**
A. I'm not sure. I know we had an



external agency who managed -- yeah, I'm not sure.
I was going to say they managed AdWords, but I'm not sure if YouTube fell under that.
**Q. Okay. What is the external agency that you utilized to assist in the marketing?**
A. They were called Five Mill.
**Q. Five Mill?**
A. Yes.
**Q. And was that utilized from 2017 through 2022?**
A. I don't recall if it was during that entire time period, but certainly portions of it.
**Q. And you said that they may have done YouTube, is that correct?**
A. I'm not sure. I know for certain they helped with Google search ads, and at some point I know Google acquired YouTube. So I'm not sure if there was overlap.
**Q. Gotcha. You mentioned earlier that you did not run Google analytics, correct?**



A. No.
**Q. Did you run any social media on any Google platform?**
A. Not to my knowledge.
**Q. Was there anyone in particular that you worked with at Five Mill?**
A. Susan was the main contact, Susan Waldes, W-a-l-d-e-s.
**Q. When was the last time you worked with Five Mill?**
A. We ended the relationship a couple years back.
**Q. Like in 2023?**
A. Past this time period.
[redacted]

[redacted]



[redacted]



**Q. What in the database did BetterHelp utilize to create more tailored content?**
A. So, for instance, anything we are looking at is going to be aggregated.
So earlier I gave the example of a mail campaign. So an instance of that is I can see, you know, males aren't quite responding with our own data. We are not seeing very much activity there. Let's create some tailored content for men.
**Q. Okay. Was that true of all the social media platforms?**
A. I'm not sure if that was true for all of them.
**Q. Was it one of the -- we sort of alluded to it in your last answer.**
**Was it one of the goals of BetterHelp to create most relevant ads as possible to a specific audience?**
A. I wouldn't say that was the goal. We tried to represent all kinds of people.
**Q. Sure. Would you try to -- would BetterHelp try to advertise to certain audiences with certain types of ads?**



A. Yeah, I would say like the man example, we have done that before.
**Q. And that is utilizing BetterHelp information, is that correct?**
A. In this case it was, yes.
**Q. What other cases did not utilize BetterHelp information?**
A. I can't think of any that we did differently.
**Q. Is it a goal of the advertising of BetterHelp to get ads in front of the most relevant audience for the least amount of money?**
MR. HAMMER: Objection, vague.
THE WITNESS: I wouldn't necessarily say that's true.
MR. HAMMER: Maureen, I think lunch is here. We can go a little bit longer if you want or we can --
MS. BRADY: We can break now. That's fine.
THE VIDEOGRAPHER: Please standby. We are going off record at 12:19 p.m.
(Lunch recess was taken from 12:19 p.m. to 12:49 p.m.)

people than people who use Tik Tok.
I don't have any supporting evidence of that, though.
BY MS. BRADY:
**Q. Okay. But you as a marketing person, you are going to have to know what platforms better suit your advertising needs, correct?**
A. I mean -- sorry, Can you restate that?
**Q. You are a marketing person, correct?**
A. Yes.
**Q. And do you have a general understanding as to which social media platforms would better reach your marketing goals?**
A. I would say we measure which ones are better reaching, but in general, yeah, I think that answers your question.
**Q. So you measure it, correct?**
A. Yes.
**Q. And based on that measurement, do you have an assessment of which social media platforms reach different types of**



**folks?**
A. I'm not really --
MR. HAMMER: Different goals or reach different types of folks.
BY MS. BRADY:
**Q. Audiences that I'm talking about.**
A. I'm not looking to see specifically what each platform is bringing in terms of audience. I'm not really looking at that. I'm looking at overall numbers aggregated, like how many people total.
**Q. Okay. You mentioned earlier that you had to curtail a marketing campaign for men. Let's say we'll use that as an example.**
**Is that something that you would do across all social media platforms?**
MR. HAMMER: You said curtail. Is that what you meant to use?
BY MS. BRADY:
**Q. Yeah, where you said you wanted to target men, so you changed your or created an ad specifically targeting or curtailed towards men, correct?**



A. [redacted]
**Q. Would you agree with me that different social media platforms are attractive to different types of folks based on age, gender, educational background, those types of things?**
A. I could agree with that.
**Q. Okay. And so in your intake questionnaire, the information that you utilized to analyze your marketing campaigns and formulate your marketing**



**campaigns, do you use that information to target folks or create content for different platforms, or is it all the same across all platforms?**
MR. HAMMER: Objection, vague, compound, assumes facts.
THE WITNESS: Can we break that down a little bit?
BY MS. BRADY:
**Q. Absolutely.**
A. Thank you.
**Q. Are all the ads that you utilize with BetterHelp the exact same through every social media platform?**
A. I'm trying to think back to the specific time period. In general, practices would be the same, and I would say, in general, most of the ads were broad.
So 18 up and specific geos as to when we did this narrowing, I can only think about one Facebook example. So I can't recall if we did that in other platforms.
**Q. Would you discuss that with Danny**

full subscription. So we would do the hashed email procedure from before as a custom audience.

**Q.** [redacted]

**Q. And that's where I'm getting confused.**

A. Right.

**Q.** [redacted]



[redacted]



A. [redacted]

**Q. Excuse me. Or would --**

THE VIDEOGRAPHER: Do you want me to go off the record?

MS. BRADY: Yeah.



THE VIDEOGRAPHER: Standby, please. Going off record at 1:19 p.m.

(Recess was taken from 1:19 p.m. to 1:20 p.m.)

THE VIDEOGRAPHER: Resuming record at 1:20 p.m.

BY MS. BRADY:

**Q. Okay. Were there any identifiable demographics other than the 90 day full subscription that BetterHelp utilized to create a custom audience?**

A. I don't recall.

**Q.** [redacted]

**Q. And my understanding from your previous testimony, you never got the**

There used to be a way to do that on Facebook, but they moved forward with a more aggregated approach, so you could not slice and dice to see what sort of information they used to have available.

**Q. Okay. Then it goes on to state, overall, the best rec we can give is women 18 to 35, higher income, suffering from mild stress, anxiety or depression.**

**Do you see where I am reading that?**

A. Yes.

**Q. What did you mean by that?**

A. I don't recall what I meant by the best rec.

**Q. Okay. Is women 18 to 35, higher income, suffering from mild stress, anxiety or depression, criteria by which you can create a custom audience?**

A. On Facebook?

**Q. Yes.**

A. I don't think it can make the custom audience based on these things, because custom audiences, again, are like email uploads that we were doing or they



are made from the pixel.

I don't think you can make custom audiences based on like this sort of demographic data.

**Q. Do you know what this data was referring to?**

A. No, I don't recall.

**Q. Okay. Let's look at Exhibit No. 172. This is a one page document, also a Slack message 3703.**

A. Okay.

**Q. Okay. And this is another Slack message. Do you know who you were communicating with?**

A. No.

**Q. Okay.** [redacted]



**Q.** [redacted]

**Q. Okay. Thank you.** [redacted]

**Q. Alright, let's look at Exhibit No. 175. And this is another one page document, BetterHelp 3720. Have you ever seen this document?**



A. I can't remember. I sent a lot of messages.

**Q. Okay. Go ahead and take a second to look at it.**

A. Okay.

**Q. Alright. It says -- well, first, who are you communicating with?**

A. I would have to speculate based on the to little line there.

**Q. Jamie Harden or Jessica Kellie Baker?**

A. I think it's the people I recognize are Jamie, Haesue and Kellie.

**Q. Oh, okay. So it looks like three people then, is that right?**

A. That's what I'm reading here.

**Q. Okay. And it says hey, so there are -- first, let me ask this. Who is Jamie?**

A. Jamie, I don't recall her specific title. She works at BetterHelp, though.

**Q. How about Haesue?**

A. She also worked at BetterHelp, no longer with the company.

**Q. Do you know what capacity Haesue**

A. Yes.

**Q. And do you have an understanding what that number represents?**

A. I'm not sure totally what it means with like the matching, but this would end up being the audience size.

**Q.** [redacted]



[redacted]



[redacted]

**Q. Gotcha. Thank you. Fair enough. Okay. David, can you scroll up a little bit.**

THE VIDEOGRAPHER: Up.

MS. BRADY: Uh-huh.

I want to get to one where she did.

THE VIDEOGRAPHER: This way?

MS. BRADY: Yeah.

Let's hold there and look at line 33. Was this one that you did?

THE WITNESS: I can't recall.

BY MS. BRADY:

**Q. Okay. How about row 35?**

A. I can't recall. This was very early on in my training. I would have only been here for two months. So I don't know if I would have been doing this yet.

**Q. Okay. Let's scroll down a little, David, and get past 2017 if we could. You can go up, yeah. Okay, let's stop at row**



**30. Is this one you did?**

A. So again, this is PrideCounseling.

**Q. Sorry. How about 29?**

A. 29. Are there any more recent? I just want to be sure it was before I start to testify against it.

**Q. Sure, no, go ahead and scroll through. Doesn't look like anything there. How about row 15?**

A. So I don't recall much about the value based ones. So I would feel more comfortable talking about 16.

**Q. Okay, sure, great. Okay, that's great.**

**Is this one of your creations for this spreadsheet?**

A. So, again, I can't promise it was, but it looks like something I could have created.

**Q.** [redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

# Exhibit 11

# Exhibit A

FOIA CONFIDENTIAL TREATMENT REQUESTED

## FACTUAL SUMMARY

[redacted]

[redacted]

- [redacted]
- [redacted]
- [redacted]
- [redacted]
- [redacted]

[redacted]

[redacted]

1 [redacted]

[redacted]

[redacted]

[redacted] [redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

---

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted] [redacted]

[redacted]

[redacted]

[redacted]

---

[redacted]

FOIA CONFIDENTIAL TREATMENT REQUESTED

[redacted]

## Response to Follow-Up Questions

This serves as the Company's response to the follow-up questions from the Federal Trade Commission ("FTC") in response to the Company's previous responses to the Civil Investigative Demand ("CID") dated July 30, 2020. The Company objects to the Requests to the extent they are overly broad, unduly burdensome, seek information protected by the attorney-client privilege or other applicable privileges or protections, and/or seek information not currently known to the Company. The Company incorporates by reference its previous objections to certain definitions in the CID including of "Personal Information." The definition of "Personal Information" in the CID is vague and overbroad to the extent it includes any "information from or about an individual consumer," irrespective of whether that information is individually identifiable. The Company also objects to this definition to the extent it does not take into account whether such information is collected, used, stored, or disclosed in an anonymized, deidentified, aggregated, or encrypted form. As explained in our Cover Letter, production of these materials is not intended to waive any of the Company's rights or remedies, all of which are expressly reserved.

1. **Please describe all versions or paths of the entire intake questionnaire flow throughout the Applicable Time Period presented on any website or mobile application owned or operated by the Company, and explain how the questions presented to an individual aredetermined by the responses to prior questions.**

As we discussed on March 16, 2021, the Company has utilized numerous iterations of the intake questionnaire. The questions are not static, and the changes are not documented in the ordinary course of business. Nor can historic versions or iterations be reconstructed without significant burden. Without waiving that objection, the Company describes the paths as follows.

A tree representing iterations of the sequence in which questions may currently appear on BetterHelp's website, Regain's website, Pride Counseling's website, and Faithful Counseling's website is produced at BHDPIP00001149. As it demonstrates, the quiz path a user will travel depends on what website the user starts at, and whether, in some instances, the user is using a mobile device or desktop. It also demonstrates how answering certain questions can result in other questions being displayed or hidden. And it details what questions will redirect the flow of questions and what questions are there by default.

So, for example, if, on the BetterHelp website, a user were to identify as non-heterosexual, the user would then be shown a question (5) about whether they want to be "matched with a counselor who specializes in LGBT issues." If that user were to answer yes, the user would then be shown a question (6) about their preferred pronouns. That user would not be shown any questions (8–10, 29–33) about religion, but will be asked about their spirituality (11) as well as questions related to their identity (26–28).

**FOIA CONFIDENTIAL TREATMENT REQUESTED**

Some questions are asked on all websites. These include: "How old are you?"; "How would you rate your current financial status?"; and "Who referred you?" Users who fill out the intake questionnaire on a mobile device complete fewer questions than those who fill out the questionnaire on a desktop.

During the Applicable Time Period, multiple departments could be involved in changes to the questions, but the Product Department had the most involvement, including approving requests to change a question. Minor changes to the wording of questions occurred approximately every few weeks, and the entire list of questions was reviewed and evaluated approximately twice a year.

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

2. **The Company's response to Specification G.5 of the CID references a banner displayedwhile users are answering the intake questionnaire on the BetterHelp website. Please produce all iterations of the banner displayed during the Applicable Time Period and, foreach, state which websites and mobile applications the banner was displayed on and when it was in effect.**

The Company has continuously striven to enhance transparency and choice with respect to its cookie and web-beacon usage.

Consistent with these efforts, in September 2020, the Company launched a banner on the BetterHelp website and mobile app that popped up on every question in the intake questionnaire. The banner originally stated "We use cookies to help the site function properly, analyze usage, and measure the effectiveness of our ads. We never sell or rent any information you share with us. Read our Privacy Policy to learn more." The banner linked to the Privacy Policy.

One month later, the Company deleted the line about selling and renting information on the banner and added a disclosure, which also was included in the Privacy Policy, that the Company also used third-party web beacons. This banner originally appeared only on the BetterHelp website and app and stated: "We use BetterHelp and third-party cookies and web beacons to help the site function properly, analyze usage, and measure the effectiveness of our ads. Read our Privacy Policy to learn more."

In the next month, November 2020, BetterHelp rolled out this banner to all its active multi-sites and their applications. The content remained the same except the multi-site banner stated that the multi-site's (rather than BetterHelp's) cookies and web beacons were used (along with third-party cookies and web beacons). The colors of the banner differed by site. (Banners are not available for iCounseling, MyTherapist, and Terappueta, which reroute to BetterHelp.)

Current banners are produced at BHDPIP00001150–BHDPIP00001154 and a compilation of historical banners is produced at BHDPIP00001155.

[redacted]

---

[redacted]

**3. The Company's response to Specification G.5 of the CID states that, in December 2020,the representation "Rest assured – any information provided in this questionnaire will stay private between you and your counselor" was changed to "Rest assured – this information will stay private between you and your counselor." Please produce all iterations of the representation displayed during the Applicable Time Period and, for each, state which websites and mobile applications the representation was displayed on and when it was in effect. In addition, please Identify who decided to change the representation and explain why it was changed.**

The Company objects to this Request to the extent it calls for information protected by the attorney-client privilege or other applicable privileges or protections, and its response to this Request is not intended to, and does not, waive any applicable privilege or other legal basis under which information may be protected from disclosure.

The Company used three iterations of this statement, which appeared on the BetterHelp, Pride Counseling, and Faithful Counseling websites and apps. The statement appears on the pop-up box that contains the question, "Are you currently taking any medication?"

Since at least the beginning of the Applicable Time Period until December 2020, the pop-up box stated: "Rest assured – any information provided in this questionnaire will stay private between you and your counselor." The statements appeared in the pop-up box that contains the question, "Are you currently taking any medication?" on BetterHelp's, Pride Counseling's, and Faithful Counseling's websites and apps until December 2020.

In December 2020, the Company revised the statement to state: "Rest assured – this information will stay private between you and your counselor," which appeared on BetterHelp's, Pride Counseling's, and Faithful Counseling's websites and apps.

In January 2021, the Company further revised the statement to state: "Rest assured—your health information will stay private between you and your counselor." This statement still appears today on BetterHelp's, Pride Counseling's, and Faithful Counseling's website and apps.

A screenshot of the 2020 and 2021 statements is produced at BHDPIP00001156. These changes were implemented by the Product Team.

**4. Please produce all iterations of the BetterHelp FAQ and, for each, state when it was in effect.**

As we discussed on March 16, 2021, BetterHelp has utilized numerous iterations of the FAQ. All iterations of the BetterHelp FAQ are not stored in the ordinary course of business. Changes, if captured at all, may be stored in an internal database. That database, however, lacks the functionality to extract prior iterations of the BetterHelp FAQ.

As we discussed on March 16, in response to this Request, we are producing: (1) screen shots and descriptions of changes made on the Company's FAQs between March and April 30th; (2) an explanation of who had the ability to make changes to the FAQ; (3) an explanation of who had the authority to authorize changes to be made; and (4) previous iterations of the "can I stay anonymous" question that could be found after a reasonable search.

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

Screen shots of the changes made since the Company's last response to the FTC are produced at BHDPIP00001157–BHDPIP00001158. A current version of BetterHelp's FAQ is produced at BHDPIP00001428–BHDPIP00001435.

5. **The Company's current and prior privacy policies state: "You may decide which Information, if any, you would like to share with us, but some functions of the Platform may not be available to you without providing us the necessary Information. By deciding to provide the Information you agree to our methods of collections and use, as well to other terms and provisions of this Privacy Policy." Describe in detail all the ways in which an individual can opt out of sharing, or otherwise decide not to share, each type of the "Information" (as it is defined in those privacy policies) with the Company or a third party.**

The Company's recent Privacy Policy explains that the Company collects, uses, and stores the following types of data: "your personally identifiable information (such as, but not limited to, your name, phone number, email address, and address), billing and payment information, profile information, log data (information such as your computer, Internet Protocol address ("IP"), pages that you visit and the amount of time spent on those pages, actions you take and other statistics), information related to the Counselor Services or your need for Counselor Services, and any information which is exchanged between you and your Counselor."

<u>The Company made updates to the Privacy Policy this month, setting forth the following categories of information</u>: (1) visitor data; (2) onboarding data; (3) account registration data; (4) transaction data; (5) login data; (6) counseling session data; (7) customer data; (8) counselor data; and (9) communications data. The updated policy is produced at BHDPIP00001443–BHDPIP00001460.

(1) *Visitor Data* includes user visits to its websites and use of the Company's applications, which also includes the particular pages visited or viewed by the user, the amount of time the user spent on the website or application, website errors experienced by the user, visits to the Company's 'FAQ' page, and information about the browser or device used to access the website and application, such as the user's mobile device ID and IP address.

(2) *Onboarding Data* includes questionnaire responses provided by users in the process of initial registration, data regarding the pages viewed by the user, whether the user clicks the "Get started" link to begin completing the questionnaire, and whether the user responds to any of the questionnaire prompts.

(3) *Account Registration Data* includes data in connection with the account registration process, such as whether users registered using their Facebook or Google profiles, and whether a user verifies their reported email address or phone number. This data also includes the Company's identifier for account holders. (The Company assigns each user who creates a Company account an anonymized, sequentially generated client ID. Please see Response to Request 14 for more information.)

(4) *Transaction Data* includes information regarding payment for the Company's services by users and related transactions on its website, such as whether a user completed payment for the Company's services, signed up for the Company's

services using a trial offer, canceled or otherwise ended a trial, or completed a request to receive financial aid for the Company's services.

(5) *Login Data* includes data regarding logins to the Company's website and application by registered users (including Counselors) and activity conducted during that log in such as when a user logs in, the number of messages received or sent through the Company's website or app during that log in, and whether a user has been assigned, started, or completed a counseling goal. Login Data does not include the content of any messages sent or received by users or the content of any counseling goals.

(6) *Counseling Session Data* includes data regarding user counseling sessions such as whether a live session has been scheduled by the user, whether a Counselor or user joins a scheduled session, when a counseling session began and ended, and whether a counseling session was canceled or re-scheduled.

(7) *Customer Data* includes data from users that have signed up for the Company's services such as a user's self-reported name or nickname, age, e-mail address, phone number, and emergency contact information.

(8) *Counselor Data* includes but is not limited to information such as the Counselor's name, e-mail address, and phone number, address, NPI number (if applicable), CAQH number (if applicable) and education and job history.

(9) *Communications Data* includes communications between users and Counselors on the Platform, and communications between users and the Company's customer service team.

The Company's previous Privacy Policy explains that the Company may collect, use, and store this information for several different "business and marketing purposes" and describes the purposes and third parties involved. The updated Privacy Policy categorizes these purposes and third parties as follows:

(1) *Communication with the user*, which includes contacting the user with information, alerts, and suggestions that are related to the Platform; verifying the user's identity; completing an activity the user requests such as registering the user for the Platform or responding to a request for information; and reaching out to a user if the Company has a good reason to believe that the user or any other person may be in danger or may be either the cause or the victim of a criminal act.

(2) *Delivery of services to the user*, which includes creating the user's account and enabling the user to log on to the Platform; managing the user's account, providing the user with customer support, and ensuring the customer is receiving quality service; for billing and transaction processing purposes; to match users with Counselors and facilitate the Counselor Services; to supervise, administer, and monitor the platform; to measure and improve the quality, effectiveness and delivery of services.

**FOIA CONFIDENTIAL TREATMENT REQUESTED**

(3) *Customization and marketing*, which includes advertising and marketing the Platform and Counselor Services to potential users and counselors; personalizing website experience and delivering content and product and service offerings relevant to individual interests, including targeted offers and ads through the Company's websites, third-party sites, and via email or text message.

(4) *Compliance with law*, which includes responding to law enforcement requests and as required by applicable law, court order, or governmental regulations; and complying with applicable state and federal laws, including, but not limited to laws related to protecting client and public health and safety.

(5) *Other uses with consent*, which includes any other purpose with the user's affirmative, specific consent.

<u>The updated Privacy Policy characterizes the information shared with third parties, along the following lines</u>:

(1) *For business purposes and advertising*, which includes facilitating Counselor Services; sharing information with vendors and service providers (including data hosting, data storage partners, analytics providers, advertising providers, and vendors providing technology services and support, payment processing and data security); and sharing information with professional advisers, such as auditors, law firms, and accounting firms.

(2) *With the user's direction or consent*, which includes sharing information with third parties if the user requests or directs the Company to do so.

(3) *With affiliates* within the Company's corporate group.

(4) *To comply with the law*, which includes sharing with a court, a regulatory entity, law enforcement personnel, or pursuant to a subpoena.

(5) *In the context of a transaction*, such as an asset sale, merger, bankruptcy, or other business transaction.

(6) *For other business reasons*, such as enforcing any applicable Term and Condition and/or Term of Use, and to ensure the safety and security of the Platform and the users of the Platform.

<u>The Privacy Policies and Opt-Out Pages inform visitors and users how they can opt out of sharing at least some of this data with either the Company and/or third parties</u>.

The previous and updated Privacy Policies explain that the Company uses cookies and web beacons; what those terms mean; and why the Company collects cookies and uses web beacons. Both specifically explain how to opt out.

**FOIA CONFIDENTIAL TREATMENT REQUESTED**

The Opt-Out page on the Company's websites further details opt-out options. Since 2018, the Company has published an "Opt-Out" page that explains how to opt out of tracking by the Company. The "opt out" page explains that a person "can clear anonymous tracking cookies from this site using your browser" and provides instructions for how to do so by linking to https://www.aboutcookies.org/how-to-delete-cookies/. At least throughout the Applicable Time Period, this option was available.[2]

The Company has since made it even easier to opt out of tracking.

[redacted] the Company began to roll out an automatic pop-up banner on the BetterHelp and multi-sites' landing pages that states: "[w]e use [Company] and third-party cookies and web beacons to help the site function properly, analyze usage, target and measure the effectiveness of our ads. Read our Privacy Policy to learn more and go to Cookie Preferences to manage your settings." This banner will be implemented for all sites by approximately June 2021.

As soon as a visitor clicks on the Cookie Preferences link, it will be given control over cookies and web beacons. The cookies/web beacons are defaulted "on" for everyone outside the European Union. However, this Cookie Preferences link offers the visitor several options to "opt out."

[redacted] The toggle tool has up to four tabs to click on, including tabs entitled (1) Your Privacy; (2) Strictly Necessary Cookies; (3) Performance Cookies; and (4) Targeting Cookies.[3]

At the tab "Your Privacy" the visitor is told that, because the Company "respect[s] [the visitor's] privacy, [the visitor] can choose not to allow some types of cookies," and directs the visitor to "learn more" by reviewing the Privacy Policy (which the tool links to).

In the other tabs, the visitor may be provided details around (1) three types of cookies—strictly necessary cookies (first-party cookies), performance cookies (third-party cookies), and targeting cookies (third-party cookies)—and (2) how to opt out.

The Company defines "strictly necessary cookies" as those "necessary for the website to function" and which "can't be switched off in [its] systems. They are usually only set in response to actions [the visitor] ha[s] taken which result in a request for services, such as setting [the visitor's] privacy preferences, logging in, or filling in forms." The visitor is not provided an option to opt out of these types of cookies as

---

2 [redacted]

3 The tabs that will appear will depend on the type of cookies on the site.

they are always active. However, the Company informs visitors that they can block these types of cookies by setting their "browser to block or alert [them] about these cookies" but warns that "some parts of the site may not work as a result."

In another tab, the Company defines "performance cookies" as cookies that "allow" the Company to "count visits and traffic sources so [it] can measure and improve the performance of [its] site. They help [the Company] to know which pages are the most and least popular and see how visitors move around the site. All information these cookies collect is usually aggregated and therefore anonymous. If [the visitor] do[es] not allow these cookies [the Company] will not know when [the visitor] ha[s] visited [the] site, and will not be able to monitor its performance." The visitor is provided an option via a toggle tool to opt out of sharing these cookies. If the visitor chooses not to share performance cookies, the web scripts for Mixpanel and Google Analytics will stop running. That means that Mixpanel and Google Analytics will not obtain any data for this visitor at that point moving forward.

The Company defines "targeting cookies" as those cookies that are "set through [its] site by [its] advertising partners and help [it] measure the effectiveness of [its] ads." The Company notes that these cookies "may also be used by those companies to build a profile of [the visitor's] interests and show [the visitor] relevant adverts on other sites." The Company further notes that these companies "do not store directly personal information but are based on uniquely identifying [the visitor's] browser and internet device." The Company explains that if the visitor doesn't "allow these cookies," the visitor "may experience less targeted advertising." The visitor is provided an option via a toggle tool to opt out of these cookies. If the visitor chooses to opt out of those cookies, the web scripts for ad partners will stop running. That means those ad partners will not obtain any data from the visitor at that point onward.

In short, to use the Services, a person can opt out of all cookies (except blocking strictly necessary cookies will mean some functionality will be lost). If the site visitor opts out of a specified category, resets the browser, or has a privacy plugin installed, web beacon script is blocked from running (and therefore tracking the visitor's actions).

<u>Historically, and now, there are other ways to opt out of providing at least some of the data described above.</u>

Those merely visiting the Company's platform do not need to share any of the information with the Company that they don't want to except the Visitor Data unless and until the visitor opts out of doing so. And a visitor doesn't share Visitor Data if they have a privacy plug in on their browser already or there is some other reason cookies are blocked.

To create an account, visitors must also provide some Onboarding Data and Account Registration Data. However, visitors choose their responses, such as whether to use a nickname. Visitors can just click whatever options they wish to answer the questions in order to create an account.

**FOIA CONFIDENTIAL TREATMENT REQUESTED**

Visitors can also opt-out of sharing data regarding the pages viewed by opting out of performance and tracking cookies. They will soon be able to do so via the CookiePro cookie-settings tool; before CookiePro, they could have adjusted their browser setting or used a privacy plug in or otherwise blocked cookies.

Subscribers to the Company's Services must provide Login Data, Counseling Session Data, Customer Data, and Communications Data. This data is not shared with third-party advertising or analytics companies.

Subscribers can also opt-out of sharing information with their Counselors. They can use nicknames with their counselors (unless the Counselor's state guidelines dictate otherwise). They are also free to choose what they do and do not share with their Counselors.

[redacted]

Additionally, anyone has the option to stop using the Company's Services and to stop providing data at any time.

6. **The Company's response to Specification G.1 of the CID states that the Company operates websites and mobile applications for MyTherapist, TeenCounseling, Faithfulcounseling, PrideCounseling, iCounseling, Regain, and Terappeuta. For each such website and mobile application, please state (1) how long it has been in operation;and (2) whether it was subject to the same privacy policies the Company provided in BHDPIP00000002, BHDPIP00000050, BHDPIP00000052, BHDPIP00000054, BHDPIP00000056, BHDPIP00000058, and BHDPIP00000060. If any such website or mobile application was subject to a different privacy policy at any time during its operation, please provide the applicable privacy policy and state when it was in effect.**

| Source | Length of Operation | Subject to Privacy Policies Provided? |
|---|---|---|
| Regain | May 2016-Present | Yes |
| TeenCounseling | January 2017-Present | Yes |
| iCounseling | February 2017-November 2020 (reroutes to BetterHelp) | Yes |
| Terappeuta* | March 2017-March 2019 (reroutes to BetterHelp) | Yes |
| MyTherapist | June 2017-March 2019 (reroutes to BetterHelp) | Yes |
| FaithfulCounseling | July 2017-Present | Yes |
| PrideCounseling | August 2017-Present | Yes |

*Changes to the Company's privacy policies were not always reflected on Terappeuta, which is a Spanish-language website. The last change made to its Privacy Policy occurred on September 18, 2018. This is produced at BHDPIP00001436–BHDPIP00001442.

7. **The Company's response to Specification P of the CID states: [redacted] With respectto this response:**

   a. **Explain the Company's understanding of the difference, if any, between pixels and web beacons, including whether the Company's reference to web beacons inthis response and elsewhere on its websites or mobile applications is meant to include the Facebook Pixel; and**

   b. **List each web beacon removed from the "BetterHelp platform":**

      i. **List each webpage it was removed from as well as how long it had been there.**

      ii. **Describe what Personal Information (including all identifiers such as name, phone number, address, geolocation, email address, device identifier, advertising identifier, IP address) and event data it was collecting and, for each such type of Personal Information or event data:**

      iii.

         1. **State the number of individuals for whom it was collected;**
         2. **Describe how the Company used it; and**
         3. **Identify each third party to which it was disclosed, and describe when and why it was disclosed to the third party;**

      iv. **Explain why the Company removed the web beacon.**

The Company objects to this Request to the extent it calls for information protected by the attorney-client privilege or other applicable privileges or protections, and its response to this Request is not intended to, and does not, waive any applicable privilege or other legal basis under which information may be protected from disclosure.

[redacted]

FOIA CONFIDENTIAL TREATMENT REQUESTED

[redacted]

[redacted]

[redacted]

[redacted]

| [redacted] | [redacted] |
| --- | --- |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |

4 [redacted]

| | |
|---|---|
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |

[redacted]

**8. Specification K.2 asks for the number of users whose Personal Information was disclosed to third parties. The Company's response (through citation to its response to Specification G.8) lists the number of visitors, sign ups, and paid users for years 2017, 2018, and 2019. Please state which number—whether visitors, sign ups, or paid users—represents the number of individuals for which the Company sent Personal Information to third parties.**

The Company objects to the characterization of the information as "Personal Information" that the Company "sent . . . to third parties." [redacted]

[redacted]

[redacted]

| [redacted] | [redacted] | [redacted] | [redacted] |
|---|---|---|---|
| [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] |

[redacted]

**FOIA CONFIDENTIAL TREATMENT REQUESTED**

**9. Please state the number of users of the Company's counseling services for each of the following of its clients:** [redacted]

[redacted]

[redacted]

**FOIA CONFIDENTIAL TREATMENT REQUESTED**

**10. With respect to BHDPIP00000049, please define "Advertising Optimization","Advertising Attribution", and "Advertising to Users."**

"Advertising optimization" refers to the process of creating and refining ads that are relevant to users who see them and "[a]dvertising attribution" refers to the way of determining which types of marketing contributes to user behavior (known as conversions). There is overlap between the concepts because "advertising attribution" is a necessary part of "advertising optimization."

[redacted]

**11. With respect to BHDPIP00000049, please describe in detail what information was provided through "every page load," including what type of "browser information" Facebook, Pinterest, Reddit, and Twitter could access through those page loads.**

The Company objects to the characterization of BHDPIP00000049. Without waiving any objection, the Company respectfully refers the FTC to its Responses to Requests 7, 13, and 17, and its factual summary.

**12. With respect to BHDPIP00000049, please list which of the Company's websites or mobile applications shared each type of Personal Information listed in column B.**

The Company objects to the characterization of BHDPIP00000049. Without waiving any objection, the Company respectfully refers the FTC to its factual summary.

**13. BHDPIP00000049 states that** [redacted]

The Company objects to this Request to the extent it calls for information protected by the attorney-client privilege or other applicable privileges or protections, and its response to this Request is not intended to, and does not, waive any applicable privilege or other legal basis under which information may be protected from disclosure.

[redacted]

[redacted]

**14. BHDPIP00000049 states that** [redacted]

The Company objects to the characterization of BHDPIP00000049. Without waiving any objection, the Company states that [redacted]

**15. Please state which identifiers (e.g., name, phone number, address, geolocation, email address, device identifier, advertising identifier, IP address) the Company [redacted]**

The Company objects to the characterization of BHDPIP00000049. Without waiving the objection, the Company respectfully refers the FTC to its factual summary and Responses to Requests 7, 13–14, 16–17, and 23–24, which provide details about Facebook and Google Tag Manager.

**16. Please state the event names provided to Facebook for the following types of Personal Information listed in column B of BHDPIP00000049:**

a. [redacted]

[redacted]

[redacted]

The Company respectfully refers the FTC to its Responses to Request 7 and 17 for more context. The Company objects to the characterization of (a)–(c) as "Personal Information." [redacted]

Without waiving any objection, the Company states the event names for each event changed over the Applicable Time Period:

[redacted]

[redacted]

[redacted]

[redacted]

**FOIA CONFIDENTIAL TREATMENT REQUESTED**

**17. Please provide the name and definition for each pixel and app event (both standard and custom events) the Company sent** [redacted]

[redacted]

[redacted]

[redacted]

[redacted]

The Company also objects to this Request to the extent it calls for information protected by the attorney-client privilege or other applicable privileges or protections, and its response to this Request is not intended to, and does not, waive any applicable privilege or other legal basis under which information may be protected from disclosure.

[redacted]

FOIA CONFIDENTIAL TREATMENT REQUESTED

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

FOIA CONFIDENTIAL TREATMENT REQUESTED

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

---

[redacted]

[redacted]

**18. Please describe in detail every advertising campaign the Company ran on Facebook during the Applicable Time period, including the targeting criteria (e.g., what events, Personal Information, and/or Custom Audiences the campaign utilized), advertisement imagery, dates of the campaign, click-through information, and conversion information.**

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

---

[redacted]

**FOIA CONFIDENTIAL TREATMENT REQUESTED**

[redacted]

**19.** [redacted]

[redacted]

[redacted]

[redacted]

**20.** [redacted]

[redacted]

[redacted]

[redacted]

---

9 [redacted]

21. [redacted]

[redacted]

[redacted] [redacted]

[redacted]

[redacted]

[redacted] [redacted]

[redacted]

[redacted]

[redacted] [redacted]

[redacted]

---

[redacted]

[redacted]

22. [redacted]

| [redacted] | [redacted] |
|---|---|
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |

FOIA CONFIDENTIAL TREATMENT REQUESTED

| | |
|---|---|
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |

**FOIA CONFIDENTIAL TREATMENT REQUESTED**

| | |
|---|---|
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY 

**FOIA CONFIDENTIAL TREATMENT REQUESTED**

[redacted]

[redacted]

[redacted]

[redacted]

**23.** [redacted]

- [redacted]
- [redacted]
- [redacted]
- [redacted]
- [redacted]

[redacted]

[redacted]

[redacted]

[redacted]



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY 

24. [redacted]

[redacted]

[redacted]

[redacted]

**25. Please state how many therapists and counselors the Company contracted for each of theyears 2017, 2018, 2019, and 2020.**

[redacted]

[redacted]

| [redacted] | [redacted] |
|---|---|
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |

**26.** [redacted]

[redacted]

[redacted]

The Company objects to the remainder of this question as it seeks information protected by the attorney-client privilege.

**27. State how many of the Company's counselors and therapists submit claims to insurance, Medicare, or Medicaid, regardless of whether those claims stem from treatment providedthrough the Company.**

[redacted]

**28. With respect to the seal for "HIPAA" on the BetterHelp website, please identify:**

**a. The organization that presented the Company with the seal;**

**b. The date the seal was granted, and, if applicable, the date of any subsequentreview by the granting organization;**

**c. The date on which the Company placed the seal on the www.betterhelp.comwebsite and its associated webpages; and**

**d. The support or basis for the seal (e.g., any review process by, or application orcertification to, an organization issuing the seal).**

The Company objects to the characterization that it placed a HIPAA "seal" on its website. From the beginning of the Applicable Time Period until January 29, 2021, the Company included a hyperlink with the graphic (presented below) in the footer of the BetterHelp website.

By clicking this graphic, users were directed to the following url: https://www.hhs.gov/hipaa/index.html. That url, in turn, simply provides information about HIPAA.

No organization "granted" or "presented" this graphic to the Company nor does the Company ever represent that one did.

**29. Please state the time periods during which the advertisements in BHDPIP00000131-135and BHDPIP00000138-139 were run, as well as how many consumers these advertisements reached and how many became users of a website or mobile application owned or operated by the Company.**

The Company does not store or track the information responsive to this Request in the ordinary course. However, it can confirm that BHDPIP00000140 ran in July 2019.

**30. Please describe what, if any, efforts the Company has ever made to notify consumers of changes to its privacy policies, practices, or procedures, including who it notified and how it notified them. Please also describe any choice mechanisms the Company offered consumers with regard to changes to its privacy policies, practices, or procedures, including when and how these mechanisms were provided; this includes whether the Company obtained consumers' consent prior to using or disclosing information collectedunder a previous privacy policy for a purpose that was newly disclosed under a revised privacy policy.**

The Company objects to this Request to the extent it calls for information protected by the attorney-client privilege or other applicable privileges or protections, and its response to this Request is not intended to, and does not, waive any applicable privilege or other legal basis under which information may be protected from disclosure.

The Company has made continuous efforts to further enhance transparency and choice related to its privacy policies, practices, and procedures.

- <u>Notice</u>

Generally, the Company has notified subscribers of Privacy Policy changes by including a "tooltip" on its sessions webpage that says, "Terms of Service have been updated" with a link to the newest Privacy Policy.

During the last year, as part of an ongoing review of its privacy policies, practices, and procedures, including consulting with counsel, the Company updated this notice. In March 2020, the Company created a modal popup for when someone logs into their account. The title of the text on the modal is "Update to Terms & Conditions." The body of the text says "Our Terms of Use and Privacy Policy has been updated. A summary of some of the changes are highlighted below."

In March 2020, the Company used this modal, and highlighted two changes. The modal also linked to the Privacy Policy and Terms and Conditions, and informed clients that, "[b]y continuing to access or use the Platform," the client had "read and agreed to the full terms in the updated" policies. It looked like this (not true to size):

Modal text:

Title: Update to Terms & Conditions

Body: Our Terms of Use and Privacy Policy have been updated. A summary of some of the changes are highlighted below.

- Terms of Use – Notice to California Residents regarding counselor complaints
- Privacy Policy – How your information is used regarding complying with state and federal laws around public safety

By continuing to access or use the Platform, you agree that you have read and agree to the full terms in the updated Terms of Use and Privacy Policy. [Click here](link) to read the full Terms of Use. [Click here](link) to read the full Privacy Policy.

[Close]

In April 2021, the Company further updated its privacy policies and the following module provides notice of the changes (not true to size):

**Updates to Client Terms and Conditions and Privacy Policy**

Our Client Terms and Conditions and Privacy Policy have been updated.
The update to the Client Terms and Conditions includes the following change:

- Clarification on procedures when a client's Counselor is no longer on our Platform

The update to the Privacy Policy includes the following changes:

- Clarification on how and when the policy is applicable
- Additional detail about how we collect, use, and disclose information to further enhance transparency into our practices
- Updates to the sections pertaining to California and EU residents

Click here to read the full Client Terms and Conditions. Click here to read the full Privacy Policy. By continuing to access and use our websites and the Platform, you agree that you have read and agree to the full terms in the updated Client Terms and Conditions and Privacy Policy.

Close

- <u>Choice</u>

Generally, visitors cannot create an account without accepting the Terms and Conditions and Privacy Policy. However, throughout the Applicable Time Period, the Company has permitted visitors and users to opt out of anonymous tracking by third parties and the Company. More details on this subject are provided in Response to Request 5.

**31. Please produce documents sufficient to show all materially different representations the Company has made to consumers and/or publicly related to COVID-19, including any representations regarding how the Company's services may assist consumers with issues related to COVID-19.**

The Company objects to this Request on the grounds that (1) "representations" is vague; and (2) it is outside the scope of the CID. Without waiving its objections, the Company states as follows.

In February 2021, BetterHelp offered "Covid19 Support" in the form of a 50% discount for its Services. In doing so, it stated: "Licensed and vetted counselors are available to support you during these uncertain times." A copy of this statement is produced at BHDPIP00001307.

The Company also published articles referring to COVID-19 on the Regain and BetterHelp websites in August and December of 2020 and in February 2021. They are produced here BHDPIP00001308–BHDPIP00001421.

The Company also ran Google Ads that referenced "Covid" or "Covid-19." An export showing the text of these ads was previously produced at BHDPIP00000121. The ads include the following statements:

- Covid Mental Health Support
- Find a Therapist During Covid
- Get Therapy During Covid
- Get Help with Covid-19 Anxiety

Finally, the Company ran ads on social media platforms that referenced COVID-19, the pandemic, working from home, quarantine, and/or feature masks. Illustrative examples are produced at BHDPIP00001203; BHDPIP00001209; BHDPIP00001225; and BHDPIP00001421.

**32. Please state the number of consumers that have used the Company's services to address issues related to COVID-19, including the number of consumers that have utilized the Company's services following a diagnosis of COVID-19.**

The Company does not ask its users to provide this information nor does it track the number of users that have used the Company's services to address issues related to COVID-19 or following a diagnosis of COVID-19.

# Exhibit 12

**Date:** Monday, July 30 2018 10:08 AM
**Subject:** Re: Lift Study Running
**From:** Jessica Honbarger <jessica@betterhelp.com>
**To:** Theo Moore <theomoore@fb.com>;
**CC:** Brad Murphy <bradm@fb.com>; Danny Bragonier <danny@betterhelp.com>; victoria@betterhelp.com; Shan Panjwani <snpanjwani@fb.com>;

---

Hi Theo,

Unfortunately, Tuesday will not be able to work for us. Could we do anything on either Monday 8/6 (available from 10-12 and from 2-5) or Wednesday 8/8 (available from 10:30-1) that week instead?

Here are the descriptions of the events you listed. Please let me know if you have any questions!

[redacted] – [redacted]

[redacted] – [redacted]

[redacted] – [redacted]

[redacted] – [redacted]

[redacted] – [redacted]

[redacted] – [redacted]

[redacted] – [redacted]

Thanks!
Jessica

On Fri, Jul 27, 2018 at 2:26 PM, Theo Moore <theomoore@fb.com> wrote:

> Hi all,
>
> Happy Friday! I hope you'll be getting a jump on your weekend soon!
>
> I just wanted to circle back to let you know our measurement team has begun the whitelisting process for the new and improved FB Attribution (replacing Advanced Measurement). This is the refreshed UI that offers many new capabilities - organic, offline conversions, multi-touch solutions – previously missing with AMT.
>
> Our measurement team would like to schedule a kickoff call/VC the week of 8/6 to explain the updated tool and how you can best leverage it, and to help you get started. Would your team have any avails Tuesday 8/7?

Additionally we're building the full narrative of your lift study and hoping you could quickly confirm what step in the funnel each event represents (so we're all speaking the same language as we further surface insights)?

[redacted] – [redacted]

[redacted] –

[redacted] –

[redacted] –

[redacted] –

[redacted] –

[redacted] –

Looking forward to tackling this measurement journey!

--

Theo Moore | Client Solutions Manager, Emerging Disruptors

423.309.6772 (m) | Menlo Park, CA

---

**From:** Brad Murphy <bradm@fb.com>
**Date:** Tuesday, July 24, 2018 at 11:13 PM
**To:** Theo Moore <theomoore@fb.com>, Danny Bragonier <danny@betterhelp.com>
**Subject:** Re: Lift Study Running

Hey Danny – I will be on call tomorrow at 2 pm to discuss. Looking forward to connecting!

Brad

---

**From:** Theo Moore <theomoore@fb.com>
**Date:** Tuesday, July 24, 2018 at 5:43 PM
**To:** Danny Bragonier <danny@betterhelp.com>
**Cc:** Brad Murphy <bradm@fb.com>

**Subject:** Lift Study Running

Hey Danny,

I wanted to flag a mistake I made that I hope will turn out to have some silver lining.

You may remember that I reached out on Friday 7/13 suggesting that we implement another lift study in order to get some additional, objective data for the meeting with Alon next week. In anticipation I set up the shell of the study on my end while I awaited your approval, but I've just realized that I accidentally published the study, meaning it's been running with a 10% holdout (same as the brand lift) in the background.

I first need to offer my sincere apologies. This is obviously a mistake I don't take lightly and would never intend to run this without your approval. I'm terribly sorry about that.

However… the results are actually pretty phenomenal and provide some very interesting insight. So much so that Brad, who has run 130+ of these, considers them Case Study worthy from an incremental and attribution standpoint. I'd ask that we jump on a call asap or use our allotted time tomorrow to discuss what we're seeing before considering turning it off. Of course if you feel strongly otherwise, we're happy to shut it off immediately.

Just let me know your thoughts, and again I'm sorry about the mistake.

Thanks,

--

Theo Moore | Client Solutions Manager, Emerging Disruptors

423.309.6772 (m) | Menlo Park, CA

# Exhibit 13

**From:** Tom Slater [t.slater@[redacted].com]
**Sent:** 7/12/2018 4:01:44 PM
**To:** Jessica Honbarger [jessica@betterhelp.com]
**CC:** Danny Bragonier [danny@betterhelp.com]; Dave Patrick [dave@betterhelp.com]; Anh Vu Huynh [av.huynh@[redacted].com]
**Subject:** RE: Danny + Jessica | Re: [redacted] - BetterHelp Partnership Next Steps

Thanks Jessica!

I will have these QA'd tomorrow morning EST.

Assuming everything looks good, do we want to push the campaign live tomorrow or wait until Monday morning?

If we push live tomorrow, I'm happy to monitor performance over the weekend.

Best,
Tom

**From:** Jessica Honbarger <jessica@betterhelp.com>
**Sent:** Thursday, July 12, 2018 6:56 PM
**To:** Tom Slater <t.slater@[redacted].com>
**Cc:** Danny Bragonier <danny@betterhelp.com>; Dave Patrick <dave@betterhelp.com>; Anh Vu Huynh <av.huynh@[redacted].com>
**Subject:** Re: Danny + Jessica | Re: [redacted] - BetterHelp Partnership Next Steps

Hi Tom,

We have updated our pixels as you have specified. Please let us know if there are any additional changes needed here!

Thanks,
Jessica

On Thu, Jul 12, 2018 at 12:05 PM, Tom Slater <t.slater@[redacted].com> wrote:

[redacted]

Tom

---

**From:** Danny Bragonier <danny@betterhelp.com>
**Sent:** Thursday, July 12, 2018 3:02:10 PM
**To:** Tom Slater
**Cc:** Dave Patrick; Jessica Honbarger; Anh Vu Huynh

**Subject:** Re: Danny + Jessica | Re: [redacted] - BetterHelp Partnership Next Steps

Hey Tom,

[redacted]

Thanks,
Danny

Danny Bragonier | Co-Founder, *BetterHelp.com*
408.781.0958 | danny@betterhelp.com | www.betterhelp.com
440 N. Wolfe Rd., Sunnyvale, CA 94085

On Thu, Jul 12, 2018 at 11:17 AM Tom Slater <t.slater@[redacted].com> wrote:

Hey Danny,

[redacted]

Best,

Tom

**From:** Danny Bragonier <danny@betterhelp.com>
**Sent:** Thursday, July 12, 2018 1:57 PM
**To:** Tom Slater <t.slater@[redacted]com>
**Cc:** Dave Patrick <dave@betterhelp.com>; Jessica Honbarger <jessica@betterhelp.com>; Anh Vu Huynh <av.huynh@[redacted].com>
**Subject:** Re: Danny + Jessica | Re: [redacted] - BetterHelp Partnership Next Steps

Hi Tom,

[redacted]

Thanks,

Danny

Danny Bragonier | Co-Founder, *BetterHelp.com*
408.781.0958 | danny@betterhelp.com | www.betterhelp.com
440 N. Wolfe Rd., Sunnyvale, CA 94085

On Thu, Jul 12, 2018 at 9:58 AM Tom Slater <t.slater@[redacted].com> wrote:

Hey Dave –

[redacted]

Best,

Tom

**From:** Dave Patrick <dave@betterhelp.com>
**Sent:** Thursday, July 12, 2018 12:49 PM
**To:** Tom Slater <t.slater@[redacted].com>
**Cc:** Jessica Honbarger <jessica@betterhelp.com>; Danny Bragonier <danny@betterhelp.com>; Anh Vu Huynh <av.huynh@[redacted].com>
**Subject:** Re: Danny + Jessica | Re: [redacted] - BetterHelp Partnership Next Steps

Hey Tom,

[redacted]

[redacted]

[redacted]

Thanks!

Dave Patrick | Software Developer
440.668.6582 | dave@betterhelp.com | www.betterhelp.com
440 N. Wolfe Rd., Sunnyvale, CA 94085

On Jul 12, 2018, at 8:09 AM, Tom Slater <t.slater@[redacted].com> wrote:

Hi Jessica,

Thanks for that, we were able to complete a transaction and see the pixel fire correctly.

[redacted]

@Dave – can you make this adjustment?

<image001.jpg>

[redacted]

Best,

Tom

**From:** Jessica Honbarger <jessica@betterhelp.com>
**Sent:** Wednesday, July 11, 2018 1:29 PM
**To:** Tom Slater <t.slater@[redacted].com>
**Cc:** Danny Bragonier <danny@betterhelp.com>; Daniel Flores Montanez <d.floresmontanez@[redacted]com>
**Subject:** Re: Danny + Jessica | Re: [redacted] - BetterHelp Partnership Next Steps

Hi Tom,

[redacted]

Thanks!

Jessica

On Wed, Jul 11, 2018 at 9:58 AM, Tom Slater <t.slater@[redacted].com> wrote:

Hi Jessica - Thanks! Is there a way that we can run a test conversion?

Best,

Tom

---

**From:** Jessica Honbarger <jessica@betterhelp.com>
**Sent:** Tuesday, July 10, 2018 7:44:40 PM
**To:** Tom Slater
**Cc:** Danny Bragonier; Daniel Flores Montanez

**Subject:** Re: Danny + Jessica | Re: [redacted] - BetterHelp Partnership Next Steps

Hi Tom,

The pixels are now live! Please let us know what the next steps are here.

I have also attached "Criteo Banners 2" which contains a new set of banners that we would like to add to our asset library.

Thanks!

Jessica

On Tue, Jul 10, 2018 at 8:26 AM, Tom Slater <t.slater@[redacted].com> wrote:

Hi Dave –

That logic makes sense to us.

Best,

Tom

**From:** Dave Patrick <dave@betterhelp.com>
**Sent:** Monday, July 9, 2018 5:33 PM

**To:** Tom Slater <t.slater@[redacted].com>
**Cc:** Jessica Honbarger <jessica@betterhelp.com>; Danny Bragonier <danny@betterhelp.com>; Daniel Flores Montanez <d.floresmontanez@[redacted].com>
**Subject:** Re: Danny + Jessica | Re: [redacted] - BetterHelp Partnership Next Steps

Hi Tom,

[redacted]

Also, for these users, should we trigger Log-In to de-tag?

Thanks for the help today.

Dave Patrick | Software Developer
440.668.6582 | dave@betterhelp.com | www.betterhelp.com
440 N. Wolfe Rd., Sunnyvale, CA 94085

On Jul 9, 2018, at 12:05 PM, Tom Slater <t.slater@[redacted].com> wrote:

Hi Dave – that will work just fine.

**From:** Dave Patrick <dave@betterhelp.com>
**Sent:** Monday, July 9, 2018 2:55 PM
**To:** Tom Slater <t.slater@[redacted].com>
**Cc:** Jessica Honbarger <jessica@betterhelp.com>; Danny Bragonier <danny@betterhelp.com>; Daniel Flores Montanez <d.floresmontanez@[redacted].com>
**Subject:** Re: Danny + Jessica | Re: [redacted]- BetterHelp Partnership Next Steps

[redacted]

[redacted]

Dave Patrick | Software Developer
440.668.6582 | dave@betterhelp.com | www.betterhelp.com
440 N. Wolfe Rd., Sunnyvale, CA 94085

On Jul 9, 2018, at 11:51 AM, Tom Slater <t.slater@[redacted].com> wrote:

Hi Dave –

The Log-In tag allows us to de-tag users who login to the platform.

[redacted]

Best,

Tom

**From:** Dave Patrick <dave@betterhelp.com>
**Sent:** Monday, July 9, 2018 2:49 PM
**To:** Tom Slater <t.slater@[redacted]com>
**Cc:** Jessica Honbarger <jessica@betterhelp.com>; Danny Bragonier <danny@betterhelp.com>; Daniel Flores Montanez <d.floresmontanez@[redacted].com>
**Subject:** Re: Danny + Jessica | Re: [redacted] - BetterHelp Partnership Next Steps

Hi Tom,

[redacted]

Thanks.

Dave Patrick | Software Developer
440.668.6582 | dave@betterhelp.com | www.betterhelp.com
440 N. Wolfe Rd., Sunnyvale, CA 94085

On Jul 9, 2018, at 11:43 AM, Tom Slater <t.slater@[redacted].com> wrote:

Hi Jessica –

[redacted]

Best,

Tom

**From:** Jessica Honbarger <jessica@betterhelp.com>
**Sent:** Monday, July 9, 2018 2:35 PM
**To:** Tom Slater <t.slater@[redacted].com>
**Cc:** Danny Bragonier <danny@betterhelp.com>; Daniel Flores Montanez <d.floresmontanez@[redacted].com>; Dave Patrick <dave@betterhelp.com>
**Subject:** Re: Danny + Jessica | Re: [redacted] - BetterHelp Partnership Next Steps

Hi Tom,

Thanks for the raw text file!

[redacted]

Thanks,

Jessica

On Mon, Jul 9, 2018 at 11:27 AM, Tom Slater <t.slater@[redacted].com> wrote:

> Hi Jessica –
>
> No problem, raw text file is attached.
>
> Best,
>
> Tom

**From:** Jessica Honbarger <jessica@betterhelp.com>
**Sent:** Monday, July 9, 2018 1:16 PM

**To:** Tom Slater <t.slater@[redacted].com>
**Cc:** Danny Bragonier <danny@betterhelp.com>; Daniel Flores Montanez <d.floresmontanez@[redacted].com>
**Subject:** Re: Danny + Jessica | Re: [redacted] - BetterHelp Partnership Next Steps

Hi Tom,

I'm not sure if I missed this earlier, but could we please get a copy of the raw text file for the pixel code?

Thanks!

Jessica

On Fri, Jul 6, 2018 at 9:12 AM, Jessica Honbarger <jessica@betterhelp.com> wrote:

Hi Tom,

[redacted]

Thanks!

Jessica

On Fri, Jul 6, 2018 at 9:09 AM, Tom Slater <t.slater@[redacted].com> wrote:

Hey Jessica –

[redacted]

Best,

Tom

---

**From:** Tom Slater
**Sent:** Monday, July 2, 2018 4:50 PM
**To:** 'Jessica Honbarger' <jessica@betterhelp.com>
**Cc:** Danny Bragonier <danny@betterhelp.com>; Daniel Flores Montanez <d.floresmontanez@[redacted].com>
**Subject:** RE: Danny + Jessica | Re: [redacted] - BetterHelp Partnership Next Steps

Perfect, thanks Jessica!

**From:** Jessica Honbarger <jessica@betterhelp.com>
**Sent:** Monday, July 2, 2018 4:49 PM
**To:** Tom Slater <t.slater@[redacted].com>
**Cc:** Danny Bragonier <danny@betterhelp.com>; Daniel Flores Montanez <d.floresmontanez@[redacted].com>
**Subject:** Re: Danny + Jessica | Re: [redacted] - BetterHelp Partnership Next Steps

Hi Tom,

Thanks for this! I will pass this along to our developers and will let you know if there are any questions.

Will keep you posted for when these are implemented.

Thanks,
Jessica

On Mon, Jul 2, 2018 at 1:45 PM, Tom Slater <t.slater@[redacted].com> wrote:

Hi Jessica –

Thanks for that insight, appreciate it.

[redacted]

Best,

Tom

**From:** Jessica Honbarger <jessica@betterhelp.com>
**Sent:** Monday, July 2, 2018 3:41 PM
**To:** Tom Slater <t.slater@[redacted].com>
**Cc:** Danny Bragonier <danny@betterhelp.com>; Daniel Flores Montanez <d.floresmontanez@[redacted].com>

**Subject:** Re: Danny + Jessica | Re: [redacted] - BetterHelp Partnership Next Steps

Hi Tom,

Good to hear that!

[redacted]

Thanks!

Jessica

On Mon, Jul 2, 2018 at 12:36 PM, Tom Slater <t.slater@[redacted].com> wrote:

Hey Jessica,

My engineer, Dan, is just finishing up the guide.

[redacted]

Thanks,

Tom

**From:** Jessica Honbarger <jessica@betterhelp.com>
**Sent:** Monday, July 2, 2018 3:27 PM

**To:** Tom Slater <t.slater@[redacted].com>
**Cc:** Danny Bragonier <danny@betterhelp.com>
**Subject:** Re: Danny + Jessica | Re: [redacted] - BetterHelp Partnership Next Steps

Hi Tom,

Just checking in to see if you have any updates/estimated time of completion [redacted]

Thanks!

Jessica

On Thu, Jun 28, 2018 at 2:54 PM, Tom Slater <t.slater@[redacted].com> wrote:

Hey Jessica -

This is super helpful, thanks for sending it over.

I will work with my engineer to [redacted]

Best,

Tom

---

**From:** Jessica Honbarger <jessica@betterhelp.com>
**Sent:** Thursday, June 28, 2018 5:44:31 PM

**To:** Tom Slater
**Cc:** Danny Bragonier
**Subject:** Re: Danny + Jessica | Re: [redacted] - BetterHelp Partnership Next Steps

Hi Tom,

For the redirect, we would like to see the users being sent to the url of this format:

https://www.betterhelp.com/go/?utm_source=[redacted]&utm_medium={xx}&utm_term={xx}&utm_campaign={xx}&utm_content={xx}

[redacted]

Thanks!

Jessica

On Thu, Jun 28, 2018 at 11:54 AM, Tom Slater <t.slater@[redacted].com> wrote:

[redacted]

[redacted]

Best,

Tom

**From:** Jessica Honbarger <jessica@betterhelp.com>
**Sent:** Thursday, June 28, 2018 2:36 PM
**To:** Tom Slater <t.slater@[redacted].com>
**Cc:** Danny Bragonier <danny@betterhelp.com>
**Subject:** Re: Danny + Jessica | Re: [redacted] - BetterHelp Partnership Next Steps

Hi Tom,

I have attached a folder of several banners in the specified sizes. Let us know if these work!

Thanks!

Jessica

On Thu, Jun 28, 2018 at 8:32 AM, Tom Slater <t.slater@[redacted].com> wrote:

Hi Danny – Thanks for pushing the IO through, attached is a countersigned copy for your records.

It would be great if you can send over some banners today, so that we can get started on the pixels.

Best,

Tom

**From:** Tom Slater
**Sent:** Wednesday, June 27, 2018 6:55 PM
**To:** 'Jessica Honbarger' <jessica@betterhelp.com>
**Cc:** 'Danny Bragonier' <danny@betterhelp.com>
**Subject:** RE: Danny + Jessica | Re: Criteo - BetterHelp Partnership Next Steps

Hi Danny + Jessica –

Thanks again for the call this afternoon, it was great to connect.

# Exhibit 14

**Date:** Wednesday, February 19 2020 04:04 PM
**Subject:** Jezebel Article
**From:** Sue Choi <sue.choi@[redacted].com>
**To:** Danny Bragonier <danny@betterhelp.com>;
**CC:** Ian Cruz <ian@[redacted].com>; Rich Mahon <rich@[redacted].com>;

---

Hi Danny,

I'm sure your team is very well of the Jezebel article that was published today, but I just wanted to reach out to let you know that we're here if you have any questions.

[redacted]

From a PR/legal perspective, our team is actively monitoring the conversation on Twitter/social media so we're prepared to make a statement if necessary.

We're sorry to hear Betterhelp is under the spotlight like this, I can how frustrating it must be. Please let us know if there is anything we can help with.

--

**Sue Choi**
[redacted]
LinkedIn

# Exhibit 18

UNITED STATES OF AMERICA

BEFORE THE FEDERAL TRADE COMMISSION

IN THE MATTER OF: )
BetterHelp, ) Matter No. 2023169
_________________________________ )

Wednesday, July 28, 2021

Federal Trade Commission
600 Pennsylvania Avenue, NW
Washington, DC 20580

VIDEOCONFERENCE EXAMINATION
OF
DANIEL BRAGONIER

The via virtual/remote investigational hearing was taken, pursuant to notice, at 10:36 a.m. EST, reported remotely by Kristy L. Clark, CA CSR# 13529.

[redacted]

A. In Jessica's tenure here or before Jessica?

Q. Would you have had to sign off on any of these decisions? Or would you have signed off on any of those decisions?

A. I don't think so.

Q. So maybe going through some of these to understand a little bit is -- we got this document from BetterHelp that my understanding is it's an export from the Ads Manager. So I'd like to enter into the record, and it's Bates numbered BHDPIP00001159.

(FTC's Exhibit 2 was marked.)

BY MR. PLANT:

Q. This will be Exhibit 2. Let me know when you can see that.

A. Yes, I can.

Q. Do you recognize this spreadsheet?

A. No.

Q. Does it look familiar to you at all?

A. It looks like an export from Ads Manager.

Q. And are you generally familiar with exports

# Exhibit 19

UNITED STATES OF AMERICA

BEFORE THE FEDERAL TRADE COMMISSION

IN THE MATTER OF: )
BetterHelp, ) Matter No. 2023169
_______________________________ )

Wednesday, July 28, 2021

Federal Trade Commission
600 Pennsylvania Avenue, NW
Washington, DC 20580

VIDEOCONFERENCE EXAMINATION
OF
DANIEL BRAGONIER

The via virtual/remote investigational hearing was taken, pursuant to notice, at 10:36 a.m. EST, reported remotely by Kristy L. Clark, CA CSR# 13529.

A. I'm not -- I'm not sure that -- that we have.
Q. Can you say that again? I couldn't hear you.
A. Sorry. I'm not sure that we have.
[redacted]
Q. Let's bring up document --
MR. PLANT: Kate, can we bring up -- it's a document called "About Lookalike Audiences." It's No. 2 in the -- yeah. Great. So this is going to be Exhibit 3.
(FTC's Exhibit 3 was marked.)
/////

# Exhibit 20

# Transmittal Letter Withheld as Nonresponsive

# Transmittal Letter Withheld as Nonresponsive

**Response to Civil Investigative Demand Issued to BetterHelp, Inc.**

This serves as BetterHelp Inc.'s ("BetterHelp" or the "Company") response to the Civil Investigative Demand ("CID") issued to BetterHelp by the Federal Trade Commission ("FTC" or the "Commission") dated July 30, 2020, subject to the clarifications and limitations discussed during our meet and confer and memorialized in our letter to you dated August 28, 2020, in the letters from the Commission to BetterHelp dated September 2, 2020 and November 6, 2020. BetterHelp's investigation into this matter is ongoing, and, as agreed upon by BetterHelp and the Commission, BetterHelp is responding to the CID on a rolling basis and reserves the right to supplement these responses should it become aware of additional responsive documents or information.

BetterHelp objects to the requests in the CID to the extent they are overly broad, unduly burdensome, seek information protected by the attorney-client privilege or other applicable privileges or protections, and/or seek information not currently known to the Company. BetterHelp objects to the definition of "Health Information" in the CID as overbroad to the extent it includes categories of information such as "information collected in BetterHelp's intake questionnaire," or "information related to counseling," irrespective of whether that information is "individually identifiable." BetterHelp objects to the definition of "Personal Information" in the CID as vague and overbroad to the extent it includes any "information from or about an individual consumer," irrespective of whether that information is individually identifiable. BetterHelp objects to the definitions of Health Information and Personal Information to the extent they do not take into account whether such information is collected, used, stored, or disclosed in an anonymized, deidentified, aggregated, or encrypted form.

Production of these materials is not intended to waive any of BetterHelp's rights or remedies, all of which are expressly reserved. Production of these materials also is not intended to, and does not, waive any applicable privilege or other legal basis under which information may be protected from disclosure. If it were found that production of the enclosed materials constituted production of otherwise privileged matters, such disclosure would be inadvertent, and is not intended to, and does not, waive the attorney-client privilege or any other privileges or protections.

This production and the below responses contain confidential business information and competitively sensitive information of BetterHelp, including highly sensitive financial information, the disclosure of which would cause substantial competitive harm to BetterHelp. BetterHelp respectfully requests the information to be treated with the highest level of confidentiality available under all applicable statutes, rules, and regulations, including the Federal Trade Commission Act. This production and its exhibits also are exempt from disclosure under the Freedom of Information Act, 5 U.S.C. § 552, *et seq*. In addition, as these materials contain confidential information, they are further exempt from disclosure pursuant to the FTC Act, 15 U.S.C. §§ 46(f) and 57b-2, and all other applicable statutes, regulations, and operating procedures. We hereby request written notice of any request under the Freedom of Information Act or otherwise seeking access to this document, any information contained therein, or any documents produced in response to the CID, to enable us to substantiate the grounds for confidential treatment.

## I. Interrogatories

**A.** *State the Company's complete legal name, including all other names under which it does or has done business; principal place of business; corporate mailing address and telephone number; and date and state of incorporation.*

The Company's full legal name is Compile, Inc. doing business in California as BetterHelp, Inc. BetterHelp's principal address is 990 Villa St. Mountain View, CA 94041. BetterHelp's telephone number is (888) 688-9296. BetterHelp was incorporated on December 16, 2014 as a Delaware Corporation.

**B.** *Identify all current and former officers, directors, principals, and owners of the Company, specifying the period during which each person held each position; and all shareholders with 5 percent or more ownership of the Company, stating each shareholder's percentage of ownership.*

BetterHelp's officers and directors are Alon Matas (President), Adam Vandervoort (Treasurer), and Samantha Macina (Secretary). They have each held those positions since 2016. BetterHelp does not have a board of directors. BetterHelp is a wholly owned subsidiary of Teladoc Health, Inc. ("Teladoc"). As of August 17, 2020, the following shareholders owned five percent or more of Teladoc stock in the proportions identified below:

| Entity | Percent Owned |
|---|---|
| The Vanguard Group, Inc. | 8.09% |
| BlackRock Fund Advisors | 9.22% |
| JP Morgan Investment Management, Inc. | 6.07% |
| Baillie Gifford & Co. | 6.96% |

**C.** *Describe in detail the Company's corporate structure by identifying each parent, subsidiary, and affiliate of the Company (whether wholly or partially owned), and describe in detail the relationship between these entities, including a description of any agreement(s) between the Company and each entity (e.g., assignment of assets, service agreements, license agreements). In addition, state whether the Company has any current or former shareholders/owners, officers, directors, or principals in common with any of these entities.*

BetterHelp's parent company is Teladoc, a Delaware corporation. Teladoc's legal address is 2 Manhattanville Road, Suite 203, Purchase, NY 10577. BetterHelp is a wholly owned subsidiary of Teladoc. BetterHelp does not have any wholly owned or partially owned subsidiaries or



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY BH0008562

affiliates. Adam Vandervoort serves as Chief Legal Officer of Teladoc and Treasurer of BetterHelp.

**D.** *For each year, state the Company's number of employees by office, and describe, including through graphic representation (e.g., organizational charts), how authority and responsibility were distributed among employees within the Company. Your response should be sufficient to Identify all individuals who had the ability to control the Company's policies, practices, and procedures related to users' Personal Information.*

The below table shows the number of BetterHelp employees by year. All BetterHelp employees are based in the Company's principal office in Mountain View, CA.

| **Date** | **Employees** |
|---|---|
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |

A chart showing the organizational structure of BetterHelp as of August 1, 2020 is attached at BHDPIP00000006. A chart showing the organizational structure of BetterHelp as of August 1, 2019 is attached at BHDPIP00000005. A chart showing the organizational structure of BetterHelp as of August 1, 2018 is attached at BHDPIP00000004. A chart showing the organizational structure of BetterHelp as of August 1, 2017 is attached at BHDPIP00000003.

BetterHelp further refers the FTC to its response to Specification Q for a list of individuals with responsibility for BetterHelp's policies, practices, and procedures related to users' Personal Information.

**E.** *State, by year, the Company's annual gross and net revenues as well as its gross and net profits.*

| Year[1] | Gross Revenues | Net Revenues | Gross Profits | Net Profits |
|---|---|---|---|---|
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |

**F.** *Describe the Company's business model, as well as every product or service it furnishes to consumers.*

BetterHelp is an online counseling platform that offers access to licensed, trained, experienced, and accredited psychologists, marriage and family therapists, clinical social workers, and board licensed professional counselors. BetterHelp matches users with professional counseling, and facilitates counseling by direct messaging, live chat sessions, phone calls, and video conferences. The cost of counseling through BetterHelp ranges from $60 to $80 per week (billed monthly).

BetterHelp operates the following websites:

https://www.betterhelp.com/
https://www.mytherapist.com/
https://www.teencounseling.com/
https://www.faithfulcounseling.com/
https://www.pridecounseling.com/
https://www.icounseling.com/
https://www.regain.us/
https://www.terappeuta.com/

**G.** *For each product or service offered by the Company to consumers that involves the collection, use, storage, or disclosure of Personal Information:*

[1] BetterHelp reiterates its request for treatment of this non-public financial information with the highest level of confidentiality.

**1.** *Describe the functionality of the product or service;*

BetterHelp facilitates access to counseling services through an online platform. Users may access BetterHelp's service through BetterHelp's website and mobile applications, including the websites or mobile applications of BetterHelp's multi-sites (MyTherapist, TeenCounseling, Faithfulcounseling, PrideCounseling, iCounseling, Regain, and Terappeuta). In order to use BetterHelp's service, users create an account on the website or mobile application, and purchase a monthly subscription. After registering, users are matched with a counselor and may use the BetterHelp platform to communicate with the counselor through direct text messaging, live chat, phone calls, or video conference. Users also may use the platform to compose and share journal entries with their counselor, post questions for counselors to answer using the "Ask a Counselor" feature, or attend virtual "webinars.".

**2.** *State the time period(s) during which the product or service was or has been available;*

BetterHelp's online counseling platform has been available since 2013.

**3.** *State the cost of the product or service;*

The cost of counseling through BetterHelp ranges from $60 to $80 per week (billed monthly).

**4.** *State, by year, the total number of that product or service sold (i.e., the number of users) and the gross revenues attributable to the sale of that product or service (both in the U.S. and worldwide);*

| **Year**[2] | | **Paid Users (U.S.)** | | **Gross Revenues (U.S.)** |
|---|---|---|---|---|
| 2017 | **Redacted** | [redacted] | **Redacted** | [redacted] |
| 2018 | | [redacted] | | [redacted] |
| 2019 | | [redacted] | | [redacted] |

**5.** *Describe the account creation process, including any information that users are or have been solicited to supply, and any*

2 BetterHelp reiterates its request for treatment of this non-public financial information with the highest level of confidentiality.

*representations users are or have been presented during that process;*

In order to create a BetterHelp account, users click the "Get started" link on the BetterHelp landing page. Users then complete a questionnaire, which includes approximately fifteen multiple choice questions regarding the user's background, counseling preferences, and financial status. Each question appears individually in a pop-up box after the user clicks a response to the prior question. The particular questions an individual user is asked depends on their responses and which multi-site they use to create an account. A complete list of questions that may appear in the questionnaire for each BetterHelp site is produced at BHDPIP00000094. Any individual user is only asked a subset of the questions that appear on that site.

While users are completing the questionnaire, a banner appears at the bottom of the screen that contains the following disclosure: "We use BetterHelp and third-party cookies and web beacons to help the site function properly, analyze usage, and measure the effectiveness of our ads. Read our Privacy Policy to learn more." The disclosure contains a hyperlink to BetterHelp's Privacy Policy. The banner appears on each page of the questionnaire until the user clicks the "OK" button or closes the banner. An image of this banner is shown below.[3]




Each question in the questionnaire appears in a pop-up box that contains the question, answer choices, and, for certain questions, additional statements related to the question as described further below:

- The pop-up box that contains the question, "How old are you?," also states: "Did you know? Almost a fifth of older adults in the United States have experienced depression. (Geriatric Mental Health Foundation, 2008)."

- The pop-up box that contains the question, "How would you rate your current physical health?," also states: "Studies

[3] Prior to October 2020, the banner stated: "We use cookies to help the site function properly, analyze usage, and measure the effectiveness of our ads. We never sell or rent any information you share with us. Read our Privacy Policy to learn more." BetterHelp is in the process of conforming the banner across all multi-sites.

show that exercise can help with depression as effectively as antidepressant medication. (*Psychosomatic Medicine*, 2007)."

- The pop-up box that contains the question, "Are you currently experiencing overwhelming sadness, grief, or depression?," also states: "Psychotherapy can serve as an effective treatment for clinical depression."

- The pop-box that contains the question, "Are you currently experiencing anxiety, panic attacks or have any phobias?," also states: "Some symptoms of panic attacks include a racing heart, dizziness, or chest pains."

- The pop-up box that contains the question, "Are you currently taking any medication?," also states: "Rest assured – this information will stay private between you and your counselor."[4]

- The pop-up box that contains the question, "How would you rate your current sleeping habits?," also states: "Many adults who have generalized anxiety disorder also suffer from sleep problems."

After completing the questionnaire, the user is then directed to a page where they may create a BetterHelp account. Users must create a BetterHelp account in order to be matched with a counselor and begin communicating with a counselor. In order to create an account, users provide a first name or nickname and email address, and create a password. Alternatively, users may create an account using their Facebook or Google log in credentials.

In order to create an account, users also must agree to the BetterHelp Terms and Conditions by checking a box next to the following statement: "I agree to the terms and conditions." This statement contains a hyperlink to the BetterHelp Terms and Conditions. By agreeing to the BetterHelp Terms and Conditions, users also agree to the BetterHelp Privacy Policy. As described further in response to Specification I, the BetterHelp Terms and Conditions and Privacy Policy contain disclosures regarding BetterHelp's policies and practices related to collection and disclosure of users' Personal Information.

[4] Prior to December 2020, the pop-up box stated: "Rest assured – any information provided in this questionnaire will stay private between you and your counselor."

After entering information to create an account and agreeing to the Terms and Conditions and Privacy Policy, users must then enter a 3-digit verification code that is automatically sent to the e-mail address they entered to create an account.

After verifying the email address, users are then asked two additional multiple choice questions regarding their counselor preferences, and one additional question ("What brings you here?") that users may answer in a free-form text box.

Users are then directed to a payment page where they can pay for their BetterHelp subscription by credit card, or using GooglePay or PayPal. The payment page also contains additional information regarding next steps in using the BetterHelp service, matching and communicating with a counselor, the cost of the service, and other differences between BetterHelp and traditional "in office" counseling.

After entering their payment information, users are asked to provide emergency contact information, including their full name, street address, and phone number. The page on which users enter emergency contact information also contains the following statement: "The emergency contact information is used to comply with counseling regulations and ethical code. It can be useful, for example, in case your counselor believes you are in immediate danger, so please enter it correctly. This information is stored safely and will be accessed only in case of emergencies. "

The foregoing description summarizes the account creation process on the BetterHelp website. The account creation process on BetterHelp's mobile application, and on the websites and mobile applications of BetterHelp's multi-sites is generally similar to the account creation process on BetterHelp's website. Differences with respect to information that users are solicited to supply, and representations presented to users during the account creation process on BetterHelp's multi-sites are described further below.

On the Faithful Counseling, iCounseling, Pride Counseling, and Teen Counseling multi-sites, the account creation page contains the below statement:




Users who create an account on the Regain multi-site, which facilitates individual as well as couples' counseling, may invite their partner to join the account. Users who select this option are requested to enter their partner's first name, email address, and a phone number, which is optional. If a user enters their partner's email address, their partner receives an automatic email containing an invitation to register on the Regain site. In order to register, the partner must click a link in the automatic email, which directs them to a page to enter their email address and password. Partners must also agree to the Terms and Conditions, and the Privacy Policy. After partners verify their email to complete the registration, a page with the following statement appears: "You are now part of a joint counseling page with [partner's name]. Please remember that all written communication is visible to you, your partner, and your counselor. If you'd like to speak privately with your counselor, you can book a live phone or video session ahead of time."

Users who register an account on the Teen Counseling site are requested to provide their parent's email address. Parents whose email address are provided receive an automatically generated email informing them of the account registration and providing a link to a page where they may sign a consent form and provide payment information. Before the email is sent, the user is shown the below preview of the email:



Email Preview

This is the email that will be sent to your parent. The link will take them to a page which explains the service, and lets them fill out a consent and payment form.

Any information about why you are seeking counseling will only be shared with your counselor.

**From:** Teencounseling.com
**Subject:** ~nik wants to talk to a licensed counselor

Dear ~nik,

~nik wants to talk to a licensed counselor on Teencounseling.com. The service is available only after a consultation and consent from a parent or legal guardian.

Please click here for more information.

Note: **Please do not share this link**, it is only meant to be used by one parent or guardian to log in.

If you have any questions or concerns, please let us know by replying to this email.

Thanks,
Teen Counseling Team

Close

The consent form is shown below:

1. I give permission for Teen Counseling to provide online counseling services to this minor.
2. I understand my consent covers online counseling services offered by licensed independent counselors who are contracted by Teen Counseling.
3. I understand that I can change my mind later on and decide I do not want this minor to get services through Teen Counseling. If I change my mind, I will follow the instructions on Teen Counseling to cancel these services. I understand that this consent form remains valid until I follow the procedures to cancel the services.
4. I understand that information shared by this minor is confidential with the following exceptions: imminent risk of harm to self or others, disclosure of abuse or neglect, or disclosure of another minor or elderly individual being abused or neglected.
5. I have the sole right to consent to mental health treatment for this minor. I am not legally mandated to confer with or get consent from any other legal guardian for mental health treatment for this minor.

Electronic Signature

Your name

Today's date

10/12/2020

Complete Consent Form

**6.** *List every website or mobile application through which the product or service is offered;*

**Websites:**

https://www.betterhelp.com/
https://www.mytherapist.com/
https://www.teencounseling.com/
https://www.faithfulcounseling.com/
https://www.pridecounseling.com/
https://www.icounseling.com/
https://www.regain.us/
https://www.terappeuta.com

**Mobile Applications:**

BetterHelp
MyTherapist
Teen Counseling
Faithfulcounseling
PrideCounseling
Regain
Terappeuta

**7.** *List each type of Personal Information that is collected, used, disclosed, or stored in connection with the product or service; and*

As a general matter, BetterHelp collects and stores all information that users provide to BetterHelp while using the platform, and data reflecting user and subscriber activity on the platform. The particular types of Personal Information that BetterHelp collects, uses, and stores are described below.

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

**8.** [redacted]

[redacted]

| [redacted] | [redacted] | [redacted] | [redacted] |
|---|---|---|---|
| [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] |

**H.** *For each type of Personal Information identified in response to Specification G.7:*

**1.** *Describe all methods and manners in which that type of Personal Information is collected, used, stored, and disclosed;*

[redacted]



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY 

[redacted]

[redacted]

[redacted]

2. *State the length of time that the Company retains such Personal Information; and*

[redacted]

3. *Describe each purpose for which that type of Personal Information is collected, used, stored, or disclosed.*

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

**I.** *Describe each representation the Company has made publicly and/or to individual consumers relating to the collection, use, disclosure, storage, or deletion of Personal Information, including the date(s) of the*

*representation, the source of the representation (e.g., the Company's website, email, privacy policy, terms of use, or other method), and whether the Company has modified or changed the representation during the applicable time period (including the reason for and date of any such change). The representations should include but are not limited to:*

**1.** *any standard notices or disclosures the Company provides to users at the time their Personal Information is collected;*

All users of BetterHelp's service must agree to BetterHelp's Terms and Conditions (BHDPIP00000001) and Privacy Policy (BHDPIP00000002), which contain detailed disclosures regarding BetterHelp's collection, use, disclosure, storage, and deletion of Personal Information.

The Terms and Conditions include disclosures regarding BetterHelp's security and privacy practices and incorporates the Privacy Policy. The Privacy Policy describes in further detail, among other things, BetterHelp's practices related to information collection, use, and disclosure; use of cookies and web beacons; and use of third party service providers. The Privacy Policy also contains disclosures related to the General Data Protection Regulation (GDPR) and the California Consumer Privacy Act (CCPA).

Since August 2017, BetterHelp has periodically updated the Terms and Conditions and Privacy Policy. Each version of the Terms and Conditions and Privacy Policy applicable during this period is produced at BHDPIP00000001 to BHDPIP00000002 and BHDPIP00000050 to BHDPIP00000061. The changes related to Personal Information are summarized below:

- On or around September 14, 2018, BetterHelp added a new section to the Privacy Policy, which included additional information related to users from the European Union consistent with the General Data Protection Regulation (GDPR). (BHDPIP00000052).

- On or around November 13, 2018, BetterHelp undertook a comprehensive review of the Terms and Conditions and Privacy Policy, including revising the sections in the Privacy Policy related to Information Collection and Use, Security, International Transfer, Compliance with Law Enforcement, and GDPR. (BHDPIP00000054; BHDPIP00000055).

- On or around September 17, 2019, BetterHelp updated the Privacy Policy, including revising the section on Information Collection, Use, and Disclosure, and adding a section related to opting out of marketing communications. (BHDPIP00000056).

- On or around December 31, 2019, BetterHelp updated the Privacy Policy, including revising the section on Information Collection, Use, and Disclosure, and adding a Privacy Notice for California Residents consistent with the California Consumer Privacy Act of 2018 (CCPA). (BHDPIP00000058).

- On or around February 27, 2020, BetterHelp updated the Privacy Policy, including revising the section on Information Collection, Use, and Disclosure. (BHDPIP00000060).

- On or around September 11, 2020, BetterHelp updated the Privacy Policy, including revising the section on Information Collection, Use, and Disclosure to conform similar language in the Privacy Notice for California residents, and revising the GDPR Notice. (BHDPIP00000002).

In addition to the Privacy Policy and Terms and Conditions, the BetterHelp Frequently Asked Questions page, available at https://www.betterhelp.com/faq/, includes the question, "How is my privacy protected?" and a response, copied below, which discusses protection of messages between users and counselors.



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY BH0008578

How is my privacy protected?

We are totally obsessed about securing your privacy and confidentiality. We have built a state-of-the-art technology, operation, and infrastructure with one thing in mind: protecting your privacy and safeguarding the information you provide. Our privacy and confidentiality standards are by far more advanced than what is required by law or regulations, so you can feel safe and comfortable.

- You don't need to identify yourself (see more about staying anonymous here).
- Everything you tell your counselor is protected by strict federal and state laws.
- We don't cooperate or work with any insurance companies or employers, so nothing needs to be shared, reported or filed with them.
- You can always click the "Shred" button next to each message that you've sent so it will no longer show in your account.
- All the messages between you and your counselor are secured and encrypted by banking-grade 256-bit encryption.
- Our servers are hosted in an "A Grade" facility, ensuring the best-in-class security and protection.
- Our browsing encryption system (SSL) follows modern best practices, providing world class online security and encryption.
- Our databases are encrypted and scrambled so they essentially become useless in the very unlikely event that they are being stolen or inappropriately used.

If you wish for any of your information or records to be released to a third party, please let your counselor know. Your counselor will send you an authorization form that you will need to fill and sign before your information can be released.

As described further in response to Specification G.5, certain pages visited by users during the account creation process contain statements regarding use of cookies and web beacons, and use of information regarding medication history, user email addresses, and emergency contact information.

The page containing the "Ask a Counselor" feature contains the following disclosure: "Note that this question will be public when answered. Avoid any personal details that can be used to identify you."

The page where users register for a Groupinar contains the disclosures shown below:

How do I join the Groupinar?

Choose the Groupinar you would like to attend and click on "register". You will be anonymously registered with the initials of the first and last letter of your BetterHelp nickname. The instructions on joining the Groupinar will be sent directly to your email. You can also download the ClickMeeting Webinar app to participate in the Groupinar on your mobile device.




**2.** *any standard notices or disclosures the Company provides to users prior to disclosing their Personal Information to a third party, including but not limited to the mechanism by which the Company discloses to users the type or Identity of each third party receiving the Personal Information;*

The BetterHelp Privacy Policy contains disclosures regarding the types of third parties that may receive Personal Information, including the following disclosures:

- "To let us operate the Platform effectively and to let you use the Platform, including the Counselor Services, we may have to collect your personally identifiable information (such as, but not limited to, your name, phone number, email address, and address), billing and payment information, profile information, log data (information such as your computer, Internet Protocol address ("IP"), pages that you visit and the amount of time spent on those pages, actions you take and other statistics), information related to the Counselor Services or your need for Counselor Services, and any information which is exchanged between you and your Counselor (collectively the "Information"). In some cases, some of the Information that you give to us is considered health related data.. . ." (BHDPIP00000002, at 1).

- User information "may be used or disclosed to third parties for one or more of the following business or marketing purposes: . . .
  - To match you with a Counselor.
  - To enable and facilitate the Counselor Services.
  - To supervise, administer and monitor the service.

  - To measure and improve the quality, the effectiveness and the delivery of our services.

  - Market the Platform and Counselor Services to you.

  . . .

  - To personalize your Website experience and to deliver content and product and service offerings relevant to your interests, including targeted offers and ads through our Websites, third-party sites, and via email or text message (with your consent, where required by law)."

  (BHDPIP00000002, at 1–2).

- "Like many websites, we use 'cookies' and 'web beacons' to collect information. A "cookie" is a small data file that is transferred to your computer's hard disk for record-keeping purposes. A "web beacon" is a tiny image, placed on a Web page or email that can report your visit or use. We use cookies and web beacons to enable the technical operation of the Platform, to administer your log-in to your account and to collect the Log Data. You can change your browser's settings so it will stop accepting cookies or to prompt you before accepting a cookie. However, if you do not accept cookies you may not be able to use the Platform. The Platform may also include the use of cookies and web beacons of services owned or provided by third parties that are not covered by our Privacy Policy and we do not have access or control over these cookies and web beacons. We may also use third party cookies for the purposes of web analytics, attribution and error management." (BHDPIP00000002, at 2).

- "We cooperate with government and law enforcement officials to enforce and comply with the law. We may disclose information necessary or appropriate to protect the safety of the public or any person, to respond to claims and legal process (including but not limited to subpoenas), and to prevent or stop activity that may be illegal or dangerous. You should also be aware that Counselors may be obliged to disclose information to law enforcement or other authorities to conform to their professional and legal responsibilities. . . ." (BHDPIP00000002, at 4).

BetterHelp further refers the FTC to its response to Specification I.1.

**3.** *any representations to users stemming from Jezebel's February 19, 2020 publication of the article: "The Spooky, Loosely Regulated World of Online Therapy" by Molly Osberg and Dhruv Mehrotra, including press statements or responses provided to consumer inquiries;*

BetterHelp refers the FTC to the documents produced in response to Specification EE, which contain BetterHelp's responses to inquiries from users regarding the above-referenced article identified based on a search using the parameters set forth in the letter from the FTC to BetterHelp dated November 6, 2020.

**4.** *any Advertisement relating to the collection, use, disclosure, storage, or deletion of Personal Information, including Advertisements using the phrase "100% private"; and*

BetterHelp refers the FTC to the documents produced at BHDPIP00000121 to BHDPIP00000127, which contain tables showing the text of BetterHelp advertisements displayed on: [redacted]

[redacted]

[redacted]

5 [redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

BetterHelp further refers the FTC to the documents produced at BHDPIP00000130 to BHDPIP00000140, which include radio advertisements promoting BetterHelp. Certain of these advertisements used the following language or similar language: "Connect with your professional counselor in a safe and private online environment."

**5.** *any representation relating to the Health Insurance Portability Accountability Act, including all uses of the following graphic:*

A hyperlink with the above-referenced graphic is included in the footer of the BetterHelp site. By clicking this graphic, users are directed to the following url: https://www.hhs.gov/hipaa/index.html. In response to inquiries from users, BetterHelp customer service representatives have stated that the BetterHelp platform is HIPAA compliant, *see, e.g.*, BHDPIP00001090, and that HIPAA imposes medical records retention requirements, *see, e.g.*, BHDPIP00001112.[6]

**J.** *Describe the means by which the Company obtains consent from users relating to the collection, use, disclosure, or storage of Personal Information, including the means by which the Company enables users to opt into or out of the disclosure of their Personal Information to third parties.*

In order to sign up for BetterHelp's service, users must agree to BetterHelp's Terms and Conditions ("Terms and Conditions) and Privacy Policy ("Privacy Policy"). The Privacy Policy describes BetterHelp's policies and practices related to the collection, use, disclosure, and storage of Personal Information as defined in the CID, including the means by which users may choose or request not to disclose their Personal Information to third parties. A copy of the Terms and Conditions is attached as BHDPIP00000001. A copy of the Privacy Policy is attached at BHDPIP00000002.

---

[6] As previously discussed, BetterHelp has redacted personally identifiable information from communications with users before production, including communications obtained [redacted] In addition, in order to extract reviewable versions of responsive communications from [redacted] for production, each of these communications had to be forwarded from [redacted] to a BetterHelp email address, and produced from that email address. The email reflecting the forwarding of each communication for purposes of production also has been redacted.

**K.** *Identify each third party, excluding licensed therapists, to which the Company has disclosed any user's Personal Information, and, for each such third party:*

**1.** *Describe the specific products and services that third party provided to the Company, as well as how users' Personal Information related to each product or service (i.e., the purposes for the disclosures);*

BetterHelp refers the FTC to the table produced at BHDPIP00000049, which describes the purpose for which each third party service was used.

**2.** *List the specific types and amount (i.e., the number of users) of Personal Information disclosed to that third party for each of the third party's services or products;*

BetterHelp refers the FTC to the table produced at BHDPIP00000049, which lists the type of Personal Information disclosed to each third party. BetterHelp further refers the FTC to its response to Specification G.8, which provides the total number of visitors to BetterHelp's websites, users who signed up for BetterHelp's service, and users who paid for the service.

**3.** *State whether the disclosed Personal Information was de-identified, anonymized, pseduonymized or otherwise de-personalized, and, if so, how;*

BetterHelp refers the FTC to the table produced at BHDPIP00000049, which reflects that Personal Information disclosed to third parties generally is not disclosed in a form that is personally identifiable. [redacted]

**4.** *Describe the contractual arrangements relating to such disclosures, including who at the Company was responsible for entering into and overseeing those contractual arrangements, and any compensation You received for such disclosures (including free or discounted services); and*

BetterHelp refers the FTC to the agreements produced at BHDPIP00000008 to BHDPIP00000048, BHDPIP00000064 to BHDPIP00000084, and BHDPIP00001117 in response to Specification BB, and to BetterHelp's response to Specification O describing those agreements. BetterHelp employees responsible for entering into and overseeing the contractual arrangements reflected in these agreements include the individuals with responsibility for the function for which the third party product or service is used,

including Alain Adler (engineering), Danny Bragonier (marketing), Rushabh Gandhi (website applications), as well as counsel Anjali Ahearn.

**5.** *Describe the date, scope, and result of any request You made for the third party to delete the Personal Information it received from the Company.*

[redacted] *See* BHDPIP00000141.

**L.** *Identify each third party from which a user can import data to the Company's products or services, or to which a user can export data from the Company's products or services, and describe the types of data that a user can import from or export to each such third party.*

When creating a BetterHelp account, users have the option of signing in to BetterHelp through their Facebook or Google account, which imports their name and email address from those accounts into their BetterHelp account. Users also have the option of paying for their BetterHelp subscription by importing their PayPal or Google Pay account information.

**M.** *Identify each third-party Software Development Kit and Application Program Interface integrated into or utilized by the Company's products or services, and describe the types of user data disclosed to a third party in connection with each such Software Development Kit or Application Program Interface.*

[redacted]



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY BH0008586

- [redacted]

[redacted]

All Personal Information disclosed in connection with these services is identified in BHDPIP00000049.

**N.** *To the extent not otherwise stated in Your response to Specifications G, H, and K, describe* ***Your use of any Facebook products and services*** *(e.g., Analytics, Advertising, Log-in, Custom Audiences, Lookalike Audiences),* ***and identify what Personal Information and App Events*** *were disclosed to, or collected by, Facebook in connection with each product or service You used (including* ***the number of users for each type of Personal Information and App Event was shared****).*

[redacted]

[redacted]

[redacted]

| [redacted] | [redacted] | [redacted] | [redacted] |
|---|---|---|---|
| [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | |
| [redacted] | [redacted] | [redacted] | |
| [redacted] | [redacted] | [redacted] | |

| | | | |
|---|---|---|---|
| [redacted] | [redacted] | [redacted] | |
| [redacted] | [redacted] | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | | |
| [redacted] | | | |
| [redacted] | | | |
| [redacted] | | | |
| [redacted] | | | |
| [redacted] | | | |
| [redacted] | | | |
| [redacted] | | | |
| [redacted] | | | |
| [redacted] | | | |
| [redacted] | | | |
| [redacted] | | | |
| [redacted] | | | |

As reflected in BHDPIP00000049 and in BetterHelp's response to Specification H.3, BetterHelp uses Facebook products to market and advertise its services, optimize its advertising on Facebook's platform, including more effectively targeting BetterHelp's advertising to potential users and delivering content relevant to those users, and assess the effectiveness of its marketing and advertising. All Personal Information disclosed to Facebook in connection with these services is identified in BHDPIP00000049.

**O.** *Describe in detail the Company's* ***policies, practices, procedures, and relationships regarding the collection, use, storage, disclosure, and destruction of Personal Information****, including, but not limited to, those concerning de-identification, anonymization, pseudonymization, or other de-personalization, if any, prior to sharing with a third party. Explain the reason (including whether it was to comply with a law or regulation) for any changes to these policies, practices, procedures, and relationships during the applicable time period.*

As described further in BetterHelp's response to Specifications I.1 and I.2, BetterHelp's Terms and Conditions and Privacy Policy describe BetterHelp's policies and practices regarding the collection, use, storage,

disclosure, and destruction of Personal Information. The Privacy Policy describes in detail, among other things, BetterHelp's practices related to information collection, use, and disclosure; use of cookies and web beacons; and the various types of third parties that may receive Personal Information.

Additional policies and procedures related to BetterHelp's data privacy and security practices are produced at BHDPIP00000085 to BHDPIP00000093, including the following:

- Global Privacy and Security Incident Investigation Policy (BHDPIP00000087), which relates to investigating, responding to, and reporting privacy and security incidents.
- Global Privacy and Security Training Policy (BHDPIP00000088), which relates to training of employees on the privacy and security of PII and PHI.
- Requests to Amend PHI (BHDPIP00000092), which relates to responding to requests for an amendment or change to their PHI.
- Compliance Policy (BHDPIP00000085), which relates to security compliance reviews.
- Incident Notification Policy (BHDPIP00000089), which relates to notification of breaches of PHI.
- Mobile Device Policy (BHDPIP00000090), which relates to use of mobile devices.
- ePHI Controls Policy (BHDPIP00000086), which relates to practices for examining and monitoring of systems containing electronic personal PHI.
- Remote Access Policy (BHDPIP00000091), which relates to remote access to the Company's systems.
- Workstation Security Policy (BHDPIP00000093), which relates to use of desktop and laptop systems.

BetterHelp administers a training for all new employees and for all existing employees on an annual basis related to BetterHelp's privacy and security policies.

BetterHelp's disclosure of Personal Information to third parties, and third parties' use of that information is subject to the limitations set forth in the terms and conditions applicable to those products and services, which are



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY BH0008589

produced at BHDPIP00000008 to BHDPIP00000048, BHDPIP00000064 to BHDPIP00000084, and BHDPIP00001117.

[redacted]

[redacted]

[redacted]

[redacted]

**P.** *Describe any audits, assessments, or compliance reviews conducted by You or on Your behalf related to the policies, procedures, practices, or relationships described in Your response to Specification O.*

[redacted]

[redacted]

[redacted]

**Q.** *Identify all person(s) at the Company responsible for designing, implementing, enforcing, or maintaining the policies, procedures, practices, and relationships described in Your response to Specification O. For each such person, state his or her job title and responsibilities during the applicable period, as well as the dates they held those titles and responsibilities.*

The below table identifies individuals responsible for BetterHelp's policies, practices, procedures, and relationships regarding the collection, use, storage, disclosure, and destruction of Personal Information.

| **Name** | **Title** | **Dates** | **Role** |
|---|---|---|---|
| Alain Adler | Head of Engineering | July 2017–present | Responsible for managing engineering team |

| | | | |
|---|---|---|---|
| Anjali Ahearn | Vice President and Corporate Counsel | February 2019–present | In-house counsel to BetterHelp |
| Michael Aldridge | Director of Information Technology | February 2020–June 2020 | Responsible for managing information technology operations |
| Danny Bragonier | Co-Founder and Director of Sales Operations | January 2015–present | Responsible for managing marketing operations |
| Sharon Cohen | Head of Security | September 2019–present | Responsible for managing information security operations |
| Rushabh Gandhi | Director of Product | June 2018–present | Responsible for development and maintenance of websites and application |
| Alon Matas | President and Founder | January 2015-present | Responsible for company-wide policy |

**R.** *To the extent not otherwise stated in Your responses to these Specifications, describe any changes You have made to Your policies, procedures, or practices since Jezebel's February 19, 2020 publication of the article "The Spooky, Loosely Regulated World of Online Therapy" by Molly Osberg and Dhruv Mehrotra.*

[redacted]

[redacted]

**S.** *State whether the Company is subject to the Health Insurance Portability Accountability Act.*

BetterHelp is subject to the Health Insurance Portability Accountability Act ("HIPAA") in its capacity as a "business associate" to counselors at BetterHelp.

**T.** *Identify all person(s) at the Company who have participated in the preparation of responses to this CID.*

The following persons at the Company have participated in the preparation of responses to this CID:

Alain Adler
Anjali Ahearn
Danny Bragonier
Sam Broer
Rushabh Gandhi
Jessica Honbarger
James Imrie
Farrah Moore
Christopher Piwarski

## II. Document Requests

**U.** *Each different organization chart in effect during the applicable time period.*

Documents responsive to this request are produced at BHDPIP00000003 to BHDPIP00000006.

**V.** *A family tree of the Company and its parents, subsidiaries, and affiliates.*

A document responsive to this request is produced at BHDPIP00000007.

**W.** *An electronic copy of each materially different version of the App.*

An electronic copy of the BetterHelp mobile application and the mobile applications for each of the BetterHelp multi-sites is available at the links provided below. BetterHelp does not maintain historic copies of the BetterHelp mobile applications in the ordinary course of business.

BetterHelp

Android:
https://play.google.com/store/apps/details?id=com.betterhelp&hl=en_US&gl=US

iOS:
https://apps.apple.com/us/app/betterhelp-online-counseling/id995252384

MyTherapist

Android:
https://play.google.com/store/apps/details?id=com.mytherapist&hl=en_US&gl=US

iOS:
https://apps.apple.com/us/app/mytherapist-counseling/id1249032168

Teen Counseling

Android:
https://play.google.com/store/apps/details?id=com.teencounseling&hl=en_US&gl=US

iOS:
https://apps.apple.com/us/app/teen-counseling/id1206966896

Faithful Counseling

Android:
https://play.google.com/store/apps/details?id=com.faithfulcounseling&hl=en_US&gl=US

iOS:
https://apps.apple.com/us/app/faithful-counseling/id1290989821

Pride Counseling

Android:
https://play.google.com/store/apps/details?id=us.regain&hl=en_US&gl=US

iOS:
https://apps.apple.com/us/app/pride-counseling/id1295966295

Regain



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY BH0008594

Android:
https://play.google.com/store/apps/details?id=us.regain&hl=en_US&gl=US

iOS:
https://apps.apple.com/us/app/regain-couples-therapy/id1206964049

Terappeuta

Android:
https://play.google.com/store/apps/details?id=com.terappeuta&hl=en_US&gl=US

iOS:
https://apps.apple.com/us/app/terappeuta/id1220973919

**X.** *Documents sufficient to show each materially different representation made to consumers relating to the collection, use, storage, or disclosure of Personal Information, including Advertisements, and screenshots of the consent flows or permission screens, as described in Your response to Specification I.*

Documents responsive to this request are produced at BHDPIP00000001 to BHDPIP00000002, BHDPIP00000095 to BHDPIP00000140, BHDPIP00000142 to BHDPIP00000152, and BHDPIP00001090 to BHDPIP00001112.

**Y.** *Documents sufficient to show the details of any disclosures of Personal Information to third parties as well as any deletion requests described in Your response to Specification K.*

Documents responsive to this request are produced at BHDPIP00000049 and BHDPIP00000141.

**Z.** *All Documents concerning the disclosure of Personal Information or App Events to Facebook.*

Documents responsive to this request are produced at:

BHDPIP00000157, BHDPIP00000159 to BHDPIP00000179, BHDPIP00000191 to BHDPIP00000196, BHDPIP00000291 to BHDPIP00000319, BHDPIP00000365 to BHDPIP00000450, BHDPIP00000459, BHDPIP00000478 to BHDPIP00000528, BHDPIP00000542 to BHDPIP00000572, BHDPIP00000582 to BHDPIP00000611, BHDPIP00000613 to BHDPIP00000615, BHDPIP00000617, BHDPIP00000649 to BHDPIP00000671, BHDPIP00000675 to BHDPIP00000695, BHDPIP00000737 to

BHDPIP00000768, BHDPIP00000817 to BHDPIP00000828, BHDPIP00000831 to BHDPIP00000858, BHDPIP00000861 to BHDPIP00000862, BHDPIP00000865 to BHDPIP00000911, BHDPIP00000922 to BHDPIP00000926, BHDPIP00000934 to BHDPIP00000955, BHDPIP00000965 to BHDPIP00000969, BHDPIP00000981 to BHDPIP00000987, BHDPIP00000998, BHDPIP00001012 to BHDPIP00001029, BHDPIP00001031 to BHDPIP00001035, BHDPIP00001037 to BHDPIP00001039, BHDPIP00001077 to BHDPIP00001079, BHDPIP00001083, BHDPIP00001105, and BHDPIP00001115.

**AA.** *Each materially different Document constituting a policy or procedure identified pursuant to Specification O, including each different privacy policy, terms of service, and terms of use.*

Documents responsive to this request are produced at BHDPIP00000050 to BHDPIP00000061 and BHDPIP00000085 to BHDPIP00000093.

**BB.** *Each materially different Document constituting a contract entered into by the Company that relates to its disclosure of Personal Information.*

Documents responsive to this request are produced at BHDPIP00000008 to BHDPIP00000048, BHDPIP00000064 to BHDPIP00000084, and BHDPIP00001117.

**CC.** *Documents sufficient to show the assessments, audits, and compliance reviews described in Your response to Specification Q.*

Documents responsive to this request are produced at BHDPIP00000062, BHDPIP00000063, and BHDPIP00000085.

**DD.** *All Documents constituting or relating to complaints You received from users regarding Your disclosure of Personal Information to third parties and your responses to such complaints, including but not limited to internal communications concerning how to respond to such complaints.*

Documents responsive to this request are produced at:[7]

BHDPIP00000354 to BHDPIP00000434, BHDPIP00000498 to BHDPIP00000511, BHDPIP00000528, BHDPIP00000564 to BHDPIP00000572, BHDPIP00000585, BHDPIP00000603, BHDPIP00000652 to BHDPIP00000659, BHDPIP00000738, BHDPIP00000753, BHDPIP00000981, BHDPIP00000992, BHDPIP00001080 to BHDPIP00001083, BHDPIP00001092 to BHDPIP00001102, BHDPIP00001108, and BHDPIP00001115.

---

[7] *See supra* note 6.

**EE.** *All Documents, including internal communications, concerning the article "The Spooky, Loosely Regulated World of Online Therapy" by Molly Osberg and Dhruv Mehrotra, published by Jezebel on February 19, 2020.*

Documents responsive to this request are produced at:

BHDPIP00000156, BHDPIP00000158, BHDPIP00000180 to BHDPIP00000188, BHDPIP00000199 to BHDPIP00000236, BHDPIP00000246 to BHDPIP00000286, BHDPIP00000325 to BHDPIP00000348, BHDPIP00000359, BHDPIP00000397 to BHDPIP00000434, BHDPIP00000450 to BHDPIP00000475, BHDPIP00000504 to BHDPIP00000541, BHDPIP00000564 to BHDPIP00000581, BHDPIP00000585 to BHDPIP00000593, BHDPIP00000612 to BHDPIP00000648, BHDPIP00000652 to BHDPIP00000659, BHDPIP00000674 to BHDPIP00000736, BHDPIP00000746 to BHDPIP00000787, BHDPIP00000789 to BHDPIP00000816, BHDPIP00000829 to BHDPIP00000830, BHDPIP00000917 to BHDPIP00000930, BHDPIP00000932 to BHDPIP00000933, BHDPIP00000935 to BHDPIP00000946, BHDPIP00000951 to BHDPIP00000955, BHDPIP00000965 to BHDPIP00000975, BHDPIP00000987 to BHDPIP00000991, BHDPIP00001005 to BHDPIP00001007, BHDPIP00001036, BHDPIP00001042 to BHDPIP00001076, BHDPIP00001083, BHDPIP00001100, and BHDPIP00001105.



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY BH0008597

**Responses to Additional Request Dated September 11, 2020**

**A.** *To BetterHelp's knowledge, how many of BetterHelp's therapists or counselors are subject to the Health Insurance Portability and Accountability Act ("HIPAA")?*

BetterHelp does not have independent knowledge of the number of counselors using the platform who are subject to HIPAA.

**B.** *Is BetterHelp a party to any HIPAA Business Associate agreements? If so, with whom?*

[redacted]

**C.** *Describe all policies, practices, and procedures BetterHelp has implemented to comply with HIPAA's Privacy Rule and Security Rule (45 CFR Part 160 and 45 CFR Part 160(A) and (C)).*

[redacted]

- [redacted]
- [redacted]
- [redacted]
- [redacted]
- [redacted]
- [redacted]



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY BH0008598

- [redacted]
- [redacted]
- [redacted]
- [redacted]
- [redacted]

**D.** *Produce all communications with Facebook concerning the disclosure of Personal Information following Jezebel's February 19, 2020 publication of "The Spooky, Loosely Regulated World of Online Therapy" by Molly Osberg and Dhruv Mehrotra.*

BetterHelp has not identified any communications responsive to this request based on a search using the parameters set forth in the letter from the FTC to BetterHelp dated November 6, 2020. BetterHelp further refers the FTC to the documents produced in response to Specification EE.

**E.** *Produce representative examples of all HIPAA Business Associate agreements and contracts to which BetterHelp is a party.*

BetterHelp refers the FTC to the documents produced at BHDPIP00000154 and BHDPIP00000155.

**F.** *Produce documents sufficient to show all policies, practices, and procedures BetterHelp has implemented to comply with HIPPA's Privacy Rule and Security Rule (45 CFR Part 160 and 45 CFR Part 160(A) and (C)).*

BetterHelp refers the FTC to the documents produced at BHDPIP00000062, BHDPIP00000063, BHDPIP00000085 through BHDPIP00000093, and BHDPIP00000153.

**G.** *Produce all communications with BetterHelp's therapists or counselors concerning Jezebel's February 19, 2020 article entitled "The Spooky, Loosely Regulated World of Online Therapy" by Molly Osberg and Dhruv Mehrotra.*

BetterHelp refers the FTC to the documents produced in response to Specification EE, which contain communications with therapists or counselors concerning the above-referenced article identified based on a search using the parameters set forth in the letter from the FTC to BetterHelp dated November 6, 2020.

* * *

# Exhibit 22

**From:** Tom Slater [redacted]
**Sent:** 7/13/2018 3:49:17 PM
**To:** Jessica Honbarger [jessica@betterhelp.com]
**CC:** Danny Bragonier [danny@betterhelp.com]; Anh Vu Huynh [redacted]; Alison Macdonald [redacted]
**Subject:** Re: Danny + Jessica | Re: [redacted] - BetterHelp Partnership Next Steps

Perfect - looking forward to getting everything ramped up.

Have a great weekend!

Best,
Tom

---

**From:** Jessica Honbarger <jessica@betterhelp.com>
**Sent:** Friday, July 13, 2018 4:30:43 PM
**To:** Tom Slater
**Cc:** Danny Bragonier; Anh Vu Huynh; Alison Macdonald
**Subject:** Re: Danny + Jessica | Re: [redacted] - BetterHelp Partnership Next Steps

Hi Tom,

That's great news!

And yes, we have both received our logins [redacted]

Thanks!
Jessica

On Fri, Jul 13, 2018 at 1:18 PM, Tom Slater [redacted] wrote:

Hey Jessica –

We're live!

Did you and Danny both receive logins to our dashboard?

Best,

Tom

**From:** Jessica Honbarger <jessica@betterhelp.com>
**Sent:** Friday, July 13, 2018 1:17 PM
**To:** Tom Slater [redacted]
**Cc:** Danny Bragonier <danny@betterhelp.com>; Anh Vu Huynh [redacted] Alison Macdonald [redacted]

**Subject:** Re: Danny + Jessica | Re: [redacted] - BetterHelp Partnership Next Steps

Hi Tom,

Great! We're very excited to get this started. We will be looking out for the confirmation and login details.

Thanks!

Jessica

On Fri, Jul 13, 2018 at 10:14 AM, Tom Slater [redacted] wrote:

Next steps will be for us to push live! I will also confirm when I have sent over a login to you and Danny to our dashboard.

---

**From:** Jessica Honbarger <jessica@betterhelp.com>
**Sent:** Friday, July 13, 2018 1:11:45 PM
**To:** Tom Slater
**Cc:** Danny Bragonier; Anh Vu Huynh; Alison Macdonald

**Subject:** Re: Danny + Jessica | Re: [redacted] - BetterHelp Partnership Next Steps

Hi Tom,

This sounds good to us as a starting number. What are the next steps from our end?

Thanks,

Jessica

On Fri, Jul 13, 2018 at 10:08 AM, Tom Slater <t.slater@criteo.com> wrote:

Hi Jessica,

I wouldn't anticipate [redacted] is there a number you'd like us to pace towards?

Best,

Tom

---

**From:** Jessica Honbarger <jessica@betterhelp.com>
**Sent:** Friday, July 13, 2018 1:03:16 PM

**To:** Tom Slater
**Cc:** Danny Bragonier; Dave Patrick; Anh Vu Huynh; Alison Macdonald

**Subject:** Re: Danny + Jessica | Re: [redacted] - BetterHelp Partnership Next Steps

Hi Tom,

[redacted]

As for a call, we are available from 11am-12pm PDT, and from 1pm-5pm PDT. Let us know if these times are good for you!

Thanks,

Jessica

On Fri, Jul 13, 2018 at 8:55 AM, Tom Slater [redacted] wrote:

Hey Jessica and Danny –

Looks like we are good to push live!

A couple of things:

- [redacted]
- Do you have some time for a kick off call on Monday? I'd like to introduce you to Ali who will be your account strategist and work with me to optimize the campaign

Best,

Tom

Tom Slater

[redacted]

**From:** Jessica Honbarger <jessica@betterhelp.com>
**Sent:** Thursday, July 12, 2018 7:17 PM

**To:** Tom Slater [redacted]
**Cc:** Danny Bragonier <danny@betterhelp.com>; Dave Patrick <dave@betterhelp.com>; Anh Vu Huynh [redacted]
**Subject:** Re: Danny + Jessica | Re: [redacted] - BetterHelp Partnership Next Steps

Hi Tom,

Sounds good! We are good to start campaigns tomorrow then if you are willing to monitor over the weekend.

Let us know next steps to get the campaign going once we get the okay from QA.

Thanks!
Jessica

On Thu, Jul 12, 2018 at 4:09 PM, Tom Slater <t.slater@criteo.com> wrote:

Hey Jessica -

[redacted]

[redacted]

Best,
Tom

---

**From:** Jessica Honbarger <jessica@betterhelp.com>
**Sent:** Thursday, July 12, 2018 7:07:17 PM
**To:** Tom Slater
**Cc:** Danny Bragonier; Dave Patrick; Anh Vu Huynh

**Subject:** Re: Danny + Jessica | Re: [redacted] - BetterHelp Partnership Next Steps

Hi Tom,

Great to hear! We'll be on the look out for confirmation from QA.

[redacted]

[redacted]

Thank you!

Jessica

On Thu, Jul 12, 2018 at 4:01 PM, Tom Slater [redacted] wrote:

Thanks Jessica!

I will have these QA'd tomorrow morning EST.

Assuming everything looks good, do we want to push the campaign live tomorrow or wait until Monday morning?

If we push live tomorrow, I'm happy to monitor performance over the weekend.

Best,

Tom

**From:** Jessica Honbarger <jessica@betterhelp.com>
**Sent:** Thursday, July 12, 2018 6:56 PM
**To:** Tom Slater [redacted]
**Cc:** Danny Bragonier <danny@betterhelp.com>; Dave Patrick <dave@betterhelp.com>; Anh Vu Huynh [redacted]
**Subject:** Re: Danny + Jessica | Re: [redacted] - BetterHelp Partnership Next Steps

Hi Tom,

[redacted] Please let us know if there are any additional changes needed here!

Thanks,

Jessica

On Thu, Jul 12, 2018 at 12:05 PM, Tom Slater [redacted] wrote:

[redacted]

Tom

---

**From:** Danny Bragonier <danny@betterhelp.com>
**Sent:** Thursday, July 12, 2018 3:02:10 PM
**To:** Tom Slater
**Cc:** Dave Patrick; Jessica Honbarger; Anh Vu Huynh

**Subject:** Re: Danny + Jessica | Re: [redacted] - BetterHelp Partnership Next Steps

Hey Tom,

[redacted]

Thanks,

Danny

Danny Bragonier | Co-Founder, *BetterHelp.com*
408.781.0958 | danny@betterhelp.com | www.betterhelp.com
440 N. Wolfe Rd., Sunnyvale, CA 94085

On Thu, Jul 12, 2018 at 11:17 AM Tom Slater [redacted] wrote:

> Hey Danny,
>
> [redacted]
>
> Best,
>
> Tom
>
> **From:** Danny Bragonier <danny@betterhelp.com>
> **Sent:** Thursday, July 12, 2018 1:57 PM
> **To:** Tom Slater [redacted]
> **Cc:** Dave Patrick <dave@betterhelp.com>; Jessica Honbarger <jessica@betterhelp.com>; Anh Vu Huynh [redacted]
> **Subject:** Re: Danny + Jessica | Re: [redacted] - BetterHelp Partnership Next Steps

Hi Tom,

[redacted]

Thanks,

Danny

Danny Bragonier | Co-Founder, *BetterHelp.com*
408.781.0958 | danny@betterhelp.com | www.betterhelp.com
440 N. Wolfe Rd., Sunnyvale, CA 94085

On Thu, Jul 12, 2018 at 9:58 AM Tom Slater [redacted] wrote:

Hey Dave –

[redacted]

Best,

Tom

**From:** Dave Patrick <dave@betterhelp.com>
**Sent:** Thursday, July 12, 2018 12:49 PM
**To:** Tom Slater [redacted]
**Cc:** Jessica Honbarger <jessica@betterhelp.com>; Danny Bragonier <danny@betterhelp.com>; Anh Vu Huynh [redacted]
**Subject:** Re: Danny + Jessica | Re: [redacted] - BetterHelp Partnership Next Steps

Hey Tom,

Right now, this is what I believe is happening:

[redacted]

[redacted]

Thanks!

Dave Patrick | Software Developer
440.668.6582 | dave@betterhelp.com | www.betterhelp.com
440 N. Wolfe Rd., Sunnyvale, CA 94085

On Jul 12, 2018, at 8:09 AM, Tom Slater [redacted] wrote:

Hi Jessica,

[redacted]

[redacted]

@Dave – can you make this adjustment?

<image001.jpg>

[redacted]

Best,
Tom

**From:** Jessica Honbarger <jessica@betterhelp.com>
**Sent:** Wednesday, July 11, 2018 1:29 PM
**To:** Tom Slater [redacted]
**Cc:** Danny Bragonier <danny@betterhelp.com>; Daniel Flores Montanez [redacted]
**Subject:** Re: Danny + Jessica | Re: [redacted] - BetterHelp Partnership Next Steps

Hi Tom,

[redacted]

Thanks!
Jessica

On Wed, Jul 11, 2018 at 9:58 AM, Tom Slater [redacted] wrote:

Hi Jessica - Thanks! Is there a way that we can run a test conversion?

Best,
Tom

---

**From:** Jessica Honbarger <jessica@betterhelp.com>
**Sent:** Tuesday, July 10, 2018 7:44:40 PM
**To:** Tom Slater
**Cc:** Danny Bragonier; Daniel Flores Montanez

**Subject:** Re: Danny + Jessica | Re: [redacted] - BetterHelp Partnership Next Steps

Hi Tom,

[redacted]

[redacted]

Thanks!
Jessica

On Tue, Jul 10, 2018 at 8:26 AM, Tom Slater [redacted] wrote:

Hi Dave –

That logic makes sense to us.

Best,
Tom

**From:** Dave Patrick <dave@betterhelp.com>
**Sent:** Monday, July 9, 2018 5:33 PM

**To:** Tom Slater [redacted]
**Cc:** Jessica Honbarger <jessica@betterhelp.com>; Danny Bragonier <danny@betterhelp.com>; Daniel Flores Montanez [redacted]
**Subject:** Re: Danny + Jessica | Re: [redacted] - BetterHelp Partnership Next Steps

Hi Tom,

[redacted]

[redacted]

Thanks for the help today.

Dave Patrick | Software Developer
440.668.6582 | dave@betterhelp.com | www.betterhelp.com
440 N. Wolfe Rd., Sunnyvale, CA 94085

On Jul 9, 2018, at 12:05 PM, Tom Slater [redacted] wrote:

Hi Dave – that will work just fine.

**From:** Dave Patrick <dave@betterhelp.com>
**Sent:** Monday, July 9, 2018 2:55 PM
**To:** Tom Slater [redacted]
**Cc:** Jessica Honbarger <jessica@betterhelp.com>; Danny Bragonier <danny@betterhelp.com>; Daniel Flores Montanez [redacted]
**Subject:** Re: Danny + Jessica | Re: [redacted] - BetterHelp Partnership Next Steps

[redacted]

[redacted]

[redacted] | Software Developer
440.668.6582 | dave@betterhelp.com | www.betterhelp.com
440 N. Wolfe Rd., Sunnyvale, CA 94085

On Jul 9, 2018, at 11:51 AM, Tom Slater [redacted] wrote:

Hi Dave –

[redacted]

[redacted]

Best,
Tom

**From:** Dave Patrick <dave@betterhelp.com>
**Sent:** Monday, July 9, 2018 2:49 PM
**To:** Tom Slater [redacted]
**Cc:** Jessica Honbarger <jessica@betterhelp.com>; Danny Bragonier <danny@betterhelp.com>; Daniel Flores Montanez [redacted]
**Subject:** Re: Danny + Jessica | Re: [redacted] - BetterHelp Partnership Next Steps

Hi Tom,

[redacted]

Thanks.

Dave Patrick | Software Developer
440.668.6582 | dave@betterhelp.com | www.betterhelp.com
440 N. Wolfe Rd., Sunnyvale, CA 94085

On Jul 9, 2018, at 11:43 AM, Tom Slater [redacted] wrote:

Hi Jessica –

[redacted]

Best,
Tom

**From:** Jessica Honbarger <jessica@betterhelp.com>
**Sent:** Monday, July 9, 2018 2:35 PM
**To:** Tom Slater [redacted]
**Cc:** Danny Bragonier <danny@betterhelp.com>; Daniel Flores Montanez [redacted] Dave Patrick <dave@betterhelp.com>
**Subject:** Re: Danny + Jessica | Re: [redacted] - BetterHelp Partnership Next Steps

Hi Tom,

Thanks for the raw text file!

[redacted]

Thanks,
Jessica

On Mon, Jul 9, 2018 at 11:27 AM, Tom Slater [redacted] wrote:

> Hi Jessica –
>
> No problem, raw text file is attached.
>
> Best,
> Tom
>
> **From:** Jessica Honbarger <jessica@betterhelp.com>
> **Sent:** Monday, July 9, 2018 1:16 PM
>
> **To:** Tom Slater [redacted]
> **Cc:** Danny Bragonier <danny@betterhelp.com>; Daniel Flores Montanez [redacted]
> **Subject:** Re: Danny + Jessica | Re: [redacted] - BetterHelp Partnership Next Steps
>
> Hi Tom,
>
> [redacted]
>
> Thanks!
> Jessica

On Fri, Jul 6, 2018 at 9:12 AM, Jessica Honbarger <jessica@betterhelp.com> wrote:

Hi Tom,

Thanks for the followup! The task of installing the pixels is still on our development team's queue, so we don't have any questions at this point. We will certainly reach out if anything arises, as well as let you know when they are implemented.

Thanks!

Jessica

On Fri, Jul 6, 2018 at 9:09 AM, Tom Slater [redacted] wrote:

Hey Jessica –

Hope you had a great 4th! I wanted to follow up, are there any preliminary questions from your development team [redacted]

Best,

Tom

---

**From:** Tom Slater
**Sent:** Monday, July 2, 2018 4:50 PM
**To:** 'Jessica Honbarger' <jessica@betterhelp.com>
**Cc:** Danny Bragonier <danny@betterhelp.com>; Daniel Flores Montanez [redacted]
**Subject:** RE: Danny + Jessica | Re: [redacted] - BetterHelp Partnership Next Steps

Perfect, thanks Jessica!

**From:** Jessica Honbarger <jessica@betterhelp.com>
**Sent:** Monday, July 2, 2018 4:49 PM
**To:** Tom Slater [redacted]
**Cc:** Danny Bragonier <danny@betterhelp.com>; Daniel Flores Montanez [redacted]
**Subject:** Re: Danny + Jessica | Re: [redacted] - BetterHelp Partnership Next Steps

Hi Tom,

Thanks for this! I will pass this along to our developers and will let you know if there are any questions.

Will keep you posted for when these are implemented.

Thanks,
Jessica

On Mon, Jul 2, 2018 at 1:45 PM, Tom Slater [redacted] wrote:

Hi Jessica –

Thanks for that insight, appreciate it.

[redacted]

Best,

Tom

**From:** Jessica Honbarger <jessica@betterhelp.com>
**Sent:** Monday, July 2, 2018 3:41 PM
**To:** Tom Slater [redacted]
**Cc:** Danny Bragonier <danny@betterhelp.com>; Daniel Flores Montanez [redacted]

**Subject:** Re: Danny + Jessica | Re: [redacted] - BetterHelp Partnership Next Steps

Hi Tom,

Good to hear that!

[redacted]

Thanks!

Jessica

On Mon, Jul 2, 2018 at 12:36 PM, Tom Slater [redacted] wrote:

Hey Jessica,

My engineer, Dan, is just finishing up the guide.

[redacted]

Thanks,

Tom

**From:** Jessica Honbarger <jessica@betterhelp.com>
**Sent:** Monday, July 2, 2018 3:27 PM

**To:** Tom Slater [redacted]
**Cc:** Danny Bragonier <danny@betterhelp.com>
**Subject:** Re: Danny + Jessica | Re: [redacted] - BetterHelp Partnership Next Steps

Hi Tom,

[redacted]

Thanks!

Jessica

On Thu, Jun 28, 2018 at 2:54 PM, Tom Slater [redacted] wrote:

> Hey Jessica -
>
> This is super helpful, thanks for sending it over.
>
> I will work with my engineer to get the pixel guide out ASAP.
>
> Best,
>
> Tom
>
> ---
>
> **From:**

...

[Message clipped]

# Exhibit 26

**FOIA CONFIDENTIAL TREATMENT REQUESTED**

**13. BHDPIP00000049 states that** [redacted]

The Company objects to this Request to the extent it calls for information protected by the attorney-client privilege or other applicable privileges or protections, and its response to this Request is not intended to, and does not, waive any applicable privilege or other legal basis under which information may be protected from disclosure.

[redacted]

[redacted]

# Exhibit 27

**Date:** Thursday, November 16 2017 09:07 AM
**Subject:** Re: FB Referral Beta
**From:** Theo Moore <theomoore@fb.com>
**To:** John Pham <john@betterhelp.com>; Doosan Baik <dbaik@fb.com>;
**CC:** Wes Kaplan <wes@betterhelp.com>; Danny Bragonier <danny@betterhelp.com>; David Welsh <david@betterhelp.com>; Victoria Butsky <victoria@betterhelp.com>; Jessica Honbarger <jessica@betterhelp.com>; Josh Jacobsen <joshj@fb.com>;

---

Hi all,

Just wanted to check in on the status here.

Doosan, do you need anything else from BetterHelp?

Thanks,
Theo

--
Theo Moore | Client Solutions Manager | Global Marketing Solutions
423.309.6772 (m) | Menlo Park, CA | 94025
Need immediate operational assistance? Facebook Client Concierge is here to help!

---

**From:** John Pham <john@betterhelp.com >
**Date:** Monday, October 23, 2017 at 5:06 PM
**To:** Doosan Baik <dbaik@fb.com >
**Cc:** Theo Moore <theomoore@fb.com >, Wes Kaplan <wes@betterhelp.com >, Danny Bragonier <danny@betterhelp.com >, David Welsh <david@betterhelp.com >, Victoria Butsky <victoria@betterhelp.com >, Jessica Honbarger <jessica@betterhelp.com >
**Subject:** Re: FB Referral Beta

Hi Doosan,

[redacted]

Thanks,
John

On Mon, Oct 23, 2017 at 4:51 PM, Doosan Baik <dbaik@fb.com> wrote:

> Hi Theo and John,
>
> [redacted]
>
> Thanks,
> Doosan
>
> ---
>
> **From:** Theo Moore <theomoore@fb.com>

**Date:** Monday, October 23, 2017 at 7:29 PM
**To:** John Pham <john@betterhelp.com>
**Cc:** Doosan Baik <dbaik@fb.com>, Wes Kaplan <wes@betterhelp.com>, Danny Bragonier <danny@betterhelp.com>, David Welsh <david@betterhelp.com>, Victoria Butsky <victoria@betterhelp.com>, Jessica Honbarger <jessica@betterhelp.com>
**Subject:** Re: FB Referral Beta

Hey John,

Sorry for the delay, I was trying to confirm with the product team. That should work just fine, please send and I'll push it to the team immediately.

Thanks,
Theo

--
Theo Moore | Client Solutions Manager | Global Marketing Solutions
423.309.6772 (m) | Menlo Park, CA | 94025
Need immediate operational assistance? Facebook Client Concierge is here to help!

---

**From:** John Pham <john@betterhelp.com>
**Date:** Monday, October 23, 2017 at 4:28 PM
**To:** Theo Moore <theomoore@fb.com>
**Cc:** Doosan Baik <dbaik@fb.com>, Wes Kaplan <wes@betterhelp.com>, Danny Bragonier <danny@betterhelp.com>, David Welsh <david@betterhelp.com>, Victoria Butsky <victoria@betterhelp.com>, Jessica Honbarger <jessica@betterhelp.com>
**Subject:** Re: FB Referral Beta

Hi Theo,

The set-up doc doesn't specify how to send the creatives over, can we just email you the google doc link to our creatives?

Thanks,
John

On Fri, Oct 20, 2017 at 4:30 PM, John Pham <john@betterhelp.com> wrote:

> Hi Theo,
>
> The set-up doc doesn't specify how to send the creatives over, can we just email you the link to our creatives?
>
> Thanks,
> John
>
> On Wed, Oct 18, 2017 at 9:58 AM, Theo Moore <theomoore@fb.com> wrote:
>
>> Hey all,
>>
>> [redacted]

I understand it's likely a little late in the game for creative, but this is what you should consider when making creative for the test:

- [redacted]

I hope that helps, let us know if you have any questions!

--
Theo Moore | Client Solutions Manager | Global Marketing Solutions
423.309.6772 (m) | Menlo Park, CA | 94025
Need immediate operational assistance? Facebook Client Concierge is here to help!

---

**From:** Theo Moore <theomoore@fb.com>
**Date:** Wednesday, October 18, 2017 at 8:16 AM
**To:** Doosan Baik <dbaik@fb.com>, Wes Kaplan <wes@betterhelp.com>
**Cc:** John Pham <john@betterhelp.com>, Danny Bragonier <danny@betterhelp.com>, David Welsh <david@betterhelp.com>, Victoria Butsky <victoria@betterhelp.com>, Josh Jacobsen <joshj@fb.com>
**Subject:** Re: FB Referral Beta

Hi all,

I hope your week is going well. The product team informed me they have not seen the creative for the referral alpha yet. Can you please send it via the method outlined in the instructions PDF (re-attached for reference)?

Let me know if you have any questions, looking forward to getting this live!

Cheers,
Theo

--
Theo Moore | Client Solutions Manager | Global Marketing Solutions
423.309.6772 (m) | Menlo Park, CA | 94025
Need immediate operational assistance? Facebook Client Concierge is here to help!

---

**From:** Doosan Baik <dbaik@fb.com>
**Date:** Monday, October 9, 2017 at 6:05 PM
**To:** Wes Kaplan <wes@betterhelp.com>
**Cc:** Theo Moore <theomoore@fb.com>, John Pham <john@betterhelp.com>, Danny Bragonier <danny@betterhelp.com>, David Welsh <david@betterhelp.com>, Victoria Butsky <victoria@betterhelp.com>, Josh Jacobsen <joshj@fb.com>
**Subject:** Re: FB Referral Beta

Hi Wes,

Thanks a lot for quick feedback! Could you please try once again now? I found that we had needed to whitelist this ad account once again, and just performed the action.

Thanks,
Doosan

---

**From:** Wes Kaplan <wes@betterhelp.com>
**Date:** Monday, October 9, 2017 at 8:03 PM
**To:** Doosan Baik <dbaik@fb.com>
**Cc:** Theo Moore <theomoore@fb.com>, John Pham <john@betterhelp.com>, Danny Bragonier <danny@betterhelp.com>, David Welsh <david@betterhelp.com>, Victoria Butsky <victoria@betterhelp.com>, Josh Jacobsen <joshj@fb.com>
**Subject:** Re: FB Referral Beta

Hi Doosan,

[redacted]

I'm guessing I'm still missing something, any ideas what that might be?

Thanks,
Wes

On Mon, Oct 9, 2017 at 4:46 PM, Doosan Baik <dbaik@fb.com> wrote:

> Hi Wes,
>
> Thanks a lot for the feedback. While following the steps below, between step 4 and 5, could you please check the following items at the section of 'Available Scopes' ?
>
> - [redacted]
>
> Please don't hesitate to let us know if you have any further questions.

Thanks,
Doosan

---

**From:** Wes Kaplan <wes@betterhelp.com>
**Date:** Thursday, October 5, 2017 at 2:24 PM
**To:** Doosan Baik <dbaik@fb.com>
**Cc:** Theo Moore <theomoore@fb.com>, John Pham <john@betterhelp.com>, Danny Bragonier <danny@betterhelp.com>, David Welsh <david@betterhelp.com>, Victoria Butsky <victoria@betterhelp.com>, Josh Jacobsen <joshj@fb.com>
**Subject:** Re: FB Referral Beta

Hi Doosan,

[redacted]

Any ideas as to why it's not working?

Thanks for your help,
Wes

On Tue, Oct 3, 2017 at 5:13 PM, Doosan Baik <dbaik@fb.com> wrote:

> Hi Wes,
>
> Thanks a lot for the inquiry. Could you please follow the steps below to retrieve the correct access_token to update the mapping to user_match API endpoint?
>
> [redacted]
>
> Please note that step 2 – 5 above needs to be taken by the administrator of BetterHelp Business Manager. If you have any further questions, please don't hesitate to let us know.
>
> Thanks,
> Doosan

---

**From:** Wes Kaplan <wes@betterhelp.com>
**Date:** Tuesday, October 3, 2017 at 5:45 PM
**To:** Theo Moore <theomoore@fb.com>
**Cc:** John Pham <john@betterhelp.com>, Danny Bragonier <danny@betterhelp.com>, David Welsh <david@betterhelp.com>, Victoria Butsky <victoria@betterhelp.com>, Josh Jacobsen <joshj@fb.com>, Doosan Baik <dbaik@fb.com>
**Subject:** Re: FB Referral Beta

[redacted]

Let me know if you need any more info.

Thanks,
Wes

On Fri, Sep 29, 2017 at 4:04 PM, Theo Moore <theomoore@fb.com> wrote:

> Hey Wes,
>
> [redacted]
>
> Also I'm copying Doosan Baik from the product team here to streamline any additional dev questions.
>
> Thanks,
> Theo
>
> --
> Theo Moore | Client Solutions Manager | Global Marketing Solutions
> 423.309.6772 (m) | Menlo Park, CA | 94025
> Need immediate operational assistance? Facebook Client Concierge is here to help!
>
> ---
>
> **From:** Wes Kaplan <wes@betterhelp.com>
> **Date:** Friday, September 29, 2017 at 3:41 PM
> **To:** Theo Moore <theomoore@fb.com>
> **Cc:** John Pham <john@betterhelp.com>, Danny Bragonier <danny@betterhelp.com>, David Welsh <david@betterhelp.com>, Victoria Butsky <victoria@betterhelp.com>, Josh Jacobsen <joshj@fb.com>
> **Subject:** Re: FB Referral Beta
>
> Hi Theo,
>
> We just tried with the new ad account and got the same error as before:
>
> [redacted]
>
> [redacted]//g[redacted]

Thanks,
Wes

On Fri, Sep 29, 2017 at 3:29 PM, Theo Moore <theomoore@fb.com> wrote:

Hey Wes,

Confirming we've whitelisted the ad account so you will be able to hit this API endpoint now. Let me know if you have any troubles.

Cheers,
Theo

--
Theo Moore | Client Solutions Manager | Global Marketing Solutions
423.309.6772 (m) | Menlo Park, CA | 94025
Need immediate operational assistance? Facebook Client Concierge is here to help!

---

**From:** Wes Kaplan <wes@betterhelp.com>
**Date:** Wednesday, September 27, 2017 at 1:15 PM
**To:** Theo Moore <theomoore@fb.com>
**Cc:** John Pham <john@betterhelp.com>, Danny Bragonier <danny@betterhelp.com>, David Welsh < david@betterhelp.com>, Victoria Butsky <victoria@betterhelp.com>, Josh Jacobsen <joshj@fb.com>
**Subject:** Re: FB Referral Beta

Thanks Theo, that's the same mistake I made! Looks like it's an easy one to make. Look forward to hearing from you soon.

Wes

On Wed, Sep 27, 2017 at 12:52 PM, Theo Moore <theomoore@fb.com> wrote:

[redacted]

I'll confirm whitelisting soon…

--
Theo Moore | Client Solutions Manager | Global Marketing Solutions
423.309.6772 (m) | Menlo Park, CA | 94025
Need immediate operational assistance? Facebook Client Concierge is here to help!

---

**From:** Wes Kaplan <wes@betterhelp.com>
**Date:** Wednesday, September 27, 2017 at 9:08 AM
**To:** Theo Moore <theomoore@fb.com>
**Cc:** John Pham <john@betterhelp.com>, Danny Bragonier <danny@betterhelp.com>, David Welsh < david@betterhelp.com>, Victoria Butsky <victoria@betterhelp.com>, Josh Jacobsen <joshj@fb.com>
**Subject:** Re: FB Referral Beta

Hi Theo,

[redacted]

[redacted]

Let me know when it's okay to try to upload some referral codes to you guys!

Thanks,
Wes

On Wed, Sep 27, 2017 at 8:29 AM, Theo Moore <theomoore@fb.com> wrote:

> Hey Wes,
>
> [redacted]
>
> Thanks,
> Theo
>
> --
> Theo Moore | Client Solutions Manager | Global Marketing Solutions
> 423.309.6772 (m) | Menlo Park, CA | 94025
> Need immediate operational assistance? Facebook Client Concierge is here to help!
>
> ---
>
> **From:** Wes Kaplan <wes@betterhelp.com>
> **Date:** Tuesday, September 26, 2017 at 5:43 PM
> **To:** Theo Moore <theomoore@fb.com>
> **Cc:** John Pham <john@betterhelp.com>, Danny Bragonier <danny@betterhelp.com>, David Welsh <david@betterhelp.com>, Victoria Butsky <victoria@betterhelp.com>, Josh Jacobsen <joshj@fb.com>
> **Subject:** Re: FB Referral Beta
>
> Sounds good Theo! Thanks.
> Wes
>
> On Tue, Sep 26, 2017 at 5:40 PM, Theo Moore <theomoore@fb.com> wrote:
>
>> Hey Wes,
>>
>> I just confirmed that the referral team is simply swamped right now so they're delayed in their response time. I hope to have an update on the error tomorrow. I'll let you know.
>>
>> Thanks,
>> Theo
>>
>> --
>> Theo Moore | Client Solutions Manager | Global Marketing Solutions
>> 423.309.6772 (m) | Menlo Park, CA | 94025
>> Need immediate operational assistance? Facebook Client Concierge is here to help!
>>
>> ---
>>
>> **From:** Wes Kaplan <wes@betterhelp.com>

**Date:** Tuesday, September 26, 2017 at 2:50 PM
**To:** Theo Moore <theomoore@fb.com>
**Cc:** John Pham <john@betterhelp.com>, Danny Bragonier <danny@betterhelp.com>, David Welsh <david@betterhelp.com>, Victoria Butsky <victoria@betterhelp.com>, Josh Jacobsen <joshj@fb.com>
**Subject:** Re: FB Referral Beta

Hi Theo,

Just pinging you in case you missed my last message! Let me know if there's anything else I can do, thanks.

Wes

On Mon, Sep 25, 2017 at 11:42 AM, Wes Kaplan <wes@betterhelp.com> wrote:

> Hi Theo,
>
> [redacted]
>
> [redacted]
>
> [redacted]
>
> [redacted]
> "
>
> Any ideas? Let me know, thanks!
>
> Wes
>
> On Thu, Sep 21, 2017 at 10:51 AM, Wes Kaplan <wes@betterhelp.com> wrote:
>
>> Hi Theo,
>>
>> Okay sounds good! The integration is basically done now, but I there's one last thing. When I send the codes, what kind of a response will I get back? Can I try sending a few codes right now in order to test that endpoint? As I send these codes, I want to mark them as successfully sent. But before I mark them I want confirmation that they were actually received on your end.
>>
>> Thanks for your help!
>> Wes
>>
>> On Wed, Sep 20, 2017 at 12:02 PM, Theo Moore <theomoore@fb.com> wrote:
>>
>>> Hey Wes,
>>>
>>> Please see responses in-line in red below. Let me know if you have any follow ups.
>>>
>>> Cheers,
>>> Theo
>>>
>>> --
>>> Theo Moore | Client Solutions Manager | Global Marketing Solutions

423.309.6772 (m) | Menlo Park, CA | 94025
Need immediate operational assistance? Facebook Client Concierge is here to help!

---

**From:** Wes Kaplan <wes@betterhelp.com>
**Date:** Monday, September 18, 2017 at 5:07 PM
**To:** Theo Moore <theomoore@fb.com>
**Cc:** John Pham <john@betterhelp.com>, Danny Bragonier <danny@betterhelp.com>, David Welsh <david@betterhelp.com>, Victoria Butsky <victoria@betterhelp.com>, Josh Jacobsen <joshj@fb.com>
**Subject:** Re: FB Referral Beta

Hi Theo,

[redacted]

[redacted]

[redacted] – [redacted]

[redacted] – [redacted]

Thanks,
Wes

On Mon, Sep 18, 2017 at 12:46 PM, Theo Moore <theomoore@fb.com> wrote:

> Hey Wes,
>
> Please find answers in-line below:
>
> [redacted]
>
> [redacted] – [redacted]
>
> Let me know if you have any additional questions.
>
> Cheers,

Theo

--
Theo Moore | Client Solutions Manager | Global Marketing Solutions
423.309.6772 (m) | Menlo Park, CA | 94025
Need immediate operational assistance? Facebook Client Concierge is here to help!

---

**From:** Wes Kaplan <wes@betterhelp.com>
**Date:** Friday, September 15, 2017 at 2:40 PM
**To:** John Pham <john@betterhelp.com>
**Cc:** Theo Moore <theomoore@fb.com>, Danny Bragonier <danny@betterhelp.com>, David Welsh <david@betterhelp.com>, Victoria Butsky <victoria@betterhelp.com>, Josh Jacobsen <joshj@fb.com>
**Subject:** Re: FB Referral Beta

Hi Theo,

I did have a couple more questions. We will be sending a list ~2 million emails and referral codes, is sending a POST request with the entire list to graph.facebook.com the best way to do that? Also, is there a way for us to test the ad once it's ready but before we start showing it to facebook users to see what the user experience will be like?

I'll probably think of more questions once I get started but that's all for now. Thanks for your help!

Wes

On Fri, Sep 15, 2017 at 2:05 PM, John Pham <john@betterhelp.com> wrote:

> Hi Theo,
>
> Will be able to create the referral ad through the power editor or ad manger? I am also including our developer Wes in the email in case he as more questions.
>
> Thanks,
> John

# Exhibit 28

**Date:** Thursday, November 30 2017 03:01 PM
**Subject:** Re: You're Invited | After the Click, presented by Facebook
**From:** Jessica Honbarger <jessica@betterhelp.com>
**To:** Danny Bragonier <danny@betterhelp.com>;
**Attachments:** image001.png

---

Below are the names of the facebook pixels per event

[redacted]

[redacted]

On Thu, Nov 30, 2017 at 2:50 PM, Danny Bragonier <danny@betterhelp.com> wrote:

Can you send me the pixel events (web and app) for landing, sign up, submit paying info?

**Danny Bragonier** | Co-Founder, *BetterHelp.com*
408.781.0958 | danny@betterhelp.com | www.betterhelp.com
440 N. Wolfe Rd., Sunnyvale, CA 94085

---------- Forwarded message ----------
From: **Theo Moore** <theomoore@fb.com>
Date: Thu, Nov 30, 2017 at 2:26 PM
Subject: Re: You're Invited | After the Click, presented by Facebook
To: Josh Jacobsen <joshj@fb.com>, Alain Adler <alain@betterhelp.com>
Cc: "andrea@betterhelp.com" <andrea@betterhelp.com>, Danny Bragonier <danny@betterhelp.com>, Jarrad Berman <jarrad@fb.com>, Bianca Regan <bregan@fb.com>

Hey BetterHelp team,

Looking forward to having you at After the Click, we're confident it will be very valuable.

[redacted]

[redacted]

- [redacted]

Danny, would you agree these represent the most valuable 4 steps to map insights against? If so or if not, can you or your team send me the corresponding standard events/custom conversions and the app events so we can ensure we pull the most appropriate data? It would be great if we could get this be EOD tomorrow so the team has time to get everything together.

Let me know if you have any questions.

Cheers,
Theo

--

Theo Moore | Client Solutions Manager | Global Marketing Solutions

423.309.6772 (m) | Menlo Park, CA | 94025

Need immediate operational assistance? Facebook Client Concierge is here to help!

---

**From:** Josh Jacobsen <joshj@fb.com>
**Date:** Thursday, November 30, 2017 at 12:36 PM
**To:** Alain Adler <alain@betterhelp.com>

**Cc:** "andrea@betterhelp.com" <andrea@betterhelp.com>, Danny Bragonier <danny@betterhelp.com>, Jarrad Berman <jarrad@fb.com>, Bianca Regan <bregan@fb.com>, Theo Moore <theomoore@fb.com>
**Subject:** Re: You're Invited | After the Click, presented by Facebook

Fantastic, thanks Alain!

Josh Jacobsen Client Partner Global Marketing Solutions

1601 Willow Road Menlo Park, CA | 94025

425.275.7112 (m)
**facebook | instagram**

---

**From:** Alain Adler <alain@betterhelp.com>
**Date:** Thursday, November 30, 2017 at 12:12 PM
**To:** Josh Jacobsen <joshj@fb.com>
**Cc:** "andrea@betterhelp.com" <andrea@betterhelp.com>, Danny Bragonier <danny@betterhelp.com>, Jarrad Berman <jarrad@fb.com>, Bianca Regan <bregan@fb.com>, Theo Moore <theomoore@fb.com>
**Subject:** Re: You're Invited | After the Click, presented by Facebook

Hey!

Yes, I can confirm that the three of us will be there next week.

Thanks!

On Thu, Nov 30, 2017 at 8:55 AM, Josh Jacobsen <joshj@fb.com> wrote:

> Good morning Andrea & team,
>
> Just wanted to double confirm that you've RSVP'd to our 12/7 event and that the three of you still plan on attending. Let us know, thanks!
>
> Josh Jacobsen | Client Partner Global Marketing Solutions
>
> 1601 Willow Road Menlo Park, CA | 94025

425.275.7112 (m)
facebook | instagram

---

**From:** Bianca Regan <bregan@fb.com>
**Date:** Monday, November 20, 2017 at 3:17 PM
**To:** "andrea@betterhelp.com" <andrea@betterhelp.com>
**Cc:** Josh Jacobsen <joshj@fb.com>, Jarrad Berman <jarrad@fb.com>
**Subject:** You're Invited | After the Click, presented by Facebook

Hi Andrea,

A Facebook event without BetterHelp just wouldn't be the same and we see that you have not RSVP'd to After the Click on Thursday, 12/7 at our office in Menlo Park.

As a reminder, After the Click is a one day event focused on the holistic nature of the path to conversion, and what happens "after the click". While consumers have made the shift to mobile, businesses have not optimized their user experiences for how mobile users discover, shop, and buy. We'll share our latest insights on how to build effective user experiences that will guide mobile shoppers to purchase and keep them coming back. We will also hear from industry thought leaders from ThredUp, Branding Brand, and BounceX.

RSVP directly at https://facebookafterthecli ck.splashthat.com/

**EVENT DETAILS**
**Who**: 25 - 30 peer brands from our disruptor vertical

**What**: 1 day event focused how to build effective user experiences that will guide mobile shoppers to purchase and keep customers coming back
**When**: Thursday, December 7th, 9am - 5pm
**Where**: Facebook Campus - Menlo Park, CA

On behalf of the whole Facebook team have a wonderful Thanksgiving and start to the holiday season. We wish you a fruitful Black Friday and Cyber Monday weekend.

**Bianca Regan** | Facebook | MKTG

bregan@fb.com | bregan@mktg.com

t: 973 309 6508 | 225 Park Ave S. NYC 10003

facebook

# Exhibit 30

**Date:** Tuesday, August 4 2020 12:17 PM
**Subject:** Fwd: I need Support #fd78dc1e8c97d3eaacdf23f18bb8ad67
**From:** Avi Elfassy <avi@betterhelp.com>
**To:** Kfir Eyal <kfir@betterhelp.com>;

Hi Kfir,

Please see the 2 follow up questions I have regarding an edu lead with who I spoke last week (Washington College of Law, under a thousand students):

**Here is my proposed response to her first question (from a previous email from Sharon):**

[redacted]

[redacted]

[redacted]

**With regards to her second question, is it ok if I ask James (or someone else) in order to formulate the right, precise answer that I can then use again if needed?**

Thanks,

---------- Forwarded message ---------
From: **Cassandre Gaspard** <cassandre.gaspard@student.american.edu >
Date: Tue, Aug 4, 2020 at 8:22 AM
Subject: Re: I need Support #fd78dc1e8c97d3eaacdf23f18bb8ad67
To: Avi Elfassy <avi@betterhelp.com>

Thank you again for your time and for answering the questions! I just need more information on two questions.

How is your company address issues concerning data sharing? Some of the faculty at our school are concerned about data sharing because of an article that was circulated. https://jezebel.com/the- spooky-loosely-regulated-world-of-online-therapy-1841791137

Has this company made any statements re BLM? and/or does your company continuously support national and local diversity initiatives? Could you share a little more about the actions you all have taken?

On Mon, Aug 3, 2020 at 4:09 PM Avi Elfassy <avi@betterhelp.com> wrote:
Hi Cassandre, I hope you had a great weekend. Please see my responses below:

On Fri, Jul 31, 2020 at 4:14 PM Cassandre Gaspard <cassandre.gaspard@student.american.edu > wrote:

Hey!

Thanks for speaking with me today!

Below are the questions I need answered to the best of your ability - you can just ignore the ones covered by your presentation.

Cassandre

---------- Forwarded message ---------
From: **Cassandre Gaspard** <cassandre.gaspard@student.american.edu>
Date: Sat, Jul 18, 2020 at 2:18 PM
Subject: Re: I need Support #fd78dc1e8c97d3eaacdf23f18bb8ad67
To: BetterHelp <contact@betterhelp.com>
Cc: SBA Health <sbahealth@wcl.american.edu>

I am a Mental Health Liason at American University Washington College of the Law, and yes, we are looking to find out what the costs would be for your services to be provided to the students at our school. If BetterHelp can facilitate this sort of partnership, could you please answer the questions below? Thanks in advance for the information and collaboration!

(1) What kind of partnership programs do you offer? How many existing clients do you have? Is there a capacity?

We offer a Pay-per-student model (PSPM) and a Pay-per-usage model, both covered in the presentation

We have over a million active users and have connected over 3M users with therapists. There is no capacity

(2) What is the per student per month cost and what is the over-cost (calculated based on enrollment of 1400 students)? What exact services are included in this rate, and what time period does it cover?

There is zero cost for students in the Pay-per-usage model. In the PSPM model, it is $25 co-pay for the first month and 30% off retail from month 2 onwards. The retail price can be found on www.betterhelp.com.

A Betterhelp membership includes up to 4 live sessions a month (phone, video or chat) and UNLIMITED a-synchronous messaging

(3) What emergency services do you offer/how does your service handle a student contemplating suicide (whether this is disclosed openly to the counselor or is implied in conversation)?

We have an ongoing partnership with Crisis Text Line (https://www.crisistextline.org/ ) and it is communicated throughout the matching process on most pages on the platform

(4) What tech/policies do you use in order to protect a student's privacy? I see information on your website's FAQ page but if you can/want to elaborate, I'd appreciate it.

We are HIPAA compliant, can provide more specific information if needed

(5) Does your company have a whitepaper on the security of their system?

Can provide information as requested

(6) How is your company address issues concerning data sharing?

Can provide information as requested

(7) Is there access to psychiatrists through the service? If so, can they fill prescriptions?

No

(8) How does your service support POC, and LBTGI+, women, and other minority student groups?

Don't understand the question

(9) Has this company made any statements re BLM? and/or does your company continuously support national and local diversity initiatives?

Yes, we do, more information available upon request

On Sat, Jul 18, 2020 at 2:01 PM BetterHelp <contact@betterhelp.com> wrote:
Hello there,

Thank you for your patience. We provide customer support by email because we are a web-based team and can communicate most effectively in this format. Please reply to this email and we'll resolve your concern as soon as possible.

When you mentioned a partnership with you school, are you referring to if your school's insurance covers our services? Or are you looking to find out what the costs would be for our services to be provided to students at your school?

Please let me know if you have any further questions.

Warm regards,
Kayla
BetterHelp Team

*IMPORTANT: Please remember that online counseling is not appropriate for crisis situations. If you need immediate attention please call now 1-800-273-TALK (24 hours hotline). If you or anyone else might be in danger please call 911 or go to the nearest emergency room. Also, please note that this email was not written by a counselor and doesn't constitute as counseling.*

How would you rate my reply?
Great Okay Not Good

On Fri, Jul 17, 2020 at 1:05 PM PDT, <cg5273a@student.american.edu> wrote:
Hi support!

This is from the support page:
first-name : Evelyne

last-name : G.

email : cg5273a@student.american.edu

message : Hello! I'm a student at a law school. I had questions about a possible partnership with my school. Please contact me as soon as you all can. Thanks in advance!

support-type :

--

**Cassandre Gaspard**
*Publications Editor, Journal of Gender, Social Policy, and the Law*

J.D. Candidate 2021 | American University Washington College of Law
M.P.P. Candidate 2022 | American University School of Public Affairs
(954) 464-0910 | cassandre.gaspard@student.american.edu

--

**Cassandre Gaspard**
*Publications Editor, Journal of Gender, Social Policy, and the Law*

J.D. Candidate 2021 | American University Washington College of Law
M.P.P. Candidate 2022 | American University School of Public Affairs
(954) 464-0910 | cassandre.gaspard@student.american.edu

--

Sincerely,

Avi Elfassy | Manager, Sales & Partnerships
Mobile: +1 (650) 867-2295
Email: avi@betterhelp.com
Let's meet? www.calendly.com/avi- elfassy

--

**Cassandre Gaspard**
*Publications Editor, Journal of Gender, Social Policy, and the Law*

J.D. Candidate 2021 | American University Washington College of Law
M.P.P. Candidate 2022 | American University School of Public Affairs
(954) 464-0910 | cassandre.gaspard@student.american.edu

--

Sincerely,

Avi Elfassy | Manager, Sales & Partnerships
Mobile: +1 (650) 867-2295
Email: avi@betterhelp.com
Let's meet? www.calendly.com/avi- elfassy

# Exhibit 35

**From**: John Mutuski [jmutuski@teladochealth.com]
on behalf of John Mutuski <jmutuski@teladochealth.com> [jmutuski@teladochealth.com]
**Sent**: 10/15/2020 5:38:38 PM
**To**: Sharon Cohen [sharon@betterhelp.com]
**Subject**: Re: Weekly Update Monday Oct 12th

Thank you

---

**From:** Sharon Cohen <sharon@betterhelp.com>
**Sent:** Thursday, October 15, 2020 8:36:06 PM
**To:** John Mutuski <jmutuski@teladochealth.com>
**Subject:** Weekly Update Monday Oct 12th

John

Please find the weekly report

1. [redacted] internal player presenating to BH status an overall idea limited access of internal employee to records concept is A ticket, A customer, A access, access close

2. rollout of [redacted]

3. BAA for [redacted]

4. Slack user access policy

5. [redacted]
with Privacy team , creating risk register

6. introduce to [redacted]

7. Audit AUR, IT, Finance - *****ZERO CONTROLS GAPS on Betterhelp******

8. Audit Hasoffers/Tune/Assess [redacted]

9. review all scan reports

10. [redacted] as the Privacy Solution for CCPA

11. [redacted] 30 questions done

12. [redacted] for 3rd party risk assessment

13. BAA with [redacted]

Thanks
Sharon

--

Sharon Cohen | Head of Security
Mobile: +1(781)504-5004
Email: sharon.cohen@betterhelp.com
990 Villa St, Mountain View, CA 94041

---

CONFIDENTIALITY NOTICE: This e-mail message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information or otherwise be protected by law. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.

# Exhibit 37

**From**: Theo Moore [theomoore@fb.com]
on behalf of Theo Moore <theomoore@fb.com> [theomoore@fb.com]
**Sent**: 6/12/2018 4:59:35 PM
**To**: Jessica Honbarger [jessica@betterhelp.com]
**CC**: Danny Bragonier [danny@betterhelp.com]; victoria@betterhelp.com; Brad Murphy [bradm@fb.com]; Suganya Sivachalam [ssivachalam@fb.com]
**Subject**: Re: FB/BetterHelp Sync Recap 6/6

Just updated it to 10:30am - thanks for the flexibility!

--
Theo Moore | Client Solutions Manager | Global Marketing Solutions
423.309.6772 (m) | Menlo Park, CA | 94025
Need immediate operational assistance? Facebook Client Concierge is here to help!

**From:** Jessica Honbarger <jessica@betterhelp.com>
**Date:** Tuesday, June 12, 2018 at 4:54 PM
**To:** Theo Moore <theomoore@fb.com>
**Cc:** Danny Bragonier <danny@betterhelp.com>, "victoria@betterhelp.com" <victoria@betterhelp.com>, Brad Murphy <bradm@fb.com>, Suganya Sivachalam <ssivachalam@fb.com>
**Subject:** Re: FB/BetterHelp Sync Recap 6/6

Hi Theo,

Let's move the call to Thursday. We are free from 10am-11am, and then from 4pm-5pm. Will any of these times work for you?

Thanks!
Jessica

On Tue, Jun 12, 2018 at 4:44 PM, Theo Moore <theomoore@fb.com> wrote:

> No problem Jessica, just wanted to make sure it went through!
>
> On another note, I'll be traveling during our scheduled time tomorrow. Would you be open to moving it to Thursday or canceling for email?
>
> Thanks!

--

Theo Moore | Client Solutions Manager | Global Marketing Solutions

423.309.6772 (m) | Menlo Park, CA | 94025

Need immediate operational assistance? Facebook Client Concierge is here to help!

**From:** Jessica Honbarger <jessica@betterhelp.com>
**Date:** Tuesday, June 12, 2018 at 4:05 PM

**To:** Theo Moore <theomoore@fb.com>
**Cc:** Danny Bragonier <danny@betterhelp.com>, "victoria@betterhelp.com" <victoria@betterhelp.com>, Brad Murphy <bradm@fb.com>, Suganya Sivachalam <ssivachalam@fb.com>
**Subject:** Re: FB/BetterHelp Sync Recap 6/6

Hi Theo,

Apologies there! I accidentally missed your previous email. [redacted]

Thanks!

Jessica

On Tue, Jun 12, 2018 at 3:51 PM, Theo Moore <theomoore@fb.com> wrote:

> Hey Jessica,
>
> Sounds good, just pass them along when you have them, and I'll start working on the coupon on my end.
>
> [redacted]
>
> --
>
> Theo Moore | Client Solutions Manager | Global Marketing Solutions

423.309.6772 (m) | Menlo Park, CA | 94025

Need immediate operational assistance? Facebook Client Concierge is here to help!

**From:** Jessica Honbarger <jessica@betterhelp.com>
**Date:** Tuesday, June 12, 2018 at 3:43 PM

**To:** Theo Moore <theomoore@fb.com>
**Cc:** Danny Bragonier <danny@betterhelp.com>, "victoria@betterhelp.com" <victoria@betterhelp.com>, Brad Murphy <bradm@fb.com>, Suganya Sivachalam <ssivachalam@fb.com>
**Subject:** Re: FB/BetterHelp Sync Recap 6/6

Hi Theo,

[redacted] I will provide you the ad set ids of ad sets that we want to be included in the test once we are all set up.

[redacted]

Thanks!

Jessica

On Fri, Jun 8, 2018 at 2:42 PM, Jessica Honbarger <jessica@betterhelp.com> wrote:

> Hi Theo,
>
> Thanks for the quick response! This looks good to us. Looking forward to kicking this off!
>
> Thanks!
>
> Jessica
>
> On Fri, Jun 8, 2018 at 2:39 PM, Theo Moore <theomoore@fb.com> wrote:
>
>> Hey Jessica,

[redacted]

Thanks for checking!

--

Theo Moore | Client Solutions Manager | Global Marketing Solutions
423.309.6772 (m) | Menlo Park, CA | 94025
Need immediate operational assistance? Facebook Client Concierge is here to help!

**From:** Jessica Honbarger <jessica@betterhelp.com>
**Date:** Friday, June 8, 2018 at 2:34 PM

**To:** Theo Moore <theomoore@fb.com>
**Cc:** Danny Bragonier <danny@betterhelp.com>, "victoria@betterhelp.com" <victoria@betterhelp.com>, Brad Murphy <bradm@fb.com>, Suganya Sivachalam <ssivachalam@fb.com>
**Subject:** Re: FB/BetterHelp Sync Recap 6/6

Hi Theo,

[redacted]

Thanks!

Jessica

On Fri, Jun 8, 2018 at 2:16 PM, Theo Moore <theomoore@fb.com> wrote:

> Whoops! See attached. ☺

--

Theo Moore | Client Solutions Manager | Global Marketing Solutions

423.309.6772 (m) | Menlo Park, CA | 94025

Need immediate operational assistance? Facebook Client Concierge is here to help!

**From:** Jessica Honbarger <jessica@betterhelp.com>
**Date:** Friday, June 8, 2018 at 1:36 PM
**To:** Theo Moore <theomoore@fb.com>
**Cc:** Danny Bragonier <danny@betterhelp.com>, "victoria@betterhelp.com" <victoria@betterhelp.com>, Brad Murphy <bradm@fb.com>, Suganya Sivachalam <ssivachalam@fb.com>

**Subject:** Re: FB/BetterHelp Sync Recap 6/6

Hi Theo,

I don't think anything was attached in your previous email. Would you mind resending the details of the study?

Thanks!

Jessica

On Fri, Jun 8, 2018 at 11:00 AM, Theo Moore <theomoore@fb.com> wrote:

Hi all,

[redacted] Please review the details attached and let me know if everything looks good. Then we should be good to go!

Cheers,

--

Theo Moore | Client Solutions Manager | Global Marketing Solutions

423.309.6772 (m) | Menlo Park, CA | 94025

Need immediate operational assistance? Facebook Client Concierge is here to help!

**From:** Theo Moore <theomoore@fb.com>
**Date:** Thursday, June 7, 2018 at 4:29 PM
**To:** Jessica Honbarger <jessica@betterhelp.com>

**Cc:** Danny Bragonier <danny@betterhelp.com>, "victoria@betterhelp.com" <victoria@betterhelp.com>, Brad Murphy <bradm@fb.com>
**Subject:** Re: FB/BetterHelp Sync Recap 6/6

Hey Jessica,

1. Thanks for confirming the questions, I think those look good. I'll aim to have this set up by tomorrow morning and will pass the details your way for final review/approval. I'm hopeful that will allow us to launch it by end of day.

2. [redacted] As long as we keep track of what's being spent against the specific test, we can structure it however you prefer.

Thanks,

--

Theo Moore | Client Solutions Manager | Global Marketing Solutions

423.309.6772 (m) | Menlo Park, CA | 94025

Need immediate operational assistance? Facebook Client Concierge is here to help!

**From:** Jessica Honbarger <jessica@betterhelp.com>
**Date:** Thursday, June 7, 2018 at 10:42 AM
**To:** Theo Moore <theomoore@fb.com>
**Cc:** Danny Bragonier <danny@betterhelp.com>, "victoria@betterhelp.com" <victoria@betterhelp.com>, Brad Murphy <bradm@fb.com>
**Subject:** Re: FB/BetterHelp Sync Recap 6/6

Hi Theo,

Thanks for sending this recap to us, as well as for the additional information regarding the Apple update. In terms of action items from our end:

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

Thanks!

Jessica

On Thu, Jun 7, 2018 at 9:09 AM, Theo Moore <theomoore@fb.com> wrote:

Hey team,

[redacted]

[redacted]

My take:

[redacted]

Further Messaging

[redacted]

[redacted]

We support efforts to provide people more control over the data that is used and stored about them, which is why we're building a Clear History feature as announced at F8. At the same time, we also remain committed to helping you effectively measure your advertising efforts with us and will help you work through solutions.

Please let us know if you have any questions.

...

Theo Moore | Client Solutions Manager | Global Marketing Solutions

423.309.6772 (m) | Menlo Park, CA | 94025

Need immediate operational assistance? Facebook Client Concierge is here to help!

---

**From:** Theo Moore <theomoore@fb.com>
**Date:** Wednesday, June 6, 2018 at 12:19 PM
**To:** Danny Bragonier <danny@betterhelp.com>, "victoria@betterhelp.com" <victoria@betterhelp.com>, Jessica Honbarger <jessica@betterhelp.com>
**Cc:** Brad Murphy <bradm@fb.com>
**Subject:** FB/BetterHelp Sync Recap 6/6

Hey team,

Good chatting with you today. Please find the recap below and let me know if I missed anything!

Cheers,
Theo

**AGENDA:**

- [redacted]

**NOTES:**

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

--

Theo Moore | Client Solutions Manager | Global Marketing Solutions
423.309.6772 (m) | Menlo Park, CA | 94025
Need immediate operational assistance? Facebook Client Concierge is here to help!

---------- Forwarded message ----------
From: Theo Moore <theomoore@fb.com>
To: Danny Bragonier <danny@betterhelp.com>, Jessica Honbarger <jessica@betterhelp.com>, "victoria@betterhelp.com" <victoria@betterhelp.com>
Cc: Brad Murphy <bradm@fb.com>
Bcc:
Date: Fri, 8 Jun 2018 13:18:20 -0700
Subject: BetterHelp: FB + TV July Lift Studies

Hi all,

[redacted] To clarify, I'm recommending that we run two studies in conjunction:

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

- [redacted]
- [redacted]
- [redacted]

[redacted]

We can discuss in more depth next week, just wanted to get this your way before the weekend!

Thanks,

--

Theo Moore | Client Solutions Manager | Global Marketing Solutions
423.309.6772 (m) | Menlo Park, CA | 94025
Need immediate operational assistance? Facebook Client Concierge is here to help!

# Exhibit 38

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

IN RE BETTERHELP, INC., DATA DISCLOSURE CASES. ) Case No. 3:23-cv-01033-RS

VIDEO-RECORDED DEPOSITION OF

ALON MATAS

3000 EL CAMINO REAL

5 PALO ALTO SQUARE, 9TH FLOOR

PALO ALTO, CALIFORNIA

WEDNESDAY, OCTOBER 16, 2024

9:29 A.M. PACIFIC STANDARD TIME

HIGHLY CONFIDENTIAL; SUBJECT TO PROTECTIVE ORDER

REPORTED BY: DAWN A. STARK
Certified Shorthand Reporter
License No. 7847

MS. BRADY: Okay.
**Q. Does BetterHelp collect geographical information on its patients and customers?**
MS. KISER: Objection to form.
THE WITNESS: Can you define "geographic information"?
MS. BRADY: Right.
Whether it's a country or a rural area or urban area, those types of things, where these individuals live.
THE WITNESS: We --
MS. KISER: Objection to form.
THE WITNESS: Sorry.
We ask for country -- we, BetterHelp.
From what I remember, at the time it was BetterHelp, BetterHelp asks for country and asks for state; I don't remember if we asked specific address.
We -- like BetterHelp may have; that I don't remember for sure.
BY MS. BRADY:
**Q. Does BetterHelp collect gender information about its customers and patients?**
MS. KISER: Objection to form.
THE WITNESS: Yes, we ask for your gender.
BY MS. BRADY:
**Q. Does BetterHelp collect age information about its**



**customers and patients?**
MS. KISER: Objection to form.
THE WITNESS: Yes, we ask the user for their age.
MS. BRADY: Okay.
**Q. Did any of that collection or request change over time?**
MS. KISER: Objection to form.
THE WITNESS: I assume it was, like over -- over a decade, I'm sure we changed multiple things multiple times.
BY MS. BRADY:
**Q. Do you know if it broadened or narrowed, or do you know?**
MS. KISER: Objection to form. Lack of foundation.
THE WITNESS: I don't think it went consistently any direction.
Sometimes someone had thought that information can be useful or that information that we're already asking is not useful.
MS. BRADY: Okay.
**Q. Would you agree with me that BetterHelp had an obligation to have a Business Associate Agreement with Facebook before it shared hashed information with it?**
MS. KISER: Objection to form. Calls for a legal conclusion.
To the extent you have any understanding that was



based on legal advice, I instruct you not to answer.
THE WITNESS: I don't know.
MS. BRADY: Okay.
**Q. Would you agree with me that BetterHelp never obtained specific authorization from its patients and customers before it shared hashed information with Facebook?**
MS. KISER: Objection to form.
To the extent that calls for a legal conclusion, I instruct you not to answer. If you have an independent understanding, you may answer.
THE WITNESS: We have a privacy policy that every user had to agree with.
That's the extent of my ability to interpret it without getting into legal advice and instructions.
BY MS. BRADY:
**Q. Did -- from your memory, did the privacy policy specifically state: We are going to share hashed information -- or BetterHelp is going to share hashed information with platforms such as Facebook?**
MS. KISER: Objection to form. Irrelevant.
THE WITNESS: I don't remember every word of the privacy policy and what it said.
MS. BRADY: Okay.
**Q. Would you agree with me that disclosing information**



**outside of BetterHelp -- disclosing -- excuse me; let me start over again.**
**Q. Would you agree with me that disclosing patient and client information outside of the BetterHelp company could cause harm to patients and customers?**
MS. KISER: Objection to form. Lack of foundation. Calls for speculation. Overbroad. Calls for a legal conclusion.
THE WITNESS: I'm -- I guess it's very much dependent on what information is shared and in what specificity.
So for example, if I say 75 percent or -- of our users are female, I don't think that harms people.
So not -- I -- I don't agree with the statement that any information on any level, regardless of whether it's anonymized or aggregated, is causing harm.
BY MS. BRADY:
**Q. Would you agree with me that sharing specific information about a patient or customer's gender-dysphoria problems, where the patient or customer could be identified, could cause harm to that patient or customer?**
MS. KISER: Objection to form. Incomplete hypothetical. Calls for a legal conclusion.
THE WITNESS: I -- you're asking me something that's very hypothetical, like can something cause harm?

Page 114

I am -- I'm not a harm expert.
Like you asked me if it's something I want to be done, no, but I -- I can't talk about harm.
BY MS. BRADY:
**Q. Why wouldn't you want it to be done?**
MS. KISER: Objection to form. Lack of foundation. Irrelevant.
THE WITNESS: When you say "this," can you define what you mean by "this"?
BY MS. BRADY:
**Q. You said, "Would you want it to be done?"**
**I'm just asking --**
A. Yeah, but that was like three questions ago.
So I -- I want to make sure that -- that we're talking about the same "it."
**Q. Yeah.**
**Disclosure of someone's suicidal ideation that would identify that particular individual.**
MS. KISER: Objection to form. Incomplete hypothetical. Lack of foundation. Irrelevant.
THE WITNESS: I wouldn't want BetterHelp to tell you, for example, that John Smith from -- from this address or this phone number, this email, has gender -- no, I wouldn't want that to happen.
//

Page 115

BY MS. BRADY:
**Q. Why wouldn't you want that to happen?**
MS. KISER: Objection to form. Irrelevant.
THE WITNESS: Because we are committed to our users' privacy, and telling you specifically about someone who's a user of us that's -- something specific about him is not something that I would want to be done.
BY MS. BRADY:
**Q. Would you agree with me that things such as suicidal ideation, gender dysphoria, those types of things, are very sensitive?**
MS. KISER: Objection to form. Irrelevant.
THE WITNESS: This is sensitive information.
BY MS. BRADY:
**Q. Do you agree with me that there's a stigma associated with individuals who may seek mental-health assistance?**
MS. KISER: Objection to form. Argumentative. Lack of foundation. Calls for speculation. Incomplete hypothetical.
THE WITNESS: If -- sorry.
Are you asking if there's a stigma in the world around mental health?
MS. BRADY: Yes, sir.
THE WITNESS: To some extent there is, yes.

Page 116

It depends on where and -- and which time, but it definitely exists.
BY MS. BRADY:
**Q. Is there a stigma in the United States with regards to mental health, from your perspective?**
MS. KISER: Objection to form. Irrelevant.
THE WITNESS: In some areas of United States, there is -- there is stigma, yes.
BY MS. BRADY:
**Q. Is privacy important?**
MS. KISER: Objection to form. Overbroad. Irrelevant.
THE WITNESS: Of course.
BY MS. BRADY:
**Q. Why?**
MS. KISER: Objection to form.
THE WITNESS: I think people generally have the expectation of not wanting to share everything with everyone all the time.
BY MS. BRADY:
**Q. Did -- did you found BetterHelp in order to give folks who may have had trepidation in seeking mental health -- a private way to seek mental health without having to expose themselves?**
MS. KISER: Objection to form.

Page 117

THE WITNESS: I started BetterHelp because I realized that millions of people that need mental healthcare do not get the care they need because of barriers of access, of price, of convenience or feasibility of using the service or awareness.
That was the reason why we started BetterHelp.
BY MS. BRADY:
**Q. Is it important, then, for these individuals who are seeking mental healthcare and treatment that BetterHelp assures them that their information will be kept private?**
MS. KISER: Objection to form.
THE WITNESS: I -- I think in general, people care about their privacy; it's not something that is specific to BetterHelp or even specific to mental health.
Obviously, some -- some people have different views about privacy and some issues, and some subjects are more sensitive than others, but it's a very general question.
So I -- I'm not sure -- I'm not sure I'm answering your question, actually.
MS. BRADY: Sure.
**Q. When I'm talking about the customers and patients of BetterHelp --**
A. Uh-huh.
**Q. -- who seek mental-health treatment --**
A. Uh-huh.

**Q. -- is it important that BetterHelp tells them that their information is going to be kept private?**
MS. KISER: Objection to form. Incomplete hypothetical. Argumentative. Irrelevant.
THE WITNESS: I think privacy is important in general, and as an extension, also, how services people use, such as BetterHelp, affects their privacy.
Did that answer your question?
MS. BRADY: Sort of, but I guess my -- my question is a little bit more specific than that.
**Q. Did -- did BetterHelp tell its patients and customers that their information would be kept private?**
MS. KISER: Objection to form. Asked and answered. The documents speak for themselves.
THE WITNESS: We had a privacy policy, and we committed to everyone that their privacy is kept in compliance with that privacy policy.
BY MS. BRADY:
**Q. Did BetterHelp train its employees on this privacy policy?**
MS. KISER: Objection to form.
THE WITNESS: BetterHelp trained its employees about privacy data protection, also specifically around health-related data protection very frequently.
//



BY MS. BRADY:
**Q. You said "very frequently"?**
A. Uh-huh.
**Q. More than once?**
A. We had -- at -- at Teladoc employees, we had a standard training process that was periodic -- some of it was quarterly; some of it was annual -- that every employee had to go through it, otherwise they would be disciplined.
**Q. Okay.**
MS. KISER: So I know that you guys have short time, but we do need to take a quick break for lunch.
Should we try to do that now?
Are you starting a new --
MS. BRADY: We can do that now.
MS. KISER: -- module? Okay.
THE VIDEOGRAPHER: We're going off the record.
The time is 11:46 A.M.
(Lunch recess taken.)



AFTERNOON SESSION

THE VIDEOGRAPHER: We are back on the record.
The time is 12:25 P.M.
Please proceed.
MS. BRADY: Mr. Matas, thanks for that short break.

EXAMINATION (Resumed)

BY MS. BRADY:
**Q. Let me ask you about the FTC investigation that you talked about earlier.**
**Are you familiar with the nature of the FTC BetterHelp -- or investigation into BetterHelp?**
MS. KISER: Objection to form.
I caution you not to disclose legal, but your personal knowledge is relevant.
THE WITNESS: Can you clarify what you mean by "nature of"?
MS. BRADY: Sure.
**Q. Do you know what the investigation was about?**
A. Yes.
**Q. What was it about?**
A. It was about privacy.
**Q. Okay. What was the complaint that the FTC made against BetterHelp?**



MS. KISER: Objection to form. Overbroad.
THE WITNESS: From my understanding, it was about data that they alleged we shared with other companies.
BY MS. BRADY:
**Q. Did you agree with that allegation?**
MS. KISER: Objection to form. Irrelevant.
THE WITNESS: We were very public that we denied the allegations.
MS. BRADY: Okay.
(Matas Deposition Exhibit No. 14 was marked for identification.)
BY MS. BRADY:
**Q. I'm going to ask you to look at Deposition Exhibit No. 14, and I think it's on your --**
A. It's not.
I have a -- I have still the other one, but I can --
**Q. Oh, sorry, thank you.**
A. (Witness reviewing screen.)
Okay.
**Q. I'm going to ask you to look down to page 27 of that document, because I've got several documents kind of smushed together.**
MS. KISER: Can -- can he please just look at the whole thing to get comfortable with what you're going to ask

THE WITNESS: Some therapists did.
I mean, some therapists used their own systems that they also used in their private practice -- they used it also for BetterHealth -- BetterHelp, yeah.
MS. BRADY: Okay.
**Q.** [redacted]
MS. BRADY: Okay. Thank you.
**Q. Do you know where in the BetterHelp system that data would be stored or saved?**
MS. KISER: Objection to form. Lack of foundation. Irrelevant.
THE WITNESS: What do you mean by "where"?
BY MS. BRADY:
**Q. Would it be in an off-site server?**
**Would it be in a Cloud-based server?**
**Would it be in some program that is separate and apart?**
MS. KISER: Objection to form. Lack of foundation. Irrelevant.



THE WITNESS: This is kind of a technical question --
MS. BRADY: Sure.
THE WITNESS: -- and I'm not sure I can answer it correctly.
BY MS. BRADY:
**Q. Do you know who would know that answer?**
MS. KISER: Objection to form. Lack of foundation. Calls for speculation.
THE WITNESS: [redacted]
MS. BRADY: Yes.
THE WITNESS: -- [redacted]
MS. BRADY: Okay. Thank you; that's helpful.
THE WITNESS: Uh-huh.
MS. BRADY: Okay.
**Q.** [redacted]
MS. KISER: Objection to form. Lack of foundation. Irrelevant.



[redacted]
MS. BRADY: Okay. Thank you.
(Matas Deposition Exhibit No. 17 was marked for identification.)
MS. BRADY: Mr. Matas, I'd like you to look at Exhibit 17 on your list.
And we'll get that circulated around to folks and posted up on the screen thing (indicating).
THE WITNESS: (Reviewing screen.)
Did you want me to read it while we --
MS. BRADY: Go ahead and read it while we're futzing around with it.
That was a technical term.
(Remarks outside the record.)
THE WITNESS: (Reviewing screen.)
MS. BRADY: Have you guys gotten it yet?
MS. KISER: Yes.
MS. BRADY: Oh, great, okay.



MS. KISER: Thanks.
MS. BRADY: Mr. Matas, just tell me when you've reviewed and are ready to talk.
THE WITNESS: Sure, sure.
(Reviewing screen.)
Okay.
MS. BRADY: Okay.
**Q. Mr. Matas, have you ever seen this document before?**
A. Yes.
**Q. And for the record, we're looking at Exhibit 17, which is a letter from the United States Senate, particularly Senator Elizabeth Warren, Senator Cory Booker and Senator Ron Wyden, that is dated June 22nd, 2022.**
**When did you receive this letter?**
A. I really don't remember myself, but given the date of -- that I'm seeing here, I assume it was June 22 (indicating).
**Q. Okay.**
A. But --
**Q. Thank you.**
**Sometime around --**
A. It's not my own personal memory, just looking at this document (indicating).
**Q. Sure. Thank you.**
**And in this document, it -- it states, within the**

**under the subheading, "So how did it all start?"**
A. (Witness reviewing screen.)
Uh-huh.
**Q. It states, "One of our core missions is to destigmatize mental health."**
A. Yes.
**Q. Do you agree that BetterHelp's core -- one of BetterHelp's core missions is to destigmatize mental health?**
MS. KISER: Objection to form. Irrelevant.
THE WITNESS: Yes.
MS. BRADY: Okay.
**Q. Do you believe that BetterHelp has achieved that goal of destigmatizing mental health?**
MS. KISER: Objection to form. Irrelevant.
THE WITNESS: I think that talking openly about mental- -- mental-health issues and treatment is -- has a lot less stigma because of our actions.
MS. BRADY: Okay.
THE WITNESS: The fact that we can -- that there are, you know, even ads to mental health -- first when we launched it, "Oh, but , you'll never be able to advertise."
And I said, "Why?"
"Because you can't talk about mental health in public and in advertising and in marketing or mention it in TV even."



I said, "But why not?"
And I think we made big strides in that.
BY MS. BRADY:
**Q. Do you think it is a good thing to talk about mental health in advertising and marketing --**
A. Yes.
**Q. -- to --**
A. I think --
**Q. Sorry.**
A. Yeah, sorry.
MS. KISER: I was going to object to the form of the question as irrelevant.
Go ahead.
THE WITNESS: Absolutely.
I think -- I think it's a -- it's a false and dangerous premise that you should not talk about it, that it's dirty and should be secret and it's not legitimate to make it a public discussion, and as a result of that, you can't advertise a service like this.
It's definitely something that you can advertise and you shouldn't be ashamed of it, and anyone who has a problem with advertising for mental healthcare is only making -- demonstrate that there are still in the stigma age of mental healthcare.
//



BY MS. BRADY:
**Q. Would you agree with me that not everybody shares your very open view of the approach to mental healthcare?**
MS. KISER: Objection to form. Irrelevant. Lack of foundation.
THE WITNESS: I'm not -- I'm not sure, like I -- I -- I don't think today like there are a lot of people that would say, "Oh, you shouldn't talk about mental health."
I think a lot has changed; part of it is because of us, part of it is not.
It's not to say that there isn't stigma around mental health, but I don't think it's frowned upon that mental-healthcare services are being advertised.
And today -- maybe we were one of the pioneers, but today, you have over 30 companies offering mental-healthcare services, sometimes therapy, sometimes psychiatry or other types of mental healthcare, and they all advertise in all channels from radio to TV to billboards to social media, and people don't see that as something problematic.
So I think a lot of it is gone since -- since we started.
(Remarks outside the record.)
BY MS. BRADY:
[redacted]



[redacted]
MS. BRADY: Okay. Thank you.
**Q. Did you have a backup practice for the platform that housed client and patient information?**
MS. KISER: Objection to form. Lack of foundation. Irrelevant.

# Exhibit 39

KING & SPALDING

King & Spalding LLP
1180 Peachtree Street N.E. Ste. 1600
Atlanta, GA 30309-3521
Tel: +1 404 572 4600
Fax: +1 404 572 5100
www.kslaw.com

Phyllis B. Sumner
Partner and Chief Privacy Officer
Direct Dial: +1 404 572 4799
psumner@kslaw.com

October 23, 2024

**FOIA CONFIDENTIAL TREATMENT REQUESTED**

*Via Email*

Ryan Mehm
Sarah Waldrop
Division of Privacy and Identity Protection
Federal Trade Commission
600 Pennsylvania Avenue NW, Mail Drop CC-8245
Washington, D.C. 20580
rmehm@ftc.gov
swaldrop@ftc.gov

**Re: BetterHelp, FTC Matter No. 2023169**

Dear Mr. Mehm and Ms. Waldrop:

Thank you for meeting with us on September 26, 2024, to discuss a correction to the FTC record. As we discussed, shortly after BetterHelp and the Commission negotiated a Consent Order in FTC Matter No. 2023169 (the "FTC Matter"), BetterHelp was sued in multiple proposed class action lawsuits in California. Those matters have been consolidated in a proceeding before Judge Richard Seeborg in the Northern District of California (*In Re BetterHelp, Inc. Data Disclosure Cases*, Case No. 3:23-cv-01033-RS) (the "California Matter").[1]

[1] Plaintiffs filed a consolidated complaint on September 6, 2023 (Dkt. 76). BetterHelp subsequently filed a motion to dismiss. On July 15, 2024, Judge Seeborg issued an opinion and order dismissing several of the claims. *See* July 15, 2024 Order (Dkt. 113), Ex. 1 hereto. Plaintiffs filed an amended consolidated complaint on August 5, 2024 (Dkt. 114) and BetterHelp moved to dismiss that amended complaint on August 28, 2024 (Dkt. 117). On October 15, 2024, Judge

**FOIA CONFIDENTIAL TREATMENT REQUESTED**



[redacted]

[redacted]

**I. Background**

In connection with the parties' efforts to reach a negotiated resolution of the FTC Matter, BetterHelp, through prior counsel, provided information to the FTC.

Subsequently, and as you are aware, on March 2, 2023, the FTC entered a Consent Order with BetterHelp resolving the FTC Matter. While the Order included neither findings of fact nor conclusions of law, nor any admission by BetterHelp of wrongdoing, BetterHelp agreed, *inter alia*, to pay $7.8 million to the FTC to use for consumer redress.

[redacted]

[redacted] [redacted]

[redacted]

[redacted]

---

Seeborg issued an order granting in part and denying in part BetterHelp's motion to dismiss (Dkt. 131).

2 [redacted]

**FOIA CONFIDENTIAL TREATMENT REQUESTED**



[redacted]

[redacted]

[redacted] [redacted] [redacted] [redacted]

[redacted] BetterHelp would be happy to answer any additional questions.

Sincerely,



Phyllis B. Sumner
Partner and Chief Privacy Officer

# Exhibit 42

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

IN RE BETTERHELP, INC. DATA DISCLOSURE CASES ) No. 3:23-cv-01033-RS

REMOTE VIDEOCONFERENCE DEPOSITION OF

SHARON COHEN

FRIDAY, APRIL 11, 2025

BY: STEVEN J. BRICKEY, CSR NO. 14480

JOB NO. 12716673

**Q. Does BetterHelp hold as a priority the trust of security of information that customers and patients put in BetterHelp?**
MR. UNGER: Object to form.
BY THE WITNESS:
A. Yes, it's a priority.
BY MS. BRADY:
**Q. Sorry. Can you describe for me what your understanding of what services BetterHelp provides?**
A. So BetterHelp is the online therapy, provide services for people that need, you know, mental health and provide matching to -- you know, to a therapist, you know, kind of sectors of the -- you know, of the society.
You know, can be, you know, from team counselor, to couple therapy, to individual therapy as well as, you know, for business therapies as well.
**Q. Does BetterHelp have a mission statement?**
A. I think we do. I don't know it by heart.
**Q. Okay.**
A. It's like we provide, Maureen, therapy to everybody. It's like buying the milk. We want it to go in every therapy. That's really the mission statement.



**Q. As part of wanting to be available to the public for therapy services, is BetterHelp dedicated to privacy of their customers and patients?**
A. Can you -- can you elaborate on the dedicate?
**Q. Sure.**
A. Yeah.
**Q. Is it -- is it a priority?**
MR. UNGER: Asked and answered.
BY THE WITNESS:
A. I can talk about my area?
BY MS. BRADY:
**Q. Yes.**
A. Yes.
**Q. I'm just speaking about your area.**
A. Yeah.
**Q. Okay.**
A. Mm-hmm.
**Q.** [redacted]
**Q. Okay. Thank you. Please educate me.**



[redacted]
**Q. Okay. That's helpful.**
A. Yeah.
**Q. Because let me just pre- -- preface this with the fact that I am not a technical person.**
A. I will try to explain to you as much as you can so you can understand it very easy and very -- you're not going to have the loss in translation here. So...
**Q. Wonderful. Thank you. I do appreciate that.**
A. Yeah.
**Q.** [redacted]



[redacted]
BY MS. BRADY:
[redacted]

[redacted]



[redacted]

**Q. That sounds like a lot of security.**

A. A lot of security in place, you know.

**Q. Why is there so much security with regards to the patient information?**

MR. UNGER: Objection. Calls for speculation.

BY THE WITNESS:

A. It's speculation, but I can educate it to you.

BY MS. BRADY:

**Q. Thank you.**

A. You know, so cyber security is a big thing right now and part of that is phishing, compromising, DDoS attack, direct attack, right. If you become very popular, you know, there is a special group, eastern European, that are attacking us all the time. So you have to be on top of it.

And cyber security is also very dynamic. It's changing all the time. You will -- and during



this conversation, you will feel it, watch me change in order for us to be able to defend against the attacks surface. It happens all the time. So it's part of our -- it's offering a service like that online, like the bank online. It's attempting to attack all the time and you need to be on top of it.

**Q. Is there something special about the customer and patient information that BetterHelp stores and protects that requires that level of security?**

MR. UNGER: Objection. Vague. Calls for speculation. Calls for a legal conclusion.

BY THE WITNESS:

A. Yes, in some point, we -- at some point, but, you know, we choosing the highest level of -- you know, enterprise level of data service in order for us to get those security features built in and able to protect us from a risk perspective, right. So --

BY MS. BRADY:

**Q. Is part of the reason that security is so tight on this type of data because patient and customer information is very sensitive?**

MR. UNGER: Objection. Calls for speculation. Calls for a legal conclusion.



If you have an understanding, you can answer.

BY THE WITNESS:

A. It's -- yes, at some point, but it's -- it's data for data, right. Not only, you know, like private health information or sensitive information. So even, you know, with, you know, the way you build the code, for example, right. So the information needs to be highly security, you know. Yeah.

BY MS. BRADY:

**Q. You mentioned that you had encryption on the information as it's stored.**

A. Mm-hmm.

**Q. Does the encryption travel with the information if it is accessed by another party?**

MR. UNGER: Objection. Vague.

BY THE WITNESS:

A. There is no other party access the information.

BY MS. BRADY:

**Q. Okay. How then -- if it's encrypted, how then can the therapist or patient access and view that information?**

A. That's part of their, you know, application, right. When they're logging in, when

**Does BetterHelp hold as a priority the trust of security of information that customers and patients put in BetterHelp?**
MR. UNGER: Object to form.
BY THE WITNESS:
A. Yes, it's a priority.
BY MS. BRADY:
**Q. Sorry. Can you describe for me what your understanding of what services BetterHelp provides?**
A. So BetterHelp is the online therapy, provide services for people that need, you know, mental health and provide matching to -- you know, to a therapist, you know, kind of sectors of the -- you know, of the society.
You know, can be, you know, from team counselor, to couple therapy, to individual therapy as well as, you know, for business therapies as well.
**Q. Does BetterHelp have a mission statement?**
A. I think we do. I don't know it by heart.
**Q. Okay.**
A. It's like we provide, Maureen, therapy to everybody. It's like buying the milk. We want it to go in every therapy. That's really the mission statement.



**Q. As part of wanting to be available to the public for therapy services, is BetterHelp dedicated to privacy of their customers and patients?**
A. Can you -- can you elaborate on the dedicate?
**Q. Sure.**
A. Yeah.
**Q. Is it -- is it a priority?**
MR. UNGER: Asked and answered.
BY THE WITNESS:
A. I can talk about my area?
BY MS. BRADY:
**Q. Yes.**
A. Yes.
**Q. I'm just speaking about your area.**
A. Yeah.
**Q. Okay.**
A. Mm-hmm.
**Q. I'd like to talk about the systems that BetterHelp uses for storage of information and those types of things.**
[redacted]



[redacted]



[redacted]

[redacted]



[redacted]

**Q. That sounds like a lot of security.**
A. A lot of security in place, you know.
**Q. Why is there so much security with regards to the patient information?**
MR. UNGER: Objection. Calls for speculation.
BY THE WITNESS:
A. It's speculation, but I can educate it to you.
BY MS. BRADY:
**Q. Thank you.**
A. You know, so cyber security is a big thing right now and part of that is phishing, compromising, DDoS attack, direct attack, right. If you become very popular, you know, there is a special group, eastern European, that are attacking us all the time. So you have to be on top of it.
And cyber security is also very dynamic. It's changing all the time. You will -- and during



this conversation, you will feel it, watch me change in order for us to be able to defend against the attacks surface. It happens all the time. So it's part of our -- it's offering a service like that online, like the bank online. It's attempting to attack all the time and you need to be on top of it.
**Q. Is there something special about the customer and patient information that BetterHelp stores and protects that requires that level of security?**
MR. UNGER: Objection. Vague. Calls for speculation. Calls for a legal conclusion.
BY THE WITNESS:
A. Yes, in some point, we -- at some point, but, you know, we choosing the highest level of -- you know, enterprise level of data service in order for us to get those security features built in and able to protect us from a risk perspective, right. So --
BY MS. BRADY:
**Q. Is part of the reason that security is so tight on this type of data because patient and customer information is very sensitive?**
MR. UNGER: Objection. Calls for speculation. Calls for a legal conclusion.



If you have an understanding, you can answer.
BY THE WITNESS:
A. It's -- yes, at some point, but it's -- it's data for data, right. Not only, you know, like private health information or sensitive information. So even, you know, with, you know, the way you build the code, for example, right. So the information needs to be highly security, you know. Yeah.
BY MS. BRADY:
**Q. You mentioned that you had encryption on the information as it's stored.**
A. Mm-hmm.
**Q. Does the encryption travel with the information if it is accessed by another party?**
MR. UNGER: Objection. Vague.
BY THE WITNESS:
A. There is no other party access the information.
BY MS. BRADY:
**Q. Okay. How then -- if it's encrypted, how then can the therapist or patient access and view that information?**
A. That's part of their, you know, application, right. When they're logging in, when