# EXHIBIT G

Gary. M. Klinger (pro hac vice)
MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC
227 W. Monroe Street, Suite 2100
Chicago, Illinois 60606
Telephone: 866.252.0878
Email: gklinger@milberg.com

*Plaintiffs' Co-Lead Interim Class Counsel*

Maureen M. Brady (pro hac vice)
MCSHANE AND BRADY LLC
4006 Central Street
Kansas City, MO 64111
816-888-8010
Email: mbrady@mcshanebradylaw.com

*Plaintiffs' Co-Lead Interim Class Counsel*

Christina Tusan (SBN 192203)
TUSAN LAW, PC
ctusan@ctusanlaw.com
680 E. Colorado Blvd. #180
Pasadena, CA 91101
Phone: 626-418-8203
Fax: 626-619-8253

*Plaintiffs' Co-Lead Interim Class Counsel*

Alan M. Mansfield (SBN: 125998)
amansfield@whatleykallas.com
WHATLEY KALLAS LLP
1 Sansome Street, 35th Floor
PMB #131
San Francisco, CA 94104 /
16870 West Bernardo Drive, Ste 400, San Diego, CA 92127
Phone: (619) 308-5034
Fax: (888) 341-5048

*Plaintiffs' Liaison Counsel*

**UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**IN RE BETTERHELP, INC. DATA DISCLOSURE CASES**

This Document Relates To: All Actions

**Master File No. 3:23-cv-01033-RS**

Hon. Richard Seeborg

**DECLARATION OF ERIC KRAUSE, MBA**

| | |
|---|---|
| Hearing Date: | August 28, 2025 |
| Time: | 1:30 p.m. |
| Courtroom: | 3 |
| Judge: | Hon. Richard Seeborg |

I, Eric Krause, hereby declare as follows:

1. I have been asked by Plaintiffs, through their counsel, to review Case No. 3:23-cv-01033-RS: In Re BetterHelp Data Disclosure Cases, to show whether class members have sustained monetary harm through the illegal sharing of their information by BetterHelp with third parties.

2. A true and correct copy of my report and opinions in this matter are attached hereto as Exhibit A.

I declare under penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct. Executed on May 8, 2025, in Austin, Texas.

*/s/ Eric Krause*
Eric Krause

# Exhibit A

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | | |
|---|---|---|
| IN RE: BETTERHELP, INC. DATA DISCLOSURE CASES<br><br>This Document Relates to: All Actions | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | **Master File No. 3:23-cv-01033-RS** |

**EXPERT REPORT**
**OF**
**ERIC R. KRAUSE, MBA**

5-8-2025

**ERIC R. KRAUSE** **DATE**

## I. NATURE OF INVOLVEMENT

1. My name is Eric R. Krause. I have been retained by counsel for the Plaintiffs in the matter of Jane Doe I, L.M., Jane Doe III, S.C., and T.R. (collectively, "Plaintiffs") individually and on behalf of all others similarly situated, against BetterHelp, Inc. ("BetterHelp" or "Defendant"). Specifically, I have been asked to determine whether economic and financial damages stemming from the Defendant's unauthorized transfer of Plaintiff and putative Class Members' personally identifiable health information can be reasonably established and valued on a class-wide basis.

## II. CREDENTIALS AND INFORMATION REVIEWED

2. I am a Director at Applied Economics Consulting Group, Inc. ("Applied Economics") in Austin, Texas. Applied Economics conducts economic and financial analyses for a wide variety of clients across several industries. I have held my role as Director since 2008 and prior to that, I was a Consultant with the same firm from 2003 to 2008.

3. I have an undergraduate degree in Economics from the University of Texas at Austin and a Master of Business Administration degree with a concentration in Finance from the University of Texas at Austin. A copy of my professional resume is attached to this Declaration as Appendix A.

4. I have significant experience with the economic issues present in this matter, and the assessment of facts, and circumstances in complex litigation. Both my academic and professional experiences qualify me to present this report. On multiple occasions, I have been engaged to assist in the analysis of economic damages, review and prepare evaluations of economic and financial damage claims, and to present written reports and provide testimony in a subset of these matters. I have served as both a consulting and testifying expert in multiple cases involving economic damage.

5. Attached, as Appendix B, is a list of cases in which I have testified in the last four years. Applied Economics is being compensated at the rate of $450 per hour for my work on this matter. This compensation is not dependent in any way upon the outcome of this litigation or upon my reaching any specific opinion or conclusion.

## III. INFORMATION REVIEWED

6. In the course of my work in this matter, Applied Economics staff and I reviewed documents and materials produced by the parties in discovery, as well as transcripts of depositions taken in this case. I also procured and reviewed information from public sources. A listing of all these materials is attached to this report as Appendix C. If any additional relevant or supplemental information or data becomes available to me, I will supplement this report as appropriate.

## IV. BACKGROUND

*Plaintiffs*

7. Plaintiff S.C. is a resident of the State of Wisconsin.[1] Plaintiff Jane Doe I is a resident of the State of Michigan.[2] Plaintiff L.M. is a resident of the state of South Carolina.[3] Plaintiffs Jane Doe II and T.R. are residents of the State of California.[4] All Plaintiffs have registered for accounts on BetterHelp to receive various forms of counseling or assistance with mental health.[5]

*Defendant*

8. Defendant BetterHelp is a "market leading D2C mental health platform".[6] It provides access counseling and therapy services through web, mobile app, phone, and text platforms across a provider network that includes more than 40,000 licensed and accredited psychologists, therapists, clinical social workers, and professional counselors in approximately 100 countries.[7] BetterHelp generates revenues primarily from monthly subscription fees charged to users for access to BetterHelp's services; in 2023, BetterHelp had approximately 460,000 paying users generating $1.1 billion in

[1] First Amended Consolidated Class Action Complaint, ¶ 26.
[2] First Amended Consolidated Class Action Complaint, ¶ 27.
[3] First Amended Consolidated Class Action Complaint, ¶ 28.
[4] First Amended Consolidated Class Action Complaint, ¶¶ 29-31.
[5] First Amended Consolidated Class Action Complaint, ¶¶ 25-31.
[6] BetterHelp Form 10K 2023, p. 4.
[7] BetterHelp Form 10K 2023, p. 4; About Us, betterhelp.com, accessed April 18, 2025; Deposition of Daniel Bragonier, March 25, 2025, p. 17:16-22.

revenues from therapy and other wellness services.[8] I understand that users pay a membership fee after providing their e-mail address and filling out an intake questionnaire designed to link them to a suitable therapist.[9]

9. I understand that BetterHelp has offered its services under various trade names. These trade names have each been accompanied by a corresponding website and application and are listed in the table below alongside the period for which they were active:[10]

| Tradename | Website | Active Period |
|---|---|---|
| BetterHelp | betterhelp.com | 2013 + |
| Faithful Counseling | faithfulcounseling.com | July 2017 + |
| Pride Counseling | pridecounseling.com | August 2017 + |
| Teen Counseling | teencounseling.com | January 2017 + |
| ReGain | regain.us | May 2016 + |

10. I understand that visitors to each of these websites are able to create and log in to their accounts, sign up for, receive, and pay for Defendant's services. I also understand that receiving therapy services or otherwise communicating with therapists is not possible without logging in to the website(s).[11]

*Relevant Background Information and Timeline of Events*

11. This matter concerns the alleged unauthorized transfer of personal information and medical information through the implementation of tracking pixels, cookies, and other marketing tools on web properties operated by the Defendant.[12]

12. A tracking pixel is a tiny, often invisible graphic - typically a 1x1 pixel -- that is embedded in webpages, emails, or cookie banner advertisements, and remains invisible to users.[13] These pixels are designed to be transparent or to match the background color of the site or email, ensuring they remain

[8] BetterHelp Form 10K 2023, pp. 5, 55, 57, 66.
[9] Deposition of Daniel Bragonier, March 25, 2025, pp. 44:23-45:4. The questions on this form may have changed over time, but I understand there has always been an intake form. At 46:5-18.
[10] First Amended Consolidated Class Action Complaint, ¶ 4.
[11] Deposition of Niklas Vaughan, March 21, 2025, pp. 47:18-48:7, 48:19-24.
[12] First Amended Consolidated Class Action Complaint, ¶¶ 1, 9-12, 67, 78.
[13] What Is a Tracking Pixel?, cookie-script.com, accessed November 14, 2024; What Is a Tracking Pixel, improvado.io, accessed November 14, 2024.

discreet, and are not noticeable to users.[14] Because pixels are directly integrated into web content, tracking pixels cannot be controlled or managed by users.[15]

13. The primary function of tracking pixels is to collect information about user behaviors and interactions with websites.[16] Tracking pixels record clicks, form submissions, and other interactions whenever a user visits a webpage with the embedded pixel and then transmit that data to an external server.[17] Personal information gathered by tracking pixels include IP addresses, device details, browser type, and operating system.[18]

14. Internet cookies, like those utilized by Google Analytics software, are "small text files" placed on a website to track, personalize and save information about each user's session.[19] Unlike tracking pixels, which are specific to the webpage they are embedded on, and limited to the duration of the user's visit, cookies can persist for a longer period: session cookies expire at the end of a browser session, whereas persistent cookies remain on a user's device and can record behavior across multiple sessions and different websites.[20] Cookies can also be categorized based on their origin: first-party cookies are set directly by the website a user is visiting and often serve a functional purpose,[21] whereas third-party cookies are set by domains other than the website a user is visiting and are typically used to track user activity, enabling detailed profiles for targeted advertising. [22]

15. Both pixels and cookies are ultimately used by third parties to track user data and browsing behavior for marketing purposes. For example, Meta Pixel, a pixel provided by Facebook, is capable of recording every page a user visits, the buttons on a webpage that a user clicks, and specific information

---

[14] Tracking Pixel, en.ryte.com, accessed November 15, 2024.
[15] What Is the Difference Between a Pixel and a Cookie?, cookieyes.com, accessed November 15, 2024. Also see the Expert Report of Dr. Zubair Shafiq.
[16] What Is a Tracking Pixel, improvado.io, accessed November 14, 2024.
[17] The ABCs of Tracking Pixels, improvado.io, accessed November 26, 2024.
[18] What Is a Tracking Pixel?, cookie-script.com, accessed November 14, 2024; What Is a Tracking Pixel, improvado.io, accessed November 14, 2024.
[19] Are Cookies Personal Data?, usercentrics.com, accessed November 14, 2024; What Are Cookies?, usa.kaspersky.com, accessed November 14, 2024.
[20] What Are Cookies and Similar Technologies, ico.org.uk, accessed November 26, 2024.
[21] What Are Cookies?, usa.kaspersky.com, accessed November 14, 2024.
[22] What Are Cookies?, usa.kaspersky.com, accessed November 14, 2024.

communicated by a user on that website.[23] Meta uses this personal information to tailor the advertisements users see and to evaluate the effectiveness of those advertisements.[24] Similarly, Google Analytics uses tags (short lines of JavaScript or HTML code) and cookies to collect user data from their web properties, including pageviews, button clicks, and user-specific information.[25] In both cases, advertisers receive aggregated reports on their performance, which help them understand how users interact with their content.[26]

16. BetterHelp sells its services "principally by marketing [its] solution directly to potential users" and has identified "various advertising channels" as the key driver behind user growth.[27] Its digital marketing efforts include the use of its websites in addition to integrated marketing campaigns.[28] To that end, BetterHelp has fostered relationships with "a wide variety of third parties, including Internet search providers such as Google, social networking platforms such as Facebook, internet advertising networks, co-registration partners, retailers, distributors, television advertising agencies, and direct marketers."[29] [redacted].[30] This activity is reflected in the advertising spend by TelaDoc Health, Inc. ("TelaDoc"), BetterHelp's parent company: between 2017 and 2021, TelaDoc spent approximately $895 million on advertising and marketing, with annual expenses increasing more than 7x over this period.[31] In 2021 alone, TelaDoc attributed the $190.5 million increase in marketing spending over 2020 to be "primarily driven by **higher digital and media advertising in support of D2C mental**

[23] What Is the Meta Pixel & What Does It Do, instapage.com, accessed November 26, 2024; How We Built a Meta Pixel Inspector, themarkup.org, accessed December 17, 2024.
[24] Terms of Service, facebook.com, accessed November 26, 2024.
[25] How Does Google Analytics Collect Data, simpleanalytics.com, accessed November 26, 2024; How Google Analytics Works, support.google.com, accessed November 26, 2024.
[26] Terms of Service, facebook.com, accessed November 26, 2024; The Value of Digital Analytics, support.google.com, accessed November 26, 2024; How Google Analytics Works, support.google.com, accessed November 26, 2024.
[27] BetterHelp Form 10K 2023, pp. 10, 55.
[28] BetterHelp Form 10K 2023, p. 9.
[29] BetterHelp Form 10K 2023, p. 10.
[30] BH0008702.
[31] BetterHelp is a wholly-owned subsidiary of TelaDoc and was acquired in January 2015. See Deposition of Daniel Bragonier, March 25, 2025, pp. 11:21-12:2, 121:24-122:6; Deposition of Niklas Vaughan, March 21, 2025, pp. 112:21-113:1; BetterHelp Forms 10K 2017, p. 48; 2018, p. 46; 2019, p. 46; 2020, p. 64; 2021, p. 70.

**health specialties**, as well as higher engagement member marketing."[32] (emphasis added) [redacted];[33] [redacted].[34]

17. BetterHelp's digital marketing efforts involve the use of analytics technologies. For example, BetterHelp has acknowledged that:

> *BetterHelp employs certain third-party tools for numerous purposes, including without limitation: to supervise, administer and monitor BetterHelp's services; to measure and improve the quality, effectiveness, and delivery of BetterHelp's services; to anonymously track user interactions with BetterHelp's websites; to monitor and analyze website traffic and application usage; and to improve the rates at which anonymous visitors to the public websites sign up for services.*[35]

I understand it is BetterHelp's position that the third-party tools installed on its web properties benefit consumers.[36]

18. BetterHelp has admitted that it knowingly implemented certain tracking cookies, pixels, and other related technologies (collectively, the "Digital Marketing Tools") on each of its web properties for purposes of improving its marketing analytics and digital campaign efforts since at least August 2017:[37]

[32] BetterHelp Form 10K 2021, p. 71.
[33] [redacted]
[34] BH0021490 at slide 4; BH0021496 at slide 6.
[35] Responses to Plaintiffs' First Set of Special Interrogatories, filed November 15, 2024 (No. 1), p. 4.
[36] Responses to Plaintiffs' First Set of Special Interrogatories, filed November 15, 2024 (No. 5), p. 10.
[37] Responses to Plaintiffs' First Set of Special Interrogatories, filed November 15, 2024 (No. 3), p. 7. BetterHelp's response noted it would "only respond with information that pertains to the period between August 1, 2017 and July 1, 2021" (p. 6).

| Digital Marketing Tool | Installation Date |
|---|---|
| Facebook | 8/2017 - 7/2021 |
| Google Ads | 8/2017 - 7/2021 |
| Google Analytics | 8/2017 - 7/2021 |
| Google Tag Manager | 8/2017 - 7/2021 |
| Pinterest | 8/2017 - 1/2021 |
| Podsights | 9/2019 - 5/2021 |
| Snap | 1/2019 - 1/2021 |
| Taboola | 8/2017 - 5/2021 |
| Twitter | 8/2017 - 11/2019 |

## V. OVERVIEW OF PLAINTIFFS' CLAIMS

19. Plaintiffs contend that the source code of the Digital Marketing Tools embedded on Defendant's websites causes communications sent by users of these webpages to be captured and disclosed to multiple third parties unbeknownst to the user.[38]

20. Specifically, Plaintiffs claim that the integration of these digital marketing and tracking technologies results in the collection, interception, and transmission of multiple forms of personal health information by BetterHelp to third parties, including:[39]

- Plaintiffs' and Class Members' personally identifiable information such as account and device identifiers, IP addresses, and e-mail addresses;
- Plaintiffs' and Class Members' patient status; and
- Plaintiffs' and Class Members' communications with BetterHelp via its websites, through completion of the intake questionnaire, signing up for therapy and counseling services, paying for services, taking mental health assessments or test, or reviewing advice articles about specific conditions and treatments.

21. Plaintiffs allege that healthcare providers have a duty to maintain confidentiality, which includes the prohibition of disclosing medical information received in connection with patients or people seeking treatment.[40] Importantly, there are both state and federal laws governing when a medical provider may

[38] First Amended Consolidated Class Action Complaint, ¶¶ 9, 11. 69, 93.
[39] *See* Expert Report of Dr. Zubair Shafiq, ¶13, Opinion #1.
[40] First Amended Consolidated Class Action Complaint, ¶¶ 2, 18-19.

release protected health information,[41] and I understand from Plaintiff's counsel that parties may not disclose personal information about a patient to third parties marketing purposes without their express written authorization.[42] BetterHelp has at multiple times acknowledged the expectation that it is obliged to protect its users' confidentiality with respect to private information.[43]

22. Plaintiff claims that the integration of these Digital Marketing Tools was done without warning or otherwise disclosing that patient and prospective patient information would be transmitted to third parties; without the knowledge, written authorization, or consent by the users of Defendant's web properties; and in direct conflict with the privacy policies stated on Defendant's web sites.[44] Indeed, Plaintiff contends that these Digital Marketing Tools are specifically designed to be invisible to users so that their information and communications may be collected without permission.[45]

23. Due to BetterHelp's alleged unauthorized disclosure of Plaintiffs' and Class Members' personal information and non-public medical information to Meta and other third parties absent written consent, Plaintiffs have asserted claims against Defendant for Invasion of Privacy, Breach of Implied Contract, Unjust Enrichment, Violation of the Electronic Communications Privacy Act (Wiretapping and Stored Communications Act), Violation of the California Invasion of Privacy Act, Violation of the Consumers Legal Remedies Act, Violation of California Constitution, Article I, Section 1, Violation of the Confidentiality of Medical Information Act, Violation of the California Consumer Privacy Act, and Violation of the Unfair Competition Law.

---

[41] Fiduciary Duty of Doctor and Patient, legalmatch.com, accessed November 26, 2024; First Amended Consolidated Class Action Complaint, ¶¶ 2, 18-19, 23, 105-126.

[42] First Amended Consolidated Class Action Complaint, ¶ 15.

[43] See BetterHelp Form 10K 2023, p. 40: "Our use and disclosure of personally identifiable information, including health information, and other personal data is subject to federal, state, and foreign privacy and security regulations…" and "HIPAA requires healthcare providers like us to develop and maintain policies and procedures with respect to PHI …". I understand that BetterHelp also displayed HIPAA seals on its platform and represented to patients and consumers that it was "HIPAA Certified" between the years 2013 and 2020 (See First Amended Consolidated Class Action Complaint, ¶¶ 8, 15, 53-56). I understand that it is now BetterHelp's position that it is not subject to HIPAA (See Responses to Plaintiffs' First Set of Special Interrogatories, filed November 15, 2024 (No. 9), p. 13; Deposition of Daniel Bragonier, March 25, 2025, pp. 137:15-138;5; Deposition of Niklas Vaughan, March 21, 2025, pp. 106:24-107:3).

[44] First Amended Consolidated Class Action Complaint, ¶¶ 51, 53-56, 58-60, 63-69, 93.

[45] First Amended Consolidated Class Action Complaint, ¶¶ 88-89, 246.

## VI. PROPOSED CLASS

24. Plaintiffs seek to have these claims adjudicated as a class action. The proposed class consists of a nationwide class including:[46]

> *"All individuals residing in the United States who, during the period beginning January 1, 2017 and continuing through March 7, 2023 (the "Class Period"), completed the BetterHelp Intake Questionnaire and provided BetterHelp with their email address."*

25. Plaintiffs T.R. and Jane Doe III (the "California Plaintiffs") also seek to define a subclass including:[47]

> *"All individuals residing in California who, during the period beginning January 1, 2017 and continuing through March 7, 2023 (the "Class Period"), completed the BetterHelp Intake Questionnaire and provided BetterHelp with their email address."*

26. Plaintiffs also seek to certify a nationwide subclass of paid users defined as:[48]

> *"All individuals residing in the United States who, during the period beginning January 1, 2017, and continuing through March 7, 2023 (the "Class Period"), completed the BetterHelp Intake Questionnaire, provided BetterHelp with their email address, and used BetterHelp's services."*

27. Excluded from both the proposed class and subclass include (1) any Judge or Magistrate presiding over this action and any members of their immediate families; (2) the Defendant, Defendant's subsidiaries, affiliates, parents, successors, predecessors, and any entity in which the Defendant or its parents have a controlling interest and its current or former employees, officers, and directors; and (3) Plaintiffs' counsel and Defendant's counsel.[49]

28. Based on my review of Plaintiffs' expert Dr. Zubair Shafiq's report, the number of unique Facebook users who completed the intake questionnaire after clicking on a Facebook ad between 2017 and 2021 totals at least 2.2 million unique individuals.[50]

---

[46] Plaintiffs' Motion for Class Certification.
[47] Plaintiffs' Motion for Class Certification.
[48] Plaintiffs' Motion for Class Certification.
[49] Plaintiffs' Motion for Class Certification.
[50] *See* Expert Report of Dr. Zubair Shafiq, ¶ 64.

## VII. CLASS-WIDE DAMAGES

29. Plaintiffs seek statutory, compensatory, consequential, nominal, and punitive damages, in addition to disgorgement of profits, for harm resulting from BetterHelp's alleged willful disclosure of protected personally identifiable health information to unauthorized third parties.

30. I have been asked to determine whether the economic damages resulting from Defendant's alleged unauthorized transfer of Plaintiffs' and Class Members' personal health information, in which the putative Class Members each have a recognizable property interest that the Defendant allegedly extracted without prior approval, are both capable of being reasonably established and valued on a class-wide basis.

31. As a threshold matter, I understand from counsel that certain requirements must be met to certify a class. I further understand that one of these requirements is commonality, or the question of whether named Plaintiff's grievances share a common question of law or of fact. I further understand from counsel that the commonality requirement is met if there is a single issue common to all members of the class. In addition, I understand from counsel that to certify a damage class as pled in this case, the proponent must establish predominance. This requires showing that substantial common issues exist which predominate over the individual issues.

32. I understand that Plaintiffs claim that the Digital Marketing Tools embedded on Defendant's web properties were present continuously from initial installation such that any visitor to these BetterHelp web pages that filled out the questionnaire would have had their information recorded and disclosed to unauthorized third parties. I understand that Plaintiffs further allege that the question of unauthorized transfer of personal identifiable information, and non-public medical information is thus common to all members of the putative class.

*Economic Value of Personal Information*

33. Throughout my career as an economist, I have routinely been engaged to perform economic valuations of various types of tangible and intangible assets utilizing commonly accepted and recognized

valuation techniques such as the Income Approach, Market Approach, and Cost Approach. As noted above, I have been asked in this matter to determine if the personal information at issue in this matter has economic value and, if so, provide an estimated quantification of that value.

34. Advancements in the Internet and information technology have dramatically increased the volume of personal information that can be collected, stored, analyzed, and repurposed or monetized.[51] This information is generated in large part by internet users, who have evolved to become mass producers of their own information concomitant with the proliferation of "free" web services such as blogs, social media, and online social networks; and web technologies such as the tracking pixels and cookies at-issue in this case.[52] For example, using an online social network such as Facebook entails, at the basest level, exchanging information about personal interests, demographics, and social connections for enhanced interaction.[53]

35. However, in addition to general consumer data such as search and browsing history, data collected by firms including data aggregators, social and advertising networks, and website operators has become increasingly personal.[54] For instance, data brokers aggregate extensive data from various offline and online sources to build detailed profiles of individuals, including information regarding name, date of birth, contact and address, social security number ("SSN"), and employment detail, among other data points.[55]

36. Though several definitions exist, "personal" information can generally be considered as any information that can be used to directly or indirectly identify a specific person.[56] It includes, but is not

[51] Acquisti, Alessandro, Curtis Taylor, and Liad Wagman. "The economics of privacy." *Journal of economic Literature* 54, no. 2 (2016): 442-492.
[52] Acquisti, Alessandro, Curtis Taylor, and Liad Wagman (2016).
[53] Acquisti, Alessandro, Curtis Taylor, and Liad Wagman (2016).
[54] Liu, Huan, Kai Li, Yan Chen, and Xin (Robert) Luo. "Is personally identifiable information really more valuable? Evidence from consumers' willingness-to-accept valuation of their privacy information." Decision Support Systems 173 (2023): 114010; Acquisti, Alessandro, Curtis Taylor, and Liad Wagman (2016).
[55] What Is a Data Broker?, mcafee.com, accessed August 9, 2024; How To Stop Data Brokers From Selling Your Personal Data, usa.kasperksy.com, accessed August 14, 2024.
[56] Soma, John T., J. Zachary Courson, John Cadkin. "Corporate Privacy Trend: The "Value" of Personally Identifiable Information ('PII') Equals the 'Value' of Financial Assets." *Richmond Journal of Law & Technology* XV, no. 4 (2009), 1-32; Alorwu, Andy, et. al. "Monetary valuation of personal health data in the wild." *Int. J. Human-Computer Studies* 185 (2024): 103241; Liu, Huan, Kai Li, Yan Chen, and Xin (Robert) Luo (2023).

limited to, name, address, phone number, driver's license, SSN, gender, birth date, financial and credit data, and medical information.[57] Personal electronic information like IP addresses, device identifiers, and browser fingerprints can also be collected to identify and authenticate internet users.[58]

37. Consumer data and personal information possess material economic value, with personal information becoming of particular interest as a commodity.[59] When combined with general consumer data, personal information enables companies to generate a comprehensive picture of a specific individual for use in tailoring internet services, providing targeted advertising, or for sale to other firms.[60] New services, companies, and markets have emerged to capitalize on this economic value, including search engines, recommender systems, social networking sites, and online advertising ecosystems. Data brokering itself is an industry worth hundreds of billions of dollars annually.[61] In this market, consumer information is continuously traded and shared among firms that profit from the aggregation and sale of consumer data, such as credit-reporting agencies, advertising companies, and "infomediaries."[62]

38. The utility and value of this personal information has given rise to what scholars call *surveillance capitalism*: the use of information from big data to predict and modify human behavior as a means to produce revenue and market control.[63] Companies utilize sophisticated algorithms to analyze large

---

[57] Soma, John T., J. Zachary Courson, and John Cadkin (2009); Alorwu, et al. (2024); Liu, Huan, Kai Li, Yan Chen, and Xin (Robert) Luo (2023).
[58] "Device Fingerprinting is the process of collecting information about a device's hardware and software configuration in order to uniquely identify it." What Is Device Fingerprinting?, arkoselabs.com, accessed August 15, 2024; What Is Device Fingerprinting And How Does It Work?, clearcode.cc, accessed August 15, 2024; A Comprehensive Analysis of Device Fingerprint Spoofing Techniques, incognia.com, accessed August 15, 2024.
[59] Wagner, Amina, Nora Wessels, Peter Buxmann, and Hanna Krasnova. "Putting a Price Tag on Personal Information – A Literature Review." *Proceedings of the 51st Hawaii International Conference on System Sciences* (2018): 3760-3769; Li, Xiao-Bai, Xiaoping Liu, and Luvai Motiwalla. "Valuing personal data with privacy consideration." *Decision Sciences* 52, no. 2 (2021): 393-426; Acquisti, Alessandro, Curtis Taylor, and Liad Wagman (2016); Alorwu, et al. (2024); Liu, Huan, Kai Li, Yan Chen, and Xin (Robert) Luo (2023).
[60] Soma, John T., J. Zachary Courson, and John Cadkin (2009); Liu, Huan, Kai Li, Yan Chen, and Xin (Robert) Luo (2023).
[61] Column: Shadowy Data Brokers Make the Most of Their Invisibility Cloak, latimes.com, accessed December 17, 2024.
[62] *See*, e.g., Acquisti, Alessandro, Leslie K. John, and George Loewenstein. "What is Privacy Worth?" *Journal of Legal Studies* 42, no. 2 (2013): 249-274; Acquisti, Alessandro, Curtis Taylor, and Liad Wagman (2016); Soma, John T., J. Zachary Courson, and John Cadkin (2009); Li, Xiao-Bai, Xiaoping Liu, and Luvai Motiwalla (2021); Liu, Huan, Kai Li, Yan Chen, and Xin (Robert) Luo (2023); Wagner, et. al (2018).
[63] Kathryn Wilson, Digital Surveillance and the Scope of the Wiretap Act's Party Exception, 68 Wash. U. J.L. & Pol'y 355, 370 (2022).

sets of data, extract patterns in individuals' conduct, and draw inferences for selling targeted advertisements.[64] For these purposes, all data such as personal information has potential value – no matter how seemingly inconsequential or ephemeral – because it strengthens the predictive capabilities of these companies and their technologies.[65]

39. While the increased availability of personal information has brought benefits, it has also intensified public concerns about privacy.[66] The rise of data analytics and the Internet has made the protection and sharing of personal information pivotal issues in economic and policy discussions. Surveys consistently reveal widespread privacy concerns among Internet users:[67] "[t]he U.S. Consumer Privacy Index data showed that 92% of U.S. internet users are concerned about their privacy online, and 89% of online users admit avoiding firms that do not protect their privacy."[68] From a self-interested standpoint, privacy concerns are rational if one assumes information equates to increased power or bargaining, because, then control over personal information can influence economic power dynamics between self-interested parties.[69]

40. The U.S. government has introduced several pieces of legislation to protect privacy.[70] Specifically, the Privacy Act of 1974 establishes rules for the collection, maintenance, use, and dissemination of personal information, addressing concerns about computerized databases.[71] Additionally, the Health Insurance Portability and Accountability Act (HIPAA) of 1996 provides a federal baseline for privacy protection regarding health information in the U.S.[72]

---

[64] *Id.* at 369.
[65] *Id.* at 369-70.
[66] Wu, Zhiyan, and Jifeng Luo. "Online information privacy and price: A theoretical model and empirical tests." *Information & Management* 59, no. 2 (2022): 103583.
[67] Wu Zhiyan and Jifeng Luo (2022).
[68] Wu Zhiyan and Jifeng Luo (2022).
[69] Acquisti, Alessandro, Curtis Taylor, and Liad Wagman (2016).
[70] U.S. Privacy Laws, epic.org, accessed August 14, 2024.
[71] U.S. Privacy Laws, epic.org, accessed August 14, 2024.
[72] U.S. Privacy Laws, epic.org, accessed August 14, 2024. Li, Xiao-Bai, Xiaoping Liu, and Luvai Motiwalla. "Valuing personal data with privacy consideration." *Decision Sciences* 52, no. 2 (2021): 393-426.

## VIII. VALUATION OF PERSONAL INFORMATION AS A MEASURE OF DAMAGES

41. The Plaintiffs allege that the Defendant harmed Plaintiffs and members of the putative Class by disseminating personal information and non-public medical information to third parties whose Digital Marketing Tools were embedded into Defendant's web properties. The Defendant allegedly installed these tools in return for information leveraged by the Defendant to benefit its own marketing campaigns.[73] By transmitting this personal information without knowledge, written authorization, or consent of the putative Class Members, the Plaintiffs argue that the Defendant ultimately deprived Plaintiffs and the putative Class Members of the market value of their own personal information.[74] It is my opinion that an appropriate measure of economic damages for the Plaintiff and the putative Class Members would thus be equivalent to the fair market value of the personal information and non-public medical information traded away by Defendant.

42. For clarity, this report does not discuss, and I am not expressing an opinion on, any legal distinctions that may exist between actual damages, restitutionary damages, and equitable restitution. While in general my report refers to "damages," I am merely expressing opinions on the independent economic fair market value of the types of sensitive data collected and allegedly disclosed by BetterHelp, and the robust market for that data.

43. Personal information has private value beyond its use as a bare commodity.[75] The value of personal information is thus inherently related to the value of privacy, which is a question that has been researched in multiple fields including decision science, economics, information systems,

[73] First Amended Consolidated Class Action Complaint, ¶¶ 10-13, 61, 72, 298.
[74] First Amended Consolidated Class Action Complaint, ¶ 138.
[75] Wagner, et. al (2018); Acquisti, Alessandro, Curtis Taylor, and Liad Wagman (2016); Li, Xiao-Bai, Xiaoping Liu, and Luvai Motiwalla (2021).

management, health care, and marketing.[76] This research has approached the valuation of personal information from multiple perspectives:[77]

- The amount one would accept to relinquish their data;
- The amount one would spend to protect their data;
- The potential harm from data exposure; and
- The benefit a data holder could gain from acquiring data.

44. These approaches can be used to establish a set of data points for the reasonable estimation of the value of personal information and non-public medical information such as patient status. I discuss these methods in greater detail in the following sections.

*Willingness to Pay or to Accept Monetary Compensation for Personal Information*

45. Two primary approaches for valuing personal information include the protection and product perspectives.[78] In the context of privacy research, the protection perspective reflects the willingness to pay ("WTP"), or the maximum price an individual would be willing to pay to protect their personal information.[79] Similarly, the product perspective reflects the willingness to accept ("WTA"), or the minimum price an individual would be willing to accept to sell their personal information.[80]

46. This question of perspective and ownership is critical – multiple studies have shown that privacy valuation is subject to the economic "endowment effect," with valuations conducted from the WTA perspective typically exceeding those from a WTP context.[81] Stated another way, it is empirically true

[76] Fehrenbach David, Carolina Herrando. "The effect of customer-perceived value when paying for a product with personal data: A real-life experimental study." *Journal of Business Research* 137 (2021): 222-232; Li, Xiao-Bai, Xiaoping Liu, and Luvai Motiwalla (2021); Alorwu, et al. (2024).
[77] Acquisti, Alessandro, Curtis Taylor, and Liad Wagman (2016).
[78] Liu, Huan, Kai Li, Yan Chen, and Xin (Robert) Luo (2023).
[79] Li, Xiao-Bai, Xiaoping Liu, and Luvai Motiwalla (2021); Liu, Huan, Kai Li, Yan Chen, and Xin (Robert) Luo (2023); Wagner, et. al (2018); Acquisti, Alessandro, Leslie K. John, and George Loewenstein (2013).
[80] Li, Xiao-Bai, Xiaoping Liu, and Luvai Motiwalla (2021); Liu, Huan, Kai Li, Yan Chen, and Xin (Robert) Luo (2023); Wagner, et. al (2018); Acquisti, Alessandro, Leslie K. John, and George Loewenstein (2013).
[81] Wu, Zhiyan and Jifeng Luo. "Online information privacy and price: A theoretical model and empirical tests." *Information & Management* 59 (2022): 103583; Li, Xiao-Bai, Xiaoping Liu, and Luvai Motiwalla (2021); Acquisti, Alessandro, Leslie K. John, and George Loewenstein (2013).

that "people value privacy more when they have it than when they do not."[82] There are several explanations for this discrepancy:[83]

- The value of privacy is more subjective than other traded goods where the WTA and WTP might meet at an equilibrium price;[84]
- Users and consumers place more value on their personal information than data-trading firms do due to personal privacy concerns;[85] and
- Consistent with Prospect Theory in economics, people place a disproportionate weight on losses (WTA) as compared to gains (WTP).[86]

47. An example of a valuation based on a WTP approach can be found in Privacy Bee, a service that charges $197 per year to monitor and remove personal information from data brokers and search databases.[87] Similar services exist today, such as DeleteMe®, which removes information from all major data broker websites for $129 per year,[88] deleteme™ which charges one-time fees ranging from $100 to $500 for search engine and data breach removals,[89] Incogni.com which charges $179 per year to remove information from major data broker websites and search databases,[90] and ReputationDefender, a service that charges $99 per year to remove personal information from various databases.[91] These provide a baseline market valuation of personal information from the WTP perspective which, as discussed above, will typically be less than that of a WTA valuation.

48. Because both the ownership and content of data is important in the valuation context for personal information, I discuss a study that specifically values personal information from a WTA perspective. In my opinion, this study is a reasonable data point as Plaintiff alleges the Defendant bartered

[82] Wu Zhiyan and Jifeng Luo (2022).
[83] Acquisti, Alessandro, Leslie K. John, and George Loewenstein (2013).
[84] Wagner, et. al (2018).
[85] Li, Xiao-Bai, Xiaoping Liu, and Luvai Motiwalla (2021).
[86] Acquisti, Alessandro, Leslie K. John, and George Loewenstein (2013).
[87] Privacy Bee - Pricing, privacybee.com, accessed September 26, 2024.
[88] Privacy Protection Plans - JoinDeleteMe, joindeleteme.com, accessed September 26, 2024.
[89] Deleteme - Services Pricing, deleteme.com, accessed September 26, 2024.
[90] Incogni – About Us, incogni.com, accessed September 26, 2024.
[91] ReputationDefender Signup, me.reputationdefender.com, accessed September 26, 2024. ReputationDefender was previously known as Reputation.com and has been offering this service since at least 2012. *See* A Vault for Taking Charge of Your Online Life, nytimes.com, accessed December 17, 2024.

Plaintiff's and putative Class Members' personal information without their prior consent or acknowledgement.[92]

49. Xiao-bai Li, Xiaoping Liu, and Luvai Motiwalla designed and conducted an important academic study to quantify the value of personal information.[93] The mechanism involved for valuation was a second-price sealed-bid procurement auction wherein participants sold their personal information.[94] This auction format and the resulting multivariate regression analysis is an accepted method in economic literature relating to valuation and price discovery.[95] Moreover, this methodology is consistent with the type of economic studies and analyses I have performed throughout my education and career. It encourages participants to truthfully disclose their valuation of personal information, as the "winner" is determined by the lowest bid, with the payment equal to the second-lowest bid.[96] In this context, participants are incentivized to bid their true valuation, as underbidding or overbidding would not improve their outcome.[97]

50. For purposes of the study, the authors defined personal information as an aggregate of four categories commonly classified in data privacy literature: direct identifiers, quasi-identifiers, nonprivate attributes (e.g., demographic information), and private attributes.[98] Participants in the study submitted bids representing the minimum payment they would accept for their personal information (their WTA) with the understanding that the total auctioneer budget was set at $500.[99] Winners were then selected based on their bids, from lowest to highest.[100] Results from 218 participants were used for the study,

[92] That is, the more appropriate valuation perspective in this matter is from a WTA context as opposed to a WTP context.
[93] Li, Xiao-Bai, Xiaoping Liu, and Luvai Motiwalla (2021).
[94] Li, Xiao-Bai, Xiaoping Liu, and Luvai Motiwalla (2021).
[95] Fay, Scott, and Robert Zeithammer. "Bidding for bidders? How the format for soliciting supplier participation in NYOP auctions impacts channel profit." *Management Science* 63, no. 12 (2017): 4324-4344.
[96] Fay, Scott, and Robert Zeithammer (2017).
[97] Fay, Scott, and Robert Zeithammer (2017).
[98] Li, Xiao-Bai, Xiaoping Liu, and Luvai Motiwalla (2021). Direct identifiers include information such as name and phone number; quasi-identifiers include information such as date of birth and zip code. Private attributes include sensitive private information including income, health information, mobile location, and online activity.
[99] Li, Xiao-Bai, Xiaoping Liu, and Luvai Motiwalla (2021).
[100] Li, Xiao-Bai, Xiaoping Liu, and Luvai Motiwalla (2021). The participant with the lowest bid received an amount equal to the second lowest bid, the second lowest bid received an amount equal to the third lowest bid, and so on,

with participants providing bid prices across the four categories of personal information.[101] Each category, in isolation, was associated with a non-additive, per capita value:[102]

- Direct Identifiers: $89.76 per record
- Quasi Identifiers: $88.94 per record
- Demographic Attributes: $78.91 per record
- Private Attributes: $117.78 per record

51. The value of personal information was then calculated as a composite function of these four attribute values using widely accepted multivariate regression methods.[103] On a combined basis, authors concluded that the estimated worth of personal information is $189.40.[104]

52. This $189.40 figure is comparable to other data points discussed in this report regarding valuation of personal information. Similarly, in terms of valuing personal privacy through the lens of potential harm from data exposure,[105] I note that a separate study conducted four years earlier in 2017 by the Ponemon Institute determined that the average cost of each compromised record lost or stolen in a data breach in the U.S. was $225, with compromised records specifically defined as those records that identified the person whose data was breached.[106]

until the auctioneer's budget for acquiring data was exhausted. The participants were told that the total budget amount that the data collectors would spend for each category was $500.

[101] Li, Xiao-Bai, Xiaoping Liu, and Luvai Motiwalla (2021). The study included 225 participants, but some data entries were deemed invalid by the authors.

[102] Li, Xiao-Bai, Xiaoping Liu, and Luvai Motiwalla (2021).

[103] Li, Xiao-Bai, Xiaoping Liu, and Luvai Motiwalla (2021).

[104] Li, Xiao-Bai, Xiaoping Liu, and Luvai Motiwalla (2021). This value was for participants who provided bids for all categories of personal information. Participants were also asked to provide prices for four optional data items that were not included in the auction: SSN, income tax data, medical claim data, and weight and height. The median price identified by participants for the medical data was an additional $75. Provided that the Plaintiff in this matter contends that personal health data was inappropriately transmitted, it would imply that $189.50 is extremely conservative for purposes of valuing the type of data being allegedly misappropriated in this matter.

[105] Acquisti, Alessandro, Curtis Taylor, and Liad Wagman (2016).

[106] 2017 Cost of Data Breach Study, Ponemon Institute Research Report. The Ponemon Institute interviewed IT, compliance, and information security practitioners representing 419 organizations across 12 countries.

*Valuing Personal Information and Non-Public Medical Information*

53. The Plaintiffs in this matter have alleged the unlawful transmission of personal information, as well as certain types of personal, non-public medical information from the Defendant's web properties. In order to determine a reasonable value for the information allegedly disseminated by Defendant, it is thus necessary to consider the value of personal medical data as it relates to personal information in general.

54. The value placed on personal information increases with the sensitivity and perceived privacy risk of that data.[107] Personal medical and health information has been similarly demonstrated as perceived as more valuable than other forms of personal information.[108] Studies have demonstrated that consumers demand a higher WTA price for health-related data due to the risk of misuse, especially in comparison to non-personal information such as consumer behavior, to the extent that some participants in one auction-based WTA study refused to place bids for the sale of their health information due to its inherently "personal nature."[109]

55. The relatively higher market value of personal medical data is also justified in comparison to data points discussed earlier in this report. For example, the four categories of personal information valued by Xiao-Bai Li, Xiaoping Liu, and Luvai Motiwalla specifically excluded medical claims data, which participants were queried on and valued at a median of $75, suggesting that the $189.10 valuation for personal information is a baseline amount that would increase with inclusion of any form of personal medical information.[110]

---

[107] Customer Data: Designing for Transparency and Trust, Harvard Business Review, May 2015; Li, Xiao-Bai, Xiaoping Liu, and Luvai Motiwalla (2021); Wagner, et. al (2018); Alorwu, et al. (2024).
[108] Liu, Huan, Kai Li, Yan Chen, and Xin (Robert) Luo (2023); Alorwu, et al. (2024).
[109] Liu, Huan, Kai Li, Yan Chen, and Xin (Robert) Luo (2023); Alorwu, et al. (2024).
[110] Li, Xiao-Bai, Xiaoping Liu, and Luvai Motiwalla (2021).

56. In addition, the value of data breaches as reported by the Ponemon Institute in the aforementioned study from 2017 was highest for health care organizations at $380 per record, as compared to financial services ($245), media ($119), research ($101), and the public sector ($71).[111]

57. In terms of studies attempting to directly measure the value of medical data, American cybersecurity firm Trustwave published a report on The Value of Data in 2017.[112] The study included survey responses from 500 senior IT managers and organizations across Australia, Canada, Japan, the U.K., and the U.S., collectively referred to as "data controllers."[113]

58. To value the information, the study employed a well-established solution known as per-capital value. This top-down approach calculates the overall value of a set of records and divides it by the number of records.[114] The per capita value was then reported by prime data subject. Of the 390 respondents who estimated a value for their records,[115] 61 identified patient records as the prime data subject at a mean value of $1,546 per record.[116]

59. This valuation is supported by the fact that the value of a dataset is a function of the amount of data contained in that set – while single data points such as a person's name, email, and phone number have economic value on their own,[117] the combined value of a data record is likely to be valued much higher if that data is also associated with financial or medical information.[118] Patient medical records, in particular, hold both a high number of attributes (individual data points) and are also more likely to contain true information.[119]

---

[111] 2017 Cost of Data Breach Study, Ponemon Institute Research Report. These numbers reflect aggregate values for all 12 countries studied in the report. As the average data breach value for the U.S. in particular was the highest among all countries, the $380 value attached to compromised health care data is likely an underestimate for the value of health care records in the U.S. specifically.
[112] The Value of Data, Trustwave, 2017.
[113] The Value of Data, Trustwave, 2017.
[114] The Value of Data, Trustwave, 2017.
[115] 110 of the 500 respondents did not provide a value. The Value of Data, Trustwave, 2017.
[116] The Value of Data, Trustwave, 2017.
[117] For example, the email address of a single internet user has been estimated to be worth $89. *See* How Much Is User Data Worth?, pawtocol.medium.com, accessed August 16, 2024.
[118] Li, Xiao-Bai, Xiaoping Liu, and Luvai Motiwalla (2021).
[119] The Value of Data, Trustwave, 2017.

60. Ernst & Young ("EY") conducted a similar study in 2019 measuring the value of healthcare data to a variety of firms.[120] Leveraging the per capita value approach from the Trustwave report referenced above, I have applied a similar methodological framework to derive an alternative estimate for the personal medical data using a sample of six firms identified in the EY report. This sample includes both public and private companies. The overall value of patient records is determined based on market valuation for the selected public companies and post-money valuation or acquisition prices for the private companies in the industry M&A activity at the time.[121] For each firm included in my analysis, I estimate the value of personal medical data by dividing the total implied value by the number of records held.[122] Based on this method, the values implied median average value of medical records in the sample is approximately $155.51 per record, with a range from a lower quartile of $56.46 to an upper quartile of $2,056.[123]

61. There are several caveats to the value of personal medical information implied by this method. Although it indirectly measures the value of personal medical data in relation to the market performance of companies that specifically derive value from the monetization of medical records (through data licensing or subscription services), these companies also generate revenues through other product or service lines.[124] Moreover, the data traded by these companies is likely more comprehensive than the data transmitted by Defendant.[125] Nonetheless, in combination with the findings from the Trustwave report, this finding underscores the enhanced value associated with personal medical and health data as compared to the more nominal values associated with base personal information and provides an upper-bound valuation for personal medical information.

[120] Realising the Value of Health Care Data: A Framework for the Future, EY, 2019.
[121] Realising the Value of Health Care Data: A Framework for the Future, EY, 2019; *See* Exhibit 1.
[122] Realising the Value of Health Care Data: A Framework for the Future, EY, 2019; *See* Exhibit 1.
[123] *See* Exhibit 1.
[124] For example, IQVIA Holdings, one of the firms in our sample, provides advanced data analytics, technology solutions, and clinical research services. Their research and development segment includes project management and clinical monitoring, among other services, which extend beyond just healthcare data.
[125] However, I note that the data traded by these companies is necessarily anonymized according to HIPAA regulations, unlike the personal medical information that was allegedly transmitted by Defendant alongside PII. HIPAA requirements specify 18 categories of personal information that need to be removed from health data before it can be released to any third party.

*Conclusions Related to Value of Personal Information*

62. As discussed above, the estimate of a fair market valuation of personal information can be approached from multiple perspectives, including an individual's WTA or WTP, the value of harm caused from data exposure, and the benefit a data holder gains from data acquisition.[126] The values for personal information implied by these different approaches range from a per-user value of $197, $179, $129, and $99 in the WTP context to $189.40 to $754 in the WTA context, with most observations supporting a typical estimated fair market valuation of approximately $200.[127]

63. When considering the value of personal, non-public medical information, there is a premium associated above the value implicit to basic personal information that can be explained due to the private and sensitive nature of health and medical information. Health-related information is more valuable than other forms of personal information, and this conclusion is corroborated by the additional value associated with personal medical data included in the studies discussed in this report.[128] When considering personal information in the form of complete medical or health records, implied market values increased even further (>$1,000) likely in part due to the breadth of information included in the underlying datasets.

64. While individual data points have economic value, this value increases when personal information can be combined in the aggregate to provide insights that would not otherwise be available at the level of discrete data points.[129]

---

[126] Acquisti, Alessandro, Curtis Taylor, and Liad Wagman. "The economics of privacy." *Journal of economic Literature* 54, no. 2 (2016): 442-492.
[127] $189.40 for the composite value of personal information and $225 for data breaches in the U.S.
[128] Customer Data: Designing for Transparency and Trust, Harvard Business Review, May 2015; Li, Xiao-Bai, Xiaoping Liu, and Luvai Motiwalla (2021); Wagner, et. al (2018); Liu, Huan, Kai Li, Yan Chen, and Xin (Robert) Luo (2023); Alorwu, et al. (2024). For example, Li, Xiao-Bai, Xiaoping Liu, and Luvai Motiwalla (2021) excluded medical-claim related data with a median price of $75 from its composite value, which inclusion would have increased the overall value of personal information. Similarly, the value of personal records through the lens of data breaches as described in the Ponemon Institute report was highest for health care organization at $380 per record, as compared to financial services ($245), media ($119), research ($101), and the public sector ($71). *See* 2017 Cost of Data Breach Study, Ponemon Institute Research Report.
[129] Soma, John T., J. Zachary Courson, and John Cadkin (2009); Li, Xiao-Bai, Xiaoping Liu, and Luvai Motiwalla (2021).

65. The Defendant in this case is accused of unlawfully transmitting multiple forms of personal information to third parties, including:[130]

- Plaintiffs' and Class Members' personally identifiable information such as account and device identifiers, IP addresses, and e-mail addresses;
- Plaintiffs' and Class Members' patient status; and
- Plaintiffs' and Class Members' communications with BetterHelp via its websites, through completion of the intake questionnaire, signing up for therapy and counseling services, paying for services, taking mental health assessments or test, or reviewing advice articles about specific conditions and treatments.

66. Based on the breadth and type of information transmitted, it is appropriate in my opinion to value the allegedly misappropriated patient status and personal information through the lens of an aggregate value for personal information. Based on my review of Plaintiff's expert Dr. Shafiq's report, I understand that the type of data transmitted in the above list can be utilized to identify and generate identifying, quasi-identifying, private, and demographic attributes for users consistent with those studied in the academic literature cited throughout this report.[131] I also note that Dr. Shafiq opines that the data sharing that can be used to make these associations was uniform across the putative Class.[132]

67. The values of $189.40 and $225 implied by Li, Xiao-Bai, Xiaoping Liu, and Luvai Motiwalla for personal information and average United States data breach costs respectively in the WTA context, as well as values from $99 to $197 per year in the WTP context, act as observations to inform a reasonable valuation for an individual's personal information as an intangible asset that was allegedly taken without permission, not one in which the Class Members were actively seeking a market in which to sell the information.

[130] *See* Expert Report of Dr. Zubair Shafiq, ¶ 13, Opinion #1.
[131] *See* Expert Report of Dr. Zubair Shafiq, Opinion #2.
[132] *See* Expert Report of Dr. Zubair Shafiq, ¶ 13.

68. Based on the significant academic and industry research and primary financial data on which I have reviewed and relied upon and discussed in detail above, it is my opinion that a reasonable and conservative nominal estimate of fair market value of the type of personal information and patient status that the Plaintiff alleges was improperly transferred in this matter is $200 per user. It is worth nothing that this $200 value is ultimately derived from figures that do not include specific personal medical data beyond patient status in their evaluations. Thus, the $200 per user valuation represents a nominal and conservative baseline fair market value for the information unlawfully transferred by the Defendant.

## IX. CALCULATING DAMAGES ON A CLASS-WIDE BASIS

69. Plaintiff alleges that Defendant's installation of the Digital Marketing Tools on its web properties and transmission of Plaintiff's and Class Members' patient status and personal information ultimately resulted in an unauthorized transfer of value, with no due compensation provided to Class Members for the trade made by Defendant. As described in detail above, it is my opinion that the combination of patient status and personal information Defendant allegedly transmitted for each Class member has a value capable of reasonable measurement. Accordingly, it is also my opinion that the value of the harm caused by Defendant can reasonably be measured as the market value of the data transferred without authorization on the part of the putative Class Members.

70. As discussed above, it is my opinion that a reasonable and conservative estimation of the nominal market value for this information is $200 per person.

71. With regards to economic damages for the putative Class as a whole, I understand from counsel that one fundamental requirement for class actions damages is that damages must be capable of being measured on a class-wide basis utilizing a common methodology.

72. Through the use of a nominal estimate of the fair market value of personal information (at a minimum) that was alleged to be inappropriately transferred by the Plaintiff and putative Class Members of $200 each, it is possible to calculate economic damages on a class-wide basis in this matter.

## X. CONCLUSION

73. Based on the preceding analysis, it is my opinion that a class-wide damages methodology can be applied across the entire Class. This calculation uses a conservative estimate of the value of the personal information and patient status that was alleged to have been misappropriated by the Defendant and applied to each putative Class Member. A reasonable, if conservative, estimate of the value of the type of personal information and patient status alleged to have been inappropriately transferred to third parties by the Defendant in this matter is $200 per user.

74. As noted above, this report does not discuss, and I am not expressing an opinion on, any legal distinctions that may exist between actual damages, restitutionary damages, and equitable restitution. While in general my report refers to "damages," I am merely expressing opinions on the independent economic fair market value of the types of sensitive data collected and allegedly disclosed by BetterHelp, and the robust market for that data.

75. This report presents my analysis, opinions and conclusions at this time and is based on information available to me as of the date above. If additional information or testimony becomes available to me, I may revise or supplement my analysis, opinions, and conclusions, and I reserve the right to modify or supplement this report, as necessary. I may testify at trial regarding any related matter raised by either party after the date of this report, if asked to do so. This report is intended solely for use in the above-referenced litigation and is not to be used for any other purpose.

Exhibit 1

## Personal Medical Data Valuation - EY Analysis[1]

| Company | Medical Data Business[2] | Estimated Value per Record[3] | |
|---|---|---|---|
| IQVIA Holdings Inc. | IQVIA Health Data Catalog | $ | 63.23 |
| Innovalon Holdings Inc. | Inovalon Data Cloud | $ | 12.91 |
| OptumInsight (UnitedHealth Subsidiary) | Optum Electronic Health Record ("EHR") data | $ | 54.20 |
| AllScripts Healthcare Solutions, Inc. | Veradigm Network | $ | 247.78 |
| Nebula Genomics, Inc | Genomic data | $ | 2,659.72 |
| Tempus | Data licensing | $ | 9,254.18 |
| | Average | $ | 2,048.67 |
| | Median | $ | 155.51 |
| | Lower Quartile | $ | 56.46 |
| | Upper Quartile | $ | 2,056.73 |

[1]Ref.: Realising the Value of Health Care Data: A Framework for the Future, EY, 2019.

Companies listed were selected from the full set of companies included in the Appendix - supplement at pp. 24-31.

Company list reduced to those whose websites or financial reports identify a business line related to monetization of electronic health or medical record data (excluding EHR/EMR administration software)

[2]Ref.: IQVIA Form 10K 2023, p. 9

Inovalon Data Cloud, inovalon.com, accessed 8-21-2024

Optum Electronic Health Record Data, optum.com, accessed 8-21-2024

Real World Data Solutions, veradigm.com, accessed 8-21-2024

FAQs - Nebula Genomics, nebula.org, accessed 8-21-2024

Data Collaborations, tempus.com, accessed 8-21-2024

Biopharma Partnership Solutions, Foundation Medicine, 2024

[3] British pound converted to USD based on January 2019 average exchange rates, retrieved from British Pound to US Dollar Spot Exchange Rates for 2019, exchangerates.org.uk, accessed 8-29-2024.

# ERIC R. KRAUSE

APPLIED ECONOMICS CONSULTING GROUP, INC.
1905 North Lamar Boulevard
Austin, Texas 78705
T-512.474.5860 F-512.474.6756
ekrause@aecgi.com www.aecgi.com

## EDUCATION

Masters in Business Administration, University of Texas at Austin, 2012

Bachelor of Arts in Economics, University of Texas at Austin, 2002

## WORK EXPERIENCE

Applied Economics Consulting Group, Inc., 2008 to Present
Director

Financial consulting, litigation support and testimony as an expert in a variety of energy and other economic related matters. Data analysis through model construction, programming, and statistical analysis. Assist clients in support of valuation and financial damages analysis.

Applied Economics Consulting Group, Inc., 2003 to 2008
Consultant

Financial consulting, litigation support to testifying experts in a variety of energy related matters.

George & Donaldson, LLP, 1998 to 2002
Litigation Assistant

Deja News, Inc., 1996 to 1997
Assistant Principal Systems Architect for Statistical Testing

## CIVIC AFFAIRS AND MEMBERSHIPS

American Economics Association

National Economics Association

World Economics Association

Eric R. Krause
List of Testimony 2008-2025
(client underlined)

1. Fridkin-Kaufman, Ltd., Plaintiff v. Gastar Exploration Texas L.P. fka First Source Gas L.P., et al, Defendant (In the 281st Judicial District Court of Harris County, Texas, Case No. 2008-74765) [Report]

2. Trust Venture Company, L.L.C. on Behalf of the Torch Energy Royalty Trust, Plaintiff v. Constellation Energy Partners, L.L.C., Defendant (In the Circuit Court of Tuscaloosa County, Alabama, Civil Action No. CV-2008-900751) [Hearing Testimony]

3. Hat Creek Energy, L.L.C., Plaintiff v. Gasco Production Company, Defendant (In the District Court, City and County of Denver, Colorado, Case No. 2012-CV-2055) [Report & Supplemental Report]

4. Fort Apache Energy, Inc. and Drilling Risk Management, Inc., Plaintiffs v. Gemini Insurance Company, Berkeley Oil & Gas Specialty Services, LLC, OCB Interests, L.L.C. f/k/a BC Johnson Associates a Unit of the Specialized Loss Adjusting Division of York Risk Services Ground, Inc., and J.H. Blades & Co., Inc., Defendants (In the 216th District Court of Kendall County, Texas, Case No. 12-066) [Designation]

5. Choice Exploration Inc.; LLOG Exploration Company, LLC; LLOG Exploration Texas, LP; Seidler Oil & Gas, LP; Overlord Energy Investments, LLC; Henderson Group, Inc.; Russo Exploration, LLC; Oil2 Eisenhower Prospect, LP; & Big "6" Drilling Company, Plaintiffs v. Weatherford U.S., LP; Weatherford International, Inc.; Weatherford Artificial Lift Systems, Inc.; Freudenberg Oil & Gas, LLC; MWW-MDV Operations, LP; MWW-MDV Properties, LP; MWW-GP, LLC; MDV-GP, LLC; Michael W. Ward; Michael D. Viator; Cameron International Corporation; Cameron, Inc.; & Cameron Solutions, Inc., Defendants (In the 269th District Court of Harris County, Texas, Cause No. 2013-18463) [Report, Supplemental Report & Deposition]

6. Bigie Lee Rhea, Plaintiff v. Apache Corporation, Defendant (In the United States District Court for the Eastern District of Oklahoma, State Case No. CJ-2014-170) [Affidavits, Report & Deposition]

7. In the Matter of the Marriage of K.S.L. and R.R.L. (In the 408th District Court of Bexar County, Texas, Case No. 2013-CI-05201) [Affidavit]

8. Energy Services Group, Inc., Plaintiff v. Quality Carriers, Inc. and Reagent Chemical & Research, Inc., Defendants (In the United States District Court for the Northern District of Texas, Fort Worth Division, Civil Action No. 4:14-cv-449-A) [Report & Supplemental Report]

9. Kevin L. Jeter, Joe A. Jeter, Barbara Lucas, James H. Miller, Sharon Rigsby Miller, Larry Smith, and Janice Sue Parker, Individually and as a Class Representatives on Behalf of All Similarly-Situated Persons, Plaintiffs v. Wild West Gas, LLC; Wild West Gas, Inc.; Bullseye Energy, Inc.; Fountainhead, LLC; and KRS&K, an Oklahoma General Partnership, Defendants (In the United States District Court for the Northern District of Oklahoma, Case No. 12-CV-411 JHP PJC) [Report, Supplemental Report & Deposition]

10. Carl O. Gurecky, Plaintiff v. Zachry Exploration LLC and Zachry Exploration, Ltd., Defendants (In the District Court Colorado County, Texas 25th Judicial District, Cause No. 23755) [Designation]

11. Roy McMullen, Plaintiff v. Quad/Graphics Marketing, LLC, Defendant (In the United States District Court in and for the Eastern District of Texas, Lufkin Division, Case No. 9:15-cv-00040-MHS) [Report]

12. Elster Oil and Gas, LLC, Claimant v. Extraction Oil and Gas, LLC, Respondent (American Arbitration Association, Case No. 01-15-0004-0836) [Report]

13. Expro Engineering, Inc., Panther City Exploration Company, LLC, and Trinity East Energy, LLC, Plaintiffs v. Weatherford International, LLC and Texas CES, Inc. d/b/a Basin Tool Company, Shale Tank Truck, and Mercer Well Service, and National Oilwell DHT, LP d/b/a National Oilwell Varco DHT, LP, Defendants (In the 68th Judicial District of Dallas County, Texas, Cause No. DC-14-13868) [Report]

14. Tony R. Whisenant, on behalf of himself and all others similarly situated, Plaintiffs v. Strat Land Exploration Co., Defendant (In the District Court of Beaver County, State of Oklahoma, Case No. CJ-2014-4) [Report & Hearing Testimony]

15. D&D Cajun Ventures, LLC and Eileen H. Baur, Plaintiffs v. Atlantic Richfield Company; Arco Oil & Gas Co.; Vista Resources, LLC; Cody Energy, LLC; Cabot Oil & Gas Corporation; Union Oil Company of California; Dunhill Exploration and Production, LLC; Dune Energy, Inc.; Brammer Engineering, Inc.; Phoenix Exploration Company, LP; White Oak Energy, LLC; White Oak Operating Company, LP; Newfield Exploration Company; Goldking Texas, Inc.; Texaco Exploration and Production, Inc.; Chevron USA, Inc.; Pan-Ok Production Company, Inc.; Henry Production Company; KMC Energy, LLC; and Bay Holdings, LLC, Defendants (in the 15th Judicial District Court of Vermilion Parish, State of Louisiana, Case No. 87,694) [Report & Deposition]

16. Fremak Industries, Inc., Claimant v. ISMT Limited, Respondent (International Court of Arbitration Case No. 20784/RD) [Report & Arbitration Testimony]

17. Lancaster Management Services, Inc., Plaintiff v. Chad Scott Nall, individually and d/b/a Setnique Tradeshow Services, and Your Labor Management, LLC, Defendants (In the District Court of Dallas County, Texas, 298th Judicial District, Case No. DC-15-08144) [Report, Supplemental Report & Hearing Testimony]

18. Prime Natural Resources, Inc., Plaintiff v. Certain Underwriters at Lloyd's London, Syndicate Numbers 2020, 1084, 2001, 457, 510, 2791, 2987, 3000, 1221, 5000, Navigators Insurance Company, UK, Defendants (In the District Court of Harris County, Texas, 281st Judicial District, Cause No. 2015-51137) [Designation, Report & Deposition]

19. Certain Underwriters at Lloyd's London and Certain Insurance Companies, Manti Exploration, LP, Shoreline Southeast, LLC, Ankor E&P Holdings Corporation, Dune Properties, Inc., Manti Exploration Operating, LLC, San Isidro Development Co., LC, Leeville West Energy, LLC, CC Bay, LLC, Winn Exploration Co., Inc., C. Douglas Jamba, LLC, D&C Energy Resources, Inc., Plaintiffs v. United States Steel Corporation and United States Steel Tubular Products, Inc., Defendants. (In

the District Court of Lafourche Parish, State of Louisiana, 17th Judicial District, Cause No. 125577) [Report, Supplemental Report, Trial Testimony]

20. Robert E. Lee, Jr., Hitch Land & Cattle Company, and Suzanne V. Landess, Trustee of the Suzanne V. Landess Revocable Trust, Plaintiffs v. ConocoPhillips Company, Defendant. (In the United States District Court for the Western District of Oklahoma, Case No. CIV-14-01391-D) [Report & Deposition]

21. Duncan Frank, on behalf of himself and all others similarly situated, Plaintiffs v. Crawley Petroleum Corporation, Defendant. (In the United States District Court for the Western District of Oklahoma, Case No. CIV-13-01193-R) [Report]

22. Portal Investments, LLC, Claimant v. Rival Holdings LLC, Douglas L. Johnson, Chad D. Johnson, Todd J. Johnson, Respondents. (JAMS Arbitration, Case No. 16372) [Report, Supplemental Report, Arbitration Hearing Testimony]

23. Chuck Travis Cowan, on behalf of himself and all others similarly situated, Plaintiff v. Devon Energy Corporation; and Devon Energy Production Company, LP (including affiliated predecessors and affiliated successors), Defendants. (In the District Court of Pittsburgh County, State of Oklahoma, Case No. CJ-2016-242) [Deposition]

24. Occidental Energy Marketing, Inc. and Oxy Ingleside LPG Pipeline, LLC, Plaintiffs v. NuStar Logistics, L.P., Defendant. (In the District Court of Harris County, Texas, 11th Judicial District, Cause No. 2015-39021) [Report]

25. Ryder Truck Rental, Inc., d/b/a Ryder Transportation Services, Plaintiff v. Maalt LP, et al, Defendants. (In the United States District Court for the Northern District of Texas, Dallas Division, Civ Action No. 3:15-CV-3325-N) [Report, Deposition, Trial Testimony]

26. Sutter Ranch Corporation, and Oklahoma corporation and Sutter Ranch Mineral Trust, Plaintiffs v. Cabot Oil & Gas Corporation, Lime Rock Resources, Apache Corporation, Defendants. (In the District Court of Ellis County, State of Oklahoma; Case No. CJ-2015-7) [Report]

27. Sutter Ranch Corporation, and Oklahoma corporation and Sutter Ranch Mineral Trust, Plaintiffs v. Cabot Oil & Gas Corporation, Lime Rock Resources, Apache Corporation, Defendants. (In the District Court of Ellis County, State of Oklahoma; Case No. CJ-2015-7) [Report]

28. Sutter Ranch Corporation, and Oklahoma corporation and Sutter Ranch Mineral Trust, Plaintiffs v. Cabot Oil & Gas Corporation, Lime Rock Resources, Apache Corporation, Defendants. (In the District Court of Ellis County, State of Oklahoma; Case No. CJ-2015-7) [Report]

29. KMD Operating Company, LLC, KMD Acquisitions, LLC, and California Resources Production Corporation, Claimants v. Innex California, Inc. and General Crude Company, Inc., Respondents. (Matter of Arbitration, CPR File No. G-16-32-C) [Report, Supplemental Report, Arbitration Hearing Testimony]

30. Ashcraft Group, LLC for itself and all others similarly situated, Plaintiffs v. Silver Creek Oil & Gas, LLC, Defendant. (In the United States District Court for the Eastern District of Oklahoma; Case No. 16-CV-388-RAW) [Report, Deposition]

31. Stellar Oil & Gas, LLC, Plaintiff v. BlueCrest Cosmopolitan, LLC, Defendant. (In the District Court of Harris County, Texas, 80th Judicial District, Cause No. 2017-04220) [Report]

32. Michael Kernen for himself and all others similarly situated, Plaintiffs v. Casillas Operating, LLC and Casillas Petroleum Corporation, Defendants. (In the District Court of Garvin County, State of Oklahoma, Case No. CJ-17-186) [Declaration, Depositions, Report, Supplemental Report]

33. Antero Resources Corporation, Plaintiff v. Washington Gas Light Company and WGL Midstream, Inc., Defendants. (In the District Court of the City and County of Denver, Colorado, Case No. 2017CV33930) [Report, Supplemental Report, Updated Supplemental Report, Rebuttal Report]

34. State of Oklahoma *ex rel.,* Commissioners of the Land Office, Plaintiff v. Apache Corporation, Defendant. (In the District Court in and for Beckham County, State of Oklahoma, Case No. CJ-17-1) [Report, Declaration, Deposition, Supplemental Report]

35. Richard L. Kuffa and Denise D. Kuffa, Claimants v. Statoil USA Onshore Properties, Inc. f/k/a StatoilHydro USA Onshore Properties, Inc., Respondent. (American Arbitration Association, Scranton, Pennsylvania, Case No. 1-17-0005-6012) [Report, Deposition]

36. San Isidro Development Company, LC and San Isidro Energy Company, LLC, Plaintiffs v. BPX Properties (NA) F/K/A BHP Billiton Petroleum Properties (N.A.), LP F/K/A Petrohawk Properties, LP, and BPX Operating Company F/K/A BHP Billiton Petroleum (TXLA) Operating Company, Defendants. (In the 36th Judicial District Court of McMullen County, Texas, Cause No. M-15-0050-CV-C) [Disclosure; Declaration, Report, Deposition]

37. Chieftain Royalty Company, for itself and all other similarly situated, Plaintiffs v. SM Energy Company (including predecessors, successors, and affiliates), Enervest Energy Institutional Fund XIII-A, L.P., Enervest Energy Institutional Fund XIII-WIB, L.P., Enervest Energy Institutional Fund XIII-WIC, L.P., Enervest Operating, L.L.C. and FourPoint Energy, LLC, Defendants. (In the United States District Court for the Western District of Oklahoma, Case No. CIV-11-177-D) [Report, Supplemental Report]

38. Hitch Enterprises, Inc., on behalf of itself and all others similarly situated, Plaintiffs v. Key Production Company, Inc., Defendant (In the District Court of Texas County, Oklahoma, Case No. CJ-2017-01) [Report, Rebuttal Report, Supplemental Report]

39. Baker Hughes Oilfield Operations, LLC and Baker Petrolite, LLC, Claimant v. BlueCrest Alaska Operating LLC, Respondent. (The American Arbitration Association Under the Commercial Rules, Case No. 01-17-0007-3892) [Report, Reply Report]

40. Perry Cline, on behalf of himself and all others similarly situated, Plaintiff v. Sunoco, Inc. (R&M) and Sunoco Partners Marketing & Terminals, LP, Defendants. (In the United States District Court

for the Eastern District of Oklahoma, Case No. 17-cv-00313-JHP) [Report, Deposition, Declarations, Merits Report, Trial Testimony]

41. Marc Marrocco and Antonio Albanese, directly and derivatively on behalf of Centurion Logistics, LLC, and directly and derivatively on behalf of Centurion Pecos Terminal, LLC, a Texas Limited Liability Company, Plaintiffs v. James Ballengee, Ballengee Interests, LLC, John Calce, Chris A. Mott, Tom Ramsey, Stampede Tx Energy, LLC, Centurion Midstream Group, LLC, Centurion Terminals, LLC, Centurion Brownsville Terminal, LLC, James Hock, Vispi Jilla, and JupiterMLP, LLC, Defendants and Centurion Pecos Terminal LLC, a Texas Limited Liability Company, Nominal Defendant. (In the District Court of Dallas County, Texas, B-44th Judicial District, Cause No. DC-16-07706) [Report, Declaration]

42. Judy Grellner, on behalf of herself and all others similarly situated, Plaintiff v. Devon Energy Corporation and Devon Energy Production Company, LP, Defendants. (In the District Court of Pittsburgh County, State of Oklahoma, Case No. CJ-2016-242) [Declaration]

43. Chieftain Royalty Company, on behalf of himself and all others similarly situated, Plaintiff v. Unit Petroleum Company, Defendant. (In the District Court of LeFlore County, State of Oklahoma, Case No. CJ-2016-230) [Report, Deposition]

44. Jesus Guerra, Plaintiff v. United States of America, Defendant. (In the United States District Court for the Western District of Texas, El Paso Division, Case No. EP-18-CV00270-FM) [Report]

45. Janie Slamon, as Executrix of the Estate of James Slamon and Eric Lewis, on behalf of themselves and all others similarly situated, Plaintiff v. Carrizo (Marcellus), LLC, Reliance Marcellus II, LLC, Reliance Holdings USA, Inc., BKV Operating LLC and BKV Chelsea, LLC, Defendants. (In the United States District Court for the Middle District of Pennsylvania, Case No. 3:16-cv-02187-RDM) [Report, Depositions, Merits Report, Merits Rebuttal Report; Merits Deposition]

46. Donald D. Miller Revocable Family Trust, Trustee Donald D. Miller, on behalf of himself and all others similarly situated, Plaintiff v. DCP Operating Company, LP and DCP Midstream, LP, Defendants. (In the United States District Court for the Eastern District of Oklahoma, Case No. 18-CV-00199-JH) [Report, Deposition, Declaration]

47. Sagacity, Inc., on behalf of itself and all other similarly situated, Plaintiff v. Magnum Hunter Production, Inc., Prize Energy Resources, LP, and Cimarex Energy Company of Colorado, Defendants. (In the United States District Court for the Eastern District of Oklahoma, Case No. 6:17-cv-00101-KEW) [Report, Deposition]

48. Maalt, LP, Plaintiff v. Sequitur Permian, LLC, Defendant. (In the 51st Judicial District Court, Irion County, Texas, Cause No. 19-003) [Report, Deposition]

49. Chieftain Royalty Company and Castlerock Resources, Inc., on behalf of themselves and all others similarly situated, Plaintiffs v. BP America Production Company, Defendant. (In the United States District Court for the Northern District of Oklahoma, Case No. 4:18-CV-00054-GKF-JFJ) [Report, Deposition]

50. *In re Unit Corporation.* (In the United States Bankruptcy Court for the Southern District of Texas, Case No. 20-32740) [Report, Hearing Testimony]

51. The Reynolds and Reynolds Company, Plaintiff v. I3 Brands, Inc., et al, Defendants. (In the United States District Court for the Southern District of Texas, Houston Division, Civil Action No. 4:19-CV-1260) [Report]

52. Victory Diesel, LLC, VicNRG, LLC, Victory Transload, LLC, Victory Blue, LLC, Claimants v. Whitley Penn LLP, Respondent. (American Arbitration Association, Case No. 01-19-0002-0493) [Report, Rebuttal Report]

53. Seneca Resources Company, LLC, Plaintiff v. Tesco Corporation (US) and U.S. Steel Oilwell Services, LLC, Defendants. (In the District Court of Harris County, Texas, 334th Judicial District; Cause No. 2019-10131) [Designation]

54. The Duncan Group, LLC, on behalf of itself and all others similarly situated, Plaintiff v. Cimarex Energy Company, Defendant. (In the United States District Court for the Western District of Oklahoma, Case No. 18-CV-123-JD) [Report, Deposition]

55. David M. Dunwoody, Jr., Plaintiff v. EnVen Energy Corporation, EnVen Energy Ventures, LLC, and EnVen Equity Holdings, LLC, Defendants. (In the District Court of Harris County, Texas, 151st Judicial District, Cause No. 2019-39608) [Report, Deposition, Trial Testimony]

56. U.S. Soil, Inc., Plaintiff v. AgriFarm Group, LLC, et al, Defendants. (In the District Court of Chaffee County, State of Colorado, Case No. 2020CV30007) [Report]

57. Williams Field Services, LLC, Plaintiff v. BP America Production Company, Defendant. (In the District Court of Tulsa County, State of Oklahoma, Cause No. CJ-2018-4872) [Report, Deposition]

58. MAKO Resources, LLC, TMN Resources, LLC, STAAB Holdings, LLC, Golden Gas Service Company, and Alan R. Staab, Plaintiffs v. Trinity Operating (USG), LLC and WSGP Gas Producing, LLC, Defendants. (In the United States District Court for the Northern District of Oklahoma, Case No. 4:19-cv-00461-GKF-JFJ) [Report, Supplemental Report]

59. Kunneman Properties LLC, et al, on behalf of themselves and all others similarly situated, Plaintiffs v. Marathon Oil Company, Defendant. (In the United States District Court for the Northern District of Oklahoma, Case No. 17-CV-456-GKF-JFJ) [Report, Deposition, Hearing Testimony]

60. Lake Carey Investments, LLC, et al, Claimants v. Statoil USA Onshore Properties, Inc. f/k/a StatoilHydro USA Onshore Properties, Inc., Respondent. (American Arbitration Association, Case No. 1-17-0007-3491) [Report, Rebuttal Report, Deposition]

61. Kenny Wayne Rounds and Randy Carl Smith, on behalf of themselves and all others similarly situated, Plaintiffs v. FourPoint Energy, LLC, Defendant. (In the United States District Court for the Western District of Oklahoma, Civil Action No. 5:20-CV-00052-JD) [Report, Deposition]

62. William A. Chambers, et al, Plaintiffs v. Chesapeake Appalachia, LLC and Equinor USA Onshore Properties, Inc. f/k/a Statoil USA Onshore Properties, Inc., Defendants. (In the United States District Court for the Middle District of Pennsylvania, Case No. 3:18-CV-437-ARC) [Report, Deposition]

63. Dab Drilling, Inc., Plaintiff v. Byline Bank, Defendant/Third Party Plaintiff v. Adam M. Komoroski, Nathan L. Price, and Aaron Jason Carmody, Third Party Defendant. (In the United States District Court for the District of Colorado, Civil Action No. 1:18-CV-02513-JLK) [Report]

64. DCP Guadalupe Pipeline, LLC, Plaintiff v. Atmos Energy Corporation, Defendant. (In the District Court of Dallas County, Texas, 14th Judicial District, Cause No. DC-18-19091) [Report, Reply Report, Declaration, Deposition]

65. SynergenX Physician Services, PLLC, Claimant v. Maxxam Hormone & Health, PLLC and Stacy Dyan Hutt, and Kimberly Kay Guinniss, Respondents. (In an Arbitration Case No. 20-037, Arbitrator: Trey Bergman) [Report, Trial Testimony]

66. BNJ Leasing, Inc. and MRB Enterprise, Inc., Plaintiffs v. Portabull Fuel Service, LLC, Defendant. (In the United States District Court for the Southern District of Mississippi, Eastern Division, Case No. 2:19-cv-156-KS-MTP) [Report, Deposition]

67. Kevin Hoog, on behalf of himself and all others similarly situated, Plaintiff v. PetroQuest Energy, LLC, et al, Defendants. (In the United States District Court for the Eastern District of Oklahoma, Case No. 16-CV-463-RAW) [Report, Deposition]

68. H. Kenneth LeFoldt, Jr. as Trustee of the Whistler Energy II, LLC Litigation Trust, Plaintiffs v. Scott A. Frankel, Defendant. (In the United States District Court for the Eastern District of Louisiana, Civil Action No. 18-5303, Section H) [Report, Deposition]

69. Tanos Exploration II, LLC, Plaintiff v. Petrotech Solutions, LLC, Integrated Chemical Services, Inc., & VRC Technologies, Inc., Defendants. (In the District Court for the 71st District Court of Harrison County, Texas, Cause No. 20-0407) [Report, Deposition]

70. Philip Lee, on behalf of himself and all others similarly situated, Plaintiff v. Petroquest Energy, LLC, Defendant. (In the United States District Court for the Eastern District of Oklahoma, Civil Action No. 16-CIV-516-RAW) [Report, Deposition]

71. Bright Rock Energy, LLC, Plaintiff v. CNOOC Energy USA, LLC, Defendant. (In the United States District Court for the District of Wyoming, Case No. 21-CV-32-NDF) [Report]

72. MidCon Gathering, LLC, Plaintiff v. Occidental Energy Marketing, Inc., Defendant. (In the District Court of Harris County, Texas, 133rd Judicial District, Cause No. 2020-42162) [Report, Deposition]

73. Box Elder Kids, LLC, C Open A, LLC, and Guest Family Trust, by its Trustee Constance F. Guest, individually and on behalf of all others similarly situated, Plaintiffs v. Anadarko E&P Onshore, LLC, Anadarko Land Corporation, and Kerr McGee Oil and Gas Onshore, LP, Defendants. (In the United States District Court for the District of Colorado, Civil Action No. 1:20-cv-02352-RMR-SKC) [Report, Deposition, Supplemental Report, Merits Report]

74. Travis Young and Michelle Bee Young, Plaintiffs v. SWN Production Company, LLC and Equinor USA Onshore Properties, Inc., Defendants. (In the United States District Court for the Northern District of West Virginia, Wheeling Division, Case No. 5:17-CV-00082) [Report, Declaration, Supplemental Report]

75. Travis Young and Michelle Bee Young, Plaintiffs v. SWN Production Company, LLC and Equinor USA Onshore Properties, Inc., Defendants. (In the United States District Court for the Northern District of West Virginia, Wheeling Division, Case No. 5:17-CV-00082) [Report, Declaration, Supplemental Report]

76. Donald Woodford, individually, and, Maria Woodford, as Trustee of the Maria Woodford Revocable Trust, Plaintiffs v. Trinity Operating (USG), LLC, WSGP Gas Producing, LLC, and WSGP Gas Producing (Arkoma), LLC, Defendants. (In the United States District Court for the Eastern District of Oklahoma, Case No. CV-166-RAW) [Report]

77. RKI Energy Resources, LLC, Plaintiff v. Cyclone Drilling Inc., Walker Inspection, LCC, New IPT, Inc. d/b/a Integrated Petroleum Technologies, Dennis Geiss, Abimael Medina and Tom Thomas, Defendants. (In the District Court for the Sixth Judicial District of Campbell County, State of Wyoming, Civil Action No. 39065) [Report, Deposition]

78. Enerfin Resources I Limited Partnership, Plaintiff v. Calyx Energy III, LLC, Defendant. (In the District Court of Harris County, Texas 189th Judicial District, Cause No. 2019-02865) [Report]

79. Sultan Oil Company, et al., Plaintiffs v. Trinity Operating (USG), LLC and WSGP Gas Producing, LLC, Defendants. (In the United States District Court for the Eastern District of Oklahoma, Case No. 19-00175-CBG) [Report]

80. Mohawk Industries, Inc. and Aladdin Manufacturing Corporation, Plaintiffs v. Equistar Chemicals, L.P. and Lyondell Chemical Company, Defendants. (In the Superior Court of Cobb County, State of Georgia, Civil Action No. 19104320) [Report, Deposition]

81. North Country Contracting, LLC, Mitchel Fuchs, and Heather Fuchs, Plaintiffs v. Citizens Alliance Bank and Nick Woodard, Defendants. (In the Seventh Judicial District Court of Clay County, State of Minnesota, Court File 14-CV-21-2671) [Report, Deposition, Rebuttal Report]

82. Manta Ray Gathering Company, LLC, Plaintiff v. Eni Petroleum US LLC and Eni Trading & Shipping, Inc., Defendants. (In the United States District Court for the Southern District of Texas, Houston Division, Civil Action No. 4:21-cv-03122) [Report, Deposition]

83. Odessa Pumps and Equipment, Inc., Plaintiff v. GR Lift, L.P., GR Energy Services Operating GP, LLC, and GR Energy Services Management, L.P., Defendants. (In the 129th District Court of Harris County, Texas, Cause No. 2022-16349) [Report, Supplemental Report, Deposition, Trial Testimony]

84. Aloha Petroleum, Ltd., Claimant v. Equilon Enterprises, LLC d/b/a Shell Oil Products U.S., Respondent. (In a Matter of Arbitration Under Arbitration Rules of the International Institute of Conflict Prevention and Resolution) [Report]

85. Southern Country Farms, Inc., a West Virginia Corporation, individually, and on behalf of all individuals or legal entities similarly situated, Plaintiff v. TH Exploration, LLC, TH Exploration II, LLC, and Tug Hill Operating, LLC, Defendants. (In the United States District Court for the Northern District of West Virginia, Case No. 5:21-CV-84) [Report, Merits Report, Rebuttal Report, Deposition]

86. Texas Brine Company, LLC, Claimant v. Occidental Chemical Corporation, Respondent. (American Arbitration Association, Case No. 01-19-0001-7699) [Report, Supplemental Report, Reply Report, Deposition, Trial Testimony]

87. James Bernard, Plaintiff v. Halliburton Company, Silverbow Resources, Inc., and Silverbow Resources, LLC, Defendants. (In the 406th Judicial District of Webb County, Texas, Cause No. 2019CVF000096D4) [Report]

88. State of Oklahoma, ex rel. Commissioners of the Land Office, Plaintiff v. Crawley Petroleum Corporation, Defendant. (In the District Court of Custer County, State of Oklahoma, Case No. CJ-2021-54) [Declarations, Report, Deposition]

89. State of Oklahoma, ex rel. Commissioners of the Land Office, Plaintiff v. Adparo, LLC, Defendant. (In the District Court of Custer County, State of Oklahoma, Case No. CJ-2021-53) [Report, Deposition]

90. Fondren Orthopedic, Ltd., Plaintiff v. Columbia/HCA of Houston, Inc.; HCA Management Services, LP, Defendant. (In the 80th Judicial District Court of Harris County, Texas, Cause No. 2021-68404) [Report, Supplemental Report, Deposition, Trial Testimony]

91. Escondido Resources Management, Inc., Escondido Resources Operating Company, LLC, and Escondido WI Holding Company, LLC, Plaintiff v. Houston International Specialty, Inc. and OFS International, LLC, Defendants. (In the 133rd Judicial District Court of Harris County, Texas, Cause No. 2020-17007) [Report, Supplemental Report, Deposition]

92. Chestnut Holdings, Inc., a Florida corporation, and Hayhurst Company, a Florida general partnership, Plaintiffs v. TH Exploration, LLC, a Texas limited liability company, Defendant. (In the United States District Court for the Northern District of West Virginia, Case No. 5:21-CV-150 (Bailey)) [Report, Supplemental Report, Deposition]

93. El Dorado Gas & Oil, Inc. and El Dorado Oil & Gas, Inc., Plaintiffs v. Texla Energy Management, Inc., Defendant. (In the 11th Judicial District of Harris County, Texas, Cause No. 2022-33271) [Report]

94. Prewit Land and Minerals, Ltd., Barbara H. Prewit, et al, Plaintiffs v. Cimarex Energy Company, Defendant. (In the United States District Court for the Western District of Texas, Pecos Division, Cause No. 4:21-CV-47) [Report]

95. Notzon Advisors Limited, Talco Partners II, LLC, Plaintiffs v. Rio Grande E&P Management, LLC, Rio Grande E&P, LLC, Columbus Energy, LLC, & Killam Oil Co., Ltd., Defendants. (In the District Court of Harris County, Texas, 334th Judicial District, Cause No. 2022-23621) [Report, Supplemental Report]

96. Low-T Physician Service, PLLC, Claimant v. Caroline Pigford and Optimize U, LLC, Respondents. (Arbitration before Jennifer Stephens, Arbitrator) [Report]

97. EagleClaw Intrastate Ventures, LLC, Plaintiff v. Luminant Energy Company, LLC, Defendant. (In the District Court of Dallas County, Texas, 193rd Judicial District, Cause No. DC-21-12148) [Report]

98. Silverbow Resources Operating, LLC, Plaintiff v. Champions Cinco Pipe & Supply, LLC; TMK IPSCO; Texas Steel Conversion, Inc.; AM Tex Machine Products, Inc., Defendants. (In the District Court of Harris County, Texas, 333rd Judicial District, Cause No. 201966559) [Designation]

99. Leslie Ray Tennant, Lonnie C. Frey, and Lawrence B. Carroll, Plaintiffs v. Southwestern Energy Company, SWN Production (Ohio), LLC F/K/A Triad Hunter, LLC and SWN Production Company, LLC, Defendants. (In the United States District Court for the Northern District of West Virginia, Wheeling Division, Case No. 5:23-cv-00087-JPB) [Report, Rebuttal Report]

100. Acis Capital Management, L.P., Acis Capital Management G.P., L.L.C., Plaintiffs v. James Dondero, Grant Scott, and CLO HoldCo, Ltd., Defendants. (In the United States Bankruptcy Court for the Northern District of Texas, Dallas Division, Case No. 18-30264-SGJ-11) [Report, Deposition]

101. Hayden Nissen, et al, Plaintiffs v. Contango Resources, LLC, Defendant. (In the United States District Court for the District of Wyoming, Case No. 23-cv-31-KHR) [Report]

102. Denver Starcher, on behalf of himself and all others similarly situated, Plaintiffs v. Southwestern Energy Company; Triad Hunter LLC n/k/a SWN Production (Ohio), LLC, and SWN Production Company, LLC, Defendants. (In the United States District Court for the Northern District of West Virginia, Wheeling Division, Case No. 5:23-cv-00061-JPB-JPM) [Report, Rebuttal Report]

103. Craig Yoho, individually and on behalf of a putative class, Plaintiff v. Southwestern Energy Company and SWN Production Company, LLC, Defendants. (In the United States District Court for the Northern District of West Virginia, Wheeling Division, Case No. 5:23-cv-00101-JPB) [Report, Deposition]

104. Gregg B. Colton and Cindy H. Colton, as Trustee for the Gregg B. Colton Trust, on behalf of themselves and a class of similarly situated persons, Plaintiffs v. Hilcorp Energy Development, LP, Defendant. (In the United States District Court for the District of Wyoming, Civil Action No. 22-CV-00149-ABJ) [Report]

105. Mary J. Smith, Plaintiff v. SWN Production (Ohio), LLC F/K/A Triad Hunter, LLC and SWN Production Company, LLC, Defendants. (In the United States District Court for the Northern District of West Virginia, Wheeling Division, Case No. 5:23-cv-00243-JPB) [Report, Rebuttal Report]

106. Sultan Oil Company, et al., Plaintiffs v. Trinity Operating (USG), LLC and WSGP Gas Producing, LLC, Defendants. (In the United States District Court for the Eastern District of Oklahoma, Case No. 24-CV-49-JAR) [Report]

107. Donald Woodford, individually, and, Maria Woodford, as Trustee of the Maria Woodford Revocable Trust, Plaintiffs v. Trinity Operating (USG), LLC, WSGP Gas Producing, LLC, and WSGP Gas Producing (Arkoma), LLC, Defendants. (In the United States District Court for the Eastern District of Oklahoma, Case No. CIV-24-93-SPS) [Report]

108. Driftwood Energy Operating, LLC, Plaintiff v. KLX Energy Services, LLC, et al., Defendants. (In the District Court of Upton County, Texas, 112th Judicial District, Cause No. 22-06-U4942-ANC) [Report, Declaration]

109. Kimberly Caraway and Veeda Wise, Individually and on behalf of themselves and all others similarly situated, Plaintiff v. The Ohio State University Wexner Medical Center, Defendant. (In the Court of Claims of Ohio, Case No. 2022-00859JD) [Report]

110. DK Trading & Supply, LLC and Lion Oil Company, LLC, Plaintiffs v. Axis Energy Marketing, LLC, et al, Defendants. (In the 385th Judicial District Court of Midland County, Texas, Cause No. CV59511) [Report, Reply Report, Deposition]

111. Jane Doe, Individually and on behalf of herself and all others similarly situated, Plaintiff v. SSM Health Care Corporation d/b/a/ SSM Health, Defendant. (In the Circuit Court of the City of St. Louis, State of Missouri, Case No. 2222-CC10014) [Report]

112. AKG Operating Company, AKG Energy, LP, and Exponential Energy, LLC, Plaintiffs v. Messy Oil & Gas, LLC, Defendant. (In the 21st District Court of Burleson County, Texas, Cause No. 31028) [Report]

113. Gateway Royalty Company, LLC, Gateway Royalty II LLC, Gateway III LLC, Gateway Royalty V LLC, Gateway Royalty VI LLC, individually and on behalf of a class of others similarly situated, Plaintiffs v. EAP Ohio LLC, EAP Holdings LLC, EAP Operating LLC, Encino Acquisition Partners Holdings, LLC, and Encino Energy, LLC, Defendants. (In the United States District Court for the Northern District of Ohio, Eastern Division, Case No. 1:20-cv-02813) [Report, Deposition]

114. Stellar Drilling Fluids, LLC, Plaintiff and Counter-Defendant v. SilverBow Resources Operating, LLC, Defendant and Counter-Plaintiff. (In the 11th Judicial District of Harris County, Texas, Cause no. 202369327) [Report]

115. Midcoast Pipeline, LP d/b/a Producers Midstream, Plaintiff v. Enerflex Energy Systems, Inc., Defendant. (In the 189th Judicial District of Harris County, Texas, Cause No. 2024-07919) [Report]

116. Foss Maritime Company, LLC, Claimant v. Rose Cay Maritime, LLC, Respondent. (Before the Society of Maritime Arbitrators) [Arbitration Hearing Testimony]

117. Centennial Bank, as successor-in-interest to Happy State Bank, Plaintiff v. American State Bank, Jerry "Bud" Holmes, Jay House, Channing Baisley, Drew Phillips, Ross Glenn, Willis McCutcheon, Michael Jackson, Jessica Terrell, Derek Dollahite, and Jaime Sikes, Defendants. (In the United States District Court for the Northern District of Texas, Lubbock Division, Civil Action No. 5:23-cv-00044-H) [Report, Deposition]

118. Jane Doe and Janice Doe, Individually and on behalf of all others similarly situated, Plaintiffs v. Mosaic Health System and Heartland Regional Medical Center d/b/a Mosaic Life Care, Defendant. (In the Circuit Court of Buchanan County, State of Missouri, Case No. 22BU-CC01774-01) [Report]

119. Jacqueline Horton and Crystal Larue, Individually and on behalf of all others similarly situated, Plaintiffs v. Willis-Knighton Medical Center, Defendant. (In the 10th Judicial District Court for the Parish of Natchitoches, State of Louisiana, Case No. 93767 Division B) [Report]

120. D&N Farms, LLC, D&R Minerals, LLC, James Harold Miller and Zeida Frances Miller, and HZM Land and Minerals, LLC, individually and on behalf of all others similarly situated, Plaintiffs v. Crawley Petroleum Corporation, Defendant. (In the United States District Court for the Eastern District of Oklahoma, Case No. CIV-23-234-RAW-DES) [Report]

**Appendix C**

Doe v. BetterHelp
Documents Received by Eric R. Krause, MBA

| Beginning Bates Numbers | Ending Bates Numbers | Date | Document Description |
|---|---|---|---|
| Bates Numbered Documents | | | |
| BH0008559 | BH0008600 | | |
| BH0008602 | BH0008657 | | |
| BH0008637 | | | |
| BH0008638 | | | |
| BH0008639 | | | |
| BH0008658 | BH0008660 | | |
| BH0008702 | | | |
| BH0008707 | BH0008726 | | |
| BH0021490 | | | |
| BH0021492 | | | |
| BH0021494 | | | |
| BH0021496 | | | |
| BH0026620 | BH0026620 | | |
| BH0026621 | | | |
| Depositions and Exhibits | | | |
| | | 3/25/2025 | Deposition Transcript of Daniel Bragonier Volume 1 with Exhibits |
| | | 3/25/2025 | Deposition Transcript of Daniel Bragonier Volume 2 with Exhibits |
| | | 3/28/2025 | Deposition Transcript of Elizabeth Eldridge with Exhibits |
| | | 4/16/2025 | Deposition Transcript of Jessica Honbarger with Exhibits |
| | | 4/4/2025 | Deposition Transcript of Juliana M. Cizek with Exhibits |
| | | 4/1/2025 | Deposition Transcript of Lauren Mindy Manaker with Exhibits |
| | | 3/21/2025 | Deposition Transcript of Niklas Vaughan |
| | | 3/27/2025 | Deposition Transcript of Raffi Sofoian with Exhibits |
| | | 4/11/2025 | Deposition Transcript of Sharon Cohen with Exhibits |
| | | 4/2/2025 | Deposition Transcript of Stephanie Crain with Exhibits |
| | | 3/26/2025 | Deposition Transcript of Tracy Reed with Exhibits |
| Court Documents and Correspondence | | | |
| | | 9/16/2023 | Complaint |
| | | 9/16/2023 | Decision |
| | | | Expert Report of Dr. Zubair Shafiq |
| | | 8/5/2024 | First Amended Consolidated Class Action Complaint with Exhibits |
| | | | Plaintiffs’ Motion for Class Certification |
| | | 5/10/2024 | Responses to Plaintiffs' First Set of Special Interrogatories |
| | | 11/15/2024 | Responses to Plaintiffs' First Set of Special Interrogatories |
| | | 11/15/2024 | Responses to Plaintiffs' Second Set of Special Interrogatories |
| | | 8/26/2024 | Responses to Plaintiffs' Second Set of Special Interrogatories |
| Publicly Available Documents | | | |
| | | | 2017 Cost of Data Breach Study, Ponemon Institute Research Report |
| | | 8/15/2024 | A Comprehensive Analysis of Device Fingerprint Spoofing Techniques, incognia.com |

**Appendix C**

Documents Received by Eric R. Krause, MBA

| Beginning Bates Numbers | Ending Bates Numbers | Date | Document Description |
|---|---|---|---|
| | | 12/17/2024 | A Vault for Taking Charge of Your Online Life, nytimes.com |
| | | 4/18/2025 | About Us, betterhelp.com |
| | | | Acquisti, Alessandro, Leslie K. John, and George Loewenstein - What is Privacy Worth, Journal of Legal Studies (2013) |
| | | | Acquisti, Taylor and Wagman - The economics of privacy, Journal of economic Literature (2016) |
| | | | Alorwu, Andy, et. al. - Monetary valuation of personal health data in the wild, Int. J. Human-Computer Studies (2024) |
| | | 11/14/2024 | Are Cookies Personal Data, usercentrics.com |
| | | | Biopharma Partnership Solutions, 2024 |
| | | 8/29/2024 | British Pound to US Dollar Spot Exchange Rates for 2019, exchangerates.org.uk |
| | | 12/17/2024 | Column-Shadowy Data Brokers Make the Most of Their Invisibility Cloak, latimes.com |
| | | | Customer Data - Designing for Transparency and Trust, Harvard Business Review, May 2015 |
| | | | D. Fehrenbach, C. Herrando - The effect of customer-perceived value when paying for a product with personal data (2021) |
| | | 8/21/2024 | Data Collaborations, tempus.com |
| | | 8/20/2024 | Deleteme - Services Pricing, deleteme.com |
| | | 8/21/2024 | FAQs - Nebula Genomics, nebula.org |
| | | | Fay, Scott and Zeithammer - Bidding For Bidders (2017) |
| | | 11/26/2024 | Fiduciary Duty of Doctor and Patient, legalmatch.com |
| | | 11/26/2024 | How does Google Analytics collect data, simpleanalytics.com |
| | | 11/26/2024 | How Google Analytics works, support.google.com |
| | | 8/16/2024 | How Much Is User Data Worth, pawtocol.medium.com |
| | | 8/14/2024 | How To Stop Data Brokers From Selling Your Personal Data, usa.kaspersky.com |
| | | 12/17/2024 | How We Built a Meta Pixel Inspector, themarkup.org |
| | | | Incogni – About Us, incogni.com |
| | | 8/21/2024 | Inovalon Data Cloud, inovalon.com |
| | | | IQVIA Form 10K 2023 |
| | | | Kathryn Wilson, Digital Surveillance and the Scope of the Wiretap Act's Party Exception, 68 Wash. (2022) |
| | | | Li, Xiao-Bai, Xiaoping Liu, and Luvai Motiwalla - Valuing personal data with privacy consideration (2021) |
| | | | Liu, Huan, Kai Li, Yan Chen, and Xin (Robert) Luo - Is personally identifiable information really more valuable (2023) |
| | | 8/21/2024 | Optum Electronic Health Record Data, optum.com |
| | | 9/26/2024 | Privacy Bee - Pricing, privacybee.com |
| | | 8/20/2024 | Privacy Protection Plans - JoinDeleteMe, joindeleteme.com |
| | | 8/21/2024 | Real World Data Solutions, veradigm.com |

**Appendix C**

Documents Received by Eric R. Krause, MBA

| Beginning Bates Numbers | Ending Bates Numbers | Date | Document Description |
|---|---|---|---|
| | | | Realising the Value of Health Care Data - A Framework for the Future, EY, 2019 |
| | | 8/20/2024 | ReputationDefender signup, me.reputationdefender.com |
| | | | Soma, John T., J. Zachary Courson, John Cadkin - Corporate Privacy Trend (2009) |
| | | | Teladoc Health(BetterHelp) Form 10K 2017 |
| | | | Teladoc Health(BetterHelp) Form 10K 2018 |
| | | | Teladoc Health(BetterHelp) Form 10K 2019 |
| | | | Teladoc Health(BetterHelp) Form 10K 2020 |
| | | | Teladoc Health(BetterHelp) Form 10K 2021 |
| | | | Teladoc Health(BetterHelp) Form 10K 2023 |
| | | 11/26/2024 | Terms of Service, facebook.com |
| | | 11/26/2024 | The ABCs of Tracking Pixels, improvado.io |
| | | | The Value of Data, Trustwave, 2017 |
| | | 11/26/2024 | The value of digital analytics, support.google.com |
| | | 11/15/2024 | Tracking Pixel, en.ryte.com |
| | | 8/14/2024 | U.S. Privacy Laws, epic.org |
| | | | Wagner, Wessels, Buxmann and Krasnova - Putting a Price Tag on Personal Information – A Literature Review (2018) |
| | | 11/26/2024 | What are cookies and similar technologies, ico.org.uk |
| | | 11/14/2024 | What Are Cookies, usa.kaspersky.com |
| | | 8/9/2024 | What Is a Data Broker, mcafee.com |
| | | 11/14/2024 | What is a Tracking Pixel, cookie-script.com |
| | | 11/14/2014 | What Is a Tracking Pixel, improvado.io |
| | | 8/12/2024 | What Is Device Fingerprinting And How Does It Work, clearcode.cc |
| | | 8/15/2024 | What Is Device Fingerprinting, arkoselabs.com |
| | | 11/15/2024 | What Is the Difference Between a Pixel and a Cookie, cookieyes.com |
| | | 11/26/2024 | What Is the Meta Pixel & What Does It Do, instapage.com |
| | | | Wu, Zhiyan and Jifeng Luo - Online Information Privacy and Price (2022) |