UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Donna M. Ryu, Magistrate Judge

C.M., et al. )
)
Plaintiffs, )
)
vs. ) No. C 23-01033-RS
)
BETTERHELP, INC., )
)
Defendant. )
_______________________________)

Oakland, California
Thursday, May 8, 2025

TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND RECORDING 3:05 - 3:44 = 39 MINUTES

APPEARANCES:

For Plaintiffs:

Tusan Law, PC
380 East Colorado Boulevard
Suite 180
Pasadena, California 91101
BY: CHRISTINA V. TUSAN, ESQ.

For Defendant:

King & Spalding
633 West Fifth Street
Suite 1600
Los Angeles, California 90071
BY: JEFFREY M. HAMMER, ESQ.

Transcribed by:

Echo Reporting, Inc.
Contracted Court Reporter/
Transcriber
echoreporting@yahoo.com

Thursday, May 8, 2025 3:05 p.m.

P-R-O-C-E-E-D-I-N-G-S

--oOo--

THE CLERK: Calling Civil Case C-23-1033-RS, C.M. versus BetterHelp, Incorporated.

Counsel, please state your appearance starting with the Plaintiff's attorneys first.

MS. TUSAN: Good afternoon. Christina Tusan on behalf of Plaintiffs.

THE COURT: Good afternoon.

MR. HAMMER: Good afternoon, your Honor. Jeffrey Hammer on behalf of the Defendant, BetterHelp, Inc.

THE COURT: Good afternoon.

Okay. So, as I understand it, Plaintiff is looking for source code. I -- I'm not completely clear on what source code you're looking for.

Here's -- so, you know, you said it's limited, but I'm not sure what. And, as I understand it, with respect to the consumer-facing code, okay, BetterHelp had said Plaintiff can get all that through the Wayback Machine, number one. And you don't -- and -- and BetterHelp says Plaintiff doesn't need anything from the server side because none of the pixels and the temperate files really interact with the server files -- server code such that, you know, it's needed to -- for Plaintiff to be able to understand where the

pixels are, when they were inserted, what they're collecting, how they're sending the information to third parties.

Am I right generally, Mr. Hammer, about the Defense position?

MR. HAMMER: Generally.

THE COURT: Okay.

MR. HAMMER: And I can unpack some of that if we -- as we go.

THE COURT: All right. I -- I thought I understood that BetterHelp did turn over the temperate files, right?

MR. HAMMER: We offered --

THE COURT: Okay.

MR. HAMMER: We offered to turn over the temperate files. That's right, your Honor.

THE COURT: But on Plaintiff's side, Plaintiffs have said, one, the Wayback Machine is very sporadic, so it doesn't give us everything. Two, once a user logs in, then we have no way of -- from the consumer-facing publicly available stuff, to understand what's being generated. And -- and, three, the TPL files aren't sufficient because they tell us when the pixels were asserted -- inserted and where but not what's being collected and how it's being sent off to -- shared with third parties.

Is that a correct statement, Ms. Tusan?

MS. TUSAN: Yes, that's -- that's accurate again. We can give you sort of a little more detail behind it, but that --

THE COURT: Okay.

MS. TUSAN: -- yes, you understand, yes.

THE COURT: So, but why don't you tell me what exactly then does the Plaintiff think they need?

MS. TUSAN: Yes, your Honor. Happy to respond. So, first and foremost, you're correct we're only seeking the consumer-facing pixels related to -- sorry -- consumer-facing source code related to the pixels, and that's in our requests seven and eight which specifically talks about documents relating to the use of third party code. We are not, we never have been, and we made clear that, you know, the initial meet and confer they just said burdensome. Never told us they thought we were looking for backend code. We had a subsequent meet and confer on the day their opposition was due. That's the first time we heard from them that it's -- it's going to take them thousands of hours to collect.

THE COURT: Okay. But hold on. You don't need any server side. That wasn't clear to me from your papers, but you're saying now consumer-facing only?

MS. TUSAN: Right.

THE COURT: Okay.

MS. TUSAN: Yes.

THE COURT: All right. So, from there, what is it exactly that you need?

MS. TUSAN: Sure. So, with respect to consumer-facing, we're looking for the source code. They've given us -- there's two pieces of the puzzle as Professor Shippick (phonetic) explained. One is the sample file that they -- they gave us one file. We had our expert look at it, and it's -- it's, again, just what's on sort of the -- the format, right, as to how source code is.

The second piece is what source code is placed on each page. So, for example, the intake questionnaire, what pixels appear on that page, and that's the information we're seeking. We're seeking both the -- the TSP files that they initially said they were potentially going to give us, the 135, and then the corresponding ones that go with the source code on specific pages where the pixels were relevant, again, consumer-facing pages. We're not looking for their backend proprietary information or anything like that. That's the limited scope of what we're looking at very specifically. And those two pieces together will tell us what happened with respect to which pixels are being used, what information they were sharing. That -- that figure will tell us that on source code.

And I'm happy to explain why GTM and the others don't get us to where we need to go further, but that's what we're looking for.

THE COURT: So, you -- you do want the TPLs that were offered?

MS. TUSAN: Yes.

THE COURT: But, in addition, you need consumer-facing source code, not backside server source code?

MS. TUSAN: Correct.

THE COURT: And what exactly of that source code are you looking for? The TPL files I think we understand they were already offered. So, it's this additional piece. How would you best describe it?

MS. TUSAN: Sure. I -- I would best describe it as the source code related to the consumer-facing pages, so, source code that's embedded by BetterHelp on the pages so that we're able to see what source code -- what -- what scripts play when you go onto each page related to pixels only. We're not looking for scripts about what color they're doing or what font or anything else that they sort of talk -- spent a lot of time talking about. We're focused on what is the source code related to pixels that are running. And -- and I do want to give the Court an update related to that, which is on Friday, our motion -- our motion for class cert is due today. So, it was a bit of a

challenge to come here anyway, and it's due today.

On Friday we received for the first time 51 new -- new documents, several of them, including consumer-facing snippets of consumer-facing source code the same type of information that they specifically told us they couldn't get.

And, so, we feel it's vastly unfair for them to be able to cherry pick the source code they like, which presumably will be in our opposition, at the same time telling us we're not entitled to get the source code to look at it for our purposes, to see what other source code is at issue. And we're very concerned about that belated correction after all the filings are done of several pages which presumably will be used in their opposition against us, snippets of source code, and that's, we feel, patently unfair and really improper.

THE COURT: Okay. Is this source code necessary for class certification?

MS. TUSAN: It's -- it's very important to us with respect particularly to time periods. So, for example, Defendants have refused to give us information past August of 2021. So, the Google Tag Manager stops at '21, and that's clear in the discovery produced that even though we asked for a longer time period, they just summarily didn't produce Google Tag Manager past then. They used another

tag manager type program called Zaraz after that. They've refused to produce any Zaraz information to us. They said that they specifically embedded source code on the website that is not in Google Tag Manager. So, we wouldn't have that.

And, finally, the Wayback Machine is a -- a product that has issues with dynamic parts of the website. So, for example, when they put on cookies, you know, click here if you want to move forward with this website later in the time period, that creates issues with respect to the accuracy of Wayback Machine as well. And, so, that creates challenges because it's not going to be able to scroll through every page because it's not a system that clicks a cookie box to say yes or no. And, so, particularly with respect to more recent time periods it's an issue.

Defendants are also claiming certain things happened at some time periods and not other time periods. So, they're saying they had a dance matching on just for a short period of time. And, so, we don't have Wayback for -- for every day or every time period. And, so, presumably, they'll make those arguments. They'll cherry pick source code to say this is what happened on this day or that day, and we won't be in a position to dispute it, and that's, you know, really significant discovery issue, again, especially because this is not a burdensome issue. When they wanted to find source

code, they found some and gave us a couple of snippets they wanted, and our experts explained why it's not hard to -- t -- again, consumer-facing code, their experts all talking about something we're not looking for, which is what's your proprietary backend data sources. We -- we don't want that.

THE COURT: Okay.

MR. HAMMER: There are a number of things in there, your Honor, that I'd like to respond to and that I don't dispute. I did -- I did bring an illustrative aid or a demonstrative I've provided to counsel in advance that speaks to some of these issues generally. I at least wanted to offer it to your Honor. I do want to address the specific issues, though, that counsel just went over. If you want me to hold onto that and then --

THE COURT: Why don't you go ahead and address what she said.

MR. HAMMER: Great. There are a number of things there. First of all, when it comes to the Wayback Machine -- so, the Wayback Machine is Archive.org. If your Honor's ever used it, it's a --

THE COURT: Yes, I have.

MR. HAMMER: Okay. That does as -- as Plaintiffs concede and acknowledge, it archives consumer-facing code.

THE COURT: Some, it does, not for every second. And Plaintiffs have shown, you know, explained -- and I

didn't see anything from the Defense on this, that you're not going to get it every single day, and you also didn't say anything in -- in response to Plaintiff saying when somebody logs in, you're not going to get it.

MR. HAMMER: Yeah, I'd like to address those. So, those are the two points that they raise about the sort of periodic archiving feature of the Wayback Machine. It is not the case that it is long span in between archiving of the website. If you go on there -- and it was not brought up until Professor Shippick's reply declaration where he said that in some instances, you know, it's only periodically archived. But if you go on the Wayback Machine, you'll see that BetterHelp.com is archived very regularly. It's definitely weekly. Some months it's near daily. Upon getting the reply brief, I went and looked on that myself. So, it is archived very regularly. And when we're talking here about the balancing of interest that goes into a discovery decision, that's relevant because, you know, they're not necessarily entitled to every single day of archived code over a multi-year period, but to get it for -- on a regular basis, many many captures of the code, that, in our view, is sufficient.

As to the second point about this Repost signup pages, once a user is converted, meaning they become a paying user and they go to the pages that were, you know, sort of for --

for example, pages in their briefing of coordinating with your counselor, there are no tracking technologies on those pages. We can represent that. Those are not at issue in this dispute. What's been at the heart of this dispute is the pixel and tracking technologies that are on the intake questionnaire and the ongoing process, and that is all archived and is all available to the Wayback Machine.

THE COURT: Let me hear Ms. Tusan's response on that.

MS. TUSAN: Yes. We -- we need to get better information to confirm exactly what was where. We have some information from that suggesting, for example, indi -- because this appeared Meta -- individual therapist information related to a particular consumer was shared with Meta.

THE COURT: Hold on. Let me clearer. I think Mr. Hammer is saying that the Court should not be concerned by the Plaintiffs's complaint that once somebody logs in, it's no longer available. That information is not available through Wayback. There's no other way to get it except through the Defense because the Defense says, You don't need that. It's not part of your case. It's all about the initial intake.

MS. TUSAN: Sure.

THE COURT: Okay. Is that true?

MS. TUSAN: No, we don't think so.

THE COURT: Okay. So, address that part so I --

MS. TUSAN: Yeah.

THE COURT: -- understand it.

MS. TUSAN: Sorry. That's what I was going through the Meta information. I probably wasn't clear. So, we have information from Meta about what they received from BetterHelp, and one of the things it says, "login", suggesting information that Meta received that a person was logging into their account, right. So, somebody might be logging into the website, "Seeing a therapist." Meta gets that. Ads can be directed to that consumer.

Now, what may happen after that, how many pixels are on it or if there are pixels on it, that's something the source code would tell us.

THE COURT: Okay.

MS. TUSAN: But, at a minimum, I want to know if somebody logs into the website, is Meta getting what we have seen they've gotten for some people, which is Christina's with her therapist. You might want to send him some ads right now about her mental health. And, so, we think that's very fair to ask for.

THE COURT: Okay. So, let me hear about burden?

MR. HAMMER: Oh, burden for BetterHelp, right there, yes.

THE COURT: So, this is consumer-facing --

MR. HAMMER: Yes.

THE COURT: -- only?

MR. HAMMER: Yes. So, one thing here that --

THE COURT: Because the burden argument by BetterHelp was very vague and not very persuasive, and apparently was about server side. We now know it's consumer side. Ms. Tusan has said exactly what it is that they're looking for. It's related to, you know, the TPL files plus the code. It's consumer-facing, so, not the super proprietary stuff, that is related to how the pixels are interacting with the website, correct, Ms. Tusan?

MS. TUSAN: Yes, yes, your Honor. That's accurate.

THE COURT: Okay. What is the burden on producing that?

MR. HAMMER: Your Honor, counsel was not super specific what they're seeking. What she said was they're looking for --

THE COURT: Now we know what it is.

MR. HAMMER: Well, she said, We're looking for source code related to consumer side website. And the -- what's critical there is --

THE COURT: Pixels, pixels on the consumer side Web --

MR. HAMMER: Yeah. What she's -- what I believe they're interested in and what I heard her say is they're looking for source code related to -- related to is key -- tracking technologies, pixels, on the consumer-facing source code.

Now, what's key there is the related to because the description that counsel just offered about how the website functions is an overly simplistic description. It is not just a matter of a single consumer-facing file. There is a whole architecture that goes into building a website in order for a consumer to interact with it, and that architecture draws upon a whole host of files.

And, so, the concern here because you -- you led, your Honor, with "I'm not quite certain what it is you're looking for."

THE COURT: Now I know better.

MR. HAMMER: We --

THE COURT: And, of course, it's harder for them to know because it's not their code. And I have to say the Defense side of the papers were a little vague.

MR. HAMMER: Our -- our concern and the reason there's still a very serious burden concern here is that to produce all documents related to the tracking technology in place could require the company to actually produce many many files over a multi-year period, not simply -- because

the -- the suggestion here is there's a single consumer-facing let's say file --

THE COURT: Have you met and conferred about what related to means? I mean, have you had the conversation to -- to see -- so, you know, I understand that's a scary phrase any time we see it. Related to can sweep in all manner of things, but if you haven't talked about it, then it's speculative.

MS. TUSAN: Your Honor, if I could clarify. I -- I don't need related to. I need the pixel source code on the page that gives consumer information. So, if I -- if they're thinking I'm asking for communications about source code or something else, I just want the source code on the consumer-facing website related to -- the pixel -- pixel source code.

THE COURT: Okay.

MS. TUSAN: The words "related to", what I meant by related to is comprising, consisting of the source code on the consumer-facing website that will tell us which pixels were where and what they were doing with their --

THE COURT: So, I'm going to ask you to dictate exactly what it is you want. The TPL files?

MS. TUSAN: Yes.

THE COURT: Plus? Give me the exact wording.

MS. TUSAN: Yes, your Honor. If you could just

give me a moment.

THE COURT: Sure.

MS. TUSAN: I think Professor Shippick explained it, and I don't -- I don't want to mis -- misstate it in a way that is -- is not clear. If you could just give me one -- one moment.

(Pause.)

MS. TUSAN: Okay. So, he described it as the Configuration Tacking Tags, and the configuration of the website involving the source code -- the pixel source code. So, I'm not sure if I explained that as clearly as I should, but -- but the tacking tags are the TPL ones we talked about.

THE COURT: So, the words you're now using are totally different.

MS. TUSAN: Okay. So, I'm going to -- I'm going to step it back because I think that's probably too technical. We're looking the pixels -- source code that comprises like -- I guess comprises -- it is the source code -- on the consumer-facing side of the website for the pixels that are placed on the pages to -- to capture information -- to share information via those pixels.

THE COURT: Source code on the consumer-facing side of the website for the pixels that? Sorry, say --

MS. TUSAN: Sorry. That -- that are used to

capture and share consumer information or interactions with website.

THE COURT: Share consumer interactions with website. Okay.

MR. HAMMER: Your Honor, that's the file we offered. That's the pixel technology TPL file.

THE COURT: Well, they explained that the TPL file itself is the -- and it sort of seems, right, the TPL file is a temperate file that -- that interacts with the source code, but it's not the source code itself. Am I --

MS. TUSAN: It's -- it's not -- it's part of it. It is some source code that will tell us, for example, a meta pixel, but it doesn't tell us on what page is that meta pixel firing, on what page is it, for example, capturing that the person says, I started the intake form. I've put on something about my mental health on question number one. It will tell you generally there's a source code, a metapixel is out there during a time period, but it doesn't tell us what we need to know, which is what is it -- what is it capturing or what is it sharing. That's the second piece of Professor Shippick's two pieces of the puzzle. You need both sides of that source code. They only offered us one, and during the meet and confer, we asked for the second side, and they said they wouldn't give it to us.

THE COURT: Okay. They have -- I am finding that

the Plaintiff has met Plaintiff's burden of showing that the information they're seeking is relevant and necessary to their -- the prosecution of their claim because they can't get it from other places. They can't get it from the Wayback Machine.

I -- I -- they've now described it in a -- and have explained that the TPL files don't do it. That only solves part of the puzzle, which is where are the pixels and when were they put there but not what they're collecting and what they're sharing, that there's other information which she has now described beyond the TPL files as source code on the consumer-facing side of the website for the pixels that are used to capture and share consumer interactions with the website. So, that's a pretty straightforward and, you know, not seemingly vague or overbroad description.

Now that we know exactly what they're looking for, is there a burden argument?

MR. HAMMER: Yes, there is, your Honor. And might I just briefly -- one of the problems here is the -- the -- the somewhat shifting description Plaintiffs are seeking.

So, for example, the description that was just said was the technology or the code that shows what is collected and shared.

THE COURT: Right.

MR. HAMMER: It does not show that, and the reason

the historic code doesn't show that is because it's not functioning. It will not show what is shared -- what is collected and shared. It will show what is -- what the code says, but I want to make clear that what they're asking for actually is what the Wayback Machine shows, because it's functioning. It's actually -- it actually replicates when a user -- how a user would interact with the website.

The static code that we would produce -- and I'll speak to burden momentarily -- would not actually show how a -- how a user -- it's static code. It wouldn't actually -- it's not connected to servers. It's not connected to data sources. This is in our papers.

And -- and the reason this is important is because my -- my concern is we're going to -- we're -- you know, I still would like to convince you there's a burden here but that we would be ordered to produce something and it's not going to be what they are seeking. And I think it's noteworthy that, you know, what our expert, Ben Jao (phonetic), attested to about what the Wayback Machine does was not disputed. That account of what is -- what information that provides, there was no response to that, and there's no response to that because that actually -- the information provided through that website does give them what it is that they're seeking.

THE COURT: So, are Plaintiffs seeking the actual

data or just the type of data?

MS. TUSAN: We -- we're seeking the source code, which tells the website what type of data to collect.

THE COURT: Okay.

MS. TUSAN: We're not seeking that, you know, on the Wayback Machine, if you go and enter in a name, you can see it. Sure. I mean, we're seeing does it have a get request, get consumer information that they started the intake questionnaire for, does it have that? We know that the source code, if it gives a command, that that's what the website does. That's what we're asking for. We're not asking for did Ms. Jones' information get shared? We're asking for the recipe for what it's -- what it's meant to share.

THE COURT: That does sound like source code, not the actual, you know, data that's being collected. They're not looking for that. Why wouldn't that be in the source code?

MR. HAMMER: Well, that -- that is different. Saying the static code, if that's what counsel's saying, that is different. The source code is status code, but it does not show what is shared to whom. It shows what the -- what the website -- how the website is programmed and --

THE COURT: Well, it -- it does -- it does -- it doesn't show that this person put in the name of this

therapist, right? But it does show that you're capturing that information the source code's asking for, whatever the input is, and sending it off, right?

MR. HAMMER: Well --

THE COURT: That's what they're looking for.

MR. HAMMER: It shows what it's asking for, but it doesn't show what it's capturing and sending off, because those functions are part of a -- you know, a functioning website.

THE COURT: Okay.

MS. TUSAN: We're -- we're happy to have an expert explain that that's how a pixel functionally works. So, yes, the -- we -- we want to know BetterHelp installs a pixel on its website. The source code says the pixel they installed has an instruction to get the following data. We have no problem having somebody else explain that how that functions and practices, once that happens, it takes the data and sends it to -- to Meta. That's -- that's a -- that's how pixels work. So, we're not asking for that part of it.

THE COURT: Is it fair to say that you're asking for what we're going to shorthand as the get code?

MS. TUSAN: Correct.

THE COURT: Okay. Now do we know what we're talking about? Is that --

MR. HAMMER: I -- well, in part, your Honor. And the other part -- and I apologize for -- I'm not trying to be difficult on this, but the -- the -- the vagueness in the request is still the underlying code that -- that builds the consumer-facing website. And my concern is that there will be a very serious burden in having to pull all of the files that go into building the consumer-facing -- what a consumer sees. I shouldn't say the consumer-facing code. It's -- what the consumer sees is -- you know, it is a collection of interrelated files. What's -- and the burden, your Honor, is what's articulated by -- by the declaration we submitted, which it is not the sort of streamline process that, you know, their expert in the abstract described. This has to do with the particular code that the company has in its possession and what will be required to go through, identify each particular file, and then manually download all versions of those files, which at this point --

THE COURT: Well, look, the -- the declaration was very vague, number one. Number two, we know it's not tailored to what -- you know, some of the tailoring has happened here on the spot. So, it's hard to say whether it's burdensome when you don't know what it was exactly that we're asking for.

So, I -- what -- what I'm -- there's two ways to go about this. I can -- I'm tempted to just order the parties

to have the experts talk to each other. They can speak the same language, what exactly is the get code, you know, what exactly -- so -- so, everybody knows what they're looking for. So then you know, you know, how long it takes to get it.

I -- I'm not -- it seems -- it does not seem persuasive at all that there'd be somebody who'd have to spend 17,000 hours pulling this. So, I -- I -- if you think there's a burden argument it's going to have to be way more convincing than that. It's going to have to explain exactly what you need to do and why it would take that long and why isn't it set up like any other modern day source code situation where you can pull it down much more easily.

MS. TUSAN: And -- and, your Honor, on that point, you know, our expert talked about GitHub or other similar formats that are used. The new production that they provided to us suggests they are using that exact -- and their deposition testimony suggests they are using that standard technology. And the coining in his declaration is no competent coder would individually download each file. It doesn't make any sense. The system is set up for anybody who knows how to do code to do an automated download. I mean, again, we aren't asking for your backend proprietary. And that's all their declarations talk to. And we specifically said in our meet and confer, You're telling us

it's 17,000 hours. We're not asking for that. Tell us how much time it takes you to get us what you're asking for, and counsel said, No, I disagree with you, that you're asking for everything, and, so, I'm not going to give you any more information. And, so --

THE COURT: What -- what do you think of my idea of having the experts talk to each other? Is that helpful or -- or --

MS. TUSAN: I mean, if -- if you -- I mean, if -- if you'd like our -- our -- I mean, yes, our expert I guess could come up with a more, you know, perfectly articulate way, description of exactly what we want. I'm just concerned that --

THE COURT: If this does it, if what you said does it --

MS. TUSAN: Yes.

THE COURT: -- it's pretty plain English.

MS. TUSAN: Right.

THE COURT: It seems like something that Mr. Hammer's client should be able to understand. I -- I'm going to find that it is relevant and necessary, but I'm going to hold open the question of burden, but it sure better be convincing because if you really -- you know, if there isn't a burden argument, just turn it over. You know, it's not -- the arguments you've been making today and the

arguments I read in the papers are more obfuscating than sort of helpful in -- in is this truly burdensome. So, we know what it is. I'll give you a chance to make a burden argument because we didn't know exactly what it was before today. I didn't. And reading the papers, my notes say, What exactly is the limited source code? What exactly are you looking for? We now have a statement, and I'm making a finding if they can show burden, they can do it. I -- I doubt they can, but I need to give them a -- a chance to show me because it wasn't articulated before.

MS. TUSAN: Okay. Your Honor, we have a timing issue. We just -- yeah, it -- so, if you could ask that they move --

THE COURT: Sure.

MS. TUSAN: -- quickly in being responsive. We -- we're in the middle of class cert and --

THE COURT: I want something filed by tomorrow at 5:00 with your burden argument because we now know what it is. So, hopefully, your engineers can say, Oh, that, you know, to get this code, it -- you know, whatever. It's either burdensome or it's not. And given the nature of the case, this goes to the heart of what the case is about. So, on the proportionality, you know, it seems like it's tailored to what's needed. It's not something that they can get elsewhere. It's not even -- you know, as the Defense

has said, it's not proprietary. This is a consumer-facing. They're not asking for the secret sauce.

So, to overcome that, we're going to have to see, you know, a pretty convincing big burden given -- you know, it's -- it's BetterHelp. It's also not a small mom and pop operation. I'm trying to give you the -- some guidance so that I don't have, you know, more disputes. Hopefully you can now take this and work it out, and sometimes it's about having the actual tech people talk directly to each other instead of going through a lawyer. Occasionally, that's been a helpful thing. If it's not, then it's not.

MR. HAMMER: Your Honor, may I just ask that we have at least until early next week? And the reason I ask that is because what I expect is going to happen is we'll get a description of -- you know, we have the description, and we'll have to go back and look at the code. My expectation from talking to the client is that in order to really ascertain all of the code that's at issue, is, in fact, going to take some time. And then, from there, they're going to need --

THE COURT: Well, they're saying that without even knowing what it is. So, first of all, you know, it's telling me something that you're telling me automatically your client's going to say that's burdensome. Why don't you actually look at it? I'll give you till the end of the day

on -- 5 o'clock on Monday to file something. Okay. Meet and confer with Ms. Tusan first before you file it because maybe you'll actually reach an agreement. And be prepared that if I rule against you, I'm going to make the production happen pretty quickly given where we are.

MR. HAMMER: And, your Honor, just to be clear, our intention here -- I mean, the motion did talk about all of the code. That's what we are responding to. The reason I did talk to the client is because we had their reply brief. It did -- it did include a description, a narrow description. I -- I still at the time -- it's now even been described in greater detail here. So, what I did was based on the description, I talked to the client. So, it's not as if there was a reaction -- you know, sort of a knee jerk reaction. It's a genuine attempt to ascertain what are we going to have to do here? I --

THE COURT: Well --

MR. HAMMER: -- hear you --

THE COURT: -- I'm just trying to tell you if -- if you have something, it better be way more convincing than what I -- I saw because, you know, it wasn't convincing at all. It was very conclusory and kind of not terribly persuasive.

If there's really an issue, a real burden issue that you can -- you know, in light of what Ms. Tusan has said

about what was produced even recently, if you can really show, No, this is a real problem, Judge, and we're putting it, you know, under oath to explain exactly what it would take and how long and -- and that you're, you know, meeting and conferring in the meantime so that there -- you know, you're not building in assumptions about what it is they're looking for, you should talk. Well, do you mean this? Maybe there's further refinements. And if it's really something that's truly burdensome, then maybe -- maybe there's an argument to be made. But, if not, you know, I think you see where I'm going with this. Okay. So, by the -- so, meet and confer. But by the end of -- of Monday, May --

THE CLERK: May 12.

THE COURT: -- 12th, 5 o'clock, if there's a dispute, then I want a -- let's make it a joint letter. It doesn't have to be long. It's solely on the question of burden. Okay. And on the Defense side, I want to have actual figures and facts, not just, you know, generalized statements about what it would take. Okay?

MS. TUSAN: Your Honor, could I just make one final point? With respect to the apps which are separate from the source code that they've argued, they didn't make -- the source code with respect to apps, they made -- they gave no response to our request for that. The burden only

relates to the website. And, so, we ask that you find the source code with respect to the app should be turned over. They didn't address that at all.

MR. HAMMER: Your Honor, my understanding is that the coding on the apps and there is the coding on the website, that's been stated in our discovery responses. We can confirm that, and to the extent, you know, there is a code specific to the app that needs to be produced, we would go about it in the same manner as with the website.

THE COURT: Okay.

MS. TUSAN: Your Honor, we -- we -- they didn't put any argument in about the app. So, we feel like that that's forfeited for them to now come up with a new burden argument. It's not fair to us.

THE COURT: I didn't -- I didn't see anything.

MR. HAMMER: Your Honor --

THE COURT: You want to point -- I have it here, so, if you -- if there's argument you want me to look at. I don't recall anything about that.

MR. HAMMER: Your Honor, the -- the way that this issue is teed up did not even put the source code for the app squarely at issue. You know, to produce -- to now be required to produce source code for apps separate and apart from the website, you know, we don't -- we don't think that would be appropriate. I don't know that our -- that our

briefs addressed it directly.

THE COURT: Well --

MR. HAMMER: But I will say that, you know, the -- the website and the Wayback Machine provides them with the primary information that they've been seeking.

MS. TUSAN: The Wayback Machine doesn't cover the apps.

THE COURT: Ms. Tusan, point me in your opening brief where you talk about the source code and the apps?

MS. TUSAN: Sure. On page two, let's see, we talk about:

> "As part of the meet and confer, Plaintiffs requested BetterHelp produce" --

THE COURT: What line are you on?

MS. TUSAN: Sorry. Page two, starting at line two:

> "As part of the meet and confer requested BetterHelp produce change log data and any advanced developed information and source code for BetterHelp websites and apps which could collectively be used to identify it as set forth in it. Plaintiffs have exchanged numerous emails, et cetera."

So, we talk about -- and then the next paragraph:

"BetterHelp has admitted it will help demonstrate when and where tools were installed on BetterHelp's website and apps, as well as what information -- what information was configured."

And then we go on to talk about the website and apps. So, we're -- we're asking for both parts of the information.

THE COURT: Okay. And where in your opposition do you talk about the apps?

(No response.)

THE COURT: Did you build it into the -- is that part of the -- of anything here or is it separate?

MR. HAMMER: Well --

THE COURT: Because you've got line three, page one.

MR. HAMMER: Your Honor, I mean, given that the apps mirror the website, I mean, it is -- it is part of the same argument because it's the same code that underlies both.

THE COURT: Okay.

MR. HAMMER: Why there would be -- you know, sort of be an end run around it --

THE COURT: Okay.

MR. HAMMER: -- focusing on the apps, I don't see

why. That would be --

THE COURT: That's fair enough. It's not --

MS. TUSAN: But the Wayback doesn't -- we can't use the Wayback to prove the apps is the point, at all.

THE COURT: Well --

MS. TUSAN: So, we have nothing.

MR. HAMMER: If -- I would -- I would love to talk more about the Wayback Machine and why it's helpful in this situation, but I -- as I understand --

THE COURT: Does it apply to the apps?

MR. HAMMER: It does not apply to the apps.

THE COURT: Okay. So, they have no way of getting it as --

MR. HAMMER: Through the Wayback Machine, that's correct.

THE COURT: Yeah.

MR. HAMMER: It does not reflect the apps.

THE COURT: Okay. So, actually, they have a greater need even --

MR. HAMMER: Well, your --

THE COURT: -- for the apps.

THE COURT: -- your Honor, except that the apps mirror the website. So, you know, it's -- it's really -- it's one mirrors the other. You get it through the website. You get it -- you get what's reflected on the apps as well.

MS. TUSAN: We -- we don't have any evidence of that. I mean, the -- they're not --

THE COURT: Okay. I --

MS. TUSAN: I mean, if they're -- yeah. I mean, he's just saying that. I don't -- I don't know that that's true.

THE COURT: I mean, I don't -- I --

MS. TUSAN: I mean, I don't have the source code. So, there might be something different that they do with the STK file on the apps versus what's on the website. I don't think we can accept counsel's representation on that.

THE COURT: Why don't we go ahead and so -- so, whatever you do between now and Monday, include the source code about the apps, just so we -- you know, we know is there some additional burden there or not, and I'm not going to treat it as waived because it's not entirely -- I -- I get that you raised it, but I also understand that it's sort of a similar issue on the Defense side, website versus apps. So, I'm going to let them go ahead and show burden. They -- but, you know, I've -- I think I've expressed my concerns about the Defense position. I've expressed exactly how careful and -- and specific and convincing they need to be, if they really think there's a burden. I am strongly urging you to consider not -- just -- just go ahead and produce it if it's not a convincing burden argument because it -- you

know, otherwise, you bring something -- fly something up again that's not very convincing in some dispute down the road. You're not going to have much credibility. So, there's a reason to be -- to be just thoughtful about how BetterHelp is approaching this, and if -- if there is really a burden and you can explain it, I will listen, okay, or at least I'll read about it. But please tell your client that it should be prepared to produce things quickly. So, it -- just, you know, don't -- don't wait for a ruling. It -- it should get itself in the ready position in case it gets ruled against, which, you know, I've already found half of it. I've found the relevance and the necessity. So, and you know ahead of time that I'm going to be giving them quick deadlines. So, might as well prime them on that. Okay?

MR. HAMMER: Yeah -- yes, your Honor. And can I just note one thing? There is a reference to the 51 documents that were recently produced. It doesn't sound as if that's factoring into your decisions before you. We disagree with the description. I won't get into it further unless your Honor would like to hear about that.

THE COURT: No. I don't -- I don't need to. I think what I'd like you to take a look at is one thing she mentioned. And, of course, I'm not really on burden right now, but she said, Look, based on what we saw in the recent

production, they may well be using something like GitHub. So, it's just information for you to take back to your client, Mr. Hammer, to say, Hey, you know, how is this working and is there a quick -- quicker way to download this? But, no, it's not factoring into my decision today. Okay.

All right. Thank you. We're concluded.

(Proceedings adjourned at 3:44 p.m.)

CERTIFICATE OF TRANSCRIBER

I certify that the foregoing is a true and correct transcript, to the best of my ability, of the above pages of the official electronic sound recording provided to me by the U.S. District Court, Northern District of California, of the proceedings taken on the date and time previously stated in the above matter.

I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this hearing was taken; and, further, that I am not financially nor otherwise interested in the outcome of the action.



Echo Reporting, Inc., Transcriber

Monday, June 2, 2025