LIVIA M. KISER (SBN 285411)
*lkiser@kslaw.com*
JEFFREY HAMMER (SBN 264232)
*jhammer@kslaw.com*
CRAIG H. BESSENGER (SBN 245787)
*cbessenger@kslaw.com*
JAMES A. UNGER (SBN 325115)
*junger@kslaw.com*
**KING & SPALDING LLP**
633 West Fifth Street, Suite 1600
Los Angeles, California 90071
Telephone: +1 213 443 4355
Facsimile: +1 213 443 4310

Attorneys for Defendant
BETTERHELP, INC.

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**IN RE BETTERHELP, INC. DATA DISCLOSURE CASES**

This Document Relates To:

All Cases/

Case No. 3:23-cv-01033-RS

**REDACTED**

**BETTERHELP, INC.'S MOTION TO EXCLUDE TESTIMONY OF ERIC KRAUSE**

[*Declaration of Jeffrey Hammer and Exhibits thereto; and [Proposed] Order filed concurrently herewith*]

Date: November 20, 2025
Time: 1:30 p.m.
Courtroom: 4
Judge: Hon. Richard Seeborg

# TABLE OF CONTENTS


I. INTRODUCTION ..... 2

II. KRAUSE'S DAMAGES OPINION ..... 3

III. LEGAL STANDARD ..... 4

IV. KRAUSE'S OPINION IS UNRELIABLE AND SHOULD BE EXCLUDED ..... 6

A. Krause Valued Information that Is Not Even at Issue ..... 6

B. There Is No Market for Individuals to Sell Their Information ..... 7

C. Krause Did Not Use Comparable Data for His "Market Valuation" ..... 7

(1) Data Deletion Services ..... 8

(2) Li Study ..... 9

(3) 2017 Ponemon Institute Study ..... 10

(4) 2017 Trustwave Study ..... 11

(5) 2019 EY Study ..... 12

D. Krause Did Not Use Any Methodology to Deduce His $200 Estimate ..... 13

E. Krause's Identical Valuations in Other Cases Confirms His Opinion Is Arbitrary ..... 14

V. CONCLUSION ..... 15

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arrow Elecs., Inc. v. Quantum Corp.*,
2024 WL 5440992 (N.D. Cal. Dec. 27, 2024) .......... 14

*Boucher v. U.S. Suzuki Motor Corp.*,
73 F.3d 18 (2d Cir. 1996) .......... 8

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
509 U.S. 209 (1993) .......... 5, 7

*Daubert v. Merrell Dow Pharm., Inc.*,
509 U.S. 579 (1993) .......... 5

*Ellis v. Costco Wholesale Corp.*,
657 F.3d 970 (9th Cir. 2011) .......... 5

*Engilis v. Monsanto Co.*,
--- F.4th ----, 2025 WL 2315898 (9th Cir. 2025) .......... 4, 5

*Gen. Elec. Co. v. Joiner*,
522 U.S. 136 (1997) .......... 5, 13

*Klein v. Meta Platforms, Inc.*,
766 F. Supp. 3d 956 (N.D. Cal. 2025) .......... 13, 14

*Koger v. Costco Wholesale Corp.*,
No. 20-cv-08759-JD, 2023 WL 8188842 (N.D. Cal. Nov. 27, 2023) .......... 5

*Kuzma v. N. Arizona Healthcare Corp.*,
607 F. Supp. 3d 942 (D. Ariz. 2022) .......... 7

*Lust v. Merrell Dow Pharms., Inc.*,
89 F.3d 594 (9th Cir. 1996) .......... 6

*Ollier v. Sweetwater Union High Sch. Dist.*,
768 F.3d 843 (9th Cir. 2014) .......... 5, 6

*Raskin v. Wyatt Co.*,
125 F.3d 55 (2d Cir. 1997) .......... 7

*Wal Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011) .......... 5

*Weisgram v. Marley Co.*,
528 U.S. 440 (2000) .......... 2, 5

*York v. BNSF Ry. Co.*,
2019 WL 764574 (D. Colo. Feb. 21, 2019) .......... 14

**Other Authorities**

*DeleteMe*, https://joindeleteme.com/ .......... 8

Fed. R. Evid. 702 .......... 2, 4, 5

Fed. R. Evid. 702(a) .......... 6

https://incogni.com/ .......... 9

https://privacybee.com/pricing/ .......... 9

https://www.deleteme.com/pricing-update/ .......... 9

*Privacy Bee*, https://privacybee.com/how-it-works .......... 8

## NOTICE OF MOTION AND MOTION

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

NOTICE IS HEREBY GIVEN that on November 20, 2025 at 1:30 p.m., in the above-entitled Court, located at 450 Golden Gate Avenue, San Francisco, California, 94102, in Courtroom 3 – 17th Floor, Defendant BetterHelp, Inc. ("BetterHelp") will and hereby does move the Court to exclude the opinions reflected in the Expert Report of Eric Krause (ECF No. 170-11). This Motion is based on this Notice, the accompanying Memorandum of Points and Authorities, the Declaration of Jeffrey M. Hammer and exhibits thereto, the accompanying Request for Judicial Notice, all pleadings, papers, and records on file in this lawsuit, and any oral argument and papers as may be presented at or before the time of adjudication of this Motion.

## STATEMENT OF RELIEF SOUGHT

BetterHelp seeks an order excluding Mr. Krause's opinion pursuant to Federal Rule of Evidence 702.

Dated: September 15, 2025

Respectfully submitted,

*/s/ Livia M. Kiser*

**KING & SPALDING LLP**
LIVIA M. KISER (SBN 285411)
*lkiser@kslaw.com*
JEFFREY HAMMER (SBN 264232)
*jhammer@kslaw.com*
CRAIG H. BESSENGER (SBN 245787)
*cbessenger@kslaw.com*
JAMES A. UNGER (SBN 325115)
*junger@kslaw.com*

Attorneys for Defendant
BETTERHELP, INC.

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I. INTRODUCTION

Plaintiffs' damages expert, Eric Krause, is a professional damages expert who, before being retained in a different pixel tracking case in September 2024, had never attempted to value individuals' personal information. Since then, Krause has rendered the identical copy-and-paste opinion based on the exact same cherry-picked "data points" in at least six different lawsuits, including this one: that a "conservative" estimate of the fair market value of the limited categories of personal information and "patient status" allegedly disclosed by Defendant BetterHelp, Inc. ("BetterHelp") is $200 (two hundred dollars) per user.

Krause's opinion fails to meet the "exacting standards of reliability," *Weisgram v. Marley Co.*, 528 U.S. 440, 455 (2000), under Federal Rule of Evidence 702 for numerous reasons and must be excluded.

***First***, Krause valued the wrong information—data that is not even claimed to have been wrongfully shared. Krause erroneously included in his valuation users' email addresses and the information users entered when creating their BetterHelp accounts. But Professor Zubair Shafiq (Plaintiffs' technical expert) did *not* opine that this information was allegedly shared. By including this extraneous information in his valuation, Krause's opinion is necessarily unreliable.

***Second***, a fair market value is the amount a willing buyer would pay a willing seller for the asset in an arm's-length transaction, yet Krause admits that there *is no market* for individuals to sell personal information of the type at issue even to a willing buyer. Because there is no market for individuals to sell their personal information, Krause's opinion about what a fictional buyer would pay for a class member's information in a fictional market cannot be accurate and is thus unreliable.

***Third***, Krause based his valuation on cherry-picked "data points" that are in no way comparable to the (so-called) fair market value of the data at issue—including fees charged by data deletion services, self-reported costs associated with data breaches (including forensic investigation, legal fees, and customer support), and the value of robust medical records derived from the overall value of the healthcare companies that own the records.

***Fourth***, Krause did not use *any* methodology to deduce his $200 estimate based on these

"data points." Krause did not weight certain comparators more than others, did not conduct any calculation, and did not offer any rationale for arriving at $200 other than his say-so.

***Fifth***, Krause's opinion is nothing more than a copy-and-paste of the *identical opinion* he offered in five other pending pixel tracking class action lawsuits. Krause offered *the exact same* $200-per-user valuation in those other cases based on the exact same cherry-picked data points, and has since repurposed the same opinion in four other lawsuits and this one as well. This confirms that Krause's opinion is not a neutral analysis based on the facts of the case, but rather a foreordained, results-driven conclusion that must be excluded.

For these reasons and as further discussed below, the Court should exclude Krause's opinion.

## II. KRAUSE'S DAMAGES OPINION

Krause is a consultant who spends the majority of his time providing expert opinions in litigation. Declaration of Jeffrey M. Hammer ("Hammer Decl."), Ex. B ("Krause Tr.") at 19:14-18. Prior to providing a damages opinion in September 2024 in another pixel tracking class action lawsuit, he had zero experience attempting to value personal information even remotely similar to the type of information at issue in this litigation.[1] *Id.* at 19:19-21:11.

Here, Krause assumed that the opinions reflected in Professor Shafiq's report were accurate and opined that the alleged economic damages for Plaintiffs and putative class members can be measured as the "fair market value of the personal information and non-public medical information" allegedly transmitted to third parties, and the value "in this matter is $200 per user." ECF No. 170-11, Ex. A[2] ("Krause Rpt.") at ¶ 68. The "personal information" Krause valued was the user's (i) account identifier, (ii) device identifier, (iii) IP address, and (iv) email address. Krause Rpt. at ¶ 65; Krause Tr. at 62:3-18. The "non-public medical information" Krause valued was limited to the fact that the user completed an intake questionnaire, *i.e.*, that the user signed up to use the BetterHelp service, or what Krause referred to as "patient status." Krause Rpt. at ¶ 65;

[1] As discussed in Section IV.E, *infra*, these other lawsuits in which Krause provided opinions involve hospital defendants and different categories of personal information.

[2] Krause's Report is reattached for convenience as Ex. A to the Hammer Declaration.

Krause Tr. at 66:15-69:10.[3] The information that Krause valued is collectively referred to as the "At-Issue Data."

To arrive at his $200 "fair market valuation," Krause referred to the following "data points": (1) the fees charged by four services that are in the business of deleting data that are already in the possession of third parties, Krause Rpt. at ¶ 47; (2) a 2021 academic study that aimed to elicit individuals' subjective valuation of four categories of personal data, *id.* at ¶¶ 49-51; (3) a 2017 surveys of unidentified organizations' estimates of the cost of responding to data breaches (e.g., forensic investigation, legal fees, customer support); (4) another 2017 survey of unidentified organizations' estimate of, among other things, the costs associated with data breaches; and (5) the supposed value of detailed patient records for six companies involved in various aspects of the healthcare industry, based on a 2019 Ernst & Young ("EY") study. As discussed below, the information considered in each of these "data points" is not comparable to the At-Issue Data.

Krause admitted that there is no market for individuals to sell the At-Issue Data, Krause Tr. at 72:10-73:10, yet nonetheless opined that $200 is a conservative estimate of what a willing buyer would pay a willing seller in an arm's-length transaction. Krause did not apply any methodology or framework to arrive at this figure—he simply identified the data points and jumped to his magic $200 estimate. *Id.* at 144:11-146:3. Tellingly, Krause formed the identical opinion in five other pending lawsuits involving pixel tracking technologies based on the identical "data points," despite the significant differences between the allegations in this case and those other lawsuits. *See* Section IV.E, *infra.*

## III. LEGAL STANDARD

Federal Rule of Evidence 702 governs the admissibility of expert testimony, which "always" requires the proponent to "establish the admissibility criteria of Rule 702 by a preponderance of the evidence." *Engilis v. Monsanto Co.*, --- F.4th ----, 2025 WL 2315898, at *6

[3] [redacted]

(9th Cir. 2025). Given that burden, "there is no presumption in favor of admission." *Id.* Rule 702 permits the introduction expert testimony only if: "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702. The rule "does not permit the expert to make claims that are unsupported by the expert's basis and methodology." *Id.*, advisory committee note.

"The touchstones for admissibility under Rule 702 are the relevance and reliability of the expert witness's opinions." *Koger v. Costco Wholesale Corp.*, No. 20-cv-08759-JD, 2023 WL 8188842 at *1 (N.D. Cal. Nov. 27, 2023). In making this determination, courts examine "'whether the reasoning and methodology underlying the testimony is scientifically valid' and 'whether that reasoning or methodology properly can be applied to the facts in issue.'" *Id.* (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592-93 (1993)).

District courts play a critical "gatekeeper" role regarding expert testimony and "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Id.* at 597. Expert testimony must meet "exacting standards of reliability." *Weisgram*, 528 U.S. at 455. In evaluating the reliability of expert testimony, the Court must "assess 'whether the reasoning or methodology underlying the testimony' is valid" and "can be applied to the facts in issue." *Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 860 (9th Cir. 2014) (quoting *Daubert*, 509 U.S. at 592-93). Opinions that lack a reliable factual foundation should be excluded. *See Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993) (expert opinion must be "supported by sufficient facts to validate it in the eyes of the law"). Expert opinions cannot be "connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); *see also Daubert*, 43 F.3d at 1316 ("[T]he expert's bald assurance of validity is not enough.").

The *Daubert* standard applies when assessing admissibility of expert opinions at the class certification stage. *Wal Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349-50 (2011); *Ellis v. Costco*

*Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011). "It is the proponent of the expert who has the burden of providing admissibility." *Lust v. Merrell Dow Pharms., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996).

## IV. KRAUSE'S OPINION IS UNRELIABLE AND SHOULD BE EXCLUDED

### A. Krause Valued Information that Is Not Even at Issue

As an initial matter, Krause's opinion will *not* "help the trier of fact to understand the evidence or to determine a fact in issue," Fed. R. Evid. 702(a), because it does not apply to the facts in issue. *See Ollie*, 768 F.3d at 860 (courts must "assess whether the reasoning or methodology underlying the testimony . . . can be applied to the facts in issue"). Krause purported to value user information that differs significantly from the information that Shafiq opined was allegedly disclosed to third parties. Based on Krause's understanding of Shafiq's opinion, Krause included five categories of information in his valuation: (i) account identifier, (ii) device identifier, (iii) IP address, (iv) email address, and (v) the fact that the user completed an intake questionnaire. Krause Rpt. at ¶ 65 (citing Dkt. No. 170-10, Ex. A ("Shafiq Rpt.") at ¶ 13); Krause Tr. at 62:3-18. But Shafiq did <u>not</u> opine that users' email addresses and "account identifier" (as Krause understood account identifier) were disclosed.

As to email addresses, Shafiq opined that various user "identifiers" were shared (which BetterHelp disputes), but these identifiers do not include email addresses. Shafiq Rpt. at ¶ 13.

As to account identifier, Shafiq explained in his report that a user's "account identifier" is the unique number that associates the user with his or her third-party account (*e.g.*, Meta, Google), to the extent the user has an account. Shafiq Rpt. at ¶¶ 29, 35.d; *see id.* at ¶ 36.d ("Facebook founder Mark Zuckerberg's account identifier is 4."). Krause, however, incorrectly understood account identifier to be a "summary term of the types of information associated with" a user's BetterHelp account, including "all the information that [a user] set[s] up when they do the questionnaire" to create a BetterHelp account and the "various profile information that gets associated with the account." Krause Tr. at 62:19-63:3, 63:17-64:12.

In other words, Krause valued information *different* from, and much more expansive than, what Shafiq opined (and Plaintiffs claim) was disclosed. This significant discrepancy would have

a dramatic impact on the valuation, as Plaintiffs do *not* claim that their email addresses and "profile information" (as Krause understood it) was disclosed, and the other information that *was* allegedly disclosed (device identifier, IP address, and the fact that the user completed an intake questionnaire) is extremely limited. Krause's "analysis rests on faulty assumptions" and must be excluded. *See Raskin v. Wyatt Co.*, 125 F.3d 55, 67-68 (2d Cir. 1997).

**B. There Is No Market for Individuals to Sell Their Information**

Krause's opinion must also be excluded because it is based on a false assumption: that there is a market for individuals to sell the type of personal information at issue to a willing buyer. *See Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993) (expert opinion must be "supported by sufficient facts to validate it in the eyes of the law").

[redacted] *see also Kuzma v. N. Arizona Healthcare Corp.*, 607 F. Supp. 3d 942, 947 (D. Ariz. 2022) ("Fair market value is generally defined as 'the price a willing buyer would pay a willing seller . . . when neither is under compulsion to buy or sell.'") (citation omitted).

Krause admits, however, that there *is no market* for individuals to sell personal information of the type at issue to a willing buyer. Krause Tr. at 72:17-73:10; Report of Professor Natalie Mizik at ¶ 25.[4] Thus, none of the data points that Krause relies upon involve a willing buyer or a market transaction. Indeed, as discussed below, none even involve the type of information that Krause purportedly valued. *See* Section IV.C, *infra*. Because there is no market for individuals to sell the information either alleged to be in issue in this case or based on Mr. Krause's erroneous understanding, Krause's opinion about what a fictional buyer would pay for a class member's information in a fictional market is unreliable. Because Krause's opinion

**C. Krause Did Not Use Comparable Data for His "Market Valuation"**

Krause selected his $200 "fair market valuation" with reference to the "data points" discussed below. The data points on which Krause relies, however, are in no way comparable to

[4] BetterHelp submits concurrently the report of retained expert Professor Natalie Mizik, who also is not aware of a market for individuals to sell the At-Issue Data.

the At-Issue Data. Krause's "apples and oranges comparison" requires the exclusion of his opinion. *See Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996).

**(1) Data Deletion Services**

Krause considered fees charged by four services that are in the business of deleting data that are already in the possession of third parties. Krause Rpt. at ¶ 47. Each of these services remove already-disclosed personal information from databases owned by data brokers, people search sites, credit check companies, and similar companies who then sell this information. *Id.* Krause claims that the fees for these services reflect an individual's *willingness-to-pay to protect* their personal information and, according to Krause, are relevant to the amount a willing buyer would pay an individual for the At-Issue Data. Krause Rpt. at ¶ 47.

The fees for these services are not relevant comparators for several reasons.

*First*, these services offer the deletion of information already available to third parties, Krause Tr. at 86:12-87:5, and have no connection whatsoever to what a buyer would be willing to pay for the At-Issue Data in an arm's-length transaction (particularly where Krause concedes no buyer would want to buy it).

*Second*, the services Krause selected offer the removal of information, such as purchase history, employment information, financial information, social media information, and demographic information, none of which are among the data at issue in this matter (*e.g.*, IP address, device properties).[5] [redacted]

*Third*, unlike the deletion of already available information, there are *no-cost* actions that individuals can (and do) take to prevent the disclosure of the At-Issue Data from the get-go when they choose to do so, *see* Report of Ben Zhao at ¶¶ 40-41 (discussing data privacy practices and use of privacy-enhanced browsers), which Krause did not consider, Krause Tr. at 80:2-14, 81:19-82:6, and which further confirms that his reliance on data deletion services is arbitrary and inapt.

---

[5] *See Privacy Bee*, https://privacybee.com/how-it-works (indicating that full name, phone number, financial data, address, employer, and email address can be deleted), *last visited* Aug. 13, 2025; *DeleteMe*, https://joindeleteme.com/ (indicating that name, age, current and former addresses, phone number, relatives, occupation, property value, marital status, and email addresses can be deleted), *last visited* Aug. 13, 2025.

*Fourth*, the specific services and fees that Krause selected are completely arbitrary. Krause selected Privacy Bee ($197 per year), DeleteMe ($129 per year), Incogni ($179 per year), and ReputationDefender ($99 per year), Krause Rpt. ¶ 47, but ignored other deletion service providers without explanation and also selected certain coverage levels for each service without explanation, while ignoring more affordable coverage levels.[6] To be clear, none of these services is an appropriate proxy for a non-existent market, but even his inapt choices make no sense.

**(2) Li Study**

Krause also considered the estimates provided by a single academic publication, Li et al. (2021) (the "Li Study"). Krause Rpt. at ¶¶ 48-49; Hammer Decl., Ex. C. The Li Study aimed to elicit individuals' valuation of four categories of personal data—direct identifiers (i.e., full name, phone number, email address, home address), quasi-identifiers (i.e., date of birth, five-digit zip code), non-private information (i.e., age, gender, race/ethnicity, zip code's first three digits, marital status, years of education, occupation), and private information (i.e., income, credit scores). Hammer Decl., Ex. C at 6-7, Table 1. The authors conducted a generalized second-price auction experiment in which participants were told that a buyer was interested in purchasing their personal data and had a budget of $500 per category to do so, and were asked to bid, for each data category, a price which they would be willing to sell such data. *Id.* at 12-13. The authors found that study participants' subjective valuations of the four data categories ranged between $78.91 and $117.78, and that the valuation of the combination of all four data categories was $189.40. *Id.* at 7, 12, Table 3. Krause took the combined valuation for all four data categories of $189.40 as one of his "data points" for estimating the value of personally identifiable information in the At-Issue Data.

Krause's reliance on this figure is unwarranted for several reasons.

*First*, the $189.40 figure is the self-reported value at which study participants would be willing to sell their personal data where they are told there was a $500 budget per data category, and thus has no relevance to what a buyer would willingly pay for the At-Issue Data.

[6] For example, PrivacyBee offers a range of options from $96 to $799/year, *see* https://privacybee.com/pricing/, *last visited* Aug. 13, 2025, DeleteMe offers a range of options from $19.99 to $499.99/year, *see* https://www.deleteme.com/pricing-update/, *last visited* Aug. 13, 2025, and Incogni offers a $96/year option, *see* https://incogni.com/, *last visited* Aug. 13, 2025. *See also* Mizik Rpt. at ¶¶ 50-52.

*Second*, the Li Study included numerous categories of information that are not included in the At-Issue Data, including date of birth, education, occupation, and credit score, among others. Ex. C at 6, 29, Table 1.

*Third*, Krause's choice of the $189.40 estimate as the comparative "data point" for valuing the At-Issue Data is wholly arbitrary. Krause did not explain why he chose to consider this figure rather than, for instance, the $89.76 value estimated by the Li Study for direct identifiers, or the $88.94 figure estimated for quasi-identifiers. Ex. C at 31, Table 3.

**(3) 2017 Ponemon Institute Study**

Krause also considered the results of a 2017 study conducted by the Ponemon Institute, which analyzed the cost of data breaches to the breached organization in multiple countries and regions, including the U.S. Krause Rpt. at ¶¶ 52, 56; Hammer Decl., Ex. D. The Ponemon Institute interviewed key employees working in areas related to information technologies, compliance, and information security in 419 organizations affected by data breaches in the previous 12 months, and collected information about direct costs (e.g., engaging forensic experts, outsourcing hotline support) and indirect costs (e.g., in-house investigations and communications, extrapolated value of customer loss) related to the data breach. Based on this information, the authors estimated that the cost of data breaches to the breached organizations in the U.S. in 2017 was $225 per lost or stolen record, and that indirect costs accounted for $146. Ex. D at 1-2, 7-8, 18. Krause took the $225 figure as one of his "data points" for estimating the value of the At-Issue Data. Krause Rpt. at ¶ 52.

As with the other "data points" Mr. Krause uses, the $225 estimated in the 2017 Ponemon Institute Study has no connection to the At-Issue Data in this matter.

*First*, $225 is the estimated *cost* for the breached organizations to resolve the data breach, which have no relationship at all to the market price that a buyer would pay an individual in a hypothetical market for the At-Issue Data.

*Second*, the data involved in the data breaches analyzed in the 2017 Ponemon Institute Study are dissimilar to the At-Issue Data. For instance, the data involved in these data breaches included a retail company's records that include individual's names and credit card information, and a health

insurer's records that include policyholders' physician and payment information. Ex. D at 7.

*Third*, the authors of the 2017 Ponemon Institute Study acknowledged that the results of the study are "non-statistical," that "[s]tatistical inferences, margins of error and confidence intervals cannot be applied to these data given that [their] sampling methods [were] not scientific." Ex. D at 33. The absence of any scientific methodology makes this study unreliable out of the gate.

**(4) 2017 Trustwave Study**

Krause also considered the results of a 2017 study by cybersecurity company Trustwave, Krause Rpt. at ¶ 57, which aimed to examine the value placed on different types of data, including personally identifiable information, by "data controllers" (i.e., organizations that own and have responsibility for the data) among other stakeholders, Ex. E at 2-3. The authors conducted a survey of 500 senior IT managers in Australia, Canada, Japan, the U.K., and the U.S. and asked them about their estimate of the value of the data their organizations held in terms of both "the profit [the] data can bring to their business and … the risk of its compromise," including "potential legal costs." *Id.* at 2-5. For the 61 respondents who were most concerned about "patient" information, they gave an average value of $1,546 per record. *Id.* at 7. Krause took the $1,546 figure estimated in the 2017 Trustwave Study for the value of a data record related to patients as a "data point" to estimate the "premium" associated with information about the so-called "patient status" (*i.e.*, the fact that a user completed the intake questionnaire). Krause Rpt. at ¶¶ 57-58.

As with the other "data points," the 2017 Trustwave Study is wholly disconnected from the facts of this case.

*First*, the results of the 2017 Trustwave Study refer to the value of data estimated by organizations that own the data in terms of profit the data can bring and the risk of its compromise, which is different from the price that an individual could obtain in a hypothetical market for the At-Issue Data. Ex. E at 3.

*Second*, the Trustwave Study does not indicate what particular information was being valued. The 61 organizations at issue are involved in sectors such as "financial services (e.g., companies that sell medical insurance), retail (e.g., pharmacies), hospitality (e.g., care homes and private healthcare), and industrial (e.g., clinical trials of medical equipment)," Ex. E at 7, and there

in no basis to conclude that their "patient" information is at all similar to the At-Issue Data.

*Third*, the Trustwave Study provides no explanation as to how the respondents arrived at their valuations. *See* Ex. E at 7. There is no indication that the respondents used *any* methodology to arrive at their estimates, let alone a reliable methodology or something more than guesswork.

**(5) 2019 EY Study**

Krause also considered a 2019 study by EY that estimated the value of the U.K.'s National Health System's patient data using, among others, a market-based approach. Krause Rpt. at ¶ 60; Ex. F. As part of this study, EY considered the valuation of 98 healthcare companies and divided such value by the company's number of health records. Ex. F at 14. From this set of 98 companies, Krause selected a subsample of six that had an average estimated value per record of $2,048.67, with a minimum of $12.91 and a maximum of $9,254.18. Krause Rpt. at Ex. 1. Krause further noted that "the values implied median average value of medical records in the sample is approximately $155.51 per record, with a range from a lower quartile of $56.46 to an upper quartile of $2,056." *Id.* at ¶ 60. Krause relied on these figures to estimate the "premium" associated with a user's "patient status." Krause Rpt. at ¶ 63.

As with Krause's other "data points," the EY Study is disconnected from the facts the of the case and unreliable.

*First*, Krause's selection of six companies out of 98 from the 2019 EY Study is arbitrary; Krause provides no legitimate explanation for his selection of the six and omission of the others.

*Second*, the patient files held by the six companies are much richer than and differ significantly from the At-Issue Data. They include companies with assets related to primary care data;[7] secondary, tertiary, or specialty care data;[8] genomic data;[9] and oncology data.[10] The data includes specific and longitudinal patient medical data as opposed to mostly one-word responses

[7] OptumInsight (UnitedHealth Subsidiary) and AllScripts Healthcare Solutions, Inc. *See* Krause Rpt., Ex. 1; Hammer Decl., Ex. F (2019 EY Study) at 24.
[8] IQVIA Holdings Inc. and Inovalon Holdings Inc. *See* Krause Rpt., Ex. 1; Hammer Decl., Ex. F (2019 EY Study) at 25.
[9] Nebula Genomics Inc. *See* Krause Rpt., Ex. 1; Hammer Decl., Ex. F (2019 EY Study) at 26.
[10] Tempus. Krause Rpt., Ex. 1; Hammer Decl., Ex. F (2019 EY Study) at 27.

to a questionnaire provided by a platform that connects users to therapists.[11]

*Third*, the 2019 EY Study makes no attempt to isolate the value of patient data from the other assets the company holds, and thus the findings confound the value of the data held by the companies with the value of other assets they may have. *See* Mizik Rpt. at ¶ 81. Krause concedes that relying on the valuation of whole companies rather than the relevant data assets is a limitation of the 2019 EY Study but still concludes, without explanation, that "[n]onetheless, in combination with the findings from the Trustwave report, this finding underscores the enhanced value associated with personal medical and health data." Krause Rpt. at ¶ 61.

*Fourth*, the broad range of values among the six companies that Krause selected—from a minimum of $12.91 and a maximum of $9,254.18—confirms that the median value of $155.51 on which Krause relied is unreliable. *See* Krause Rpt., Ex. 1.

* * *

Krause selected these figures based only on his say-so, but "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec., Co.*, 522 U.S. at 146. "[T]here is simply too great an analytical gap between the data and the opinion proffered," *id.*, and thus the opinion must be rejected.

**D. Krause Did Not Use Any Methodology to Deduce His $200 Estimate**

Courts also "look[] at whether the reasoning and methodology underlying the testimony is scientifically valid and whether that reasoning or methodology properly can be applied to the facts in issue." *Klein v. Meta Platforms, Inc.*, 766 F. Supp. 3d 956, 961 (N.D. Cal. 2025) (excluding expert opinion). Here, Krause's opinion is based on nothing more than his *ipse dixit* and must be excluded.

Krause did not apply *any* methodology to deduce his $200 estimate. Instead, Krause (i) took the five figures listed above—$99, $129, $179, $197, $189.40, and $225—as "observations" that would be informative for estimating a "reasonable valuation for an individual's personal

11 [redacted]

information," Krause Rpt. at ¶¶ 67-68. Krause relied on two additional sources of information to identify "data points"— $75, $380, $1,546, and $12.91–$9,254.18—to conclude that a "premium" should be applied for the value of what he calls "patient status" (i.e., the mere fact that a user completed the Intake Questionnaire). *Id.*

Krause did not use any methodology to arrive at a $200 fair market value based on these "data points" or "observations." Krause admitted that he did not do any computation, analysis, or weighting of these various "data points" to arrive at his $200 estimate. Krause Tr. at 144:11-146:3. It was merely "based on [his] opinion." Krause Tr. at 144:13. Krause did no more than arbitrarily pick a number based on "data points" that, as discussed above, are unreliable. His opinion must be excluded. *See Arrow Elecs., Inc. v. Quantum Corp.*, 2024 WL 5440992 at *3 (N.D. Cal. Dec. 27, 2024) (excluding "untestable" expert opinions that "did not sufficiently disclose what 'principles and methods' [were] used."); *York v. BNSF Ry. Co.*, 2019 WL 764574, at *7 (D. Colo. Feb. 21, 2019) (excluding proposed expert testimony which was "the product of guesswork and assumption—which is not fairly attributable to any scientific data-gathering or methodological analysis").

**E. Krause's Identical Valuations in Other Cases Confirms His Opinion Is Arbitrary**

Krause's opinion in this case is nothing more than a copy-and-paste of his opinion in five other class action lawsuits involving pixel tracking technologies. Krause was retained as the plaintiffs' damages expert and—in all five cases—arrived at the *identical valuation* based on the *exact same flawed inputs*[12]: namely, that the so-called fair market value of the proposed class members' personal information is $200. *See* Krause Rpt., Appdx. B (Case No. 109 (*Wexner Medical Ctr.* Matter), No. 111 (*SSM Health* Matter), 118 (*Mosaic Health Sys.* Matter), and 119 (*Willis-Knighton Medical Ctr.* Matter)); Krause Tr. at 36:5-10, 36:1-3 (*Wexner Medical Ctr.* Matter; report issued September 2024); *id.* at 33:17-22, 34:4-8, 35:2-6 (*SSM Health* Matter; report issued December 2024); *id.* at 29:6-21, 30:24-31:2 (*Mosaic Health Sys.* Matter; report issued March

[12] Krause Tr. at 90:21-91:7; 94:7-10; 136:2-12.

2025); *id.* at 26:18-27:10, 28:16-25 (*Willis-Knighton Medical Ctr.* Matter; report issued April 2025).[13]

Unlike this case, those other lawsuits involve hospital defendants who allegedly disclosed patients' sensitive health information, including patients' communications about their health conditions, the medical treatment they were seeking, and the doctor treating them.[14] Despite these significant differences, Krause simply regurgitated those prior opinions and adopted them wholesale in this case, reaching the same conclusion based on the same flawed inputs discussed above. [redacted] He did no new work for this engagement.

Krause's identical opinions in other lawsuits (complete with identical inputs) confirm that his opinion here was not the result of a reliable methodology and thus should be excluded.

## V. CONCLUSION

For the foregoing reasons, BetterHelp respectfully requests that Court exclude the expert opinion of Eric Krause.

///

///

[13] Krause issued a report in a fifth case pending in Arizona state court, *Doe v. Community Health*, one week before his deposition that was not included in Appendix B to the Krause Report. Krause Tr. at 39:22-41:22. Krause also rendered the identical opinion in that case. *Id.*

[14] *See* Hammer Decl., Ex. G (*Wexner Medical Ctr.* Compl.) at ¶¶ 42-45, Hammer Decl., Ex. H (*SSM Health* First Am. Compl.) at ¶¶ 36, 75-109, 118; Hammer Decl., Ex. I (*Mosaic Health Sys.* Compl.) at ¶¶ 77-115, Hammer Decl., Ex. J (*Willis-Knighton Medical Ctr.* First Am. Compl.) at ¶¶ 84-98.

Dated: September 15, 2025

**KING & SPALDING LLP**

By: */s/ Livia M. Kiser*

LIVIA M. KISER (SBN 285411)
*lkiser@kslaw.com*
JEFFREY HAMMER (SBN 264232)
*jhammer@kslaw.com*
CRAIG H. BESSENGER (SBN 245787)
*cbessenger@kslaw.com*
JAMES A. UNGER (SBN 325115)
*junger@kslaw.com*
Attorneys for Defendant
BETTERHELP, INC.