# EXHIBIT B

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

IN RE BETTERHELP, INC. ) Case No. 3:23-cv-01033-RS
DATA DISCLOSURE CASES )
)
)
This Document Relates To: )
)
All Cases/ )

ORAL AND VIDEOTAPED DEPOSITION OF
ERIC KRAUSE
Tuesday, June 10, 2025

THIS DEPOSITION HAS BEEN DESIGNATED CONFIDENTIAL

ORAL AND VIDEOTAPED DEPOSITION OF ERIC KRAUSE, produced as a witness at the instance of the Defendant, BetterHelp, Inc., and duly sworn, was taken in the above-styled and numbered cause on the 10th of June, 2025, from 9:40 a.m. to 2:52 p.m., before Sharon Ross, Certified Shorthand Reporter in and for the State of Texas, reported at King & Spalding LLP, 500 West 2nd Street, Suite 1800, Austin, Texas 78701 by computerized stenotype machine, pursuant to the Federal Rules of Civil Procedure and/or any provisions stated on the record or attached hereto.

Reported by:
SHARON ROSS, Texas CSR #1961,
Hawaii CSR #432, RMR, CRR, CRC
Realtime Systems Administrator

improperly disclosed, as alleged by the plaintiffs, medical data, I doubt it. 10:00

Q. Looking at your CV at Appendix A, it looks like all of your professional work is focused on litigation support? 10:00

A. No, sir. 10:00

Q. Which experience listed in Appendix A was not related to litigation support? 10:00

A. Both my consultant and director work includes -- probably about 25 percent of the work that I perform at Applied Economics throughout my career is what I would call business consulting as opposed to litigation consulting. 10:00

I would say approximately three fourths of my time at Applied Economics is engagements that are litigation related or in preparation of litigation potentially, but 25 percent of my work has nothing to do with litigation. 10:01

Q. Have you ever performed a valuation of personal or medical information? 10:01

A. Yes. 10:01

Q. Outside of the litigation context? 10:01

A. No. 10:01

Q. Are you -- do you consider the report you issued in this case a valuation of personal and medical 10:01

information? 10:01
A. Yes. 10:01
Q. Outside of the litigation context, have you performed a valuation of anything that you believe is similar to the personal and medical information at issue in this case? 10:01
A. I have certainly consulted outside of litigation on valuations for licenses in the use of intellectual property. I would consider that a relevant, if not adjacent, exercise. 10:02
Q. What were those -- what was the intellectual property at issue that you're referring to where you're consulting with the business end? 10:02
A. It's been a number of cases. It may have been -- it would include things like medical device patents. It would include trade secrets for banking organizations in West Texas. It would include the valuation of some oil and gas assets, many, many times, things like pipelines, valuation of contracts, and reservation rights, throughput rights. 10:02
I have certainly valued dedication con -- rights under contracts, a number of tangible and intangible assets in a non-litigation context. 10:03
Q. What makes you say that valuing oil and gas assets has any similarity to valuing the type of 10:03

personal and medical information at issue in this case? 10:03

A. The assets underlying it are different, certainly; but the valuation techniques and the consideration of the three primary techniques for doing so is completely the same whether you utilize the market approach, a discounted cash flow income approach, a cost approach. 10:03

All of those need to be considered and applied appropriately whether it's a tangible asset like an oil and gas property or an intangible asset like personal information. 10:03

But given the alleged inappropriate nature of that improper disclosure, obviously there is no perfect analog to that in my professional career. 10:03

It is an asset. It's an intangible asset, but it's a unique asset in that it's not supposed to be sold or disclosed. 10:04

Q. What are the three approaches you just mentioned? Can you list them for me again? 10:04

A. Sure. Market approach, income approach, cost approach. 10:04

Q. And which approach did you employ here? 10:04

A. The market approach. 10:04

Q. What does the market approach to valuation entail? 10:04

disclosed across the entire putative class and whether that can be valued. 10:12 10:12

Q. When you refer to patient status, what are you talking about? 10:12 10:12

A. There -- they being engaged with that entity as a patient. Whether they are a customer of the -- of the facility, whether they're a customer of the website services, whatever they may be, the patient status, as I've been advised, is health information and the core uniform health information that was disclosed. 10:12 10:13 10:13 10:13 10:13 10:13

Q. Am I right that when you say patient status, you mean the mere fact that the individual has a relationship with that entity? 10:13 10:13 10:13

A. Yes. 10:13

Q. And no other facts regarding whatever medical care might have been received; is that right? 10:13 10:13

A. Correct. 10:13

Q. For this Horton matter, what was the PII or the -- excuse me. Strike that. 10:13 10:13

For the Horton matter, what was the personal information at issue? 10:13 10:13

A. I would need to review my report but I -- it would have been fairly comparable to some of the personal identifying information here, such as device identifiers, personal identifiers, name, location. 10:13 10:13 10:13 10:14

But as to the specific list, I would have to review Dr. Shafiq's report in that matter as well as mine. 10:14 10:14 10:14

Q. Dr. Shafiq was a technical expert in that case? 10:14
A. Yes, sir. 10:14
Q. It says here that you issued a report in the Horton matter; is that right? 10:14 10:14
A. Yes. 10:14
Q. When did you issue that report? 10:14
A. I believe that was in April of 2025. 10:14
Q. What were your opinions in the Horton matter? 10:14
A. My opinion was that a methodology for classwide damages -- uniform classwide damages could be -- I want to raise -- I do not -- I believe there may have been a protective order in that case and certainly a confidentiality agreement. I'm not sure if I am able to disclose fully what my opinions were. 10:14 10:14 10:15 10:15 10:15 10:15
Q. Well, I'm entitled to know if you rendered similar opinions in other cases. I'm certainly asking you about what your opinion was in the Horton case, and I believe I'm entitled to know. 10:15 10:15 10:15 10:15

There's a protective order in this case. There's even an attorneys' eyes only provision if it needs to be applied. 10:15 10:15 10:15

So I ask that you answer the question and 10:15

we can apply that provision to the -- if needed, to your testimony. 10:15

THE WITNESS: As long as you're okay with that. 10:15

MS. BRADY: I do not know what's in that other protective order -- 10:15

THE WITNESS: Yeah. 10:15

MS. BRADY: -- that would potentially prohibit you. 10:16

A. I can certainly testify that I did have similar opinions to the ones here. In the ones here, I believe a classwide damages methodology can be established and can reliably measure the damages to the putative class members utilizing an estimated fair market value of the data that was alleged to be improperly disclosed. 10:16

And I provided a preliminary opinion as to the value of that data that was very similar, if not exactly comparable to the opinions that I issued in this report. 10:16

Q. What was the estimated fair market value that you concluded applied to the information in the Horton matter? 10:16

A. It was identical to the amount in this case. 10:16

Q. $200 per person? 10:16

A. Yes, sir. 10:16

Q. And did you apply the same methodology that you used in this case in the Horton matter? 10:16 10:17
A. I did. 10:17
Q. In the Horton matter, the putative class, were they -- did they receive certain types of services from the hospital? 10:17 10:17 10:17
A. Exclusively a type or a variety of types? I'm not sure I understand your question. 10:17 10:17
Q. Yeah, that's what I'm asking. Was it a particular type or a variety of services? 10:17 10:17
A. A variety of services, I -- as I understand it. 10:17
Q. So it's not -- were they all, for example, cancer patients? 10:17 10:17
A. No, sir. It was not an exclusive type of medical facility, as I understand it. 10:17 10:17
Q. Okay. Let's turn to No. 118. This is the Doe versus Mosaic Health System case. 10:18 10:18
When did you issue a report in that case? 10:18
A. I believe March of 2025. 10:18
Q. Was Dr. Shafiq an expert in that case? 10:18
A. Yes, sir. 10:18
Q. What type of personal information is at issue in the Mosaic Health System case? 10:18 10:18
A. Same answer as the Willis-Knighton matter. It would have dealt with identifying fingerprint -- device 10:18 10:18

fingerprints, name, location, and patient status. 10:18

Q. And, again, patient status is just the mere fact of individuals having a relationship with Mosaic Health System? 10:18 10:18 10:19

A. Yes, sir. 10:19

Q. What was the fair -- well, what was your assignment in the Doe versus Mosaic Health System case? 10:19 10:19

A. It was comparable to the Willis-Knighton matter and this BetterHelp matter. 10:19 10:19

I was asked to evaluate whether a classwide damages methodology that would uniformly apply across the putative class could be devised and to provide a preliminary opinion of the estimated fair market value of that information. 10:19 10:19 10:19 10:19 10:19

Q. What personal information was at issue -- of is at issue in the Doe versus Mosaic Health System case? 10:19 10:19

A. As I just said, it's the same type of information, the browser fingerprints, the name, the location. I believe email addresses in that one as well as patient status. 10:19 10:19 10:19 10:20

Q. Did you apply the same methodology in the Mosaic Health case that you've applied in this case? 10:20 10:20

A. Yes, sir. 10:20

Q. Did you determine that the fair market value of the information at issue in the Mosaic Health case is 10:20 10:20

$200 per user? 10:20
A. Yes, I did. 10:20
Q. For the Horton case, what's the current status? 10:20
A. I've issued a report. Nothing -- I'm not aware of anything having happened since then. I've not been deposed, and I have not received any type of reply report. 10:20
Q. You don't know if the case -- the class has been certified in the Horton matter? 10:20
A. I am aware that it has not been certified yet. There's not been any -- I'm not aware that a hearing has occurred yet. 10:20
Q. In the Mosaic Health System case, have you been deposed? 10:20
A. I have. 10:20
Q. When was your deposition taken? 10:20
A. Three weeks ago tomorrow. 10:20
Q. Do you know if the class has been certified in the Mosaic Health System case? 10:21
A. It has not. It has -- no hearing has been -- 10:21
Q. You don't know either way. 10:21
A. Right. 10:21
Q. Or you just know that there hasn't been a decision yet? 10:21
A. It's pending. There's no decision. 10:21

A. Public disclosures of publicly traded banks gave me significant insight into internal valuations of those types of records and information. 10:22 10:23 10:23

Q. I want to go back briefly. In the Horton matter, do you know if your -- there's been a motion to exclude you as an expert? 10:23 10:23 10:23

A. If there has, I'm not aware of it. 10:23

Q. Do you know if there's been a motion to strike your opinion in that case? 10:23 10:23

A. No, sir. 10:23

Q. Same thing for the Mosaic Health System case: Do you know if there's been a motion to exclude you or to strike your opinion? 10:23 10:23 10:23

A. No, sir, I do not know. I do not believe those deadlines have come to pass in those cases -- on the scheduling orders for those cases. 10:23 10:23 10:23

Q. Let's turn to No. 111. This is the Doe versus SSM Health Care Corporation case. 10:23 10:23

When did you issue a report in that case? 10:23

A. That would have been in December of 2024 -- either December '24 or January '25, but I believe December '24. 10:24 10:24 10:24

Q. What was that case about? 10:24

A. It is a comparable case to this matter, the BetterHelp matter. It is a allegation of improper 10:24 10:24

disclosure of personal identifying health information by SSM Health Care Corporation using tracking technologies such as the Meta Pixel and Google Analytics. 10:24 10:24 10:24

Q. In the SSM Health Care case, what is the personal information at issue? 10:24 10:24

A. Same answer. I would need to review my report and Dr. Shafiq's report to commit to specific items, but I believe they would be somewhat comparable. 10:24 10:24 10:24

Obviously they're browser fingerprints, name, location, and patient status at a minimum. Whether there was other information, I can't recall specifically. 10:24 10:25 10:25 10:25

Q. And what healthcare information were you valuing in that case? 10:25 10:25

A. The patient status was the healthcare information in addition to the personally identifying information. 10:25 10:25 10:25

Q. So, again, in that case you did not take into account any additional health information other than the very fact that a class member has a patient relationship with SSM Health Care? 10:25 10:25 10:25 10:25

A. Correct. That's the uniform information that was transmitted, and I sought to value that. 10:25 10:25

Q. In the SSM Health Care case, did you use the same methodology that you've used in this case? 10:25 10:25

A. I did. 10:25
Q. And in the SSM Health Care case, did you conclude or did you estimate that the fair market value of class members' personal and health information is approximately $200 per person? 10:25
A. I did. 10:26
Q. Has there been a decision on class certification in the SSM Health Care case? 10:26
A. Not that I'm aware of. 10:26
Q. Has there, to your knowledge, been a motion to exclude or strike your opinion in the SSM Health Care case? 10:26
A. No, sir. 10:26
Q. Has your deposition been taken in that case? 10:26
A. It has not. 10:26
Q. Is it scheduled? 10:26
A. It is not. 10:26
Q. Let's talk about entry No. 109, the Kimberly Caraway case. 10:26
What is that case about? 10:26
A. Very comparable to this, the SSM, Willis-Knighton, and Mosaic case. It is an allegation of improper disclosure of personal health information comparable to the types of information alleged in this matter. 10:27

And I performed a similar analysis of whether or not a classwide damages methodology could be established and a preliminary estimate of fair market value. 10:27

Q. When did you issue your report in the Caraway case? 10:27

A. September 2024. 10:27

Q. Is Dr. Shafiq the technical expert in that case? 10:27

A. He is. 10:27

Q. What's the personal information at issue in the Caraway case? 10:27

A. Very same -- very similar answer. I'd need to go back and review Dr. Shafiq and my report in that matter, but certainly the same type of browser fingerprints, name, location, patient status. 10:27

Q. For purposes of your valuation, did you consider any health information other than the patient status of class members? 10:28

A. No, sir. In the Caraway case? 10:28

Q. In the Caraway case, yes. 10:28

A. No, sir. 10:28

Q. Did you use the same methodology in the Caraway case that you've used in this case? 10:28

A. Yes. 10:28

There was a -- there's a significant number of them. And so there was -- I was able to use some guideline transactions from M&A activity in that sector to evaluate and consider the market approach valuation. 10:31

Q. So part of those transactions that you analyzed include the value of the patient information that is part of the transaction; is that right? 10:31

A. That's correct. 10:31

Q. If you turn with me to No. 65, which is another case you flagged, this is the SynergenX Physician Services case. 10:31

What was that case about? 10:31

A. The exact same thing as the preceding case we just discussed. 10:31

Q. Totally different parties? 10:32

A. The SynergenX ultimately took over Low-T Physicians. They acquired them. 10:32

So it was the same actual claimant entity, just different names and different -- but different respondents, similar behavior, similar assignment, similar valuations. 10:32

Q. Are there any engagements that are not listed here on Appendix B that you have had that involve valuing personal and medical information? 10:32

A. Yes. 10:32



Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

Q. What engagements are those? 10:32
A. Case called Doe versus Community Health. I issued that report after this report. So it's not included on Appendix B. 10:33 10:33 10:33
Q. Where is that case pending? 10:33
A. Arizona. 10:33
Q. State Court? 10:33
A. Yes, sir. 10:33
Q. Is Dr. Shafiq the technical expert in that case? 10:33 10:33
A. He is. 10:33
Q. Are plaintiffs' counsel in the Community Health case any of the plaintiffs' counsel from this case? Let me ask that again. 10:33 10:33 10:33
Are any of the plaintiffs' counsel from this case involved in the Community Health case? 10:33 10:33
A. I don't believe so. 10:33
Q. Have you -- 10:33
A. But I'm not sure. 10:33
Q. Have you issued a report in the Community Health case? 10:33 10:33
A. I did. 10:33
Q. When did you issue it? 10:33
A. Last Monday. No, I'm sorry. The Monday be -- the Tuesday before last, Tuesday after Memorial Day, so 10:33 10:34

late May 2025. 10:34
Q. What was that dis -- what is that dispute about? 10:34
A. The same type of information being alleged to being improperly disclosed as in this matter, personal health information and personal identifying information, using tracking technologies such as Meta Pixel and Google Analytics. That's the topic of the case. 10:34
Q. And in the Community Health case, did you consider any health information besides patient status in coming up with your valuation? 10:34
A. No, sir. 10:34
Q. Was your assignment in the Community Health case the same as your assignment here in this case? 10:34
A. It was. 10:34
Q. Did you use, in the Community Health case, the same methodology that you used in this case? 10:34
A. I did. 10:34
Q. Did you arrive at a fair market valuation of approximately $200 per user in the Community Health case? 10:34 10:35
A. Yes, sir. 10:35
Q. Did you issue your report in the Community Health case in connection with a motion for class certification? 10:35

A. Yes. 10:43
Q. And then for the next grouping, the date refer -- for the complaint and the other documents, there's the date that those materials were issued; is that right? 10:43
A. Yes. 10:43
Q. When it comes to the materials pulled from the Internet, what does the date signify? 10:43
A. That looks like the access date that is associated with the footnotes. 10:43
Q. Okay. So when those materials were accessed on the Internet? 10:43
A. Yes. 10:43
Q. A lot of the dates for the materials that you relied upon predate your engagement in this case. Is that because you gathered those materials in connection with prior engagements? 10:43 10:44
A. Yes, sir. I certainly accessed, downloaded, reviewed those materials. And to the extent I found any materials that I previously reviewed relevant to my analysis in this case, I certainly relied upon them. 10:44
Q. Who did the research to gather materials that you relied upon? 10:44
A. The majority of it was myself. I was assisted by Dr. Groga-Bada and Ms. Donovan, who I talked about 10:44 10:45

Q. Have you conducted any additional analysis since this report was finalized? 10:52 10:52
A. In this matter? 10:52
Q. In this matter. 10:52
A. No, sir. 10:52
MR. HAMMER: Let's take a break. 10:52
MS. BRADY: Before we take that break, Jeffrey, you asked me for the engagement letter and invoices. Those were actually included in the link, but we -- Jake in my office went ahead and emailed those directly to you. 10:52 10:52 10:52 10:52 10:52
MR. HAMMER: Thank you. I'll check. 10:52
MS. BRADY: Okay. 10:52
THE VIDEOGRAPHER: Time is 10:51 a.m. We're off the record. 10:52 10:52
(Recess from 10:51 a.m. to 11:05 a.m.) 11:06
THE VIDEOGRAPHER: Time is 11:05 a.m. We're on the record. 11:06 11:06
Q. (BY MR. HAMMER) Mr. Krause, do you understand you are still under oath? 11:06 11:06
A. Yes, sir. 11:06
Q. What does fair market value mean? 11:06
A. It is the value at which a asset or good or service can -- would trade for in -- to willing buyers and sellers. 11:06 11:06 11:06

Q. In an arm's-length transaction? 11:06
A. Generally speaking, yes. 11:06
Q. I want to turn to your ultimate opinion in this 11:06
case, which I believe is at paragraph 68 of your report. 11:06
Does paragraph 68 capture your opinion? 11:07
A. This is one of the derivative opinions. This 11:07
is not my primary opinion. 11:07
Q. What is your primary opinion? 11:07
A. That a classwide damages methodology can be 11:07
devised in this matter given the allegations in which 11:07
one values the alleged improperly disclosed information 11:07
based on a benchmark of fair market value less an amount 11:07
that they were actually compensated for that, which in 11:07
this case is zero. 11:07
And the paragraph 68 is simply a 11:07
preliminary valuation of what that fair market value is 11:07
but, to be clear, my primary opinion in this report is 11:07
that a damages meth -- classwide damages methodology can 11:07
be performed for the putative class. 11:08
Q. So you said in the answer you just provided 11:08
that the amount compensated was zero. 11:08
Is it your -- did you ascribe any value to 11:08
any benefit received by class members from the 11:08
disclosure of information? 11:08
A. Not for the disclosure of information. As I 11:08

companies? 11:17
A. Yes. 11:17
Q. Are you assuming that the information listed in paragraph 65 was transmitted to third parties? 11:17 11:17
A. That is an assumption that I am making based on Dr. Shafiq's report. I am not a technical expert. I have not performed any primary research or analysis into what specifically was transmitted. I'm relying on Dr. Shafiq for that information. 11:17 11:18 11:18 11:18 11:18
Q. You didn't do any independent investigation to confirm the information was transmitted; is that right? 11:18 11:18
A. That's correct. 11:18
Q. The first bullet point there in paragraph 65 refers to "Class Members' personally identifiable information such as account and device identifiers, IP addresses, and email addresses." 11:18 11:18 11:18 11:18
Do you see that? 11:18
A. Yes. 11:18
Q. What are account identifiers? 11:18
A. They are identifiers that tie a specific count on BetterHelp's questionnaire to who they are. 11:18 11:18
And their browser they're using, their computer they're using, the IP address, it -- all that account information that they set up when they do the questionnaire, that is my understanding of what 11:18 11:18 11:18 11:18

Dr. Shafiq is talking about. 11:18
Q. The BetterHelp account? 11:19
A. That's correct. 11:19
Q. What are -- what is a -- what are device identifiers? 11:19
A. Those are signatures in the browsing -- I am speaking as a layperson, to be clear. I am not setting myself out as a technical expert on this, but I'm providing my understanding with regards to the data that I then valued. 11:19
But I can't -- browser identifiers -- I'm sorry -- device identifiers give an ability to see what type of device the user was utilizing. Was it a computer? Was it a phone? Was it an Apple phone? Was it a Google phone? Was it a Windows machine? That type of information. 11:19
Q. For the -- going back to the BetterHelp account identifiers, what value do account identifiers have to third parties? 11:19
A. I'd have to go back and look at what specifically Dr. Shafiq referred to as being a part of those account identifiers; but to the extent it includes names, to the extent it includes location, information like that, there's is significant value. 11:20
You know, it would be part of the 11:20

approximately $200 of value that I've ascribed here. 11:20
Q. So account identifiers is valuable insofar as it contains other information? 11:20
A. Well, what account it is. As I understand from Dr. Shafiq, that's just a summary term of the types of information that are associated with that account. 11:20
Q. So you're referring to, you know, I go set up an account -- if I go set up an account with BetterHelp and I list various profile information that gets associated with the account, you're referring to the content of my profile that's the account information? 11:20
A. That's what I understand. 11:20
Q. And then device identifier, what value does it have to a third party to know what device is being used? 11:20
A. How they target their advertising, what type of -- what type of platform they utilize, for example. 11:20
You -- you know, you're someone who utilizes a phone or a tablet, you might be more -- you might target social media instead of websites. 11:21
Someone who uses a computer, you might target website advertising instead of social media. 11:21
That type of information is valuable to these companies. Otherwise, they wouldn't be attempting to collect it. 11:21
Q. And you're assuming that the disclosure of 11:21

that the IP address was static versus dynamic? 11:22
A. No, sir. I'm just assuming that IP address information, whether it was dynamic or static, was collected and utilized as part of the profile building as detailed by Dr. Shafiq. 11:23
Q. So whether static or dynamic, that does not impact your opinion? 11:23
A. No. 11:23
Q. For all the information listed here in that first bullet point in paragraph 65, are you assuming that all of that information was disclosed to third parties for all class members? 11:23
A. Yes. Based on Dr. Shafiq's report, that is my understanding of the allegation and his conclusion. 11:23
Q. Second bullet point there refers to "Class Members' patient status." 11:23
And, again, patient status just means that they're individuals who completed the questionnaire and submitted it to BetterHelp; is that right? 11:23
A. That's correct. 11:24
Q. I want to focus on the next bullet point. 11:24
It states that "Class Members' communications with BetterHelp via its websites, through completion of the in-take questionnaire, signing up for therapy and counseling services, paying for services, 11:24

taking mental health assessments or tests, or reviewing advice articles about specific conditions and treatments" was also disclosed to third parties; is that right? 11:24 11:24 11:24 11:24

A. Yes. 11:24

Q. Did that information factor into your analysis for the $200 fair market valuation? 11:24 11:24

A. Partially. 11:24

Q. Which part? 11:24

A. Obviously through the completion of the intake questionnaire is a key portion of the class definition, and so I considered that. 11:24 11:24 11:24

The rest of it are communications that helped inform and buttress their patient status, but none of the specific outcomes of certain therapies or counseling services, certain mental health assessments -- those outcomes are not part of my valuation, to be clear. 11:24 11:24 11:24 11:25 11:25 11:25

Those are -- that is information, I understand, was transmitted and it certainly informs the patient status but to the extent that mental health data specifically was disclosed, it's not part of the -- what I call the nominal $200. 11:25 11:25 11:25 11:25 11:25

Q. Was whether -- is whether a class member paid for services part of your valuation? 11:25 11:25



Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

A. No, sir. 11:25
Q. Is whether a class member took a mental health assessment or test part of your valuation? 11:25 11:25
A. Not insofar as a -- the specific outcomes of it but, again, it helps inform patient status and there was health information disclosed. 11:25 11:25 11:25
But it -- I'm not ascribing a specific value to completing a particular therapy, you know, health assessment or anything like that, that those would be upward variances potentially in value; but they are not part of the floor. 11:25 11:25 11:26 11:26 11:26
Q. I want to make sure I'm clear. You estimated a fair market value of $200 for certain information; is that right? 11:26 11:26 11:26
A. Yes. 11:26
Q. Is the information that that fair market value, $200, captures, does it include taking -- whether a class member took a mental health assessment test? 11:26 11:26 11:26
A. No, sir. 11:26
Q. Does that $200 valuation include whether a class member reviewed advice articles about specific conditions and treatments? 11:26 11:26 11:26
A. No, sir, not specifically. Again, that just informs patient status, right? Just like the intake quest -- the completion of the intake questionnaire. 11:26 11:26 11:26

But I'm not performing any valuation of the transmission of information associated with the completion of a health assessment. 11:27 11:27 11:27

Q. Does your $200 valuation include valuing any information that may have been transmitted to third parties from -- from the questionnaire itself? 11:27 11:27 11:27

A. No, sir. 11:27

Q. It's just the very fact that the questionnaire was completed? 11:27 11:27

A. Precisely. 11:27

Q. If a particular user has already provided to Facebook all of the information -- the personal information captured under the first bullet of 65 and the only new information that's being transmitted to Facebook is the patient status for that individual, does that change your valuation? 11:27 11:27 11:27 11:27 11:27 11:27

A. No, sir. 11:27

Q. Why not? 11:27

A. Because it's about control. If they choose to share something with a family member, a friend with Facebook, that is their choice. 11:27 11:28 11:28

When BetterHelp became the custodian of that information and it shared it, that is when there was a alleged improper disclosure in which that valuation of that information can be ascribed and was 11:28 11:28 11:28 11:28

really to -- to those purchasers, it has value en masse. 11:30
Q. Are you aware of any marketplace in which there are buyers willing to pay individuals for their personal information? 11:31
A. Where there are buyers that interact specifically with a seller of information? And one individual or as opposed to the many markets that exist for the purchase of personal information? 11:31
Q. Any individual. 11:31
A. There are the willing-to-pay examples that I give in which there are numerous buyers who are engaging in economic transactions for the regain of control of their personal information, such as the examples I provided here in my report. 11:31
Those exist everywhere, and then en masse obviously there's a lot of marketplaces for that. 11:31
Q. And that wasn't my question. My question was whether you're aware of a marketplace in which there are buyers willing to pay individuals for their private personal information. 11:31
A. Not legal ones. 11:32
Q. Are you aware of illegal ones? 11:32
A. Oh, there's certainly dark web places in which people can sell information on behalf of individuals but it's -- generally that is not a -- that is not an 11:32

understood marketplace. 11:32
Q. And what you're talking about is where an individual would sell somebody else's individual information. 11:32
A. Poss -- 11:32
Q. That's right? 11:32
A. Possibly, possibly their own. It depends. 11:32
But to answer your question, there is no marketplace in which one person can go and sell this type of information to potential buyers. 11:32
Q. If one of -- if a class member wanted to sell their personal information that is at issue in this case to one of these third-party tech companies, how would they go about doing it? 11:32
A. As I said, there's not a legitimate marketplace to do so. I'm sure there are certain individuals that tech companies would love to pay for, celebrities and public figures; but I'm not aware of any of those transactions. 11:33
Q. Is it your understanding -- strike that. 11:33
You're aware and you noted that there are other websites that BetterHelp operates. Are you assuming that the same information was transmitted to third parties from each of these websites? 11:33
A. Yes, that was my understanding from Dr. Shafiq. 11:33

prevent -- may -- may prevent. 11:41

Q. I want you to assume that there are free technologies available that can prevent the disclosure of users' information to third parties via tracking technologies, okay? 11:41 11:42 11:42 11:42

A. Okay. 11:42

Q. Do you know -- first of all, are you aware that such technologies exist? 11:42 11:42

A. I am not aware of any technology that would have stopped the disclosure of information such as patient status through filling out a form on BetterHelp's website to Google or Facebook through their pixel and Google Analytics technology. I'm not aware of anything that would have stopped that. 11:42 11:42 11:42 11:42 11:42 11:42

Q. If there were such a technology -- assume that there were such a technology and that it was free of charge to a user. Would that change your analysis at all? 11:42 11:42 11:42 11:42

A. I'd need to know more detail about that technology. How is it going to stop someone being identified as completing the intake questionnaire on BetterHelp's website? 11:42 11:42 11:42 11:42

You're asking me: If there were a way to instantly teleport to Mars, this hypothetical -- I cannot -- I can't accept the hypothetical. 11:43 11:43 11:43



Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

Q. Did you talk to Dr. Shafiq about whether such tech -- free technologies that are available? 11:43 11:43

A. I have talked to Dr. Shafiq about various masking VPN technologies and whether or not they would be effective in keeping things like patient status or information that is contained in a questionnaire like BetterHelp utilizes, that it would keep that information from being transmitted; and my understanding is that there aren't. 11:43 11:43 11:43 11:43 11:43 11:43 11:43

Q. Well, assume that there is such a technology. 11:43

A. Okay. 11:43

Q. If there were such technology, the cost of protecting information would be zero. Do you agree with that? 11:43 11:43 11:43

A. In your hypothetical where you are imposing a hypothetical in which there's a free technology to keep all of this information out, the -- the answer would be it's free. 11:43 11:43 11:43 11:44

Q. Are you aware of whether there are techniques that can be used to prevent the disclosure of a user's information to third parties on the Internet? 11:44 11:44 11:44

A. I am aware of techniques that can be used to mask certain activities; but, again, based on discussions I've had with Dr. Shafiq, there are no technologies that if the forms that BetterHelp had on 11:44 11:44 11:44 11:44

its website are filled out accurately, there is nothing that -- and an email address is provided, we're not talking about untruthful users, I'm not aware of any technologies that would preclude the Pixel and Google Analytics from pulling that information based on my understanding from Dr. Shafiq. 11:44 11:44 11:44 11:44 11:44 11:44

Q. I want you to assume that if the user of BetterHelp logs out of Facebook and otherwise takes measures in Facebook to prevent information being conveyed to Facebook when they're on the BetterHelp website, that Facebook would not be able to put together a profile of that person. 11:44 11:45 11:45 11:45 11:45 11:45

A. Okay. 11:45

Q. Okay. 11:45

A. That's in your hypothetical. I can -- I think I understand what you're asking. It's not really relevant -- but okay. 11:45 11:45 11:45

Q. Well, if a user were to be able -- were able to prevent the transmission of information to Facebook that can be linked up to a particular individual by Facebook and if that technique were -- you know, didn't cost anything to the user, do you agree that that would be -- there would be no cost associated under the WTP approach? 11:45 11:45 11:45 11:45 11:45 11:45 11:46

A. In your hypothetical you're saying just because 11:46

Q. You say these are examples of valuations. How are these services examples of valuations? 11:50 11:50

A. These are transactions -- these are arm's-length transactions between users and service providers for the protection of information, personal information. 11:50 11:50 11:50 11:50

So these are variables that I consider in reaching my appraisal opinion. They are highly relevant, in my opinion, because they show user intent with regards to being willing to pay to regain control of their data. 11:50 11:50 11:50 11:50 11:50

Q. The services offered through this -- the example cited in paragraph 47, those are not services to protect against disclosure of user information. Those are services to remove information that's already been disclosed; is that right? 11:50 11:50 11:51 11:51 11:51

A. Well, I think it's a mixed bag. I think it's both because some of the data rolls in which they are paying to be removed from are transacted routinely. And so it is a disclosure any time that data is sold and leveraged. 11:51 11:51 11:51 11:51 11:51

And so I do agree with your characterization that the primary goal in the transaction is the removal of information, which goes back to that endowment effect that I talked about, the 11:51 11:51 11:51 11:51

economic endowment effect. 11:51
But to say that it doesn't prevent 11:51
disclosure to additional entities, I think, is not 11:51
necessarily accurate. Removal of those data rolls can 11:51
prevent disclosure in the future. 11:51
Q. Because those existing data rolls could be 11:51
used -- later sold to another third party. Is that what 11:52
you're saying? 11:52
A. Precisely, yes, sir. 11:52
Q. Did you research how many users there are for 11:52
any of these services? 11:52
A. For the services in paragraph 47? 11:52
Q. Yes. 11:52
A. I did do some research on their websites to see 11:52
if they disclosed, you know, how -- how many customers 11:52
they had. There wasn't a great deal of information 11:52
available. 11:52
But -- so I do not know the number of users 11:52
that each service provides, but they are going-concern 11:52
businesses. So I'm assuming that they have some 11:52
customers. 11:52
Q. Did any of the named plaintiffs in this case 11:52
pay for date deletion services like the ones described 11:53
in paragraph 47? 11:53
A. Not that I'm aware of. 11:53

Q. They include removal of other category of 11:54
information, such as financial data; is that right? 11:54
A. They can. Some of them do, yes. 11:54
Q. Many of them advertise that, right? 11:54
A. Some of them do, yes. 11:54
Q. Gone -- they remove information like Social 11:54
Security numbers and other personal identifying 11:54
information; is that right? 11:54
A. Yes, some that overlaps and that does not. 11:54
Q. They also advertise for the removal of personal 11:54
information from services that the individuals have 11:55
signed up for; is that right? 11:55
A. Yes. 11:55
Q. So that includes a removal or deletion of 11:55
information that users have willingly in consent 11:55
provided to third parties? 11:55
A. Well, they consented by -- for example, they 11:55
sought a home equity loan and they went to a bank and 11:55
they applied for a home equity loan. 11:55
And then suddenly for the next three weeks 11:55
they get a thousand phone calls from every single bank 11:55
or financial institution in the region because that 11:55
data -- without them necessarily affirmatively 11:55
consenting by signing up for a loan application, they 11:55
unwittingly oftentimes had their information shared. 11:55

And so that's a perfect example of: You know, that information was shared and they sought to pay to get it removed. 11:55 11:55 11:56
Q. The deletion services also include deleting employment history and employer history; is that right? 11:56 11:56
A. I don't recall that specifically. I think maybe one of them had that. I don't -- I don't specifically recall. 11:56 11:56 11:56
Q. When was the last time you reviewed the privacy of these services? 11:56 11:56
A. That probably would have been this spring. 11:56
Q. Sometime prior to -- did you review it in connection with writing your report in this matter? 11:56 11:56
A. Yes, sir. 11:56
Q. Did you review all the service details for all these services in connection with offering your report here? 11:56 11:56 11:57
A. Yes. I went back and reviewed each of them to make sure the prices were still relevant and to understand the services that they were offering. 11:57 11:57 11:57
Q. And you applied the WTP approach in all of the other tracking -- pixel-tracking cases we talked about earlier? 11:57 11:57 11:57
A. I considered the WTP approach in every single one of them, yes. 11:57 11:57

Q. And if I were to get a copy of your report in those cases, you would have a similar analysis referring to the charges -- the amounts charged by these service providers? 11:57 11:57 11:57 11:57

A. Yes. There would be exception of the Community Health report that I described earlier that would have an additional data point called CyEx, C-Y-E-X. 11:57 11:57 11:57

Q. Why didn't you include CyEx here? 11:58

A. I wasn't aware of it when I wrote this report. Following the writing of this report, I was made aware of it. 11:58 11:58 11:58

And, as I said, it's a service. It's been utilized in a number of settlements in cases similar to this in which part of the settlement was to pay for deletion services such as these. 11:58 11:58 11:58 11:58

And so I researched CyEx after becoming aware of that. This, to be clear, is not intended to be some sort of comprehensive rundown of every single company in this industry. 11:58 11:58 11:58 11:58

Q. What is the willingness-to-accept approach? 11:58

A. The willingness-to-accept approach is the flip side of this. To the extent you have an asset, what is a price that you would be willing to sell it for. 11:58 11:58 11:58

Q. How did you perform a valuation using the WTL -- WTA approach in this case? 11:58 11:59



Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

reports you authored in the other pixel-tracking cases we talked about earlier? 12:02

A. It was one of my considerations, yes, sir. 12:02

Q. And did you rely on the same articles in those other reports that you're relying on in this report? 12:02

A. Yes, sir. 12:02

Q. And did you rely on the findings in the Li study in those other reports, as you do here in this report? 12:02

A. Yes, sir. 12:02

Q. Footnote 92 in your report says that "the more appropriate valuation perspective in this matter is from a WTA context as opposed to a WTP context. 12:02

Why do you say that? 12:02

A. Because that's an asset that the customers had, that the patients had, that they believed -- they did not know was being transmitted. It was their asset. 12:02

And so in determining what the fair market value was to each of those patients, it wasn't a situation that they are going out to purchase the ability to not transmit it. 12:03

It is something that they owned that BetterHelp improperly disclosed on their behalf, according to the plaintiffs' allegations. 12:03

And so, in my opinion, the WTA approach -- 12:03



Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

commissioned by the government. 14:03
Q. Did you cite to this EY report in all the prior engagements we talked about involving pixel tracking? 14:03 14:03
A. Yes, sir. 14:04
Q. And if I were to look at the reports you issued in those other matters, would I find the same table that's reflected in Exhibit 1 of this report? 14:04 14:04 14:04
A. Yes, sir. 14:04
Q. Did you do anything to update this Exhibit 1 in this report following your most recent expert report you've issued in other matters? 14:04 14:04 14:04
A. No, sir. 14:04
Q. Now, if we go to, in Exhibit 67, the supplemental appendix. This is "Appendix - supplement" beginning on Page 24. 14:04 14:04 14:04
Am I right that the information in these tables you pulled -- strike that. 14:04 14:04
Am I right that what's reflected in Exhibit 1 from your report is information that's pulled from these EY tables? 14:04 14:04 14:04
A. Yes, sir. 14:04
Q. And why did you pull the information for the particular companies that we see in Exhibit 1? 14:04 14:05
A. Because they were companies that actually have a primary portion of their business that relates to the 14:05 14:05

A. In reaching an opinion as to what the premium associated with healthcare data was, I took into account that there is a richness to the healthcare data that may impact the value. It may create some of those upward variances that we talked about. 14:11 14:12 14:12 14:12 14:12

What I sought to do was come up with a nominal value of the uniform health data that was -- transmitted patient status and took a very conservative number in light of the observations I made between these various studies and accounting for the fact that the fundamental health data that I'm valuing is probably on the lower end of this kind of rich volatility that exists on more specific -- specific health data that may be associated with someone such as their medication history, et cetera. 14:12 14:12 14:12 14:12 14:12 14:12 14:12 14:12 14:12 14:12

So I certainly considered that in reaching my appraisal opinion. 14:12 14:12

Q. Do you know one way or the other whether the health records at issue for the companies listed on your Exhibit 1 were limited to onetime visits to a medical care provider? 14:12 14:13 14:13 14:13

A. No, sir. 14:13

Q. You don't know one way or the other whether it's including longitudinal information versus a discrete point in time information? 14:13 14:13 14:13

A. Whether it was -- it's probably in here. I do not recall, sitting here now, if it was a slice of time. 14:13 14:13
And certainly the M&A activity wouldn't have all happened on the same day. That's for sure; but as to the valuations that they imply in actual acquisition, there's no way that those can all be one moment in time. 14:13 14:13 14:13 14:13 14:13
So I would assume that there is a time series of data that's included. 14:13 14:13
Q. You've gone through your report, and we've seen a number of different data points that you have pointed to. There is -- for the WTP approach, you had the data points of the various service providers that delete information; is that right? 14:13 14:14 14:14 14:14 14:14
A. Yes. 14:14
Q. For the WTA approach, we had the figures that we saw in the Li report with the aggregate figure of $189 and change. 14:14 14:14 14:14
Do you recall that? 14:14
A. Yes. 14:14
Q. And then we've been looking at the various numbers for -- attached to medical information in the EY study and the Trustwave report and the Ponemon Institute report; is that right? 14:14 14:14 14:14 14:14
A. Yes. 14:14



Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

Q. We also have observed the data breach figures, which was the Ponemon Institute, both for non-medical and medical information; is that right? 14:14 14:14 14:14
A. Correct. 14:14
Q. And am I right that you took all of those figures from all these various approaches and then you came up with $200 as your fair market value estimate? 14:14 14:14 14:15
A. Correct. As an appraiser of fair market value, I synthesized all of that information, considered it all in reaching my opinion. 14:15 14:15 14:15
Q. Explain to me how you got from all of those data points to the $200 figure. 14:15 14:15
A. Based on my opinion. It's an analysis in which I quantify all these different variables of PII. I consider things like the $189 includes information beyond what was disclosed based on Dr. Shafiq. 14:15 14:15 14:15 14:15
I considered that the medical claims data in the Li report was $75 when they valued it. I considered that the patient status at a -- you know, would have, at a minimum, been included in some of these healthcare record valuations that range up into the thousands of dollars. 14:15 14:15 14:15 14:15 14:15 14:15
Taking all of that into account, as any appraiser giving a professional opinion on value, after synthesizing all the information, I concluded 14:16 14:16 14:16

preliminarily -- again, this is a merits phase issue, but preliminarily the $200 is a reasonable floor for the value of the data that the plaintiffs allege was improperly disclosed. 14:16 14:16 14:16 14:16

Q. What methodology did you use to look at all the figures you were just discussing and decide which ones to weight more, which ones to weight less to arrive at that $200 figure? 14:16 14:16 14:16 14:16

A. The primary weighting was looking at the WTA versus WTP, for example. The endowment effect that exists in the counterfactual in this case, that would have factored in. The nominal nature of the patients' status certainly would have factored in in weighting, coming up with the $75. 14:16 14:16 14:16 14:16 14:16 14:17

All -- the specific identifiers provided in the Li report and their comparability to the data that was alleged to have been disclosed improperly here, all of that provides a very rich data set of market approach guideline transactions for me to look at and reach my opinion. 14:17 14:17 14:17 14:17 14:17 14:17

Q. I want to know how you weighted each one of those. Is there anything I -- you can tell me or a computation you ran that I can look at or analysis you ran that I can look at to see how you weighted any one of those factors versus another? 14:17 14:17 14:17 14:17 14:17

A. No, sir. There's not a spreadsheet or any kind of coefficient analysis. I am reaching an appraiser's opinion preliminarily. 14:17 14:17 14:17

This is not a completed analysis in terms of the estimated fair market value. My primary task here was to devise a methodology and to give a preview of the types of information that I would rely upon to reach an opinion with regards to the fair market value. 14:17 14:18 14:18 14:18 14:18

There's no spreadsheet with any type of weightings with regard to the specific data points. 14:18 14:18

Q. Is there anything else you can tell me because I want to know -- I want -- I want to know what more you did to arrive at this $200 figure other than what you've told me. 14:18 14:18 14:18 14:18

Did you do any other further analysis? 14:18

A. No. What I've told you is a comprehensive rundown of my analysis. 14:18 14:18

Q. You mentioned and you've said a few times you referred to the endowment effect. Can you remind me what the endowment effect is that you're referring to? 14:18 14:18 14:18

A. It -- the endowment effect is why I believe the willing to accept is more relevant than the willing to pay in this particular scenario because the owner of the data is the putative class members. 14:18 14:19 14:19 14:19

And because they own it and would be 14:19

REPORTER'S CERTIFICATION

I, SHARON ROSS, Certified Shorthand Reporter, do hereby certify:

That on Tuesday, June 10, 2025, at 9:40 a.m., appeared before me ERIC KRAUSE, the witness whose deposition is contained herein; that prior to being examined was by me duly sworn;

That the deposition was taken down by me in machine shorthand and was thereafter reduced to typewriting; that the foregoing represents, to the best of my ability, a true and correct transcript of the proceedings had in the foregoing matter.

That a request for an opportunity to review and make changes to this transcript:

X Was made by the deponent or a party (and/or their attorney) prior to the completion of the deposition.

Was not made by the deponent or a party (and/or their attorney) prior to the completion of the deposition.

Was waived.

I further certify that I am not an attorney for any of the parties hereto, nor in any way concerned with the cause.

Dated June 23, 2025.

Sharon Ross

SHARON ROSS, HI CSR NO. 432,
TX CSR NO. 1961, CRR, RMR, CRC
Realtime Systems Administrator