# EXHIBIT H

Electronically Filed - CITY OF ST. LOUIS - October 25, 2023 - 11:26 AM

**IN THE CIRCUIT COURT OF THE CITY OF ST. LOUIS**
**STATE OF MISSOURI**

| | | |
|---|---|---|
| **JOHN DOE & JAMES DOE,**<br>Individually and on behalf of all others similarly situated,<br><br>Plaintiffs<br><br>v.<br><br>**SSM HEATH CARE CORPORATION**<br>d/b/a SSM Health,<br><br>SERVE:<br>CT Corporation System<br>120 S. Central Ave<br>Clayton, MO 63105<br><br>Defendant. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | **CASE NO. 2222-CC10014**<br><br>**JURY TRIAL DEMANDED** |

**FIRST AMENDED CLASS ACTION PETITION**

Plaintiffs John Doe and James Doe ("Plaintiffs"), individually and on behalf of all other Citizens of the state of Missouri similarly situated ("Class Members"), brings suit against Defendant SSM Health Care Corporation d/b/a SSM Health, SSM Health Saint Louis University Hospital, SSM Health Cardinal Glennon Children's Hospital, SSM Health St. Mary's Hospital-St. Louis, SSM Health DePaul Hospital-St. Louis, SSM Health St. Clare Hospital-Fenton, SSM Health St. Joseph Hospital-St. Charles, SSM Health St. Joseph Hospital-Lake Saint Louis, SSM Health St. Joseph Hospital-Wentzville, SSM Health St. Mary's Hospital-Centralia, and SSM Health Good Samaritan Hospital-Mt. Vernon, et. al. ("Defendant" or "SSM Health"), and upon personal knowledge as to Plaintiffs' own conduct and on information and belief as to all other matters based upon investigation by counsel, alleges as follows:

Not an Official Court Document

Electronically Filed - CITY OF ST. LOUIS - October 25, 2023 - 11:26 AM

## INTRODUCTION

1. This case arises from Defendant's intention, reckless, and negligent disclosure of its patients' confidential and private medical information to Facebook and other third parties without its patients' knowledge or consent.

2. At all relevant times, Defendant has disclosed information about its patients—including their status as patients, their physicians, their medical treatments, the hospitals they visited, and their personal identities—to Facebook and other third parties without their patients' knowledge, authorization, or consent.

3. Defendant disclosed this protected health information through the deployment of various digital marketing and tracking technologies embedded on its websites that purposefully and intentionally disclose patients' personal health information to third parties who exploit that information for advertising purposes, including Facebook's Meta Pixel. Defendant's use of these tools causes its patients' personally identifiable information and the contents of its patients' communications exchanged with Defendant to be automatically transmitted to third parties in violation of those patients' reasonable expectations of privacy, their rights as patients, and their rights as citizens of Missouri.

4. Based on Defendant's use of the Meta Pixel, and evidence demonstrating that the information transmitted via the Pixel, and evidence demonstrating that the information transmitted via the Meta Pixel was linked to Plaintiffs' personal Facebook accounts, Plaintiffs assert that Defendants also installed and implemented the Facebook Conversion Application Programming Interface ("Conversions API") on their website.

5. By implementing Conversions API, Defendant secretly enabled additional unauthorized transmissions and disclosures of Plaintiffs' and Class Members' personally

Electronically Filed - CITY OF ST. LOUIS - October 25, 2023 - 11:26 AM

identifiable information ("PII") and protected health information ("PHI") (collectively, "Personal Health Information") to Facebook.

6. Operating as designed and implemented by Defendant, the Meta Pixel allowed the Personal Health Information that Plaintiffs and Class Members shared with Defendant to be disclosed to Facebook along with each patient's unique and persistent Facebook ID. Similarly, Conversions API stored Plaintiffs' and Class Members' Personal Health Information obtained when they visited Defendant's website and transmitted it to Facebook.

7. Defendant's conduct in disclosing such protected health information about their patients to Facebook and other third parties without notice or consent violates Missouri law, including Mo. Rev. Stat. § 569.095 (Tampering with Computer Data), Mo. Rev. Stat. § 407.020 (Unlawful Practices), Mo. Rev. Stat. § 491.060(5) (Persons Incompetent to Testify), Mo. Rev. Stat. § 407.1500 (Notice to Consumer for Breach of Security), and the fiduciary duty of confidentiality owed by hospitals to their patients first established in *Brandt v. Med. Def. Assocs*., 856 S.W.2d 667, 674 (Mo. 1993).

8. On behalf of themselves and all similarly situated citizens in the state of Missouri, Plaintiffs seek an order enjoining Defendant from further unauthorized disclosure of their personal information; awarding liquidated damages in the amount of $5,000 per violation, attorney's fees and costs; and granting any other preliminary or equitable relief the Court deems appropriate.

**PARTIES TO THE ACTION**

9. Defendant SSM Health Care Corporation is a Missouri corporation with its principal office at 3 Cityplace Drive, Suite 700, St. Louis, MO 63141-7389. Defendant is one of

Electronically Filed - CITY OF ST. LOUIS - October 25, 2023 - 11:26 AM

the largest health systems in the Midwest.[1] Defendant owns and manages numerous healthcare facilities in Missouri, including SSM Health Saint Louis University Hospital, SSM Health Cardinal Glennon Children's Hospital, SSM Health St. Mary's Hospital-St. Louis, SSM Health DePaul Hospital-St. Louis, SSM Health St. Clare Hospital-Fenton, SSM Health St. Joseph Hospital-St. Charles, SSM Health St. Joseph Hospital-Lake Saint Louis, SSM Health St. Joseph Hospital-Wentzville, SSM Health St. Mary's Hospital-Centralia, SSM Health Good Samaritan Hospital-Mt. Vernon, and numerous physician offices, post-acute care facilities, home care services, and other outpatient services.[2]

10. Plaintiff, John Doe, is a Missouri citizen residing in the city of St. Louis, Missouri, has been treated by Defendant's physicians, and has been a patient at SSM Health Saint Louis University Hospital,[3] and thus also a patient of Defendant.

11. Plaintiff, James Doe, is a Missouri citizen residing in the city of St. Louis, has been a patient of SSM Health at its Missouri facilities, and thus also a patient of Defendant.

## **JURISDICTION AND VENUE**

12. This Court has personal jurisdiction over Defendant because it regularly conducts business throughout Missouri and has its principal place of business at 3 Cityplace Drive, Suite 700, St. Louis, MO 63141-7389.

13. Venue is appropriate in this Court because Plaintiffs were first injured by Defendant's conduct while residing in the city of St. Louis. Mo. Rev. Stat. § 508.010. Pursuant to Mo. Rev. Stat. § 508.101(8), Plaintiffs are deemed to have been injured in the county in which the invasion first took place. Specifically, Plaintiffs' Protected Health Information was first

[1] https://www.ssmhealth.com/resources/about
[2] https://www.ssmhealth.com/resources/about
[3] https://www.ssmhealth.com/locations/saint-louis-university-hospital

Electronically Filed - CITY OF ST. LOUIS - October 25, 2023 - 11:26 AM

tracked and transmitted to Facebook when Plaintiffs accessed Defendant's website while located in the City of St. Louis. Thus, the private information was published in the City of St. Louis.

14. Venue is also appropriate under Mo. Rev. Stat. 407.025(1) because this Circuit is where the complained of transactions took place.

## FACTUAL BACKGROUND

### A. Defendant routinely discloses the protected health information of its patients to third parties including Facebook.

15. As the Missouri Supreme Court has long recognized, hospital systems have "a fiduciary duty of confidentiality not to disclose medical information received in connection with the treatment of the patient." *Brandt v. Med. Def. Assocs*., 856 S.W.2d 667, 674 (Mo. 1993).

16. Medical patients in Missouri such as Plaintiffs have a legal interest in preserving the confidentiality of their communications with healthcare providers and have reasonable expectations of privacy that their personally identifiable information and communications will not be disclosed to third parties by Defendant without their express written consent and authorization.

17. As a health care provider, Defendant has fiduciary, common law, and statutory duties to protect the confidentiality of patient information and communications.

18. Patients are aware of the promises of confidentiality contained within the Hippocratic Oath and are protected against unauthorized disclosures of their private medical information by statutory, regulatory, and common law protections afforded them under the law.

19. Patients rely on these promises, obligations, and protections when seeking medical care.

Electronically Filed - CITY OF ST. LOUIS - October 25, 2023 - 11:26 AM

20. Patients also have reasonable expectations of privacy that their personally identifiable information and communications will not be disclosed to third parties by Defendants without their express written consent and authorization.

21. Defendant operates websites for patients, including www.ssmhealth.com.

22. Defendant's websites are designed for interactive communication with patients, including scheduling appointments, searching for physicians, paying bills, requesting medical records, learning about medical issues and treatment options, and joining support groups.

23. Defendant encourages patients to use digital tools on its websites to seek and receive health care services.

24. The home page of Defendant's website is designed for use by patients. The homepage provides patients with tools to seek medical treatment, such as to find a doctor, learn about medical treatments, and pay bills.

25. Defendant also maintains a patient portal, which allows patients to make appointments, access medical records, view lab results, and exchange communications with their health care providers. On information and belief, source code on Defendant's patient portal caused these communications to be intercepted and disclosed to multiple third parties.

26. Plaintiffs and Class Members provided their private information to Defendant's websites with the reasonable understanding that Defendant would secure and preserve the confidentiality of that information.

27. Notwithstanding patients' reasonable expectations of privacy and Defendant's legal and ethical duties of confidentiality, Defendant disclosed the contents of patients' communications and protected healthcare information via automatic data collection mechanisms embedded in the websites operated by Defendant without patients' knowledge, authorization, or

Electronically Filed - CITY OF ST. LOUIS - October 25, 2023 - 11:26 AM

consent. In doing so, Defendant systematically violated the medical privacy rights of its patients by causing the unauthorized disclosure of patient communications to be transmitted to Facebook, and other third parties.

28. The private information provided by Plaintiffs and Class Members has been—and likely will be—further disseminated to additional third parties utilizing the information for retargeting.

29. While Defendant intentionally incorporated tracking tools into its website, Defendant never disclosed to Plaintiffs or Class Members that it shared patients' sensitive and confidential communications with Facebook and other third parties. As a result, Plaintiffs and Class Members were unaware that their private information was being surreptitiously transmitted to third parties when they visited Defendant's website.

30. By design, none of the tracking mechanisms employed by Defendant are visible to patients visiting Defendant's website.

31. Defendant did not warn or otherwise disclose to Plaintiffs and Class Members that Defendant bartered their confidential medical communications to Facebook for advertising purposes.

32. Plaintiffs and Class Members provided Private Information to Defendant to receive medical services rendered and with the reasonable expectation that Defendant would protect their Personal Health Information. Plaintiffs and Class Members relied on Defendant to secure and protect their Personal Health Information and not disclose it to unauthorized third parties without their knowledge or consent.

33. Defendant owed common law, ethical, and statutory duties to keep Plaintiffs' and Class Members' Private Information safe, secure, and confidential. Furthermore, by obtaining,

Electronically Filed - CITY OF ST. LOUIS - October 25, 2023 - 11:26 AM

collecting, using, and deriving a benefit from Plaintiffs' and Class Members' Personal Health Information, Defendant assumed legal and equitable duties to those individuals to protect and safeguard that information from unauthorized disclosure.

34. Defendant, however, failed in its obligations and promises by utilizing the Meta Pixel and Conversions API on its websites knowing that such technology would transmit and share Plaintiffs' and Class Members' Private Information with Facebook.

35. Plaintiffs and Class Members never consented, agreed, or otherwise authorized Defendant to disclose their confidential medical communications.

36. Upon information and belief, Defendants intercepted and disclosed the following non-public private information to Facebook and other third parties:

a. Plaintiffs' and Class Members' status as patients;

b. Plaintiffs' and Class Member's communications with Defendant via their websites;

c. Plaintiffs' and Class Members' use of Defendant's patient portal;

d. Plaintiffs' and Class Member's searches for information regarding specific medical conditions and treatments, their medical providers, and their physical location.

37. Defendant interfered with Plaintiffs' and Class Members' privacy rights when it implemented technology (including the Meta Pixel) on every page of its websites that surreptitiously tracked, recorded, and disclosed Plaintiffs' and Class Members' confidential information to Facebook and other third parties.

38. Defendant also breached their obligations to Plaintiffs and Class Members in multiple other ways, including failing to obtain their consent to disclose their private information to Facebook, (2) failing to adequately review its marketing programs and web-based technology to ensure their website was safe and secure, (3) failing to remove or disengage software code that

Electronically Filed - CITY OF ST. LOUIS - October 25, 2023 - 11:26 AM

was known and designed to share patients' private information with third parties, (4) failing to take steps to block the transmission of Plaintiffs' and Class Members' private information to Facebook and other third-party advertising companies, (5) failing to warn Plaintiffs and Class Members that Defendant was routinely bartering their private information to Facebook via the Meta Pixel, and (6) otherwise ignoring Defendant's common and statutory obligations to protect the confidentiality of patients' protected health information.

39. Plaintiffs and Class Members have suffered injury because of Defendant's conduct. Their injuries include, but are not limited to, invasion of privacy and the continued and ongoing risk of irreparable harm from the disclosure of their most sensitive and personal information.

**B. The nature of Defendant's unauthorized disclosure of patients' health care information.**

40. Defendant's disclosure of patients' personal healthcare information occurred because Defendant intentionally deployed source code on the websites it operates that caused patients' personally identifiable information (as well as the exact contents of their communications) to be transmitted to third parties.

41. By design, third parties receive and record the exact contents of patient communications before the full response from Defendant to patients has been rendered on the screen of the patient's computer device and while the communication between Defendant and the patient remains ongoing.

42. Websites like those maintained by Defendant are hosted by a computer server through which the business in charge of the website exchanges and communicates with internet users via their web browsers.

Electronically Filed - CITY OF ST. LOUIS - October 25, 2023 - 11:26 AM

43. For example, when Plaintiffs or a Class Member accessed Defendant's website pages hosting the Meta Pixel, the Meta Pixel software hosted on Defendant's servers directed their browsers to send a message to Facebook's servers. The information that Defendant sent to Facebook included the private information that Plaintiffs and Class Members communicated to Defendant's websites, such as the type of medical appointment the patient made, the date, and the specific doctor the patient was seeing. Such private information allows third-party advertising companies like Facebook to determine that a specific patient was seeking a specific type of confidential medical treatment. This kind of disclosure also allows Facebook to reasonably infer that a specific patient was being treated for specific types of medical conditions, such as cancer and pregnancy.

44. Websites like those maintained by Defendant are hosted by a computer server through which the business in charge of the website exchanges and communicates with internet users via their web browsers. Via Defendant's computer, Defendant exchanged communications with internet users via a client device, such as a computer, tablet, or smart phone, via the client device's web browser.

45. Web browsers are software applications that allow users to exchange electronic communications over the internet.

46. Each exchange of an electronic communication over the internet typically consists of an HTTP request from a client device and an HTTP response from a server. When a user types a URL into a web browser, for example, the URL is sent as an HTTP request to the server corresponding to the web address, and the server then returns an HTTP response that consists of a web page to render in the client device's web browser.

Electronically Filed - CITY OF ST. LOUIS - October 25, 2023 - 11:26 AM

47. In addition to specifying the URL, HTTP requests can also send data to the host server, including users' cookies. Cookies are text files stored on client devices to record data, often containing sensitive, personally identifiable information.

48. In turn, HTTP responses may consist, among other things, of a web page, another kind of file, text information, or error codes.

49. A web page consists primarily of "Markup" and "Source Code." The markup of a web page comprises the visible portion of that web page. Markup is displayed by a web browser in the form of words, paragraphs, images, and videos displayed on a users' device screen. The source code of a web page is a set of instructions that commands the browser to take certain actions, either when the web page loads or when a specified event triggers the code.

50. For example, typing www.ssmhealth.com into a browser sends a HTTP request to Defendant's website, which returns a HTTP response in the form of the home page of Defendant's website:




Not an Official Court Document

Electronically Filed - CITY OF ST. LOUIS - October 25, 2023 - 11:26 AM

51. Source code is not visible on the client device's screen, but it may change the markup of a webpage, thereby changing what is displayed on the client device's screen. Source code may also execute a host of other programmatic instructions, including commanding a web browser to send data transmissions in the form of HTTP requests to the website's server, or, as is the case with Defendants' website, to third parties via pixels.

52. For example, Defendant's websites include software code that transmits HTTP requests directly to Facebook, including patients' private health information, every time a patient interacts with a page on their websites.

53. The basic command that web browsers use to exchange data and user communications is called a GET request. For example, when a patient types "heart failure treatment" into the search box on Defendant's website and hits 'Enter,' the patient's web browser makes a connection with the server for Defendant's website and sends the following request: "GET search/q=heart+failure+treatment."

54. When Defendant's server receives a GET request, the information becomes appended to the next URL (or "Uniform Resource Locator") accessed by the user. For example, if a patient enters "respiratory problems" into the query box of a website search engine, and the search engine transmits this information using a GET request method, then the words "respiratory" and "problems" will be appended to the query string at the end of the URL of the webpage showing the search results.

55. The other basic transmission command utilized by web browsers is POST, which is typically employed when a user enters data into a form on a website and clicks 'Enter' or some other form of submission button. POST sends the data entered in the form to the server hosting the website that the user is visiting.

Electronically Filed - CITY OF ST. LOUIS - October 25, 2023 - 11:26 AM

56. In response to receiving a GET or POST command, the server for the website with which the user is exchanging information will send a set of instructions to the web browser and command the browser with source code that directs the browser to render the website's responsive communication.

57. Once the initial connection is made between a user and a website, the communications commence and continue between the parties in a bilateral fashion until the user leaves the website.

58. Unbeknownst to users, however, the website's server may also transmit the user's communications to third parties via third party tracking tools. Indeed, Google warns website developers and publishers that installing its ad tracking software on webpages employing GET requests will result in users' personally identifiable information being disclosed to Google.

59. Third parties (such as Facebook and Google) use the information they receive to track user data and communications for marketing purposes.

60. In many cases, third-party marketing companies acquire the content of user communications through a 1x1 pixel (the smallest dot on a user's screen) called a tracking pixel, a web-bug, or a web beacon. These tracking pixels are tiny and are purposefully camouflaged to remain invisible to users.

61. Tracking pixels can be placed directly on a web page by a developer, or they can be funneled through a "tag manager" service to make the invisible tracking run more efficiently and to further obscure the third parties to whom users' personally identifiable data and communications are transmitted without their knowledge or consent.

62. Tag managers are simple enough that non-programmers can use them to deploy and remove digital tracking tools from web-properties with just the click of a few buttons.

Electronically Filed - CITY OF ST. LOUIS - October 25, 2023 - 11:26 AM

63. By design, none of the tracking is visible to patients visiting Defendants' website.

64. Tracking pixels can collect dozens of data points about individual website users who interact with a website. For example, when a patient clicked through Defendant's website to the page describing Defendants' "Cancer Care & Support" services at https://www.ssmhealth.com/services/cancer-care-support, the source code deployed on Defendant's websites causes personally identifiable information and the content of patient communications to be transmitted to third parties, including Heap Analytics, You Tube, and Facebook:




65. By design, the transmission of patient data to third parties occurs before Defendants' responsive communications about "Cancer Care" services have been delivered in full to the patient.

66. With substantial work and technical know-how, internet users can sometimes circumvent this browser-based wiretap technology. This is why third parties bent on gathering

Electronically Filed - CITY OF ST. LOUIS - October 25, 2023 - 11:26 AM

Private Information, like Facebook, implement workarounds that cannot be evaded by savvy users. Facebook's workaround, for example, is called Conversions API (CAPI). CAPI is an effective workaround because it does not intercept data communicated from the user's browser. Instead, Conversions API is designed to create a direct connection between web hosts marketing data and Facebook. Thus, the communications between patients and Defendant, which are necessary to use Defendant's website, are actually received by Defendant and stored on its server before CAPI collects and sends the Private Information contained in those communications directly from Defendant to Facebook. Client devices do not have access to host servers and thus cannot prevent (or even detect) this transmission.

67. The Conversions API is an alternative method of tracking versus the Meta Pixel because no privacy protections on the user's end can defeat it. This is because it is Server-Side implementation versus execution by users' web browsers.

68. While there is no way to confirm with certainty that a web host like Defendant have implemented workarounds like CAPI without access to the host server, companies like Facebook instruct companies to use the CAPI in addition to the Pixel, and share the same events using both tools because such a redundant event setup allows website owners to share website events with Facebook that the pixel may lose. Thus, it is reasonable to infer that Facebook's customers who implement the Meta Pixel in accordance with Facebook's documentation will also implement the CAPI workaround.

69. A web site developer who chooses to deploy third-party source code, like a tracking pixel, on their website must include the third-party source code directly in their website for every third party they wish to send user data and communications. This source code operates

Electronically Filed - CITY OF ST. LOUIS - October 25, 2023 - 11:26 AM

invisibly in the background when users visit a site employing such code. Tracking pixels can collect dozens of data points about individual website users who interact with a website.

70. For example, one of the world's most prevalent tracking pixels, called the Meta Pixel, is provided by Facebook.

71. Tracking pixels such as the Meta Pixel tool allow Defendant and Facebook to secretly track, intercept, record, and transmit every patient communication made on Defendant's website. When patients visited Defendant's website, unbeknownst to them, the web page displayed on the patient's browser includes the Meta Pixel as embedded code, which is not visible to patients or other visitors to Defendant's websites. This code is triggered when a patient or visitor interacts with the web page. Each time the Meta Pixel is triggered, the software code is executed and sends patient's private information directly to Facebook.

72. The Meta Pixel and similar tracking pixels act like a physical wiretap on a phone. Like a physical wiretap, pixels do not appear to alter the function of the communication device on which they surreptitiously installed. Instead, these pixels lie in wait until they are triggered by an event, at which time they effectively open a channel through the website funnels data about users and their actions to third parties via a hidden HTTP request that is never shown to or agreed to by the user.

73. For example, a patient can trigger an HTTP request by interacting with the search bar on Defendant's website by typing a term such as "breast cancer" into the search bar and then hitting enter. Defendant's server in turn sends an HTTP response, which results in the search results being displayed.

74. This is not the only HTTP request, however, that was created by a patient's interaction with Defendant's website. In fact, at the very same time the website was instructed to

Electronically Filed - CITY OF ST. LOUIS - October 25, 2023 - 11:26 AM

send an HTTP request to Defendant's server requesting search results, the embedded source code, acting as a tap, was triggered, such that patient's browsers were also instructed to send an HTTP request directly to Facebook and other third parties informing them of the patient's exact search and the patient's identifiable information.

**C. Tracking pixels provide third parties with a trove of personally identifying data permitting them to uniquely identify the individuals browsing a website.**

75. Tracking pixels are especially pernicious because they result in the disclosure of personally identifiable information.

76. For example, an IP address is a number that identifies a computer connected to the internet. IP addresses are used to identify and route communications on the internet. IP addresses of individual users are used by internet service providers, websites, and tracking companies to facilitate and track internet communications and content. IP addresses also offer advertising companies like Facebook a unique and semi-persistent identifier across devices—one that has limited privacy controls.[4]

77. Because of their uniquely identifying characteristics, IP addresses are considered personally identifiable information.[5]

78. Tracking pixels can (and typically do) collect website visitors' IP addresses.

79. Likewise, internet cookies also provide personally identifiable information.

80. In the early years of the internet, advertising on websites followed the same model as traditional newspapers. Just as a sporting goods store would choose to advertise in the sports section of a traditional newspaper, advertisers on the early internet paid for ads to be placed on specific web pages based on the type of content displayed.

[4] https://adtechexplained.com/the-future-of-ip-address-as-an-advertising-identifier/
[5] 45 CFR § 164.514.

Electronically Filed - CITY OF ST. LOUIS - October 25, 2023 - 11:26 AM

81. Computer programmers eventually developed 'cookies'—small text files that web servers can place on a user's browser and computer when a user's browser interacts with a website server. Eventually some cookies were designed to acquire and record an individual internet user's communications and activities on websites across the internet.

82. Cookies are designed to operate as a means of identification for internet users. Advertising companies like Facebook have developed methods for monetizing and profiting from cookies. These companies use third-party tracking cookies to help them acquire and record user data and communications in order to sell targeted advertising that is customized to a user's personal communications and browsing history. To build individual profiles of internet users, third party advertising companies assign each user a unique (or a set of unique) identifiers to each user.

83. Cookies are considered personal identifiable information,[6] and tracking pixels can collect cookies from website visitors.

84. In general, cookies are categorized by (1) duration and (2) party.

85. There are two types of cookies classified by duration.

86. "Session cookies" are placed on a user's computing device only while the user is navigating the website that placed and accesses the cookie. The user's web browser typically deletes session cookies when the user closes the browser.

87. "Persistent cookies" are designed to survive beyond a single internet-browsing session. The party creating the persistent cookie determines its lifespan. As a result, a persistent cookie can acquire and record a user's internet communications for years and over dozens or even hundreds of websites. Persistent cookies are also called "tracking cookies."

88. Cookies are also classified by the party that uses the collected data.

[6] 45 CFR § 164.514.

Electronically Filed - CITY OF ST. LOUIS - October 25, 2023 - 11:26 AM

89. "First-party cookies" are set on a user's device by the website with which the user is exchanging communications. First-party cookies can be helpful to the user, server, and/or website to assist with security, login, and functionality.

90. "Third-party cookies" are set on a user's device by website servers other than the website or server with which the user is exchanging communications. For example, the same patient who visits Defendants' website will also have cookies on their device from third parties, such as Facebook. Unlike first-party cookies, third-party cookies are not typically helpful to the user. Instead, third-party cookies are typically used for data collection, behavioral profiling, and targeted advertising.

91. Data companies like Facebook have developed methods for monetizing and profiting from cookies. These companies use third-party tracking cookies to help them acquire and record user data and communications in order to sell advertising that is customized to a user's communications and habits. To build individual profiles of internet users, third party data companies assign each user a unique identifier or set of unique identifiers.

92. Traditionally, first-party and third-party cookies were kept separate. An internet security policy known as the same-origin policy required web browsers to prevent one web server from accessing the cookies of a separate web server. For example, although Defendant can deploy source code that uses Facebook third-party cookies to help Facebook acquire and record a patient's communications, Defendant is not permitted direct access to Facebook third-party cookie values. The reverse *was* also true: Facebook was not provided direct access to the values associated with first-party cookies set by companies like Defendant. But Data companies have designed a way to hack around the same-origin policy so that third-party data companies like Facebook can gain access to first-party cookies.

Electronically Filed - CITY OF ST. LOUIS - October 25, 2023 - 11:26 AM

93. JavaScript source code developed by third party data companies and placed on a webpage by developers such as Defendant can bypass the same-origin policy to send a first-party cookie value in a tracking pixel to the third-party data company. This technique is known as "cookie synching," and it allows two cooperating websites to learn each other's cookie identification numbers for the same user. Once the cookie synching operation is completed, the two websites can exchange any information that they have collected and recorded about a user that is associated with a cookie identifier number. The technique can also be used to track an individual who has chosen to deploy third-party cookie blockers.

94. In effect, cookie synching is a method through which Facebook and other third-party marketing companies set and access third-party cookies that masquerade as first-party cookies. By designing these special third-party cookies that are set for first-party websites, Facebook hacks its way around any cookie blockers that users set up to stop their tracking. On information and belief, the letters fbp are an acronym for Facebook Pixel.

95. The Facebook _fbp cookie is a Facebook identifier that is set by Facebook source code and associated with the health care provider using the Meta Pixel.

96. The _fbp cookie is also a third-party cookie in that it is also a cookie associated with Facebook that is used by Facebook to associate information about a person and their communications with non-Facebook entities while the person is on a non-Facebook website or app.

97. Defendant requires patients using their patient portal to have enabled first-party cookies to gain access to their patient portal.

98. The _fbp cookie is used as a unique identifier for patients by Facebook.

Electronically Filed - CITY OF ST. LOUIS - October 25, 2023 - 11:26 AM

99. If a patient takes an action to delete or clear third-party cookies from their device, the _fbp cookie is not impacted—even though it is a Facebook cookie—because Facebook has disguised it as a first-party cookie. Facebook also uses IP addresses and user-agent information to match the health information it receives from Defendant with Facebook users.

100. Defendants engaged in cookie synching with Facebook and other third parties.

101. Defendant's cookie disclosures include the deployment of cookie synching techniques that cause the disclosure of the first-party cookie values that Defendant assigns to patients to also be made to third parties.

102. Defendant uses and causes the disclosure of patient cookie identifiers with each re-directed communication described herein, including patient communications concerning individual providers, conditions, and treatments.

103. A third type of personally identifiable information is what data companies refer to as a "browser-fingerprint." A browser-fingerprint is information collected about a computing device that can be used to identify the specific device.

104. These browser-fingerprints can be used to uniquely identify individual users when a computing device's IP address is hidden or cookies are blocked and can provide a wide variety of data. With browser fingerprinting, developers have found ways to use tiny bits of information that vary between users, such as what device they have or what fonts they have installed to generate a unique identifier which can then be used to match a user across websites.[7] The value of browser-fingerprinting to advertisers (and trackers who want to monetize aggregated data) is that they can be used to track website users just as cookies do, but it employs much more subtle

[7] https://www.blog.google/products/chrome/building-a-more-private-web/

Electronically Filed - CITY OF ST. LOUIS - October 25, 2023 - 11:26 AM

techniques.[8] Additionally, unlike cookies, users cannot clear their fingerprint and therefore cannot control how their personal information is collected.[9]

105. In 2017, researchers demonstrated that browser fingerprinting techniques can successfully identify 99.24 percent of all users.[10]

106. Browser-fingerprints are considered personal identifiers, and tracking pixels can collect browser-fingerprints from website visitors.

107. Defendant uses and causes the disclosure of data sufficient for third parties to create a browser-fingerprint identifier with each re-directed communication described herein, including patient communications concerning individual providers, conditions, and treatments.

108. A fourth kind of personally identifiable information protected by law against disclosure are unique user identifiers (such as Facebook's "Facebook ID") that permit companies like Facebook to quickly and automatically identify the personal identity of its user across the internet whenever the identifier is encountered. A Facebook ID is an identifiable number string that is connected to a user's Facebook profile. Anyone with access to a user's Facebook ID can locate a user's Facebook profile.

109. Unique personally identifiable information such as a person's Facebook ID are likewise capable of collection through pixel trackers.

40. Each of the individual data elements described above is personally identifiable on their own. However, Defendant's disclosures of such personally identifiable data elements did not occur in a vacuum. The disclosures of the different data elements are tied together and, when taken together, these data elements are even more accurate in identifying individual patients,

[8] https://pixelprivacy.com/resources/browser-fingerprinting/
[9] https://www.blog.google/products/chrome/building-a-more-private-web/
[10] https://www.ndss-symposium.org/ndss2017/ndss-2017-programme/cross-browser-fingerprinting-os-and-hardware-level-features/

Electronically Filed - CITY OF ST. LOUIS - October 25, 2023 - 11:26 AM

particularly when disclosed to data companies such as Facebook and other internet marketing companies that expressly state that they use such data elements to identify individuals.

**D. Facebook's Business Model: Exploiting Users' Personal Information for Profit**

110. Facebook, a social media platform founded in 2004 and today operated by Meta Platforms, Inc., was originally designed as a social networking website for college students.

111. Facebook describes itself as a "real identity" platform.[11] This means that users are permitted only one account and must share "the name they go by in everyday life." To that end, Facebook requires users to provide their first and last name, along with their birthday, telephone number and/or email address, and gender, when creating an account.

112. In 2007, realizing the value of having direct access to millions of consumers, Facebook began monetizing its platform by launching "Facebook Ads," proclaiming this service to be a "completely new way of advertising online," that would allow "advertisers to deliver more tailored and relevant ads."[12] Facebook has since evolved into one of the largest advertising companies in the world.[13] Facebook can target users so effectively because it surveils user activity both on and off their website through the use of tracking pixels. This allows Facebook to make inferences about users based on their interests, behavior, and connections.

113. Today, Facebook provides advertising on its own social media platforms, as well as other websites through its Facebook Audience Network. Facebook has more than 2.9 billion users.[14]

114. In conjunction with its advertising business, Facebook encourages and promotes entities and website owners, such as Defendant, to utilizes its "Business Tools" to gather,

[11] https://www.wsj.com/articles/how-many-users-does-facebook-have-the-company-struggles-to-figure-it-out-11634846701#:~:text=Facebook%20said%20in%20its%20most,of%20them%20than%20developed%20ones.
[12] https://about.fb.com/news/2007/11/facebook-unveils-facebook-ads/
[13] https://www.pewresearch.org/fact-tank/2021/06/01/facts-about-americans-and-facebook/
[14] https://www.statista.com/statistics/264810/number-of-monthly-active-facebook-users-worldwide/

Electronically Filed - CITY OF ST. LOUIS - October 25, 2023 - 11:26 AM

identify, target, and market products and services to individuals. Facebook's Business Tools, including the Pixel and Conversions API, are bits of code that advertisers can integrate into their webpages, mobile applications, and servers, thereby enabling the interception and collection of user activity on those platforms. By installing and implementing these tools, on its own website and servers, Defendant caused Plaintiffs' and Class Members' communications to be intercepted and transmitted to Facebook via the Meta Pixel, and it caused a second improper disclosure of that information through Conversions API.

115. The Business Tools Facebook provides are automatically configured to capture "Standard Events" such as when a user visits a particular webpage, that webpage's Universal Resource Locator ("URL") and metadata, button clicks, etc. Advertisers, such as Defendant, can then track other user actions and can create their own tracking parameters by building a "custom event."

116. Facebook maintains profiles on users that include users' real names, locations, email addresses, friends, likes, and communications. These profiles are associated with personal identifiers, including IP addresses, cookies, and other device identifiers. Facebook also tracks non-users across the web through its internet marketing products and source code.

117. Facebook offers several advertising options based on the type of audience that an advertiser wants to target. Those options include targeting "Core Audiences," "Custom Audiences," "Look Alike Audiences," and even more granulated approaches within audiences called "Detailed Targeting." Each of Facebook's advertising tools allow an advertiser to target users based, among other things, on their personal data, including geographic location, demographics (e.g., age, gender, education, job title, etc.), interests, (e.g., preferred food, movies), connections (e.g., particular events or Facebook pages), and behaviors (e.g., purchases,

Electronically Filed - CITY OF ST. LOUIS - October 25, 2023 - 11:26 AM

device usage, and pages visited). This audience can be created by Facebook, the advertiser, or both working in conjunction.

118. Ad Targeting has been extremely successful due to Facebook's ability to target individuals at a granular level. For example, among many possible target audiences, "Facebook offers advertisers 1.5 million people 'whose activity on Facebook suggests that they're more likely to engage with/distribute liberal political content' and nearly seven million Facebook users who 'prefer high-value goods in Mexico.'"[15] Aided by highly granular data used to target specific users, Facebook's advertising segment quickly became Facebook's most successful business unit, with millions of companies and individuals utilizing Facebook's advertising services.

**E. Facebook's Meta Pixel tool allows Facebook to track the personal data of individuals across a broad range of third-party websites.**

119. To power its advertising business, Facebook uses a variety of tracking tools to collect data about individuals, which it can then share with advertisers. These tools include software development kits incorporated into third-party applications, its "Like" and "Share" buttons (known as "social plug-ins"), and other methodologies, which it then uses to power its advertising business.

120. One of Facebook's most powerful tools is called the "Meta Pixel."

121. The Meta Pixel is a snippet of code embedded on a third-party website that tracks users' activities as users navigate through a website. Once activated, the Meta Pixel "tracks the people and type of actions they take." Meta Pixel can track and log each page a user visits, what buttons they click, as well as specific information that users input into a website. The Meta Pixel code works by sending Facebook a detailed log of a user's interaction with a website such as

[15] https://www.nytimes.com/2018/04/11/technology/facebook-privacy-hearings.html

Electronically Filed - CITY OF ST. LOUIS - October 25, 2023 - 11:26 AM

clicking on a product or running a search via a query box. The Meta Pixel also captures information such as what content a user views on a website or how far down a web page they scrolled.[16] The analytics provided by the Meta Pixel tool allow website developers to improve "website operability" by giving developers insight into how customers use and interact with companies' websites.[17]

122. When a patient uses their healthcare provider's website or application where the Meta Pixel is present, the Meta Pixel transmits the content of their communications to Facebook, including but not limited to (1) signing up for a patient portal, (2) signing-in and -out of a patient portal, (3) taking actions inside a patient portal, (4) making or scheduling appointments, (5) exchanging communications related to doctors, treatments, payment information, health insurance information, prescription drugs, prescriptions, side effects, conditions, diagnoses, prognoses, or symptoms of health conditions, (6) conduct a search on a Facebook partner website, and (7) other information that qualifies as personal health information under state and federal laws.

123. In many circumstances, Facebook also obtains information from health care providers that identify a Facebook user's status as a patient and other health information that is protected by state and federal law. This occurs through tools that Facebook encourages health care providers to use to upload customer (i.e., patient) lists for use in its advertising systems.

124. The information transmitted from a health care provider's website or application is sufficient to uniquely identify a patient under federal law (such as IP addresses and device identifiers that Facebook associates with a patient's Facebook account), and may also include a

[16] https://themarkup.org/show-your-work/2022/04/28/how-we-built-a-meta-pixel-inspector
[17] https://www.fiercehealthcare.com/health-tech/advocate-aurora-health-data-breach-revealed-pixels-protected-health-information-3

Electronically Filed - CITY OF ST. LOUIS - October 25, 2023 - 11:26 AM

patient's demographic information, email address, phone number, computer ID address, contact information, appointment type and date, treating physicians, button and menu selections, the content of buttons clicked, information typed into text boxes, and information about the substance, purport, and meaning of patient requests for information from their health care providers.

125. When someone visits a third-party website page that includes the Meta Pixel code, the Meta Pixel code is able to replicate and send the user data to Facebook through a separate (but simultaneous) channel in a manner that is undetectable by the user.[18] This information is disclosed to Facebook regardless of whether a user is logged into their Facebook account at the time.

126. The transmission is instantaneous—indeed Facebook often receives the information before the health care provider does.

127. The transmission is invisible.

128. The transmission is made without any affirmative action taken by the patient.

129. The transmission occurs without any notice to the patient that it is occurring.

130. Facebook collects the transmitted identifiable health information and uses "cookies" to match it to Facebook users, allowing Facebook to target ads to a person who, for example, has used a patient portal and has exchanged communications about a specific condition, such as cancer.

131. The information Meta Pixel captures and discloses to Facebook includes a referrer header (or "URL"), which includes significant information regarding the user's browsing history, including the identifiable information of the individual internet user and the web server, as well

[18] *See, e.g., In re Facebook, Inc. Internet Tracking Litigation,* 956 F.3d 589, 596 (9th Cir. 2020) (explaining functionality of Facebook software code on third-party websites).

Electronically Filed - CITY OF ST. LOUIS - October 25, 2023 - 11:26 AM

as the name of the web page and the search terms used to find it.[19] When users enter a URL address into their web browser using the 'http' web address format, or click hyperlinks embedded on a web page, they are actually telling their web browsers (the client) which resources to request and where to find them. Thus, the URL provides significant information regarding a user's browsing history, including identifiable information for the individual internet user and the web server, as well as the name of the web page and the search terms that the user used to find it.

132. These search terms and the resulting URLs divulge a user's personal interests, queries, and habits on third-party websites operating outside of Facebook's own platform. In this manner, Facebook tracks users browsing histories on third-party websites, and compiles these browsing histories into personal profiles which are sold to advertisers to generate revenue.[20]

133. For example, if Meta Pixel is incorporated on a shopping website, it may log what searches a user performed, which items of clothing a user clicked on, whether they added an item to their cart, as well as what they purchased. Along with this data, Facebook also receives personally identifiable information like IP addresses, Facebook IDs, user agent information, device identifiers, and other data. All this personally identifiable data is available each time the Meta Pixel forwards a user's interactions with a third-party website to Facebook's servers. Once Facebook receives this information, Facebook processes it, analyzes it, and assimilates it into datasets like its Core Audiences and Custom Audiences. Facebook can then sell this information to companies who wish to display advertising for products similar to what the user looked at on the original shopping website.

[19] *In re Facebook*, 956 F.3d at 596.
[20] *In re Facebook*, 956 F.3d at 596.

Electronically Filed - CITY OF ST. LOUIS - October 25, 2023 - 11:26 AM

134. These communications with Facebook happen silently, without users' knowledge. By default, the transmission of information to Facebook's servers is invisible. Facebook's Meta Pixel allows third-party websites to capture and send personal information a user provides to match them with Facebook or Instagram profiles, even if they are not logged into Facebook at the time.[21]

135. In exchange for installing its Meta Pixel, Facebook provides website owners like Defendant with analytics about the ads they've placed on Facebook and Instagram and tools to target people who have visited their website.[22] The Meta Pixel collects data on website visitors regardless of whether they have Facebook or Instagram accounts.[23]

136. The Meta Pixel collects data on website visitors regardless of whether they have Facebook or Instagram accounts.[24]

137. Facebook can then share analytic metrics with the website host, while at the same time sharing the information it collects with third-party advertisers who can then target users based on the information collected and shared by Facebook.

138. Facebook touted Meta Pixel (which it originally called "Facebook Pixel") as "a new way to report and optimize for conversions, build audiences and get rich insights about how people use your website."[25] According to Facebook, the Meta Pixel is an analytics tool that allows business to measure the effectiveness of their advertising by understanding the actions people take on their websites."[26]

[21] https://themarkup.org/show-your-work/2022/04/28/how-we-built-a-meta-pixel-inspector
[22] https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites
[23] https://themarkup.org/show-your-work/2022/04/28/how-we-built-a-meta-pixel-inspector
[24] https://themarkup.org/show-your-work/2022/04/28/how-we-built-a-meta-pixel-inspector
[25] https://developers.facebook.com/ads/blog/post/v2/2015/10/14/announcing-facebook-pixel/
[26] https://www.oviond.com/understanding-the-facebook-pixel

Electronically Filed - CITY OF ST. LOUIS - October 25, 2023 - 11:26 AM

139. Facebook warns web developers that its Meta Pixel enables Facebook "to match your website visitors to their respective Facebook User accounts."[27]

140. Facebook recommends that its Meta Pixel code be added to the base code on every website page (including the website's persistent header) to reduce the chance of browsers or code from blocking Pixel's execution and to ensure that visitors will be tracked.

141. Once Meta Pixel is installed on a business's website, the Meta Pixel tracks users as they navigate through the website and logs which pages are visited, which buttons are clicked, the specific information entered in forms (including personal information), as well as "optional values" set by the business website. Meta Pixel tracks this data regardless of whether a user is logged into Facebook.

142. Facebook tracks non-Facebook users through its widespread internet marketing products and source code and Mark Zuckerberg has conceded that the company maintains "shadow profiles" on nonusers of Facebook.[28]

143. For Facebook, the Meta Pixel tool embedded on third-party websites acts as a conduit for information, sending the information it collects to Facebook through scripts running in a user's internet browser, similar to how a "bug" or wiretap can capture audio information. The information is sent in data packets, which include personally identifiable data.

144. For Facebook, the Meta Pixel tool embedded on third-party websites acts as a conduit for information, sending the information it collects to Facebook through scripts running in a user's internet browser, similar to how a "bug" or wiretap can capture audio information. The information is sent in data packets, which include personally identifiable data such as a user's IP address.

---

[27] https://developers.facebook.com/docs/meta-pixel/get-started
[28] https://techcrunch.com/2018/04/11/facebook-shadow-profiles-hearing-lujan-zuckerberg/

Electronically Filed - CITY OF ST. LOUIS - October 25, 2023 - 11:26 AM

145. For example, the Meta Pixel is configured to automatically collect "HTTP Headers" and "Pixel-specific data." HTTP headers collect data including "IP addresses, information about the web browser, page location, document, referrer and person using the website." Pixel-specific data includes such data as the "Pixel ID and the Facebook Cookie."

146. Meta Pixel takes the information it harvests and sends it to Facebook with personally identifiable information, such as a user's IP address, name, email, phone number, and specific Facebook ID. Anyone who has access to this Facebook ID can use this identifier to quickly and easily locate, access, and view a user's corresponding Facebook profile. Facebook stores this information on its servers, and, in some instances, maintains this information for years.[29]

147. Facebook has a number of ways that it can potentially use personally identifiable information being forwarded from third-party websites through the Meta Pixel.

148. If a user has a Facebook account, other personally identifiable information can potentially be linked to an individual user's Facebook account. For example, if the user is logged into their Facebook account when the user visits a third-party website where the Meta Pixel is installed, many common browsers will attach third-party cookies allowing Facebook to link the data collected by Meta Pixel to the specific Facebook user.

149. Alternatively, Facebook can link personally identifiable information to a user's Facebook account through the "Facebook Cookie."[30] The Facebook Cookie is a workaround to recent cookie-blocking applications used to prevent websites from tracking users.[31]

150. While the Meta Pixel tool "hashes" personal data—obscuring it through a form of

[29] https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites
[30] https://clearcode.cc/blog/facebook-first-party-cookie-adtech/
[31] https://clearcode.cc/blog/difference-between-first-party-third-party-cookies/

Electronically Filed - CITY OF ST. LOUIS - October 25, 2023 - 11:26 AM

cryptography before sending the data to Facebook—that hashing does not prevent *Facebook* from using the data. In fact, Facebook can use the hashed information to build user profiles.[32]

151. Facebook also receives personally identifiable information in the form of user's unique IP addresses that stay the same as users visit multiple websites. When browsing a third-party website that has embedded Facebook code, a user's IP address is forwarded to Facebook by GET requests, which are triggered by Facebook code snippets. The IP address enables Facebook to keep track of the website page visits associated with that address.

152. Facebook also places cookies on visitors' computers. It then uses these cookies to store information about each user. For example, the "c_user" cookie is a unique identifier that identifies a Facebook user's ID. The c_user cookie value is the Facebook equivalent of a user identification number. Each Facebook user has one—and only one—unique c_user cookie. Facebook uses the c_user cookie to record user activities and communications.

153. The data supplied by the c_user cookie allows Facebook to identify the Facebook account associated with the cookie. One simply needs to log into Facebook, and then type www.facebook.com/#, with the c_user identifier in place of the "#." For example, the c_user cookie for Mark Zuckerberg is 4. Logging into Facebook and typing www.facebook.com/4 in the web browser retrieves Mark Zuckerberg's Facebook page: www.facebook.com/zuck.

154. Similarly, the "lu" cookie identifies the last Facebook user who logged in using a specific browser. Like IP addresses, cookies are included with each request that a user's browser makes to Facebook's servers. Facebook employs similar cookies such as "datr," "fr," "act," "presence," "spin," "wd," "xs," and "fbp" cookies to track users on websites across the

[32]https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites

Electronically Filed - CITY OF ST. LOUIS - October 25, 2023 - 11:26 AM

internet.[33] The fbp cookie, for example, is a Facebook identifier that is set by Facebook source code and associated with Defendant's use of the Facebook Tracking Pixel program. The fbp cookie emanates from Defendants' web properties but is transmitted to Facebook through cookie synching technology that Facebook employs. These cookies allow Facebook to easily link the browsing activity of its users to their real-world identities, and such highly sensitive data as medical information, religion, and political preferences.[34]

155. Facebook also uses browser fingerprinting to uniquely identify individuals. Web browsers have several attributes that vary between users, like the browser software system, plugins that have been installed, fonts that are available on the system, the size of the screen, color depth, and more. Together, these attributes create a fingerprint that is highly distinctive. The likelihood that two browsers have the same fingerprint is at least as low as 1 in 286,777, and the accuracy of the fingerprint increases when combined with cookies and the user's IP address. Facebook recognizes a visitor's browser fingerprint each time a Facebook button is loaded on a third-party website page. Using these various methods, Facebook can identify individual users, watch as they browse third-party websites like www.sssmhealth.com, and target users with advertising based on their web activity.

156. Facebook then sells advertising space by highlighting its ability to target users. Facebook can target users so effectively because it surveils user activity both on and off its official website. This allows Facebook to make inferences about users far beyond what they explicitly disclose, like their "interests," "behavior," and "connections." Facebook compiles this information into a generalized dataset called "Core Audiences," which advertisers use to create highly specific targeted advertising. Indeed, Facebook utilizes precisely the type of personal

[33] https://techexpertise.medium.com/facebook-cookies-analysis-e1cf6ffbdf8a#:~:text=browser%20session%20ends.-,%E2%80%9Cdatr%E2%80%9D,security%20and%20site%20integrity%20features.

[34] https://securehomes.esat.kuleuven.be/~gacar/fb_tracking/fb_plugins.pdf

Electronically Filed - CITY OF ST. LOUIS - October 25, 2023 - 11:26 AM

health information that Defendant bartered to Facebook so that Facebook can identify, target, and market products and services to individuals.

157. Advertisers can also build "Custom Audiences." Custom Audiences enable advertisers to reach people who have already shown interest in their business, whether they are loyal customers or people who have used their app or visited their website.

158. With Custom Audiences, advertisers can target existing customers directly, and they can also build "Lookalike Audiences," which leverages information such as demographics, interests, and behavior from a business's source audience to find new people who share similar qualities. Unlike Core Audiences, advertisers can build Custom Audiences and Lookalike Audiences only if they first supply Facebook with the underlying data. They can do so through two mechanisms: By manually uploading contact information for customers, or by utilizing Facebook's "Business Tools," including the Meta Pixel.

159. As Facebook explains, the Business Tools help website owners and publishers, app developers and business partners, including advertisers and others, integrate with Facebook, understand and measure their products and services, and better reach and serve people who might be interested in their products and services. Put more succinctly, Facebook's Business Tools are bits of code that advertisers can integrate into their website, mobile applications, and servers, thereby enabling Facebook to intercept and collect user activity on those platforms.

160. The Business Tools are automatically configured to capture certain data, like when a user visits a webpage, that webpage's Universal Resource Locator ("URL") and metadata, or when a user downloads a mobile application or makes a purchase.19 Facebook's Business Tools can also track other events. Facebook offers a menu of "standard events" from which advertisers can choose, including what content a visitor views or purchases.20 Advertisers

Electronically Filed - CITY OF ST. LOUIS - October 25, 2023 - 11:26 AM

can even create their own tracking parameters by building a "custom event."

161. The Meta Pixel is one such Business tool. Facebook offers this piece of code to advertisers like Defendant, to integrate into their websites. As the name implies, the Meta Pixel tracks the people and type of actions they take. When a user accesses a website hosting the Meta Pixel, Facebook's software script surreptitiously directs the user's browser to send a separate message to Facebook's servers. This second, secret transmission contains the original GET request sent to the host website, along with additional data that the Meta Pixel is configured to collect. This transmission is initiated by Facebook code the Defendant voluntarily added to its website and is sent concurrently with patients' communications with Defendant's website. Said differently, the Meta Pixel is able to send a copy of Class Members' communications to Defendant and Facebook.

**F. Defendant discreetly embedded the Meta Pixel tool on its website, resulting in the capture and disclosure of patients' protected health information to Facebook.**

162. A third-party website that incorporates Meta Pixel benefits from the ability to analyze a user's experience and activity on the website to assess the website's functionality and traffic. The third-party website also gains information from its customers through Meta Pixel that can be used to target them with advertisements, as well as to measure the results of advertising efforts.

163. Facebook's intrusion into the personal data of visitors to third-party websites incorporating the Meta Pixel is both significant and unprecedented. When Meta Pixel is incorporated into a third-party website, unbeknownst to users and without their consent, Facebook gains the ability to surreptitiously gather every user interaction with the website ranging from what the user clicks on to the personal information entered on a website search bar. Facebook aggregates this data against all websites. Facebook benefits from obtaining this

Electronically Filed - CITY OF ST. LOUIS - October 25, 2023 - 11:26 AM

information because it improves its advertising network, including its machine-learning algorithms and its ability to identify and target users with ads.

164. As Facebook explains, the Business Tools help website owners and publishers, app developers and business partners, including advertisers and others, integrate with Facebook, understand and measure their products and services, and better reach and serve people who might be interested in their products and services. Put more succinctly, Facebook's Business Tools are bits of code that advertisers can integrate into their website, mobile applications, and servers, thereby enabling Facebook to intercept and collect user activity on those platforms.

165. Facebook provides websites using Meta Pixel with the data it captures in the "Meta Pixel page" in Events Manager, as well as tools and analytics to reach these individuals through future Facebook ads. For example, websites can use this data to create "custom audiences" to target the specific Facebook user, as well as other Facebook users who match "custom audience's" criteria.[35] Businesses that use Meta Pixel can also search through Meta Pixel data to find specific types of users to target, such as men over a certain age.

166. Businesses install the Meta Pixel software code to help drive and decode key performance metrics from visitor traffic to their websites.[36] Businesses also use the Meta Pixel to build custom audiences on Facebook that can be used for advertising purposes.[37]

167. For example, when a user on many hospital websites clicks on a "Schedule Online" button next to a doctor's name, Meta Pixel sends the text of the button, the doctor's name, and the search term (such as "cardiology") used to find the doctor to Facebook. If the hospital's website has a drop-down menu to select a medical condition in connection with locating a doctor or making an appointment, that condition is also transmitted to Facebook

[35] https://developers.facebook.com/docs/marketing-api/reference/custom-audience/
[36] https://instapage.com/blog/meta-pixel
[37] https://instapage.com/blog/meta-pixel

Electronically Filed - CITY OF ST. LOUIS - October 25, 2023 - 11:26 AM

through Meta Pixel.

168. Facebook has designed the Meta Pixel such that Facebook receives information about patient activities on hospital websites as they occur in real time. Indeed, the moment that a patient takes any action on a webpage that includes the Meta Pixel—such as clicking a button to register, login, or to create an appointment—Facebook code embedded on that page redirects the content of the patient's communications to Facebook while the exchange of information between the patient and hospital is still occurring.

169. Defendant is among the hospital systems who embedded Meta Pixel on their websites. Defendant used Facebook's business tools and intentionally installed the Meta Pixel and Conversions API on its Web Properties to secretly track patients by recording their activity and experiences in violation of their statutory and regulatory duties to refrain from sharing patient data with third party advertising companies.

170. Defendant's Pixel had its own unique identifier, which could be used to identify which of Defendant's webpages contain the Pixel.

171. The Meta Pixel allowed Defendant to optimize delivery of ads, measure cross-device conversions, create custom audiences, and decrease advertising and marketing costs. However, Defendant's Web Properties do not rely on or require the Meta Pixel to function.

172. Via their use of the Meta Pixel, Defendant intercepted and disclosed the contents of Plaintiffs' and Class Members' communications with Defendant, including the precise text of patient search queries and communications about specific doctors, communications about medical conditions and treatments, and buttons clicked to Search, Find a Provider, connect, Login, Logout, or Enroll in Defendants' patient portal, summaries of Defendant's responsive communications, the parties to the communications, and the existence of communications at

Electronically Filed - CITY OF ST. LOUIS - October 25, 2023 - 11:26 AM

Defendant's websites

173. For example, when a patient visits the homepage of Defendants' website, the source code employed by Defendants causes personally identifiable information to be transmitted to Facebook.

174. Likewise, when a patient enters their personal information through Defendants' websites that incorporate Meta Pixel, such as to locate a doctor or make an appointment, this information, including what the patient is being treated for, those communications are immediately and instantaneously routed to Facebook via the Meta Pixel. The acquisition and disclosure of these communications occurs contemporaneously with the transmission of these communications by patients.

175. This data, which can include sensitive health information such as health conditions (e.g., addiction, Alzheimer's, heart disease), diagnoses, procedures, test results, the treating physician, medications, as well as personally identifiable information, is obtained and used by Facebook.

176. An example illustrates the point. Plaintiffs and Class Members submitted medical information to Defendant via the Website. Because Defendant utilizes the Meta Pixel, the Website's Source Code sends a secret set of instructions back to the individual's browser, causing it to secretly duplicate communications with Defendant. As a result, a second and identical set of information is automatically and instantaneously sent to Facebook's servers without the Website visitors' knowledge.

177. As the images below demonstrate, when a patient communicates their health information to the Website, that information is duplicated and sent to Facebook.

178. For example, the first image indicates that a patient has used the Website to

Electronically Filed - CITY OF ST. LOUIS - October 25, 2023 - 11:26 AM

search for a provider by Specialty or Condition (here, ADHD Attention deficit hyperactivity disorder) and who is currently accepting new patients and offering online appointment scheduling services:




179. When a patient like Plaintiffs ran a search for a doctor using this feature, SSM sent significant information about the patient's communications to Facebook, including information about the specific page the patient viewed and a full-string URL communicating that the the fact that the patient used the "find-a-doctor" tool to locate a physician who is "accepting new patients," offers "online-scheduling," and treats "adhd attention deficit hyperactivity disorder." The patient's zip code was also communicated to Facebook along with their individual Facebook ID.

Not an Official Court Document

Electronically Filed - CITY OF ST. LOUIS - October 25, 2023 - 11:26 AM

180. During the same unauthorized transmissions, the SSM website routinely provided Facebook with its patients' Facebook IDs, IP addresses, and/or device IDs or other the information they input into Defendant's website, like their home address, zipcode, or phone number. The Plaintiff's and Class Members' identities could be easily determined based on the Facebook ID, IP address, and/or reverse lookup from the collection of other identifying information that was improperly disclosed, meaning Defendant failed in its duty to adequately anonymize the personal Private Information of Plaintiff and the members of the Class.

181. The Meta Pixel also intercepted and transmitted information that patients typed into search boxes, e.g., "Do I have Covid" or forms that request confidential information like patient contact information, medical histories, insurance and financial information, and social security numbers.

182. For example, when a patient typed the phrase "I have female incontinence" into Defendant's website search bar, SSM provided a full-string URL to Facebook that provided the exact search term the patient typed ("I have female incontinence") to Facebook, along with the patient's personally identifying information, such as their Facebook ID, which is captured by the c_user data in the archived image below:

Electronically Filed - CITY OF ST. LOUIS - October 25, 2023 - 11:26 AM

▾ **Request Headers**

:authority: www.facebook.com
:method: GET
:path: /tr/?id=272252120841273&ev=PageView&dl=https%3A%2F%2Fwww.ssmhealth.com%2Fsearch%3Fsearchtext%3DI%28have%28female%28incontinence%26searchmode%3Danyword&rl=https%3A%2F%2Fwww.ssmhealth.com%2Fsearch%3Fsearchtext%3Dfemale%28incontinence%26searchmode%3Danyword&if=false&ts=1672861426389&sw=1920&sh=1080&v=2.9.90&r=stable&ec=0&o=28&it=1672861426065&coo=false&rqm=GET
:scheme: https
accept: image/avif,image/webp,image/apng,image/svg+xml,image/*,*/*;q=0.8
accept-encoding: gzip, deflate, br
accept-language: en-US,en;q=0.9
cookie: sb=G1UJYYwZM-i797zPAJe7wSMo; datr=G1UJYcU6fHxA7S_dXYoksRLp; c_user=150[redacted] xs=13%3A_J9153zJbvWkKg%3A2%3A1672416877%3A-1%3A2663%3A%3AAcVNxbZ1Z077xN2nOKiicGSXbmhu-axDDYXMp7j5uA; fr=0h8pcRNO2Xh8qjCcn.AWWWbwJvW9DT9QOB9vzYsF1XMSo.Bjtc-a.3g.AAA.0.0.Bjtc-a.AWU-ORgmOqI
referer: https://www.ssmhealth.com/
sec-ch-ua: "Not?A_Brand";v="8", "Chromium";v="108", "Google Chrome";v="108"
sec-ch-ua-mobile: ?0
sec-ch-ua-platform: "Windows"
sec-fetch-dest: image
sec-fetch-mode: no-cors
sec-fetch-site: cross-site
user-agent: Mozilla/5.0 (Windows NT 10.0; WOW64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/108.

183. Likewise, a patient searching for a doctor on Defendant's website located at www.ssmhealth.com is asked to provide a variety of information to filter the various physicians available to treat various medical conditions, including the doctor's specialty, the patient's hometown, the patient's language preference, and other information that the patient provides:

Not an Official Court Document

Electronically Filed - CITY OF ST. LOUIS - October 25, 2023 - 11:26 AM

Not an Official Court Document




184. All this data was disclosed to Facebook simultaneously in real time as patients transmitted their information, along with other data, such as patient's unique Facebook ID that is captured by the c_user cookie, which allowed Facebook to link this information to patients' unique Facebook accounts. Defendant also disclosed other personally identifying information to Facebook, such as patient IP addresses, cookie identifiers, browser-fingerprints, and device identifiers.

185. Defendant disclosed such personally identifying information and sensitive medical information even when patients were searching for doctors on its websites to assist them with conditions such as substance abuse and addiction:

Electronically Filed - CITY OF ST. LOUIS - October 25, 2023 - 11:26 AM




186. Defendant even disclosed personally identifying and sensitive medical information to Facebook about patients who were searching for treatment of HIV (Human Immunodeficiency Virus):




Not an Official Court Document

Electronically Filed - CITY OF ST. LOUIS - October 25, 2023 - 11:26 AM

187. Similarly, a patient who desires an appointment at a specific hospital using Defendant's websites was asked to fill out an extensive questionnaire, including their name, address, email address, birth date, and the provider they seek to make an appointment with. Defendant contemporaneously shares this kind of information with Facebook as well via the Meta Pixel:


Request a Pediatric Specialist Appointment

It's easy for you to request an appointment with a pediatric specialist at SSM Health Cardinal Glennon Children's Hospital using our online pediatric appointment request form or call us at 314-268-4010. After submitting the request form an SSM Health Cardinal Glennon representative will call you to schedule your child's appointment within two business days.

For Developmental Pediatrics, Psychology or Psychiatry

Please note, if you're interested in developmental pediatrics, psychology or psychiatry, please call 314-577-5609 or visit the Knights of Columbus Developmental Center page for more information.

If your child is experiencing a medical emergencies, please dial 911.

Patient's First Name

Patient's Last Name

Birth Date

*Please enter as MM/DD/YYYY.*

Parent or Guardian's First Name (if patient is under 18)

Electronically Filed - CITY OF ST. LOUIS - October 25, 2023 - 11:26 AM

Not an Official Court Document


Parent or Guardian's Last Name (if patient is under 18)

Email Address

Parent or Guardian's Phone Number

Best time of day to reach me

Morning

Address

Address 2

City

State

188. In other words, Facebook learned not just that patients are seeking treatment, but where and typically when they are seeking treatment, along with other information that patients would reasonably assume that Defendant was not sharing with third party marketing companies. Defendant make similar disclosures to Facebook and other third parties when patients click on the "Log in" buttons of the password protected portions of their website, including their patient portal and bill pay functions, and when patients "Log out" of those same password protected portions, confirming to these companies that the website users are Defendants' patients.

189. Defendant also disclosed patient information from other sections of its website including (but not limited to) communications that are captured by the website's search bar, communications that are captured when a patient searches for "Services" offered by Defendant, communications made by patients using the website's Bill Pay/Financials function, and communications made when patients are researching specific medical conditions such as

Electronically Filed - CITY OF ST. LOUIS - October 25, 2023 - 11:26 AM

COVID-19.

190. Facebook's Meta Pixel collects and forwards this data to Facebook, including the full referral URL (including the exact subpage of the precise terms being reviewed) and Facebook then correlates the URL with the patient's Facebook user ID, time stamp, browser settings, and even the type of browser used. In short, the URLs, by virtue of including the particular document within a website that a patient views, reveal a significant amount of personal data about a patient. The captured search terms and the resulting URLs divulge a patient's medical issues, personal interests, queries, and interests on third-party websites operating outside of Facebook's platform.

191. The transmitted URLs contain both the "path" and the "query string" arising from patients' interactions with Defendant's website. The path identifies where a file can be found on a website. For example, a patient reviewing information about the "Services" that Defendants offer patients such as information about pregnancy and Defendants' maternity center will generate a URL with the path https://www.ssmhealth.com/services/maternity-care.

192. Likewise, a query string provides a list of parameters. An example of a URL that provides a query string is https://www.ssmhealth.com/search?SearchValue=heart%20attack. The query string parameters in this search indicate that a search was done at Defendants' website for information about heart attacks. In other words, the Meta Pixel captures information that connects a particular user to a particular healthcare provider.

193. Defendant also provided Facebook with details about online forms that patients fill out in the form of POST requests. All the information that patients provide when filling out these forms was also disclosed to Facebook.

Electronically Filed - CITY OF ST. LOUIS - October 25, 2023 - 11:26 AM

194. As the above demonstrates, knowing what information a patient is reviewing on Defendant's website can reveal deeply personal and private information. For example, a simple search for "pregnancy" on Defendant's website tells Facebook that the patient is likely pregnant. Indeed, Facebook might know that the patient is pregnant before the patient's close family and friends. But there was nothing visible on Defendant's website that would indicate to patients that, when they used Defendant's search function, their personally identifiable data and the precise content of their communications with Defendant were being automatically captured and made available to Facebook, who could then use that information for advertising purposes even when patients searched for treatment options for sensitive medical conditions such as cancer or substance abuse.

195. The amount of data collected is significant. Via the Meta Pixel, when patients interact with their website, Defendant disclosed a full-string, detailed URL to Facebook, which contained the name of the website, folder and sub-folders on the webserver, and the name of the precise file requested. For example, when a patient types a search term into the search bar on Defendant's website, the website returns links to information relevant to the search term. When patients then click these links, a communication is created that contains a GET request and a full-string detailed URL.

196. Facebook's Meta Pixel collected and forwarded this data to Facebook, including the full referral URL (including the exact subpage of the precise terms being reviewed) and Facebook then correlates the URL with the patient's Facebook user ID, time stamp, browser settings, and even the type of browser used. In short, the URLs, by virtue of including the particular document within a website that a patient views, reveal a significant amount of personal data about a patient. The captured search terms and the resulting URLs divulge a patient's

Electronically Filed - CITY OF ST. LOUIS - October 25, 2023 - 11:26 AM

medical issues, personal interests, queries, and interests on third-party websites operating outside of Facebook's platform.

197. The contents of patients' search terms shared with Facebook plainly relate to (and disclose) the past, present, or future physical or mental health or condition of individual patients who interact with Defendant's website as well as the provision of healthcare services to those patients. Worse, no matter how sensitive the area of the Defendant's website that a patient reviews, the full-string referral URL is acquired by Facebook along with other personally identifiable information.

198. The nature of the collected data is also important. Defendant's unauthorized disclosures result in Facebook obtaining a comprehensive browsing history of an individual patient, no matter how sensitive the patient's medical condition. Facebook is then able to correlate that history with the time of day and other user actions on Defendant's website. This process results in Facebook acquiring a vast repository of personal data about patients—all without their knowledge or consent. Defendants also disclosed the same kind of information above to other third parties involved in internet marketing, including You Tube, Heap Analytics, and Siteimprove.

199. Defendant employed such pixel tracking technology on every page of its Web Properties.

200. By compelling visitors to its websites to disclose personally identifying data and sensitive medical information to Facebook and other third parties, Defendant knowingly disclosed information that allowed Facebook and other advertisers to link its patients' Personal Health Information to their private identities and target them with advertising. Defendant intentionally shared the Personal Health Information of its patients with Facebook in order to

Electronically Filed - CITY OF ST. LOUIS - October 25, 2023 - 11:26 AM

gain access to the benefits of the Meta Pixel tool.

201. For example, Plaintiff James Doe is an individual with a Facebook account. Plaintiff James Doe is also a former patient of SSM Health who, on numerous occasions from 2018 to 2023, accessed Defendant's Web Properties from his home in St. Louis, Missouri. Plaintiff used Defendant's website to find and obtain a physician specializing in treating his medical conditions, and he communicated information about his medical condition, treatments, and symptoms during his interactions with Defendant's website and patient portal. During his interactions with Defendant's Web Properties, Plaintiff James Doe entered data relating to his Attention Deficit Disorder ("ADD") and Attention Deficit Hyperactivity Disorder ("ADHD").

202. During these interactions, Plaintiff James Doe specifically searched and clicked on the "Neuropsychology" tab on Defendant's website located at https://www.ssmhealth.com/services/neurosciences/neuropsychology. Defendant also used Defendant's website to locate a physician and schedule an appointment to begin receiving treatment for his ADD and ADHD conditions. Unbeknownst to Plaintiff James Doe, during this entire time Defendant was transmitting data about Plaintiff James Doe's search for medical treatment for his psychology-treatment needs, including details about the psychiatrist appointments he made for ADHD treatment and the treatment information he reviewed, to Facebook and Google.

203. For example, Plaintiff James Doe used the search function on SSM's website to search for medical treatment:




Not an Official Court Document

Electronically Filed - CITY OF ST. LOUIS - October 25, 2023 - 11:26 AM

204. Plaintiff James Doe typed multiple search terms into the SSM search box, including "ADHD" and "psychiatrist."

205. Unbeknownst to Plaintiff James Doe, SSM had installed tracking pixels inside the search function on its website. Consequently, every time that Plaintiff James Doe used the search function, SSM shared the exact search terms that he typed with Facebook and Google, along with the full-string URL capturing the search, and personally identifying information such as Plaintiff James Doe's Facebook ID, device identifier, IP address, and browser fingerprint, which allowed Facebook and Google to specifically identify who Plaintiff James Doe and what medical condition(s) he had.

206. Plaintiff James Doe also regularly used SSM's patient portal to review doctor notes, test and lab results, and communicate with his doctors. During these interactions, Plaintiff James Doe entered medical information, including information related to his ADHD and ADD conditions, into the SSM patient portal.

207. Unbeknownst to Plaintiff James Doe, SSM had installed tracking pixels on the "MyChart" buttons that patients (including Plaintiff James Doe) used on its website to navigate to the SSM patient portal.




208. Plaintiff James Doe clicked on this button every time that he used the SSM website to navigate to the patient portal. When he did, SSM surreptitiously sent information to



Not an Official Court Document

Electronically Filed - CITY OF ST. LOUIS - October 25, 2023 - 11:26 AM

Facebook and Google confirming Plaintiff James Doe's patient status, including additional information—such as his IP address, Facebook ID, and browser fingerprint—that allowed Facebook and Google to identify him.

209. Unbeknownst to Plaintiff James Doe, SSM had also installed tracking pixels on the landing page and login button for the SSM patient portal:




210. To access his patient portal, Plaintiff James Doe visited the portal webpage and clicked on the login button every time that he accessed the SSM patient portal. Every time that he visited the patient portal page, SSM surreptitiously transmitted information about Plaintiff James Doe to third parties like Facebook and Google, including personally identifying information such as his Facebook ID. SSM also installed tracking pixels on the login buttons to its patient portal. Accordingly, every time that Plaintiff clicked on the login button to the patient portal, Prime Healthcare surreptitiously confirmed Plaintiff's patient status to Google, along with her personally identifying information, such as her IP address and browser fingerprint.

211. On information and belief, SSM also installed tracking pixels inside its patient portal that surreptitiously forwarded patient interactions to third parties, including Google. Once

Electronically Filed - CITY OF ST. LOUIS - October 25, 2023 - 11:26 AM

Plaintiff James Doe gained access to the patient portal, SSM continued to share information about his interactions with Google, including actions such as reviewing medical records related to his ADHD and ADD conditions. SSM also shared information such as his IP address and browser fingerprint that could be used to personally identify Plaintiff James Doe.

212. After using SSM's website and patient portal, Plaintiff James Doe began receiving advertisements on his Facebook page related to his ADHD and ADD medical conditions.

213. Likewise, Plaintiff John Doe also visited Defendant's website multiple times beginning in 2017 at www.ssmhealth.com and entered data, including sensitive medical information, such as details about his medical condition and doctor. The information that Plaintiff John Doe transmitted included queries about his treatment for dermatological issues and his search for a dermatologist who could assist with his treatment. Plaintiff John Doe used multiple functions on Defendant's web site, including the Find a Provider function, the search function, and the Health Services function to locate treatment for his dermatological-related issues. For example, Plaintiff John Doe typed the term "dermatologist" into the SSM website search box function while searching for medical treatment.

214. Unbeknownst to Plaintiff John Doe, SSM surreptitiously shared all of his communications with its website with Facebook and Google, including the precise text of the searches that he ran, the pages of the doctors that he reviewed as potential treating physicians, the full-string URLs from his searches, and other personally identifying information such as his IP address, browser fingerprint, and device identifiers.

215. Plaintiffs believed that their interactions with Defendant's website were private and would not be shared with anyone besides his health care providers and their staff. Plaintiffs

Electronically Filed - CITY OF ST. LOUIS - October 25, 2023 - 11:26 AM

were dismayed when they learned that their Personal Health Information, including private and potentially embarrassing facts, had been sent to Facebook and other third parties without their knowledge, consent, or express written authorization.

216. Because Defendant embedded the Meta Pixel on their websites, Defendant disclosed intimate details about Plaintiffs' interactions with their websites. Each time the Meta Pixel was triggered, it caused Plaintiffs' information to be secretly transmitted to Facebook's servers, as well as additional information that captures and discloses the communications' content and Plaintiffs' personally identifiable information. For example, when Plaintiffs and Class Members visited Defendant's Web website, their personal health information was transmitted to Facebook, including such engagement as using the website's search bar, using the website's Find a Doctor function, and typing content into online forms like their names, email addresses, and medical conditions. During these same transmissions, Defendant's website would also provide Facebook with Plaintiffs' and Class Members' Facebook ID, IP addresses, device IDs, and other information that Plaintiffs and Class Members provided. This is precisely the type of information that state and federal law require healthcare providers to de-identify to protect the privacy of patients.

217. The information Plaintiffs provided could be combined with other information in Facebook's possession, like their names, dates of birth, and phone numbers, to more effectively target Plaintiffs with advertisements or sell Plaintiffs' data to third parties.

218. Defendant knew that by embedding Meta Pixel—a Facebook advertising tool—it was permitting Facebook to collect, use, and share Plaintiffs' and the Class Members' Personal Health Information, including sensitive medical information and personally identifying data. Defendant was also aware that such information would be shared with Facebook simultaneously

Electronically Filed - CITY OF ST. LOUIS - October 25, 2023 - 11:26 AM

with patients' interactions with its websites. Defendant made the decision to barter its patients' Personal Health Care Information to Facebook because it wanted access to the Meta Pixel tool. While that bargain may have benefited Defendant and Facebook, it also betrayed the privacy rights of Plaintiffs and Class Members.

**G. Defendant's interception and disclosure of patient communications permits Facebook and other third-party advertising companies to engage in cross-device targeting across multiple devices.**

219. In addition to enabling Defendant to advertise to patients and potential patients on non-Defendant websites, Defendant's misuse and exploitation of patient data and communications also facilitates third parties' ability to target advertisements on other computing devices that a patient uses. This is called cross-device targeting.

220. Third parties including Facebook and Google have established a unique ID for individuals that tie together their desktop, laptop, and smartphone computing devices. For example, even if a patient has never visited Defendant's websites on their smartphone, cross-device tracking and marketing allows Defendant and other third parties to target patients on that device. In other words, a patient or potential patient who visited Defendant's websites on his desktop, but never on his smartphone, can nevertheless be targeted with advertisements by both Defendant and other third parties on his smartphone.

221. Defendant's and other third parties' use of cross-device targeting demonstrates that the data Defendant discloses to third parties is personally identifiable because it enables patients to be tracked across multiple devices that patients own—even if a patient has never communicated with Defendant on one or more of their devices.

222. Defendant made the decision that access to the targeted advertising (including retargeting and cross-device tracking) that is enabled by their disclosure of patient data and communications is of commercial benefit to Defendant.

Electronically Filed - CITY OF ST. LOUIS - October 25, 2023 - 11:26 AM

223. Defendant obtained additional revenue from its deployment of third-party tracking tools through which it discloses personally identifiable patient data and communications to third parties, including Google and Facebook.

224. Any additional revenue that that Defendant obtained from their unauthorized misuse of their own patients' personal health information is unearned and is the rightful property of the patients (including Plaintiffs and Class Members) from whom it was obtained.

**H. Plaintiff and the Class Members did not consent to the interception and disclosure of their protected health information.**

225. Plaintiffs and Class Members had no idea when they interacted with Defendant's websites that their personal data, including sensitive medical data, was being collected and simultaneously transmitted to Facebook. That is because, among other things, Meta Pixel is secretively and seamlessly integrated into Defendant's websites and is invisible to patients visiting those websites.

226. For example, when Plaintiff John Doe visited Defendant's website at www.ssmhealth.com there was no indication that the Meta Pixel was embedded on the website or that it would collect and transmit his sensitive medical data to Facebook.

227. Defendant does not have a legal right to share Plaintiff's and Class Members' Protected Health Information without their written consent to third parties, because this information is protected from such disclosure by law. *E.g.* Mo. Rev. Stat. § 542.402; 45 C.F.R. § 164.508. Nor is Defendant permitted to disclose patients' Protected Health Information to advertising and marketing companies like Facebook without express written authorization from patients. *E.g.* Mo. Rev. Stat. § 569.095; 45 C.F.R. § 164.502(a)(5)(ii).

228. Indeed, the United States Department of Health and Human Services ("HHS") recently confirmed that hospitals are prohibited from transmitting individually identifiable health

Electronically Filed - CITY OF ST. LOUIS - October 25, 2023 - 11:26 AM

information via tracking technology like the Meta Pixel without a patient's authorization and other protections like a business associate agreement with the recipient of the patient data:

> Regulated entities [those to which HIPAA applies] are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules. For example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures.[38]

229. The disclosure of Plaintiffs' and Class Members' PHI via the tracking pixels contravenes both the letter and spirit of HIPAA's "Standards for Privacy of Individually Identifiable Health Information" (also known as the "Privacy Rule") which governs how health care providers must safeguard and protect PHI.

230. The bulletin discusses the types of harm that disclosure may cause to the patient:

> An impermissible disclosure of an individual's PHI not only violates the Privacy Rule but also may result in a wide range of additional harms to the individual or others. For example, an impermissible disclosure of PHI may result in identity theft, financial loss, discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others identified in the individual's PHI. Such disclosures can reveal incredibly sensitive information about an individual, including diagnoses, frequency of visits to a therapist or other health care professionals, and where an individual seeks medical treatment. While it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors, because of the proliferation of tracking technologies collecting sensitive information, now more than ever, it is critical for regulated entities to ensure that they disclose PHI only as expressly permitted or required by the HIPAA Privacy Rule.[39]

231. Plaintiffs and Class Members face the same risks the government is warning

[38] *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates,* https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html, HHS.gov (emphasis added).

[39] *Id.* (emphasis added)

Electronically Filed - CITY OF ST. LOUIS - October 25, 2023 - 11:26 AM

about. Defendant has shared Plaintiffs' and Class Members' search terms about health conditions for which they seek doctors; their contacts with doctors to make appointments; the names of their doctors; the frequency with which they take steps to obtain healthcare for certain conditions; and where they seek medical treatment. This information is, as described by the OCR bulletin, "highly sensitive." The bulletin goes on to make clear that the information that the government considers to be protected includes an individual's medical record number, home and email address, or dates of appointments, as well as an individual's IP address or geographic location, medical device IDs, or any unique identifying code.[40]

232. Crucially, the government's bulletin also provides:

> All such IIHI [individually identifiable health information] collected on a regulated entity's website or mobile app generally is PHI, even if the individual does not have an existing relationship with the regulated entity and even if the IIHI, such as IP address or geographic location, does not include specific treatment or billing information like dates and types of health care services. This is because, when a regulated entity collects the individual's IIHI through its website or mobile app, the information connects the individual to the regulated entity (i.e., it is indicative that the individual has received or will receive health care services or benefits from the covered entity), and thus relates to the individual's past, present, or future health or health care or payment for care.[41]

233. Likewise, after it became public knowledge that healthcare companies had been sharing their customers' medical information with Facebook and Google via tracking technologies, the FTC instituted a series of enforcement actions, including lawsuits against BetterHelp, GoodRx, Premom, and Vitagene. These lawsuits, which resulted healthcare companies paying millions of dollars in fines, underscore that healthcare companies violate federal law by failing "to get consumers' affirmative express consent for the disclosure of

[40] *Id.* (emphasis added)

[41] *Id.*

Electronically Filed - CITY OF ST. LOUIS - October 25, 2023 - 11:26 AM

sensitive health information."[42] For example, the FTC took enforcement action against GoodRx, a telehealth and prescription drug discount provider, for "failing to notify consumers and others of its unauthorized disclosures of consumers' personal health information to Facebook, Google, and other companies."[43]

234. On July 20, 2023, the Federal Trade Commission, acting in concert with the HHS for Civil Rights, sent letters to approximately 130 hospital systems and telehealth providers to alert them "[of] the serious privacy and security risks related to the use of online tracking technologies" on hospital websites which have been "impermissibly disclosing consumers' sensitive health information to third parties."[44]

235. The FTC's letter specifically warned hospitals that "use of technologies, such as the Meta/Facebook pixel and Google Analytics, that can track a user's online activities" can result in "a wide range of harms to an individual or others," including the disclosure of "health conditions, diagnoses, medications, medical treatments, frequency of visits to health care professionals, where an individual seeks medical treatment, and more."[45] The FTC's letter further warned hospitals that "HIPPA rules apply when the information that a regulated entity collects through tracking technologies or discloses to third parties (e.g. tracking technology vendors) includes PHI. HIPAA regulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to third parties or any other

[42] https://www.ftc.gov/business-guidance/blog/2023/07/protecting-privacy-health-information-bakers-dozen-takeaways-ftc-cases

[43] FTC, *FTC Enforcement Action to Bar GoodRx from Sharing Consumers' Sensitive Health Info for Advertising*, https://www.ftc.gov/news-events/news/press-releases/2023/02/ftc-enforcement-action-bar-goodrx-sharingconsumers-sensitive-health-info-advertising

[44] https://www.ftc.gov/system/files/ftc_gov/pdf/FTC-OCR-Letter-Third-Party-Trackers-07-20-2023.pdf

[45] *Id*.

Electronically Filed - CITY OF ST. LOUIS - October 25, 2023 - 11:26 AM

violations of the HIPAA rules."[46]

236. That same day the FTC issued a bulletin warning that even companies not covered by HIPAA have a responsibility to protect against the unauthorized disclosure of PHI and cautioning that the "unauthorized disclosure of such information may violate the FTC Act and could constitute a breach of security under the FTC's Health Breach Notification Rule."[47]

237. Likewise, the Direct Marketing Association, the leading industry group for companies, both for-profit and non-profit, that market to consumers, publishes principles of ethical business practices for marketing practices such as those in which Defendant engages. The principles are known as the Direct Marketing Association's Guidelines for Ethical Business Practice.[48]

238. "The Direct Marketing Association's Guidelines for Ethical Business Practice are intended to provide individuals and organizations involved in direct marketing in all media with generally accepted principles of conduct."[49]

239. The Guidelines are explicit when it comes to the requirement for consent when transferring health-related data:

> These fair information practices and principles apply to any individual or entity that collects, maintains, uses, and/or transfers health-related data for marketing purposes, whether or not marketing is a primary purpose. These principles are applicable to nonprofit as well as for-profit entities.
>
> > 1. Personally identifiable health-related data gained in the context of a relationship between consumers and health or medical care providers or medical treatment facilities should not be transferred for marketing purposes without the specific prior consent of those consumers. Health or medical care providers include licensed health care practitioners, such as doctors, nurses, psychologists,

---

[46] *Id.*

[47] *Id.*

[48] Available at https://repository.globethics.net/bitstream/handle/20.500.12424/209969/DMA-Ethics-Guidelines.pdf

[49] *Id.* at 2.



Not an Official Court Document

Electronically Filed - CITY OF ST. LOUIS - October 25, 2023 - 11:26 AM

pharmacists, and counselors, and those who support health care providers and therefore have access to personally identifiable information, such as insurance companies, pharmacy benefits managers or other business partners, and businesses that sell prescription drugs.

2. Personally identifiable health-related data, including the occurrence of childbirth, gained in the context of a relationship between consumers and health or medical care providers or medical treatment facilities (as defined in #1) should not be used to contact those consumers for marketing purposes without giving consumers a clear notice of the marketer's intended uses of the data and the opportunity to request not to be so contacted.

3. Personally identifiable health-related data volunteered by consumers, and gathered outside of the relationship between consumers and health care providers, should also be considered sensitive and personal in nature. Such data should not be collected, maintained, used, and/or transferred for marketing purposes unless those consumers receive, at the time the data are collected, a clear notice of the marketer's intended uses of the data, whether the marketer will transfer the data to third parties for further use, the name of the collecting organization, and the opportunity to opt out of transfer of the data. Such data include, but are not limited to, data volunteered by consumers when responding to surveys and questionnaires. Clear notice should be easy to find, read, and understand.

4. Personally identifiable health-related data inferred about consumers, and gathered outside of the relationship between consumers and health care providers, should also be considered sensitive and personal in nature. These are data based on consumers' purchasing behavior. Such data include, but are not limited to, data captured by inquiries, donations, purchases, frequent shopper programs, advertised toll-free telephone numbers, or other consumer response devices. Any entity, including a seller of over-the-counter drugs, which uses inferred health-related data should promptly provide notice and the opportunity to opt out of any transfer of the data for marketing purposes.

***

6. Consumers should not be required to release personally identifiable health-related information about themselves to be used for marketing purposes as a condition of receiving insurance coverage, treatment or information, or otherwise completing their health care-related transaction.

Electronically Filed - CITY OF ST. LOUIS - October 25, 2023 - 11:26 AM

***

> 9. If personally identifiable health-related data are transferred from one direct marketer to another for a marketing purpose, the transferor should arrange strict security measures to assure that unauthorized access to the data is not likely during the transfer process. Transfers of personally identifiable health-related data should not be permitted for any marketing uses that are in violation of any of DMA's Guidelines for Ethical Business Practice.

240. At least one court has used the DMA's Guidelines as a basis to determine that unethical conduct had occurred and was sufficient to establish a violation of the Missouri law.[50]

241. Defendant failed to obtain a valid written authorization from Plaintiffs or any of the Class Members to allow the capture and exploitation of their personally identifiable information and the contents of their communications for marketing purposes.

242. Accordingly, Defendant lacked authorization to intercept, collect, and disclose Plaintiffs' and Class Members' personal health information to Facebook, Google, and other third parties or to aid in the same.

**I. Defendant's disclosures of personal patient data to Facebook are unnecessary.**

243. There is no information anywhere on the websites operated by Defendant that would alert patients that their most private information (such as their identifiers, their medical conditions, and their medical providers) is being automatically transmitted to Facebook. Nor are any of the disclosures of patient Personal Health Information to Facebook necessary for Defendant to maintain its healthcare website or provide medical services to patients.

244. For example, it is possible for a healthcare website to provide a doctor search function without allowing disclosures to third-party advertising companies about patient sign ups or appointments. It is also possible for a website developer to utilize tracking tools without

[50] *See Byler v. Deluxe Corp.*, 222 F. Supp. 3d 885, 901 (S.D. Cal. 2016).

Electronically Filed - CITY OF ST. LOUIS - October 25, 2023 - 11:26 AM

allowing disclosure of patients' Personal Healthcare Information to companies like Facebook. Likewise, it is possible for Defendant to provide medical services to patients without sharing their Personal Health Information with Facebook so that this information can be exploited for advertising purposes.

245. Despite these possibilities, Defendant willfully chose to implement Meta Pixel on its websites and aid in the disclosure of personally identifiable information and sensitive medical information about its patients, as well as the contents of their communications with Defendant, to third-parties, including Facebook.

**J. Plaintiffs and Class Members have a reasonable expectation of privacy in their Personal Health Information, especially with respect to sensitive medical information.**

246. Plaintiffs and Class Members have a reasonable expectation of privacy in their Personal Health Information, including personally identifying data and sensitive medical information. Defendant's surreptitious interception, collection, and disclosure of patients' Personal Health Information to Facebook violated Plaintiff and Class Member's privacy interests.

247. As patients, Plaintiffs had a reasonable expectation of privacy that their health care provider and its associates would not disclose their personal health information to third parties without their express authorization.

248. The original Hippocratic Oath, circa 400 B.C., provided that physicians must pledge, "What I may see or hear in the course of treatment or even outside of the treatment in regard to the life of man, which on no account must be spread abroad, I will keep to myself holding such things shameful to be spoken about."[51]

249. The modern Hippocratic Oath provides, "I will respect the privacy of my patients,

[51] *Brandt v. Medical Defense Associates*, 856 S.W.2d 667, 671 n.1 (Mo. 1993).

Electronically Filed - CITY OF ST. LOUIS - October 25, 2023 - 11:26 AM

for their problems are not disclosed to me that the world may know."[52] Likewise, the American Medical Association's ("AMA") Code of Medical Ethics contains numerous rules protecting the privacy of patient data and communications. For example, the AMA has issued medical ethics opinions providing that "[p]rotecting information gathered in association with the care of a patient is a core value in health care. However, respecting patient privacy in other forms is also fundamental, as an expression of respect for patient autonomy and a prerequisite for trust….Physicians must seek to protect patient privacy in all settings to the greatest extent possible and should … [m]inimize intrusion on privacy when the patient's privacy must be balanced against other factors [and inform] the patient when there has been a significant infringement on privacy of which the patient would otherwise not be aware."[53]

250. The AMA's ethics opinions have further cautioned physicians and hospitals that "[d]isclosing information to third parties for commercial purposes without consent undermines trust, violates principles of informed consent and confidentiality, and may harm the integrity of the patient-physician relationship." [54]

251. Patient personal health information is also specifically protected by law. *E.g.* Mo. Rev. Stat. § 491.060(5); Mo. Rev. Stat. § 407.1500. The prohibitions against disclosing patient personal health information include prohibitions against disclosing personally identifiable information such as patient names, IP addresses, and other unique characteristics or codes. *E.g.* Mo. Rev. Stat. § 569.095; 45 C.F.R. § 164.514. Both state and federal law also restrict the use of patients' Personal Health information, including their status as patients, to only those uses related to their care unless patients have provided express written authorization to the contrary.

---

[52] https://www.pbs.org/wgbh/nova/doctors/oath_modern.html

[53] https://www.ama-assn.org/sites/ama-assn.org/files/corp/media-browser/code-of-medical-ethics-chapter-3.pdf (opinion 3.1.1).

[54] https://www.ama-assn.org/sites/ama-assn.org/files/corp/media-browser/code-of-medical-ethics-chapter-3.pdf (opinion 3.2.4).

Electronically Filed - CITY OF ST. LOUIS - October 25, 2023 - 11:26 AM

252. Missouri courts have also long recognized that physicians owe a duty of confidentiality to patients, which prohibits them from disclosing patients' health information without patients' written consent. *Brandt v. Medical Defense Associates*, 856 S.W.2d 667, 674 (Mo. 1993).

253. Plaintiffs' and Class Members' reasonable expectations of privacy in their personal health information are grounded in, among other things, Defendant's status as health care providers, Defendant's common law obligation to maintain the confidentiality of patients' personal health information, state and federal laws protecting the confidentiality of medical information, state and federal laws protecting the confidentiality of communications and computer data, and state laws prohibiting the unauthorized use and disclosure of personal means of identification.

254. What is more, multiple studies examining the collection and disclosure of consumers' sensitive medical information confirm that the disclosure of sensitive medical information violates expectations of privacy that have been established as general social norms.

255. Privacy polls and studies also uniformly show that the overwhelming majority of Americans consider one of the most important privacy rights to be the need for an individual's affirmative consent before a company collects and shares its customers' data.

256. For example, a recent study by *Consumer Reports* showed that 92% of Americans believe that internet companies and websites should be required to obtain consent before selling or sharing consumers' data, and the same percentage believed that internet companies and websites should be required to provide consumers with a complete list of the data that has been collected about them.[55]

[55] https://www.consumerreports.org/consumer-reports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety-a3980496907/



Not an Official Court Document

Electronically Filed - CITY OF ST. LOUIS - October 25, 2023 - 11:26 AM

257. Users act consistently with these preferences. For example, following a new rollout of the iPhone operating software—which asks users for clear, affirmative consent before allowing companies to track users—85 percent of worldwide users and 94 percent of U.S. users chose not to share data when prompted.[56]

258. "Patients are highly sensitive to disclosure of their health information," particularly because it "often involves intimate and personal facts, with a heavy emotional overlay." Peter A. Winn, *Confidentiality in Cyberspace: The HIPAA Privacy Rules and the Common Law*, 33 RUTGERS L.J. 617, 621 (2002). Unsurprisingly, empirical evidence demonstrates that "[w]hen asked, the overwhelming majority of Americans express concern about the privacy of their medical records." Sharona Hoffman & Andy Podgurski, *E-Health Hazards: Provider Liability and Electronic Health Record Systems*, 24 BERKLEY TECH L.J. 1523, 1557 (2009).

259. The concern about sharing personal medical information is compounded by the reality that advertisers view this type of information as particularly valuable. Indeed, having access to the data women share with their healthcare providers allows advertisers to obtain data on children before they are even born. As one recent article noted, "What is particularly worrying about this process of datafication of children is that companies like [Facebook] are harnessing and collecting multiple typologies of children's data and have the potential to store a plurality of data traces under unique ID profiles."[57]

260. Many privacy law experts have expressed serious concerns about patients' sensitive medical information being disclosed to third-party companies like Facebook. As those critics have pointed out, having a patient's personal health information disseminated in ways the

[56] https://www.wired.co.uk/article/apple-ios14-facebook
[57] https://thereader.mitpress.mit.edu/tech-companies-are-profiling-us-from-before-birth/

Electronically Filed - CITY OF ST. LOUIS - October 25, 2023 - 11:26 AM

patient is unaware of could have serious repercussions, including affecting their ability to obtain life insurance, how much they might pay for such coverage, the rates they might be charged on loans, and the likelihood of their being discriminated against.

**K. Plaintiff's Personal Health Data that Defendant collected, disclosed, and used is Plaintiff's property, has economic value, and its illicit disclosure has caused Plaintiff harm.**

261. It is common knowledge that there is an economic market for consumers' personal data—including the kind of data that Defendant has collected and disclosed from Plaintiffs and Class Members.

262. In 2013, the *Financial Times* reported that the data-broker industry profits from the trade of thousands of details about individuals, and that within that context, "age, gender and location information" were being sold for approximately "$0.50 per 1,000 people."[58]

263. In 2015, *TechCrunch* reported that "to obtain a list containing the names of individuals suffering from a particular disease," a market participant would have to spend about "$0.30" per name.[59] That same article noted that "Data has become a strategic asset that allows companies to acquire or maintain a competitive edge" and that the value of a single user's data can vary from $15 to more than $40 per user.[60]

264. In a 2021 Washington Post article, the legal scholar Dina Srinivasan said that consumers "should think of Facebook's cost as [their] data and scrutinize the power it has to set its own price."[61] This price is only increasing. According to Facebook's own financial statements, the value of the average American's data in advertising sales rose from $19 to $164

[58] https://ig.ft.com/how-much-is-your-personal-data-worth/
[59] https://techcrunch.com/2015/10/13/whats-the-value-of-your-data/
[60] https://techcrunch.com/2015/10/13/whats-the-value-of-your-data/
[61] https://www.washingtonpost.com/technology/2021/08/29/facebook-privacy-monopoly/

Electronically Filed - CITY OF ST. LOUIS - October 25, 2023 - 11:26 AM

per year between 2013 and 2020.[62]

265. Despite the protections afforded by law, there is an active market for health information. Medical information obtained from health providers garners substantial value because of the fact that it is not generally available to third party data marketing companies because of the strict restrictions on disclosure of such information by state laws and provider standards, including the Hippocratic oath. Even with these restrictions, however, a multi-billion-dollar market exists for the sale and purchase of such private medical information.[63]

266. Further, individuals can sell or monetize their own data if they so choose. For example, Facebook has offered to pay individuals for their voice recordings,[64] and has paid teenagers and adults up to $20 a month plus referral fees to install an app that allows Facebook to collect data on how individuals use their smart phones.[65]

267. A myriad of other companies and apps such as DataCoup, Nielsen Computer, Killi, and UpVoice also offer consumers money in exchange for access to their personal data.[66]

268. Defendant's unauthorized disclosure harmed Plaintiffs and Class Members, robbing them of the value of their Personal Health Information. Conservative estimates suggest that in 2018, internet marketing companies like Facebook and Google earned $202 per American user from mining and selling their data. More recent estimates are as high as $434 per user.

269. Given the monetary value that data companies like Facebook have already paid for personal information in the past, Defendants have deprived Plaintiffs and the Class Members of the economic value of their sensitive medical information by collecting, using, and disclosing

[62] https://www.washingtonpost.com/technology/2021/08/29/facebook-privacy-monopoly/
[63] https://revealnews.org/blog/your-medical-data-is-for-sale-and-theres-nothing-you-can-do-about-it/; *see also https://slate.com/technology/2022/06/health-data-brokers-privacy.html*
[64] https://www.theverge.com/2020/2/20/21145584/facebook-pay-record-voice-speech-recognition-viewpoints-prounounciations-app
[65] https://www.cnbc.com/2019/01/29/facebook-paying-users-to-install-app-to-collect-data-techcrunch.html
[66] https://www.creditdonkey.com/best-apps-data-collection.html; *see also https://www.monetha.io/blog/rewards/earn-money-from-your-data/*

Electronically Filed - CITY OF ST. LOUIS - October 25, 2023 - 11:26 AM

that information to Facebook and other third parties without consideration for Plaintiffs and the Class Member's property.

**L. Defendant is enriched by making unlawful, unauthorized, and unnecessary disclosures of its patients' protected health information.**

270. Defendant's sole purpose for installing tracking technologies on their Web Properties was marketing and profits. Indeed, the *only* reason for installing tracking pixels on a website is to share information with third parties like Facebook and Google.

271. In exchange for disclosing Personal Health Information about its patients, Defendant is compensated by Facebook with enhanced online advertising services, including (but not limited to) retargeting and enhanced analytics functions.

272. For example, one hospital system, Aurora Advocate Health, recently explained that it had installed the Meta Pixel tool and similar technologies "to gather information that we review in aggregate so that we can better understand patient needs and preferences."[67] Likewise, a second hospital system, WakeMed, explained that it had installed the Meta Pixel tool "to optimize the functionality of our websites so that we can improve the user experience."[68]

273. Similarly, retargeting is a form of online targeted advertising that targets users with ads based on their previous internet actions, which is facilitated through the use of cookies and tracking pixels. Hospital systems using the Meta Pixel can also take advantage of retargeting to display ads to "target audience" composed of visitors to their websites. But once personally identifiable information relating to patient communications is disclosed to third parties like Facebook, Defendants lose the ability to control how that information is subsequently disseminated and exploited.

---

[67] https://www.fiercehealthcare.com/health-tech/advocate-aurora-health-data-breach-revealed-pixels-protected-health-information-3

[68] https://www.wakemed.org/patients-and-visitors/patient-rights-and-privacy-policies/meta-pixel-privacy#:~:text=Protecting%20the%20privacy%20and%20security,(now%20Meta)%20in%20error.

Electronically Filed - CITY OF ST. LOUIS - October 25, 2023 - 11:26 AM

274. For example, when an individual's data is disclosed and shared with a third-party marketing company, however, the advertiser is able to show ads to the user elsewhere on the internet. Retargeting also allows third party advertisers to show advertisements on other websites to customers or potential customers based on the specific communications exchanged by a patient or their activities on a website. Using the Meta Pixel, a website could target ads on Facebook itself or on the Facebook advertising network. The same or similar advertising can be accomplished via disclosures to other third-party advertisers and marketers.

275. The monetization of the data being disclosed by Defendants, both by Defendants and Facebook, demonstrates the inherent value of the information being collected. By utilizing tracking technologies such as the Meta Pixel, Defendants' cost of advertising and retargeting was reduced, thereby benefitting Defendants.

**M. Facebook's history of egregious privacy violations.**

276. Defendants knew or should have known that Facebook could not be trusted with their patients' sensitive medical information.

277. Due to its ability to target individuals based on granular data, Facebook's ad-targeting capabilities have frequently come under scrutiny. For example, in June 2022, Facebook entered into a settlement with the Department of Justice regarding its Lookalike Ad service, which permitted targeted advertising by landlords based on race and other demographics in a discriminatory manner. That settlement, however, reflected only the latest in a long history of egregious privacy violations by Facebook.

278. In 2007, when Facebook launched "Facebook Beacon," users were unaware that their online activity was tracked, and that the privacy settings originally did not allow users to opt-out. As a result of widespread criticism, Facebook Beacon was eventually shut down.

Electronically Filed - CITY OF ST. LOUIS - October 25, 2023 - 11:26 AM

279. In 2011, Facebook settled charges with the Federal Trade Commission relating to its sharing of Facebook user information with advertisers, as well as its false claim that third-party apps were able to access only the data they needed to operate when—in fact—the apps could access nearly all of a Facebook user's personal data. The resulting Consent Order prohibited Facebook from misrepresenting the extent to which consumers can control the privacy of their information, the steps that consumers must take to implement such controls, and the extent to which Facebook makes user information available to third parties.[69]

280. Facebook found itself in another privacy scandal in 2015 when it was revealed that Facebook could not keep track of how many developers were using previously downloaded Facebook user data. That same year, it was also revealed that Facebook had violated users' privacy rights by harvesting and storing Illinois' users' facial data from photos without asking for their consent or providing notice. Facebook ultimately settled claims related to this unlawful act for $650 million.[70]

281. In 2018, Facebook was again in the spotlight for failing to protect users' privacy. Facebook representatives testified before Congress that a company called Cambridge Analytics may have harvested the data of up to 87 million users in connection with the 2016 election. This led to another FTC investigation in 2019 into Facebook's data collection and privacy practices, resulting in a record-breaking five-billion-dollar settlement.

282. Likewise, a different 2018 report revealed that Facebook had violated users' privacy by granting access to user information to over 150 companies.[71] Some companies were even able to read users' private messages.

283. In June 2020, after promising users that app developers would not have access to

[69] https://www.ftc.gov/legal-library/browse/cases-proceedings/092-3184-182-3109-c-4365-facebook-inc-matter
[70] A similar case is pending in Texas.
[71] https://www.cnbc.com/2018/12/19/facebook-gave-amazon-microsoft-netflix-special-access-to-data-nyt.html

Electronically Filed - CITY OF ST. LOUIS - October 25, 2023 - 11:26 AM

data if users were not active in the prior 90 days, Facebook revealed that it still enabled third-party developers to access this data.[72] This failure to protect users' data enabled thousands of developers to see data on inactive users' accounts if those users were Facebook friends with someone who was an active user.

284. On February 18, 2021, the New York State Department of Financial Services released a report detailing the significant privacy concerns associated with Facebook's data collection practices, including the collection of health data. The report noted that while Facebook maintained a policy that instructed developers not to transmit sensitive medical information, Facebook received, stored, and analyzed this information anyway. The report concluded that "[t]he information provided by Facebook has made it clear that Facebook's internal controls on this issue have been very limited and were not effective … at preventing the receipt of sensitive data."[73]

285. The New York State Department of Financial Service's concern about Facebook's cavalier treatment of private medical data is not misplaced. In June 2022, the FTC finalized a different settlement involving Facebook's monetizing of sensitive medical data. In that case, the more than 100 million users of Flo, a period and ovulation tracking app, learned something startling: the company was sharing their data with Facebook.[74] When a user was having her period or informed the app of her intention to get pregnant, Flo would tell Facebook, which could then use the data for all kinds of activities including targeted advertising. In 2021, Flo settled with the Federal Trade Commission for lying to its users about secretly sharing their data with Facebook, as well as with a host of other internet advertisers, including Google, Fabric, AppsFlyer, and Flurry. The FTC reported that Flo "took no action to limit what these companies

[72] https://fortune.com/2020/07/01/facebook-user-data-apps-blunder/
[73] https://www.dfs.ny.gov/system/files/documents/2021/02/facebook_report_20210218.pdf
[74] https://slate.com/technology/2022/06/health-data-brokers-privacy.html

Electronically Filed - CITY OF ST. LOUIS - October 25, 2023 - 11:26 AM

could do with users' information."[75]

286. More recently, Facebook employees admitted to lax protections for sensitive user data. Facebook engineers on the ad business product team conceded in a 2021 privacy review that "We do not have an adequate level of control and explainability over how our systems use data, and thus we can't confidently make controlled policy changes or external commitments such as 'we will not use X data for Y purpose.'"[76]

287. These revelations were confirmed by an article published by the Markup on June 16, 2022, which found during the course of its investigation that Facebook's purported "filtering" failed to discard even the most obvious forms of sexual health information. Worse, the article found that the data that the Meta Pixel was sending Facebook from hospital websites not only included details such as patients' medications, descriptions of their allergic reactions, details about their upcoming doctor's appointments, but also included patients' names, addresses, email addresses, and phone numbers.[77]

288. Despite knowing that the Meta Pixel code embedded in their websites was sending patients' personal health information to Facebook, Defendants did nothing to protect their patients from egregious intrusions into their privacy, choosing instead to benefit at those patients' expense.

**N. Defendant's failure to inform its patients that their personal health information has been disclosed to Facebook or to take steps to halt the continued disclosure of such information to third parties is malicious, oppressive, and in reckless disregard of Plaintiffs' and Class Members' rights.**

289. Hospital systems, like other businesses, have a legal obligation to disclose data breaches to their customers. *E.g.* Mo. Rev. Stat. § 407.1500(2).

[75] https://slate.com/technology/2022/06/health-data-brokers-privacy.html
[76] https://www.vice.com/en/article/akvmke/facebook-doesnt-know-what-it-does-with-your-data-or-where-it-goes
[77] https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites



Not an Official Court Document

Electronically Filed - CITY OF ST. LOUIS - October 25, 2023 - 11:26 AM

290. After publication of the Markup's investigative article in June 2022, hospital systems around the United States began self-reporting data breaches arising from their installation of pixel technology on their websites.[78]

291. For example, in August 2022, Novant Health informed approximately 1.3 million patients that their medical data was disclosed to Facebook due to the installation of the Facebook Meta Pixel on the hospital system's websites.[79] Novant Health's data breach announcement conceded that the Meta Pixel tool installed on their websites "allowed certain private information to be transmitted to Meta from the Novant Health website."[80] Novant Health further admitted that the information about its patients that was disclosed to Facebook included "an impacted patient's: demographic information such as email address, phone number, computer IP address, and contact information entered into Emergency Contacts or Advanced Care Planning; and information such as appointment type and date, physician selected, button/menu selections, and/or content typed into free text boxes."[81]

292. Likewise, in October 2022, Advocate Aurora Health informed approximately 3 million patients that their personal health information had been disclosed to Facebook via the Meta Pixel installed on Advocate Aurora Health's website.[82]

293. Advocate Aurora Health's data breach notification conceded that patient information had been transmitted to third parties including Facebook and Google when patients used the hospital system's website.[83]

[78] https://www.scmagazine.com/analysis/breach/pixel-fallout-expands-community-health-informs-1-5m-of-unauthorized-disclosure
[79] https://www.scmagazine.com/analysis/breach/1-3m-novant-health-patients-notified-of-unintended-disclosure-via-facebook-pixel
[80] https://www.novanthealth.org/home/about-us/newsroom/press-releases/newsid33987/2672/novant-health-notifies-patients-of-potential-data-privacy-incident-.aspx
[81] https://www.novanthealth.org/home/about-us/newsroom/press-releases/newsid33987/2672/novant-health-notifies-patients-of-potential-data-privacy-incident-.aspx
[82] https://www.fiercehealthcare.com/health-tech/advocate-aurora-health-data-breach-revealed-pixels-protected-health-information-3

Electronically Filed - CITY OF ST. LOUIS - October 25, 2023 - 11:26 AM

294. Advocate Aurora Health further admitted that a substantial amount of its patients' personal health information has been shared with Facebook and Google including patients' "IP address; dates, times, and/or locations of scheduled appointments; your proximity to an Advocate Aurora Health location; information about your provider; [and] type of appointment or procedure."[84] Even more troubling, Advocate Aurora Health admitted that "[w]e cannot confirm how vendors used the data they collected."[85]

295. Advocate Aurora Health claimed that, in conjunction with its data breach notice, the hospital system had "disabled and/or removed the pixels from our platforms and launched an internal investigation to better understand what patient information was transmitted to our vendors."[86] Advocate Aurora Health also promised its 3 million patients that the company had instituted an "enhanced, robust technology vetting process" to prevent such disclosures of its patients' personal health information in the future.[87]

296. Similarly, in October 2022, WakeMed notified more than 495,000 patients that their personal health information had been transmitted to Facebook through the use of tracking pixels installed on its websites.[88] In announcing this data breach, WakeMed admitted that the Facebook Meta Pixel tool had been installed on its website resulting in the transmission of patient information to Facebook.[89] WakeMed further admitted that "[d]epending on the user's activity, the data that may have been transmitted to Facebook could have included information such as: email address, phone number, and other contact information; computer IP address; emergency contact information; information provided during online check-in, such as allergy or

[83] https://www.advocateaurorahealth.org/
[84] https://www.advocateaurorahealth.org/pixel-notification/faq
[85] https://www.advocateaurorahealth.org/pixel-notification/faq
[86] https://www.advocateaurorahealth.org/pixel-notification/faq
[87] https://www.advocateaurorahealth.org/pixel-notification/faq
[88] https://healthitsecurity.com/news/wakemed-faces-data-breach-lawsuit-over-meta-pixel-use
[89] https://www.wakemed.org/about-us/news-and-media/wakemed-news-releases/wakemed-notifies-patients-of-potential-data-privacy-incident

Electronically Filed - CITY OF ST. LOUIS - October 25, 2023 - 11:26 AM

medication information; COVID vaccine status; and information about an upcoming appointment, such as appointment type and date, physician selected, and button/menu selections."[90]

297. WakeMed also conceded that it had no idea what Facebook had done with the personal health information that WakeMed had disclosed about its patients.[91] Like other the other hospital systems who have come clean about their use of the Meta Pixel tool, WakeMed promised its patients that it had "proactively disabled Facebook's pixel" and had "no plans to use it in the future without confirmation that the pixel no longer has the capacity to transmit potentially sensitive or identifiable information."[92]

298. In November 2022, the fallout from hospital systems' use of the Meta Pixel tool expanded when Community Health Network informed 1.5 million of its patients that their personal health information had been routinely transmitted and disclosed to Facebook since at least April 2017.[93]

299. In its data breach notice, Community Health admitted that it had "discovered through our investigation that the configuration of certain technologies allowed for a broader scope of information to be collected and transmitted to each corresponding third-party tracking technology vendor (e.g., Facebook and Google) than Community had ever intended." Community Health further conceded that its use of the Meta Pixel and related third-party tracking technologies had resulted in surreptitiously recording and transmitting a wide range of patient engagements with its websites, including "includes scheduling an appointment online or

[90] https://www.wakemed.org/about-us/news-and-media/wakemed-news-releases/wakemed-notifies-patients-of-potential-data-privacy-incident

[91] https://www.wakemed.org/about-us/news-and-media/wakemed-news-releases/wakemed-notifies-patients-of-potential-data-privacy-incident

[92] https://www.wakemed.org/about-us/news-and-media/wakemed-news-releases/wakemed-notifies-patients-of-potential-data-privacy-incident

[93] https://healthitsecurity.com/news/community-health-network-notifies-1.5m-of-data-breach-stemming-from-tracking-tech; *see also* https://www.ecommunity.com/notice-third-party-tracking-technology-data-breach

Electronically Filed - CITY OF ST. LOUIS - October 25, 2023 - 11:26 AM

directly with a provider" and "seeking treatment at a Community or affiliated provider location."[94]

300. Community Health, like WakeMed, Novant, and Advocate Aurora Health also promised its patients that it had disabled or removed the third-party tracking technologies that it had installed on its website and had instituted new "evaluation and management processes for all website technologies moving forward."[95] Community Health, however, also conceded that it had no idea how Facebook or other third parties had exploited the patient personal health information that had been disclosed to them via the pixel technology.

301. Unlike Community Health, WakeMed, Novant, Advocate Aurora Health, and other responsible hospital systems who have informed their patients of the serious privacy violations resulting from the installation of Facebook's Meta Pixel tool on their websites, Defendants have done nothing. Indeed, not only have Defendants hidden these privacy violations from their patients, but Defendants continue to collect, transmit, and disclose their patients' personal health information to Facebook despite widespread knowledge in the health care community that such collection and disclosure of patient personal health information is patently illegal and in violation of the fundamental privacy rights of patients.

302. As these data breach announcements demonstrate, there is widespread knowledge within the health care community that installation of the Meta Pixel tool on hospital websites results in the disclosure of patients' personal health information Facebook. There is also widespread recognition that such disclosures are not only illegal but fundamentally unethical, given the privacy rights involved.

303. Defendant's decision to hide its use of the Meta Pixel tool from its patients and its

[94] https://www.ecommunity.com/notice-third-party-tracking-technology-data-breach
[95] https://www.ecommunity.com/notice-third-party-tracking-technology-data-breach

Electronically Filed - CITY OF ST. LOUIS - October 25, 2023 - 11:26 AM

refusal to completely remove all such technologies from its websites even after learning that its patients' personal health information was being routinely collected, transmitted, and exploited by third parties is malicious, oppressive, and in reckless disregard of Plaintiffs' and Class Members' rights.

**TOLLING, CONCEALMENT, AND ESTOPPEL**

304. The applicable statutes of limitation have been tolled as a result of Defendant's knowing and active concealment and denial of the facts alleged herein.

305. Defendant seamlessly incorporated Meta Pixel and other trackers into its websites, providing no indication to users that they were interacting with a website enabled by Meta Pixel. Defendant had knowledge that its websites incorporated Meta Pixel and other trackers yet failed to disclose that by interacting with Meta-Pixel enabled websites that Plaintiffs and Class Members' sensitive medical information would be intercepted, collected, used by, and disclosed to Facebook.

306. Plaintiffs and Class Members could not with due diligence have discovered the full scope of Defendants' conduct, because there were no disclosures or other indication that they were interacting with websites employing Meta Pixel.

307. All applicable statutes of limitation have also been tolled by operation of the discovery rule and the doctrine of continuing tort. Defendant's illegal interception and disclosure of patients' Personal Health Information has continued unabated through the date of the filing of Plaintiff's Original Complaint. What's more, Defendant was under a duty to disclose the nature and significance of their data collection practices but did not do so. Defendant is therefore estopped from relying on any statute of limitations defenses.

Electronically Filed - CITY OF ST. LOUIS - October 25, 2023 - 11:26 AM

## CLASS ACTION ALLEGATIONS

308. Defendant's conduct violates the law and breaches its express and implied privacy promises.

309. Defendant's unlawful conduct has injured Plaintiffs and Class Members.

310. Defendant's conduct is ongoing.

311. Plaintiff brings this action individually and as a class action against Defendant.

312. Plaintiff seeks class certification for the following proposed Class:

> **The SSM Health Class:** During the fullest period allowed by law, all Missouri citizens who are, or were, patients of SSM Health Care Corporation, or any of its affiliates and who exchanged communications at Defendant's websites, including www.ssmhealth.com and any other SSM Health Care Corporation affiliated website, including Defendant's patient portal.

313. Excluded from the proposed Class are: (1) any Judge or Magistrate presiding over this action and members of their families; (2) the Defendant, Defendant's subsidiaries, affiliates, parents, successors, predecessors, and any entity in which the Defendant or its parent has a controlling interest and their current or former employees, officers, and directors; and (3) Plaintiff's counsel and Defendant's counsel.

314. Plaintiff reserves the right to redefine the Class and/or add Subclasses at, or prior to, the class certification stage, in response to discovery or pursuant to instruction by the Court.

315. Plaintiff and the Class Members satisfy the numerosity, commonalty, typicality, adequacy, and predominance prerequisites for suing as representative parties pursuant to Rule 52.08.

316. **Numerosity:** While the exact number of Class Members is unknown to Plaintiff at this time, the Class, based on information and belief, consists of thousands of people dispersed throughout the State of Missouri, such that joinder of all members is impracticable. The exact

Electronically Filed - CITY OF ST. LOUIS - October 25, 2023 - 11:26 AM

number of Class Members can be determined by review of information maintained by Defendants.

317. **Commonality and Predominance:** There are questions of law and fact common to Class Members and which predominate over any questions affecting only individual members. A class action will generate common answers to the questions below, which are apt to drive resolution:

a. Whether Defendant's acts and practices violated Plaintiffs and Class Members' privacy rights;

b. Whether Defendant's acts and practices violate Mo. Rev. Stat § 542.402;

c. Whether Defendant's acts and practices violate Mo. Rev. Stat § 407.020;

d. Whether Defendant's acts and practices violate Mo. Rev. Stat § 569.095;

e. Whether Defendant's acts and practices violate Mo. Rev. Stat. § 191.656;

f. Whether Defendant knowingly allowed the surreptitious collection and disclosure of Plaintiffs and Class Members' Personal Health Information to Facebook;

g. Whether Defendant's acts and practices constitute a breach of fiduciary duty;

h. Whether Defendant profited from disclosures of patient Personal Health Information to third parties including Facebook;

i. Whether Defendant was unjustly enriched;

j. Whether Defendant's acts and practices harmed and continue to harm Plaintiffs and Class Members and, if so, the extent of that injury;

k. Whether Plaintiffs and Class Members are entitled to equitable relief including, but not limited to, injunctive relief, restitution, and disgorgement; and

l. Whether Plaintiffs and Class Members are entitled to actual, statutory, or other forms of damages, and other monetary relief.

318. These common questions of law and fact predominate over any questions affecting only the individual Class Members.

Electronically Filed - CITY OF ST. LOUIS - October 25, 2023 - 11:26 AM

319. Defendant engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff individually and on behalf of the other Class Members. Identical statutory and common law violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quantity and quality, to the numerous questions that dominate this action.

320. **Typicality:** Plaintiff's claims are typical of the claims of other Class Members and Plaintiff have substantially the same interest in this matter as other Class Members. Plaintiff has no interests that are antagonist to, or in conflict with, the interests of other members of the Class. Plaintiff's claims arise out of the same set of facts and conduct as all other Class Members. Plaintiff and all Class Members are patients of Defendant who used the websites set up by Defendant for patients and are victims of Defendant's respective unauthorized disclosures to third parties including Facebook. All claims of Plaintiffs and Class Members are based on Defendant's wrongful conduct and unauthorized disclosures.

321. **Adequacy of Representation:** Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature. Plaintiff's claims are coincident with, and not antagonistic to, those of other Class Members he seeks to represent. Plaintiff has no disabling conflicts with Class Members. Accordingly, Plaintiff is an adequate representative of the Class and, along with counsel, will fairly and adequately protect the interests of the Class and any Subclasses.

322. **Superiority:** A class action is the superior method for fair and efficient adjudication of the controversy. Although all Class Members have claims against Defendant, the likelihood that individual Class Members will prosecute separate actions is remote due to the time and expense necessary to conduct such litigation. The damages, harm, and other financial

Electronically Filed - CITY OF ST. LOUIS - October 25, 2023 - 11:26 AM

detriment suffered individually by Plaintiff and other Class Members are relatively small compared to the burden and expense that would be required to litigate their claims on an individual basis against Defendant, making it impractical for Class Members to individually seek redress for Defendant's wrongful conduct. Moreover, serial adjudication in numerous venues is not efficient, timely, or proper. Judicial resources would be unnecessarily depleted by prosecution of individual claims. The prosecution of separate actions by individual Class Members could create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which could establish incompatible standards of conduct for Defendant or adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the members of the Class Members who are not parties to the adjudications. If a class action is not permitted, Class Members will continue to suffer losses and Defendant's misconduct will continue without proper remedy.

323. In addition to satisfying the prerequisites of Rule 52.08(a), Plaintiff satisfies the requirements for maintaining a class action under Rule 52.08(b) because (a) the prosecution of separate actions by the individual Class Members would create a risk of inconsistent or varying adjudication which would establish incompatible standards of conduct for Defendant; (b) the prosecution of separate actions by individual Class Members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other Class Members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; (c) Defendant has acted or refused to act on grounds that apply generally to the proposed Class, thereby making final injunctive relief or declaratory relief herein appropriate with respect to the proposed Class as a whole; and (d) questions of law or fact common to the members of the class predominate over any questions affecting only individual

Electronically Filed - CITY OF ST. LOUIS - October 25, 2023 - 11:26 AM

members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

324. Plaintiff anticipates no unusual difficulties in the management of this litigation as a class action. The Class is readily ascertainable and direct notice can be provided from the records maintained by Defendant, electronically or by publication, the cost of which is properly imposed on Defendant.

325. For the above reasons, among others, a class action is superior to other available methods for the fair and efficient adjudication of this action.

**CAUSES OF ACTION**

**COUNT I**
**Tampering with Computer Data**
**in Violation of Mo. Rev. Stat. §§ 569.095 & 537.525**
**(On Behalf of Plaintiff and the Class)**

326. Plaintiffs re-allege and incorporate by reference all paragraphs above as if fully set forth herein.

327. Plaintiffs bring this claim on behalf of themselves and all members of the Class.

328. A person commits the offense of tampering with computer data if he or she knowingly and without authorization or without reasonable grounds to believe that he or she has such authorization discloses data "residing or existing internal or external to a computer, computer system, or computer network." Mo. Rev. Stat. § 569.095.

329. All health care providers owe their patients a duty not to disclose medical information about a patient without a patient's informed consent.

330. Maintaining the confidentiality of the doctor-patient relationship is a cardinal rule of the medical profession which has come to be justifiably relied on by patients seeking advice and treatments.

Electronically Filed - CITY OF ST. LOUIS - October 25, 2023 - 11:26 AM

331. Plaintiffs and Class Members are patients of Defendant.

332. Defendant owes Plaintiffs and Class Members a duty of confidentiality.

333. Despite its duty not to disclose Personal Health Information without informed consent and written authorization, Defendant disclosed information relating to Plaintiffs and Class Members' medical treatment to third parties without their knowledge, consent, or authorization.

334. In doing so, Defendant disclosed data to Facebook and other third parties that it knew or should have known its patients had not authorized Defendant to disclose.

335. The information disclosed included personally identifiable information, Plaintiffs and Class Members' statuses as patients of Defendant, and the exact contents of communications exchanged between Plaintiffs and/or Class Members with Defendant, including but not limited to information about treating doctors, potential doctors, conditions, treatments, appointments, search terms, bill payment, and logins to Defendant's website.

336. The disclosure of personally identifiable medical information constitutes an unreasonable, substantial, and serious interference with Plaintiffs and Class Members' legal rights.

337. Plaintiffs and Class Members did not consent to, authorize, or know about Defendant's disclosure of their Personal Health Information to Facebook and other third parties at the time it occurred. Plaintiffs and Class Members never agreed that their sensitive medical information could be collected, used, and monetized by Facebook.

338. Defendant's intentional disclosure of patients' Personal Health Information to a third-party advertising company like Facebook without consent would be highly offensive to a

Electronically Filed - CITY OF ST. LOUIS - October 25, 2023 - 11:26 AM

reasonable person. Plaintiffs and Class Members reasonably expected that their Personal Health Information would not be collected, used, and monetized by third party advertising companies.

339. Defendant's disclosure of Personal Health Information from thousands of individuals was highly offensive because it violated expectations of privacy that have been established by social norms. Privacy polls and studies show that Americans believe that one of the most important privacy rights is the need for an individual's affirmative consent before their personal data is collected, shared, or used.

340. Given the nature of the Personal Health Information that Defendant disclosed to Facebook, such as patients' names, email addresses, phone numbers, information entered into forms, doctor's names, potential doctor's names, the search terms used to locate doctors (i.e. "Alzheimer's"), the condition selected from dropdown menus (i.e. "Heart Disease"), medications, and details about upcoming doctor's appointments, this kind of intrusion would be (and in fact is) highly offensive to a reasonable person.

341. Plaintiffs and Class Members own their Personal Health Information data.

342. Plaintiffs and Class Members who paid money to Defendant reasonably believed and expected that Defendant would use part of those funds to operate its websites free of surreptitious collection and exploitation of communications between the parties. Defendant failed to do so. Plaintiffs and Class Members would not have purchased medical services from Defendant if they knew that Defendant would share their Personal Health Information with Facebook without their knowledge or written consent.

343. Missouri Revised Statute Section 537.525 authorizes parties like Plaintiffs and Class Members to bring a civil action against any person who violates Section 569.095 for compensatory damages and reasonable attorney's fees.

Electronically Filed - CITY OF ST. LOUIS - October 25, 2023 - 11:26 AM

344. Defendant's breach caused Plaintiffs and Class Members, at minimum, the following damages:

a. Sensitive and confidential information that Plaintiffs and Class Members intended to remain private is no longer private;

b. Defendants eroded the essential confidential nature of the doctor-patient and provider-patient relationship;

c. Defendants took something of value from Plaintiffs and Class Members and derived benefit therefrom without Plaintiffs and Class Members' knowledge, consent, or authorization and without sharing the benefit of such value;

d. Plaintiffs and Class Members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain the confidentiality of their Personal Health Information;

e. Defendant's actions diminished the value of Plaintiffs and Class Members' personal information.

345. Plaintiffs and Class Members have suffered harm and injury, including but not limited to the invasion of their privacy rights.

346. Plaintiffs and Class Members have been damaged as a direct and proximate result of Defendant's invasion of their privacy and are entitled to seek just compensation, including monetary damages.

347. Plaintiffs and Class Members seek appropriate relief for their injuries, including but not limited to damages that will reasonably compensate Plaintiffs and Class Members for the harm to their privacy interests as well as a disgorgement of profits made by Defendant as a result of its intrusions on Plaintiffs and Class Members' privacy.

Electronically Filed - CITY OF ST. LOUIS - October 25, 2023 - 11:26 AM

348. Plaintiffs and Class Members also seek such other relief as the Court may deem equitable, legal, and proper.

**COUNT II**
**Breach of Fiduciary Duty of Confidentiality**
***Brandt v. Medical Defense Associates*, 856 S.W.2d 667 (Mo. 1993)**
**(On Behalf of Plaintiffs and the Class)**
**Against Defendants**

349. Plaintiffs re-allege and incorporate by reference all paragraphs above as if fully set forth herein.

350. Plaintiffs bring this claim on behalf of themselves and all members of the Class.

351. All conditions precedent to this action have been performed or occurred.

352. In *Brandt v. Medical Defense Associates*, 856 S.W.2d 667, 674 (1993), the Missouri Supreme Court held that a duty of confidentiality arises from the physician-patient relationship and that a violation of that duty gives rise to a cause of action sounding in tort.

353. As medical provider for Plaintiffs and Class Members, Defendant owes Plaintiffs and Class Members a fiduciary duty of confidentiality in the data and content of communications exchanged between Defendant and Plaintiff or Class Members.

354. Plaintiffs and Class Members who paid money to Defendant reasonably believed and expected that Defendant would use part of those funds to operate its websites free of surreptitious collection and exploitation of communications between the parties. Defendant failed to do so. Plaintiffs and Class Members would not have purchased medical services from Defendant if they knew that Defendant would share their Personal Health Information with Facebook without their knowledge or written consent.

355. Defendant breached its duty of confidentiality by disclosing Personal Health Information about Plaintiffs and Class Members, including their status as patients, the content of

Electronically Filed - CITY OF ST. LOUIS - October 25, 2023 - 11:26 AM

their communications, and information about their doctors, potential doctors, conditions, treatments, appointments, search terms, and bill payment.

356. Defendant also materially breached its obligation to protect Plaintiffs' and Class Members' non-public Personal Health Information when it failed to implement adequate security measures and policies to protect the confidentiality of that information. For example, on information and belief, Defendant (1) failed to implement internal policies and procedures prohibiting the disclosure of patients' Personal Health Information without consent to third-party advertising companies like Facebook, (2) failed to implement adequate reviews of the software code and java script installed on its websites to ensure that patients' Personal Health Information was not being automatically routed without consent to third party advertising companies like Facebook, (3) failed to provide adequate notice to the public that visitors to its websites risked having their Personal Health Information shared with third party advertising companies like Facebook, (4) failed to take other industry standard privacy protection measures such as providing a "cookie" acceptance button on its website homepages, (5) failed to provide visitors to its websites with a means to opt out of the automatic transfer of data regarding their website interactions to third party advertising companies like Facebook, (6) failed to implement internal policies and educational programs to ensure that Defendants' website managers and coders were familiar with the legal regulations governing the disclosure patient Personal Health Information to third parties, and (7) failed to install adequate firewalls or take similar measures to prevent the automatic routing of patients' Personal Health Information to third party advertising companies like Facebook.

357. Defendant's breach caused Plaintiffs and Class Members the following damages:

Electronically Filed - CITY OF ST. LOUIS - October 25, 2023 - 11:26 AM

a. Sensitive and confidential information that Plaintiffs and Class Members intended to remain private is no longer private;

b. Defendants eroded the essential confidential nature of the doctor-patient and provider-patient relationship;

c. Defendants took something of value from Plaintiffs and Class Members and derived benefit therefrom without Plaintiffs and Class Members' knowledge, consent, or authorization and without sharing the benefit of such value;

d. Plaintiffs and Class Members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain the confidentiality of their Personal Health Information; and

e. Defendant's actions diminished the value of Plaintiffs and Class Members' personal information.

**COUNT III**
**Unjust Enrichment/Quasi-Contract**
**(On Behalf of Plaintiff and the Class)**

358. Plaintiffs re-allege and incorporate by reference all paragraphs above as if fully set forth herein.

359. Plaintiffs bring this claim on behalf of themselves and all members of the Class.

360. Plaintiffs and Class Members conferred a benefit on Defendant in the form of valuable sensitive medical information that Defendant collected from Plaintiffs and Class Members under the guise of keeping this information private. Defendant collected, used, and disclosed this information for its own gain, including for advertisement purposes, sale, or trade for valuable services from third parties. Additionally, Plaintiff and the Class Members conferred a benefit on Defendant in the form of monetary compensation.

Electronically Filed - CITY OF ST. LOUIS - October 25, 2023 - 11:26 AM

361. Plaintiff and the Class Members would not have used the Defendant's services, or would have paid less for those services, if they had known that Defendant would collect, use, and disclose this information to third parties.

362. Plaintiffs and Class Members who paid money to Defendant reasonably believed and expected that Defendant would use part of those funds to operate its websites free of surreptitious collection and exploitation of communications between the parties. Defendant failed to do so. Plaintiffs and Class Members would not have purchased medical services from Defendant if they knew that Defendant would share their Personal Health Information with Facebook without their knowledge or written consent.

363. Consumers of healthcare value their privacy, the privacy of their dependents, and the ability to keep their Private Health Information associated with obtaining healthcare private. To customers such as Plaintiff and the Class Members, healthcare that allows third parties to secretly collect their Private Health Information without consent is fundamentally less useful and less valuable than healthcare that refrains from such practices.

364. Defendant unjustly retained those benefits at the expense of Plaintiffs and Class Members because Defendant's conduct damaged Plaintiffs and Class Members, all without providing any commensurate compensation to Plaintiffs and Class Members.

365. T The medical services that Defendant offers are available from many other health care systems who do protect the confidentiality of patient communications. Had Defendant disclosed that it would allow third parties to secretly collect Plaintiffs and Class Members' Private Health Information without consent, neither the Plaintiff, the Class Members, nor any reasonable person would have purchased healthcare from Defendant and/or its affiliated healthcare providers.

Electronically Filed - CITY OF ST. LOUIS - October 25, 2023 - 11:26 AM

366. Defendant's conduct in sharing Plaintiff's and Class Members' Personal Health Information with Facebook also diminished the sales value of that information. There is a robust market for the type of information that Plaintiffs and Class Members shared with Defendant (which Defendant then shared with Facebook). Indeed, Facebook and Google have offered to pay the public to acquire similar information in the past so that they could use such information for marketing purposes. Plaintiffs and Class Members were harmed both by the dissemination of their Personal Health Information and by losing the sales value of that information.

367. The benefits that Defendant derived from Plaintiffs and Class Members rightly belong to Plaintiffs and Class Members. It would be inequitable under unjust enrichment principles for Defendant to be permitted to retain any of the profit or other benefits it derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

368. Defendant should be compelled to disgorge in a common fund for the benefit of Plaintiffs and Class Members all unlawful or inequitable proceeds that Defendant received, and such other relief as the Court may deem just and proper.

**COUNT IV**
**Invasion of Privacy—Unreasonable Intrusion upon the Seclusion of Another**
**(On Behalf of Plaintiff and the Class)**

369. Plaintiff re-alleges and incorporates by reference all paragraphs above as if fully set forth herein.

370. Plaintiff brings this claim on behalf of himself and all members of the Class.

371. Missouri established a right to privacy in Article 1, Section 15 of the Missouri Constitution.

372. Under Missouri law, there is a tortious intrusion on seclusion when there is an intentional intrusion on the solitude, seclusion, or private affairs of another by a means that is

Electronically Filed - CITY OF ST. LOUIS - October 25, 2023 - 11:26 AM

unreasonable or highly offensive to a reasonable person. A claim for unreasonable intrusion upon the seclusion of another encompasses three elements: (1) the existence of a secret and private subject matter; (2) a right in the plaintiff to keep that subject matter private; and (3) the obtaining by the defendant of information about that subject matter through unreasonable means. *Corcoran v. Southwestern Bell Tel. Co.*, 572 S.W.2d 212, 215 (Mo.App.1978).

373. Plaintiffs and Class Members had a legitimate and reasonable expectation of privacy with respect to their Personal Health Information and were accordingly entitled to protection of this information against the acquisition and disclosure of their Personal Health Information by unreasonable means.

374. Defendant owed a duty to Plaintiffs and Class Members to protect the confidentiality of their Personal Health Information and not to share such information with Facebook for marketing purposes without the express written consent of Plaintiffs and Class Members.

375. Defendant obtained Plaintiff's and Class Members' Personal Health Information by falsely promising that it would safeguard the confidentiality of that information and that it would never disclose such information to third parties for marketing purposes without written consent. The deceitful method through which Defendant obtained Plaintiff's and Class Member's Personal Health Information (i.e., lying to patients about how their Personal Health Information would be used) would be objectionable to a reasonable person.

376. The unauthorized acquisition, appropriation, and disclosure of Plaintiff's and Class Members' Personal Health Information would also be highly offensive to a reasonable person.

Electronically Filed - CITY OF ST. LOUIS - October 25, 2023 - 11:26 AM

377. The intrusion was into subject matter that was private and is entitled to be private. Plaintiffs and Class Members disclosed their Personal Health Information to Defendant with the understanding that it would only be used for their medical treatment and that such information would be kept confidential and protected from disclosure to third parties. Plaintiffs and Class Members reasonably believed that such information would be kept private and would not be shared with Facebook without their authorization so that Facebook could target them with advertising.

378. The disclosure of Plaintiff's and Class Members' Personal Health Information by Defendant constitutes an unreasonable intrusion upon Plaintiff's and Class Members' seclusion, as to both their persons, their private affairs, and private concerns of a kind that would be highly offensive to a reasonable person.

379. Defendant acted with a knowing mind when it intentionally disclosed Plaintiffs and Class Members' Personal Health Information to Facebook. Defendant further invaded Plaintiff's and Class Members' privacy by failing to implement adequate data security measures, despite its obligations to protect patients' Personal Health Information.

380. Acting with knowledge, Defendant had notice and knew that its disclosure of Plaintiff's and Class Members' Personal Health Information would cause injury to Plaintiffs and Class Members.

381. As a proximate result of Defendant's acts and omissions, Plaintiff's and Class Members' Personal Health Information was transmitted to Facebook and other third parties without authorization, causing Plaintiffs and Class Members to suffer injury, including, at minimum, the following damages:

Electronically Filed - CITY OF ST. LOUIS - October 25, 2023 - 11:26 AM

a. Sensitive and confidential information that Plaintiffs and Class Members intended to remain private is no longer private;

b. Defendants eroded the essential confidential nature of the doctor-patient and provider-patient relationship;

c. Defendants took something of value from Plaintiffs and Class Members and derived benefit therefrom without Plaintiffs and Class Members' knowledge, consent, or authorization and without sharing the benefit of such value;

d. Plaintiffs and Class Members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain the confidentiality of their Personal Health Information; and

e. Defendant's actions diminished the value of Plaintiffs and Class Members' personal information.

382. Unless and until enjoined and restrained by order of this Court, Defendant's wrongful conduct will continue to cause great and irreparable injury to Plaintiffs and Class Members in that their Personal Health Information can be accessed, acquired by, appropriated by, disclosed to, used by, and/or viewed by unauthorized third parties.

383. Plaintiffs and Class Members have no adequate remedy at law for the injuries that they have suffered (and will continue to suffer) because of Defendant's wrongful practices in that a judgment for money damages will not end the invasion of privacy for Plaintiffs and Class Members. Accordingly, Plaintiffs and Class Members seek such injunctive relief as the Court deems legal, equitable, and proper.

Electronically Filed - CITY OF ST. LOUIS - October 25, 2023 - 11:26 AM

**COUNT V**
**Identity Theft**
**Mo. Rev. Stat. § 570.223**
**(On Behalf of Plaintiffs and the Class)**
**Against Defendants**

384. Plaintiffs re-allege and incorporate by reference all paragraphs above as if fully set forth herein.

385. Plaintiffs bring this claim on behalf of themselves and all Class Members.

386. Section 570.233 provides that a person "commits the offense of identity theft if he or she knowingly and with the intent to deceive or defraud obtains, possesses, transfers, uses, or attempts to obtain, transfer, or use, one or more means of identification not lawfully issued for his or her use."

387. "Deceive" is defined as "making a representation which is false and which the actor does not believe to be true and upon which the victim relies, as to a matter of fact, law, value, intention or other state of mind, or concealing a material fact as to the terms of a contract or agreement." Mo. Rev. Stat. § 570.010(8).

388. "Defraud" is defined as "[t]o cause injury or loss to (a person or organization) by deceit; to trick (a person or organization) in order to get money." Black's Law Dictionary (11th ed. 2019) ("Defraud").

389. "Means of identification" is defined under § 570.010(15) as "*anything* used by a person as a means to uniquely distinguish himself or herself."

390. Defendant committed identity theft under § 570.223 by knowingly obtaining, using, and transferring to Facebook and other third-party marketing companies Plaintiff' and Class Members' "means of identification" in the form of IP addresses, cookie identifiers, account

Electronically Filed - CITY OF ST. LOUIS - October 25, 2023 - 11:26 AM

numbers, and browser-fingerprint information without Plaintiff' and Class Members' authorization.

391. For example, when a patient clicked the button to log into Defendant's patient portal, Defendant used and transferred patients' personal identifiers by causing the identifiers to be transmitted to Facebook, notifying Facebook, among other things, that the patient has attempted to log into Defendant's patient portal.

392. Defendant's use and transfer of Plaintiffs' and Class Members' means of identification occurred because Defendant installed source code on its website, including the Meta Pixel, that resulted in the transfer of Plaintiffs' and Class Members' personally identifiable information to Facebook, Google, and other third-party marketing companies.

393. Defendant deceived Plaintiffs and Class Members into providing such personally identifiable data by making a series of false representations to patients.

394. For example, Defendant promised on its website that it would never sell its patients' personal health information for marketing purposes without their written authorization. Defendant also falsely promised patients that it would ensure that medical information that identified individual patients would be kept private. These promises were false and misleading because, contrary to Defendants' promises, Defendants did not protect patients' personal health information but instead routinely sold and/or bartered such information to Facebook in return for access to the Meta Pixel.

395. Defendant also defrauded Plaintiffs and Class Members by concealing a material fact from Plaintiffs and Class Members: i.e., that their most sensitive personal communications with Defendant were routinely and automatically disclosed to Facebook and other third-party marketing companies.

Electronically Filed - CITY OF ST. LOUIS - October 25, 2023 - 11:26 AM

396. Section 570.223.4 provides that "any person who commits an act made unlawful by subsection 1 of this section shall be liable to the person to whom the identifiable information belonged for civil damages of up to five thousand dollars for each incident, or three times the amount of actual damages, whichever amount is greater. A person damaged as set forth in subsection 1 of this section may also institute a civil action to enjoin and restrain future acts that would constitute a violation of subsection 1 of this section."

397. As a direct and proximate result of Defendant's violation of § 570.223, Plaintiffs and Class Members were damaged by Defendant in multiple ways, including at minimum, the following damages:

a. Sensitive and confidential information that Plaintiffs and Class Members intended to remain private is no longer private;

b. Defendant harmed Plaintiffs' and Class Members' privacy interests;

c. Defendant eroded the essential confidential nature of the doctor-patient and provider-patient relationship;

d. Defendant took something of value from Plaintiffs and Class Members and derived benefit therefrom without Plaintiffs and Class Members' knowledge, consent, or authorization and without sharing the benefit of such value; and

e. Statutory damages as prescribed by Mo. Rev. Stat. § 570.223.4

WHEREFORE, on behalf of themselves and others, Plaintiffs pray judgment against Defendant for an amount in excess of $25,000 that is fair, just, and reasonable and for the costs expended herein, for judgment interest on said sums, and for such other relief as the Court deems just and proper.

Electronically Filed - CITY OF ST. LOUIS - October 25, 2023 - 11:26 AM

**COUNT VI**
**Negligence**
**(On Behalf of Plaintiffs and the Class)**
**Against Defendants**

398. Plaintiffs re-allege and incorporate by reference all paragraphs above as if fully set forth herein.

399. Plaintiffs hereby plead this Count in the alternative to Counts I to V.

400. Plaintiffs bring this claim on behalf of themselves and all Class Members.

401. Defendant owed a duty to Plaintiffs and Class Members to keep confidential the Protected Health Information of Plaintiffs and Class Members and to protect this information from disclosure to third parties such as Facebook.

402. Defendant had the ability to safeguard the Personal Health Information of Plaintiffs and Class members but failed to take steps to do so.

403. Defendant negligently incorporated pixel tracking technologies into the source code for its Web Properties, which resulted in the unauthorized transmission of Plaintiffs' and Class Members' Personal Health Information.

404. As a proximate result of Defendant's acts and omissions, Plaintiffs' and Class Members' Personal Health Information was transmitted to Facebook and other third parties without authorization, causing Plaintiffs and Class Members to suffer injury, including, at minimum, the following damages:

a. Sensitive and confidential information that Plaintiffs and Class Members intended to remain private is no longer private;

b. Defendants eroded the essential confidential nature of the doctor-patient and provider-patient relationship;

Electronically Filed - CITY OF ST. LOUIS - October 25, 2023 - 11:26 AM

c. Defendants took something of value from Plaintiffs and Class Members and derived benefit therefrom without Plaintiffs and Class Members' knowledge, consent, or authorization and without sharing the benefit of such value;

d. Plaintiffs and Class Members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain the confidentiality of their Personal Health Information; and

e. Defendant's actions diminished the value of Plaintiffs and Class Members' personal information.

WHEREFORE, on behalf of themselves and others, Plaintiffs pray judgment against Defendant for an amount in excess of $25,000 that is fair, just, and reasonable and for the costs expended herein, for judgment interest on said sums, and for such other relief as the Court deems just and proper.

**COUNT VII**
**Interception of Wire Communications in Violation of**
**Mo. Rev. Stat. § 542.402**
**(On Behalf of Plaintiffs and the Class)**

405. Plaintiffs re-allege and incorporate by reference all paragraphs above as if fully set forth herein.

406. Plaintiffs bring this claim on behalf of themselves and all members of the Class.

407. All conditions precedent to this action have been performed or have occurred.

408. Mo. Rev. Stat. § 542.402 provides that it is unlawful under the provisions of sections 542.0400 to 542.422 for a person not acting under law to intercept a wire communication "for the purpose of committing any criminal or tortious act."

Electronically Filed - CITY OF ST. LOUIS - October 25, 2023 - 11:26 AM

409. Defendant intercepted Plaintiffs' and Class Members' wire communications for the purpose of committing multiple criminal and tortious acts, including, but not limited to, the criminal and tortious acts specified below.

410. For example, Defendant intercepted Plaintiffs' and Class Members' wire communications for the purpose of invading Plaintiffs' and Class Members' privacy by disclosing those communications to third parties including Facebook and Google without the knowledge, consent, or written authorization of Plaintiffs or Class Members. Because the disclosure of Plaintiffs' and Class Members' Personal Health Information to third parties including Facebook without consent or proper authorization is both a criminal and tortious act that violates multiple laws, including (but not limited to) 42 U.S.C. § 1320d-6, 15 U.S.C. 45, Mo. Rev. Stat. § 542.402(1)(3), Mo. Rev. Stat. § 542.406(4), Mo. Rev. Stat. § 569.095(1)(3), 45 CFR § 164.508(a)(1), Mo. Rev. Stat. § 407.1500, and Mo. Rev. Stat. § 407.020, Defendant's misconduct falls within the ambit of Missouri's wiretapping statute.

411. For example, 42 U.S.C. § 1320d-6, it is a criminal violation for a person to "use[] or cause[] to be used a unique health identifier" or to "disclose[] individually identifiable health information to another person … without authorization" from the patient.

412. The penalty for violation is enhanced where "the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage, personal gain, or malicious harm." 42 U.S.C. § 1320d-6.

413. SSM's conduct violated 42 U.S.C. § 1320d-6 in that it used and caused to be used fbp, ga, and gid cookies associated with specific patients without patient authorization and disclosed individually identifiable health information to Facebook, Google, and others.

Electronically Filed - CITY OF ST. LOUIS - October 25, 2023 - 11:26 AM

414. SSM's conduct would be subject to the enhanced provisions of 42 U.S.C. § 1320d-6 because SSM's use of the Facebook and Google source code was for SSM's commercial advantage to increase revenue from existing patients and gain new patients. The unauthorized disclosure of individually identifiable health information is a criminal violation of 42 U.S.C. § 1320d-6 regardless of any subsequent purpose or use of the individually identifiable health information. SSM violated 42 U.S.C. 1320d-6 by intentionally disclosing individually identifiable health information without authorization.

415. Further, Defendant intentionally intercepted Plaintiffs' and Class Members' wire communications for the illegitimate purpose of committing further tortious and criminal acts by misappropriating Plaintiffs and Class Member's valuable Personal Health Information so that Defendant could not only spy on Plaintiffs' and Class Members' web surfing activities but could also monetize and exploit their Personal Health Information without paying fair value for such valuable information.

416. Defendant's interception of Plaintiffs' and Class Member's wire communications for the purpose of bartering and/or selling Plaintiffs' and Class Members' Personal Health Information to Facebook in return for access to Facebook's Meta Pixel tool also constitutes the tort of conversion under Missouri law. Under Missouri law, conversion occurs where there is an unauthorized assumption of the right of ownership over the personal property of another to the exclusion of the owner's rights. By disclosing Plaintiffs' and Class Members' Personal Health Information without their knowledge or consent, Defendant deprived Plaintiffs and Class Members of their property rights in their Personal Health Information and caused Plaintiffs and Class Members injury by diminishing the value of their Personal Health Information, depriving Plaintiffs and Class Members of the full value of the

Electronically Filed - CITY OF ST. LOUIS - October 25, 2023 - 11:26 AM

medical services for which they paid, which included Defendants' obligation to maintain the confidentiality of their Personal Health Information, and depriving Plaintiffs and Class Members of their right to control who had access to their sensitive medical and personal information. Defendants' decision to steal and exploit Plaintiffs' and Class Members' Personal Health Information without their knowledge or consent is sufficient to bring Defendant's conduct within the ambit of Missouri's wiretapping statute.

417. Defendants' interception of Plaintiffs' and Class Members' wire communications for the purpose of disclosing their Personal Health Information to Facebook and Google is also a tortious act that constitutes a breach of the fiduciary duty of confidentiality owed by doctors and hospital systems to their patients as set forth by the Missouri Supreme Court in *Brandt v. Medical Defense Associates*, 856 S.W.2d 667, 674 (1993).

418. Defendants' interception of Plaintiffs' and Class Members' wire communications for the purpose of disclosing their Personal Health Information to Facebook and other third parties also constitutes the tort of invasion of privacy under Missouri law—specifically an intrusion on Plaintiffs' and Class Members' seclusion and private affairs. Plaintiffs and Class Members had a reasonable expectation of privacy that Defendants would not share their Personal Health Information with Facebook so that Facebook could target them with advertising. Defendants obtained Plaintiffs' and Class Members' Personal Health Information by falsely promising that it would safeguard the confidentiality of that information and that it would never disclose such information to third parties for marketing purposes without written consent. The method through which Defendants obtained Plaintiffs' and Class Members' Personal Health Information (i.e., lying to patients about how their Personal Health Information would be used) would be objectionable to a reasonable person. Defendants'

Electronically Filed - CITY OF ST. LOUIS - October 25, 2023 - 11:26 AM

disclosure of Plaintiffs' and Class Members' Personal Health Information thus violated their right to privacy.

419. Any person whose wire communication is intercepted, disclosed, or used in violation of the statute "shall have a civil cause of action against any person who intercepts, discloses, or uses, or procures any other person to intercept, disclose, or use such communications." Mo. Rev. Stat. § 542.418.

420. Defendants violated the Missouri Wiretap Act by intercepting Plaintiffs' and Class Members' wire communications in violation of Mo. Rev. Stat. § 542.402(1).

421. Defendants separately violated the Missouri Wiretap Act by disclosing the contents of Plaintiffs' and Class Members' wire communications to Facebook in violation of Mo. Rev. Stat. § 542.402(3).

422. Defendants also separately violated the Missouria Wiretap Act by "knowingly" using the contents of Plaintiffs' and Class Members' wire communications to barter and/or sell that information to Facebook in return for access to the Meta Pixel tool in violation of Mo. Rev. Stat. § 542.402(4).

423. Defendants qualify as a person under the statute.

424. All alleged communications between Plaintiffs or Class Members and Defendants qualify as wire communications under Missouri law because each communication is made using personal computing devices (e.g., computers, smartphones, tablets) that send and receive communications in whole or in part through the use of facilities used for the transmission of communications aided by wire, cable, or other like connections.

425. A "wire communication" under the statute means "any communication made in whole or in part through the use of facilities for the transmission of communications by the aid

Electronically Filed - CITY OF ST. LOUIS - October 25, 2023 - 11:26 AM

of wire, cable, or other like connection between the point of origin and the point of reception." Mo. Rev. Stat. § 542.400(12).

426. Defendants engaged in and continue to engage in interception by aiding others (including Facebook) to secretly record the contents of Plaintiffs' and Class Members' wire communications.

427. The intercepting devices used in this case include, but are not limited to:

a. Plaintiffs and Class Members' personal computing devices;

b. Plaintiffs and Class Members' web browsers;

c. Plaintiffs and Class Members' browser-managed files;

d. Facebook's Meta Pixel;

e. Internet cookies;

f. Defendants' computer servers;

g. Third-party source code utilized by Defendants; and

h. Computer servers of third parties (including Facebook) to which Plaintiffs and Class Members' communications were disclosed.

428. "Contents" under the statute, when used with respect to any wire communication, includes "any information concerning the identity of the parties, the substance, purport, or meaning of that communication." Mo. Rev. Stat. § 542.400(3).

429. Defendants aided in, and continue to aid in, the interception of contents in that the data from the communications between Plaintiffs and/or Class Members and Defendants that were redirected to and recorded by the third parties include information which identifies the parties to each communication, their existence, and their contents.

Electronically Filed - CITY OF ST. LOUIS - October 25, 2023 - 11:26 AM

430. Defendants aided in the interception of "contents" in at least the following forms:

a. The parties to the communications;

b. The precise text of patient search queries;

c. Personally identifying information such as patients' IP addresses, Facebook IDs, browser fingerprints, and other unique identifiers;

d. The precise text of patient communications about specific doctors;

e. The precise text of patient communications about specific medical conditions;

f. The precise text of patient communications about specific treatments;

g. The precise text of patient communications about scheduling appointments with medical providers;

h. The precise text of patient communications about billing and payment;

i. The precise text of specific buttons on Defendants' website(s) that patients click to exchange communications, including Log-Ins, Registrations, Requests for Appointments, Search, and other buttons;

j. The precise dates and times when patients click to Log-In on Defendants' website(s);

k. The precise dates and times when patients visit Defendants' websites;

l. Information that is a general summary or informs third parties of the general subject of communications that Defendants sends back to patients in response to search queries and requests for information about specific doctors, conditions, treatments, billing, payment, and other information; and

Electronically Filed - CITY OF ST. LOUIS - October 25, 2023 - 11:26 AM

m. Any other content that Defendants have aided third parties in scraping from webpages or communication forms at web properties.

431. Plaintiffs and Class Members reasonably expected that their Personal Health Information was not being intercepted, recorded, and disclosed to Facebook and other third parties.

432. No legitimate commercial purpose was served by Defendants' willful and intentional disclosure of Plaintiffs' and Class Members' Personal Health Information to Facebook. Neither Plaintiffs nor Class Members consented to the disclosure of their Personal Health Information by Defendants to Facebook and other third parties. Nor could they have consented, given that Defendants never sought Plaintiffs' or Class Members' consent, much less told visitors to its website that their every interaction was being recorded and transmitted to Facebook via the Meta Pixel tool.

433. Plaintiffs' and Class Members' electronic communications were intercepted during transmission, without their consent, for the unlawful and/or wrongful purpose of monetizing their Personal Health Information, including using their sensitive medical information to develop marketing and advertising strategies.

434. Under the Wiretapping Act, aggrieved persons are entitled to recover actual damages, but not less than liquidated damages computed at the rate of one hundred dollars a day for each day of the violation or ten thousand dollars whichever is greater, punitive damages, and reasonable attorney's fees and other litigation costs. Mo. Rev. Stat. § 542.418.

435. In addition to statutory damages, Defendants' breach caused Plaintiffs and Class Members the following damages:

Electronically Filed - CITY OF ST. LOUIS - October 25, 2023 - 11:26 AM

a. Sensitive and confidential information that Plaintiffs and Class Members intended to remain private is no longer private;

b. Defendants eroded the essential confidential nature of the doctor-patient relationship;

c. Defendants took something of value from Plaintiffs and Class Members and derived benefit therefrom without Plaintiffs' and Class Members' knowledge or informed consent and without sharing the benefit of such value;

436. Plaintiffs and Class Members also seek such other relief as the Court may deem equitable, legal, and proper.

WHEREFORE, on behalf of themselves and others, Plaintiffs pray judgment against Defendants for an amount in excess of $25,000 that is fair, just, and reasonable and for the costs expended herein, for judgment interest on said sums, and for such other relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury on all issues so triable.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, asks for judgment in his favor, and that the Court enter an order as follows:

a. Certifying the Class and appointing Plaintiffs as the Class's representatives;

b. Appointing Plaintiffs' attorneys as interim class counsel;

c. Finding that Defendant's conduct as alleged herein was unlawful;

d. Awarding such injunctive and other equitable relief as the Court deems just and proper, including enjoining Defendant from making any further disclosure of Plaintiffs or Class Members' communications to third parties without the Plaintiff or Class Members' express, informed, and written consent;

Electronically Filed - CITY OF ST. LOUIS - October 25, 2023 - 11:26 AM

e. Awarding statutory damages of $5,000 per Plaintiffs and Class Members pursuant to Mo. Rev. Stat. § 570.223.4.

f. Imposing a constructive trust against Defendant through which Plaintiffs and Class Members can be compensated for any unjust enrichment gained by Defendant;

g. Awarding Plaintiffs and Class Members statutory, actual, compensatory, consequential, and nominal damages, as well as restitution and/or disgorgement of profits unlawfully obtained;

h. Awarding Plaintiffs and Class Members pre-judgment and post-judgment interest as provided by law;

i. Awarding Plaintiffs and Class Members reasonable attorney's fees, costs, and expenses;

j. Awarding costs of suit; and

k. Such other and further relief to which Plaintiffs and Class Members may be entitled.

Not an Official Court Document

Electronically Filed - CITY OF ST. LOUIS - October 25, 2023 - 11:26 AM

Dated: October 25, 2023

*/s/ John F. Garvey*
John F. Garvey #35879
Colleen Garvey #72809
Ellen Thomas #73043
**STRANCH, JENNINGS, & GARVEY, PLLC**
St. Louis, Missouri, Suite 1510
Telephone: (314) 390-6750
Facsimile: (615) 255-5419
jgarvey@stranchlaw.com
cgarvey@stranchlaw.com
ethomas@stranchlaw.com

Lynn A. Toops*
**COHEN & MALAD, LLP**
One Indiana Square, #1400
Indianapolis, IN 46204
Telephone: (317) 636-6481
ltoops@cohenandmalad.com

Foster C. Johnson*
Kyle Poelker #65586
**AHMAD, ZAVITSANOS, & MENSING, PLLC**
1221 McKinney Street, Suite 3460
Houston, Texas 77010
Telephone: (713) 655-1101
Facsimile: (713) 655-0062
fjohnson@azalaw.com
kpoelker@azalaw.com

Samuel J. Strauss*
Raina C. Borrelli*
**TURKE & STRAUSS LLP**
613 Williamson St., Suite 201
Madison, Wisconsin 53703
Telephone: (608) 237-1775
Facsimile: (608) 509-4423
sam@turkestrauss.com
raina@turkestrauss.com

Gary M. Klinger*
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**
227 W. Monroe Street, Suite 2100
Chicago, IL 60606
Telephone: (866) 252-0878
*gklinger@milberg.com*

Electronically Filed - CITY OF ST. LOUIS - October 25, 2023 - 11:26 AM

Bryan L. Bleichner*
**CHESTNUT CAMBRONNE PA**
100 Washington Avenue South, Suite 1700
Minneapolis, MN 55401
Phone: (612) 339-7300
Fax: (612) 336-2940
*bbleichner@chestnutcambronne.com*

Tiffany Marko Yiatras, #58197
**CONSUMER PROTECTION LEGAL, LLC**
308 Hutchinson Road
Ellisville, Missouri 63011-2029
Phone: (314) 541-0317
tiffany@consumerprotectionlegal.com

Terence R. Coates*
Dylan J. Gould*
**MARKOVITS, STOCK & DEMARCO, LLC**
119 E. Court St., Ste. 530
Cincinnati, Ohio 4502
Phone: (513) 651-3700
Fax: (513) 665-0219
*tcoates@msdlegal.com*
*dgould@msdlegal.com*

Joseph M. Lyon*
**The LYON LAW FIRM**
2754 Erie Ave.
Cincinnati, Ohio 45208
Phone: (513) 381-2333
Fax: (513) 766-9011
*jlyon@thelyonfirm.com*

* Motions for Admission to be filed

*Attorneys for Plaintiff and the Proposed Class*

Electronically Filed - CITY OF ST. LOUIS - October 25, 2023 - 11:26 AM

**CERTIFICATE OF FILING**

The undersigned hereby certifies that the foregoing First Amended Class Action Complaint has been filed using the Court's electronic case filing system on this 25th day of October 2023.

*/s/ John F. Garvey*

Not an Official Court Document