# EXHIBIT I

Electronically Filed - BUCHANAN - July 08, 2024 - 03:33 PM

**IN THE CIRCUIT COURT OF BUCHANAN COUNTY**
**STATE OF MISSOURI**

**JANE DOE AND JANICE DOE**,
Individually and on behalf of all others similarly situated,

Plaintiffs

v.

**MOSAIC HEALTH SYSTEM**

SERVE:
Michael Rinard
5325 Faraon Street
St. Joseph, MO 64506

And

**HEARTLAND REGIONAL MEDICAL CENTER**
d/b/a Mosaic Life Care,

SERVE:
Michael Rinard
5325 Faraon Street
St. Joseph, MO 64506

Defendant.

**CASE NO. 22BU-CC01774-01**

**JURY TRIAL DEMANDED**

**FIRST AMENDED CLASS ACTION PETITION**

Plaintiffs Jane Doe and Janice Doe (collectively "Plaintiffs"), individually and on behalf of all other Citizens of the state of Missouri similarly situated ("Class Members"), brings suit against Defendant Mosaic Health System and Heartland Regional Medical Center d/b/a Mosaic Life Care, (collectively referred to herein as "Defendant"), and upon personal knowledge as to Plaintiffs' own conduct and on information and belief as to all other matters based upon investigation by counsel, alleges as follows:

Electronically Filed - BUCHANAN - July 08, 2024 - 03:33 PM

## INTRODUCTION

1. This case arises from Defendant's systematic violation of the medical privacy rights of its patients, exposing highly sensitive personal information to third parties without those patients' knowledge or consent.

2. Defendant assures visitors to its website that it is "required by law to maintain the privacy of your Protected Health Information."[1] Indeed, Defendant represents that "[c]ertain uses and disclosures of PHI require an authorization from you. These include psychotherapy notes not maintained in the electronic medical record, PHI used for marketing purposes or the sale of PHI."[2] Contrary to these assurances, however, Defendant does not follow these policies, nor the law prohibiting such disclosures.

3. At all relevant times, Defendant disclosed information about its patients—including their status as patients, their physicians, their medical treatments, when they made appointments, when they paid bills, the hospitals they visited, and their personal identities—to Facebook and other third parties without their patients' knowledge, authorization, or consent.

4. Defendant discloses this protected health information through the deployment of various digital marketing and automatic rerouting tools embedded on its websites that purposefully and intentionally redirect patients' personal health information to third parties who exploit that information for advertising purposes. Defendant's use of these rerouting tools causes its patients' personally identifiable information and the contents of its patients' communications exchanged with Defendant to be automatically redirected to third parties in violation of those patients' reasonable expectations of privacy, their rights as patients, their rights as citizens of Missouri, and both the express and implied promises of Defendant.

[1] https://www.mymlc.com/General/Privacy-Policy/
[2] *Id.*

Electronically Filed - BUCHANAN - July 08, 2024 - 03:33 PM

5. Defendant's conduct in disclosing such protected health information about its patients to Facebook and other third parties without notice or consent violates Missouri law, including Mo. Rev. Stat. § 542.402 (Wiretapping), Mo. Rev. Stat. § 569.095 (Tampering with Computer Data), Mo. Rev. Stat. § 407.020 (Unlawful Practices), Mo. Rev. Stat. § 491.060(5) (Persons Incompetent to Testify), Mo. Rev. Stat. § 407.1500 (Notice to Consumer for Breach of Security), and the fiduciary duty of confidentiality owed by hospitals to their patients first established in *Brandt v. Med. Def. Assocs*., 856 S.W.2d 667, 674 (Mo. 1993).

6. On behalf of themselves and all similarly situated citizens in the state of Missouri, Plaintiffs seek an order enjoining Defendant from further unauthorized disclosures of their personal information; awarding liquidated damages in the amount of $10,000 per violation, attorney's fees and costs; and granting any other preliminary or equitable relief the Court deems appropriate.

**PARTIES TO THE ACTION**

7. Defendant Mosaic Health System is a Missouri corporation with its principal office at 5325 Faraon Street, St. Joseph, MO 64506. Defendant owns and manages numerous healthcare facilities in Missouri, serving 35 counties in northwest Missouri, northeast Kansas, southeast Nebraska and southwest Iowa, and employing more than 4,000 individuals.[3]

8. Defendant Heartland Regional Medical Center d/b/a/ Mosaic Life Care is a Missouri corporation with its principal office at 5325 Faraon Street, St. Joseph, MO 64506. Defendant owns and manages numerous healthcare facilities in Missouri, system serving 35 counties in northwest Missouri, northeast Kansas, southeast Nebraska and southwest Iowa, employing more than 4,000 individuals.[4]

[3] https://www.mymlc.com/Main/About-Mosaic-Life-Care/
[4] https://www.mymlc.com/Main/About-Mosaic-Life-Care/



Not an Official Court Document

Electronically Filed - BUCHANAN - July 08, 2024 - 03:33 PM

9. Plaintiff Jane Doe is a Missouri citizen residing in Buchanan County, Missouri, has been treated by Defendant's physicians, and has been a patient Mosaic Life Care, and thus also a patient of Defendant.

10. Plaintiff Janice Doe is a Missouri citizen residing in Nodaway County, Missouri, has been treated by Defendant's physicians, and has been a patient Mosaic Life Care, and thus also a patient of Defendant.

## JURISDICTION AND VENUE

11. This Court has personal jurisdiction over Defendant because it regularly conducts business throughout Missouri and has its principal place of business 5325 Faraon Street, St. Joseph, MO 64506.

12. Venue is appropriate in this Court because Plaintiffs were first injured by Defendant's conduct while residing in Buchanan County, Missouri. Mo. Rev. Stat. § 508.010.

## FACTUAL BACKGROUND

### A. Defendant routinely discloses the protected health information of its patients to third parties including Facebook.

13. Plaintiffs Jane Doe and Janice Doe are patients of Defendant who have received treatment from Mosaic Life Care.

14. As the Missouri Supreme Court has long recognized, hospital systems have "a fiduciary duty of confidentiality not to disclose medical information received in connection with the treatment of the patient." *Brandt v. Med. Def. Assocs.*, 856 S.W.2d 667, 674 (Mo. 1993).

15. Medical patients in Missouri such as Jane and Janice Doe have a legal interest in preserving the confidentiality of their communications with healthcare providers and have reasonable expectations of privacy that their personally identifiable information and

Electronically Filed - BUCHANAN - July 08, 2024 - 03:33 PM

communications will not be disclosed to third parties by Defendant without their express written consent and authorization.

16. As a health care provider, Defendant has fiduciary, common law, and statutory duties to protect the confidentiality of patient information and communications.

17. Defendant expressly and impliedly promises patients that it will maintain and protect the confidentiality of personally identifiable patient information and communications.

18. Defendant operates websites for patients, including www.mymlc.com.

19. Defendant's websites are designed for interactive communication with patients, including scheduling appointments, searching for physicians, paying bills, requesting medical records, learning about medical issues and treatment options, and joining support groups.

20. Defendant also maintains a patient portal, which allows patients to make appointments, access medical records, view lab results, and exchange communications with health care providers. On information and belief, Defendant installed source code on one or more version of its patient portal that caused these communications to be intercepted and disclosed to multiple third parties without those patients' authorization.

21. In addition, Defendant invites patients to access its patient portal using the MyChart Application. On information and belief, Defendant placed SDK code on that application which causes patients' communications with Defendant to be intercepted and disclosed to multiple third parties without those patients' authorization.

22. Defendant's websites and the patient portal are referred to herein as the "Web Properties."

23. Notwithstanding patients' reasonable expectations of privacy, Defendant's legal duties of confidentiality, and Defendant's express promises to the contrary, Defendant discloses

Electronically Filed - BUCHANAN - July 08, 2024 - 03:33 PM

the contents of patients' communications and protected healthcare information via automatic re-routing mechanisms embedded in and/or on the web properties operated by Defendant, including its patient portal, without patients' knowledge, authorization, or consent.

**B. The nature of Defendant's unauthorized disclosure of patients' health care information.**

24. Defendant's disclosures of patients' personal healthcare information occur because Defendant intentionally deploys source code on the Web Properties it operates, including https://www.mymlc.com, that cause patients' personally identifiable information (as well as the exact contents of their communications) to be transmitted to third parties.

25. By design, third parties receive and record the exact contents of patient communications before the full response from Defendant to patients has been rendered on the screen of the patient's computer device and while the communication between Defendant and the patient remains ongoing.

26. Web Properties like those maintained by Defendant are hosted by a computer server through which the business in charge of the websites exchange and communicate with internet users via their web browsers.

27. The basic command that web browsers use to exchange data and user communications is called a GET request.[5] For example, when a patient types "heart failure treatment" into the search box on Defendant's website and hits 'Enter,' the patient's web browser makes a connection with the server for Defendant's website and sends the following request: "GET search/q=heart+failure+treatment."

28. The other basic transmission command utilized by web browsers is POST, which is typically employed when a user enters data into a form on a website and clicks 'Enter' or some

[5] https://www.w3schools.com/tags/ref_httpmethods.asp

Electronically Filed - BUCHANAN - July 08, 2024 - 03:33 PM

other form of submission button. POST sends the data entered in the form to the server hosting the website that the user is visiting.

29. In response to receiving a GET or POST command, the server for the website with which the user is exchanging information will send a set of instructions to the web browser and command the browser with source code that directs the browser to render the website's responsive communication.

30. Unbeknownst to most users, however, the website's server may also redirect the user's communications to third parties. Typically, users are provided no notice that these disclosures are being made. Third parties (such as Facebook and Google) use the information they receive to track user data and communications for marketing purposes.

31. In many cases, third-party marketing companies acquire the content of user communications through a 1x1 pixel (the smallest dot on a user's screen) called a tracking pixel, a web-bug, or a web beacon. These tracking pixels are tiny and are purposefully camouflaged to remain invisible to users.

32. Tracking pixels can be placed directly on a web page by a developer, or they can be funneled through a "tag manager" service to make the invisible tracking run more smoothly. A tag manager further obscures the third parties to whom user data is transmitted.

33. These tracking pixels can collect dozens of data points about individual website users who interact with a website. One of the world's most prevalent tracking pixels, called the Meta Pixel, is provided by Facebook.

34. A web site developer who chooses to deploy third-party source code, like a tracking pixel, on their website must enter the third-party source code directly onto their website

Electronically Filed - BUCHANAN - July 08, 2024 - 03:33 PM

for every third party they wish to send user data and communications. This source code operates invisibly in the background when users visit a site employing such code.

**C. Tracking pixels provide third parties with a trove of personally identifying data permitting them to uniquely identify the individuals browsing a website.**

35. Tracking pixels are lines of source code embedded in websites such as Defendant's. Tracking pixels are particularly pernicious because they result in the disclosure of a variety of data that permits third parties to determine the unique personal identities of website visitors. While most users believe that the internet provides them with anonymity when, for example, they browse a hospital website for treatment information about a medical condition, that is not the case when the hospital website has embedded third party tracking devices, as Defendant has.

36. For example, an IP address is a number that identifies a computer connected to the internet. IP addresses are used to identify and route communications on the internet. IP addresses of individual users are used by internet service providers, websites, and tracking companies to facilitate and track internet communications and content. IP addresses also offer advertising companies like Facebook a unique and semi-persistent identifier across devices—one that has limited privacy controls.[6]

37. Because of their uniquely identifying characteristics, IP addresses are considered personally identifiable information. Tracking pixels can (and typically do) collect website visitors' IP addresses.

38. Likewise, internet cookies also provide personally identifiable information. Cookies are small text files that web servers can place on a user's browser and computer when a user's browser interacts with a website server. Cookies are typically designed to acquire and

[6] https://adtechexplained.com/the-future-of-ip-address-as-an-advertising-identifier/

Electronically Filed - BUCHANAN - July 08, 2024 - 03:33 PM

record an individual internet user's communications and activities on websites and were developed by programmers to aid with online advertising.

39. Cookies are designed to operate as a means of identification for internet users. Advertising companies like Facebook and Google have developed methods for monetizing and profiting from cookies. These companies use third-party tracking cookies to help them acquire and record user data and communications in order to sell targeted advertising that is customized to a user's personal communications and browsing history. To build individual profiles of internet users, third party advertising companies assign each user a unique (or a set of unique) identifiers to each user.

40. Cookies are considered personal identifiers, and tracking pixels can collect cookies from website visitors.

41. A third type of personally identifying information is what data companies refer to as a "browser-fingerprint." A browser-fingerprint is information collected about a computing device that can be used to identify the specific device.

42. These browser-fingerprints can be used to uniquely identify individual users when a computing device's IP address is hidden or cookies are blocked and can provide a wide variety of data. As Google explained, "With fingerprinting, developers have found ways to use tiny bits of information that vary between users, such as what device they have or what fonts they have installed to generate a unique identifier which can then be used to match a user across websites."[7] The value of browser-fingerprinting to advertisers (and trackers who want to monetize aggregated data) is that they can be used to track website users just as cookies do, but it

[7] https://www.blog.google/products/chrome/building-a-more-private-web/

Electronically Filed - BUCHANAN - July 08, 2024 - 03:33 PM

employs much more subtle techniques.[8] Additionally, unlike cookies, users cannot clear their fingerprint and therefore cannot control how their personal information is collected.[9]

43. In 2017, researchers demonstrated that browser fingerprinting techniques can successfully identify 99.24 percent of all users.[10]

44. Browser-fingerprints are considered personal identifiers, and tracking pixels can collect browser-fingerprints from website visitors.

45. A fourth kind of personally identifying information protected by law against disclosure are unique user identifiers (such as Facebook's "Facebook ID") that permit companies like Facebook to quickly and automatically identify the personal identity of its user across the internet whenever the identifier is encountered. A Facebook ID is an identifying number string that is connected to a user's Facebook profile.[11] Anyone with access to a user's Facebook ID can locate a user's Facebook profile.[12]

46. Unique personal identifiers such as a person's Facebook ID are likewise capable of collection through pixel trackers.

**D. Facebook**

47. Facebook, a social media platform founded in 2004 and today operated by Meta Platforms, Inc., was originally designed as a social networking website for college students.

48. Facebook describes itself as a "real identity" platform.[13] This means that users are permitted only one account and must share "the name they go by in everyday life."[14] To that

[8] https://pixelprivacy.com/resources/browser-fingerprinting/
[9] https://www.blog.google/products/chrome/building-a-more-private-web/
[10] https://www.ndss-symposium.org/ndss2017/ndss-2017-programme/cross-browser-fingerprinting-os-and-hardware-level-features/
[11] https://www.facebook.com/help/211813265517027
[12] https://smallseotools.com/find-facebook-id/
[13] https://www.wsj.com/articles/how-many-users-does-facebook-have-the-company-struggles-to-figure-it-out-11634846701#:~:text=Facebook%20said%20in%20its%20most,of%20them%20than%20developed%20ones.
[14] https://transparency.fb.com/policies/community-standards/account-integrity-and-authentic-identity/

Electronically Filed - BUCHANAN - July 08, 2024 - 03:33 PM

end, Facebook requires users to provide their first and last name, along with their birthday, telephone number and/or email address, and gender, when creating an account.[15]

49. Facebook maintains profiles on users that include users' real names, locations, email addresses, friends, likes, and communications. These profiles are associated with personal identifiers, including IP addresses, cookies, and other device identifiers. Facebook also tracks non-users across the web through its internet marketing products and source code.

50. In 2007, realizing the value of having direct access to millions of consumers, Facebook began monetizing its platform by launching "Facebook Ads," proclaiming this service to be a "completely new way of advertising online," that would allow "advertisers to deliver more tailored and relevant ads."[16] Facebook has since evolved into one of the largest advertising companies in the world.[17] Facebook can target users so effectively because it surveils user activity both on and off its website through the use of tracking pixels.[18] This allows Facebook to make inferences about users based on their interests, behavior, and connections.[19]

51. Facebook offers several advertising options based on the type of audience that an advertiser wants to target. Those options include targeting "Core Audiences," "Custom Audiences," "Look Alike Audiences," and even more granulated approaches within audiences called "Detailed Targeting." Each of Facebook's advertising tools allow an advertiser to target users based, among other things, on their personal data, including geographic location, demographics (e.g., age, gender, education, job title, etc.), interests, (e.g., preferred food, movies), connections (e.g., particular events or Facebook pages), and behaviors (e.g., purchases, device usage, and pages visited). This audience can be created by Facebook, the advertiser, or

[15] https://www.facebook.com/help/406644739431633
[16] https://about.fb.com/news/2007/11/facebook-unveils-facebook-ads/
[17] https://www.pewresearch.org/fact-tank/2021/06/01/facts-about-americans-and-facebook/
[18] https://www.facebook.com/business/help/742478679120153?id=1205376682832142
[19] https://www.facebook.com/business/ads/ad-targeting

Electronically Filed - BUCHANAN - July 08, 2024 - 03:33 PM

both working in conjunction.

**E. Facebook's Meta Pixel tool allows Facebook to track the personal data of individuals across a broad range of third-party websites.**

52. One of Facebook's most powerful tools is called the "Meta Pixel."

53. The Meta Pixel is a snippet of code embedded on a third-party website that tracks users' activities as users navigate through a website. Once activated, the Meta Pixel "tracks the people and type of actions they take." Meta Pixel can track and log each page a user visits, what buttons they click, as well as specific information that users input into a website. The Meta Pixel code works by sending Facebook a detailed log of a user's interaction with a website such as clicking on a product or running a search via a query box. The Meta Pixel also captures information such as what content a user views on a website or how far down a web page they scrolled. The analytics provided by the Meta Pixel tool allow website developers to improve "website operability" by giving developers insight into how customers use and interact with companies' websites.

54. When a patient uses their healthcare provider's website or application where the Meta Pixel is present, the Meta Pixel transmits the content of their communications to Facebook, including but not limited to (1) signing up for a patient portal, (2) signing-in and -out of a patient portal, (3) taking actions inside a patient portal, (4) making or scheduling appointments, (5) exchanging communications related to doctors, treatments, payment information, health insurance information, prescription drugs, prescriptions, side effects, conditions, diagnoses, prognoses, or symptoms of health conditions, (6) conduct a search on a Facebook partner website, and (7) other information that qualifies as personal health information under state and federal laws.

Electronically Filed - BUCHANAN - July 08, 2024 - 03:33 PM

55. In many circumstances, Facebook also obtains information from health care providers that identify a Facebook user's status as a patient and other health information that is protected by state and federal law. This occurs through tools that Facebook encourages health care providers to use to upload customer (i.e., patient) lists for use in its advertising systems.

56. The information transmitted from a health care provider's website or application is sufficient to uniquely identify a patient under federal law (such as IP addresses and device identifiers that Facebook associates with a patient's Facebook account), and may also include a patient's demographic information, email address, phone number, computer ID address, contact information, appointment type and date, treating physicians, button and menu selections, the content of buttons clicked, information typed into text boxes, and information about the substance, purport, and meaning of patient requests for information from their health care providers.

57. When someone visits a third-party website page that includes the Meta Pixel code, the Meta Pixel code is able to replicate and send the user data to Facebook through a separate (but simultaneous) channel in a manner that is undetectable by the user.[20]

58. The transmission is instantaneous—indeed Facebook often receives the information before the health care provider does.

59. The transmission is invisible.

60. The transmission is made without any affirmative action taken by the patient.

61. The transmission occurs without any notice to the patient that it is occurring.

[20] *See, e.g., In re Facebook, Inc. Internet Tracking Litigation,* 956 F.3d 589, 596 (9th Cir. 2020) (explaining functionality of Facebook software code on third-party websites).

Electronically Filed - BUCHANAN - July 08, 2024 - 03:33 PM

62. Facebook collects the transmitted identifiable health information and uses "cookies" to match it to Facebook users, allowing Facebook to target ads to a person who, for example, has used a patient portal and has exchanged communications about a specific condition, such as cancer.

63. The information Meta Pixel captures and discloses to Facebook includes a referrer header (or "URL"), which includes significant information regarding the user's browsing history, including the identifiable information of the individual internet user and the web server, as well as the name of the web page and the search terms used to find it.[21] When users enter a URL address into their web browser using the 'http' web address format, or click hyperlinks embedded on a web page, they are actually telling their web browsers (the client) which resources to request and where to find them. Thus, the URL provides significant information regarding a user's browsing history, including identifiable information for the individual internet user and the web server, as well as the name of the web page and the search terms that the user used to find it.

64. These search terms and the resulting URLs divulge a user's personal interests, queries, and habits on third-party websites operating outside of Facebook's own platform. In this manner, Facebook tracks users browsing histories on third-party websites, and compiles these browsing histories into personal profiles which are sold to advertisers to generate revenue.[22]

65. Meta Pixel takes the information it harvests and sends it to Facebook with personally identifiable information, such as a user's IP address, name, email, phone number, and specific Facebook ID. Anyone who has access to this Facebook ID can use this identifier to quickly and easily locate, access, and view a user's corresponding Facebook profile. Facebook

[21] *In re Facebook*, 956 F.3d at 596.
[22] *In re Facebook*, 956 F.3d at 596.

Electronically Filed - BUCHANAN - July 08, 2024 - 03:33 PM

stores this information on its servers, and, in some instances, maintains this information for years.[23]

66. Facebook has a number of ways that it can potentially use personally identifiable information being forwarded from third-party websites through the Meta Pixel.

67. If a user has a Facebook account, other personally identifiable information can potentially be linked to an individual user's Facebook account. For example, if the user is logged into their Facebook account when the user visits a third-party website where the Meta Pixel is installed, many common browsers will attach third-party cookies allowing Facebook to link the data collected by Meta Pixel to the specific Facebook user.

68. Alternatively, Facebook can link personally identifiable information to a user's Facebook account through the "Facebook Cookie."[24] The Facebook Cookie is a workaround to recent cookie-blocking applications used to prevent websites from tracking users.[25]

69. While the Meta Pixel tool "hashes" personal data—obscuring it through a form of cryptography before sending the data to Facebook—that hashing does not prevent *Facebook* from using the data. In fact, Facebook can use the hashed information to build user profiles.[26]

70. Facebook also receives personally identifiable information in the form of user's unique IP addresses that stay the same as users visit multiple websites. When browsing a third-party website that has embedded Facebook code, a user's IP address is forwarded to Facebook by GET requests, which are triggered by Facebook code snippets. The IP address enables Facebook to keep track of the website page visits associated with that address.

[23] https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites
[24] https://clearcode.cc/blog/facebook-first-party-cookie-adtech/
[25] https://clearcode.cc/blog/difference-between-first-party-third-party-cookies/
[26] https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites

Electronically Filed - BUCHANAN - July 08, 2024 - 03:33 PM

71. Facebook also places cookies on visitors' computers. It then uses these cookies to store information about each user. For example, the "c_user" cookie is a unique identifier that identifies a Facebook user's ID. The c_user cookie value is the Facebook equivalent of a user identification number. Each Facebook user has one—and only one—unique c_user cookie. Facebook uses the c_user cookie to record user activities and communications.

72. Facebook also uses browser fingerprinting to uniquely identify individuals. Web browsers have several attributes that vary between users, like the browser software system, plugins that have been installed, fonts that are available on the system, the size of the screen, color depth, and more. Together, these attributes create a fingerprint that is highly distinctive.

73. Facebook warns web developers that its Meta Pixel enables Facebook "to match your website visitors to their respective Facebook User accounts."[27]

74. Facebook nevertheless recommends that its Meta Pixel code be added to the base code on every website page (including the website's persistent header) to reduce the chance of browsers or code from blocking Pixel's execution and to ensure that visitors will be tracked.

75. Once Meta Pixel is installed on a business's website, the Meta Pixel tracks users as they navigate through the website and logs which pages are visited, which buttons are clicked, the specific information entered in forms (including personal information), as well as "optional values" set by the business website. Meta Pixel tracks this data regardless of whether a user is logged into Facebook.

76. In exchange for installing its Meta Pixel, Facebook provides website owners like Defendant with analytics about the ads they've placed on Facebook and Instagram and tools to

[27] https://developers.facebook.com/docs/meta-pixel/get-started

Electronically Filed - BUCHANAN - July 08, 2024 - 03:33 PM

target people who have visited their website.[28] The Meta Pixel collects data on website visitors regardless of whether they have Facebook or Instagram accounts.[29]

**D. Defendant has discretely embedded the Meta Pixel and similar tools on its website, resulting in the capture and disclosure of patients' protected health information to Facebook, Google, and other third parties.**

77. A third-party website that incorporates Meta Pixel benefits from the ability to analyze a user's experience and activity on the website to assess the website's functionality and traffic. The third-party website also gains information from its customers through Meta Pixel that can be used to target them with advertisements, as well as to measure the results of advertisement efforts.

78. Facebook's intrusion into the personal data of the visitors to third-party websites incorporating the Meta Pixel is both significant and unprecedented. When Meta Pixel is incorporated into a third-party website, unbeknownst to users and without their consent, Facebook gains the ability to surreptitiously gather every user interaction with the website ranging from what the user clicks on to the personal information entered on a website search bar. Facebook aggregates this data against all websites.[30] Facebook benefits from obtaining this information because it improves its advertising network, including its machine-learning algorithms and its ability to identify and target users with ads.

79. Facebook provides websites using Meta Pixel with the data it captures in the "Meta Pixel page" in Events Manager, as well as tools and analytics to reach these individuals through future Facebook ads.[31] For example, websites can use this data to create "custom audiences" to target the specific Facebook user, as well as other Facebook users who match

---

[28] https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites
[29] https://themarkup.org/show-your-work/2022/04/28/how-we-built-a-meta-pixel-inspector
[30] https://www.facebook.com/business/help/742478679120153?id=1205376682832142
[31] https://www.facebook.com/business/help/742478679120153?id=1205376682832142

Electronically Filed - BUCHANAN - July 08, 2024 - 03:33 PM

"custom audience's" criteria.[32] Businesses that use Meta Pixel can also search through Meta Pixel data to find specific types of users to target, such as men over a certain age.

80. For example, when a user on many of these hospital websites clicks on a "Schedule Online" button next to a doctor's name, Meta Pixel sends the text of the button, the doctor's name, and the search term (such as "cardiology") used to find the doctor to Facebook. If the hospital's website has a drop-down menu to select a medical condition in connection with locating a doctor or making an appointment, that condition is also transmitted to Facebook through Meta Pixel.

81. Facebook has designed the Meta Pixel such that Facebook receives information about patient activities on hospital websites as they occur in real time. Indeed, the moment that a patient takes any action on a webpage that includes the Meta Pixel—such as clicking a button to register, login, or to create an appointment—Facebook code embedded on that page redirects the content of the patient's communications to Facebook while the exchange of information between the patient and hospital is still occurring.

82. Defendant is among the hospital systems who have embedded Meta Pixel on their websites. When a patient enters their personal information through Defendant's websites that incorporate Meta Pixel, such as to locate a doctor or make an appointment, this information, including what the patient is being treated for, those communications are immediately and instantaneously routed to Facebook via the Meta Pixel. The acquisition and disclosure of these communications occurs contemporaneously with the transmission of these communications by patients.

83. This data, which can include health conditions (e.g., addiction, Alzheimer's, heart disease), diagnoses, procedures, test results, the treating physician, medications, and other

[32] https://developers.facebook.com/docs/marketing-api/reference/custom-audience/

Electronically Filed - BUCHANAN - July 08, 2024 - 03:33 PM

personally identifying information ("Personal Health Information"), is obtained and used by Facebook, as well as other parties, for the purpose of targeted advertising.

84. For example, a patient searching for a doctor on Defendant's website located at www.mymlc.com is asked to provide a variety of information to filter the various physicians available to treat various medical conditions, including the doctor's specialty, the patient's preferred location, and other information that the patient provides:




Not an Official Court Document

Electronically Filed - BUCHANAN - July 08, 2024 - 03:33 PM

85. All this data is disclosed to Facebook simultaneously in real time as patients transmit their information, along with other data, such as patient's unique Facebook ID that is captured by the c_user cookie, which allows Facebook to link this information to patients' unique Facebook accounts. Defendant also discloses other personally identifying information to Facebook, such as patient IP addresses, cookie identifiers, browser-fingerprints, and device identifiers.

86. Defendant discloses such personally identifying information and sensitive medical information even when patients are searching for doctors or treatment options on its websites to assist them with conditions such as substance abuse and addiction:




87. Defendant even discloses personally identifying and sensitive medical information to Facebook about patients who are searching for treatment of HIV (Human Immunodeficiency Virus):



Not an Official Court Document

Electronically Filed - BUCHANAN - July 08, 2024 - 03:33 PM




87. Without alerting the patient, Defendant's Meta Pixel sends each and every communication the patient makes to Defendant via the website to Facebook.

88. For example, until shortly before the filing of this action, a patient who desired to an appointment at a specific hospital using Defendant's websites was asked to fill out an extensive questionnaire, including their name, address, email address, birth date, and the provider they seek to make an appointment with. Defendant contemporaneously share this kind of information with Facebook as well via the Meta Pixel.

Not an Official Court Document

Electronically Filed - BUCHANAN - July 08, 2024 - 03:33 PM

Not an Official Court Document




89. The line of text, "id: 601079540756042," refers to the Defendant's Meta Pixel ID for this particular Webpage and confirms that Defendant downloaded the Pixel into their Source Code on this particular Webpage.

90. The second line of text, "ev: SubscribedButtonClick," identifies and categorizes which actions the user took on the Webpage ("ev:" is an abbreviation for event, and "Subscribed Button Click" is the type of event). Thus, this identifies the user as having clicked a button on this Webpage.

91. The remaining lines of text identify the user as a patient seeking medical care from Defendant via www.mymlc.com who is in the process of booking an appointment for medical care.

92. In other words, Facebook learns not just that patients are seeking treatment, but where and typically when they are seeking treatment, along with other information that patients would reasonably assume that Defendant are not sharing with third party marketing companies.

93. Defendant also disclose patient information from other sections of its website

Electronically Filed - BUCHANAN - July 08, 2024 - 03:33 PM

including (but not limited to) communications that are captured by the website's search bar, communications that are captured when a patient searches for "Services" offered by Defendant, communications made by patients using the website's Bill Pay/Financials function, and communications made when patients are researching specific medical conditions such as COVID-19.

88. By compelling visitors to its websites to disclose personally identifying data and sensitive medical information to Facebook and other third parties, Defendant knowingly discloses information that allows Facebook and other advertisers to link its patients' Personal Health Information to their private identities and target them with advertising. Defendant intentionally shares the Personal Health Information of its patients with Facebook in order to gain access to the benefits of the Meta Pixel tool.

89. The contents of patients' search terms shared with Facebook plainly relate to (and disclose) the past, present, or future physical or mental health or condition of individual patients who interact with Defendant's website. Worse, no matter how sensitive the area of the Defendant's website that a patient reviews, the referral URL is acquired by Facebook along with other personally identifiable information.

90. The nature of the collected data is also important. Defendant's unauthorized disclosures result in Facebook obtaining a comprehensive browsing history of an individual patient, no matter how sensitive the patient's medical condition. Facebook is then able to correlate that history with the time of day and other user actions on Defendant's website. This process results in Facebook acquiring a vast repository of personal data about patients—all without their knowledge or consent.

Electronically Filed - BUCHANAN - July 08, 2024 - 03:33 PM

91. Defendant also disclose the same kind of patient data described above to other third parties involved in internet marketing, including at least Google. As with the Facebook Meta Pixel, Defendant provide patients and prospective patients with no notice that Defendant are disclosing the contents of their communications to these third parties. Likewise, Defendant do not obtain consent from patients and prospective patients before forwarding their communications to these companies.

92. These disclosures to third parties other than Facebook are equally disturbing. Google Analytics, for example, has been described by the Wall Street Journal as "far and away the web's most dominant analytics platform," which "tracks you whether or not you are logged in."[33] Like Facebook, Google tracks internet users with IP addresses, cookies, geolocation, and other unique device identifiers. Defendant routinely disclose patients' Personal Health Information to such Google services as Google Analytics, Google DoubleClick, and Google AdWords.

93. Google cookies provide personally identifiable data about patients who visit Defendant's website to Google. Defendant transmit personally identifiable Google cookie data to Google.

94. Google warns web-developers that Google marketing tools are not appropriate for health-related webpages and websites. Indeed, Google warns web developers that "Health" is a prohibited category that should not be used by advertisers to target ads to users or promote advertisers' products or services.

95. Defendant deploys Google tracking tools on every page of its websites, resulting in the disclosure of communications exchanged with patients to be transmitted to Google. These transmissions occur simultaneously with patients' communications with Defendant and include

[33] https://www.wsj.com/articles/who-has-more-of-your-personal-data-than-facebook-try-google-1524398401

Electronically Filed - BUCHANAN - July 08, 2024 - 03:33 PM

communications that Plaintiff and Class Members made about specific medical providers, treatments, conditions, appointments, payments, registrations, and logins to and logouts from Defendant's patient portal.

96. For example, even after this action was filed, Defendant continued to deploy Google Analytics tracking tools on the page that patients used to access Defendant's patient portal:




97. The combination of the event – "page view" – and url – "https%A2F%2Fwww.mymlc.com%2Fportal" – confirms that every time a patient visited this page, Defendant shared that information, along with other identifying information, with Google.

98. By compelling visitors to their websites and patient portal to disclose personally identifiable data and sensitive medical information to Facebook, Google, and other third parties, Defendant knowingly disclose information that allows Facebook, Google, and other advertisers to link their patients' personal health information to their private identities and target them with advertising. Defendant intentionally share the personal health information of their patients with

Electronically Filed - BUCHANAN - July 08, 2024 - 03:33 PM

Facebook and Google in order to gain access to the benefits of the Meta Pixel, Google Analytics, and similar analytical tools.

99. Defendant facilitated the disclosure of Plaintiffs' Personal Health Information, including sensitive medical information, to Facebook, Google, and other third parties without their consent or authorization when they entered information on the websites that Defendant maintains. Plaintiffs continued to have their privacy violated when Defendant permitted Facebook and other third parties to send them targeted advertising related to their medical conditions.

100. For example, Jane Doe has been a patient of Defendant for more than five years. Since becoming a patient of Defendant, Jane Doe has repeatedly visited Defendant's Web Properties, including its website at www.mymlc.com, and entered data about her medical conditions and the medical treatment that she has sought from Defendant.

101. Among other things, Jane Doe entered sensitive medical information such as details about her medical conditions, including anxiety and depression. Jane Doe also used Defendant's Web Properties to research both primary care physicians and to find doctors for specific medical conditions and treatment. Moreover, Jane Doe used Defendant's web properties to schedule appointments with both her primary care physician and at various urgent care locations that are owned and operated by Defendant.

102. Unbeknownst to Plaintiff Jane Doe, Defendant had installed tracking pixels across its websites. Consequently, every time that Plaintiff Jane Doe searched for medical treatment on those website, Defendant shared her interactions with Facebook and Google, along with the full-string URL capturing the search, and personally identifying information such as Plaintiff Jane Doe's Facebook ID, device identifier, IP address, and browser fingerprint, which allowed

Electronically Filed - BUCHANAN - July 08, 2024 - 03:33 PM

Facebook and Google to specifically identify who Plaintiff Jane Doe was and what medical condition(s) she had.

103. In addition, Defendant installed Meta Pixel on the "Schedule Appointment" pages that Mosaic previously hosted separate from its patient portal. This Meta Pixel captured when a patient clicked on a button to schedule an appointment and tracked the patient's flow through the appointment scheduling process. As a consequence, every time that Jane Doe used this feature of Mosaic's websites to schedule an appointment, Mosaic confirmed to Facebook that Jane Doe was a patient seeking treatment with Mosaic physicians. Mosaic simultaneously also disclosed to Facebook personally identifying information such as Plaintiff Jane Doe's Facebook ID, device identifier, IP address, and browser fingerprint.

104. Plaintiff Jane Doe also utilized Defendant's patient portal to communicate with her doctor, make appointments, look up test results, and review her medications.

105. Unfortunately, Mosaic had installed tracking pixels on the buttons that patients (including Plaintiff Jane Doe) used on its website to navigate to the Mosaic patient portal. Plaintiff Jane Doe clicked on this button every time that she used the Mosaic to navigate to the patient portal. When she did, Mosaic surreptitiously sent information to Facebook and Google confirming her patient status, including additional information—such as her IP address, Facebook ID, and browser fingerprint—that allowed Facebook and Google to identify her.

106. On information and belief, Defendant also installed tracking pixels inside its patient portal at various points in time that surreptitiously forwarded patient interactions to third parties. Once Plaintiff Jane Doe gained access to the patient portal, Mosaic continued to share information about her interactions with those third parties, including actions such as reviewing her medical records. Defendant also shared information such as her IP address and browser

Electronically Filed - BUCHANAN - July 08, 2024 - 03:33 PM

fingerprint that could be used to personally identify Plaintiff Jane Doe.

107. After visiting and entering sensitive medical information on Defendant's Web Properties, Jane Doe received advertisements on her Facebook page related to her medical condition, including advertisements directed to treatments for anxiety and depression. Among other things, she received advertisements for the specific medications that were prescribed for her by physicians employed by Defendant.

108. Janice Doe has also visited Defendant's website at www.mymlc.com multiple times since she became a patient of Defendant in 2022. Janice Doe uses that website at least once a month to find doctors, search for treatment information, and schedule appointments with the multiple physicians from whom she receives treatment at Defendant's medical facilities. Among other things, she has sought treatment for eye issues, menopause, and depression. Janice Doe has also undergone a breast cancer-related biopsy through Defendant.

109. Unbeknownst to Plaintiff Janice Doe, Defendant had installed tracking pixels across its websites. Consequently, every time that Plaintiff Janice Doe searched for medical treatment on those websites, Defendant shared her interactions with Facebook and Google, along with the full-string URL capturing the search, and personally identifying information such as Plaintiff Janice Doe's Facebook ID, device identifier, IP address, and browser fingerprint, which allowed Facebook and Google to specifically identify who Plaintiff Janice Doe was and what medical condition(s) she had.

110. Plaintiff Janice Doe has also regularly used Defendant's patient portal to communicate with her physicians and review test results. During her visits to Defendant's website and patient portal, Janice Doe entered nonpublic information, including sensitive medical information. This sensitive medical information included details about the medical

Electronically Filed - BUCHANAN - July 08, 2024 - 03:33 PM

conditions for which she was seeking treatment, including eye issues, depression, and menopause.

111. Unfortunately, Mosaic had installed tracking pixels on the buttons that patients (including Plaintiff Janice Doe) used on its website to navigate to the Mosaic patient portal. Plaintiff Jane Doe clicked on this button every time that she used the Mosaic to navigate to the patient portal. When she did, Mosaic surreptitiously sent information to Facebook and Google confirming her patient status, including additional information—such as her IP address, Facebook ID, and browser fingerprint—that allowed Facebook and Google to identify her.

112. On information and belief, Defendant also installed tracking pixels inside its patient portal at various points in time that surreptitiously forwarded patient interactions to third parties. Once Plaintiff Janice Doe gained access to the patient portal, Mosaic continued to share information about her interactions with those third parties, including actions such as reviewing her medical records. Defendant also shared information such as her IP address and browser fingerprint that could be used to personally identify Plaintiff Janice Doe.

113. After visiting and entering sensitive medical information on Defendant's Web Properties, Janice Doe received advertisements on her Facebook page regarding her medical conditions and treatment, including advertisements related to her eye issues, menopause, and for psychiatric help.

114. Plaintiff Jane Doe and Plaintiff Janice Doe believed that their interactions with Defendant's Web Properties were private and would not be shared with anyone besides their health care providers — including Mosaic Life Care — and their staff. Plaintiffs Jane Doe and Janice Doe were surprised and dismayed when they learned that their Personal Health Information, including private and potentially embarrassing facts, had been sent to Facebook and

Electronically Filed - BUCHANAN - July 08, 2024 - 03:33 PM

Google without their consent.

115. Defendant knew that by embedding Meta Pixel, Google Analytics, and similar advertising tools, it was permitting third parties to collect, use, and share Plaintiffs' and the Class Members' Personal Health Information, including sensitive medical information and personally identifying data. Defendant was also aware that such information would be shared with Facebook simultaneously with patients' interactions with its websites and patient portal. Defendant made the decision to barter its patients' Personal Health Care Information to Facebook, Google, and similar third parties because it wanted access to their advertising and analytics tools. While that bargain may have benefited Defendant and those third party advertisers, it also betrayed the privacy rights of Plaintiffs and Class Members.

**F. Defendant's interception and disclosure of patient communications permits Facebook and other third-party advertising companies to engage in cross-device targeting across multiple devices.**

116. In addition to enabling Defendant to advertise to patients and potential patients on non-Defendant websites, Defendant's misuse and exploitation of patient data and communications also facilitates third parties' ability to target advertisements on other computing devices that a patient uses. This is called cross-device targeting.

117. Third parties including Facebook and Google have established a unique ID for individuals that tie together their desktop, laptop, and smartphone computing devices. For example, even if a patient has never visited Defendant's websites on their smartphone, cross-device tracking and marketing allows Defendant and other third parties to target patients on that device. In other words, a patient or potential patient who visited Defendant's websites on his desktop, but never on his smartphone, can nevertheless be targeted with advertisements by both Defendant and other third parties on his smartphone.

Electronically Filed - BUCHANAN - July 08, 2024 - 03:33 PM

118. Defendant's and other third parties' use of cross-device targeting demonstrates that the data Defendant disclose to third parties is personally identifiable because it enables patients to be tracked across multiple devices that patients own—even if a patient has never communicated with Defendant on one or more of their devices.

119. Defendant has made the decision that access to the targeted advertising (including retargeting and cross-device tracking) that is enabled by its disclosure of patient data and communications is of commercial benefit to Defendant.

120. Defendant obtains additional revenue from its deployment of third-party tracking tools through which it discloses personally identifiable patient data and communications to third parties, including Google and Facebook.

121. Any additional revenue that that Defendant obtained from its unauthorized misuse of its own patients' personal health information is unearned and is the rightful property of the patients (including Plaintiff and Class Members) from whom it was obtained.

**G. Plaintiffs and the Class Members did not consent to the interception and disclosure of their protected health information.**

122. Plaintiffs and Class Members had no idea when they interacted with Defendant's websites that their personal data, including sensitive medical data, was being collected and simultaneously transmitted to Facebook. That is because, among other things, Meta Pixel, Google Analytics, and similar tracking technologies are secretively and seamlessly integrated into Defendant's websites and are invisible to patients visiting those websites.

123. For example, when Plaintiffs Jane Doe Janice Doe visited Defendant's website at www.mymlc.com there was no indication that the Meta Pixel, Google Analytics, or other third-party tracking technologies were embedded on that website or that those technologies would collect and transmit their sensitive medical data to Facebook, Google, and other third parties.

Electronically Filed - BUCHANAN - July 08, 2024 - 03:33 PM

124. Plaintiffs and their fellow Class Members could not consent to Defendant's conduct when there was no indication that their sensitive medical information would be collected and transmitted to Facebook in the first place.

125. While Defendant purport to have "Privacy Practices," those Privacy Practices are effectively hidden from patients, buried inside a link labeled "Privacy Policy" that is concealed at the bottom of Defendant's homepage in type so small as to be unreadable to many visitors:




126. Defendant's "Notice of Privacy Practices" gives no indication to patients that Defendant routinely allow Facebook and Google to capture and exploit patients' Personal Health Information. Indeed, Defendant expressly promise in its "Notice of Privacy Practices" that it is committed to protecting patients' medical information:

> **Other use of medical information**
>
> Certain uses and disclosures of PHI require an authorization from you. These include psychotherapy notes not maintained in the electronic medical record, PHI used for marketing purposes or the sale of PHI.
>
> Other uses and disclosures of medical information not covered by this notice or the laws that apply to us will be made only with your written permission. If you provide us permission to use or disclose medical information about you, you may revoke that permission, in writing, at any time. If you revoke your permission, we will no longer use or disclose medical information about you for the reasons covered by your written authorization. You understand that we are unable to take back any disclosures we have already made with your permission and that we are required to retain our records of the care that we provided to you. If you have any questions about this notice, please contact our Corporate Compliance Officer at (816) 271-6006.

127. Even if a patient stumbled upon Defendant's carefully hidden "Notice of Privacy Practices" nothing in that notice would be understood by any reasonable patient to mean that Defendant are routinely allowing Facebook to capture and exploit patients' Personal Health Information.

Not an Official Court Document

Electronically Filed - BUCHANAN - July 08, 2024 - 03:33 PM

128. Defendant do not have a legal right to share Plaintiffs' and Class Members' Protected Health Information without their written consent to third parties, because this information is protected from such disclosure by law. *E.g.* Mo. Rev. Stat. § 542.402; 45 C.F.R. § 164.508. Much less are Defendant permitted to disclose patients' Protected Health Information to advertising and marketing companies like Facebook without express written authorization from patients. *E.g.* Mo. Rev. Stat. § 569.095.

129. Defendant failed to obtain a valid written authorization from Plaintiffs or any of the Class Members to allow the capture and exploitation of their personally identifiable information and the contents of their communications for marketing purposes.

130. A patient's reasonable expectation that their health care provider will not share their information with third parties for marketing purposes is not subject to waiver via an inconspicuous privacy policy hidden away on a company's website. Such "Browser-Wrap" statements do not create an enforceable contract against consumers. Further, Defendant expressly promised its patients that it would never sell or use their Personal Health Information for marketing purposes without express authorization.

131. Indeed, the United States Department of Health and Human Services ("HHS") recently confirmed that hospitals are prohibited from transmitting individually identifiable health information via tracking technology like the Meta Pixel without a patient's authorization and other protections like a business associate agreement with the recipient of the patient data:

> Regulated entities [those to which HIPAA applies] are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules. For example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations,



Not an Official Court Document

Electronically Filed - BUCHANAN - July 08, 2024 - 03:33 PM

would constitute impermissible disclosures.[34]

132. The disclosure of Plaintiffs' and Class Members' PHI via the tracking pixels contravenes both the letter and spirit of HIPAA's "Standards for Privacy of Individually Identifiable Health Information" (also known as the "Privacy Rule") which governs how health care providers must safeguard and protect PHI.

133. The bulletin discusses the types of harm that disclosure may cause to the patient:

> An impermissible disclosure of an individual's PHI not only violates the Privacy Rule but also may result in a wide range of additional harms to the individual or others. For example, an impermissible disclosure of PHI may result in identity theft, financial loss, discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others identified in the individual's PHI. Such disclosures can reveal incredibly sensitive information about an individual, including diagnoses, frequency of visits to a therapist or other health care professionals, and where an individual seeks medical treatment. While it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors, because of the proliferation of tracking technologies collecting sensitive information, now more than ever, it is critical for regulated entities to ensure that they disclose PHI only as expressly permitted or required by the HIPAA Privacy Rule.[35]

134. The bulletin goes on to describe how use of tracking technologies on authenticated webpages in particular, such as patient portals, can result in unlawful disclosures of PHI.[36] It notes that "[t]racking technologies on a regulated entity's user-authenticated webpages generally have access to PHI," so, "a regulated entity must configure any user-authenticated webpages that include tracking technologies to allow such technologies to only use and disclose

[34] *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html, HHS.gov (emphasis added).

[35] *Id.* (emphasis added)

[36] *Id.*



Not an Official Court Document

Electronically Filed - BUCHANAN - July 08, 2024 - 03:33 PM

PHI in compliance with the HIPAA Privacy Rule."[37] The same is true where tracking technologies capture when an individual logs in to a patient portal or similar authenticated page.[38]

135. On July 20, 2023, the Federal Trade Commission, acting in concert with the HHS for Civil Rights, sent letters to approximately 130 hospital systems and telehealth providers to alert them "[of] the serious privacy and security risks related to the use of online tracking technologies" on hospital websites which have been "impermissibly disclosing consumers' sensitive health information to third parties."[39]

136. The FTC's letter specifically warned hospitals that "use of technologies, such as the Meta/Facebook pixel and Google Analytics, that can track a user's online activities" can result in "a wide range of harms to an individual or others," including the disclosure of "health conditions, diagnoses, medications, medical treatments, frequency of visits to health care professionals, where an individual seeks medical treatment, and more."[40] The FTC's letter further warned hospitals that "HIPAA rules apply when the information that a regulated entity collects through tracking technologies or discloses to third parties (e.g. tracking technology vendors) includes PHI. HIPAA regulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to third parties or any other violations of the HIPAA rules."[41]

137. That same day the FTC issued a bulletin warning that even companies not

---

[37] *Id.*

[38] *Id.*

[39] https://www.ftc.gov/system/files/ftc_gov/pdf/FTC-OCR-Letter-Third-Party-Trackers-07-20-2023.pdf

[40] *Id.*

[41] *Id.*

Electronically Filed - BUCHANAN - July 08, 2024 - 03:33 PM

covered by HIPAA have a responsibility to protect against the unauthorized disclosure of PHI and cautioning that the "unauthorized disclosure of such information may violate the FTC Act and could constitute a breach of security under the FTC's Health Breach Notification Rule."[42]

138. Accordingly, Defendant lacked authorization to intercept, collect, and disclose Plaintiffs and Class Members' Personal Health Information to Facebook or aid in the same.

**H. The disclosures of personal patient data to Facebook, Google and other third parties are unnecessary.**

139. There is no information anywhere on the websites operated by Defendant that would alert patients that their most private information (such as their identifiers, their medical conditions, and their medical providers) is being automatically transmitted to Facebook, Google, or other third parties. Nor are any of the disclosures of patient Personal Health Information to Facebook, Google, and others necessary for Defendant to maintain its healthcare website or provide medical services to patients.

140. For example, it is possible for a healthcare website to provide a doctor search function without allowing disclosures to third-party advertising companies about patient sign ups or appointments. It is also possible for a website developer to utilize tracking tools without allowing disclosure of patients' Personal Healthcare Information to companies like Facebook. Likewise, it is possible for Defendant to provide medical services to patients without sharing their Personal Health Information with Facebook so that this information can be exploited for advertising purposes.

141. Despite these possibilities, Defendant willfully chose to implement Meta Pixel, Google Analytics, and similar tools on its Web Properties and aid in the disclosure of personally identifiable information and sensitive medical information about its patients, as well as the

[42] *Id.*

Electronically Filed - BUCHANAN - July 08, 2024 - 03:33 PM

contents of their communications with Defendant, to third-parties, including Facebook.

**I. Plaintiffs and Class Members have a reasonable expectation of privacy in their Personal Health Information, especially with respect to sensitive medical information.**

142. Plaintiffs and Class Members have a reasonable expectation of privacy in their Personal Health Information, including personally identifying data and sensitive medical information. Defendant's surreptitious interception, collection, and disclosure of patients' Personal Health Information to Facebook violated Plaintiffs and Class Member's privacy interests.

143. As patients, Plaintiffs had a reasonable expectation of privacy that their health care provider and its associates would not disclose their personal health information to third parties without their express authorization.

144. The original Hippocratic Oath, circa 400 B.C., provided that physicians must pledge, "What I may see or hear in the course of treatment or even outside of the treatment in regard to the life of man, which on no account must be spread abroad, I will keep to myself holding such things shameful to be spoken about."[43]

145. The modern Hippocratic Oath provides, "I will respect the privacy of my patients, for their problems are not disclosed to me that the world may know."[44] Likewise, the American Medical Association's ("AMA") Code of Medical Ethics contains numerous rules protecting the privacy of patient data and communications. For example, the AMA has issued medical ethics opinions providing that "[p]rotecting information gathered in association with the care of a patient is a core value in health care. However, respecting patient privacy in other forms is also fundamental, as an expression of respect for patient autonomy and a prerequisite for

[43] *Brandt v. Medical Defense Associates*, 856 S.W.2d 667, 671 n.1 (Mo. 1993).
[44] https://www.pbs.org/wgbh/nova/doctors/oath_modern.html



Not an Official Court Document

Electronically Filed - BUCHANAN - July 08, 2024 - 03:33 PM

trust….Physicians must seek to protect patient privacy in all settings to the greatest extent possible and should … [m]inimize intrusion on privacy when the patient's privacy must be balanced against other factors [and inform] the patient when there has been a significant infringement on privacy of which the patient would otherwise not be aware."[45]

146. The AMA's ethics opinions have further cautioned physicians and hospitals that "[d]isclosing information to third parties for commercial purposes without consent undermines trust, violates principles of informed consent and confidentiality, and may harm the integrity of the patient-physician relationship." [46]

147. Patient Personal Health Information is also specifically protected by law. *E.g.* Mo. Rev. Stat. § 491.060(5); Mo. Rev. Stat. § 407.1500. The prohibitions against disclosing patient Personal Health Information include prohibitions against disclosing personally identifying information such as patient names, IP addresses, and other unique characteristics or codes. *E.g.* Mo. Rev. Stat. § 569.095; 45 C.F.R. § 164.514.

148. Missouri courts have long recognized that physicians owe a duty of confidentiality to patients, which prohibits them from disclosing patients' health information without patients' written consent. *Brandt v. Medical Defense Associates*, 856 S.W.2d 667, 674 (Mo. 1993). And Missouri law subjects medical providers who treat conditions such as HIV to heightened duties of confidentiality. Mo. Rev. Stat. § 191.656. This legal framework applies to health care providers, such as Defendant.

149. Given the public policy expressed by these laws, Plaintiffs and the Members of the Class had a reasonable expectation of privacy in their protected health information.

---

[45] https://www.ama-assn.org/sites/ama-assn.org/files/corp/media-browser/code-of-medical-ethics-chapter-3.pdf (opinion 3.1.1).

[46] https://www.ama-assn.org/sites/ama-assn.org/files/corp/media-browser/code-of-medical-ethics-chapter-3.pdf (opinion 3.2.4).

Electronically Filed - BUCHANAN - July 08, 2024 - 03:33 PM

150. Several studies examining the collection and disclosure of consumers' sensitive medical information confirm that the disclosure of sensitive medical information violates expectations of privacy that have been established as general social norms.

151. Privacy polls and studies also uniformly show that the overwhelming majority of Americans consider one of the most important privacy rights to be the need for an individual's affirmative consent before a company collects and shares its customers' data.

152. For example, a recent study by *Consumer Reports* showed that 92% of Americans believe that internet companies and websites should be required to obtain consent before selling or sharing consumers' data, and the same percentage believed that internet companies and websites should be required to provide consumers with a complete list of the data that has been collected about them.[47]

153. Users act consistently with these preferences. For example, following a new rollout of the iPhone operating software—which asks users for clear, affirmative consent before allowing companies to track users—85 percent of worldwide users and 94 percent of U.S. users chose not to share data when prompted.[48]

154. The concern about sharing personal medical information is compounded by the reality that advertisers view this type of information as particularly valuable. Indeed, having access to the data women share with their healthcare providers allows advertisers to obtain data on children before they are even born. As one recent article noted, "What is particularly worrying about this process of datafication of children is that companies like [Facebook] are harnessing and collecting multiple typologies of children's data and have the potential to store a

[47] https://www.consumerreports.org/consumer-reports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety-a3980496907/
[48] https://www.wired.co.uk/article/apple-ios14-facebook

Electronically Filed - BUCHANAN - July 08, 2024 - 03:33 PM

plurality of data traces under unique ID profiles."[49]

155. Many privacy law experts have expressed serious concerns about patients' sensitive medical information being disclosed to third-party companies like Facebook. As those critics have pointed out, having a patient's personal health information disseminated in ways the patient is unaware of could have serious repercussions, including affecting their ability to obtain life insurance, how much they might pay for such coverage, the rates they might be charged on loans, and the likelihood of their being discriminated against.

**J. Plaintiffs' Personal Health Data that Defendant collected, disclosed, and used is Plaintiffs' property, has economic value, and its illicit disclosure has caused Plaintiffs harm.**

156. It is common knowledge that there is an economic market for consumers' personal data—including the kind of data that Defendant has collected and disclosed from Plaintiffs and Class Members.

157. In 2013, the *Financial Times* reported that the data-broker industry profits from the trade of thousands of details about individuals, and that within that context, "age, gender and location information" were being sold for approximately "$0.50 per 1,000 people."[50]

158. In 2015, *TechCrunch* reported that "to obtain a list containing the names of individuals suffering from a particular disease," a market participant would have to spend about "$0.30" per name.[51] That same article noted that "Data has become a strategic asset that allows companies to acquire or maintain a competitive edge" and that the value of a single user's data can vary from $15 to more than $40 per user.[52]

159. In a 2021 Washington Post article, the legal scholar Dina Srinivasan said that

[49] https://thereader.mitpress.mit.edu/tech-companies-are-profiling-us-from-before-birth/
[50] https://ig.ft.com/how-much-is-your-personal-data-worth/
[51] https://techcrunch.com/2015/10/13/whats-the-value-of-your-data/
[52] https://techcrunch.com/2015/10/13/whats-the-value-of-your-data/

Electronically Filed - BUCHANAN - July 08, 2024 - 03:33 PM

consumers "should think of Facebook's cost as [their] data and scrutinize the power it has to set its own price."[53] This price is only increasing. According to Facebook's own financial statements, the value of the average American's data in advertising sales rose from $19 to $164 per year between 2013 and 2020.[54]

160. Despite the protections afforded by law, there is an active market for health information. Medical information obtained from health providers garners substantial value because of the fact that it is not generally available to third party data marketing companies because of the strict restrictions on disclosure of such information by state laws and provider standards, including the Hippocratic oath. Even with these restrictions, however, a multi-billion-dollar market exists for the sale and purchase of such private medical information.[55]

161. Further, individuals can sell or monetize their own data if they so choose. For example, Facebook has offered to pay individuals for their voice recordings,[56] and has paid teenagers and adults up to $20 a month plus referral fees to install an app that allows Facebook to collect data on how individuals use their smart phones.[57]

162. A myriad of other companies and apps such as DataCoup, Nielsen Computer, Killi, and UpVoice also offer consumers money in exchange for access to their personal data.[58]

163. Given the monetary value that data companies like Facebook have already paid for personal information in the past, Defendant has deprived Plaintiffs and the Class Members of the economic value of their sensitive medical information by collecting, using, and disclosing

Not an Official Court Document

---

[53] https://www.washingtonpost.com/technology/2021/08/29/facebook-privacy-monopoly/
[54] https://www.washingtonpost.com/technology/2021/08/29/facebook-privacy-monopoly/
[55] https://revealnews.org/blog/your-medical-data-is-for-sale-and-theres-nothing-you-can-do-about-it/; *see also https://slate.com/technology/2022/06/health-data-brokers-privacy.html*
[56] https://www.theverge.com/2020/2/20/21145584/facebook-pay-record-voice-speech-recognition-viewpoints-prounanciations-app
[57] https://www.cnbc.com/2019/01/29/facebook-paying-users-to-install-app-to-collect-data-techcrunch.html
[58] https://www.creditdonkey.com/best-apps-data-collection.html; *see also https://www.monetha.io/blog/rewards/earn-money-from-your-data/*

Electronically Filed - BUCHANAN - July 08, 2024 - 03:33 PM

that information to Facebook and other third parties without consideration for Plaintiffs and the Class Member's property.

**K. Defendant is enriched by making unlawful, unauthorized, and unnecessary disclosures of its patients' protected health information.**

164. Defendant's sole purpose for installing tracking technologies on their Web Properties was to gain access to third-party technologies that would optimize those Web Properties, and in turn, Defendant's marketing and profits.

165. For example, one hospital system, Aurora Advocate Health, recently explained that it had installed the Meta Pixel tool and similar technologies "to gather information that we review in aggregate so that we can better understand patient needs and preferences."[59] Likewise, a second hospital system, WakeMed, explained that it had installed the Meta Pixel tool "to optimize the functionality of our websites so that we can improve the user experience."[60]

166. Similarly, retargeting is a form of online targeted advertising that targets users with ads based on their previous internet actions, which is facilitated through the use of cookies and tracking pixels. Hospital systems using the Meta Pixel can also take advantage of retargeting to display ads to "target audience" composed of visitors to their websites. But once personally identifiable information relating to patient communications is disclosed to third parties like Facebook, Defendant lose the ability to control how that information is subsequently disseminated and exploited.

167. For example, retargeting could allow a web-developer to show advertisements on other websites to customers or potential customers based on the specific communications exchanged by a patient or their activities on a website. Using the Meta Pixel, a website could

---

[59] https://www.fiercehealthcare.com/health-tech/advocate-aurora-health-data-breach-revealed-pixels-protected-health-information-3

[60] https://www.wakemed.org/patients-and-visitors/patient-rights-and-privacy-policies/meta-pixel-privacy#:~:text=Protecting%20the%20privacy%20and%20security,(now%20Meta)%20in%20error.



Not an Official Court Document

Electronically Filed - BUCHANAN - July 08, 2024 - 03:33 PM

target ads on Facebook itself or on the Facebook advertising network. The same or similar advertising can be accomplished via disclosures to other third-party advertisers and marketers.

168. Once personally identifiable information relating to patient communications is disclosed to third parties like Facebook, Defendant loses the ability to control how that information is subsequently disseminated and exploited.

169. The monetization of the data being disclosed by Defendant, both by Defendant and Facebook, demonstrates the inherent value of the information being collected.

**L. Facebook's history of egregious privacy violations.**

170. Defendant knew or should have known that Facebook could not be trusted with its patients' sensitive medical information.

171. Due to its ability to target individuals based on granular data, Facebook's ad-targeting capabilities have frequently come under scrutiny. For example, in June 2022, Facebook entered into a settlement with the Department of Justice regarding its Lookalike Ad service, which permitted targeted advertising by landlords based on race and other demographics in a discriminatory manner. That settlement, however, reflected only the latest in a long history of egregious privacy violations by Facebook.

172. In 2007, when Facebook launched "Facebook Beacon," users were unaware that their online activity was tracked, and that the privacy settings originally did not allow users to opt-out. As a result of widespread criticism, Facebook Beacon was eventually shut down.

173. Two years later, Facebook made modifications to its Terms of Service, which allowed Facebook to use anything a user uploaded to its site for any purpose, at any time, even after the user ceased using Facebook. The Terms of Service also failed to provide for any way for users to completely delete their accounts. Under immense public pressure, Facebook

Electronically Filed - BUCHANAN - July 08, 2024 - 03:33 PM

eventually returned to its prior Terms of Service.

174. In 2011, Facebook settled charges with the Federal Trade Commission relating to its sharing of Facebook user information with advertisers, as well as its false claim that third-party apps were able to access only the data they needed to operate when—in fact—the apps could access nearly all of a Facebook user's personal data. The resulting Consent Order prohibited Facebook from misrepresenting the extent to which consumers can control the privacy of their information, the steps that consumers must take to implement such controls, and the extent to which Facebook makes user information available to third parties.[61]

175. Facebook found itself in another privacy scandal in 2015 when it was revealed that Facebook could not keep track of how many developers were using previously downloaded Facebook user data. That same year, it was also revealed that Facebook had violated users' privacy rights by harvesting and storing Illinois' users' facial data from photos without asking for their consent or providing notice. Facebook ultimately settled claims related to this unlawful act for $650 million.[62]

176. In 2018, Facebook was again in the spotlight for failing to protect users' privacy. Facebook representatives testified before Congress that a company called Cambridge Analytics may have harvested the data of up to 87 million users in connection with the 2016 election. This led to another FTC investigation in 2019 into Facebook's data collection and privacy practices, resulting in a record-breaking five-billion-dollar settlement.

177. Likewise, a different 2018 report revealed that Facebook had violated users' privacy by granting access to user information to over 150 companies.[63] Some companies were even able to read users' private messages.

[61] https://www.ftc.gov/legal-library/browse/cases-proceedings/092-3184-182-3109-c-4365-facebook-inc-matter
[62] A similar case is pending in Texas.
[63] https://www.cnbc.com/2018/12/19/facebook-gave-amazon-microsoft-netflix-special-access-to-data-nyt.html

Electronically Filed - BUCHANAN - July 08, 2024 - 03:33 PM

178. In June 2020, after promising users that app developers would not have access to data if users were not active in the prior 90 days, Facebook revealed that it still enabled third-party developers to access this data.[64] This failure to protect users' data enabled thousands of developers to see data on inactive users' accounts if those users were Facebook friends with someone who was an active user.

179. On February 18, 2021, the New York State Department of Financial Services released a report detailing the significant privacy concerns associated with Facebook's data collection practices, including the collection of health data. The report noted that while Facebook maintained a policy that instructed developers not to transmit sensitive medical information, Facebook received, stored, and analyzed this information anyway. The report concluded that "[t]he information provided by Facebook has made it clear that Facebook's internal controls on this issue have been very limited and were not effective … at preventing the receipt of sensitive data."[65]

180. The New York State Department of Financial Service's concern about Facebook's cavalier treatment of private medical data is not misplaced. In June 2022, the FTC finalized a different settlement involving Facebook's monetizing of sensitive medical data. In that case, the more than 100 million users of Flo, a period and ovulation tracking app, learned something startling: the company was sharing their data with Facebook.[66] When a user was having her period or informed the app of her intention to get pregnant, Flo would tell Facebook, which could then use the data for all kinds of activities including targeted advertising. In 2021, Flo settled with the Federal Trade Commission for lying to its users about secretly sharing their data with Facebook, as well as with a host of other internet advertisers, including Google, Fabric,

[64] https://fortune.com/2020/07/01/facebook-user-data-apps-blunder/
[65] https://www.dfs.ny.gov/system/files/documents/2021/02/facebook_report_20210218.pdf
[66] https://slate.com/technology/2022/06/health-data-brokers-privacy.html



Not an Official Court Document

Electronically Filed - BUCHANAN - July 08, 2024 - 03:33 PM

AppsFlyer, and Flurry. The FTC reported that Flo "took no action to limit what these companies could do with users' information."[67]

181. More recently, Facebook employees admitted to lax protections for sensitive user data. Facebook engineers on the ad business product team conceded in a 2021 privacy review that "We do not have an adequate level of control and explainability over how our systems use data, and thus we can't confidently make controlled policy changes or external commitments such as 'we will not use X data for Y purpose.'"[68]

182. These revelations were confirmed by an article published by the Markup on June 16, 2022, which found during the course of its investigation that Facebook's purported "filtering" failed to discard even the most obvious forms of sexual health information. Worse, the article found that the data that the Meta Pixel was sending Facebook from hospital websites not only included details such as patients' medications, descriptions of their allergic reactions, details about their upcoming doctor's appointments, but also included patients' names, addresses, email addresses, and phone numbers.[69]

183. Despite knowing that the Meta Pixel code embedded in its Web Properties was sending patients' Personal Health Information to Facebook, Defendant did nothing to protect its patients from egregious intrusions into its patients' privacy, choosing instead to benefit at those patients' expense.

**M. Defendant's failure to inform its patients that their personal health information has been disclosed to Facebook or to take steps to halt the continued disclosure of such information is malicious, oppressive, and in reckless disregard of Plaintiffs' and Class Members' rights.**

[67] https://slate.com/technology/2022/06/health-data-brokers-privacy.html
[68] https://www.vice.com/en/article/akvmke/facebook-doesnt-know-what-it-does-with-your-data-or-where-it-goes
[69] https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites

Electronically Filed - BUCHANAN - July 08, 2024 - 03:33 PM

184. Hospital systems, like other businesses, have a legal obligation to disclose data breaches to their customers. *E.g.* Mo. Rev. Stat. § 407.1500(2).

185. After publication of the Markup's investigative article in June 2022, hospital systems around the United States began self-reporting data breaches arising from their installation of pixel technology on their websites.[70]

186. For example, in August 2022, Novant Health informed approximately 1.3 million patients that their medical data was disclosed to Facebook due to the installation of the Facebook Meta Pixel on the hospital system's websites.[71] Novant Health's data breach announcement conceded that the Meta Pixel tool installed on their websites "allowed certain private information to be transmitted to Meta from the Novant Health website."[72] Novant Health further admitted that the information about its patients that was disclosed to Facebook included "an impacted patient's: demographic information such as email address, phone number, computer IP address, and contact information entered into Emergency Contacts or Advanced Care Planning; and information such as appointment type and date, physician selected, button/menu selections, and/or content typed into free text boxes."[73]

187. Likewise, in October 2022, Advocate Aurora Health informed approximately 3 million patients that their personal health information had been disclosed to Facebook via the Meta Pixel installed on Advocate Aurora Health's website.[74]

[70] https://www.scmagazine.com/analysis/breach/pixel-fallout-expands-community-health-informs-1-5m-of-unauthorized-disclosure
[71] https://www.scmagazine.com/analysis/breach/1-3m-novant-health-patients-notified-of-unintended-disclosure-via-facebook-pixel
[72] https://www.novanthealth.org/home/about-us/newsroom/press-releases/newsid33987/2672/novant-health-notifies-patients-of-potential-data-privacy-incident-.aspx
[73] https://www.novanthealth.org/home/about-us/newsroom/press-releases/newsid33987/2672/novant-health-notifies-patients-of-potential-data-privacy-incident-.aspx
[74] https://www.fiercehealthcare.com/health-tech/advocate-aurora-health-data-breach-revealed-pixels-protected-health-information-3

Electronically Filed - BUCHANAN - July 08, 2024 - 03:33 PM

188. Advocate Aurora Health's data breach notification conceded that patient information had been transmitted to third parties including Facebook and Google when patients used the hospital system's website.[75]

189. Advocate Aurora Health further admitted that a substantial amount of its patients' personal health information has been shared with Facebook and Google including patients' "IP address; dates, times, and/or locations of scheduled appointments; your proximity to an Advocate Aurora Health location; information about your provider; [and] type of appointment or procedure."[76] Even more troubling, Advocate Aurora Health admitted that "[w]e cannot confirm how vendors used the data they collected."[77]

190. Advocate Aurora Health claimed that, in conjunction with its data breach notice, the hospital system had "disabled and/or removed the pixels from our platforms and launched an internal investigation to better understand what patient information was transmitted to our vendors."[78] Advocate Aurora Health also promised its 3 million patients that the company had instituted an "enhanced, robust technology vetting process" to prevent such disclosures of its patients' personal health information in the future.[79]

191. Similarly, in October 2022, WakeMed notified more than 495,000 patients that their personal health information had been transmitted to Facebook through the use of tracking pixels installed on its websites.[80] In announcing this data breach, WakeMed admitted that the Facebook Meta Pixel tool had been installed on its website resulting in the transmission of

Not an Official Court Document

[75] https://www.advocateaurorahealth.org/
[76] https://www.advocateaurorahealth.org/pixel-notification/faq
[77] https://www.advocateaurorahealth.org/pixel-notification/faq
[78] https://www.advocateaurorahealth.org/pixel-notification/faq
[79] https://www.advocateaurorahealth.org/pixel-notification/faq
[80] https://healthitsecurity.com/news/wakemed-faces-data-breach-lawsuit-over-meta-pixel-use

Electronically Filed - BUCHANAN - July 08, 2024 - 03:33 PM

patient information to Facebook.[81] WakeMed further admitted that "[d]epending on the user's activity, the data that may have been transmitted to Facebook could have included information such as: email address, phone number, and other contact information; computer IP address; emergency contact information; information provided during online check-in, such as allergy or medication information; COVID vaccine status; and information about an upcoming appointment, such as appointment type and date, physician selected, and button/menu selections."[82]

192. WakeMed also conceded that it had no idea what Facebook had done with the personal health information that WakeMed had disclosed about its patients.[83] Like other the other hospital systems who have come clean about their use of the Meta Pixel tool, WakeMed promised its patients that it had "proactively disabled Facebook's pixel" and had "no plans to use it in the future without confirmation that the pixel no longer has the capacity to transmit potentially sensitive or identifiable information."[84]

193. In November 2022, the fallout from hospital systems' use of the Meta Pixel tool expanded when Community Health Network informed 1.5 million of its patients that their personal health information had been routinely transmitted and disclosed to Facebook since at least April 2017.[85]

194. In its data breach notice, Community Health admitted that it had "discovered through our investigation that the configuration of certain technologies allowed for a broader

[81] https://www.wakemed.org/about-us/news-and-media/wakemed-news-releases/wakemed-notifies-patients-of-potential-data-privacy-incident
[82] https://www.wakemed.org/about-us/news-and-media/wakemed-news-releases/wakemed-notifies-patients-of-potential-data-privacy-incident
[83] https://www.wakemed.org/about-us/news-and-media/wakemed-news-releases/wakemed-notifies-patients-of-potential-data-privacy-incident
[84] https://www.wakemed.org/about-us/news-and-media/wakemed-news-releases/wakemed-notifies-patients-of-potential-data-privacy-incident
[85] https://healthitsecurity.com/news/community-health-network-notifies-1.5m-of-data-breach-stemming-from-tracking-tech; *see also* https://www.ecommunity.com/notice-third-party-tracking-technology-data-breach

Electronically Filed - BUCHANAN - July 08, 2024 - 03:33 PM

scope of information to be collected and transmitted to each corresponding third-party tracking technology vendor (e.g., Facebook and Google) than Community had ever intended." Community Health further conceded that its use of the Meta Pixel and related third-party tracking technologies had resulted in surreptitiously recording and transmitting a wide range of patient engagements with its websites, including "includes scheduling an appointment online or directly with a provider" and "seeking treatment at a Community or affiliated provider location."[86]

195. Community Health, like WakeMed, Novant, and Advocate Aurora Health also promised its patients that it had disabled or removed the third-party tracking technologies that it had installed on its website and had instituted new "evaluation and management processes for all website technologies moving forward."[87] Community Health, however, also conceded that it had no idea how Facebook or other third parties had exploited the patient personal health information that had been disclosed to them via the pixel technology.

196. Unlike Community Health, WakeMed, Novant, Advocate Aurora Health, and other responsible hospital systems who have informed their patients of the serious privacy violations resulting from the installation of Facebook's Meta Pixel tool on their websites, Defendant have done nothing. Indeed, not only have Defendant hidden these privacy violations from their patients, but Defendant continue to collect, transmit, and disclose their patients' personal health information to Facebook despite widespread knowledge in the health care community that such collection and disclosure of patient personal health information is patently illegal and in violation of the fundamental privacy rights of patients.

---

[86] https://www.ecommunity.com/notice-third-party-tracking-technology-data-breach

[87] https://www.ecommunity.com/notice-third-party-tracking-technology-data-breach

Electronically Filed - BUCHANAN - July 08, 2024 - 03:33 PM

197. As these data breach announcements demonstrate, there is widespread knowledge within the health care community that installation of the Meta Pixel tool on hospital websites results in the disclosure of patients' personal health information Facebook. There is also widespread recognition that such disclosures are not only illegal but fundamentally unethical, given the privacy rights involved.

198. Defendant's decision to hide its use of the Meta Pixel, Google Analytics, and similar tools from its patients and its refusal to remove such technologies from its websites even after learning that their patients' personal health information was being routinely collected, transmitted, and exploited by Facebook is malicious, oppressive, and in reckless disregard of Plaintiffs' and Class Members' rights.

**TOLLING, CONCEALMENT, AND ESTOPPEL**

199. The applicable statutes of limitation have been tolled as a result of Defendant's knowing and active concealment and denial of the facts alleged herein.

200. Defendant seamlessly incorporated Meta Pixel, Google Analytics, and other trackers into its Web Properties, providing no indication to users that they were interacting with a website enabled by these technologies. Defendant had knowledge that its Web Properties incorporated Meta Pixel, Google Analytics, and other trackers yet failed to disclose that by interacting with Meta Pixel and Google Analytics enabled Web Properties that Plaintiffs and Class Members' sensitive medical information would be intercepted, collected, used by, and disclosed to Facebook.

201. Plaintiffs and Class Members could not with due diligence have discovered the full scope of Defendant's conduct, because there were no disclosures or other indication that they were interacting with websites employing Meta Pixel and Google Analytics.

Electronically Filed - BUCHANAN - July 08, 2024 - 03:33 PM

202. The earliest that Plaintiffs and Class Members, acting with due diligence, could have reasonably discovered this conduct would have been on June 16, 2022, following the release of the Markup's investigation.

203. All applicable statutes of limitation have also been tolled by operation of the discovery rule and the doctrine of continuing tort. Defendant's illegal interception and disclosure of patients' Personal Health Information has continued unabated through the date of the filing of Plaintiffs' Original Petition. What's more, Defendant was under a duty to disclose the nature and significance of its data collection practices but did not do so. Defendant is therefore estopped from relying on any statute of limitations defenses.

## CLASS ACTION ALLEGATIONS

204. Defendant's conduct violates the law and breaches its express and implied privacy promises.

205. Defendant's unlawful conduct has injured Plaintiffs and Class Members.

206. Defendant's conduct is ongoing.

207. Plaintiffs bring this action individually and as a class action against Defendant.

208. Plaintiffs seeks class certification for the following proposed Class:

> **The Mosaic Health System Class:** During the fullest period allowed by law, all Missouri citizens who are, or were, patients of Mosaic Health System, or any of its affiliates and who exchanged communications at Defendant's websites, including www.mymlc.com and any other Mosaic Health System affiliated website that caused disclosures of patient personally identifiable information and communications to third parties, including (but not limited to) Facebook.

209. Excluded from the proposed Class are: (1) any Judge or Magistrate presiding over this action and members of their families; (2) the Defendant, Defendant's subsidiaries, affiliates, parents, successors, predecessors, and any entity in which the Defendant or its parent has a

Electronically Filed - BUCHANAN - July 08, 2024 - 03:33 PM

controlling interest and their current or former employees, officers, and directors; and (3) Plaintiffs' counsel and Defendant's counsel.

210. Plaintiffs reserve the right to redefine the Class and/or add Subclasses at, or prior to, the class certification stage, in response to discovery or pursuant to instruction by the Court.

211. Plaintiffs and the Class Members satisfy the numerosity, commonalty, typicality, adequacy, and predominance prerequisites for suing as representative parties pursuant to Rule 52.08.

212. **Numerosity:** While the exact number of Class Members is unknown to Plaintiffs at this time, the Class, based on information and belief, consists of thousands of people dispersed throughout the State of Missouri, such that joinder of all members is impracticable. The exact number of Class Members can be determined by review of information maintained by Defendant.

213. **Commonality and Predominance:** There are questions of law and fact common to Class Members and which predominate over any questions affecting only individual members. A class action will generate common answers to the questions below, which are apt to drive resolution:

a. Whether Defendant's acts and practices violated Plaintiffs and Class Members' privacy rights;

b. Whether Defendant's acts and practices violate Mo. Rev. Stat § 542.402;

c. Whether Defendant's acts and practices violate Mo. Rev. Stat § 407.020;

d. Whether Defendant's acts and practices violate Mo. Rev. Stat § 569.095;

e. Whether Defendant's acts and practices violate Mo. Rev. Stat. § 191.656;

f. Whether Defendant knowingly allowed the surreptitious collection and disclosure of Plaintiffs and Class Members' Personal Health Information to Facebook;

g. Whether Defendant's acts and practices constitute a breach of fiduciary duty;

Electronically Filed - BUCHANAN - July 08, 2024 - 03:33 PM

h. Whether Defendant profited from disclosures of patient Personal Health Information to third parties including Facebook;

i. Whether Defendant was unjustly enriched;

j. Whether Defendant's acts and practices harmed and continue to harm Plaintiffs and Class Members and, if so, the extent of that injury;

k. Whether Plaintiffs and Class Members are entitled to equitable relief including, but not limited to, injunctive relief, restitution, and disgorgement; and

l. Whether Plaintiffs and Class Members are entitled to actual, statutory, or other forms of damages, and other monetary relief.

214. These common questions of law and fact predominate over any questions affecting only the individual Class Members.

215. Defendant engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiffs individually and on behalf of the other Class Members. Identical statutory and common law violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quantity and quality, to the numerous common questions that dominate this action.

216. **Typicality:** Plaintiffs' claims are typical of the claims of other Class Members and Plaintiffs have substantially the same interest in this matter as other Class Members. Plaintiffs have no interests that are antagonist to, or in conflict with, the interests of other members of the Class. Plaintiffs' claims arise out of the same set of facts and conduct as all other Class Members. Plaintiffs and all Class Members are patients of Defendant who used the Web Properties set up by Defendant for patients and are victims of Defendant's respective unauthorized disclosures to third parties including Facebook. All claims of Plaintiffs and Class Members are based on Defendant's wrongful conduct and unauthorized disclosures.

217. **Adequacy of Representation:** Plaintiffs are committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature. Plaintiffs' claims are

Electronically Filed - BUCHANAN - July 08, 2024 - 03:33 PM

coincident with, and not antagonistic to, those of other Class Members they seek to represent. Plaintiffs have no disabling conflicts with Class Members. Accordingly, Plaintiffs are an adequate representative of the Class and, along with counsel, will fairly and adequately protect the interests of the Class and any Subclasses.

218. **Superiority:** A class action is the superior method for fair and efficient adjudication of the controversy. Although all Class Members have claims against Defendant, the likelihood that individual Class Members will prosecute separate actions is remote due to the time and expense necessary to conduct such litigation. The damages, harm, and other financial detriment suffered individually by Plaintiffs and other Class Members are relatively small compared to the burden and expense that would be required to litigate their claims on an individual basis against Defendant, making it impractical for Class Members to individually seek redress for Defendant's wrongful conduct. Moreover, serial adjudication in numerous venues is not efficient, timely, or proper. Judicial resources would be unnecessarily depleted by prosecution of individual claims. The prosecution of separate actions by individual Class Members could create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which could establish incompatible standards of conduct for Defendant or adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the members of the Class Members who are not parties to the adjudications. If a class action is not permitted, Class Members will continue to suffer losses and Defendant's misconduct will continue without proper remedy.

219. In addition to satisfying the prerequisites of Rule 52.08(a), Plaintiffs satisfy the requirements for maintaining a class action under Rule 52.08(b) because (a) the prosecution of separate actions by the individual Class Members would create a risk of inconsistent or varying

Electronically Filed - BUCHANAN - July 08, 2024 - 03:33 PM

adjudication which would establish incompatible standards of conduct for Defendant; (b) the prosecution of separate actions by individual Class Members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other Class Members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; (c) Defendant has acted or refused to act on grounds that apply generally to the proposed Class, thereby making final injunctive relief or declaratory relief herein appropriate with respect to the proposed Class as a whole; and (d) questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

220. Plaintiffs anticipate no unusual difficulties in the management of this litigation as a class action. The Class is readily ascertainable and direct notice can be provided from the records maintained by Defendant, electronically or by publication, the cost of which is properly imposed on Defendant.

221. For the above reasons, among others, a class action is superior to other available methods for the fair and efficient adjudication of this action.

## CAUSES OF ACTION

### COUNT I
### Interception of Wire Communications in Violation of Mo. Rev. Stat. § 542.402
### (On Behalf of Plaintiffs and the Class)

222. Plaintiffs re-allege and incorporate by reference all paragraphs above as if fully set forth herein.

223. Plaintiffs bring this claim on behalf of themselves and all members of the Class.

224. All conditions precedent to this action have been performed or have occurred.

Electronically Filed - BUCHANAN - July 08, 2024 - 03:33 PM

225. Mo. Rev. Stat. § 542.402 provides that it is unlawful under the provisions of sections 542.0400 to 542.422 for a person not acting under law to intercept a wire communication "for the purpose of committing any criminal or tortious act."

226. Defendant intercepted Plaintiffs' and Class Members' wire communications for the purpose of committing multiple criminal and tortious acts, including, but not limited to, the criminal and tortious acts specified below.

227. For example, Defendant intercepted Plaintiffs' and Class Members' wire communications for the purpose of disclosing those communications to third parties including Facebook without the knowledge, consent, or written authorization of Plaintiffs or Class Members. Because the disclosure of Plaintiffs' and Class Members' Personal Health Information to third parties including Facebook without consent or proper authorization is both a criminal and tortious act that violates multiple laws, including (but not limited to) Mo. Rev. Stat. § 542.402(1)(3), Mo. Rev. Stat. § 542.406(4), Mo. Rev. Stat. § 569.095(1)(3), 45 CFR § 164.508(a)(1), Mo. Rev. Stat. § 407.1500, and Mo. Rev. Stat. § 407.020, Defendant's misconduct falls within the ambit of Missouri's wiretapping statute.

228. Further, Defendant intentionally intercepted Plaintiffs' and Class Members' wire communications for the illegitimate purpose of committing further tortious and criminal acts by misappropriating Plaintiffs and Class Member's valuable Personal Health Information so that Defendant could not only spy on Plaintiffs' and Class Members' web surfing activities but could also monetize and exploit their Personal Health Information without paying fair value for such valuable information.

229. Defendant's interception of Plaintiffs' and Class Member's wire communications for the purpose of bartering and/or selling Plaintiffs' and Class Members'

Electronically Filed - BUCHANAN - July 08, 2024 - 03:33 PM

Personal Health Information to Facebook in return for access to Facebook's Meta Pixel tool also constitutes the tort of conversion under Missouri law. Under Missouri law, conversion occurs where there is an unauthorized assumption of the right of ownership over the personal property of another to the exclusion of the owner's rights. By disclosing Plaintiffs' and Class Members' Personal Health Information without their knowledge or consent, Defendant deprived Plaintiffs and Class Members of their property rights in their Personal Health Information and caused Plaintiffs and Class Members injury by diminishing the value of their Personal Health Information, depriving Plaintiffs and Class Members of the full value of the medical services for which they paid, which included Defendant's obligation to maintain the confidentiality of their Personal Health Information, and depriving Plaintiffs and Class Members of their right to control who had access to their sensitive medical and personal information. Defendant's decision to steal and exploit Plaintiffs' and Class Members' Personal Health Information without their knowledge or consent is sufficient to bring Defendant's conduct within the ambit of Missouri's wiretapping statute.

230. Defendant's interception of Plaintiffs' and Class Members' wire communications for the purpose of disclosing their Personal Health Information to Facebook is also a tortious act that constitutes a breach of the fiduciary duty of confidentiality owed by doctors and hospital systems to their patients as set forth by the Missouri Supreme Court in *Brandt v. Medical Defense Associates*, 856 S.W.2d 667, 674 (1993).

231. Defendant's interception of Plaintiffs' and Class Members' wire communications for the purpose of disclosing their Personal Health Information to Facebook and other third parties also constitutes the tort of invasion of privacy under Missouri law—specifically an intrusion on Plaintiffs' and Class Members' seclusion and private affairs.

Electronically Filed - BUCHANAN - July 08, 2024 - 03:33 PM

Plaintiffs and Class Members had a reasonable expectation of privacy that Defendant would not share their Personal Health Information with Facebook so that Facebook could target them with advertising. Defendant obtained Plaintiffs's and Class Members' Personal Health Information by falsely promising that it would safeguard the confidentiality of that information and that it would never disclose such information to third parties for marketing purposes without written consent. The method through which Defendant obtained Plaintiffs' and Class Members' Personal Health Information (i.e., lying to patients about how their Personal Health Information would be used) would be objectionable to a reasonable person. Defendant's disclosure of Plaintiffs' and Class Members' Personal Health Information thus violated their right to privacy.

232. Any person whose wire communication is intercepted, disclosed, or used in violation of the statute "shall have a civil cause of action against any person who intercepts, discloses, or uses, or procures any other person to intercept, disclose, or use such communications." Mo. Rev. Stat. § 542.418.

233. Defendant violated the Missouri Wiretap Act by intercepting Plaintiffs' and Class Members' wire communications in violation of Mo. Rev. Stat. § 542.402(1).

234. Defendant separately violated the Missouri Wiretap Act by disclosing the contents of Plaintiffs' and Class Members' wire communications to Facebook in violation of Mo. Rev. Stat. § 542.402(3).

235. Defendant also separately violated the Missouria Wiretap Act by "knowingly" using the contents of Plaintiffs' and Class Members' wire communications to barter and/or sell that information to Facebook in return for access to the Meta Pixel tool in violation of Mo. Rev. Stat. § 542.402(4).

Electronically Filed - BUCHANAN - July 08, 2024 - 03:33 PM

236. Defendant qualifies as a person under the statute.

237. All alleged communications between Plaintiffs or Class Members and Defendant qualify as wire communications under Missouri law because each communication is made using personal computing devices (e.g., computers, smartphones, tablets) that send and receive communications in whole or in part through the use of facilities used for the transmission of communications aided by wire, cable, or other like connections.

238. A "wire communication" under the statute means "any communication made in whole or in part through the use of facilities for the transmission of communications by the aid of wire, cable, or other like connection between the point of origin and the point of reception." Mo. Rev. Stat. § 542.400(12).

239. Defendant engaged in and continues to engage in interception by aiding others (including Facebook) to secretly record the contents of Plaintiffs' and Class Members' wire communications.

240. The intercepting devices used in this case include, but are not limited to:

a. Plaintiffs and Class Members' personal computing devices;

b. Plaintiffs and Class Members' web browsers;

c. Plaintiffs and Class Members' browser-managed files;

d. Facebook's Meta Pixel;

e. Google Analytics;

f. Internet cookies;

g. Defendant's computer servers;

h. Third-party source code utilized by Defendant; and

Electronically Filed - BUCHANAN - July 08, 2024 - 03:33 PM

i. Computer servers of third parties (including Facebook) to which Plaintiffs and Class Members' communications were disclosed.

241. "Contents" under the statute, when used with respect to any wire communication, includes "any information concerning the identity of the parties, the substance, purport, or meaning of that communication." Mo. Rev. Stat. § 542.400(3).

242. Defendant aided in, and continues to aid in, the interception of contents in that the data from the communications between Plaintiffs and/or Class Members and Defendant that were redirected to and recorded by the third parties include information which identifies the parties to each communication, their existence, and their contents.

243. Defendant aided in the interception of "contents" in at least the following forms:

a. The parties to the communications;

b. The precise text of patient search queries;

c. Personally identifying information such as patients' IP addresses, Facebook IDs, browser fingerprints, and other unique identifiers;

d. The precise text of patient communications about specific doctors;

e. The precise text of patient communications about specific medical conditions;

f. The precise text of patient communications about specific treatments;

g. The precise text of patient communications about scheduling appointments with medical providers;

h. The precise text of patient communications about billing and payment;

i. The precise text of specific buttons on Defendant's website(s) that patients click to exchange communications, including Log-Ins, Registrations, Requests for Appointments, Search, and other buttons;

Electronically Filed - BUCHANAN - July 08, 2024 - 03:33 PM

j. The precise dates and times when patients click to Log-In on Defendant's website(s);

k. The precise dates and times when patients visit Defendant's Web Properties;

l. Information that is a general summary or informs third parties of the general subject of communications that Defendant sends back to patients in response to search queries and requests for information about specific doctors, conditions, treatments, billing, payment, and other information; and

m. Any other content that Defendant has aided third parties in scraping from webpages or communication forms at web properties.

244. Plaintiffs and Class Members reasonably expected that their Personal Health Information was not being intercepted, recorded, and disclosed to Facebook and other third parties.

245. No legitimate commercial purpose was served by Defendant's willful and intentional disclosure of Plaintiffs' and Class Members' Personal Health Information to Facebook. Neither Plaintiffs nor Class Members consented to the disclosure of their Personal Health Information by Defendant to Facebook and other third parties. Nor could they have consented, given that Defendant never sought Plaintiffs' or Class Members' consent, much less told visitors to its website that their every interaction was being recorded and transmitted to Facebook, Google, and similar third parties via tracking technologies.

246. Plaintiffs' and Class Members' electronic communications were intercepted during transmission, without their consent, for the unlawful and/or wrongful purpose of monetizing their Personal Health Information, including using their sensitive medical information to develop marketing and advertising strategies.

Electronically Filed - BUCHANAN - July 08, 2024 - 03:33 PM

247. Under the Wiretapping Act, aggrieved persons are entitled to recover actual damages, but not less than liquidated damages computed at the rate of one hundred dollars a day for each day of the violation or ten thousand dollars whichever is greater, punitive damages, and reasonable attorney's fees and other litigation costs. Mo. Rev. Stat. § 542.418.

248. In addition to statutory damages, Defendant's breach caused Plaintiffs and Class Members the following damages:

a. Sensitive and confidential information that Plaintiffs and Class Members intended to remain private is no longer private;

b. Defendant eroded the essential confidential nature of the doctor-patient relationship;

c. Defendant took something of value from Plaintiffs and Class Members and derived benefit therefrom without Plaintiffs' and Class Members' knowledge or informed consent and without sharing the benefit of such value;

d. Plaintiffs and Class Members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain confidentiality; and

e. Defendant's actions diminished the value of Plaintiffs and Class Members' personal information.

249. Plaintiffs and Class Members also seek such other relief as the Court may deem equitable, legal, and proper.

**COUNT II**
**Tampering with Computer Data**
**in Violation of Mo. Rev. Stat. §§ 569.095 & 537.525**
**(On Behalf of Plaintiffs and the Class)**

250. Plaintiffs re-allege and incorporate by reference all paragraphs above as if fully set forth herein.

251. Plaintiffs bring this claim on behalf of themselves and all members of the Class.

Electronically Filed - BUCHANAN - July 08, 2024 - 03:33 PM

252. A person commits the offense of tampering with computer data if he or she knowingly and without authorization or without reasonable grounds to believe that he or she has such authorization discloses data "residing or existing internal or external to a computer, computer system, or computer network." Mo. Rev. Stat. § 569.095.

253. All health care providers owe their patients a duty not to disclose medical information about a patient without a patient's informed consent.

254. Maintaining the confidentiality of the doctor-patient relationship is a cardinal rule of the medical profession which has come to be justifiably relied on by patients seeking advice and treatments.

255. Plaintiffs and Class Members are patients of Defendant.

256. Defendant owes Plaintiffs and Class Members a duty of confidentiality.

257. Despite its duty not to disclose Personal Health Information without informed consent and written authorization, Defendant disclosed information relating to Plaintiffs and Class Members' medical treatment to third parties without their knowledge, consent, or authorization.

258. In doing so, Defendant disclosed data to Facebook and other third parties that it knew or should have known its patients had not authorized Defendant to disclose.

259. The information disclosed included personally identifiable information, Plaintiffs and Class Members' statuses as patients of Defendant, and the exact contents of communications exchanged between Plaintiffs and/or Class Members with Defendant, including but not limited to information about treating doctors, potential doctors, conditions, treatments, appointments, search terms, bill payment, and logins to Defendant's website.

Electronically Filed - BUCHANAN - July 08, 2024 - 03:33 PM

260. The disclosure of personally identifiable medical information constitutes an unreasonable, substantial, and serious interference with Plaintiffs and Class Members' legal rights.

261. Plaintiffs and Class Members did not consent to, authorize, or know about Defendant's disclosure of their Personal Health Information to Facebook and other third parties at the time it occurred. Plaintiffs and Class Members never agreed that their sensitive medical information could be collected, used, and monetized by Facebook.

262. Defendant's intentional disclosure of patients' Personal Health Information to a third-party advertising company like Facebook without consent would be highly offensive to a reasonable person. Plaintiffs and Class Members reasonably expected that their Personal Health Information would not be collected, used, and monetized by third party advertising companies.

263. Defendant's disclosure of Personal Health Information from thousands of individuals was highly offensive because it violated expectations of privacy that have been established by social norms. Privacy polls and studies show that Americans believe that one of the most important privacy rights is the need for an individual's affirmative consent before their personal data is collected, shared, or used.

264. Given the nature of the Personal Health Information that Defendant disclosed to Facebook, such as patients' names, email addresses, phone numbers, information entered into forms, doctor's names, potential doctor's names, the search terms used to locate doctors (i.e. "Alzheimer's"), the condition selected from dropdown menus (i.e. "Heart Disease"), medications, and details about upcoming doctor's appointments, this kind of intrusion would be (and in fact is) highly offensive to a reasonable person.

265. Plaintiffs and Class Members own their Personal Health Information data.

Electronically Filed - BUCHANAN - July 08, 2024 - 03:33 PM

266. Plaintiffs and Class Members who paid money to Defendant reasonably believed and expected that Defendant would use part of those funds to operate its Web Properties free of surreptitious collection and exploitation of communications between the parties. Defendant failed to do so. Plaintiffs and Class Members would not have purchased medical services from Defendant if they knew that Defendant would share their Personal Health Information with Facebook without their knowledge or written consent.

267. Missouri Revised Statute Section 537.525 authorizes parties like Plaintiffs and Class Members to bring a civil action against any person who violates Section 569.095 for compensatory damages and reasonable attorney's fees.

268. Defendant's breach caused Plaintiffs and Class Members, at minimum, the following damages:

a. Sensitive and confidential information that Plaintiffs and Class Members intended to remain private is no longer private;

b. Defendant eroded the essential confidential nature of the doctor-patient and provider-patient relationship;

c. Defendant took something of value from Plaintiffs and Class Members and derived benefit therefrom without Plaintiffs and Class Members' knowledge, consent, or authorization and without sharing the benefit of such value;

d. Plaintiffs and Class Members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain the confidentiality of their Personal Health Information;

e. Defendant's actions diminished the value of Plaintiffs and Class Members' personal information.

Electronically Filed - BUCHANAN - July 08, 2024 - 03:33 PM

269. Plaintiffs and Class Members have suffered harm and injury, including but not limited to the invasion of their privacy rights.

270. Plaintiffs and Class Members have been damaged as a direct and proximate result of Defendant's invasion of their privacy and are entitled to seek just compensation, including monetary damages.

271. Plaintiffs and Class Members seek appropriate relief for their injuries, including but not limited to damages that will reasonably compensate Plaintiffs and Class Members for the harm to their privacy interests as well as a disgorgement of profits made by Defendant as a result of its intrusions on Plaintiffs and Class Members' privacy.

272. Plaintiffs and Class Members also seek such other relief as the Court may deem equitable, legal, and proper.

**COUNT III**
**Breach of Fiduciary Duty of Confidentiality**
**(On Behalf of Plaintiffs and the Class)**

273. Plaintiffs re-allege and incorporate by reference all paragraphs above as if fully set forth herein.

274. Plaintiffs bring this claim on behalf of themselves and all members of the Class.

275. All conditions precedent to this action have been performed or occurred.

276. In *Brandt v. Medical Defense Associates*, 856 S.W.2d 667, 674 (1993), the Missouri Supreme Court held that a duty of confidentiality arises from the physician-patient relationship and that a violation of that duty gives rise to a cause of action sounding in tort.

277. As medical provider for Plaintiffs and Class Members, Defendant owes Plaintiffs and Class Members a fiduciary duty of confidentiality in the data and content of communications exchanged between Defendant and Plaintiffs or Class Members.

Electronically Filed - BUCHANAN - July 08, 2024 - 03:33 PM

278. Plaintiffs and Class Members who paid money to Defendant reasonably believed and expected that Defendant would use part of those funds to operate its Web Properties free of surreptitious collection and exploitation of communications between the parties. Defendant failed to do so. Plaintiffs and Class Members would not have purchased medical services from Defendant if they knew that Defendant would share their Personal Health Information with Facebook without their knowledge or written consent.

279. Defendant breached its duty of confidentiality by disclosing Personal Health Information about Plaintiffs and Class Members, including their status as patients, the content of their communications, and information about their doctors, potential doctors, conditions, treatments, appointments, search terms, and bill payment.

280. Defendant's breach caused Plaintiffs and Class Members the following damages:

a. Sensitive and confidential information that Plaintiffs and Class Members intended to remain private is no longer private;

b. Defendant eroded the essential confidential nature of the doctor-patient and provider-patient relationship;

c. Defendant took something of value from Plaintiffs and Class Members and derived benefit therefrom without Plaintiffs and Class Members' knowledge, consent, or authorization and without sharing the benefit of such value;

d. Plaintiffs and Class Members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain the confidentiality of their Personal Health Information; and

e. Defendant's actions diminished the value of Plaintiffs and Class Members' personal information.

Electronically Filed - BUCHANAN - July 08, 2024 - 03:33 PM

**COUNT IV**
**Breach of Implied In Fact Contract**
**(On Behalf of Plaintiffs and the Class)**

281. Plaintiffs re-allege and incorporate by reference all paragraphs above as if fully set forth herein.

282. Plaintiffs bring this claim on behalf of themselves and all members of the Class.

283. Defendant promises in its "Notice of Privacy Practices" that it is committed to protecting patients' medical information, telling patients that "We understand that medical information about you and your health is personal [and] we are committed to protecting medical information about you." Defendant also assures patients that it would never sell their Personal Health Information for marketing purposes without their written authorization.

284. Defendant solicited and invited Plaintiffs and Class Members to provide their Private Health Information on its website as part of Defendant's regular business practices. Plaintiffs and Class Members accepted Defendant's offers and provided their Private Health Information to Defendant as part of acquiring Defendant's medical services. Per its contractual, legal, ethical, and fiduciary duties, Defendant was obligated to take adequate measures to protect Plaintiffs' and Class Members' Personal Health Information from unauthorized disclosure to third parties such as Facebook. These facts give rise to the inference that Defendant took on obligations outside the plain terms of any express contracts that they may have had with Plaintiffs and Class Members.

285. Plaintiffs and the Class Members entered into valid and enforceable implied contracts with Defendant when they sought medical treatment from Defendant. Specifically, through their course of conduct, Defendant, Plaintiffs, and Class Members entered into implied contracts for the provision of medical care and treatment, which included an implied agreement

Electronically Filed - BUCHANAN - July 08, 2024 - 03:33 PM

for Defendant to retain and protect the privacy of Plaintiffs' and Class Members' Personal Health Information.

286. Defendant required and obtained Plaintiffs' and Class Members' Personal Health Information as part of the physician-patient relationship, evincing an implicit promise by Defendant to act reasonably to protect the confidentiality of Plaintiffs' and Class Members' Personal Health Information. Defendant, through its privacy policies, codes of conduct, company security practices, and other conduct, implicitly that it would safeguard Plaintiffs' and Class Members' Personal Health Information in exchange for access to that information and the opportunity to treat Plaintiffs and Class Members.

287. Implied in the exchange was a promise by Defendant to ensure that the Personal Health Information of Plaintiffs and Class Members in its possession would only be used for medical treatment purposes and would not be shared with third parties such as Facebook without the knowledge or consent of Plaintiffs and Class Members. By asking for and obtaining Plaintiffs' and Class Members' Personal Health Information, Defendant assented to protecting the confidentiality of that information. Defendant's implicit agreement to safeguard the confidentiality of Plaintiffs' and Class Members' Personal Health Information was necessary to effectuate the contract between the parties.

288. Plaintiffs and Class Members provided their Personal Health Information in reliance on Defendant's implied promise that this information would not be shared with third parties without their consent.

289. These exchanges constituted an agreement and meeting of the minds between the parties: Plaintiffs and Class Members would provide their Personal Health Information in exchange for the medical treatment and other benefits provided by Defendant (including the

Electronically Filed - BUCHANAN - July 08, 2024 - 03:33 PM

protection of their confidential personal and medical information). A portion of the price of each payment that Plaintiffs and the Class Members made to Defendant for medical services was intended to ensure the confidentiality of their Personal Health Information.

290. In entering into such implied contracts, Plaintiffs and Class Members reasonably believed and expected that Defendant would comply with its promises to protect the confidentiality of their Personal Health Information as well as applicable laws and regulations governing the disclosure of such information and that Defendant would not allow third parties to collect or exploit their communications with Defendant without their consent.

291. It is clear by these exchanges that the parties intended to enter into an agreement and mutual assent occurred. Plaintiffs and Class Members would not have disclosed their Personal Health Information to Defendant but for the prospect of Defendant's promise of medical treatment and other benefits. Conversely, Defendant presumably would not have taken Plaintiffs and Class Members' Personal Health Information if it did not intend to provide them with medical treatment and other benefits.

292. Defendant was therefore required to reasonably safeguard and protect the Personal Health Information of Plaintiffs and Class Members from unauthorized disclosure and/or use by third parties.

293. Plaintiffs and Class Members accepted Defendant's medical services offer and fully performed their obligations under the implied contract with Defendant by providing their Personal Health Information to Defendant among other obligations. Plaintiffs and Class Members would not have provided and entrusted their Personal Health Information to Defendant in the absence of their implied contracts with Defendant and would have instead retained the

Electronically Filed - BUCHANAN - July 08, 2024 - 03:33 PM

opportunity to control their Personal Health Information for uses other than the benefits offered by Defendant.

294. Plaintiffs and Class Members relied on Defendant's implied promises to safeguard their Personal Health Information to their detriment. Defendant breached the implied contracts with Plaintiffs and Class Members by failing to reasonably safeguard and protect Plaintiffs' and Class Members' Personal Health Information from disclosure to Facebook and other third parties.

295. Defendant's failure to implement adequate measures to protect the Personal Health Information of Plaintiffs and Class Members and Defendant's intentional disclosure of the same to Facebook violated the purpose of the agreement between the parties: Plaintiffs' and Class Members' provision of money and Personal Health Information in exchange for medical services and other benefits.

296. Instead of safeguarding Plaintiffs' and Class Members' Personal Health Information, Defendant intentionally shared that information with Facebook thereby breaching the implied contracts it had with Plaintiffs and Class Members.

297. Plaintiffs and Class Members who paid money to Defendant reasonably believed and expected that Defendant would use part of those funds to operate its Web Properties free of surreptitious collection and exploitation of communications between the parties. Defendant failed to do so. Plaintiffs and Class Members would not have purchased medical services from Defendant if they knew that Defendant would share their Personal Health Information with Facebook without their knowledge or written consent.

298. Under the implied contracts, Defendant and/or its affiliated healthcare providers promised and were obligated to: (a) provide healthcare to Plaintiffs and Class Members; and

Electronically Filed - BUCHANAN - July 08, 2024 - 03:33 PM

(b) protect Plaintiffs and the Class Members' Personal Health Information provided to obtain such healthcare. In exchange, Plaintiffs and Class Members agreed to pay money for these services, and to turn over their Personal Health Information through the use of Defendant's Web Properties.

299. Both the provision of medical services healthcare and the protection of Plaintiffs and Class Members' Private Health Information were material aspects of these implied contracts.

300. The implied contracts for the provision of medical services—contracts that include the contractual obligations to maintain the privacy of Plaintiffs and Class Members' Private Health Information unless they consent—are also acknowledged, memorialized, and embodied in multiple documents, including (among other documents) Defendant's published Notice of Privacy Practices.

301. Defendant's express representations, including, but not limited to the express representations found in its Notice of Privacy Practices, memorialize and embody an implied contractual obligation requiring Defendant refrain from aiding or allowing third parties to collect or Plaintiffs and Class Members' Private Health Information without consent. By soliciting and acquiring Plaintiffs' and Class Members' Personal Health Information Defendant assumed an independent duty to handle Plaintiffs' and Class Members' Personal Health Information with due care and consistent with industry standards to prevent the foreseeable harm that arises from a breach of that duty.

302. Consumers of healthcare value their privacy, the privacy of their dependents, and the ability to keep their Private Health Information associated with obtaining healthcare private. To customers such as Plaintiffs and the Class Members, healthcare that allows third parties to secretly collect their Private Health Information without consent is fundamentally less useful and

Electronically Filed - BUCHANAN - July 08, 2024 - 03:33 PM

less valuable than healthcare that refrains from such practices. Plaintiffs and Class Members would not have entrusted their Private Health Information to Defendant and entered into these implied contracts with Defendant without an understanding that their Private Health Information would be safeguarded and protected or entrusted their Private Health Information to Defendant in the absence of its implied promise to do so.

303. A meeting of the minds occurred when Plaintiffs and the Class Members agreed to, and did, provide their Private Health Information to Defendant and/or its affiliated healthcare providers, and paid for the provided healthcare in exchange for, amongst other things, (a) the provision of healthcare and medical services and (b) the protection of their Private Health Information.

304. Plaintiffs and the Class Members performed their obligations under the contract when they paid for their healthcare services and provided their Private Health Information.

305. Defendant materially breached its contractual obligation to protect the nonpublic Private Health Information Defendant gathered when it allowed third parties to collect and exploit that information without Plaintiffs' and Class Members' consent.

306. Defendant also materially breached its contractual obligation to protect Plaintiffs' and Class Members' non-public Personal Health Information when it failed to implement adequate security measures and policies to protect the confidentiality of that information. For example, on information and belief, Defendant (1) failed to implement internal policies and procedures prohibiting the disclosure of patients' Personal Health Information without consent to third-party advertising companies like Facebook, (2) failed to implement adequate reviews of the software code and java script installed on its Web Properties to ensure that patients' Personal Health Information was not being automatically routed without consent to third party advertising

Electronically Filed - BUCHANAN - July 08, 2024 - 03:33 PM

companies like Facebook, (3) failed to provide adequate notice to the public that visitors to its Web Properties risked having their Personal Health Information shared with third party advertising companies like Facebook, (4) failed to take other industry standard privacy protection measures such as providing a "cookie" acceptance button on its website homepages, (5) failed to provide visitors to its Web Properties with a means to opt out of the automatic transfer of data regarding their website interactions to third party advertising companies like Facebook, (6) failed to implement internal policies and educational programs to ensure that Defendant's website managers and coders were familiar with the legal regulations governing the disclosure patient Personal Health Information to third parties, and (7) failed to install adequate firewalls or take similar measures to prevent the automatic routing of patients' Personal Health Information to third party advertising companies like Facebook.

307. As a result of Defendant's failure to fulfill the data privacy protections promised in these contracts, Plaintiffs and Class Members did not receive the full benefit of their bargains, and instead received healthcare and other services that were of a diminished value compared to those described in the contracts. Plaintiffs and Class Members were therefore damaged in an amount at least equal to the difference in the value of the healthcare services with data privacy they paid for and the healthcare services they received.

308. As a result of Defendant's material breaches, Plaintiffs and Class Members were deprived of the benefit of their bargain with Defendant because they spent more on medical services with Defendant than they would have if they had known that Defendant was not providing the reasonable data security and confidentiality of patient communications that Defendant represented that it was providing in its privacy policies. Defendant's failure to honor

Electronically Filed - BUCHANAN - July 08, 2024 - 03:33 PM

its promises that it would protect the confidentiality of patient communications thus resulted in Plaintiffs and Class Members overpaying Defendant for the services they received.

309. The services that Plaintiffs and Class Members ultimately received in exchange for the monies paid to Defendant were worth quantifiably less than the services that Defendant promised to provide, which included Defendant's promise that any patient communications with Defendant would be treated as confidential and would never be disclosed to third parties for marketing purposes without the express consent of patients.

310. The medical services that Defendant offers are available from many other health care systems who do protect the confidentiality of patient communications. Had Defendant disclosed that it would allow third parties to secretly collect Plaintiffs and Class Members' Private Health Information without consent, neither the Plaintiffs, the Class Members, nor any reasonable person would have purchased healthcare from Defendant and/or its affiliated healthcare providers.

311. Defendant's conduct in sharing Plaintiffs' and Class Members' Personal Health Information with Facebook also diminished the sales value of that information. There is a robust market for the type of information that Plaintiffs and Class Members shared with Defendant (which Defendant then shared with Facebook). Indeed, Facebook itself has offered to pay the public to acquire similar information in the past so that Facebook could use such information for marketing purposes. Plaintiffs and Class Members were harmed both by the dissemination of their Personal Health Information and by losing the sales value of that information.

312. As a direct and proximate result of these failures, Plaintiffs and the Class Members have been harmed and have suffered, and will continue to suffer, actual damages and injuries, including, without limitation, the release and disclosure of their Private Health

Electronically Filed - BUCHANAN - July 08, 2024 - 03:33 PM

Information, the loss of control of their Private Health Information, the diminution in value of their Personal Health Information, and the loss of the benefit of the bargain they had struck with Defendant.

313. Plaintiffs and the Class Members are entitled to compensatory and consequential damages suffered as a result.

314. Plaintiffs and Class Members also face a real and immediate threat of future injury to the confidentiality of their Personal Health information both because such information remains within Defendant's control and because anytime that Plaintiffs and/or Class Members interact with Defendant's Web Properties to make appointments, such information about their medical conditions, search for a doctor, or otherwise seek assistance with their medical conditions they risk further disclosure of their Personal Health Information. Plaintiffs and the Class Members are therefore also entitled to injunctive relief requiring Defendant to cease all website operations that allow for the third-party capture of Private Health Information.

**COUNT V**
**Unjust Enrichment/Quasi-Contract**
**(On Behalf of Plaintiffs and the Class)**

315. Plaintiffs re-allege and incorporate by reference all paragraphs above as if fully set forth herein.

316. Plaintiffs hereby plead this Count in the alternative to Count IV.

317. Plaintiffs bring this claim on behalf of themselves and all members of the Class.

318. Plaintiffs and Class Members conferred a benefit on Defendant in the form of valuable sensitive medical information that Defendant collected from Plaintiffs and Class Members under the guise of keeping this information private. Defendant collected, used, and disclosed this information for its own gain, including for advertisement purposes, sale, or trade

Electronically Filed - BUCHANAN - July 08, 2024 - 03:33 PM

for valuable services from third parties. Additionally, Plaintiffs and the Class Members conferred a benefit on Defendant in the form of monetary compensation.

319. Plaintiffs and the Class Members would not have used the Defendant's services, or would have paid less for those services, if they had known that Defendant would collect, use, and disclose this information to third parties.

320. Defendant unjustly retained those benefits at the expense of Plaintiffs and Class Members because Defendant's conduct damaged Plaintiffs and Class Members, all without providing any commensurate compensation to Plaintiffs and Class Members.

321. The benefits that Defendant derived from Plaintiffs and Class Members rightly belong to Plaintiffs and Class Members. It would be inequitable under unjust enrichment principles for Defendant to be permitted to retain any of the profit or other benefits it derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Petition.

322. Defendant should be compelled to disgorge in a common fund for the benefit of Plaintiffs and Class Members all unlawful or inequitable proceeds that Defendant received, and such other relief as the Court may deem just and proper.

**COUNT VI**
**Unlawful Practices in Violation of Mo. Rev. Stat. § 407.020**
**(On Behalf of Plaintiffs and the Class)**

323. Plaintiffs re-allege and incorporate by reference all paragraphs above as if fully set forth herein.

324. Plaintiffs bring this claim on behalf of themselves and all members of the Class.

325. Defendant promises patients that it is committed to protecting the privacy of the Personal Health Information they provide. Defendant also promises patients that it will never sell their medical information without patients' written authorization.

Electronically Filed - BUCHANAN - July 08, 2024 - 03:33 PM

326. Despite these promises, and despite its duty not to disclose Personal Health Information without informed consent and written authorization, Defendant disclosed information relating to Plaintiffs and Class Members' medical treatment to third parties without their knowledge, consent, or authorization.

327. Likewise, Defendant's Web Properties give no indication to patients that Defendant routinely allows Facebook to capture and exploit patients' Personal Health Information. Defendant's failure to disclose to patients and visitors to its website that it has installed the Meta Pixel and is sharing patients' and visitors' Personal Health Information with Facebook and other third parties is also a material omission of material fact that would be relevant to anyone visiting Defendant's Web Properties.

328. Defendant's conduct constitutes an unlawful practice pursuant to Missouri Revised Statute Section 407.020, which prohibits the "use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce."

329. Medical goods and services meet the statutory definition of merchandise as defined by Missouri Revised Statute Section 407.010(4). *Freeman Health Sys. v. Wass*, 124 S.W.3d 504, 507 (Mo. Ct. App. 2004).

330. The information disclosed included personally identifiable information, Plaintiffs and Class Members' statuses as patients of Defendant, and the exact contents of communications exchanged between Plaintiffs and/or Class Members with Defendant, including but not limited to information about treating doctors, potential doctors, conditions, treatments, appointments, search terms, bill payment, and logins to Defendant's Web Properties.

Electronically Filed - BUCHANAN - July 08, 2024 - 03:33 PM

331. The disclosure of personally identifiable medical information constitutes an unreasonable, substantial, and serious interference with Plaintiffs and Class Members' legal rights.

332. Plaintiffs and Class Members did not consent to, authorize, or know about Defendant's disclosure of their Personal Health Information to Facebook and other third parties at the time it occurred. Plaintiffs and Class Members never agreed that their sensitive medical information could be collected, used, and monetized by Facebook.

333. Defendant's intentional disclosure of patients' Personal Health Information to a third-party advertising company like Facebook without consent would be highly offensive to a reasonable person. Plaintiffs and Class Members reasonably expected that their Personal Health Information would not be collected, used, and monetized by third party advertising companies.

334. Defendant's disclosure of Personal Health Information from thousands of individuals was highly offensive because it violated expectations of privacy that have been established by social norms. Privacy polls and studies show that Americans believe that one of the most important privacy rights is the need for an individual's affirmative consent before their personal data is collected, shared, or used.

335. Given the nature of the Personal Health Information that Defendant disclosed to Facebook, such as patients' names, email addresses, phone numbers, information entered into forms, doctor's names, potential doctor's names, the search terms used to locate doctors (i.e. "Alzheimer's"), the condition selected from dropdown menus (i.e. "Heart Disease"), medications, and details about upcoming doctor's appointments, this kind of intrusion would be (and in fact is) highly offensive to a reasonable person.

Electronically Filed - BUCHANAN - July 08, 2024 - 03:33 PM

336. Plaintiffs and Class Members paid Defendant for goods and services and suffered an ascertainable loss as a result of Defendant's unlawful practices.

337. Defendant's breach caused Plaintiffs and Class Members, at minimum, the following damages:

f. Sensitive and confidential information that Plaintiffs and Class Members intended to remain private is no longer private;

g. Defendant eroded the essential confidential nature of the doctor-patient and provider-patient relationship;

h. Defendant took something of value from Plaintiffs and Class Members and derived benefit therefrom without Plaintiffs and Class Members' knowledge, consent, or authorization and without sharing the benefit of such value;

i. Plaintiffs and Class Members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain the confidentiality of their Personal Health Information; and

j. Defendant's actions diminished the value of Plaintiffs and Class Members' personal information.

338. Plaintiffs and Class Members have suffered harm and injury, including but not limited to the invasion of their privacy rights.

339. Plaintiffs and Class Members have been damaged as a direct and proximate result of Defendant's invasion of their privacy and are entitled to seek just compensation, including monetary damages.

340. Plaintiffs and Class Members seek appropriate relief for their injuries, including but not limited to damages that will reasonably compensate Plaintiffs and Class Members for the

Electronically Filed - BUCHANAN - July 08, 2024 - 03:33 PM

harm to their privacy interests as well as a disgorgement of profits made by Defendant as a result of its intrusions on Plaintiffs and Class Members' privacy. Plaintiffs and Class Members also seek an award of reasonable attorney's fees pursuant to Mo. Rev. Stat. § 407.025.2(2).

341. Plaintiffs and Class Members also seek such other relief as the Court may deem equitable, legal, and proper.

**COUNT VII**
**Invasion of Privacy—Unreasonable Intrusion upon the Seclusion of Another**
**(On Behalf of Plaintiffs and the Class)**

342. Plaintiffs re-allege and incorporate by reference all paragraphs above as if fully set forth herein.

343. Plaintiffs bring this claim on behalf of themselves and all members of the Class.

344. Missouri established a right to privacy in Article 1, Section 15 of the Missouri Constitution.

345. Under Missouri law, there is a tortious intrusion on seclusion when there is an intentional intrusion on the solitude, seclusion, or private affairs of another by a means that is unreasonable or highly offensive to a reasonable person. A claim for unreasonable intrusion upon the seclusion of another encompasses three elements: (1) the existence of a secret and private subject matter; (2) a right in the Plaintiffs to keep that subject matter private; and (3) the obtaining by the defendant of information about that subject matter through unreasonable means. *Corcoran v. Southwestern Bell Tel. Co.*, 572 S.W.2d 212, 215 (Mo.App.1978).

346. Plaintiffs and Class Members had a legitimate and reasonable expectation of privacy with respect to their Personal Health Information and were accordingly entitled to protection of this information against the acquisition and disclosure of their Personal Health Information by unreasonable means.

Electronically Filed - BUCHANAN - July 08, 2024 - 03:33 PM

347. Defendant owed a duty to Plaintiffs and Class Members to protect the confidentiality of their Personal Health Information and not to share such information with Facebook for marketing purposes without the express written consent of Plaintiffs and Class Members.

348. Defendant obtained Plaintiffs' and Class Members' Personal Health Information by falsely promising that it would safeguard the confidentiality of that information and that it would never disclose such information to third parties for marketing purposes without written consent. The deceitful method through which Defendant obtained Plaintiffs' and Class Member's Personal Health Information (i.e., lying to patients about how their Personal Health Information would be used) would be objectionable to a reasonable person.

349. The unauthorized acquisition, appropriation, and disclosure of Plaintiffs' and Class Members' Personal Health Information would also be highly offensive to a reasonable person.

350. The intrusion was into subject matter that was private and is entitled to be private. Plaintiffs and Class Members disclosed their Personal Health Information to Defendant with the understanding that it would only be used for their medical treatment and that such information would be kept confidential and protected from disclosure to third parties. Plaintiffs and Class Members reasonably believed that such information would be kept private and would not be shared with Facebook without their authorization so that Facebook could target them with advertising.

351. The disclosure of Plaintiffs' and Class Members' Personal Health Information by Defendant constitutes an unreasonable intrusion upon Plaintiffs' and Class Members' seclusion,

Electronically Filed - BUCHANAN - July 08, 2024 - 03:33 PM

as to both their persons, their private affairs, and private concerns of a kind that would be highly offensive to a reasonable person.

352. Defendant acted with a knowing mind when it intentionally disclosed Plaintiffs and Class Members' Personal Health Information to Facebook. Defendant further invaded Plaintiffs' and Class Members' privacy by failing to implement adequate data security measures, despite its obligations to protect patients' Personal Health Information.

353. Acting with knowledge, Defendant had notice and knew that its disclosure of Plaintiffs' and Class Members' Personal Health Information would cause injury to Plaintiffs and Class Members.

354. As a proximate result of Defendant's acts and omissions, Plaintiffs' and Class Members' Personal Health Information was transmitted to Facebook and other third parties without authorization, causing Plaintiffs and Class Members to suffer injury, including, at minimum, the following damages:

a. Sensitive and confidential information that Plaintiffs and Class Members intended to remain private is no longer private;

b. Defendant eroded the essential confidential nature of the doctor-patient and provider-patient relationship;

c. Defendant took something of value from Plaintiffs and Class Members and derived benefit therefrom without Plaintiffs and Class Members' knowledge, consent, or authorization and without sharing the benefit of such value;

d. Plaintiffs and Class Members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain the confidentiality of their Personal Health Information; and

Electronically Filed - BUCHANAN - July 08, 2024 - 03:33 PM

e. Defendant's actions diminished the value of Plaintiffs and Class Members' personal information.

355. Unless and until enjoined and restrained by order of this Court, Defendant's wrongful conduct will continue to cause great and irreparable injury to Plaintiffs and Class Members in that their Personal Health Information can be accessed, acquired by, appropriated by, disclosed to, used by, and/or viewed by unauthorized third parties.

356. Plaintiffs and Class Members have no adequate remedy at law for the injuries that they have suffered (and will continue to suffer) because of Defendant's wrongful practices in that a judgment for money damages will not end the invasion of privacy for Plaintiffs and Class Members. Accordingly, Plaintiffs and Class Members seek such injunctive relief as the Court deems legal, equitable, and proper.

**COUNT VIII**
**Breach of the Covenant of Good Faith and Fair Dealing**
**(On Behalf of Plaintiffs and the Class)**

357. Plaintiffs re-allege and incorporate by reference all paragraphs above is if fully set forth herein.

358. Plaintiffs bring this claim on behalf of themselves and all members of the Class.

359. As described above, when Plaintiffs and Class Members provided their Personal Health Information to Defendant, they entered into implied contracts in which Defendant agreed to comply with its statutory and common law duties to protect their Personal Health Information from disclosure to unauthorized third parties and to timely notify them in the event of a data breach.

360. These exchanges constituted an agreement between the parties: Plaintiffs and Class Members were required to provide their Personal Health Information in exchange for

Electronically Filed - BUCHANAN - July 08, 2024 - 03:33 PM

medical services and other benefits provided by Defendant. These agreements were made by Plaintiffs and Class Members in the course of their medical treatment by Defendant.

361. It was clear by these exchanges that the parties intended to enter into an agreement. Plaintiffs and Class Members would not have disclosed their Personal Health Information to Defendant but for Defendant's promise that it would provide medical services and would also protect the confidentiality of the Personal Health Information that Plaintiffs and Class Members provided during the course of their treatment. Conversely, Defendant presumably would not have taken Plaintiffs' and Class Members' Personal Health Information if it did not intend to provide Plaintiffs and Class Members medical services and other benefits.

362. Implied in these exchanges was a promise by Defendant to ensure that the Personal Health Information of Plaintiffs and Class Members in its possession was only used to provide medical services.

363. Defendant's failure to implement adequate security measures to protect the Personal Health Information of Plaintiffs and Class Members constituted a denial of Plaintiffs' and Class Members' expected benefit of the contract between the parties.

364. Both Defendant's disclosure of Plaintiffs' and Class Members' Personal Health Information and Defendant's lack of diligence with regard to its implementation of adequate security measures to protect the Personal Health Information of Plaintiffs and Class Members constituted a denial of Plaintiffs' and Class Members' expected benefit of the contract between the parties and evaded the spirit of the transaction between the parties. Defendant did not just breach the contract by this misconduct—Defendant frustrated its essential purpose by intentionally sharing confidential Personal Health Information with Facebook without notice to or consent of Plaintiffs and Class Members.

Electronically Filed - BUCHANAN - July 08, 2024 - 03:33 PM

365. Defendant acted in bad faith by intentionally and unreasonably disclosing Plaintiffs' and Class Members' Personal Health Information to Facebook despite having promised that it would never disclose such information without express written authorization from patients. In doing so, Defendant frustrated the rights and reasonable expectations of Plaintiffs and Class Members to receive the benefit of the implied agreements that they made with Defendant. Defendant's intentional disclosure of Plaintiffs' and Class Members' sensitive personal and medical information to Facebook was neither honest nor faithful to the agreed purposes of the contract, which included Defendant's promise to protect the confidentiality of Plaintiffs' and Class Members' Personal Health Information.

366. Defendant further performed in bad faith by exercising its discretion in a manner not contemplated by parties. Specifically, Defendant's conduct in failing to institute reasonable data security measures and policies demonstrates both a lack of diligence and a willful rendering of imperfect performance. So too, Defendant's decision to install the Meta Pixel tool on its Web Properties, with the knowledge that patients' sensitive personal and medical information would be automatically sent to Facebook, also demonstrates not just a willful rendering of imperfect performance but an intentional, bad faith breach of Defendant's obligations to Plaintiffs and Class Members.

367. Plaintiffs and Class Members did not receive the benefit of the bargain with Defendant because their provision of Personal Health Information was made in exchange for Defendant's implied agreement to keep that information confidential.

368. While Defendant had discretion in the specifics of how it met the applicable laws and industry standards governing Personal Health Information, this discretion was governed by an implied covenant of good faith and fair dealing.

Electronically Filed - BUCHANAN - July 08, 2024 - 03:33 PM

369. Defendant breached this implied covenant when it engaged in acts and/or omissions that are declared unlawful. These acts and omissions included (1) disclosing Plaintiffs' and Class Members' Personal Health Information to Facebook without the knowledge or consent of Plaintiffs and Class Members; (2) omitting, suppressing, and concealing the inadequacy of the privacy and security protections for Plaintiffs' and Class Members' Personal Health Information; (3) intentionally misleading Plaintiffs and Class Members' about how their Personal Health Information would be shared with and used by third party marketing companies like Facebook; (4) failing to disclose to Plaintiffs and Class Members that Defendant had installed the Meta Pixel tool on its Web Properties; and (5) failing to disclose to Plaintiffs and Class Members at the time they provided their Personal Health Information to Defendant that Defendant's data security systems, including training, auditing, and implementation of data security policies failed to meet applicable legal and industry standards.

370. Plaintiffs and Class Members did all or substantially all the significant things that the contract required them to do.

371. Likewise, all conditions required for Defendant's performance were met.

372. Defendant's acts and omissions unfairly interfered with Plaintiffs' and Class Members' rights to receive full benefits of their contracts.

373. Plaintiffs and Class Members have been harmed by Defendant's breach of the implied covenant of good faith and fair dealing in multiple ways, including at minimum, the following damages:

a. Sensitive and confidential information that Plaintiffs and Class Members intended to remain private is no longer private;

Electronically Filed - BUCHANAN - July 08, 2024 - 03:33 PM

b. Defendant eroded the essential confidential nature of the doctor-patient and provider-patient relationship;

c. Defendant took something of value from Plaintiffs and Class Members and derived benefit therefrom without Plaintiffs and Class Members' knowledge, consent, or authorization and without sharing the benefit of such value;

d. Plaintiffs and Class Members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain the confidentiality of their Personal Health Information; and

e. Defendant's actions diminished the value of Plaintiffs and Class Members' personal information.

374. Defendant is liable for this breach of these implied covenants whether or not it is found to have breached any specific express contractual term.

375. Plaintiffs and Class Members are entitled to damages, including compensatory damages and restitution, injunctive relief, attorney's fees, costs, and expenses in amounts to be determined at trial.

**COUNT IX**
**Bailment**
**(On Behalf of Plaintiffs and the Class)**

376. Plaintiffs re-allege and incorporate by reference all paragraphs above as if fully set forth herein.

377. Plaintiffs bring this claim on behalf of themselves and all Class Members.

378. Plaintiffs and Class Members entrusted their Personal Health Information to Defendant for the purpose of obtaining medical services.

Electronically Filed - BUCHANAN - July 08, 2024 - 03:33 PM

379. Plaintiffs and Class Members owned the Personal Health Information that they entrusted to Defendant's care. Plaintiffs and Class Members agreed to entrust their Personal Health Information into Defendant's care for an agreed price. The bargain between Plaintiffs and Class Members and Defendant included an obligation that Defendant safeguard and protect the Personal Health Information provided by Plaintiffs and Class Members.

380. Defendant had knowledge that Plaintiffs and Class Members were providing it with Personal Health Information through their interactions with Defendant's Web Properties. By soliciting and acquiring Plaintiffs' and Class Members' Personal Health Information Defendant assumed an independent duty to handle Plaintiffs' and Class Members' Personal Health Information with due care and consistent with industry standards to prevent the foreseeable harm that arises from a breach of that duty.

381. Defendant wrongfully retained and failed to safeguard and protect the Personal Health Information provided by Plaintiffs and Class Members by knowingly and intentionally sharing that information with Facebook and other third parties. Defendant's wrongful actions, including its failure to safeguard Plaintiffs' and Class Members' Personal Health Information, resulted in injury to Plaintiffs and Class Members because their Personal Health Information is now in the hands of unauthorized persons and has thus been compromised.

382. During the time of bailment, Defendant owed Plaintiffs and Class Members the duty to safeguard and protect their Personal Health Information by maintaining reasonable and effective data security practices, procedures, and protocols to protect their Personal Health Information. Defendant further breached its obligations to Plaintiffs and Class Members by intentionally disclosing their Personal Health Information to Facebook, which, in turn, caused the wrongful dissemination of this information to unauthorized persons.

Electronically Filed - BUCHANAN - July 08, 2024 - 03:33 PM

383. Defendant's breach of its duty to safeguard and protect Plaintiffs' and Class Members' Personal Health Information directly caused, at minimum, the following damages:

a. Sensitive and confidential information that Plaintiffs and Class Members intended to remain private is no longer private;

b. Defendant eroded the essential confidential nature of the doctor-patient and provider-patient relationship;

c. Defendant took something of value from Plaintiffs and Class Members and derived benefit therefrom without Plaintiffs and Class Members' knowledge, consent, or authorization and without sharing the benefit of such value;

d. Plaintiffs and Class Members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain the confidentiality of their Personal Health Information; and

e. Defendant's actions diminished the value of Plaintiffs and Class Members' personal information.

**DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury on all issues so triable.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, ask for judgment in his favor, and that the Court enter an order as follows:

a. Certifying the Class and appointing Plaintiffs as the Class's representatives;

b. Appoint the law firms of Gorny Dandurand, LC, Turke & Strauss, LLP, and Ahmad, Zavitsanos, & Mensing P.C. as proposed interim class counsel;

c. Finding that Defendant's conduct as alleged herein was unlawful;

Electronically Filed - BUCHANAN - July 08, 2024 - 03:33 PM

d. Awarding such injunctive and other equitable relief as the Court deems just and proper, including enjoining Defendant from making any further disclosure of Plaintiffs or Class Members' communications to third parties without the Plaintiffs or Class Members' express, informed, and written consent;

e. Awarding statutory damages of $10,000 per Plaintiffs and Class Members pursuant to Mo. Rev. Stat. § 542.418.

f. Imposing a constructive trust against Defendant through which Plaintiffs and Class Members can be compensated for any unjust enrichment gained by Defendant;

g. Awarding Plaintiffs and Class Members statutory, actual, compensatory, consequential, and nominal damages, as well as restitution and/or disgorgement of profits unlawfully obtained;

h. Awarding Plaintiffs and Class Members pre-judgment and post-judgment interest as provided by law;

i. Awarding Plaintiffs and Class Members reasonable attorney's fees, costs, and expenses;

j. Awarding costs of suit; and

k. Such other and further relief to which Plaintiffs and Class Members may be entitled.

Not an Official Court Document

Electronically Filed - BUCHANAN - July 08, 2024 - 03:33 PM

Dated: July 8, 2024

*_/s/ Christopher D. Dandurand_*
STEPHEN M. GORNY MO # 45417
CHRISTOPHER D. DANDURAND MO # 63775
GORNY DANDURAND, LC
The Gorny Law Building
4330 Belleview Avenue, Suite 200
Kansas City, Missouri 64111
(816) 756-5071 (telephone)
(816) 756-5067 (facsimile)
steve@gornylawfirm.com
chris@gornylawfirm.com

Foster C. Johnson*
David Warden*
Justin Kenney*
Kyle Poelker #65586
AHMAD, ZAVITSANOS, & MENSING, P.C.
1221 McKinney Street, Suite 3460
Houston, Texas 77010
Telephone: (713) 655-1101
Facsimile: (713) 655-0062
fjohnson@azalaw.com
dwarden@azalaw.com
jkenney@azalaw.com
kpoelker@azalaw.com

Samuel J. Strauss*
Raina C. Borrelli*
TURKE & STRAUSS LLP
613 Williamson St., Suite 201
Madison, Wisconsin 53703
Telephone: (608) 237-1775
Facsimile: (608) 509-4423
sam@turkestrauss.com
raina@turkestrauss.com

* Motions for Admission to be filed

*Attorneys for Plaintiffs and the Proposed Class*

Not an Official Court Document

Electronically Filed - BUCHANAN - July 08, 2024 - 03:33 PM

## CERTIFICATE OF FILING

The undersigned hereby certifies that the foregoing First Amended Class Action Petition has been filed using the Court's electronic case filing system on this 8th day of July, 2024.

*/s/ Christopher D. Dandurand*
Christopher Dandurand

Not an Official Court Document