# EXHIBIT A

02/18/2025

FILED
Superior Court of California
County of Los Angeles
FEB 14 2025
David W. Slayton, Executive Officer/Clerk of Court
By: N. Navarro, Deputy

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

JANE DOE, JAN DOE, JANET DOE, and JANICE DOE, individually and on behalf of others similarly situated,

Plaintiffs,

vs.

ADVENTIST HEALTH CARE NETWORK, INC.; ADVENTIST HEALTH CALIFORNIA MEDICAL GROUP, INC., and ADVENTIST HEALTH SYSTEM/WEST,

Defendants.

Case No.: 22STCV36304

ORDER RE PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

Date: December 19, 2024
Time: 9:00 a.m.
Dept.: SSC 17

Plaintiffs filed a motion for class certification against Defendant Adventist Healthcare, seeking to certify a class of "all Adventist Health patients with an address in California who used the Adventist website or patient portal to exchange communications with Adventist Health, including researching medical conditions or treatments, finding a physician, making an appointment, or submitting a health risk assessment form" from November 16, 2017, to April 30, 2024, as well as four subclasses.

02/18/2025

At the hearing on the motion, Plaintiffs' counsel asked to file a trial plan, which the court allowed along with a responsive brief from Defendant. The parties each filed those additional documents, and the court took the motion under submission upon receipt of Defendant's responsive brief.

Plaintiffs' trial plan modified the requested class and subclasses:

Class: "For the period November 16, 2017 to April 30, 2024, all Adventist Health patients with an address in California who used the Adventist website or patient portal to exchange communication with Adventist Health for researching medical conditions or treatments, finding a physician, making an appointment, or submitting a health risk assessment form."

(1) Patient Portal Subclass: "All Class members who were logged into Adventist Health's patient portal up until May 2023."

(2) Online Appointment Subclass: "All Class members who used Adventist Health's doctors.adventisthealth.org to schedule a health care appointment."

(3) Provider Search Subclass: "All Class members who used Adventist's Health's website to find a physician."

(4) Health Risk Assessment Form Subclass: "All Class members who submitted an online Health Risk Assessment Form to Adventist Health."

(Trial Plan at pp. 1-2.)

In addition, the trial plan narrowed the class claims to the causes of action under the California Invasion of Privacy Act ("CIPA"), the California Confidentiality of Medical Information Act ("CMIA"), and the Unfair Competition Law ("UCL"). (Trial Plan at p. 2.) In the third amended complaint ("TAC"), the first cause of action is for violation of CIPA, alleging Defendants aided Facebook to learn the contents of Plaintiffs' and class members communications with Defendant. The second, third, and fourth causes of action are for violation of CMIA, alleging Defendant disclosed Plaintiffs' and class member's medical information to third parties without their consent. The fifth cause of action is for invasion of privacy. The sixth cause of action is for violation of Penal Code section 502. The seventh cause of action covers common counts. The eighth and ninth causes of action claim violations of the UCL, alleging Defendant engaged in

02/18/2025

unlawful and unfair business practices by violating CIPA and CMIA and disclosing health care information without consent. The tenth cause of action alleges violation of Civil Code section 1798.82. Thus, according to the trial plan, the first, second, third, fourth, eighth, and ninth causes of action remain at issue for this motion.

## I. <u>LEGAL STANDARD</u>

"The party advocating class treatment must demonstrate the existence of an ascertainable and sufficiently numerous class, a well-defined community of interest, and substantial benefits from certification that render proceeding as a class superior to the alternatives." (*Brinker Restaurant Corp. v. Superior Court* (2012) 53 Cal.4th 1004, 1021.) Numerosity asks if the proposed class is numerous in size. (*Hendershot v. Ready to Roll Transportation, Inc.* (2014) 228 Cal.App.4th 1213, 1222.) A class is ascertainable when it is defined "in terms of objective characteristics and common transactional facts" that make "the ultimate identification of class members possible when that identification becomes necessary." (*Noel v. Thrifty Payless, Inc.* (2019) 7 Cal.5th 955, 980, citing *Hicks v. Kaufman & Broad Home Corp.* (2001) 89 Cal.App.4th 908, 915.) Community of common interest refers to whether common questions of law or fact predominate, and whether class representatives have claims or defenses typical of the class and can adequately represent the class. (*Richmond v. Dart Industries, Inc.* (1981) 29 Cal.3d 462, 470.) Finally, superiority exists if proceeding with the case as a class action is superior to other methods of adjudication. (*Fireside Bank v. Superior Court* (2007) 40 Cal.4th 1069, 1089.)

The California Supreme Court also cautions that "the class action procedural device may not be used to abridge a party's substantive rights." (*Duran v. U.S. Bank Natl. Assoc.* (2014) 59 Cal.4th 1, 34.) "'[C]lass actions are provided only as a means to enforce substantive law. Altering the substantive law to accommodate procedure would be to confuse the means with the ends — to sacrifice the goal for the going.' " (*Payton v. CSI Electrical Contractors, Inc.* (2018) 27 Cal.App.5th 832, 841.) This includes the right to present a defense. (See *Hale v. Sharp Healthcare* (2014) 232 Cal.App.4th 50, 66 [courts should "be 'procedurally innovative' in managing class actions," but " 'procedural innovation must conform to the substantive rights of the parties,' including the right for the defendant to litigate its affirmative defenses"].)

02/18/2025

## II. ANALYSIS

### A. Numerosity and Ascertainable

A class is numerous if "the class is too large to make joinder [of each class member] practicable," supporting the use of the class action mechanism. (*Hendershot, supra,* 228 Cal.App.4th at p. 1222.) A class is ascertainable if defined in terms of "objective characteristics and common transactional facts" that permit "the ultimate identification of class members when necessary. (*Noel, supra,* 7 Cal.5th at p. 980.)

There is no dispute the class and subclasses are numerous.

Plaintiffs have not established that class members are ascertainable. As discussed in greater detail below, Plaintiffs allege Defendant transmitted different types of information to third parties depending on the actions patients took on Defendant's website. For example, Plaintiffs state that "the URL transmitted when a patient initially navigates to the 'Find a Doctor' search page will not contain any search terms." (Reply at p. 12 n.16.) But Plaintiffs contend "the search term would be transmitted when the patient went on to actually search for a physician." (*Ibid.*) Plaintiffs then say that if the patient did not actually search for a doctor after navigating to the "Find a Doctor" search page, then the patient would not be part of the class. (*Ibid.*) Plaintiffs do not explain how to distinguish between those patients who go to the "Find a Doctor" search page and go no further, those who actually enter search terms on the "Find a Doctor" search page, and those who search for a doctor on the website by clicking on links on the website or who scroll through doctor profiles on the website rather than by entering search terms.

Instead, Plaintiffs propose that Defendant generate a list of all California patients and then "patients could identify themselves as having used the website or patient portal to research medical conditions or treatments, find a physician, make an appointment, or submit a health risk assessment form." (Motion at p. 12.) Plaintiffs contend patients will be able to figure out from the class definition whether they are part of the class and they can "self-report." (*Ibid.*; Reply at p. 18.) It is not so simple. For example, the class definition is not limited to patients who searched for doctors by entering search terms on the "Find a Doctor" search page, and it does not mention search terms. The class definition is overinclusive because it includes members who researched

02/18/2025

medical issues or doctors in ways that did not result in transmitting "content" or "medical information" in violation of CIPA or CMIA, as discussed below. Because the class definition is so broad and not specifically defined, it does not clearly tell putative class member how to self-report.

The patient portal subclass has a similar problem. Plaintiffs define it as "All Class members who were logged into Adventist Health's patient portal up until May 2023." Plaintiffs contend those class members can be ascertained because Defendant has information of all registered patient portal users in its records. (Motion at p. 13; Reply at p. 18.) Simply being a registered user of the patient portal does not mean a patient engaged in activity on the patient portal that resulted in information, let along "content" and "medical information," being transmitted to third parties. Plaintiffs do not explain how to ascertain which patients logged into the patient portal and engaged in the types of activities that allegedly resulted in "content" and "medical information" being transmitted, as discussed below.

When Plaintiffs filed their motion, they defined the online appointment subclass as patients who used Defendant's PMC online scheduling system to schedule a health care appointment, and Plaintiffs said the PMC system's vendor had records of the appointments. (Motion at pp. 11, 13.) In their reply and trial plan, Plaintiffs revised this subclass to be patients who used Defendant's website doctors.adventisthealth.org to book/schedule a health care appointment. (Reply at p. 17; Trial Plan at p. 2.) But Plaintiffs did not submit evidence of how those patients can be ascertained.

Similarly, when Plaintiffs filed their motion, they defined the provider search subclass as patients who used Defendant's PMC online provider search system to find a physician. Plaintiffs said the PMC system's vendor had records of the searches. (Motion at pp. 12, 13.) In their reply and trial plan, Plaintiffs revised this subclass to be patients who used Defendant's website to find a physician. (Reply at p. 3 n.4; Trial Plan at p. 2.) Plaintiffs did not submit evidence of how those patients can be ascertained.

Plaintiffs showed Defendant or its vendor has records of submitted Health Risk Assessment Forms from which the class can be ascertained. (Motion at p. 14.)

02/18/2025

**B. Predominance of Common Issues**

The "party seeking certification must show that issues of law or fact common to the class predominate" over individualized issues. (*Duran, supra,* 59 Cal.4th at p. 28.) The predominance analysis "hinges on 'whether the theory of recovery advanced by the proponents of certification is, as an analytical matter, likely to prove amenable to class treatment.' . . . 'As a general rule if the defendant's liability can be determined by facts common to all members of the class, a class will be certified even if the members must individually prove their damages.' " (*Brinker, supra,* 53 Cal.4th at pp. 1021-1022.) Common issues do not predominate "'if every member of the alleged class would be required to litigate numerous and substantial questions determining his individual right to recover following the 'class judgment' on common issues." (*Duran, supra*, 59 Cal.4th at p. 28.) "In the certification context . . . common issues may be present when a defendant's tortious acts . . . 'allegedly are the same with regard to each plaintiff.' " (*Sav-On Drug Stores, Inc. v. Superior Court* (2004) 34 Cal.4th 319, 331.) Plaintiffs' burden is "not merely to show that some common issues exist, but . . . to place substantial evidence in the record that common issues predominate" over individual issues. (*Lockheed Martin Corp. v. Superior Court* (2003) 29 Cal.4th 1096, 1108.)

**1. Class**

Plaintiffs' proposed class covers "For the period November 16, 2017 to April 30, 2024, all Adventist Health patients with an address in California who used the Adventist website or patient portal to exchange communication with Adventist Health for researching medical conditions or treatments, finding a physician, making an appointment, or submitting a health risk assessment form."

**a. CIPA Cause of Action**

The first cause of action for violation of CIPA alleges Defendant violated Penal Code section 632, subdivision (a) when it "used a recording device to record confidential communications . . . and then transmitted such information to others, such as Facebook." (TAC, ¶¶ 413, 415.) Neither Plaintiffs' motion nor reply brief mentions section 632. (See, e.g., Motion at pp. 15-16.) Therefore, the court assumes Plaintiffs have dropped any attempt to certify a class

02/18/2025

for alleged violations of section 632. Plaintiffs' trial plan, filed after the hearing in this case, lists section 632 issues to be decided in the trial, but asserting those issues after the hearing without briefing or citations to the evidence is too late.

The first cause of action for violation of CIPA also alleges Defendant violated Penal Code section 631, subdivision (a) by aiding a third party to learn the contents of communications while the communications were in transit. (TAC, ¶¶ 412, 420, 421, 425.) Plaintiffs argue Defendant installed tracking technologies on its websites to transmit patients' communications to Facebook and Google. (Motion at pp. 15-16.) Plaintiffs argue "common issues predominate because this case centers on whether Adventist deployed tracking technologies on its website and patient portal that shared patients' communications, including personal identifiers and sensitive health information, with third parties." (Motion at p. 14.) Plaintiffs contend the common issues are whether the tracking devices redirected patients' communications to third parties, whether the tracking devices intercepted communications while in transit, whether patients had a reasonable expectation of privacy, and whether the tracking devices transmitted the contents of patients' communications. (*Id.* at p. 16.) Defendant argues individual issues predominate because "whether a detailed URL constitutes 'content,' as opposed to record information, depends on the URL itself, how detailed it is, and what information is conveyed thereby." (Opposition at p. 18.) According to Defendant, some website searches contain "content" under CIPA, while others do not. (*Ibid.*)

Both sides cite *Cousin v. Sharp Healthcare* (S.D. Cal. 2023) 702 F.Supp.3d 967 in support of their positions. (Motion at p. 16 n.9; Opposition at p. 18.) In that case, the court adopted the reasoning that a court should " 'employ a contextual "case-specific" analysis hinging on "how much information would be revealed" by the information's tracking and disclosure.' [Citation.] " (*Cousin, supra*, 702 F.Supp.3d at p. 976.) " 'UFLs are record information when they only reveal a general webpage address and basic identification information, but when they reproduce a person's personal search engine queries, they are contents.' [Citation.]" (*Ibid.*; see also *In re Zynga Privacy Litigation* (9th Cir. 2014) 750 F.3d 1098, 1108-1109 [while URLs that contain a user's search terms could be "content," information about the webpage a user views contains only "basic identification and address information" that "does not constitute the contents of a

02/18/2025

communication"].) Because *Cousins* and *Zynga* dealt with motions to dismiss, they did not decide whether a class can be certified for a CIPA claim alleging interception or transmission of "contents" based on website use and search terms.

Plaintiffs argue the tracking devices transmitted URLs containing patients' search terms, citing Shafiq's reports, Exhibit A at paragraphs 79-80 and Exhibit M at paragraphs 31-32. (Reply at p. 7.) Shafiq states Defendant shared "Page URL that includes search terms," "Page title that includes search terms, and "content information (e.g., URL and page title that may include sensitive search terms)." (Ex. A, ¶¶ 68, 75.) He gives some examples of URLs containing search terms. (Ex. A, ¶ 70(c)(i).) However, he also refers to "Page title that includes search terms such as 'surgical abortion – Find a Physician or Provider/Adventist Health" and "MyAdventistHealth Patient Portal" (Ex. A, ¶ 70(c)(ii)) – one appears to contain a search term, while the other appears not to. He does not distinguish between page titles containing user-inputted search terms and page titles that identify the webpage without including search terms. Some of the page titles Shafiq quotes appear not to contain users' search terms, such as "MyAdventistHealth Patient Portal," and merely identify the page. Those types of page titles are not "a person's personal search engine queries" that can be content. (*Cousin, supra*, 702 F.Supp.3d at p. 976.) Shafiq also refers to Defendant tracking and transmitting "specific events such as 'HRA Report Accessed,' 'Online Scheduling Confirmation,' 'Adventist Health PDF Download,' etc." (Ex. A, ¶ 54; see also *id.* at ¶¶ 48, 52 [tracking specific events such as "Knee Webinar Thank-You," "Urology Seminar Thank-You," "Lodi Ortho Thank-You," "Adventist Health All Virtual Visit Pageview," "Adventist Health All Contact Button Clicks," "Health Webinar Pageview," and "patient-assessment-report"].) Again, Shafiq does not say these events contain patient search terms. Rather they appear to be records of page views or buttons/links that a patient clicked. As such, they are not "content." (*Zynga, supra,* 750 F.3d at pp. 1108-1109.)

In his reply report, Shafiq contends the class is limited to patients who communicated in particular ways that resulted in the contents of their communications being transmitted. (Ex. M at ¶ 32.) He give examples of URLs containing patients' search terms. (Ex. M, ¶ 32.) But the reply report does not state whether his definition of "contents" includes page title information that does

02/18/2025

not contain search terms and specific events such as "Adventist Health All Contact Button Clicks" and "Health Webinar Pageview."

Plaintiffs' class definition by its own terms is not limited to patients who entered search terms into Defendant's website. Shafiq's report defines "content information" as including page titles. (Ex. A, ¶¶ 68, 75.) Navigating to a webpage without entering search terms does not transmit "contents," even if information about that webpage (i.e., record data) is transmitted. (*Zynga, supra,* 750 F.3d at pp. 1108-1109.) Thus, the class definition raises issues that cannot be determined by common proof – whether a particular patient's transmitted information contained the patient's search terms or only the title of a webpage the patient clicked on without entering search terms or only an "event" such as "Adventist Health All Virtual Visit Pageview." These different types of information raise different legal issues because search terms could be content, while webpage or event information could be record information. Plaintiffs did not show the common issues predominate regarding these elements of proof.

**b. <u>CMIA Causes of Action</u>**

The second, third, and fourth causes of action allege violations of CMIA for disclosing patients' medical information to Facebook without their consent. (TAC, ¶¶ 435, 444, 452.) Civil Code section 56.10, subdivision (a) prohibits the disclosure of "medical information regarding a patient" without authorization. Section 56.05, subdivision (i) defines "medical information" as "any individually identifiable information . . . regarding a patient's medical history, mental health application information, mental or physical condition, or treatment." Liability under CMIA requires a showing "that the confidential nature of the plaintiff's medical information was breached as a result of the health care provider's negligence" or affirmative conduct. (*Regents of Univ. of Cal. v. Superior Court* (2013) 220 Cal.App.4th 549, 570, 564.)

Plaintiffs argue a predominate common question is whether Defendant disclosed patients' "sensitive health information," citing Exhibit A at paragraphs 68-71, 79, and 80 and Exhibit M at paragraphs 31-32. (Motion at p. 18; Reply at p. 7.) Those paragraphs state Defendant shared page URLs and page titles containing search terms and patient identifiers, and they give some examples

02/18/2025

of URLs containing search terms. (Ex. A, ¶¶ 68-71, 80; Ex. M, ¶ 32.) Defendant argues not all allegedly-shared information is "medical information" under CMIA. (Opposition at pp. 18-19.)

When describing the allegedly-shared information, Plaintiffs use the term "sensitive health information," which is not used in CMIA. (See, e.g., Motion at pp. 5-6.) Shafiq says Defendant shared "sensitive information about patient activity," "sensitive content information," and "sensitive information." (Ex. A, ¶¶ 68, 68, 70.) He does not define exactly what he means by "sensitive." His reports do not say the term "sensitive information" refers to information regarding a patient's medical history, mental health application information, mental or physical condition, and/or treatment. As discussed below, Shafiq's use of the term "sensitive" includes more than "medical information" as defined by CMIA.

Shafiq gives the following examples, among others, of sensitive information: (a) a page title "MyAdventist Health Patient Portal/Adventist Health," (b) page URLs "https://adventisthealth.org," "https://hra.adventisthealth.org," and "https://quiz.adventisthealth.org," and (c) page titles "Healthaware-admin," "AdventistHealth – Doctors," and "MyAdventistHealth Patient Portal/Adventist Health, meta:description: Welcome to MyAdventistHealth – your direct link to your personal electronic health record where ever you are, 24/7 – easily, accurately and securely." (Ex. A, ¶¶ 70.c.ii., 71.d, and at p.57 n.143.) Shafiq concludes Defendant shared patients' "sensitive information nearly a million time in just one month," including "'PageView' event," "'HRA Disclaimer Agree' event," "'HRA Report Accessed' event," and "'HRA Email Sign Up' event." (Ex. A, ¶ 79.) But those URLs, page titles, and events provide no information on their face about a patient's medical history, mental or physical condition, or treatment. Other examples include URLs with search terms that could convey medical information, such as "surgical%20abortion&sort." (Ex. A, ¶ 70.c.i.)

Shafiq's analysis shows that determining whether a patient's use of Defendant's website resulted in medical information being transmitted requires an examination of the particular page URLs and page titles transmitted, in other words, individualized proof for each use of the website. While "surgical%20abortion&sort" may convey medical information, "MyAdventistHealth Patient Portal/Adventist Health, meta:description: Welcome to MyAdventistHealth – your direct link to

02/18/2025

your personal electronic health record where ever you are, 24/7 – easily, accurately and securely" and "HRA Email Sign Up" appear not to.

Because Shafiq's analysis aggregates different types of information – such as URLs that may or may not convey medical information, page titles that may not or may not include descriptive or generic search terms or no search terms, and page views and events with generic names that may not convey medical information – into the category of "sensitive information," his reports do not support Plaintiffs' conclusion of a common question concerning whether the transmissions violate CMIA. Rather his reports lead to the conclusion that determining whether a patient's use of Defendant's website transmitted medical information under CMIA requires an individual analysis of the patient's search terms, as well as whether the patient just clicked on links, scrolled through webpages, or engaged in other events that do not reveal search terms.

**c. UCL Causes of Action**

The eighth and ninth causes of action depend on violations of CIPA and CMIA and the allegedly wrongful sharing of the contents of communications and medical information. (See, e.g., TAC, ¶¶ 507, 526.) Plaintiffs contend the UCL claims have the same common issues as the CMIA claims. (Motion at p. 22.) Therefore, the discussion and conclusions above apply to the UCL claims.

**2. Patient Portal Subclasses**

This subclass covers "All Class members who were logged into Adventist Health's patient portal up until May 2023." Plaintiffs contend whether Defendants transmitted medical information from the patient portal along with identifying information is a common issue. (Motion at pp. 17, 20.) Plaintiffs assert that Google Analytics on the patient portal sent "identifiers and full URLs to Google whenever patients used the portal to view their medical records, message their doctors, or pay bills," and Defendant also installed tracking code "so that whenever patients accessed the patient portal from the website, information was sent to Facebook and Google." Plaintiffs cite Exhibit A at paragraphs 56, 57, 58, and 80. (Motion at pp. 5, 17.) Plaintiffs also cite Exhibit A at paragraphs 14, 68, 70, 72, and 71 and notes 71, 127, and 128. (Motion at p. 6.)

02/18/2025

Most of those paragraphs are not expressly about the patient portal. Regarding the patient portal specifically, Shafiq states Google Analytics "was tracking information about 'Logins,' 'Pageviews,' 'Health Record – Results,' 'Download/Transmit,' 'On Dwnld, etc." (Ex. A, ¶ 58.) The default configuration of Google Analytics "shares information about the following events: page views, scrolls, outbound clicks, site search, form interactions, video engagement, file downloads." (*Ibid.*) Google Analytics shares "full page URLs," for example revealing that a patient viewed a radiology report. (*Ibid.*) Defendant acknowledges Google Analytics was on the patient portal until May 2023. (Opposition at p. 23.) Defendant's expert confirmed the example given by Shafiq – a URL revealed a radiology record in the patient portal. (Ex. B, ¶¶ 49-51.)

Plaintiffs establishes medical information may have been revealed by some of the URLs (such as the radiology report). But Shafiq also includes information that may not transmit medical information, such as page views and scrolls. For example, if Google Analytics tracked and sent to Google the fact that a patient's activity in the patient portal caused a "Download/Transmit" or "Health Record – Results" event, the transmission of that event information may not reveal either "content" under CIPA or "medical information" under CMIA. "Download/Transmit" and "Health Record – Results" appear not to contain patient search terms or anything about a patient's medical condition or treatment.

Further Plaintiffs did not submit evidence that merely logging into the patient portal transmits information in violation of CIPA or CMIA, or that each activity that a logged-in patient can do within the patient portal transmits information in violation of CIPA or CMIA. For example, when a patient pays a bill in the patient portal, does the payment result in the transmission of violative information? Because Plaintiffs did not address these questions, Plaintiffs did not establish that common questions predominate concerning this subclass.

**3. <u>Online Appointment Subclass</u>**

This subclass includes "All Class members who used Adventist Health's doctors.adventisthealth.org to schedule a health care appointment." Plaintiffs contend Defendant transmitted information revealing the identity of doctors when patients booked appointments on

02/18/2025

Defendant's website, citing Exhibit A paragraphs 44, 47-49, 81-107, and n. 127. (Motion at pp. 17, 20-21.)

Shafiq concludes Defendant's website transmitted to Google and Meta the fact that a patent booked an appointment with a specific provider. (Ex. A, ¶ 49.) Shafiq's evidence supporting this conclusion is an example of a URL – https://doctors.adventisthealth.org/book/1861318tt= dcf0011b-ab58-49cc-9377236ba7fe79fb&ut=8b566df9-27a5-421418be8-b00b81bb594&st= d8c68924-0ae5-4549-b9b2-6ceb4b22b3. (Ex. A at p. 52.) Obviously that URL on its face does not reveal the identity or specialty of a particular provider. A footnote states that clicking on that URL pulls up a webpage identifying a particular healthcare provider. (Ex. A at p. 52 n. 127.) While the URL cited above could allow someone to do some additional research (e.g., clicking on the link) to discover the identity of the healthcare provider, the URL on its own does not transmit medical information. Plaintiffs do not cite law that transmitting information that could lead to the discovery of medical information violates CMIA. Rather, "a breach of confidentiality under the CMIA requires a showing that an unauthorized party viewed the confidential information." (*Vigil v. Muir Medical Group IPA, Inc.* (2022) 84 Cal.App.5th 197, 213.) "The mere ability of an unauthorized party to access information cannot support a claim under section 56.101." (*Id.* at pp. 218-219.)

Plaintiffs have shown the ability to access medical information but not that a third party actually viewed the information by clicking on the URL link. That Google or Meta might have viewed the URL cited above does not mean that Google or Meta clicked on the URL, went to a website page, and thereby identified the particular provider. Nor do Plaintiffs show the URL cited above transmitted the content of a patient's communications under CIPA, rather than record information identifying a webpage. To the extent Plaintiffs contend that the process of booking appointments resulted in some URLs containing the providers' names being transmitted to third parties, then individual inquiry will be necessary to determine which bookings resulted in URLs containing an unreadable string of letters and numbers (like the one cited above) and which resulted in URLs containing particular names of providers being transmitted.

02/18/2025

While there are some common issues, individual issues predominate about whether (a) particular URLs transmitted information that third parties actually viewed and (b) particular URLs contained patients' search terms or provider names or merely transmitted record information identifying web pages.

**4. <u>Provider Search Subclass</u>**

This subclass covers "All Class members who used Adventist's Health's website to find a physician." Plaintiffs make the same argument regarding this subclass as the online appointment subclass. (Motion at pp. 17, 20-21.) In addition, Plaintiffs cite Exhibit M at paragraph 32 to argue that provider searches transmitted information to third parties. (Reply at p. 7.) Shafiq lists examples of URLs showing various search terms, such as "pregnancy," "breast cancer," "std," and "depression," and what appear to be provider names like "yamaguchi" and "mitchelle goettman." (Ex. M, ¶ 32.)

For the reasons discussed above in connection with the class, whether provider searches on Defendant's website revealed "content" under CIPA or "medical information" under CMIA depends on the particular search. Plaintiffs did not show that search terms are transmitted when a patient scrolls through a list of providers on the website or clicks on profiles. Also, if a patient searches by a provider name, that name does not reveal the patient's medical information. Instead, to try to figure out a patient's medical information – i.e., medical history, physical condition, or treatment – based solely on a doctor's name, a third party would need to do some additional research about the doctor's specialty. And the fact that a patient is searching for a doctor does not necessarily mean the doctor is for that patient. A patient searching for a doctor using "pediatrics" or "childhood vaccines" or "RSV" may be looking for a doctor for a baby or child. In other words, to determine whether a provider search reveals "content" or "medical information" requires determining whether the patient actually used search terms, and then requires reviewing each URL resulting from the search terms. Individual issues predominate.

**5. <u>Health Risk Assessment Form Subclass</u>**

This subclass includes "All Class members who submitted an online Health Risk Assessment Form to Adventist Health."

Plaintiffs contend Defendant employed tracking code on HRA forms resulting in notifications to Facebook and Google that HRA forms had been completed and the transmission of "full-string URLS" to Facebook and Google that "included a unique string of numbers that would allow anyone . . . to access the HRA reports' contents." (Motion at p. 21.) In support of these assertions, Plaintiffs cite Exhibit A at paragraphs 48-55, 79 and n.128. (*Ibid.*) At those paragraphs, Shafiq states Defendant shared information "about specific events such as 'HRA Report Accessed'" and URLs such as "https://quiz.adventisthealth.org/v3/c6c2ecf4-abec-4222-843a-65e83697f7b0/report/a2d7dfd4-c6fe-4c53-8d41-eacf4e4e87a0." (Ex. A, ¶¶ 48, 79 and pp. 52-53 n.128.)

It is questionable whether the fact that a person filled out an HRA reveals the contents of a patient's communications with Defendant or anything about the patient's physical or mental condition or treatment. On the other hand, the actual HRAs likely contain both contents of patients' communications and their medical information.

That Google and Facebook received URLs containing links to completed HRAs raises the issue whether Google and Facebook actually followed the links to the completed forms. The URL cited above containing a string of numbers and letters does not, on its face, reveal medical information. Rather it provides access to medical information. In *Vigil,* the court held that "a breach of confidentiality under the CMIA requires a showing that an unauthorized party viewed the confidential information." (*Vigil, supra*, 84 Cal.App.5th at p. 213.) Simply having access to the information is not enough. (*Id.* at pp. 218-219.) The court held that "a breach of confidentiality under the CMIA is an individualized issue" because each of the class members would need to show the third party, who had access, actually viewed the confidential information. (*Id.* at pp. 219, 220.) One way of showing this is evidence of use of the plaintiff's information sometime after the alleged unauthorized access, as well as evidence that the third party could not have obtained the confidential information some other way. (*Id.* at p. 222.) For example, class members could show that after they submitted HRAs, they received ads for health issues disclosed in the HRAs and that Facebook and Google could not have obtained that information from some source other than the HRAs. That requires person-by-person inquiry.

02/18/2025

In sum, while there are some common issues, there are also numerous individualized issues. Plaintiffs did not show the common issues predominate.

C. **Superiority and Manageability**

"In general, a class action is proper where it ' " 'provides small claimants with a method of obtaining redress' " ' and ' "when numerous parties suffer injury of insufficient size to warrant individual action." ' [Citations.] . . . [¶] In deciding whether a class action would be superior to individual lawsuits, 'the court will usually consider [four factors]: [¶] [(1)] The interest of each member in controlling his or her own case personally; [¶] [(2)] The difficulties, if any, that are likely to be encountered in managing a class action; [¶] [(3)] The nature and extent of any litigation by individual class members already in progress involving the same controversy; [and] [¶] [(4)] The desirability of consolidating all claims in a single action before a single court.' " (*Ali v. U.S.A. Cab. Ltd.* (2009) 176 Cal.App.4th 1333, 1353, quoting *Basurco v. 21st Century Ins. Co.* (2003) 108 Cal.App.4th 110, 120-21.)

"Class certification is appropriate only if . . . individual questions can be managed with an appropriate trial plan." (*Duran, supra*, 59 Cal.4th at p. 27.) " 'Trial courts must pay careful attention to manageability when deciding whether to certify a class action. In considering whether a class action is a superior device for resolving a controversy, the manageability of individual issues is just as important as the existence of common questions uniting the proposed class.' " (*McCleery v. Allstate Ins. Co.* (2019) 37 Cal.App.5th 434, 449-450, citations omitted.)

Plaintiffs assert that few class members have the time and resources to pursue their claims on an individual basis. (Motion at p. 25.) Plaintiffs cite no evidence in support of that assertion and do not state the value of the individual claims. Thus Plaintiffs did not show the superiority of a class action.

Plaintiffs did not address manageability of the individual questions identified above. For example, Plaintiffs did not discuss whether it is possible to filter website searches to find only those where URLs contain patients' search terms, whether page view information that does not contain search terms can be filtered out, whether some kind of statistical analysis could show the percentage of patients' activity in the patient portal that resulted in URLs containing medical

02/18/2025

information being sent to third parties, or whether there is a way to identify the URLs containing links to HRAs that third parties actually clicked on to view the HRAs. These are just some possibilities. There may be other ways to manage the individual issues, but Plaintiffs did not provide them.

While Plaintiffs' trial plan details common issues, it does not analyze how the individual issues can be managed. To give two examples, the trial plan states the following common issues: "Whether the baseline information transmitted by Google Analytics and the Facebook Meta Pixel constitutes 'contents'" under CIPA," and "Whether the baseline data constitutes 'medical information' under California's Confidentiality of Medical Information Act." (Trial Plan at pp. 3, 4.) The trial plan defines "baseline data as "including first party cookie identifiers, page view information, URLs, IP addresses, and user agent data." (*Id.* at p. 3.) As explained above, some of that "baseline data" (such as page view information and URLs) may or may not be "contents" or "medical information" depending on whether the data reveals patient's search terms, the descriptive quality of the search terms, and other characteristics. The trial plan does not explain how analyzing the different types of "baseline data" class member can be handled to determine which class members had their "contents" or "medical information" transmitted to a third party.

**D. <u>Typicality and Adequacy</u>**

The crux of the adequacy inquiry is whether the representative's "personal claim [is] inconsistent with the claims of other members of the class." (*J.P. Morgan & Co., Inc. v. Superior Court* (2003) 113 Cal.App.4th 195, 212.) "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." (*Seastrom v. Neways, Inc.* (2007) 149 Cal.App.4th 1496, 1502.)

Defendant argues Plaintiffs lack claims typical of the "subclasses they purport to represent." (Opposition at p. 9.) Defendant argues Janet Doe cannot represent the provider search subclass because she last used Defendant's provider search function before November 16, 2018, outside the four-year statute of limitations applicable to Plaintiffs' claims. (Opposition at p. 9.) Plaintiffs argue the statute of limitations did not begin to run until June 2022 with the publication

02/18/2025

of an article on the use of trackers on hospital websites. (Reply at pp. 3, 19.) However, Plaintiffs present no evidence that Janet Doe first learned about the issue when the article was published. Instead, Plaintiffs cite to the allegations in their unverified third amended complaint, which is not evidence. (Reply at p. 19.) Plaintiff Janet Doe also cites her own interrogatory responses to support her argument. (Reply at p. 3.) The responding party may not use an interrogatory response as evidence. (Code Civ. Proc., § 2030.410.) Thus, Plaintiffs did not show Janet Does is typical.

Defendant argues Jan Doe cannot represent the online appointment subclass because the "PMC online scheduling system" did not exist until 2020, after she last made an appointment through Defendant's mobile application in 2019. (Opposition at p. 9.) Jan Doe states she must have made an appointment through the website in 2021 because she attended a doctor's appointment on June 16, 2021. (Oct. 25, 2024 Jan Doe Decl., ¶ 2].) However, she does not state she made that appointment using Defendant's website, rather than, for example, by a phone call. Thus, Plaintiffs did not show Jan Does is typical.

Defendant argues James Doe cannot represent the class or patient portal subclass because he agreed to an arbitration provision and class action waiver in Defendant's terms of use for adventisthealth.org. (Opposition at pp. 9-10.) Plaintiffs deny James Doe agreed to the arbitration agreement presented, arguing he only reviewed the terms of use for the patient portal (myadventisthealth.org) which lack an arbitration clause, not the terms of use for the main website (adventisthealth.org) which contain an arbitration clause. (Reply at p. 2.) Defendant does not address the July 24, 2023 order denying a motion to compel arbitration. Defendants did not show James Doe agreed to arbitration and is therefore not typical.

For the reasons stated above, Plaintiffs' Motion for Class Certification is DENIED.

Dated: 2/14/2025

Laura Seigle

LAURA A. SEIGLE
JUDGE OF THE SUPERIOR COURT