1  LIVIA M. KISER (SBN 285411)
     *lkiser@kslaw.com*
2  JEFFREY HAMMER (SBN 264232)
     *jhammer@kslaw.com*
3  CRAIG H. BESSENGER (SBN 245787)
     *cbessenger@kslaw.com*
4  JAMES A. UNGER (SBN 325115)
     *junger@kslaw.com*
5  **KING & SPALDING LLP**
   633 West Fifth Street, Suite 1600
6  Los Angeles, California 90071
   Telephone:    +1 213 443 4355
7  Facsimile:    +1 213 443 4310

8  Attorneys for Defendant
   BETTERHELP, INC.

9

10              **UNITED STATES DISTRICT COURT**

11            **NORTHERN DISTRICT OF CALIFORNIA**

12

13 | **IN RE BETTERHELP, INC. DATA** | Case No. 3:23-cv-01033-RS
   | **DISCLOSURE CASES** |
14 |  |            REDACTED

15 | This Document Relates To: | **DEFENDANT BETTERHELP, INC.'S**
   |  | **OPPOSITION TO PLAINTIFFS'**
16 |  | **MOTION FOR CLASS**
   |  | **CERTIFICATION**
17 | All Cases/ |
   |  | Date:        November 20, 2025
18 |  | Time:        1:30 p.m.
   |  | Courtroom: 3
19 |  | Judge:      Hon. Richard Seeborg

20

21

22

23

24

25

26

27

28

1

**TABLE OF CONTENTS**

2

**Page(s)**

3    I.    INTRODUCTION ................................................................................................ 1

4    II.    FACTUAL BACKGROUND ............................................................................ 2

5          A.    With Consumer Consent, BetterHelp Shared Only Limited, *Anonymized*
                Information and Never Confidential Consumer Data. ............................ 2

6

7                (1)    Any Data Shared Via Pixel Depended on Individual User Choices. ........... 5

8                (2)    Mixpanel and Google Analytics Provide Back Office Functions. .............. 6

9          B.    BetterHelp Disclosed Its Use of Pixels and Obtained Consumer Consent. ............ 7

10               (1)    BetterHelp's Privacy Policy Evolved During the Proposed Class
                        Period. ........................................................................................... 7

11
12               (2)    BetterHelp Had Banner Disclosures, Which Also Changed Over
                        Time ............................................................................................. 8

13         C.    BetterHelp's Other Marketing Practices *vis-à-vis* Facebook Were Proper. ............. 9

14         D.    Plaintiffs' False Representations to the Court ............................................. 9

15         E.    Plaintiffs' Own Evidence Reveals the Misleading Nature of Their Claims .......... 11

16         F.    BetterHelp Was Never Subject to HIPAA. ................................................ 12

17         G.    Plaintiffs Have No Evidence of Harm ...................................................... 13

18               (1)    Plaintiffs' Technical Expert Is Unreliable with Irrelevant Opinions ......... 13

19               (2)    Plaintiffs' Damages Expert Is Unreliable with Irrelevant Opinions .......... 13

20    III.   BETTERHELP'S CONSENT ORDER AND THIS COPYCAT PROCEEDING ........... 14

21    IV.    LEGAL STANDARD ....................................................................................... 15

22    V.    ARGUMENT ................................................................................................... 15

23         A.    Plaintiffs' Evidence Shows Heterogeneity and a Host of Individualized
                Issues. .......................................................................................... 15

24
25         B.    Plaintiffs Do Not (and Cannot) Meet Their Burden Under Rule 23(a) ................ 17

26               (1)    Plaintiffs Fail to Establish Commonality. ......................................... 17

27

28

|  |  | a) | Whether Any Data Was Collected Depends On Each Consumer. .................................................................. 17 |
|  |  | b) | The Alleged Harms Misalign with Plaintiffs' Claimed Damages. ....................................................................... 19 |
|  | (2) | | Plaintiffs Fail to Establish Typicality. ........................................... 20 |
|  | (3) | | Plaintiffs and Their Counsel Are Inadequate. ........................... 21 |
|  | (4) | | Plaintiffs Fail to Establish Numerosity. ..................................... 22 |
| C. | | | Plaintiffs Do Not (and Cannot) Satisfy the Requirements of Rule 23(b)(3) .......... 22 |
|  | (1) | | Individual Questions Predominate Over Any Common Questions .......... 23 |
|  |  | a) | Persuasive Authority Supports Denying Certification. .................. 23 |
|  |  | b) | The Privacy Torts Demand Individual Inquiries. ............................ 26 |
|  |  | c) | The CIPA and ECPA Claims Require Individual Inquiries. ........... 28 |
|  |  | d) | Consent to and Scope of the Privacy Policy Is Individualized. .................................................................. 30 |
|  |  | e) | Material Differences in State Law Preclude a Nationwide Class. ........................................................................ 30 |
|  | (2) | | Plaintiffs' Claimed "Damages" Cannot Be Measured Classwide. .............. 34 |
|  |  | a) | Statutory damages cannot be established by common proof ......... 34 |
|  |  | b) | Plaintiffs Cannot Establish Actual Damages. ................................. 36 |
|  | (3) | | A Class Action Is Neither Manageable Nor Superior Under These Facts ..... 36 |
|  |  | a) | Plaintiffs Fail to Provide Any Trial Plan (Let Alone a Viable One). .................................................................... 36 |
|  |  | b) | The FTC Settlement Efficiently Resolved the Dispute. ................. 37 |
| VI. | | | CONCLUSION ........................................................................................................ 37 |

KING & SPALDING LLP
ATTORNEYS AT LAW
LOS ANGELES

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Allen v. Hylands, Inc.*,
2012 WL 1656750 (C. D. Cal. May 2, 2012) ........................................................................ 34

*Backhaut v. Apple Inc.*,
2015 WL 4776427 (N.D. Cal. Aug. 13, 2015) ..................................................................... 21

*Badella v. Deniro Mktg. LLC.*,
2011 WL 5358400 (N.D. Cal. Nov. 4, 2011) ....................................................................... 37

*Black Lives Matter Los Angeles v. City of Los Angeles*,
113 F.4th 1249 (9th Cir. 2024) ............................................................................. 20, 22, 24

*Bliss v. CoreCivic, Inc.*,
711 F. Supp. 3d 1233 (D. Nev. 2024) .................................................................................. 35

*Brazil v. Dole Packaged Foods, LLC*,
2014 WL 2466559 (N.D. Cal. May 30, 2014) .............................................................. 30, 34

*Bustillos v. W. Covina Corp. Fitness, Inc.*,
2022 WL 423396 (C.D. Cal. Jan. 3, 2022) .......................................................................... 20

*Buzayan v. City of Davis*,
927 F. Supp. 2d 893 (E.D. Cal. 2013) ................................................................................. 28

*Calhoun v. Google LLC*,
349 F.R.D. 588 (N.D. Cal. 2025) ........................................................................................ 21

*Calhoun v. Google LLC*,
526 F. Supp. 3d 605 (N.D. Cal. 2021) ................................................................................ 20

*Camenish v. Umpqua Bank*,
2024 WL 3186552 (N.D. Cal. June 25, 2024) .................................................................... 34

*Campbell v. Facebook Inc.*,
315 F.R.D. 250 (N.D. Cal. 2016) ........................................................................................ 35

*Cherkin v. PowerSchool Holdings, Inc.*,
2025 WL 844378 (N.D. Cal. Mar. 17, 2025) ...................................................................... 36

*Cimoli v. Alacer Corp.*,
587 F. Supp. 3d 978 (N.D. Cal. 2022) ................................................................................ 34

*Clay v. Am. Tobacco Co.*,
188 F.R.D. 483 (S.D. Ill. 1999)...................................................................................... 31

*Cline v. Reetz-Laiolo*,
329 F. Supp. 3d 1000 (N.D. Cal. 2018) ........................................................................ 35

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013) ........................................................................................................ 34

*Conde v. Sensa*,
2018 WL 4297056 (S.D. Cal. Sep. 10, 2018) .............................................................. 37

*Darisse v. Nest Labs, Inc.*,
2016 WL 4385849 (N.D. Cal. Aug. 15, 2016)........................................................ 32, 34

*Diamond Multimedia Sys., Inc. v. Super. Ct.*,
968 P.2d 539 (Cal. 1999) .............................................................................................. 33

*DirecTV, Inc. v. Huynh*,
2005 WL 5864467 (N.D. Cal. May 31, 2005) .............................................................. 35

*Doe v. Adv. Health Care Network*,
Case No. 22STCV36304 (Los Angeles Super. Ct. Dec. 19, 2024)........................................ 29

*Doe v. Kaiser Found. Health Plan, Inc.*,
2024 WL 1589982 (N.D. Cal. Apr. 11, 2024) ............................................................. 33

*Doe v. Meta Platforms, Inc.*,
690 F. Supp. 3d 1064 (N.D. Cal. 2023) ....................................................................... 36

*In re Facebook Priv. Litig.*,
2016 WL 4585817 (N.D. Cal. Sept. 2, 2016) ........................................................... 2, 25

*In re Facebook, Inc. Internet Tracking Litig.*,
956 F.3d 589 (9th Cir. 2020)........................................................................................ 36

*Forcellati v. Hylands, Inc.*,
2014 WL 1510264 (C.D. Cal. Apr. 9, 2014) ............................................................... 34

*Frasco v. Flo Health*,
349 F.R.D. 557, 569 (N. D. Cal. 2025) ........................................................... 25, 29, 36

*Gaudin v. Saxon Mortg. Servs., Inc.*,
297 F.R.D. 417 (N.D. Cal. 2013) ................................................................................. 23

*In re Google Inc. Gmail Litig.*,
2014 WL 1102660 (N.D. Cal. Mar. 18, 2014) ............................................................. 21

KING & SPALDING LLP
ATTORNEYS AT LAW
LOS ANGELES

BETTERHELP'S OPPOSITION TO
MOTION FOR CLASS CERTIFICATION

CASE NO. 3:23-cv-01033-RS

*In re Google, Inc. Priv. Policy Litig.*,
    58 F. Supp. 3d 968 (N.D. Cal. 2014) ........................................................................ 15, 18, 23

*Grace v. Apple, Inc.*,
    328 F.R.D. 320 (N.D. Cal. 2018) ................................................................................ 33

*In re Graphics*,
    527 F. Supp. 2d 1011 (N. D. Cal. 2007) ..................................................................... 28

*Griffith v. TikTok, Inc.*,
    2024 WL 4308813 (C.D. Cal. Sept. 9, 2024) ............................................................ 17, 24

*Gustafson v. BAC Home Loans Servicing, LP*,
    294 F.R.D. 529 (C.D. Cal. 2013) ................................................................................ 32, 33

*Hammerling v. Google LLC*,
    615 F. Supp. 3d 1069 (N.D. Cal. 2022) ...................................................................... 18

*Hanlon v. Chrysler Corp.*,
    150 F.3d 1011 (9th Cir. 1998) .................................................................................... 21

*In re Hulu Priv. Litig.*,
    2014 WL 2758598 (N.D. Cal. June 7, 2014) ............................................................ 18, 23, 24

*Imber-Gluck v. Google Inc.*,
    2015 WL 1522076 (N.D. Cal. Apr. 3, 2015) ............................................................. 2, 14, 37

*In re iPhone Application Litig.*,
    844 F. Supp. 2d 1040 (N.D. Cal. 2012) ..................................................................... 18

*Jancik v. WebMD LLC*,
    2025 WL 560705 (N.D. Ga. Feb. 20, 2025) .............................................................. 26

*Javier v. Assurance IQ, LLC*,
    649 F. Supp. 3d 891 (N.D. Cal. 2023) ....................................................................... 29

*Ji v. Naver Corp.*,
    2022 WL 4624898 (N.D. Cal. Sep. 30, 2022) ........................................................... 18

*Kain v. Bluemound E. Indus. Park, Inc.*,
    635 N.W.2d 640 (Wis. Ct. App. 2001) ...................................................................... 32

*Kamm v. Cal. City Dev. Co.*,
    509 F.2d 205 (9th Cir. 1975) ..................................................................................... 14, 37

*Katz-Lacabe v. Oracle Am., Inc.*,
    668 F. Supp. 3d 928 (N.D. Cal. 2023) ....................................................................... 33, 36

KING & SPALDING LLP
ATTORNEYS AT LAW
LOS ANGELES

BETTERHELP'S OPPOSITION TO
MOTION FOR CLASS CERTIFICATION

CASE NO. 3:23-cv-01033-RS

*Kishnani v. Royal Caribbean Cruises Ltd.*,
  2025 WL 1745726 (N.D. Cal. June 24, 2025) ........................................................ 18

*Konop v. Hawaiian Airlines, Inc.*,
  302 F.3d 868 (9th Cir. 2002) .................................................................................. 28

*Leyva v. Medline Indus. Inc.*,
  716 F.3d 510 (9th Cir. 2013) .................................................................................. 34

*Lineberry v. AddShoppers, Inc*,
  2025 WL 1533136 (N.D. Cal. May 29, 2025) ................................................... 21, 25

*Mangum v. Action Collective Serv., Inc.*,
  575 F.3d 935 (9th Cir. 2009) .................................................................................. 28

*Martinez v. D2C, LLC*,
  2024 WL 4367406 (S.D. Fla. Oct. 1, 2024) ........................................................... 22

*Mazza v. Am. Honda Motor Co.*,
  666 F.3d 581 (9th Cir. 2012) ............................................................................ *passim*

*McHugh v. Metro. Life Ins. Co.*,
  2023 WL 3318691 (C.D. Cal. Mar. 31, 2023) ........................................................ 20

*McKinnon v. Dollar Thrifty Auto. Grp., Inc.*,
  2013 WL 791457 (N.D. Cal. Mar. 4, 2013) ............................................................ 33

*Meyer v. Mittal*,
  2024 WL 4003509 (D. Or. Aug. 29, 2024) ............................................................. 35

*Moore v. Centerlake Med. Grp., Inc.*,
  83 Cal. App. 5th 515 (2022) ................................................................................... 36

*Ochoa v. Zeroo Gravity Games LLC*,
  2023 WL 4291650 (C.D. Cal. May 24, 2023) ......................................................... 31

*Oman v. Delta Air Lines, Inc.*,
  889 F.3d 1075, 1079 (9th Cir. 2018) ...................................................................... 34

*Opperman v. Path, Inc.*,
  2016 WL 3844326 (N.D. Cal. July 15, 2016) ..................................................... 31, 32

*Pardon v. Lara*,
  2018 WL 2213462 (E.D. Cal. May 11, 2018) ......................................................... 28

*Radcliffe v. Experian Info. Sols. Inc.*,
  715 F.3d 1157 (9th Cir. 2013) ................................................................................ 21

KING & SPALDING LLP
ATTORNEYS AT LAW
LOS ANGELES

BETTERHELP'S OPPOSITION TO
MOTION FOR CLASS CERTIFICATION

CASE NO. 3:23-cv-01033-RS

*Robbins v. Phillips 66 Co.*,
    343 F.R.D. 126 (N.D. Cal. 2022) (Seeborg, J.)................................................................. 17, 18

*Rodriguez v. Google*,
    2024 WL 380302 (N.D. Cal., Jan. 3, 2024) ........................................................................ 24

*Rodriguez v. Google LLC*,
    2024 WL 38302 (N.D. Cal. Jan. 3, 2025) ...................................................................... 26, 27

*Schmitt v. SN Servicing Corp.*,
    2021 WL 3493754 (N.D. Cal. Aug. 9, 2021) ..................................................................... 34

*Seale v. Peacock*,
    32 F.4th 1011 (10th Cir. 2022)........................................................................................... 35

*Sherman v. Yahoo! Inc.*,
    2015 WL 5604400 (S.D. Cal. Sept. 23, 2015) ............................................................. 20, 21

*Smith v. Facebook, Inc.*,
    262 F. Supp. 3d 943 (N.D. Cal. 2017) .............................................................................. 20

*Smith v. Facebook, Inc.*,
    745 F. App'x 8 (9th Cir. 2018) .......................................................................................... 20

*Torres v. Prudential Fin., Inc.*,
    2025 WL 1135088 (N.D. Cal. Apr. 17, 2025) .................................................................. 30

*In re Toyota Rav4 Hybrid Fuel Tank Litig.*,
    534 F. Supp. 3d 1067 (N.D. Cal. 2021) ....................................................................... 31, 32

*Tyson Foods, Inc. v. Bouaphakeo*,
    577 U.S. 442 (2016)........................................................................................................... 22

*United Steel Workers v. ConocoPhillips Co.*,
    593 F.3d 802 (9th Cir. 2010)............................................................................................. 15

*Valentino v. Carter-Wallace, Inc.*,
    97 F.3d 1227 (9th Cir. 1996)............................................................................................. 36

*Van Alstyne v. Elec. Scriptorium, Ltd.*,
    560 F.3d 199 (4th Cir. 2009)............................................................................................. 35

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) .............................................................................................. 1, 15, 17

*Wilson v. Frito-Lay N. Am., Inc.*,
    961 F. Supp. 2d 1134 (N.D. Cal. 2013) ............................................................................ 33

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

KING & SPALDING LLP
ATTORNEYS AT LAW
LOS ANGELES

BETTERHELP'S OPPOSITION TO
MOTION FOR CLASS CERTIFICATION

CASE NO. 3:23-cv-01033-RS

*In re Yahoo Mail*,
    308 F.R.D. 577 (N.D. Cal. 2015) ........................................................................... 31, 32, 33, 34

*Zackaria v. Wal-Mart Stores, Inc.*,
    2014 WL 11398759 (C.D. Cal. Feb. 21, 2014) ..................................................... 21

*In re Zynga Priv. Litig.*,
    750 F.3d 1098 (9th Cir. 2014) ............................................................................. 27

**Statutes**

18 U.S.C. § 2511 .................................................................................................... 20

18 U.S.C. § 2702 .................................................................................................... 20

Cal. Civ. Code § 1798.150 ..................................................................................... 35

Cal. Civ. Code § 3515 ............................................................................................ 20

Cal. Pen. Code § 631 .................................................................................... 20, 29, 30

**Other Authorities**

45 C.F.R. § 160.102 ................................................................................................ 12

45 C.F.R. § 160.103 ........................................................................................... 12, 13

Fed. R. Evid. 702 ..................................................................................................... 5

KING & SPALDING LLP
ATTORNEYS AT LAW
LOS ANGELES

BETTERHELP'S OPPOSITION TO
MOTION FOR CLASS CERTIFICATION

CASE NO. 3:23-cv-01033-RS

1

## **QUESTIONS PRESENTED**

2       Whether the Court should certify Plaintiffs' proposed Nationwide Class and subclasses,

3 where Plaintiffs have failed to proffer any evidence that proposed class members' confidential

4 information was shared and where resolving numerous disputed issues, including whether any

5 information was even collected (let alone shared), will require individualized inquiries for each

6 proposed class member.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

KING & SPALDING LLP
ATTORNEYS AT LAW
LOS ANGELES

BETTERHELP'S OPPOSITION TO
MOTION FOR CLASS CERTIFICATION

CASE NO. 3:23-cv-01033-RS

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.     INTRODUCTION

Rule 23 does not allow for certification of any proposed class in this case. To avoid this reality, Plaintiffs are counting on the Court accepting without proof their sensational claims that BetterHelp unlawfully disclosed protected health information or other confidential information (collectively "Confidential Consumer Data") to Facebook and other social media platforms. To be clear, BetterHelp never shared *any* consumers' health information with anyone, including "confidential interactions and communications" or "HIPAA-protected personally identifiable information and PHI" as Plaintiffs falsely claim. Plaintiffs must satisfy the required elements of Rule 23 with admissible evidence—not the mere *ipse dixit* of their lawyers and so-called "experts"—and the record here plainly demonstrates that a proceeding on behalf of any proposed class, no matter how defined, will not "generate common answers apt to drive the resolution of the litigation." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349-50 (2011).

BetterHelp is a technology platform created to make therapy more accessible by providing an online meeting space for (1) individuals seeking counseling and (2) licensed therapists. Plaintiffs concede, as they must, that BetterHelp did not disclose any confidential communications with therapists with anyone. Nor is this a case about HIPAA violations—BetterHelp is not a healthcare provider and at no time during the Proposed Class Period (*i.e.*, January 1, 2017 to March 7, 2023) did HIPAA apply to BetterHelp. Plaintiffs' claims focus on tiny pieces of software code known as "pixels" (a.k.a. third-party web beacons and cookies), which are ubiquitous on websites and often used to collect limited information from website visitors to measure the efficacy of digital ads. Whether pixels collect and share *any* information, however, depends on numerous contingencies, including choices by each website visitor as to the web browser and operating system used, browser and social media privacy settings, use of ad-blocking software, choice of devise, and giving social media platforms like Facebook permission to track off-Facebook activity when browsing the web.

Plaintiffs' testimony, and records produced by Meta itself, prove that how pixels on BetterHelp's website operated as to each Plaintiff (and by extension every proposed class member) depends on answers to these (and other) individual inquiries, rendering Plaintiffs' claims wholly

KING & SPALDING LLP
ATTORNEYS AT LAW
LOS ANGELES

BETTERHELP'S OPPOSITION TO                    CASE NO. 3:23-cv-01033-RS
MOTION FOR CLASS CERTIFICATION

unsuitable for class treatment. *In re Facebook Priv. Litig.*, 2016 WL 4585817, at *7-10 (N.D. Cal. Sept. 2, 2016) (denying class certification where alleged sharing of users' information could have been blocked or altered, preventing resolution by common proof). Other key issues, including the impact of consent and (lack of) damages, are equally dependent on individual inquiries, all of which confirm that Plaintiffs cannot meet the requirements of Rule 23(a), let alone demonstrate predominance or superiority under Rule 23(b). Notwithstanding this reality, immediately after BetterHelp reached a negotiated settlement with the FTC providing (without any admission of fault, findings of fact, or conclusions of law) permanent injunctive relief and a redress fund related to certain alleged marketing practices, Plaintiffs hastily filed putative class action lawsuits simply parroting the FTC's unproven allegations.

The Court has already recognized that Plaintiffs' "scattershot" consolidated complaint contained a "grab bag" of "not adequately pleaded" claims, several of which, including all requests for injunctive relief, the Court dismissed. *See* ECF No. 113. Plaintiffs now move for class certification on their remaining causes of action, even though the FTC and BetterHelp have agreed to a permanent injunction, with BetterHelp providing $7.8 million in redress to users who paid for its services. A class action is plainly not "superior" where (as here) there has already been an administrative or regulatory resolution. *See Imber-Gluck v. Google Inc.*, 2015 WL 1522076, at *3 (N.D. Cal. Apr. 3, 2015) (plaintiff failed to establish superiority because of prior FTC settlement). As set out further below, Plaintiffs demonstrably fail to meet their evidentiary burden under Rule 23 for a host of other reasons as well, and their motion for class certification is properly denied.

## II. FACTUAL BACKGROUND

### A. With Consumer Consent, BetterHelp Shared Only Limited, *Anonymized* Information and Never Confidential Consumer Data.

BetterHelp is an online platform that connects individuals with mental health professionals to receive counseling and therapy services in an online setting. Vaughan Decl. ¶ 2. Like virtually all internet-based companies, BetterHelp works with social media platforms (*e.g.*, Facebook) to market itself online. Facebook (like other social media platforms) directs advertising partners to install the Meta/Facebook Pixel to try to measure the "value" of the advertising (*i.e.*, for attribution purposes). Declaration of Niklas Vaughan ("Vaughan Decl.") ¶ 25; Report of Prof. Ben Zhao ("BZ

Rpt.") ¶ 19. More generally, a "pixel" is a small piece of software code on a website that can be used for many different purposes besides marketing measurement and attribution, including bot and fraud detection, and website analytics. Vaughan Decl. ¶ 11; BZ Rpt. ¶ 19. Pixel use in the digital age is ubiquitous—Plaintiffs' counsel and their technical expert's employer, for example, use pixels on their websites to collect information from (and about) visitors. BZ Rpt. ¶ 51.

BetterHelp's use of pixels provided by the social media platforms on which BetterHelp advertised was modest and conservative, and BetterHelp altered the pixels and other relevant settings in response to unilateral changes to the software code made by Facebook (among other reasons). Vaughan Decl. ¶¶ 12-14, 48; *see* Declaration of James A. Unger "Unger Decl.," Ex. A ("Honbarger Tr.") at 56:3-10. BetterHelp's use of digital advertising helped it reach consumers most interested in virtual therapy, enabling thousands of individuals to access mental health therapy who otherwise might not be aware that such a service existed. *Id*. at 118:4-7. Critically, BetterHelp never sold or monetized consumer data. Unger Decl., Ex. B., ("Matas Tr."). at 223:16-22.

Plaintiffs refer throughout their Motion to "Tracking Tools" generally, but this is inaccurate. Plaintiffs' technical expert, Professor Zubair Shafiq, opines as to just three entities—Mixpanel, Google Analytics, and Facebook[1]—only one of which (Facebook) is consumer-facing and requires using a pixel to measure ad conversions. With a few limited exceptions that do not apply to Plaintiffs, the Facebook Pixel captured only commodity-level information ("Common Digital Information"). Common Digital Information does not include "patient identifiers" as Plaintiffs claim (Mot. at 8), but rather is anonymized, standard device data, much of which automatically changes over time. Prof. Shafiq claims the Facebook Pixel captured the following Common Digital Information for every consumer who signed up on the BetterHelp platform (not correct), and he claims this Common Digital Information constitutes "patient identifiers" (also not correct):

| Data Category | What It Actually Is |
|---|---|
| | |

---

[1] Plaintiffs proffer no evidence that BetterHelp placed digital ads on any consumer-facing social media platform other than Facebook, so only Facebook is properly in issue for purposes of Plaintiffs' motion. As discussed *infra*, Mixpanel and Google Analytics are tools, no different from (for example) a cloud-based document management system a law firm might utilize to store documents and therefore are also not properly in issue. BZ Rpt. at ¶¶ 30-31.

KING & SPALDING LLP
ATTORNEYS AT LAW
LOS ANGELES

| | |
|---|---|
| **Device properties** | Metadata containing the default attributes and property tags of a device, e.g., language and time zone settings, operating system (OS) and browser versions, and notification opt-in status. It is far too common to identify a user—e.g., tens of millions of devices share the same 1920×1080 resolution or "en US" locale. BZ Rpt. ¶ 25; *but see* ECF No. 170-10, Report of Prof. Zubair Shafiq ("ZS Rpt.") ¶¶ 78, 94. |
| **Unique User Identifier (UUID)** | A 128-bit label used to uniquely identify objects in computer systems. A UUID is typically a string of numbers that does not personally identify anyone and is not tied to any particular person. BZ Rpt. ¶ 25; *but see* ZS Rpt. ¶ 29. |
| **User-agent string** | Indicates browser/OS version (e.g., "Chrome 123 on Windows 11"). All browsers send this header by design; it is neither unique nor static (it changes when users update software). On its own (or even combined with other data described in this table) it cannot identify an individual. Beginning in May 2021, Google began limiting the amount of information contained in a user-agent string sent through the Chrome browser. BZ Rpt. ¶ 25; *but see* ZS Rpt. ¶¶ 31, 94. |
| **Third-party cookies** | A third-party cookie can be set when a link is clicked on one website to navigate to another website. A pixel is a type of third-party cookie. Consumers can block these in a variety of ways, as discussed *infra*. BZ Rpt. ¶ 25. |
| **IP address** | IP addresses reveal, at best, a geographic region or internet service provider ("ISP"). Households share a router; VPNs mask true IPs; mobile carriers use Carrier Grade Network Address Translation ("CG-NAT"). Linking an IP to a person generally requires a subpoena to the ISP. Advertisers use IP addresses mainly for coarse geolocation and fraud checks—not as a personal identifier. During the Proposed Class Period, virtually all major operating systems supported IPv6 temporary addresses (masking the actual IP address), and this privacy feature was often enabled by default. BZ Rpt. ¶ 25; *but see* ZS Rpt. ¶¶ 31, 92. |
| **URLs of pages visited** | Every website logs its own URLs in ordinary server access logs; third-party tags also capture URLs so advertisers can measure which pages perform best. BetterHelp's public pages use neutral URL path names that do not embed answers or diagnoses in the URL, so *no sensitive content is ever exposed* via a URL on the BetterHelp website. BZ Rpt. ¶ 25; *but see* ZS Rpt. ¶¶ 13, 60(a). |

As should be evident to the Court, there is a profound mismatch between the information Plaintiffs claim BetterHelp wrongfully disclosed (e.g., Mot. at 7 (claiming "Tracking Tools" "uniformly and secretly captured their identities, confidential interactions, and communications, along with their HIPAA-protected personally identifiable information and PHI"); id. at 8 (third parties allegedly collected whether users had previously received therapy, users' financial condition, users' relationship status, and whether they were suicidal)) versus the actual categories of data Prof. Shafiq admits are in issue and as compared to the so-called "value" of (still different) data that Plaintiffs' so-called "damages" expert claims he is measuring. See supra and at ZS Rpt.

¶ 37 (identifying cookies, IP addresses, user-agent, device properties, URL, and page title as data at issue); Krause Rpt. ¶ 65 (including email addresses in purported damages valuation).

### (1)    *Any Data Shared Via Pixel Depended on Individual User Choices.*

Whether any data (or no data at all) was shared by the Facebook Pixel (or any pixel) depended on a myriad of choices within the control of individual consumers. BZ Rpt. ¶ 35. Prof. Shafiq fails to account for these undisputed realities in his opinions, one key reason his opinions are unreliable and properly excluded under Fed. R. Evid. 702.

| BetterHelp User Choices | Impact on Data Shared Via Pixel |
|---|---|
| **Has no Facebook account** | If the user does not have a Facebook cookie (*e.g.*, user is not a Facebook account holder, or is not logged into Facebook, or browser blocks third-party cookies), the Facebook cookie will not load in the user's browser. BZ Rpt. ¶ 36. |
| **Has Facebook account, but is not logged into Facebook when visiting BetterHelp, or cleared cookies** | A third party cannot recognize a BetterHelp user from pixel data unless the user is already known to the third party (*e.g.*, by having an account). If a BetterHelp user was not logged into Facebook when visiting BetterHelp, and the user cleared cookies, Facebook could not connect data received to the user. *Id.* |
| **Uses different email addresses (1) to register for Facebook and (2) for BetterHelp sign up** | There is no evidence that hashed emails were shared with Facebook via the Pixel, nor is there any evidence that Facebook "resolved" hashed emails. In any event, Facebook would not be able to connect a hashed email address from BetterHelp to a hashed email address in Facebook's records if a Facebook user signed up for BetterHelp using a different email address or utilized an ad blocker (see *infra*). BZ Rpt. ¶ 36. |
| **Uses a browser that blocks third-party cookies (*e.g.*, Safari or Firefox)** | Pixels would not capture any information if the browser blocked third-party cookies. Unger Decl., Ex. C "(Shafiq Tr.") at 276:8-14; 302:14-16; BZ Rpt. ¶ 40 (citing Shafiq publication). ████████████████████████████████ |
| **Uses Safari's Intelligent Tracking Prevention (ITP)** | Safari blocks or purges many third-party cookies automatically. Safari and other privacy-oriented browsers will treat Facebook Pixel requests as coming from a known tracker and would either block or severely limit them. This means Safari users or others with strict settings likely would not send any meaningful cookie identifiers through pixels. BZ Rpt. ¶ 36. |
| **Uses ad blockers (such as uBlock Origin, Privacy Badger, or built-in browser tracking** | Ad blockers can completely prevent a pixel from loading or its data from leaving the browser and can be configured to block communication with domains like facebook.com or google-analytics.com, meaning no data would be sent to third parties, as |

KING & SPALDING LLP
ATTORNEYS AT LAW
LOS ANGELES

5

BETTERHELP'S OPPOSITION TO
MOTION FOR CLASS CERTIFICATION

CASE NO. 3:23-cv-01033-RS

| | |
|---|---|
| **protection modes)** | Prof. Shafiq admitted. Shafiq Tr. at 285:19-287:3. Many internet users employ ad-blocking or anti-tracking browser extensions. BZ Rpt. ¶ 36. |
| **Has a dynamic IP address** | Virtually *all* IP addresses in the United States are dynamic, obfuscated, or shared by many consumers. Residential IP addresses change over time, and mobile carrier IP addresses are shared by thousands of users. In corporate or university networks, people may share a handful of external IP addresses. Therefore, an IP address alone cannot identify a single individual. *Id.* |
| **Uses a virtual private network ("VPN")** | Just over 30% of internet users regularly use VPNs, which alter or conceal a user's data by, for example, masking a real IP address with a different IP address. *Id.* |
| **Adjusts browser settings to limit data sharing** | Modifying permission settings on mobile devices and in browsers limits the amount of data shared. BetterHelp informed its users that they could change their browser settings to block cookies. *See* Section II.B.1, *infra.* |
| **Regularly clears cookies** | Clearing cookies precludes or limits social media sites from being able to track a user's online activity. *Id.* |
| **Uses Facebook settings to limit Facebook's ability to track off-Facebook activity** | Consumers can change Facebook permissions to prevent tracking them online, including websites visited and actions taken on those sites. Doing so would prevent Facebook from knowing (for example) whether a Facebook member clicked on the BetterHelp website. *Id.*; *see also* Unger Decl., Ex. G ("Jane Doe I Tr.") at 169:2-4, 172:2-11. |
| **Uses BetterHelp's settings to manage privacy preferences** | Users had various privacy options on BetterHelp's website. Prior to 2021, BetterHelp informed users that they could use their browser controls to limit tracking. In 2021, BetterHelp introduced a more explicit cookie consent mechanism, allowing users to manage preferences on the site. Vaughan Decl. ¶¶ 25-28, Ex. M. |

### (2)   *Mixpanel and Google Analytics Provide Back Office Functions.*

Plaintiffs claim that BetterHelp's use of Mixpanel and Google Analytics harmed them. Mot. at 14-15. Not so: that is like saying a therapist's use of Microsoft Word to keep notes "harms" their patients because their confidential information is put into the program. Mixpanel, like Microsoft Word, is a software tool. Mixpanel is not a social media platform, does not advertise to consumers, and consumers do not "join," "use," or otherwise become members of Mixpanel (as Prof. Shafiq admitted at his deposition). BZ Rpt. ¶ 50. Rather, Mixpanel is software that collects, measures, analyzes, and reports data related to website usage *to the website owner* (here, BetterHelp). Vaughan Decl. ¶ 42, Ex. O at BH000077. Mixpanel is obligated to keep confidential the information shared with it by BetterHelp and cannot use it for any purpose. *Id.* ("Mixpanel does

not sell, lease, rent or otherwise share for consideration Customer Content.").

Google Analytics is a common business tool similar to Mixpanel (BZ Rpt. ¶ 51) that uses standard web metrics to provide insights for entities with an online presence like BetterHelp (as well as Plaintiffs' counsel and Prof. Shafiq's university, U.C. Davis). *Id.* Beginning in 2022, when BetterHelp began using Google Analytics 4, it did not log or store IP addresses. BZ Rpt. ¶ 52. Google Analytics is bound by contract not to share any information provided to it with third parties. Google Analytics expressly forbids sharing any confidential information with it, and BetterHelp never shared any confidential information with Google Analytics. Vaughan Decl., Ex. P.

## B.    BetterHelp Disclosed Its Use of Pixels and Obtained Consumer Consent.

At all relevant times, BetterHelp had a Privacy Policy on its website that expressly disclosed its use of third-party "cookies and web beacons," *i.e.*, pixels, and that these would be used to share certain anonymized user information with third parties. Although the Privacy Policy evolved over time, throughout the Proposed Class Period it truthfully explained what a pixel is and how it functions. In September 2020, BetterHelp also began using banners to disclose its use of pixels.

### (1)    *BetterHelp's Privacy Policy Evolved During the Proposed Class Period.*

BetterHelp's Privacy Policy (and how it changed during the Proposed Class Period) is set out in the table below. The Privacy Policy was expressly incorporated into BetterHelp's Terms of Service and also hyperlinked at the bottom of the user's view of BetterHelp's webpage. Vaughan Decl. ¶ 22. BetterHelp also required users to agree to the Terms of Service and Privacy Policy when signing up for the service and also when they were updated. *Id.* Beginning in September 2020, the Privacy Policy was also made available via a banner on BetterHelp's website. Throughout the Proposed Class Period, the Privacy Policy informed users that, "[l]ike many websites," BetterHelp uses "'cookies' and 'web beacons' to collect information" (Vaughan Decl. ¶ 25, Ex. D at BH0000591 (defining "web beacon" as "a tiny image, placed on a Web page or e-mail that can report your visit or use"); *id.* Ex. E at BH0000601; *id.* Ex. F at BH0000611; *id.* Ex. G at BH0000620; *id.* Ex. H at BH0000629; *id.* Ex. I at BH0000642, and that users could change their web browser settings to stop accepting cookies, *e.g.*, *id.* Ex. D at BH00005991.

Following is a non-exclusive sample of relevant Privacy Policy provisions over time:

| Date Range | Privacy Policy Disclosures |
|---|---|
| Jan. 1, 2017 – Nov. 13, 2018 | The website "may also include the use of cookies and web beacons of services owned or provided by third parties . . . ." Vaughan Decl., Ex. D at BH0000591, 600. |
| Sept. 17, 2019 – Dec. 30, 2019 | Certain user information, *e.g.*, "personally identifiable information," "billing and payment information," IP address, and "pages that you visit and the amount of time spent on those pages," may be used to "Market the Platform and Counselor Services to you." *Id.* at Ex. G at BH0000619 at 621. |
| Apr. 29, 2021 – Nov. 9, 2021 | Under bold heading: "Purposes for Which Information is Used," included "[c]ustomization and marketing," e.g., to "advertise and market the Platform . . . to potential users" and, as stated in earlier versions, to send "targeted offers and ads" through "third-party sites." *Id.* at Ex. J at BH0003648. |
| Nov. 10, 2021 – Nov. 21, 2022 | "Due to the use of cookies and web beacons, information regarding your activity on our websites, excluding activity when you are logged in and have started therapy, may be disclosed to our advertising partners to optimize marketing. . . . If you want to opt out of these cookies and web beacons, manage your options here." *Id.* at Ex. K at BH0085420. |
| Nov. 22, 2022 – Mar. 7, 2023 | "[W]e advertise on some Third-Party web properties (for example, Third-Party websites and apps). . . . [I]f you opt in to targeting cookies and web beacons, your IP address, Third-Party identifier (if applicable), Checkout Flow Data (if applicable) and/or some Visitor Data (like the fact of you 'viewing a page'), excluding activity when you're logged in and have started therapy, may be shared for advertising purposes. As a result, you may see ads for our services on some Third-Party websites." *Id.* at Ex. L at BH0085439. |

**(2)    *BetterHelp Had Banner Disclosures, Which Also Changed Over Time***

Beginning in September 2020, BetterHelp added a pop-up banner disclosing BetterHelp's use of pixels and a link to the Privacy Policy, which appeared with every question of the Intake Questionnaire until users clicked a button indicating their consent, and which changed over time:

| Date | Banner Text |
|---|---|
| Sept. 30, 2020 | "We use cookies to help the site function properly, analyze usage, and measure the effectiveness of our ads. We never sell or rent any information you share with us. Read our Privacy Policy to learn more." "Privacy Policy" was hyperlinked and accompanied by "OK" button. Vaughan Decl., Ex. M. |
| April 23, 2021 | "We use BetterHelp and third-party cookies and web beacons to help the site function properly, analyze usage, and measure the effectiveness of our ads. Read our Privacy Policy to learn more." "Privacy Policy" was hyperlinked, and it was accompanied by "OK" button. *Id.* |
| Jan. 22, 2022 | "We use our own and third-party cookies and web beacons to help the site function properly, analyze usage, and for marketing purposes. Your IP address and third party identifier may be shared with advertising partners to help us deliver more relevant ads. By clicking 'I Agree', you agree to the use of cookies and web beacons to collect information on and off this site as described here. To update your settings or opt out, go to 'Cookie Settings'. To learn more read our Privacy Policy." "Privacy Policy" and "Cookie Settings" were hyperlinked. *Id.* |
| Feb. 9, 2023 | "We use our own and third-party cookies and web beacons to deliver a faster and safer experience, to monitor and analyze usage, to comply with laws, and for advertising purposes. By clicking 'I Agree', you agree that data such as your IP address and third party identifier may be shared with advertising |

KING & SPALDING LLP
ATTORNEYS AT LAW
LOS ANGELES

BETTERHELP'S OPPOSITION TO
MOTION FOR CLASS CERTIFICATION

CASE NO. 3:23-cv-01033-RS

partners may be shared with advertising partners to help us deliver more relevant ads.  To update your settings or opt out, go to 'Cookie Settings'. To learn more read our Privacy Policy." "Privacy Policy" and "Cookie Settings" were hyperlinked.  *Id.*

### C.    BetterHelp's Other Marketing Practices *vis-à-vis* Facebook Were Proper.

For a limited period, BetterHelp periodically provided hashed email addresses to Facebook to create "custom audiences" in connection with BetterHelp's digital advertising strategy advertising. Honbarger Tr. at 79:1-4, 83:8-11. "Hashing" is an encryption device that converts readable text, such as an email address, into a unique string of indecipherable characters. BZ Rpt. ¶ 57. Hashing is extremely difficult (if even possible) for a third party to reverse, providing a secure method of transferring information, and potentially allows for more useful but still privacy-friendly advertising. BZ Rpt. ¶ 57. BetterHelp did not share any additional user information with the hashed email addresses (contrary to Plaintiffs' false claims). Honbarger Tr. at 91:10-11.

Even if Facebook theoretically could match the hashed email addresses of BetterHelp users to the email addresses of Facebook users—which would require (at a minimum) that individuals used identical email addresses for their Facebook and BetterHelp accounts—there is no evidence Facebook ever did so, or that it used the hashed email addresses for any purpose other than creating custom audiences for BetterHelp. BZ Rpt. ¶ 36. BetterHelp had no reason to believe that Facebook ever attempted to compare the hashed email addresses to identify Facebook users (or otherwise tried to "match" such email addresses to try to reverse them). Vaughan Decl. ¶ 39. Plaintiffs falsely claim that BetterHelp "consistently" provided Facebook with the email addresses of BetterHelp users who had completed the Intake Questionnaire (Mot. 10) when they know that only hashed emails were provided and for only a limited time and that hashed emails are nothing but a randomized string of characters that reveal nothing (let alone a user's identity).

### D.    Plaintiffs' False Representations to the Court

Plaintiffs make other demonstrably untrue claims in their motion. For example, Plaintiffs claim that the amount and type of information available to Facebook was somehow entirely dependent upon how BetterHelp "implemented" the Facebook Pixel. Mot. at 16. This is demonstrably false. From January 1, 2017 through December 30, 2021, Facebook frequently

changed its software code without informing BetterHelp, adding events, data elements, and other features that potentially impacted information Facebook tried to collect via its Pixel. BZ Rpt. ¶ 62. BetterHelp actually *prevented* Facebook from collecting more information when it discovered Facebook's conduct. BZ Rpt. ¶ 98; Vaughan Decl. ¶ 48.

Desperate to pin Facebook's conduct on BetterHelp, Plaintiffs claim that BetterHelp disclosed button-click information and Intake Questionnaire responses to Facebook (*e.g.*, Mot. at 9, 20) based on Prof. Shafiq's cherry-picked analysis of BetterHelp's website on a single day, March 2, 2021. *See* ZS Rpt. ¶ 68. Plaintiffs falsely claim BetterHelp's website was identically configured during the entire Class Period (Mot. at 19), but that is also demonstrably false. What's true is that: (1) on February 23, 2021, Facebook changed the software code in the Facebook Pixel, *without telling BetterHelp*, to collect more data (*i.e.*, the information reflected on certain buttons in the Intake Questionnaire), BZ Rpt. ¶¶ 84-100; Vaughan Decl., ¶¶ 46-47; and (2) on March 12, 2021, as soon as BetterHelp discovered this change to the Facebook Pixel, BetterHelp implemented its own changes to prevent collection of that data. BZ Rpt. ¶ 98; Vaughan Decl. ¶ 48.

Notably, no Plaintiff signed up for BetterHelp or used its service from February 23, 2021 to March 12, 2021, so they were not affected in any way by Facebook's change. FACC ¶¶ 25-31 Even during this brief period, Facebook collected only certain answers to questions—*not* the Intake Questionnaire questions themselves (contrary to Prof. Shafiq's misleading report)—and thus could not have discerned the import of the data, even if it had tried to do so (and there is no evidence Facebook ever did). BZ Rpt. ¶¶ 84, 91; 72-77. Plaintiffs' expert also falsely claims that BetterHelp used Facebook's Advanced Matching feature to share BetterHelp users' names, phone numbers, and zip code information (ZS Rpt. ¶ 53), but analysis of the relevant code confirms that BetterHelp's website was *never* configured to share this information. BZ Rpt. ¶¶ 102-03.

As discussed *supra*, BetterHelp never disclosed Confidential Customer Data, and consumers had numerous options throughout the Proposed Class Period to prevent disclosure of even their Common Digital Information. In another patently false representation, Plaintiffs claim that different browsers have no impact on what information is shared. Mot. at 11. This is not true, as even Prof. Shafiq admitted at his deposition and publicly in a published article (but said

KING & SPALDING LLP
ATTORNEYS AT LAW
LOS ANGELES

10

BETTERHELP'S OPPOSITION TO
MOTION FOR CLASS CERTIFICATION

CASE NO. 3:23-cv-01033-RS

1  otherwise, falsely, in his report in this case). *Compare* Shafiq Tr. at 286:25-287:12; 302:14-16;

2  Shafiq, et al., *CookieGraph*, at 2 *with* ZS Rpt. ¶ 59.



10      **E.    Plaintiffs' Own Evidence Reveals the Misleading Nature of Their Claims**

11          Plaintiffs' evidence makes clear that completing BetterHelp's Intake Questionnaire and

12  providing an email address (as Plaintiffs have defined membership in their Proposed Classes) says

13  nothing about whether a BetterHelp user had *any* information shared without consent, much less

14  any confidential information. Even among Plaintiffs, privacy and browsing practices varied

15  significantly, and those variations had a material impact on whether their information was shared

16  with (for example) Facebook. They fail to disclose this key evidence to the Court, but it entirely

17  undermines their position.

25  Most tellingly, documents

26  provided by Meta in discovery reflect that Meta possessed *no information* about Plaintiffs Doe III

27

28
_____
[2] Plaintiffs also maintained different social media accounts and had different practices for logging in and out of social media accounts, all choices within their control that could possibly have impacted what they shared with (for example) Facebook. *See infra*, Section V.A.

and T.R, and only certain limited information about Plaintiffs S.C., Jane Doe I, L.M., and R.S., again due to their own privacy choices, which is consistent with the opinions of BetterHelp's technical expert that information collected depends on individualized user choices.[3] Tusan Decl., Ex. 41 (Meta production); BZ Rpt. ¶ 47.

### F.    BetterHelp Was Never Subject to HIPAA.

Desperate to manufacture any basis for liability, Plaintiffs falsely claim that BetterHelp is "a healthcare provider" subject to the Health Insurance Portability and Accountability Act ("HIPAA"). Mot. at 12-13. But during the Proposed Class Period, BetterHelp was *not* a "covered entity" under HIPPA, meaning a "health care provider who transmits [] health information in electronic form in connection with a transaction covered by" HIPAA. 45 C.F.R. §§ 160.102(a), 160.103; *see* FACC ¶ 106 (citing 45 C.F.R. § 160.102). Specifically, BetterHelp did not accept insurance or submit health care claims for reimbursement and did not coordinate benefits or check a patient's eligibility for reimbursement. Vaughan Decl. ¶ 31. BetterHelp only allowed users to pay with credit cards or other online payment methods. Vaughan Decl. ¶ 30. Plaintiffs admit this is true: they paid BetterHelp directly and BetterHelp did not submit any insurance claim on their behalf. (Unger Decl., Exs. DD-HH.) BetterHelp did not conduct "transactions" covered by HIPAA, such as "[h]ealth care claims"; "[h]ealth care payment and remittance advice"; or "[c]oordination of benefits." Declaration of Andrew Mahler ("Mahler Decl.") ¶¶ 5, 10; *see also* 45 C.F.R. § 160.103 (defining "transaction"). Plaintiffs do not, and cannot, present any contrary evidence. Nor have Plaintiffs alleged (or submitted any evidence) that BetterHelp is a HIPAA "business associate"— *i.e.*, a person who handles protected health information on behalf of a covered entity for a HIPAA-covered function or activity. Mahler Decl. ¶¶ 4, 6, 11; *see* 45 C.F.R. § 160.103. BetterHelp has never performed any services involving protected health information for a HIPAA-covered function or activity for <u>anyone</u>, including independent contractor therapists. Vaughan Decl. ¶ 36. BetterHelp provides only a technology platform and service offerings to therapists, such as marketing, none of which are subject to HIPAA. *Id.* ¶ 34. Under no scenario would BetterHelp's

---

[3]  Plaintiffs' counsel has represented that R.S. will no longer serve as a proposed class representative, but the operative complaint has not yet been amended to reflect this change.

KING & SPALDING LLP
ATTORNEYS AT LAW
LOS ANGELES

12

BETTERHELP'S OPPOSITION TO
MOTION FOR CLASS CERTIFICATION

CASE NO. 3:23-cv-01033-RS

1    conduct have been regulated under HIPAA. Mahler Decl. ¶¶ 8-10; 45 C.F.R. § 160.103.[4]

2    **G.    Plaintiffs Have No Evidence of Harm**

3    **(1)    *Plaintiffs' Technical Expert Is Unreliable with Irrelevant Opinions***

4    Plaintiffs' bid for class certification relies on their technical "expert," Prof. Shafiq, whose

5    opinions should be excluded, including because he cherrypicked limited dates to test BetterHelp's

6    website, analyzed one day with anomalous activity using the Chrome browser and a laptop and

7    extrapolated his findings to the entire six-year Proposed Class Period ███████████████████

8    ████████████████████████████████████████████████████████████████████

9    ████████████████████████████████████████████████████████████████████

10   ███████████████████████████████████████████ See Motion to

11   Exclude (ECF No. 205). Prof. Shafiq also opines, falsely, that a user's privacy practices and

12   technology choices do not impact the information shared via pixels, which is demonstrably untrue;

13   ignores BetterHelp's Privacy Policy, which plainly disclosed the use of pixels; and relies on an

14   irrelevant, untested, and unreliable "entropy" theory to conclude that Facebook and Google could

15   identify BetterHelp users based on small amounts of anonymous information (and even suggests

16   that if Facebook and Google did so, it would be BetterHelp's fault).

17   **(2)    *Plaintiffs' Damages Expert Is Unreliable with Irrelevant Opinions***

18   Plaintiffs' damages expert, Eric Krause, estimated that the Proposed Classes suffered

19   approximately ███████████████████████████████████████████████████████

20   ██████████████████████████████ ECF 170-11 ¶ 62. Mr. Krause's opinions should be excluded,

21   including because he attempted to value information that is not even at issue, namely, personal

22   information contained in BetterHelp account profiles. *See* Motion to Exclude (ECF No. 204).

23   ████████████████████████████████████████████████████████████████████

24   ████████████████████████████████████████████████████████████████████

25

---

26   [4] Plaintiffs cite to a business associate agreement, but BetterHelp used it for a limited period and
     only "to the extent the Services create[d] a business associate relationship between the parties."

27   Tusan Decl., Ex. 33 at 1. Entering into such an agreement is standard practice and does not *make*
     BetterHelp subject to HIPAA, which instead depends on services provided to a given therapist and

28   whether that therapist is covered under HIPAA. Mahler Decl. at ¶ 12. As noted above, BetterHelp
     provided no such services to anyone. Vaughan Decl. at ¶ 36; 45 C.F.R. §§ 160.102(a), 160.103.

1

2

3

4

5 **III.    BETTERHELP'S CONSENT ORDER AND THIS COPYCAT PROCEEDING**

6    As noted, BetterHelp and the FTC entered a Consent Order, which the FTC approved on

7 March 2, 2023. ECF No. 76-2 ("Consent Order"). The Consent Order does not include any findings

8 of facts or conclusions of law, and BetterHelp did not admit to any allegations included therein (to

9 the contrary, it denied liability). As part of the Consent Order, BetterHelp agreed to pay $7.8 million

10 to the FTC to use for redress to "Customers," defined as consumers who "between August 1, 2017,

11 and December 31, 2020, signed up for and paid for the use of" any BetterHelp service. Consent

12 Order at 8-9 (Definitions); *id.* at §§ XI (Monetary Relief), XIII (Independent Redress

13 Administrator). To date, at least 534,130 consumers have accepted redress funds. Vaughan Decl.

14 ¶ 49, Ex. W. The Consent Order also provides for injunctive relief regarding BetterHelp's alleged

15 use and disclosure of consumer information. *Id.* at §§ I-II, III.A-B, III.F, IV.B, VI.E.[5] This

16 resolution, however, renders these proceedings wasteful and superfluous as consumers in the

17 Proposed Classes have already received monetary compensation. *See Kamm v. Cal. City Dev. Co.*,

18 509 F.2d 205, 211 (9th Cir. 1975); *Imber-Gluck*, 2015 WL 1522076, at *3.

19    Plaintiffs subsequently parroted the FTC's allegations and initially brought twelve claims.

20 After two motions to dismiss, the following claims remain: (i) Invasion of Privacy; (ii) Breach of

21 Implied Contract; (iii) Unjust Enrichment; (iv) Violation of the Federal Wiretap Act ("FWA"); (v)

22 Violation of the Stored Communications Act ("SCA"); (vi) Violation of the California Invasion of

23 Privacy Act ("CIPA"); (vii) Violation of the California Consumer Legal Remedies Act ("CLRA");

24 (viii) Violation of California Constitution (Invasion of Privacy); (ix) Violation of California

25 Consumer Privacy Act ("CCPA"); and (x) Violation of California Unfair Competition Law

26 ("UCL"). *See* First Amended Consolidated Class Action Complaint (ECF No. 114).

27

28

---

[5] BetterHelp subsequently corrected certain information initially provided to the FTC, because additional analysis showed that less consumer information had been shared than previously believed. Vaughan Decl. at ¶ 49.

1    Plaintiffs now seek certification of the following Proposed Classes (Notice of Motion at 1):

2    **Nationwide Class**: All individuals residing in the United States who, during the period

3    beginning January 1, 2017, and continuing through March 7, 2023 (the "Proposed Class Period"),

4    completed the BetterHelp Intake Questionnaire and provided BetterHelp with their email address.

5    **Nationwide User Subclass**: All individuals residing in the United States who, during the

6    Class Period, completed the BetterHelp Intake Questionnaire, provided BetterHelp with their email

7    address, and paid BetterHelp for services.

8    **California Subclass**: All individuals residing in California who, during the Class Period,

9    completed the BetterHelp Intake Questionnaire and provided BetterHelp with their email address.

10    Plaintiffs further allege that BetterHelp disclosed the following user information without

11    permission: (1) email address; (2) IP address; (3) device properties (including user-agent strings);

12    (4) URLs visited on BetterHelp's website; and (5) certain responses to BetterHelp's Intake

13    Questionnaire (but not the corresponding questions).[6] (Mot. at 7-9.) Plaintiffs misstate the evidence,

14    their claims are wholly unsuitable for class treatment, and their motion is properly denied.

15    **IV.    LEGAL STANDARD**

16    The party seeking class certification bears the burden of demonstrating based on a

17    preponderance of the evidence that the requirements of Rules 23(a) and (b) are met. *United Steel*

18    *Workers v. ConocoPhillips Co.*, 593 F.3d 802, 807 (9th Cir. 2010). "A party seeking class

19    certification must affirmatively demonstrate [] compliance with the Rule [and] be prepared to prove

20    that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Wal-*

21    *Mart*, 564 U.S. at 350.

22    **V.    ARGUMENT**

23    **A.    Plaintiffs' Evidence Shows Heterogeneity and a Host of Individualized Issues.**

24    Plaintiffs' own individualized issues demonstrate how unsuitable their claims are for class

25    treatment. ███████████████████████████████████████████████████

26    ███████████████████████████████████████████████████████████

27

---

[6] As discussed further *infra*, consumers have no privacy interest in IP addresses, device properties, and basic URLs, and the "disclosure of common, basic digital information" is not a basis for liability. *In re Google, Inc. Priv. Policy Litig.*, 58 F. Supp. 3d 968, 985 (N.D. Cal. 2014).

28

KING & SPALDING LLP
ATTORNEYS AT LAW
LOS ANGELES

BETTERHELP'S OPPOSITION TO          CASE NO. 3:23-cv-01033-RS
MOTION FOR CLASS CERTIFICATION



[8] *See* Tusan Decl., Ex. 41 (META_BETTERHELP_000000003-05) (showing limited information BetterHelp shared with Meta for Plaintiffs Jane Doe I, S.C., and L.M.)

BETTERHELP'S OPPOSITION TO
MOTION FOR CLASS CERTIFICATION

CASE NO. 3:23-cv-01033-RS

KING & SPALDING LLP
ATTORNEYS AT LAW
LOS ANGELES

Given the obvious differences among Plaintiffs themselves concerning just Facebook specifically, Plaintiffs cannot possibly satisfy their burden under Rule 23(a) or (b).

### B.    Plaintiffs Do Not (and Cannot) Meet Their Burden Under Rule 23(a).

Plaintiffs fail to satisfy Rule 23(a) because they cannot "demonstrate through facts rather than allegations" that (1) questions of law or fact are common to the class ("commonality"); (2) that their claims are typical of the proposed class members ("typicality"); (3) that Plaintiffs are adequate class representatives ("adequacy"); or (4) that the proposed classes satisfy numerosity. *Griffith v. TikTok, Inc.*, 2024 WL 4308813, at *3 (C.D. Cal. Sept. 9, 2024); Fed. R. Civ. P. 23(a).

### (1)    *Plaintiffs Fail to Establish Commonality.*

A party seeking class certification must prove the proposed class has common "questions of law or fact." Fed. R. Civ. P. 23(a)(2); *Wal-Mart*, 564 U.S. at 349. To establish commonality Plaintiffs must demonstrate "that the class members 'have suffered the same injury'" and credibly demonstrate "the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation." *Id.* at 349-50. "The issue is not merely whether there are common questions, but common answers." *Robbins v. Phillips 66 Co.*, 343 F.R.D. 126, 131 (N.D. Cal. 2022) (Seeborg, J.) (no commonality where "[t]he answer[s] might depend on facts unique to each claimant, necessitating mini-trials, beyond mere damages calculation").

Plaintiffs argue commonality is met based on four purported "common questions," all of which (falsely) presume that every BetterHelp user's "private information" was collected and disclosed without consent, thereby causing injury. *See* Mot. at 16. In so doing, Plaintiffs sidestep the threshold questions of: (1) whether any of Plaintiffs' information (private or otherwise) was collected in the first instance; (2) if any information was collected, whether it was "shared"; and (3) whether Plaintiffs consented to BetterHelp's practices. Plaintiffs avoid these threshold questions because there is literally no evidence that Plaintiffs' (or anyone else's) "private information" was collected and shared without consent and certainly *no common evidence* to resolve these questions.

### a)    Whether Any Data Was Collected Depends On Each Consumer.

To level set, although Plaintiffs fail to cite this dispositive authority to the Court, Common Digital Information (IP addresses, device properties, UUIDs, basic URLs, etc.) is not actionable as

KING & SPALDING LLP
ATTORNEYS AT LAW
LOS ANGELES

a matter of law. Individuals have no privacy interest in IP addresses, device properties, or basic URLs, and the "disclosure of common, basic digital information to third parties" is not a basis for liability. *In re Google, Inc. Priv. Policy Litig.*, 58 F. Supp. 3d at 985; *see also Kishnani v. Royal Caribbean Cruises Ltd.*, 2025 WL 1745726, at *4 (N.D. Cal. June 24, 2025) ("[I]t is well established in the Ninth Circuit that 'there is no legally protected privacy interest in IP addresses.'") (collecting cases); *In re iPhone Application Litig.*, 844 F. Supp. 2d 1040, 1063 (N.D. Cal. 2012) (disclosure of unique device identifier number did not constitute breach of social norms and thus could not establish a serious invasion of a protected privacy interest); *Ji v. Naver Corp.*, 2022 WL 4624898 (N.D. Cal. Sep. 30, 2022) (similar). In *In re Zynga Priv. Litig.*, the Ninth Circuit held that there is no reasonable expectation of privacy in the disclosure of identification and address information through a URL, as distinguished from circumstances where specific search terms are disclosed. 750 F.3d 1098, 1108 (9th Cir. 2014). The fact that a party "might infer a user's traits and habits" because they use an app designed for a specific purpose, or visit a certain webpage, is not the same as transmission of the content of a user's searches or similar communications. *Hammerling v. Google LLC*, 615 F. Supp. 3d 1069, 1093 (N.D. Cal. 2022).

But even if any data purportedly shared via a Pixel on the BetterHelp website could form the basis for liability (it cannot) as explained further in the Rebuttal Report of Prof. Ben Zhao and as summarized above, *supra*, whether any data was shared via a Pixel at all depends on a variety of factors unique to each proposed class member and within their exclusive control. Given this, there could be no common answer based on evidence common to the Proposed Classes as to whether *any* information was shared. Rather, the answer for each proposed class member would be contingent "on facts unique to each claimant, necessitating mini-trials." *Robbins*, 343 F.R.D. at 131. These material differences are evident even in the widely divergent online privacy habits and practices of *Plaintiffs*, as discussed above in Section V.A. Indeed, Facebook has confirmed that it does not have *any* information for two Plaintiffs, which confirms that the sharing of information was individualized and dependent upon consumer choice. Proposed class members' online privacy practices will likewise vary, and there is no reliable classwide means of gathering evidence to resolve these issues. *See In re Hulu Priv. Litig.*, 2014 WL 2758598, at *16 (N.D. Cal. June 7, 2014)

1  (not reliable for putative class members to self-report online privacy habits).

2              **b)      The Alleged Harms Misalign with Plaintiffs' Claimed Damages.**

3         Plaintiffs' proffered "evidence" and deposition testimony demonstrates a total mismatch

4  between their claims and the "damages" their experts contend they suffered.

5

6

7

8

9

10

11

12         Some Plaintiffs have alleged that they experienced an increase in targeted advertisements

13  related to mental health after they signed up with BetterHelp. FACC ¶¶ 26-31. But the evidence

14  shows these same Plaintiffs conducted Google searches for therapists, clicked on targeted

15  advertisements, and posted on social media about their mental health, *see* pp. 26-27, *supra*—actions

16  that would have caused this increase in advertisements without any conduct by BetterHelp.[9]

17  Moreover, discovery produced by Meta shows that it had no information about two of the five

18  remaining Plaintiffs, underscoring that BetterHelp was not in control of what Meta learned about

19  Plaintiffs. *See* Tusan Decl., Ex. 41.

20         Plaintiffs alleged they would have paid less for BetterHelp's services, had they known

21  BetterHelp would "share" their data. FACC ¶¶ 26-31.

22

23

24

25

26  ────────────────
[9] *See* Google's "Advertising" disclosures, at https://policies.google.com/technologies/ads?hl=en-
27  US (last visited September 15, 2025) ("Many decisions . . . determine which ad you see. Sometimes
   the ad you see is based on your current or past location. Your IP address is usually a
28  good indication of your approximate location. . . . Sometimes you might also see an ad on the
   web that's based on your app activity or activity on Google services . . . .").

KING & SPALDING LLP
ATTORNEYS AT LAW
LOS ANGELES

BETTERHELP'S OPPOSITION TO              CASE NO. 3:23-cv-01033-RS
MOTION FOR CLASS CERTIFICATION

1
2
3
4

5      [REDACTED] Plaintiffs cannot carry their burden to show that they themselves have any injury, much less

6      that common evidence can establish either the existence of injury or damage for anyone in their

7      Proposed Classes. *See Black Lives Matter Los Angeles v. City of Los Angeles*, 113 F.4th 1249, 1264

8      (9th Cir. 2024) ("[P]laintiffs have not explained what common evidence can prove the claims of

9      the hundreds, if not thousands, of the members in all the classes who had diverging experiences.").

10                          **(2)    *Plaintiffs Fail to Establish Typicality.***

11             When Plaintiffs signed up for BetterHelp they consented to its practices—disclosed in the

12     Privacy Policy and incorporated into the Terms of Service—and consent is a defense to Plaintiffs'

13     claims. *See Smith v. Facebook, Inc.*, 745 F. App'x 8, 9 (9th Cir. 2018); *see* 18 U.S.C.

14     § 2511(3)(b)(ii) (FWA); 18 U.S.C. § 2702(b)(3) (SCA); Cal. Pen. Code § 631(a) (CIPA); *Smith v.*

15     *Facebook*, Inc., 262 F. Supp. 3d 943, 955-56 (N.D. Cal. 2017), *aff'd*, 745 F. App'x 8 (9th Cir. 2018)

16     ("Plaintiffs' consent . . . bars their common-law tort claims" for intrusion upon seclusion) (citing

17     Cal. Civ. Code § 3515); *Calhoun v. Google LLC*, 526 F. Supp. 3d 605, 620-21 & n.3 (N.D. Cal.

18     2021) (applying consent defense to bar contract and UCL claims).

19             The Privacy Policy and banner disclosures evolved over the six years of the Proposed Class

20     Period, *see* Section II.B, *supra*, and any argument that a particular version of the Privacy Policy did

21     not encompass the conduct at issue—or that users were not given adequate notice of the policy—

22     would necessarily defeat typicality. *See McHugh v. Metro. Life Ins. Co.*, 2023 WL 3318691, at *3-

23     4 (C.D. Cal. Mar. 31, 2023) (differences between disclosures defeated typicality); *Bustillos v. W.*

24     *Covina Corp. Fitness, Inc.*, 2022 WL 423396, at *3-4 (C.D. Cal. Jan. 3, 2022) (divergence on

25     consent defeated typicality); *Sherman v. Yahoo! Inc.*, 2015 WL 5604400, at *8-9 (S.D. Cal. Sept.

26     23, 2015) (same). Individual inquiries would also be necessary to determine how consent was

27     obtained, and whether it was express or implied. "Implied consent asks about a user's subjective

28     understanding of the terms of the relevant agreement; it is 'an intensely factual question that

requires consideration of the circumstances surrounding the alleged privacy violation' that takes into account 'a broad set of materials.'" *Calhoun v. Google LLC*, 349 F.R.D. 588, 597 n.3 (N.D. Cal. 2025). Issues arising from implied consent for Plaintiffs alone (much less each class member) would overwhelm common questions. *See id.* at *7 (denying certification based on implied consent); *In re Google Inc. Gmail Litig.*, 2014 WL 1102660, at *17 (N.D. Cal. Mar. 18, 2014) (same); *Backhaut v. Apple Inc.*, 2015 WL 4776427, at *14 (N.D. Cal. Aug. 13, 2015) (same).

Accordingly, the terms to which Plaintiffs consented and circumstances relating to their consent varied such that typicality is defeated.

### (3)    *Plaintiffs and Their Counsel Are Inadequate.*

Rule 23(a)(4)'s adequacy of representation requirement involves a two-part inquiry: (1) do the named plaintiffs and their counsel have conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class? *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998), *overruled on other grounds by Wal-Mart*, 564 U.S. 338. . Plaintiffs are plainly inadequate given that two of the five remaining Plaintiffs have failed to adduce any evidence that third parties ever received any information about them from BetterHelp. *See* Tusan Decl., Ex. 41. Plaintiffs also admitted to publicly disclosing far more personal information than what they now claim is "private," which directly undercuts their claims of suffering any actionable injuries. *See Lineberry v. AddShoppers, Inc*, 2025 WL 1533136, at *10 (N.D. Cal. May 29, 2025) ("If the only named plaintiff you can find is someone whose presence threatens to weaken the claims of the absent class members, don't bring the lawsuit."); *Radcliffe v. Experian Info. Sols. Inc.*, 715 F.3d 1157, 1167 (9th Cir. 2013) (where class representatives are inadequate, class counsel is likely also rendered inadequate).

Plaintiffs' counsel also failed to submit correct evidence in support of the Motion, which is rife with inaccurate and misleading citations. *See Zackaria v. Wal-Mart Stores, Inc.*, 2014 WL 11398759, at *2 (C.D. Cal. Feb. 21, 2014) (denying certification for failure to properly cite evidentiary support). Inexplicably, the Motion even includes a claim for Breach of Confidence that this Court previously dismissed. One illustrative example of Plaintiffs' misleading citations is in support of their claim that "tracking tools" captured "HIPAA-protected personally identifiable

information and PHI" and that "BetterHelp internally admitted that [Intake Questionnaire responses are] all sensitive protected data." Mot. at 9. Plaintiffs cite in support a BetterHelp presentation slide that references a screenshot of a GDPR consent banner for EU users reading: "Users provide 'sensitive protected data' (*per EU laws*) during the intake questionnaire . . . ." *See* Tusan Decl., Ex. 16 at 63 (emphasis added). The laws of the European Union have no bearing on this case, and this slide in no way supports Plaintiffs' inflammatory assertion that "BetterHelp internally admitted" that Intake Questionnaire responses are protected data under HIPAA, let alone that "tracking tools" captured this information. *See also* Appendix A (collecting examples of misleading citations).

### (4) *Plaintiffs Fail to Establish Numerosity.*

Numerosity is often assumed, but certification has been denied for failing to establish numerosity based on contingent factors also present here. *Martinez v. D2C, LLC*, 2024 WL 4367406, at *6-9 (S.D. Fla. Oct. 1, 2024) ("*Univision*"). In *Univision*, plaintiffs' case "rest[ed] on their central theory that the mere presence of the Meta [Facebook] Pixel on Univision's website resulted in the transmission of tens of thousands of Univision subscribers' personally identifiable information from Univision to Meta." *Id.* at *6. The *Univision* court held that because the pixel's transmission of information was contingent on, *e.g.*, class members having a Facebook account, various browser settings, and use of other software, there was no non-speculative means to estimate the putative class size. *Id.* at *8-9. The same contingent factors discussed in *Univision* are present here, with the same result—there is no non-speculative means to establish numerosity.

### C. Plaintiffs Do Not (and Cannot) Satisfy the Requirements of Rule 23(b)(3)

Plainly, because Plaintiffs do not meet the requirements of Rule 23(a), their motion is properly denied. But they do not even begin to satisfy Rule 23(b)(3). "[T]o certify a damages class under Rule 23(b)(3), the burden is even higher: the district court must find that common questions predominate over individual ones." *Black Lives Matter*, 113 F.4th at 1258. "Showing predominance is difficult, and it regularly presents the greatest obstacle to class certification." *Id.* (cleaned up). "The predominance inquiry asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (cleaned up). "In determining whether

1    common questions predominate, the Court identifies the substantive issues related to plaintiff's

2    claims (both the causes of action and affirmative defenses); then considers the proof necessary to

3    establish each element of the claim or defense; and considers how these issues would be tried."

4    *Gaudin v. Saxon Mortg. Servs., Inc.*, 297 F.R.D. 417, 426 (N.D. Cal. 2013).

5              **(1)    *Individual Questions Predominate Over Any Common Questions***

6              The answer to the central dispute in this litigation—whether BetterHelp shared Plaintiffs'

7    Confidential Consumer Data without their consent—is plainly no. And Common Digital

8    Information is not actionable as a matter of law. *In re Google, Inc. Priv. Policy Litig.*, 58 F. Supp.

9    3d at 985(disclosure of IP addresses, device properties, basic URLs, and "common, basic digital

10   information" is not a basis for liability). Even if the question were framed in terms of whether *any*

11   *data at all* was shared, the question could not be answered without resolving numerous individual

12   inquiries as to each proposed class member. These include the browser each Plaintiff used to access

13   BetterHelp; Plaintiffs' online privacy practices (*e.g.*, browser settings, use of a VPN or ad-blocker,

14   social media account settings, etc.); when Plaintiffs signed up for BetterHelp and the configuration

15   of its website at the time (which impacts the functionality of the Pixel as well as third-party

16   practices); and the Privacy Policy in place at the time.[10]

17             **a)    Persuasive Authority Supports Denying Certification.**

18             **(1)    *Courts Have Denied Certification In Similar Cases.***

19             Numerous courts have refused to certify classes in similar privacy litigation due to the

20   individualized inquiries required to determine if class members' information was transmitted. In *In*

21   *re Hulu Priv. Litig.,* under factually indistinguishable circumstances, this Court held that such a

22   lack of commonality precludes class certification. 2014 WL 2758598 at *1. Viewers of Hulu's

23   online video content alleged that Hulu wrongfully disclosed their viewing selections and PII to third

24   parties, including data-tracking companies and social networks like Facebook. *Id*. The Court

---

[10] Plaintiffs try to avoid these individual inquiries by falsely claiming that the Facebook Pixel's
configuration, which Prof. Shafiq evaluated on a *single day* (March 2, 2021), applies to the entire
class period. *See* Section II.A.3, *supra*. But Prof. Shafiq admitted that he was not opining that the
configuration on that one day applied to the entire Proposed Class Period. BZ. Rpt. ¶¶ 85, 99.
Plaintiffs also refuse to acknowledge the existence of technologies commonly employed by the vast
majority of U.S. consumers to block collection of even pedestrian information. *See* Sections II.A.1;
II.D, *supra*.

concluded that where individual internet use and privacy practices create individualized issues about what data was shared with third parties, the claims were not susceptible to class treatment. *Id.* at *22. "In the end, substantial issues about remaining logged into Facebook and clearing and blocking cookies means that the court cannot conclude on this record that the common issues predominate over the individualized ones." *Id.* Given the numerous factors unique to each Plaintiff here, any of which could impact whether information was collected and shared (let alone whether any information shared was actionable), the Court should reach the same conclusion in this case.

In *Griffith v. TikTok, Inc.*, the court declined to certify a class due to meaningful variations among putative class members in any data transmitted, similar to those here. 2024 WL 4308813 (C.D. Cal. Sept. 9, 2024), appeal docketed, No. 25-553 (9th Cir. 2025). The *Griffith* plaintiffs brought claims under CIPA, ECPA, and various California privacy claims based upon TikTok's use of a pixel to collect information about non-TikTok users' internet activity when they visited third-party websites that had installed TikTok's software. *Id.* at *1. The court held that the analysis of plaintiffs' expert—Prof. Shafiq, the same expert Plaintiffs hired in this case—did not support the assertion that "from the data TikTok collects, Defendants can determine the actual identity of every non-TikTok user who visits a website with the Pixel installed." *Id.* at *3. In addition to variations among websites, it was not clear that "all visitors to the same website have identically strong claims." *Id.* at *5.[11] The claims in *Griffith* could not be certified because "the viability of Plaintiffs' claims depends on the nature of the information sent to Defendants. This information varies widely." *Id.* at *4. "This variation among class members . . . matters because the nature of the information Defendants receive about a class member is central to that individual's claims." *Id.* at *5; *Black Lives Matter*, 113 F.4th at 1258, 1264 ("[P]laintiffs have not explained what common evidence can prove the claims of . . . members in all the classes who had diverging experiences.").

In *AddShoppers, Inc.*, the putative named plaintiffs presented individualized factual issues such that "if a class were certified and the case went to trial, a jury could easily find against the

---

[11] The *Griffith* court distinguished *Rodriguez v. Google*, 2024 WL 380302 (N.D. Cal., Jan. 3, 2024)—a case on which Plaintiffs heavily rely—because, unlike in *Rodriguez*, the plaintiffs in *Griffith* "did not all take the same steps to safeguard their privacy." *Id. Rodriguez* is inapplicable to the facts of this case on the same basis—Plaintiffs' own testimony made clear that they had entirely divergent approaches to their online privacy. *See supra* at 11-12.

KING & SPALDING LLP
ATTORNEYS AT LAW
LOS ANGELES

1    named plaintiffs on grounds that wouldn't apply to the absent class members. At a minimum, the

2    specific problems with the named plaintiffs' claims would overshadow the question whether the

3    defendants are liable to the class." 2025 WL 1533136, at *1 (denying class certification where one

4    plaintiff deleted browsing history, preventing defendant from testing her allegation, and another

5    plaintiff lacked evidence he was member of proposed class). The same reasoning applies here and

6    results in the same conclusion—individual issues predominate and preclude class certification.

7         In *In re Facebook Priv. Litig.*, the court denied class certification because (as here) the

8    alleged transmission of users' personal information to advertisers could have been blocked or

9    altered, which prevented resolution by common proof. 2016 WL 4585817, at *7-10. As the court

10   stated, "In order to avoid class certification, Facebook is not required to prove that transmission did

11   not occur—Facebook must show only that the question is not subject to common proof." *Id.* at *9.

12   That the question of data transmission could not be resolved on a classwide basis by common proof

13   was underscored by the named plaintiff herself being "unable to answer questions about her use of

14   privacy or security software in her deposition." *Id.* at *10.

15              **(2)    *Cases Granting Class Certification Are Distinguishable.***

16        *Frasco v. Flo Health*, which granted class certification in part and denied it in part, is also

17   readily distinguishable. 349 F.R.D. 557, 569 (N.D. Cal. 2025). The *Flo Health* plaintiffs presented

18   evidence that "user entries for the Custom Events were sent to Meta and Google" and "featured

19   words like 'pregnancy' and 'period,' which communicated information about the dates on which a

20   user menstruated or became pregnant." *Id.* at 573. The *Flo Health* court concluded that "whether

21   health information was conveyed is answerable with common evidence" because the "evidence

22   about the transmission of Custom Events, the names of the Custom Events, and whether . . . those

23   names . . . convey[ed] sensitive health information, demonstrate that they have a classwide method

24   of resolving the merits questions." *Id.* at 582. Here, in direct contrast, BetterHelp never shared *any*

25   "sensitive health information." Also in contrast to *Flo Health* (which did not raise the issue),

26   whether even pedestrian information like IP addresses or device settings was conveyed here cannot

27   be answered with common evidence because it is contingent on numerous individual user choices,

28   as discussed above. The *Flo Health* court also determined that "evidence of Flo's privacy

disclosures is common to the class" such that "[t]he common disclosures will permit a jury to conclude in one fell swoop" whether a basis for implied consent existed. BetterHelp's Privacy Policy and banners are not "common to the class" because they evolved over time, as set forth above, and also provide a basis for express (not merely implied) consent. *Id.* at 576.

*Rodriguez v. Google LLC* is also readily distinguishable. In *Rodriguez*, there was no dispute that common evidence could establish that class members affirmatively switched off certain data collection functions, that Google nonetheless continued to collect such data, and that doing so was inconsistent with its disclosures. *Rodriguez v. Google LLC*, 2024 WL 38302, *3-6 (N.D. Cal. Jan. 3, 2025). But here, whether *any* information was shared is a highly individualized inquiry that depends on the numerous user choices and technical factors that differ across the class. *See* Section V(A), *supra*. And unlike in *Rodriguez*, the disclosures to users varied over time. *See* Section II.B. *Rodriguez* also demonstrates that consumers who care about privacy make affirmative choices to prevent the collection of data, which BetterHelp instructed users they could do and—unlike in *Rodriguez*—prevented the sharing of information.

Plaintiffs' reliance on *Jancik v. WebMD LLC*, 2025 WL 560705 (N.D. Ga. Feb. 20, 2025) is also misplaced. *See* Mot. at 24, 35. That case, in which the plaintiff alleged only violations of the Video Privacy Protection Act ("VPPA"), only highlights the lack of common proof here. The *Jancik* court acknowledged that "a specific privacy, cookie, or other setting" by a class member might "block[] the Facebook Pixel from automatically transmitting Event Data to Facebook" but nevertheless granted class certification because, given the elements of a VPPA violation, plaintiff could use "common evidence that will not differ . . . from one class member to another." *Id.* at 7, 9. Specifically, the class was limited to Facebook account holders for whom Meta had data showing that a given user had viewed a particular video, which the plaintiff argued was "absolute proof" of a VPPA violation. *Id.* at *7. But here, there is no such "common evidence that will not differ in the slightest from one class member to another" to establish liability. *Id.* at *9. To the contrary, whether even Common Digital Information was shared would depend on a host of factors unique to each user—as confirmed by the fact that Meta had no information at all for two of five Plaintiffs.

**b)    The Privacy Torts Demand Individual Inquiries.**

Plaintiffs' claims for Invasion of Privacy and violation of the Constitutional Right of Privacy require a reasonable expectation of privacy in any data purportedly shared. Given they have no evidence that their own Confidential Consumer Data was shared by BetterHelp with anyone, they lack standing to assert these claims on behalf of anyone else. Even if they had standing, putting aside Common Digital Information, which is not actionable as a matter of law, determining whether each Plaintiff (and each member of the Proposed Classes) had a reasonable expectation of privacy in any given piece of information is necessarily an individual inquiry that is not amenable to class treatment. *In re Zynga Priv. Litig.*, 750 F.3d at 1108.

The evidence also shows that Plaintiffs willingly shared with Meta, Google, and other entities the very information they now claim BetterHelp is somehow responsible for disclosing by performing online searches and by posting information to their social media accounts.  Google tracks user IP addresses, searches, and page views to serve users with targeted ads. *See* https://policies.google.com/privacy?hl=en-US. Each Plaintiff admitted to searching Google for therapists or counselors *before* signing up for BetterHelp. Unger Decl., Exs. S-W (*see* responses to Rog No. 4); Doe I Tr. at 126:17-20; L.M. Tr. at 42:12-44:25; Doe III Tr. at 32:21-33:3; R.S. Tr. at 51:3-52:20. Plaintiff Doe I testified that she searched Facebook for issues related to mental health. Jane Doe I Tr. at 146:21-147:15. Plaintiff L.M. testified that she originally accessed BetterHelp's website *after conducting a Google search and clicking on an advertisement for BetterHelp.* L.M. Tr. at 104:13-105:1. Plaintiff Doe III posted publicly on her Twitter about health and mental health related issues, including a depression diagnosis. Jane Doe III Tr. at 101:7-103:5. Plaintiff Doe I also posted on Facebook regarding her sexual health, genetic testing, experience with family trauma, and desired salary range. Jane Doe I. Tr. at 149:1-150:15, 155:11-156:7, 162:19-164:7, 183:20-185:3. Similarly, Plaintiff L.M. likewise posted publicly on her Instagram about health and mental health related issues, including infertility and drinking too much wine. L.M. Tr. at 56:2-57:15, 88:2-90:5.

These facts differ fundamentally from *Rodriguez*, where the privacy claims were certified. There, "the relevant inquiries [were] primarily Google's *uniform disclosures* and users' *uniform conduct*." *Rodriguez*, 2024 WL 38302, at *6 (emphasis added). Here, (a) whether *any* information

1  was shared, (b) even if information were shared, whether it was private, and (c) whether the class

2  member separately and/or publicly shared information with and via Facebook or Google related to

3  their mental health status and seeking therapy (as did most named Plaintiffs), are *all* individualized

4  inquiries that would defeat their claims as a matter of law. *See, e.g.*, *Mangum v. Action Collective*

5  *Serv., Inc.*, 575 F.3d 935, 943-44 (9th Cir. 2009) (no constitutional right to informational privacy

6  where plaintiff voluntarily placed private information into stream of commerce), *abrogated on*

7  *other grounds by Rotkiske v. Klemm*, 140 S. Ct. 355 (2019); *Pardon v. Lara*, 2018 WL 2213462, at

8  *14 (E.D. Cal. May 11, 2018) (no constitutional right to informational privacy where plaintiff

9  voluntarily and publicly disclosed allegedly private information); *Buzayan v. City of Davis*, 927 F.

10  Supp. 2d 893, 904 (E.D. Cal. 2013) (privacy claims dismissed where plaintiffs publicly

11  disseminated purportedly private information). As they lack viable individual claims, they cannot

12  assert claims on behalf of others. *In re Graphics*, 527 F. Supp. 2d 1011, 1026-27 (N. D. Cal. 2007).

13  **c)  The CIPA and ECPA Claims Require Individual Inquiries.**

14  Plaintiffs' claims under CIPA Section 631 and the ECPA's Wiretap Act and Stored

15  Communications Act require proof that the "contents" of communications were "intercepted"

16  without consent, and the claims fail for numerous reasons. *Konop v. Hawaiian Airlines, Inc.*, 302

17  F.3d 868, 876 (9th Cir. 2002). First, Plaintiffs consented to BetterHelp's practices. Second,

18  Plaintiffs have no evidence that BetterHelp facilitated the classwide interception of "content" of

19  any communications. Common digital information such as IP addresses, device properties, and

20  basic URLs, are not "content" for purposes of these statutes. *See* disc. at 19 *supra*. Even "referer

21  header information … [that] included the user's Facebook ID and the address of the webpage from

22  which the user's HTTP [] request was sent" is not "content" because it does not convey the

23  "substance, purport or meaning" of a communication. *In re Zynga Priv. Litig.*, 750 F.3d at 1102,

24  1107, 1109 (affirming district court's dismissal with prejudice of ECPA claim because plaintiffs

25  failed to plausible allege Zynga or Facebook disclosed "contents" of a communication).

26  But under the circumstances, whether the "contents" of any communication were

27  intercepted could not be decided by common proof and would instead require an individualized

28  inquiry into the specific communication and what exactly was "intercepted." For this reason, in

*Doe v. Adv. Health Care Network*, Case No. 22STCV36304, (Los Angeles Super. Ct. Dec. 19, 2024)—another case in which a court rejected the sufficiency of Prof. Shafiq's analysis—the court refused to certify the class, concluding that the plaintiff's claims, including a CIPA claim, "cannot be determined by common proof—whether a particular patient's transmitted information contained the patient's search terms or only the title of a webpage the patient clicked on without entering search terms or only an 'event' such as 'Adventist Health All Virtual Visit Pageview.'" The same would be true here: in the case of each URL, for example, Plaintiffs would need to prove that substantive information—if any—conveyed with the URL would elevate the particular URL to the status of "content" (and there is zero evidence that this occurred).

A CIPA claim must be asserted within one year of the alleged violation, but the proposed class period runs from 2017-2023, making it likely that this claim is time barred for a good many of the proposed class members (including even some Plaintiffs). *Javier v. Assurance IQ, LLC*, 649 F. Supp. 3d 891, 901 (N.D. Cal. 2023). A CIPA Section 631 violation also requires a party to intercept and "read[], or attempt[] to read, or . . . learn the contents of" a communication while "being sent from, or received at any place within this state." Plaintiffs mistakenly focus on where BetterHelp is headquartered or decisions may have been made, Mot. at 25, but offer no evidence— let alone common evidence—that any communications were sent from or received alleged interceptions occurred *within California*. BetterHelp's servers are in Virginia and have been during the entire class period, Vaughan Decl. ¶ 3, and Plaintiffs have offered no evidence of where class members were located when signing up with BetterHelp.[12] In *Flo Health*, the court denied certification of a Section 631 claim because the plaintiffs offered no common evidence that communications were sent from or received in California—even though there was "evidence that Google and Meta are based in California" and designed the technology at issue in California—and the Court should reach the same result here. *See Flo Health, Inc.*, 349 F.R.D. at 586-87.

Certification of Plaintiffs' Section 631 claim should also be denied because they offer no evidence that Meta (or any third party) "read" or "learn[ed] the contents of" any communication *in*

---

[12] The number of California users provided by BetterHelp, *see* Tusan Decl., Ex. 4 at 8, is based on a user's self-selected state of residence, not location when registering. Vaughan Decl. at ¶ 21.

BETTERHELP'S OPPOSITION TO
MOTION FOR CLASS CERTIFICATION

CASE NO. 3:23-cv-01033-RS

*transit.* Cal. Pen. Code § 631; *Torres v. Prudential Fin., Inc.*, 2025 WL 1135088, at *5 (N.D. Cal. Apr. 17, 2025) ("[N]othing in the record plausibly indicates that [a third party] reads or attempts to read the contents of the communication <u>while they are in transit</u>. . . . Whether Defendants access or even analyze inputs . . . after they have been transmitted to the server and reassembled has no bearing on whether Defendants read the communications while they were in transit.").

### d)    Consent to and Scope of the Privacy Policy Is Individualized.

Consent is a defense to Plaintiffs' claims and, as discussed in Section V.B.2, establishing consent will require individualized inquiries into the terms consented to and the circumstances surrounding such consent, because the Privacy Policy and banner disclosures evolved over the six years of the Proposed Class Period.

### e)    Material Differences in State Law Preclude a Nationwide Class.

Plaintiffs seek to certify a nationwide class to pursue numerous claims under California law, but "California law may only be used on a classwide basis if 'the interests of other states are not found to outweigh California's interest in having its law applied.'" *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 590 (9th Cir. 2012), *overruled in part on other grounds by Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651 (9th Cir. 2022). If the adjudication of "nationwide claims will require application of the laws of 50 states," then "common questions of law would not predominate for the proposed nationwide class, as is required by Rule 23(b)(3)." *Brazil v. Dole Packaged Foods, LLC*, 2014 WL 2466559, at *14 (N.D. Cal. May 30, 2014).[13] A tripartite test determines whether the interests of other states outweigh California's interest in applying its law: (1) is the law of the affected states materially different from California law; (2) if so, what is each state's interest in applying its law; and (3) if there is a conflict between the interests of California and another state, the law of the state whose interest would be more impaired is applied. *Mazza*, 666 F.3d at 590-91. Under this analysis, six of Plaintiffs' California law claims (CIPA, CLRA, UCL, unjust enrichment, invasion of privacy, and implied contract claims) cannot be applied nationwide, which compels a finding that "common questions of law would not predominate for the proposed nationwide class . . . ". *Brazil*, 2014 WL 2466559, at *14.

---

[13] Plaintiffs' nationwide class would include individuals from all 50 states. Vaughan Decl. at ¶ 7.

BETTERHELP'S OPPOSITION TO
MOTION FOR CLASS CERTIFICATION                CASE NO. 3:23-cv-01033-RS

**(1)** ***California Laws Conflict with the Laws of Other States.***

There are numerous material differences between the California laws underlying Plaintiffs' claims and the equivalent laws of the other 49 states, including:

*Consumer Protection Laws* (CLRA, UCL): Key differences include (i) California requires proof of actual injury, while other states, such as Illinois and Minnesota, require a likelihood of future injury to recover; (ii) California permits consumer class actions, while other states prohibit or at least restrict such actions; (iii) the statute of limitations ("SOL") under California's UCL and CLRA are four and three years, respectively, while the SOL for consumer protection statutes in other states ranges from one to six years, with differing applications of the delayed discovery rule; (iv) California does not require a showing of scienter, while other states' do; and (v) remedies available under consumer protection laws vary widely. *See* Consumer Protection Appendix.

*Wiretapping Statutes (CIPA)*: "[T]here are material differences between CIPA and the wiretapping statutes of the other 49 states." *In re Yahoo Mail*, 308 F.R.D. 577, 602 (N.D. Cal. 2015). Other states (i) require only one-party consent; (ii) require that the plaintiff had an expectation of privacy; and (iii) at least ten states do not provide for a private right of action. "[T]here are also material differences in the remedies given by state laws . . . ." *Id.* at 602-03; *see* Wiretapping Statutes Appendix.

*Unjust Enrichment*: "The elements necessary to establish a claim for unjust enrichment . . . vary materially from state to state." *Mazza*, 666 F.3d at 591. As an example, "[s]ome states do not specify the misconduct necessary to proceed, while others require that the misconduct include dishonesty or fraud." *Clay v. Am. Tobacco Co.*, 188 F.R.D. 483, 501 (S.D. Ill. 1999). Accordingly, even if California law permits a cause of action for unjust enrichment (which is not settled), it cannot be applied nationwide. *In re Toyota Rav4 Hybrid Fuel Tank Litig.*, 534 F. Supp. 3d 1067, 1121-22 (N.D. Cal. 2021) (unjust enrichment laws vary materially).

*Invasion of Privacy*: The *Mazza* choice of law analysis also "applie[s] to common law claims . . . ." *Ochoa v. Zeroo Gravity Games LLC*, 2023 WL 4291650, at *11 (C.D. Cal. May 24, 2023), *adopted*, 2023 WL 12079144 (C.D. Cal. May 25, 2023). Material differences also exist between California and several states regarding common law invasion of privacy torts. *Opperman*

1     *v. Path, Inc.*, 2016 WL 3844326, at *9 (N.D. Cal. July 15, 2016).

2         <u>*Breach of Implied Contract*</u>: Material differences exist among states' laws of contract that

3     "could greatly affect how the relevant provisions of the agreements are interpreted and ultimately

4     whether there was a breach of those provisions." *Gustafson v. BAC Home Loans Servicing, LP*, 294

5     F.R.D. 529, 544 (C.D. Cal. 2013) (denying certification of nationwide class). Here, Plaintiffs have

6     pleaded an implied contract, but the materially distinct law of various states, including as to

7     establishing the existence of an implied contract and its terms precludes a nationwide class.

8         Virtually every court to have analyzed the issue has concluded these laws vary materially

9     from state to state. *See Mazza*, 666 F.3d at 590-91 (consumer protection and unjust enrichment

10    laws); *Darisse v. Nest Labs, Inc.*, 2016 WL 4385849, at *9-10 (N.D. Cal. Aug. 15, 2016) (same);

11    *In re Yahoo Mail*, 308 F.R.D. at 602 (CIPA); *In re Toyota Rav4 Hybrid Fuel Tank Litig.*, 534 F.

12    Supp. 3d at 1121-22 (unjust enrichment); *Gustafson*, 294 F.R.D. at 544 (breach of implied

13    contract); *Opperman*, 2016 WL 3844326, at *9 (invasion of privacy). The differences are also

14    material, because they could be dispositive of Plaintiffs' claims. Plaintiff L.M., for example, resides

15    in South Carolina, FACC ¶ 26, which does not permit consumer protection class actions. Unger

16    Decl., Ex. II. Plaintiff S.C. resides in Wisconsin, and her consumer protections claims would be

17    barred by Wisconsin's three-year statute of limitations because she used BetterHelp's services in

18    approximately 2019 (FACC ¶ 26), and the discovery rule does not apply. *Kain v. Bluemound E.*

19    *Indus. Park, Inc.*, 635 N.W.2d 640, 645 (Wis. Ct. App. 2001). Variations in party consent and

20    statutes of limitations for wiretapping claims would be similarly dispositive, with Plaintiffs' claims

21    dependent on whether/when a communication was made in a single-party or all-party consent state.

22    Finally, state law remedies for these claims are materially different because they dictate what relief

23    a successful plaintiff would be entitled to. Accordingly, the differences in state law for consumer

24    protection, wiretapping, and unjust enrichment claims are indisputably material to this litigation.

25         **(2)**     ***Other Jurisdictions Have Interests in Applying Their Laws***

26         "[E]very state has an interest in having its law applied" to its residents and "ordinarily has

27    the predominant interest in regulating conduct . . . within its borders." *Mazza*, 666 F.3d at 591-92

28    (cleaned up). This is true of consumer protection and unjust enrichment laws, for example, because

"each state has an interest in setting the appropriate level of liability for companies conducting business within its territory." *Id.* at 592. Similarly, other states have an interest in applying their own wiretapping laws. *See In re Yahoo Mail*, 308 F.R.D. at 603 (wiretapping statutes); *Doe v. Kaiser Found. Health Plan, Inc.*, 2024 WL 1589982, at *13 (N.D. Cal. Apr. 11, 2024) (same).

### (3)    *Other States' Interests Will be Most Impaired*

Finally, other states' interests would be more impaired than California's if their law was not applied. "California's interest in applying its laws to residents of foreign states is 'attenuated,'" *Gustafson,* 294 F.R.D. at 540, and California law has a strong presumption against applying statutes extraterritorially. *Diamond Multimedia Sys., Inc. v. Super. Ct.*, 968 P.2d 539, 554 (Cal. 1999). Numerous courts have held that the UCL, CLRA, and CIPA, for example, do not apply extraterritorially. *See In re Yahoo Mail*, 308 F.R.D. at 604 (CIPA); *Wilson v. Frito-Lay N. Am., Inc.*, 961 F. Supp. 2d 1134, 1147 (N.D. Cal. 2013) (UCL); *McKinnon v. Dollar Thrifty Auto. Grp., Inc.*, 2013 WL 791457 (N.D. Cal. Mar. 4, 2013) (CLRA).

"California recognizes that with respect to regulating or affecting conduct within its borders, the place of the wrong has the predominant interest," *i.e.*, "the state where the last event necessary to make the actor liable occurred." *Katz-Lacabe v. Oracle Am., Inc.*, 668 F. Supp. 3d 928, 948 (N.D. Cal. 2023) (Seeborg, J.) (cleaned up). Similarly, the *Mazza* court held that California law did not apply to non-resident class members because "the last events necessary for liability as to the foreign class members—communication of the advertisements to the claimants and their reliance thereon in purchasing vehicles—took place in the various foreign states, not in California." 666 F.3d at 594; *see also Grace v. Apple, Inc.*, 328 F.R.D. 320, 348 (N.D. Cal. 2018) (place of wrong was where class members were exposed to harm of FaceTime ceasing to work). Here, the relevant "place of the wrong" is each user's home state, where they allegedly relied on BetterHelp's representations, navigated to BetterHelp's website, filled out the questionnaire, and signed up for an account.

Plaintiffs rely on inapposite and poorly-reasoned authority for their assertion that the place of the wrong is where BetterHelp's headquarters or servers are located.[14] (Mot. at 18, 25.) Most

---

[14] Moreover, Plaintiffs' assertions are not supported by their citations to the record. BetterHelp's servers, for example, are located in Virginia, *not* California. Vaughan Decl. at ¶ 3.

KING & SPALDING LLP
ATTORNEYS AT LAW
LOS ANGELES

BETTERHELP'S OPPOSITION TO
MOTION FOR CLASS CERTIFICATION

CASE NO. 3:23-cv-01033-RS

glaringly, Plaintiffs cite *Forcellati v. Hylands, Inc.*, which directly contradicted the Ninth Circuit's controlling *Mazza* decision. 2014 WL 1510264 (C.D. Cal. Apr. 9, 2014). Compounding that error, *Forcellati* relied on "outdated California cases from decades before *Mazza* that unlikely survived *Mazza*'s holding." *Cimoli v. Alacer Corp.*, 587 F. Supp. 3d 978, 995 (N.D. Cal. 2022). Another decision, *Camenish v. Umpqua Bank*, is easily distinguishable from *Mazza* (and this case) because it "involve[ed] conduct almost exclusively within California." 2024 WL 3186552, at *4 (N.D. Cal. June 25, 2024). Finally, *Oman v. Delta Air Lines, Inc.* did not conduct a choice of law analysis, and instead analyzed the potential application of California wage and labor laws to out-of-state employers and employees. 889 F.3d 1075, 1079 (9th Cir. 2018).[15]

Because the consumer protection, wiretapping, invasion of privacy, unjust enrichment, and breach of implied contract claims will require application of the laws of 50 states, "common questions of law would not predominate for the proposed nationwide class" as required by Rule 23(b)(3). *Brazil*, 2014 WL 2466559, at *14; *see also Mazza*, 666 F.3d at 594 (vacating district court's nationwide class certification order for UCL, CLRA, and unjust enrichment claims); *Darisse*, 2016 WL 4385849, at *15 (denying nationwide class certification for UCL and CLRA claims); *In re Yahoo Mail*, 308 F.R.D. at 605-06 (same regarding CIPA).

### (2) Plaintiffs' Claimed "Damages" Cannot Be Measured Classwide.

Plaintiffs bear the burden of showing that "damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)." *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013). At the class certification stage, Plaintiffs must show that damages can "feasibly and efficiently be calculated once the common liability questions are adjudicated." *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir. 2013). Plaintiffs do not and cannot meet their burden.

### a) Statutory damages cannot be established by common proof

Classwide monetary relief cannot be established through common proof here, because class members are not entitled to uniform statutory damages and there is mismatch between their claimed harms and their expert's opinion. In fact, Plaintiffs' "damages" expert purports to measures

---

[15] Plaintiffs also cite two cases that address standing, not choice of law. *See, e.g.*, *Schmitt v. SN Servicing Corp.*, 2021 WL 3493754, at *3 (N.D. Cal. Aug. 9, 2021). "[C]hoice of law is not the same thing as standing." *Allen v. Hylands, Inc.*, 2012 WL 1656750, at *2 (C. D. Cal. May 2, 2012).

KING & SPALDING LLP
ATTORNEYS AT LAW
LOS ANGELES

| BETTERHELP'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION | CASE NO. 3:23-cv-01033-RS |

1    "damage" that Plaintiffs themselves did not even suffer. Under the ECPA, "statutory damages are

2    not to be awarded mechanically . . . ." *Campbell v. Facebook Inc.*, 315 F.R.D. 250, 268 (N.D. Cal.

3    2016) (denying certification where individual issues would predominate). The ECPA "makes the

4    decision of whether or not to award damages subject to the court's discretion." *DirecTV, Inc. v.*

5    *Huynh*, 2005 WL 5864467, at *8 (N.D. Cal. May 31, 2005). Courts have found "that individualized

6    statutory damages issues 'would predominate over common ones' because weighing the relevant

7    factors would require 'individualized inquiries' that would vary across class members." *Bliss v.*

8    *CoreCivic, Inc.*, 711 F. Supp. 3d 1233, 1244-45 (D. Nev. 2024) (quoting *Campbell*, 315 F.R.D. at

9    268-69) (finding that individualized damages inquiries would predominate). Here, these factors

10   would require individualized analyses, including determining the "extent of any intrusion into the

11   plaintiff's privacy." *Campbell*, 315 F.R.D. at 268.

12       The SCA "requires proof of actual damages or the violator's profits from the violation in

13   order to trigger the $1,000 minimum recovery." *Meyer v. Mittal*, 2024 WL 4003509, at *6 (D. Or.

14   Aug. 29, 2024) (collecting cases); *Van Alstyne v. Elec. Scriptorium, Ltd.*, 560 F.3d 199, 206 (4th

15   Cir. 2009) ("[T]he Supreme Court has already interpreted language that is substantively identical

16   to § 2707(c) [of the SCA] to require proof of actual damages."); *Seale v. Peacock*, 32 F.4th 1011,

17   1027 (10th Cir. 2022) (accord); *but see Cline v. Reetz-Laiolo*, 329 F. Supp. 3d 1000, 1045-46 (N.D.

18   Cal. 2018) (holding to the contrary and collecting cases). Before awarding at least the $1,000

19   minimum recovery under the SCA, this Court would have to determine (1) whether Plaintiffs

20   suffered actual damages or BetterHelp profited from the alleged violation of the SCA as to each

21   Plaintiff, and (2) if so, in what amount. *Meyer*, 2024 WL 4003509, at *6.

22       Finally, under CIPA, "In assessing the amount of statutory damages, the court shall consider

23   any one or more of the relevant circumstances presented by any of the parties to the case . . . ." Cal.

24   Civ. Code § 1798.150(a)(2)); *see also Campbell*, 315 F.R.D. at 268 (analyzing availability of

25   statutory damages under ECPA and CIPA together). As is evident from the varying circumstances

26   of each Plaintiff, the "relevant circumstance" would differ by Plaintiff and each member of the

27   proposed classes and the analysis would mirror that of the ECPA claim, leading to individualized

28   inquiries that cannot be determined on a classwide basis.

KING & SPALDING LLP
ATTORNEYS AT LAW
LOS ANGELES

BETTERHELP'S OPPOSITION TO                    CASE NO. 3:23-cv-01033-RS
MOTION FOR CLASS CERTIFICATION

### b)    Plaintiffs Cannot Establish Actual Damages.

Plaintiffs claim that "damages and restitution can be proven in a uniform way" (Mot. at 35), but as this Court has observed, "the mere misappropriation of personal information does not establish compensable damages." *Katz-Lacabe,* 668 F. Supp. 3d at 943 (Seeborg, J.) (cleaned up); *see also Doe v. Meta Platforms, Inc.*, 690 F. Supp. 3d 1064, 1089-90 (N.D. Cal. 2023); *Moore v. Centerlake Med. Grp., Inc.*, 83 Cal. App. 5th 515, 538 (2022).[16] And here, there is no proof of any such "misappropriation." Plaintiffs' economic expert estimates the fair market value of the purported "personal information and non-public medical information" to be $200 per consumer, but his opinion is ludicrous and does not align with the any evidence in the record for any Plaintiff. For a host of reasons, Mr. Krause's opinions are irrelevant, not reliable and should be rejected— both as a theory for establishing damages and for doing so by common proof—as discussed more fully in BetterHelp's motion to exclude. ECF No. 204; *see also* Report of Dr. Natalie Mizik.

There is no market for individuals to sell Common Digital Information or any other data that could possibly be in issue here, which Plaintiffs' expert concedes. *Id.* ¶ 25; Krause Tr. at 72:17-73:19. Even if there were such a market, there is no evidence that Plaintiffs attempted or intended to participate in it (which would be another individualized inquiry). *See Flo Health*, 349 F.R.D. at 584-85 (denying certification for CDAFA claims because plaintiffs failed to present evidence that they attempted or intended to participate in a market for their data); *Cherkin v. PowerSchool Holdings, Inc.*, 2025 WL 844378, at *5 (N.D. Cal. Mar. 17, 2025) ("[E]ven if plaintiffs adequately alleged a market . . . there is no non-speculative basis . . . for thinking plaintiffs can or would transact with the personal information at issue . . . .").

### (3)    *A Class Action Is Neither Manageable Nor Superior Under These Facts*
### a)    Plaintiffs Fail to Provide Any Trial Plan (Let Alone a Viable One).

In determining whether to certify a class, courts must evaluate whether a viable trial plan has been presented. *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996) (abuse

---

[16] *Moore* distinguished *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 599-600 (9th Cir. 2020) ("*Facebook Tracking*"), the case on which Plaintiffs primarily rely, noting it "did not suggest the plaintiffs suffered any corresponding loss of value" and instead focused on the information's value to Facebook. *Moore*, 83 Cal. App. 5th at 541. Plaintiffs also cite *Brown v. Google LLC*, but it likewise relies on *Facebook Tracking*. 685 F. Supp. 3d 909 (N.D. Cal. 2023).

KING & SPALDING LLP
ATTORNEYS AT LAW
LOS ANGELES

BETTERHELP'S OPPOSITION TO
MOTION FOR CLASS CERTIFICATION

CASE NO. 3:23-cv-01033-RS

of discretion to certify class without showing "how the class trial could be conducted"); *Badella v. Deniro Mktg. LLC*, 2011 WL 5358400, at *13 (N.D. Cal. Nov. 4, 2011). Here, Plaintiffs have failed to offer any trial plan and there is no plausible means of conducting a "trial by proxy" in light of the numerous individualized inquiries discussed above, which would resolve no classwide issues, because the determinative facts will vary for each member of the Proposed Classes.

### b)    The FTC Settlement Efficiently Resolved the Dispute.

Courts routinely deny certification on superiority grounds where, as here, an administrative or regulatory resolution exists. *See Kamm,* 509 F.2d at 211; *Imber-Gluck*, 2015 WL 1522076, at *3. As discussed above, the FTC and BetterHelp agreed to a permanent injunction, with BetterHelp to provide $7.8 million in redress to users who paid for its services. Plaintiffs try to sidestep the settlement by extending their Proposed Class Period to 2023 (even though the FTC determined redress was only appropriate through December 31, 2020), but Plaintiffs do not explain why their Proposed Class Period still includes the redress period, nor why a *longer* period is warranted.

Plaintiffs argue that only a "small" subset of the Proposed Classes is eligible for relief under the FTC settlement, when that is plainly untrue. *See, e.g.*, Vaughan Decl. ¶ 49, Ex. W (at least 534,130 consumers have accepted redress funds). Regardless, an FTC settlement was deemed superior to a class action where more than 97% of a proposed class recovered nothing. *Conde v. Sensa*, 2018 WL 4297056, at *10 (S.D. Cal. Sep. 10, 2018). There is also no basis for Plaintiffs' argument that the FTC settlement addressed "largely different" harms. Mot. at 37. Plaintiffs' claims are clearly based on the same conduct. *See* FACC ¶ 142 (alleging Plaintiffs were not aware of their claims prior to FTC publicizing settlement). Merely alleging different causes of action does not impact this analysis. *Kamm*, 509 F.2d at 213. Finally, any differences in recovery under the FTC settlement and here do not prevent the Court from considering the FTC settlement in analyzing superiority. *Conde*, 2018 WL 4297056, at *15; *Kamm*, 509 F.2d at 211. In sum, applying the *Kamm* factors, a class action in this case is not superior to the FTC settlement, because both involve the same conduct and seek to provide relief for harm resulting from that conduct.

## VI.    <u>CONCLUSION</u>

BetterHelp respectfully requests the Court deny Plaintiffs' Motion for Class Certification.

1    Dated:  September 15, 2025                 **KING & SPALDING LLP**

2

3                                          By:    /s/ Livia M. Kiser

4                                               LIVIA M. KISER (SBN 285411)
                                               *lkiser@kslaw.com*
5                                               JEFFREY HAMMER (SBN 264232)
                                               *jhammer@kslaw.com*
6                                               CRAIG H. BESSENGER (SBN 245787)
                                               *cbessenger@kslaw.com*
7                                               JAMES A. UNGER (SBN 325115)
                                               *junger@kslaw.com*

8                                               Attorneys for Defendant
                                               BETTERHELP, INC.
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

38

BETTERHELP'S OPPOSITION TO                         CASE NO. 3:23-cv-01033-RS
MOTION FOR CLASS CERTIFICATION