LIVIA M. KISER (SBN 285411)
*lkiser@kslaw.com*
JEFFREY HAMMER (SBN 264232)
*jhammer@kslaw.com*
CRAIG H. BESSENGER (SBN 245787)
*cbessenger@kslaw.com*
JAMES A. UNGER (SBN 325115)
*junger@kslaw.com*
**KING & SPALDING LLP**
633 West Fifth Street, Suite 1600
Los Angeles, California 90071
Telephone: +1 213 443 4355
Facsimile: +1 213 443 4310
Attorneys for Defendant
BETTERHELP, INC.

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

**IN RE BETTERHELP, INC. DATA DISCLOSURE CASES**

This Document Relates To:

All Cases/

Case No. 3:23-cv-01033-RS

**BETTERHELP'S MOTION TO EXCLUDE TESTIMONY OF PROFESSOR ZUBAIR SHAFIQ**

[Declaration of James A. Unger with exhibits; and [Proposed] Order filed concurrently herewith]

Date: November 20, 2025
Time: 1:30 p.m.
Courtroom: 4
Judge: Hon. Richard Seeborg

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE** that on November 20, 2025 at 1:30 p.m., in the above-entitled Court, located at 450 Golden Gate Avenue, San Francisco, California, 94102, in Courtroom 3 – 17th Floor, Defendant BetterHelp, Inc. ("BetterHelp") will and hereby does move the Court to exclude the opinions reflected in the Expert Report (ECF No. 170-10) and Supplemental Expert Report (ECF No. 200-3) of Professor Zubair Shafiq. This Motion is based on this Notice, the accompanying Memorandum of Points and Authorities, the Declaration of James A. Unger and exhibits thereto, all pleadings, papers, and records on file in this lawsuit, and any oral argument and papers as may be presented at or before the time of adjudication of this Motion.

**STATEMENT OF RELIEF SOUGHT**

BetterHelp seeks an order excluding Prof. Shafiq's opinion pursuant to Federal Rule of Evidence 702.

Dated: September 15, 2025

**KING & SPALDING LLP**

By: */s/ Livia M.Kiser*

LIVIA M. KISER (SBN 285411)
*lkiser@kslaw.com*
JEFFREY HAMMER (SBN 264232)
*jhammer@kslaw.com*
CRAIG H. BESSENGER (SBN 245787)
*cbessenger@kslaw.com*
JAMES A. UNGER (SBN 325115)
*junger@kslaw.com*

Attorneys for Defendant
BETTERHELP, INC.

# TABLE OF CONTENTS

I. INTRODUCTION ........ 1

II. PROFESSOR Shafiq's unsupported, Error-riddled OPINIONS ........ 2

III. GOVERNING LEGAL STANDARD ........ 3

IV. LEGAL ARGUMENT ........ 5

A. Professor Shafiq's Opinions Fail to Satisfy Fed. R. Evid. 702(a). ........ 7

B. Professor Shafiq Fails to Satisfy Fed. R. Evid. 702(b) ........ 14

C. Prof. Shafiq Fails to Satisfy Fed. R. Evid. 702(c) ........ 17

D. Professor Shafiq Fails to Satisfy Fed. R. Evid. 702(d). ........ 21

V. CONCLUSION ........ 22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Acetaminophen - ASD-ADHD Prods. Liab. Litig.*,
707 F. Supp. 3d 309 (S.D.N.Y. 2023)........................................ 5

*Arrow Elecs., Inc. v. Quantum Corp.*,
2024 WL 5440992 (N.D. Cal. Dec. 27, 2024)........................................ 17

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
509 U.S. 209 (1993)........................................ 4

*Calhoun v. Google, LLC*,
645 F. Supp. 3d 916 (N.D. Cal. 2022), *rev'd and remanded*, 113 F.4th 1141 (9th Cir. 2024)........................................ 15, 21

*Cmty. Care Companions, Inc. v. Interim Healthcare, Inc.*,
2025 WL 929407 (E.D.N.Y. Mar. 27, 2025)........................................ 21

*Daubert v. Merrell Dow Pharm., Inc.*,
509 U.S. 579 (1993)........................................ *passim*

*Doe I v. Google LLC*,
2023 WL 6882766 (N.D. Cal. Oct. 18, 2023)........................................ 13

*Doe v. Adventist Health*,
Case No. 22STCV36304 (L.A. Super. Ct. Feb. 14, 2025)........................................ 1, 2, 6, 18

*Ellis v. Costco Wholesale Corp.*,
657 F.3d 970 (9th Cir. 2011)........................................ 3

*Engilis v. Monsanto Co.*,
--- F.4th ----, 2025 WL 2315898 (9th Cir. 2025)........................................ *passim*

*Est. of Barabin v. AstenJohnson, Inc.*,
740 F.3d 457 (9th Cir. 2014), *overruled on other grounds by U.S. v. Bacon*, 979 F.3d 766 (9th Cir. 2020)........................................ 4

*Gen. Elec. Co. v. Joiner*,
522 U.S. 136........................................ 4, 18, 21

*In re Google RTB Consumer Priv. Litig.*,
2024 WL 2242690 ........................................ 1, 6, 21

*In re Google, Inc. Priv. Policy Litig.*,
58 F. Supp. 3d 968 (N.D. Cal. 2014)........................................ 9

*Griffith v. TikTok, Inc.*,
2024 WL 5279224 (C.D. Cal. Dec. 24, 2024) ........................................ 1, 5, 6, 21

*Harris v. Extendicare Homes, Inc.*,
829 F. Supp. 2d 1023 (W.D. Wash. 2011) ........................................ 2

*Koger v. Costco Wholesale Corp.*,
2023 WL 8188842 (N.D. Cal. Nov. 27, 2023) ........................................ 3, 6

*In re Mirena IUS Levonogestrel-Related Prods. Liab. Litig.*
(No. II), 982 F.3d 113, 123 (2d Cir. 202) ........................................ 5

*Ollier v. Sweetwater Union High Sch. Dist.*,
768 F.3d 843 (9th Cir. 2014) ........................................ 4

*Primiano v. Cook*,
598 F.3d 558 (9th Cir. 2010) ........................................ 21

*United States v. Sandoval-Mendoza*,
472 F.3d 645 (9th Cir. 2006) ........................................ 14

*United States v. Valencia-Lopez*,
971 F.3d 891 (9th Cir. 2020) ........................................ 4

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011) ........................................ 3

*Weisgram v. Marley Co.*,
528 U.S. 440 (2000) ........................................ 4, 7

*York v. BNSF Ry. Co.*,
2019 WL 764574 (D. Colo. Feb. 21, 2019) ........................................ 17

**Other Authorities**

Fed. R. Evid. 104(a) ........................................ 4

Fed. R. Evid. 702 ........................................ *passim*

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

Plaintiffs' Motion for Class Certification entirely depends on the unreliable (and in many respects, irrelevant) opinions of Professor Zubair Shafiq, whose testimony cannot be reconciled with computer science, the operation of the internet, modern day technology, the factual record, or even his own publications when he is not acting as a hired gun. Professor Shafiq starts on the wrong foot by improperly declaring he is providing a legal opinion: specifically, "whether class members would have uniformly had their information illegally shared by BetterHelp with third parties." ECF No. 170-10, Declaration of Zubair Shafiq, PhD at ¶ 1. It goes downhill from there.

This is not the first time—or even the second or third time—that Professor Shafiq has offered error-riddled and half-baked analysis in support of a proposed privacy class action on behalf of plaintiffs. In *Griffith v. TikTok, Inc.*, for example, the court held that Professor Shafiq's report "contained numerous serious errors." 2024 WL 4874556, at *1 (C.D. Cal. Oct. 22, 2024). In that case, the court denied the motion for class certification in part because it relied on "deeply flawed analysis" by Professor Shafiq that the plaintiffs ultimately "abandoned." *Id.* at *2. In another recent case, *In re Google RTB Consumer Priv. Litig.*, the court found Professor Shafiq's theories "insufficiently developed" and inadequate to meet plaintiffs' commonality burden. 2024 WL 2242690, at *10 (N.D. Cal. Apr. 4, 2024). Likewise, in *Doe v. Adventist Health*, Case No. 22STCV36304 (L.A. Super. Ct. Feb. 14, 2025),[1] the court analyzed Professor Shafiq's opinions in detail and found numerous errors including, in support of plaintiffs' CIPA claim, failing to "distinguish between page titles containing user-inputted search terms," which might be "content" subject to CIPA, and "page titles that identify the webpage without including search terms," which are not "content." *Id.* at 8. For this and other reasons, his opinions did not support certification of a class on *any* claim. *Id.* at 18. In fact, the court found that Professor Shafiq's flawed analysis actually *confirmed* that common issues did *not* predominate, including, for example, because "his reports lead to the conclusion that determining whether a patient's use of Defendant's website

[1] The cited order is attached as Exhibit A to the Declaration of James Unger ("Unger Decl.").

transmitted medical information under CMIA requires an individual analysis of the patient's search terms, as well as whether the patient just clicked on links, scrolled through webpages, or engaged in other events that do not reveal search terms." *Id.* at 11.

These criticisms of Professor Shafiq apply with equal force to the opinions he purports to offer here. In fact, the opinions he offers in this case underscore why numerous other courts have found his opinions to be error-ridden and useless. Here too, Professor Shafiq offers flawed analysis based on misleadingly selective evidence and unsound methodology, the results of which are unreproducible because he failed to preserve the record of his work. At best, Professor Shafiq's opinions confirm, as in *Doe v. Adventist*, that common issues do not predominate. Professor Shafiq's testimony does not satisfy Fed. R. Evid. 702 and is therefore properly stricken.

## II. PROFESSOR SHAFIQ'S UNSUPPORTED, ERROR-RIDDLED OPINIONS

Professor Shafiq issued two reports (Unger Decl., Ex. B, "Shafiq Rpt. I" and Ex. C, "Shafiq Rpt. II").[2] In those reports, among other significant errors, he (1) purports to analyze a website not even owned or operated by BetterHelp (and attributes that website's pixel configuration to BetterHelp); (2) failed to download and include with his opinions the technical files (known as .har files) that would have made his analysis replicable (and which would have explained his obvious mistakes), instead relying on demonstrably inaccurate screenshots; (3) claims commodity bits of data such as (i) device properties, (ii) a string of numbers known as unique user identifiers ("UUID"), (iii) user-agent strings, (iv) third party cookies (*i.e.*, third party software code such as pixels), (v) IP addresses, and (vi) URLs of webpages visited (collectively, "Common Digital Information") all constitute "personal identifiers" akin to a personal government-issued ID like a driver's license; (4) failed to consider or even acknowledge BetterHelp's privacy policies, which at all times disclosed the use of web beacons and third party cookies (a.k.a "Pixels"); (5) erroneously claims that consumers cannot limit or prevent even Common Digital Information from

---

[2] Professor Shafiq's Supplemental Report was filed on the docket without any sworn attestation, either within the report itself or in an accompanying declaration, and is undated. "[C]ourts in this circuit have routinely held that unsworn expert reports are inadmissible." *Harris v. Extendicare Homes, Inc.*, 829 F. Supp. 2d 1023, 1027 (W.D. Wash. 2011) (collecting cases). For this reason as well, the Supplemental Report should be stricken.

being shared with third parties against their will, among many other significant mistakes. These errors are discussed in greater detail below.

Based solely on Professor Shafiq's flawed opinions, and contrary to all record evidence concerning Named Plaintiffs specifically, Plaintiffs claim that BetterHelp disclosed information to third parties that allowed such parties to "uniformly and secretly capture[] their identities, confidential interactions, and communications, along with their HIPAA-protected personally identifiable information and PHI." Mot. for Class Cert. at 7.

## III. GOVERNING LEGAL STANDARD

Federal Rule of Evidence 702 governs the admissibility of expert testimony, which "always" requires the proponent to "establish the admissibility criteria of Rule 702 by a preponderance of the evidence." *Engilis v. Monsanto Co.*, --- F.4th ----, 2025 WL 2315898, at *6 (9th Cir. 2025). Given that burden, "there is no presumption in favor of admission." *Id.* "The touchstones for admissibility under Rule 702 are the relevance and reliability of the expert witness's opinions." *Koger v. Costco Wholesale Corp.*, 2023 WL 8188842 at *1 (N.D. Cal. Nov. 27, 2023). In making this determination, courts examine "'whether the reasoning or methodology underlying the testimony is scientifically valid' and 'whether that reasoning or methodology properly can be applied to the facts in issue.'" *Id.* (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592-93 (1993)). Significantly, the *Daubert* standard applies when assessing admissibility of expert opinions at the class certification stage. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349-50 (2011); *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011).

Rule 702 sets out five independent admissibility criteria for expert testimony, each of which the proponent must "demonstrate[] to the court." Fed. R. Evid. 702; *see also Engilis*, 2025 WL 2315898, at *5 (witness properly excluded when proponent failed to demonstrate one criterion). *First*, the proponent must show the witness is "qualified as an expert by knowledge, skill, experience, training, or education." Fed. R. Evid. 702. *Second*, the proponent must show the witness' testimony will satisfy each of the Rule's four distinct criteria for reliability and relevance:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case. *Id*. When evaluating proposed expert testimony under the Rule, district courts must carry out the "essential" role of "judicial gatekeeping." Fed. R. Evid. 702 advisory committee's note to 2023 amendments. They must "scrutinize" proposed testimony to ensure it meets the requirements of Rule 702. Fed. R. Evid. 702 advisory committee's note to 2000 amendments; *see also* Fed. R. Evid. 104(a) ("court must decide any preliminary question about whether a witness is qualified . . . or evidence is admissible") (emphasis added). That role is mandatory. A district court abuses its discretion if "abdicate[s] its role as gatekeeper" or "delegate[es] that role to the jury." *Est. of Barabin v. AstenJohnson, Inc*., 740 F.3d 457, 464 (9th Cir. 2014), *overruled on other grounds by U.S. v. Bacon*, 979 F.3d 766 (9th Cir. 2020); *see also United States v. Valencia-Lopez*, 971 F.3d 891, 898 (9th Cir. 2020) (district court "necessarily abuses its discretion[] when it makes no reliability findings").

Expert testimony must meet "exacting standards of reliability." *Weisgram v. Marley Co.*, 528 U.S. 440, 455 (2000). In evaluating the reliability of expert testimony, the Court must "assess 'whether the reasoning or methodology underlying the testimony' is valid" and "can be applied to the facts in issue." *Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 860 (9th Cir. 2014) (quoting *Daubert*, 509 U.S. at 592-93). Opinions that lack a reliable factual foundation should be excluded. *See Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993) (expert opinion must be "supported by sufficient facts to validate it in the eyes of the law"). Expert opinions cannot be "connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146; *see also Daubert*, 43 F.3d at 1316 ("[T]he expert's bald assurance of validity is not enough.").

Despite Rule 702's command, "many courts" had "incorrect[ly]" held "that the critical questions of the sufficiency of an expert's basis, and the application of the expert's methodology, are questions of weight and not admissibility." Fed. R. Evid. 702 advisory committee's note to 2023 amendments. To address these decisions, the Supreme Court amended Rule 702 in 2023,

clarifying that all of the Rule's admissibility criteria must be "demonstrate[d] to the court"—they are not questions for the jury. Fed. R. Evid. 702. And the court "should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." *In re Acetaminophen - ASD-ADHD Prods. Liab. Litig.*, 707 F. Supp. 3d 309, 335 (S.D.N.Y. 2023); *In re Mirena IUS Levonogestrel-Related Prods. Liab. Litig.* (No. II), 982 F.3d 113, 123 (2d Cir. 2020) ("[N]ot only was it appropriate for the district court to take a hard look at plaintiffs' experts' reports, the court was required to do so to ensure reliability."). Federal Rule of Evidence 702 permits the introduction of expert testimony only if: "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702. The rule "does not permit the expert to make claims that are unsupported by the expert's basis and methodology." *Id.*, advisory committee note.

## IV. LEGAL ARGUMENT

Although Professor Shafiq might otherwise have the requisite education, his opinions do not satisfy any of the criteria that Rule 702 dictates they must. *First*, Professor Shafiq fails to apply "scientific, technical or other specialized knowledge" that would help the trier of fact to understand the evidence. *Engilis*, 2025 WL 2315898, at *5; *Griffith*, 2024 WL 4874556, at *2; *see also* disc. *infra* at 20. This is because, among other reasons: (1) he ignores record evidence and asserts a theory that is not only inconsistent with undisputed facts but also governing law; (2) he blatantly cherry picks and attributes the conduct of third parties (*e.g.*, Meta, Mind Diagnostics) to BetterHelp, and speculates that Meta and Google are engaging in wrongful conduct for which he purports to blame BetterHelp; and (3) he frankly misleads the Court as to the roles played by Mixpanel and Google Analytics, neither of which are social media platforms on which digital advertising could possibly be placed but rather back-office tools with contractual limits on what they can do with information.

*Second*, as to whether his testimony is based on "sufficient facts or data"—the answer is a resounding no. *Engilis*, 2025 WL 2315898, at *5; disc. *infra* at 14. *Griffith*, 2024 WL 4874556, at *2. In addition to the material errors of fact and analysis that pervade his opinions, among other things, Professor Shafiq completely disregards record evidence in this case produced by a third party (Meta) that proves that even as to the Named Plaintiffs, their own individual privacy decisions dictated what (if any) information was shared with Meta. Professor Shafiq also fails to consider or address the impact of BetterHelp's privacy policies and its cookie banner, which at all relevant times (though they varied with time) disclosed the use of pixel technology and in some cases operated to prevent/limit the amount and type of information shared. *See*, *e.g.*, *Griffith,* 2024 WL 4874556, at *2.

*Third*, his opinions are in no sense the product of "reliable principles and methods." *Engilis*, 2025 WL 2315898, at *5; disc. *infra* at 17. To the contrary, his opinions contain demonstrable, material mistakes, but because he only "proved" most of his work through inaccurate screenshots (rather than downloading the technical .har files that would have shown his work), there is no way to replicate his "methodology" to see where he went wrong. And as to that, because he only "tested" from a single browser (Chrome) on a laptop, even if his results were otherwise reliable (though they are not), they do not and cannot possibly apply to users of the BetterHelp mobile application or other browsers and types of devices (*i.e.*, the vast majority, as is clear from the record evidence in the case). *See In re Google RTB Consumer Priv. Litig.*, 2024 WL 2242690, at *10. He also asserts wildly speculative opinions regarding "fingerprinting," "identity resolution services" purportedly being employed by Meta and Google, and a so-called "entropy theory," which could not possibly apply to BetterHelp in this case and for which he has zero actual evidence. *Id.*; *see also Doe v. Adventist Health*, Case No. 22STCV36304 (L.A. Super. Ct. Feb. 14, 2025), Unger Decl., Ex. A.

*Lastly*, because Professor Shafiq's opinions are riddled with technical and factual errors; ignore (or fail to address) relevant, salient evidence; are not replicable and are in many respects wildly speculative, he could not possibly have reliably applied valid "principles and methods" to the facts of the case. *Engilis*, 2025 WL 2315898, at *5 *Koger*, 2023 WL 8188842 at *1; disc. *infra*

at 17-20. Failing under one criterion warrants exclusion; here, Professor Shafiq meets none. *Engilis*, 2025 WL 2315898, at *6. Professor Shafiq's opinions do not come close to satisfying Rule 702's "exacting standards of reliability." *Weisgram*, 528 U.S. at 455. They are properly excluded.

### A. Professor Shafiq's Opinions Fail to Satisfy Fed. R. Evid. 702(a).

As the examples below illustrate, none of Professor Shafiq's opinions will help the trier of fact to understand the evidence or to determine a fact in issue because they are full of mistakes, mischaracterizations, and blame BetterHelp for the conduct of third parties.

#### 1. Professor Shafiq's Opinions Regarding "Common Digital Information" Are Inapt and Contrary to Law.

Professor Zubair Shafiq opines as to just three entities—Mixpanel, Google Analytics, and Facebook— only one of which, Facebook, is consumer-facing and directs the installation of a Pixel to measure advertising effectiveness. *But see* Shafiq Rpt. I at ¶¶ 68-73. Google Analytics' terms of service expressly forbid business partners like BetterHelp from providing any "personally identifying information" to Google.[3] Mixpanel is contractually obligated to keep confidential the information shared with it by BetterHelp and cannot use it for any purpose.[4] With a few limited exceptions indisputably inapplicable to the Named Plaintiffs, the Facebook Pixel captured only commodity-level information ("Common Digital Information"). Common Digital Information does not include "patient identifiers" as Plaintiffs claim (Mot. at 8), but rather is anonymized, standard device data, much of which automatically changes over time:

---

[3] Google Analytics requires companies like BetterHelp to promise that it "will not and will not assist or permit any third party to pass information, hashed or otherwise, to Google that Google could use or recognize as personally identifiable information . . . ." and requires companies using Google Analytics to post a privacy policy disclosing "the use of Google Analytics, and how it collects and processes data." https://marketingplatform.google.com/about/analytics/terms/us/ (last visited September 12, 2025). And even Facebook was contractually barred from using data received from BetterHelp for its own purposes beyond providing services to BetterHelp (per Facebook's terms with advertisers, they are not supposed to, for example, resell or misuse conversion data). Expert Report of Dr. Ben Zhao ("Zhao Rpt."), ¶¶ 49-61.

[4] Unger Decl. Ex. D (BH0000069-89 at BH0000076).

| Data Category | What It Actually Is[5] |
|---|---|
| **URLs of webpages visited** | *Every* website logs its own URLs in ordinary server access logs; third-party tags also capture them so advertisers can measure which pages perform best. BetterHelp's public pages use neutral path names rather than embedding answers or diagnoses in the URL, so no sensitive content is ever exposed via a URL. |
| **Third Party Cookies** | A third-party cookie can be set when a link is clicked on one website to navigate to another website or can be used as part of a Pixel software code as configured by the provider (e.g., Meta). Consumers can and do block these in a variety of ways. The Meta Pixel third-party cookies are not always placed and depend on a number of variables which differ by user. |
| **IP address** | IP addresses reveal, at best, a rough region or ISP. They do not identify specific devices or specific users. Devices in the same household share a router; VPNs mask true IPs; mobile carriers use Carrier Grade Network Address Translation ("CG-NAT").[6] Linking an IP address to a person generally requires a subpoena to the ISP. Advertisers use IP addresses mainly for coarse geolocation and fraud checks—not as a personal identifier. Moreover, during the relevant time period, many major operating systems supported IPv6 temporary addresses and in many instances this privacy feature was enabled by default. |
| **User-agent string** | Indicates browser/OS version (e.g., "Chrome 123 on Windows 11"). All browsers send this header by design; it is neither unique nor static (it changes when users update software). On its own (or even combined with other commodity-level data) it cannot identify an individual. Beginning in May 2021, Google began limiting the amount of information contained in a user-agent string sent through the Chrome browser.[7] |
| **Device properties (screen size, language)** | Used to serve correct layouts and language-specific content. Tens-of-millions of devices share the same 1920×1080 resolution or "en-US" locale; the signal is far too common to single out a single type of device, much less a particular device or a single user. |
| **Unique User Identifier (UUID)** | A 128-bit label used to uniquely identify objects in computer systems. A UUID is typically a string of numbers that does not personally identify anyone. |

To support his contention of uniform sharing of "sensitive information," Professor Shafiq makes multiple unsupported assertions and ignores basic facts about the Internet. Professor Shafiq sensationalizes the sharing of Common Digital Information which is routinely shared by websites

---

[5] *See* Zhao Rpt., ¶ 25.

[6] International standard RFC 6888 requires mobile networks to use CG-NAT. Studies show that mobile networks using CG-NAT assign an average of 438 users to each public IPv4 address, and addresses are reassigned every 24–48 hours. Richter, P., et al. (2016), *A Multi-perspective Analysis of Carrier-Grade NAT Deployment*, ACM IMC 2016. https://dl.acm.org/doi/10.1145/2987443.2987474.

[7] Chromium User-Agent Reduction. https://www.chromium.org/updates/ua-reduction/.

as part of normal internet infrastructure (and is not actionable as a matter of law). Shafiq Rpt. I at ¶¶ 78, 79; *In re Google, Inc. Priv. Policy Litig.*, 58 F. Supp. 3d 968, 985 (N.D. Cal. 2014) (consumers have no privacy interest in IP addresses, device properties, and basic URLs, and the "disclosure of common, basic digital information" is not a basis for liability).

But Professor Shafiq nevertheless opines that Common Digital Information (*i.e.*, URLs, third-party cookies, IP addresses, UUIDs, user-agent strings and device properties) are (1) identifying information at an individual consumer level and (2) were always shared for each Proposed Class Member regardless of consumer choice. Shafiq Rpt. I ¶ 59. He even goes so far as to compare such "identifiers" to driver's license numbers, and device identifiers to license plates. *Id.* But these so-called "identifiers" (cookies, UUIDs) are not government-issued, they are not centrally indexed and available, they are not formally linked to an identity by a public authority, and users can (and do) reset or delete them at will. Zhao Rpt. ¶ 26. They are not static, not official identifiers and cannot validly be compared to official government credentials under the law. *Id.*; *In re Google, Inc.*, 58 F. Supp. 3d at 985.

**2. Professor Shafiq's Opinions that Consumers Could Not/Did Not Prevent Sharing of Data Are Counterfactual and Inconsistent with Undisputed Evidence.**

Professor Shafiq also failed to consider at all the impact that numerous individual consumer choices—like using web browsers with privacy-enhancing features, Virtual Private Networks (VPNs) that obscure a user's IP address, ad-blocking software, logging out of third-party accounts, and clearing cookies—have on the collection and sharing of information. *See* Zhao Rpt. at ¶ 36. Professor Shafiq's opinion that Proposed Class Members were somehow unable to prevent sharing even Common Digital Information via Pixels is flat-out wrong and directly contradicted by modern technology and credible research. Statistical surveys show that most consumers have widely adopted pixel-blocking browsers or technologies. A recent Pew Research survey reports that "[r]oughly seven-in-ten social media users (68%) say they have changed their social media privacy settings as a way to manage their online privacy." Pew Research Center, 2023 https://www.pewresearch.org/internet/2023/10/18/how-americans-protect-their-online-data/ (last

visited September 12, 2025). In fact, 44% of U.S. adults use a browser that does not track their activities, and 67% use available tools to turn off tracking and cookies. *Id.*

This reality is borne out through third party evidence produced by Meta about the Named Plaintiffs, which, incredibly, Professor Shafiq entirely ignored, but which demonstrates that Plaintiffs (and all other Proposed Class Members) had the ability to (and did) take simple steps to prevent or limit the impact of Pixels such as the Meta/Facebook Pixel when visiting betterhelp.com via the Internet. Of the five Named Plaintiffs, two testified that they took some of those steps.[8] When they did, Meta did not collect any information about them, as indicated below[9]:

| **Plaintiff** | **Used Service** | **Device / Browser** | **Privacy Practices** | **Meta Had Info?**[10] |
|---|---|---|---|---|
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |

8 [redacted]

9 Relevant excerpts of the transcripts of depositions of Plaintiffs Jan Doe I, Jane Doe III, S.C., T.R., and L.M. are attached as Unger Decl., Exs. E-I respectively.

10 *See* Tusan Decl., Ex. 41 (META_BETTERHELP_000000003–05) (showing limited information BetterHelp shared with Meta for Plaintiffs Jane Doe I, S.C., and L.M.)

11 Plaintiffs' interrogatory responses are attached as Exs. U-X to the Unger Declaration.

| Plaintiff | Used Service | Device / Browser | Privacy Practices | Meta Had Info?[10] |
|---|---|---|---|---|
| | [redacted] | [redacted] [redacted] | [redacted] | |
| [redacted] | [redacted] [redacted] | [redacted] [redacted] | [redacted] [redacted] | [redacted] |

### 3. Professor Shafiq Improperly Ascribes To BetterHelp Allegedly Wrongful Conduct of Third Parties.

In his reports, Professor Shafiq purports to blame BetterHelp for the conduct of third parties by (among other things) misleadingly claiming that BetterHelp is actually responsible for their alleged conduct. Those opinions are unreliable and wholly irrelevant.

#### *a. Facebook Changed Its Pixel Configuration.*

For example, Professor Shafiq makes the claim that BetterHelp "shared the intake questionnaire information with Facebook," suggesting that BetterHelp voluntarily shared both the questions that users were prompted to answer during the signup process for BetterHelp and the answers they provided. Shafiq Rpt. I ¶ 68. In his report, Professor Shafiq provides "screenshots" purporting to show the same (though these screenshots are materially misleading for reasons discussed *infra* at 18-20). Shafiq Rpt. I ¶ 68(a)-(e).

In truth, only (mostly one word) answers (and not the Intake Questionnaire questions themselves) were shared for a very brief (19 day) period, **not** because BetterHelp voluntarily shared the answers, but due to Facebook modifying its Pixel without BetterHelp's knowledge or consent. Declaration of James A. Unger, Exh. J ("Shafiq Tr.") at 168:13–169:13; *see also* Zhao Rpt. at ¶¶ 84-100. As soon as BetterHelp realized this was occurring it immediately put a stop to it. Vaughan Decl. ¶ 45.

But Professor Shafiq omits all of this from his report; not only does he falsely suggest that BetterHelp shared *both* questions and responses with Facebook (though it did not), he fails to clarify

that answers were shared only briefly (but not for any of the Named Plaintiffs, none of whom completed the questionnaire during this period, *see* FACC ¶¶ 25-31). Even worse, he misleadingly characterizes Facebook's *taking* of the data as BetterHelp willingly "sharing" the data (though he knew or should have known otherwise). Shafiq Rpt. I at ¶ 68. At his deposition, when confronted with the evidence, Professor Shafiq was forced to concede that, notwithstanding the broad language in his report, he was "not claiming that all the answers to all the intake questioning were shared throughout the [proposed] class period." Unger Decl. Ex. J (Shafiq Tr.) at 168:23–25.

***b. Mind Diagnostics Is Not Owned or Operated by BetterHelp***

Another significant error Professor Shafiq made in his report pertains to a screenshot of a "test" from a website that is not owned or operated by BetterHelp. Figure (h) in paragraph 68 of Professor Shafiq's first report shows a screenshot from MindDiagnostics.org. According to Professor Shafiq, the screenshot shows that "BetterHelp shared information with Facebook about a user starting a gender dysphoria test." But the screenshot makes clear that the Mind Diagnostics site has a Facebook Pixel ID that is different from the Facebook Pixel ID on the BetterHelp site. *Compare, e.g.*, Shafiq Rpt. I at ¶68(g)-(h) with ¶68(a)-(e) (showing different pixel identification numbers); Zhao Rpt. ¶. The different Facebook Pixel IDs mean that this is not the same Facebook Pixel used by BetterHelp. Mind Diagnostics is a third party, not related to BetterHelp like one of its sister sites like ReGain or Pride Counseling. Declaration of Niklas Vaughan at ¶ 17. The Mind Diagnostics website should not have been included as part of the set of screenshots as purported evidence of BetterHelp disclosing information to Meta. It was plainly an error for Professor Shafiq to have included it.

When confronted with this mistake, however, Professor Shafiq doubled down, claiming without basis that BetterHelp is somehow responsible for Mind Diagnostics' Facebook Pixel simply because the Mind Diagnostics URL appears in a former plaintiff's Meta logs. Shafiq Tr. 126:14-18. While the Mind Diagnostics URL appears in a Meta log of a former plaintiff, (Meta-003, tab 4, row 36, col. M), that in no sense means that BetterHelp "controlled" the Facebook Pixel of Mind Diagnostics. Had Professor Shafiq appropriately documented his work by preserving the .har file of his analysis (disc. *infra* at 17), one would be able to tell how he generated the screenshot

in Figure (h) of his report and where he went wrong. But it is also true that the Mind Diagnostic's URL appearance in the logs produced by Meta could be explained by the fact that the Mind Diagnostics site has a link on it to the BetterHelp website.[12] When a user clicks on the BetterHelp link present on the Mind Diagnostics website, what may have occurred is that BetterHelp's Facebook Pixel detected a new user on the website and captured the URL referrer information, as nearly all websites do. Zhao Rpt. at ¶ 80. The URL referrer will include the URL of the website that referred, or sent, the user to BetterHelp (here, Mind Diagnostics). *Id.* But one thing that is readily apparent is that the text of the URL from the Mind Diagnostics website, "gender-dysphoria-test," was set by Mind Diagnostics, not by BetterHelp, a key point that Professor Shafiq failed to acknowledge. Because Mind Diagnostics is a third party, the Mind Diagnostics URL is irrelevant, as are Professor Shafiq's opinions about it (and any other third party's conduct). "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 591 (1993); *Doe I v. Google LLC*, 2023 WL 6882766, at *1 (N.D. Cal. Oct. 18, 2023) (Excluding improper rebuttal declaration of Professor Shafiq and stating: "Although the plaintiffs presented evidence suggesting Google has the *capability* of using this information for its own purposes, they did not present evidence suggesting Google actually connects the health information with any specific patient or uses the acquired health information itself.").

***c. BetterHelp Did Not Facilitate "Fingerprinting" or "Entropy"***

Professor Shafiq claims falsely that Google and Meta use data from BetterHelp to identify Proposed Class Members. Shafiq Rpt. I at ¶¶ 31, 78–79, 82. He claims that Google and Meta use a combination of Common Digital Information purportedly collected from the BetterHelp website to create a unique identifier that can "fingerprint" an individual and/or use "identity resolution services." *Id.* at ¶13(b). But there is no evidence that Google or Meta were engaging in fingerprinting (*i.e.*, trying to create unique identifiers for individuals visiting the BetterHelp website without their knowledge or consent) or that they have ever used "identity resolution services." Nor

---

[12] *See*, *e.g.*, https://www.mind-diagnostics.org/blog/general/betterhelp-counseling-an-overview-for-patients-and-therapists (last visited Sept. 15, 2025).

was BetterHelp engaging in any conduct that would have facilitated fingerprinting or identity resolution. To plausibly engage in "fingerprinting," a website needs to use a specific fingerprinting library or code. Zhao Rpt. ¶ 113. Prof. Shafiq did not identify any such code in BetterHelp's implementation of the Pixel, and there is none. Vaughan Decl. ¶ 15. In his deposition, when asked what he meant by "fingerprinting on BetterHelp," Professor Shafiq essentially referred to non-private Common Digital Information—IP address, browser, and device information that he contends was transmitted via the Facebook Pixel. Shafiq Tr. at 273:22-274:6.

Professor Shafiq also claims without basis that Meta and Google employ "entropy" to identify individuals. This is a wildly speculative, unproven theory that is directly contradicted by evidence produced by Meta for the two Named Plaintiffs who claimed to take their online privacy seriously. For those individuals who took affirmative steps to keep their online presences private, Meta had **zero** information. Disc. *supra* at 10. And in any case, if Meta and Google were attempting to use "entropy" to identify people based on Common Digital Information, and that conduct were somehow found to be wrongful, that would not be BetterHelp's fault. BetterHelp would have no need to use entropy to identify the consumers who signed up to use the BetterHelp platform – it already knows who those individuals are. There is no evidence that BetterHelp was somehow coordinating with Google or Meta to share "patient level data"; to the contrary, the uncontroverted evidence is that BetterHelp never sold or otherwise monetized consumer data. Unger Decl. Ex. K, Matas Tr. at 221:1-6, 223:16-22 ; Vaughan Decl. ¶ 13. And although Professor Shafiq opines BetterHelp should be made responsible for the conduct of third parties (imagined or otherwise), such *ipse dixit* opinions are irrelevant, including because they lack a "valid connection to the pertinent inquiry." *United States v. Sandoval-Mendoza*, 472 F.3d 645, 654 (9th Cir. 2006) (internal quotation marks and alteration omitted). "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Daubert,* 509 U.S. at 591.

**B. Professor Shafiq Fails to Satisfy Fed. R. Evid. 702(b)**

Professor Shafiq's opinions are not based on sufficient facts or data. There are many, many errors in his reports, not only in his analysis, but in his claims related to technology and how it

operates. [13] To begin, every single member of Plaintiffs' proposed classes had the ability to prevent the sharing of even pedestrian information with Facebook. Disc. *supra* at 9-10. Professor Shafiq fails to acknowledge that even the device-level information Facebook or any other social media platform captured necessarily would vary between and among consumers depending on a variety of different factors within each consumer's control. Shafiq Rpt. I at ¶ 56. Prof. Shafiq's contention that consumers cannot prevent Common Digital Information from being transmitted to Facebook (or any other third party) is demonstrably not true.

To prop up this untenable theory, Prof. Shafiq incorrectly suggests in his report that all browsers transmit the same information, displaying a chart showing that four browser types (Chrome, Safari, Edge, and Firefox) all disclose "cookies." Shafiq Rpt. I at ¶ 59. The chart is frankly misleading and contradicted by his own published writings upon which he purports to rely as well as prior testimony given in other proceedings. *Calhoun v. Google, LLC*, 645 F. Supp. 3d 916, 930 (N.D. Cal. 2022), *rev'd and remanded*, 113 F.4th 1141 (9th Cir. 2024), and *rev'd and remanded*, 113 F.4th 1141 (9th Cir. 2024). In an article he wrote called CookieGraph: Understanding and Detecting First-Party Tracking Cookies (which Professor Shafiq cites five times), he admits that Apple's Safari browser, Microsoft Edge and Firefox *block* third-party cookies by default.[14]

In fact, there are myriad ways in which consumers who visited the BetterHelp site or mobile application are differently situated from one another based on their privacy choices alone. Zhao Rpt. at ¶ 36. Every member of Plaintiffs' Proposed Classes, including Plaintiffs themselves, had the ability to prevent third-party cookies and web beacons (a.k.a. Pixels) from capturing and transmitting information by one or more of these choices. For example, they could use browsers

---

[13] These are detailed more fully in the Rebuttal Report of Dr. Ben Zhao, submitted concurrently herewith.

[14] Shafiq Rpt. I at n. 33, 47, 165, 220 and 221, citing "CookieGraph: Understanding and Detecting First-Party Tracking Cookies," at 3491-92.

that by default block tracking technologies, like Safari,[15] Firefox,[16] or Microsoft Edge.[17] A Chrome user could set their browser's cookie settings to block tracking.[18] BetterHelp's privacy policies even told consumers that they could change their browser settings to block cookies.[19]

Professor Shafiq's decision to use only a Chrome browser for his so-called testing without implementing any of the available privacy safeguards on Chrome, *see* Zhao Rpt. at ¶ 40 also means that even if his opinions were valid in any respect, though they are not, Professor Shafiq could not reliably extrapolate his so-called findings across all members of the Proposed Classes. Professor Shafiq provides an aggregate data point that shows over 52% of the browser market is owned by Chrome and just under 31% is Safari. Shafiq Rpt. I at 36, n. 219. But BetterHelp's own (accurate) data shows that its users meaningfully diverge from this proffered "norm." Just 43% of BetterHelp users visit the site using Chrome (settings unknown), and 45% of users visit on Safari.[20] This information was available to Professor Shafiq to consider but he did not consider it.

Moreover, Dr. Shafiq only used a laptop device when conducting his testing. But BetterHelp's website data shows that over **83%** of active users visit from a mobile device (*e.g.*, mobile phone) and not a personal computer,[21] another reason Prof. Shafiq's testing is irrelevant to most users. Mobile devices behave differently, as they introduce other variables, including (for example) the impact of mobile operating devices and cellular networks. Zhao Rpt. at ¶ 41 (discussing differences). Prof. Shafiq failed to consider any of these differences and variables. His opinions indisputably would also not apply to these devices, rendering his unreliable opinions wholly inapplicable to at least **83%** of the consumers in the Proposed Classes out of the gate, not counting everyone else who had different configurations than Professor Shafiq (including,

---

[15] https://www.apple.com/safari/docs/Safari_White_Paper_Nov_2019.pdf.; https://developer.apple.com/documentation/safari-release-notes/safari-13_1-release_notes.

[16] https://web.archive.org/web/20191022135346/https://support.mozilla.org/en-US/kb/enhanced-tracking-protection-firefox-desktop.

[17] support.microsoft.com/en-us/microsoft-edge/learn-about-tracking-prevention-in-microsoft-edge-5ac125e8-9b90-8d59-fa2c-7f2e9a44d869.

[18] https://support.google.com/chrome/answer/95647?co=GENIE.Platform%3DDesktop.

[19] Unger Decl. Exs. L – Q (BH0000590 at 591; BH0000600 at 601; BH0000610 at 611; BH0000619 at 620; BH0000628 at 629; BH0000641 at 642).

[20] Unger Decl. Ex. R, BH0085413.

[21] Unger Decl., Ex. S, BH0085416.

apparently, 2 of the 5 Named Plaintiffs).

Professor Shafiq also utterly disregarded BetterHelp's privacy policies and cookie banners as if they never existed. *See generally* Shafiq Rpt. I and II at *passim*; *see also* Defendant BetterHelp Inc.'s Opposition to Plaintiffs' Motion for Class Certification (ECF No. 205) at 8-11 (discussing policies, banners and changes made during the Proposed Class Period). But BetterHelp always disclosed the use of "cookies and web beacons of services owned or provided by third parties" to consumers, and the disclosures only became more detailed and explicit over time. Vaughan Decl. at ¶ 25. Moreover, beginning in September 2020, BetterHelp added a pop-up banner disclosing BetterHelp's use of Pixels and a link to the Privacy Policy. Every single member of Plaintiffs' Proposed Classes from and after September 2020: (1) saw the pop-up banner and (2) had to click to affirmatively indicate their consent ***with every question of the Intake Questionnaire***. *Id.* at ¶¶ 27-28. Professor Shafiq's opinions are rife with guesswork and assumptions and ignore great swaths of not only the evidence but also the realities of modern technology and how it operates. *York v. BNSF Ry. Co.*, 2019 WL 764574, at *7 (D. Colo. Feb. 21, 2019) (excluding proposed expert testimony which was "the product of guesswork and assumption—which is not fairly attributable to any scientific data-gathering or methodological analysis" and where "conclusions are little more than a vehicle for the conclusory suppositions of" plaintiff's counsel). They are properly stricken.

**C. Prof. Shafiq Fails to Satisfy Fed. R. Evid. 702(c)**

The issues with Professor Shafiq's "analysis" discussed above are exacerbated by the fact that his conclusions are "untestable" based on the limited data he provided. In *Daubert*, the Court outlined other factors relevant to the reliability prong, including "whether the theory or technique in question can be (and has been) tested." 509 U.S. at 580. This Court has previously rejected "untestable" expert opinions that "did not sufficiently disclose what 'principles and methods' [were] used." *Arrow Elecs., Inc. v. Quantum Corp.*, 2024 WL 5440992 at *3 (N.D. Cal. Dec. 27, 2024). Specifically, Professor Shafiq failed to preserve and produce the .har files, which would have documented his testing methodology. Zhao Rpt. ¶¶ 69-70. A .har file records a user's journey on a website and lets another person see the browser's interaction with the site, including what cookies and other data were transmitted. *Id.* at ¶ 69; Shafiq Tr. 46:19-48:1, 55:24-56:24.

Researchers often use .har files to document their process so it can be replicated by someone else. *Id.* A .har file is easy to generate; a researcher can download them by clicking a button on the "inspect" console in their Chrome or Safari browser. Zhao Rpt. ¶¶ 69.

Because Professor Shafiq did not produce .har files to "show his work," no one can validate his methodology (or in this case, understand why he made the errors he did). *Id.* at ¶¶ 69-70. Professor Shafiq is well aware of .har files and has even submitted them as part of his workpapers in another case (albeit one where he was sharply criticized for rampant errors). *Doe v. Adventist Health*, Case No. 22STCV36304 (LASC Feb. 14, 2025), Unger Decl. Ex. A. Professor Shafiq failed to use them here, however, incredibly taking the position that screenshots were somehow "better." Shafiq Tr. at 295:4-9. To the contrary, without the .har file, the screenshots Professor Shafiq pasted in his report cannot be replicated or validated. Zhao Rpt. ¶¶ 69-70. In the absence of this basic documentation, Plaintiffs are asking the Court to take Professor Shafiq's word for the accuracy of his analysis, even where the material submitted, on its face, reveals substantial mistakes. *See Gen. Elec.*, 522 U.S. at 146 ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert" and where "there is simply too great an analytical gap between the data and the opinion proffered").

The Court need not, and should not, do so, particularly given the screenshots pasted in Professor Shafiq's first report are affirmatively misleading, and in some cases downright wrong, including in the following important ways: **Professor Shafiq erroneously and misleadingly makes supposed findings for the entire class period based on cherry-picked screenshots.** Professor Shafiq concludes that BetterHelp "shared the intake questionnaire information with Facebook" for the entire class period based on screenshots from a single day, March 2, 2021. Shafiq Report ¶ 68(a)-(d). This conclusion is false and misleading for at least two fundamental reasons. *First*, as discussed in Section IV(3)(a), *supra*, there was a limited, three-week period during which a change that Facebook implemented without BetterHelp's knowledge or consent caused certain limited *answers* (not questions) to be transmitted to Facebook. In other words, there is no evidence that Facebook collected any information that allowed Facebook to match answers with the

associated questions. *Second*, Professor Shafiq knowingly selected a date within this brief and anomalous 19-day period and misleadingly applied it to the entire class period. Indeed, Professor Shafiq acknowledged at his deposition that he knew March 2, 2021 fell within this anomalous period, Shafiq Tr. at 168:13–169:13, and conceded that he was "not claiming that all the answers to all the intake questioning were shared throughout the class period." Shafiq Tr. at 168:23–25.

**Figure (e) is completely misleading**. Professor Shafiq falsely suggests that BetterHelp "told" Facebook that a user was considering suicide throughout the Proposed Class Period. Shafiq Rpt. I at ¶ 68. This is not true and never was. When a user takes the BetterHelp Intake Questionnaire, at some point they get to the question: "Have you made specific plans for suicide?" This is a screening question not being asked out of prurient curiosity. Rather, it is important for people in crisis to get immediate help. For this reason, if the user selects "Yes," the questionnaire is structured to immediately route the user to a crisis page for those at risk for self-harm.[22]

[redacted]

*Second*, in Figure (e) specifically, the screenshot shows a BetterHelp page for "Crisis Resources" alongside "I have made specific plans." This too is materially misleading: the "Crisis Resources" page does not actually generate that Facebook Pixel traffic (or any Pixel traffic at all), according to testing of the page preserved by an actual .har file. Zhao Rpt. at ¶ 79. It only appears

[22] BetterHelp has explained that its platform is not appropriate for people who have made specific plans for suicide, as they need immediate psychiatric assistance. Vaughn Decl. ¶ 9.
[23] ECF No. 170-1 (Tusan Decl.), Ex. 41 (META_BETTERHELP_000000003–05).

to do so in Professor Shafiq's report because Prof. Shafiq's screenshot shows his Chrome inspect console preserving the network traffic from *different* navigations in the session. *Id.*

*Third*, the date stamps in Figure (e) further prove the unreliability of Professor Shafiq's conclusions because they do not match. Specifically, the dates in his Figures (b) – (d) show a date of March 2, 2021. Shafiq Rpt. I at ¶ 68. Figure (e), on the contrary, reads March 27, 2021. *Id.* But the BetterHelp Intake Questionnaire is not preserved by the Wayback Machine on that date (Zhao Rpt. ¶ 76 n.152),[24] so Prof. Shafiq must have navigated there from the March 2, 2021 date, or from another date (no one can tell, because he did not preserve his work). There is no other explanation for the "I have specific plans" button text in the traffic not otherwise on the page. This means that the screenshots in Figure (e) show traffic generated from a *different page* on a *different day*.[25]

**Professor Shafiq mischaracterizes the screenshots generally**. In addition, the screenshots at Shafiq Rpt. ¶ 68, Figures (a)-(e) misleadingly give the reader the impression that Facebook would receive the left-hand context of the user's actions (the browser window), alongside the right-hand traffic data (the Chrome inspect Network console). In fact, however, only the right-hand traffic data shows what is sent over the network (and only via Chrome with default browser settings). The side-by-side screenshots are thus inaccurate and misleading.

**Professor Shafiq fails to properly align the screens and button text.** Prof. Shafiq also fails to display the correct screen with the correct button text. Shafiq Rpt. I at ¶ 68, Figures (b), (c), (d), and (e). The button text corresponds to previous selections on *prior* questions. But because the screenshot on the left side of the report is not content that was ever shared with any third party, the screenshots are useless in any event.

[24] Citing https://web.archive.org/web/20211101000000*/https://www.betterhelp.com/start/, last visited September 15, 2025.

[25] Wayback Machine's architecture stitches together different dates and displays them as a coherent whole when pages are missing on a given date or dates, as occurred on the date he tested, March 2, 2021. Prof. Shafiq's failure to identify this characteristic of the Wayback is another material error, which would have been evident from the .har file had he preserved it. Whether or not Prof. Shafiq realized his mistakes, if he had downloaded the .har file his errors would have been apparent.

Professor Shafiq has been criticized by courts specifically for selective use of unrepresentative samples, including (as here) use of specific dates that cannot be extrapolated to an entire user population. *See Griffith v. TikTok, Inc.*, 2024 WL 5279224, at *3 (C.D. Cal. Dec. 24, 2024) (listing "numerous" such errors by Prof. Shafiq.) Such serious errors are profoundly misleading, smack of blind advocacy rather than scholarship, and warrant exclusion of the opinions. *Id.*; *Cmty. Care Companions, Inc. v. Interim Healthcare, Inc.*, 2025 WL 929407, at *14 (E.D.N.Y. Mar. 27, 2025) ("would-be [legal] brief masquerading as an expert opinion" properly excluded under Rule 702).

**D. Professor Shafiq Fails to Satisfy Fed. R. Evid. 702(d).**

*Daubert*'s relevance prong requires the court to determine if the expert's opinions "fit" the case at hand and thereby "assist the trier of fact to understand or determine a fact in issue." *Daubert*, 509 U.S. at 591-92. Where "there is simply too great an analytical gap between the data and the opinion proffered," the testimony is neither helpful nor reliable. *Gen. Elec.,* 522 U.S. at 146. Expert testimony should be excluded where it does not "assist the trier of fact." *Primiano v. Cook*, 598 F.3d 558, 563 (9th Cir. 2010).

As discussed above, Professor Shafiq's Reports are irrelevant and unreliable because they (1) lack scientific and technical foundation; (2) disregard significant evidence that is not in dispute; (3) are riddled with mistakes, cherry-pick and affirmatively mislead the Court and trier of fact; (4) blame BetterHelp for the so-called wrongful conduct of third parties (including in connection with a website BetterHelp does not own or operate), (5) fail provide sufficient data to test (or at least understand) Professor Shafiq's erroneous conclusions; (6) focus on irrelevant subject matter; and (7) draw unsupported conclusions. As a result, Shafiq's testimony falls well below requirements of Rule 702, including for many of the same reasons Courts have rejected his opinions in the past. *In re Google RTB Consumer Priv. Litig.*, 2024 WL 2242690, at *10; *Calhoun*, 645 F. Supp. 3d at 930; *Griffith*, 2024 WL 5279224, at *4. Under both governing and highly persuasive authority, they are properly excluded here as well. *Engilis*, --- F.4th ----, 2025 WL 2315898, at *6.

## V. CONCLUSION

For the reasons stated herein, BetterHelp respectfully requests that the Court strike Professor Shafiq's two reports and exclude his testimony in this matter.

Dated: September 15, 2025

**KING & SPALDING LLP**

By: */s/ Livia M. Kiser*

LIVIA M. KISER (SBN 285411)
*lkiser@kslaw.com*
JEFFREY HAMMER (SBN 264232)
*jhammer@kslaw.com*
CRAIG H. BESSENGER (SBN 245787)
*cbessenger@kslaw.com*
JAMES A. UNGER (SBN 325115)
*junger@kslaw.com*

*Attorneys for Defendant BETTERHELP, INC.*