# EXHIBIT A

**REDACTED VERSION OF DOCUMENT PROPOSED
TO BE FILED UNDER SEAL**

# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF CALIFORNIA

| IN RE BETTERHELP, INC. DATA DISCLOSURE CASES | Master File No. 3:23-cv-01033-RS |
| --- | --- |

# Expert Report of Dr. Natalie Mizik
# September 12, 2025

Confidential / Subject to Protective Order

# Table of Contents

I.  Qualifications.................................................................................................................1

II.  Case Background and Plaintiffs' Claims............................................................................4

III.  Assignment ....................................................................................................................9

IV.  Summary of Opinions......................................................................................................9

V.  Mr. Krause's Proposed Damages Approach Is Unreliable Because It Is Disconnected From the Specific Context of the Case ........................................................................................11

    A.  Mr. Krause's Proposed Damages Approach Ignores That a Market for the At-Issue Data In which Putative Class Members Could Sell Their Individual At-Issue Data to Third Parties Does Not Exist...............................................................................12

    B.  Mr. Krause's Proposed Damages Approach Ignores That the At-Issue Data May Have Been—and Likely Were—Available to Third Parties through Other Means ..................17

    C.  Mr. Krause's Proposed Damages Approach Ignores Any Benefits that Putative Class Members May Have Received Because of the At-Issue Conduct....................................25

VI.  Mr. Krause's Proposed Damages Approach Is Unreliable Because It Ignores Heterogeneity across Putative Class Members ...................................................................................27

VII.  Mr. Krause's Estimate of "Fair Market Value" of $200 Per Putative Class Member Is Unreliable Because It Is Not Based on a Scientific Methodology and Is Based on Biased "Data Points" that Are Untethered to the Facts of the Case ...............................................29

    A.  Mr. Krause's Estimate of "Fair Market Value" of $200 per Putative Class Member Is Not Based on a Scientific Methodology ..................................................................29

    B.  The "Data Points" Mr. Krause Relies on to Estimate the Value of Personally Identifying Information Are Disconnected from the Facts of The Case and Their Selection Left Out Sources Providing Estimates Lower than Mr. Krause's $200 Estimate...........................32

        1.  Data Deletion Services Fees ...............................................................33

        2.  Li et al. (2021) ..................................................................................35

        3.  2017 Ponemon Institute Study...........................................................39

        4.  Mr. Krause Left Out From His Analysis Sources of Information Estimating a Value of Personally Identifying Information Significantly Lower than Mr. Krause's $200 Estimate ...................................................................................41

    C.  "Data Points" Mr. Krause Relied on for Estimating a "Premium" for the "Patient Status" in the At-Issue Data Are Disconnected from the Facts of the Case ..................................43

        1.  Li et al. (2021) ..................................................................................44

        2.  2017 Ponemon Institute Study...........................................................45

        3.  2017 Trustwave Study .......................................................................45

        4.  2019 EY Study ..................................................................................48

## I. Qualifications

1.      I am a tenured Professor of Marketing and the J. Gary Shansby Endowed Chair in Marketing Strategy at the University of Washington Foster School of Business.  I received my Ph.D. in Marketing from the University of Washington in 2002.  Before returning to join the University of Washington faculty in 2012, I served on the faculty of Columbia University from 2002 to 2011, first as an Assistant Professor and later as the Gantcher Associate Professor of Business.  From 2010 to 2011, I was a Visiting Associate Professor of Marketing at the MIT Sloan School of Management.  From 2011 to 2012, I served on the faculty of the Kenan-Flagler Business School at UNC-Chapel Hill as an Associate Professor of Marketing and Sarah Graham Kenan Scholar.  As a part of the Columbia-Berkeley joint Executive MBA program, I have also taught executive MBA students at the University of California, Berkeley in 2009 and 2010.

2.      My academic research has focused on, among other topics, marketing strategy, branding, brand valuation, methods for assessing financial consequences of marketing strategies, valuation of intangible marketing assets, and consumer engagement with firm-generated social media content.  My research experience and methodological expertise cover statistics, marketing research methods, and econometrics.  I conduct primary data collection (surveys), lab experiments, and use econometric methods, applied to large secondary data sets, to assess empirically the influence of strategic factors (such as resource allocation) and assets (such as customer satisfaction, brand perceptions, and corporate branding strategy) on firm performance outcomes (such as sales, profitability, and stock market valuation).

3.      My research has been published in top peer-reviewed marketing, management, and accounting journals, including *Marketing Science, Management Science, Journal of Marketing, Journal of Marketing Research*, and *The Accounting Review*.  My research has also been summarized in business practitioner outlets such as the *Harvard Business Review*.  In 2018, together with Dr. Dominique Hanssens serving as my co-editor, I published the *Handbook of Marketing Analytics with Applications in Marketing, Public Policy, and Litigation* (Elgar Publishing, March 2018), which features contributed chapters on topics such as consumer

behavior, survey techniques, user profiling for display advertising applications, and regulation and online advertising markets.

4.      In 2021–2022, I served as an Editor-in-Chief for the *Marketing Letters* journal published by Springer Nature.  I have also served and/or continue to serve on the editorial boards of the *Journal of Marketing*, *Journal of Marketing Research*, *Marketing Science*, *Marketing Letters*, and the *International Journal of Research in Marketing*, and serve as an ad-hoc reviewer for other academic journals, such as *Health Economics*, *Journal of Brand Management*, *Journal of Accounting and Public Policy*, and *California Management Review*, among others.  I have served as an officer at academic non-profit organizations.  In 2017–2018 and 2023–2024, I served as the Treasurer and in 2013–2014, as the Liaison Officer for the Marketing Science Society at the Institute for Operations Research and the Management Sciences ("ISMS INFORMS").  I have also served as a member of the Academic Council at the American Marketing Association ("AMA").

5.      I have won several national awards and honors for my academic research and teaching. My 2008 article in the Journal of Marketing Research ("The Financial Value Impact of Perceptual Brand Attributes")[1] was a finalist for both the 2012 William F. O'Dell award (for the article published in 2008 that made the most significant, long-term contribution to marketing theory, methodology, and/or practice) and for the 2009 Paul E. Green Award (for the Journal of Marketing Research paper with the most potential to contribute to the practice of marketing research and research in marketing).  My 2014 paper in the Journal of Marketing Research ("Assessing the Total Financial Performance Impact of Brand Equity with Limited Time-Series Data")[2]  won the 2011 Robert D. Buzzell MSI Best Paper Award.[3]  In addition, I received the 2015 AMA Distinguished Service Award, the 2012 AMA Erin Anderson Award for an Emerging Female Marketing Scholar and Mentor, and the 2011 AMA Strategy Special Interest Group Varadarajan Award for Early Career Contributions to Marketing Strategy Research.

---

[1] Mizik, N., and R. Jacobson (2008), "The Financial Value Impact of Perceptual Brand Attributes," *Journal of Marketing Research*, 45, 1, 15–32.
[2] Mizik, N. (2014), "Assessing the Total Financial Performance Impact of Brand Equity with Limited Time-Series Data," *Journal of Marketing Research*, 51, 6, 691–706.
[3] "Robert D. Buzzell MSI Best Paper Award," *MSI*, https://www.msi.org/research/robert-d-buzzell-msi-best-paper-award/.

6.      I have also received several research awards and grants, including the 2017 Adobe Data Science Research Award for my study titled "Increasing Consumer Engagement with Firm-Generated Social Media Content: The Role of Images and Words," the 2017 University of Washington ("UW") Population Health Initiative grant for the study titled "Caring Letters After the War: Veterans Writing to Veterans to Prevent Suicide" (with co-PIs from Veterans Administration / UW School of Medicine Department of Psychiatry & Behavioral Sciences and UW Psychology Department), and several grants from the Marketing Science Institute.

7.      Since 2002, all of my teaching has been at the Ph.D., MBA, Technology Management MBA, Executive MBA, and Executive Programs levels.  In my PhD course, I primarily cover advanced econometric methods for assessing the financial impact of marketing actions and assets (e.g., event studies, calendar time portfolio method, issues in dynamic panel data methods).

8.      I served as a marketing, strategy, economic, and statistics consultant to non-profit organizations and corporate clients on a variety of issues.  For example, between 2009 and 2011, I served on the Marketing Accountability Standards Board (MASB) as a Charter Director and Project Co-lead and was a member of the MASB Academic Advisory Council until 2012. MASB is a non-profit organization focused on establishing measurement and accountability standards across the marketing industry with the aim of improving financial returns to marketing efforts.  I also served on special consulting projects for private clients.  For example, over many years I have worked in both an academic and consulting capacity with Brand Asset Valuator (BAV Consulting), a brand management and valuation division of Young and Rubicam of WPP, a global marketing communications firm.  This work involved survey design for special projects, conducting primary data collection of consumer perceptions, developing and evaluating brand dimensions, and assessing their effect on financial performance.

9.      I have served as an expert witness in litigation matters, and among others, I have opined on issues relating to data privacy, advertising and marketing effectiveness, and methods used to assess damages in consumer class actions.  My curriculum vitae, which includes a complete list of my publications, is included as **Appendix A**.  A list of my prior testimony in the past four years is included as **Appendix B**.

## II. Case Background and Plaintiffs' Claims

10.     BetterHelp provides a direct-to-consumer virtual therapy platform.[4]  BetterHelp's technology platform facilitates access to counseling and therapy services "via [a] network of over 35,000 licensed clinicians leveraging [the] platform for web, mobile app, phone, and text-based interactions."[5]  BetterHelp's goals are to "change the way people approach their mental health and help them tackle life's challenges by providing accessible and affordable care."[6]  I understand that, to enroll in BetterHelp's services, users first need to complete a questionnaire which asks them about demographic information (e.g., age, gender), their therapeutic needs or interests (e.g., the type of therapy they are interested in), and basic information about their health (e.g., whether they are taking any medications or currently suffer from anxiety) ("Intake Questionnaire").[7]  I understand that the questionnaire's specific questions changed over time.[8] At the end of the Intake Questionnaire, users are asked to create a BetterHelp account with an email address or, for at least some of the relevant period, to continue with credentials from their Facebook or Google account.[9]  After creating a BetterHelp account, users can choose to purchase a paid therapy service, but are not required to do so.[10]  I understand that BetterHelp operates multiple websites ("BetterHelp websites") under different brands (e.g., Teen Counseling, ReGain) and that all these websites work in similar ways.[11]

---

[4] Teladoc Health Inc., 2024 Annual Report, February 27, 2025, available at https://s21.q4cdn.com/672268105/files/doc_financials/2024/ar/2024-Annual-Report.pdf ("Teladoc Health 2024 Annual Report"), p. 3. *See also* Teladoc Health, Inc., SEC Form 10-K for Period Ended December 31, 2022, filed on March 1, 2023 ("Teladoc Health, Inc. 2022 Form 10-K") p. 4 ("Our BetterHelp segment primarily consists of our market leading direct-to-consumer ('D2C') mental health platform. The online counseling and therapy services are provided via our network of over 30,000 licensed clinicians leveraging our platform for web, mobile app, phone, and text-based interactions."), p. 8 ("Through… our BetterHelp platform, we … contract with a network of providers.").

[5] Teladoc Health 2024 Annual Report, p. 9.

[6] "Frequently Asked Questions," *BetterHelp*, https://www.betterhelp.com/faq/.

[7] *See, e.g.,* "*NEWS*\* Get Online Counseling with BetterHelp," *YouTube*, https://www.youtube.com/watch?v=F1zoE0QGfQA, 2:28–3:15; "Help Us Match You to the Right Counselor," *BetterHelp [Archived],* https://web.archive.org/web/20200121043946/https://www.betterhelp.com/start/

[8] ███████████████████████████████████████████████████████████████████████████████

[9] *See, e.g.,* "*NEWS*\* Get Online Counseling with BetterHelp," *YouTube*, https://www.youtube.com/watch?v=F1zoE0QGfQA, 3:15–3:20

[10] ████████████████████

[11] First Amended Consolidated Class Action Complaint, *In Re BetterHelp, Inc. Data Disclosure Cases*, Master File No. 3:23-cv-01033-RS, (August 5, 2024) ("First Amended Complaint"), Exhibit A, ¶ 10 ("Respondent offers the Service under several names, each of which has its own website and app (collectively, the 'Multi-Sites'). Its primary

11.     C.M., Jane Doe I, L.M., Jane Doe III, R.S., S.C., and T.R. ("Plaintiffs") allege that BetterHelp used certain digital tools ("Digital Marketing Tools"), such as pixels and web beacons, on its websites that "collected and disclosed personal information that Plaintiffs and other consumers shared with BetterHelp."[12]  Specifically, Plaintiffs allege ██████████████

██████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████████

██████████████████████████   ████████████████

███████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████████

---

website and app, which is named "BetterHelp," serves general audiences and has been in operation since 2013. Teen Counseling, in operation since January 2017, offers counseling to 13- to 18-year-olds with parental consent. And ReGain, in operation since May 2016, offers couples counseling. The Multi-Sites all function similarly and facilitate therapy via the Service, and they are all subject to Respondent's policies, practices, and procedures.").
[12] Plaintiffs' Notice of Motion and Memorandum of Points and Authorities in Support of Their Motion for Class Certification, *In Re BetterHelp, Inc. Data Disclosure Cases*, Master File No. 3:23-cv-01033-RS, (May 8, 2025) ("Motion for Class Certification"), p. 5.
[13] Motion for Class Certification, p. 7.
[14] Motion for Class Certification, p. 14 ("Each of the Plaintiffs used BetterHelp's websites containing the Tracking Tools to complete the Intake Questionnaire, provide their email address, and pay for BetterHelp's service. None were aware that all of their interactions with BetterHelp's web properties, and consequently their PHI, were being captured and shared with Facebook, Snap, Google, MixPanel, and other third parties and were harmed thereby.").
[15]

██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
█████████████████████████████████████
██████████████████████████████████████████

Plaintiffs also allege that this transmission of information to third parties harmed them because it deprived them of the economic value of these data,[16] among other reasons.[17]

12.     Plaintiffs seek to certify one class and two subclasses: (i) a Nationwide Class of "[a]ll individuals residing in the United States who, during the period beginning January 1, 2017, and continuing through March 7, 2023 …, completed the BetterHelp Intake Questionnaire and provided BetterHelp with their email address[;]"[18] (ii) a Nationwide User Subclass of "[a]ll individuals residing in the United States who, during [the period beginning January 1, 2017, and continuing through March 7, 2023], completed the BetterHelp Intake Questionnaire, provided BetterHelp with their email address, and paid BetterHelp for services[;]"[19] and a California Subclass of "[a]ll individuals residing in California who, during [the period beginning January 1, 2017, and continuing through March 7, 2023], completed the BetterHelp Intake Questionnaire and provided BetterHelp with their email address."[20]  Throughout this report, I will refer to the proposed class and subclasses as the "Putative Classes," to the members of the proposed class and subclasses as "Putative Class Members," and to the period between January 1, 2017 and March 7, 2023 as the "Proposed Class Period."

---

[16] First Amended Complaint, ¶ 320 ("Plaintiffs and/or Class Members have also suffered (and will continue to suffer) economic loss and other injury and actual harm in the form of, *inter alia*: … (iii) deprivation of the value of their Private Information, including medical information for which there is a well-established national and international market."). *See also*, Declaration of Eric Krause, MBA., *In Re BetterHelp, Inc. Data Disclosure Cases*, Master File No. 3:23-cv-01033-RS and backup materials, (May 8, 2025) ("Krause Report"), ¶ 41 ("The Plaintiffs allege that the Defendant harmed Plaintiffs and members of the [P]utative Class by disseminating personal information and non-public medical information to third parties whose Digital Marketing Tools were embedded into Defendant's web properties. … By transmitting this personal information without knowledge, written authorization, or consent of the Putative Class Members, the Plaintiffs argue that the Defendant ultimately deprived Plaintiffs and the [P]utative Class Members of the market value of their own personal information.").

[17] I understand that Plaintiffs have also presented other reasons why Plaintiffs and Putative Class Members would have been harmed by the At-Issue Conduct. *See* Motion for Class Certification, p. 14 ("None were aware that all of their interactions with BetterHelp's web properties, and consequently their PHI, were being captured and shared with Facebook, Snap, Google, MixPanel, and other third parties and were harmed thereby. All believed such information was being kept confidential and doing so was material to their decisions to work with BetterHelp, including filling out the Intake Questionnaire with their private information."); First Amended Complaint, ¶ 271 ("Plaintiffs and Class Members also suffered damage as they paid for Defendant's services and/or provided their Private Information to Defendant, and they would not have paid for those Service, would have paid less for that Service and/or would not have provided such Private Information to BetterHelp had they known that Defendant would fail to keep their Private Information confidential."); ¶ 320 ("Plaintiffs and/or Class Members have also suffered (and will continue to suffer) economic loss and other injury and actual harm in the form of, *inter alia*: (i) invasion of privacy; (ii) breach of the confidentiality of their Private Information."). I understand that neither the Plaintiffs nor their damages expert put forward any damages based on these alleged harms.

[18] Motion for Class Certification, p. 1.

[19] Motion for Class Certification, p. 1.

[20] Motion for Class Certification, p. 1.

13.     On May 8, 2025, Plaintiffs filed an expert report by Mr. Eric Krause ("Mr. Krause").[21]  In his report, Mr. Krause opined that: (i) "[c]onsumer data and personal information possess material economic value" because companies can use it to improve their services and conduct targeted advertising or can sell it to other companies,[22] (ii) the alleged economic damages for Plaintiffs and Putative Class Members can be measured as the "fair market value of the personal information and non-public medical information" allegedly transmitted by BetterHelp to third parties,[23] and (iii) $200, which Mr. Krause estimated by considering five pieces of information,[24] is "a reasonable and conservative nominal estimate of fair market value of the type of personal information and patient status that the Plaintiff alleges was improperly transferred" and that such value can be used to calculate damages on a class-wide basis.[25]  Mr. Krause claimed that his "fair market value" estimate is "conservative" because his estimate of $200 is low compared with the values found in the studies that he relied on to account for the value of what he calls "patient

---

[21] Krause Report.

[22] Krause Report, ¶ 37 ("Consumer data and personal information possess material economic value, with personal information becoming of particular interest as a commodity. When combined with general consumer data, personal information enables companies to generate a comprehensive picture of a specific individual for use in tailoring internet services, providing targeted advertising, or for sale to other firms. New services, companies, and markets have emerged to capitalize on this economic value, including search engines, recommender systems, social networking sites, and online advertising ecosystems. Data brokering itself is an industry worth hundreds of billions of dollars annually. In this market, consumer information is continuously traded and shared among firms that profit from the aggregation and sale of consumer data, such as credit-reporting agencies, advertising companies, and 'infomediaries.'"), ¶ 38 ("[A]ll data such as personal information has potential value – no matter how seemingly inconsequential or ephemeral – because it strengthens the predictive capabilities of these companies and their technologies.").

[23] Krause Report, ¶ 41 ("It is my opinion that an appropriate measure of economic damages for the Plaintiff and the putative Class Members would thus be equivalent to the fair market value of the personal information and non-public medical information traded away by Defendant.").

[24] Krause Report, ¶ 44, ¶¶ 47–52, ¶ 57–60.

[25] Krause Report, ¶ 68 ("[I]t is my opinion that a reasonable and conservative nominal estimate of fair market value of the type of personal information and patient status that the Plaintiff alleges was improperly transferred in this matter is $200 per user."), ¶ 72 ("Through the use of a nominal estimate of the fair market value of personal information (at a minimum) that was alleged to be inappropriately transferred by the Plaintiff and [P]utative Class Members of $200 each, it is possible to calculate economic damages on a class-wide basis in this matter.").

status,"[26, 27] which is an indicator of whether an individual had completed the Intake Questionnaire.[28]  Throughout this report, I will refer to type of personal information and "patient status" that the Plaintiffs allege was improperly transferred by BetterHelp to third parties and appraised  by Mr. Krause in his $200 "fair market value" estimate as the "At-Issue Data."

14.     Based on Mr. Krause's opinions, Plaintiffs claim that $200 per Putative Class Member is a conservative estimate of damages and restitution for the At-Issue Conduct,[29] and that "[t]his figure represents a conservative floor that is common to all Class Members, each of whom had, at a minimum, their personal information (i.e., the 'identifiers' that disclose their identity) and their status as a person who was interested in seeking mental health services through BetterHelp taken and disclosed to third parties without their consent."[30]

---

[26] In deposition, Mr. Krause testified that his $200 estimates the value of the "personally identifiable information" and what he calls "patient status" and does not include other types of information allegedly transmitted by BetterHelp to third parties.  *See* Deposition of Eric Krause, June 10, 2025 ("Krause Deposition), 66:21–67:23 ("Q. I want to focus on the next bullet point. It states that 'Class Members' communications with BetterHelp via its websites, through completion of the in-take questionnaire, signing up for therapy and counseling services, paying for services, taking mental health assessments or test, or reviewing advice articles about specific conditions and treatments' was also disclosed to third parties; is that right? A. Yes. Q. Did that information factor into your analysis for the $200 fair market valuation? A. Partially. Q. Which part? A. Obviously through the completion of the in-take questionnaire is a key portion of the class definition, and so I considered that. The rest of it are communications that helped inform and buttress their patient status, but none of the specific outcomes of certain therapies or counseling services, certain mental health assessments -- those outcomes are not part of my valuation, to be clear. Those are -- that is information, I understand, was transmitted and it certainly informs the patient status but to the extent that mental health data specifically was disclosed, it's not part of the -- what I call the nominal $200."), 160:21–161:3 ("Q. I want to revisit this again. If we're talking about user data -- we have two general buckets that are the subject of your analysis: Personal information and patient[] status. Is that fair? A. Yes. Q. And your fair market valuation encompasses both of those buckets; is that right? A. Yes, sir.").
[27] Krause Deposition, 141:21–142:15 ("Q. Did you take into account that very wide variation in record value in relying on this information for your opinion? A. I did. Q. How so? A. … What I sought to do was come up with a nominal value of the uniform health data that was -- transmitted patient status and took a very conservative number in light of the observations I made between these various studies and accounting for the fact that the fundamental health data that I'm valuing is probably on the lower end of this kind of rich volatility that exists on more specific -- specific health data that may be associated with someone such as their medication history, et cetera.").
[28] Krause Deposition, 66:15–20 ("Q. Second bullet point refers to 'Class Members' patient status.' And, again, patient status just means that they're individuals who completed the questionnaire and submitted it to BetterHelp; is that right? A. That's correct.").
[29] Motion for Class Certification, p. 35 ("Plaintiffs' economic expert has further demonstrated that, based on the market for personal information, the existing markets for PHI and reliable mechanisms for measuring the monetary value of that information, and the uniform nature in which Plaintiffs' and Class Members' PHI and other private information was disclosed by BetterHelp, damages and restitution can be proven in a uniform way applicable to the Nationwide Class and California Subclass. He conservatively estimates those amounts as $200 per Class Member.").
[30] Motion for Class Certification, p. 15.

### III.     Assignment

15.     I was asked by counsel for BetterHelp to assess Mr. Krause's opinions and analysis relating to the "fair market value" of the At-Issue Data and whether the purported value he puts forward can be used to calculate damages on a class-wide basis.[31]

16.     In carrying out my assignment, I relied on my training, experience, and expertise as a professor of marketing, including my academic work on valuation of intangible assets. **Appendix C** contains a list of material I considered in forming my opinions in this matter to date.

17.     I am being compensated at the billing rate of $1,050 per hour.  I have been assisted in this matter by the staff at Cornerstone Research who worked under my direction.  I receive compensation from Cornerstone Research based on its collected staff billings for its support of me in this matter.  Neither my compensation in this matter nor my compensation from Cornerstone Research is in any way contingent or based on the content of my opinion or the outcome of this matter or any other matter.  My work is ongoing, and I reserve the right to update or supplement my opinions as new information becomes available during the course of this litigation.

### IV.     Summary of Opinions

18.     Mr. Krause's opinion that the "fair market value" of the At-Issue Data is an appropriate measure of damages and estimate of a "fair market value" of $200 per Putative Class Member is unreliable.  First, his opinion is disconnected from the specific context of the case.  Second, he ignores heterogeneity across Putative Class Members that prevents the application of his damages estimate on a class-wide basis.  Third, his purported "fair market value" estimate of $200 is based on biased "data points" that are untethered to the facts of the case.

19.     Mr. Krause's proposed damages approach is unreliable because it is disconnected from the specific context of the case.  First, while Mr. Krause opines that a "fair market value" is an

---

[31] Krause Report, ¶ 68 ("[I]t is my opinion that a reasonable and conservative nominal estimate of fair market value of the type of personal information and patient status that the Plaintiff alleges was improperly transferred in this matter is $200 per user."), ¶ 72 ("Through the use of a nominal estimate of the fair market value of personal information (at a minimum) that was alleged to be inappropriately transferred by the Plaintiff and [P]utative Class Members of $200 each, it is possible to calculate economic damages on a class-wide basis in this matter.").

appropriate measure of damages, Mr. Krause failed to identify any legitimate "market" in which Putative Class Members could directly sell their individual At-Issue Data to the third parties that allegedly received it from BetterHelp, or any third parties. Second, Mr. Krause's proposed damages approach ignores that, even if such a market were to exist, the third parties that allegedly received the At-Issue Data would likely have low or even zero willingness to pay for the data, because at least part of and potentially all of the At-Issue Data was likely available through other means to these third parties. For example, even absent the At-Issue Conduct, Facebook would have had access to at least part of the At-Issue Data for those individual Putative Class Members who navigated to a BetterHelp website by clicking on a BetterHelp advertisement on Facebook. Third, economics damages must consider both the costs and benefits to Plaintiffs from the At-Issue Conduct, but Mr. Krause's proposed damages approach ignores any benefits that Putative Class Members may have received, such as receiving useful information through advertising that is targeted and relevant.

20.     Mr. Krause's proposed damages approach is also unreliable because it ignores heterogeneity across Putative Class Members that prevents its application on a class-wide basis. Putative Class Members are heterogeneous in terms of the amount of personal information that would have been transmitted to third parties, which would depend on Putative Class Members' choices to use privacy-protection tools (e.g., VPNs, browsers with privacy-enhancing features). Putative Class Members are also heterogeneous to the extent their online behavior resulted in transmission of their At-Issue Data through means other than the At-Issue Conduct. Finally, Putative Class Members are heterogenous in the benefits they may have received because of the At-Issue Conduct. Because of these differences across Putative Class Members, the extent of net harm or benefit, if any, to different Putative Class Members would likely also be heterogeneous and would need to be assessed on an individualized basis.

21.     Mr. Krause's "fair market value" estimate of $200 is also unreliable because it is based on biased "data points" that are untethered to the facts of the case and is not based on a scientific methodology. Mr. Krause based his $200 estimate on "data points" selected from five sources of information, all with disparate underlying approaches, to estimate the value of personally identifying information and a "premium" for what he refers to as "patient status" (i.e., the mere fact that an individual completed the Intake Questionnaire). However, this estimate is not a

product of any systematic, scientific, or widely accepted methodology as Mr. Krause admittedly reached this estimate "based on [his] opinion" and not any computation, analysis, or weighting of these various "data points;" for example, "[t]here [was] not a spreadsheet or any kind of coefficient analysis."[32] Moreover, the sources of information Mr. Krause relied on to gather his "data points" are disconnected from the facts of the case. For instance, some of the sources Mr. Krause relied on evaluate data sources far richer than the At-Issue Data, such as data on financial information or rich medical information. Other sources of information that Mr. Krause relied on provide services related to the deletion of personal information already available to third parties. The prices for such services have no direct relation to the price that an individual could obtain in a hypothetical market for the At-Issue Data. Further, some of the sources Mr. Krause relied on pertain to the estimated costs of addressing data breaches by the breached organizations (such as engaging forensic experts, outsourcing hotline support, in-house investigations and communications, extrapolated value of customer loss) and have no relation to the fair market value of the data Mr. Krause seeks to determine. Moreover, other sources Mr. Krause relied on attempt to approximate the value of personal information from the perspective of organizations that hold that information, which is different from the price that an individual could obtain in a hypothetical market for the At-Issue Data and conflates this value with the value added by the organization through the process of aggregating and validating the data.

## V. Mr. Krause's Proposed Damages Approach Is Unreliable Because It Is Disconnected From the Specific Context of the Case

22.     Plaintiffs allege that they and Putative Class Members were harmed because, by transmitting the At-Issue Data to third parties, BetterHelp deprived Putative Class Members of the value of these data.[33] Given this theory of harm, Mr. Krause opined that the "fair market

---

[32] Krause Deposition, 144:11–16 ("Q. Explain to me how you got from all of those data points to the $200 figure. A. Based on my opinion. It's an analysis in which I quantify all these different variables of PII. I consider things like the $189 includes information beyond what was disclosed based on Dr. Shafiq."),145:21–146:3 ("Q. I want to know how you weighted each one of those. Is there anything I -- you can tell me or a computation you ran that I can look at or analysis you ran that I can look at to see how you weighted any one of those factors versus another? A. No, sir. There's not a spreadsheet or any kind of coefficient analysis. I am reaching an appraiser's opinion preliminarily.).
[33] I understand that Plaintiffs, in their First Amended Complaint, also present other reasons why, according to them, Putative Class Members would have been harmed by BetterHelp's At-Issue Conduct. *See, e.g.*, First Amended Complaint, ¶ 271 ("Plaintiffs and Class Members also suffered damage as they paid for Defendant's services and/or

value" of the At-Issue Data is an appropriate measure of the economic damages allegedly suffered by Plaintiffs and Putative Class Members.[34] However, as I explain below, Mr. Krause's proposed damages approach is unreliable because it ignores the specific context of the matter at hand.

> ### A. Mr. Krause's Proposed Damages Approach Ignores That a Market for the At-Issue Data In which Putative Class Members Could Sell Their Individual At-Issue Data to Third Parties Does Not Exist

23.    The academic literature recognizes significant differences between tangible and intangible assets that explain why the valuation of intangible assets, such as the At-Issue Data, is problematic. In particular, (i) many intangibles are not "separate, saleable, or discrete items," (ii) property rights for intangibles are often not well-defined, (iii) "there are no liquid secondary markets for many intangibles, making it difficult to reliably measure the value of these resources," and (iv) "it is often difficult to write fully-specified contracts for intangibles."[35]

---

provided their Private Information to Defendant, and they would not have paid for those Service, would have paid less for that Service and/or would not have provided such Private Information to BetterHelp had they known that Defendant would fail to keep their Private Information confidential."); ¶ 320 ("Plaintiffs and/or Class Members have also suffered (and will continue to suffer) economic loss and other injury and actual harm in the form of, *inter alia*: (i) invasion of privacy; (ii) breach of the confidentiality of their Private Information; and/or (iii) deprivation of the value of their Private Information, including medical information for which there is a well-established national and international market.").

[34] Krause Report, ¶ 41 ("The Plaintiffs allege that the Defendant harmed Plaintiffs and members of the [P]utative Class by disseminating personal information and non-public medical information to third parties whose Digital Marketing Tools were embedded into Defendant's web properties. … By transmitting this personal information without knowledge, written authorization, or consent of the [P]utative Class Members, the Plaintiffs argue that the Defendant ultimately deprived Plaintiffs and the [P]utative Class Members of the market value of their own personal information. It is my opinion that an appropriate measure of economic damages for the Plaintiff and the [P]utative Class Members would thus be equivalent to the fair market value of the personal information and non-public medical information traded away by Defendant.").

[35] Skinner, D. J. (2008), "Accounting for Intangibles–A Critical Review of Policy Recommendations," *Accounting and Business Research*, 38, 3, 191–204, p. 203. *See also*, Holthausen, R. W. and R. L. Watts (2001), "The Relevance of the Value-Relevance Literature for Financial Accounting Standard Setting," *Journal of Accounting and Economics*, 31, 3–75, pp. 20–21 ("The inferences for the relevance and reliability of fair value estimates of investment securities held by banks …, have a greater probability of being valid than do the inferences for intangibles and goodwill. In the investment securities case, the valuation model is likely to be somewhat descriptive (rents are likely to be relatively low) and marketable investment securities probably enter equity value at close to their market value. Further, given liquid markets for such securities, the fair values are likely to be verifiable estimates of their market values (the link between the accounting number and the valuation model is relatively well-specified)."), p. 33 ("Intangible assets that represent the excess of the value of the future cash flows over the value of the net separable assets and are not separately saleable (e.g., goodwill) are excluded from assets in debt contracts."); Maines, L. A., et al. (2003), "Implications of Accounting Research for the FASB's Initiative on Disclosure of Information about Intangible Assets," *Accounting Horizons*, 17, 2, 175–185, p. 181 ("Intangible 'assets' such as intellectual capital and customer loyalty are conceptually different from assets normally recognized on the balance sheet. These differences include: Many intangibles like customer loyalty are not separate and salable assets—their value can be measured only as part of the residual value of the firm. The well-defined property rights of physical and financial assets that effectively define control and exclude others from enjoying the benefits of these assets often do not extend to intangibles. There are few organized, liquid markets for most intangibles. Due to the inseparability of intangible assets and the ill-defined property rights, it is often difficult to write complete contracts for intangible assets.").

These issues are compounded in the specific case of personally identifying information because this type of information remains connected to the person it refers to even after disclosure and because some of the use cases of this type of information (e.g., prediction of individual behaviors) are affected by network effects (i.e., the value of an individual data record depends on the other specific data records available to the data user).[36]

24.     Mr. Krause opines that the "fair market value" of the At-Issue Data is an appropriate measure of economic damages.[37]  A market is characterized by a set of buyers and sellers who willingly exchange something of value, and the "market value" (or "market price") is the price at which these parties agree to conduct that exchange.[38, 39]  Mr. Krause has not provided any evidence that Plaintiffs and Putative Class Members would be able to sell their individual records of At-Issue Data if they wanted to do so.

25.     I am not aware of any market where the At-Issue Data could be sold by Plaintiffs or Putative Class Members and Mr. Krause has not identified any legitimate market where Plaintiffs and Putative Class Member could sell their individual data that is at issue.  In fact, in deposition, Mr. Krause testified that "there's not a legitimate  marketplace" where an individual could sell

---

[36] Verstraete, M. (2020), "Inseparable Uses," *North Carolina Law Review*, 99, 427–478, p. 427 ("The central claim is that personal data—as well as other unique cases that this Article identifies—retains a connection to the person even after they no longer control it."), p. 429 ("The appropriate limits of control that people retain over their personal information are deeply contested among scholars and policymakers. … This Article argues that the crux of this confusion stems from the central (and correct) intuition that a person retains a normatively significant connection to their personal information even after they relinquish control over it."); Birch, K., et al. (2021), "Data as Asset? The Measurement, Governance, and Valuation of Digital Personal Data by Big Tech," *Big Data & Society*, 8, 1, 1–15, p. 3 ("The collection, use, and exploitation of personal data has a long history, including the credit scoring activities of data brokers like Experian and Axciom … However, digital personal data is different … mass digital personal data … entails different dynamics than earlier credit scoring, most obviously in terms of the inherently collective nature of its algorithmic applications and the network effects that arise; for example, using personal data from thousands or millions of people to predict individual or group behaviors.").

[37] Krause Report, ¶ 41 ("It is my opinion that an appropriate measure of economic damages for the Plaintiff and the [P]utative Class Members would thus be equivalent to the fair market value of the personal information and non-public medical information traded away by Defendant.").

[38] *See, e.g.,* Mankiw, N. G. (2008), *Principles of Economics,* Mason, OH: South-Western Cengage Learning ("Mankiw (2008)") at p. 6 ("A **market** is a group of buyers and sellers of a particular good or service."), pp. 76–78 ("At the equilibrium price, the quantity of the good that buyers are willing and able to buy exactly balances the quantity that sellers are willing and able to sell. The equilibrium price is sometimes called the market-clearing price because, at this price, everyone in the market has been satisfied: Buyers have bought all they want to buy, and sellers have sold all they want to sell.").

[39] In deposition, Mr. Krause agreed with this characterization. Krause Deposition 54:22–55:2 ("Q. What does fair market value mean? A. It is the value at which a asset or good or service can -- would trade for in -- to willing buyers and sellers. Q. In an arm's-length transaction? A. Generally speaking, yes.").

the At-Issue Data,[40] that he is not aware of any Putative Class Member having done so,[41] and that he is not aware of Plaintiffs having made any effort to sell their information.[42] In his report, Mr. Krause mentioned the existence of the data brokering market—in which personal information is traded by data brokers, who aggregate data from online and offline sources and create individual profiles including personal information—and firms that use this information, such as credit-reporting agencies, advertising companies, and "infomediaries."[43] However, Mr. Krause has stated in deposition that an individual, such as individual members of the Putative Classes, would not be able to sell the At-Issue Data in a legitimate market.[44]

26. Consistently, in deposition, Plaintiffs indicated that they considered themselves harmed by the At-Issue Conduct from a belief that certain identifying information had been transmitted to third parties, such as Facebook, and receiving what they considered to be targeted advertising, which they alleged caused them mental distress.[45] None of the Plaintiffs claimed that they were

---

[40] Krause Deposition, 72:17–73:19 ("Q. …My question was whether you're aware of a marketplace in which there are buyers willing to pay individuals for their private personal information? A. Not legal ones…. It depends…. But to answer your question, there is no marketplace in which one person can go and sell this type of information to potential buyers. Q. If one of -- if a class member wanted to sell their personal information that is at issue in this case to one of these third-party tech companies, how would they go about doing it? A. As I said, there's not a legitimate marketplace to do so. I'm sure there are certain individuals that tech companies would love to pay for, celebrities and public figures; but I'm not aware of any of those transactions.").

[41] Krause Deposition 73:11–19 ("If one of -- if a class member wanted to sell their personal information that is at issue in this case to one of these third-party tech companies, how would they go about doing it? A. As I said, there's not a legitimate marketplace to do so. I'm sure there are certain individuals that tech companies would love to pay for, celebrities and public figures; but I'm not aware of any of those transactions.").

[42] Krause Deposition, 147:6–11 ("And you're not aware of any -- outside of even this case or other cases, you're not aware of any individuals going out looking to actually sell their personal information to third parties like Facebook, are you? A. No, sir.").

[43] Krause Report, ¶ 35 ("[D]ata brokers aggregate extensive data from various offline and online sources to build detailed profiles of individuals, including information regarding name, date of birth, contact and address, social security number ('SSN'), and employment detail, among other data points."), ¶ 37 ("When combined with general consumer data, personal information enables companies to generate a comprehensive picture of a specific individual for use in tailoring internet services, providing targeted advertising, or for sale to other firms. New services, companies, and markets have emerged to capitalize on this economic value, including search engines, recommender systems, social networking sites, and online advertising ecosystems. Data brokering itself is an industry worth hundreds of billions of dollars annually. In this market, consumer information is continuously traded and shared among firms that profit from the aggregation and sale of consumer data, such as credit-reporting agencies, advertising companies, and 'infomediaries.'").

[44] Krause Deposition, 73:11–16 ("Q. If one of -- if a class member wanted to sell their personal information that is at issue in this case to one of these third-party tech companies, how would they go about doing it? A. As I said, there's not a legitimate marketplace to do so.").

[45] *See e.g.*, Deposition of Jane Doe III, March 28, 2025, 10:2–15 ("



); Deposition of Jane Doe I, April 4, 2025, 12:19–22; 14:5–11 ("

harmed due to any loss of "fair market value" they could have obtained by selling their data in any market.

27.     Although I understand that whether "personally identifying information" of Plaintiffs or Putative Class Members was shared via the BetterHelp platform with third parties is in dispute, I also understand that there are certain frameworks through which individuals can monetize some types of personally identifying information.  For instance, SavvyShares offers the SavvyConnect App which provides compensation for users' device information, IP address, browsing activity, online search queries and results, and online purchase information, among other types of information the app collects.[46]  Participants who keep a minimum level of activity in their devices are compensated with $3 per device type per month (with a maximum of two devices per participant).[47]  Further, I understand that during the Proposed Class Period, in order to be compensated, SavvyConnect App users were required to participate in surveys they were invited to complete,[48] and that, when they did so, the SavvyConnect App collected personal information

---

<div style="background:black"> </div>

Deposition of S.C., April 2, 2025, 98:16–99:13

Deposition of L.M., April 1, 2025, 5:2–13 .

[46] "Privacy Policy," *SurveySavvy*, https://surveysavvy.com/privacy-policy/ ("Our App gives you the opportunity to earn incentives by sharing certain data about your personal computer and mobile device usage ("device usage data"). Your device usage data includes information relating to your device including your type of device and IP address, information relating to the use and function of your mobile device including battery status, which mobile network you use, and which wi-fi networks you connect to, information relating to your access and use of web browser, mobile applications installed or used, browsing activities and habits, online search queries and the results of such searches, the videos you view, the products you shop for online, information you enter into forms, the materials you download or upload, the advertisements you see, cookies on websites you visit, information and content on sites or apps that you visit or use and with which you interact.").

[47] "SavvyConnect Monthly Participation Requirements," *SurveySavvy*, https://surveysavvy.com/savvyconnect-requirements ("Monthly Incentive Requirements. This is a unique opportunity where we pay you guaranteed monthly incentives. US members earn $3 per device type simply for remaining active in the SavvyConnect community! … Paid incentive limited to one mobile device (a smartphone OR a tablet) and one computer.").

[48] "SurveySavvy: $15+ Monthly (Data tracking MobileApp:Phone, Tablet, Computer)," *YouTube*, https://www.youtube.com/watch?app=desktop&v=IzSy_jUNrOI, 0:50 –1:04; "SurveySavvy – Get $20 Per Month for Online Behavioral Market Research," *Maximizing Money*, November 13, 2018, https://www.maximizingmoney.com/referral-programs/surveysavvy/ ("To earn monthly incentives, members will need to maintain a positive standing in the SavvyConnect community, which includes… [a]ttempting all required SavvyConnect surveys displayed on the SavvyConnect Dashboard.").

specific to each individual such as race/ethnicity, political opinions, religious beliefs, whether the individual was part of a union, health-related data, and sexual orientation.[49]

28.    Similarly, Nielsen's Computer & Mobile Panel offers participants compensation in exchange for installing a data collection app in their devices.  The app collects, among other data items, device identifiers, IP addresses, browsing activity, and device's geolocation.[50] Additionally, participants are invited to complete surveys and participate in market research opportunities through which Nielsen can collect additional personal information specific to each individual,[51] such as nutrition habits, purchase behavior, or media consumption.[52]  Active participants are rewarded with up to $60 per year in reward points ($30 if they install the app in a mobile devices and $30 if they install the app in a desktop computer) redeemable for gift cards, and via participation in a monthly $10,000 sweepstakes.[53]

29.    However, none of these frameworks represent a market for the At-Issue Data or a market where sellers and buyers of information interact to set prices.  In these frameworks, the type of

---

[49] "Privacy Policy," *SavvyShares [Archived]*, https://web.archive.org/web/20210802092056/https://www.savvyshares.com/privacy-policy/ ("For members who provide Member Data via surveys or other methods of participation, we may collect information such as, but not limited to, personal data revealing racial or ethnic origin, political opinions, religious or philosophical beliefs, or trade union membership, data concerning health or data concerning your sex life or sexual orientation.").

[50] "Frequently Asked Questions," *Nielsen*, https://computermobilepanel.nielsen.com/ui/US/en/faqen.html; "Nielsen Panel Privacy Notice (U.S. Panel Members), *Nielsen*, https://www.nielsen.com/legal/us-digital-panel-privacy-notice/ ("Participation in mobile device measurement. If your household's participation in the Panel includes measurement of your mobile device(s), once you have downloaded the necessary software (the '**Technology**'), it will run in the background and transmit certain information to us automatically, including: information about your mobile device and network performance (e.g., unique device identifier, device model, operating system and version, and Internet Protocol (IP) address); details about the pieces of hardware and/or software connected to or installed on your mobile device; details about the applications you use and games you play on your mobile device (e.g., name and amount of time spent); details about your web browsing activity (e.g., the browser that you are using and the URLs of the websites that you visit); the file types of the materials that you transmit, receive, upload, or download on your mobile device; and the geolocation of your mobile device (as determined by GPS, Wi-Fi signals/connections, or other data depending on your mobile device), where enabled. The Technology may track activity on your Devices whether you are offline or online.").

[51] "Nielsen Computer & Mobile Panel, *Nielsen*, https://computermobilepanel.nielsen.com/ui/US/en/sdp/landing ("Sign up your computers, smartphones and tablets to earn: [1.] Up to $60 in reward points for gift cards[;] [2.] Instant win games[;] [3.] Exclusive invitations for survey and research opportunities … Your participation matters. By participating in Nielsen research, you can improve products and services you use online today. Nielsen Computer & Mobile Panel combines your device usage with people like you to build a picture of consumer behavior. By using your devices as you do every day and participating in special surveys, you will make a difference - and earn rewards while doing so!").

[52] "Nielson Panels & Surveys," *Nielsen*, https://panels.nielsen.com/panels-and-surveys/ ("[I]n addition to our panels, we have surveys to learn more about what you and people like you like to read, eat and purchase. … Our surveys can cover a variety of topics,or may just ask you to keep a record of what you're watching or listening to.").

[53] "Frequently Asked Questions," *Nielsen*, https://computermobilepanel.nielsen.com/ui/US/en/faqen.html ("What rewards can I earn? For signing up you will receive opportunities to play scratch-off or spin-the-wheel style games to earn rewards. For installing our app and/or computer software on one or more devices and staying connected, you will receive weekly points redeemable for up to $60 a year in rewards ($30 for mobile; $30 for computer). In addition, for installing our computer software on at least one computer and staying connected each month, you will also be entered into our monthly $10,000 sweepstakes. Lastly, you will receive special invites for unique survey and research opportunities to earn even more rewards!").

information being exchanged is much richer than the At-Issue Data (i.e., it includes information that is not part of the At-Issue Data, such as purchase history, political information, religious beliefs, browsing activity, and individuals' participation in surveys and information collected via those surveys). Further, some of these frameworks require and encourage participation in surveys, which in turn requires participants' time and effort. Moreover, despite the fact that, in these frameworks, companies collect data richer than the At-Issue Data and require participants' time and effort, the compensation they provide is not always money and its value appears to be lower than the $200 "fair market value" estimate put forward by Mr. Krause. For instance, a participant in Nielsen's Computer & Mobile Panel who receives $60 per year would need to remain an active participant for more than three years to receive $200. In addition, and tellingly, individuals who participate in these frameworks are not prevented from also sharing such information with other third parties, meaning that the information is not somehow devalued by having been shared with others in addition to (for example) Nielsen or SavvyConnect.

### B. Mr. Krause's Proposed Damages Approach Ignores That the At-Issue Data May Have Been—and Likely Were—Available to Third Parties through Other Means

30.     Plaintiffs allege that Putative Class Members were harmed because, by transmitting the At-Issue Data to third parties, BetterHelp deprived Plaintiffs and Putative Class Members of the purported value of these data.[54] To isolate the damages attributable to the At-Issue Conduct (if any), it is necessary to compare the economic value that Plaintiffs and Putative Class Members

---

[54] First Amended Complaint, ¶ 320 ("Plaintiffs and/or Class Members have also suffered (and will continue to suffer) economic loss and other injury and actual harm in the form of, *inter alia*: … (iii) deprivation of the value of their Private Information, including medical information for which there is a well-established national and international market."). *See also*, Krause Report, ¶ 41 ("The Plaintiffs allege that the Defendant harmed Plaintiffs and members of the [P]utative Class by disseminating personal information and non-public medical information to third parties whose Digital Marketing Tools were embedded into Defendant's web properties. … By transmitting this personal information without knowledge, written authorization, or consent of the [P]utative Class Members, the Plaintiffs argue that the Defendant ultimately deprived Plaintiffs and the [P]utative Class Members of the market value of their own personal information.").

could have obtained in the actual world with the economic value they could have obtained in a "but-for world" that differed from the actual world only with respect to the harmful act.[55, 56]

31.     Mr. Krause, in his report, indicated that $200 per Putative Class Member is his estimate of the "fair market value" of the personally identifying information and "patient status" in the At-Issue Data.[57]   Regarding "patient status," in deposition, Mr. Krause clarified that "patient status" referred to the mere fact that an individual had completed BetterHelp's Intake Questionnaire.[58]   Regarding personally identifying information, in deposition, Mr. Krause clarified that the personally identifying information he considered in his $200 estimate included "account [identifiers], device identifiers, IP addresses, and e-mail addresses."[59]   According to Mr.

[55] Federal Judicial Center, National Research Council of the National Academies (2011), *Reference Manual on Scientific Evidence*, Washington, D.C.: The National Academic Press ("Reference Manual on Scientific Evidence (2011)"), p. 432 ("Damages measurement then determines the plaintiff 's hypothetical value in the but-for scenario. Economic damages are the difference between that value and the actual value that the plaintiff achieved. Because the but-for scenario differs from what actually happened only with respect to the harmful act, damages measured in this way isolate the loss of value caused by the harmful act and exclude any change in the plaintiff 's value arising from other sources. Thus, a proper construction of the but-for scenario and measurement of the hypothetical but-for plaintiff 's value by definition includes in damages only the loss *caused* by the harmful act.").

[56] In deposition, Mr. Krause agreed with this methodology. *See* Krause Deposition, 56:11–58:5 ("Q. You just described your primary opinion about there being a methodology that could be used to determine damages on a classwide basis. Describe for me that methodology. A. It is a but-for versus actual methodology in which the damages are applied to each [P]utative class member that's determined to be part of the class in which they are compensated for the alleged improper disclosure of their information by compensating them the fair market value of that information in the but for less any compensation they received for the improper disclosure of that information that's the actual….Q. And you referred to a valuation in a but-for scenario. That scenario is one in which but for BetterHelp's alleged conduct, the information would not have been disclosed to the third parties; is that right? A. Yes. Q. And then generally when you're assessing damages, you do so in a but-for world; is that right? A. In a counterfactual, yes. Q. And here your understanding of the but-for world is that but for BetterHelp's conduct, these third parties would not have the user's information; is that right? A. Yes. Q. The but-for is an assessment of if they were going to compensate them for their information that they disclosed, what would the fair market value be?").

[57] Krause Report, ¶ 68 ("Based on the significant academic and industry research and primary financial data on which I have reviewed and relied upon and discussed in detail above, it is my opinion that a reasonable and conservative nominal estimate of fair market value of the type of personal information and patient status that the Plaintiff alleges was improperly transferred in this matter is $200 per user.").

[58] Krause Deposition, 66:15–20 ("Q. Second bullet point there refers to "Class Members' patient status." And, again, patient status just means that they're individuals who completed the questionnaire and submitted it to BetterHelp; is that right? A. That's correct.").

[59] In his report, Mr. Krause indicated that BetterHelp was accused of transmitting to third parties "Plaintiffs' and Class Members' personally identifiable information such as account and device identifiers, IP addresses, and e-mail addresses; Plaintiffs' and Class Members' patient status; and Plaintiffs' and Class Members' communications with BetterHelp via its websites, through completion of the intake questionnaire, signing up for therapy and counseling services, paying for services, taking mental health assessments or test, or reviewing advice articles about specific conditions and treatments." Krause Report, ¶ 65.  In deposition, Mr. Krause clarified that, of this set of information, only the personally identifying information and patient status were considered in his $200 estimate. Krause Deposition, 62:3–6 ("Q. Are you assuming that the information listed in paragraph 65 was transmitted to third parties? A. That is an assumption that I am making based on Dr. Shafiq's report…"), 66:21–67:23 ("Q. I want to focus on the next bullet point. It states that 'Class Members' communications with BetterHelp via its websites, through completion of the in-take questionnaire, signing up for therapy and counseling services, paying for services, taking mental health assessments or tests, or reviewing advice articles about specific conditions and treatments' was also disclosed to third parties; is that right? A. Yes. Q. Did that information factor into your analysis for the $200 fair market valuation? A. Partially. Q. Which part? A. Obviously through the completion of the in-take questionnaire is a key portion of the class definition, and so I considered that. The rest of it are communications that helped inform and

Krause, "account identifiers" referred to the information in the individual's BetterHelp profile (which, according to Mr. Krause, includes information that ties a specific account to an individual and "all that account information that they set up when they do the questionnaire"),[60] and "device identifiers" referred to information about the specific browser and devices used by the individual.[61] Mr. Krause further testified in his deposition that, according to him, this personally identifying information considered in his $200 estimate corresponded to the "personally identifying information that's detailed in opinion No. 1 from Dr. Shafiq's report."[62] However, I understand that the personally identifying information considered by Mr. Krause in his valuation (i.e., account identifiers, device identifiers, IP addresses, and e-mail addresses) is broader than the personally identifying information that was shared with third parties according to Dr. Shafiq.[63]

---

buttress their patient status, but none of the specific outcomes of certain therapies or counseling services, certain mental health assessments – those outcomes are not part of my valuation, to be clear. Those are -- that is information, I understand, was transmitted and it certainly informs the patient status but to the extent that mental health data specifically was disclosed, it's not part of the – what I call the nominal $200.").

[60] Krause Deposition, 62:19–63:3 ("Q. What are account identifiers? A. They are identifiers that tie a specific count on BetterHelp's questionnaire to who they are. And their browser they're using, their computer they're using, the IP address, it -- all that account information that they set up when they do the questionnaire, that is my understanding of what Dr. Shafiq is talking about. Q. The BetterHelp account? A. That's correct."), 64:2–12 ("Q. So account identifiers is [sic] valuable insofar as it contains other information? A. Well, what account it is. As I understand from Dr. Shafiq, that's just a summary term of the types of information that are associated with that account. Q. So you're referring to, you know, I go set up an account -- if I go set up an account with BetterHelp and I list various profile information that gets associated with the account, you're referring to the content of my profile that's the account information? A. That's what I understand.").

[61] Krause Deposition,63:4–16 ("Q. What… are device identifiers? A. Those are signatures in the browsing -- I am speaking as a layperson, to be clear. … device identifiers give an ability to see what type of device the user was utilizing. Was it a computer? Was it a phone? Was it an Apple phone? Was it a Google phone? Was it a Windows machine? That type of information.").

[62] Krause Deposition, 59:13–25 ("Q. What does the $200 figure represent? A. It represents the combination of the information that was uniformly transmitted. It represents a conservative floor. As you asked earlier, could there be more information -- mental health information, for example, that was more valuable? Certainly, but in my methodology, what I'm doing is providing a uniform methodology of valuing what was transmitted across the entire [P]utative class.  And so the $200 represents that personally identifying information that's detailed in opinion No. 1 from Dr. Shafiq's report as well as patient status.").

[63] I understand that, according to Dr. Shafiq, BetterHelp shared with third parties a "baseline set of identifying information" consisting of "[c]ookies containing account or device identifiers" and "IP address, user agent, and device properties containing identifying information," and that, according to Dr. Shafiq, these "account identifiers" are information "uniquely identifying the user visiting the website."  This "baseline set of identifying information" does not include email addresses or "all that account information that they set up when they do the questionnaire" which were considered in Mr. Krause's valuation. Declaration of Zubair Shafiq, Ph.D., *In Re BetterHelp, Inc. Data Disclosure Cases*, Master File No. 3:23-cv-01033-RS, (May 8, 2025) ("Shafiq Report"), ¶ 19 ("An HTTP request/response also contains headers, which contain additional information about the request. Notable headers include: … User-Agent which identifies the operating system and the web browser."), ¶ 29 ("The identifiers stored in cookies can include both account identifiers (that uniquely identify the user visiting the website) and device identifiers (that uniquely identify the user's device)."),

32.     Setting aside any discrepancies between the data Plaintiffs' technical expert identifies as being at issue and the data that Mr. Krause purports to value, the facts in this matter suggest that in a but-for world in which the At-Issue Conduct did not take place, third parties would have had access through some other means to at least some, and potentially all, of the information allegedly transmitted to them by BetterHelp.  Hence, the incremental information that the third parties would have received *due to* the At-Issue Conduct could be negligible or even zero.

33.     For instance, the Putative Classes include Facebook users who navigated to a BetterHelp website by clicking on a BetterHelp advertisement on Facebook.[64, 65]  For these Putative Class Members, Facebook, one of the third parties that allegedly received the At-Issue Data from BetterHelp, would already have had access to device identifiers, IP address, email address, and information about the fact that these individuals navigated to a BetterHelp website even absent the At-Issue Conduct.  This is the case because these Putative Class Members would have been logged on to their Facebook account to be able to see and interact with BetterHelp's Facebook ads and would have been using the same device when they accessed the BetterHelp website after clicking on the advertisement.[66]  Alternatively, Facebook users who allowed Facebook to track their off-Facebook activity would also have shared their interactions with Facebook when they

---



[64] *See, e.g.,* Deposition of T.R., March 26, 2025, 74:18-75:7 ("███████████████████████████

███████████████████████████████████████████████████████████████████████████████████

; Deposition of R.S., March 27, 2025, ████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████ Teladoc Health, Inc. 2022
Form 10-K, p. 10-11 ("We sell our BetterHelp services principally through marketing our solution directly to potential users. We also rely on relationships for our BetterHelp business with a wide variety of third parties, including … social networking platforms such as Facebook … to source new users and to promote or distribute our services and products.").
[65] BetterHelp had approximately 560,000 paid customers in 2021.  Plaintiffs allege that BetterHelp's "advertising through Facebook [] generat[ed] approximately 90,000 – 120,000 new customers" in 2021.  First Amended Complaint, ¶ 43 ("In 2020, Defendant spent between $10 million and $20 million on Facebook advertising alone. This advertising was extremely successful; by 2021, Defendant's advertising through Facebook was generating approximately 90,000 – 120,000 new customers per year.");  Responses to Plaintiff's Second Set of Special Interrogatories, *In Re BetterHelp, Inc. Data Disclosure Cases*, Case No. 3:23-cv-01033-RS, (November 15, 2024), p. 4 ("Individuals residing in the United States registered for and paid for BetterHelp's services… [in] year…2021: 563,203.").
[66] Interview with Professor Ben Zhao, July 11, 2025 ("Zhao Interview").

engaged with the BetterHelp platform, and this activity would or would not be linked to specific individuals depending on any privacy protections they used.[67]

34.     For these individuals, even under Mr. Krause's assumptions, the incremental information that Facebook would have received due to the At-Issue Conduct would have been the fact that they completed the Intake Questionnaire and the information contained in their profile (although I understand that Plaintiff's technical expert, Prof. Shafiq, did not opine that this profile information was transmitted to third parties as part of the At-Issue Data).  Further, even this incremental information would likely have had limited, if any, incremental value for Facebook. For example, information regarding an individual's potential interest in mental health services would likely have been known to Facebook when that individual clicked on a BetterHelp advertisement while using Facebook.  Moreover, after completing the Intake Questionnaire, individuals were prompted to create a BetterHelp account with an email address or to continue using credential from their Facebook or Google account as shown in Exhibit 1 below.[68] Individuals who chose to use credentials from their Facebook accounts after completing the Intake Questionnaire would similarly be known to Facebook.

---

[67] Zhao Interview; "Off-Facebook Activity," *Facebook*, https://www.facebook.com/off-facebook-activity ("You control it. If you'd like, you can disconnect that information from your account, and it will not be associated with you personally.").

[68] For at least part of the relevant period, immediately after completing the Intake Questionnaire, users are given the option to create a BetterHelp account, continue using their Facebook, or continue using their Google account.  Unless the user closes their browser or navigates away from the BetterHelp website, they would need to choose one of these three options.  "*NEWS* Get Online Counseling with BetterHelp," *YouTube*, https://www.youtube.com/watch?v=F1zoE0QGfQA, at 3:15–3:20.

*Exhibit 1:  Screenshots of the End of the Intake Questionnaire and the Prompt to Create a BetterHelp Account or to Continue with a Facebook or Google Account*



Source:  "*NEWS* Get Online Counseling with BetterHelp," YouTube, March 30, 2021, https://www.youtube.com/watch?v=F1zoE0QGfQA, 3:15–3:20

Note:  Exhibit 1A shows the last page of the Intake Questionnaire as would be seen by a user of the BetterHelp app.  Exhibit 1B shows the prompt, immediately after the Intake Questionnaire, to create a BetterHelp account or to continue with a Facebook or Google account as would be seen by a user using the BetterHelp app.

35.     Facebook could have also been informed of an individual Facebook user's interest in mental health services based on the users' activities on Facebook (e.g., users who have clicked on Facebook ads associated with mental health services unrelated to BetterHelp, users who liked mental well-being content or activity in Facebook posts, users who have joined Facebook

communities focused on mental health, etc.).[69]  Finally, as noted above, Facebook users who allowed Facebook to track their off-Facebook activity would also have transmitted similar information to Facebook themselves, depending on any privacy protections they used.[70,71]

36.     Thus, in all of these examples, the incremental value to Facebook of the At-Issue Data would be limited or even zero.  This implies that Facebook's willingness to pay Putative Class Members for such information would also be limited or even zero.[72]  Moreover, Putative Class Members and Plaintiffs were not prevented from monetizing such information through other third parties, although I am not aware of a market where the At-Issue Data could be sold by Plaintiffs or Putative Class Members, as I explain in Section V.A.

37.     Similarly, the Putative Classes include individuals who conducted Google searches related to mental health,[73] and saw and clicked on search results or ads for BetterHelp.[74]  At least

---

[69] *See, e.g.*, Deposition of Jane Doe I, April 4, 2025, 146:21–146:23 ("Q. …Have you searched for any mental health topics on Facebook? A. Yes."); Deposition of L.M., April 1, 2025, 72:22–96:12 ("Q. Do you recognize this post as being from your Instagram account?  A. Yes, from a long time ago. … And this post says … and I keep my gut health in check. Gut health and mental health may be connected…Q. So there you discussed what your husband affectionally calls a mood swing fit of rage. Is that -- were -- were you sharing something that is -- is true? Is it accurate that your husband says that you sometimes have mood swing fits of rage? A. I don't -- I truly -- I don't know why I said fits of rage. He calls them mood swings, and I shared that he has them, too. Q. And why did you share that?  A. Because I wanted people to understand that being angry may affect their heart health. …Q. And were the personal stories you shared in this post true stories? A. They are true stories that I chose to share on my terms."); Deposition of R.S., March 27, 2025, 77:21–78:2 ("[Q.] You testified earlier that you first learned of BetterHelp through an ad that you saw when using Facebook; is that right? A. To my knowledge, yes. Q. And then you clicked on the ad which took you to BetterHelp's website; is that right? A. To my knowledge, yes.").

[70] Zhao Interview.

[71] Moreover, as I discuss further in Section VI, for each individual Putative Class Member, the amount of personal information that would have been transferred to Facebook depends on the individual's choices (e.g., privacy tools or settings employed).

[72] Mankiw (2008), p. 6 ("The reason is that a person's willingness to pay for any good is based on the marginal benefit that an extra unit of the good would yield. The marginal benefit, in turn, depends on how many units a person already has.").

[73] *See, e.g.*, Plaintiff Jane Doe III's Amended Supplemental Responses to Defendant BetterHelp Inc.'s First Set of Interrogatories, *In Re BetterHelp, Inc. Data Disclosure Cases*, Case No. 3:23-cv-01033-RS, (March 27, 2025), p. 6 ("Plaintiff performed a Google search for female therapists in her area and BetterHelp came up in the results.").

[74] *See, e.g.*, Deposition of Jane Doe I, April 4, 2025, 127:5–130:3 ("Q[.] Have you seen this document before? A[.] Yes. Q[.] What is it? A[.] The plaintiff Jane Doe's I's responses to defendant BetterHealth's first set of interrogatories. Q[.] I'm going to correct you on that. It's plaintiff Jane Doe I's supplemental responses to defendant BetterHelp's first set of interrogatories… Where it says, plaintiff Jane Doe I maintains her objections listed above. Plaintiff further responds as follows: Plaintiff performed a Google search for, quote, therapists near me, end quote, approximately 10 to 15 times since August 1st, 2017. Did I read that correctly? A[.] You did, yes. … Q[.] Okay. And were there any therapists near you? A[.] There -- there was one in Michigan that was through BetterHelp. Q[.] Okay. So is it correct that during one of these searches you saw a link to BetterHelp? A Yeah, it showed her profile. Q[.] Okay. And you clicked on her profile? A[.] Yes. Q[.] And it brought you to her? A[.] Yeah, like I think to the general page first, and then I had to submit information and then it showed the list of therapists."); Deposition of L.M., April 1, 2025, 104:13–105:1 ("Q. And it sounded like you found BetterHelp through a Google search; is that right? A. Correct. Q. And after you performed the Google search, how did you get to the BetterHelp platform? A. I -- I believe it was an advertisement that I saw, so I clicked on the advertisement and got to the BetterHelp website. Q. And that was directly -- you -- you entered a Google search related to therapy, then you got an ad for the BetterHelp website and then you clicked on it and went to the BetterHelp website? A. I believe so."); Teladoc Health, Inc. 2022 Form 10-K, p.

for some of these Putative Class Members, Google, one of the third parties that allegedly received the At-Issue Data from BetterHelp, would have had access to device identifiers, IP addresses and possibly email addresses (e.g., for the individuals who had Google accounts and were logged onto their Google account when they conducted these searches).[75] Further, for those Putative Class Members who navigated to mental health websites unrelated to BetterHelp, which used Google Analytics, using the same device they used to visit BetterHelp's websites,[76] Google would have had access to device identifiers, IP addresses, and possibly email addresses (e.g., for the individuals who had Google accounts and were logged onto their Google account when they conducted these searches).[77,78] Thus, the incremental value of at least some of the At-Issue Data to Google would be limited or even zero, which implies that Google's willingness to pay Putative Class Members for such information would also be limited or even zero.[79]

38.     Even if Putative Class Members could obtain economic value from sharing their At-Issue Data, given that at least some third parties likely already had or would have been able to access most, if not all, of the At-Issue Data through other means, the incremental value of the data generated by the At-Issue Conduct would likely be negligible or possibly even zero for at least some of the Putative Class Members.[80]

---

10 ("We sell our BetterHelp services principally through marketing our solution directly to potential users. We also rely on relationships for our BetterHelp business with a wide variety of third parties, including Internet search providers such as Google … to source new users and to promote or distribute our services and products.").

75 Zhao Interview.

76 ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ Google Analytics is one of the most popular web analytics software. It is estimated that between one third and 85.8 percent of websites use it.  Alby, T. (2023), "Popular, But Hardly Used: Has Google Analytics Been to the Detriment of Web Analytics?" *Proceedings of the 15th ACM Web Science Conference 2023*, 304–311, p. 304 ("Web analytics software allows to measure and optimize the value added by a website based on 'the collection, measurement, analysis, and reporting of internet data', according to the Digital Analytics Association. Google Analytics has been dominating the web analytics tool market for several years now, with a market share between a 3rd of all websites up to 85.8%, depending on how the measurements took place.").

77 Zhao Interview.

78 Moreover, as I discuss further in Section VI, for each individual Putative Class Member, the amount of personal information that would have been transferred to Google depends on the individual's choices (e.g., privacy tools or settings employed).

79 Mankiw (2008), p. 6 ("The reason is that a person's willingness to pay for any good is based on the marginal benefit that an extra unit of the good would yield. The marginal benefit, in turn, depends on how many units a person already has.").

80 For instance, as noted above, some Plaintiffs testified that they found out about BetterHelp via Facebook and clicked on BetterHelp ads on Facebook.  Deposition of T.R., 74:18–75:7 ("Q[.] How did you first hear about BetterHelp? A[.] Via an ad. Q[.] Where did you see that ad? A[.] Where did I see it? Probably on Facebook. Q[.] And what did you do when you saw that ad? Well, for example, did you click on the ad to see -- to take you to where it led

### C. Mr. Krause's Proposed Damages Approach Ignores Any Benefits that Putative Class Members May Have Received Because of the At-Issue Conduct

39.     Mr. Krause acknowledges in his report that "increased availability of personal information has brought benefits."[81] His proposed damages approach, however, fails to consider benefits for Plaintiffs and Putative Class Members that may arise from the At-Issue Conduct.[82] This omission violates the principles of economic damages analysis, in which economic damages "are the difference between the value the plaintiff would have received if the harmful event had not occurred and the value the plaintiff has or will receive, given the harmful event."[83] Importantly, value includes the net effect of both costs and benefits.

40.     In particular, Mr. Krause ignores the fact that third parties may use the At-Issue Data to provide useful information via targeted advertisement.  Academics in the field of technology and economics recognize the benefits that consumers may receive from the commercial use of personal information.[84]  One of the ways in which personal information produces benefits for consumers is that "[t]argeted advertising gives consumers useful information," and targeted advertising is only possible because of, and is improved by the availability of, customer information.[85]  Consistently, academic and industry research has found that, while consumer preferences regarding receiving targeted advertising vary, many consumers (especially younger

---

[81] you to? A[.] Yeah. Actually, I'm sure it was on Facebook. And, yes, I did click on the ad. Q[.] Where did the ad take you to? What website? A[.] It would have taken me to a landing page on the BetterHelp website. Q[.] And is that BetterHelp.com? A[.] Yes."); Deposition of R.S., 77:19–78:4 ("Q. …You testified earlier that you first learned of BetterHelp through an ad that you saw when using Facebook; is that right? A. To my knowledge, yes. Q. And then you clicked on the ad which took you to BetterHelp's website; is that right? A. To my knowledge, yes. Q. Do you recall if it was BetterHelp.com? A. To my knowledge, yes").

[81] Krause Report, ¶ 39 ("While the increased availability of personal information has brought benefits, it has also intensified public concerns about privacy.").

[82] Mr. Krause confirmed in his deposition testimony that his proposed damages approach did not account for any benefits to Plaintiffs or Putative Class Members.  Krause Deposition, 55:22–56:10 ("Q. …Is it your -- did you ascribe any value to any benefit received by class members from the disclosure of information? A. Not for the disclosure of information…Q. Setting aside any compensation received, did you ascribe any value to any other benefit received by class members? A. No, sir.").

[83] Reference Manual on Scientific Evidence (2011), p. 430.

[84] Lenard, T. M. and P. H. Rubin (2009), "In Defense of Data: Information and the Costs of Privacy," *Technology Policy Institute*, 2, 1, pp. 2–56 ("Lenard and Rubin (2009)") at p. 2 ("The commercial use of information on the Internet has produced substantial benefits for consumers.").

[85] Lenard and Rubin (2009), p. 2 ("Targeted advertising gives consumers useful information. The online advertising industry uses customer information to target advertising messages to consumers' specific interests. Such targeting reduces the cost to producers of communicating with consumers and the cost to consumers of obtaining useful information. Internet advertising often introduces consumers to products they were unaware of and therefore unable to seek out on their own. If information about consumers becomes less available and more expensive, sellers rely more on sending messages to poorly targeted sets of consumers. As this occurs, consumers receive more irrelevant messages and find it more difficult to obtain useful information.").

consumers) like receiving targeted advertisements.[86] Further, academic research has found that targeted advertising leads to more positive consumer responses to the ad because targeted advertising is perceived as more relevant,[87] and that personalization is positively associated with informativeness, credibility and entertainment of the advertising message.[88] For example, Plaintiffs argue that the At-Issue Conduct allowed BetterHelp to target advertisements about its services to consumers.[89] Such advertisements would be expected to contain information useful to at least some Putative Class Members, some of whom clicked on targeted BetterHelp advertisements and all of whom exhibited interest in BetterHelp's platform by completing the BetterHelp Intake Questionnaire.

[86] *See, e.g.*, "Share of Consumers Who Liked Personalized Ads in the United States as of March 2022, by generation," *Statista*, https://www.statista.com/statistics/796167/us-internet-users-primary-attitude-personalized-video-ads/; "From A to Gen Z: How and Where Young Consumers are shopping," *Tinuiti*, https://reports.tinuiti.com/from-a-to-gen-/?utm_source=accountengagement&utm_medium=email&utm_campaign=G-23-08-24-ALL-From-A-to-Gen-Z-CPG&utm_term=guide_confirmation&utm_content=heroCTA ("When asked what kinds of ads they would prefer to see for CPG products, Gen Z was the least likely to select ads that appealed to the most people, and instead showed relatively strong preferences for ads that were personalized based on past actions or for offers that were created to appeal to people with similar demographics or interests."); "Consumer Psychology Survey Key Takeaways," *Iterable*, https://iterable.com/blog/6-insights-from-iterables-2021-consumer-psychology-poll/ ("The large majority of consumers (58%) said they feel positive about receiving a hyper-personalized online ad, and 23% said they feel neither positive nor negative about the matter. In comparison, 19% said they feel negative about receiving hyper-personalized ads, with only 8% saying they feel very negative. Data privacy is paramount when it comes to brand trust. But data doesn't have to be a divider—it's evident that consumers want a personalized experience and aren't against their information being used for targeted marketing… And they want a personalized customer experience that offers a deeper connection with the brands they engage."); O'Donnell, K. and H. Cramer (2015), "People's Perceptions of Personalized Ads," *Proceedings of the 24th International Conference on World Wide Web*, pp. 1293–1298, p. 1294 ("[The] online survey consisted of mostly Likert 5-point scale questions on services and devices used, attitudes towards personalization of ads … Receiving personalized ads as an overall concept appeared to appeal to our survey participants. 'I like receiving ads that are personalized to me" scored a slightly positive M=3.5 (SD=1.2, range=1-5, Mdn=4), and 'I think ads that are personalized to me are useful" reached a M=3.6 (SD=1.1, range=1-5, Mdn=4). However, similar to 2011findings, we also see distinct groups: 20% (strongly) disagreed, 24% were neutral, and 54% (strongly) agreed that they would like to see ads personalized to them.").
[87] De Keyzer, F., et al. (2015), "Is This for Me? How Consumers Respond to Personalized Advertising on Social Network Sites," *Journal of Interactive Advertising*, 15, 2, 124–134, p. 8 ("Our results provide guidelines for practitioners. Personalized advertising on [social networking sites] leads to more positive consumer responses than nonpersonalized advertising. This is mainly because personalized ads are perceived as more relevant.").
[88] Kim, Y. J. and J. Han (2014), "Why Smartphone Advertising Attracts Customers: A Model of Web Advertising, Flow, And Personalization," *Computers in Human Behavior*, 33, 256–269, p. 256 ("The results show that personalization has a positive association with informativeness, credibility, and entertainment of the advertising message while having a negative association with irritation. Purchase intention is increased by advertising value and flow experience.), Table 6.
[89]

## VI.     Mr. Krause's Proposed Damages Approach Is Unreliable Because It Ignores Heterogeneity across Putative Class Members

41.     Mr. Krause claimed that his estimate of $200 per Putative Class Member can be used to calculate damages on a class-wide basis.  However, this claim ignores that the extent of harm, if any, to an individual Putative Class Member would depend on aspects that are heterogeneous across Putative Class Members.

42.     First, Putative Class Members are heterogeneous in terms of the amount of personal information that would have been transmitted to third parties.  The amount of personal information of a given Putative Class Member that would have been transmitted to third parties in turn depends on the extent to which such Putative Class Member used tools to prevent the transmission of such information.  For instance, the Putative Classes include individuals who use virtual private networks ("VPN").[90]  A VPN is a system that encrypts personal data and masks IP addresses, making it difficult for unauthorized parties to track an individual's online activity.[91,92] Hence, for Putative Class Members who used a VPN, a comparatively more limited set of data (if any) would have been transmitted to third parties due to the At-Issue Conduct relative to Putative Class Members who did not use a VPN. Similarly, any members of the Putative Classes who had used browsers with privacy-enhancing features such as DuckDuckGo browser or Tor would likely have been less affected by the At-Issue Conduct (if at all) compared to those who did not use such measures.  DuckDuckGo is a "privacy-focused browser" that comes with a "built-in web and app tracker blocker that protects [users] from third-party software designed to

---

[90] *See, e.g.*, Deposition of T.R., 39:6–18 ("Q[.] You also use a VPN; right? A[.] Correct. Q[.] And how long have you used a VPN? A. Fifteen years, probably. Q[.] If your -- so VPN applies to your computer; is that right? A[.] Correct. Q[.] And also to your smartphone? A[.] I have a VPN on my smartphone, but I don't often use it. Q[.] How long have you had a VPN on your smartphone? A[.] Off and on ten years as well."); Plaintiff T.R.'s Responses to Defendant BetterHelp Inc.'s First Set of Interrogatories, *In Re BetterHelp, Inc. Data Disclosure Cases*, Master File No. 3:23-cv-01033-RS, (August 26, 2024), p. 7 ("Subject to and without waiving the foregoing objections, Plaintiff responds as follows: … he uses a VPN.").

[91] "What is a VPN?", *Microsoft*, https://azure.microsoft.com/en-us/resources/cloud-computing-dictionary/what-is-vpn ("A VPN, which stands for virtual private network, establishes a digital connection between your computer and a remote server owned by a VPN provider, creating a point-to-point tunnel that encrypts your personal data, masks your IP address, and lets you sidestep website blocks and firewalls on the internet. This ensures that your online experiences are private, protected, and more secure."); "What is a VPN? How It Works, Types, and Benefits," *Kaspersky*, https://www.kaspersky.com/resource-center/definitions/what-is-a-vpn ("VPNs encrypt your internet traffic and disguise your online identity. This makes it more difficult for third parties to track your activities online and steal data.").

[92] As of 2023, 33 percent of U.S. adults used a VPN in personal devices.  "Virtual Private Network (VPN) usage in the United States in 2023," *Statista*, https://www.statista.com/statistics/1342696/vpn-usage-united-states.

collect [users'] data for marketing purposes."[93]  Tor is a browser that has "settings that disable tracking, and everything [users] do in the browser gets run through a variety of privacy-protecting measures that help obscure [the user's] identity."[94]  Tor hides users' IP addresses and prevents websites from tracking searches.[95]  Even Dr. Shafiq acknowledged that there are privacy tools available that would eliminate the transfer of information.[96]  Because of this, the extent of harm, if any, to individual Putative Class Members would depend on the individual Putative Class Member's use of available privacy-protection tools.

43.     Second, Putative Class Members are heterogeneous in terms of the personal information that may be available to third parties through means other than the At-Issue Conduct, reducing or possibly eliminating the value Putative Class Members could obtain in exchange for their data even if they could access a market for such data (which they cannot because such market does not exist).  The extent to which At-Issue Data are available to third parties through different means would vary depending on the individual Putative Class Member's online behavior.  For instance, Putative Class Members who are active in various online environments such as social media are likely to generate more data as they browse the internet (e.g., device identifiers) and share content on their interests (e.g., mental health) or post or respond to comments (e.g., comments sharing that they are looking for or seeing a new therapist) compared to those Putative Class Members who are less active online or do not have social media accounts.  Similarly, the amount of a Putative Class Member's personal information available to third parties through other means would vary depending on whether a Putative Class Member created a BetterHelp account or logged onto BetterHelp using their Facebook or Google account, or navigated away

---

[93] David Pierce, "DuckDuckGo's Privacy-Focused Browser Is Available for Windows Now," *The Verge*, June 22, 2023, https://www.theverge.com/2023/6/22/23769084/duckduckgo-browser-windows-download; Desire Athrow, "DuckDuckGo Private Browser Review," *Tech Radar*, July 13,2023, https://www.techradar.com/pro/duckduckgo-private-browser.

[94] Thorin Klosowski, "Simple Online Security: Search for Information Online as Privately as Possible," *The New York Times Wirecutter*, November 2, 2022, https://www.nytimes.com/wirecutter/guides/simple-online-security-searching-online-privately.

[95]"What is a Tor Relay?" *Electronic Frontier Foundation*, https://www.eff.org/pages/what-tor-relay ("When you use the Tor software, your IP address remains hidden and it appears that your connection is coming from the IP address of a Tor exit relay, which can be anywhere in the world. There are many reasons you might use Tor, including keeping websites from tracking you and your family members.").

[96] Deposition of Zubair Shafiq, June 13, 2025, 284:25–287:12 ("Q. All right, Professor Shafiq, is it your understanding that most ad blocking extensions rely on public filter lists? … A. Ad blocking -- yes, ad blocking list, yes, ad blocking tools rely on the list and the most commonly used list is what is called EasyList to block ads….A. If consumer uses uBlock Origin and visits a website that has tracking pixels installed, the blocking tool in this case uBlock Origin would block the tracking tools that the filter lists are designed to block. In case of uBlock Origin, I have not done this test, so I can't recall from memory, but if I have to offer a guess, my guess is it probably does block transmissions to Google Analytics.").

from the BetterHelp website, after completing the Intake Questionnaire.[97]  Because of this, the extent of "harm", if any, to individual Putative Class Members would depend on the online behavior of individual Putative Class Members.

44.     Third, Putative Class Members are heterogeneous in terms of the benefits they may have received due to the At-Issue Conduct.  The extent to which an individual Putative Class Member benefited from the At-Issue Conduct would depend, for example, on the extent to which they received useful information via targeted advertisements that they would not have received absent the At-Issue Conduct and on their individual preferences regarding receiving targeted advertising.[98]  Given that economic damages "are the difference between the value the plaintiff would have received if the harmful event had not occurred and the value the plaintiff has or will receive, given the harmful event,"[99]  the extent of harm, if any, to individual Putative Class Members would depend on the extent to which the At-Issue Conduct caused them to receive targeted advertisements with useful information, such as advertisements about mental health services, and the personal value from receiving targeted advertisements to the individual Putative Class Members.

**VII.    Mr. Krause's Estimate of "Fair Market Value" of $200 Per Putative Class Member Is Unreliable Because It Is Not Based on a Scientific Methodology and Is Based on Biased "Data Points" that Are Untethered to the Facts of the Case**

    **A.    Mr. Krause's Estimate of "Fair Market Value" of $200 per Putative Class Member Is Not Based on a Scientific Methodology**

45.     Mr. Krause arrived at his $200 "fair market value" estimate by considering five sources of information that, according to Mr. Krause, provided "data points for the reasonable estimation of the value of personal information and non-public medical information such as patient status."[100]

---

[97] *See* discussion in Section V.B.
[98] As explained in Section V.C, although many consumers like receiving targeted advertisements, preferences regarding receiving targeted advertising may vary across consumers.
[99] Reference Manual on Scientific Evidence (2011), p. 430.
[100] Krause Report, ¶ 44.

46.     First, Mr. Krause relied on three of his information sources to identify "data points" to value the personally identifying information in the At-Issue Data.[101]  Specifically, he relied on (i) the price per year of four services that remove personal information from databases owned by data brokers, people search websites, and other companies that collect personal data (Privacy Bee, DeleteMe, Incogni, and ReputationDefender),[102] (ii) the results of a single academic publication (Li et al. (2021)), which attempts to provide estimates of study participants' willingness-to-sell certain types of personal information,[103] and (iii) the results of a single study conducted by the Ponemon Institute in 2017, which attempts to provide an estimate of the cost of addressing data breach incidents to the breached organizations.[104]  Based on his review of these sources, Mr. Krause identified $99, $129, $179, $197, $189.40, and $225 as "observations" that would be informative for estimating a "reasonable valuation for an individual's personal information."[105, 106]

---

[101] In deposition, Mr. Krause indicated that he considered the prices of privacy services, the results from the Li et al. (2021) study that was not related to medical data, and the results from the 2017 Ponemon Study that was related to the value of personal information, not medical information.  Krause Deposition, 85:10–13 ("Q. In paragraph 47 you referred to a number of services that you write are examples 'of a valuation based on a WTP approach.' Do you see that? A. Yes."), 93:1–5 ("Q. And you relied on the ultimate findings of the Li report … as a data point that informed your ultimate $200 valuation; is that right? A. It was one of the variables I considered in reaching my conclusion."), p. 117:14–22 ("Q. You then go on in paragraph 52 to state that 'Similarly in terms of valuing personal privacy through the lens of potential harm from data exposure, I note that a separate study conducted four years earlier in 2017 by the Ponemon Institute determined that the average cost of each compromised record lost or stolen in a data breach in the US was $225.' Do you see that? A. Yes.") p. 124:16–125:6 ("Q. … I want to move to the portion of your report where you discuss valuing non-public medical information beginning at paragraph 53. … I want to make sure I understand. We already went over sort of the information that you were valuing in come up -- coming up with your fair market valuation of $200. And that did not include any non-public medical information other than patient status; is that right? A. Correct. Patient status is the medical information -- the PHI that I'm valuing in this case. And everything we've talked about up to this point has largely been related to the just personal information.").

[102] Krause Report, ¶ 47.

[103] Li, X., et al. (2021), "Valuing Personal Data with Privacy Consideration," *Decision Sciences*, 52, 2, 393–426 ("Li et al. (2021)"); Krause Report, ¶¶ 48–49 ("Because both the ownership and content of data is important in the valuation context for personal information, I discuss a study that specifically values personal information from a WTA perspective. … Xiao-bai Li, Xiaoping Liu, and Luvai Motiwalla designed and conducted an important academic study to quantify the value of personal information. The mechanism involved for valuation was a second price sealed-bid procurement auction wherein participants sold their personal information.").

[104] "2017 Cost of Data Breach Study," Ponemon Institute, June 2017, https://documents.ncsl.org/wwwncsl/Task-Forces/Cybersecurity-Privacy/IBM_Ponemon2017CostofDataBreachStudy.pdf ("2017 Ponemon Institute Study"); Krause Report, ¶ 52 ("I note that a separate study conducted four years earlier in 2017 by the Ponemon Institute determined that the average cost of each compromised record lost or stolen in a data breach in the U.S. was $225, with compromised records specifically defined as those records that identified the person whose data was breached.").

[105] Krause Report, ¶ 67 ("The values of $189.40 and $225 implied by Li, Xiao-Bai, Xiaoping Liu, and Luvai Motiwalla for personal information and average United States data breach costs respectively in the WTA context, as well as values from $99 to $197 per year in the WTP context, act as observations to inform a reasonable valuation for an individual's personal information as an intangible asset that was allegedly taken without permission."); ¶ 62 ("The values for personal information implied by these different approaches range from a per-user value of $197, $179, $129, and $99 in the WTP context to $189.40 to $754 in the WTA context, with most observations supporting a typical estimated fair market valuation of approximately $200.") .

[106] In Section VII.B, I explain why these sources are disconnected from the facts of this matter and, hence, cannot be relied on for the valuation of the At-Issue Data.

47.     Second, Mr. Krause relied on two additional sources of information to identify "data points" to account for the value of what he calls "patient status" (i.e., the mere fact that Putative Class Members completed the Intake Questionnaire).[107]  Specifically, Mr. Krause relied on (i) the results of a single 2017 study conducted by cybersecurity company Trustwave that aims to assess the value of data from the perspective of companies that control data,[108] and (ii) the results of a single 2019 Ernst & Young study, which aims to assess the value of the United Kingdom National Health Services' medical records.[109]  From these sources, Mr. Krause identified $75, $380, $1,546, and $12.91–$9,254.18 as "data points" that were indicative of the existence of a premium for medical information.[110]

48.     In the following sections, I explain that neither Mr. Krause's damages approach nor his selection and use of these "data points" nor the ultimate "fair market value" of $200 that he puts forward are a product of any systematic, scientific, or widely accepted methodology.  I explain that the "data points" or "observations" used by Mr. Krause are not tethered to the facts of this case and, therefore, cannot be relied on for the valuation of the At-Issue Data.  I further explain that the $200 "fair market value," an estimate Mr. Krause determined based on his selected "data points," (which range from $12.91 to $9,254.18) is simply a product of Mr. Krause's personal opinion rather than a product of reliable, replicable methodology.  Indeed, in his deposition, Mr.

---

[107] Mr. Krause refers as "patient status" to the fact that an individual completed the Intake Questionnaire.  Krause Deposition, 66:15–20 ("Q. Second bullet point there refers to 'Class Members' patient status.' And, again, patient status just means that they're individuals who completed the questionnaire and submitted it to BetterHelp; is that right? A. That's correct.").  In paragraphs 53 through 61 of his report, Mr. Krause discussed additional results from the studies by Li et al. (2021) and from the 2017 Ponemon Institute Study related to health data, and two additional sources: the 2017 Trustwave Study and the 2019 EY Study.  Krause Report, ¶ 53–61.  In deposition, Mr. Krause indicated that that portion of his report was aimed to account for the fact that there is a premium associated with medical information such as "patient status."  Krause Deposition, 126:3–12 ("Q. With that in mind, am I right in understanding that this portion of your report, paragraphs 53 through 61 -- the purpose of this portion is to account for the patient status portion of the information you're valuing? A. It is largely in support of that and the notion that patient status health information is a premium above and beyond what was, say, included as identifiers or quasi-identifiers in the type of personal information analysis I was performing.").  Further, in deposition, Mr. Krause also implied that this premium for "patient status" was incorporated in his $200 estimate.  Krause Deposition, 59:13–25 ("Q. What does the $200 figure represent? A. … And so the $200 represents that personally identifying information that's detailed in opinion No. 1 from Dr. Shafiq's report as well as patient status.").
[108] Krause Report, ¶ 57 ("In terms of studies attempting to directly measure the value of medical data, American cybersecurity firm Trustwave published a report on The Value of Data in 2017."); "The Value of Data," Trustwave, 2017, https://www.infopoint-security.de/media/TrustwaveValue_of_Data_Report_Final_PDF.pdf ("2017 Trustwave Study").
[109] Krause Report, ¶ 60 ("Ernst & Young ('EY') conducted a similar study in 2019 measuring the value of healthcare data to a variety of firms,"); "Realising the Value of Health Care Data: A Framework for Future Work," Ernst & Young, 2019, https://www.ey.com/content/dam/ey-unified-site/ey-com/en-gl/insights/life-sciences/documents/ey-value-of-health-care-data-v20-final.pdf ("2019 EY Study").
[110] In Section VII.C, I explain why these sources are disconnected from the facts of this matter and, hence, cannot be relied on for the valuation of the At-Issue Data.

Krause testified that he relied on all these figures despite the disparate approaches underlying each of them, and that he arrived to his $200 "fair market value" estimate "based on [his] opinion" and the "data points" he identified.[111]  Mr. Krause further testified that "[t]here [was] not a spreadsheet or any kind of coefficient analysis" and that he was "reaching an appraisers' opinion preliminarily."[112]  As a result, Mr. Krause's damages approach and his "fair market value" estimate are unscientific, and $200 cannot be used as reliable measure of the purported damages in this matter.

      **B.**      **The "Data Points" Mr. Krause Relies on to Estimate the Value of Personally Identifying Information Are Disconnected from the Facts of The Case and Their Selection Left Out Sources Providing Estimates Lower than Mr. Krause's $200 Estimate**

49.      Mr. Krause relied on three sources of information to gather "data points" to estimate the value of the personally identifying information in the At-Issue Data.[113]  However, as I explain below, these "data points" are disconnected from the facts of the case and cannot be used as basis for arriving at a "fair market value" estimate.  In addition, Mr. Krause's selection of these three

---

[111] Krause Deposition, 144:11–145:4 ("Q. Explain to me how you got from all of those data points to the $200 figure. A. Based on my opinion. It's an analysis in which I quantify all these different variables of PII. I consider things like the $189 includes information beyond what was disclosed based on Dr. Shafiq. I considered that the medical claims data in the Li report was $75 when they valued it. I considered that the patient status at a -- you know, would have, at a minimum, been included in some of these healthcare record valuations that range up into the thousands of dollars. Taking all of that into account, as any appraiser giving a professional opinion on value, after synthesizing all the information, I concluded preliminarily -- again, this is a merits phase issue, but preliminarily the $200 is a reasonable floor for the value of the data that the plaintiffs allege was improperly disclosed.").

[112] Krause Deposition, 145:21–146:3 ("Q. I want to know how you weighted each one of those. Is there anything I -- you can tell me or a computation you ran that I can look at or analysis you ran that I can look at to see how you weighted any one of those factors versus another? A. No, sir. There's not a spreadsheet or any kind of coefficient analysis. I am reaching an appraiser's opinion preliminarily.")

[113] In deposition, Mr. Krause indicated that the prices of privacy services he considered, the results from the Li et al. (2021) study not related to medical data, and the results from the 2017 Ponemon Study related to the value of personal information, not medical information.  Krause Deposition, 85:10–13 ("Q. In paragraph 47 you referred to a number of services that you write are examples 'of a valuation based on a WTP approach.' Do you see that? A. Yes."), 93:1–5 ("Q. And you relied on the ultimate findings of the Li report … as a data point that informed your ultimate $200 valuation; is that right? A. It was one of the variables I considered in reaching my conclusion."), p. 117:14–22 ("Q. You then go on in paragraph 52 to state that 'Similarly in terms of valuing personal privacy through the lens of potential harm from data exposure, I note that a separate study conducted four years earlier in 2017 by the Ponemon Institute determined that the average cost of each compromised record lost or stolen in a data breach in the US was $225.' Do you see that? A. Yes."), p. 124:16–125:6 ("Q. … I want to move to the portion of your report where you discuss valuing non-public medical information beginning at paragraph 53. … I want to make sure I understand. We already went over sort of the information that you were valuing in come up -- coming up with your fair market valuation of $200. And that did not include any non-public medical information other than patient status; is that right? A. Correct. Patient status is the medical information -- the PHI that I'm valuing in this case. And everything we've talked about up to this point has largely been related to the just personal information.").

sources of information left out other sources of information estimating a value of personally identifying information significantly lower than his $200 estimate.

### 1. Data Deletion Services Fees

50.     Mr. Krause considered fees charged by four services that are in the business of deleting data that are already available to various third parties.  Each of these services remove personal information from databases owned by data brokers, people search sites, credit check companies, and other companies that collect personal data who then sell this information.  These services and corresponding fees Mr. Krause used are Privacy Bee ($197 per year), DeleteMe ($129 per year), Incogni ($179 per year), and ReputationDefender ($99 per year).[114, 115]

51.     Mr. Krause did not explain the methodology he used to select these services or if there were other services he considered and then discarded.  Further, Mr. Krause failed to explain why he selected these specific fees even when multiple pricing options are available for a given service.  For example, PrivacyBee offers multiple levels of coverage, ranging from $96 to $799 per year.[116]  DeleteMe offers six plans, with options for one, two, or four-person coverage for either one or two years, with prices ranging from $105 to $329 per year.[117]  Incogni offers four plans, including "Standard" ($96/year), "Unlimited" ($180/year), a family plan ($192/year for up to five people), and a "Family Unlimited" plan ($276/year).[118]

---

[114] Krause Report, ¶ 47, ¶62.

[115] In his report, Mr. Krause also mentioned a company called "deleteme™" which seems to be different from "DeleteMe®" as "DeleteMe®" is a company owned by Abine, Inc., a company based in the U.S. and "deleteme™" is owned by Deleteme Europe Ltd, a company based in Cyprus. *See* "About Us," *DeleteMe*, https://joindeleteme.com/about-us/; "Abine," *Abine*, https://abine.com/; "Abine," *Crunchbase*, https://www.crunchbase.com/organization/abine#faq; "Who We Are," *deleteme,* https://www.deleteme.com/who-we-are/.  Mr. Krause indicates that "deleteme™" charges one-time fees ranging from $100 to $500 for search engine and data breach removals" *See* Krause Report, ¶ 47.  However, Mr. Krause does not include these figures from "deleteme" among those that he considers to be "values for personal information implied .. in the WTP context."  *See* Krause Report, ¶ 62.  Further, as in the case of the other data deletion services Mr. Krause refers to, the services offered by "deleteme™" are related to the deletion of information already available to third parties, not the protection of information to prevent its disclosure.  Moreover, "deleteme™" offers different one-time fees for different services ranging between $13 to $370, and different packages through which consumers can purchase credits to pay for different services.  *See* "Services Pricing," *deleteme*, https://www.deleteme.com/pricing-update/.

[116] PrivacyBee offers three coverage levels: "Essentials" for $96/year, "Pro" for $197/year, and "Signature" for $799/year. Mr. Krause considers only the price of the "Pro" package. "Pricing," *PrivacyBee*, https://privacybee.com/pricing/.

[117] Mr. Krause considers only the price for the one-year plan for one person ($129/year). However there are plans and prices including a two-year plan for one person, which is $209 for two years (or $105/year). "Save More With Our Best Value Plans," *DeleteMe*, https://joindeleteme.com/start.

[118] Mr. Krause considers only the price for the "Unlimited" plan. "Personal Information removals made easy," *Incogni*, https://incogni.com/pricing.

52.     In deposition, Mr. Krause explained that he regarded fees for these services as informative about the valuation of personal information because, per Mr. Krause, these fees reflect an individual's *willingness-to-pay to protect* their personal information.[119]  However, these services offer the deletion of information already available to third parties, not the protection of information to prevent its disclosure.  I understand that, unlike the deletion of already available information, there are actions that individuals can take to prevent the disclosure of personal information that are inexpensive or free.  For instance, an individual can modify their browser privacy settings to prevent disclosure of personal information or use a freely available browser with enhanced privacy features such as DuckDuckGo browser.[120]  Second, the fees for the services identified by Mr. Krause do not represent prices that a Putative Class Member would be able to obtain in a market by offering their personal information for sale and are therefore disconnected from Plaintiffs' theory of harm.  Third, the services identified by Mr. Krause have no connection to the At-Issue Data.  For instance, some of the services identified by Mr. Krause offer the removal of information related to purchase history, employment information, financial information, social media information, and demographic information, none of which are among the data at issue in this matter (e.g., IP address, device identifiers).[121]  Mr. Krause, in fact, acknowledged this difference between the At-Issue Data and the data removed by the services he identified.[122]

---

[119] Krause Deposition, 85:10–86:11 ("In paragraph 47, you referred to a number of services that you write are examples "of a valuation based on a WTP approach. Do you see that? A. Yes… Q. You say these are examples of valuations. How are these services examples of valuations? A. These are transactions -- these are arm's-length transactions between users and service providers for the protection of information, personal information. So these are variables that I consider in reaching my appraisal opinion. They are highly relevant, in my opinion, because they show user intent with regards to being willing to pay to regain control of their data.").

[120] Zhao Interview; "DuckDuckGo," *DuckDuckGo*, https://duckduckgo.com/ ("The browser that actively protects your personal information."); "About DuckDuckGo," *DuckDuckGo*, https://duckduckgo.com/about ("The DuckDuckGo browser is designed for data protection, not data collection. Our browsing protections, such as ad tracker blocking and cookie blocking, help stop your data from being collected. And our built-in search engine never tracks your searches.").

[121] "Privacy Bee," *Privacy Bee*, https://privacybee.com/; "DeleteMe," *DeleteMe*, https://joindeleteme.com/ ("Name[,] Age[,]  Address[,]  Phone[,] Relatives[,] Social media[,] Occupation[,] Marital Status[,] Property Value[,] Past Address[,] Photos[,] Email[.]")].

[122] Krause Deposition, 88:10–89:13 ("Q. The services they provide, they go above and beyond removing the information that is at issue in this case. Do you agree with that? A. I think that there is a different -- the data set is not a perfect overlap Venn diagram. There are data elements of these services that are different than what Dr. Shafiq has identified as being transmitted and vice versa. Generally you're not going to find a lot of health information out there, and disclosures of being a patient of a mental health … operator… Q. They include removal of other category of information, such as financial data; is that right? A. They can. Some of them do, yes. … Q. … they remove information like Social Security numbers and other personal identifying information; is that right? A. Yes, some that overlaps and that does not. … Q. They also advertise for the removal of personal information from services that the individuals have signed up for; is that right? A. Yes.").

## 2.    Li et al. (2021)

53.     Mr. Krause also considered the estimates provided by a single academic publication: Li et al. (2021).  Mr. Krause did not explain the methodology he used to select the academic publications to consider in his analysis.  In his report, Mr. Krause did not indicate why Li et al. (2021) was the only academic publication he selected as a source of "data points" and, instead, just indicated that this study was "a reasonable data point as Plaintiff alleges the Defendant bartered Plaintiff's and Putative Class Members' personal information without their prior consent or acknowledgement" without explaining how he reached such a conclusion or why other academic papers did not provide "reasonable data points."[123]  In deposition, Mr. Krause indicated that he was aware of other studies using a similar approach for the valuation of personal information, but those other studies provided "ranges" and that Li et al. (2021) was the "primary one that had the most relevant overlap of the type of data that they were studying that came up with a point estimate valuation."[124]  However, Mr. Krause failed to explain why he could not rely on academic studies providing ranges.  In fact, his own report relies on a 2019 study by Ernst & Young, discussed below, which presents a "range of estimated values" of patient data from the U.K.'s National Health System.[125]  He also failed to explain why he considered Li et al. (2021) the "primary one" among those studies that provided point estimates.

54.     Li et al. (2021), among other goals, aimed to elicit individuals' valuation of four categories of personal data[126]—direct identifiers (i.e., full name, phone number, email address, home address), quasi-identifiers (i.e., date of birth, five-digit zip code), non-private information (i.e., age, gender, race/ethnicity, zip code's first three digits, marital status, years of education,

---

[123] Krause Report, ¶¶ 48–49 ("Because both the ownership and content of data is important in the valuation context for personal information, I discuss a study that specifically values personal information from a WTA perspective. In my opinion, this study is a reasonable data point as Plaintiff alleges the Defendant bartered Plaintiff's and [P]utative Class Members' personal information without their prior consent or acknowledgement. Xiao-bai Li, Xiaoping Liu, and Luvai Motiwalla designed and conducted an important academic study to quantify the value of personal information.").
[124] Krause Deposition, 101:20–102:4 ("Q. Are you aware of any WTA base studies, other than this Li study, that came up with valuations for the type of information we're dealing with here? A. There were ranges that were provided in some of the other studies. So they certainly had tangible members that they assigned, but they were generally ranges. This was the primary one that had the most relevant overlap of the type of data that they were studying that came up with a point estimate valuation.").
[125] Krause Report, ¶ 60 ("Ernst & Young ("EY") conducted a similar study in 2019 measuring the value of healthcare data to a variety of firms. … Based on this method, the values … range from a lower quartile of $56.46 to an upper quartile of $2,056."); Krause Deposition, 141:15–17 ("Q. … in your Exhibit 1, there's a very broad range of value per record figures. Is that fair? A. Yes, I would agree."); "2019 EY Study", p. 12 ("The range of estimated values per patient record and company-level analyses are listed in the appendix…").
[126] Li et al. (2021), p. 6.

occupation), and private information (i.e., income, credit scores).[127] The authors conducted a generalized second-price auction experiment in which participants were told that a buyer was interested in purchasing their personal data and had a budget of $500 per category to do so, and were asked to bid, for each data category, a price which they would be willing to sell such data.[128] They found that study participants' subjective valuations of the four data categories ranged between $78.91 and $117.78,[129] and that the valuation of the combination of all four data categories was $189.40.[130] The study sample was composed of 218 participants,[131] of which approximately one third were students,[132] and the authors noted that the sample included "relatively high percentages of Asian and Never Married, and low average Age."[133] They also noted that the valuations of data varied depending on demographics, with statistically significant differences between students and non-students.[134]

55.    Mr. Krause took the combined valuation for all four data categories of $189.40 as one of this "data points" for estimating the value of personally identifying information in the At-Issue Data. However, Mr. Krause's reliance on this figure is unwarranted for several reasons.

56.    First, the $189.40 figure estimated by Li et al. (2021) is not a market valuation but the self-reported value at which study participants would be willing to sell their personal data in an

---

[127] Li et al. (2021), p.7 ("[W]e have designed the auction that asks a bidder to submit a price for each of the following categories: Identifiers (I), Quasi-identifiers (Q), Demographics or nonprivate (D), and Private (P) information. Specific items included in the four types are given in Table 1."), Table 1.

[128] Li et al. (2021), p. 12 ("[W]e propose using [Generalized Second-Price] auction mechanism … which is a single auction mechanism that is relatively easy to implement. … The winners are selected by the bids from the lowest to the highest. The person with the lowest bid is paid an amount equal to the second lowest bid, the person with the second lowest bid is paid an amount equal to the third lowest bid, and so on. This continues until the budget of the auctioneer/buyer for acquiring data runs out. In this way, all data can be acquired in a single auction."), p. 13 ("The participants then entered the bid price, one price for each of the four categories, as the requested compensation for providing their personal data (they were asked to complete and bid for at least two categories). The participants were told that the total budget amount that the data collectors would spend for each category is $500, and the participants were paid based on their bids in each category from the lowest to the highest until the budget was used up.").

[129] Li et al. (2021), Table 3.

[130] Li et al. (2021), p. 19.

[131] Li et al. (2021), p. 14 ("Overall, 225 people participated in the auction study, but data entered by a few participants were invalid. As a result, there were 218 records useful for the study.").

[132] Li et al (2021), p. 14 ("A few statistics appear to have some bias, such as relatively high percentages of Asian and Never Married, and low average Age, which are likely caused by a sizable proportion (36.2%) of the student participants.").

[133] Li et al. (2021), p. 14.

[134] Li et al. (2021), pp. 14–15 ("It is observed that, in general, the average bid prices for all four data types are lower for males (than females), nonwhites (than whites), never married (than others), and students (than nonstudents). A multivariate analysis of variance (MANOVA) was performed for each of these cases. The results indicate that the differences are significant for the student status case (at α = .01). They are not significant for the other three cases in the MANOVA test (at α = .1). We also performed two-sample $t$-tests, as well as their nonparametric counterpart Mann–Whitney tests, on each price type considering gender, race, marital status, and student status, respectively. The results of these tests were similar to those of MANOVA, although price differences in gender were somewhat more significant for some types in Mann–Whitney test.").

experiment where they are told there is a $500 budget per data category. As explained in Section V.A, a market price is a price at which a party willing to sell something of value and a party willing to buy something of value agree to exchange the valuable item. Li et al. (2021) did not provide evidence that, in the real world, any party would be willing to pay $189.40 for the four data categories considered in the experimental auction (or other types of personal data) regardless of the individuals' willingness to sell at this price point.

57. Second, the data considered by Li et al. (2021) are different from the personally identifying data in the At-Issue Data. Li et al. (2021) did not include some data that are part of the personally identifying information in the At-Issue Data, such as device identifiers. Further, Li et al. (2021) *did* include data that are not at issue in this matter, such as date of birth, education, occupation, and credit score, among others. In fact, I understand that the only item of personally identifying information considered in this study that overlaps with the At-Issue Data considered by Mr. Krause is an email address.[135] Further, of the different valuation estimates provided by Li et al. (2021), Mr. Krause arbitrarily chose to focus on the combined valuation of all four data categories considered in the study rather than on any specific category. For instance, the data category "direct identifiers," which contains email addresses and other items (e.g., full name, phone number, and home address), was valued by Li et al. (2021) at $89.76,[136] significantly less than the $189.40 valuation considered by Mr. Krause or his "fair market value" estimate of $200.

58. Third, Mr. Krause failed to consider that estimates of willingness-to-sell in Li et al. (2021) varied across study participants, depending on their demographic characteristics.[137] This variability suggests that the $189.40 estimate provided by Li et al. (2021) and considered by Mr. Krause cannot be directly applied to all Putative Class Members and that, instead, Putative Class Members' willingness-to-sell their private information would need to be to be assessed on an

---

[135] As mentioned above, Mr. Krause also assumed that information in the individual's BetterHelp profile was transmitted to third parties, but I understand that this is inconsistent with Prof. Shafiq's opinions.

[136] Li et al. (2021), Table 1; Table 3

[137] Li et al. (2021), pp. 14–15 ("It is observed that, in general, the average bid prices for all four data types are lower for males (than females), nonwhites (than whites), never married (than others), and students (than nonstudents). A multivariate analysis of variance (MANOVA) was performed for each of these cases. The results indicate that the differences are significant for the student status case (at α = .01). They are not significant for the other three cases in the MANOVA test (at α = .1). We also performed two-sample *t*-tests, as well as their nonparametric counterpart Mann–Whitney tests, on each price type considering gender, race, marital status, and student status, respectively. The results of these tests were similar to those of MANOVA, although price differences in gender were somewhat more significant for some types in Mann–Whitney test.").

individualized basis (if such measure were relevant for the matter at hand, which it is not). In this matter, many Plaintiffs exhibited behavior inconsistent with them valuing their private information. For example, some Plaintiffs testified that they have not taken efforts to protect their privacy online, such as using a VPN, or that they have willingly shared information, such as an email address or phone number, in online activities like shopping or on social media.[138]

59.     Fourth, Mr. Krause did not consider that the estimates presented by Li et al. (2021) may be affected by methodological issues that limit their generalizability beyond the experimental context of their study. In particular, communicating the $500 budget to the participants may have affected participants responses due to the anchoring effect (i.e., the psychological tendency to use the first piece of information given as a reference point of value— the so-called anchor— when making decisions or judgments, which can lead to skewed results) and could have incentivized them to maximize their gains in the auction experiment rather than to provide a thoughtful estimate of their valuation of their personal information.[139]

---

[138] *See e.g.,* Defendant BetterHelp Inc.'s Second Set of Interrogatories to Plaintiff S.C., *In Re BetterHelp, Inc. Data Disclosure Cases*, Case No. 3:23-cv-01033-RS, (January 8, 2025), p. 7 ("…Plaintiff S.C. did not install any browser extensions, plugins, add-ons, or toolbars on the devices that she used to access BetterHelp's services."); Deposition of S.C., April 2, 2025, 141: 5–12 ("Q. …Are you aware of any browser extensions and plug-ins that are geared toward protecting privacy? A. I believe they do exist, but I'm not familiar with the specifics. Q. Okay. And you have not undertaken an effort to familiarize yourself with those? A. No."), 170:20–21 ("Q. Have you ever purchased a VPN service? A. No."), 241:2–5 ("Q. Have you ever configured a VPN on your router or a whole network VPN so that all devices in your home go through an encrypted tunnel? A. No."); Deposition of Jane Doe I, April 4, 2025, 77: 6–19 ("Q. Okay. Earlier we had talked about your efforts to keep I believe you said your privacy private, and you mentioned that you used -- you had used a VPN in the past? A. I have. Q Under what circumstances did you use a VPN? A. I wanted to try it out. Q. And did you stop using the VPN? A. Yeah. Q. Why? A I just wanted to save on cost savings. Q. So you're not currently using one? A. Correct."); Deposition of R.S., March 27, 2025, 27:11–13 ("Q. Do you -- have you changed any features on Brave, any privacy settings or anything like that? A. To my knowledge, no."), 28: 7–9 ("Q. Have you ever changed the privacy settings in Safari? A. Not to my knowledge, no."), 31:24–32:2 ("Q. From the period of 2013 to present, have you made any efforts to keep your personal information confidential on the Internet? A. To my knowledge, no."), 35:5–9 ("Q. Have you ever used a VPN to protect your privacy? A. I think I may have used NordVPN at one point, but I don't know exactly when and I don't use it anymore."); Deposition of Jane Doe III, March 28, 2025, 36:25–37:21 ("Q. Okay. What do you do when a website prompts you to enter your e-mail? Do you enter it if you need to [] use the website? A. It depends on how much I want to use the website. Q. So, for example, have you used your e-mail address to engage in online shopping? A. Yes. Q. And what about for various social media applications? A. Yes. Q. Do you use the same e-mail address that you use for daily e-mailing? A. Usually, yes. Q. And what about when a website asks you to enter your name? Do you use your real name? A. Usually. Q. And what about your phone number? A. If I really want that discount. Q. And have you ever done anything to block websites from knowing your IP address? A. I have not.").

[139] *See* Liu, X., et al. (2024), "The Two-Stage Presale Pricing for Online Products Considering Anchoring Effect and Payment Pain Reduction," *Managerial and Decision Economics*, 45, pp. 3865–3885, p. 3867 ("…anchoring effect refers to the fact that when people need to make a quantitative estimation of an event, they will take some specific values as the starting value. The starting value is similar to an anchor that restricts the estimation value[.]"); Yasseri, T. and J. Reher (2022), "Fooled By Facts: Quantifying Anchoring Bias Through A Large-Scale Experiment," *Journal of Computational Social Science*, 5, 1001–2021, p. 1002 ("The term 'anchoring' can therefore be understood as people's tendency to rely heavily on these prior values (or 'anchors') when making decisions. This effect is pervasive and robust in a variety of experimental settings[.]").

60. Finally, Mr. Krause's choice of the $189.40 estimate presented by Li et al. (2021) to account for the value of personal information in the At-Issue Data is wholly arbitrary. In his report, Mr. Krause did not explain why he chose to consider this figure rather than, for instance, the $89.76 value estimated by Li et al. (2021) for direct identifiers, or the $88.94 figure estimated by Li et al. (2021) for quasi-identifiers.[140]

### 3. 2017 Ponemon Institute Study

61. Mr. Krause also considered the results of a 2017 study conducted by the Ponemon Institute. Mr. Krause did not explain the methodology he used to select this study nor if there were other studies that he considered and then discarded.

62. The 2017 Ponemon Institute Study analyzed the cost of data breaches to the breached organization in multiple countries and regions, including the U.S.[141] To do this, the researchers interviewed key employees working in areas related to information technologies, compliance, and information security in 419 organizations affected by data breaches in the previous 12 months,[142] and collected information about direct costs (e.g., engaging forensic experts, outsourcing hotline support) and indirect costs (e.g., in-house investigations and communications, extrapolated value of customer loss) related to the data breach.[143] Based on this information, the authors estimated that the cost of data breaches to the breached organizations in

---

[140] Li et al. (2021), Table 3.

[141] 2017 Ponemon Institute Study, p. 1 ("419 companies in 13 country or regional samples").

[142] 2017 Ponemon Institute Study, p. 7 ("How do you collect the data? Our researchers collected in-depth qualitative data through more than 1,900 separate interviews conducted over a 10-month period in the 419 companies. Recruiting organizations began in February 2016 and interviews were completed March 2017. In each of the 419 participating organizations, we spoke with IT, compliance and information security practitioners who are knowledgeable about their organization's data breach and the costs associated with resolving the breach."), p. 33 ("Our study draws upon a representative, non-statistical sample of global entities experiencing a breach involving the loss or theft of customer or consumer records during the past 12 months.").

[143] 2017 Ponemon Institute Study, p. 1 ("419 companies in 13 country or regional samples"), p. 7 ("How do you calculate the cost? To calculate the average cost of data breach, we collected both the direct and indirect expenses incurred by the organization. Direct expenses include engaging forensic experts, outsourcing hotline support and providing free credit monitoring subscriptions and discounts for future products and services. Indirect costs include in-house investigations and communication, as well as the extrapolated value of customer loss resulting from turnover or diminished customer acquisition rates."). *See also*, 2017 Ponemon Institute Study, p. 2 ("In the course of our interviews, we also asked questions to determine what the organization spent on activities for the discovery of and the immediate response to the data breach, such as forensics and investigations, and those conducted in the aftermath of discovery, such as the notification of victims and legal fees. … Other issues covered that may have an influence on the cost are the root causes of the data breach (i.e. malicious or criminal attack, insider negligence or system glitch) and the time to detect and contain the incident.").

the U.S. in 2017 was $225 per lost or stolen record,[144, 145] and that indirect costs accounted for $146 (i.e., 65 percent of the total estimated cost of $225 per record).[146]

63.     Mr. Krause took the $225 figure estimated in the 2017 Ponemon Institute Study as one of his "data points" for estimating the value of personally identifying information within the At-Issue Data.  Similar to the other "data points" Mr. Krause used, the $225 estimated in the 2017 Ponemon Institute Study has no connection to the alleged conduct or the At-Issue Data in this matter.  First, the 2017 Ponemon Institute Study estimated the *cost* for the breached *organizations to resolve the data breach*, not the *market price* that an *individual* could obtain in a hypothetical market for the At-Issue Data.  The costs considered in this study, such as outsourcing hotline support, in-house investigations, or customer turnover, are borne by the breached organizations, not by individuals that could have been affected by the data breach.  Second, the data involved in the data breaches analyzed in the 2017 Ponemon Institute Study are dissimilar to the At-Issue Data.  For instance, the data involved in these data breaches included a retail company's data of individual's names and credit card information and a health insurer's data of policyholders' physician and payment information.[147]  Third, even leaving the aforementioned issues aside, the authors of the 2017 Ponemon Institute Study acknowledged that the results of the study are "non-statistical," and that "[s]tatistical inferences, margins of error and confidence intervals cannot be applied to these data given that [their] sampling methods [were] not scientific."[148]  This limits the ability to generalize the results of this study beyond the sample of organizations considered and renders Mr. Krause's reliance on it in his damages estimate inappropriate.

---

[144] 2017 Ponemon Institute Study, p. 8, Figure 1.

[145] This figure was calculated by dividing the total cost of the data breach for the breached organization and by the number of lost or stolen records and considered records that allowed for the identification of the individual whose information was lost or stolen.  2017 Ponemon Institute Study, p. 1 ("We define a compromised record as one that identifies the natural person whose information has been lost or stolen in a data breach."), footnote 4 ("Per capita cost is defined as the total cost of data breach divided by the size of the data breach (i.e., the number of lost or stolen records).").

[146] 2017 Ponemon Institute Study, Figure 18.

[147] 2017 Ponemon Institute Study, p. 7 ("What is a compromised record? We define a record as information that identifies the natural person (individual) whose information has been lost or stolen in a data breach. One example is a retail company's database with an individual's name associated with credit card information and other personally identifiable information. Another is a health insurer's record of the policyholder with physician and payment information.").

[148] 2017 Ponemon Institute Study, p. 33.

### 4. Mr. Krause Left Out From His Analysis Sources of Information Estimating a Value of Personally Identifying Information Significantly Lower than Mr. Krause's $200 Estimate

64.　Mr. Krause's seemingly arbitrary selection of information sources to identify his "data points" left out sources that are similarly disconnected from the fact of this matter, but suggest that, at least in some contexts, the value of personally identifying information is significantly lower than his $200 estimate.　For instance, as I explained in Section V.A, there are opt-in frameworks through which individuals can share personally identifying information together with other personal information in exchange for compensation that is significantly less than Mr. Krause's $200 estimate.

65.　Researchers have evaluated several contexts to study individuals' willingness to sell their information.　For instance, Butler and Glasgow (2017) used a discrete-choice experiment to estimate respondents' willingness-to-pay to avoid sharing non-personally identifying information and personally identifying information in the context of streaming services subscriptions.[149]　The authors found that respondents would be willing to pay $5.52 per month to avoid sharing both non-personally identifying information and personally identifying information.[150]　This amount is equivalent to $66.24 per year, lower than the yearly prices of the information removal services that Mr. Krause relied on (which range between $99 and $197 per year) and substantially lower than Mr. Krause's $200 estimate, even though Butler and Glasgow (2017)'s estimate also included non-personally identifying information such as information on their usage of streaming services.[151]

---

[149] Glasgow, G. and S. Butler (2017), "The Value of Non-Personally Identifiable Information to Consumers of Online Services: Evidence from a Discrete Choice Experiment," *Applied Economics Letters*, 24, 6, 392–395 ("Butler and Glasgow (2017)"), p. 392 ("We estimate the value of non-personally identifying information to consumers of online services through a discrete choice experiment based on hypothetical streaming video services. … We estimate the value of NPII [(non-personally identifiable information)] through a discrete choice experiment that examines hypothetical streaming video services. … One attribute of these hypothetical services was the privacy policy that governed the sharing of the individual's NPII and PII [(personally identifiable information)].").

[150] Butler and Glasgow (2017), p. 394 ("The mean WTP to avoid sharing [non-personally identifiable information] and [personally identifiable information] together is $5.52 per month.").

[151] Butler and Glasgow (2017), p. 393 ("Sharing NPII was described as: 'Some services share your usage information with third parties engaged in research, marketing or advertising.' The phrase 'usage information' was hyperlinked. Clicking on the link created a popup textbox that read: 'Third parties use usage information to adjust program offerings, create advertising for different types of audiences and develop new products. While this is information about you, it is not connected to information that would allow someone to contact you directly.'").

66.     Similarly, Berke et al. (2023) used a discrete choice experiment to estimate consumers' willingness-to-pay for enhanced privacy in the context of drone deliveries.[152]  Specifically, the authors explained that drone deliveries may pose a risk for privacy because a third party may detect the drone's flight information and be able to associate the vendor and the order to the consumer.[153]  A privacy-enhancing practice in this context is to pool together multiple orders from different consumers to obscure the associations between customers and their orders.[154]  In their study, Berke et al. (2023) found that study participants would be willing to pay between $1.84 and $4.43, depending on the type of purchase, to have their order fulfilled using the privacy-enhancing practice.[155]

67.     Further, Wu (2025) used an online experiment to study individual's willingness to share personal information and the prices they would demand in exchange (i.e., their willingness to sell).[156]  Study participants were first asked to generate psychometric data by taking a personality test that scored traits including extraversion, agreeableness, conscientiousness, stability, and intellect.[157]  Then, they were given the option to release those data to anonymous recipients in exchange for monetary compensation under different experimental conditions that differed in terms of the number of data recipients and the salience of the fact that data recipients would be

---

[152] Berke, A., et al. (2023), "Drone Delivery and the Value of Customer Privacy: A Discrete Choice Experiment with U.S. Consumers," *Transportation Research Part C*, 157, 104391, 1–26 ("Berke et al. (2023)") pp. 1–2 ("[D]rone delivery presents a new and specific consumer privacy risk, which can be mitigated with strategies that may incur additional delivery costs or wait times. This work studies the extent to which delivery customers are willing to pay for privacy enhancements.").

[153] Berke et al. (2023), p. 2 ("Rather than privacy risks related to aerial surveillance, we consider new privacy risks, with more specific impacts on individual drone delivery customers. These risks have emerged due to new safety regulations which require drones to publicly broadcast their in-flight locations … Third parties can collect the broadcasted locations information and deduce the routes of delivery drones, from a vendor where a drone picked up a product to the address where the drone delivered the product to a customer. This can allow third parties to link customers with their purchases.").

[154] Berke et al. (2023), p. 5 ("'YES' Privacy might involve a drone making other stops before their address to obscure their order from outside observers.").

[155] Berke et al. (2023), Table 5.

[156] Wu, J. (2025), "Secondary Market Monetization and Willingness to Share Personal Data," *Management Science*, pp. 1–20 ("Wu (2025)"), p. 1 ("A large online laboratory experiment involving personally identifiable psychometric data is implemented with real data-sharing consequences and monetary benefits. I find that individuals decrease their willingness to share data–both in terms of their likelihood of participating in the data market and the prices demanded for such participation–when the recipient's ability to monetize the data through secondary trade is salient."), pp. 18–19 ("These data are in the form of five-factor scores and are the same as those obtained by Cambridge Analytica from users' activities on Facebook. …. Psychometric controls include whether the individual scored above 30 (on a scale from 10 to 50) in each of the five-factor traits: extraversion, agreeableness, conscientiousness, emotional stability, and intellect").

[157] Wu (2025), p. 7 ("First, in the data generation stage, subjects generate psychometric data that are personally identifiable.").

able to monetize the data they would receive by selling to a third party.[158] Wu (2025) found that between 58 percent and 79 percent of study participants accepted to share their personal data for $2.99 or less, depending on the experimental condition.[159]

68. Just as the sources Mr. Krause relied on, none of these studies pertained to a context relevant to the matter at hand, but they suggest notably lower estimates of the willingness-to-sell personal information than Mr. Krause's $200 estimate.

### C. "Data Points" Mr. Krause Relied on for Estimating a "Premium" for the "Patient Status" in the At-Issue Data Are Disconnected from the Facts of the Case

69. Mr. Krause claims that, for medical information such as "patient status" (i.e., information about the fact that Putative Class Members completed BetterHelp's Intake Questionnaire), there is a "premium associated above the value implicit to basic personal information."[160] Mr. Krause relied on the study by Li et al. (2021), the 2017 Ponemon Institute Study discussed above, and on two additional pieces of information to identify "data points" to estimate the "premium" associated with information about the so-called "patient status."[161] However, as I explain below, these "data points" are disconnected from the facts of the case and cannot be used as a basis for arriving at a premium or a "fair market value" estimate for the At-Issue Data.

---

[158] Wu (2025), p. 7 ("Then, in the data-sharing stage, individuals choose to release their data to anonymous recipients in the study in return for monetary benefits."), Figure 2.

[159] Wu (2025), Figure 4.

[160] Krause Report, ¶ 63; Krause Deposition, 66:17-20 ("Q. … And, again, patient status just means that they're individuals who completed the questionnaire and submitted it to BetterHelp; is that right? A. That's correct.").

[161] Mr. Krause refers as "patient status" to the fact that an individual completed the Intake Questionnaire. Krause Deposition, 66:15–20 ("Q. Second bullet point there refers to 'Class Members' patient status.' And, again, patient status just means that they're individuals who completed the questionnaire and submitted it to BetterHelp; is that right? A. That's correct."). In paragraphs 53 through 61 of his report, Mr. Krause discussed additional results from the studies by Li et al. (2021), from the 2017 Ponemon Institute Study related to health data, and from two additional sources: the 2017 Trustwave Study and the 2019 EY Study. *See* Krause Report, ¶ 53–61. In deposition, Mr. Krause indicated that that portion of his report was aimed to account for the fact that there is a premium associated with medical information such as "patient status." Krause Deposition, 126:3–12 ("Q. With that in mind, am I right in understanding that this portion of your report, paragraphs 53 through 61 -- the purpose of this portion is to account for the patient status portion of the information you're valuing? A. It is largely in support of that and the notion that patient status health information is a premium above and beyond what was, say, included as identifiers or quasi-identifiers in the type of personal information analysis I was performing."). Further, in deposition, Mr. Krause also implied that this premium for "patient status" was incorporated in his $200 estimate. Krause Deposition, 59:13–25 ("Q. What does the $200 figure represent? A. … [T]he $200 represents that personally identifying information that's detailed in opinion No. 1 from Dr. Shafiq's report as well as patient status.").

70.    Mr. Krause relied on the results of some additional questions asked to participants in the Li et al. (2021) study.  Specifically, while medical information was not included in the experimental auction conducted by Li et al. (2021), the authors asked study participants to optionally submit the price they would be willing to accept in exchange for providing information about (i) their social security number, (ii) total federal income tax paid the previous year, (iii) their total medical claims from the previous year, and (iv) their body weight and height.[162]  Participants were told that there would not be actual payment for these data.[163]  In this part of the study, participants indicated that they would be willing to sell their social security number, on average, for $350, their total federal income tax from the previous year, on average, for $100, their total medical claims from the previous year, on average, for $75, and information on their body weight and height, on average, for $30.[164]

71.    Mr. Krause took the estimate of $75 that, on average, study participants indicated they would be willing to accept for providing information about their total medical claims the previous year as a "data point" to estimate the "premium" associated with information about the so-called "patient status."[165]  However, the results from the Li et al. (2021) study are

---

[162] Li et al. (2021), p. 13 ("As part of this study, we also mentioned that the data collectors are interested in purchasing the following information items about the participants: (i) SSN, (ii) total federal income tax paid last year, (iii) total medical claims last year, and (iv) body weight and height. This is an optional part and the participants were asked to specify a price for each item. Because these data are very sensitive, we did not intend to collect them but would like to get some idea about how consumers would value these data.").

[163] Li et al. (2021), pp. 13–14 ("We clearly instructed the participants not to enter the actual information (i.e., SSN, income tax, etc.) and emphasized that no payment would be involved in this part.").

[164] Li et al. (2021), p.15 ("More than 80% of the participants specified prices for the four optional items, i.e., prices for SSN, total income tax paid last year, total medical claims last year, and body weight and height. These prices exhibit very large variations, however. The median prices are $350 for SSN, $100 for tax data, $75 for medical data, and $30 for weight and height.").

[165] Krause Deposition, 105:2–106:20 ("Q. If BetterHelp did not share these same direct identifiers with third parties, does it impact the applicability of this Li study to your analysis? A. Yes. Q. How so? A. It reduces the value. Primarily why my number -- in terms of reaching my appraised opinion of 200, why it's not 300 is because some of these identifiers that are in the Li study that aggregate to 189 in their approach are not included in some of the data that Dr. Shafiq has identified. As I said, I'm valuing a large set of -- not a large -- a collection of data that includes some of the identifiers that are in Li and some identifiers that are not in Li. And in coming up with my $200 value, if -- if all of the identifiers that were in the Li study had been present in the data that the plaintiffs allege was improperly disclosed, then my number would probably be higher. It would be higher than 200. Q. You're saying if all of the information or identifiers that were part of the Li study were also disclosed by BetterHelp to third parties, your valuation number would be higher than the aggregate amount from the Li study? A. From the aggregate amount of the Li study on these four identifying categories, the 189 that he comes up with -- or that they come up with. They aren't valuing health information in any of those. In the study they do note that there was a significant premium with medical claims that was worth $75 in and of itself, but that was not part of the aggregation and the regression that they -- the multivariate regression that they came up with to conclude the 189. That was just the personal identifying information without the health data. So if one were trying to build a one-to-one bridge between the Li study and my opinion, first

disconnected from the facts of the case and cannot be used as basis for arriving at a "fair market value" estimate for the At-Issue Data, as I explained in Section VII.B.2. Further, the $75 estimate that Mr. Krause relies on refers to data about study participants' total medical claims, which has no connection to the At-Issue Data. Furthermore, the choice of this value to account for what Mr. Krause calls "patient status" is arbitrary. Indeed, in his report, Mr. Krause did not explain why he selected this $75 estimate rather than, for instance, the $30 estimate for information about the study participant's weight and height.

## 2. 2017 Ponemon Institute Study

72. Mr. Krause also relied on a disaggregation of the results in the 2017 Ponemon Institute Study. This study, which considered data from 13 countries and regions , found that the average cost of a data breach to healthcare organizations (across the different countries and regions in the study) was $380 per lost or stolen record.[166] Mr. Krause considered this $380 figure as a "data point" to estimate the "premium" associated with information about the so-called "patient status."[167] However, for the reasons I explained in Section VI.B.3, the results of this study cannot be used as basis for arriving at a premium or a "fair market value" estimate for the At-Issue Data.

## 3. 2017 Trustwave Study

73. Mr. Krause also considered the results of a 2017 study by cybersecurity company Trustwave.[168] The 2017 Trustwave Study, among other goals, aimed to examine the value placed

---

of all, that's not what's happening. I'm not relying exclusively on Li in reaching my opinion. But if one were trying to build that one-to-one bridge, it would be a subset of the information that leads to their 189 in combination with the patient status health data.").

[166] 2017 Ponemon Institute Study, Figure 5. Even if this cost information were relevant -which it is not- it is not clear why costs from regions and countries outside the U.S. would be relevant to Mr. Krause's purported analysis.

[167] Krause Report, ¶¶ 55–56 ("The relatively higher market value of personal medical data is also justified in comparison to data points discussed earlier in this report. … In addition, the value of data breaches as reported by the Ponemon Institute in the aforementioned study from 2017 was highest for health care organizations at $380 per record, as compared to financial services ($245), media ($119), research ($101), and the public sector ($71).").

[168] Krause Report, ¶ 57 ("In terms of studies attempting to directly measure the value of medical data, American cybersecurity firm Trustwave published a report on The Value of Data in 2017."); "The Value of Data," Trustwave, 2017, https://www.infopoint-security.de/media/TrustwaveValue_of_Data_Report_Final_PDF.pdf ("2017 Trustwave Study").

on different types of data, including personally identifying information,[169] by "data controllers" (i.e., organizations that own and have responsibility for the data) and other stakeholders.[170] To do this, the authors conducted a survey of 500 senior IT managers in Australia, Canada, Japan, U.K., and U.S. and asked them for their estimate of the value of the data their organizations held in terms of both "the profit [the] data can bring to their business and … the risk of its compromise," including "potential legal costs".[171] Participants were asked to identify the "data subject about which they had greatest concern regarding the damage that would be caused if [personally identifying information] of the data subject was leaked," termed the "prime data subject" of the data.[172] Out of the 500 respondents, 390 chose a prime data subject, and they were asked to estimate the value of their chosen prime data subject.[173] The 2017 Trustwave Study found that the value of personally identifying information was, on average, $1,198, ranging between $1,725 per record (shareholders) and $596 per record (contractors) depending on the prime data subject of the organization that held them.[174] For data held by organizations whose prime data subject were patients, 61 of the 390 respondents from various industries, ranging from healthcare to financial services, gave an average value of $1,546 per record.[175]

74.     Mr. Krause took the $1,546 figure estimated in the 2017 Trustwave Study for the value of a data record related to patients as a "data point" to estimate the "premium" associated with information about the so-called "patient status," even though this study is disconnected from the

---

[169] 2017 Trustwave Study, p. 2 ("Trustwave commissioned industry analyst firm Quocirca to conduct a study into the Value of Data between May and September 2017. … Data types: The report focuses on four basic data types: personally identifiable information (PII), payment card data (PC data), intellectual property (IP), and corporate email."
[170] 2017 Trustwave Study, p. 3 ("The Data Value Stakeholders … Data controllers (the organizations that own and have responsibility for data) … Regulators … Insurers.").
[171] 2017 Trustwave Study, p. 2 ("Trustwave commissioned industry analyst firm Quocirca to conduct a study into the Value of Data between May and September 2017. It included a survey of 500 senior IT managers in the Australia, Canada, Japan, U.K. and U.S."); p. 16 ("Respondents were asked the value of a single record pertaining to both their prime data subject and their prime IP type, using the ranges shown below."); p.3 ("Data controllers (the organizations that own and have responsibility for data) must find a value that both reflects the profit data can bring to their business and covers the risk of its compromise.").
[172] 2017 Trustwave Study, p. 6 ("Each respondent was asked to select the data subject about which it had greatest concern regarding the damage that would be caused if PII of the data subject was leaked. This is termed its prime data subject.").
[173] 2017 Trustwave Study, Figure 10.
[174] 2017 Trustwave Study, Figure 10.  The study's estimate of $1,725 per record for data related to shareholders comes from 18 organizations that indicated their "prime data subject" were shareholders, and $596 per record for data related to contractors from the 5 organizations that indicated their "prime data subject" were contractors. 2017 Trustwave Study, p. 7 ("Unsurprisingly, patients are the prime data subjects for health care organizations (Figure 7). However, patients are also the prime data subjects for some in financial services (e.g. companies that sell medical insurance), retail (e.g. pharmacies), hospitality (e.g. care homes and private healthcare) and industrial (e.g. clinical trials of medical equipment"); Trustwave Study, Figure 10.  The study's estimate of $1,546 per record for data related to patients comes from 61 organizations that indicated their "prime data subject" were patients.

facts of this case.  First, the results of the 2017 Trustwave Study refer to the value of data estimated by *organizations* that own the data and have responsibility for the data, which is different from the price that an *individual* could obtain in a hypothetical market for the At-Issue Data.  Indeed, even the authors of the study indicate that different stakeholders place different values on data.[176]

75.     Second, the 2017 Trustwave Study assessed the value of data from the perspective of organization such as companies in the retail, financial services, hospitality, IT, industrial, and healthcare sectors.[177]  It is likely that these organizations not only accumulate data about individuals, but add value by aggregating and validating it, ensuring its quality and uniformity.[178,179]  Hence, any estimate of the value of data provided by respondents in the 2017 Trustwave Study would include the value of this process of aggregation and validation, which would not be part of the value that an individual could obtain in a hypothetical market for the At-Issue Data.

76.     Third, the organizations for which respondents indicated that "patients" were the prime data subject include organizations in sectors such as "financial services (e.g., companies that sell medical insurance), retail (e.g., pharmacies), hospitality (e.g., care homes and private healthcare), and industrial (e.g., clinical trials of medical equipment),"[180] which are not focused on mental health and likely have data dissimilar from the At-Issue Data.[181]

---

[176] 2017 Trustwave Study, p. 2 ("Dramatic differences exist between values placed on PII data by attackers, senior IT managers, insurers and regulators. The mean PCV placed on a PII record by cyber criminals is $39 compared to $1,198 by senior IT managers, $3,211 for insurers and $8,118 for regulators.").

[177] 2017 Trustwave Study, Figure 7.

[178] Sarah Lee, "Data Aggregation Strategies," *NumberAnalytics*, June 11, 2025, https://www.numberanalytics.com/blog/data-aggregation-strategies ("Data quality is essential in data aggregation because it directly impacts the accuracy and reliability of the insights generated. Poor-quality data can result in incorrect conclusions, wasted resources, and poor decision-making. … To ensure data quality in data aggregation, organizations can implement the following strategies: [1.] Data Validation: Verify data against a set of rules or constraints to ensure accuracy and consistency. [2.] Data Cleansing: Identify and correct errors or inconsistencies in the data. [3.] Data Normalization: Standardize data formats to ensure consistency across different sources.").

[179] In fact, in his report, Mr. Krause agrees that personal information creates value when combined with other forms of data.  Krause Report, ¶ 37 ("When combined with general consumer data, personal information enables companies to generate a comprehensive picture of a specific individual for use in tailoring internet services, providing targeted advertising, or for sale to other firms. New services, companies, and markets have emerged to capitalize on this economic value, including search engines, recommender systems, social networking sites, and online advertising ecosystems.").

[180] 2017 Trustwave Study, p. 7.

[181] To the extent this cost information is relevant (which it is not), It is not clear why costs from regions and countries outside the US would be relevant to Mr. Krause's purported analysis.

### 4.     2019 EY Study

77.     Mr. Krause also considered the results of a 2019 study by Ernst & Young.[182]  Mr. Krause did not explain the methodology he used to select this study or if there were other studies that he considered and then discarded.

78.     The 2019 EY Study aimed to estimate the value of the U.K.'s National Health System's patient data using, among others, a market-based approach.  To do this, the study considered the valuation of 98 companies and divided that value by the number of health records they had.[183, 184] From this set of 98 companies, Mr. Krause selected a subsample of six and, based on this information, found that the average estimated value per record was $2,048.67, with a minimum of $12.91 and a maximum of $9,254.18.[185]  He further pointed out that "the values implied median average value of medical records in the sample is approximately $155.51 per record, with a range from a lower quartile of $56.46 to an upper quartile of $2,056."[186, 187]  However, these findings from the 2019 EY Study are disconnected from the facts of the case and cannot be considered as basis for arriving at a "fair market value" estimate for the At-Issue Data.

79.     First, setting aside the fact that the EY study considered U.K. and not the U.S. medical records, making this data source irrelevant to the matter at hand, Mr. Krause's selection of six companies out of 98 from the 2019 EY Study is arbitrary.  In his report, Mr. Krause indicates that he reduced the list of companies in the 2019 EY Study "to those whose websites or financial reports identify a business line related to monetization of electronic health or medical record data

---

[182] Krause Report, ¶ 60 ("Ernst & Young ('EY') conducted a similar study in 2019 measuring the value of healthcare data to a variety of firms,"); 2019 EY Study.

[183]  2019 EY Study, Cover Page.

[184] The authors generated "valuation multiples" to approximate the value of each data record held by a company whose assets included patient data.  To do so, they divided companies' "observed valuations" by the number of data records they held.  2019 EY Study, p. 6 ("Market pricing is analysed by calculating the implied 'per-record' valuation multiples of comparable data assets or, in the absence of such information for 'pure' data assets, valuation multiples of companies with significant patient data assets. By applying the benchmark per-record valuation multiples to the [National Health System] data set, one can estimate the data's value based on recent 'market transactions'."), p. 14 ("We derived the following benchmark valuation multiples using primarily the observed valuations of companies with assets that include patient data.").

[185] Krause Report, Exhibit 1.

[186] Krause Report, ¶ 60.

[187] The estimated value per record reported by Mr. Krause for these six companies are the estimates reported in the 2019 EY Study re-expressed in U.S. dollars (the 2019 EY Study presented its estimated valuations in U.K. pounds). Mr. Krause did not conduct any analysis in addition to the analysis conducted in the 2019 EY Study.  Krause Deposition. 137:11–16 ("Q. And so for these -- am I right that for the companies listed in your Table 1, you essentially took the figure from the "EV/record" column in the EY report; and then you just converted it into dollars? A. Yes, sir, based on the conversion rate as of the date of this report.").

(excluding EHR/EMR administration software)."[188]  However, Mr. Krause does not provide any additional detail on how he implemented his selection of six companies or why having a business line related to the monetization of electronic health record or medical records was sufficient to qualify for his subsample.

80.     Second, the type of data held by the companies considered in the 2019 EY Study and in the subsample analyzed by Mr. Krause includes data far beyond the scope of the only "non-public medical information" he purports to value: "patient status" (i.e., the completion of the BetterHelp intake questionnaire).[189]  In fact, the six companies selected by Mr. Krause for his subsample include companies with assets related to primary care data,[190] secondary, tertiary, or specialty care data,[191] genomic data,[192] and oncology data.[193]  These types of data are not only different from the At-Issue Data, but also include patient-specific, medical data as opposed to the mere fact of completion of a questionnaire on a mental wellness website.[194]

81.     Third, the methodology of the 2019 EY Study makes no attempt to isolate the value of patient data from the other assets the company holds, and thus the findings confound the value of the data held by the companies with the value of other assets they may have.  In his report, Mr. Krause indeed acknowledged that relying on the valuation of whole companies rather than the relevant data assets is a limitation of the 2019 EY Study but still concludes, without proper explanation, that "[n]onetheless, in combination with the findings from the Trustwave report, this finding underscores the enhanced value associated with personal medical and health data."[195]

---

[188] Krause Report, Exhibit 1.
[189] Krause Deposition, 66:17–20 ("[Q.] And, again, patient status just means that they're individuals who completed the questionnaire and submitted it to BetterHelp; is that right?  A. That's correct."), 124:20–125:3 ("Q. … I want to make sure I understand. We already went over sort of the information that you were valuing in … coming up with your fair market valuation of $200.  And that did not include any non-public medical information other than patient status; is that right?  A. Correct. Patient status is the medical information -- the PHI that I'm valuing in this case.").
[190] The companies with assets including access to primary care data in Mr. Krause's subsample are OptumInsight (UnitedHealth Subsidiary) and AllScripts Healthcare Solutions, Inc.  See Krause Report, Exhibit 1; 2019 EY Study, p. 24.
[191] The companies with assets including access to secondary, tertiary, or specialty care data in Mr. Krause's subsample are IQVIA Holdings Inc. and Inovalon Holdings Inc.  See Krause Report, Exhibit 1; 2019 EY Study, p. 25.
[192] The company with assets including access to genomic data in Mr. Krause's subsample is Nebula Genomics Inc.  See Krause Report, Exhibit 1; 2019 EY Study, p. 26.
[193] The company with assets including access to oncology data in Mr. Krause's subsample is Tempus.  See Krause Report, Exhibit 1; 2019 EY Study, p. 27.
[194] In deposition, Mr. Krause acknowledged that the data records of the companies in his sample are richer in terms of patient information than identifying the fact that a person is a patient. Krause Deposition, 140:16–24 ("Q. … To be included on this list, the patient records indicate that, in fact, you have a patient and, therefore, there is a patient status, right? A. Yes. Q. So presumably each of these records is much richer in terms of patient data than merely identifying the fact that the person is a patient, right? A. I would agree.").
[195] Krause Report, ¶ 61.

82.     Fourth, the methodology of the 2019 EY Study is unreasonable for estimating the "market value" of patient data and leads to unreasonable results and, therefore, lacks validity and relevance for the matter at hand.  Indeed, under the 2019 EY Study methodology, if a company in the sample considered by the 2019 EY Study were to use its cash reserves to purchase additional data records at market price to double the number of records it holds (i.e., simply converting cash asset into patient records asset at fair market value), its market value would presumably remain the same (i.e., there is only a change in the type of assets the company holds, not in the aggregate value of its assets).  Under the study methodology, however, immediately after the purchase, the value of an individual data record would be diminished by half because the company valuation is now divided by twice the number of records.  This result is unreasonable because it implies immediate depreciation of original data while any intrinsic value of the data originally held by the company has not been reduced due to this transaction and its nature has not changed.

83.     Fifth, even leaving aside the fact that the 2019 EY Study' methodology is unable to isolate the value of patient data from other company assets, Mr. Krause ignores that the data collected by the companies considered in the 2019 EY Study, including in his subsample of six companies, has likely undergone a process of aggregation and validation that improves the data's usability and, ultimately, its value to potential users of the data.[196]  In fact, the study itself states that "many third-party data aggregators and resellers may clean and organi[z]e data" which leads to an "increase of data value."[197]  Because of this, even if company valuations were an appropriate input for the estimation of the value of data (which they are not), they would include

---

[196] 2019 EY Study, p. 14 ("Benchmark valuation multiples are estimated primarily using the observed valuations of companies with assets that include patient data. The data is understood to be curated (clean) and actively used. The range of estimated values per patient record and company-level analyses are listed in the appendix — supplement."); Sarah Lee, "Data Aggregation Strategies," *NumberAnalytics*, June 11, 2025, https://www.numberanalytics.com/blog/data-aggregation-strategies ("Data quality is essential in data aggregation because it directly impacts the accuracy and reliability of the insights generated. Poor-quality data can result in incorrect conclusions, wasted resources, and poor decision-making. … To ensure data quality in data aggregation, organizations can implement the following strategies: [1.] Data Validation: Verify data against a set of rules or constraints to ensure accuracy and consistency. [2.] Data Cleansing: Identify and correct errors or inconsistencies in the data. [3.] Data Normalization: Standardize data formats to ensure consistency across different sources.").
[197] 2019 EY Study, pp. 22-23 ("Factors affecting value of data … many third-party data aggregators and resellers may clean and organise data to make it easier to analyse.  [An] incremental increase of data value result[s] from this analytical process… More often than not, raw data sets are disorganised and complex, or lack structure. To extract insights from it, one must clean, organise and analyse it.").  Similarly, Mr. Krause explains that "data brokers aggregate extensive data from various offline and online sources to build detailed profiles of individuals, including information regarding name, date of birth, contact and address, social security number ('SSN'), and employment detail, among other data points. … Data brokering itself is an industry worth hundreds of billions of dollars annually. In this market, … firms … profit from the aggregation and sale of consumer data…"  *See* Krause Report, ¶ 35–37.

value generated by the companies' process of data aggregation and validation. By contrast, Plaintiffs do not allege that individual Putative Class Members' At-Issue Data went through such a process. Consequently, the values from the 2019 EY Study do not reflect the value an individual could get in a hypothetical market for an individual record of the At-Issue Data.

Dr. Natalie Mizik

September 12, 2025

**Natalie Mizik**
Professor of Marketing
J. Gary Shansby Endowed Chair in Marketing Strategy
Foster School of Business, UW
412 Paccar Hall, Box 353226
Seattle, WA 98195-3226
(206) 543-9001 | nmizik@uw.edu

August 2025

## Education:
Ph.D., Marketing, University of Washington, Seattle, 2002
M.S., Economics, Moscow State Institute of International Relations (MGIMO University), Moscow, Russia, 1995

## Academic Employment:
| | |
|---|---|
| 2014-present | UW-Seattle, Foster Business School, Professor of Marketing, J. Gary Shansby Endowed Chair in Marketing Strategy |
| 2012- 2014 | UW-Seattle, Foster Business School, J. Gary Shansby Associate Professor of Marketing |
| 2011- 2012 | UNC-Chapel Hill, Associate Professor of Marketing and Sarah Graham Kenan Scholar |
| 2010- 2011 | MIT Sloan School of Management, Visiting Associate Professor of Marketing |
| 2007- 2011 | Columbia Graduate School of Business, Gantcher Associate Professor of Business |
| 2002- 2007 | Columbia Graduate School of Business, Assistant Professor of Marketing |

## Academic Awards, Honors, and Service:

| | |
|---|---|
| 2025 | AMA Consortium Faculty – AMA Sheth Foundation Doctoral Consortium (2025-Ohio State, 2023-BI Norwegian Business School, Oslo, Norway, 2022-UT Austin, 2015-LBS, 2014-Kellogg, 2012-UW, 2009-GSU, 2008-UMC, 2007-Arizona) |
| 2025, 2018 | Doctoral Business Student Association (DBSA) Faculty Mentor Award in Marketing |
| 2024-2026 | PI, Contract with the Pacific Northwest National Laboratory (PNNL), part of a $3M PNNL DOE grant funded by the US Department of Energy, Hydrogen Fuel Cell Technology Office (EERE-HFTO) to study hydrogen fuels adoption. Project canceled by sponsor, March 2025 |
| 2023-2024, 2017-2018 | Treasurer, ISMS INFORMS |
| 2023 | Senior Faculty Fellow, ISMS Early-Career Scholars Camp, Duke |
| 2022, 2020, 2011, 2009 | Robert D. Buzzell Best Paper Award, MSI, Winner (2020, 2011), Finalist (2022, 2009) |
| 2021-2022 | Editor-in-Chief, Marketing Letters |
| 2020 | ISMS INFORMS John D.C. Little Best Paper Award, Finalist |
| 2020 | ISMS INFORMS Frank M. Bass Award, Finalist |
| 2020 | 2020 Marketing Strategy Consortium, Faculty Fellow (Austin, TX), December 2020 |
| 2019 | ISMS INFORMS Doctoral Consortium faculty (2019-Rome) |
| 2019 | Dean's Award for Excellence in Graduate Teaching, UW Foster School |
| 2018 | Robert M. Bowen EMBA Excellence in Teaching Award, UW Foster School |
| 2017 | 2017 Adobe Data Science Research Award |
| 2017 | UW Population Health Initiative, grant to study "Caring Letters After the War: Veterans Writing to Veterans to Prevent Suicide," Co-PI |
| 2017, 2014, | Teaching Excellence Award, UW TMMBA |

2013

2016    Nominated for the University of Washington Distinguished Teaching Award, the highest teaching distinction a faculty member can receive at the U of Washington

2015    American Marketing Association, AMA Distinguished Service Award

2014    Marketing Science Certificate of Appreciation

2013-2014    ISMS Liaison Officer, INFORMS Subdivision Council

2012-2016    Faculty of the Quarter teaching awards, UW TMMBA program

2012-2015    American Marketing Association, AMA Academic Council, Member

2012    AMA Erin Anderson Award for an Emerging Female Marketing Scholar and Mentor

2012    Journal of Marketing Research, JMR, William F. O'Dell Award, Finalist

2011    Varadarajan Award for Early Career Contributions to Marketing Strategy Research, American Marketing Association, Strategy SIG

2011    Nominated for the *Excellence in Teaching Award*, MIT Sloan School of Management

2011, 2009    Journal of Marketing Research, JMR, Paul E. Green best paper Award, Finalist

2011, 2010, 2009, 2008    Voted by the 2nd-year graduating Columbia MBA students favorite core professor and attended as a guest of honor to lead pre-graduation Capstone Meeting (voted in every year the program was in place)

2010    Co-founder with Sandy Jap of Women in Marketing Academia (AMA) and Women in Marketing Science (ISMS) annual events at AMA and Mktg Science Conferences

2010    Management Science Meritorious Service Award

2009-2012    Marketing Accountability Standards Board (MASB), Charter Director and Project Co-Lead (2009-2011), Advisory Council (2011-2012)

2009    John D.C. Little Best Paper Award, Finalist

2009    Marketing Association of Columbia *Most Engaging and Dynamic Professor* and *Best Marketing Class Taken at CBS* Teaching Award for the Core MBA Marketing Strategy course

2005    MSI third biennial Young Scholars Program

2001, 2000    ISBM Award Winner (2001), Honorable Mention (2000)

## Publications:

Deer, Lachlan, Susanne Adler, Hannes Datta, Natalie Mizik, and Marko Sarstedt (2025), "Toward Open Science in Marketing Research," ***IJRM, International Journal of Research in Marketing,*** 42 (1): 212-233. https://doi.org/10.1016/j.ijresmar.2024.12.005

Livingston, W. S., Carter, S. P., Leitner, R., Ton, A. T., Gebhardt, H., Zoellner, L., Mizik, N., Rojas, S. M., Buchholz, J. R., & Reger, M. A. (2024) "A Peer Veteran Approach to the Caring Letters Suicide Prevention Program: Preliminary Data," ***Psychological Services***, 21(1): 1-12. DOI: 10.1037/ser0000760

Ton, A. T., Carter, S. P., Leitner, R., Zoellner, L. A., Mizik, N., & Reger, M. A. (2024), "Peer-Written Caring Letters for Veterans after a Suicidal Crisis," ***Archives of Suicide Research***, *28* (2), 585–599. https://doi.org/10.1080/13811118.2023.2199799

Labroo, Aparna A., Natalie Mizik, Russell S. Winer (2022), "Introducing Marketing Letters' Data Policy," ***Marketing Letters***, 33 (3), 361-364.

Labroo, Aparna A., Natalie Mizik, Russell S. Winer (2022), "Sparking Conversations: Editors' Pick with

Commentaries and Thematic Article Compilations," *Marketing Letters*, 33 (1), 1-4

Labroo, Aparna A., Natalie Mizik, Russell S. Winer (2021), "Introduction to Special Issue on Gender and Ethnicity in the Marketing Professoriate," *Marketing Letters*, 32 (3), 273-274

Bradlow, Eric T., Peter N. Golder, Joel Huber, Sandy Jap, Aparna A. Labroo, Donald R. Lehmann, John Lynch, Natalie Mizik, Russell S. Winer (2020), "Editorial: Relaunching Marketing Letters," *Marketing Letters*, 31 (4), 311-314

Liu, Liu, Daria Dzyabura, and Natalie Mizik (2020), "Visual Listening In: Extracting Brand Image Portrayed on Social Media," *Marketing Science*, 39 (4), 669-686
- lead article
- ISMS INFORMS 2020 John D.C. Little Best Paper Award Finalist
- ISMS INFORMS 2020 Frank M. Bass Award Finalist
- Best Paper award at the Sixth China Marketing International Conference (CMIC), Shanghai, July 2018

Kothari, S.P., Natalie Mizik, Sugata Roychowdhury (2016), "Managing for the Moment: Role of Real Activity Manipulation versus Accruals in SEO Over-Valuation," *The Accounting Review*, 91 (2), 559-586

Mizik, Natalie (2014), "Assessing the Total Financial Performance Impact of Brand Equity with Limited Time-Series Data," *Journal of Marketing Research*, 51 (6), 691-706
- 2011 Robert D. Buzzell MSI Best Paper Award Winner

Moorman, Christine, Simone Wies, Natalie Mizik, and Fredrika Spencer (2012), "Firm Innovation and the Ratchet Effect among Consumer Packaged Goods Firms," *Marketing Science,* 31 (6), 934–951

Sismeiro, Catarina, Natalie Mizik, and Randolph Bucklin (2012), "Modeling coexisting business scenarios with time-series panel data: A dynamics-based segmentation approach," *IJRM, International Journal of Research in Marketing,* 29 (2), 134–147

Mizik, Natalie (2010), "The Theory and Practice of Myopic Management," *Journal of Marketing Research*, 47 (4), 594-611
- 2011 Paul E. Green Award Finalist for the JMR paper with the most potential to contribute to the practice of marketing research and research in marketing

Jacobson, Robert and Natalie Mizik (2009), "The Financial Markets and Customer Satisfaction: Re-examining Possible Financial Market Mis-Pricing of Customer Satisfaction," *Marketing Science*, 28 (5), 810-819
- lead article with invited commentaries
- 2009 John D.C. Little Award Finalist for best paper in the Marketing Sciences Literature
- 2009 Robert D. Buzzell MSI Best Paper Award Finalist

Jacobson, Robert and Natalie Mizik (2009), "Customer Satisfaction-Based Mispricing: Issues and Misconceptions," *Marketing Science*, 28 (5), 836-845

Mizik, Natalie and Robert Jacobson (2009), "Valuing Branded Businesses," *Journal of Marketing*, 73 (6), 137-153

Mizik, Natalie and Robert L. Jacobson (2009), "The Financial Markets Research in Marketing," *Journal of Marketing Research*, 46 (3), 320-324

Mizik, Natalie and Robert L. Jacobson (2008), "The Financial Value Impact of Perceptual Brand Attributes," *Journal of Marketing Research*, 45 (1), 15-32
- 2012 William F. O'Dell award Finalist for article published in 2008 that has made the most significant, long-term contribution to marketing theory, methodology, and/or practice
- 2009 Paul E. Green Award Finalist for the JMR paper with the most potential to contribute to the practice of marketing research and research in marketing

Mizik, Natalie and Robert L. Jacobson (2007) "Myopic Marketing Management: Evidence of the Phenomenon and Its Long-Term Performance Consequences in the SEO Context," *Marketing Science*, 26 (3), 361-379

Manchanda, Puneet, Dick R. Wittink, Andrew Ching, Paris Cleanthous, Min Ding, Xiaojing J. Dong, Peter S. H. Leeflang, Sanjog Misra, Natalie Mizik, Sridhar Narayanan, Thomas Steenburgh, Jaap E. Wieringa, Marta Wosinska, Ying Xie (2005), "Understanding Firm, Physician and Consumer Choice Behavior in the Health Care Industry," *Marketing Letters*, 16 (3-4), 293-308

Pauwels, Koen, Imran Currim, Marnik G. Dekimpe, Eric Ghysels, Dominique M. Hanssens, Natalie Mizik, Prasad Naik (2005), "Modeling Marketing Dynamics by Time Series Econometrics," *Marketing Letters*, 15 (4), 167-183
- lead article

Mizik, Natalie and Robert Jacobson (2004), "Are Physicians 'Easy Marks'? Quantifying the Effects of Detailing and Sampling on New Prescriptions," *Management Science*, 51 (12), 1704-1715
- 2001 ISBM Award Winner

Mizik, Natalie and Robert Jacobson (2003), "Trading Off between Value Creation and Value Appropriation: The Financial Implications of Shifts in Strategic Emphasis," *Journal of Marketing*, 67 (January), 63-76
- 2000 ISBM Award Finalist

**Practitioner-focused Publications:**

Artz, Martin and Natalie Mizik (2023), "Compensation-Related Metrics and Marketing Myopia," *NIM Marketing Intelligence Review*, 15 (1) 40-44. https://doi.org/10.2478/nimmir-2023-0006

Knowles, Jonathan, Isaac Dinner, and Natalie Mizik (2011), "Why Fusing Company Identities Can Add Value," *Harvard Business Review*, 89 (September), 26

Mizik, Natalie and Robert L. Jacobson (2007), "The Cost of Myopic Management," *Harvard Business Review*, 85 (July-August), 22-24

Mizik, Natalie and Robert L. Jacobson (2005), "Talk about Brand Strategy," *Harvard Business Review*, 83 (October), 24-26

**Books:**

Mizik, Natalie and Dominique Hanssens, eds. (expected 2025). *Handbook of Marketing Analytics with Applications in Marketing, Public Policy, and Litigation*. 2nd Edition. Elgar Publishing, expected 2025

Mizik, Natalie and Dominique Hanssens, eds. (2018). *Handbook of Marketing Analytics with Applications in Marketing, Public Policy, and Litigation*. Elgar Publishing, March 2018

## Book Chapters:

Natalie Mizik, and Eugene Pavlov (2025), "Panel Data Methods in Marketing" in Mizik and Hanssens, Eds. Handbook of Marketing Analytics, 2nd Edition. Elgar Publishing, expected 2025

Mizik Natalie and Robert Jacobson (2025), "Panel Data Models for Evaluating Effectiveness of Direct-to-Physician Pharmaceutical Marketing Activities" in Mizik and Hanssens, Eds. Handbook of Marketing Analytics, 2nd Edition. Elgar Publishing, expected 2025

Hanssens, Dominique M., Lorenzo Michelozzi, Natalie Mizik (2023), "Brand Value, Marketing Spending, and Brand Royalty Rates" in Steckel and Gersen, Eds. The Cambridge Handbook of Marketing and the Law. Cambridge University Press, July 2023

Natalie Mizik, and Eugene Pavlov (2018), "Panel Data Methods in Marketing" in Mizik and Hanssens, Eds. Handbook of Marketing Analytics. Elgar Publishing, March 2018

Mizik Natalie and Robert Jacobson (2018), "Panel Data Models for Evaluating Effectiveness of Direct-to-Physician Pharmaceutical Marketing Activities" in Mizik and Hanssens, Eds. Handbook of Marketing Analytics. Elgar Publishing, March 2018

Mizik Natalie and Eugene Pavlov (2018), "Measuring Financial Impact of Brand Equity" in Homburg, Christian, Martin Klarmann, and Arnd Vomberg, Eds. Handbook of Marketing Research. Springer

Mizik, Natalie (2012), "How to Better Value Branded Businesses: A Conditional Multiplier Approach," book chapter in Shankar Ganesan, Eds. Handbook of Marketing and Finance. Edward Elgar Publishers

Mizik, Natalie and Robert Jacobson (2004), "Stock Return Response Modeling," book chapter in Christine Moorman and Donald R. Lehmann, Eds. Assessing Marketing Strategy Performance, Cambridge, MA: MSI Marketing Science Institute, 29-46

## Working Papers and Papers under Review:

Pavlov, Eugene and Natalie Mizik (2024), "Brand Political Positioning: Implications of the 2016 US Presidential Election"

Pavlov, Eugene, Dinner, Isaac, Jonathan Knowles, Natalie Mizik (2023), "Branding a Merger: Implications for Merger Valuation and Future Performance"

Artz, Martin, Natalie Mizik (2018), "How Incentives Shape Strategy: The Role of CMO and CEO Equity Compensation in Inducing Marketing Myopia"

Mizik, Natalie and Doron Nissim (2012) "Accounting for Marketing Activities: Implications for Marketing Research and Practice"

Jacobson, Robert and Natalie Mizik (2009) "Assessing the Value-Relevance of Customer Satisfaction"

**Research in Progress:**

Pavlov, Eugene and Mizik, Natalie, "'Values' Voters and Their Brands"

Mizik, Natalie, "Company Actions and Consumer Perceptions of Corporate Social Responsibility: Impact on Firm Financial Performance"

Mizik, Natalie, "Focus on Differentiation: Understanding the Market Anomaly"

Mizik, Natalie and Robert Jacobson, "Strategy in Recession: The Role of Marketing"

Mizik, Natalie (2011), "Tobin's Q: The Theoretical Construct and Its Use and Validity in Marketing Applications"

Dinner, Isaac and Natalie Mizik (2011), "Communicating with the Financial Markets: The Role and the Value of Non-Financial Information in Marketing Metrics," supported by **MSI grant #4-1455**

**Cases for MBA teaching:**

Mizik, Natalie (2016), "*Emue: A Solution to Raising Credit Card Fraud?*" June 1, 2016

Mizik, Natalie (2010), "*The Pharmaceutical Industry Interactions with Physicians: The Cost, the Ethics, and the Patient Welfare*," Columbia Business School Case ID# 100513, published December 6, 2010

Dore, Blair and Natalie Mizik (2010), "*Time Inc.*" Columbia Business School Case ID# 100512, published November 23, 2010

Mizik, Natalie (2010), "*How to Better Value Branded Businesses*," Columbia Business School Case ID# 100502, published January 27, 2010

Mizik, Natalie (2009), "*Sonance (B)*," Columbia Business School Case ID# 080515B, published September 23, 2009

Mizik, Natalie (2009), "*Sonance at a Turning Point. Teaching Note*," Columbia Business School, Case ID# 080515TN, published August 31, 2009; revised June 3, 2018

Mizik, Natalie and Paul Glasserman (2009), "*Does Detailing Pay? Teaching Note*" Columbia Business School, Case ID# 090202TN, published July 28, 2009

Mizik, Natalie and Paul Glasserman (2009), "*Does Detailing Pay?*" Columbia Business School, Case ID# 090202, published February 23, 2009, revised July 28, 2009

Mizik, Natalie (2008) "*Sonance at a Turning Point*," HBR Product #: CU140-PDF-ENG, Columbia Business School, Case ID# 080515A, published October 23, 2008; revised February 25, 2018
- included in the 13th edition of Kerin and Peterson, "Strategic Marketing Problems: Cases and Comments" (Pearson/Prentice Hall).

**Published Research Reports:**

Pavlov, Eugene and Natalie Mizik (2021), "Brand Political Positioning: Implications of the 2016 US Presidential Election," *Marketing Science Institute* Working Paper Series 2021, Report No. 21-122
- 2022 Robert D. Buzzell MSI Best Paper Award Nominee

Liu, Liu, Daria Dzyabura, and Natalie Mizik (2020), "Visual Listening In: Extracting Brand Image Portrayed on Social Media," *Marketing Science Institute* Research Report No. 20-113

Artz, Martin, Natalie Mizik (2018), "How Incentives Shape Strategy: The Role of CMO and CEO Equity Compensation in Inducing Marketing Myopia," *Marketing Science Institute* Research Report No. 18-105
- 2020 Robert D. Buzzell MSI Best Paper Award Winner

Mizik, Natalie and Doron Nissim (2011) "Accounting for Marketing Activities: Implications for Marketing Research and Practice," *Marketing Science Institute* Research Report No. 11-103

Mizik, Natalie, Jonathan Knowles, and Isaac Dinner (2010), "Value Implications of Corporate Branding in Mergers," *Marketing Science Institute* Research Report No. 10-119

Mizik, Natalie (2009) "Assessing the Total Financial Performance Impact of Marketing Assets with Limited Time-Series Data: A Method and an Application to Brand Equity Research," *Marketing Science Institute* Research Report No. 09-116
- 2011 Robert D. Buzzell MSI Best Paper Award Winner

Isaac Dinner, Natalie Mizik, Don Lehmann (2009) "The (Unappreciated) Value of Marketing," *Marketing Science Institute* electronic Research Report No. 09-204

Mizik, Natalie (2009), "The Theory and Practice of Myopic Management," *Marketing Science Institute* electronic Research Report No. 09-203

Mizik, Natalie and Robert Jacobson (2008) "Valuing Branded Businesses," *Marketing Science Institute* Research Report No. 08-115

Mizik, Natalie and Robert Jacobson (2008) "Earnings Inflation through Accruals and Real Activity Manipulation: Its Prevalence at the Time of an SEO and the Financial Market Consequences," *Marketing Science Institute* electronic Research Report No. 08-202

Sismeiro, Catarina, Natalie Mizik, and Randolph Bucklin (2008) "A New Dynamics-based Segmentation Approach for Maximizing Long-term Marketing Impact," *Marketing Science Institute* Research Report No. 08-109

Jacobson, Robert and Natalie Mizik (2007) "The Financial Markets and Customer Satisfaction: Re-examining the Value Relevance of Customer Satisfaction from the Efficient Markets Perspective," Cambridge, Mass.: MSI *Marketing Science Institute* Working Paper Series, Issue 3, Report No. 07-115
- 2009 Robert D. Buzzell MSI Best Paper Award Finalist

Mizik, Natalie and Robert L. Jacobson (2006) "Myopic Marketing Management: The Phenomenon and

Its Long-Term Impact on Firm Value," Cambridge, Mass.: MSI ***Marketing Science Institute*** Working Paper Series, Issue 1, 3-21, Report No. 06-100

Mizik, Natalie and Robert Jacobson (2005), "How Brand Attributes Drive Financial Performance," Cambridge, Mass.: MSI ***Marketing Science Institute*** Working Paper Series, Issue 3, 21-39, Report No. 05-111

Mizik, Natalie and Robert Jacobson (2004), "Are Physicians 'Easy Marks'? Quantifying the Effects of Detailing and Sampling on New Prescriptions," Cambridge, Mass.: MSI, ***Marketing Science Institute*** Working Paper Series, Issue 1, 129-151, Report No. 04-105

Mizik, Natalie and Robert Jacobson (2002), "Trading Off Value Creation and Value Appropriation: The Financial Implications of Shifts in Strategic Emphasis," Cambridge, Mass.: MSI ***Marketing Science Institute***, Report No. 20-114

### Other Publications:

Artz, Martin and Natalie Mizik (2018), "Executive Equity Compensation Drives Earnings Inflation," *Columbia Law School's Blog on Corporations and the Capital Markets,* April 5, 2018. http://clsbluesky.law.columbia.edu/2018/04/05/executive-equity-compensation-drives-earnings-inflation/

Mizik, Natalie (2005), "Are Physicians Easy Marks? A Closer Look at Pharmaceutical Marketing Practices," ***Hermes*** (Summer), 10-12

### Competitive Grants:

2024   PI, Collaboration with the Pacific Northwest National Laboratory (PNNL), $100K contract as a part of a $3M three-year PNNL DOE grant funded by the US Department of Energy, Hydrogen Fuel Cell Technology Office (EERE-HFTO) to study hydrogen fuels and technologies adoption in the US (adoption study project canceled at the request of the sponsor, March 2025).

2024   UW Foster, Purpose Grant ($3,000), with Francesca Valsesia

2017   Population Health Initiative, UW grant ($50,000) for "Caring Letters After the War: Veterans Writing to Veterans to Prevent Suicide," with Mark Reger (VA and UW School of Medicine/Department of Psychiatry & Behavioral Sciences) and Lori Zoellner (UW Psychology Department)

2017   Data Science Research Award 2017 ($50,000) for "Increasing Consumer Engagement with Firm-Generated Social Media Content: The Role of Images and Words"

2011   MSI grant #4-1715 ($21,000) to study the company communications, media, and UGC impact on brand, with Daria Dzyabura, John Hauser, and Andrey Mizik

2008   Center on Global Brand Leadership, BRITE grant ($8,000)

2007   CeBiz research grant ($1,000) to study the role of customer satisfaction

2007   MSI grant #4-1455 ($13,000) to study the value of non-financial information, with Isaac Dinner

2005   MSI grant # 4-1316 ($9,000) to study Myopic Marketing Management with Robert Jacobson

1999   Dissertation Summer Scholarship, Tilburg University, the Netherlands

### Invited Talks, Panels:

1. 2025 AMA-Sheth Foundation Doctoral Consortium, Ohio State U., June 2025
2. MSI 2025 Summit, "Marketing in the Age of AI," UCLA, February 2025
3. Automotive, Technology & AI Summit, "Cracking the Data Privacy and data Breach Issues in Automobile Litigation," Nashville, TN, September 2024 – re-scheduled, due to severe weather
4. 2024 Winter AMA, Branding SIG, "Visionaries in Branding," panelist, February 2024
5. 2023 ISMS Senior Faculty Fellow, ISMS Early-Career Scholars Camp, Duke, October 2023
6. 2023 AMA-Sheth Foundation Doctoral Consortium, BI Norwegian Business School, Oslo, Norway, June 2023
7. 2022 The Ph.D. Project's Marketing Doctoral Student Association's (MDSA) annual conference "Meet the Editors," Chicago, August 11, 2022
8. 2022 AMA-Sheth Foundation Doctoral Consortium, UT Austin, June 2022
9. MSI, Marketing Science Institute, webinar, June 21, 2022
10. AMA, Meet the Editors session, 2022 Winter AMA Conference, Las Vegas, February 20, 2022
11. Cornerstone Research Expert Forum, Continuing Legal Education (CLE), "Cracking the Commonalities and Differences in Data Breach and Data Privacy Cases: Current Trends and Future Directions," October 5, 2021 (remote)
12. AMA, Meet the Editors session, 2021 Summer AMA Conference, August 4, 2021 (remote)
13. American Bar Association, Antitrust Law Section, "Analytical Tools Used in False Advertising Class Actions," June 7, 2021 (Zoom)
14. Marketing Strategy Consortium, Faculty Fellow, U. Texas, Austin, December 2020 (Zoom)
15. UW Foster Finance Department Brown Bag Seminar, February 2020
16. UT Austin Marketing Department, November 2019
17. 2019 ISMS INFORMS Doctoral Consortium, Rome, June 2019
18. Don Lehmann 50th Anniversary Conference, Columbia, NYC, May 2019
19. 2019 Law & Economics Symposium: Current Topics in Life Sciences, MIT, Boston, May 2019
20. Legal Applications of Marketing Theory Conference, Harvard, Boston, May 2019
21. Women in Marketing Winter AMA Pre-Conference, Austin, TX, February 2019
22. MSI, Marketing Science Institute, MSI Fall Board of Trustees Meeting, San Francisco, November 2018
23. MSI, Marketing Science Institute, webinar, May 23, 2018
24. Goizueta School of Business, Emory University, February 2017
25. Katz Graduate School of Business, University of Pittsburgh, January 2017
26. NYU, April 2016
27. Lehigh University, April 2016
28. UC Irvine, November 2015
29. 2015 AMA Sheth Foundation Doctoral Consortium, LBS, London, July 2015
30. Washington State University, September 2014
31. 2014 AMA Sheth Foundation Doctoral Consortium, Northwestern U., Evanston, IL, June 2014
32. 2014 Winter AMA pre-conference Doc SIG Symposium, Orlando, February 2014
33. U of Georgia, February 2014
34. INSEAD, January 2014
35. 2012 AMA Sheth Foundation Doctoral Consortium, UW, Seattle, June 2012
36. U. of Maryland, April 2012
37. North Carolina State University, March 2012
38. 2012 AMA winter conference, FL, February 2012
39. Tinbergen Marketing Research Camp, Erasmus University, Rotterdam, June 2011
40. MIT Sloan School of Management, May 2011
41. Marketing Science Institute (MSI), Workshop on the Mktg-Fin Interface, Boston, May 2011
42. Michael G. Foster School of Business, University of Washington, Seattle, May 2011

43. Boston College, April 2011
44. Marketing Science Institute (MSI), MSI's 50th Anniversary Celebration, Boston, April 2011
45. Association of American Law Schools, Section on Socio-Economics, AALS Annual Meeting, San Francisco, January 2011
46. Invitational Choice Symposium, Florida, May 2010
47. Goizueta School of Business, Emory University, April 2010
48. University of Pittsburgh, April 2010
49. Penn State, March 2010
50. MASB, 2010 Chicago meeting, March 2010
51. Wharton, U. Pennsylvania, February 2010
52. Kenan-Flagler Business School, UNC-Chapel Hill, January 2010
53. MI9, Marketing in Israel conference, December 2009
54. Stern School of Business, New York University, November 2009
55. 2009 AMA Sheth Foundation Doctoral Consortium, GSU, Atlanta, GA, June 2009
56. Yale School of Management, Collaborative & Multidisciplinary Research Conference, Session Chair, May 2009
57. Rensselaer Polytechnic Institute, Lally School of Management & Technology, April 2009
58. USC, Marshall School of Business, marketing department, April 2009
59. MIT Sloan School of Management, marketing department, March 2009
60. Harvard Business School, marketing department, March 2009
61. Duke University, Fuqua School of Business, marketing department, March 2009
62. BRITE Conference, Columbia University, October 2008
63. 2008 AMA Sheth Foundation Doctoral Consortium, University of Missouri, June 2008
64. Georgetown U, marketing camp, April 2008
65. University of Texas (Austin), March 2008
66. Columbia University QMSS seminar, October 2007
67. U of Washington, Ross School of Business, Marketing department, September 2007
68. 2007 AMA Sheth Foundation Doctoral Consortium, Arizona, May 2007
69. Columbia Marketing department PhD seminar, April 2007
70. Columbia Accounting department PhD seminar, January 2007
71. Northwestern University, January 2007
72. Erasmus University, Netherlands, October 2006
73. University of British Columbia, marketing department, August 2006
74. U of Washington Accounting department, August 2005
75. HKUST, Hong Kong, marketing department, April 2005
76. MSI third Young Scholars Program, Park City, Utah, January 2005
77. Dartmouth, Time Series Conference, September 2004
78. Invitational Choice Symposium, Colorado, June 2004
79. MSI research generation workshop, Emory, Atlanta, May 2004
80. UCLA marketing department, May 2004
81. Duke University, Fuqua School of Business, marketing department, February 2004
82. Columbia GSB Accounting department, December 2003
83. Marketing Modelers Group, New York, December 2003
84. Wyeth, Management Science department, September 2003
85. MSI conference on assessing marketing strategy performance, August 2003
86. Harvard Business School marketing department, January 2003
87. MSI Conference on Measuring Marketing Profitability, October 2002
88. UBC marketing department, October 2001
89. Columbia GSB marketing department, October 2001
90. Babson College marketing department, October 2001

91. Michigan State University marketing department, September 2001
92. Rutgers University marketing department, September 2001
93. University of Illinois, Chicago, marketing department, September 2001
94. Eli Lilly & Co, Indianapolis, August 2000
95. Tilburg University, Netherlands, July 1999

## Conference Presentations and Talks:

2022 Marketing Strategy Meets Wall Street, Chicago, August 2022
2018 Marketing Science conference, Philadelphia, June 2018
2018 Theory + Practice Conference, UCLA, May 2018
2014 Marketing Science conference, Atlanta, June 2014
2013 Marketing Science conference, Istanbul, July 2013
2013 Theory and Practice in Marketing, London, May 2013
2012 Brands and Branding in Law, Accounting and Marketing, Chapel Hill, NC April 2012
2011 Marketing Science conference, Houston, June 2011
2011 Marketing Meets Wall Street, Boston University, May 2011
2010 Marketing Dynamics Conference, Ozyegin University, June 2010
2009 Marketing Dynamics Conference, NYU, August 2009
2009 Marketing Science conference, Ann Arbor, MI, June 2009
2008 Marketing Science conference, Vancouver, CA, June 2008
2007 Four-school conference (Columbia-NYU-Wharton-Yale), NYU, April 2007
2007 Marketing Dynamics Conference, University of Groningen, August 2007
2006 Marketing Dynamics Conference, UCLA, August 2006
2006 Corporate Social Responsibility Conference, London Business School, July 2006
2006 Marketing Science conference, Pittsburgh, June 2006
2005 Marketing Dynamics Conference, UC Davis, September 2005
2005 Marketing Science Conference, June 2005
2005 Four-school conference (Columbia-NYU-Wharton-Yale), April 2005
2004 Marketing Science Conference, June 2004
2003 Marketing Science Conference, June 2003
2003 Four-school conference (Columbia-NYU-Wharton-Yale), May 2003
2001 UW–UBC Marketing Conference, May 2001

## Dissertation Committees:

Alireza Aminkhaki (expected 2025). Role: GSR, Supervisory Committee Member

Eugene Pavlov (2020, first academic position: Assistant Professor of Marketing, University of Miami, FL). Dissertation title: "Increasing Consumer Engagement with Firm-Generated Social Media Content: The Role of Images and Words." Role: Chair

Dmitry Brizhatyuk (2020, first academic position: Moody's). Dissertation title: "Essays on Business Cycles and Endogenous Growth." Role: GSR, Supervisory Committee Member. Chair: Fabio Ghironi

Daria Dzyabura (2012, PhD at MIT – Marketing, first academic position: Assistant Professor of Marketing, NYU). Dissertation title: "Essays on Modeling and Measurement of Consumers' Decision Strategies." Role: committee member. Chair: John Hauser

Eelco Kappe (2011, PhD at Erasmus – Marketing, first academic position: Assistant Professor of Marketing, Penn State University). Dissertation title: "The Effectiveness of Pharmaceutical Marketing." Role: opponent. Chair: Stefan Stremersch

Isaac Dinner (2011, PhD at Columbia – Marketing, first academic position: Assistant Professor of Marketing, IE Business School, Madrid, Spain). Dissertation title: "The Interpretation of Marketing Actions and Communications by the Financial Markets." Role: co-chair. Co-chairs: Don Lehman and Natalie Mizik

Feng Chen (2008, PhD at Columbia – Accounting, first academic position: Assistant Professor at University of Toronto at Mississauga). Dissertation title: "Capital Market Pressures and Earnings Management: Evidence from U.S. Dual-Class Firms." Role: committee member. Chair: Bjorn Jorgensen

Seema Pai (2008, PhD at USC – Marketing, first academic position: Assistant Professor at Boston U). Dissertation title: "Does it Matter What People Say about You: The Impact of the Content of Buzz on Firm Performance," Role: committee member. Chair: S. Siddarth

Marc Badia (2008, PhD at Columbia – Accounting, first academic position: faculty at IESE, University of Navarra, Barcelona). Dissertation essays: "Probability Thresholds and Equity Values," and "Operating Profit Variation Analysis: Implications for Future Earnings and Equity Values," Role: committee member. Chair: Doron Nissim

Markus Maedler (2007, PhD at Columbia – Accounting, first academic position: faculty at IESE, University of Navarra, Barcelona). Dissertation title: "Job Rotation and Performance Measurement," Role: committee member. Chair: Tim Baldenius

**Promotion and Tenure Letters:**
Clemson University
University of Idaho
Texas Tech University
MSU
UT San Antonio
Indian School of Business
University of Main
Singapore Management University
Ivey Business School, Western University, Canada
UC Riverside
University of Melbourne

**Editor-in-Chief:**
2021 – 2022          Marketing Letters (2-year commitment)

**Associate Editor:**
2012 – present, Customer Needs and Solutions (CNS)
Ad Hoc Guest AE for JM, IJRM

**Editorial Review Board Membership:**
2011 – 2024          Marketing Science
2008 – 2022          Marketing Letters
2007 – 2020          JMR, Journal of Marketing Research

2010 – 2018        JM, Journal of Marketing
2008 – 2015        IJRM, International Journal of Research in Marketing

**Ad Hoc Reviewing**:
National Science Foundation, Journal of Accounting and Public Policy, QME, Management Science, Journal of Brand Management, Journal of Business, Journal of Business Research, Health Economics, JAMS, California Management Review, Journal of Retailing, MSI, EMAC, ISBM, ISMS, and others

**Professional Affiliations:**

AAAS, AMA, INFORMS – Member

**Conference Organizing and Select Service to the Profession:**

Co-Chair for the "Brands and Branding in Law, Accounting, and Marketing" conference, 2012 April (UNC, Chapel Hill)

Member of the Organizing and/or Program Committees for the Marketing Dynamics Conferences:
MDC 2013 May (UNC, Chapel Hill)
MDC 2011 July (Jaipur, India)
MDC 2010 June (Ozyegin University, Turkey)
MDC 2009 August (NYU)
MDC 2009 January (U of Waikato, New Zeeland)
MDC 2007 (U of Groningen, Netherlands)
MDC 2006 (UCLA)
MDC 2005 (UC Davis)

Member of the Advisory and/or Program Committee:
12th Triennial Invitational Choice Symposium, INSEAD, Fontainebleau, France, August 9-12, 2023
Marketing Strategy Meets Wall Street Conference VI, INSEAD, June 16-18, 2019
Marketing Strategy Meets Wall Street III Conference, Frankfurt, July 7-9, 2013
Marketing Strategy Meets Wall Street II: Emerging Perspectives from Academics and Practitioners Conference, Boston, MA, May 12 - 14, 2011

Co-founder of Women in Marketing Academia (Organizer of the event at AMA conferences in 2010, 2012, 2013)
Co-founder of Women in Marketing Science (Organizer of the event at MktgSci ISMS conferences in 2011, 2012, 2018)

Co-organizer of the ISMS Code of Conduct town hall meeting at the 2018 Mktg Sci conference

Organizing special sessions:
Marketing Science conferences 2018, 2011, 2010
Theory + Practice conference 2018

**Teaching:**

***UW Foster School of Business***
PhD Course                                    Marketing Performance Measurement
EMBA Core (North America and Regional):   Marketing Management

Technology Management MBA Core:      Marketing Management
Global Leadership and Strategy Exec Ed:      Strategic Marketing

***UNC Kenan-Flagler Business School***
MBA Core:      Marketing: Core Concepts & Tools

***MIT Sloan School of Management***
MBA Core:      Marketing Management
Executive Education:      Entrepreneurship Development Program

***Columbia Business School***
MBA Core:      Marketing Strategy, incl. Business Values and Ethics
MBA Electives:      Strategic Marketing Planning
     Advanced Mktg Strategy

Executive MBA Core:      Marketing Strategy
(Columbia NYC and Berkeley-
Columbia EMBA programs)
Executive MBA Electives:      Strategic Marketing Planning
(Columbia NYC and BLOCK programs)      Advanced Marketing Strategy

## Teaching and Mentorship Awards and Recognition of Teaching Quality:

2025, 2018 ***Doctoral Business Student Association (DBSA) Faculty Mentor Award*** in Marketing

2019 ***Dean's Award for Excellence in Graduate Teaching***, UW Foster School of Business

2018 ***Robert M. Bowen EMBA Excellence in Teaching Award***, UW EMBA program

2017, 2014, 2013 ***Teaching Excellence Award***, UW TMMBA program

2016 Nominated for the University of Washington Distinguished Teaching Award (the highest teaching distinction at the University of Washington)

2016, 2015, 2014, 2013, 2012 ***Faculty of the Quarter*** in the UW TMMBA program in a vote for a "faculty member who demonstrates outstanding teaching efforts and impact in the classroom," UW Foster School of Business

2011 Nominated for the ***Excellence in Teaching Award***, MIT Sloan School of Management

2011, 2010, 2009, 2008 – Voted by the second-year graduating MBA students as their ***favorite core professor*** and attended as a guest of honor pre-graduation Capstone Meeting (voted in every year the program was in place)

2008-2009 Marketing Association of Columbia ***Most Engaging and Dynamic Professor*** Award

2008-2009 Marketing Association of Columbia ***Best Marketing Class Taken at CBS*** Award for the Core MBA Marketing Strategy course

## Select UW School Service:

Promotion and Tenure Committee, Faculty Council, Master Programs Committee, Foster Branding Committee, Research Committee (Chair, 2014), Hybrid MBA committee, Faculty Excellence Awards Committee (Chair, 2021), Diversity Committee, various other committees

**Natalie Mizik**
**Prior Testimony in the Last Four Years**
(*The party I was retained by is underlined*)

1. *Csupo, et al. v. <u>Alphabet, Inc.</u>*, Superior Court of California, County of Santa Clara, 19CV352557.
   - Filed expert report (3/10/2023); Deposition: April 5, 2023
   - Filed expert report (10/15/2024); Deposition: December 18, 2024[1]
   - Filed expert report (12/12/2024)

2. *Miguel, et al. v. <u>Apple Inc.</u>*, Superior Court of California, County of Los Angeles, Case No. 21STCV08348
   - Filed expert report (06/25/2024); Deposition date: August 7, 2024

3. *Taylor, et al. v. <u>Google LLC.</u>*, United States District Court, Northern District of California San Jose Division, Case No. 5:20-CV-07956-VKD
   - Filed expert report (11/12/2024); Deposition: December 18, 2024[2]
   - Filed expert report (1/15/2025)

4. *Peter Burke, et al., v. <u>VISA Inc., et al.,</u>* and *National ATM Council, Inc., et al., v. <u>VISA Inc., et al.</u>*, United States District Court, District of Columbia, Civil Action No. 1:11-cv-1882-RJL and Civil Action No 1:11-cv-1803-RJL
   - Filed expert report (12/19/2024); Deposition: August 28, 2025

---

[1] The deposition covered expert reports I filed in Csupo, et al. v. Alphabet, Inc. and Taylor, et al. v. Google LLC.

[2] The deposition covered expert reports I filed in Csupo, et al. v. Alphabet, Inc. and Taylor, et al. v. Google LLC.

# Documents Considered List

**Academic Articles**

- Alby, T. (2023), "Popular, But Hardly Used: Has Google Analytics Been to the Detriment of Web Analytics?" *Proceedings of the 15th ACM Web Science Conference 2023*, 304–311

- Berke, A., et al. (2023), "Drone Delivery and the Value of Customer Privacy: A Discrete Choice Experiment with U.S. Consumers," *Transportation Research Part C*, 157, 104391, 1–26

- Birch, K., et al. (2021), "Data as Asset? The Measurement, Governance, and Valuation of Digital Personal Data by Big Tech," *Big Data & Society*, 8, 1, 1–15

- De Keyzer, F., et al. (2015), "Is This for Me? How Consumers Respond to Personalized Advertising on Social Network Sites," *Journal of Interactive Advertising*, 15, 2, 124–134

- Glasgow, G. and S. Butler (2017), "The Value of Non-Personally Identifiable Information to Consumers of Online Services: Evidence from a Discrete Choice Experiment," *Applied Economics Letters*, 24, 6, 392–395

- Holthausen, R. W. and R. L. Watts (2001), "The Relevance of the Value-Relevance Literature for Financial Accounting Standard Setting," *Journal of Accounting and Economics*, 31, 3–75

- Kim, Y. J. and J. Han (2014), "Why Smartphone Advertising Attracts Customers: A Model of Web Advertising, Flow, And Personalization," *Computers in Human Behavior*, 33, 256–269

- Li, X., et al. (2021), "Valuing Personal Data with Privacy Consideration," *Decision Sciences*, 52, 2, 393–426

- Liu, X., et al. (2024), "The Two-Stage Presale Pricing for Online Products Considering Anchoring Effect and Payment Pain Reduction," *Managerial and Decision Economics*, 45, pp. 3865–3885

- Maines, L. A., et al. (2003), "Implications of Accounting Research for the FASB's Initiative on Disclosure of Information about Intangible Assets," *Accounting Horizons*, 17, 2, 175–185

- Mizik, N. (2014), "Assessing the Total Financial Performance Impact of Brand Equity with Limited Time-Series Data," *Journal of Marketing Research*, 51, 6, 691–706

- Mizik, N. and R. Jacobson (2008), "The Financial Value Impact of Perceptual Brand Attributes," *Journal of Marketing Research*, 45, 1, 15–32

- O'Donnell, K. and H. Cramer (2015), "People's Perceptions of Personalized Ads," *Proceedings of the 24th International Conference on World Wide Web*, pp. 1293–1298

- Skinner, D. J. (2008), "Accounting for Intangibles–A Critical Review of Policy Recommendations," *Accounting and Business Research*, 38, 3, 191–204

- Verstraete, M. (2020), "Inseparable Uses," *North Carolina Law Review*, 99, 427–478

- Wu, J. (2025), "Secondary Market Monetization and Willingness to Share Personal Data," *Management Science*, pp. 1–20

- Yasseri, T. and J. Reher (2022), "Fooled By Facts: Quantifying Anchoring Bias Through A Large-Scale Experiment," *Journal of Computational Social Science*, 5, 1001–2021

**Books and Book Chapters**

- Federal Judicial Center, National Research Council of the National Academies (2011), *Reference Manual on Scientific Evidence*, Washington, D.C.: The National Academic Press

- Mankiw, N. G. (2008), *Principles of Economics*, Mason, OH: South-Western Cengage Learning

**Depositions and Interviews**

- Deposition of T.R., March 26, 2025

- Deposition of R.S., March 27, 2025

- Deposition of Jane Doe III, March 28, 2025

- Deposition of L.M., April 1, 2025

- Deposition of S.C., April 2, 2025

- Deposition of Jane Doe I, April 4, 2025

- Deposition of Eric Krause, June 10, 2025

- Deposition of Zabir Shafiq, June 13, 2025

- Interview with Professor Ben Zhao, July 11, 2025

**Expert Reports**

- Declaration of Eric Krause, MBA., *In Re BetterHelp, Inc. Data Disclosure Cases*, Master File No. 3:23-cv-01033-RS and backup materials, (May 8, 2025)

- Declaration of Zubair Shafiq, Ph.D., *In Re BetterHelp, Inc. Data Disclosure Cases*, Master File No. 3:23-cv-01033-RS, (May 8, 2025) and ████████████

**Industry and Policy Reports**

- "In Defense of Data: Information and the Costs of Privacy," *Technology Policy Institute*, 2009, https://techpolicyinstitute.org/wp-content/uploads/2009/05/in-defense-of-data-information-2007340.pdf

- "2017 Cost of Data Breach Study," *Ponemon Institute*, June 2017, https://documents.ncsl.org/wwwncsl/Task-Forces/Cybersecurity-Privacy/IBM_Ponemon2017CostofDataBreachStudy.pdf

- "The Value of Data," *Trustwave*, 2017, https://www.infopoint-security.de/media/TrustwaveValue_of_Data_Report_Final_PDF.pdf

- "Realising the Value of Health Care Data: A Framework for Future Work," *Ernst & Young*, 2019, https://www.ey.com/content/dam/ey-unified-site/ey-com/en-gl/insights/life-sciences/documents/ey-value-of-health-care-data-v20-final.pdf


**Legal Documents**

- Certificate of Service of Defendant BetterHelp, Inc.'s First Set of Interrogatories to Plaintiffs, *In Re BetterHelp, Inc. Data Disclosure Cases*, Case No. 3:23-cv-01033-RS, (July 10, 2024)

- Reponses to Plaintiff's Second Set of Special Interrogatories, *In Re BetterHelp, Inc. Data Disclosure Cases*, Case No. 3:23-cv-01033-RS, (November 15, 2024)

- Defendant BetterHelp Inc.'s First Set of Interrogatories to Plaintiff R.S., *In Re BetterHelp, Inc. Data Disclosure Cases*, Case No. 3:23-cv-01033-RS, (July 10, 2024)

- Defendant BetterHelp Inc.'s First Set of Interrogatories to Plaintiff S.C., *In Re BetterHelp, Inc. Data Disclosure Cases*, Case No. 3:23-cv-01033-RS, (July 10, 2024)

- Defendant BetterHelp Inc.'s First Set of Interrogatories to Plaintiff T.R., *In Re BetterHelp, Inc. Data Disclosure Cases*, Case No. 3:23-cv-01033-RS, (July 10, 2024)

- Defendant BetterHelp Inc.'s Second Set of Interrogatories to Plaintiff L.M., *In Re BetterHelp, Inc. Data Disclosure Cases*, Case No. 3:23-cv-01033-RS, (January 8, 2025)

- Defendant BetterHelp Inc.'s Second Set of Interrogatories to Plaintiff R.S., *In Re BetterHelp, Inc. Data Disclosure Cases*, Case No. 3:23-cv-01033-RS, (January 8, 2025)

- Defendant BetterHelp Inc.'s Second Set of Interrogatories to Plaintiff S.C., *In Re BetterHelp, Inc. Data Disclosure Cases*, Case No. 3:23-cv-01033-RS, (January 8, 2025)

- Defendant BetterHelp Inc.'s Second Set of Interrogatories to Plaintiff T.R., *In Re BetterHelp, Inc. Data Disclosure Cases*, Case No. 3:23-cv-01033-RS, (January 8, 2025)

- Defendant BetterHelp, Inc.'s First Set of Interrogatories to Plaintiff C.M., *In Re BetterHelp, Inc. Data Disclosure Cases*, Case No. 3:23-cv-01033-RS, (July 10, 2024)

- Defendant BetterHelp, Inc.'s First Set of Interrogatories to Plaintiff Jane Doe I, *In Re BetterHelp, Inc. Data Disclosure Cases*, Case No. 3:23-cv-01033-RS, (July 10, 2024)

- Defendant BetterHelp, Inc.'s First Set of Interrogatories to Plaintiff Jane Doe III, *In Re BetterHelp, Inc. Data Disclosure Cases*, Case No. 3:23-cv-01033-RS, (July 10, 2024)

- Defendant BetterHelp, Inc.'s Second Set of Interrogatories to Plaintiff C.M., *In Re BetterHelp, Inc. Data Disclosure Cases*, Case No. 3:23-cv-01033-RS, (January 8, 2024)

- Defendant BetterHelp, Inc.'s Second Set of Interrogatories to Plaintiff Jane Doe I, *In Re BetterHelp, Inc. Data Disclosure Cases*, Case No. 3:23-cv-01033-RS, (January 8, 2025)

- Defendant BetterHelp, Inc.'s Second Set of Interrogatories to Plaintiff Jane Doe III, *In Re BetterHelp, Inc. Data Disclosure Cases*, Case No. 3:23-cv-01033-RS, (January 8, 2025)

- First Amended Consolidated Class Action Complaint, *In Re BetterHelp, Inc. Data Disclosure Cases*, Master File No. 3:23-cv-01033-RS, (August 5, 2024)

- Plaintiff C.M.'s Responses to Defendant BetterHelp Inc.'s First Set of Interrogatories, *In Re BetterHelp, Inc. Data Disclosure Cases*, Case No. 3:23-cv-01033-RS, (August 26, 2024)

- Plaintiff C.M.'s Supplemental Responses to Defendant BetterHelp Inc.'s First Set of Interrogatories, *In Re BetterHelp, Inc. Data Disclosure Cases*, Case No. 3:23-cv-01033-RS, (February 14, 2025)

- Plaintiff C.M.'s Responses to Defendant BetterHelp Inc.'s Second Set of Interrogatories, *In Re BetterHelp, Inc. Data Disclosure Cases*, Case No. 3:23-cv-01033-RS, (February 25, 2025)

- Plaintiff Jane Doe I's Responses to Defendant BetterHelp Inc.'s First Set of Interrogatories, *In Re BetterHelp, Inc. Data Disclosure Cases*, Case No. 3:23-cv-01033-RS, (August 26, 2024)

- Plaintiff Jane Doe I's Responses to Defendant BetterHelp Inc.'s Second Set of Interrogatories, *In Re BetterHelp, Inc. Data Disclosure Cases*, Case No. 3:23-cv-01033-RS, (February 25, 2025)

- Plaintiff Jane Doe I's Supplemental Responses to Defendant BetterHelp Inc.'s First Set of Interrogatories, *In Re BetterHelp, Inc. Data Disclosure Cases*, Case No. 3:23-cv-01033-RS, (February 14, 2025)

- Plaintiff Jane Doe III's Amended Supplemental Responses to Defendant BetterHelp Inc.'s First Set of Interrogatories, *In Re BetterHelp, Inc. Data Disclosure Cases*, Case No. 3:23-cv-01033-RS, (March 27, 2025)

- Defendant BetterHelp Inc.'s First Set of Interrogatories to Plaintiff L.M., *In Re BetterHelp, Inc. Data Disclosure Cases*, Case No. 3:23-cv-01033-RS, (July 10, 2025)

- Plaintiff Jane Doe III's Responses to Defendant BetterHelp Inc.'s First Set of Interrogatories, *In Re BetterHelp, Inc. Data Disclosure Cases*, Case No. 3:23-cv-01033-RS, (August 26, 2024)

- Plaintiff Jane Doe III's Responses to Defendant BetterHelp Inc.'s Second Set of Interrogatories, *In Re BetterHelp, Inc. Data Disclosure Cases*, Case No. 3:23-cv-01033-RS, (February 25, 2025)

- Plaintiff Jane Doe III's Supplemental Responses to Defendant BetterHelp Inc.'s First Set of Interrogatories, *In Re BetterHelp, Inc. Data Disclosure Cases*, Case No. 3:23-cv-01033-RS, (February 14, 2025)

- Plaintiff L.M.'s Responses to Defendant BetterHelp Inc.'s First Set of Interrogatories, *In Re BetterHelp, Inc. Data Disclosure Cases*, Case No. 3:23-cv-01033-RS, (August 26, 2024)

- Plaintiff L.M.'s Responses to Defendant BetterHelp Inc.'s Second Set of Interrogatories, *In Re BetterHelp, Inc. Data Disclosure Cases*, Case No. 3:23-cv-01033-RS, (February 25, 2025)

- Plaintiff L.M.'s Supplemental Responses to Defendant BetterHelp Inc.'s First Set of Interrogatories, *In Re BetterHelp, Inc. Data Disclosure Cases*, Case No. 3:23-cv-01033-RS, (February 14, 2025)

- Plaintiff R.S.'s Responses to Defendant BetterHelp Inc.'s First Set of Interrogatories, *In Re BetterHelp, Inc. Data Disclosure Cases*, Case No. 3:23-cv-01033-RS, (August 26, 2024)

- Plaintiff R.S.'s Responses to Defendant BetterHelp Inc.'s Second Set of Interrogatories, *In Re BetterHelp, Inc. Data Disclosure Cases*, Case No. 3:23-cv-01033-RS, (February 25, 2025)

- Plaintiff R.S.'s Supplemental Responses to Defendant BetterHelp Inc.'s First Set of Interrogatories, *In Re BetterHelp, Inc. Data Disclosure Cases*, Case No. 3:23-cv-01033-RS, (February 14, 2025)

- Plaintiff S.C.'s Responses to Defendant BetterHelp Inc.'s First Set of Interrogatories, *In Re BetterHelp, Inc. Data Disclosure Cases*, Case No. 3:23-cv-01033-RS, (August 26, 2024)

- Plaintiff S.C.'s Responses to Defendant BetterHelp Inc.'s Second Set of Interrogatories, *In Re BetterHelp, Inc. Data Disclosure Cases*, Case No. 3:23-cv-01033-RS, (February 25, 2025)

- Plaintiff S.C.'s Supplemental Responses to Defendant BetterHelp Inc.'s First Set of Interrogatories, *In Re BetterHelp, Inc. Data Disclosure Cases*, Case No. 3:23-cv-01033-RS, (February 14, 2025)

- Plaintiff T.R.'s Responses to Defendant BetterHelp Inc.'s First Set of Interrogatories, *In Re BetterHelp, Inc. Data Disclosure Cases*, Master File No. 3:23-cv-01033-RS, (August 26, 2024)

- Plaintiff T.R.'s Responses to Defendant BetterHelp Inc.'s Second Set of Interrogatories, *In Re BetterHelp, Inc. Data Disclosure Cases*, Case No. 3:23-cv-01033-RS, (February 25, 2025)

- Plaintiff T.R.'s Supplemental Responses to Defendant BetterHelp Inc.'s First Set of Interrogatories, *In Re BetterHelp, Inc. Data Disclosure Cases*, Case No. 3:23-cv-01033-RS, (February 14, 2025)

- Plaintiffs' Notice of Motion and Memorandum of Points and Authorities in Support of Their Motion for Class Certification, *In Re BetterHelp, Inc. Data Disclosure Cases*, Master File No. 3:23-cv-01033-RS, (May 8, 2025)

- Declaration of Christina Tusan in Support of Plaintiffs' Administrative Motion to Seal and Motion for Class Certification, *In Re BetterHelp, Inc. Data Disclosure Cases*, Master File No. 3:23-cv-01033-RS, (May 8, 2025)

- Declaration of Alan M. Mansfield in Support of Plaintiffs' Motion for Class Certification, *In Re BetterHelp, Inc. Data Disclosure Cases*, Master File No. 3:23-cv-01033-RS, (May 8, 2025)

- Declaration of Gary M. Klinger in Support of Plaintiffs' Motion for Class Certification, *In Re BetterHelp, Inc. Data Disclosure Cases*, Master File No. 3:23-cv-01033-RS, (May 8, 2025)

- Declaration of Maureen M. Brady in Support of Plaintiffs' Motion for Class Certification, *In Re BetterHelp, Inc. Data Disclosure Cases*, Master File No. 3:23-cv-01033-RS, (May 8, 2025)

- Declaration of Jane Doe One in Support of Plaintiffs' Motion for Class Certification, *In Re BetterHelp, Inc. Data Disclosure Cases*, Master File No. 3:23-cv-01033-RS, (May 8, 2025)

- Declaration of Jane Doe Three in Support of Plaintiffs' Motion for Class Certification, *In Re BetterHelp, Inc. Data Disclosure Cases*, Master File No. 3:23-cv-01033-RS, (May 8, 2025)

- Declaration of L.M. in Support of Plaintiffs' Motion for Class Certification, *In Re BetterHelp, Inc. Data Disclosure Cases*, Master File No. 3:23-cv-01033-RS, (May 8, 2025)

- Declaration of T.R. in Support of Plaintiffs' Motion for Class Certification, *In Re BetterHelp, Inc. Data Disclosure Cases*, Master File No. 3:23-cv-01033-RS, (May 8, 2025)

- Declaration of S.C. in Support of Plaintiffs' Motion for Class Certification, *In Re BetterHelp, Inc. Data Disclosure Cases*, Master File No. 3:23-cv-01033-RS, (May 8, 2025

**SEC Filings**

- Teladoc Health, Inc., SEC Form 10-K for Period Ended December 31, 2022, filed on March 1, 2023

- Teladoc Health Inc., 2024 Annual Report, filed on February 27, 2025, available at https://s21.q4cdn.com/672268105/files/doc_financials/2024/ar/2024-Annual-Report.pdf

**Websites**

- "*NEWS* Get Online Counseling with BetterHelp," *YouTube*, https://www.youtube.com/watch?v=F1zoE0QGfQA

- "About DuckDuckGo," *DuckDuckGo*, https://duckduckgo.com/about

- About Us," *DeleteMe*, https://joindeleteme.com/about-us

- "Abine," *Abine*, https://abine.com/

- "Abine," *Crunchbase*, https://www.crunchbase.com/organization/abine#faq

- "Consumer Psychology Survey Key Takeaways," *Iterable*, https://iterable.com/blog/6-insights-from-iterables-2021-consumer-psychology-poll/

- David Pierce, "DuckDuckGo's Privacy-Focused Browser Is Available for Windows Now," *The Verge*, June 22, 2023, https://www.theverge.com/2023/6/22/23769084/duckduckgo-browser-windows-download

- "DeleteMe," *DeleteMe*, https://joindeleteme.com/

- Desire Athrow, "DuckDuckGo Private Browser Review," *Tech Radar*, July 13,2023, https://www.techradar.com/pro/duckduckgo-private-browser

- "DuckDuckGo," *DuckDuckGo*, https://duckduckgo.com/

- Frequently Asked Questions," *BetterHelp*, https://www.betterhelp.com/faq/

- "Frequently Asked Questions," *Nielsen*, https://computermobilepanel.nielsen.com/ui/US/en/faqen.html

- "From A to Gen Z: How and Where Young Consumers are Shopping," *Tinuiti*, https://reports.tinuiti.com/from-a-to-gen-z/?utm_source=accountengagement&utm_medium=email&utm_campaign=G-23-08-24-ALL-From-A-to-Gen-Z-CPG&utm_term=guide_confirmation&utm_content=heroCTA

- "Help Us Match You to the Right Online Therapist," *BetterHelp [Archived]*, https://web.archive.org/web/20200121043946/https://www.betterhelp.com/start/

- "Nielsen Computer & Mobile Panel, *Nielsen*, https://computermobilepanel.nielsen.com/ui/US/en/sdp/landing

- "Nielsen Panel Privacy Notice (U.S. Panel Members), *Nielsen*, https://www.nielsen.com/legal/us-digital-panel-privacy-notice/

- "Nielson Panels & Surveys," *Nielsen*, https://panels.nielsen.com/panels-and-surveys/

- "Off-Facebook Activity," *Facebook*, www.facebook.com/off-facebook-activity

- "Personal Information Removals Made Easy," *Incogni*, https://incogni.com/pricing

- "Pricing," *PrivacyBee*, https://privacybee.com/pricing/

- "Privacy Bee," *Privacy Bee*, https://privacybee.com/

- "Privacy Policy," *SavvyShares [Archived]*, https://web.archive.org/web/20210802092056/https://www.savvyshares.com/privacy-policy/

- "Privacy Policy," *SurveySavvy*, https://surveysavvy.com/privacy-policy/

- "Robert D. Buzzell MSI Best Paper Award," *MSI*, https://www.msi.org/research/robert-d-buzzell-msi-best-paper-award/

- Sarah Lee, "Data Aggregation Strategies," *NumberAnalytics*, June 11, 2025, https://www.numberanalytics.com/blog/data-aggregation-strategies

- "Save More With Our Best Value Plans and Most Popular DeleteMe Plans," *DeleteMe*, https://joindeleteme.com/start

- "SavvyConnect Monthly Participation Requirements," *SurveySavvy*, https://surveysavvy.com/savvyconnect-requirements

- "Services Pricing," *deleteme*, https://www.deleteme.com/pricing-update/

- "Share of Consumers Who Liked Personalized Ads in the United States as of March 2022, by Generation," *Statista*, https://www.statista.com/statistics/796167/us-internet-users-primary-attitude-personalized-video-ads/

- "SurveySavvy – Get $20 Per Month for Online Behavioral Market Research," *Maximizing Money*, November 13, 2018, https://www.maximizingmoney.com/referral-programs/surveysavvy/

- "SurveySavvy: $15+ Monthly (Data tracking MobileApp:Phone, Tablet, Computer),"*YouTube*, https://www.youtube.com/watch?app=desktop&v=IzSy_jUNrOI

- Thorin Klosowki, "Simple Online Security: Search for Information Online as Privately as Possible," *The New York Times Wirecutter*, November 2, 2022, https://www.nytimes.com/wirecutter/guides/simple-online-security-searching-online-privately

- "Virtual Private Network (VPN) usage in the United States in 2023," *Statista*, https://www.statista.com/statistics/1342696/vpn-usage-united-states

- "What Is A VPN? How It Works, Types, and Benefits," *Kaspersky*, https://www.kaspersky.com/resource-center/definitions/what-is-a-vpn

- "What is a VPN?", *Microsoft*, https://azure.microsoft.com/en-us/resources/cloud-computing-dictionary/what-is-vpn

- "What is Tor Relay?" *Electronic Frontier Foundation*, https://www.eff.org/pages/what-tor-relay
- "Who We Are," *deleteme,* https://www.deleteme.com/who-we-are/

**Note: In addition to the documents on this list, I considered all documents cited in my report to form my opinions.**