Gary M. Klinger (*pro hac vice*)
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**
227 W. Monroe Street, Suite 2100
Chicago, Illinois 60606
Telephone: (866) 252-0878
Email: gklinger@milberg.com

*Plaintiffs' Co-Lead Interim Class Counsel*

Christina Tusan (SBN 192203)
**TUSAN LAW, PC**
680 E. Colorado Blvd. #180
Pasadena, CA 91101
Telephone: (626) 418-8203
Facsimile: (626) 619-8253
Email: ctusan@ctusanlaw.com

*Plaintiffs' Co-Lead Interim Class Counsel*

Maureen M. Brady (*pro hac vice*)
**McSHANE AND BRADY LLC**
1656 Washington Suite 140
Kansas City, MO 64108
Telephone: (816) 888-8010
Email: mbrady@mcshanebradylaw.com

*Plaintiffs' Co-Lead Interim Class Counsel*

Alan M. Mansfield (SBN 125998)
**WHATLEY KALLAS LLP**
1 Sansome Street, 35th Floor, PMB #131
San Francisco, CA 94104 /
16870 West Bernardo Drive, Suite 400
San Diego, CA 92127
Telephone: (619) 308-5034
Facsimile: (888) 341-5048
Email: amansfield@whatleykallas.com

*Plaintiffs' Liaison Counsel*

**UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

IN RE BETTERHELP, INC. DATA DISCLOSURE CASES

This Document Relates To: All Actions

Case No. 3:23-cv-01033-RS

**PLAINTIFFS' OPPOSITION TO BETTERHELP, INC.'S MOTION TO EXCLUDE TESTIMONY OF ERIC KRAUSE**

Date: November 21, 2025
Time: 9:30 a.m.
Courtroom: 3 - 17th Floor
Judge: Hon. Richard Seeborg

## TABLE OF CONTENTS


TABLE OF AUTHORITIES

I. INTRODUCTION ..... 1

II. BACKGROUND ..... 2

- A. Mr. Krause Is Well Qualified ..... 2
- B. Mr. Krause Formed His Damages Valuation Based Upon Sound Methodology and Professional Experience ..... 2

III. LEGAL STANDARD ..... 4

IV. KRAUSE'S EXPERT OPINIONS ARE RELIABLE, RELEVANT, AND WILL AID THE FINDER OF FACT ON THE ISSUE OF CLASS MEMBERS DAMAGES ..... 5

- A. Krause Analyzes a Wide Array of Users' PII, Not Just Email Addresses, That BetterHelp Improperly Disclosed to Others to Form His Expert Opinions ..... 5
- B. BetterHelp's Argument About the Absence of a Liquid Market Ignores Established Economic Theory ..... 8
- C. Krause Relied on Appropriate Data Points for His Analysis ..... 10
- D. Krause's Sound Methodology and Extensive Valuation Experience Helped Form His Opinions and Damages Calculation ..... 12
- E. Krause's Prior Opinions and Valuations show He Utilizes a Consistent and Reliable Approach in Privacy Cases ..... 13

V. CONCLUSION ..... 14

## TABLE OF AUTHORITIES

**Cases**


*Aberin v. Am. Honda Motor Co., Inc.*, 2021 WL 1320773 (N.D. Cal. Mar. 23, 2021) ..... 5

*Acree v. Gen. Motors Acceptance Corp.*, 92 Cal. App. 4th 385 (2001) ..... 2

*Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960 (9th Cir. 2013) ..... 4, 10

*Arrow Elecs., Inc. v. Quantum Corp.*, 2024 WL 5440992 (N.D. Cal. Dec. 27, 2024) ..... 13

*Bally v. State Farm Life Ins. Co.*, 335 F.R.D. 288 (N.D. Cal. 2020) ..... 5

*Bautista v. Valero Mktg. & Supply Co.*, 2018 WL 7142094 (N.D. Cal. Dec. 4, 2018) ..... 4

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) ..... 4, 11, 13

*Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017 (9th Cir. 2022) ..... 4

*Hsingching Hsu v. Puma Biotechnology, Inc.*, 2018 WL 3078589 (C.D. Cal. June 20, 2018) ..... 7

*In re Dealer Mgmt. Sys. Antitrust Litig.*, 581 F. Supp. 3d 1029 (N.D. Ill. 2022) ..... 13

*In re High-Tech Emp. Antitrust Litig.*, 2014 WL 1351040 (N.D. Cal. Apr. 4, 2014) ..... 4

*In re Juul Labs, Inc. Mktg., Sales Pracs. & Prods. Liab. Litig.*, 2022 WL 1814440 (N.D. Cal. June 2, 2022) ..... 13

*In re Optical Disk Drive Antitrust Litig.*, 2017 WL 11513318 (N.D. Cal. Dec. 18, 2017) ..... 10

*In re Xyrem (Sodium Oxybate) Antitrust Litig.*, 2023 WL 3440399 (N.D. Cal. May 12, 2023) ..... 4

*In re Zurn Pex Plumbing Prods. Liab. Litig.*, 644 F.3d 604 (8th Cir. 2011) ..... 5

*JH Kelly, LLC v. AECOM Tech. Servs., Inc.*, 605 F. Supp. 3d 1295 (N.D. Cal. 2022) ..... 10

*Kamradt v. Esurance Ins. Co.*, 2024 WL 5356886 (W.D. Wash. Nov. 1, 2024) ..... 7

*Lytle v. Nutramax Lab'ys, Inc.*,
114 F.4th 1011, 1030 (9th Cir. 2024)
*cert. denied*, 2025 WL 663695 (U.S. Mar. 3, 2025) .......... 5, 10

*Nat'l Fire Prot. Ass'n, Inc. v. UpCodes, Inc.*,
2023 WL 6194385 (C.D. Cal. Sept. 7, 2023).......... 13

*Primano v. Cook*,
598 F.3d 558 (9th. Cir. 2010),
*as amended* (Apr. 27, 2010).......... 4

*Putnam v. Henkel Consumer Adhesives, Inc.*,
2007 WL 4794115 (N.D. Ga. Oct. 29, 2007).......... 9

*Rodriguez v. Google LLC*,
2024 WL 38302 (N.D. Cal. Jan. 3, 2024) .......... 11, 13

*Sali v. Corona Reg'l Med. Ctr.*,
909 F.3d 996 (9th Cir. 2018).......... 5, 10

*Savidge v. Pharm-Save, Inc.*,
2023 WL 2755305, at *19 (W.D. Ky. Mar. 31, 2023).......... 8, 12, 13

*United States v. Holguin*,
51 F.4th 841 (9th Cir. 2022).......... 13

*United States v. Sandoval-Mendoza*,
472 F.3d 645 (9th Cir. 2006).......... 4

*USI Ins. Servs. LLC v. Alliant Ins. Servs. Inc.*,
2025 WL 1794356 (D. Ariz. June 30, 2025).......... 8

*Vizcarra v. Michaels Stores, Inc.*,
2025 WL 1561530 (N.D. Cal. June 2, 2025) .......... 4

*Wells Fargo Bank, N.A. v. LaSalle Bank Nat. Ass'n*,
2011 WL 743929 (D. Nev. Feb. 23, 2011).......... 13

*York v. BNSF Ry. Co.*,
2019 WL 764574 (D. Colo. Feb. 21, 2019) .......... 13

**Other Authorities**

Bart J. Bronnenberg et al.,
*Marketing Investment and Intangible Brand Capital*, 36 J. Econ. Persp. 53 (2022).......... 8

Carol Carrado et al.,
*Intangible Capital and Modern Economies*, 36 J. Econ. Persp. 3 (2022).......... 8

Federal Judicial Center, National Research Council of the National Academies (2011),
*Reference Manual on Scientific Evidence*,
Washington, D.C.: The National Academic Press .......... 10

Nicolas Crouzet et al.,
*The Economics of Intangible Capital*, 36 J. Econ. Persp. 29 (2022) .......... 8

**Rules**

Fed. R. Evid. 702 .......... 4

## I. INTRODUCTION

Plaintiffs' damages expert, Eric R. Krause ("Krause"), has 30 years of experience in asset valuation in a variety of contexts, including intangible assets such as personal data. Dkt. 170-11, Ex. A ("Krause Rpt.") ¶¶ 2-5, Appx. B. As in other pixel-tracking cases where Krause has offered damages opinions—none of which have been excluded—Krause applied his expertise to calculate damages for BetterHelp's improper sharing of sensitive personal identifying information ("PII") and personal health information ("PHI") with third parties via tracking technologies on its website during the Class Period. *Id.* ¶ 73-74. Krause's conclusion that a conversative estimate of damages is $200 per Class Member is both relevant and reliable and will aid the jury in determining Plaintiffs' and Class Members'[1] damages from having their personal information shared without their consent.

BetterHelp now moves to exclude his testimony (Dkt. 204), but each of its five arguments for exclusion fall flat. First, BetterHelp claims that Krause based his opinion on the disclosure of information that is not at issue in this case. Krause's report and testimony, however, are consistent with the analysis of Plaintiffs' technical expert, Professor Zubair Shafiq, and Plaintiffs' theory that BetterHelp disclosed a core set of information that allows third parties like Meta and Google to learn that a specific user sought help for their mental health on BetterHelp's website. Second, BetterHelp insists that Krause's opinion is unreliable because there is no market for selling the type of information at issue in this case. This argument ignores established economic theory and practice that allow economists to value intangible assets without liquid markets and should be rejected. Third, BetterHelp quibbles with the services and studies Krause considered to arrive at his damages estimate, but Krause explains that while imperfect, these sources of information are sufficiently analogous and shed light on how consumers and businesses value personal and health information.

BetterHelp's fourth argument that Krause does not apply a methodology ignores that he outlines his methodology in his report and that his opinions are also derived from his experience and specialized knowledge in valuing intangible assets. Finally, BetterHelp takes issue with the fact that Krause's valuation is consistent with the conclusions he reached in other cases involving sensitive health and

---

[1] Plaintiffs herein use the term "Class Member" throughout this memorandum of law as defined in Plaintiffs' Motion for Class Certification, Dkt. 170.

medical information. Yet his opinions have not been excluded in any of those cases and this fact only confirms that he applies a consistent and reliable methodology when calculating damages.

Krause's damages opinions satisfy *Daubert* and Rule 702 and BetterHelp's motion to exclude them should be denied.

## II. BACKGROUND

### A. Mr. Krause Is Well Qualified

Mr. Krause is a Director at Applied Economics Consulting Group, Inc., a role held since 2008. Dkt. 169-6 ("Krause Rpt.") ¶ 2, Appx. A. He holds a B.A. in economics and an M.B.A. from the University of Texas at Austin. *Id.* Mr. Krause has worked for almost 30 years in consulting. *Id.* During that time, Krause has not favored one "side of the v" over another—he has regularly consulted for both defendants and plaintiffs. *Id.* Unlike the expert BetterHelp hired to try and poke holes in Krause's report (Ms. Mizik), Krause has extensive experience, training, and publications on the critical issue here: valuing intangible assets (*e.g.*, trade secrets, intellectual property, and personal medical information). *Id.* at Appx. B; *see also* Declaration of Christina Tusan in Support of Plaintiffs' Opposition to Motion to Exclude Testimony of Eric Krause, Exhibit 1 ("Krause Tr.") 20:3-23. Prior to this case, Krause provided expert opinions in at least seven different cases where individuals' personal identifying and health information was improperly disclosed to third parties. *Id.* at Appx. B; Krause Tr. 23:12-18. Mr. Krause's damages opinions in these cases have not been excluded. Krause Tr. 45:17-25, 46:1-12.

### B. Mr. Krause Formed His Damages Valuation Based Upon Sound Methodology and Professional Experience

Mr. Krause applied sound methodology and professional experience in economic valuations to determine a "conservative" class-wide damages calculation of $200 per class member. Krause Rpt. ¶ 73. Because Plaintiffs now propose to certify only four claims—including three that provide for statutory damages—Krause's damages opinions are relevant only to the claim for common law invasion of privacy under California law, which does not demand that damages be determined with mathematical precision. Instead, the law asks Plaintiffs to offer only a "reasonable approximation" of damages, based on "some reasonable basis of computation." *Acree v. Gen. Motors Acceptance Corp.*, 92 Cal. App. 4th 385, 398

(2001). Mr. Krause's opinions satisfy this standard, as well as Rule 702 and *Daubert*.

To arrive at his conclusion, Mr. Krause identified the types of PII and PHI collected and improperly transmitted by BetterHelp to third parties like Google and Meta based on the analysis of Plaintiffs' other expert, Professor Shafiq, including: [redacted] Krause Rpt. ¶ 20.

Krause explains there are three different commonly accepted and recognized types of valuation techniques for valuing a tangible or an intangible asset: 1) the Income Approach; 2) the Market Approach; and 3) the Cost Approach. Krause Rpt. ¶ 33; Krause Tr. 21:2-11. Because of the sensitive nature and intangible quality of PII and PHI, Krause ultimately used the Market Approach as the basis for his opinions. Krause Tr. 21:18-23, 57: 2-20; *see also* Krause Rpt. ¶¶ 41-68. More specifically, Krause opines that to provide a fair market value of the PII and PHI that was disclosed, he must consider different perspectives, including: 1) the amount one would accept to relinquish the data; 2) the amount one would spend to protect the data; 3) the potential harm from data exposure; and 4) the benefit a data holder could gain from acquiring data. *Id.* These different approaches and perspectives allow Mr. Krause to review and consider a set of data points and comparable market data for the reasonable estimation of value of PII and PHI, such as patient status. *Id.*

Krause opines that "personal information has private value beyond its use as a bare commodity," and that "the value of personal information is thus inherently related to the value of privacy." Krause Rpt. ¶ 43. Using the two primary perspectives of a user's "willingness to pay" ("WTP") money to protect their personal information in contrast with a user's "willingness to accept" ("WTA") money to sell their personal information, Krause uses empirical evidence from several scientific studies relevant to the types of PHI and PII identified by Professor Shafiq to calculate his damages figure of $200 per Class Member. Krause Tr. 143:10-25, 144:1-10, 145:1-4; *see also* Krause Rpt. ¶¶ 45-46, 65-68. These studies find that

"consumers demand a higher WTA price for health-related data due the risk of misuse, especially in comparison to non-personal information such as consumer behavior." *Id.* ¶ 54. Krause concludes that the $200 per user figure is a "conservative baseline fair market value," and in reaching his opinion, he considered "the richness" of the PHI; more specifically, Krause opines that the calculation "uses a conservative estimate of the value of the personal information and the patient status" misappropriated by BetterHelp. Krause Tr. 142:1-17; Krause Rpt. ¶ 73.

## III. LEGAL STANDARD

An expert witness must be "qualified . . . by knowledge, skill, experience, training, or education[.]" Fed. R. Evid. 702. Testimony is admissible if it "will help the trier of fact to understand the evidence or to determine a fact in issue," "is based upon sufficient facts or data," and is sufficiently reliable. *Id.*; *see Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). Expert opinion testimony "is reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline." *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013).

"[R]ejection of expert testimony is the exception rather than the rule." Fed. R. Evid. 702 advisory committee's note (2000). "Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded." *In re High-Tech Emp. Antitrust Litig.*, 2014 WL 1351040, at *22 (N.D. Cal. Apr. 4, 2014) (citation omitted). "*Daubert* makes the district court a gatekeeper, not a fact finder." *United States v. Sandoval-Mendoza*, 472 F.3d 645, 654 (9th Cir. 2006). "Courts reviewing Daubert motions focus on the principles and methodology employed by the expert, not the conclusions the expert ultimately reaches." *In re Xyrem (Sodium Oxybate) Antitrust Litig.*, 2023 WL 3440399, at *3 (N.D. Cal. May 12, 2023) (citations omitted).

"An expert's specialized knowledge and experience can serve as the requisite 'facts or data' on which they render an opinion." *Vizcarra v. Michaels Stores, Inc.*, 2025 WL 1561530, at *1 (N.D. Cal. June 2, 2025) (quoting *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1024 (9th Cir. 2022)). Neither the opposing party's nor even the Court's disagreement with the expert's conclusion is a basis for exclusion; the focus "must remain on the principles and methodology at issue, not the expert's conclusion." *Bautista v. Valero Mktg. & Supply Co.*, 2018 WL 7142094, at *1 (N.D. Cal. Dec. 4, 2018) (Seeborg, J.). "Shaky

but admissible evidence is to be attacked by cross-examination, contrary evidence, and attention to the burden of proof, not exclusion." *Primano v. Cook*, 598 F.3d 558, 564 (9th. Cir. 2010), *as amended* (Apr. 27, 2010).

With respect to *Daubert* motions at the class certification stage, the Ninth Circuit has held that although the *Daubert* standard of admissibility applies, "an inquiry into the evidence's ultimate admissibility should go to the weight that evidence is given[.]" *Sali v. Corona Reg'l Med. Ctr.*, 909 F.3d 996, 1006 (9th Cir. 2018). Accordingly, the Ninth Circuit "license[s] greater evidentiary freedom at the class certification stage." *Id.* This is because, "[t]he main purpose of *Daubert* exclusion is to protect juries from being swayed by dubious scientific testimony. That interest is not implicated at the class certification stage where the judge is the decision maker." *In re Zurn Pex Plumbing Prods. Liab. Litig.*, 644 F.3d 604, 613 (8th Cir. 2011); *see also Lytle v. Nutramax Lab'ys, Inc.*, 114 F.4th 1011, 1030 (9th Cir. 2024), *cert. denied*, 2025 WL 663695 (U.S. Mar. 3, 2025) (noting the Ninth Circuit has cited *Zurn* with approval and holding the district court did not err in conducting a "limited" *Daubert* analysis). As a result, "a *Daubert* analysis alone, while relevant, should not prevent a court from considering expert testimony at [this] stage." *Bally v. State Farm Life Ins. Co.*, 335 F.R.D. 288, 297 (N.D. Cal. 2020) (denying motion to strike); *see Aberin v. Am. Honda Motor Co., Inc.*, 2021 WL 1320773, at *4 (N.D. Cal. Mar. 23, 2021) (similar).

## IV. KRAUSE'S EXPERT OPINIONS ARE RELIABLE, RELEVANT, AND WILL AID THE FINDER OF FACT ON THE ISSUE OF CLASS MEMBERS' DAMAGES

### A. Krause Analyzes a Wide Array of Users' PII, Not Just Email Addresses, That BetterHelp Improperly Disclosed to Others to Form His Expert Opinions

BetterHelp leads with the argument that Krause's opinions are unreliable because he supposedly "valued information different from, and much more expansive than, what [plaintiff's expert] Shafiq opined . . . was disclosed." Mot. at 6. Specifically, BetterHelp claims Krause erroneously assumed that (i) BetterHelp *always* shared Class Members' emails during the Class Period, and (ii) a user's "account identifier" includes substantive information it does not actually include. *Id.* at 7. This argument is not supported by Krause's report or deposition testimony.

BetterHelp's argument about email addresses hinges on Paragraph 65 of Krause's report, which states, in full:

[redacted]

According to BetterHelp, this statement means that Krause assumed email addresses were always shared, but that is not a reasonable reading of Krause's report. Krause states BetterHelp shared both personal information and personally identifiable information, and that this information included personally identifiable information "*such as*" e-mail addresses. *Id.* (emphasis added). BetterHelp's interpretation of the qualifier "such as" as meaning that everything listed was always shared is contrary to the ordinary understanding of those words. Even if BetterHelp were somehow confused about what Krause meant, it need only refer to Krause's footnote 130 citing paragraph 13 of Professor Shafiq's initial report, which BetterHelp acknowledges does not state that emails were always shared over the Class Period. Mot. at 6.

BetterHelp's suggestion that Krause misunderstood what account identifiers are, based on selective excerpts from his deposition testimony, is also wrong. Professor Shafiq explains in his initial report that an account identifier is essentially a number unique to a particular user and akin to a driver's license number. Shafiq Rpt. ¶ 29; *id.* ¶ 36d (explaining that a Facebook account identifier is a unique number linked to a Facebook user's profile page). Significantly, BetterHelp does not and cannot criticize Krause's report on this issue, which in Paragraph 65 accurately—citing to Professor Shafiq's report—describes account identifiers as a type of personally identifiable information similar to a device identifier, IP address, or email address. Thus, BetterHelp does not actually claim that Krause's opinion in his report was based on an erroneous factual assumption about the nature of account identifiers.

[2] Krause's report contains footnote #130 here which states: "*See* Dkt. 169-5 Expert Report of Dr. Zubair Shafiq ("Shafiq Rpt."), ¶ 13, Opinion #1."

Rather, BetterHelp argues Krause erroneously defined account identifiers during his deposition. He did not. During the deposition, BetterHelp asked Krause a few different questions about account identifiers. BetterHelp's argument on this point misleadingly pieces together snippets from those exchanges and fails to mention that some of the testimony BetterHelp emphasizes in its brief was responding to a question asking about "account information" not "account identifiers":

[redacted]

Krause. Tr. 62:19-63:1, 63:17-64:12.

The full context of this exchange reveals that Krause correctly testified [redacted] *Id.* Krause also made clear that [redacted] *Id.* An expert "deposition is not a memory test," so even if there is any ambiguity in Krause's testimony—and there is none when his deposition testimony is viewed together—it is not grounds for exclusion. *Hsingching Hsu v. Puma Biotechnology, Inc.*, 2018 WL 3078589, at *9 (C.D. Cal. June 20, 2018); *see also Kamradt v. Esurance Ins. Co.*, 2024 WL 5356886, at *5 (W.D. Wash. Nov. 1, 2024) (similar).

In insisting that Krause made a mistake, BetterHelp ignores those correct definitions and citation to the portions of Shafiq's report, instead emphasizing out of context statements from Krause's deposition. Specifically, [redacted] BetterHelp's attempt to infer an incorrect understanding of account identifiers is strained and should be rejected.

BetterHelp's other snippets of testimony are even less supportive of its argument because they were answers to questions that did not ask about the definition of account identifiers. Rather, Krause's statement that "account identifiers" is a summary term describing "types of information associated with" accounts is correct—[redacted] Krause Tr. 63:17-64:12. BetterHelp's reliance on the phrases "all the information that [a user] set[s] up when they do the questionnaire," and "various profile information that gets associated with the account" leaves out that [redacted]

**B. BetterHelp's argument about the absence of a liquid market ignores established economic theory**

BetterHelp next argues Krause's opinion should be excluded because there is no thriving liquid market where individuals can easily go to sell the type of information that BetterHelp helped share without consent. Mot. at 7. This argument disregards threshold economic concepts about the kinds of intangible assets at issue in this case. A significant sub-group of economists focus on theory and practice surrounding the value of intangible assets without liquid markets. *See, e.g.*¸ Carol Carrado et al., *Intangible Capital and Modern Economies*, 36 J. Econ. Persp. 3 (2022); Nicolas Crouzet et al., *The Economics of Intangible Capital*, 36 J. Econ. Persp. 29 (2022); Bart J. Bronnenberg et al., *Marketing*

*Investment and Intangible Brand Capital*, 36 J. Econ. Persp. 53 (2022). That field exists because such assets—including good will, patents, trade secrets, copyrights, and trademarks—have very real value that drive billion-dollar businesses. *See, e.g.*, *See Savidge v. Pharm-Save, Inc.*, 2023 WL 2755305, at *19 (W.D. Ky. Mar. 31, 2023) (applying market approach in data breach case); *USI Ins. Servs. LLC v. Alliant Ins. Servs. Inc.*, 2025 WL 1794356, at *3 (D. Ariz. June 30, 2025) (using market approach methodology to calculate value of business, including intangible assets); *Inline Connection Corp. v. AOL Time Warner Inc.*, 470 F. Supp. 2d 424, 432 (D. Del. 2007) (noting established methods for valuing intangible assets); *Putnam v. Henkel Consumer Adhesives, Inc.*, 2007 WL 4794115, at *4 (N.D. Ga. Oct. 29, 2007) (applying such methods to calculate royalty rate). Plaintiffs hired an expert in this sub-specialty: Mr. Krause. Krause Rpt. ¶ 4; *id.* App'x A. By contrast, BetterHelp's expert has little to no expertise in this field and therefore lacks a basic understanding of the relevant theory. Dkt. 210-3, Mizik Rpt. ¶ 2, Appx. A; Declaration of Christina Tusan in Support of Plaintiffs' Opposition to Motion to Exclude Testimony of Eric Krause, Exhibit 2 ("Mizik Tr.") at 54:4-17; 61:16-20.

Mr. Krause's methodology *starts* from the premise that no established liquid market for the at-issue personal data exists because the value of the data derives in part from the value of privacy. Krause Rpt. ¶¶ 43-44. If such a market existed, neither side in this case would need an expert because anyone could search online for current pricing. Nevertheless, the relevant and accepted economic theory and methodology for valuing an intangible asset like the PII and PHI here is known as market valuation. Krause Rpt. ¶¶ 45–61; Krause Tr. 21: 2-17. Under this approach, the expert uses appraisal judgment to examine the nature of the asset and pulls data points from analogous contexts understood to be necessarily imperfect due to the absence of liquid market. *See* "Fair Value Measurement," International Financial Reporting Standard 13, ¶¶ 2-3, 16(b) ("A fair value measurement assumes that the transaction to sell the asset or transfer the liability takes place … in the absence of a principal market, the most advantageous market for the asset or liability. An entity need not undertake an exhaustive search of all possible markets to identify the most advantageous market, but it shall take into account all information that is reasonably available."); *see also* Krause Rpt. ¶¶ 45-46.

This analysis is necessarily done in a counterfactual "but-for" world that assumes the information is not being improperly disclosed at any point. Krause Tr. 57:16-23. This is in part because the current lack of a liquid market may well be the result of the challenged conduct: advertisers like Meta and Google currently do not have to deal directly with consumers because entities like BetterHelp share it without user consent. To determine damages from that improper sharing, it is necessary to analyze what the market would look like without such improper sharing. Krause Tr. 144:11-25, 145:1-4.

This is textbook economic theory about market damages widely accepted in a variety of litigation contexts. *E.g.*, Federal Judicial Center, National Research Council of the National Academies (2011), *Reference Manual on Scientific Evidence*, Washington, D.C.: The National Academic Press, p. 432 ("Damages measurement then determines the plaintiff 's hypothetical value in the but-for scenario."). Yet BetterHelp and its proffered expert Dr. Mizik are asking the Court to disregard established economic theory to exclude Krause.

**C. Krause relied on appropriate data points for his analysis**

BetterHelp next offers a series of arguments that the data points Krause relies upon are not close enough to the facts here. Mot. at 7-8. This quibbling fundamentally misunderstands *Daubert*, particularly at the class certification stage. *See Sali*, 909 F.3d at 1006; *Lytle*, 114 F.4th at 1031. Krause's report and deposition explain why he picked the data points he did from a variety of analogous personal data contexts, and he never claimed that any of the data points were perfect. Krause Rpt. ¶¶ 45-61; Krause Tr. 88:18-25. These data points include WTP data about the costs for data deletion services, the Li Study, research performed by Alessandro Acquisti, the Ponemon Institute Study, the Trustwave Study, and an Ernst & Young study for the WTA aspect of the defined market. Krause Tr. 91:24-25, 92:1-22.

Given the acknowledged absence of a current liquid market, Krause necessarily relied on "a significant amount of academic research into the value of personal information and data privacy." Krause Tr. 92:1-11. While BetterHelp is free to point out the ways each of these data points are not exactly like the facts here during cross-examination—and it spills much ink doing so in its brief—its arguments go to weight not admissibility. *See In re Optical Disk Drive Antitrust Litig.*, 2017 WL 11513318, at *2 (N.D. Cal. Dec. 18, 2017) (Seeborg, J.) ("Dr. Flamm's report explains the bases for

each of his analytical choices, and while open to attack on cross-examination, the report is not so fundamentally flawed as to render it unreliable."); *JH Kelly, LLC v. AECOM Tech. Servs., Inc.*, 605 F. Supp. 3d 1295, 1318 (N.D. Cal. 2022) (flawed assumptions or faulty conclusions "plainly bear on the weight of his testimony, not its admissibility"); *Alaska Rent-A-Car*, 738 F.3d at 969-70 (even "colorable" challenges to an expert's "assumptions and comparisons" only went to admissibility).

In any event, BetterHelp has not shown that the information and studies Krause considered are so flawed that his analysis is unreliable. *See Rodriguez v. Google LLC*, 2024 WL 38302, at *11-12 (N.D. Cal. Jan. 3, 2024) (Seeborg, J.) (denying *Daubert* challenge to expert who calculated actual damages based in part on willingness to pay studies).

**a. Data Deletion Services Shed Light on How Consumers Value Their Privacy**

BetterHelp says fees charged for getting rid of data are not the same thing as what a buyer would be willing to pay for the data in this case. True, but as Krause explained in his deposition, that does not make the data point wholly irrelevant because it remains a window into how consumers practically value their personal information. Krause Tr. 89:1-25, 90:1-3.

**b. The Li Study Provides Valid Data Points for Valuing Personal Information**

BetterHelp next takes aim at Krause's use of the Li Study, in which individuals assigned dollar values to the amount they would willingly accept to disclose their own categories of information. Krause Rpt. ¶¶ 49-52. Krause carefully notes that this study is informative though not a direct comparison to the at-issue PII and PHI disclosed in this case. Krause Tr. 105:2-21. BetterHelp suggests some figures in the study are perhaps more or less analogous than the one Krause discussed (Mot. at 9), but Krause explains why he selected the $189.40 figure from the study: it was a combined basis of the estimated worth of personal information across the four categories of personal information tested. Krause Rpt. ¶¶ 51-52. Again, BetterHelp can cross-examine Krause based on its belief that a different figure is more analogous, but those points are no basis for excluding Krause's opinion altogether.

**c. The 2017 Ponemon Institute Study Comports with the WTA Aspect of Krause's Analysis**

For similar reasons, BetterHelp's complaint that the 2017 Ponemon Institute Study Krause considered involved data breaches and was aimed at determining the cost organizations would pay to

resolve a data breach misses the mark. Krause Rpt. ¶¶ 52, 56. Krause explained this data point shows an implied value to remediate the improper disclosure of PII and PHI, or the WTA angle of his analysis. Krause Tr. 120:6-23, 121:9-24, 122:5-12. ("All of this is relevant. Again, it's not a direct analogy but it's relevant because it demonstrates that these companies were []willing to undertake these costs to remediate the breach.").

**d. The 2017 Trustwave Study is Relevant to the Value of Health Information**

Krause cited the Trustwave Study because it "provided a good data point for consideration on the value of data from a lot of different organizations." Krause Tr. 129:4-10. Applying the same rationale as the Ponemon Institute Study, Krause explained that the noted healthcare segment indicated that "health data carries a premium with it." Krause Tr. 130:12-14. Krause also acknowledged that the $225 and $1,546 figures included additional healthcare information beyond the data involved in this case, which is why his $200 value for the data in this case is "less than what these [studies] imply." Krause Tr. 130:24-25, 131:1-6. BetterHelp's arguments about why the study is too dissimilar again go to weight, not the admissibility of Krause's report.

**e. The 2019 Ernst & Young Study is Also Relevant to the Value of Healthcare Data**

BetterHelp also critiques Krause's consideration of a 2019 study Ernst & Young performed to better evaluate the value of healthcare data to certain companies. Krause testified he relied on market transaction data in the study observed through M&A activity. Krause Tr. 135:11-22. Specifically, Krause explained how he performed a calculation based on the data to arrive at a figure representing what enterprise value was placed on healthcare data. Krause Tr. 138:13-25. This is simply another relevant analogous data point in a case involving the value of health-related data.

**D. Krause's Sound Methodology and Extensive Valuation Experience Helped Form His Opinions and Damages Calculation**

BetterHelp contends that Krause "did not use any methodology" to reach his specific damages figure of $200. Mot. at 13. This is a recycled version of its first argument, and boils down to BetterHelp's

insistence that if there is no current liquid market and no easy formula to arrive at a value, there is no value at all. That argument is inconsistent with rudimentary economic theory and the law.

Krause explains in his report and deposition testimony the methodology he used to reach his opinions. Krause Rpt. ¶¶ 45-61; Krause Tr. at 56:11-25, 57:1-15; *see also supra* § II.A, II.B. As explained above, the market approach to valuing intangible assets lacking liquid markets requires appraisal judgment in selecting analogous data points and arriving at a reasoned valuation. *See Savidge*, 2023 WL 2755305, at *19 (rejecting *Daubert* challenge to plaintiff's expert damages expert who applied market approach in data breach case). The fact this valuation approach requires judgment and experience does not mean it lacks an accepted methodology. *See id.* (expert's analysis was properly based on his knowledge and experience); *In re Dealer Mgmt. Sys. Antitrust Litig.*, 581 F. Supp. 3d 1029, 1049 (N.D. Ill. 2022) (noting that aspects of *Daubert* concerning testability work well for sciences but not necessarily economics); *Nat'l Fire Prot. Ass'n, Inc. v. UpCodes, Inc*, 2023 WL 6194385, at *3 (C.D. Cal. Sept. 7, 2023) (an expert's experience "can support an adequate methodology") (citing *United States v. Holguin*, 51 F.4th 841, 855-56 (9th Cir. 2022)); *In re Juul Labs, Inc. Mktg., Sales Pracs. & Prods. Liab. Litig.*, 2022 WL 1814440, at *21 (N.D. Cal. June 2, 2022) (critiques of experts' analysis based on their experience should be addressed through cross examination); *Wells Fargo Bank, N.A. v. LaSalle Bank Nat. Ass'n*, 2011 WL 743929, at *3 (D. Nev. Feb. 23, 2011) (attacks on how an expert arrived at his conclusions went to weight).

BetterHelp's cited cases are inapposite. In one case, the expert failed to provide any basis for how he arrived at certain opinions, and the Court found the expert invaded the purview of the jury in offering a legal conclusion. *See Arrow Elecs., Inc. v. Quantum Corp.*, 2024 WL 5440992, at *3 (N.D. Cal. Dec. 27, 2024). Here, Krause explains how he arrives at his conclusions and offers no legal opinions. *See Savidge*, 2023 WL 2755305, at *19. The other cited case involved scientific and medical testimony where testability is more important under *Daubert*. *See York v. BNSF Ry. Co.*, 2019 WL 764574, at *7 (D. Colo. Feb. 21, 2019) (testimony regarding causation in cancer case).

### E. Krause's Prior Opinions and Valuations Show He Utilizes a Consistent and Reliable Approach in Privacy Cases

BetterHelp's brief closes by suggesting that it is somehow suspect that Krause arrived at similar dollar-value valuations for personal data in other, *similar* cases involving improper data sharing via pixel trackers. Mot. at 14-15. While BetterHelp insists that those cases are different because they involved hospital defendants and medical information, this case also involves a defendant "who allegedly disclosed . . . sensitive health information[.]" Mot. at 15. Its argument is thus counterintuitive: what would be odd is if Krause arrived at wildly different numbers about the value of improperly shared personal information in similar cases. *See Rodriguez*, 2024 WL 38302, at *12 ("Google argues that Lasinski's actual damages model should be excluded because it is 'cribbed' from another case. However, that by itself should not preclude Lasinski's actual damages model.").

BetterHelp also cross-examined Krause on this point during his deposition at length. Krause testified that he applied the same methodology to each pixel-tracking case. Krause Tr. 29:1-3, 34:24-25, 35:1-6, 90:21-25, 93:25, 94:1-10, 96:13-23. That does not mean he did not perform any new work specific to this case. Moreover, BetterHelp does not claim that the courts in those cases found any flaws in his methodology. *See generally*, Mot. at 14-15. As explained above, BetterHelp's attacks on that methodology lack merit.

## V. CONCLUSION

For the foregoing reasons, BetterHelp's Motion to Exclude the Testimony of Eric Krause should be denied in its entirety.

Dated: October 31, 2025

Respectfully submitted,

*/s/ Gary. M. Klinger*
Gary M. Klinger (*pro hac vice*)
William J. Edelman (SBN 285177)
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**
227 W. Monroe Street, Suite 2100
Chicago, Illinois 60606
Telephone: (866) 252-0878
Email: gklinger@milberg.com
Email: wedelman@milberg.com

*Plaintiffs' Co-Lead Interim Class Counsel*

*/s/ Christina Tusan*
Christina Tusan (SBN 192203)
**TUSAN LAW, PC**
680 E. Colorado Blvd. #180
Pasadena, CA 91101
Telephone: (626) 418-8203
Facsimile: (626) 619-8253
Email: ctusan@ctusanlaw.com

*Plaintiffs' Co-Lead Interim Class Counsel*

*/s/ Maureen M. Brady*
Maureen M. Brady (*pro hac vice*)
**McSHANE AND BRADY LLC**
1656 Washington Suite 140
Kansas City, MO 64108
Telephone: (816) 888-8010
Email: mbrady@mcshanebradylaw.com

*Plaintiffs' Co-Lead Interim Class Counsel*

*/s/ Alan M. Mansfield*
Alan M. Mansfield (SBN 125998)
**WHATLEY KALLAS LLP**
1 Sansome Street, 35th Floor, PMB #131
San Francisco, CA 94104 /
16870 West Bernardo Drive, Suite 400
San Diego, CA 92127
Telephone: (619) 308-5034
Facsimile: (888) 341-5048
Email: amansfield@whatleykallas.com

*Plaintiffs' Liaison Counsel*

*/s/ Dena C. Sharp*
Dena C. Sharp (SBN 245869)
Trevor T. Tan (SBN 281045)
Nina Gliozzo (SBN 333569)
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, CA 94108
Telephone: 415.981.4800
Email: dsharp@girardsharp.com
Email: ttan@girardsharp.com
Email: ngliozzo@girardsharp.com

*Plaintiffs' Trial Counsel*