LIVIA M. KISER (SBN 285411)
*lkiser@kslaw.com*
JEFFREY HAMMER (SBN 264232)
*jhammer@kslaw.com*
CRAIG H. BESSENGER (SBN 245787)
*cbessenger@kslaw.com*
JAMES A. UNGER (SBN 325115)
*junger@kslaw.com*
**KING & SPALDING LLP**
633 West Fifth Street, Suite 1600
Los Angeles, California 90071
Telephone: +1 213 443 4355
Facsimile: +1 213 443 4310

Attorneys for Defendant
BETTERHELP, INC.

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **IN RE BETTERHELP, INC. DATA DISCLOSURE CASES**<br><br>This Document Relates To:<br><br>All Cases/ | Case No. 3:23-cv-01033-RS<br><br>**REPLY IN SUPPORT OF BETTERHELP, INC.'S MOTION TO EXCLUDE TESTIMONY OF ERIC KRAUSE**<br><br>Date: January 29, 2026<br>Time: 1:30 p.m.<br>Courtroom: 4<br>Judge: Hon. Richard Seeborg |

# TABLE OF CONTENTS

I. INTRODUCTION ..... 1

II. KRAUSE'S OPINION IS UNRELIABLE AND SHOULD BE EXCLUDED..... 2

A. Krause Valued Information that Is Not at Issue..... 2

B. There Can Be No Fair Market Valuation Without a Market ..... 5

C. Krause's "Data Points" Are Not Reliable ..... 7

D. Krause Did Not Use Any Methodology to Arrive at His Opinion..... 9

E. Krause's Identical Valuations in Different Cases Involving Different Categories of Information Confirm His Opinion Must Be Excluded ..... 10

III. CONCLUSION ..... 11

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Boucher v. U.S. Suzuki Motor Corp.*,
73 F.3d 18 (2d Cir. 1996) ........ 7

*Browne v. Clark*,
No. 2:21-CV-02840-AB-AJR, 2025 WL 1683640 (C.D. Cal. June 12, 2025) ........ 3

*In re Dealer Mgmt. Sys. Antitrust Litig.*,
581 F. Supp. 3d 1029 (N.D. Ill. 2022) ........ 10

*Ellis v. Costco Wholesale Corp.*,
657 F.3d 970 (9th Cir. 2011) ........ 2

*Gen. Elec. Co. v. Joiner*,
522 U.S. 136 (1997) ........ 9

*Inline Connection Corp. v. AOL Time Warner Inc.*,
470 F. Supp .2d 424 (D. Del. 2007) ........ 6

*In re Juul Labs, Inc. Mktg., Sales Pracs. & Prods. Liab. Litig.*,
No. 19-MD-02913-WHO, 2022 WL 1814440 (N.D. Cal. June 2, 2022) ........ 10

*Klein v. Meta Platforms, Inc.*,
766 F. Supp. 3d 956 (N.D. Cal. 2025) ........ 9

*Kuzma v. N. Arizona Healthcare Corp.*,
607 F. Supp. 3d 942 (D. Ariz. 2022) ........ 7

*Lust v. Merrell Dow Pharms.*, Inc.,
89 F.3d 594 (9th Cir. 1996) ........ 2

*Putnam v. Henkel Consumer Adhesives, Inc.*,
No. 1:05-CV-2011-BBM, 2007 WL 4794115 (N.D. Ga. Oct. 29, 2007) ........ 6

*Raskin v. Wyatt Co.*,
125 F.3d 55 (2d Cir. 1997) ........ 5

*Savidge v. Pharm-Save, Inc.*,
2023 WL 2755305 (W.D. Ky. Mar. 31, 2023) ........ 6, 10

*USI Ins. Servs. LLC v. Alliant Ins. Servs. Inc.*,
2025 WL 1794356 (D. Ariz. June 30, 2025) ........ 6

*Wal Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011) .......... 2

*Weisgram v. Marley Co.*,
528 U.S. 440 (2000) .......... 2

*Wells Fargo Bank, N.A. v. LaSalle Bank Nat. Ass'n*,
No. 2:08-CV-1448 JCM RJJ, 2011 WL 743929 (D. Nev. Feb. 23, 2011) .......... 10

**Other Authorities**

Fed. R. Evid. 702 .......... 1, 5

## I. INTRODUCTION

Plaintiffs' retained expert, Eric Krause, is a professional damages expert who has identified a new niche for himself: providing the exact same $200 valuation opinion in every pixel tracking case he handles based on identical cherry-picked "data points" and his say-so. But as explained in Defendant BetterHelp, Inc.'s ("BetterHelp") Motion, Krause's opinion fails to satisfy Rule 702's exacting standards of reliability in numerous respects and must be excluded.

***First***, Krause valued the wrong information. Plaintiffs claim that Krause only valued the information that Professor Zubair Shafiq opined was commonly shared across all class members, but Plaintiffs' attempt to cover for Krause is belied by his deposition testimony. Krause explained at his deposition that he included in his valuation users' email addresses and the information users entered when creating their BetterHelp accounts. But Shafiq did *not* opine that this information was allegedly shared and therefore Krause's opinion is a total mismatch and necessarily unreliable.

***Second***, because there is no market for individuals to sell their personal information, Krause's opinion about what a willing buyer would pay for a class member's information in a made-up market cannot be accurate and is thus unreliable. Plaintiffs concede there is no market for such information but claim none is needed for a fair market valuation—an assertion that is contrary to the authority Plaintiffs purport to rely upon and common sense.

***Third***, Krause based his valuation on cherry-picked "data points" that are in no way comparable to the value of the data at issue. Plaintiffs assert without any explanation that these data points are relevant, but even a cursory review of the data on which Krause relies shows that they differ fundamentally from the information that Krause purports to value. The data points on which Krause relies are so disconnected from the actual facts of this case that they render his opinion unreliable.

***Fourth***, Krause did not use any methodology to arrive at his $200 number (the exact same number he always provides). Plaintiffs claim that Krause's methodology was simply his "appraisal judgment," which is just a way of saying the valuation is based on Krause's say-so. But the law is clear that an expert's opinion must be based on sounds methodology, not their mere say-so. Krause

did not offer any rationale for arriving at his $200 "valuation." Instead, Krause arbitrarily plucked his $200 magic number from a jumble of "data points" that ranged from $12.91 to $9,254.18.

***Fifth***, Krause's opinion here is identical to the opinion he offered in at least five other pending pixel tracking class action lawsuits. Incredibly, Plaintiffs claim that this is a virtue because it demonstrates Krause's consistency. But that argument is in no sense credible; those other lawsuits are hospital cases involving healthcare information that is much more sensitive and robust than the limited information Krause purported to value here. Krause's opinion here is nothing more than a results-driven copy of his prior opinions in very different cases. They thus must be excluded.

For these reasons and as further discussed below, the Court should exclude Krause's opinion.

## II. KRAUSE'S OPINION IS UNRELIABLE AND SHOULD BE EXCLUDED

Plaintiffs "ha[ve] the burden of providing admissibility," *Lust v. Merrell Dow Pharms.*, Inc., 89 F.3d 594, 598 (9th Cir. 1996), which they have failed to meet here. Contrary to Plaintiffs' suggestion (Opp. at 5), which reads as a wish, the *Daubert* standard applies when assessing admissibility of expert opinions at the class certification stage. *Wal Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349-50 (2011); *see also Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011) (reversing order granting class certification and holding that "[a] trial court has broad latitude not only in determining whether an expert's testimony is reliable, but also in deciding how to determine the testimony's reliability"). Here, Krause's opinion does not meet the "exacting standards of reliability," *Weisgram v. Marley Co.*, 528 U.S. 440, 455 (2000), and must be excluded.

### A. Krause Valued Information that Is Not at Issue

Krause's opinion should be excluded because he valued information entirely *different* from, and much more expansive than, what Shafiq (Plaintiffs' technical expert) claimed was disclosed for all class members. Shafiq's opinions are unreliable for a host of reasons, but to have any chance of relevance, Krause's "valuation" of the data purportedly shared for all class members would at a minimum need to match what the technical "expert" opines was shared. Plaintiffs' attempt to walk back Krause's testimony should be rejected.

Krause's report provided a general description of three categories of information that, based on Shafiq's Opinion No. 1, Krause assumed were disclosed to third parties. Krause Rpt., ¶ 65[1]. Shafiq's Opinion No. 1 spans 35 pages and describes in detail various types of information that, according to Shafiq, were shared with third parties. *See* Shafiq Rpt. at ¶¶ 41-73. Krause did not indicate in his Report what personal information formed the basis for his opinion that the "conservative baseline fair market value" of the information that was uniformly shared for all class members is $200, Krause Rpt., ¶ 68, and thus it was necessary to question Krause to determine *what* information he actually valued. *See Browne v. Clark*, No. 2:21-CV-02840-AB-AJR, 2025 WL 1683640, at *6 (C.D. Cal. June 12, 2025) (holding that it is "entirely appropriate to question an expert about the assumptions they relied upon in forming their opinions").

For example, Krause testified at his deposition that the second category of information—class members' "patient status"—refers solely to the fact that an individual completed BetterHelp's intake questionnaire, and that this information was included in his valuation. Krause Tr. at 66:15-19.[2] Krause affirmatively testified at his deposition that Krause *did not* include the third category of information in his valuation. [3]

As to the first category of user information ("personally identifiable information such as account and device identifiers, IP addresses, and e-mail addresses"), Krause confirmed that he included (i) users' e-mail addresses, Krause Tr. at 66:9-14, and (ii) "all the information that [a user] set[s] up when they do the questionnaire" to create a BetterHelp account and the "various profile information that gets associated with the account." *Id.* at 62:19-63:3, 63:17-64:12. Plaintiffs do

---

[1] Plaintiffs' and class members' (1) "personally identifiable information such as account and device identifiers, IP addresses, and e-mail addresses;" (2) "patient status;" and (3) "communications with BetterHelp via its websites, through completion of the intake questionnaire, signing up for therapy and counseling services, paying for services, taking mental health assessments or test, or reviewing advice articles about specific conditions and treatments."

[2] Excerpts of Krause's deposition testimony cited herein are attached as Exhibit B [Under Seal] to the Declaration of Jeffrey Hammer. ECF No. 215-4.

[3] Although Krause stated in his report that users' "communications with BetterHelp via its websites, through completion of the intake questionnaire, signing up for therapy and counseling services, paying for services, taking mental health assessments or test, or reviewing advice articles about specific conditions and treatments" was included among the information that was allegedly shared, Krause Rpt. at ¶ 65, Krause clarified at his deposition that his valuation did not include any of this information, other than the fact that a user completed the questionnaire and signed up for a BetterHelp account, Krause Tr. 66:15-69:10.

not dispute that Shafiq did not opine that users' email addresses and certain internal "account identifiers" (as Krause understood account identifier) were disclosed. Instead, Plaintiffs now try to claim in their Opposition that Krause did not include this information in his valuation. Plaintiffs' attempts to cover up the fact that Krause valued the wrong information should be rejected.

As to e-mail addresses, Plaintiffs claim that the use of "such as" in Krause's report indicates that e-mail addresses were not necessarily shared for all class members and thus not part of Krause's opinion. (Opp. at 6.) But that too is false. Krause confirmed at deposition that his valuation assumed that e-mail addresses *were* disclosed for *all* class members:

> Q. For all the information listed here in that first bullet point in paragraph 65 [*i.e.*, "personally identifiable information such as account and device identifiers, IP addresses, and e-mail addresses"] are you assuming that all that information was disclosed to third parties for all class members?
>
> A. Yes. Based on Dr. Shafiq's report, that is my understanding of the allegation and his conclusions.

Krause Tr. at 66:9-14.

As to account identifier, Krause also testified that he understood a user's "account identifier" to include robust information associated with the user's account. Contrary to Plaintiffs' argument in their Opposition, BetterHelp did not "misleadingly piec[e] together snippets from" from Krause's deposition in its Motion (Opp. at 8), but rather relied on the *same testimony* cited by Plaintiffs, (*see* Mot. at 6-7 (citing Krause Tr. at 62:19-63:3, 63:17-64:12)), in which Krause testified that there is information that is "a part of those account identifiers," and that "to the extent it includes names, to the extent it includes location, information like that, there is significant value. You know, *it would be part of the approximately $200 of value that I've ascribed here*." Krause Tr. at 63:17-64:1 (emphasis added). Counsel for BetterHelp then clarified that Krause valued account identifiers based on the information associated with those accounts:

> Q. So account identifiers is valuable insofar as it contains other information?
>
> A. Well, what account it is. As I understand from Dr. Shafiq, *that's just a summary term of the types of information that are associated with that account*.
>
> Q. So you're referring to, you know, I go set up an account -- if I go set up an

> account with BetterHelp and I list various profile information that gets associated with the account, you're referring to the content of my profile that's the account information?
>
> A. That's what I understand.

Krause Tr. at 64:2-12 (emphasis added).

Krause thus acknowledged at his deposition that he included class members' email addresses and "account information" when arriving at his $200 "fair market value."

Even putting aside the fact that Krause always values information at $200 no matter what it is, Krause's opinion will not "help the trier of fact to understand the evidence or to determine a fact in issue," Fed. R. Evid. 702(a), because Krause purported to value user information that differs significantly from the information that Shafiq opined was allegedly disclosed to third parties. This significant discrepancy would have a dramatic impact on any valuation, as Plaintiffs do *not* claim that their email addresses and "profile information" (as described by Krause) were disclosed, and the other information that Shafiq contends *was* allegedly disclosed (device identifier, IP address, and the fact that the user completed an intake questionnaire) is extremely limited. Krause's "analysis rests on faulty assumptions" and must be excluded. *See Raskin v. Wyatt Co.*, 125 F.3d 55, 67-68 (2d Cir. 1997).

**B. There Can Be No Fair Market Valuation Without a Market**

Krause's opinion that "an appropriate measure of economic damages . . . would be equivalent to the fair market value" of the personal information at issue (Krause Rpt., ¶ 41) and his estimation of such fair market value is based on the false assumption that there is a market for individuals to sell the type of personal information at issue to a willing buyer and therefore must be excluded. Plaintiffs' attempts to justify this fundamental flaw in Krause's opinion should be rejected.

Plaintiffs claim that "[a] significant sub-group of economists focus on theory and practice surrounding the value of intangible assets without liquid markets," (Opp. at 8) but the academic articles on which Plaintiffs rely—which Krause did not cite in his report and Plaintiffs do not attach

to their Opposition—do not involve fair market valuations or the value of personal information.[4] To the extent there may be *other* theories for valuing personal information, Krause has neither disclosed nor relied on them.

Instead, Krause has purported to perform a fair market valuation of class members' personal information. But the cases Plaintiffs cite (Opp. at 8) confirm that, even for intangible assets, a fair market valuation approach requires the existence of a *bona fide* market in order to "compar[e] similar transactions by unrelated parties." *Putnam v. Henkel Consumer Adhesives, Inc.*, No. 1:05-CV-2011-BBM, 2007 WL 4794115, at *4 (N.D. Ga. Oct. 29, 2007). In *Putnam*, a patent infringement case, the expert analyzed eleven licensing agreements in other similar transactions to perform a fair market valuation of the royalty rate. *Id*. at *4. Similarly, in *Inline Connection Corp. v. AOL Time Warner Inc.*, 470 F. Supp .2d 424 (D. Del. 2007), evaluated the three defendants' license history to opine on the fair market value of the royalty rate for the patents at issue. *Id.* at 432 n.38. And in *USI Ins. Servs. LLC v. Alliant Ins. Servs. Inc.*, 2025 WL 1794356, at *3 (D. Ariz. June 30, 2025), which involved a market valuation of a book of business, there was no dispute that a market existed and that books of business are regularly valued on a fair market basis.[5] A "thriving liquid market" (Opp. at 8) may not be required—to use the phrase coined by Plaintiffs to set up their straw man argument—but there must be *some* actual market where the information at issue is sold in arm's length transactions between a willing seller (in this case, allegedly Plaintiffs and class members) and a willing buyer (which Krause failed to identify, because none exists).

As Plaintiffs concede, Krause not only is assuming a counterfactual but-for world where class members' information was not disclosed, but also a counterfactual but-for world where there

[4] *See* Opp. at 8 (citing Carol Carrado, et al., *Intangible Capital and Modern Economies*, 36 J. Econ. Persp. 3 (2022) (theorizing that the concept of capital should include both tangible and intangible capital); Nicolas Crouzet, et al., *The Economics of Intangible Capital*, 36 J. Econ. Persp. 29 (2022) (discussing production using intangible capital); Bart J. Bronnenberg, et al., *Marketing Investment and Intangible Brand Capital*, 36 J. Econ. Persp. 53 (2022) (discussing marketing investments and the intangible capital they create)). In any event, Plaintiffs may not augment Krause's opinion by belatedly citing to sources that Krause did not cite.

[5] Plaintiffs also cite *Savidge v. Pharm-Save, Inc.*, 2023 WL 2755305, at *19 (W.D. Ky. Mar. 31, 2023), an inapposite data breach case in which the expert "value[d] Plaintiffs' time to mitigate against future nefarious use of their PII and to estimate future out-of-pocket expenses necessary to do so." *Id.* at *19.

is a market for Plaintiffs' information. (Opp. at 10.) As Krause acknowledged at his deposition, a fair market value is the amount a willing buyer would pay a willing seller for the asset in an arm's-length transaction. Krause Tr. at 54:22-55:2; *see also Kuzma v. N. Arizona Healthcare Corp.*, 607 F. Supp. 3d 942, 947 (D. Ariz. 2022) ("Fair market value is generally defined as 'the price a willing buyer would pay a willing seller . . . when neither is under compulsion to buy or sell.'") (citation omitted). Because there is no actual market for individuals to sell the information either alleged to be in issue in this case or based on Mr. Krause's erroneous understanding, Krause's opinion about what a fictional (non-existent) buyer would pay for a class member's information in a fictional (non-existent) market is unreliable and must be excluded.[6]

### C. Krause's "Data Points" Are Not Reliable

Krause selected his $200 "fair market valuation" with reference to "data points" that differ fundamentally from the At-Issue Data that Krause is purportedly valuing here. Plaintiffs assert that Krause "picked the data points" from "a variety of analogous personal data contexts," (Opp. at 10), but it is apparent from even a cursory review of the information Krause relied on that it is in no way analogous to the At-Issue Data. Plaintiffs attempt to sidestep this fundamental flaw in Krause's opinion by claiming it goes to weight and not admissibility (Opp. at 10-11), but Krause's "apples and oranges comparison" renders his opinion so unreliable that it would only confuse the trier of fact and thus should be excluded. *See Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996).

**Data Deletion Services.** Plaintiffs essentially concede that the fees charged by four data deletion services are not analogous, claiming only that it is not "wholly irrelevant" because it supposedly "shed[s] light on" and provides "a window into how consumers practically value their personal information." (Opp. at 11.) Plaintiffs do not dispute any of the reasons raised by BetterHelp as to why such fees are not reliable comparators, *see* Mot. at 8-9, including that the services are for the deletion of information already available to third parties (not the sale of such

[6] Plaintiffs' claim that Prof. Mizik "has little to no expertise in this field" (Opp. at 9) is belied by her extensive experience valuing intangible assets and the expert testimony she has provided in other cases involving personal information. *See* Mizik Rpt., Appx. A.

information) that is much more extensive than the At-Issue Data.

**Li Study.** Plaintiffs likewise do not address any of the reasons that the Li Study is unreliable. (*See* Mot. at 9-10.) Plaintiffs state that Krause found the Li Study "informative" (Opp. at 11) but do not even attempt to explain, for example, how the robust categories of information at issue in the study are similar to the At-Issue Data. The Li Study involved direct identifiers (i.e., full name, phone number, email address, home address), quasi-identifiers (i.e., date of birth, five-digit zip code), non-private information (i.e., age, gender, race/ethnicity, zip code's first three digits, marital status, years of education, occupation), and private information (i.e., income, credit scores) that are in no way comparable to the limited At-Issue Data. (Mot. at 9.)

**2017 Ponemon Institute Study.** The 2017 Ponemon Institute Study estimated the cost of responding to a data breach on a per record basis. (*See* Mot. at 10-11.) Plaintiffs fail to provide *any* explanation for how these comprehensive estimates provide a reliable "data point" for determining the fair market value of the At-Issue Data. Indeed, the estimates in the study involve completely dissimilar information (e.g., a retail company's records that include individual's names and credit card information, and a health insurer's records that include policyholders' physician and payment information) and reflect organizations' estimates of their all-in costs to respond to a data breach (including, e.g., the cost of engaging forensic experts, outsourcing hotline support, in-house investigations and communications, extrapolated value of customer loss).

**2017 Trustwave Study.** The 2017 study by cybersecurity company Trustwave examined the value that organizations place on their data based on the profit the data can bring and the risk of its compromise. The report *does not even indicate the specific information being valued*. (*See* Mot. at 11-12.) Not surprisingly, Plaintiffs (and Krause) thus do not (and cannot) provide any explanation about how the Trustwave Study is connected to the facts of this case. The absence of any connection between the information that was the subject of the Trustwave Study and the At-Issue Data—along with the many other problems with the Trustwave Study (*see* Mot. at 11-12) render it unreliable.

**EY Study.** Plaintiffs also fail to explain how the data that Krause cherry-picked from a

2019 EY Study is, as they assert, a "relevant analogous data point." (Opp. at 12.) EY, as part of its study, considered the valuation of 98 healthcare companies and divided such value by the company's number of health records. From this set of 98 companies, Krause selected a subsample of six (without any legitimate explanation) that had a minimum per record value of $12.91 and a maximum per record value of $9,254.18. (Mot. at 12-13.) The records being valued include information related to primary care data; secondary, tertiary, or specialty care data; genomic data; and oncology data, and include specific and longitudinal patient medical data. *Id.* Plaintiffs do not attempt to explain how this information is in any way similar to the At-Issue Data (it is not), why Krause selected the companies he did, or how the "value per record" figures are in any way reliable given the broad range of values. As with the other sources on which Krause bases his opinion, the EY Report is unreliable.

Plaintiffs' failure to provide a rational (much less credible) basis for the "data points" confirms that Krause selected them based only on his say-so, not because they are reliable comparators. "[T]here is simply too great an analytical gap between the data and the opinion proffered" and thus Krause's opinion must be rejected. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert").

**D. Krause Did Not Use Any Methodology to Arrive at His Opinion**

Plaintiffs' explanation of Krause's supposed "methodology" amounts to a single sentence in which Plaintiffs state that Krause used "appraisal judgment in selecting analogous data points and arriving at a reasoned valuation." (Opp. at 13.) But Krause did not describe how he "arriv[ed] at a reasoned valuation." (*See* Mot. at 13-14.) Krause did not do any computation, analysis, or weighting of these various "data points" to arrive at his $200 number, which renders his estimate particularly unreliable given the disparate values of the "data points" on which Krause relied, which range from $12.91 to $9,254.18. (*See* Mot. 13-14.) Here, "appraisal judgment" simply means "because I say so." But that is not enough: Krause was required to use a methodology that "is scientifically valid" and "can be applied to the facts in issue." *Klein v. Meta Platforms, Inc.*, 766

F. Supp. 3d 956, 961 (N.D. Cal. 2025) (excluding expert opinion). He failed to do so or apply any methodology.

In the cases Plaintiffs cite (*see* Opp. at 13), the expert used *some* methodology—as required by *Daubert*—rather than relying merely on their expertise. *See Savidge*, 2023 WL 2755305, at *19 (using average labor rates to determine the value of time to mitigate against future harm caused by data breach); *In re Dealer Mgmt. Sys. Antitrust Litig.*, 581 F. Supp. 3d 1029, 1073 (N.D. Ill. 2022) (applying "well-established" "yardstick" methodology by comparing sales volumes); *In re Juul Labs, Inc. Mktg., Sales Pracs. & Prods. Liab. Litig.*, No. 19-MD-02913-WHO, 2022 WL 1814440, at *20 (N.D. Cal. June 2, 2022) (using regression analysis to form opinions regarding youth vaping epidemic); *Wells Fargo Bank, N.A. v. LaSalle Bank Nat. Ass'n*, No. 2:08-CV-1448 JCM RJJ, 2011 WL 743929, at *2 (D. Nev. Feb. 23, 2011) (assessing underwriting practices in light of industry standards). Unlike in these cases, Krause arbitrarily arrived at his $200 estimate based on cherry-picked and unreliable data points, and his opinion must be excluded.

### E. Krause's Identical Valuations in Different Cases Involving Different Categories of Information Confirm His Opinion Must Be Excluded

Krause's $200 valuation in this case is a regurgitation of the identical valuation he provided in at least five hospital cases based on the exact same flawed "data points." (*See* Mot. at 14-15.) Plaintiffs claim that this only demonstrates Krause's consistency (*see* Opp. at 14), but—contrary to Plaintiffs' assertion—the personal information at issue in the five hospital cases differs significantly from the At-Issue Data.

As explained in BetterHelp's Motion, and which Plaintiffs do not dispute, those other lawsuits involve hospital defendants who allegedly disclosed patients' sensitive health information, including patients' communications about their health conditions, the medical treatment they were seeking, and the doctor treating them. (Mot. at 15.) Here, the "personal information" Krause purported to value was the user's (i) account identifier, (ii) device identifier, (iii) IP address, and (iv) email address. (Mot. at 3.) Putting aside the fact that the "personal information" Krause purported to value does not track the "personal information" that Shafiq contended is in issue,

Krause's copy-and-paste of his identical opinions in other lawsuits (complete with identical inputs) confirms that his opinion here was not the result of a reliable methodology and thus should be excluded.

## III. CONCLUSION

For the foregoing reasons, BetterHelp respectfully requests that the Court exclude the expert opinion of Eric Krause.

Dated: November 24, 2025

**KING & SPALDING LLP**

By: */s/ Livia M. Kiser*

LIVIA M. KISER (SBN 285411)
*lkiser@kslaw.com*
JEFFREY HAMMER (SBN 264232)
*jhammer@kslaw.com*
CRAIG H. BESSENGER (SBN 245787)
*cbessenger@kslaw.com*
JAMES A. UNGER (SBN 325115)
*junger@kslaw.com*
Attorneys for Defendant
BETTERHELP, INC.