Gary. M. Klinger (pro hac vice)
MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC
227 W. Monroe Street, Suite 2100
Chicago, Illinois 60606
Telephone: 866-252-0878
Email: gklinger@milberg.com

*Plaintiffs' Co-Lead Interim Class Counsel*

Maureen M. Brady (pro hac vice)
MCSHANE AND BRADY LLC
4006 Central Street
Kansas City, MO 64111
Telephone: 816-888-8010
Email: mbrady@mcshanebradylaw.com

*Plaintiffs' Co-Lead Interim Class Counsel*

Christina Tusan (SBN 192203)
TUSAN LAW, PC
680 E. Colorado #180
Pasadena, CA 91101
Telephone: 626-418-8203
Email: ctusan@ctusanlaw.com

*Plaintiffs' Co-Lead Interim Class Counsel*

Alan M. Mansfield (SBN: 125998)
WHATLEY KALLAS LLP
1 Sansome Street, 35th Floor
PMB #131
San Francisco, CA 94104 /
16870 West Bernardo Drive, Ste 400, San Diego, CA 92127
Telephone: 619- 308-5034
Fax: 888-341-5048
Email: amansfield@whatleykallas.com

*Plaintiffs' Liaison Counsel*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

**IN RE BETTERHELP, INC. DATA DISCLOSURE CASES**

This Document Relates To:

All Cases.

**Master File No. 3:23-cv-01033-RS**

**SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED ON ALL CAUSES OF ACTION SO TRIABLE**

Plaintiffs Jane Doe I, L.M., Jane Doe III, S.C., and T.R. (collectively "Plaintiffs") on behalf of themselves and all others similarly situated and for the benefit of the general public as applicable, assert the following against Defendants BetterHelp, Inc. ("BetterHelp" or "Defendant") and DOES 1-10 inclusive, based upon personal knowledge where so identified and otherwise on information and belief formed after an inquiry reasonable under the circumstances and the investigation of counsel, which included consultation with experts in the field of data privacy and review of publicly available reports, as to all other matters, which allegations will likely have evidentiary support after a reasonable opportunity for further investigation and discovery.

## SUMMARY OF ALLEGATIONS

1. This is a class action lawsuit brought on behalf of a nationwide class to seek redress for Defendant's improper, unauthorized, and illegal disclosure of millions of individuals' personally identifiable information ("PII") and/or Protected Health Information ("PHI") (collectively referred to as "Private Information") to third-party advertising platforms including, but not limited to, Facebook, Snapchat, Pinterest, Criteo, and others. The Private Information disclosed by BetterHelp includes, but is not limited to, Plaintiffs' and Class Members' names, email addresses, IP addresses, the fact that Plaintiffs and Class Members enrolled in Defendant's services, certain intake responses to a questionnaire required by BetterHelp to be completed prior to a referral that requested sensitive information related to their mental health and other medical conditions, and additional highly sensitive personal medical and mental health information.

2. Information about a person's mental health is among the most confidential and sensitive information in our society. The mishandling and unauthorized sharing of such information, and medical information generally, can have serious consequences, including harassment, discrimination in the workplace, and social stigmatization. If people do not trust that their medical information will be kept private, they may be less likely to seek medical treatment or to disclose sensitive information, which can lead to more health problems down the road. In addition, protecting medical information and making sure it is kept confidential is an obligation imposed by federal and state law on companies such as Defendant, and is necessary to maintain public trust in the healthcare system as a whole.

3. Defendant BetterHelp is an online "market leading direct-to-consumer ("D2C") mental health platform"[1] and offers online counseling and therapy services (the "Service") to consumers through its network of over 30,000 licensed clinicians who use BetterHelp's platform for web, mobile app, phone, and text-based interactions.[2] In fiscal year 2022 (the 52 weeks ending on Dec. 31, 2022), BetterHelp had revenues of over $1 billion.[3] As of December 31, 2022, Defendant had 420,000 paying users.[4] According to the Form 10-K of BetterHelp's parent company for fiscal year ended December 31, 2023, BetterHelp  users purchase virtual therapy services for an access fee, generally on a monthly basis, and BetterHelp "primarily generate[s] revenue from paying users who pay a fee, most commonly monthly, to access our network of therapists and psychiatrists." According to this Form 10-K: "BetterHelp's total revenues increased by $114.0 million, or 11%, to $1,133.6 million [$1.14 Billion] for the year ended December 31, 2023, driven by a 9% increase in average monthly paying users. BetterHelp's Adjusted EBITDA increased by $22.1 million, or 19%, to $136.2 million for the year ended December 31, 2023, primarily reflecting higher gross profit, offset by higher operating expenses, most significantly higher advertising and marketing expenses." The importance of such marketing efforts, including the efforts described herein, is key to BetterHelp's success, as according to this Form 10-K: "Our ability to reach new potential paying users through various advertising channels helped us to increase BetterHelp paying users by 9% to 0.46 million [460,000] as of December 31, 2023, compared to 0.42 million [420,000] as of December 31, 2022."[5]

4. Defendant offers and has offered its Service under several different names, each of which had its own website and app (collectively the "Sites"). These Sites were designed to accommodate different demographics of people who are seeking mental health and counseling

---

[1] Teladoc Health, Inc., Fiscal 2022 Annual Report, Form 10-K, p. 4 (2022).
[2] *Id.* at p. 4.
[3] *Id.* at p. F-41.
[4] *Id.* at p. 60.
[5] *See* Teledoc Health, Inc. Form 10-K for year ended December 31, 2023 ,with references in this Complaint located at pp. 14-15, 32, 40-41, 55, 57, 66 (available at https://www.sec.gov/ix?doc=/Archives/edgar/data/1477449/000147744924000023/tdoc-20231231.htm (last accessed July 31, 2024).

services. Defendant's primary website and app, named "BetterHelp" (found at www.betterhelp.com) serves general audiences and has been in operation since about 2013. Faithful Counseling, in operation since about July 2017, is aimed at members of the Christian faith. Pride Counseling, in operation since about August 2017, caters to the LGBTQ community. Teen Counseling, in operation since about January 2017, offers counseling to 13- to 18-year-olds with parental consent. ReGain, in operation since about May 2016, offers couples counseling. Defendant also offered the Service through the iCounseling website and app from about February 2017 to November 2020, the Terrapeuta website and app from about March 2017 to March 2019, and the MyTherapist website and app from about June 2017 to March 2019. Each of these Sites operates, or has operated, through BetterHelp's servers located primarily in California, and each of these Sites facilitates counseling and/or therapy via the Service.

5. As noted above, BetterHelp collects and receives revenues from consumers, generally on a monthly basis, in exchange for providing access to its network of therapists and psychiatrists. In fact, BetterHelp's website has stated that, "The cost of counseling through BetterHelp ranges from $40 to $70 per week (billed monthly) and includes unlimited access to your counselor."[6] BetterHelp has also negotiated arrangements with various third-party organizations to provide access to their mental health therapist network for employees, paid for by such organizations. BetterHelp's parent company's Form 10-K explains that, "As it relates to the BetterHelp segment, users can purchase virtual therapy services for an access fee, generally on a monthly basis. . . . BetterHelp also provides virtual therapy services to employers as part of employee assistance programs, with revenues recorded based on completion of visit." BetterHelp is thereby responsible for furnishing and/or billing for such mental health therapy services to patients and/or is paid by patients and third-party organizations for providing mental health care access in the normal course of its business.

6. When Plaintiffs and Class Members used one of Defendant's Sites in order to sign

---

[6] See, e.g., https://web.archive.org/web/20200321045022/https://www.betterhelp.com/ (website version from 3/21/2020)(last visited August 2, 2024); and https://web.archive.org/web/20190426114300/https://www.betterhelp.com/faq/ (website version from 4/26/2019) (last visited August 2, 2024).

up for the Service and become a paying user, they were required to fill out a questionnaire (the "Intake Questionnaire"), answering detailed questions regarding themselves, their health status and histories—including their mental health issues, whether they are in therapy for mental health issues and whether they are seeking therapy from BetterHelp. Upon completing the Intake Questionnaire, Plaintiffs and Class Members were required to create a paid account for the Service by entering their name, email address, phone number, emergency contact information, and payment details.

7. Since the time of BetterHelp's inception, millions of consumers and patients, including Plaintiffs and Class Members, have signed up for Defendant's counseling services and completed the required Intake Questionnaire on one of the Sites. In doing so, they entrusted Defendant with their Private Information, including their health status and histories, mental health condition, their symptoms, the fact that they are seeking therapy to assist with their then-current mental health issues, whether they previously were in therapy, as well as identifying information such as names dates of birth, physical addresses, email addresses, and IP addresses. In providing such information to BetterHelp these consumers reasonably expected and understood that BetterHelp would keep that information confidential. BetterHelp and its parent company also recognizes this expectation and the obligations imposed upon BetterHelp in its most recent Form 10-K: "**Our use and disclosure of personally identifiable information, including health information, and other personal data is subject to federal, state, and foreign privacy and security regulations, and our failure to comply with those regulations or to adequately secure the information we hold could result in significant liability or reputational harm and, in turn, a material adverse effect on our Client base, membership base, and revenue**." (emphasis in original).

8. Recognizing the sensitivity of this Private Information, as well as patient and consumer concerns about privacy—particularly as it relates to their mental health issues and related medical conditions—Defendant repeatedly promised to keep such Private Information private and use it only for non-advertising purposes, *i.e.,* to facilitate consumers' mental health therapy.

9. Rather than protecting Class Members' confidential and sensitive Private

Information, however, Defendant installed web beacons and cookies on its platform for the Sites that enabled third party marketing companies like Facebook (also now known as "Meta" and jointly referred to herein as "Facebook/Meta" in this Complaint), Snapchat, Criteo, and Pinterest to intercept users' Private Information, gathered both in the information sign up process and thereafter, and to track users as well as to collect information that could be used to build individual consumer profiles and ultimately, market to them. As stated in BetterHelp parent company's 2023 Form 10-K: "In addition, we rely on relationships for our BetterHelp business with a wide variety of third parties, including internet search providers such as Google, social networking platforms such as Facebook, internet advertising networks, co-registration partners, retailers, distributors, television advertising agencies, and direct marketers, *to source new members and to promote or distribute our services and products*." (emphasis added).

10. Advertisers also use the information provided to them through third parties such as Defendant to build and expand upon profiles reflecting an individual's interests, concerns, or habits in intimate detail. This can be done by associating a website visitor's browser fingerprint, IP address, name, email address, telephone number, or other unique identifier with their use of a particular website, such as the Sites. BetterHelp's practices allowed these third-party websites to gain information about specific individuals that was thereafter used to target/retarget them with advertisements and to measure the results of their advertisement efforts – which as noted above is a key element of BetterHelp's business model.

11. Unbeknownst to Plaintiffs and Class Members, the answers they gave to the questions on the Intake Questionnaire, along with the Private Information and personal identifiers they provided as they subsequently used the Service, were secretly intercepted by and/or disclosed to at least Facebook/Meta, Snapchat, Criteo, and Pinterest. None of these third parties were authorized by Plaintiffs or Class Members to receive their Private Information from and through BetterHelp.

12. BetterHelp's goal in sharing its users' Private Information and communications with these companies was not to provide any medical or other benefit to the users of its Service but instead was intended to, *inter alia*: (1) increase its market share through the identification of new potential patients and the recapture/retention of prior patients, and (2) to cultivate and maintain relationships

with various social media sites.

13. According to the United States Federal Trade Commission ("FTC"), from 2013 to at least December 2020, Defendant continually broke its promises to protect consumers' Private Information, instead using it to intentionally target existing and new customers with advertising for its and others' goods and services. Defendant also handed over Plaintiffs' and Class Members' Private Information to some of the largest online advertising companies in the world, such as Facebook/Meta, Pinterest, Criteo, and Snapchat, often permitting these companies to use the sensitive Private Information for their own research, product development, and advertising purposes.

14. On March 2, 2023, the FTC announced that it had finalized a Consent Order with Defendant addressing Defendant's deceptive and misleading business practices in using sensitive Private Information and disclosing it to third parties.[7][8]

15. The importance of keeping consumers' health information confidential also has been addressed by the United States Department of Health and Human Services ("HHS"). The HHS, in order to implement the requirements of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), established "Standards for Privacy of Individually Identifiable Health Information" (also known as the "Privacy Rule") governing how companies, such as BetterHelp, must safeguard and protect Private Information. Under the HIPAA Privacy Rule, **<u>no</u>** covered entity or business associate can disclose a person's personally identifiable or protected health information to a third party without express written authorization. In addition, as BetterHelp's parent company recognized in its most recent Form 10-K: "HIPAA further requires that patients be notified of any unauthorized acquisition, access, use or disclosure of their unsecured PHI that has more than a low probability of compromising the privacy or security of such information, with certain exceptions related to unintentional or inadvertent use or disclosure by employees or authorized individuals. HIPAA specifies that such notifications must be made without unreasonable delay and in no case later than 60 calendar days after discovery of the breach. If a breach affects 500 patients or more, it

---

[7] Attached hereto as Exhibit A is a true and correct copy of the FTC's Complaint against BetterHelp.
[8] Attached hereto as Exhibit B is a true and correct copy of the FTC's Consent Order with BetterHelp.

must be reported to HHS without unreasonable delay, and HHS will post the name of the breaching entity on its public website. Breaches affecting 500 patients or more in the same state or jurisdiction must also be reported to the local media. If a breach involves fewer than 500 people, the covered entity must record it in a log and notify HHS at least annually." Yet, as set forth below, BetterHelp has failed and still refuses to comply with these obligations, despite the significant civil and criminal penalties associated with not doing so—as well as the harm to the public caused by its failure to comply with these laws.

16. In response to the use of tracking and data collection technologies by online companies offering health care services like BetterHelp, the Office for Civil Rights ("OCR") at HHS recently published a bulletin concerning the Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates.[9] The bulletin warns that:

> An impermissible disclosure of an individual's PHI not only violates the Privacy Rule but also may result in a wide range of additional harms to the individual or others. For example, an impermissible disclosure of PHI may result in identity theft, financial loss, discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others identified in the individual's PHI. Such disclosures can reveal incredibly sensitive information about an individual, including diagnoses, frequency of visits to a therapist or other health care professionals, and where an individual seeks medical treatment.
>
> While it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors, because of the proliferation of tracking technologies collecting sensitive information, OCR is providing this reminder that it is critical for regulated entities to ensure that they disclose PHI **only** as expressly permitted or required by the HIPAA Privacy Rule.[10]

17. The bulletin further states that covered or regulated entities, such as BetterHelp, "**are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules.** For example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures."[11]

---

[9] https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (last visited August 2, 2024).
[10] *Id.* (internal citations omitted).
[11] U.S. Department of Health and Human Services, Office of Civil Rights, Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates (content last reviewed Aug. 2,

BetterHelp's own parent company recognizes the application of HIPAA to entities such as BetterHelp, stating in its most recent Form 10-K: "HIPAA requires healthcare providers **like us** to develop and maintain policies and procedures with respect to PHI that is used or disclosed, including the adoption of administrative, physical, and technical safeguards to protect such information." (emphasis added).

18. Similarly, under California law, medical information is considered to be among the most sensitive private personal information available. "Medical Information" is defined by California's Confidential Medical Information Act, Cal. Civ. Code sections 56, *et seq*. ("CMIA") as:

> any individually identifiable information,[12] in electronic or physical form, in possession of or derived from a provider of health care, health care service plan, pharmaceutical company, or contractor regarding a patient's medical history, mental or physical condition, or treatment.

19. The California Constitution also recognizes the right of individuals to privacy in their affairs generally: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy." Cal. Const., Art. I., § 1. In addition, in order to protect those rights in an increasingly technological world, the California Invasion of Privacy Act ("CIPA") was enacted in 1967 to address "the development of new devices and techniques for the purpose of eavesdropping upon private communications and the invasion of privacy resulting from the continual and increasing use of such devices and techniques." Cal. Pen. Code § 630.

20. Privacy polls and studies show that almost all Americans consider one of the most important privacy rights to be the need to obtain an individual's affirmative consent before a company collects and shares its customers' data with third parties. Thus, the expectation that

---

2024) (emphasis in the original), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/ hipaa-online-tracking/index.html#ftnref9.

[12] "Individually identifiable" means that the Medical Information includes or contains any element of personal identifying information sufficient to allow identification of the individual, such as the patient's name, address, electronic mail address, telephone number, or Social Security Number, or other information that, alone or in combination with other publicly available information, reveals the identity of the individual.

companies such as BetterHelp will protect the confidentiality of Private Information and not share such data without their authorization and consent is both reasonable and material to consumers. For example, a recent study by Consumer Reports shows that 92% of Americans believe that internet companies and websites should be required to obtain consent before selling or sharing consumers' data, and the same percentage believe internet companies and websites should be required to provide consumers with a complete list of the data that has been collected about them.[13] Moreover, according to a study by Pew Research Center, approximately 79% of Americans are concerned about how data is collected about them by companies.[14]

21. The concern about sharing medical information is compounded by the reality that advertisers view this type of information as being of particularly high value. Indeed, having access to the data women share with their healthcare providers allows advertisers to obtain data on children before they are even born. As one article put it: "the datafication of family life can begin from the moment in which a parent thinks about having a baby."[15] The article continues "Children today are the very first generation of citizens to be datafied from before birth, and we cannot foresee—as yet—the social and political consequences of this historical transformation. What is particularly worrying about this process of datafication of children is that companies like . . . Facebook . . . are harnessing and collecting multiple typologies of children's data and have the potential to store a plurality of data traces under unique ID profiles."[16]

22. Privacy law experts have expressed concerns about the disclosure to third parties of a user's sensitive medical information in particular. For example, Dena Mendelsohn—the former Senior Policy Counsel at *Consumer Reports* and current Director of Health Policy and Data

---

[13] *Consumers Less Confident About Healthcare, Data Privacy, and Car Safety, New Survey Finds*, CONSUMER REPORTS (May 11, 2017), https://www.consumerreports.org/consumer-reports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety/.

[14] *Americans and Privacy: Concerned, Confused, and Feeling Lack of Control Over Their Personal Information*, PEW RESEARCH CENTER, (Nov. 15, 2019), https://www.pewresearch.org/internet/2019/11/15/americans-and-privacy-concerned-confused-and-feeling-lack-of-control-over-their-personal-information/.

[15] Veronica Barassi, *Tech Companies Are Profiling Us From Before Birth*, THE MIT PRESS READER, https://thereader.mitpress.mit.edu/tech-companies-are-profiling-us-from-before-birth/.

[16] *Id.*

Governance at Elektra Labs—explained that having one's personal health information disseminated in ways one is unaware of could have serious repercussions, including affecting one's ability to obtain life insurance and how much one pay for that coverage, increasing the rate one is charged on loans, and leaving one vulnerable to workplace discrimination.[17]

23. Defendant's actions constitute an extreme invasion of Plaintiffs' and Class Members' right to privacy and violate several statutory and common law doctrines, including CIPA, Cal. Penal Code § 631 and 632, *et seq.*; the California Consumer Privacy Act, Cal. Civ. Code § 1798.100, *et seq.* ("CCPA"); the Electronic Communications Privacy Act, 18 U.S.C. § 2510 *et seq*. ("ECPA"); the Federal Trade Commission Act, 15 U.S.C. § 45 *et seq*. ("FTC Act"); the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Parts 160 and 164; 42 C.F.R. §2; and common law doctrines such as breach of privacy.

24. As a result of Defendant's acts and omissions detailed herein, Plaintiffs and Class Members seek remedies on their own behalf and on behalf of all those similarly situated for violations of the aforementioned statutes and common law doctrine.

## PARTIES

### A. Plaintiffs

***Plaintiff S.C.***

25. Plaintiff S.C. is a resident of the State of Wisconsin. Plaintiff S.C. created her BetterHelp account in approximately 2019 for help dealing with depression. Before creating her account, Plaintiff S.C. was required to fill out the Intake Questionnaire in effect at that time and she provided her Private Information as requested by BetterHelp. In the course of filling out her questionnaire, Plaintiff S.C. read and relied on BetterHelp's representations concerning its commitment to keep the information she provided confidential. Ultimately, Plaintiff S.C. signed up for BetterHelp's services for which she paid approximately $65 weekly. Had Plaintiff S.C. known that Defendant would not keep her information confidential she would not have completed the

[17] Donna Rosato, *What Your Period Tracker App Knows About You*, CONSUMER REPORTS (Jan. 28, 2020), https://www.consumerreports.org/health-privacy/what-your-period-tracker-app-knows-about-you/.

questionnaire and would not have paid BetterHelp for the Service or would have paid significantly less and thus lost money or property as a result of BetterHelp's unlawful conduct. Plaintiff S.C. had a Facebook and Instagram account during the relevant time period. Almost immediately after creating her BetterHelp account, Plaintiff S.C. received targeted ads for alternative mental health services providers and mood supplements on Facebook and Instagram that she believes resulted from her use of the Sites. Plaintiff S.C. reasonably expected that her communications with BetterHelp were solely between herself and BetterHelp and that any information that she provided to BetterHelp would be maintained as confidential. Plaintiff S.C. first learned that BetterHelp had shared her Private Information without her consent or knowledge after she read an online post in or about March of 2023.

***Plaintiff Jane Doe I***

26. Plaintiff Jane Doe I is a resident of the State of Michigan. Plaintiff Jane Doe I created her BetterHelp account in approximately October of 2021 for help with dialectical behavior therapy and cognitive behavior therapy. Before creating her account, Plaintiff Jane Doe I was required to fill out the Intake Questionnaire in effect at that time and she provided her Private Information as requested by BetterHelp. In the course of filling out her questionnaire, Plaintiff Jane Doe I read and relied on BetterHelp's representations concerning its commitment to keep the information she provided confidential. Ultimately, Plaintiff Jane Doe I signed up for BetterHelp's services for which she paid BetterHelp approximately $240 for a month. Plaintiff Jane Doe I had a Facebook and Instagram account during the relevant time period. Had Plaintiff Jane Doe I known that Defendant would not keep her information confidential, she would not have completed the questionnaire and would not have paid for the Service or would have paid significantly less and thus lost money or property as a result of BetterHelp's unlawful conduct. Both during and after stopping use of the Service, Plaintiff Jane Doe I began to receive advertisements from BetterHelp encouraging her to renew her use of the Service multiple times a day. She believes she started to see an increase in BetterHelp advertisements after she stopped using the Service. Plaintiff Jane Doe I reasonably expected that her communications with BetterHelp were solely between herself and BetterHelp and that any information that she provided to BetterHelp would be maintained as confidential. Plaintiff

Jane Doe I first learned that BetterHelp had shared her Private Information without her consent or knowledge after she read a CNN article in or about March of 2023. In addition, as set forth herein, on or about March 21, 2023, Plaintiff Jane Doe I's counsel served the required CLRA and CCPA demand letter on BetterHelp by certified mail, return receipt requested, seeking relief on behalf of herself and all Class members. BetterHelp failed to respond to that letter in the 30-day period as required by law.

***Plaintiff L.M.***

27. Plaintiff L.M. is a resident of the State of South Carolina. Plaintiff L.M. created her BetterHelp account in approximately October of 2021 for help coping with feelings of stress and to learn coping mechanisms. Before creating her account, Plaintiff L.M. was required to fill out the Intake Questionnaire in effect at that time and she provided her Private Information as requested by BetterHelp. In the course of filling out her questionnaire, Plaintiff L.M. read and relied on BetterHelp's representations concerning its commitment to keep the information she provided confidential. Ultimately, Plaintiff L.M. signed up for BetterHelp's services. She purchased a month's subscription through a promotional coupon. Had Plaintiff L.M. known that Defendant would not keep her information confidential she would not have completed the questionnaire and would not have paid for the Service or would have paid significantly less and thus lost money or property as a result of BetterHelp's unlawful conduct. Plaintiff L.M. had a Facebook and Instagram account during the relevant time period. After creating her account with BetterHelp, Plaintiff L.M. began to receive an increase in the number of targeted advertisements she received that she believes resulted from her use of the Service. Plaintiff L.M. reasonably expected that her communications with BetterHelp were solely between herself and BetterHelp and that any information that she provided to BetterHelp would be maintained as confidential. Plaintiff L.M. first learned that BetterHelp had shared her Private Information without her consent or knowledge after she received an email from BetterHelp disclosing that her Private Information was shared.

***Plaintiff Jane Doe III***

28. Plaintiff Jane Doe III is a resident of the State of California. Plaintiff Jane Doe III

created her BetterHelp account in approximately October of 2018 for mental health counseling. Before creating her account, Plaintiff Jane Doe III was required to fill out the Intake Questionnaire in effect at that time and she provided her Private Information as requested by BetterHelp. In the course of filling out her questionnaire, Plaintiff Jane Doe III read and relied on BetterHelp's representations concerning its commitment to keep the information she provided confidential. Plaintiff Jane Doe III used the platform to review billing information and to communicate with her therapist. Plaintiff Jane Doe III paid approximately $954 to BetterHelp for mental health services. Had Plaintiff Jane Doe III known that Defendant would not keep her information confidential she would not have completed the questionnaire and would not have paid for the Service or would have paid significantly less and thus lost money or property as a result of BetterHelp's unlawful conduct. Plaintiff Jane Doe III had a Facebook, Instagram, and Twitter account during the relevant time period. Shortly after beginning use of the Service, Plaintiff Jane Doe III began to receive advertisements for BetterHelp products and services that she believes resulted from her use of the Service. Plaintiff Jane Doe III reasonably expected that her communications with BetterHelp were solely between herself and BetterHelp and that any information that she provided to BetterHelp would be maintained as confidential. Plaintiff Jane Doe III first learned that BetterHelp had shared her Private Information without her consent or knowledge after she read a Facebook post in or about March of 2023.

***Plaintiff T.R.***

29. Plaintiff T.R. is a resident of the State of California. Plaintiff T.R. created his BetterHelp account in approximately 2019 or 2020 for mental health counseling. Before creating his account, Plaintiff T.R. was required to fill out the Intake Questionnaire in effect at that time and provided his Private Information as requested by BetterHelp. In the course of filling out his questionnaire Plaintiff T.R. read and relied on BetterHelp's representations concerning its commitment to keep the information he provided confidential. Ultimately, Plaintiff T.R. signed up for BetterHelp's services and paid $80 a month for four months of the Service. Had Plaintiff T.R. known that Defendant would not keep his information confidential, he would not have completed the questionnaire and would not have paid for the Service, or would have paid significantly less and

thus lost money or property as a result of BetterHelp's unlawful conduct. Shortly after creating his BetterHelp account, Plaintiff T.R. received targeted ads for BetterHelp multiple times a day that he believes resulted from his use of the Service. Plaintiff T.R. reasonably expected that his communications with BetterHelp were solely between himself and BetterHelp and that any information that he provided to BetterHelp would be maintained as confidential. Plaintiff T.R. first learned that BetterHelp had shared his Private Information without his consent or knowledge after he read a Facebook post in or about March of 2023.

30. Based on the above allegations, each of the Plaintiffs suffered economic injury not only in terms of the taking and unauthorized dissemination of their Private Information in which they have a vested interest but also as a result of being required to pay money to BetterHelp for subscription services that were not consistent with the benefit of their bargain and their reasonable belief that BetterHelp would keep such information private and confidential. As alleged above, they either would have paid less or not subscribed to such Service at all had the true facts about BetterHelp's information gathering and sharing practices been timely and fully disclosed to them, and thus each lost money or property as a result of BetterHelp's unlawful conduct.

31. Each of these Plaintiffs also reasonably believes they are subject to the continued risk of ongoing or future harm from BetterHelp's as well as third parties' continued retention and use of their Private Information, based in part on the advertisements from BetterHelp many continue to receive despite no longer using the Service, as well as BetterHelp's right or duty established by its own promises to protect such data and not to share it with third parties, federal and state law, and the FTC Order requiring it demand such data be deleted (discussed *infra)*, and thus to control the conduct of such third parties. Several of these third parties still retain such Private Information, directly derived from Plaintiffs' and Class Members' use of BetterHelp Sites. It was BetterHelp's programming of the Sites that permitted the sharing of such data with such third parties. While the FTC Order compels BetterHelp to request such information be deleted, Facebook/Meta, Snapchat, Pinterest and Criteo have each advised Plaintiffs that they received no such request from BetterHelp. In addition, Plaintiffs have obtained discovery showing third parties continue to possess information

improperly disclosed by BetterHelp, including certain Plaintiffs' Private Information obtained through BetterHelp. In addition to the other relief set forth below, BetterHelp can and should be compelled by this Court to do.

32. In addition, as detailed below, BetterHelp has its own direct duties and obligations to Plaintiffs and Class Members to redress the ongoing or future harm that exists as a result of its failure to comply with numerous rules and regulations applicable to it under various state and federal laws, including the disclosure requirements set forth by HHS as well as requirements under HIPAA and the CMIA regarding the sharing, deletion and notification to affected persons whose Private Information was shared without their authorization or consent, including taking all efforts necessary to ensure the deletion of such Private Information in the hands of third parties and all notifications as required by law.

33. In addition, while Plaintiffs and Class Members may wish to continue to use the benefits BetterHelp offers through its Service, they are unable to rely on Defendant's representations about the protection of such highly sensitive data in deciding whether or not to sign up again for such services in the future, and therefore, find themselves unable to use such services absent appropriate injunctive relief requiring that BetterHelp comply with the applicable requirements of state and federal law, and the requirement to only make truthful representations about the protection of such Private Information upon which they could reasonably rely.

**B. Defendants**

34. Defendant BetterHelp, Inc., also doing business as Compile, Inc.; MyTherapist; Teen Counseling; Faithful Counseling; Pride Counseling; iCounseling; ReGain; and Terappeuta, is a Delaware corporation with its principal office or place of business located at 990 Villa St., Mountain View, CA 94041.

35. BetterHelp operates in and from California through various Sites, including, https://www.BetterHelp.com, https://www.regain.us, and https://www.teencounseling.com. The company provides its Service to millions of consumers nationwide, with its operations emanating out of its corporate offices in California.

36. The true names, roles, and capacities in terms of their involvement in the wrongdoing

at issue, whether individual, corporate, associate, or otherwise, of Defendants named as Does 1 through 10, inclusive, are currently unknown to Plaintiffs and, therefore, these entities and/or individuals are named as Defendants under fictitious names. Plaintiffs will identify these Defendants' true identities and their involvement in the wrongdoing at issue if and when they become known.

## JURISDICTION AND VENUE

37. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C § 1331 as this matter asserts a Cause of Action over which there is federal jurisdiction, and § 1332(d), because the amount in controversy for the Class exceeds $5,000,000 exclusive of interest and costs, there are more than 100 putative Class Members defined below, and minimal diversity exists because a significant portion of putative Class Members, including several of the named Plaintiffs, are citizens of a state different from the citizenship of Defendant.

38. This Court has general personal jurisdiction over BetterHelp because it maintains its principal place of business in California. Additionally, BetterHelp is subject to specific personal jurisdiction in this State because a substantial part of the events and conduct giving rise to Plaintiffs' and others' claims occurred in, emanated from or arose out of actions taken within this State.

39. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), (c), and (d) because BetterHelp is based in this District, transacts business in this District and a substantial portion of the events giving rise to the claims occurred in this District.

## FACTUAL ALLEGATIONS

### A. THE BETTERHELP PLATFORM

40. Defendant BetterHelp has been in operation since 2013, offering paid subscription online mental health counseling services via various websites and apps, including the Sites. BetterHelp has spent significant effort and capital since inception by advertising and marketing its services through various digital and traditional media platforms, including television and radio as well as podcasts, search engine ads, and through third parties such as Facebook/Meta, Snapchat, Pinterest, and Criteo.

41. Defendant has spent tens if not hundreds of millions of dollars annually to market its counseling services. In 2020, Defendant spent between $10 million and $20 million on Facebook advertising alone. This advertising was extremely successful; by 2021, Defendant's advertising through Facebook was generating approximately 90,000 – 120,000 new customers per year.

42. Defendant markets its services by offering consumers online communications with licensed therapists "who you can trust." BetterHelp also claims that customers using its therapists will "get the same professionalism and quality you would expect from an in-office therapist, but with the ability to communicate when and how you want."[18]

43. To begin the process of signing up for the Service or using the platform, when a Class Member visited one of Defendant's Sites, she would be asked if she was looking for "Individual," "Couples," or "Teen" therapy. Having made her selection, she would then be asked a series of questions in the Intake Questionnaire regarding her mental health, including "Have you been in therapy before", "Rate your physical health", and "Are you experiencing depression."

44. Defendant's mandatory Intake Questionnaire also asks a series of sensitive questions about mental health symptoms and the reasons why the individual is seeking therapy (e.g., feelings of depression, anxiety, grief, etc.), including if the customer is "experiencing overwhelming sadness, grief, or depression" or has been having thoughts that the customer "would be better off dead or hurting yourself in some way."

45. Depending upon the answers to some of the questions in Defendant's Intake Questionnaire, the Class Member might be invited to move to another of Defendant's Sites or respond to another Questionnaire asking even more intimate questions. If, for example, the Class Member was on one of the Sites and indicated that she was seeking couples counseling she might be re-directed to Defendant's ReGain website; if she indicated that she was a member of the LGBTQ community she might be re-directed to Defendant's Pride Counseling website. All Class Members, regardless of the type of service they selected, were required to complete the Intake Questionnaire in order to sign up for the Service. The Intake Questionnaire on each Site was identical or substantially similar in all material respects.

[18] betterhelp.com (last visited Aug. 2, 2024).

46. Upon completing the Intake Questionnaire, Plaintiffs and Class Members would be prompted to create a paid account for the Service by entering personal information, including name, email address, phone number, emergency contact information, and payment details.

47. Throughout the Class Period, the process of signing up for the Service on each of Defendant's Sites has been substantially the same.

48. Thus, as a condition of using the Service, Plaintiffs and other Class Members were required by Defendant to enter confidential, private, and sensitive personal and health information into the respective Sites they accessed.

## B. BETTERHELP PROMISED TO MAINTAIN CONFIDENTIALITY

49. Throughout the operation of its Service, BetterHelp made repeated representations to its users, and to those who fill out its mandatory Intake Questionnaire, regarding its commitment to maintaining the Private Information of Plaintiffs and Class Members as confidential. Plaintiffs relied on these representations when deciding to provide their Private Information to BetterHelp and when deciding whether to pay for BetterHelp's Service or access its platform.

50. Unfortunately for Plaintiffs and Class Members, BetterHelp's representations that it would keep the Private Information of Plaintiffs and Class Members confidential were false, misleading, and deceptive as BetterHelp completely disregarded its commitment to confidentiality and instead allowed third parties to monitor Plaintiffs and Class Members in real time as they filled out the Intake Questionnaire or used the Sites.

51. For example, from September 2013 to December 2020, Defendant displayed HIPAA seals on its platform, which reasonable patients and consumers, including Plaintiffs and Class Members, understood to signal Defendant's purported compliance with HIPAA regulations.

52. By displaying HIPAA seals on many pages of Defendant's Sites, BetterHelp signaled and suggested to Plaintiffs and Class Members that a government agency or other third party had reviewed Defendant's privacy and information security practices and determined that they met HIPAA's requirements.

53. Defendant also represented to patients and consumers that it was in fact "HIPAA

certified," with its customer service representatives informing consumers that Defendant was HIPAA Certified.

54. By displaying HIPAA seals and informing patients and customers that BetterHelp was HIPAA certified it reasonably enticed patients and customers, including Plaintiffs and the Class Members, to believe that any information collected from them would be kept private in compliance with industry standards for protecting such information. As such, Plaintiffs and the Class Members provided their Private Information to BetterHelp.

55. No government agency or other third party reviewed Defendant's information practices for compliance with HIPAA, let alone determined that its practices met the requirements of HIPAA and that BetterHelp did qualify for such certification.

56. BetterHelp also made repeated and unambiguous privacy assurances to Plaintiffs and Class Members throughout its Intake Questionnaire. For example, at least until November 2021, each of Defendant's platforms displayed a banner at the top of each question in the questionnaire, explaining that BetterHelp was merely asking for "some general and *anonymous* background information about you and the issues you'd like to deal with in online therapy" (emphasis added) so that the individual completing the questionnaire could be matched "with the most suitable therapist for you."

57. As Plaintiffs and other Class Members proceeded through the Intake Questionnaire, Defendant made additional privacy assurances, which it periodically modified. From at least August 2017 to December 2020, when a Plaintiff or other Class Member reached the question as to whether they had taken medication, they were shown the statement: "Rest assured – any information provided in this questionnaire will stay private between you and your counselor." In December 2020, Defendant changed the statement to read: "Rest assured – *this information* will stay private between you and your counselor." (emphasis on alteration added). And in January 2021, Defendant changed it again to state: "Rest assured – *your health information* will stay private between you and your counselor. (emphasis on alteration added). This latter version of the representation remained in use until September 2021, when it was removed altogether, but could still be reasonably presumed.

58. Defendant also made false promises about its use of customers' email addresses,

telling visitors to the Faithful Counseling, Pride Counseling, and Teen Counseling websites during the sign-up process that their email addresses would not be shared. From at least August 2017 to December 2020, Defendant assured such Website visitors that "Your email address is kept *strictly private*. It is never shared sold or disclosed to anyone. Even your counselor won't know your real email address." (emphasis added).

59. Millions of users, including Plaintiffs and Class Members, who ultimately signed up for BetterHelp's counseling services were presented with these repeated promises and relied on these promises when deciding to pay for Defendant's Service and whether to provide their Private Information to Defendant. Despite these promises, and contrary to Plaintiffs' and Class Members' reasonable expectations, Defendant shared the Private Information with unauthorized third parties for its own benefit, including by sharing it, allowing for its interception by third parties, and disclosing it in return for valuable marketing and analytical data.

60. In addition to the unambiguous representations that BetterHelp presented to Plaintiffs and Class Members about how it would keep their information confidential throughout out the mandatory Intake Questionnaire process, BetterHelp also maintained a Privacy Policy that could only be accessed by scrolling to the bottom of the webpage and clicking on a hyperlink in shaded and fine print font. Users were never affirmatively required to read or assent to the Privacy Policy before completing BetterHelp's Intake Questionnaire or using the Sites.[19] Moreover, prominently displayed on the BetterHelp landing page was a representation that "[a]ll counselors are licensed, accredited professionals. BetterHelp allows you to connect with them in a safe and private online environment. Anything you share is confidential."[20]

61. From August 2013 to November 2018, Defendant's Privacy Policy represented that BetterHelp would only use and disclose users' email addresses, IP addresses, enrollment in the Service, and intake questionnaire responses for certain purposes, including to connect them with

---

[19] Defendant's Landing Page as of June 3, 2017 with the Privacy Policy hyperlink located at the bottom of the page can be found at https://web.archive.org/web/20170603005910/https://www.betterhelp.com/

[20] *Id.*

therapists and operate the Service.[21] Notably, the Privacy Policy made no mention of using or disclosing this information for advertising purposes, and it said nothing about permitting third parties to actually acquire, intercept, view, collect and use this information for their own purposes.

62. In November 2018, Defendant updated the Privacy Policy to state affirmatively that it would use and disclose this information only for limited purposes, such as to operate and improve the Service. These limited purposes did not include using or disclosing the information for advertising or disclosing the information to third parties to actually acquire, view, collect and use for their own purposes.[22]

63. Defendant revised its Privacy Policy again in September 2019, stating that it might *use* this medical information for advertising. But the policy continued to say that defendant would only *disclose this medical information to third parties* for certain stated limited purposes, which did not include advertising or allowing the third parties to actually acquire, intercept, view, collect and use for their own purposes.[23]

64. In September 2020, Defendant revised the Privacy Policy yet again to state that it might both use and disclose users' information for advertising. However, the Privacy Policy continued to claim that Defendant would disclose this information to third parties for only the stated limited purposes, which did not include third parties' to actually acquire, intercept, view, collect and use for their own purposes.[24]

65. From August 2013 to June 2021, Defendant's privacy policies stated that it would use web beacons (including pixels) and cookies for limited purposes. These limited purposes did not include the use or disclosure of users' Private Information for advertising purposes, or the disclosure of this information for third parties to actually intercept, acquire, view, collect and use for their own purposes. In fact, the Privacy Policy expressly represented that "[w]e use cookies and web beacons

---

[21] Defendant's Privacy Policy as of February 28, 2017 can be found at https://web.archive.org/web/20170228111124/https://www.betterhelp.com/privacy/

[22] Defendant's Privacy Policy as of December 5, 2018 can be found at https://web.archive.org/web/20181205150455/https://www.betterhelp.com/privacy/

[23] Defendant's Privacy Policy as of January 9, 2020 can be found at https://web.archive.org/web/20200109021030/https://www.betterhelp.com/privacy/

[24] Defendant's Privacy Policy as of November 27, 2020 can be found at https://web.archive.org/web/20201127181507/https://www.betterhelp.com/privacy/

to enable the technical operation of the platform, to administer your log-in to your account and to collect the Log Data." Accordingly, the Privacy Policy represented that the use of such tools was limited to the platform's functionality. However, as discussed below, these tools permitted Defendant and third parties, including Facebook/Meta, to collect Plaintiffs' and Class Members' Private Information, including what pages they visited and what information they communicated through the Sites.

## C. BETTERHELP DISCLOSED THE PRIVATE INFORMATION OF PLAINTIFFS AND CLASS MEMBERS TO UNAUTHORIZED PARTIES

66. Despite Defendant's consistent and unambiguous messaging regarding its commitment to the confidentiality of information communicated through the use of its Sites, Defendant disregarded its promises and the rights and expectations of Plaintiffs and Class Members by sharing their Private Information with third party marketing companies in exchange for valuable analytics and marketing insights.

67. Completely unbeknownst to Plaintiffs and Class Members, the Private Information that they communicated to Defendant through the use of Defendant's Sites, both while signing up for the Service and thereafter, including the fact that they were seeking mental health treatment, was intercepted by and/or disclosed to unauthorized third parties including Facebook/Meta, Pinterest, Criteo, and Snapchat.

68. Contrary to the understanding and expectations of Plaintiffs and Class Members, BetterHelp used a wide variety of tactics to share the Private Information of over 7 million consumers who filled out Defendant's Intake Questionnaire or who provided Private Information during their use of the Service.

69. On several occasions during the Class Period, Defendant uploaded Plaintiffs' and Class Members' email addresses to Meta. For example: (a) between January 2017 and October 2018, Defendant uploaded 170,000 visitors' and users' email addresses to Facebook, re-targeting these individuals and targeting potential new users with advertisements for the Service; (b) between January 2018 and October 2018, Defendant uploaded 15,000 users' email addresses to Facebook to find and target new potential users with advertisements for the Service; and, (c) in October 2017

Defendant uploaded the email addresses of all of their current and former users – nearly 2 million in total – to Meta, targeting them all with advertisements to refer their Facebook friends to the Service.

70. Defendant also used Private Information obtained from Class Members who signed up for the Service through Pride Counseling in order to optimize Defendant's future advertisements for the Service. From November 2017 to October 2020, Defendant gathered information concerning Class Members' mental health statuses and their connection with Class Members' LGBTQ identities when they visited its Site. For example, Defendant gathered this information through the Intake Questionnaire whenever a Pride Counseling user revealed that the User's "LGBTQ identity is contributing to your mental health concerns." Defendant used Facebook to identify characteristics and interests common among these users and then to target future advertisements for the Service on Facebook to individuals with similar characteristics and interests.

71. As another example, in January 2019, Defendant disclosed the IP addresses and email addresses of approximately 5.6 million visitors to its Sites (including Class Members) to Snapchat in order to re-target them with advertisements for the Service.

72. Similarly, from July 2018 to January 2019, Defendant disclosed the email addresses of over 70,000 visitors to its Sites (including Class Members) to Criteo in order to re-target them with advertisements.

73. And, from August 2019 to September 2020, Defendant disclosed the email addresses of thousands of visitors to its Sites (including Class Members) to Pinterest for advertising purposes.

74. As evidenced by Defendant's repeated and willful disclosure of Private Information, Defendant failed to implement reasonable and adequate data security policies and procedures and failed to employ, train, and oversee its marketing personnel to ensure that their practices complied with BetterHelp's representations and applicable laws.

75. For example, according to the FTC, in 2017 Defendant delegated most decision-making authority over its use of Facebook/Meta's advertising services to a junior marketing analyst who was a recent college graduate, had never worked in marketing, and had no experience and little training in safeguarding consumers' Private Information or ensuring that only appropriate information was used for advertising. In 2017, Defendant gave the analyst unilateral authority to

decide what Private Information to upload to Facebook and how to use that information. Defendant provided this marketing analyst with little training on how to protect customers' Private Information in connection with advertising until 2021.

76. As a result of Defendant's failure to perform due diligence in hiring and training its employees, Defendant's marketing team not only disclosed the Private Information of Plaintiffs and Class Members as described above, but also made the decision to employ tracking software that allowed companies like Facebook/Meta to intercept the communications of Plaintiffs and Class Members with BetterHelp in real time, including the Private Information transmitted through the Intake Questionnaire and thereafter when using the Sites.

## D. BETTERHELP'S TRACKING PIXELS TRANSMITTED CONFIDENTIAL INFORMATION TO FACEBOOK IN REAL TIME

77. Facebook/Meta and other online platforms derive revenue almost exclusively from selling targeted advertising to both the users of its own platform, Facebook, and to internet users generally by integrating web beacons and cookies onto websites like BetterHelp's Sites. Facebook/Meta generated $117 billion in revenue in 2021, roughly 97% of which was derived from selling advertising space.[25] Facebook/Meta can generate such revenue through its ability to precisely target individual consumers. One way it is able to do this is through the use of web beacons or "pixels."

78. A pixel is a piece of code that "tracks the people and [the] type of actions they take"[26] as they interact with a website, including, inter alia, how long a person spends on a particular web page, which buttons the person clicks, which pages they view, and the text or phrases they type into various portions of the website (such as a general search bar, chat feature, or text box), among other things.

79. Social media platforms like Facebook/Meta use the pixel and similar tracking software to build profiles on web users that include real names, locations, email addresses, telephone

---

[25] FACEBOOK, META REPORTS FOURTH QUARTER AND FULL YEAR 2021 RESULTS, https://investor.fb.com/investor-news/press-release-details/2022/Meta-Reports-Fourth-Quarter-and-Full-Year-2021-Results/default.aspx

[26] See *Retargeting*, Facebook, https://www.facebook.com/business/goals/retargeting.

numbers, interests, purchasing habits, and communications that the companies associate with unique personal identifiers like IP addresses, browser fingerprints, device IDs and cookie identifiers.

80. By associating or assigning these identifiers to a particular individual these companies can track a user's behavior across websites in order to build a more detailed consumer profile. Facebook/Meta for example assigns what it calls a Facebook user ID ("FID") to each individual user of its platform. A user's FID is associated with their Facebook profile, which typically includes diverse demographic and personal information such as user's location, photos, interests, employment history, relationship status, and other details. Since the FID serves as a unique identifier for an individual's Facebook account, Facebook or any regular person can effortlessly utilize the FID to locate, access, and view the user's corresponding Facebook profile without difficulty. In the case of Facebook/Meta, the pixel forces the website user to share the user's FID with each communication via a "cookie" that Facebook/Meta stores in users browsers. And for both Facebook account-holders and users who do not have a Facebook account, these identifiers also include cookies that Facebook/Meta ties to users' browsers, such as "datr" and "fr" cookies.[27]

81. The pixel functions by being embedded in a user's browser after they request to visit a website, such as the Sites. Web browsers are software applications that allow consumers to navigate the Internet and view and exchange electronic information and communications over the Internet. Each "client device" (such as computer, tablet, or smart phone) accesses web content through a browser (*e.g.*, Google's Chrome browser, Mozilla's Firefox browser, Apple's Safari browser, or Microsoft's Edge browser).

82. Every website, including the BetterHelp Sites, is hosted by a computer "server" that holds the website's contents and through which the entity in charge of the website exchanges communications with Internet users' client devices via the users' browsers.

83. Web communications consist of "HTTP" or HTTPS Requests and HTTP or HTTPS Responses, and any given browsing session may consist of thousands of individual HTTP Requests and HTTP Responses, along with corresponding cookies:

**HTTP Request**: an electronic communication sent from the client device's browser to the

[27] Facebook/Meta, *Cookies Policy* (Oct. 5, 2022), https://www.facebook.com/policy/cookies.

website's server. GET Requests are one of the most common types of HTTP Requests. In addition to specifying a particular URL (i.e., web address), GET Requests can also send data to the host server embedded inside the URL, and can include cookies. POST Requests can send a large amount of data outside of the URL. (For instance, uploading a PDF for filing a motion to a court).

**Cookies**: a small text file that can be used to store information on the client device which can later be communicated to a server or servers. Cookies are sent with HTTP Requests from client devices to the host server. Some cookies are "third-party cookies," which means they can store and communicate data when visiting one website to an entirely different website.

**HTTP Response**: an electronic communication that is sent as a reply to the client device's web browser from the host server in response to an HTTP Request. HTTP Responses may consist of a web page, another kind of file, text information, or error codes, among other data.[28]

84. A website visitor's HTTP Request essentially asks BetterHelp's servers to retrieve certain information (such as the Intake Questionnaire page and any submitted responses). The HTTP Response sends the requested information in the form of a "Markup." This is the foundation for the pages, images, words, buttons, and other features that appear on Plaintiffs' and Class Members' screens as they navigate Defendant's Sites.

85. Every website is comprised of Markup and "Source Code." Source Code is simply a set of instructions that commands the website visitor's browser to take certain actions when the web page first loads or when a specified event triggers the source code.

86. Source code may also command a web browser to send data transmissions to third parties in the form of HTTP Requests quietly executed in the background without notifying the browser's user. The pixel software is source code that does just that. The pixel acts much like a traditional wiretap. When a user visits a BetterHelp Site and accesses its servers via an HTTP Request to BetterHelp's server, the server sends an HTTP Response including the Markup that displays the webpage visible to the user and the invisible Source Code, in this case, the pixel. Once the webpage is loaded into the users' browser, the pixel software waits for the user to communicate information via a GET Request, which duplicates that GET Request in dispatch and directs it to a third-party server, in this case for example, Facebook/Meta's server.

---

[28] One browsing session may consist of hundreds or thousands of individual HTTP Requests and HTTP Responses.

87. This second transmission, completely invisible and unknown to the user, contains the content of the original request sent to the host website ("GET request"), along with the data that the pixel was configured to collect ("POST request"). GET and POST requests are communications that contain contents from both the user and from servers associated with the website they are visiting, including the Sites. These second transmissions are initiated by pixel code and concurrent with the communications to and from the host websites, including the Sites.

88. In addition to the communication itself, the pixel software that Defendant intentionally embeds on its Sites will also capture personal identifiers like the FID, browser fingerprints, device IDs, and IP addresses. IP addresses are used to identify and route communications on the Internet. IP addresses of individual Internet users are used by websites and tracking companies to facilitate and track Internet communications. Individual homes and their occupants can be, and are, tracked and targeted with advertising using IP addresses. Thus, IP addresses are personally identifiable, particularly in combination with other information disclosed through the pixel software.

89. Completely unbeknownst to Plaintiffs and other Class Members, and continuing to the present, Private Information that they communicated to Defendant through Defendant's Sites and while signing up for the Service and thereafter, including the fact that they signed up for the Service, was intercepted by and/or disclosed to unauthorized third parties including at least Facebook/Meta, Pinterest, Criteo, and Snapchat.

90. Facebook/Meta warns developers and those who incorporate the Facebook pixel into their website that the pixel is a personal identifier because it "relies on Facebook cookies, which enable us to match your website visitors to their respective Facebook user accounts."[29]

91. Nevertheless, on date unknown and continuing to the present, Defendant embedded pixel software and other tracking tools throughout its Sites, including the Intake Questionnaire, and allowed third parties to intercept the confidential communications and Private Information of Plaintiffs and Class Members without their authorization, consent or knowledge.

[29] Facebook, Get Started, https://developers.facebook.com/docs/meta-pixel/get-started (last visited Jan. 18, 2023).

92. When a Plaintiff or Class Member visited one or more of Defendant's Sites and completed the steps necessary to obtain Defendant's Service, the pixel or other tracking tool automatically caused the users' personal identifiers, including email addresses, IP addresses and the c_user, _fr, _datr, and _fbp cookies, to be transmitted to Facebook/Meta, attached to the fact that the particular user had visited the Sites, the titles of the pages the user visited, and the text they inputted into form fields, like those on the Intake Questionnaire, as well as additional sensitive information.

93. Because Defendant only collected email addresses from individuals seeking mental health therapy via the Service, disclosure of simply a Plaintiffs' or a Class Member's email address implicitly identified Plaintiffs or the respective Class Member as one seeking and/or receiving mental health treatment via the Service. Thus, each such disclosure constituted a disclosure of Private Information.

94. Because Defendant disclosed Plaintiffs' and Class Members' email addresses, names, IP addresses and other personal identifiers, including their FIDs, in conjunction with other data about their enrollment in the Service and/or their Intake Questionnaire responses and other sensitive information, each such disclosure constituted a disclosure of Private Information of Plaintiffs and Class Members.

95. In addition to the "automatic events" that the pixel automatically collects and transmits from a website without the website owner or developer being required to add any additional code, Defendant intentionally configured the pixel on its Sites to track, collect, and disclose "custom events" such as a user's response to certain questions in the Intake Questionnaire such as: "Have you been in counseling or therapy before?" or questions regarding their faith, their sexuality, and even their financial condition.

96. Defendant disclosed to Facebook/Meta the details of over 1.5 million visitors' and users' previous therapy – gathered through their affirmative responses to the Intake Questionnaire question: "Have you been in counseling or therapy before?"

97. Between October 2018 and November 2020, Defendant disclosed to Facebook/Meta the financial status of over 3.5 million visitors and users who answered that they had "good" or

"fair" financial status on the Intake Questionnaire.

98. In addition, between January and December 2020, Defendant shared with Facebook the fact that over 180,000 identifiable visitors had become paying users. This information was disclosed through an event notifying Facebook that the users had entered credit card information after completing the Intake Questionnaire.

99. Put simply, when Plaintiffs or other Class Members used Defendant's Sites to obtain the Service from Defendant, their Private Information, including their identities, unique identifiers, and protected health information was disclosed to Facebook/Meta and other third parties.

100. Defendant disclosed Plaintiffs' and Class Members' Private Information to Facebook/Meta and other third parties in order to allow BetterHelp to improve its marketing and advertising and to increase Defendant's subscribers, revenues, and profits. Thus, Defendant embedded the pixel on its Sites solely for its own benefit and used Plaintiffs' and Class Members' Private Information for its own marketing and advertising purposes and to increase its revenues and profits rather than to provide medical services to such individuals.

101. Moreover, and as evidenced by Plaintiffs' receipt of targeted ads from BetterHelp or related to mental health products and services, Facebook/Meta analyzes, categorizes, and uses the Private Information disclosed to them by BetterHelp through the Sites for their own purposes, including building consumer profiles and directing advertisements at Plaintiffs and Class Members. Defendant did not contractually limit how Facebook/Meta and other third parties could use and disclose the Private Information they received from Defendant about Plaintiffs and Class Members other than merely agreeing to those third parties' general terms of service, which either placed no restrictions on the third parties' use and disclosure of the information or specifically permitted the third parties to use the information for their own purposes, contrary to BetterHelp's representations and obligations under federal and state law, as discussed *infra.*

102. Facebook/Meta viewed and continues to have in its possession information that BetterHelp provided access to regarding several of the Plaintiffs' interactions with BetterHelp, including their Private Information. Facebook/Meta has viewed the information unlawfully shared with it by BetterHelp, associated it with individual Plaintiffs, and continues to possess information

that verifies the fact, *inter alia*, that they were seeking mental health therapy from BetterHelp. Facebook/Meta also received from BetterHelp and retained and viewed information about the specific date and time when people log in to the BetterHelp website and, in some cases, highly private and Private Information they have not shared with others – and certainly did not authorize to be shared with companies such as Facebook/Meta. This is evidenced by the fact that Plaintiffs continue to receive advertisements from BetterHelp on Facebook/Meta despite no longer using the Service.

## E. DEFENDANT HAD A DUTY TO PROTECT THE PRIVATE INFORMATION OF PLAINTIFFS AND CLASS MEMBERS FROM DISCLOSURE

103. Defendant is required by the laws identified herein and various other laws and regulations designed to protect Plaintiffs' and Class Members' Private Information and to handle notification of any unauthorized use of such Private Information in accordance with applicable statutes, including breach notification statutes. These duties are established in numerous California statutes, including Cal. Civ. Code §§ 56.10(d), 1798.21, 1798.29, Cal. Bus. and Prof. Code §§ 17200 *et seq.,* the Online Privacy Protection Act, California Business and Professions Code §§ 22575-22579 ("CalOPPA"); Cal. Penal Code § 630-632 *et seq*., as well as Article I, § 1 of the California Constitution.

104. Based on the Service it provides consumers and its business model and practices as set forth above, Defendant is a "covered entity" as a "health care provider" pursuant to HIPAA. *See* 45 C.F.R. § 160.102. Defendant must, therefore, comply with the HIPAA Privacy Rule and Security Rule. *See* 45 C.F.R. Part 160 and Part 164, Subparts A through E.

105. Defendant is also a "covered entity" pursuant to the Health Information Technology Act ("HITECH")[30]. *See* 42 U.S.C. §17921, 45 C.F.R. § 160.103.

106. HIPAA's Privacy Rule, otherwise known as "Standards for Privacy of Individually Identifiable Health Information," establishes national security standards and duties for Defendant's protection of Private Information maintained by it.

---

[30] HIPAA and HITECH work in tandem to provide guidelines and rules for maintaining protected health information. HITECH references and incorporates HIPAA.

107. HIPAA's Security Rule, otherwise known as "Security Standards for the Protection of Electronic Protected Health Information," establishes national security standards for the protection of health information that is held or transferred. See 42 C.F.R. §§ 164.302-164.318.

108. HIPAA limits the permissible uses and disclosure of "protected health information" by companies such as BetterHelp and prohibits the unauthorized disclosure of "protected health information." 45 C.F.R. § 164.502. HIPAA requires that covered entities implement appropriate administrative, technical, and physical safeguards for this information and requires that covered entities reasonably safeguard protected health information from any intentional or unintentional use or disclosure that is in violation of the standards, implementation specifications or other requirements of this subpart. *See* 45 C.F.R. § 164.530(c).

109. HIPAA requires a covered entity to have and apply appropriate sanctions against members of its workforce who fail to comply with the privacy policies and procedures of the covered entity or the requirements of 45 C.F.R. Part 164, Subparts D or E. *See* 45 C.F.R. § 164.530(e).

110. HIPAA requires a covered entity to mitigate, to the extent practicable, any harmful effect that is known to the covered entity of a use or disclosure of protected health information in violation of its policies and procedures or the requirements of 45 C.F.R. Part 164, Subpart E by the covered entity or its business associate. *See* 45 C.F.R. § 164.530(f).

111. Under HIPAA, PHI means individually identifiable health information:

> (1) Except as provided in paragraph (2) of this definition, that is:
>
> (i) Transmitted by electronic media;
>
> (ii) Maintained in electronic media; or
>
> (iii) Transmitted or maintained in any other form or medium.[31]

112. HIPAA and HITECH obligated Defendant to implement technical policies and procedures for electronic information systems that maintain electronic protected health information so that such systems were accessible only to those persons or software programs that had been granted access rights and who have a working need to access and view the information. *See* 45

[31] 45 C.F.R. § 160.103

C.F.R. § 164.312(a)(1); *see also* 42 U.S.C. §17902.

113. HIPAA and HITECH also obligated Defendant to implement policies and procedures to prevent, detect, contain, and correct security violations, and to protect against uses or disclosures of electronic protected health information that are reasonably anticipated but not permitted by the Privacy Rule and the Security Rule. *See* 45 C.F.R. § 164.306(a)(1) and § 164.306(a)(3); *see also* 42 U.S.C. §17902.

114. HIPAA further obligated Defendant to ensure that its workforce complied with HIPAA security standard rules (*see* 45 C.F.R. § 164.306(a)(4)) to effectively train its workforces on the policies and procedures with respect to protected health information, as necessary and appropriate for those individuals to carry out their functions and maintain the security of protected health information. *See* 45 C.F.R. § 164.530(b)(1).

115. HIPAA also requires the Office of Civil Rights ("OCR"), within the "HHS", to issue annual guidance documents on the provisions in the HIPAA Security Rule. *See* 45 C.F.R. §§ 164.302-164.318. For example, "HHS has developed guidance and tools to assist HIPAA covered entities in identifying and implementing the most cost effective and appropriate administrative, physical, and technical safeguards to protect the confidentiality, integrity, and availability of e-PHI and comply with the risk analysis requirements of the Security Rule." *See* U.S. Department of Health & Human Services, Security Rule Guidance Material.[32] The list of resources includes a link to guidelines set by the National Institute of Standards and Technology ("NIST"), which OCR says "represents the industry standard for good business practices with respect to standards for securing e-PHI." *See* US Department of Health & Human Services, Guidance on Risk Analysis.[33]

116. Should a health care provider experience an unauthorized disclosure, it is required to conduct a Four Factor Risk Assessment under the "HIPAA Omnibus Rule." This standard requires, "A covered entity or business associate must now undertake a four-factor risk assessment to determine whether or not PHI has been compromised and overcome the presumption that the breach

[32] http://www.hhs.gov/hipaa/for-professionals/security/guidance/index.html

[33] https://www.hhs.gov/hipaa/for-professionals/security/guidance/guidance-risk-analysis/index.html

must be reported. The four-factor risk assessment focuses on:

> (1) the nature and extent of the PHI involved in the incident (e.g., whether the incident involved sensitive information like social security numbers or infectious disease test results);
>
> (2) the recipient of the PHI;
>
> (3) whether the PHI was actually acquired or viewed; and
>
> (4) the extent to which the risk that the PHI was compromised has been mitigated following unauthorized disclosure (e.g., whether it was immediately sequestered and destroyed).[34]

117. The HIPAA Breach Notification Rule, 45 C.F.R. §§ 164.400-414, requires HIPAA covered entities and their business associates to provide notification following a breach or unauthorized access of unsecured protected health information.

118. The HIPAA Contingency Operations Rule, 45 C.F.R. §164.301(a), requires a healthcare provider to have security measures in place and train its employees and staff so that all its staff and employees know their roles in facility security.

119. Defendant has failed to provide proper notice to Plaintiffs and Class Members of the unauthorized disclosures set forth above, as required by the laws and regulations set forth above and herein.

120. Defendant failed to conduct or improperly conducted the four-factor risk assessment following the unauthorized disclosures set forth above.

121. As Defendant is an entity covered by HIPAA it is required to comply with the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E and Security Rule 45 C.F.R. Part 160 and Part 164, Subparts A and C, which establish national security standards and duties for Defendant's protection of Private Information maintained by them in electronic form. HIPAA limits the permissible uses of health information and prohibits the disclosure of this

[34] 78 Fed. Reg. 5641-46, *See also*, 45 C.F.R. §164.304

information without explicit authorization. *See* 45 C.F.R. § 164.502. HIPAA also requires that covered entities implement appropriate safeguards to protect this information. See 45 C.F.R. § 164.530(c)(1).

122. HIPAA requires Defendant to "comply with the applicable standards, implementation specifications, and requirements" of HIPAA "with respect to electronic protected health information [defined above]" 45 C.F.R. § 164.302.

123. HIPAA's Security Rule requires Defendant to: (a) ensure the confidentiality, integrity, and availability of all electronic protected health information the covered entity or business associate creates, receives, maintains, or transmits; (b) protect against any reasonably anticipated threats or hazards to the security or integrity of such information; (c) protect against any reasonably anticipated uses or disclosures of such information that are not permitted; and (d) ensure compliance by its workforce.

124. HIPAA also requires Defendant to "review and modify the security measures implemented . . . as needed to continue provision of reasonable and appropriate protection of electronic protected health information" (45 C.F.R. § 164.306(c)), and also to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. § 164.312(a)(1).

125. Defendant failed to comply with safeguards mandated by the above HIPAA regulations by, *inter alia*, doing the following:

(a) Failing to ensure the confidentiality and integrity of electronic PHI that Defendant creates, receives, maintains, and transmits, in violation of 45 C.F.R. § 164.306(a)(1);

(b) Failing to implement technical policies and procedures for electronic information systems that maintain electronic PHI to allow access only to those persons or software programs that have been granted access rights such as by the use of multi-factor authentication, in violation of 45 C.F.R. § 164.312(a)(1);

(c) Failing to implement policies and procedures to prevent, detect, contain, and correct

security violations, in violation of 45 C.F.R. § 164.308(a)(1);

(d) Failing to identify and respond to suspected or known security incidents and mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity, in violation of 45 C.F.R. § 164.308(a)(6)(ii);

(e) Failing to protect against any reasonably-anticipated threats or hazards to the security or integrity of electronic PHI, in violation of 45 C.F.R. § 164.306(a)(2);

(f) Failing to protect against any reasonably anticipated uses or disclosures of electronic PHI that are not permitted under the Privacy Rules regarding individually identifiable health information, in violation of 45 C.F.R. § 164.306(a)(3);

(g) Failing to ensure compliance with HIPAA Security Rules by its workforce by providing for adequate comprehensive training rather than simply using training software to test staff by imitating phishing emails, in violation of 45 C.F.R. § 164.306(a)(4);

(h) Impermissibly and improperly using and disclosing PHI that is and remains accessible to unauthorized persons, in violation of 45 C.F.R. § 164.502, et seq.;

(i) Failing to effectively train all members of its workforce (including independent contractors) on the policies and procedures with respect to PHI as necessary and appropriate for the members of its workforce to carry out their functions and to maintain security of PHI, in violation of 45 C.F.R. sections 164.530(b) and 164.308(a)(5); and

(j) Failing to design, implement, and enforce policies and procedures establishing physical and administrative safeguards to reasonably safeguard PHI, in violation of 45 C.F.R. § 164.530(c).

126. BetterHelp, by now claiming that HIPAA does not apply to it despite the laws governing its conduct and the representations it has publicly made, has not acted in accordance with these requirements, and still is not doing so. It has failed and refused to provide notice to either the OCR or the State Attorneys General of the unauthorized disclosure of such information. It has failed to disclose to each affected individual the nature of the Private Information disclosed and to whom

it was disclosed as required by 45 C.F.R. § 164.404 *et seq*. It has failed to notify the Secretary of the HHS about the information that was disclosed to unauthorized third parties without Plaintiffs' and Class Members' authorization, as required by 45 C.F.R. § 16.408. It has failed to notify the media of the disclosure of Plaintiffs' and Class Members' information, as required by 45 C.F.R. § 164.406. And it has failed to comply with its legal obligations to prove that all disclosures were made as required to meet its burden to do so, as set forth in 45 C.F.R. § 164.402. BetterHelp also has failed to comply with its legal obligation to notify consumers and the California Attorney General of the unlawful disclosure of Plaintiffs' and Class Members' Private Information as required by, *inter alia*, the CMIA and sections California Civ. Code § 1798.82(a) and California Civ. Code § 1798.82(f). These violations have not been addressed by prior orders or directives from any Court or regulatory authority, and are the appropriate subject of injunctive relief to enjoin BetterHelp from failing and refusing to do so.

127. Defendant also violated the duties applicable to it under the Federal Trade Commission Act, 15 U.S.C. § 45 *et seq*. ("FTC Act"), from engaging in "unfair or deceptive acts or practices in or affecting commerce." The FTC, pursuant to that Act, has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive information, such as the Private Information at issue herein, is an "unfair practice" in violation of the FTC Act.

128. As established by these laws, Defendant owed a duty to Plaintiffs and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Private Information in its possession from being provided to, intercepted by, and/or misused by unauthorized persons such as the companies identified herein.

129. By taking affirmative acts inconsistent with these obligations, Defendant disclosed and permitted the disclosure of Private Information to unauthorized third parties. Through such actions or inactions, BetterHelp failed to preserve the confidentiality of Plaintiff and Class Members' Private Information that it was duty-bound to protect.

## F. PRIVATE INFORMATION IS A VALUABLE PROPERTY RIGHT

130. As evidenced by the value that BetterHelp and its advertising partners derived from the Private Information of Plaintiffs and Class Members, Private Information is a valuable

commodity. Unsurprisingly, Facebook/Meta and others do not offer the pixel to companies like BetterHelp solely for Defendant's benefit. "Data is the new oil of the digital economy,"[35] and Facebook has built its more-than $300 billion market capitalization on mining and using that "digital" oil. Thus, the large volumes of personal and sensitive health-related data Defendant provides to Facebook/Meta are actively viewed, examined, analyzed, curated, and used by the company. Facebook/Meta acquires the raw data in order to transform it into a monetizable commodity, just as an oil company acquires crude oil to transform it into gasoline. Indeed, Facebook/Meta offers the pixel free of charge[36] and the "price" that Defendant pays for the pixel is the data from Plaintiffs and Class Members that it allows Facebook/Meta to collect.

131. Conservative estimates suggest that in 2018, Internet companies earned $202 per American user from mining and selling data. That figure is expected to keep increasing; estimates for 2022 are as high as $434 per user, for a total of more than $200 billion industry-wide.

132. An active and robust legitimate marketplace for Private Information taken from Plaintiffs and Class Members exists. In 2021, the data brokering industry was worth roughly $200 billion.[37] In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who, in turn, aggregates the information and provides it to marketers or app developers.[38,39] Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50.00 a year.[40] Users of the personal data collection app Streamlytics can earn up to $200 a month by selling their personal information to marketing companies who use it to build consumer demographics profiles.[41]

133. Moreover, health information has value to consumers. According to the annual

---

[35] https://www.wired.com/insights/2014/07/data-new-oil-digital-economy/ (last visited April 25, 2023).

[36] https://seodigitalgroup.com/facebook-pixel/ (last visited April 25, 2023).

[37] https://www.latimes.com/business/story/2019-11-05/column-data-brokers

[38] https://datacoup.com/

[39] https://digi.me/what-is-digime/

[40] Nielsen Computer & Mobile Panel, *Frequently Asked Questions, available at* https://computermobilepanel.nielsen.com/ui/US/en/faqen.html

[41] How To Sell Your Own Data And Why You May Want to, available at https://www.mic.com/impact/selling-personal-data-streamlytics (last accessed August 7, 2023)

Financial Trust Index Survey, conducted by the University of Chicago's Booth School of Business and Northwestern University's Kellogg School of Management, which interviewed more than 1,000 Americans, 93 percent would not share their health data with a digital platform for free. Half of the survey respondents would only share their data for $100,000 or more, and 22 percent would only share their data if they received between $1,000 and $100,000.[42]

134. In 2015, *TechCrunch* reported that "to obtain a list containing the names of individuals suffering from a particular disease," a market participant would have to spend about "$0.30 per name."[43] That same report noted that "Data has become a strategic asset that allows companies to acquire or maintain a competitive edge" and that the value of a single user's data (within the corporate acquisition context) can vary from $15 to more than $40 per user.[44]

135. Similarly, CNBC published an article in 2019 in which it observed that "[d]e-identified patient data has become its own small economy: There's a whole market of brokers who compile the data from providers and other health-care organizations and sell it to buyers."[45]

136. Given the existence of a market for the Private Information disclosed by Defendant, in which Plaintiffs and Class Members have a privacy and property interest, Defendant has deprived Plaintiffs and Class Members of the economic value of their Private Information by disclosing such Private Information to unauthorized third parties such as Facebook/Meta without authorization and to do so and without providing proper consideration for Plaintiffs' and other Class Members' property.

**TOLLING, CONCEALMENT, AND ESTOPPEL**

137. The applicable statutes of limitation have been tolled as a result of Defendant's knowing and active concealment and denial of the facts alleged herein.

---

[42] Andrea Park, *How much should health data cost? $100K or more, according to patients*, Becker's Hosp. Rev. (Feb. 12, 2020), https://www.beckershospitalreview.com/healthcare-information-technology/how-much-should-health-data-cost-100k-or-more-according-to-patients.html.

[43] Pauline Glickman and Nicholas Glady, *What's the Value of Your Data?*, TECHCRUNCH (Oct. 13, 2015), https://techcrunch.com/2015/10/13/whats-the-value-of-your-data/.

[44] *Id.*

[45] *See* https://www.cnbc.com/2019/12/18/hospital-execs-say-theyre-flooded-with-requests-for-your-health-data.html (last visited August 16, 2023).

138. Defendant had exclusive knowledge of the material facts set forth above yet failed to disclose to Plaintiffs and Class Members that by interacting with the Sites their sensitive Private Information, including medical information, would be disclosed by Defendant and actually viewed, intercepted, collected, used, and stored by unauthorized third parties.

139. Plaintiffs and Class Members could not with due diligence have discovered the full scope of Defendant's conduct prior to March 2, 2023 because there were no disclosures or other indication that BetterHelp was sharing such Private Information and, in fact, BetterHelp kept them from discovering this information by falsely claiming that their information would be kept confidential.

140. The earliest that Plaintiffs and Class Members, acting with due diligence, could have reasonably discovered this conduct would have been on March 2, 2023, when the FTC announced its settlement with BetterHelp, and the news of that settlement was widely reported in the media.

141. All applicable statutes of limitation also have been tolled by operation of the discovery rule. Under the circumstances, Defendant was under a duty to disclose the nature and significance of their data collection practices but did not do so. Defendant is therefore estopped from relying on any potentially applicable statutes of limitation.

## CLASS ACTION ALLEGATIONS

142. Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23 individually and on behalf of the following Class:

> All individuals residing in the United States who, during the period beginning January 1, 2017, and continuing through March 7, 2023 (the "Class Period"), completed the BetterHelp Intake Questionnaire and provided BetterHelp with their email address.

143. Plaintiffs T.R., Jane Doe I, Jane Doe III, and R.S. (California Plaintiffs) bring this action pursuant to Federal Rule of Civil Procedure 23 individually and on behalf of the following California Subclass:

> All individuals residing in California who, during the Class Period, completed the BetterHelp Intake Questionnaire and provided BetterHelp with their email address.

144. Excluded from the Class and Subclass are: (1) any Judge or Magistrate presiding over

this action and any members of their immediate families; (2) the Defendant, Defendant's subsidiaries, affiliates, parents, successors, predecessors, and any entity in which the Defendant or its parents have a controlling interest and its current or former employees, officers, and directors; and (3) Plaintiffs' counsel and Defendant's counsel.

145. **Numerosity:** The exact number of members of the Class and Subclass are unknown and unavailable to Plaintiffs at this time but is estimated to number in the millions and individual joinder in this case is impracticable. The members of the Class and Subclass can be identified through BetterHelp's records.

146. **Predominant Common Questions:** The Class's and Subclass's claims present common questions of law and fact, and those questions predominate over any questions that may affect individual Class Members. Common questions for the Class and Subclass include, but are not limited to, the following:

- Whether Defendant implemented and maintained reasonable security practices and procedures appropriate to protect Plaintiffs' and Class Members' Private Information from unauthorized access, or disclosure;
- Whether Defendant negligently created, maintained, preserved, stored, abandoned, or disposed of Plaintiffs' and Class Members' Private Information, and failed to protect and preserve the integrity of the Private Information provided by Plaintiffs and Class Members to BetterHelp and/or through the Sites;
- Whether Defendant adequately, promptly, timely, and accurately informed Plaintiffs and the Class Members that their Private Information had been compromised and whether Defendant violated the law by failing to promptly and fully notify Plaintiffs and the Class Members of this material fact;
- Whether Defendant violated the state and federal laws cited herein; and
- Whether Plaintiffs and the Class are entitled to damages, equitable and/or injunctive relief to redress the imminent and currently ongoing harm faced as a result of the unauthorized disclosures described herein and Defendant's failure to provide full and

adequate notice thereof, and the scope of such relief.

147. **Typicality:** Plaintiffs' claims are typical of the claims of the other members of the Class and the Subclass, respectively. The claims of Plaintiffs and the members of the Class and Subclass arise from the same conduct by Defendant and are based on the same legal theories.

148. **Adequate Representation:** Plaintiffs have, and will continue to, fairly and adequately represent and protect the interests of the Class and Subclass. Plaintiffs have retained counsel competent and experienced in complex litigation and class actions, including litigations to remedy privacy violations. Defendant has no defenses unique to any Plaintiffs. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the members of the Class and Subclass, and they have the resources to do so. Neither Plaintiffs nor their counsel have any interest materially antagonistic or adverse to the interests of the other members of the Class and Subclass.

149. **Substantial Benefits:** This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy considering (a) the Class Members' interests in individually controlling the prosecution or defense of separate actions; (b) the extent and nature of any litigation concerning the controversy already begun by Class Members; (c) the desirability or undesirability of concentrating the litigation of the claims in this particular forum; and (d) the potential difficulties in managing a class action. This proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Class treatment will create economies of time, effort, and expense and promote uniform decision-making.

150. In addition, prosecuting separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members that would establish incompatible standards of conduct for Defendant, or adjudications with respect to individual Class Members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests. BetterHelp has acted or refused to act on grounds that apply

generally to the Class, such that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole.

151. Plaintiffs reserve the right to revise the class allegations and definitions based on facts learned and legal developments following additional investigation, discovery, or otherwise.

## COUNT I

### Common Law Invasion of Privacy – Intrusion Upon Seclusion(On Behalf of the California Plaintiffs and the California Subclass)

152. California Plaintiffs Jane Doe III, and T.R. ("Plaintiffs" for the purposes of this Count) incorporate the foregoing allegations by reference as if fully set forth herein to the extent relevant to this Count and the relief available thereunder.

153. California Plaintiffs bring this claim on behalf of the California Subclass under California law ("Class" for purposes of this Count).

154. Defendant's secret disclosure of Plaintiffs' and other Class Members' Private Information, including each Class Member's email address, IP address, FID, and other individually identifying information, and information about their medical history, mental and physical condition, and treatment (including that they were seeking or receiving mental health treatment), constitutes an intentional intrusion upon Plaintiffs' and Class Members' private matters that were intended to stay private from third parties.

155. Plaintiffs and Class Members had an objectively reasonable expectation of privacy in their Private Information. Plaintiffs and Class Members did not consent to, authorize, or have any reason to know about Defendant's intrusion into their privacy at the time it occurred.

156. Defendant's intrusion into Plaintiffs' and Class Members' private affairs, seclusion, and solitude, would be highly offensive to a reasonable person.

157. Plaintiffs and Class Members expected that the Private Information, including PHI, they shared with a provider of mental healthcare (particularly one who promised that it would keep this information confidential and indicated it was HIPAA compliant on its website) would not be disclosed to an unauthorized third party. Social norms and industry standards inform the understanding that Private Information, including PHI, is highly protected and that disclosure of that information to third parties requires consent and authorization. The secret disclosure of Private

Information would be highly offensive to a reasonable person and was highly offensive to Plaintiffs.

158. Plaintiffs and Class Members have been harmed as a result of Defendant's actions, including, but not limited to, an invasion of their privacy rights.

159. Plaintiffs and Class Members seek appropriate relief for their injuries, including, but not limited to, monetary damages to compensate for the harm to their privacy interests and disgorgement of profits made by Defendant as a result of its intrusions into Plaintiffs' and Class Members' private matters.

160. Plaintiffs and Class Members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Defendant's actions, which were directed at invading Plaintiffs' and Class Members' privacy rights in conscious disregard of those rights. Such damages are necessary to deter Defendant from engaging in such conduct in the future.

161. This action, if successful, will enforce an important right affecting the public interest and would confer a significant benefit on a large class of persons and/or the general public. Private enforcement is necessary and places a disproportionate financial burden on Plaintiffs in relation to Plaintiffs' stake in the matter. Because this case is brought for the purposes of enforcing important rights affecting the public interest, Plaintiffs also seek the recovery of attorneys' fees and costs in prosecuting this action against Defendant under Code of Civil Procedure § 1021.5 and other applicable law.

162. Plaintiffs, on behalf of themselves and the Class, request relief as further described below.

## COUNT II
## Violation of the Electronic Communications Privacy Act (ECPA)
## Wiretapping
## 18 U.S.C. § 2510 *et seq.*

163. **(On Behalf of Plaintiffs and the Nationwide Class)**Plaintiffs incorporate the foregoing allegations as if fully set forth herein to the extent relevant to this Count and the relief available thereunder.

164. Plaintiffs bring this claim on behalf of the Class.

165. The ECPA, 18 U.S.C. § 2510 *et seq.*, makes it unlawful for a "person" to "intentionally intercept[], endeavor[] to intercept, or procure[] any other person to intercept or endeavor to intercept, any wire, oral, or electronic communications." 18 U.S.C. § 2511(1).

166. "Intercept" is defined as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

167. "Contents" is defined as "includ[ing] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8).

168. "Person" is defined as "any employee, or agent of the United States or any State or political subdivision thereof, and any individual, partnership, association, joint stock company, trust, or corporation." 18 U.S.C. § 2510(6).

169. "Electronic communication" is defined as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce . . . ." 18 U.S.C. § 2510(12).

170. Plaintiffs' and Class Members' communications with BetterHelp through its Sites during which Plaintiffs and Class Members communicated Private Information with BetterHelp were electronic communications within the meaning of the ECPA.

171. BetterHelp, Facebook/Meta, Google, Mixpanel, Criteo, Pinterest, and Snapchat are persons within the meaning of the ECPA as they are corporations.

172. Pixels and other web beacons and tracking tools used by the other unauthorized third parties as identified herein are each a "device or apparatus" that is "used to intercept a wire, oral, or electronic communication." 18 U.S.C. 2510(4).

173. By incorporating the pixels and other web beacons and tracking tools into its Sites and permitting them to intercept Plaintiffs' and Class Members' Private Information, Defendant intercepted or endeavored to intercept Plaintiffs' and Class Members' electronic communications and/or enabled and procured Facebook/Meta and the other unauthorized third parties identified

herein to intercept or endeavor to intercept Plaintiffs' and Class Members' electronic communications, in violation of the ECPA.

174. 18 U.S.C. § 2511(2)(d) provides a "party exception" to 18 U.S.C. § 2511(1) that does not apply in this case. Section 2511(1) provides: "It shall not be unlawful under this chapter [18 U.S.C. §§ 2510 *et seq*.] for a person not acting under color of law to intercept a wire, oral, or electronic communication where such person is a party to the communication or where one of the parties to the communication has given prior consent to such interception *unless such communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State*." (emphasis added).

175. Neither Plaintiffs nor the Class Members consented to Defendant's interception of, or to Defendant's procuring Facebook/Meta and the other unauthorized third parties identified herein to intercept, their electronic communications with Defendant through Defendant's Sites.

176. Defendant does not meet the requirements of the "party exception" to the ECPA because the electronic communications intercepted by Defendant, or which Defendant procured Meta and the other unauthorized third parties identified herein to intercept, were intercepted as part of Defendant's practice of divulging Private Information, including medical information, to an unauthorized third party in violation of numerous federal and state laws identified herein, including HIPAA, which provides for significant criminal penalties.

177. As detailed in this Complaint, Defendant violated the CMIA and the California Constitution, and committed a tortious invasion of privacy, when it disclosed Plaintiffs' and Class Members' Private Information to Meta and the other unauthorized third parties identified herein through the Meta Pixel and other tracking tools.

178. Also as detailed herein, Defendant violated the federal HIPAA Privacy Rule which regulates the use and disclosure of "protected health information" by "covered entities."

179. Defendant is a "covered entity" within the meaning of 45 C.F.R. § 160.103.

180. "Disclosure" within the meaning of the HIPAA Privacy Rule is defined as "the release, transfer, provision of access to, or divulging in any manner of information outside the entity holding the information." 45 C.F.R. § 160.103.

181. The medical information provided by Plaintiffs and Class Members to BetterHelp when they signed up for and/or used Defendant's Service, as described above, is protected health information within the meaning of the HIPAA Privacy Rule. 45 C.F.R. § 160.103.

182. As described above, Defendant disclosed Plaintiffs' and Class Members' protected health information to Facebook/Meta and the other unauthorized third parties identified herein through the Meta Pixel and other tracking tools incorporated into Defendant's Sites. This disclosure was neither permitted nor required within the meaning of 45 C.F.R. § 164.502(a).

183. Thus, Defendant committed a tortious act in violation of the federal HIPAA Privacy Rule when it disclosed Plaintiffs' and Class Members' private health information to Facebook/Meta and the other unauthorized third parties identified herein.

184. Moreover, pursuant to 42 U.S.C. § 1320d-6, it is a crime for a "person," such as Defendant, to knowingly disclose "individually identifiable health information" to a third party for "commercial reasons". Thus, Defendant committed criminal acts when it knowingly disclosed Plaintiffs' and Class Members' private health information to Facebook/Meta and the other unauthorized third parties identified herein.

185. Accordingly, Defendant violated the ECPA each time the Meta Pixel and other tracking tools on Defendant's Sites intercepted Plaintiffs' and Class Members' electronic communications through those Sites.

186. Pursuant to 18 U.S.C. § 2520, Plaintiffs and Class Members have been damaged by the interception and disclosure of their electronic communications in violation of the ECPA and are entitled to: (1) appropriate equitable or declaratory relief; (2) damages, in an amount to be determined at trial, assessed as the greater of (a) the sum of the actual damages suffered by Plaintiffs and the Class and any profits made by Defendant as a result of its violations, or (b) statutory damages of whichever is the greater of $100 per day per violation or $10,000 per Class Member; and (3) reasonable attorneys' fees and other litigation costs reasonably incurred.

187. Plaintiffs, on behalf of themselves and the Class, seek relief as further described below.

**COUNT III**
**Violations of the California Invasion of Privacy Act, Cal. Pen. Code § 630 *et seq.***
**(On Behalf of the California Plaintiffs and the California Subclass)**

188. California Plaintiffs R.S., Jane Doe III, and T.R. ("Plaintiffs" for the purposes of this Count) incorporate the foregoing allegations as if fully set forth herein to the extent relevant to this Count and the relief available thereunder.

189. The California Plaintiffs bring this claim on behalf of the California Subclass ("Class" for the purposes of this Count).

190. The California Invasion of Privacy Act begins with its statement of purpose:

> The legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society. The Legislature by this chapter intends to protect the right of privacy of the people of this state.

Cal. Penal Code § 630.

191. California Penal Code section 631(a) provides a remedy against, *inter alia*: "Any person who … intentionally taps, or makes any unauthorized connection, whether physically, electrically, …, or otherwise, with any telegraph or telephone wire, line, cable, or instrument … or who willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section."

192. California Penal Code section 632(a) makes liable any person "who, intentionally and without the consent of all parties to a confidential communication, uses an electronic amplifying or recording device to eavesdrop upon or record the confidential communication, whether the communication is carried on among the parties in the presence of one another or by means of a telegraph, telephone, or other device[.]"

193. Defendant is a "person" within the meaning of Cal. Penal Code sections 631 and 632.

194. Plaintiffs' and Class Members' communications of Private Information with Defendant on and through Defendant's Sites and servers are "confidential communications" under sections 631 and 632. These communications were intended to be confined to the parties. Plaintiffs and Class Members were using what they understood to be Defendant's secure Sites and servers and no indication was given that their Private Information would be shared with or viewed by any unauthorized third party. The circumstances reasonably indicate that Plaintiffs and Class Members desired their communications with Defendant to be confined to the parties thereto and that they had objectively reasonable grounds to believe that their communications would remain confidential and would not be intercepted, overheard, or recorded by a third party.

195. Pixels, website beacons, and other third-party tracking technologies are "electronic amplifying or recording devices" within the meaning of section 632(a) because they are used by companies such as Facebook/Meta, Google and other third parties, with the active assistance and support of Defendant through its knowing and intentional placement of the pixels, website beacons, and other third-party tracking technologies on Defendant's Sites and servers, to allow these third parties to use such devices to intentionally record and independently track Class members' interactions with Defendant.

196. Despite not having any authorization from Plaintiffs or Class Members, Defendant aided, agreed with, or conspired with Facebook/Meta and other third parties to permit those third parties to intercept these communications and to learn the content of those communications while in transit or in the process of being sent or received in violation of section 631(a).

197. Defendant allowed Facebook/Meta and other third parties to "intentionally tap . . . or make [an] unauthorized connection" with respect to Class Members' communications by placing and using pixels, website beacons and other third party tracking codes on its Sites without "the consent of all parties", including Plaintiffs and Class Members, and thereby violated section 631(a).

198. Defendant "aid[ed], agree[d] with, employ[d], or conspire[d] with" various third parties including Facebook/Meta and others providing marketing services to BetterHelp by allowing

such entities to "tap" communications on its Sites without "the consent of all parties", including Plaintiffs and Class Members, and thereby violated section 631(a).

199. By allowing these third parties to duplicate and divert its users' GET Requests to Facebook/Meta's and others' servers, Defendant facilitated the interception and simultaneous transmission to Facebook and other third-party advertisers of Plaintiffs 'and other Class Members' Private Information while the information was "in transit" without their informed authorization or consent, in violation of section 631(a).

200. The information communicated between Plaintiffs and Class Members and BetterHelp was transmitted to or from the State of California. The information was wiretapped "while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state."

201. BetterHelp enabled non-parties to the communications to "read" the communications for the purposes of section 631(a). For example, Facebook/Meta and other third parties could see the information that Plaintiffs and Class Members communicated to BetterHelp via the Intake Questionnaire and throughout the Sites and then used that information to build consumer profiles and target individuals, including Plaintiffs and Class Members, with advertisements tailored to mental health care or treatment.

202. BetterHelp aided and abetted Facebook/Meta and other third parties' use of pixels, website beacons, and other third-party tracking technologies as recording devices to eavesdrop upon and record the confidential communications of Plaintiffs and Class Members with BetterHelp, which communications occurred by telegraph, telephone, or other device, in violation of California Penal Code sections 631(a), 632(a), and 31. BetterHelp's aiding and abetting included but was not limited to, BetterHelp's knowing and intentional placement of pixels, website beacons, and other third-party tracking technologies on BetterHelp's website(s) and app(s).

203. BetterHelp facilitated these communications and recordings "without authorization" of Plaintiffs and Class Members because it did not give Plaintiffs and Class Members any hint that the transmission was happening. Plaintiffs and Class members did not consent to having such confidential communications intercepted and recorded.

204. Plaintiffs and Class Members did not request that Defendant and third parties target them with advertising that might be related to their health conditions and reasonably expected and had objectively reasonable grounds to believe that their communications with BetterHelp were solely between themselves and BetterHelp and would remain confidential.

205. Plaintiffs and Class Members have also suffered irreparable injury from these unauthorized acts of disclosure. Their personal, private, and sensitive Private Information has been collected, viewed, accessed, stored, and used by Facebook/Meta and other third parties, has not been destroyed, and has not been reported in compliance with Defendant's obligation to do so pursuant to 45 C.F.R. § 164.402 *et seq*. and their obligations under state law to report such incidents as discussed herein. Due to the continuing threat of such injury, Plaintiffs and Class Members have no adequate remedy at law and are entitled to injunctive relief. Plaintiffs and Class Members thus seek an injunction under Penal Code § 637.2 enjoining Defendant from engaging in further conduct in violation of Cal. Penal Code § 630, *et seq*., and enjoining Defendant from failing to meet its obligation to comply with 45 C.F.R. § 164.402 *et seq*. including its obligation to do the following: a) disclose to each affected individual the nature of the Private Information disclosed and to whom it was disclosed as required by 45 C.F.R. § 164.404 *et seq*., b) notify the Secretary of the HHS about the information that was disclosed as required by 45 C.F.R. § 164.408, (c) notify the media of the disclosure of Plaintiff and Class Members' Private Information as required by 45 C.F.R. § 164.406 (which required that such a disclosure should have occurred within 60 days of discovery); and (d) complying with its legal obligation to prove that all disclosures were made as required to meet its burden to do so as set forth in 45 C.F.R. § 164.402.

206. Cal. Penal Code § 637.2(a) provides that any person who has been injured by a violation of this chapter (including Penal Code § 631 and 632) may bring an action against the person who committed the violation for the greater of five thousand dollars ($5,000) per violation or three times the amount of actual damages, if any, sustained by Plaintiffs and Class Members.

207. Cal. Penal Code § 637.2(b) provides that "[a]ny person may . . . bring an action to enjoin and restrain any violation of this chapter, and may in the same action seek damages as

provided by subdivision (a)." Cal. Penal Code § 637.2(c) further provides, "It is not a necessary prerequisite to an action pursuant to this section that the plaintiff has suffered, or be threatened with, actual damages."

208. Defendant is therefore liable to Plaintiffs and the Class for, at a minimum, statutory damages of $5,000 per Plaintiff and Class Member per violation and Plaintiffs and Class Members are also entitled to injunctive relief.

209. Plaintiffs, on behalf of themselves and the Class, seek relief as further described below.

**COUNT IV**
**Violation of the California Consumer Privacy Act**
**(On Behalf of California Plaintiffs and the California Subclass)**

210. California Plaintiffs R.S., Jane Doe III, and T.R. ("Plaintiffs" for the purposes of this Count) incorporate the foregoing allegations by reference as if fully set forth herein to the extent relevant to this Count and the relief available thereunder.

211. The California Plaintiffs bring this claim on behalf of the California Subclass ("Class" for purposes of this Count).

212. The CCPA was enacted to protect consumers' sensitive information from collection and use by businesses without appropriate notice and consent. The CCPA protects the personal information of California consumers regardless of the location of the business holding the information.

213. Through the above-detailed conduct, Defendant violated CCPA by subjecting the nonencrypted and nonredacted Private Information of Plaintiffs and Class Members that it maintained to unauthorized access or disclosure as a result of Defendant's violation of its duty to implement and maintain reasonable security procedures and practices appropriate to the nature and protection of that information. Cal. Civ. Code § 1798.150(a).

214. Under Section 1798.150(a)(1) of the CCPA, as defined by California Civil Code Section 1798.81.5(d)(1)(A) "personal information" means an individual's first name or first initial and the individual's last name in combination with any one or more of the following data elements, when either the name or the data elements are not encrypted or redacted: (i) Social security number,

(ii) Driver's license number, California identification card number, tax identification number, passport number, military identification number, or other unique identification number issued on a government document commonly used to verify the identity of a specific individual, (iii) Account number or credit or debit card number, in combination with any required security code, access code, or password that would permit access to an individual's financial account, (iv) Medical information, (v) Health insurance information, (vi) Unique biometric data generated from measurements or technical analysis of human body characteristics, such as a fingerprint, retina, or iris image, used to authenticate a specific individual. Unique biometric data does not include a physical or digital photograph, unless used or stored for facial recognition purposes, and (vii) Genetic data. Additionally, as set forth in Civil Code Section 1798.150(a)(1), the phrase "personal information" may also mean an email address in combination with a password or security question and answer that would permit access to an account.

215. The Private Information at issue in this action falls within the types of information actionable under Civil Code Section 1798.150(a)(1), since, as described above, Defendant, by its actions and inactions, has caused the access and disclosure of Private Information as described herein, where either the name or the data elements were not encrypted nor redacted.

216. Defendant maintained the personal information identified above in a different manner than any Plaintiff or Class Member's medical history, mental or physical condition, or treatment.

217. In accordance with Cal. Civ. Code § 1798.150(b), on or about March 21, 2023, Plaintiffs' counsel sent a Notice of Violation to Defendant identifying the specific provisions of this title that Plaintiffs alleged have been or are being violated.

218. As Defendant failed to cure the noticed violations within 30 days of Plaintiffs' Notice of Violation or represent that the violations have been cured and that no further violations shall occur, Plaintiffs seek actual and punitive damages, statutory damages of between $100 and $750 per Class Member, attorneys' fees and costs, and any other relief the Court deems proper as a result of Defendant's CCPA violations.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of the Class Members and for the benefit of the public, pray for orders and judgment in favor of Plaintiffs and against Defendant as follows, as may be applicable to the causes of action set forth above:

- Finding that this action satisfies the prerequisites for maintenance as a class action and certifying the Class and California Subclass defined herein;
- Designating Plaintiffs as representatives of the Class, the California Plaintiffs as representatives of the California Subclass, and Plaintiffs' counsel as Class Counsel;
- Awarding Plaintiffs and Class Members compensatory damages, disgorgement of profits, and punitive damages for Defendant's invasion of privacy;
- Awarding Plaintiffs and Class Members appropriate equitable or declaratory relief, the greater of the sum of the actual damages suffered and any profits made by BetterHelp as a result of its violations, or statutory damages of whichever is the greater of $100 per day per violation or $10,000, and reasonable attorneys' fees and other litigation costs reasonably incurred, for each of Defendant's violations of the ECPA, 18 U.S.C. §§ 2510 *et seq*.;
- Awarding Plaintiffs and Class Members statutory damages of $5,000 per violation, or three times the amount of actual damages, and injunctive relief for Defendant's violations of California's Invasion of Privacy Act, Penal Code §§ 630 *et seq*.;
- Awarding California Plaintiffs and California Subclass Members statutory damages of between $100 to $750 per Class Member per violation for Defendant's violation of the California Consumer Privacy Act, Cal. Civ. Code § 1798.100;
- Awarding pre-judgment and post-judgment interest at the maximum rate permitted by applicable law;
- Awarding attorneys' fees and costs as authorized by statute and governing law, including but not limited to Cal. Code of Civil Procedure § 1021.5; and
- Awarding such other and further relief, at law and in equity, as the nature of this case may require or as this Court deems just and proper.

**JURY TRIAL DEMANDED**

Plaintiffs demand a trial by jury on all issues so triable.

Dated: February 13, 2026

*/s/ Gary M. Klinger*
Gary M. Klinger (pro hac vice)
William J. Edelman (SBN 285177)
MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC
227 W. Monroe Street, Suite 2100
Chicago, Illinois 60606
Telephone: 866.252.0878
gklinger@milberg.com
wedelman@milberg.com

*Plaintiffs' Co-Lead Interim Class Counsel*

Dated: February 13, 2026

*/s/ Christina Tusan*
Christina Tusan (SBN 192203)
TUSAN LAW, PC
680 E. Colorado #180
Pasadena, CA 91101
Telephone: 626-418-8203
Email: ctusan@ctusanlaw.com

*Plaintiffs' Co-Lead Interim Class Counsel*

Dated: February 13, 2026

*/s/ Maureen M. Brady*
Maureen M. Brady (pro hac vice)
MCSHANE AND BRADY LLC
4006 Central Street
Kansas City, MO 64111
816-888-8010
Email: mbrady@mcshanebradylaw.com

*Plaintiffs' Co-Lead Interim Class Counsel*

Dated: February 13, 2026

*/s/ Alan M. Mansfield*
Alan M. Mansfield (SBN: 125998)
amansfield@whatleykallas.com
WHATLEY KALLAS LLP
1 Sansome Street, 35th Floor
PMB #131
San Francisco, CA 94104 /
16870 West Bernardo Drive, Ste 400
San Diego, CA 92127
Telephone: (619) 308-5034
Facsimile: (888) 341-5048

*Plaintiffs' Liaison Counsel*

Dated: February 13, 2026

*/s/ Dena C. Sharp*

Dena C. Sharp (SBN 245869)
Trevor T. Tan (SBN 281045)
Nina Gliozzo (SBN 333569)
GIRARD SHARP LLP
601 California Street, Suite 1400
San Francisco, CA 94108
Telephone: 415.981.4800
Email: dsharp@girardsharp.com
Email: ttan@girardsharp.com
Email: ngliozzo@girardsharp.com

*Plaintiffs' Trial Counsel*